# PX 683

1              UNITED STATES DISTRICT COURT
2              SOUTHERN DISTRICT OF NEW YORK
3
4  SECURITIES AND EXCHANGE      )
   COMMISSION,                  )
5                               )
                Plaintiff,      )
6                               )
         vs.                    ) Case No.
7                               ) 20 Civ. 10832(AT)(SN)
   RIPPLE LABS, INC., BRADLEY   )
8  GARLINGHOUSE, and CHRISTIAN  )
   A. LARSEN,                   )
9                               )
                Defendants.     )
10 _____)
11
12
13
14      VIDEOCONFERENCE VIDEO-RECORDED DEPOSITION OF
15                   YESHA YADAV
16               New York, New York
17             Friday, February 11, 2022
18
19
20
21
22
23  Reported Stenographically By:
    PATRICIA A. BIDONDE
24  Registered Professional Reporter
    Realtime Certified Reporter
25  JOB No. 220211PBI

                                                    1

1

2

3                               February 11, 2022

                                9:21 a.m.

4

5

6               Videoconference Video-Recorded

7       Deposition of YESHA YADAV, held at the

8       offices of Debevoise & Plimpton, 919

9       Third Avenue, New York, New York, before

10      Patricia A. Bidonde, Stenographer,

11      Registered Professional Reporter,

12      Realtime Certified Reporter, Certified

13      eDepoze Court Reporter, Notary Public of

14      the States of New York, New Jersey, and

15      Connecticut.

16

17

18

19

20

21

22

23

24

25

                                                    2

```
 1              A P P E A R A N C E S

 2

 3   U.S. SECURITIES AND EXCHANGE COMMISSION

 4   Attorneys for Plaintiff

 5          200 Vesey Street

 6          Suite 400

 7          New York, New York 10281-1022

 8   BY:    LADAN F. STEWART, ESQ.

 9          212-336-1060

10          (Via Videoconference)

11   BY:    MARK R. SYLVESTER, ESQ.

12          212-336-0159

13          sylvesterm@sec.gov

14   BY:    DAPHNA WAXMAN, ESQ.

15

16   DEBEVOISE & PLIMPTON LLP

17   Attorneys for Defendant Ripple Labs, Inc.

18          919 Third Avenue

19          New York, New York 10022

20   BY:    LISA ZORNBERG, ESQ.

21          212-909-6945

22          lzornberg@debevoise.com

23   BY:    MAUREEN GALLAGHER MENTREK, ESQ.

24          212-909-6579

25          mgmentre@debevoise.com
```

3

```
 1           A P P E A R A N C E S   (CONTINUED)

 2

 3    DEBEVOISE & PLIMPTON LLP

 4    Attorneys for Defendant Ripple Labs, Inc.

 5           650 California Street

 6           San Francisco, California 94108

 7    BY:    CHRISTOPHER S. FORD, ESQ.

 8           415-738-5705

 9           csford@debevoise.com

10

11    CLEARY GOTTLIEB STEEN & HAMILTON LLP

12    Attorneys for Defendant Bradley Garlinghouse

13           2112 Pennsylvania Avenue

14           Washington, DC 20037

15    BY:    MATTHEW SOLOMON, ESQ.

16           202-974-1680

17           msolomon@cgsh.com

18    BY:    MICHAEL SCHULMAN, ESQ.

19           202-974-1562

20           Mschulman@cgsh.com

21           (Via Videoconference)

22

23

24

25
```

4

```
 1            A P P E A R A N C E S  (CONTINUED)
 2    CLEARY GOTTLIEB STEEN & HAMILTON LLP
 3    Attorney for defendant Bradley Garlinghouse
 4            One Liberty Plaza
 5            New York, New York 10006
 6    BY:    SAMUEL LEVANDER, ESQ.
 7            212-225-2951
 8            slevander@cgsh.com
 9            (Via Videoconference)
10    PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
11    Attorneys for defendant Christian A. Larsen
12            1285 Avenue of the Americas
13            New York, New York 10019-6064
14    BY:    KRISTINA BUNTING, ESQ.
15            212-373-3503
16            kbunting@paulweiss.com
17    BY:    CARLY LAGROTTERIA, ESQ.
18            212-373-3547
19            Clagrotteria@paulweiss.com
20            (Via Videoconference)
21    ALSO PRESENT:
22    CHRISTIAN BIDONDE, Legal Video Specialist
23    STELLA UVAYDOVAS, Paralegal, Via
24    Videoconference
25                    - - -
```

5

1

2

3

4          IT IS HEREBY STIPULATED AND

5     AGREED, by and between the attorneys for

6     the respective parties, that all

7     objections, except as to the form of the

8     questions, shall be reserved to the time

9     of the trial.

10          IT IS FURTHER STIPULATED AND

11     AGREED that the filing of the original

12     transcript of the examination is waived.

13

14

15

16

17

18

19

20

21

22

23

24

25

6

```
 1                    I N D E X

 2   EXAMINATIONS                        PAGE    LINE

 3   BY MS. STEWART                        10      6

 4   BY MR. SYLVESTER                      84     12

 5

 6                  E X H I B I T S

 7   NO.             DESCRIPTION          PAGE    LINE

 8   Exhibit YY-1    Expert report of

 9                   Professor Yesha Yadav......15     24

10   Exhibit YY-10   "Fintech and the

11                   Innovation Trilemma" by

12                   Yesha Yadav and Chris

13                   Bummer....................35      4

14

15              *** EXHIBITS BOUND SEPARATELY ***

16

17

18

19   DIRECTIONS:                          18     23

20

21

22

23

24

25

                                                    7
```

```
 1              P R O C E E D I N G S
 2                     -  -  -
 3              THE VIDEOGRAPHER:  We are now on
 4         the record.  The time is 9:21 a.m. on
 5         February 11, 2022.  Audio and video
 6         recording will continue to take place
 7         until all parties agree to go off the
 8         record.  Please note that microphones
 9         are sensitive and may pick up whispering
10         and private conversations.
11              This is the video-recorded
12         deposition of Yesha Yadav in the matter
13         of Securities and Exchange Commission
14         versus Ripple Labs, Inc., Bradley
15         Garlinghouse, and Christian Larsen.
16         This deposition is being held at
17         Debevoise & Plimpton, 919 Third Avenue,
18         New York, New York.
19              My name is Christian Bidonde.  I
20         am the legal video specialist on behalf
21         of Gradillas.  The certified
22         stenographer is Patricia Bidonde on
23         behalf of Gradillas.  I am not related
24         to any party in this action nor am I
25         financially interested in the outcome.
```

8

|       |    |                                                    |
|-------|----|----------------------------------------------------|
|       | 1  | Counsel will state their                           |
|       | 2  | appearances for the record after which             |
|       | 3  | the certified stenographer will swear in           |
| 09:22 | 4  | the witness.                                        |
| 09:22 | 5  | MS. STEWART:  Ladan Stewart for                    |
| 09:22 | 6  | plaintiff, the SEC, along with Mark                |
| 09:22 | 7  | Sylvester.                                          |
| 09:22 | 8  | MS. ZORNBERG:  Lisa Zornberg from                  |
| 09:22 | 9  | Debevoise & Plimpton on behalf of Ripple            |
| 09:22 | 10 | Labs.                                               |
| 09:22 | 11 | MS. BUNTING:  Kristina Bunting                      |
| 09:23 | 12 | from Paul, Weiss, Rifkind, Wharton &               |
| 09:23 | 13 | Garrison on behalf of Christian Larsen.             |
| 09:23 | 14 | MR. FORD:  Christopher Ford,                        |
| 09:23 | 15 | Debevoise & Plimpton, on behalf of                 |
| 09:23 | 16 | Ripple Labs.                                        |
| 09:23 | 17 | MR. SOLOMON:  Matthew Solomon                       |
| 09:23 | 18 | from Cleary Gottlieb Steen & Hamilton on            |
| 09:23 | 19 | behalf of Brad Garlinghouse.                        |
| 09:23 | 20 | MS. MENTREK:  Maureen Mentrek,                      |
| 09:23 | 21 | Debevoise & Plimpton, on behalf of                 |
| 09:23 | 22 | Ripple Labs.                                        |
| 09:23 | 23 | MR. SYLVESTER:  Mark Sylvester on                   |
| 09:23 | 24 | behalf of the SEC.                                  |
|       | 25 |                                                    |

9

```
 1    Y E S H A   Y A D A V, called as a witness,
 2              having been duly sworn by a Notary
 3              Public, was examined and testified as
 4              follows:
 5    EXAMINATION BY
 6    MS. STEWART:
```

09:23   7        Q.    Good morning, Professor Yadav.

09:23   8   As I mentioned, my name is Ladan Stewart.  I'm

09:23   9   going to be asking questions on behalf of the

09:23 10   SEC.  Thank you for indulging us in this, sort

09:23 11   of, half remote, half in-person deposition

09:23 12   today.

09:23 13        Have you had your deposition

09:24 14   taken before?

09:24 15        A.    I have not.

09:24 16        Q.    So before we begin, let's just

09:24 17   start with some sort of rules of the road for

09:24 18   today, the most important of which is that the

09:24 19   court reporter in the room with you is

09:24 20   transcribing everything that we say.  So in

09:24 21   order to make a good record for her, it's

09:24 22   important that we don't talk over each other.

09:24 23        So if you could please wait for

09:24 24   me to finish my question before you answer,

09:24 25   and I'll do my best to wait until you finish

10

| | | |
|---|---|---|
| 09:24 | 1 | your answer before I ask my next question. |
| 09:24 | 2 | Okay? |
| 09:24 | 3 | A.    Okay. |
| 09:24 | 4 | Q.    And along the same lines, the |
| 09:24 | 5 | court reporter can't take down nods of the |
| 09:24 | 6 | head or shakes of the head.  So if you can |
| 09:24 | 7 | give verbal, audible answers to my questions. |
| 09:24 | 8 | Okay? |
| 09:24 | 9 | A.    Okay. |
| 09:24 | 10 | Q.    And if you don't understand any |
| 09:24 | 11 | question, let me know and I will rephrase it. |
| 09:24 | 12 | And if at any time you need a break, just ask |
| 09:24 | 13 | me and we can go off the record.  But I would |
| 09:24 | 14 | ask that you answer the question that I posed |
| 09:24 | 15 | to you before we take a break.  Okay? |
| 09:24 | 16 | A.    Okay. |
| 09:24 | 17 | MS. ZORNBERG:  Ladan. |
| 09:25 | 18 | MS. STEWART:  Yes. |
| 09:25 | 19 | MS. ZORNBERG:  I'd like to also |
| 09:25 | 20 | just put on the record, as with prior |
| 09:25 | 21 | depositions, that an objection by any |
| 09:25 | 22 | counsel for the defendant is sufficient |
| 09:25 | 23 | to preserve it on behalf of all |
| 09:25 | 24 | defendants. |
| 09:25 | 25 | MS. STEWART:  Okay. |

11

09:25  1          Q.    Professor Yadav, is there any
09:25  2   reason that you can't testify truthfully or
09:25  3   accurately today?
09:25  4          A.    There is not.
09:25  5          Q.    Were you retained to provide
09:25  6   expert services in this case?
09:25  7          A.    I am, yes.
09:25  8          Q.    Who retained you?
09:25  9          A.    I've been retained by Ripple
09:25 10   Labs, Christian Larsen, and Brad Garlinghouse
09:25 11   and the lawyers on behalf of the defendants.
09:25 12          Q.    Thank you.  When were you first
09:25 13   contacted about this engagement?
09:25 14          A.    I was first contacted
09:25 15   approximately in mid-September about this
09:25 16   engagement.
09:25 17          Q.    In September of what year?
09:25 18          A.    2021.
09:26 19          Q.    And who contacted you?
09:26 20          A.    I was contacted by Sam Levander
09:26 21   and Alex Janghorbani of Cleary Gottlieb on
09:26 22   behalf of Brad Garlinghouse.
09:26 23          Q.    How much time have you spent on
09:26 24   this engagement to date?
09:26 25          A.    I can't say exactly.  I would say

                                                    12

```
09:26  1    maybe over a hundred hours certainly.
09:26  2           Q.    Do you mean between 100 and 150,
09:26  3    would you say?
09:26  4           A.    I would say so.  I can't say
09:26  5    exactly.
09:26  6           Q.    What have you billed so far for
09:26  7    your services in this matter?
09:26  8           A.    I have not actually sent a bill
09:26  9    yet.
09:26 10           Q.    Do you plan to send a bill?
09:26 11           A.    I do, yes.
09:27 12           Q.    Did you take any steps to prepare
09:27 13    for today's deposition?
09:27 14           A.    I did, yes.
09:27 15           Q.    What did you do?
09:27 16           A.    I have reviewed my own documents
09:27 17    in the report, and I've also prepared with
09:27 18    counsel.
09:27 19           Q.    And when you say "counsel," who
09:27 20    are you referring to?
09:27 21           A.    I'm referring to counsel for the
09:27 22    defendants.
09:27 23           Q.    Which counsel specifically did
09:27 24    you meet with to prepare for your deposition?
09:27 25           A.    I have met with counsel for
```

13

09:27  1    Ripple Labs, counsel for Brad Garlinghouse and

09:27  2    counsel for Christian Larsen.

09:27  3         Q.    Can you identify the lawyers that

09:27  4    you've met with?

09:27  5         A.    Yes, I can identify Lisa

09:27  6    Zornberg, Christopher Ford, Meredith Dearborn,

09:27  7    Kristina Bunting, Michael Schulman, Carly

09:28  8    Lagrotteria, and Maureen Mentrek.  I think

09:28  9    that should be all, and Matthew Solomon as

09:28  10   well.

09:28  11        Q.    And how many sessions did you

09:28  12   meet with counsel to prepare for your

09:28  13   deposition?

09:28  14        A.    I can't remember exactly.  I

09:28  15   would say maybe five, five or six.  I can't

09:28  16   say exactly.

09:28  17        Q.    How many hours total would you

09:28  18   say you spent with counsel in preparing for

09:28  19   your deposition?

09:28  20        A.    Again, I can't say exactly.  I

09:28  21   would say between maybe 15 to 20 hours.

09:28  22        Q.    And sorry if I'm misremembering,

09:28  23   but you said other than meeting with counsel,

09:28  24   you also reviewed documents.  Is that right?

09:28  25        A.    I reviewed my own report and the

14

09:28  1    documents cited in the report.

09:29  2         Q.    All of the documents cited in

09:29  3    your report or any particular?

09:29  4         A.    I just reviewed --

09:29  5              MS. ZORNBERG:  Objection to form.

09:29  6              You can answer.

09:29  7         A.    I reviewed the documents that I

09:29  8    felt would be useful for my analysis.

09:29  9         Q.    Did you review anything else?

09:29 10         A.    I focused on reviewing my report.

09:29 11         Q.    Did you speak with anyone other

09:29 12    than the counsel that you mentioned in

09:29 13    preparing for your deposition?

09:29 14         A.    I have not.

09:29 15         Q.    Okay.  Now I'm going to ask

09:29 16    Mr. Sylvester to please hand you a copy of

09:29 17    your report which we had premarked as Exhibit

09:29 18    YY-1.

09:29 19         A.    Thank you.

09:29 20         Q.    I'm going to ask you to take a

09:29 21    look at the document in the binder that was

09:29 22    just handed to you and tell me if you

09:29 23    recognize it.

09:29 24              (Exhibit YY-1, Expert report of

09:29 25              Professor Yesha Yadav, marked for

15

09:30  1                    identification, as of this date.)

09:30  2          A.     (Document review.)

09:30  3          MS. STEWART:  And for the counsel

09:30  4      who are participating by Zoom, I'm going

09:30  5      to ask our paralegal Stella not to

09:30  6      display the documents on Zoom just

09:30  7      because, when that happens, I can't see

09:30  8      Professor Yadav.  So we will e-mail you

09:30  9      the exhibits instead.

09:30 10          A.     I recognize my report, yes.

09:30 11          Q.     And so it is your expert report

09:30 12   in this matter?

09:30 13          A.     This is my expert report in the

09:30 14   matter.

09:30 15          Q.     And if you look at the page

09:31 16   following page 71, is that your signature?

09:31 17          A.     That is my signature, yes.

09:31 18          Q.     When did you finalize this

09:31 19   report?

09:31 20          A.     This report was finalized on

09:31 21   October the 4th, 2021.

09:31 22          Q.     Have you finished all the work

09:31 23   that you were assigned to do in this case?

09:31 24          A.     I believe so.  For the moment,

09:31 25   yes.

                                                      16

09:31  1          Q.    Are you planning to submit a

09:31  2     supplemental report in this case?

09:31  3          A.    Not that I know of, no.

09:31  4          Q.    And in the pocket of the binder

09:31  5     that has your report, there should be an

09:31  6     errata sheet that's dated January 28, 2022.

09:31  7               Do you see that?

09:31  8          A.    I do, yes.

09:31  9          Q.    Is that your signature on the

09:32 10     errata sheet?

09:32 11          A.    It is, yes.

09:32 12          Q.    Did you prepare this errata

09:32 13     sheet?

09:32 14          A.    I did, yes.

09:32 15          Q.    Other than the information on

09:32 16     this errata sheet, is there any inaccuracy

09:32 17     that you're aware of in your report that you

09:32 18     would like to correct here today?

09:32 19          A.    Not that I know of, no.

09:32 20          Q.    Since you signed this report,

09:32 21     have you become aware of anything that has

09:32 22     affected or altered the opinions that are set

09:32 23     forth in the report?

09:32 24          A.    I have not, no.

09:32 25          Q.    Who wrote this report?

                                                           17

09:32   1          A.    I did.

09:32   2          Q.    Did anyone help you draft the

09:32   3    report?

09:32   4                 MS. ZORNBERG:  You can answer

09:32   5          without disclosing communications with

09:32   6          counsel.

09:32   7                 THE WITNESS:  Sure.

09:32   8          A.    I wrote this report.  I received

09:32   9    comments from counsel.  In addition I

09:32  10    requested counsel to help me with various

09:32  11    research in relation to the preparation of

09:32  12    this report.  But I held the pen.  This is my

09:33  13    opinion and conclusions.

09:33  14          Q.    Other than asking counsel for

09:33  15    comments on the report, did you ask anyone

09:33  16    else for comments on the report?

09:33  17          A.    I did not, no.

09:33  18          Q.    Did counsel draft any portion of

09:33  19    the report?

09:33  20                 MS. ZORNBERG:  Objection.

09:33  21                 MS. STEWART:  I'm sorry, what was

09:33  22          your answer?

09:33  23                 MS. ZORNBERG:  I'm going to

09:33  24          direct the witness not to answer to the

09:33  25          extent that the witness has already --

                                                              18

```
09:33  1              on grounds that it's prohibited by
09:33  2              Rule 26 and you're calling for attorney
09:33  3              work product.  The witness has already
09:33  4              said that she received comments.
09:33  5                   MS. STEWART:  So you're not going
09:33  6              to let her answer a yes or no question
09:33  7              as to whether counsel drafted any
09:33  8              portion of the report?
09:33  9                   MS. ZORNBERG:  I'm not, no.  I
09:34 10              think that's -- you're calling for
09:34 11              privileged information.  I'll certainly
09:34 12              permit questions about, you know, if you
09:34 13              want to ask questions about what she did
09:34 14              with comments that she received from
09:34 15              counsel.
09:34 16                   MS. STEWART:  Okay.
09:34 17  BY MS. STEWART:
09:34 18         Q.    Are you going to follow counsel's
09:34 19  instructions not to answer that question,
09:34 20  Professor?
09:34 21         A.    I am, yes.
09:34 22         Q.    With respect to the comments that
09:34 23  you received from counsel, did you incorporate
09:34 24  those into the final version of the report?
09:34 25                   MS. ZORNBERG:  You can answer.
```

                                                            19

| | | |
|---|---|---|
| 09:34 | 1 | A.    I reflected on the comments, I |
| 09:34 | 2 | considered the comments, I incorporated the |
| 09:34 | 3 | comments that I was comfortable with in my own |
| 09:34 | 4 | language and with my own interpretation and |
| 09:34 | 5 | thinking. |
| 09:34 | 6 | Q.    And you said that you asked |
| 09:35 | 7 | counsel to undertake various research for you |
| 09:35 | 8 | in connection with the report.  Is that right? |
| 09:35 | 9 | A.    That's right, yes. |
| 09:35 | 10 | Q.    What research did you ask counsel |
| 09:35 | 11 | to undertake? |
| 09:35 | 12 | MS. ZORNBERG:  You can answer. |
| 09:35 | 13 | A.    The research that I asked counsel |
| 09:35 | 14 | to undertake mainly related to helping locate |
| 09:35 | 15 | information in relation to the location of the |
| 09:35 | 16 | exchanges set out in Table A. |
| 09:35 | 17 | Q.    And what specifically did you ask |
| 09:35 | 18 | counsel to do? |
| 09:35 | 19 | A.    In general -- |
| 09:35 | 20 | MS. ZORNBERG:  Again, again, just |
| 09:35 | 21 | as an instruction, I'll allow you to |
| 09:35 | 22 | answer.  But just focus on what the task |
| 09:35 | 23 | was that you wanted to perform and not |
| 09:35 | 24 | get into the specifics of communications |
| 09:35 | 25 | with counsel. |

20

09:35 1          A.     In general, I asked counsel to

09:35 2     help me locate information in relation to the

09:35 3     various aspects of the location of the

09:36 4     different exchanges in Table A.

09:36 5          Q.     What steps are you aware that

09:36 6     counsel took in order to conduct this

09:36 7     research?

09:36 8          A.     I believe that counsel consulted

09:36 9     with various databases and sources to provide

09:36 10    the information.

09:36 11         Q.     What databases did counsel

09:36 12    consult?

09:36 13         A.     I believe that counsel consulted

09:36 14    databases including CipherTrace, S&P

09:36 15    Intelligence, as well as reputable news

09:36 16    sources.

09:36 17         Q.     And you mentioned, in addition to

09:36 18    databases, sources.  Any other sources that

09:36 19    you're aware of that counsel consulted?

09:36 20         A.     I believe the --

09:36 21              MS. ZORNBERG:  Object to form.

09:36 22              You can answer.

09:36 23         A.     I believe the focus here was on

09:37 24    the CipherTrace and S&P databases, as well as

09:37 25    reputable news sources that are cited in this

21

09:37  1    report.

09:37  2         Q.    And when you refer to counsel

09:37  3    undertaking this research, just to be clear,

09:37  4    who are you referring to?

09:37  5         A.    I'm referring to counsel for the

09:37  6    defendants.

09:37  7         Q.    Were you involved in this

09:37  8    research process?

09:37  9         A.    I was constantly involved as part

09:37 10    of the conversations surrounding the research,

09:37 11    yes.

09:37 12         Q.    How were you involved?

09:37 13              MS. ZORNBERG:  I'm just going to

09:37 14              give the instruction not to disclose

09:37 15              your communications with counsel.  I

09:37 16              think these questions are approaching

09:37 17              the line, especially in light of the

09:37 18              witness' answers so far.

09:37 19              But if you want to -- if you want

09:37 20              to answer by specifically providing

09:37 21              information on what you did as part of

09:38 22              your research, that's fine.

09:38 23         A.    I received information.  I

09:38 24    reviewed information.  I incorporated the

09:38 25    insights and information that I wished to

                                                        22

09:38  1    include in the report as part of my analysis.

09:38  2         Q.    What, if anything, did you do to

09:38  3    check the accuracy of the research that

09:38  4    counsel performed?

09:38  5         A.    I went through the footnotes, I

09:38  6    checked the sources, made sure I was

09:38  7    comfortable with the databases that were being

09:38  8    consulted, and carefully read through the

09:38  9    documents provided to me.

09:38 10         Q.    Did you check each and every

09:38 11    source?

09:38 12         A.    I attempted to check each and

09:38 13    every source, yes.

09:38 14         Q.    Were there some that you were not

09:38 15    successful in checking?

09:38 16         A.    Not that I can recall, sitting

09:39 17    here today.

09:39 18         Q.    And did you carefully read

09:39 19    through all of the documents provided to you?

09:39 20              MS. ZORNBERG:  Objection to form.

09:39 21         A.    I have --

09:39 22         Q.    Well, just to be clear, I thought

09:39 23    that your previous answer was that you

09:39 24    carefully reviewed the documents.  If that's

09:39 25    not what you said, I apologize.

23

09:39  1           But did you review all the
09:39  2    documents provided to you?
09:39  3               MS. ZORNBERG:  Objection.  Asked
09:39  4        and answered.
09:39  5               You can answer.
09:39  6        A.    I've gone through all the
09:39  7    documents provided to me as part of the -- as
09:39  8    part of the footnotes.
09:39  9        Q.    What, if anything, did you do to
09:39 10    check the thoroughness of the research that
09:39 11    counsel performed?
09:39 12               MS. ZORNBERG:  Object to form.
09:39 13               You can answer.
09:39 14        A.    I did my own research in relation
09:39 15    to the -- in relation to the matters detailed
09:39 16    in the report.  I went through counsel's
09:39 17    documents that were sent to me and made sure I
09:39 18    was comfortable.
09:39 19        Q.    When you say that you did your
09:40 20    own research, what are you referring to?
09:40 21        A.    Referring to my own research and
09:40 22    experience in relation to the matters being
09:40 23    dealt with in the report, as well as ensuring
09:40 24    that I was comfortable with the databases that
09:40 25    were consulted as part of this research.

                                                    24

09:40  1          Q.    Did you do any research in

09:40  2    connection with the footnotes that you're

09:40  3    referring to independent of the research that

09:40  4    counsel performed?

09:40  5          A.    I did research

09:40  6    independent -- independently.  That is

09:40  7    referenced throughout my report.  My

09:40  8    independent research was certainly a part of

09:40  9    my process in preparing this report.

09:40 10          Q.    What did you do to make sure that

09:40 11    you were comfortable with the databases that

09:40 12    counsel was using for its research?

09:41 13          A.    I had heard of the databases

09:41 14    before.  Certainly in one case, I had used

09:41 15    that database myself, or reports from that

09:41 16    database myself in relation to S&P.  And I

09:41 17    made sure that I was comfortable with

09:41 18    CipherTrace, and I was very comfortable.  It

09:41 19    was a firm that I had heard of before.

09:41 20          Q.    Taking a look at Exhibit A to

09:41 21    your report, if you can turn to that, please.

09:41 22    Are you there, Professor?

09:41 23          A.    I am.  I am here.

09:41 24          Q.    Is Exhibit A -- I'm sorry.  Does

09:42 25    Exhibit A to your report include your CV?

                                                          25

09:42 1          A.    It does, yes.

09:42 2          Q.    Sitting here today, are you aware

09:42 3   of any inaccuracies in your CV as presented in

09:42 4   Exhibit A?

09:42 5          A.    There are no inaccuracies in the

09:42 6   CV.  However, it does -- it does need updating

09:42 7   to reflect various conferences that I've been

09:42 8   attending and presentations that I've been

09:42 9   giving over the course of the last year as

09:42 10  well as early this year.

09:42 11              Including, for example, several

09:42 12  presentations in relation to the regulation of

09:42 13  cryptocurrency exchanges that I gave towards

09:42 14  the latter half of 2021, as well as talks that

09:42 15  I've given this year, including a talk last

09:42 16  week in relation to the insolvency of

09:42 17  cryptocurrency exchanges.

09:42 18              And I'm happy to talk more about

09:42 19  these conferences and talks that I've been

09:43 20  giving that are not reflected in this current

09:43 21  draft of the CV.

09:43 22         Q.    Okay.  Thank you.  Does the

09:43 23  education section of your CV accurately list

09:43 24  the degrees that you earned?

09:43 25         A.    Yes, it does.

26

09:43  1          Q.    Do you hold any professional

09:43  2    licenses?

09:43  3          A.    Yes, I am qualified to practice

09:43  4    as a solicitor in England and Wales in the UK.

09:43  5          Q.    Have you held any other

09:43  6    professional licenses in the past?

09:43  7          A.    I don't believe so, no.

09:43  8          Q.    Have you ever been the subject of

09:43  9    a disciplinary action related to your

09:43 10    professional activity?

09:43 11          A.    I have not, no.

09:43 12          Q.    And you've been a professor at

09:43 13    Vanderbilt Law School since 2006.  Is that

09:43 14    right?

09:43 15          A.    No, I've been a professor at

09:44 16    Vanderbilt Law School since 2011.

09:44 17          Q.    Okay.  Are you currently tenured?

09:44 18          A.    I am, yes.

09:44 19          Q.    When did you become tenured?

09:44 20          A.    I believe I became tenured in

09:44 21    2016.  I should know that better, but I think

09:44 22    it was 2016.

09:44 23          Q.    Have you testified as an expert

09:44 24    witness before?

09:44 25          A.    I have not.

27

09:44 1        Q.    Have you submitted an expert
09:44 2    report before?
09:44 3        A.    I have not.
09:44 4        Q.    Have you been retained as an
09:44 5    expert witness before?
09:44 6        A.    I have not.
09:44 7        Q.    When did you first hear of
09:44 8    Ripple?
09:44 9        A.    I first came across Ripple as
09:45 10   part of my general work into financial
09:45 11   markets.  I can't recall exactly when, but I
09:45 12   came across Ripple as part of my everyday
09:45 13   research work.
09:45 14       Q.    And when did you first hear of
09:45 15   XRP?
09:45 16       A.    Again, I came across XRP as part
09:45 17   of my normal research into financial markets.
09:45 18   Again, I can't recall at what time and when.
09:45 19       Q.    And just so the record is clear,
09:45 20   when I said "Ripple," I'm referring to Ripple
09:45 21   Labs.  Is that right?
09:45 22            MS. ZORNBERG:  Object to form.
09:45 23       A.    I'm sorry, could you --
09:45 24       Q.    When I asked you questions about
09:45 25   Ripple, I was referring to Ripple Labs.  Were

                                                      28

09:45   1    your answers also referring to Ripple Labs?

09:45   2            A.    Yes.   Ripple Labs.

09:45   3            Q.    And just so the record is clear,

09:45   4    what is XRP?

09:45   5            A.    XRP is a token that is a part of

09:45   6    the XRP ledger that is -- that is a --

09:46   7    produced by the XRP ledger.

09:46   8            Q.    And what is the XRP ledger?

09:46   9            A.    The XRP ledger is a ledger that

09:46  10    is providing validation in relation to

09:46  11    transactions in XRP as well as other

09:46  12    currencies that are part of -- that are a part

09:46  13    of the ledger.

09:46  14            Q.    Prior to your retention as an

09:46  15    expert in this matter, what did you know about

09:46  16    Ripple?

09:46  17            A.    The knowledge that I had about

09:46  18    Ripple was a fairly general knowledge in

09:46  19    relation to the role of Ripple as a payment

09:46  20    services facilitator.

09:46  21            Q.    And how did you gain this

09:47  22    knowledge about Ripple prior to your retention

09:47  23    for this case?

09:47  24            A.    It was part of conversations I

09:47  25    had with academics as well as a part of the

29

09:47  1   general research ecosystem that I work in in
09:47  2   relation to Fintech.
09:47  3            Q.    And prior to your retention as an
09:47  4   expert witness, what did you know about XRP?
09:47  5            A.    What I knew about XRP related to
09:47  6   its role as a cryptocurrency that facilitated
09:47  7   international payment transactions.
09:47  8            Q.    And how did you learn this
09:47  9   information about XRP?
09:47  10           MS. ZORNBERG:   Object to form.
09:47  11           A.    Again, I can't say exactly.  I
09:47  12   had various conversations with academics as
09:47  13   well as part of the general Fintech system
09:47  14   that I am researching in.
09:48  15           Q.    Have you ever met Chris Larsen?
09:48  16           A.    I have not.
09:48  17           Q.    Have you ever heard Chris Larsen
09:48  18   speak?
09:48  19           A.    No, I don't believe I have.
09:48  20           Q.    Have you ever met Brad
09:48  21   Garlinghouse?
09:48  22           A.    I have not.
09:48  23           Q.    Have you ever heard
09:48  24   Mr. Garlinghouse speak?
09:48  25           A.    I don't believe I have.

30

09:48   1          Q.    Were you a speaker at the DC

09:48   2     Fintech Week virtual experience in October

09:48   3     2021?

09:48   4          A.    I was, yes.

09:48   5          Q.    Do you recall whether

09:48   6     Mr. Garlinghouse was also a speaker at that

09:48   7     conference?

09:48   8          A.    I believe he was in the program.

09:48   9          Q.    But you don't believe that you

09:48  10     heard him speak?

09:48  11          A.    No, I was not able to be there

09:49  12     for his session.

09:49  13          Q.    And the same question with

09:49  14     respect to that conference in October of 2020.

09:49  15     Were you a speaker at that conference in

09:49  16     October 2020?

09:49  17          A.    At which conference, sorry?

09:49  18          Q.    At the same -- the DC week

09:49  19     virtual experience?

09:49  20               MS. ZORNBERG:  Objection.  And

09:49  21          just to note, unless I misheard, I

09:49  22          thought you previously said the date was

09:49  23          October 2021.  And now you're saying

09:49  24          October 2020.

09:49  25               Can you just clarify the year

31

09:49  1            that you're addressing?

09:49  2        Q.    Sure.  I'm asking about both

09:49  3    years.  So I think my initial question was

09:49  4    about October 2021.

09:49  5            And now I want to ask the same

09:49  6    question about whether you also spoke at the

09:49  7    same conference the year before in

09:49  8    October 2020.

09:49  9        A.    I believe I did.

09:49 10        Q.    And do you recall if

09:49 11    Mr. Garlinghouse was a speaker at that

09:49 12    conference in October 2020?

09:49 13        A.    I really can't recall.  I did not

09:49 14    attend his session, if he would have been in

09:49 15    the program.

09:50 16        Q.    Prior to your retention as an

09:50 17    expert, did you have any relationship with any

09:50 18    Ripple board member?

09:50 19        A.    I -- I'm not sure if he is a

09:50 20    board member.  I do know a professor who I

09:50 21    believe may be affiliated, potentially.  But

09:50 22    I'm not sure.

09:50 23        Q.    And who is the professor you're

09:50 24    referring to?

09:50 25        A.    Michael Barr.

                                                    32

09:50  1          Q.    Prior to your retention as an
09:50  2    expert, did you have any relationship with any
09:50  3    Ripple executive?
09:50  4          A.    No.
09:50  5          Q.    Are you on the advisory board for
09:51  6    Leaf Global Fintech?
09:51  7          A.    Am I?  I am not sure.  It's --
09:51  8    one of the my students was a person who was
09:51  9    directing that.  I asked him that -- not to be
09:51 10    on the board.  So I don't believe I am.
09:51 11          Q.    Do you have any connection with
09:51 12    Leaf Global Fintech?
09:51 13          A.    All -- I just -- I know Nat
09:51 14    Robinson, who I believe started it.  But
09:51 15    beyond that, no.
09:51 16          Q.    Before your retention in this
09:51 17    case, did you have any meetings or
09:51 18    conversations with anyone affiliated with
09:51 19    Ripple?
09:51 20          A.    Affiliated in what sense?
09:51 21          MS. ZORNBERG:  Yeah, object to
09:51 22          form of that question.
09:51 23          Q.    Anyone who was an employee,
09:52 24    executive, board member, shareholder, or
09:52 25    otherwise affiliated with Ripple?

                                                    33

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

```
09:52  1              MS. ZORNBERG:  Objection.
09:52  2         Q.    I believe you can answer but --
09:52  3              MS. STEWART:  Lisa, you can
09:52  4         correct me.
09:52  5              MS. ZORNBERG:  Objection noted.
09:52  6              You can answer if you understand
09:52  7         the question.
09:52  8         A.    I'm not sure I understand the
09:52  9    question.  It's a very broad question.  I'm
09:52 10    not sure who is affiliated with Ripple
09:52 11    exactly.  The only person I know who may be
09:52 12    potentially at some point is Michael Barr, who
09:52 13    is a colleague of mine at Michigan University.
09:52 14         Q.    Do you own any XRP?
09:52 15         A.    I do not.
09:52 16         Q.    Have you ever owned XRP?
09:52 17         A.    I have not.
09:52 18         Q.    Do you expect to receive any
09:53 19    compensation in XRP in this case?
09:53 20         A.    I do not.
09:53 21         Q.    Do you own other
09:53 22    cryptocurrencies?
09:53 23         A.    I do not.
09:53 24         Q.    Have you ever?
09:53 25         A.    I have not.
```

34

09:53  1                    MS. STEWART:  Mark, can we hand

09:53  2           out Exhibit YY-10.

09:53  3           A.    Thank you very much.

09:53  4                    (Exhibit YY-10, "Fintech and the

09:53  5           Innovation Trilemma" by Yesha Yadav and

09:53  6           Chris Bummer, marked for identification,

09:53  7           as of this date.)

09:53  8           Q.    Now, professor, take however long

09:53  9    you need to examine YY-10.  And I'm going to

09:53 10    ask you if you recognize it.

09:53 11           A.    (Document review.)

09:55 12                    Yes, it's my article with

09:55 13    Professor Chris Brummer.

09:55 14           Q.    And the title of it is "Fintech

09:56 15    and the Innovation Trilemma."  Is that right?

09:56 16           A.    That's right, yeah.

09:56 17           Q.    Did you discuss digital assets in

09:56 18    this article?

09:56 19           A.    I believe digital assets are

09:56 20    referenced in this article, yes.

09:56 21           Q.    Did you discuss XRP in this

09:56 22    article?

09:56 23           A.    It is very briefly referenced in

09:56 24    the first page, I believe.

09:56 25           Q.    And that's the page that is

                                                        35

09:56  1    numbered on top 237.  Is that right?

09:56  2            A.    That's right.

09:56  3            Q.    And that reference is to Ripple's

09:56  4    XRP.  Is that right?

09:56  5            A.    It is, yes.

09:57  6            Q.    Why did you reference "Ripple's

09:57  7    XRP" as opposed to just "XRP"?

09:57  8            A.    It was a sloppy use of wording on

09:57  9    my part and my coauthor's part.  We recognized

09:57 10    the separation; however, it was just a

09:57 11    colloquial and sloppy usage.

09:57 12            Q.    And if you look at page 277 of

09:57 13    the article, the fourth line down, do you see

09:57 14    another reference to Ripple's XRP?

09:57 15            A.    Yes.

09:57 16            Q.    And why did you use this term

09:57 17    "Ripple's XRP" here?

09:57 18            A.    Again, it was sloppy, sloppiness

09:57 19    on our part.

09:57 20            Q.    And when you say "sloppy," what

09:58 21    do you mean?

09:58 22            A.    We should have been more careful

09:58 23    in referencing XRP as a separate

09:58 24    cryptocurrency distinct from Ripple Labs.

09:58 25            Q.    Have you ever written a

                                                        36

09:58  1    publication critiquing any aspect of the US

09:58  2    regulatory regime?

09:58  3                 MS. ZORNBERG:  Objection.

09:58  4         A.    Many, I believe.  It's -- I'm not

09:58  5    very sure, the question is very broad as to

09:58  6    the definition of "critique."  But I certainly

09:58  7    write publications on the various aspects of

09:58  8    US regulation in different context.

09:58  9         Q.    And are some of these

09:58 10    publications critical of the US regulatory

09:58 11    regime?

09:58 12                 MS. ZORNBERG:  Objection to form.

09:58 13         A.    I'm not really sure what you mean

09:59 14    about "critical," about the regulatory regime.

09:59 15         Q.    What is it that you don't

09:59 16    understand about that?

09:59 17         A.    It's just very --

09:59 18                 MS. ZORNBERG:  Object to form.

09:59 19         A.    It's very broad.  The definition

09:59 20    of "critique" is not necessarily a

09:59 21    particularly accurate description.  It

09:59 22    critiques certainly some aspects of it.  But

09:59 23    the idea here is to improve and enhance the

09:59 24    framework that is currently in place in

09:59 25    different context.

                                                      37

```
09:59   1            Q.    When you say "the idea here,"
09:59   2    what are you referring to?
09:59   3            A.    My goal in my research.
09:59   4            Q.    If the word "critique" is not an
09:59   5    appropriate word, how would you describe your
09:59   6    research as it applies to the US regulatory
09:59   7    regime?
09:59   8            MS. ZORNBERG:  Object to form.
09:59   9            A.    I suppose "critique" can be used.
09:59  10    The word is really to try and examine
10:00  11    innovations that are currently underway in the
10:00  12    marketplace, and to think about ways in which
10:00  13    our current regulatory regime fits the
10:00  14    innovations that are developing in the market
10:00  15    today.
10:00  16            Q.    And is it your view in general
10:00  17    that the corrupt regulatory regime does not
10:00  18    fit the innovations in the market today?
10:00  19            MS. ZORNBERG:  Object to form.
10:00  20            A.    That's very broad.  I'm sorry.
10:00  21    It's a very broad question.
10:00  22            Q.    Okay.  So tell me what your view
10:00  23    is.
10:00  24            MS. ZORNBERG:  Object to form.
10:00  25            View of what?
```

38

10:00  1          Q.    You started talking about the

10:00  2    goals of your research.  Right?  Correct?

10:00  3          A.    I can --

10:00  4                MS. ZORNBERG:  Object to form.

10:00  5          Put a question.

10:00  6          Q.    You were referring to the goals

10:00  7    of your research with respect to innovations

10:00  8    and the US regulatory regime.  Correct?

10:01  9                MS. ZORNBERG:  Object to form.

10:01 10          A.    Yes, I'm happy to go through my

10:01 11    papers with you and to discuss particular

10:01 12    aspects of my thesis in relation to what would

10:01 13    substantiate the overall framework that I

10:01 14    have.

10:01 15                So, for example, in relation to

10:01 16    my research in market microstructure, I

10:01 17    examined innovations in the ways in which our

10:01 18    trading systems have evolved to incorporate

10:01 19    high-speed traders, high-speed communication

10:01 20    technologies, and then to look at aspects of

10:01 21    our regulatory system that perhaps are less

10:01 22    well adapted than they should be to these

10:01 23    innovations in the marketplace.

10:01 24                So, for example, in "The Failure

10:01 25    of Liability in Modern Markets," which was

                                                    39

| 10:01 | 1 | published in Virginia Law Review, I detail |
| 10:01 | 2 | aspects of our liability structure, for |
| 10:01 | 3 | example, in relation to negligence, in |
| 10:01 | 4 | relation to intent, in relation to strict |
| 10:01 | 5 | liability, that do not necessarily fit within |
| 10:02 | 6 | a paradigm where we have extremely high-speed |
| 10:02 | 7 | traders in an interconnected marketplace. |
| 10:02 | 8 | What I argue in that paper is |
| 10:02 | 9 | that the lack of a proper fit of the liability |
| 10:02 | 10 | structure to a modern market structure can |
| 10:02 | 11 | create costs for different participants in the |
| 10:02 | 12 | market, as well as for the structural |
| 10:02 | 13 | integrity of the marketplace as a whole. |
| 10:02 | 14 | In addition, looking at why |
| 10:02 | 15 | the -- looking at inefficiencies in the |
| 10:02 | 16 | algorithmic trading market, I have written a |
| 10:02 | 17 | paper in the Vanderbilt Law Review on how |
| 10:02 | 18 | algorithmic trading undermines efficiency in |
| 10:02 | 19 | capital markets. |
| 10:02 | 20 | Again, that paper examines |
| 10:02 | 21 | innovations in market structure; notably |
| 10:02 | 22 | high-speed trading, to think about ways in |
| 10:02 | 23 | which the disclosure paradigm that we have |
| 10:02 | 24 | doesn't exactly fit in a market in which time |
| 10:03 | 25 | horizons tend to be pretty short term in |

40

10:03  1  nature, and to try to think of ways in which

10:03  2  we might incorporate a more long-term vision

10:03  3  into incorporating fundamental information

10:03  4  into our disclosure regimes.

10:03  5          Similarly, in the oversight

10:03  6  failure in securities markets, I examine

10:03  7  innovations in relation to platforms and

10:03  8  platform design.

10:03  9          So here I look at competition in

10:03  10  the marketplace to bring in insights about

10:03  11  dark pools, particularly as they're

10:03  12  colloquially known, alternative trading

10:03  13  systems, and to think about ways in which

10:03  14  exchanges and dark pools can exercise

10:03  15  oversight across the marketplace as a whole

10:03  16  that is innovating rapidly to include

10:03  17  competition and innovation in platform design.

10:03  18          In addition, more recently, I've

10:03  19  been working on projects in relation to the US

10:03  20  treasury markets, US treasury market

10:03  21  microstructure, which has seen tremendous

10:04  22  innovation over the last ten years, and where

10:04  23  regulation has not kept pace at all to meet

10:04  24  the structure of this marketplace.

10:04  25          There I have written two papers,

41

10:04  1     one is my own and one is coauthored, that

10:04  2     examine the ways in which US treasury market

10:04  3     microstructure, as well as the Ripple market

10:04  4     microstructure and their regulation, do not

10:04  5     fit together given the evolving paradigms

10:04  6     within our marketplace today.

10:04  7               In the broken bond market, again,

10:04  8     I examine the ways in which our regulation is

10:04  9     not -- is insufficient to provide a way for

10:04 10     the bond market to offer efficiency in the

10:04 11     marketplace.

10:04 12               And, again, this paper provides

10:04 13     ways in which to think about -- think about

10:04 14     innovations within private governance that we

10:04 15     could bring in that could help make the bond

10:04 16     market a more amenable one for efficiency.

10:04 17               So, you know, thinking through

10:04 18     this, sort of, line of projects, I have also

10:05 19     papers on Fintech and the Innovation Trilemma,

10:05 20     which you already mentioned, as well as one

10:05 21     looking at international Fintech that examines

10:05 22     the challenges that regulators face when

10:05 23     dealing with Fintech Innovations.

10:05 24               What we do in that paper is that

10:05 25     we look at the ways in which Fintech is

42

10:05  1    different from past iterations of financial

10:05  2    innovation.  We examine the use of algorithms.

10:05  3    We examine the use of big data.  We examine

10:05  4    the entry of smaller nontraditional firms into

10:05  5    the financial ecosystem, and think about the

10:05  6    ways in which that poses special and new

10:05  7    challenges for regulators.

10:05  8              In addition, I have a few papers,

10:05  9    as I've referenced in my CV, in relation to

10:05 10    cryptocurrency exchanges.  And here, I think

10:05 11    about ways or I'm proposing to think about

10:05 12    ways that cryptocurrency exchanges are

10:05 13    evolving and to help make their evolution as

10:05 14    something that can be a positive for the

10:06 15    regulatory oversight of the market as a whole.

10:06 16              So it's very hard for me to

10:06 17    provide a, sort of -- you know, without going

10:06 18    through individual papers to provide a, sort

10:06 19    of, overarching description, as it were.

10:06 20              But my goal here, as you can see,

10:06 21    is to think about innovations in the financial

10:06 22    marketplace and to think about ways in which

10:06 23    our regulatory paradigms that we rely on

10:06 24    currently may not be a great fit.

10:06 25         Q.    Professor, how would you describe

                                                           43

```
10:06  1    your area of expertise?
10:06  2            A.    I would describe my area of
10:06  3    expertise as market microstructure and
10:06  4    innovation.
10:06  5                MS. STEWART:  Can we go off the
10:06  6            record, please.
10:07  7            A.    I would also add --
10:07  8                MS. ZORNBERG:  Wait, wait, wait,
10:07  9            hold on.
10:07 10                Are we off or are we on?
10:07 11                MS. STEWART:  Can we go off,
10:07 12            please.
10:07 13                MS. ZORNBERG:  Was there
10:07 14            something that you needed to finish to
10:07 15            answer the last question?
10:07 16            A.    Yes, I wanted to add financial
10:07 17    markets -- financial markets and their
10:07 18    regulation to my area of expertise as well.
10:07 19                MS. STEWART:  Okay.  Thank you.
10:07 20            That's helpful.
10:07 21                Now can we go off the record.
10:07 22                MS. ZORNBERG:  Yes.
10:07 23                THE VIDEOGRAPHER:  The time is
10:07 24            10:07 a.m.  This concludes Media 1.  Off
10:07 25            the record.
```

44

```
10:25  1                    (Recess taken from 10:07 a.m. to
10:25  2              10:25 a.m.)
10:25  3                    THE VIDEOGRAPHER:  The time now
10:25  4              is 10:25 a.m.  This begins Media 2.  On
10:25  5              the record.
10:25  6     BY MS. STEWART:
10:25  7              Q.    Professor Yadav, before we went
10:25  8     off the record, we were talking about your
10:25  9     area of expertise.  Do you recall that?
10:25 10              A.    I do, yes.
10:25 11              Q.    Does your area of expertise
10:25 12     include Fintech?
10:25 13              A.    It does, yes.
10:25 14              Q.    And just so the record is clear,
10:25 15     what is Fintech?
10:25 16              A.    There is no standard definition
10:25 17     of Fintech.  Broadly speaking, it refers to
10:25 18     the use of digital technologies in the area of
10:25 19     financial markets.
10:26 20                    In my article, I define, it
10:26 21     alongside my coauthor, as entailing the use of
10:26 22     algorithms, big data, as well as including
10:26 23     smaller, less traditional players in the
10:26 24     financial marketplace.
10:26 25              Q.    And what is your expertise with
```

45

10:26  1    respect to Fintech?

10:26  2              MS. ZORNBERG:  Object to form.

10:26  3         A.    So I have a great deal of

10:26  4    expertise in relation to the role of new

10:26  5    technologies that are entering the financial

10:26  6    marketplace.

10:26  7              And that has come from my

10:26  8    personal professional experience that grew out

10:26  9    of my time in legal practice that examined

10:26 10    innovations in financial market design, at

10:26 11    that time focusing on financial markets'

10:26 12    contracts, financial markets' engineering,

10:27 13    looking, for example, at derivatives

10:27 14    contracts, at innovations in banking, and in

10:27 15    payment technologies.

10:27 16              And working through my research

10:27 17    in relation to the expertise that I have today

10:27 18    in relation to various aspects of Fintech,

10:27 19    including cryptocurrencies, cryptocurrency

10:27 20    exchanges, looking at also various types of

10:27 21    online advising in relation to financial

10:27 22    products, investment advice, thinking broadly

10:27 23    in relation to blockchains, looking at the

10:27 24    aspect of financial markets products that are

10:27 25    entering the marketplace such as online

46

10:27  1    lending that are important in the market

10:27  2    today.

10:27  3              So that is that is, in a

10:27  4    nutshell, some of the expertise that is

10:27  5    encapsulated in the word "Fintech."

10:27  6        Q.   You mentioned in your last answer

10:28  7    cryptocurrency exchanges.  Do you consider

10:28  8    yourself an expert with respect to the

10:28  9    functioning of cryptocurrency exchanges?

10:28 10        A.   I do consider myself to be

10:28 11    knowledgeable and expert in the area of

10:28 12    cryptocurrency exchanges.

10:28 13        Q.   And can you expand on how you're

10:28 14    knowledgeable and expert in that area?

10:28 15        A.   Sure.  The expertise that I have

10:28 16    in the area of cryptocurrency exchanges has

10:28 17    developed out of a career that has focused

10:28 18    intensively on market structure, market

10:28 19    structure platforms, platform design,

10:28 20    clearing, and settlement.

10:28 21              I began this expertise in my

10:28 22    career at Clifford Chance where I specialized

10:28 23    as a lawyer that worked in market structure,

10:28 24    in exchange design, in clearing, settlement,

10:29 25    and risk management.

47

10:29  1              At that time, I worked heavily in
10:29  2       relation to advising various aspect -- on
10:29  3       various aspects of exchange design, clearing,
10:29  4       and settlement and risk management.
10:29  5              In addition, as part of this
10:29  6       overall expertise into market structure and
10:29  7       platforms, I worked as a key person, a key --
10:29  8       one of the two key lawyers that advised the
10:29  9       European payments council.
10:29 10              That was a council that was a,
10:29 11       sort of, Pan -- Pan-European effort to create
10:29 12       a harmonized payments environment for the
10:29 13       European economic area and Switzerland.
10:29 14              In that capacity, I was one of
10:29 15       the key drafters of the rules that undergirded
10:29 16       various payment schemes that included various
10:29 17       innovative forms of payments.
10:29 18              And I worked as a key resource
10:29 19       person that provided the rulemaking for those
10:29 20       schemes, as well as engaged heavily with
10:29 21       respect to the technical and operational
10:30 22       standards that were driving those payments
10:30 23       schemes.
10:30 24              Further to that work, I have
10:30 25       worked at the World Bank on various aspects of

48

10:30 1    cross-border finance.  That is important in

10:30 2    the area of cryptocurrency exchanges as well.

10:30 3                    I have worked in -- in various

10:30 4    aspects of looking at firm design, looking at

10:30 5    insolvency aspects, looking at the

10:30 6    cross-border flow of transactions and data,

10:30 7    also as part of my World Bank work into the

10:30 8    study and implementation of international

10:30 9    cross-border standards.

10:30 10                   Following my time in research, I

10:30 11   have worked extremely intensively looking at

10:30 12   aspects of exchanges, clearing and settlement,

10:30 13   looking at innovations in exchange technology,

10:30 14   as I discussed with you as part of my earlier

10:30 15   answer, looking at high-frequency trading

10:30 16   platforms, for example, looking at dark pools

10:30 17   as I noted before.

10:30 18                   And so the work in

10:31 19   cryptocurrencies that I am doing today is very

10:31 20   much a natural extension of that expertise and

10:31 21   knowledge and research and background that

10:31 22   have developed throughout my career in legal

10:31 23   practice, in policy, as well as today as part

10:31 24   of my research.

10:31 25                   In addition, I should mention

49

10:31  1    that I am constantly in conversation with

10:31  2    policymakers, with thinkers, with other

10:31  3    academics, in relation to various aspects of

10:31  4    exchange design, thinking about aspects of

10:31  5    market innovation, and certainly building --

10:31  6    building a platform, a foundation for

10:31  7    developing expertise in relation to

10:31  8    cryptocurrencies and cryptocurrency exchanges.

10:31  9         Q.    Which policymakers are you

10:31 10    constantly in conversations with with respect

10:31 11    to exchange design?

10:31 12         A.    So I have had conversations

10:31 13    certainly as part of my work with the CFTC.  I

10:32 14    was a member -- I've been a member since 2018

10:32 15    of the technology advisory committee.  That

10:32 16    committee is currently, I believe it's waiting

10:32 17    for a commission sponsorship at present, so

10:32 18    it's not presently active.

10:32 19              But that was a committee in which

10:32 20    the conversations on exchange design, platform

10:32 21    design, market design, clearing, and

10:32 22    settlement were ongoing really on a very, very

10:32 23    regular basis.

10:32 24              In addition, I have also had

10:32 25    conversations with the SEC in relation to

50

10:32  1    aspects of treasury market structure and

10:32  2    platforms.

10:32  3              I have had conversations with

10:32  4    respect to European policymakers, the EU, the

10:32  5    EU commission.  I have spoken to them about

10:32  6    aspects of treasury market platforms and

10:32  7    treasury market risks.

10:32  8              And so, you know, this is very

10:32  9    much a part of my work to engage in

10:32 10    conversations with policymakers, with leading

10:33 11    thinkers in order to be able to forward my

10:33 12    ideas for reform.

10:33 13         Q.    Who at the SEC have you had

10:33 14    conversations with with respect to treasury

10:33 15    market structure and platform?

10:33 16         A.    I had a conversation with Gary

10:33 17    Gensler's office, with his chief of staff, I

10:33 18    believe.

10:33 19         Q.    And when was this conversation?

10:33 20         A.    This conversation was, I would

10:33 21    say, just prior to Thanksgiving, if I recall

10:33 22    correctly.

10:33 23         Q.    Was it a phone conversation?

10:33 24              MS. ZORNBERG:  Excuse me.  Can

10:33 25         you repeat that.  I didn't hear it.

51

10:33   1          Q.    Was is it a phone conversation?

10:33   2          A.    It was a conversation over Zoom,

10:34   3    I think.  It was a conversation on Zoom.

10:34   4          Q.    Okay.

10:34   5          A.    Or WebEx or one of them, yeah.

10:34   6          Q.    Before your retention as an

10:34   7    expert in this matter, were you aware that XRP

10:34   8    was traded on cryptocurrency exchanges?

10:34   9          A.    I was generally aware.  I was

10:34  10    generally aware, I think.

10:34  11          Q.    Now, professor, I want to go

10:34  12    through your report.  So if you can get that

10:34  13    binder that has Exhibit YY-1 back in front of

10:34  14    you, please.

10:35  15                Do you have your report in front

10:35  16    of you?

10:35  17          A.    I do, yes.

10:35  18          Q.    Okay.  Taking a look at paragraph

10:35  19    2, sort of, the middle of the paragraph where

10:35  20    you speak about your research, including

10:35  21    Fintech and cryptocurrencies.

10:35  22                Do you see that?

10:35  23          A.    Yes, I do.

10:35  24          Q.    I think you've spoken a little

10:35  25    bit about this in general, but I just want to

                                                         52

10:35  1    make sure we have it in the record.

10:35  2            Can you explain what research

10:35  3    you've conducted with respect to

10:35  4    cryptocurrency?

10:35  5            A.    Yes.

10:35  6            MS. ZORNBERG:  Object to form.

10:35  7            A.    Could you be a little bit more

10:35  8    specific about what you're looking for here?

10:35  9            Q.    Sure.  I would like to understand

10:36 10    better the research that you're referring to

10:36 11    in this paragraph as it relates to

10:36 12    cryptocurrencies.

10:36 13            A.    Sure.

10:36 14            MS. ZORNBERG:  Objection.  I'm

10:36 15            sorry.  Can you -- are you talking about

10:36 16            a specific part of the paragraph?

10:36 17            MS. STEWART:  Yeah.  We're -- I'm

10:36 18            asking, Lisa, about this sentence that

10:36 19            begins with "This research spans equity

10:36 20            markets," and ends with, "and Fintech

10:36 21            including cryptocurrencies."

10:36 22            So I just want to understand the

10:36 23            portion that refers to cryptocurrencies

10:36 24            and the research that the professor has

10:36 25            conducted with respect to

53

10:36  1          cryptocurrencies.  I'm not sure what's

10:36  2          unclear about that.

10:36  3                    MS. ZORNBERG:  Thank you.

10:36  4          A.    The research that I'm currently

10:36  5     undertaking on cryptocurrencies spans at

10:36  6     present, I believe, four projects.  So I will

10:36  7     speak on each of them in turn.

10:36  8                    So with respect to cryptocurrency

10:36  9     exchanges, I'm currently working on an article

10:36 10     that examines the ability of cryptocurrency

10:37 11     exchanges to perform the role of

10:37 12     self-regulatory organizations as traditional

10:37 13     exchanges currently do under the Securities

10:37 14     and Exchange Act.

10:37 15                    So what my article seeks to do is

10:37 16     examine the pros and the cons, the rationales,

10:37 17     the theoretical payoffs that might come from

10:37 18     cryptocurrency exchanges, exercising private

10:37 19     oversight and discipline of the marketplace as

10:37 20     traditional exchanges currently do.

10:37 21                    What this paper seeks to argue is

10:37 22     that cryptocurrency exchanges on the positive

10:37 23     side can bring a great deal of expertise, of

10:37 24     industry experience, and also disciplinary

10:37 25     power arising from their very important,

                                                      54

10:37 1    indeed, central role within the cryptocurrency

10:37 2    ecosystem.

10:37 3              However, the paper also points to

10:38 4    potential drawbacks of cryptocurrency

10:38 5    exchanges performing this oversight role.  For

10:38 6    example, it details various potential for

10:38 7    conflicts of interest that may arise where

10:38 8    cryptocurrency exchanges that provide

10:38 9    oftentimes a variety of products to their

10:38 10   users are exercising discipline over those

10:38 11   that they are currently in business with in a

10:38 12   very deep way.

10:38 13             However, these are not concerns

10:38 14   that are particularly new to the

10:38 15   cryptocurrency marketplace.  They have been

10:38 16   dealt with.

10:38 17             Also, in the context of

10:38 18   traditional exchanges like the New York Stock

10:38 19   Exchange and NASDAQ, there is extensive

10:38 20   literature, for example, on the conflicts of

10:38 21   interest that may apply in the case of the

10:38 22   NASDAQ and the New York Stock Exchange

10:38 23   exercising discipline over the folks that they

10:38 24   supervise.

10:38 25             And so what this paper goes on to

55

| | | |
|---|---|---|
| 10:38 | 1 | do is to propose and to think about potential |
| 10:39 | 2 | ways in which to make cryptocurrency exchanges |
| 10:39 | 3 | positive actors that can exercise discipline |
| 10:39 | 4 | and oversight and bring safety and integrity |
| 10:39 | 5 | to the marketplace as a whole, and provides a |
| 10:39 | 6 | series of ideas that can -- that might work to |
| 10:39 | 7 | enhance that going forward.  So that is one |
| 10:39 | 8 | paper here. |
| 10:39 | 9 | In addition, I would -- I'm |
| 10:39 | 10 | looking at the application of international |
| 10:39 | 11 | standards as promulgated by the committee on |
| 10:39 | 12 | payment and settlement systems, the Basel |
| 10:39 | 13 | committee, looking at IOSCO, and seeing how |
| 10:39 | 14 | well these standards might apply in the |
| 10:39 | 15 | context of clearing and settlement exchanges, |
| 10:39 | 16 | as well as also the clearing and settlement |
| 10:39 | 17 | mechanisms that these exchanges deployed. |
| 10:39 | 18 | So in particular, what that |
| 10:39 | 19 | research will seek to examine is the ability |
| 10:39 | 20 | of clearing and settlement standards, for |
| 10:39 | 21 | example, to apply in the context of |
| 10:40 | 22 | cryptocurrency exchanges that internalize much |
| 10:40 | 23 | of the role of clearing and settlement within |
| 10:40 | 24 | their firm. |
| 10:40 | 25 | As you know in the traditional |

56

10:40 1     context -- and this is detailed in this report

10:40 2     as well -- traditional exchanges tend to rely

10:40 3     on clearinghouses to perform -- and custodians

10:40 4     to perform a variety of risk management

10:40 5     functions.

10:40 6               In the context of clearing --

10:40 7     central clearing in the context of

10:40 8     cryptocurrency exchanges on the other hand,

10:40 9     many of these functions are internalized

10:40 10    generally by the cryptocurrency exchanges

10:40 11    themselves.

10:40 12              And what this paper and research

10:40 13    seeks to look at is whether the international

10:40 14    standards that we have existing in place for

10:40 15    cryptocurrency risk management for -- sorry.

10:40 16    I take that back.

10:40 17              The existing standards we have in

10:40 18    place for traditional service providers can

10:40 19    apply with equal force to cryptocurrency

10:40 20    clearing and settlement mechanisms.  And I

10:40 21    argue, as I will argue in this paper, there

10:40 22    are some issues to think about that are

10:40 23    different and interesting.

10:41 24              In particular, the role of

10:41 25    storage and private keys is something to think

57

10:41  1    about that is new to the cryptocurrency

10:41  2    marketplace.  How to safeguard those keys, how

10:41  3    to think about those keys, that's something

10:41  4    that is particularly important.

10:41  5              Data management, risk management,

10:41  6    collateral, cryptocurrency exchanges, and how

10:41  7    they should calibrate their levels of capital,

10:41  8    for example, to safeguard and maintain

10:41  9    credential safety for the marketplace as a

10:41 10    whole.  So that is one project that is also

10:41 11    underway.

10:41 12              In addition, I have a couple of

10:41 13    projects that are looking at CBDCs.  That's a

10:41 14    slightly different take here.  I am looking at

10:41 15    Central Bank digital currencies, and

10:41 16    specifically on the role of privacy in the

10:41 17    context of Central Bank digital currencies.

10:41 18              That will be a coauthored

10:41 19    project, and that will examine how

10:41 20    programmable Central Bank digital currencies

10:41 21    operate within a privacy framework that we

10:41 22    have today, and how to potentially enhance the

10:41 23    privacy safeguards that we will have

10:42 24    potentially in the context of a CBDC.

10:42 25              Finally, a project that I am --

58

10:42 1    that I am planning to do that I am currently

10:42 2    researching the material for looks at how to

10:42 3    think about code in the context of a Central

10:42 4    Bank digital currency.

10:42 5             In particular, when we do have a

10:42 6    Central Bank digital currency that is

10:42 7    promulgated by our government, how should the

10:42 8    code underlying that currency be regulated?

10:42 9    What is the difference between a Central Bank

10:42 10   digital currency and the digital mechanisms

10:42 11   for payments that we deploy today?

10:42 12            If our government is providing a

10:42 13   programmable digital currency as might be

10:42 14   proposed, in that context, how should the

10:42 15   underlying code for that currency be thought

10:42 16   about?

10:42 17            What kind of safeguards should be

10:42 18   put in?  What kind of potential fragilities

10:42 19   exist within a market space?  For example, in

10:43 20   relation to cyber risks where much of our

10:43 21   monetary system is subject to an underlying

10:43 22   code.

10:43 23            So that gives you some flavor of

10:43 24   the current projects that I'm doing.  And just

10:43 25   last week I was speaking to federal judges

                                                    59

10:43  1    from the fifth circuit bankruptcy -- from the

10:43  2    fifth circuit.

10:43  3              And I was discussing a potential

10:43  4    project in relation to the insolvency of

10:43  5    cryptocurrency exchanges and what kind of

10:43  6    procedures that might have to be put in place

10:43  7    to deal with the resolution of an exchange

10:43  8    where assets like cold storage of keys, for

10:43  9    example, may be very difficult to locate, take

10:43 10    possession of, and distribute within the

10:43 11    communities that judges are used to dealing

10:43 12    with.  So, you know, that hopefully gives you

10:43 13    some idea of the current research that is

10:43 14    underway.

10:43 15    BY MS. STEWART:

10:43 16         Q.    Thank you.  That's helpful.  Was

10:43 17    any of this current research that you spoke

10:43 18    about in your last answer underway at the time

10:44 19    you were retained as an expert in this case?

10:44 20         A.    I had been working on a paper in

10:44 21    relation to the cryptocurrencies as SROs work.

10:44 22    In addition, I had had several conversations

10:44 23    as well as planned out my projects with

10:44 24    respect to Central Bank digital currencies.

10:44 25         Q.    And that paper that you referred

60

10:44   1    to with respect to cryptocurrencies -- crypto

10:44   2    exchanges as SROs, do you know when that paper

10:44   3    will be published?

10:44   4           A.    As an academic, I can't give you

10:44   5    a clear answer on that.  I am working on it at

10:44   6    present.

10:44   7           Q.    So in that same paragraph in your

10:45   8    report, paragraph 2, toward the end, you

10:45   9    state:

10:45   10              "My work also engages with

10:45   11          international developments in market

10:45   12          design to explore how foreign

10:45   13          jurisdictions organize their trading

10:45   14          markets, oversee innovation," et cetera.

10:45   15              Do you see that sentence?

10:45   16          A.    I do, yes.

10:45   17          Q.    What work are you referring to in

10:45   18    that sentence?

10:45   19          A.    So, for example, I am -- I have

10:45   20    been a financial regulatory lawyer throughout

10:45   21    my career, essentially, in international

10:45   22    financial market standards.

10:45   23              That began at Clifford Chance

10:45   24    where I engaged very, very frequently with

10:45   25    international standards, for example, in

61

10:45 1  relation to banking, regulation in the Basel

10:45 2  standards, as well as numerous other

10:45 3  standards, for example, in relation to

10:45 4  clearing and settlement systems.

10:46 5          I was advising heavily at that

10:46 6  time in relation to these standards.  And this

10:46 7  work obviously became much more directly

10:46 8  involved in financial standard setting from

10:46 9  the policy side when I joined the World Bank.

10:46 10          At the World Bank, much of my

10:46 11  work at the bank was focused on the

10:46 12  implementation of the Financial Stability

10:46 13  Board's international standards, notably in

10:46 14  relation to insolvency and creditor rights.

10:46 15          But as detailed in the CV, the

10:46 16  engagement at the bank also included thinking

10:46 17  about and discussing and engaging with the

10:46 18  other standards that the financial stability

10:46 19  board has promulgated.

10:46 20          So this was really the work that

10:46 21  I have grown up in.  This is the work that I

10:46 22  have deep expertise in, in relation to the --

10:46 23  in relation to the crafting and implementation

10:46 24  and operationalizing of global international

10:46 25  standards within domestic spaces.

62

10:47  1          In terms of my research work,

10:47  2    this work has been reflected in a number of

10:47  3    papers as well as in my policy work.  So, for

10:47  4    example, in the extraterritorial regulation of

10:47  5    clearinghouses, I explore the international

10:47  6    regulation of clearinghouses, how divergent

10:47  7    standards post Dodd-Frank have been dealt with

10:47  8    in the context of clearinghouses.

10:47  9          I have a paper in the Vanderbilt

10:47  10   Journal of Transnational -- in the Vanderbilt

10:47  11   Transnational Law Journal that speaks to the

10:47  12   international regulation of Fintech in the

10:47  13   context of our global financial stability

10:47  14   board standards.

10:47  15         In addition, I have engaged with

10:47  16   policy work that -- that is directly concerned

10:47  17   with the implementation of the G20's

10:47  18   Pittsburgh agenda into financial market

10:47  19   systems, and that was with the Atlanta council

10:47  20   where I focused on chapters in relation to

10:48  21   derivatives and clearinghouses.

10:48  22         And in addition, obviously, I

10:48  23   have worked with the -- I have been an

10:48  24   honorary advisor to the Indian Financial

10:48  25   Services Law Reform Commission, where I was

                                                    63

```
10:48   1    advising on the implementation of

10:48   2    international financial regulatory standards

10:48   3    into the domestic framework for the Indian

10:48   4    financial market and for their proposed

10:48   5    reforms that were underway at that time.

10:48   6                In addition, this international

10:48   7    standard setting work that you referenced is

10:48   8    something that has come up also in the context

10:48   9    of my policy work with the CFTC.

10:48  10                There in meetings with the CFTC,

10:48  11    I have discussed aspects of international

10:48  12    financial standards in the context of

10:48  13    discussions that were underway at the

10:48  14    technology advisory committee meetings that

10:48  15    were ongoing at that time.

10:48  16          Q.   Turning now to paragraph 3 of

10:48  17    your report, and I want to look at the last

10:49  18    sentence of that paragraph where you say, sort

10:49  19    of, starting in the middle of the sentence:

10:49  20                "My research has focused on how

10:49  21          effectively international standards can

10:49  22          apply in this area and the implications

10:49  23          of divergent jurisdictional approaches

10:49  24          to the supervision of highly mobile and

10:49  25          geographically dispersed cross-border
```

64

10:49  1          technologies (e.g., cryptocurrencies)."

10:49  2                Do you see that?

10:49  3          A.    I do, yes.

10:49  4          Q.    Am I understanding correctly

10:49  5    that, based on the example you provide in that

10:49  6    sentence, that you believe that

10:49  7    cryptocurrencies are highly mobile and

10:49  8    geographically dispersed cross-border

10:49  9    technologies?

10:49 10          A.    Cryptocurrencies can be mobile

10:49 11    and geographically dispersed technologies.

10:50 12          Q.    And as you use it in your report,

10:50 13    what does the term "highly mobile" mean?

10:50 14          A.    Cryptocurrencies can be traded on

10:50 15    a cross-border basis.  They can be traded by

10:50 16    people who are moving between jurisdictions.

10:50 17    They can be traded on various blockchains that

10:50 18    are global in nature and whose nodes are

10:50 19    global in nature.

10:50 20          Q.    And as you use it in your report,

10:50 21    what does "geographically dispersed" mean?

10:50 22          A.    "Geographically dispersed" means

10:50 23    not confined necessarily to one country.

10:50 24          Q.    And as you use it in your report,

10:50 25    what does "cross-border" mean?

65

10:50  1          A.    Again, not confined to one

10:51  2    country but going between different countries.

10:51  3          Q.    Turning to paragraph 4 of your

10:51  4    report, in the middle of the paragraph, you

10:51  5    say:

10:51  6              "My focus lies in determining

10:51  7              whether unique aspects about the design

10:51  8              and structure of cryptocurrency

10:51  9              exchanges will impact their capacity to

10:51 10              deliver robust oversight of the

10:51 11              marketplace and users."

10:51 12          Do you see that?

10:51 13          A.    I do, yes.

10:51 14          Q.    What "unique aspect" are you

10:51 15    referring to in that sentence?

10:51 16          A.    So, for example, one unique

10:51 17    aspect of cryptocurrency design, exchange

10:51 18    design, is the fact that they tend to engage

10:52 19    in their own clearing and settlement and

10:52 20    custody of the assets being traded.

10:52 21              That is different and divergent

10:52 22    from current practices that traditional

10:52 23    exchanges deploy, and that has been referenced

10:52 24    in my report as well.

10:52 25              So current traditional exchanges

66

10:52  1    tend to rely on specialized clearinghouses,

10:52  2    for example, like Depository Trust and

10:52  3    Clearing Corporation or CME.  The Chicago CME

10:52  4    clearing, Chicago Mercantile Exchange

10:52  5    Clearing, ICE clearing as well, they rely on

10:52  6    specialist clearinghouses to provide clearing

10:52  7    services as well as custody services for

10:52  8    assets.

10:52  9             Now, looking at cryptocurrency

10:52 10    exchanges by contrast, they tend to clear

10:52 11    in-house, meaning that they tend to -- they

10:52 12    tend to modify the books and records of their

10:53 13    exchange itself and modify user records to

10:53 14    reflect the trading and the gains of different

10:53 15    users on the exchange using an internal -- an

10:53 16    internal system of clearing -- pardon me, of

10:53 17    clearing in this regard.

10:53 18             That has several implications for

10:53 19    the ability of cryptocurrency exchanges to

10:53 20    deliver private oversight.  Most notably, in

10:53 21    my paper, I argue that it can be a real

10:53 22    incentive for cryptocurrency exchanges to do a

10:53 23    good job in delivering cryptocurrency exchange

10:53 24    oversight.

10:53 25             And the reason for that is that

                                                        67

10:53  1    cryptocurrency exchanges are more centralized

10:53  2    than traditional marketplaces are, because

10:53  3    they are centralizing and internalizing this

10:53  4    clearing and settlement function.

10:53  5              So to just give you one example

10:53  6    that is a unique aspect of cryptocurrency

10:53  7    exchange design that is different from

10:53  8    traditional exchanges.

10:53  9              Nevertheless, as I've detailed

10:53 10    throughout this paper, opinion, as well as

10:54 11    discussed in my research paper, cryptocurrency

10:54 12    exchanges also harness a lot of similarities

10:54 13    with traditional exchanges like the New York

10:54 14    Stock Exchange, NASDAQ, CME, and others,

10:54 15    meaning that we really have to think deeply

10:54 16    about distinguishing features of

10:54 17    cryptocurrency exchanges to think about

10:54 18    potential ways in which they may be subject to

10:54 19    certain risks that are different from the

10:54 20    traditional risks that are -- that they're

10:54 21    subject to common to other types of exchanges

10:54 22    and marketplaces.

10:54 23         Q.    Okay.  Turning to paragraph 5 of

10:54 24    your report, and looking at the last sentence

10:54 25    where you say:

68

10:54  1            "For example, in discussing
10:54  2        cryptocurrencies, I seek to provide
10:54  3        students with an overview of the
10:54  4        computational principles that are
10:55  5        utilized in the creation of
10:55  6        cryptocurrencies like Bitcoin (e.g., to
10:55  7        explain the need for mining within its
10:55  8        decentralized blockchain)."
10:55  9            Do you see that?
10:55 10        A.    I do, yes.
10:55 11        Q.    And when you refer in this
10:55 12   sentence to "decentralized blockchain," what
10:55 13   do you mean by that?
10:55 14        A.    I refer to traditional
10:55 15   blockchains in the context of Bitcoin and
10:55 16   Ethereum in particular.  Those are the ones
10:55 17   that I focus on in my course.
10:55 18        Q.    And what does the term
10:55 19   "decentralization" mean as applied to
10:55 20   blockchains?
10:55 21        A.    So just in a general level, how I
10:55 22   teach it really references the use of multiple
10:55 23   different nodes within -- multiple different
10:55 24   nodes within the blockchain that don't
10:55 25   necessarily know each other.

                                              69

10:56  1          Q.    Are you offering an opinion in

10:56  2    this case about whether or not the bitcoin

10:56  3    blockchain is decentralized?

10:56  4          A.    I am not.

10:56  5          Q.    Do you have an opinion on whether

10:56  6    or not the bitcoin blockchain is

10:56  7    decentralized?

10:56  8          A.    I do not.

10:56  9          Q.    Are you offering an opinion about

10:56 10    whether or not the XRP ledger is

10:56 11    decentralized?

10:56 12          A.    I am not.

10:56 13          Q.    Do you have an opinion about

10:56 14    whether or not the XRP ledger is

10:56 15    decentralized?

10:56 16          A.    I do not.

10:56 17          Q.    Turning to paragraph 9 of your

10:57 18    report, you say:

10:57 19                "For example, in "The Broken Bond

10:57 20                Market" (with Professor Jonathan

10:57 21                Brogaard), I studied over-the-counter

10:57 22                bond market microstructure to develop an

10:57 23                understanding of why bond markets appear

10:57 24                to lack attributes like liquidity and

10:57 25                transparency."

                                                          70

10:57  1                    Do you see that?

10:57  2            A.    I do, yes.

10:57  3            Q.    What is "liquidity" as you use it

10:57  4     in your report?

10:57  5            A.    As I use it in my report or as I

10:57  6     use it in this paper?

10:57  7            Q.    Well, as you use it in your

10:57  8     reference to this paper in your report.

10:57  9            A.    Ah, okay.  The liquidity that I'm

10:57 10     referencing in the broken bond market refers

10:57 11     to the ability of bonds to be able to trade in

10:57 12     a smooth manner where the trading is cheap,

10:58 13     where the trading is -- where there's

10:58 14     plentiful ability of market makers to enter

10:58 15     and exit and provide opportunities for

10:58 16     trading, and for the trading not to impact the

10:58 17     prices when investors potentially undertake a

10:58 18     large order.

10:58 19                    So the liquidity that is detailed

10:58 20     and discussed in this paper is referencing the

10:58 21     inability of the bond market to create a

10:58 22     marketplace where investors can enter and exit

10:58 23     the bond market with ease, do so cheaply, and

10:58 24     do so in a way where their actions do not

10:58 25     necessarily impact prices in the market.

71

10:58  1              I should add that one of the

10:58  2     aspects that is important here is also the

10:58  3     ability of prices to be informative.  So that

10:58  4     is a corollary of the liquidity that is

10:58  5     discussed in this paper.

10:59  6          Q.    When you say "that is a corollary

10:59  7     of the liquidity discussed in this paper," can

10:59  8     you explain to me what you mean by that?

10:59  9          A.    Certainly.  What that means is

10:59 10     that the liquidity would encourage a broad

10:59 11     swath of traders to enter the market, would

10:59 12     afford informed, uniformed, other traders to

10:59 13     be part of the market.  This is discussed as

10:59 14     part of my work in this opinion as well.

10:59 15              And it offers a way for

10:59 16     that -- the information that is contained in

10:59 17     that trading to then be reflected in the

10:59 18     prices at which the assets are being traded.

10:59 19          Q.    And as you use it in your report

10:59 20     with respect to the paper that you're

10:59 21     referring to in paragraph 9, what does the

10:59 22     term "transparency" mean?

10:59 23          A.    Part of the transparency that is

10:59 24     discussed here is in relation to pretrade

11:00 25     transparency in the bond market.

                                                        72

11:00  1              One of the unique features of our
11:00  2      bond market today, which is surprising, is
11:00  3      that it lacks, for the most part, pretrade
11:00  4      transparency, which means that the
11:00  5      infrastructure for trading in the market does
11:00  6      not advertise systematically the prices at
11:00  7      which the bonds are being offered by the
11:00  8      different dealers.
11:00  9              Dealers have a lot of discretion
11:00 10      in the prices that they quote in the
11:00 11      over-the-counter market for bond trading, and
11:00 12      what that means, essentially, is that there is
11:00 13      a lack of pretrade transparency in the bond
11:00 14      market that implies that investors entering
11:00 15      the market do not always know the prices at
11:00 16      which they are likely to execute the
11:00 17      transactions they are looking to get into.
11:00 18          Q.    Are liquidity and transparency
11:01 19      important in cryptocurrency markets?
11:01 20              MS. ZORNBERG:  Object to form.
11:01 21          A.    That is a broad question.
11:01 22      Liquidity and transparency are aspects that
11:01 23      are arguably quite contentious, even in the
11:01 24      traditional market.
11:01 25              So in the context of the

73

11:01 1    traditional market, for example, transparency

11:01 2    is something that is not always provided by

11:01 3    the market, sometimes deliberately not

11:01 4    provided by the market.

11:01 5              So, for example, when one looks

11:01 6    at transparency, there is a lack of

11:01 7    transparency even in the equity market, which

11:01 8    is supposedly one of the most transparent

11:01 9    markets in our system today.

11:01 10             If one takes a look at dark

11:01 11   pools, for example, which are a part of our

11:01 12   equity market structure trading system, there

11:01 13   is a lack of pretrade transparency even on

11:01 14   those dark pools.

11:01 15             However, policy considers some of

11:02 16   this lack of transparency to be desirable in

11:02 17   order to afford investors a choice about how

11:02 18   they wish to execute their trades.

11:02 19             In addition, as we just

11:02 20   discussed, the treasury market lacks

11:02 21   transparency on multiple different measures,

11:02 22   and oftentimes that is by design, in order to

11:02 23   prevent potential systemic damage arising from

11:02 24   the trading of treasury.

11:02 25             So in asking about cryptocurrency

74

11:02  1    market, it's a very, very difficult question.

11:02  2    There is a lack of empirical study about the

11:02  3    trading structure in this market that could

11:02  4    give credible responses about some of the

11:02  5    aspects of transparency and liquidity that you

11:02  6    were discussing.

11:03  7         Q.    As part of your work for the CFTC

11:03  8    technology advisory committee that you

11:03  9    referenced today, did you participate in any

11:03 10    discussions regarding Ripple or XRP?

11:03 11         A.    Not that I can recall, no.

11:03 12         Q.    As part of your work on that

11:03 13    committee, did you conduct any research or

11:03 14    analysis of Ripple or XRP?

11:03 15         A.    Not that I can recall.

11:03 16         Q.    Looking at paragraph 18 of your

11:03 17    report, you say:  "I am being compensated at

11:03 18    my ordinary hourly rate of $800 per hour."

11:03 19              Do you see that?

11:03 20         A.    I do, yes.

11:03 21         Q.    What do you mean by "ordinary

11:03 22    hourly rate"?

11:03 23         A.    Just the normal rate.

11:03 24         Q.    Okay.  Have you charged that rate

11:04 25    for other engagements?

75

11:04  1          A.    I have not, no.

11:04  2          Q.    So what makes it ordinary?

11:04  3                MS. ZORNBERG:  Objection.  Object

11:04  4          to form.

11:04  5          A.    It's just that -- it's just the

11:04  6    normal rate for me.

11:04  7          Q.    Have you charged a different rate

11:04  8    for other engagements?

11:04  9          A.    I have not had other engagements.

11:04 10          Q.    Turning now to paragraph 19 of

11:04 11    your report, you say:

11:04 12                "I have been asked by counsel for

11:04 13          Ripple to offer an opinion on how offers

11:04 14          to buy and sell, and trades of,

11:04 15          cryptocurrencies are made on

11:04 16          cryptocurrency exchanges, the location

11:04 17          of those offers and trades, and the

11:04 18          location of various cryptocurrency

11:04 19          exchanges."

11:04 20                Do you see that?

11:04 21          A.    I do, yes.

11:05 22          Q.    Is this an accurate description

11:05 23    of the scope of your assignment in this

11:05 24    matter?

11:05 25          A.    Yes, it is.

76

11:05  1          Q.    As you use the terms in this

11:05  2    sentence and in your report, what are "offers

11:05  3    to buy and sell cryptocurrencies made on

11:05  4    cryptocurrency exchanges"?

11:05  5          A.    I'm not sure -- I don't

11:05  6    understand the question.

11:05  7          Q.    Can you explain to me what you

11:05  8    mean when you say "offers to buy and sell

11:05  9    cryptocurrencies on cryptocurrency exchanges"?

11:05 10          A.    What I generally mean by that are

11:05 11    offers that are submitted into cryptocurrency

11:05 12    exchanges in order to buy and sell

11:06 13    cryptocurrencies on that exchange that are

11:06 14    then matched by the exchange and made final on

11:06 15    those exchanges.

11:06 16          Q.    And as you use it in this

11:06 17    sentence we just read in paragraph 19 and

11:06 18    throughout your report, what are "trades of

11:06 19    cryptocurrencies made on cryptocurrency

11:06 20    exchanges"?

11:06 21          A.    "Trades" references transactions

11:06 22    that are consummated.  In other words, once an

11:06 23    offer to trade, meaning an offer to buy or

11:06 24    sell a cryptocurrency, is matched by the

11:06 25    exchange in accordance with its rules and

77

11:06  1    processes, that then becomes a consummated

11:06  2    transaction, in other words, a trade.

11:06  3         Q.   As you use the term in your

11:06  4    report, does "offer" refer to a trade order?

11:07  5         A.   An "offer" refers to an offer to

11:07  6    buy or sell a cryptocurrency.

11:07  7         Q.   So as you use it in your report,

11:07  8    an "offer" does not refer to a trade order?

11:07  9         A.   I don't know what you mean by

11:07 10    "trade order."

11:07 11         Q.   You don't understand what the

11:07 12    term "trade order" means generally?

11:07 13              MS. ZORNBERG:  Objection.

11:07 14              You can answer.

11:07 15         A.   An order to trade?  Yes.  "Trade

11:07 16    order," that's not a term I'm -- that comes up

11:07 17    very often.

11:07 18         Q.   What is an order to trade?

11:07 19         A.   Meaning an order to buy or sell a

11:07 20    cryptocurrency on an exchange that is made in

11:07 21    accordance with the exchange's specific rules

11:07 22    and processes for submitting an order into

11:07 23    that exchange.

11:07 24         Q.   So as you just defined the term

11:07 25    "order of trade," is that what you're

78

11:07  1    referring to when you use the word "offer" in
11:08  2    your report?
11:08  3            A.    That's really broad.  The -- you
11:08  4    know, I'd have to go through my whole report
11:08  5    for various uses here.  Certainly in the
11:08  6    scope, the order that I'm referring is the
11:08  7    order to buy and sell a cryptocurrency.
11:08  8            Q.    As you use it in paragraph 19,
11:08  9    would it be accurate to say that "the offer to
11:08 10    buy and sell a cryptocurrency" refers to an
11:08 11    order of trade to buy or sell a
11:08 12    cryptocurrency?
11:08 13            A.    Refers to an order to buy and
11:08 14    sell a cryptocurrency on an exchange made in
11:08 15    accordance with the rules and processes of
11:08 16    that exchange.
11:08 17            Q.    Is your opinion in this case
11:08 18    limited to offers and trades of
11:09 19    cryptocurrencies on cryptocurrency exchanges?
11:09 20                  MS. ZORNBERG:  Object to form.
11:09 21                  You can answer.
11:09 22            A.    Yes, it is.
11:09 23            Q.    In your opinion, is it possible
11:09 24    for an offer for a cryptocurrency on an
11:09 25    exchange to occur at a different place than

79

11:09  1    the trade for that cryptocurrency?

11:09  2         A.    Could you repeat the question,

11:09  3    please.

11:09  4         Q.    In your opinion, is it possible

11:09  5    for an offer for a cryptocurrency on an

11:09  6    exchange to occur at a different place than

11:09  7    the trade for that cryptocurrency?

11:09  8         A.    No.  In my opinion, an offer that

11:09  9    is made to trade a cryptocurrency, in other

11:09 10    words, an offer that is made to buy or sell a

11:09 11    cryptocurrency is made on that exchange in

11:09 12    accordance with the rules and processes of

11:09 13    that exchange.

11:09 14              It is then matched by that

11:10 15    exchange in accordance with its rules and

11:10 16    processes, and it becomes final on that

11:10 17    exchange in accordance with its rules and

11:10 18    processes.

11:10 19         Q.    So would you agree that an offer

11:10 20    for a cryptocurrency on an exchange is

11:10 21    transmitted to the exchange from the place the

11:10 22    person making the offer is located?

11:10 23              MS. ZORNBERG:  Object to form.

11:10 24         A.    No.  The exchange receives the

11:10 25    order in accordance with its own order

80

11:10  1    submission mechanisms.  How that is

11:10  2    transmitted is not particularly relevant or

11:10  3    germane or always known to the exchange.

11:10  4         Q.    Putting aside whether it's

11:10  5    relevant or germane or known to the exchange,

11:11  6    is it fair to say that an offer for

11:11  7    cryptocurrency is transmitted to the exchange

11:11  8    from the place that the person making that

11:11  9    offer is located at the time he or she makes

11:11 10    that offer?

11:11 11              MS. ZORNBERG:  Object to form.

11:11 12         A.    It's very broad.  The offer to

11:11 13    buy or sell a cryptocurrency is made in

11:11 14    accordance with the exchange's own order

11:11 15    submission system.

11:11 16         Q.    So you can't answer my question

11:11 17    about whether an offer is transmitted from the

11:11 18    place of the person transmitting the offer is

11:11 19    located?

11:11 20         A.    The order takes on a form only

11:11 21    under the rules and processes of the exchange

11:11 22    itself.  In other words, an order becomes an

11:11 23    order only when it enters the submission

11:11 24    system that the exchange deploys in order to

11:11 25    vet incoming instructions, to take those

81

11:11 1     instructions, to make them into viable orders

11:12 2     to buy and sell a cryptocurrency.  That order

11:12 3     only becomes an order in accordance with the

11:12 4     rules and processes of the exchange itself.

11:12 5          Q.    Looking at paragraph 20 of your

11:12 6     report, you say:

11:12 7               "I also requested, reviewed, and

11:12 8          considered additional materials,

11:12 9          information, and documents."

11:12 10              Do you see that sentence?

11:12 11         A.    I do, yeah.

11:12 12         Q.    Is all of the material that you

11:12 13    requested, reviewed, and considered reflected

11:12 14    either in Exhibit B to your report or in the

11:12 15    footnotes to your report?

11:12 16         A.    Yes.  Although, as you can see,

11:13 17    I've also relied on my, sort of, general

11:13 18    academic knowledge as well as my own

11:13 19    professional experience and judgment.

11:13 20         Q.    Who did you request materials

11:13 21    from?

11:13 22              MS. ZORNBERG:  Objection.  Asked

11:13 23         and answered.

11:13 24              You can answer again but without

11:13 25         disclosing the substance of

82

11:13 1          communications with counsel.

11:13 2          A.    I requested material from

11:13 3    counsel.

11:13 4          Q.    Anyone other than counsel?

11:13 5          A.    No.

11:13 6          Q.    Without getting into the

11:13 7    specifics, did counsel supply any facts that

11:13 8    you considered in forming your opinions?

11:13 9          A.    No.

11:13 10         Q.    Did counsel supply any data that

11:13 11   you considered in forming your opinion?

11:14 12               MS. ZORNBERG:  Object to form.

11:14 13         A.    The only thing I received from

11:14 14   counsel was in relation to the Table A

11:14 15   exchanges and that's it.

11:14 16         Q.    Did counsel supply any

11:14 17   assumptions that you relied on in forming your

11:14 18   opinions?

11:14 19         A.    No, they did not.

11:14 20         Q.    So I want to turn now to Exhibit

11:14 21   B of your report.

11:14 22               MS. ZORNBERG:  I don't know,

11:14 23         Ms. Stewart, if -- we're coming up on

11:14 24         another hour.  Just at some point, I'd

11:14 25         be interested in taking a five-minute

                                                      83

11:14   1        break.

11:14   2            MS. STEWART:  Sure.  Now is fine.

11:14   3            THE VIDEOGRAPHER:  The time now

11:14   4        is 11:14 a.m.  This concludes Media 2.

11:14   5        Off the record.

11:41   6            (Recess taken from 11:14 a.m. to

11:41   7        11:40 a.m.)

11:41   8            THE VIDEOGRAPHER:  The time now

11:41   9        is 11:40 a.m.  This begins Media 3.  On

11:41 10        the record.

11:41 11   EXAMINATION BY

11:41 12   MR. SYLVESTER:

11:41 13        Q.   Professor, you testified earlier

11:41 14   today that you were generally aware that XRP

11:41 15   was traded on digital asset platforms prior to

11:41 16   your retention as an expert witness in this

11:41 17   case.  Correct?

11:41 18        A.   That's correct.

11:41 19        Q.   Okay.  Again, prior to your

11:41 20   retention as an expert witness, what, if

11:41 21   anything, was your understanding about any

11:41 22   link between XRP's role in facilitating

11:41 23   international payment transactions and its

11:41 24   trading on digital asset platforms?

11:41 25        A.   I didn't have any particular

84

11:41  1   knowledge in that regard.

11:41  2         Q.    Did you know whether the trading

11:41  3   and the facilitation of international payment

11:41  4   transactions were linked in any way?

11:41  5         A.    I'm sorry, could you repeat the

11:41  6   question.

11:41  7         Q.    Sure.  Did you know whether XRP's

11:41  8   trading on digit asset trading platforms and

11:41  9   its use in facilitating international payment

11:42 10   transactions were linked in any way?

11:42 11         A.    No, I --

11:42 12         MS. ZORNBERG:  Object to form.

11:42 13         A.    I had no real knowledge in that

11:42 14   regard.

11:42 15         Q.    Okay.  Can we turn to Table A of

11:42 16   your report, please.

11:42 17         A.    Sure.

11:42 18         Q.    It's on page 59.  Earlier today

11:42 19   we discussed that you asked counsel to do

11:42 20   research into certain digital asset trading

11:42 21   platforms.  Is that correct?

11:42 22         A.    I asked counsel to help me do

11:42 23   research on the exchanges set out in Table A.

11:42 24         Q.    Okay.  And are the results of

11:42 25   counsel's research reflected in Table A?

85

11:42   1                    MS. ZORNBERG:  Objection.

11:42   2                    First of all, I think it's -- I

11:43   3            think you're asking about -- I'm

11:43   4            going --

11:43   5                    Professor Yadav, you can answer

11:43   6            without disclosing conversations with

11:43   7            counsel.

11:43   8                    I also just object to the form.

11:43   9            A.    Counsel helped me do research.

11:43  10    The research that is reflected in Table A

11:43  11    reflects counsel's help as well as, obviously,

11:43  12    my research and my review and consideration of

11:43  13    the work provided to me by counsel.

11:43  14            Q.    After receiving the research that

11:43  15    counsel conducted related to what is presently

11:43  16    displayed in Table A, what changes, if any,

11:43  17    did you make to that information that you

11:43  18    received from counsel?

11:43  19                    MS. ZORNBERG:  Objection.

11:43  20            Assumes facts not in evidence.  Lack of

11:44  21            foundation.

11:44  22            Q.    You can answer if you can.

11:44  23            A.    Could you repeat the question.

11:44  24                    MR. SYLVESTER:  Could you read

11:44  25            her that back, madam court reporter.

                                                            86

11:44    1                    (Record read by the certified

         2            stenographer as follows:

         3                    "QUESTION:  After receiving the

         4            research that counsel conducted related

         5            to what is presently displayed in Table

         6            A, what changes, if any, did you make to

         7            that information that you received from

11:44    8            counsel?")

11:44    9                    MS. ZORNBERG:  Same objection.

11:44   10                    You can answer.

11:44   11            A.    It's very hard to recall specific

11:44   12    changes here.

11:44   13            Q.    Sitting here today, can you

11:44   14    recall whether you made any changes?

11:44   15            A.    I would imagine I did, yes.

11:44   16    Sitting here today, I would imagine so.

11:44   17            Q.    To make sure I understand your

11:44   18    answer, drawing a distinction between having a

11:45   19    recollection and assuming you might have, do

11:45   20    you have a recollection that you made changes?

11:45   21            A.    I have a recollection that I made

11:45   22    changes.

11:45   23            Q.    Okay.

11:45   24            A.    I can't say which ones.

11:45   25            Q.    Let's take a look at Exhibit B to

                                                                  87

11:45  1    your report.

11:45  2              With respect to the Bates-stamped

11:45  3    materials beginning on page 3, did you request

11:45  4    any of these documents from counsel?

11:45  5         A.   I'm sorry, which materials are

11:45  6    you referring to?

11:45  7         Q.   There's a subheading on page 3 of

11:45  8    Exhibit B that's entitled "Bates-stamped

11:45  9    materials."

11:45 10              Do you see that?

11:45 11         A.   "Bates-stamped materials"?

11:46 12         Q.   Yes.  So my question was whether

11:46 13    you requested from counsel any of the

11:46 14    documents that are listed under the subheading

11:46 15    "Bates-stamped materials."

11:46 16         A.   I requested "Terms of Use"

11:46 17    certainly, yes.

11:46 18         Q.   How about the documents ending

11:46 19    with the Bates-stamped digits and prior to the

11:46 20    digits RFA that are listed on page 6?

11:46 21         A.   I'm sorry.  I don't --

11:46 22              MS. ZORNBERG:  Object to form.

11:46 23         A.   I'm so sorry.  I can't find the

11:47 24    material you're referencing on page 6.

11:47 25         Q.   So do you see on the top of page

                                                          88

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

11:47  1    6, there's a number of bullets?

11:47  2         A.    Yes.

11:47  3         Q.    Okay.  And do you see how the --

11:47  4    my understanding is that after each bullet is

11:47  5    a reference to a document by Bates stamp.  Is

11:47  6    that correct?

11:47  7              MS. ZORNBERG:  Object to form.

11:47  8         Q.    Do you need me to clarify?

11:47  9         A.    Yes, please.  Because I'm not

11:47 10    sure I'm looking at the same thing.

11:47 11         Q.    I'm on Exhibit B, "Materials

11:47 12    Considered and Relied Upon," and page 6 of

11:47 13    Exhibit B.

11:47 14         A.    I'm on page 6.

11:47 15         Q.    Okay.  And at the top of page 6,

11:47 16    are you looking at a series of approximately

11:47 17    ten bullets?

11:48 18         A.    11.

11:48 19         Q.    Okay.  And do each of those

11:48 20    bullets end with a digit?

11:48 21         A.    They do.

11:48 22         Q.    And at the prior -- strike that.

11:48 23              Prior to the digits, do you see

11:48 24    the letters RFA for each of those bullets?

11:48 25         A.    I do.

89

11:48  1          Q.    Okay.  Do you understand each of

11:48  2     those bullets to be a reference to a document?

11:48  3          A.    I do.

11:48  4          Q.    Okay.  Did you request the

11:48  5     documents referenced by those bullets at the

11:48  6     top of page 6?

11:48  7          A.    I really --

11:48  8                MS. ZORNBERG:  Objection.

11:48  9          A.    I can't recall.  I'm sorry.

11:48 10          Q.    Did you review each of the

11:48 11     documents that are listed in Exhibit B?

11:48 12          A.    As far as I can recall, I

11:48 13     reviewed the documents listed in Exhibit B.

11:48 14          Q.    Turning to page 8 of your Exhibit

11:49 15     B, do you see where it says "Statutes and

11:49 16     Regulations"?

11:49 17          A.    Yes, I do.

11:49 18          Q.    And under Statutes and

11:49 19     Regulations, there is one statute and one

11:49 20     regulation listed.  Do you see that?

11:49 21          A.    Yes, I do.

11:49 22          Q.    How did those -- strike that.

11:49 23                How did that statute and that

11:49 24     regulation inform your opinions in this case?

11:49 25          A.    This was, I believe, a general

                                                        90

11:49  1  reference to the role played by traditional

11:49  2  exchanges as overseers of marketplaces in the

11:49  3  report.

11:49  4       Q.   Did you consider Section 5 of the

11:49  5  Securities Act of 1933 as part of your

11:49  6  opinion?

11:49  7       A.   I did not.  I'm not here to give

11:49  8  a legal opinion.  I'm here as a market

11:49  9  structure expert.

11:49 10       Q.   Are you offering any opinion

11:49 11  regarding whether or not defendants violated

11:49 12  Section 5 as part of the conduct at issue in

11:50 13  this matter?

11:50 14       A.   I am not.

11:50 15       Q.   Did you consider any case law as

11:50 16  part of your opinion?

11:50 17       A.   I don't believe I did.

11:50 18       Q.   Are you familiar with the United

11:50 19  States Supreme Court's United States versus

11:50 20  Morrison decision?

11:50 21       A.   I'm not here as a legal expert.

11:50 22  I am here as a expert in market structure and

11:50 23  would prefer to talk about market structure.

11:50 24       Q.   Be that as it may, are you

11:50 25  familiar with that decision?

91

11:50  1          A.    I am, yes.

11:50  2          Q.    Are you offering an opinion on

11:50  3    whether the supreme court's holding in United

11:50  4    States versus Morrison applies to the conduct

11:50  5    at issue in this case?

11:50  6          A.    I'm not offering an opinion.

11:50  7          Q.    Okay.  Does the opinion in United

11:50  8    States versus Morrison inform your opinion at

11:50  9    all in this case?

11:50 10               MS. ZORNBERG:  Objection.

11:50 11          A.    No, it does not.

11:50 12          Q.    Are you offering an opinion as to

11:50 13    whether the supreme court's holding in United

11:50 14    States versus Morrison extends to Section 5 of

11:50 15    the Securities Act?

11:50 16          A.    I'm not offering that opinion.

11:51 17          Q.    Are you offering any opinion on

11:51 18    the efficiency of the XRP market?

11:51 19          A.    No.

11:51 20               MS. ZORNBERG:  Object to form.

11:51 21          A.    No.

11:51 22          Q.    Do you understand the question

11:51 23    that I just asked?

11:51 24          A.    I believe so.

11:51 25          Q.    Okay.  Let's turn to paragraph 32

                                                        92

11:51  1    of your report, please.  That's on page 17.

11:51  2              The second sentence says:

11:51  3              "To operationalize trading,

11:51  4         cryptocurrency exchanges utilize key

11:51  5         conventions that have long been relied

11:51  6         on by traditional venues to enable order

11:51  7         submission, matching, trade execution,

11:51  8         and information dissemination."

11:52  9              Do you see that?

11:52 10              MS. ZORNBERG:  Mark, if you could

11:52 11         just slow down a little in your

11:52 12         questioning, I'd appreciate it.

11:52 13              MR. SYLVESTER:  Sure.

11:52 14         A.    I'm sorry.  Which paragraph are

11:52 15    you referring to?

11:52 16         Q.    It's paragraph 32 and I just read

11:52 17    into the record the second sentence.

11:52 18         A.    Paragraph 32.  Okay.  Sorry.

11:52 19         Q.    My question is:  Which key

11:53 20    conventions are you referring to in that

11:53 21    sentence?

11:53 22         A.    As described in detail in the

11:53 23    report, there are a number.  For example, in

11:53 24    relation to order submission, order matching,

11:53 25    the kind of central limit order book

                                              93

11:53  1    convention that is deployed in cryptocurrency

11:53  2    exchanges to match transactions and conclude

11:53  3    them and finalize them, for example.

11:53  4         Q.    How did you determine that crypto

11:53  5    exchanges utilized the key conventions you

11:53  6    just listed?

11:53  7         A.    This was based off of my own

11:53  8    research as well as through the review of the

11:53  9    terms of service of the exchanges, 24 of the

11:53 10    exchanges set out in Table A.

11:53 11         Q.    When you say your "own research,"

11:54 12    are you referring to research you conducted in

11:54 13    preparing your expert opinion or different

11:54 14    research?

11:54 15         A.    My general research into market

11:54 16    structure as well as the general research I do

11:54 17    into cryptocurrency markets as part of my

11:54 18    work.

11:54 19         Q.    Is the research that you just

11:54 20    described research that you conducted separate

11:54 21    from forming your opinion in this case?

11:54 22         A.    The research that I have relied

11:54 23    on is set out in the footnotes to this

11:54 24    opinion.

11:54 25         Q.    Turning to paragraph 33, about

94

11:54  1    midway through the paragraph, you write:

11:54  2                "Instead, the exchange's 'floor'

11:54  3           is more accurately seen as a function of

11:54  4           its internal computerized matching

11:54  5           engines."

11:54  6           Do you see that?

11:54  7    A.    I do, yes.

11:54  8    Q.    Why is it -- strike that.

11:54  9           What properties of a trading

11:54 10    floor are now reflected with respect to

11:55 11    cryptocurrency exchanges in internalized

11:55 12    computerized matching engines?

11:55 13           MS. ZORNBERG:  Object to form.

11:55 14    A.    This paragraph references

11:55 15    traditional financial markets, as in

11:55 16    traditional financial exchanges and not

11:55 17    necessarily crypto exchanges.

11:55 18           However, the "floor," as it's

11:55 19    referenced here, means the order submission,

11:55 20    order matching, and finalizing is done in an

11:55 21    electronic and dematerialized way.

11:55 22    Q.    And is the description of the

11:55 23    floor that you just gave with respect to

11:55 24    traditional exchanges also true of

11:55 25    cryptocurrency exchanges?

                                                      95

11:55  1          A.    As set out in my opinion,

11:55  2   cryptocurrency exchanges deeply borrow the

11:55  3   order submission, matching, finalizing

11:55  4   conventions from traditional marketplaces,

11:55  5   yes.

11:55  6          Q.    What is an internal computerized

11:56  7   matching engine?

11:56  8          A.    An internal computerized matching

11:56  9   engine references the matching protocols used

11:56 10   by the exchange that take incoming orders and

11:56 11   match them in accordance with preset rules to

11:56 12   finalize a trade on the exchange.

11:56 13          Q.    Can you explain what you mean by

11:56 14   the word "protocols"?

11:56 15          A.    A protocol references the

11:56 16   algorithms, essentially, that are programmed

11:56 17   to deploy a certain matching convention.  For

11:56 18   example, many central limit order books that

11:56 19   matching engines use, use a price-time

11:56 20   priority convention, which is referenced and

11:56 21   detailed in the report.

11:56 22          Q.    When you say "algorithms," are

11:56 23   you referencing a computer software?

11:56 24              MS. ZORNBERG:  Object to form.

11:56 25          A.    It's a broad question.  I'm not

96

11:56  1   an computer expert.  Based off my own

11:57  2   knowledge and research into the area, what I'm

11:57  3   referencing are essentially preprogrammed

11:57  4   computerized sequences that reflect a certain

11:57  5   protocol to match incoming orders.

11:57  6        Q.   I guess what I'm getting at is:

11:57  7   This matching is done by a computer, not by a

11:57  8   person receiving the order.  Is that fair?

11:57  9        A.   In electronic exchanges, the

11:57 10   matching is done automatically by algorithms

11:57 11   that receive the orders.

11:57 12        Q.   Computerized algorithms?

11:57 13        A.   Algorithms are computerized, yes.

11:57 14        Q.   The very last sentence of

11:57 15   paragraph 33, you state:

11:57 16             "In this way, the 'floor' or

11:57 17        'pit' is now very much electronic and

11:57 18        essentially dematerialized."

11:58 19             Do you see that?

11:58 20        A.   I do, yes.

11:58 21        Q.   What does "essentially

11:58 22   dematerialized" mean?

11:58 23        A.   Means it's essentially

11:58 24   electronic.

11:58 25        Q.   Going back to an internal

97

11:58  1    computerized matching engine, where is an

11:58  2    exchange's computerized matching engine

11:58  3    typically located?

11:58  4         A.    Depends on the exchange.

11:58  5         Q.    Can you give me one example?

11:58  6         A.    It's very hard to describe

11:58  7    exactly and answer the question exactly as you

11:58  8    state it.  The matching engines of an exchange

11:58  9    reflect a number of its roles and processes

11:58 10    which can't necessarily be confined to a

11:58 11    computer.

11:58 12         Q.    Can you say more about how they

11:59 13    can't be confined to a computer?

11:59 14         A.    For example, when you have the

11:59 15    central limit order book of an exchange, it

11:59 16    reflects the various rules and processes that

11:59 17    an exchange puts in place to make sure that

11:59 18    that central limit order book has actual

11:59 19    meaning.  In other words, when trades come in,

11:59 20    they become binding.

11:59 21         Q.    And in your view, are those

11:59 22    various rules and processes in a different

11:59 23    location than the internal computerized

11:59 24    matching engine?

11:59 25              MS. ZORNBERG:  Object to form.

98

11:59  1                    You can answer.

11:59  2           A.    Those rules and processes are a

11:59  3    function of the exchange itself, wherever that

11:59  4    exchange is located.

11:59  5           Q.    Are the rules and processes

11:59  6    themselves computer programs?

11:59  7           A.    Not necessarily, no.

11:59  8           Q.    Okay.  So I want to go back to

11:59  9    where an exchange's matching engine is

11:59 10    located.

12:00 11                    In your view, is -- does that

12:00 12    matching take place on the exchange's servers?

12:00 13           A.    Part of it may -- part of it will

12:00 14    take place -- there'll be a server involved

12:00 15    somewhere.  However, the matching process is

12:00 16    much more than an interaction on a server.

12:00 17                    It reflects the rules and

12:00 18    processes that give that order form, that give

12:00 19    that matching actual content, which means that

12:00 20    that bargain becomes binding and the exchange

12:00 21    moves forward to enforce that binding bargain

12:00 22    in accordance with its rules and processes.

12:00 23           Q.    Okay.  So part of the matching

12:00 24    takes place on a server.  Is that right?

12:00 25           A.    I'm not a computer expert.  I'm

99

12:00  1    not here to provide a expert -- expertise in

12:00  2    relation to computer science.  Some part of

12:00  3    that mechanical aspect of the matching may

12:00  4    take place on a server somewhere.

12:00  5           Q.   The mechanical aspect is exactly

12:00  6    what I'm getting at, and you're free to draw

12:00  7    any lines around your expert opinion.  But I

12:01  8    want to tease out what your opinions are about

12:01  9    that.  So --

12:01 10           MS. BUNTING:  Objection.

12:01 11           Q.   So is the -- what part of the

12:01 12    matching process takes place on the server?

12:01 13           A.   Again, I'm --

12:01 14           MS. ZORNBERG:  Objection.

12:01 15    Just --  objection.  Asked and answered.

12:01 16           You can answer again.

12:01 17           A.   I would dispute the contention

12:01 18    that the matching that takes place is anything

12:01 19    other than the interaction of one byte,

12:01 20    b-y-t-e, as it were, with another.

12:01 21           The actual matching, as it were,

12:01 22    is undertaken in accordance with the

12:01 23    exchange's preset rules, the central limit

12:01 24    order book, as well as its system of

12:01 25    governance that gives that matching form and

100

12:01  1    binding quality.

12:01  2        Q.    Does that interaction between two

12:01  3    bytes take place in any particular geographic

12:01  4    location, in your view?

12:01  5            MS. ZORNBERG:  Object to the

12:01  6        form.

12:01  7        A.    I have really no response to

12:02  8    that.  I don't know.

12:02  9        Q.    Is that interaction of bytes that

12:02 10    you just described necessary in order to

12:02 11    complete a trade on a cryptocurrency exchange?

12:02 12        A.    It is necessary but not

12:02 13    sufficient.

12:02 14        Q.    What else is needed?

12:02 15        A.    What else -- as detailed in the

12:02 16    report and as set out in my prior answer, what

12:02 17    is needed here is the rules and processes of

12:02 18    an exchange that ensure that matching has

12:02 19    formed, that ensure that the matching follows

12:02 20    a certain convention such as a price-time

12:02 21    priority model, that the exchange then honors

12:02 22    that bargain and forces that bargain as

12:02 23    between the parties concerned.

12:02 24        Q.    Geographically, where are the

12:02 25    rules and processes of an exchange located?

101

12:02  1          A.     On the exchange.

12:03  2          Q.     When you say "on the exchange,"

12:03  3    can you be more specific?

12:03  4                 MS. ZORNBERG:  Objection.

12:03  5          A.     In my opinion, those rules and

12:03  6    processes are located where the exchange is

12:03  7    located.

12:03  8          Q.     And when we're discussing rules

12:03  9    and processes, are we thinking about a paper

12:03 10    document, are we thinking about a computer

12:03 11    program?  Can you tell me how the rules and

12:03 12    processes are embodied in the world?

12:03 13                 MS. ZORNBERG:  Objection.

12:03 14          A.     The way I understand it, those

12:03 15    rules and processes are embodied as part of

12:03 16    the exchange's institution and its governance

12:03 17    processes, its internal governance, its rule

12:03 18    book that sets out the rules for parties to

12:03 19    follow.

12:03 20                 And that ensures those rules

12:03 21    become binding in accordance with the party's

12:03 22    agreement to those rules, which includes the

12:03 23    order submission, order binding, and order

12:04 24    finalization processes.

12:04 25          Q.     Is that rule book a material,

102

12:04  1    physical rule book, like, a physical book?  Or

12:04  2    is it something else?

12:04  3         A.    That's very broad.  It depends on

12:04  4    the exchange.

12:04  5         Q.    Sitting here today, do you know

12:04  6    of any exchanges where the rule book takes the

12:04  7    form of an actual physical book?

12:04  8         A.    I really can't speak to every

12:04  9    particular exchange and how they document

12:04 10    their rule book.  The way in which that rule

12:04 11    book is documented can vary.

12:04 12         Q.    Understanding that, I'm just

12:04 13    asking if you can think of any example within

12:04 14    your knowledge where the rule book that you

12:04 15    referenced in your earlier testimony takes the

12:04 16    form of an actual physical book.

12:04 17         A.    I'm sure there's a physical book

12:04 18    for most exchanges.  For example, the CME, as

12:04 19    detailed here, has a rule book.  That rule

12:04 20    book is very thick, deep.  You can find it

12:05 21    online.  And I imagine the CME keeps a hard

12:05 22    copy for those members that need it.

12:05 23         Q.    Now, focusing just on

12:05 24    cryptocurrency exchanges, are you aware of any

12:05 25    cryptocurrency exchanges where the rule book

                                                    103

12:05   1   that you referenced in your earlier testimony

12:05   2   is also actually a physical book?

12:05   3          A.   You know, cryptocurrency

12:05   4   exchanges, as set out in this report,

12:05   5   stipulate various terms and conditions with

12:05   6   their members, which are highlighted here,

12:05   7   that require consent by those trading on the

12:05   8   exchange to consent to the rules of the

12:05   9   exchange.

12:05  10          If that's done in paper form,

12:05  11   perhaps that's the case.  I don't know.

12:05  12          Q.   And sitting here today, you're

12:05  13   not sure one way or the other whether those

12:05  14   rule books that you just described are or are

12:05  15   not in paper form.  Is that right?

12:05  16          MS. ZORNBERG:  Object to form.

12:05  17          A.   I really don't understand the

12:05  18   thrust of the question.  In other words, it's

12:05  19   perfectly possible to print a document and put

12:06  20   it in paper form.

12:06  21          Q.   Right.  I'm trying to understand

12:06  22   in your view where physically in the world all

12:06  23   components of a trade take place.  And one --

12:06  24          MS. ZORNBERG:  Objection.  Sorry.

12:06  25          Q.   -- one of the items you listed

12:06 1    that's necessary for completion of a trade is

12:06 2    a rule book.  Is that right?

12:06 3              MS. ZORNBERG:  Object to form.

12:06 4         A.    One of them, yes.

12:06 5         Q.    And so the reason why I'm asking

12:06 6    is -- is it in physical form is because if it

12:06 7    was in physical form, we could determine its

12:06 8    physical location in the world.  Right?

12:06 9              MS. ZORNBERG:  Objection.

12:06 10        A.    Perhaps, yeah.

12:06 11        Q.    So are you aware of

12:06 12   cryptocurrency exchanges keeping a rule book

12:06 13   in a physical form?

12:06 14        A.    I imagine they might.

12:06 15        Q.    Setting aside whether they might,

12:06 16   are you aware that they do?

12:06 17             MS. ZORNBERG:  Object to form.

12:06 18        A.    I really can't speak to whether

12:06 19   they do or not.  I've not examined the -- I've

12:06 20   not -- gone into a cryptocurrency exchange to

12:07 21   examine whether they keep their paper rule

12:07 22   book or not.

12:07 23        Q.    Once a trade has happened on a

12:07 24   cryptocurrency exchange, is it recorded

12:07 25   somewhere?

                                                    105

12:07  1          A.     Yes.

12:07  2          Q.     Where?

12:07  3          A.     On the internal books and records

12:07  4     of the exchange.

12:07  5          Q.     Where are those located for

12:07  6     cryptocurrency exchanges?

12:07  7          A.     In my opinion, they are located

12:07  8     at the exchange.

12:07  9          Q.     Are the internal books and

12:07 10     records of the -- of cryptocurrency exchanges

12:07 11     kept in paper format typically?

12:07 12          A.     I don't know.  I imagine there's

12:07 13     a digital and paper record potentially.

12:07 14          Q.     Setting aside what you imagine

12:07 15     and just focusing on what you know for sure,

12:07 16     do cryptocurrency exchanges keep their books

12:08 17     and records on which they record trades in

12:08 18     physical paper format?

12:08 19                 MS. ZORNBERG:  Object to form.

12:08 20          A.     I would imagine it would be very

12:08 21     useful for cryptocurrency exchanges to keep

12:08 22     books and records in paper form.

12:08 23          Q.     And I just want to follow up

12:08 24     because you've used the word "imagine" twice

12:08 25     now.  And I appreciate your answer, but I want

                                                    106

12:08   1     to just --
12:08   2              A.     Sure.
12:08   3              Q.     -- carve out what you imagine and
12:08   4     focus just on what you know.
12:08   5                     So do you know one way or the
12:08   6     other whether cryptocurrency exchanges keep
12:08   7     the records of completed trades in paper form?
12:08   8                     MS. BUNTING:  Objection.
12:08   9              A.     I think for exchanges it is
12:08  10     extremely advisable, like it is for
12:08  11     traditional exchanges, to keep books and
12:08  12     records in paper form.  And some --
12:08  13              Q.     Go ahead.  I'm sorry.  Please
12:08  14     finish.
12:08  15              A.     No, that's it.
12:08  16              Q.     So you've said it's advisable,
12:08  17     but that doesn't tell me whether or not they
12:09  18     actually do it.
12:09  19                     So could you let me know whether
12:09  20     or not you know whether cryptocurrency
12:09  21     exchanges keep their records of trades in
12:09  22     paper form?
12:09  23                     MS. ZORNBERG:  Object to form.
12:09  24              Asked and answered.
12:09  25                     You can answer.

                                                        107

12:09  1          A.    For example, in the case of

12:09  2    traditional exchanges, rules pertaining to

12:09  3    that exchange itself require the keeping of

12:09  4    paper records in order to maintain the

12:09  5    integrity of paper records.  And that's set

12:09  6    out in my report.

12:09  7          I would imagine that

12:09  8    cryptocurrency exchanges may be subject or

12:09  9    would think it would be advisable to do a

12:09 10    similar thing.

12:09 11          Q.    Are you aware of any such rules

12:09 12    governing cryptocurrency exchanges?

12:09 13          MS. BUNTING:  Objection.

12:09 14          A.    As I sit here today, I'm not

12:09 15    aware of any rules, however there certainly

12:09 16    may be, as the regulatory rules here are

12:09 17    developing.

12:09 18          Q.    And setting aside what any rules

12:09 19    governing cryptocurrency exchanges might

12:09 20    require, are you aware of any cryptocurrency

12:10 21    exchanges that keep their trading records in

12:10 22    paper form?

12:10 23          MS. ZORNBERG:  Object to form.

12:10 24          A.    In my opinion, it would be

12:10 25    important for cryptocurrency exchanges to keep

108

12:10  1    records in paper form, owing to potential

12:10  2    disruptions, damage, that may occur to digital

12:10  3    formats.

12:10  4           Q.    Professor, with all due respect,

12:10  5    I understand your opinion that it would be

12:10  6    important for them to do so.  But I'm trying

12:10  7    to focus on what it is that you know as to

12:10  8    what they actually do.

12:10  9                 So do you know one way or the

12:10 10    other whether cryptocurrency exchanges keep

12:10 11    their trading records in paper form?

12:10 12                 MS. ZORNBERG:  Objection.  Asked

12:10 13           and answered.

12:10 14                 You can answer.

12:10 15           A.    I can't speak to every

12:10 16    cryptocurrency exchange as to how they keep

12:10 17    their books and records.

12:10 18           Q.    Are you aware of any

12:10 19    cryptocurrency exchange that keeps its records

12:10 20    in paper form?

12:10 21           A.    I would be shocked if there

12:10 22    wasn't one.

12:10 23           Q.    Sitting here today, are you aware

12:11 24    of any?

12:11 25           A.    I'm not aware of one.  But again,

                                                      109

12:11  1    like I said, I would be shocked if there

12:11  2    wasn't one or many, in fact.

12:11  3            Q.    If a cryptocurrency exchange did

12:11  4    not keep their trading records in paper form,

12:11  5    how do they keep them?

12:11  6                  MS. ZORNBERG:  Objection.

12:11  7            A.    Presumably, they would keep them

12:11  8    in some kind of digital storage.

12:11  9            Q.    And where would that digital --

12:11 10    strike that.

12:11 11                  Where is that digital storage

12:11 12    located?

12:11 13                  MS. ZORNBERG:  Objection.  Lack

12:11 14         of foundation.

12:11 15            A.    I have no idea.

12:11 16            Q.    Okay.  Let's turn to paragraph

12:11 17    37, please.  The second sentence of paragraph

12:11 18    37 says:

12:12 19                  "Here, there is significant

12:12 20         convergence on the key principles among

12:12 21         exchanges."

12:12 22                  Do you see that?

12:12 23            A.    I do.

12:12 24            Q.    Okay.  Can you tell me what you

12:12 25    mean by "significant convergence"?

                                                         110

12:12  1          A.    What I mean by that is that there

12:12  2   is significant commonality in the practice of

12:12  3   the fact that when orders match, they become

12:12  4   final.

12:12  5          Q.    Significant commonality between

12:12  6   what and what?

12:12  7          A.    Between traditional marketplaces

12:12  8   and the -- the fact that exchanges essentially

12:12  9   cue to the principle that when orders match,

12:12 10   they become final.

12:12 11          Q.    Are you aware of any traditional

12:12 12   financial exchanges where a buyer or a

12:12 13   seller's order becomes binding as soon as the

12:12 14   order is placed but before it is matched?

12:12 15                MS. ZORNBERG:  Object to form.

12:13 16                You can answer.

12:13 17          A.    I'm sorry, are you asking -- can

12:13 18   you repeat that question, please.

12:13 19          Q.    Of course.  Are you aware of any

12:13 20   traditional financial exchanges where an order

12:13 21   becomes binding as soon as the order is placed

12:13 22   but before it is matched?

12:13 23                MS. ZORNBERG:  Same objection.

12:13 24          A.    Not that I can think of.

12:13 25          Q.    Are you aware of any

                                                      111

12:13  1    cryptocurrency exchanges where an order

12:13  2    becomes binding as soon as the order is placed

12:13  3    but before it is matched?

12:13  4         A.    No.

12:14  5         Q.    Let's look at paragraph 41,

12:14  6    please.  The second sentence states:

12:14  7              "Orders may be submitted from

12:14  8         around the world, while still executing

12:14  9         within the order books of an exchange

12:14 10         and within its home jurisdiction."

12:14 11              Do you see that?

12:14 12         A.    Yes, I do.

12:14 13         Q.    Okay.  Where is an exchange's

12:14 14    order book located?

12:14 15         A.    In my opinion, an exchange's

12:14 16    order book is located at the exchange.

12:14 17         Q.    When you say "in your opinion,

12:14 18    the order book is located at the exchange" --

12:14 19    strike that.

12:15 20              Is the order book that's being

12:15 21    referenced -- strike that.

12:15 22              Is the order book that you

12:15 23    reference in paragraph 41 a physical book?

12:15 24         A.    The -- it may be.  Order books

12:15 25    tend to be digital in electronic markets.

                                                    112

12:15  1          Q.    Are you aware of any

12:15  2   cryptocurrency exchange whose order book is a

12:15  3   physical book?

12:15  4          A.    Not that I can think of.

12:15  5          Q.    You testified order books tend to

12:15  6   be digital in electronic markets.  Is that

12:15  7   right?

12:15  8              MS. ZORNBERG:  Objection.  Asked

12:15  9          and answered.

12:15 10          Q.    Is that correct?

12:15 11          A.    Yes.

12:15 12          Q.    Where are digital order books

12:15 13   kept?

12:15 14          A.    Again, that's a very broad

12:16 15   question.

12:16 16          Q.    If a record book is digital,

12:16 17   where in the world does it exist?

12:16 18          A.    In my opinion, the --

12:16 19              MS. BUNTING:  Objection.

12:16 20          A.    Sorry.  In my book -- in my

12:16 21   opinion, that order book exists at the

12:16 22   exchange.

12:16 23          Q.    What does the -- where are the

12:16 24   digital records of an order book maintained

12:16 25   physically?

113

12:16 1     MS. ZORNBERG: Objection.

12:16 2     MS. BUNTING: Objection.

12:16 3   A. The digital order book of the

12:16 4 exchange references the orders that are coming

12:16 5 into the exchange and going into its central

12:16 6 limit order book.

12:16 7    That is a function of what the

12:16 8 exchange does and is determined, as before, by

12:16 9 the various rules and processes of the

12:16 10 exchange that ensure those order books have

12:17 11 form and that protocols applied to those order

12:17 12 books to match the orders as they come in.

12:17 13   Q. And as a practical matter, is the

12:17 14 process that you just described executed by a

12:17 15 computer program?

12:17 16     MS. ZORNBERG: Objection.

12:17 17   A. Some part of it.

12:17 18   Q. Which part is not?

12:17 19     MS. ZORNBERG: Objection.

12:17 20   A. As detailed in this opinion as

12:17 21 well as in our answers in our conversation

12:17 22 already, that matching process has multiple

12:17 23 parts to it. Orders match mechanically. That

12:17 24 matching has form and content based on the

12:17 25 governance and rules and processes of that

114

12:17  1     exchange.

12:17  2          Q.    When you say "orders match

12:17  3     mechanically," is that a reference to orders

12:17  4     matching through a computer program?

12:17  5          A.    Some part of it will match, the

12:17  6     b-y-t-e will match on a computer at some point

12:18  7     at some level, yes.

12:18  8          Q.    Can you describe to me what

12:18  9     portions of the order book are not executed by

12:18 10     a computer program?

12:18 11          MS. ZORNBERG:  Object to form.

12:18 12          A.    Sure.  The order book exists to

12:18 13     collect the orders, match those orders, make

12:18 14     them final.  Then the exchange has to enforce

12:18 15     that bargain.

12:18 16          In some cases, that enforcement

12:18 17     takes place using actual human beings that are

12:18 18     responsible for verifying the orders, making

12:18 19     sure that the order book has integrity in real

12:18 20     time, as well as finally, potentially, dealing

12:18 21     with any disputes that may arise with respect

12:18 22     to any orders that are concluded.

12:18 23          Q.    You say in some cases human

12:18 24     beings are involved.  Is that typical?

12:19 25          MS. ZORNBERG:  Object to form.

                                                   115

12:19  1          A.    Human beings are involved even in

12:19  2   the highly digital matching process because

12:19  3   human beings have to check the constant

12:19  4   integrity of the programs that are running.

12:19  5   Where there's a problem, human beings have to

12:19  6   get involved to fix that problem.

12:19  7          Q.    Is the exchange's digital order

12:19  8   book located on a server or elsewhere?

12:19  9          MS. ZORNBERG:   Object to form.

12:19 10          A.    Again, some part of it may be,

12:19 11   but that order book has a far larger and more

12:19 12   institutional existence than the simple

12:19 13   mechanical matching of one byte with another.

12:19 14          Q.    Is the institutional existence

12:19 15   that you just referenced -- strike that.

12:19 16          Can you tell me what you mean by

12:19 17   "institutional existence"?

12:19 18          A.    The institutional existence that

12:19 19   I referenced means the fact that the exchange

12:20 20   has to develop a protocol for ensuring the

12:20 21   order book has real form, for ensuring that

12:20 22   binding bargains are enforced, for dealing

12:20 23   with any problems that may arise, either in

12:20 24   the context of a digital order book operating

12:20 25   in real time, or in the context of potential

116

12:20   1    disputes that may arise in relation to

12:20   2    concluded orders.

12:20   3            Q.    Is the word "protocol," as you

12:20   4    just used it, a reference to a computer

12:20   5    program?

12:20   6                  MS. ZORNBERG:  Object to form.

12:20   7            And I don't think her last answer used

12:20   8            the word "protocol."

12:20   9                  CERTIFIED STENOGRAPHER:  Yes, it

12:20  10            did.  It didn't translate properly.

12:20  11            A.    It doesn't have to.  I mean, a

12:20  12    computerized -- it doesn't have to be

12:20  13    computerized.  A protocol may be written

12:20  14    outside of the computer and then potentially

12:21  15    instrumentalized through a computer.

12:21  16                  But a protocol is a general word

12:21  17    referencing a set of conventions in relation

12:21  18    to a particular exchange practice.

12:21  19            Q.    Are all trades on cryptocurrency

12:21  20    exchanges instrumentalized, at least in some

12:21  21    part, through a computer program?

12:21  22            A.    At some point, a computer may be

12:21  23    involved.  A computer -- certainly a computer

12:21  24    is involved.  However, the order matching,

12:21  25    order submission, order conclusion, the

117

12:21  1    governance, making sure that disputes are

12:21  2    dealt with, that is all a part of the larger

12:21  3    institutional existence of the exchange.  And

12:21  4    no order can exist outside of it.

12:21  5         Q.   The portion that takes place via

12:21  6    a computer program, where in the world,

12:21  7    geographically, does that take place?

12:21  8              MS. ZORNBERG:  Objection.

12:21  9         A.   I have no idea.

12:21 10         Q.   Is it your view that locating

12:22 11    computer servers around the world facilitates

12:22 12    rapid trading?

12:22 13         A.   It does facilitate rapid trading.

12:22 14    It can facilitate rapid trading.

12:22 15         Q.   In what way does locating

12:22 16    computer servers around the word facilitate

12:22 17    rapid trading?

12:22 18         A.   For any number of reasons.  I'm

12:22 19    not a computer expert.  So ...

12:22 20         Q.   In that case, what's the basis

12:22 21    for your belief that computer servers --

12:22 22    strike that.

12:22 23              What's the basis for your belief

12:22 24    that locating computer servers around the

12:23 25    world facilitate rapid trading?

118

12:23   1          A.    I know a lot about the topic

12:23   2    based off my own research, in general, into

12:23   3    high frequency markets.

12:23   4          Q.    So if I understand your

12:23   5    testimony, you understand that that statement

12:23   6    is true.  But from a mechanical perspective,

12:23   7    you're not sure why.  Is that fair?

12:23   8          A.    I mean, it helps to ease

12:23   9    communication between jurisdictions.

12:23  10          Q.    Why is that?

12:23  11          A.    It reduces the physical distance

12:23  12    that communication has to travel.

12:23  13          Q.    So if the physical distance

12:23  14    between two servers is shorter, in general,

12:23  15    the communication between those servers is

12:23  16    faster.  Is that right?

12:23  17                MS. ZORNBERG:  Object to form.

12:23  18          A.    Again, I'm not a computer expert.

12:23  19    But just based off my own knowledge and

12:23  20    research, that tends to be the case.

12:23  21          Q.    Do any cryptocurrency exchanges

12:23  22    that are based outside the United States have

12:24  23    computer servers located in the United States?

12:24  24          A.    I have no idea.

12:24  25          Q.    Is it the case that the closer

                                                      119

12:24  1    one is physically to an exchange's server, the

12:24  2    faster one can obtain price information and

12:24  3    place trade orders?

12:24  4              MS. ZORNBERG:  Objection.

12:24  5         Outside the scope.

12:24  6         A.    It depends.

12:25  7         Q.    What does it depend on?

12:25  8         A.    It depends on any number of

12:25  9    things.  For example, even if you place a

12:25 10    server closer to that of the exchange, it may

12:25 11    not necessarily get that information faster,

12:25 12    because you may not pay for a faster service.

12:25 13         Q.    In your experience, do

12:25 14    professional traders typically want to be

12:25 15    located close to servers to obtain an

12:25 16    advantage of speed of execution?

12:25 17              MS. ZORNBERG:  Objection.

12:25 18         A.    It depends on the trader.

12:25 19         Q.    Is it typical within the

12:25 20    professional trading industry for traders to

12:25 21    want to be located close to servers for speed

12:25 22    reasons?

12:25 23              MS. ZORNBERG:  Objection.

12:25 24         A.    It depends on the trader.

12:25 25         Q.    And why do you say "it depends on

                                                   120

12:26  1    the trader"?

12:26  2         A.    Some traders pursue strategies

12:26  3    that depend on speed.  Others don't.

12:26  4         Q.    That's a very fair point.  If the

12:26  5    trader is concerned -- strike that.

12:26  6              If a trader is pursuing a

12:26  7    strategy that depends on speed, is it typical

12:26  8    for that trader to want to be physically

12:26  9    located closer to a server?

12:26 10              MS. ZORNBERG:  Object to form.

12:26 11         A.    They may want to do that.

12:26 12         Q.    Is it typical?

12:26 13              MS. ZORNBERG:  Objection.

12:26 14         A.    It is typical if their strategy

12:26 15    is focused purely on speed to try and do that.

12:26 16    Nevertheless, there are many contingencies

12:26 17    that can still apply.

12:26 18              MS. ZORNBERG:  Just, we're almost

12:26 19         at 12:30.  Just, I think, whenever you

12:27 20         finish this line, maybe we can break.

12:27 21              MR. SYLVESTER:  That sounds good.

12:27 22         I think I have, like, a couple more

12:27 23         questions.

12:27 24              MS. ZORNBERG:  Okay.

12:27 25         Q.    If a trader is typically

121

```
12:27  1    focused -- strike that.
12:27  2            If a trader's strategy is
12:27  3    typically focused on speed of transaction, why
12:27  4    is it that that trader might want to be
12:27  5    located closer to a server?
12:27  6        A.    Whose server?  Sorry.
12:27  7        Q.    The exchange's server.
12:27  8            MS. ZORNBERG:  Object to form.
12:27  9        A.    In general, a trader that is
12:27 10    pursuing a speed-based strategy may want to
12:27 11    co-locate alongside the servers of an exchange
12:27 12    in order to try and get data faster and to be
12:27 13    able to send orders quicker into the order
12:27 14    submission system.
12:27 15        Q.    Can you explain what you mean by
12:27 16    "co-locate"?
12:27 17        A.    Locate next to -- locate their
12:28 18    servers next to the servers of the exchange.
12:28 19            MR. SYLVESTER:  Okay.  I think
12:28 20            that's a good place to stop.  Let's go
12:28 21            off the record.
12:28 22            THE VIDEOGRAPHER:  The time now
12:28 23            is 12:28 p.m.  This concludes Media 3.
12:28 24            Off the record.
12:45 25            (Recess taken from 12:28 p.m. to
```

                                    122

12:45   1              12:45 p.m.)
12:45   2                   THE VIDEOGRAPHER:  The time now
12:45   3              is 12:45 p.m.  This begins Media 4.  On
12:45   4              the record.
12:45   5    BY MR. SYLVESTER:
12:45   6              Q.    Professor, why would co-locating
12:45   7    a trader's server next to the servers of an
12:45   8    exchange allow the trader to send his order
12:45   9    quicker into the order submission system?
12:45  10              A.    In general, co-location helps
12:45  11    reduce the time it takes to send an order by
12:45  12    reducing the distance that has to be traveled.
12:46  13              Q.    When you reference distance in
12:46  14    your answer, do you mean the distance between
12:46  15    the trader's servers and the exchange's
12:46  16    servers?
12:46  17              A.    I did, yes.
12:46  18              Q.    Okay.  Let's go back to paragraph
12:46  19    41, please.  Professor, at the end of 41, do
12:46  20    you see a discussion of the London Stock
12:46  21    Exchange?
12:46  22              A.    I do, yes.
12:46  23              Q.    Where are the London Stock
12:46  24    Exchange's order books?
12:46  25              A.    In my opinion, in London.

                                                         123

12:46 1          Q.    What is the basis for your

12:47 2    opinion that the London Stock Exchange's order

12:47 3    books are in London?

12:47 4          A.    In my mind, in my opinion, the

12:47 5    exchange's order books reflect the exchange's

12:47 6    institutionalized processes for determining

12:47 7    how orders match, what happens when they

12:47 8    match, and for ensuring that the order becomes

12:47 9    final and is enforced.

12:47 10          That system for doing so is

12:47 11   located at the exchange, in this case, in the

12:47 12   London Stock Exchange, where the stock

12:47 13   exchange operates its central limit order

12:47 14   book, orders go into that central limit order

12:47 15   book, are finalized in accordance with the

12:47 16   rules and processes of the London Stock

12:47 17   Exchange, and enforced under the rules of the

12:47 18   London Stock Exchange, as governed by the laws

12:47 19   of England and Wales.

12:47 20          Q.    Is the London Stock Exchange's

12:47 21   central limit order book a physical book?

12:47 22          A.    Some part of it might be.

12:48 23          Q.    Is any part of it not a physical

12:48 24   book?

12:48 25          A.    The central limit order book

124

12:48   1   references the system whereby orders are

12:48   2   collected, they're matched in accordance with

12:48   3   a certain convention, they become binding and

12:48   4   final based on that matching, and that central

12:48   5   limit order book is then enforced by the

12:48   6   exchange.

12:48   7         Q.   Is any of what you just -- strike

12:48   8   that.

12:48   9              Does any of what you just

12:48  10   described take place via a computer program?

12:48  11         A.   Some part of it will take place

12:48  12   using a computer at some point.

12:48  13         Q.   And for the portion of what you

12:48  14   described that takes place via computer, is

12:48  15   the data processed by that computer program

12:48  16   located on the London Stock Exchange's

12:48  17   servers?

12:48  18              MS. ZORNBERG:  Object to form.

12:48  19         A.   I would imagine so somewhere.

12:49  20         Q.   You cite in Footnote --

12:49  21   Footnote 73 and 75 the London Stock

12:49  22   Exchange's -- "A Guide to London Stock

12:49  23   Exchange Trading Service For Equity

12:49  24   Securities."

12:49  25              Do you see that?

125

12:49  1          A.    I do.

12:49  2          Q.    Does the guide referenced in

12:49  3    those footnotes say that orders are matched in

12:49  4    London?

12:49  5          A.    I can't recall.

12:49  6          Q.    The second to last sentence of

12:49  7    paragraph 41 reads:

12:49  8                "Nevertheless, even with these

12:49  9                operations, including in the United

12:49 10                States, it is clear that market

12:49 11                participants understand the London Stock

12:49 12                Exchange to be located in London, United

12:49 13                Kingdom."

12:49 14                Can you tell me what the basis is

12:49 15    for your statement that it is clear that the

12:49 16    market participants understand that the LSE is

12:50 17    located in London?

12:50 18          A.    Yes, it's a common understanding

12:50 19    that the London Stock Exchange is located in

12:50 20    London.  A part of that process involves

12:50 21    market participants having to become a part of

12:50 22    the London Stock Exchange in some form in

12:50 23    order to be able to trade on it.

12:50 24          Q.    So in order for a trader to trade

12:50 25    in the London Stock Exchange, that trader has

                                                    126

```
12:50  1    to become a part of the London Stock Exchange
12:50  2    in some way?
12:50  3            A.   Has to be connected to the London
12:50  4    Stock Exchange in some way, yes.
12:50  5            Q.   Can you explain what you mean by
12:50  6    "connected" in that context?
12:50  7            A.   So, for example, you may have to
12:50  8    use a particular broker that is a member of
12:50  9    the London Stock Exchange in order to be able
12:50 10    to trade.
12:50 11            Q.   Are there any cryptocurrency
12:50 12    exchanges that have similar requirements?
12:50 13                 MS. ZORNBERG:  Object to form.
12:51 14            A.   Cryptocurrency -- cryptocurrency
12:51 15    exchanges, as detailed in the report, require,
12:51 16    for the most part, in the terms of service
12:51 17    that I have reviewed, to have users download a
12:51 18    particular wallet that is particular to that
12:51 19    exchange itself.
12:51 20            Q.   Is the -- strike that.
12:51 21                 Is your answer the only
12:51 22    similarity you can think of between the London
12:51 23    Stock Exchange's requirement that a specific
12:51 24    broker has to be affiliated with the exchange
12:51 25    to trade on the exchange and cryptocurrency
```

127

| | | |
|---|---|---|
| 12:51 | 1 | exchanges? |
| 12:51 | 2 | MS. ZORNBERG:  Objection. |
| 12:51 | 3 | Q.    You can answer. |
| 12:51 | 4 | A.    It's -- |
| 12:52 | 5 | MS. ZORNBERG:  Okay.  You can |
| 12:52 | 6 | answer. |
| 12:52 | 7 | A.    I'm sorry, could you repeat the |
| 12:52 | 8 | question. |
| 12:52 | 9 | Q.    Can you tell me what it means to |
| 12:52 | 10 | be a member of the London Stock Exchange? |
| 12:52 | 11 | A.    Sure.  To be a member of the |
| 12:52 | 12 | London Stock Exchange means that you have |
| 12:52 | 13 | certain rights and privileges in order to be |
| 12:52 | 14 | able to trade on the London Stock Exchange, |
| 12:52 | 15 | and members subscribe for that privilege. |
| 12:52 | 16 | Q.    How is it that one becomes a |
| 12:52 | 17 | member of the London Stock Exchange? |
| 12:52 | 18 | A.    It's been a long time since I |
| 12:52 | 19 | read those rules.  There's a process. |
| 12:52 | 20 | Q.    Is anyone required to be a member |
| 12:52 | 21 | of a cryptocurrency exchange to trade on that |
| 12:52 | 22 | exchange? |
| 12:52 | 23 | A.    Crypto- -- |
| 12:52 | 24 | MS. ZORNBERG:  Object to form. |
| 12:52 | 25 | A.    Cryptocurrency exchanges require |

128

| | | |
|---|---|---|
| 12:52 | 1 | their users, in general and as detailed in |
| 12:53 | 2 | this report, to submit to terms of service |
| 12:53 | 3 | that require them to provide various |
| 12:53 | 4 | representations as to who they are, get a |
| 12:53 | 5 | wallet that is particular to that exchange, |
| 12:53 | 6 | and ensure that they abide by the rules of the |
| 12:53 | 7 | exchange including with respect to the trading |
| 12:53 | 8 | process. |
| 12:53 | 9 | Q.    Does taking the steps that you |
| 12:53 | 10 | just described make a trader a member of a |
| 12:53 | 11 | particular cryptocurrency exchange? |
| 12:53 | 12 | A.    As far as I understand it, the |
| 12:53 | 13 | concept of membership is different in the |
| 12:53 | 14 | context of a cryptocurrency exchange.  I don't |
| 12:53 | 15 | believe they follow that same member-based |
| 12:53 | 16 | structure that more traditional exchanges like |
| 12:53 | 17 | the New York Stock Exchange and the London |
| 12:53 | 18 | Stock Exchange follow. |
| 12:53 | 19 | Q.    Returning to your statement about |
| 12:53 | 20 | "it is clear that market participants |
| 12:54 | 21 | understand that the LSE is located in London," |
| 12:54 | 22 | did you speak to any market participants about |
| 12:54 | 23 | that topic? |
| 12:54 | 24 | A.    Based on my own research and |
| 12:54 | 25 | understanding, the fact that I was a lawyer in |

129

12:54   1      London, the London Stock Exchange, for all
12:54   2      intents and purposes, it would be absurd to
12:54   3      think otherwise.
12:54   4          Q.    I appreciate that.  But did you
12:54   5      speak to any market participants on the topic
12:54   6      of their understanding of where the London
12:54   7      Stock Exchange is located?
12:54   8          A.    I haven't.  It's such a basic
12:54   9      question, it would be weird to ask.
12:54  10          Q.    The next sentence, the concluding
12:54  11      sentence of paragraph 41 says:
12:54  12              "As such, offers to buy and sell
12:54  13          on the London Stock Exchange are made in
12:54  14          London once they enter its order books,
12:54  15          and trades become final there once
12:54  16          offers match on its platform in
12:54  17          accordance with the Exchange's rules and
12:54  18          procedures."
12:54  19              Do you see that?
12:54  20          A.    I do, yes.
12:54  21          Q.    Is where the London Stock
12:55  22      Exchange's offers to buy and sell match
12:55  23      influenced, in your view, by where market
12:55  24      participants understand the London Stock
12:55  25      Exchange to be located?

                                                    130

12:55  1          MS. ZORNBERG:  Object to form.

12:55  2      A.    Could you repeat the question.

12:55  3      Q.    Sure.  What is the relevance, if

12:55  4  at all, to market participants' understanding

12:55  5  of where the London Stock Exchange is located

12:55  6  to where the London Stock Exchange's orders

12:55  7  match?

12:55  8      A.    It's all part of the exchange.

12:55  9  It's all part of where the exchange -- the

12:55 10  institutional existence of the exchange.

12:55 11      Q.    So in your view, a market

12:56 12  participant's understanding of where an

12:56 13  exchange is located has some relevance to the

12:56 14  question of where its orders to buy and sell

12:56 15  are matched?

12:56 16      A.    Likely so.

12:56 17      Q.    Can you explain the relevance?

12:56 18      A.    The order submission process that

12:56 19  the customer thinks they're entering into,

12:56 20  they believe that it's happening in London.

12:56 21          If you take a look at the terms

12:56 22  of service of the London Stock Exchange, in

12:56 23  other words, its rule book, it sets out

12:56 24  dispute resolution processes, for example,

12:56 25  that need to be followed that consistently

131

12:56  1     reference the laws of England and Wales and

12:56  2     obviously the London Stock Exchange in London.

12:56  3              And so the fact that investors

12:56  4     are engaging in a direct way with the London

12:56  5     Stock Exchange with all of the paraphernalia

12:56  6     that references the London Stock Exchange as

12:56  7     being in London, I think that's -- influences

12:56  8     their judgment and certainly the -- that's

12:57  9     a -- shows what they -- how they understand

12:57 10     the order submission process there to

12:57 11     function.

12:57 12         Q.    In your view, is it obvious that

12:57 13     the London Stock Exchange is located in

12:57 14     London?

12:57 15         A.    To me?  Yes.

12:57 16         Q.    Why is that?

12:57 17         A.    For many reasons.  The first is

12:57 18     historical.  The London Stock Exchange has

12:57 19     centuries-deep roots in London.  It is

12:57 20     governed by the laws of England and Wales.  It

12:57 21     is governed by a rule book that has organized

12:57 22     this marketplace for a very long time.

12:57 23              The London Stock Exchange also

12:57 24     offers a particular set of products that

12:57 25     reflect the fact that it is based in the

132

```
12:57  1    United Kingdom, and therefore, at a location
12:57  2    which is in the middle of the US, Europe, and
12:58  3    Asia.
12:58  4              And so the fact of being in
12:58  5    London is, in fact, very important for the
12:58  6    London Stock Exchange to actually have the
12:58  7    kind of products that it offers to the rest of
12:58  8    the global trading community.
12:58  9         Q.   There are a number of
12:58 10    cryptocurrency exchanges.  Correct?
12:58 11         A.   Yes.
12:58 12              MS. ZORNBERG:  Object to form.
12:58 13         Q.   What's the oldest?
12:58 14         A.   Cryptocurrency exchanges?
12:58 15         Q.   Yes.
12:58 16         A.   Well, are you asking is it still
12:58 17    in existence or not?
12:58 18         Q.   No, I apologize.  Of all the
12:58 19    cryptocurrency exchanges that exist, which is
12:58 20    the oldest?
12:58 21         A.   I'm not sure if it still exists
12:58 22    in some form, but my understanding is that the
12:58 23    first real big exchange was the Mt. Gox
12:58 24    exchange, which subsequently imploded.
12:58 25         Q.   When was the Mt. Gox exchange
```

133

12:59  1    founded?

12:59  2         A.    I believe it was

12:59  3    around -- early -- maybe 2013-'14.

12:59  4         Q.    Excluding Mt. Gox, what's the

12:59  5    second oldest cryptocurrency exchange?

12:59  6              MS. ZORNBERG:  Objection.

12:59  7         Outside scope.

12:59  8         A.    There -- you know, it's hard for

12:59  9    me to say.

12:59 10         Q.    Because you don't know?

12:59 11              MS. ZORNBERG:  Objection.

12:59 12         Q.    Just for clarity.

12:59 13         A.    I don't know exactly which

12:59 14    exchange was the second to come into existence

12:59 15    after Mt. Gox.

12:59 16         Q.    Sure.  Paragraph 42, the last

12:59 17    sentence reflects your view that it's:

12:59 18              "Clear that market participants

12:59 19              understand that the Chicago Mercantile

12:59 20              Exchange is located in Chicago" and the

12:59 21              Tokyo Stock Exchange is located in

01:00 22              Tokyo.

01:00 23              Do you see that?

01:00 24         A.    I do, yes.

01:00 25         Q.    Did you speak to any market

                                                        134

01:00   1   participants on the topic of their belief as

01:00   2   to where either of those exchanges are

01:00   3   located?

01:00   4         A.   I did not.

01:00   5         Q.   Okay.   Did you review any

01:00   6   literature regarding market participants'

01:00   7   belief as to whether -- where either of those

01:00   8   exchanges were located?

01:00   9         A.   I don't know what you mean by

01:00 10   "literature."

01:00 11         Q.   I would include within literature

01:00 12   any papers, articles, media.

01:00 13           MS. ZORNBERG:   I'm going to

01:00 14         object to form.

01:00 15           You can answer.

01:00 16         A.   It's -- you know, there is a

01:00 17   lengthy literature in relation to the history

01:00 18   of the Chicago Mercantile Exchange, some of it

01:00 19   which is referenced here, that speaks to the

01:00 20   centrality of Chicago as the reason why the

01:00 21   Chicago Mercantile Exchange came into being

01:00 22   for the reasons it came into being.

01:01 23         There's an extensive literature

01:01 24   detailing the importance of Chicago as one of

01:01 25   the key players in the commodities

01:01 1    marketplace.

01:01 2              And so I imagine that is an

01:01 3    important structural connection point between

01:01 4    the minds of market participants and the

01:01 5    trade -- trading hub itself.

01:01 6              The fact that Chicago is so

01:01 7    essential to the economic history of the US,

01:01 8    and in particular, the economic history of the

01:01 9    commodities trading marketplace.

01:01 10        Q.    Did any of the literature that

01:01 11   you just described discuss the specific point

01:01 12   of market participants' understanding of the

01:01 13   location of the Chicago Mercantile Exchange?

01:01 14             MS. ZORNBERG:  Object to form.

01:01 15        A.    I don't actually know what that

01:01 16   question really means.

01:01 17             I mean, I think the historical

01:01 18   record in some of the articles speaks to folks

01:02 19   meeting in Chicago in the earliest days to try

01:02 20   and create a grain market, for example.  So I

01:02 21   don't know if that counts.

01:02 22        Q.    Where are the Chicago Mercantile

01:02 23   Exchange's order books located?

01:02 24        A.    In Chicago.

01:02 25        Q.    How do you know that?

136

01:02  1          A.    Well, the Chicago Mercantile

01:02  2    Exchange is the Chicago Mercantile Exchange.

01:02  3    Going back to my earlier answers, there's an

01:02  4    institutional existence for the order book

01:02  5    that encompasses the rule book of the exchange

01:02  6    that encompasses the fact that the exchange

01:02  7    has a presence in Chicago, the governance

01:02  8    processes of the Chicago Mercantile Exchange,

01:02  9    its rules and processes that give effect to

01:02  10   the order book.

01:02  11         Q.    Where does the Chicago Mercantile

01:02  12   Exchange match its orders?

01:02  13         A.    The matching process, as detailed

01:02  14   in my earlier answers, references the

01:03  15   mechanical matching process that may exist on

01:03  16   a b-y-t-e, byte-to-byte level as well as the

01:03  17   larger rules and processes that give that

01:03  18   matching form, that ensure that orders that

01:03  19   match become a trade that is binding and that

01:03  20   ensure the enforceability of that bargaining.

01:03  21         Q.    At the byte level, where

01:03  22   do -- where does the Chicago Mercantile

01:03  23   Exchange match its orders?

01:03  24              MS. ZORNBERG:  Objection.

01:03  25         A.    Depends on orders.  It's hard to

                                                        137

01:03  1    say.

01:03  2         Q.    When you say "it depends on

01:03  3    orders," can you say what it depends on?

01:03  4         A.    I mean, the Chicago Mercantile

01:03  5    Exchange may have computers anywhere.  I'm not

01:03  6    sure.

01:03  7         Q.    Globally?

01:03  8         A.    Presumably.

01:03  9         Q.    When you say "presumably," why

01:03 10    presumably?

01:03 11         A.    I don't know the exact location,

01:03 12    if it's various operations around the world.

01:04 13         Q.    When you say "presumably," do you

01:04 14    suggest that it's probably the case that they

01:04 15    have global servers?

01:04 16              MS. BUNTING:  Objection.

01:04 17         A.    I would be extremely shocked if

01:04 18    they didn't have -- well, they -- I believe

01:04 19    they will have servers at locations around the

01:04 20    globe.

01:04 21         Q.    Okay.  Where is the Tokyo Stock

01:04 22    Exchange's order books located?

01:04 23         A.    I'm guessing in Tokyo, given my

01:04 24    earlier answers that the Tokyo Stock Exchange,

01:04 25    like the Chicago Mercantile Exchange,

                                                    138

01:04  1    encompasses an institutional presence that

01:04  2    ensures that orders matching are matched,

01:04  3    become final trades, and are enforced as

01:04  4    bargains by the Tokyo Stock Exchange.

01:04  5         Q.    Where does the Tokyo Stock

01:04  6    Exchange match its orders?

01:04  7         A.    The Tokyo Stock Exchange's

01:04  8    matching includes the, b-y-t-e, byte-to-byte

01:04  9    matching that may exist, as well as ensuring

01:05  10   that the matching process, which is

01:05  11   mechanical, has actual meaning in accordance

01:05  12   with the rules and conventions of the central

01:05  13   limit order book and the governance processes

01:05  14   of the Chicago -- of the Tokyo Stock Exchange.

01:05  15        Q.    Focusing just on the byte-to-byte

01:05  16   matching process, where does the Tokyo Stock

01:05  17   Exchange match its orders?

01:05  18             MS. ZORNBERG:  Objection.

01:05  19             MS. BUNTING:  Objection.

01:05  20        A.    I don't know.

01:05  21        Q.    Are you offering any opinion in

01:05  22   this case that XRP is a currency?

01:05  23        A.    I am not.

01:05  24        Q.    Are you offering any opinion in

01:05  25   this case as to whether or not XRP has the

                                              139

01:05  1   attributes of a currency?

01:05  2        A.    I am not.

01:05  3        Q.    Let's look at the last sentence

01:06  4   of paragraph 49, please.  You write:

01:06  5             "The XRP cryptocurrency, for

01:06  6        example, has been used as a digital

01:06  7        settlement asset to overcome the speed

01:06  8        and costly frictions entailed in making

01:06  9        cross-border payments between different

01:06  10       currencies."

01:06  11            Do you see that?

01:06  12       A.    I'm sorry, I must be on the wrong

01:06  13  page.

01:06  14       Q.    I'm on page -- I'm starting at

01:06  15  the bottom of page 26.

01:06  16       A.    (Document review.)

01:06  17            Yes.

01:06  18       Q.    What is your basis for that

01:07  19  statement?

01:07  20       A.    I've cited a source at source 86

01:07  21  as an example --

01:07  22       Q.    Sorry.  Is there any other basis

01:07  23  for the statement that I just read aloud other

01:07  24  than the source cited in Note 86?

01:07  25       A.    Based off my general background

                                                    140

01:07 1  understanding.

01:07 2       Q.    What is that general background

01:07 3  understanding?

01:07 4       A.    That XRP offers a settlement --

01:07 5  payment settlement asset for international

01:07 6  payments.

01:07 7       Q.    And remind me how you learned

01:07 8  that.

01:07 9            MS. ZORNBERG:  Object to form.

01:07 10      A.    It's part of my general research

01:07 11 into the marketplace.

01:07 12      Q.    Prior to your retention in this

01:07 13 case?

01:07 14      A.    Yes.

01:07 15      Q.    When you say "the marketplace" in

01:07 16 that answer, what marketplace?

01:08 17      A.    The financial markets.

01:08 18      Q.    And how was it that you came

01:08 19 across XRP's use as a -- strike that.

01:08 20            How is it that you came across

01:08 21 the use of XRP in making cross-border payments

01:08 22 in your research into the financial markets?

01:08 23      A.    I can't recall exactly.  However,

01:08 24 I imagine -- I think it may have been as part

01:08 25 of conversations I have with academics,

                                                141

01:08  1    discussions at conferences, for example, in

01:08  2    relation to innovations in payments

01:08  3    technology.

01:08  4         Q.   Is cross-border payments

01:08  5    something that you study?

01:08  6         A.   Cross-border payments has been an

01:08  7    area in which I developed extensive expertise

01:08  8    and practice and as part of my overall

01:08  9    research.

01:08  10        Q.   Are you aware of any disruptions

01:08  11   or halts on the XRP ledger?

01:08  12        A.   None specifically at present.

01:09  13        Q.   Let's look at paragraph 59,

01:09  14   please.  That is on page 32.  The third

01:09  15   sentence in that paragraph is:

01:09  16             "Many cryptocurrency exchanges,

01:09  17        including several on which I understand

       18        XRP to have been transacted,

       19        contractually stipulate

       20        rules-of-the-road for order submission,

       21        matching, trade execution, and

       22        settlement that are consistent with this

       23        understanding."

01:09  24             And I believe "this

01:09  25   understanding" refers to the previous sentence

                                              142

```
01:09   1    where you say:
01:09   2              "Market participants understand
01:09   3         that their trades will be executed and
01:09   4         then immediately settled within the
01:09   5         confines of the exchange."
01:10   6              Is that correct?
01:10   7         A.   Are you on page 32?
01:10   8         Q.   I am.
01:10   9         A.   Okay.
01:10  10         Q.   Paragraph 59.
01:10  11              MS. ZORNBERG:  Object to form.
01:10  12         Are you just asking her if that's
01:10  13         correctly -- you read it correctly?
01:10  14              MR. SYLVESTER:  No.  I'm asking
01:10  15         whether or not the phrase "this
01:10  16         understanding" referenced the
01:10  17         understanding of market participants
01:10  18         described in the previous sentence.
01:11  19         A.   (Document review.)
01:11  20              I'm sorry.  What's the question?
01:11  21         Q.   Do you see the reference in the
01:11  22    third sentence of paragraph 59, at the end,
01:11  23    "this understanding"?
01:11  24         A.   Third sentence of paragraph 59.
01:11  25    Are you referring to "market participants'
```

143

01:11  1      understand that their trades will be executed

01:11  2      and then immediately settled"?

01:11  3            Q.    That's what I'm asking, is

01:11  4      whether or not this phrase "this

01:11  5      understanding" used in the third sentence is

01:11  6      referring back to your description of market

01:11  7      participants' understanding in the second

01:11  8      sentence of the paragraph.

01:11  9            A.    I believe it's referencing market

01:11 10      participants' understanding that their trades

01:11 11      will be executed and then settled within the

01:11 12      exchange.

01:12 13            Q.    Okay.  So you say that many

01:12 14      cryptocurrency exchanges, including several on

01:12 15      which you understand XRP to have been

01:12 16      contracted -- transacted, have contractual

01:12 17      rules of the road that reflects the

01:12 18      understanding that trades will be executed and

01:12 19      then immediately settled within the confines

01:12 20      of the exchange.  Is that right?

01:12 21                  MS. ZORNBERG:  Object to form.

01:12 22                  You can answer.

01:12 23            A.    Right.

01:12 24            Q.    Let me ask a better question.

01:12 25                  You say many -- the third

                                                            144

01:12  1   sentence seems to be about the

01:12  2   rules of the road for many cryptocurrency

01:12  3   exchanges.

01:12  4           I'm trying to get at:  What is it

01:12  5   that they contain?

01:12  6           A.    Okay.

01:12  7           Q.    In your third sentence, what are

01:12  8   you describing?

01:12  9           A.    That's a broad question.  The

01:12 10   rules of the road for cryptocurrency exchanges

01:12 11   are set out in the terms of service that are

01:12 12   discussed in this report.

01:13 13           I reviewed 24 of them for

01:13 14   exchanges set out in Table A, and many of

01:13 15   those terms of service set out the processes

01:13 16   that exchanges use for order submission, what

01:13 17   makes orders binding, for dispute resolution,

01:13 18   for ensuring that users comply with a certain

01:13 19   standard of behavior when they're on the

01:13 20   exchange, as well as rules with respect to how

01:13 21   they maintain their solvency on the exchange,

01:13 22   for example.

01:13 23           Q.    Are there any rules of the road

01:13 24   that you reviewed that do not include any of

01:13 25   the information you just described?

145

01:14  1                    MS. ZORNBERG:  Object to form.

01:14  2          A.    There may be a couple of -- there

01:14  3    may have been -- there were, rather, I should

01:14  4    say, some terms of service that were much more

01:14  5    basic than others.

01:14  6          Q.    When you say they were "much more

01:14  7    basic," does that mean they did not include

01:14  8    the information that you just described?

01:14  9          A.    They may have included some of

01:14 10    it, but the detail was varied in the depth

01:14 11    depending on the terms of service.

01:14 12          Q.    Were there any rules of the road

01:14 13    that you read that did not set forth what

01:14 14    makes an order binding?

01:14 15                    MS. ZORNBERG:  Object to form.

01:14 16          A.    You know, I think there may have

01:14 17    been one user agreement or a couple user

01:14 18    agreements that perhaps weren't as clear on

01:15 19    that.  But in general, the user agreements

01:15 20    were very categorical about the fact that

01:15 21    orders become binding when they are matched by

01:15 22    the exchange, partially-filled orders become

01:15 23    binding to the part that is filled when

01:15 24    matched by the exchange.

01:15 25          Q.    Which were those one or two that

                                                        146

01:15  1     you just described?

01:15  2         A.    I can't exactly recall.  I'd have

01:15  3     to go through the user agreements to fish them

01:15  4     out.

01:15  5         Q.    Is there anywhere in your report

01:15  6     that reflects that those one or two do not set

01:15  7     forth information about what makes orders

01:15  8     binding on those exchanges?

01:15  9         A.    In the report, I focus on the

01:15 10     general.  I did -- may -- I don't think I

01:15 11     noted the one or two that did not include that

01:15 12     information specifically.

01:15 13         Q.    Okay.  The third to last sentence

01:16 14     in paragraph 59 says:

01:16 15             "As with traditional exchanges

01:16 16         that enter into contracts with users,

01:16 17         thereby creating a unique trading

01:16 18         environment, cryptocurrency exchanges

01:16 19         tend to similarly establish a core set

01:16 20         of rules and standards for their

01:16 21         particular market."

01:16 22             Do you see that?

01:16 23         A.    I'm so sorry, which paragraph?

01:16 24         Q.    59 again.

01:16 25         A.    Sorry.

                                                        147

01:16  1          Q.     It's okay.

01:16  2          A.     (Document review.)

01:16  3                 Yes.

01:16  4          Q.     Are there any exchange rules that

01:16  5    you reviewed that do not set forth the core

01:16  6    set of rules and standards that you describe

01:16  7    in that sentence?

01:16  8                 MS. ZORNBERG:  Objection.

01:16  9          A.     Again, referencing back to my

01:16 10    previous answer, there were some

01:17 11    exchange -- there were a couple of exchanges,

01:17 12    some user agreements that were much more basic

01:17 13    than others.  Yeah.

01:17 14          Q.     For the exchanges with user

01:17 15    agreements that were much more basic than

01:17 16    others, as you describe it, was XRP traded on

01:17 17    those exchanges?

01:17 18                 MS. ZORNBERG:  Objection to form.

01:17 19          A.     I believe so.  I can't say for

01:17 20    sure.

01:17 21          Q.     Is it your understanding that all

01:17 22    of the -- strike that.

01:17 23                 Is it your understanding that XRP

01:17 24    was traded on all the exchanges that are

01:17 25    listed in your Table A?

                                                      148

01:17  1          A.    I believe so.

01:17  2          Q.    Did you confirm that in any way

01:17  3    before putting Table A in your report?

01:17  4          A.    I think I did -- I did -- I think

01:17  5    I did confirm it.

01:17  6          Q.    How did you do that?

01:17  7          A.    Discuss broadly with counsel.

01:18  8          Q.    And did you personally review all

01:18  9    of the user agreements for each of the

01:18 10    exchanges on which XRP traded?

01:18 11          A.    I did not review -- with respect

01:18 12    to the exchanges listed in Table A, I reviewed

01:18 13    all of the user agreements minus that of

01:18 14    Bitlish.

01:18 15          Q.    Why didn't you review Bitlish?

01:18 16          A.    It was not available.

01:18 17          Q.    Is it your understanding that

01:18 18    Table A contains all of the cryptocurrency

01:18 19    exchanges on which XRP has ever been traded?

01:18 20          A.    I have no idea.  Sorry.  I

01:18 21    don't --

01:18 22          Q.    Let's go to paragraph 63 on the

01:18 23    next page, page 33.

01:18 24          A.    Yup.

01:18 25          Q.    The first sentence says:

                                                        149

01:18  1          "Based on my review of their user

01:19  2      agreements, exchanges mostly use a

01:19  3      trading model that closely resembles a

01:19  4      central order book that matches buy and

01:19  5      sell orders in accordance with a set

01:19  6      matching algorithm."

01:19  7          Do you see that?

01:19  8      A.    I do.

01:19  9      Q.    I'm focusing just in on the word

01:19 10  "mostly."  Which are the exchanges that do not

01:19 11  use a trading model that closely resembles a

01:19 12  central order book, as you describe in

01:19 13  paragraph 63?

01:19 14      A.    The reason I use the word

01:19 15  "mostly" there is because, as I said, some

01:19 16  user agreements are much more basic and don't

01:19 17  provide a detail description of their order

01:19 18  matching system.

01:19 19          I will say that the central limit

01:19 20  order book is the dominant form that has

01:19 21  appeared in the user agreements.

01:19 22      Q.    Of the user agreements that you

01:19 23  reviewed, how many of them don't provide that

01:20 24  detailed description of their order matching

01:20 25  system?

                                                  150

01:20  1          A.    I would have to go through them

01:20  2    all to fish out the ones that are more basic

01:20  3    and don't stipulate exactly what their order

01:20  4    matching mechanisms look like.

01:20  5          Q.    For the ones that don't stipulate

01:20  6    exactly what their order matching mechanisms

01:20  7    look like, do you know how those exchanges

01:20  8    match their orders?

01:20  9               MS. ZORNBERG:  Object to form.

01:20 10          A.    I do not, no.

01:20 11          Q.    The next sentence says -- of

01:20 12    paragraph 63 -- says:

01:20 13               "Offers to buy or sell are made

01:20 14               on the exchange and appear on the

01:20 15               central order book within the confines

01:20 16               of the exchange."

01:20 17               Do you see that?

01:20 18          A.    That's right.

01:20 19          Q.    Can you tell me what you mean by

01:20 20    the phrase "within the confines of the

01:21 21    exchange"?

01:21 22          A.    What I mean by that phrase is

01:21 23    within the order submission ecosystem of that

01:21 24    exchange that sets up an order submission

01:21 25    system, order matching system, and then the

151

01:21  1    clearing and settlement system for regulating

01:21  2    the accounts of the different users.

01:21  3          Q.   Is the order submission ecosystem

01:21  4    consistent -- strike that.

01:21  5              Does the order submission

01:21  6    ecosystem consist of an order submission

01:21  7    system, an order matching system, and a

01:21  8    clearing and settlement system?

01:21  9              MS. ZORNBERG:  Object to form.

01:21 10          A.   Going back to my earlier answers,

01:21 11    the order matching system, the central limit

01:21 12    order book, consists of the order matching,

01:21 13    the binding quality that comes about when

01:21 14    orders match, the rules and processes that

01:21 15    ensure that binding bargain is then recognized

01:22 16    and enforced by the exchange.

01:22 17          Q.   Is what you just described in

01:22 18    your answer what you would consider to be the

01:22 19    order submission ecosystem?

01:22 20          A.   Broadly, yes.

01:22 21          Q.   Okay.  Let's go to paragraph 64,

01:22 22    the first sentence.  It says:

01:22 23              "Orders, once matched, then

01:22 24          become automatically binding in the

01:22 25          exchange's trading system."

                                                    152

01:22  1                    Do you see that?

01:22  2          A.    I do, yes.

01:22  3          Q.    Is that always true?

01:22  4                MS. ZORNBERG:  Object to form.

01:23  5          A.    In general, it is by far, by far,

01:23  6     the prevailing convention across exchanges,

01:23  7     traditional and cryptocurrency exchanges, that

01:23  8     orders, once matched, immediately become

01:23  9     binding in the exchange's trading system.

01:23 10          Q.    Focusing just on cryptocurrency

01:23 11     exchanges, what are the exceptions?

01:23 12          A.    Going back to my earlier answer,

01:23 13     there were some terms of service that were

01:23 14     more basic, and so I cannot give a conclusive

01:23 15     answer with respect to those exchanges.

01:24 16          Q.    The first complete sentence of

01:24 17     paragraph 64 that appears on page 34 begins:

01:24 18                "The terms of service of most of

01:24 19                the exchanges that I reviewed refer to

01:24 20                specific in-house order matching systems

01:24 21                that result in orders becoming binding

01:24 22                as soon as a sell and buy order match."

01:24 23                Do you see that?

01:24 24          A.    I do, yes.

01:24 25          Q.    Were there any terms of service

                                                          153

01:24  1    that you read where that statement was not

01:24  2    true?

01:24  3            A.    Which part of it was not true?

01:24  4            Q.    Did you review any terms of

01:24  5    service where the in-house order matching

01:24  6    systems did not result in orders becoming

01:24  7    binding as soon as a sell and buy order

01:24  8    matched?

01:24  9            A.    You know, as I sit here today and

01:25 10    think back to the terms of service I reviewed,

01:25 11    where they mention order submission, whenever

01:25 12    they do mention it, that mention states that

01:25 13    whenever orders match, they become binding.

01:25 14            Q.    Near the end of paragraph 64,

01:25 15    second to last sentence says:

01:25 16                  "Once offers entering the

01:25 17            exchange are matched by the exchange and

01:25 18            become final, reversal can occur only on

01:25 19            narrow grounds (as described below) and

01:25 20            per my review of several user

01:25 21            agreements, only at the discretion of

01:25 22            the exchange."

01:25 23                  Do you see that?

01:25 24            A.    I do, yes.

01:25 25            Q.    Which are the "several user

                                                              154

01:25  1    agreements" you're referring to?

01:25  2         A.    I can give you some examples.

01:25  3         Q.    Sure.  Go ahead.

01:25  4         A.    So, for example, when one looks

01:26  5    at the Coinbase exchange, Coinbase Singapore

01:26  6    sets out in its terms of service that trades

01:26  7    may be reversed by the exchange only on

01:26  8    extremely narrow grounds, like a clearly

01:26  9    erroneous trade.

01:26 10              Similarly, if one looks at

01:26 11    BitMax, as I recall, trades may be reversed

01:26 12    for clearly erroneous transactions that take

01:26 13    place on an exchange but, again, only at the

01:26 14    absolute discretion of the exchange itself.

01:26 15         Q.    Were there any user agreements

01:26 16    you reviewed where reversal was not only at

01:26 17    the discretion of the exchange?

01:26 18         A.    There was only one where the user

01:26 19    could ask for help in helping reverse a trade,

01:27 20    but ultimately it would be up to the exchange,

01:27 21    as far as I can recall, to ensure that

01:27 22    reversal would happen.

01:27 23              That one exception, I cannot

01:27 24    remember exactly which one that was, had the

01:27 25    exchange offering to work with the market

155

01:27  1    participants.

01:27  2              However, it is a very fundamental

01:27  3    principle in exchange design that trades are

01:27  4    final as soon as they become binding on

01:27  5    exchanges and that where reversals happen,

01:27  6    these happen on extremely narrow grounds and

01:27  7    only at the discretion of the exchange itself.

01:27  8         Q.   When you say "it's a principle of

01:27  9    exchange design," do you mean traditional

01:27 10    exchanges or crypto exchanges or both?

01:27 11         A.   Let me start at the broadest

01:27 12    level.  It is a fundamental principle of

01:27 13    exchange design that orders, when they match,

01:28 14    become final and binding on the exchange.

01:28 15              That is critical, as detailed in

01:28 16    this report, because without that finality,

01:28 17    market participants cannot rely on their

01:28 18    bargain and cannot then take on any kind of

01:28 19    reliance on that bargain.

01:28 20              And that principle is applied by

01:28 21    traditional exchanges, as cited here in this

01:28 22    report, as well as by cryptocurrency

01:28 23    exchanges, for the most part, as I detail in

01:28 24    this report.

01:28 25         Q.   Did you review all of the user

                                                      156

01:28  1    agreements that are cited in your Appendix B?

01:28  2                    MS. ZORNBERG:  Objection.  Asked

01:28  3          and answered.

01:28  4                    You can answer again.

01:28  5          A.    I reviewed all of the user

01:28  6    agreements for Table A exchanges minus

01:28  7    Bitlish.

01:29  8          Q.    Let's turn to the first sentence

01:29  9    of paragraph 65 on page 34.  You write:

01:29 10                    "Per many of the terms of service

01:29 11          that I reviewed, cryptocurrency

01:29 12          exchanges appear to use the common order

01:29 13          matching conventions seen in traditional

01:29 14          financial exchanges to create binding

01:29 15          finality for offers entering an exchange

01:29 16          once they match on the exchange in

01:29 17          accordance with exchange rules."

01:29 18                    Do you see that?

01:29 19          A.    I do, yes.

01:29 20          Q.    Can you tell me what you mean by

01:29 21    the phrase "appear to use"?

01:29 22          A.    Yes, it's the fact that I'm

01:29 23    looking at the user agreements, and based off

01:29 24    the user agreements, that's what I understand

01:29 25    those order matching conventions to be.

                                                    157

01:30   1          Q.    The first sentence of paragraph

01:30   2   66 on page 35.  Do you see that?  It says:

01:30   3              "This order matching process and

01:30   4          the finality of trades is further

01:30   5          corroborated by industry participants'

01:30   6          understanding of how trades are executed

01:30   7          on cryptocurrency exchanges."

01:30   8              Do you see that?

01:30   9          A.    I do, yes.

01:30  10          Q.    What's your basis for your

01:30  11   knowledge of what industry participants'

01:30  12   understanding is of how trades are executed on

01:30  13   cryptocurrency exchanges?

01:30  14          A.    For example, as stated in the

01:30  15   report, I relied on the testimony of

01:30  16   Mr. Cristian Gil for his understanding as a

01:30  17   longtime market participant in the

01:30  18   cryptocurrency industry.

01:30  19          Q.    Is there any other basis for your

01:30  20   knowledge other than Mr. Gil's testimony?

01:30  21          A.    The user agreements that are

01:30  22   being signed by the customers of

01:31  23   cryptocurrency exchanges presumably would

01:31  24   match and create an understanding on their

01:31  25   part as to what they expect the exchange to

                                                    158

01:31  1    deliver for them.

01:31  2              In addition, cryptocurrency

01:31  3    exchanges, as detailed in this report, are

01:31  4    conducting very high trade volumes.  Without

01:31  5    those trade volumes having -- without trades

01:31  6    being binding, those volumes would be -- users

01:31  7    would not be attracted to those exchanges if

01:31  8    they did not -- if they could not rely on the

01:31  9    finality of their trades.

01:31 10         Q.   Do you have any basis to believe

01:31 11    that traders on cryptocurrency exchanges

01:31 12    actually read the user agreements of those

01:31 13    exchanges?

01:31 14              MS. ZORNBERG:  Object to form.

01:31 15         A.   I'm sorry.  I don't really

01:31 16    understand the question.

01:31 17         Q.   I understood your last answer to

01:31 18    be based, in part, on traders' review of

01:32 19    cryptocurrency exchanges' user agreements.

01:32 20              So my question is whether or not

01:32 21    you have any -- strike that.

01:32 22              Do you have any basis to believe

01:32 23    that traders on cryptocurrency exchanges

01:32 24    actually read those user agreements of those

01:32 25    exchanges?

159

01:32  1          A.    I mean, I can't say for sure.  I

01:32  2    can't speak to every trader everywhere.

01:32  3    However, the user agreements certainly

01:32  4    stipulate some very clear requirements that

01:32  5    are demanded of users.

01:32  6               For example, in many of the user

01:32  7    agreements I reviewed here, it demands that a

01:32  8    user get a wallet that is particular to that

01:32  9    exchange, that that user then fill that wallet

01:32 10    with a certain amount of value.

01:32 11               So I would imagine that user

01:32 12    agreements would have to -- users would have

01:32 13    to reflect and think and read that agreement

01:32 14    in order to know what to do when they -- when

01:33 15    they naturalize themselves on a cryptocurrency

01:33 16    exchange.

01:33 17          Q.    Do you have any basis to believe

01:33 18    that a trader on a cryptocurrency exchange

01:33 19    would read the entire user agreement of that

01:33 20    exchange?

01:33 21               MS. ZORNBERG:  Objection.

01:33 22          A.    I really can't speak to every

01:33 23    trader everywhere.  It would be certainly in

01:33 24    the trader's interest to read those user

01:33 25    agreements because it sets out the obligations

                                              160

01:33   1    of traders.

01:33   2              In addition, the user agreements

01:33   3    also sets out the kind of conduct that is

01:33   4    expected of traders and the punishment that

01:33   5    may arise if that conduct is not observed.

01:33   6              Moreover, these user agreements

01:33   7    are, for the most part, clearly written

01:33   8    generally.  They're not particularly long

01:33   9    generally.

01:34  10              And so they do appear to be

01:34  11    amenable to being easily read by folks using

01:34  12    the exchange.

01:34  13         Q.   Are you expressing an opinion

01:34  14    here that traders on cryptocurrency exchanges

01:34  15    actually do read those exchanges' user

01:34  16    agreements?

01:34  17         A.   I'm not expressing that opinion.

01:34  18         Q.   Okay.  Paragraph 68 on page 37.

01:34  19    Near the bottom of the paragraph, you

01:34  20    reference trading on Bittrex.

01:34  21              Do you see that?

01:34  22         A.   Which part?  I'm sorry.

01:34  23         Q.   Say, the bottom half of paragraph

01:34  24    68 discusses Bittrex?

01:34  25         A.   Okay.

                                                    161

01:34  1        Q.    And you reference that Bittrex

01:35  2   offers customers both on-chain and off-chain

01:35  3   settlement options.  Is that correct?

01:35  4        A.    Yes.

01:35  5        Q.    Okay.  Was XRP traded on Bittrex?

01:35  6        A.    I believe so.

01:35  7        Q.    Do you know whether any of the

01:35  8   XRP traded on Bittrex was traded using

01:35  9   on-chain settlement?

01:35  10       A.    I don't know.

01:35  11       Q.    Turning to page -- the next page,

01:35  12  page 38 and paragraph 69.  The first sentence

01:35  13  is:

01:35  14            "The fact that transactions are

01:35  15            executed instantaneously and are final

01:35  16            following matching is supported by the

01:35  17            understanding of market participants."

01:35  18            Do you see that?

01:35  19       A.    I do.

01:35  20       Q.    And right after that sentence,

01:35  21  you again cite Mr. Gil's testimony.

01:35  22            Do you see that?

01:35  23       A.    I do.

01:35  24       Q.    Do you have any basis for your

01:35  25  conclusion about the understanding of market

162

01:35  1    participants other than Mr. Gil's testimony?

01:36  2         A.    Going back to my earlier answer,

01:36  3    it is a core and fundamental principle of

01:36  4    exchange design that transactions become final

01:36  5    as soon as they're matched.  Without that,

01:36  6    transaction functions would be extremely

01:36  7    diminished in quality.

01:36  8         Q.    And focusing just on market

01:36  9    participants' understanding of that principle,

01:36 10    do you have any basis, other than Mr. Gil's

01:36 11    testimony, for your belief that market

01:36 12    participants understand that?

01:36 13              MS. ZORNBERG:  Objection.  Asked

01:36 14         and answered.

01:36 15              You can answer again.

01:36 16         A.    Again, it is a core principle of

01:36 17    exchange design that transactions become final

01:36 18    once they're matched and become binding.

01:36 19              As noted earlier, that is set out

01:36 20    in many user agreements and reflected in the

01:37 21    fact that users are assenting to these user

01:37 22    agreements.

01:37 23         Q.    I'm sorry, I didn't hear that

01:37 24    word.  Users are what?

01:37 25         A.    Assenting.

163

01:37  1             Q.    When you say "assenting," can you
01:37  2    tell me what --
01:37  3             A.    Agreeing to.
01:37  4             Q.    How do users reflect their
01:37  5    agreement -- their -- with the user
01:37  6    agreements?
01:37  7             A.    I'm sorry?
01:37  8             Q.    How, if at all, do users --
01:37  9    strike that.
01:37 10             How, if at all, do traders on
01:37 11    cryptocurrency exchanges reflect their
01:37 12    agreement with user agreements?
01:37 13             MS. ZORNBERG:  Object to form.
01:37 14             A.    It's my understanding that a user
01:37 15    agreement has to be completed by a user before
01:37 16    they're able to access exchange services on a
01:37 17    cryptocurrency exchange.
01:37 18             Q.    Did you read the entirety of
01:37 19    Mr. Gil's deposition testimony?
01:37 20             A.    I did.
01:37 21             Q.    Did Mr. Gil speak to the physical
01:37 22    location of matching agents on cryptocurrency
01:38 23    exchanges?
01:38 24             MS. ZORNBERG:  Objection.
01:38 25             A.    I can't recall.  I'm sorry.

                                              164

```
01:38   1              MR. SYLVESTER:  I think this is
01:38   2         probably a good time for a break if that
01:38   3         works for you.
01:38   4              MS. ZORNBERG:  Of course.
01:38   5              MR. SYLVESTER:  Okay.  Let's go
01:38   6         off the record.
01:38   7              THE VIDEOGRAPHER:  The time now
01:38   8         is 1:38 p.m.  This concludes Media 4.
01:38   9         Off the record.
01:38  10              (Lunch recess taken from
02:27  11         1:38 p.m. to 2:27 p.m.)
       12           (Continued on the next page.)
       13                    - - -
       14
       15
       16
       17
       18
       19
       20
       21
       22
       23
       24
       25
```

                                                        165

```
 1        A F T E R N O O N   S E S S I O N
 2                      - - -
 3             (Time noted:  2:27 p.m.)
 4                      - - -
 5             THE VIDEOGRAPHER:  The time now
 6        is 2:27.  This begins Media 5.  On the
 7        record.
 8
 9    Y E S H A   Y A D A V, resumed and testified
10             further as follows:
11    CONTINUED EXAMINATION
12    BY MR. SYLVESTER:
13        Q.    Professor, can we look at
14    paragraph 71 of your report on page 39.  The
15    first sentence of paragraph 71 says:
16             "I have been asked to provide an
17        opinion on whether offers to buy and
18        sell cryptocurrencies like XRP, trading
19        on an exchange, take place on the
20        exchange itself or elsewhere."
21             My first question is:  Is your
22    opinion limited to offers to buy and sell XRP
23    on an exchange?
24             MS. ZORNBERG:  Objection.  Asked
25        and answered.
```

02:27 13
02:28 14
02:28 15
02:28 16
02:28 17
02:28 18
02:28 19
02:28 20
02:28 21
02:28 22
02:28 23
02:28 24
02:28 25

166

02:28   1                    You can answer.

02:28   2          A.    My opinion is limited to offers

02:28   3   to buy and sell cryptocurrencies trading on an

02:28   4   exchange.

02:28   5          Q.    The last portion of that sentence

02:28   6   says "take place on the exchange itself or

02:29   7   elsewhere."

02:29   8                    Do you see that?

02:29   9          A.    I do.

02:29  10          Q.    When you say "elsewhere," what do

02:29  11   you mean by that?  Where else could offers or

02:29  12   trades on an exchange happen?

02:29  13                    MS. ZORNBERG:  Object to form.

02:29  14          A.    Perhaps they might happen off

02:29  15   exchange.

02:29  16          Q.    When you say "off exchange," can

02:29  17   you explain what you mean by that?

02:29  18          A.    It can reference any number of

02:29  19   different market structure possibilities.

02:29  20          Q.    Can you give me an example?

02:29  21          A.    For example, over-the-counter

02:29  22   bilateral trades happen off exchange.

02:29  23          Q.    Okay.  The next sentence says:

02:29  24                    "Based on my research and

02:29  25               experience, I conclude that offers to

                                                    167

02:30  1            buy and sell cryptocurrencies take place

02:30  2            on an exchange and become binding trades

02:30  3            as soon as they are matched within the

02:30  4            books and records of the exchange in

02:30  5            accordance with the rules of the

02:30  6            exchange."

02:30  7                 Do you see that?

02:30  8        A.    Yes.

02:30  9        Q.    On what research is that

02:30  10   conclusion based?

02:30  11        A.    That is based on my general body

02:30  12   of research, my work experience in

02:30  13   professional practice, as well as specific

02:30  14   research material that I reference in this

02:30  15   report.

02:30  16        Q.    Okay.  Is there a distinction

02:30  17   between research and experience in that

02:30  18   sentence?

02:30  19        A.    For example, I have had

02:30  20   professional experience during which time I

02:31  21   was involved, as part of legal practice, in

02:31  22   advising on matters relating to exchanges,

02:31  23   clearinghouses, and other market

02:31  24   infrastructure providers.

02:31  25        Q.    Is any of the experience that you

                                                      168

02:31  1    just discussed related to cryptocurrency

02:31  2    exchanges?

02:31  3             A.    That experience happened in

02:31  4    the -- at a time when cryptocurrency exchanges

02:31  5    weren't around.

02:31  6             Q.    Do you have any professional

02:31  7    experience relevant to -- strike that.

02:31  8                   Do you have any professional

02:31  9    experience related to cryptocurrency exchanges

02:31 10    that's encompassed within your reference to

02:31 11    experience in paragraph 71?

02:31 12             A.    So the --

02:31 13                   MS. ZORNBERG:  Object to form.

02:31 14                   You can answer.

02:31 15                   THE WITNESS:  Sorry.

02:31 16             A.    So the experience that I have in

02:31 17    professional practice included frequently

02:31 18    advising on and studying matters relating to

02:31 19    exchange design, transactions, payment

02:32 20    finality, and so forth.

02:32 21                   In addition, the work that I was

02:32 22    doing as part of practice, as detailed in the

02:32 23    CV, also looked at payment services providers

02:32 24    and innovation in payment services.

02:32 25                   Work in relation to

                                                      169

02:32  1    cryptocurrencies and cryptocurrency exchanges

02:32  2    is a very natural extension of the work that I

02:32  3    did in professional practice.  That was

02:32  4    examining issues of exchange design, order

02:32  5    submission, settlement, finality, and risk

02:32  6    management.

02:32  7            As noted in this report, many

02:32  8    practices that are deployed by cryptocurrency

02:32  9    exchanges borrow heavily from existing

02:32 10    paradigms in traditional market design.

02:32 11            And that work I did extensively

02:32 12    throughout practice in my legal practice as

02:32 13    well as studied it as part of my research

02:32 14    thoroughly over this last decade.

02:32 15        Q.    Just focusing on your legal

02:33 16    practice, did any of that touch on matters

02:33 17    related to cryptocurrency exchanges?

02:33 18            MS. ZORNBERG:  Object to form.

02:33 19        A.    That was at the time prior to

02:33 20    when cryptocurrencies were around, if one

02:33 21    takes Satoshi Nakamoto's 2008 paper as

02:33 22    potentially an origin point.

02:33 23            However, the experience that I

02:33 24    gleaned as part of that professional practice

02:33 25    provides a very natural foundation for

170

02:33  1    studying and analyzing the operations of

02:33  2    cryptocurrency exchanges.

02:33  3          Q.    I think I follow what you're

02:33  4    saying, but I just want to make sure I

02:33  5    understand.

02:33  6               So none of your professional

02:33  7    experience had to do with cryptocurrency

02:33  8    exchanges, but it -- your professional

02:33  9    experience nevertheless informs your view in

02:33 10    the report?

02:33 11          A.    It --

02:33 12               MS. ZORNBERG:  Object to --

02:33 13          object to form.

02:33 14          Q.    Is that fair?

02:33 15          A.    My professional experience

02:33 16    informs my research and understanding of

02:33 17    cryptocurrency exchanges.

02:33 18               In addition, I would highlight my

02:34 19    policy experience that I've engaged in over

02:34 20    the last -- over a period of years, for

02:34 21    example, in relation to work with the CFTC,

02:34 22    where there has been discussion and

02:34 23    examination of various cryptocurrency-related

02:34 24    technologies.

02:34 25          Q.    Other than your policy work, what

                                                        171

02:34  1    professional experience do you have strictly

02:34  2    related to cryptocurrency exchanges?

02:34  3              MS. ZORNBERG:  I have a standing

02:34  4         objection to the word "professional,"

02:34  5         because I don't know if you mean law

02:34  6         firm or something broader.

02:34  7              Q.    Do you have an understanding of

02:34  8    what I mean by "professional experience"?

02:34  9              A.    My teaching and research

02:34 10    experience, if that -- I mean, I consider that

02:34 11    to be my professional experience as well.

02:34 12              And in that regard, in addition

02:34 13    to my practice work at Clifford Chance, which

02:34 14    provided a very granular understanding of

02:34 15    exchange design, I was advising very

02:35 16    frequently various market participants in

02:35 17    relation to issues pertaining to exchanges,

02:35 18    clearinghouses, finality, risk management, on

02:35 19    a cross-border basis.

02:35 20              I worked extensively, as noted

02:35 21    earlier, with the European Payments Council in

02:35 22    relation to developing rules and processes for

02:35 23    payment services on a Pan-European level.

02:35 24    Those -- that scheme, that governance

02:35 25    structure is still there today.

02:35  1          My professional experience in the

02:35  2     academic context includes extensive teaching.

02:35  3     I have taught -- I have taught

02:35  4     cryptocurrencies as part of my courses in

02:35  5     relation to financial markets innovation.

02:35  6     Currently I'm teaching a seminar on

02:35  7     cryptocurrencies that is focused exclusively

02:35  8     on cryptocurrencies.

02:35  9          In addition, of course, I'm

02:35 10     researching cryptocurrencies extensively as

02:35 11     part of my research agenda.

02:35 12          Q.   When you were in private

02:35 13     practice, were any of your clients

02:35 14     cryptocurrency exchanges?

02:35 15          A.   When I was in private practice?

02:36 16     At what time?  When were you -- which practice

02:36 17     are you referring to?

02:36 18          Q.   It doesn't matter for the scope

02:36 19     of my question.  Any time you were in private

02:36 20     practice, were any of your clients

02:36 21     cryptocurrency exchanges?

02:36 22          MS. ZORNBERG:  Object to form.

02:36 23          A.   So when I was in private practice

02:36 24     in Clifford Chance in London, it would have

02:36 25     been impossible to have clients relating to

                                                      173

02:36  1   cryptocurrency exchanges, as that technology

02:36  2   did not exist as I understand it.

02:36  3           However, I did have, as noted,

02:36  4   plenty of clients that related to various

02:36  5   aspects of different exchange functions.

02:36  6   So -- and including clearing and settlement

02:36  7   systems, and obviously in relation to payment

02:36  8   systems as well.

02:36  9       Q.   Okay.  But you've never had a

02:36 10   client that actually was a cryptocurrency

02:36 11   exchange?

02:36 12           MS. ZORNBERG:  Objection.  Asked

02:36 13       and answered.

02:36 14       A.   No, I haven't.

02:37 15       Q.   Okay.  The last sentence of

02:37 16   paragraph 71 says:

02:37 17           "Therefore, both offers and

02:37 18       trades occur on the exchange and at the

02:37 19       geographic location of the exchange."

02:37 20           Do you see that?

02:37 21       A.   I do.

02:37 22       Q.   Okay.  What do you mean by "the

02:37 23   geographic location of the exchange"?

02:37 24       A.   I mean where the exchange is

02:37 25   located.

                                           174

02:37  1          Q.    How does one make the
02:37  2    determination where an exchange is located?
02:37  3          A.    In my opinion, I set out four
02:37  4    indicia that I considered to be the core
02:37  5    indicia for determining the location of a
02:37  6    cryptocurrency exchange.
02:37  7          Q.    Did you create those core
02:37  8    indicia?
02:37  9          A.    I did.
02:38 10          Q.    Do you believe that those core
02:38 11    indicia are generally accepted in your field
02:38 12    as authoritative on determining the location
02:38 13    of a cryptocurrency exchange?
02:38 14          A.    This is a new issue.  The
02:38 15    criteria that I set out reflects what I
02:38 16    consider to be an informed understanding of
02:38 17    what I would imagine researchers in my field
02:38 18    would consider to be eminently reasonable and
02:38 19    correct as a way of identifying four core
02:38 20    criteria that would be dispositive in
02:38 21    determining the location of a cryptocurrency
02:38 22    exchange.
02:38 23          Q.    Do you know one way or another
02:38 24    whether researchers in your field do consider
02:38 25    your criteria to be eminently reasonable and

                                               175

02:38  1     correct?

02:38  2                    MS. ZORNBERG:  Object to form.

02:38  3          A.    I've put forward these indicia in

02:38  4     this opinion.  It's a new area.  I have made

02:39  5     an attempt to put out four core indicia that I

02:39  6     consider to be very logical, very reasonable,

02:39  7     well-founded, that would govern and provide a

02:39  8     credible understanding of where an exchange is

02:39  9     located.

02:39 10                    This is a new issue.  I believe

02:39 11     if researchers in my field were to have a look

02:39 12     and consider this opinion, I imagine that they

02:39 13     would be very supportive of the reasoning and

02:39 14     the logic that is put forward in this opinion

02:39 15     with respect to these indicia.

02:39 16          Q.    Did you consult with any of the

02:39 17     researchers in your field when forming your

02:39 18     indicia?

02:39 19          A.    I did not.  However, I have

02:39 20     relied on my extensive professional

02:39 21     experience, including legal practice, legal

02:39 22     research, and teaching as well in the area of

02:39 23     cross-border payments and cross-border

02:39 24     banking, to determine what I consider to be

02:39 25     four core indicia for determining the location

                                                        176

02:39   1   of a cryptocurrency exchange.

02:39   2          Q.    To your knowledge, are any of the

02:40   3   researchers in your field aware of the four

02:40   4   indicia that you've selected to determine the

02:40   5   location of a cryptocurrency exchange?

02:40   6               MS. ZORNBERG:  Object to form.

02:40   7          A.    I do not believe so.  This

02:40   8   opinion is confidential as far as I

02:40   9   understand.

02:40  10          Q.    Have you ever read any academic

02:40  11   literature setting forth the four criteria

02:40  12   that you selected for determining the location

02:40  13   of a cryptocurrency exchange?

02:40  14          A.    I have not but this is a new

02:40  15   issue.  And my opinion provides an attempt to

02:40  16   set out four core indicia that I feel

02:40  17   is -- that I feel are logical, reasonable, and

02:40  18   well founded.

02:40  19          Q.    Is it fair to say that because

02:40  20   this issue is so new, your four indicia could

02:40  21   not possibly be generally accepted in your

02:40  22   field yet?

02:40  23               MS. ZORNBERG:  Object to form.

02:40  24          A.    I disagree.  I feel that the

02:40  25   indicia that I provided here is based on

177

02:40  1    extensive professional experience that comes

02:40  2    from a very close interaction with the

02:40  3    exchange industry, advising on issues with

02:41  4    respect to the cross-border migration of

02:41  5    value, capital, cash securities, assets

02:41  6    elsewhere, and dealing with where the location

02:41  7    of transactions may be and firms in that

02:41  8    context.

02:41  9                Furthermore, at the World Bank, I

02:41 10    was involved extensively in relation to

02:41 11    thinking about issues pertaining to

02:41 12    international insolvencies, thinking about

02:41 13    where assets might be located, where

02:41 14    jurisdiction might be established, for the

02:41 15    purposes of international insolvencies.

02:41 16                As far as my research is

02:41 17    concerned, I have worked extensively on issues

02:41 18    relating to cross-border finance,

02:41 19    international standard setting in that regard.

02:41 20                And so the indicia that I provide

02:41 21    here is based on an understanding of what four

02:41 22    core factors would be that would be supported

02:41 23    by that research and experience.

02:41 24                And so I believe that researchers

02:41 25    in my field would be supportive of the

                                                      178

02:42  1    conclusions I draw here.

02:42  2          Q.    But there's no way to know for

02:42  3    sure because they're not aware of your

02:42  4    conclusions that you draw here.  Correct?

02:42  5                MS. ZORNBERG:  Objection.  Asked

02:42  6          and answered.

02:42  7          A.    I don't believe the opinion's

02:42  8    been seen.  I believe it's a confidential

02:42  9    opinion.

02:42 10          Q.    Okay.  Can we go back to the end

02:42 11    of paragraph 33 which is on page 18.  Can you

02:42 12    explain to me -- strike that.

02:43 13                Professor, do you see at the end

02:43 14    of paragraph 33 where you write:

02:43 15                "In this way, the 'floor' or

02:43 16          'pit' is now very much electronic and

02:43 17          essentially dematerialized."

02:43 18                Do you see that?

02:43 19          A.    (Document review.)

02:43 20                Yes.

02:43 21          Q.    Can you reconcile for me your

02:43 22    view that the trading function of an exchange

02:43 23    is essentially dematerialized with your

02:43 24    conclusion that an exchange has a geographical

02:43 25    location, as reflected at the end of paragraph

                                                    179

02:43  1    71?

02:43  2                    MS. ZORNBERG:  Object to form.

02:43  3                    You can answer.

02:43  4           A.    The opinion sets out four

02:43  5    criteria that are indicative of the location

02:44  6    of an exchange.  Those four criteria provide

02:44  7    an understanding of what the institutional

02:44  8    existence of an exchange is.  They provide and

02:44  9    link to the governance, the processes, the

02:44  10   rules of an exchange.

02:44  11                   And so that is very much

02:44  12   consistent with the fact that an exchange runs

02:44  13   a electronic trading operation.

02:44  14          Q.    And the electronic trading

02:44  15   operation is the part that's dematerialized in

02:44  16   your view.  Is that correct?

02:44  17          A.    The electronic trading operation,

02:44  18   parts of it may be very physical.  They may

02:44  19   involve bricks and mortar, computers at the

02:44  20   exchange.

02:44  21          Q.    Servers?  Sorry.

02:44  22          A.    So they may involve physical

02:45  23   aspects.  "Dematerialized" refers to the fact

02:45  24   of electronic trading.

02:45  25          Q.    And just to follow up, that

                                                    180

02:45  1   electronic trading operation would also

02:45  2   involve servers, too.  Correct?

02:45  3        A.   Coming back do my earlier answer,

02:45  4   a part of that operation, the matching of one

02:45  5   byte with another, b-y-t-e, with another, at

02:45  6   some point would likely involve the operation

02:45  7   of some server.

02:45  8             However, that trade process is

02:45  9   much bigger and deeper than the simple

02:45 10   mechanical matching of one byte, b-y-t-e, with

02:45 11   another.

02:45 12        Q.   Is a trade final when -- strike

02:45 13   that.

02:45 14             Is a trade final upon the simple

02:45 15   mechanical matching of one byte with another

02:45 16   if the one byte on the one side is an offer to

02:45 17   buy and the other byte on the other side is an

02:45 18   offer to sell?

02:45 19        A.   When trades match, they becoming

02:45 20   binding in accordance with the rules and

02:45 21   processes of an exchange.

02:46 22        Q.   And I'm asking about when -- what

02:46 23   moment in time.  So when the offer to buy byte

02:46 24   and the offer to sell byte meet somewhere, is

02:46 25   that the moment in which the trade is

181

02:46 1    finalized?

02:46 2                    MS. BUNTING:  Objection.

02:46 3                    MS. ZORNBERG:  Object to form.

02:46 4         Q.    You can answer.

02:46 5         A.    So that matches.  However, that

02:46 6    also has to be recognized as matched by the

02:46 7    exchange.  So the exchange has to validate

02:46 8    that matching.

02:46 9               It's not simply the case that one

02:46 10   electron interacts with another electron in

02:46 11   space.  The exchange has to give it form.  And

02:46 12   the exchange has to validate that interaction

02:46 13   with its own rules and processes to determine

02:46 14   whether that electron matching was done in a

02:46 15   valid way in accordance with the exchange's

02:46 16   rules and processes.

02:46 17        Q.    So it's your view that the trade

02:46 18   is finalized at some moment in time past the

02:46 19   matching of the offer to buy byte and the

02:46 20   offer to sell byte?

02:46 21                   MS. ZORNBERG:  Objection.

02:46 22        A.    The point I'm making is

02:46 23   conceptual.  The conceptual point I'm making

02:47 24   here is that the electron matching of one

02:47 25   electron with another isn't sufficient.

                                                      182

02:47  1          The exchange has to be present in

02:47  2  its rules and processes to validate that

02:47  3  matching is providing a binding trade on the

02:47  4  platform of the exchange.

02:47  5          Q.    Okay.  Let me pose a

02:47  6  hypothetical.  If I'm sitting at my computer

02:47  7  and I enter a keystroke in which I offer to

02:47  8  buy on a cryptocurrency exchange, in your

02:47  9  view, is the trade final?

02:47 10          MS. BUNTING:  Objection.

02:47 11          A.    No.

02:47 12          Q.    Okay.  What needs to happen next?

02:47 13          A.    So once you've submitted an order

02:47 14  to buy, where has that -- where have you

02:47 15  submitted that order?

02:48 16          Q.    Let's say Binance.

02:48 17          (Stenographer clarification.)

02:48 18          A.    So once you've submitted that

02:48 19  order into the -- Binance's order submission

02:48 20  system, that order has to then -- that

02:48 21  instruction, rather, has then to be turned

02:48 22  into an order.

02:48 23          So the instruction that you gave

02:48 24  into the Binance order submission system then

02:48 25  has to be digested by that order submission

183

02:48   1   system, vetted, validated, and then it enters

02:48   2   the matching engine of Binance, whereupon it

02:48   3   may match with another corresponding offer.

02:48   4   And as and when that happens, a trade becomes

02:48   5   final.

02:48   6          Q.    When after the matching of my

02:48   7   offer to buy with the offer to sell does the

02:48   8   trade become final?

02:48   9          A.    Ideally, that process should

02:48  10   happen as soon as possible afterwards.

02:48  11          Q.    Let me ask a better question.

02:48  12                What has to happen after my offer

02:49  13   to buy and the other person's offer to sell

02:49  14   match in order for the trade to become final?

02:49  15          A.    As soon as it matches, the

02:49  16   exchange determines that it's final.  But that

02:49  17   matching process is set up in such a way that

02:49  18   the orders that are coming into the exchange

02:49  19   are vetted and validated as orders recognized

02:49  20   by the exchange's order submission system.

02:49  21   Once that's done, those orders match and they

02:49  22   become final.

02:49  23          Q.    So if the exchange's rules are

02:49  24   such that the trade becomes final on matching,

02:49  25   then the moment in time it becomes final is

                                                        184

02:49  1    when my offer to buy meets the other person's

02:49  2    offer to sell?

02:49  3            A.    As soon as possible afterwards.

02:49  4            Q.    Okay.  Turning back to paragraph

02:50  5    71, you use the word "offer" in the -- strike

02:50  6    that.

02:50  7                  You use the word "offer"

02:50  8    throughout paragraph 71.

02:50  9                  In that paragraph, are you

02:50 10    offering any opinion on the meaning of the

02:50 11    term "offer" under the Securities Act of 1933?

02:50 12            A.    I am not.

02:50 13            Q.    Okay.  And when you use the word

02:50 14    "offer," are you intending to use it

02:50 15    co-extensively with the meaning of the word

02:50 16    "offer" under the Securities Act of 1933?

02:50 17                  MS. ZORNBERG:  Objection.  Asked

02:50 18            and answered.

02:50 19                  Are you specific to paragraph 71

02:50 20            still?

02:50 21                  MR. SYLVESTER:  Yes.

02:50 22            A.    I am not.

02:50 23            Q.    Okay.  Is there any place in your

02:50 24    report where you use the word "offer" and you

02:50 25    intend it to be co-extensive with the meaning

185

02:51  1    of the term "offer" in the Securities Act of

02:51  2    1933?

02:51  3           A.    I do not.

02:51  4           Q.    Okay.  Is it your opinion that in

02:51  5    the case of each unit of XRP offered by

02:51  6    defendants, defendant's offer was limited to

02:51  7    the entry of a buy-or-sell order on a

02:51  8    cryptocurrency exchange?

02:51  9                 MS. ZORNBERG:  Objection.

02:51 10           A.    I'm sorry.  Can you repeat the

02:51 11    question.

02:51 12           Q.    Sure.  Is it your opinion that in

02:51 13    the case of each unit of XRP offered by

02:51 14    defendants, defendants' offer was limited to

02:51 15    the entry of a buy-or-sell order on a

02:51 16    cryptocurrency exchange?

02:51 17                 MS. ZORNBERG:  Objection.

02:51 18           A.    My opinion here --

02:51 19                 MS. ZORNBERG:  Outside the scope.

02:51 20                 THE WITNESS:  Sorry.

02:51 21           A.    My opinion here relates to the

02:51 22    question about how offers to buy and sell

02:51 23    cryptocurrencies in exchange are made and

02:51 24    become final and where the exchange is then

02:51 25    located.

                                                    186

02:52 1          Q.    As part of your work on your --

02:52 2    strike that.

02:52 3                As part of forming your expert

02:52 4    opinion, did you consider the geographic

02:52 5    location where orders to buy or sell XRP were

02:52 6    placed?

02:52 7                MS. ZORNBERG:  Object to form.

02:52 8          A.    I'm sorry, could you repeat the

02:52 9    question.

02:52 10         Q.    Sure.  As part of your work

02:52 11   forming your opinion, did you consider the

02:52 12   geographic location where orders to buy or

02:52 13   sell XRP were placed?

02:52 14               MS. ZORNBERG:  Object to form.

02:52 15         A.    In forming my opinion, I

02:52 16   considered the microstructural processes for

02:52 17   submitting orders to an exchange in order to

02:52 18   determine how these microstructural processes

02:52 19   operate to make the offer to buy and sell a

02:53 20   cryptocurrency final on a cryptocurrency

02:53 21   exchange.

02:53 22         Q.    Can you define "microstructural

02:53 23   processes" as you just used it in your answer?

02:53 24         A.    Sure.  There's no defined term as

02:53 25   such with respect to microstructure; however,

187

02:53 1    broadly speaking, this refers to the detailed

02:53 2    processes, operational processes by which

02:53 3    trades happen and value moves within an

02:53 4    exchange.

02:53 5          Q.    As part of forming your opinions

02:53 6    set forth in your report, did you consider

02:53 7    where the -- a person submitting an offer to

02:53 8    buy or sell on an exchange was physically

02:53 9    located?

02:53 10         A.    What I considered in my opinion

02:53 11   was how offers to buy and sell a

02:53 12   cryptocurrency are made in order for these

02:53 13   offers to be valid orders on an exchange that

02:53 14   become binding on that exchange.

02:54 15               As part of that process, I

02:54 16   detailed the order submission processes that

02:54 17   allow orders to be made and become valid and

02:54 18   binding for trades to take place on an

02:54 19   exchange.

02:54 20         Q.    In your view and in your opinion,

02:54 21   is there any relevance to where an individual

02:54 22   trader is located in the world when he or she

02:54 23   places an order on an exchange?

02:54 24         A.    What do you mean by "place an

02:54 25   order"?

188

02:54  1          Q.    Let's go back to my example.

02:54  2     Let's go back to the hypothetical.  I'm going

02:54  3     to place an order an Binance.  Two

02:54  4     hypotheticals.  In one, I'm sitting here in

02:54  5     New York City.  Another one, I'm sitting in

02:54  6     London.

02:54  7                Does the difference between my

02:54  8     physical location in placing an offer to buy

02:54  9     on Binance have any relevance whatsoever to

02:54 10     your opinion about where an order takes place?

02:54 11          A.    No.

02:54 12                MS. ZORNBERG:  Objection -- I'm

02:54 13          going to object to the form, although

02:54 14          the witness answered.

02:55 15          Q.    And as part of forming your

02:55 16     opinions in this case, did you consider the

02:55 17     geographic location that title passed in

02:55 18     transactions involving the purchase or sale of

02:55 19     XRP?

02:55 20                MS. ZORNBERG:  Object to form.

02:55 21          A.    Could you repeat the question.

02:55 22          Q.    Sure.  In forming your opinions

02:55 23     in this case, did you consider the geographic

02:55 24     location that title passed in transactions

02:55 25     involving the purchase or sale of XRP?

189

02:55  1                    MS. ZORNBERG:  Same objection.

02:55  2            A.    The purchase and sale of XRP.  In

02:55  3    what context are you discussing this?

02:55  4            Q.    The purchase of XRP on

02:55  5    cryptocurrency exchanges.

02:55  6            A.    Could you repeat the question

02:55  7    again.

02:55  8            Q.    Sure.

02:55  9                    MS. BUNTING:  Could you slow it

02:55 10            down a bit, Mark.  It's just a bit fast.

02:55 11                    MR. SYLVESTER:  Sure.

02:55 12            Q.    In forming your opinions in this

02:55 13    case, did you consider the geographic location

02:55 14    that title passed in transactions involving

02:55 15    the purchase or sale of XRP on cryptocurrency

02:55 16    exchanges?

02:55 17            A.    My --

02:55 18                    MS. ZORNBERG:  Objection.

02:55 19            A.    -- opinion, I looked at how

02:55 20    offers to buy and sell cryptocurrencies are

02:55 21    made on an exchange, how they become final in

02:55 22    the exchange, final and binding on the

02:56 23    exchange, and where the exchange is located.

02:56 24            Q.    Is it of any relevance to your

02:56 25    opinion where title is passed in a sale on a

                                                          190

02:56  1    cryptocurrency exchange?

02:56  2              MS. ZORNBERG:  Objection.

02:56  3         A.    Could you repeat the question

02:56  4    again.

02:56  5         Q.    Sure.  Is it of any relevance to

02:56  6    your opinion where title is passed for any

02:56  7    given sale on a cryptocurrency exchange?

02:56  8         A.    No.

02:56  9         Q.    Okay.  Is it -- was it of any

02:56 10    relevance to your expert opinion the

02:56 11    geographic location in which payment was

02:56 12    exchanged for any transaction that occurred on

02:56 13    a cryptocurrency exchange?

02:56 14              MS. ZORNBERG:  Object to form.

02:56 15         A.    So in looking at the question of

02:56 16    how offers to buy and sell cryptocurrencies

02:57 17    are made on an exchange and become binding on

02:57 18    the exchange and its location, I -- it's not

02:57 19    relevant to my opinion regarding payment.

02:57 20         Q.    Was it of any relevance to your

02:57 21    opinion -- strike that.

02:57 22              Was the geographic location of

02:57 23    any contracts for the purchase or sale of a

02:57 24    digital asset of any relevance to your opinion

02:57 25    in this case?

                                                        191

02:57  1            A.    I'm not sure what you mean by
02:57  2    that.
02:57  3            Q.    Under the user agreements you
02:57  4    reviewed, at some point, a trader on a
02:57  5    cryptocurrency exchange becomes bound
02:57  6    to -- strike that.
02:57  7                  Is there a point in a
02:57  8    cryptocurrency transaction in which a trader
02:58  9    becomes bound to -- becomes bound to his offer
02:58 10    to buy or sell?
02:58 11                  MS. ZORNBERG:  On an exchange?
02:58 12                  MR. SYLVESTER:  On an exchange.
02:58 13            A.    Well, yes.  When the orders to
02:58 14    buy and sell match, that transaction becomes
02:58 15    binding on the participants that submit that
02:58 16    order.
02:58 17            Q.    Was where the orders to buy and
02:58 18    sell match of any relevance to you in
02:58 19    determining where a cryptocurrency exchange
02:58 20    was located for purposes of your opinion?
02:58 21                  MS. ZORNBERG:  Object to form.
02:58 22            A.    In my opinion, orders to buy and
02:58 23    sell are matched by the exchange and on the
02:58 24    exchange.  And so they happen at the location
02:58 25    of the exchange, as set out in this opinion.

192

02:58  1          Q.    In your opinion, is it possible

02:59  2     for parties to trade on an exchange and become

02:59  3     bound to the transaction at two separate times

02:59  4     or locations?

02:59  5          A.    In my opinion, parties become

02:59  6     bound to the transaction once orders to buy

02:59  7     and sell the cryptocurrency are made on the

02:59  8     exchange and made binding by the exchange in

02:59  9     accordance with its rules and processes and at

02:59 10     the geographic location of the exchange.

02:59 11          Q.    Did any of the user agreements

02:59 12     that you reviewed in connection with your work

02:59 13     on this case expressly state where trades of

02:59 14     digital assets occur?

02:59 15          A.    I'm not sure what you mean by

02:59 16     that.

02:59 17          Q.    Did any of the user agreements

02:59 18     that you reviewed in this case state, "The

02:59 19     trades on this exchange occur in," and then

02:59 20     name a jurisdiction?

03:00 21          A.    Many of the user agreements that

03:00 22     I reviewed, most of them, had some kind of

03:00 23     governing law provision attached to it.  And

03:00 24     that governing law provision would govern

03:00 25     presumably whatever rule book and terms of

193

03:00  1    services apply to the parties that are

03:00  2    transacting on the exchange.

03:00  3          Q.    I'm asking something a little

03:00  4    narrower, though, just about your review of

03:00  5    the words that are in the user agreements.

03:00  6                Did any of those user agreements

03:00  7    expressly state, "The trades on our exchange

03:00  8    take place in X jurisdiction"?

03:00  9          A.    I can't recall.

03:00 10          Q.    If you had seen those words or

03:00 11    language similar to that in a user agreement,

03:00 12    do you think you would have put that in your

03:00 13    report?

03:00 14                MS. ZORNBERG:  Objection.

03:00 15          A.    Yes.

03:01 16          Q.    Why?

03:01 17          A.    May be a consideration to think

03:01 18    about.

03:01 19          Q.    Let's look at paragraph 77,

03:01 20    please.  I'm looking at the bottom of -- the

03:01 21    portion of 77 that's on page 42, starting with

03:01 22    "In other words, parties do not generally

03:01 23    know."

03:01 24                Do you see where I am?  It's the

03:01 25    last, say, five lines of paragraph 77 on page

                                                      194

```
03:02   1    42.
03:02   2            A.      (Document review.)
03:02   3                    Okay.
03:02   4            Q.      You write:
03:02   5                    "In other words, parties do not
03:02   6            generally know in advance with whom they
03:02   7            are trading.  They cannot submit an
03:02   8            offer with the express aim of trading
03:02   9            with a specific party on the other side.
03:02  10            It seems extremely unlikely that
03:02  11            cryptocurrency exchanges would depart
03:02  12            from this model."
03:02  13                    Do you see that?
03:02  14            A.      Yes.
03:02  15            Q.      Do you know one way or another
03:02  16    whether or not cryptocurrency exchanges
03:02  17    actually do depart from this model?
03:03  18            A.      Whether they do?
03:03  19            Q.      Mm-hmm.
03:03  20                    MS. ZORNBERG:  Object to form.
03:03  21            A.      Candidly, it would be unthinkable
03:03  22    and possibly create a venue that is rife with
03:03  23    manipulation if they did.  So in my mind, any
03:03  24    exchange that did would be a completely
03:03  25    disreputable exchange.
```

195

03:03 1          Q.   Be that as it may, sitting here

03:03 2     today, do you know whether or not any

03:03 3     cryptocurrency exchanges actually do depart

03:03 4     from this model?

03:03 5          A.   I can't say for sure.  I would be

03:03 6     shocked if they did.  In the user agreements

03:03 7     that I looked at, there were at least two,

03:03 8     DigiFinex and BitMax, whose language made

03:03 9     clear that trading in these spaces is

03:03 10    anonymous.

03:03 11              It is a absolutely cardinal rule

03:03 12    of traditional marketplaces, modern electronic

03:04 13    marketplaces, that pretrade anonymity be

03:04 14    sacrosanct.

03:04 15              Given how deeply cryptocurrency

03:04 16    exchanges borrow from traditional rules and

03:04 17    processes of traditional exchanges, and

03:04 18    particularly given how important this

03:04 19    principle is, especially arguably in the

03:04 20    context of cryptocurrencies, I would be truly

03:04 21    shocked if an exchange, cryptocurrency

03:04 22    exchange, did not have pretrade anonymity as

03:04 23    part of its offering.

03:04 24         Q.   Understood.  But do you know one

03:04 25    way or the other?

                                                    196

03:04  1          MS. ZORNBERG:  Objection.

03:04  2      A.    With respect to BitMEX, with

03:04  3  respect to DigiFinex, their rules of service

03:04  4  certainly suggest that transactions are

03:04  5  safeguarding pretrade anonymity.

03:05  6          Furthermore, the order submission

03:05  7  processes that are described in the user

03:05  8  agreements that I've reviewed for most of the

03:05  9  exchanges in Table A certainly seem to suggest

03:05 10  that trading there is anonymous.

03:05 11          For example, the user -- the

03:05 12  order submission paragraphs do not require

03:05 13  that one specifies a particular party to

03:05 14  transact with.  They simply refer to the

03:05 15  placing of a buying and selling order into the

03:05 16  order -- into the order submission system.

03:05 17      Q.    Let's go to paragraph 83, please.

03:06 18  My question is:  Is the question of the point

03:06 19  at which an offer to trade made on an exchange

03:06 20  becomes binding controlled by the contractual

03:06 21  provisions of an exchange's user agreement?

03:06 22      A.    I'm so sorry.  I was just reading

03:06 23  that paragraph.

03:06 24      Q.    Sure.  Did you want to continue?

03:06 25  I --

                                                    197

03:06  1          A.    If you can give me just two
03:06  2    seconds.
03:06  3          Q.    Of course.  Go ahead.
03:06  4          A.    Thank you.
03:06  5                (Document review.)
03:06  6          Q.    So may question was:  Is the
03:07  7    question of the point at which an offer to
03:07  8    trade made on an exchange becomes binding
03:07  9    controlled by the contractual provisions of
03:07 10    the user agreement of that exchange?
03:07 11          A.    Those are -- those user
03:07 12    agreements stipulate the rules of the road as
03:07 13    between the exchange and the user.  The
03:07 14    exchange establishes its order submission,
03:07 15    matching, and finality procedures, and users
03:07 16    agree to be subject to those submission,
03:07 17    matching, and finality procedures.
03:07 18          Q.    So is it fair to say that those
03:07 19    user agreements govern the question of when an
03:07 20    offer to trade made on an exchange becomes
03:07 21    binding?
03:07 22          A.    They govern the bargain reached
03:07 23    between the exchange and the user to determine
03:07 24    when orders to buy and sell a cryptocurrency
03:07 25    become binding and final on the exchange.

198

03:07   1         Q.    Is there anything outside of the

03:08   2   user agreement that is relevant to the

03:08   3   question of when an offer to trade on an

03:08   4   exchange becomes binding?

03:08   5         MS. ZORNBERG:   Object to form.

03:08   6         A.    I'm not sure what you mean.

03:08   7         Q.    We can move on.   Looking at the

03:08   8   last two sentences of paragraph 83, you write:

03:08   9         "As per my review of various user

03:08 10         agreements, these rules establish, inter

03:09 11         alia, processes and procedures relating

03:09 12         to dispute resolution, governing law,

03:09 13         place of domicile, and incorporation.

03:09 14         In doing so, they also work to tie an

03:09 15         exchange more formally to a geographic

03:09 16         locale as a matter of its operation and,

03:09 17         arguably, also in the expectations of

03:09 18         those that use the venue."

03:09 19         Can you explain how the processes

03:09 20   and procedures relating to dispute resolution,

03:09 21   governing law, place of domicile, and

03:09 22   incorporation work to tie an exchange more

03:09 23   formally to a geographic locale as a matter of

03:09 24   its operation?

03:09 25         A.    So here the terms of service

199

03:09  1    often include a governing law, as set out in

03:09  2    Table A, for the different exchanges.  That

03:10  3    governing law can determine any number of

03:10  4    important issues, for example, in relation to

03:10  5    asset distribution, potentially, upon an

03:10  6    exchange's insolvency, for example.

03:10  7            And so in so doing, the terms of

03:10  8    service and the procedures that establish

03:10  9    where governing law -- what governing law

03:10 10    applies to that will tie the geographic

03:10 11    location of the exchange more closely to the

03:10 12    exchange's terms of service and its terms of

03:10 13    operation.

03:10 14        Q.   In the last sentence of paragraph

03:10 15    83, can you explain what you mean by the

03:10 16    phrase "as a matter of its operation"?

03:10 17        A.   Yes.  What I mean in general is

03:11 18    the -- as a part of its institutional

03:11 19    existence.

03:11 20        Q.   Is there a particular operational

03:11 21    component to its institutional existence that

03:11 22    you're referencing in the last sentence of

03:11 23    paragraph 83?

03:11 24        A.   What I mean here is that these

03:11 25    user agreements tie the general workings and

200

03:11  1    institutional existence of an exchange more

03:11  2    closely to its geographic location.

03:11  3          Q.    In your view, does the

03:11  4    understanding of market participants affect

03:11  5    the actual geographic location where trading

03:11  6    platforms match trades?

03:11  7                MS. ZORNBERG:  Objection.  Asked

03:11  8          and answered.

03:11  9                You can answer.

03:11 10          A.    So as set out in Table A, and as

03:12 11    detailed in this opinion, I set out four core

03:12 12    indicia that I believe are credible and

03:12 13    informative in providing an analysis of where

03:12 14    an exchange is located.

03:12 15                And one of these criteria

03:12 16    includes the assessment of reasonable market

03:12 17    participants as to where they think an

03:12 18    exchange is located.

03:12 19          Q.    And does your opinion -- strike

03:12 20    that.

03:12 21                Are you offering an opinion on

03:12 22    what reasonable market participants believe as

03:12 23    to the locations of all of the exchanges

03:12 24    listed in your Table A?

03:12 25          A.    I'm not.

201

03:12  1          Q.    To take, for example, Bitlish,

03:13  2    which appears to be incorporated in the United

03:13  3    Kingdom -- I'm looking at page 61.

03:13  4                Do you see that?

03:13  5          A.    Yes.

03:13  6          Q.    If, for some strange reason,

03:13  7    everyone who traded on Bitlish thought that

03:13  8    Bitlish was located in the United States,

03:13  9    would that have any bearing on where Bitlish

03:13 10    was actually located?

03:13 11          A.    So the four criteria that I set

03:13 12    out here provide a guidepost for determining

03:13 13    the location of an exchange and in determining

03:13 14    whether we can exclude or include the US as a

03:13 15    place where these exchanges may be located.

03:13 16                If one of these criteria were to

03:13 17    refer to the US as a possible location, that

03:13 18    would be a part of thinking about whether the

03:13 19    US could be excluded as a possible location or

03:13 20    included.

03:13 21          Q.    So if your average trader thought

03:14 22    Bitlish was located in the United States,

03:14 23    would you then have included Bitlish within

03:14 24    the four that have some indicia of US contact?

03:14 25          A.    If market participants believed

202

03:14  1    that Bitlish was located in the United States,

03:14  2    then I could not exclude Bitlish as an

03:14  3    exchange that wasn't located in the United

03:14  4    States.  In other words, that would be part of

03:14  5    the four exchanges that have indicia of

03:14  6    location in the US.

03:14  7         Q.   Okay.  And for all of the

03:14  8    exchanges that are listed in your Table A

03:14  9    what, if anything, did you do to determine

03:14 10    what actual market participants believe as to

03:14 11    where these exchanges are located?

03:14 12         A.   In terms of trying to determine

03:14 13    or trying to gauge the perception of market

03:14 14    participants, I looked at credible news

03:15 15    sources to get a sense of where the general

03:15 16    perception of location is likely to be.

03:15 17         Q.   What credible news sources did

03:15 18    you review?

03:15 19         A.   They are set out here in the

03:15 20    footnotes.

03:15 21         Q.   How did you locate these news

03:15 22    sources?

03:15 23         A.   I --

03:15 24         Q.   Strike that.  Actually, I want to

03:15 25    clarify.  When you say they're set out here in

203

03:15  1     the footnotes, are you referring to the
03:15  2     footnotes that appear under Table A?
03:15  3          A.    That's right.
03:15  4          Q.    Okay.  Let me re-ask the
03:15  5     question.
03:15  6                How did you locate the news
03:15  7     sources listed on the footnotes under Table A?
03:15  8          A.    Asked counsel for assistance in
03:15  9     helping collect reputable news articles that
03:15 10     would reference particular exchanges set out
03:15 11     in Table A.
03:15 12                I reviewed and checked and went
03:16 13     through these articles to determine if they
03:16 14     provided a credible gauge in my opinion, and
03:16 15     then I -- these were included as part of Table
03:16 16     A's indicia as to the perception of market
03:16 17     participants with respect to each exchange.
03:16 18          Q.    What instructions, if any, did
03:16 19     you give counsel on how to locate materials
03:16 20     that supplied you with the views of market
03:16 21     participants as to where cryptocurrency
03:16 22     exchanges are located?
03:16 23                MS. ZORNBERG:  Hold on just a
03:16 24          minute.  I just want to consult on a
03:16 25          privilege question.

                                                      204

03:16  1          MR. SYLVESTER:  Yes, of course.

03:16  2      Let's go off the record while you guys

03:16  3      consult, please.

03:16  4          THE VIDEOGRAPHER:  The time is

       5      3:16 p.m.  This concludes Media 5.  Off

       6      the record.

       7          (Recess taken from 3:16 p.m. to

       8      3:25 p.m.)

       9          THE VIDEOGRAPHER:  The time now

      10      is 3:25 p.m.  This begins Media 6.  On

      11      the record.

03:25 12          MS. ZORNBERG:  Okay.  Thank you.

03:25 13      So Mr. Sylvester, we took a short break

03:25 14      in response to your last question

03:25 15      because of concerns so I could consult

03:25 16      with cocounsel about issues that touch

03:25 17      on privilege.

03:25 18          And I would just like to make a

03:25 19      proffer to see if it helps us move

03:25 20      forward.  If not, we'll take it question

03:25 21      by question, of course.

03:25 22          But the proffer is that there was

03:25 23      dialogue by Professor Yadav with counsel

03:25 24      in relation to selecting sources that

03:25 25      she wished to use for her report.

                                              205

03:25   1              Professor Yadav made the
03:25   2         determinations ultimately after viewing
03:26   3         materials about which sources she would
03:26   4         use, and she's testified to her process
03:26   5         for that.
03:26   6              The concern touching on privilege
03:26   7         and attorney work product is that the
03:26   8         nature of the dialogue was -- it's
03:26   9         intertwined in a way that I think makes
03:26  10         it difficult for her to answer the
03:26  11         questions -- your question more
03:26  12         specifically without getting into
03:26  13         communications with counsel.
03:26  14              So first, let me just ask
03:26  15         Professor Yadav if what I've said in
03:26  16         terms of the proffer about dialogue with
03:26  17         counsel is accurate to your knowledge?
03:26  18              THE WITNESS:  To my knowledge,
03:26  19         yes.
03:26  20              MS. ZORNBERG:  So that's the
03:26  21         proffer.  I don't know if that helps
03:26  22         you, there was testimony this morning
03:26  23         under questioning by Ms. Stewart about
03:26  24         her process so we can -- beyond that, we
03:26  25         can take it one by one if you'd like.

                                                    206

03:26  1          MR. SYLVESTER:  That sounds good.
03:26  2      And just for the record, I'm only
03:27  3      concerned with any instructions that the
03:27  4      professor gave to anyone, counsel or
03:27  5      otherwise, performing work on her behalf
03:27  6      to prepare her opinions in this report.
03:27  7      I'm not interested in work product
03:27  8      flowing from counsel to Professor Yadav.
03:27  9      Understanding --
03:27 10          MS. ZORNBERG:  Yeah.
03:27 11          MR. SYLVESTER:  I think what
03:27 12      you're saying is that it might be hard
03:27 13      to separate the two.
03:27 14          MS. ZORNBERG:  That's the issue.
03:27 15          MR. SYLVESTER:  But maybe I can
03:27 16      ask you the question and see if it's
03:27 17      possible for you to answer, strictly
03:27 18      your instructions to counsel, that
03:27 19      direction.
03:27 20          Which I think we both agree it
03:27 21      can't be work product.
03:27 22          MS. ZORNBERG:  Well, I'm not sure
03:27 23      that it can't be work product.  Let me
03:27 24      make the proffer a little bit more
03:27 25      specific.  I'll ask professor Yadav to

                                                207

03:27  1          confirm so you understand the nature.

03:27  2               MR. SYLVESTER:  Okay.

03:27  3               MS. ZORNBERG:  If the instruction

03:27  4          was a request for the research

03:27  5          assistants to identify and pull together

03:27  6          articles from reputable sources, and

03:28  7          then the dialogue with counsel that

03:28  8          followed was a dialogue surrounding

03:28  9          sources in relation to her request for

03:28 10          assistance, we don't think it's

03:28 11          appropriate for her to get into the back

03:28 12          and forth of that dialogue.

03:28 13               And ultimately what came out of

03:28 14          it was a set of materials that she

03:28 15          reviewed to decide what to include or

03:28 16          not include in her report.

03:28 17               Professor Yadav, is that a fair

03:28 18          statement?

03:28 19               THE WITNESS:  That's fair.

03:28 20               MR. SYLVESTER:  Okay.  What I'm

03:28 21          struggling with is just, you know, if

03:28 22          she had asked a research assistant

03:28 23          instead of counsel, then I'd have a

03:28 24          perfect view of exactly the methodology

03:28 25          she conducted that's baked into Table A.

                                                     208

| | | |
|---|---|---|
| 03:28 | 1 | And if she asked counsel instead |
| 03:28 | 2 | of a research assistant, it seems like |
| 03:28 | 3 | there's little bit of a black box as to |
| 03:28 | 4 | the methodology.  That's, sort of, what |
| 03:28 | 5 | I'm hearing. |
| 03:28 | 6 | MS. ZORNBERG:  I disagree with |
| 03:28 | 7 | that in the sense that she has |
| 03:28 | 8 | already -- Professor Yadav has already |
| 03:29 | 9 | testified that she sought assistance of |
| 03:29 | 10 | counsel in locating media, public media |
| 03:29 | 11 | sources on the exchanges in Table A. |
| 03:29 | 12 | There's been a proffer that |
| 03:29 | 13 | Professor Yadav has confirmed that she |
| 03:29 | 14 | had a dialogue with counsel in relation |
| 03:29 | 15 | to her specific request that they assist |
| 03:29 | 16 | in pulling sources.  She's provided |
| 03:29 | 17 | testimony that counsel did, in fact, |
| 03:29 | 18 | pull together a set of materials to give |
| 03:29 | 19 | her for consideration and review. |
| 03:29 | 20 | She's testified about her process |
| 03:29 | 21 | of reviewing them.  She's testified that |
| 03:29 | 22 | she included it in her report the ones |
| 03:29 | 23 | she found to be credible, and the report |
| 03:29 | 24 | extensively identifies each one of those |
| 03:29 | 25 | media articles. |

03:29  1              MR. SYLVESTER:  Okay.  I hear

03:29  2      you.  I'm not sure that quite addresses

03:29  3      my concerns.  But I think I have a

03:29  4      couple questions that I'll ask and just

03:29  5      see if you're able to answer them.

03:29  6              MR. SOLOMON:  Hey Mark, if I can

03:29  7      just say it in a slightly different way,

03:29  8      maybe it will help.  Probably saying the

03:29  9      same thing.

03:29 10              But, you know, she -- if she

03:29 11      relies on facts or assumptions that she

03:30 12      used to form her opinions about that,

03:30 13      that's fair game and you can ask about

03:30 14      that.  You can ask about assumptions,

03:30 15      you can ask about facts.  Those are not

03:30 16      privileged.

03:30 17              But other than facts or

03:30 18      assumptions that she considered or

03:30 19      relied on, we believe that

03:30 20      communications with counsel are

03:30 21      privileged.  And those communications

03:30 22      could be compromised by her explaining

03:30 23      to you direction, express direction she

03:30 24      gave to lawyers for Mr. Garlinghouse,

03:30 25      Mr. Larsen, or Ripple in connection with

210

03:30  1          preparation of her report.

03:30  2                  Now, you're fine asking her

03:30  3          obviously, you know, did you rely on

03:30  4          this?  Why would you rely on it?  Why

03:30  5          did you think that was credible?

03:30  6                  But we're just trying to avoid a

03:30  7          situation where she's telling you what

03:30  8          she told lawyers.  That would be what we

03:30  9          believe to be privileged communications,

03:30 10          outside of facts and assumptions that

03:30 11          she used in connection with her report.

03:30 12                  That's our position.  And I think

03:30 13          we're going to stick to that position.

03:30 14          So --

03:30 15                  MR. SYLVESTER:  I understand.  I

03:30 16          think the use of lawyers in this

03:30 17          particular instance seems to insulate

03:31 18          some questioning from our perspective on

03:31 19          her methodology.  That's my view.  But

03:31 20          we can take it a couple at a time.

03:31 21                  MS. ZORNBERG:  We'll disagree on

03:31 22          that but ...

03:31 23                  MR. SYLVESTER:  Okay.

03:31 24    BY MR. SYLVESTER:

03:31 25          Q.   So let me ask you this:  If it's

                                                      211

03:31  1    possible to just isolate instructions you gave

03:31  2    counsel, perhaps at the beginning of the

03:31  3    process, what instructions, if any, did you

03:31  4    give to counsel on how to locate materials

03:31  5    that supplied you with views of market

03:31  6    participants as to where a cryptocurrency

03:31  7    exchange was located?

03:31  8            MS. ZORNBERG:  Okay.  So

03:31  9        Professor Yadav, I'm going to instruct

03:31 10        you to answer that question only if you

03:31 11        can do so in a way that is not

03:31 12        intertwined with substantive dialogue

03:31 13        and communications with counsel.  In

03:31 14        other words, a back and forth.

03:31 15        A.    At the very broadest level, I

03:31 16    requested assistance in identifying

03:31 17    information on various exchanges in Table A

03:31 18    from reputable news sources.

03:32 19        Q.    Did you identify for counsel what

03:32 20    news sources you believed to be reputable?

03:32 21            MS. ZORNBERG:  Hold it.  You can

03:32 22        answer that -- again, I think the

03:32 23        instruction is that you can answer that

03:32 24        if there's a clear yes or no, or

03:32 25        something that you can say that does not

212

```
03:32  1              involve a dialogue between you and
03:32  2              counsel, sort of a back-and-forth
03:32  3              discussion.
03:32  4          A.    Would you repeat the question,
03:32  5    please.
03:32  6              MR. SYLVESTER:  Madam court
03:32  7              reporter, would you mind reading that
03:32  8              back, please.
03:32  9              (Record read by the certified
03:32 10              stenographer as follows:
03:32 11              "QUESTION:  "Did you identify for
03:32 12              counsel what news sources you believed
03:33 13              to be reputable?")
03:33 14          A.    On a general level, yes.
03:33 15          Q.    How did you determine that the
03:33 16    sources in your report are reputable news
03:33 17    sources on the topic of what market
03:33 18    participants believe as to where
03:33 19    cryptocurrency exchanges are located?
03:33 20          A.    So the methodology I used there
03:34 21    was based on my professional judgment, my
03:34 22    research into cryptocurrency markets
03:34 23    generally, my general reading and interest in
03:34 24    this market to consider and identify sources
03:34 25    that I believe to be credible and that are
```

                                                      213

03:34 1    doing well-sourced, thoughtful, nuanced

03:34 2    reporting on how cryptocurrency exchanges

03:34 3    operate and how users interact with these

03:34 4    exchanges.

03:34 5         Q.    What criteria did you apply when

03:34 6    determining whether or not a particular news

03:34 7    source was credible?

03:34 8              MS. ZORNBERG:  Object to form.

03:34 9         A.    So in general, I relied on my own

03:34 10   experience with that news source, reading

03:34 11   about cryptocurrency exchanges in general as

03:34 12   part of my research -- as part of my research,

03:34 13   as part of my teaching.

03:34 14             This judgment as to which news

03:35 15   sources I believe to be credible came from

03:35 16   that reading and my experience with absorbing

03:35 17   news from particular sources that I considered

03:35 18   to be especially thoughtful, well resourced,

03:35 19   well sourced, and that appear to be well

03:35 20   connected with the overall conversation in

03:35 21   relation to the cryptocurrency ecosystem.

03:35 22        Q.    Were there any sources that you

03:35 23   were presented with that you rejected as

03:35 24   unreliable?

03:35 25        A.    I can't recall specifically.

214

03:35  1          Q.    Okay.  Of the exchanges whose

03:35  2     user agreements you reviewed, are there any

03:35  3     other than Bittrex that use on-chain

03:35  4     settlement?

03:35  5          A.    I think there may have been one

03:35  6     that uses on-chain settlement, one other one.

03:35  7     I can't exactly remember which one.  But if I

03:36  8     can recall, there was one that offers either

03:36  9     the option for on-chain or does settlement

03:36 10     on-chain.

03:36 11          Q.    Do you know whether -- one way or

03:36 12     the other whether XRP was traded on the

03:36 13     exchange you just described?

03:36 14          A.    I'm sorry.  I have no idea.  I

03:36 15     don't know.

03:36 16          Q.    There are certain user agreements

03:36 17     that you reviewed that provided that, after

03:36 18     the offer and bid are matched, the trade

03:36 19     becomes irreversible.  Is that right?

03:36 20          A.    I'm sorry, could you repeat the

03:36 21     question?

03:36 22          Q.    Sure.

03:36 23          A.    Thank you.

03:36 24          Q.    There are certain user agreements

03:36 25     you reviewed that provide that, after the

215

03:36  1    offer and bid are matched, the trade becomes

03:36  2    irreversible.  Is that right?

03:36  3            A.    That's correct.

03:36  4            Q.    Were there any user agreements

03:36  5    you reviewed that were in conflict with that

03:36  6    position?

03:36  7            A.    What the user agreement said, for

03:36  8    the most part, where information existed,

03:37  9    referring to our conversation earlier, where

03:37 10    orders for buying and selling a cryptocurrency

03:37 11    match, the trade becomes final.

03:37 12            In certain very, very limited

03:37 13    circumstances, trades may be reversed by the

03:37 14    exchange, in case of a clearly erroneous

03:37 15    transaction, for example, and this provision

03:37 16    was included, for example, in the case of the

03:37 17    Coinbase user agreement, Coinbase Singapore,

03:37 18    as well as the BitMax Singapore user

03:37 19    agreement --

03:37 20            Q.    Were --

03:37 21            A.    -- for example.

03:37 22            Q.    Sorry.

03:37 23            Were there any user agreements

03:37 24    that you reviewed that did not specify when

03:37 25    the trade became irreversible?

216

03:37  1            MS. ZORNBERG:  Objection.

03:37  2        A.      Returning to our earlier

03:37  3   discussion, there were some user agreements

03:37  4   that were very basic and did not fully specify

03:37  5   the process involved.

03:37  6              Where the process was specified

03:37  7   and mentioned order handling, as far as I can

03:37  8   recall, it was very categorical in stating

03:38  9   that, as soon as orders to buy and sell a

03:38 10   cryptocurrency match, a trade becomes final

03:38 11   and binding and, as far as the customers are

03:38 12   concerned, entirely irreversible.

03:38 13        Q.      When you say "there were some

03:38 14   user agreements that did not fully specify the

03:38 15   process involved," does that mean that there

03:38 16   were some user agreements that did not

03:38 17   expressly set forth when a trade becomes

03:38 18   irreversible?

03:38 19            MS. ZORNBERG:  Objection.  Asked

03:38 20        and answered.

03:38 21        Q.      You can answer.

03:38 22        A.      Okay.  As detailed in my earlier

03:38 23   response, there were some user agreements that

03:39 24   were very basic and did not fully specify the

03:39 25   order handling, submission, and finality

                                                    217

03:39  1    provisions.

03:39  2            Q.    Let's look at paragraph 92,

03:39  3    please, on page 50.  The sentence I'm looking,

03:39  4    it's mid -- it's, sort of, towards the end of

03:39  5    the paragraph:

03:39  6            "As acknowledged by certain user

03:39  7            agreements (e.g., Korbit) transactions

03:39  8            on these exchanges are therefore

03:39  9            never/infrequently published to the

03:39 10            cryptocurrency blockchains."

03:40 11            Do you see that?

03:40 12            A.    (Document review.)

03:40 13            That's right, thank you.

03:40 14            Q.    My question is:  Other than

03:40 15    Korbit, did you review any other user

03:40 16    agreements that stated that the transactions

03:40 17    on the exchange would not be published to

03:40 18    cryptocurrency blockchains?

03:40 19            A.    It was implied in a number of the

03:40 20    user agreements I reviewed.  In particular,

03:40 21    the user agreements stated that the

03:40 22    transaction would settle immediately.

03:41 23            This was the case, for example,

03:41 24    in the CoinOne exchange service that's

03:41 25    referenced here, in the case of Binance, in

                                                  218

03:41  1    the case of Coinbase user agreement, that

03:41  2    the -- for example, that the transaction would

03:41  3    settle immediately upon being matched, and

03:41  4    what this implied was that the clearing and

03:41  5    settlement happened immediately following the

03:41  6    transaction becoming final rather than having

03:41  7    any interaction with an underlying blockchain.

03:41  8          Q.    What's the -- strike that.

03:41  9                How is it that you conclude

03:41 10    that -- strike that.

03:41 11                Is there ever a point at which a

03:41 12    cryptocurrency trade on, say, Coinbase is

03:41 13    recorded on the blockchain?

03:41 14                MS. ZORNBERG:  Object to form.

03:42 15          A.    As far as I can tell by Coinbase

03:42 16    itself, the settlement happens in-house.

03:42 17    Where interaction with an underlying

03:42 18    blockchain may happen is when a customer

03:42 19    transfers their holdings to an address on an

03:42 20    underlying blockchain.

03:42 21                A couple of the user agreements

03:42 22    explicitly allow for this and mention the fact

03:42 23    that they will charge a user for any fees that

03:42 24    arise in relation to a transaction to an

03:42 25    underlying blockchain to transfer value out

219

03:42  1     from an exchange wallet into a wallet on the

03:42  2     underlying blockchain.

03:42  3           Q.    At the -- let's turn to paragraph

03:42  4     98, please.  That's page 53.  You

03:42  5     write -- this is the last sentence:

03:43  6                 "By becoming final and binding

03:43  7           within an exchange and not requiring

03:43  8           settlement on a blockchain, it is my

03:43  9           opinion that transactions become binding

03:43 10           in the geographic location of the

03:43 11           exchange upon which the trades are

03:43 12           made."

03:43 13                 My question is:  What is the

03:43 14     relevance to not requiring settlement on a

03:43 15     blockchain to your opinion set forth that I

03:43 16     just read?

03:43 17           A.    I'm sorry, what was your

03:43 18     question?

03:43 19           Q.    What is the relevance of the fact

03:43 20     that settlement on the blockchain is not

03:43 21     required to your opinion set forth in the last

03:43 22     sentence of paragraph 98?

03:43 23           A.    What I mean here is that the

03:44 24     transactions become valid and binding as soon

03:44 25     as the orders are matched and clearing and

                                                          220

03:44  1    settlement takes place by the exchange on the

03:44  2    exchange, and therefore, the location of the

03:44  3    exchange.

03:44  4         Q.    If the trade required settlement

03:44  5    on a blockchain, how would that affect your

03:44  6    opinion about where the trade took place, if

03:44  7    it would?

03:44  8         A.    It wouldn't.  The trade becomes

03:44  9    binding and valid as soon as orders are

03:44 10    matched on the exchange.

03:44 11         Q.    Okay.  Let's move on to --

03:44 12              THE WITNESS:  Is it possible to

03:44 13         take a break?

03:44 14              MR. SYLVESTER:  Do you want to

03:44 15         take a break?

03:44 16              THE WITNESS:  Would that be okay?

03:44 17              MR. SYLVESTER:  Sure.

03:44 18         Absolutely.  Let's go off the record.

03:44 19              THE VIDEOGRAPHER:  The time now

03:44 20         is 3:43 p.m.  This concludes Media 6.

03:44 21         Off the record.

04:04 22              (Recess taken from 3:43 p.m. to

04:04 23         4:04 p.m.)

04:04 24              THE VIDEOGRAPHER:  The time is

04:04 25         4:04 p.m.  This begins Media 7.  On the

                                                        221

04:04 1              record.

04:04 2      BY MR. SYLVESTER:

04:04 3              Q.    Professor, let's turn to

04:04 4      paragraph 99 of your report.  That's on page

04:04 5      54.  The second sentence starts:

04:04 6                      "I conclude that for all but four

04:04 7              of the exchanges listed in Table A,

04:04 8              there is no indication that offers are

04:04 9              made on the exchanges in the US or that

04:05 10             trades on these exchanges become final

04:05 11             in the US."

04:05 12             Do you see that?

04:05 13             A.    (Document review.)

04:05 14             Okay.

04:05 15             Q.    Can you please describe the facts

04:06 16     that, in your view, support that conclusion?

04:06 17             A.    In Table A I set out four indicia

04:06 18     of location that I believe provide a credible

04:06 19     and informative account of where that exchange

04:06 20     is located, and based on those four indicia, I

04:06 21     can exclude or include a particular exchange

04:06 22     from whether or not it is situated in or

04:06 23     outside the United States.

04:06 24             Q.    Do you see the next sentence:

04:06 25                     "While a small handful of the

                                                        222

04:06  1          exchanges" -- actually, strike that.

04:06  2               Are all the facts that underlie

04:06  3          your opinion that I just read in

04:06  4          paragraph 99 set forth in Table A?

04:06  5               MS. ZORNBERG:  Objection.

04:06  6          A.    The -- Table A sets out the

04:07  7     application of the four indicia to the

04:07  8     exchanges listed in Table A.

04:07  9          Q.    And in the application of your

04:07 10     indicia, you concluded that certain facts were

04:07 11     relevant in forming your opinion.  Is that

04:07 12     right?

04:07 13          A.    I concluded that certain indicia,

04:07 14     the four indicia I mentioned, were the indicia

04:07 15     that I looked for in determining the location

04:07 16     of the different exchanges.

04:07 17          Q.    And you applied those indicia to

04:07 18     each of the exchanges in your Table A.  Right?

04:07 19          A.    Yes.

04:07 20          Q.    Okay.  And the facts that are

04:07 21     relevant to the indicia that you applied to

04:07 22     the 24 exchanges are set forth in Table A.

04:07 23     Correct?

04:07 24               MS. ZORNBERG:  Objection.

04:07 25          A.    Table A --

                                                      223

04:07  1          Q.    Go ahead.

04:07  2          A.    Table A sets out references that

04:07  3   speak to where -- to what these indicia are

04:08  4   with respect to each of the exchanges listed

04:08  5   in Table A.

04:08  6          Q.    Okay.  Let's look at Table A.

04:08  7   Let's just start on page 59, please.

04:08  8                Do you see the first row on Table

04:08  9   A says "Binance"?

04:08 10          A.    Yes.

04:08 11          Q.    Okay.  Are there any other facts

04:08 12   about Binance that are relevant to your

04:08 13   conclusions set forth in paragraph 99 that are

04:08 14   not listed in Table A?

04:08 15          A.    Table A identifies and lists the

04:08 16   four key indicia that I conclude are essential

04:08 17   for establishing the location of a

04:08 18   cryptocurrency exchange.  Table A, with

04:08 19   respect to Binance, sets out how these four

04:08 20   indicia applied in the case of Binance.

04:09 21                MS. ZORNBERG:  I have a request

04:09 22          to go off the record just for a moment.

04:09 23                MR. SYLVESTER:  Sure.  Let's go

04:09 24          off the record.

04:09 25                MS. ZORNBERG:  Okay.

                                                    224

04:09  1            THE VIDEOGRAPHER:  The time is
04:09  2       4:09 p.m.  This concludes Media 7.  Off
04:09  3       the record.
04:10  4            (Recess taken from 4:09 p.m. to
04:10  5       4:10 p.m.)
04:10  6            THE VIDEOGRAPHER:  The time is
04:10  7       4:10 p.m.  This begins Media 8.  On the
04:10  8       record.
04:10  9       A.    I'd like to correct something I
04:10 10   said.
04:10 11   By MR. SYLVESTER:
04:10 12       Q.    Please do.
04:10 13       A.    Which is that Table A lists three
04:10 14   of the indicia that I discussed.  In addition,
04:10 15   I also include observation of where regulators
04:10 16   believe an exchange is located.  And that
04:10 17   information is not contained with respect to
04:10 18   the actual Table A references here.
04:10 19       Q.    Okay.  Maybe you can help me with
04:10 20   this.  The Table A has six columns.  Do you
04:10 21   see that?
04:10 22       A.    That's right.
04:10 23       Q.    And one column -- the first
04:10 24   column is "Exchange."  Do you see that?
04:10 25            Can you explain which columns

                                                    225

04:10  1    correspond with which indicia?

04:10  2         A.    Yes.  "Place of

04:11  3    Incorporation/Domicile," "Place of Business,"

04:11  4    "Registered Office," that is one indicia.  The

04:11  5    "Location That is Referenced in the Terms of

04:11  6    Service and Governing Laws," that is a second

04:11  7    indicia.  The perception of market, reasonable

04:11  8    market participants, that is a third indicia

04:11  9    as set out in the "Notable Items in Public

04:11 10    Sources and Media."

04:11 11         Q.    Why did you call the final column

04:11 12    "Notable Items in Public Sources and Media"?

04:11 13         A.    It references the perception of

04:11 14    market participants in relation to where the

04:11 15    exchanges are believed to be located.

04:11 16         Q.    Yes.  So why not call it the

04:11 17    "Perception of Market Participants."  Why call

04:11 18    it "Notable Items in Public Sources and

04:11 19    Media"?

04:11 20              MS. ZORNBERG:  Object to form.

04:11 21         A.    The reason I did that was because

04:12 22    I looked at the credible media sources in

04:12 23    order to identify and gauge what reasonable

04:12 24    market participants believe -- where they

04:12 25    believe an exchange to be located.

226

| | | |
|---|---|---|
| 04:12 | 1 | Q.    I think I'm asking a much more |
| 04:12 | 2 | basic question, which is why did you select |
| 04:12 | 3 | the words "Notable Items in Public Sources and |
| 04:12 | 4 | Media" for your chart? |
| 04:12 | 5 | MS. ZORNBERG:  Objection.  Asked |
| 04:12 | 6 | and answered. |
| 04:12 | 7 | A.    The fourth indicia also was in |
| 04:12 | 8 | relation to the regulators' perception. |
| 04:12 | 9 | Q.    So the fourth column -- sorry -- |
| 04:12 | 10 | the sixth column in Table A combines both -- |
| 04:12 | 11 | MS. ZORNBERG:  Object.  There's a |
| 04:12 | 12 | misunderstanding going on. |
| 04:12 | 13 | MR. SYLVESTER:  Okay. |
| 04:12 | 14 | MS. ZORNBERG:  I don't think the |
| 04:12 | 15 | witness thought -- realized there was a |
| 04:12 | 16 | question pending, your last question. |
| 04:12 | 17 | So she had moved on to talk about where |
| 04:12 | 18 | the fourth indicia is reflected. |
| 04:12 | 19 | MR. SYLVESTER:  I see. |
| 04:13 | 20 | Q.    I see.  Okay.  Let me go back to |
| 04:13 | 21 | my original question, which I understand |
| 04:13 | 22 | your -- Ripple's counsel believes it is asked |
| 04:13 | 23 | and answered, but I don't think I've gotten an |
| 04:13 | 24 | answer. |
| 04:13 | 25 | I just want to know why is it |

227

04:13  1     that you labeled the column "Notable Items in

04:13  2     Public Sources and Media"?  Why select those

04:13  3     words?

04:13  4          A.    I selected those words because

04:13  5     that's where I got the information.

04:13  6          Q.    Okay.  But sitting here today,

04:13  7     you're explaining that, in fact, that column

04:13  8     represents sources of information that are

04:13  9     relevant to the criteria of what, in your

04:13 10     view, market participants believed as to the

04:13 11     location of these exchanges?

04:13 12          A.    That's how I gauged information

04:13 13     regarding the perception of market

04:13 14     participants and where they believed an

04:13 15     exchange to be located.

04:14 16          Q.    Okay.  Let's flip back to

04:14 17     paragraph 99, please.  About midway through

04:14 18     the paragraph, you write:

04:14 19               "Given the possible presence of a

      20               foreign arm on which a trade may have

      21               occurred, it is not determinable in the

      22               abstract whether, for any particular

      23               trade, the transaction became final

      24               within the US or outside the US through

      25               a unit located in a foreign

                                                          228

```
              1              jurisdiction."
04:14    2              My question is just:  What does
04:14    3    the term "foreign arm" mean as used in that
04:14    4    sentence?
04:14    5          A.    (Document review.)
04:14    6              An arm that is not a US arm.
04:15    7          Q.    What does the word "arm" mean in
04:15    8    your answer?
04:15    9          A.    An affiliate, a unit -- an
04:15   10    affiliate or unit of the exchange.
04:15   11          Q.    Did you determine for all 24
04:15   12    exchanges whether or not there was a US
04:15   13    affiliate or unit associated with each of
04:15   14    those exchanges?
04:15   15          A.    I looked at the list of exchanges
04:15   16    I received from counsel.
04:15   17          Q.    Okay.  After you received that
04:15   18    list, did you take any steps to determine
04:15   19    whether or not, for any of the exchanges
04:15   20    listed in Table A, all of -- any of the
04:15   21    exchanges had a US affiliate or unit?
04:15   22          A.    I relied on the exchanges that I
04:15   23    received from counsel as set out in Table A.
04:15   24          Q.    I understand that but I just want
04:15   25    to -- I want to see if, once you received the
```

229

04:15  1   information from counsel that's in Table A,

04:15  2   whether you took any additional steps.

04:15  3              So once you received that

04:15  4   information, did you take any steps to

04:15  5   determine that any of the exchanges listed in

04:15  6   Table A did or did not have a US affiliate or

04:16  7   unit?

04:16  8        A.   My reliance here was in relation

04:16  9   to the exchanges set out in Table A.  I did

04:16  10  not go through each and every exchange to

04:16  11  determine whether they were US units.

04:16  12       Q.   Okay.  Sitting here today and

04:16  13  excluding Bittrex, Poloniex, Coinbase, and

04:16  14  Kraken, do any of the remaining exchanges

04:16  15  listed in Table A have a US affiliate or unit?

04:16  16             MS. ZORNBERG:  Object to the

04:16  17        form.

04:16  18       A.   I did not do specific research

04:16  19  with respect to each and every exchange listed

04:16  20  in Table A.  I did not -- based on my own

04:16  21  general understanding, for example, Binance

04:16  22  has a US affiliate.

04:16  23       Q.   Okay.  Does bitbank?

04:16  24       A.   I can't say specifically.

04:16  25       Q.   Is that because you don't know?

                                                    230

04:17  1          A.    I can't recall.

04:17  2                MS. ZORNBERG:  Objection.

04:17  3          A.    I don't know.

04:17  4          Q.    Does Bitfinex have a US

04:17  5    affiliate?

04:17  6          A.    I believe it does.

04:17  7          Q.    Does BitForex have a US

04:17  8    affiliate?

04:17  9          A.    I don't know.

04:17  10         Q.    Does Bithumb have a US affiliate?

04:17  11         A.    I don't know.

04:17  12         Q.    Does Bitlish have a US affiliate?

04:17  13         A.    I don't know.

04:17  14         Q.    Does BitMart have a US affiliate?

04:17  15         A.    Does which one?

04:17  16         Q.    BitMart?

04:17  17         A.    I don't know.

04:17  18         Q.    Does Bitmax have a US affiliate?

04:17  19         A.    I believe it does.

04:17  20         Q.    Does Bitrue have a US affiliate?

04:17  21         A.    I don't know.

04:17  22         Q.    Does Bitstamp have a US

04:17  23    affiliate?

04:17  24         A.    Bitstamp, I believe it does.

04:17  25         Q.    Does Bittrex have a US affiliate?

                                                      231

04:17  1          A.    Yes.

04:17  2          Q.    Does BW have a US affiliate?

04:18  3          A.    I don't know.

04:18  4          Q.    If you'd like, I'm reading from

04:18  5     page 62 of your report.  It's not just --

04:18  6          A.    Okay.

04:18  7          Q.    You're free to follow along.

04:18  8                Does CoinBene, B-e-n-e, have a US

04:18  9     affiliate?

04:18 10          A.    I don't know.

04:18 11          Q.    Does CoinOne have a US affiliate?

04:18 12          A.    I don't know.

04:18 13          Q.    Does DigiFinex have a US

04:18 14     affiliate?

04:18 15          A.    I don't know.

04:18 16          Q.    Does HitBTC have a US affiliate?

04:18 17          A.    I don't know.

04:18 18          Q.    Does Huobi Global have a US

04:18 19     affiliate?

04:18 20          A.    I believe it may have had one.

04:18 21          Q.    In what time period?

04:18 22          A.    Around summer 2018 for a period

04:19 23     of time.

04:19 24          Q.    Does Korbit have a US affiliate?

04:19 25          A.    I don't know.

232

04:19  1          Q.    There's no way I'm going to be

04:19  2    able to pronounce this.   Does the company

04:19  3    that's doing business as OKEx have a US

04:19  4    affiliate?

04:19  5          A.    I don't know.

04:19  6          Q.    Does Upbit have a US affiliate?

04:19  7          A.    I don't know.

04:19  8          Q.    Does ZB have a US affiliate?

04:19  9          A.    I don't know.

04:19 10          Q.    Does ZBG have a US affiliate?

04:19 11          A.    I don't know.

04:19 12          Q.    For all of the exchanges that you

04:19 13    are not aware whether or not they have a US

04:19 14    affiliate, how can you be sure that the trades

04:19 15    of digital assets on those exchanges did not

04:20 16    take place in the United States?

04:20 17                MS. ZORNBERG:  Object to form.

04:20 18          A.    I looked at the exchanges

04:20 19    provided to me in Table A and applied the

04:20 20    indicia to those exchanges in Table A.

04:20 21          Q.    Okay.  Let me ask you a different

04:20 22    question:  Did you take any steps -- strike

04:20 23    that.

04:20 24                For the exchanges that we just

04:20 25    discussed where you're not sure whether or not

233

04:20  1    they have a US affiliate, sitting here today,

04:20  2    can you -- can you definitively say that

04:20  3    trades taking place on those exchanges did not

04:20  4    take place in the United States?

04:20  5              MS. ZORNBERG:  Object to form.

04:20  6         A.    My opinion was to look at the

04:20  7    exchanges set out in Table A and to determine

04:20  8    how trades become final, binding -- and

04:20  9    binding on exchanges and cryptocurrency

04:20 10    exchanges and where those trades then become

04:20 11    final.  That was the scope of my opinion.

04:21 12         Q.    Let me return to your opinion to

04:21 13    paragraph 99.  About midway through the

04:21 14    paragraph, you write:

      15              "Given the possible presence of a

      16              foreign arm on which a trade may have

      17              occurred, it is not determinable in the

      18              abstract whether, for any particular

      19              trade, the transaction became final

      20              within the US or outside the US through

04:21 21              a unit located in a foreign

04:21 22              jurisdiction."

04:21 23              Do you see that?

04:21 24         A.    Yes.

04:21 25         Q.    Does that sentence that I just

                                                      234

04:21  1    read describe Bittrex, Poloniex, Coinbase, and

04:21  2    Kraken?

04:21  3         A.    It references the fact that

04:22  4    Bittrex, Poloniex, Coinbase, and Kraken may

04:22  5    have had foreign affiliates through which

04:22  6    transactions could have occurred.

04:22  7         Q.    Okay.  And is it in your view --

04:22  8    strike that.

04:22  9              Is it your opinion that you're

04:22 10    unable to conclude that trades on Bittrex,

04:22 11    Poloniex, Coinbase, and Kraken occurred in the

04:22 12    US because of the existence of a foreign

04:22 13    affiliate of those four entities?

04:22 14         A.    I wasn't providing a particular

04:22 15    opinion here.  I was merely suggesting for the

04:22 16    sake of, you know, completeness that one may

04:22 17    want to look at the particular facts on the

04:22 18    ground.

04:22 19              The opinion I provide is in

04:22 20    relation to Table A, and applying those four

04:22 21    indicia to the exchanges listed on Table A,

04:22 22    and then identifying, based on those indicia,

04:22 23    which exchanges can be included within the --

04:22 24    as US exchanges and which are excluded as US

04:22 25    exchanges.

235

04:23  1          Q.    So in light of that, why was it

04:23  2     not important for you to determine whether or

04:23  3     not any of the remaining 20 exchanges on

04:23  4     Table A had a US affiliate?

04:23  5          A.    The reason I made this

04:23  6     observation for the sake of completeness is

04:23  7     because I had reviewed Mr. Gil's deposition,

04:23  8     which mentioned the fact that he transacted on

04:23  9     platforms that he believed were located

04:23 10     offshore.

04:23 11          In addition, with respect to

04:23 12     Coinbase, I had Coinbase Singapore's terms of

04:23 13     service.  And so, again, for the sake of

04:23 14     completeness, I mentioned the fact that one

04:23 15     may want to consider looking at where the

04:23 16     actual trades take place, given what was said

04:23 17     by Mr. Gil in his deposition and given the

04:23 18     fact that my materials included Coinbase

04:23 19     Singapore's terms of service.

04:23 20          Q.    When you say "where the actual

04:23 21     trades take place" in your answer just now,

04:23 22     what is it that you mean?

04:24 23          A.    If the trades became -- it

04:24 24     became -- if the orders were submitted to and

04:24 25     became final on the foreign arm of an exchange

236

04:24 1   affiliated with Coinbase, Bittrex, Kraken, or

04:24 2   Poloniex.

04:24 3          Q.    If an exchange became -- strike

04:24 4   that.

04:24 5               If a trade became final on the US

04:24 6   affiliate arm of an otherwise foreign

04:24 7   exchange, would that make that trade, in your

04:24 8   view, occurring in the United States?

04:24 9          A.    If the indicia points to that

04:24 10   exchange as being a US exchange and the trades

04:24 11   become final on that exchange, that trade

04:24 12   becomes final in the geographic location of

04:24 13   the exchange, which, as the indicia would

04:24 14   point out, would include the US.

04:24 15          Q.    Okay.  So let me pose a

04:24 16   hypothetical that, as far as I know -- well,

04:24 17   strike that.

04:24 18               Let me pose a hypothetical.

04:24 19   Let's talk about Bitlish again.  That's on

04:24 20   page 61 of your report.

04:25 21               Let's assume -- I'm not saying

04:25 22   this is true.  I'm just saying let's assume as

04:25 23   a hypothetical that Bitlish has a US

04:25 24   affiliate.

04:25 25               Are you with me so far?

237

04:25  1          A.     I'm with you so far.

04:25  2          Q.     Okay.  If a particular trade

04:25  3   takes place on the US affiliate of Bitlish, in

04:25  4   your view, would that trade have taken place

04:25  5   within the United States?

04:25  6          A.     Applying those indicia to the

04:25  7   platform that is a US affiliate of Bitlish, if

04:25  8   those indicia point to a US location, then the

04:25  9   US could not be excluded as a geographic

04:25  10  location where the transaction becomes final.

04:25  11         Q.     So my question is:  Why wasn't it

04:25  12  of relevance for you to determine whether many

04:25  13  of these exchanges listed in Table A had a US

04:25  14  affiliate in order to reach your opinion?

04:25  15         A.     My opinion was simply to identify

04:26  16  for -- identify the indicia to determine the

04:26  17  location of the exchange, not to pinpoint any

04:26  18  particular location where trades become final.

04:26  19  I applied my indicia to the exchanges given to

04:26  20  me in Table A, and that was my -- that was the

04:26  21  scope of my opinion.

04:26  22         Q.     So Table A does not reflect your

04:26  23  opinion as to where any particular trade

04:26  24  became final.  Is that fair?

04:26  25         A.     What my opinion -- what my

238

04:26  1   opinion here does is apply the indicia to
04:26  2   determine whether or not these indicia can
04:26  3   exclude or include the US as a possible
04:26  4   geographic location for a cryptocurrency
04:26  5   exchange listed in Table A.
04:26  6          Q.    Okay.  Let me pose another
04:26  7   hypothetical.  Let's say I have made a trade
04:26  8   on Bitlish.  Do you have enough information,
04:26  9   based on the application of your criteria, to
04:27 10   say where that trade was finalized?
04:27 11          A.    It's not my opinion to give a
04:27 12   particular location.  But applying my indicia
04:27 13   to the current Bitlish indicia here, it would
04:27 14   indicate that all the indicia would point to
04:27 15   the UK.
04:27 16          Q.    Okay.  Could you conclusively
04:27 17   determine that that trade happened in the UK?
04:27 18          A.    My opinion is simply to look --
04:27 19   describe how orders are made on cryptocurrency
04:27 20   exchanges and become final on cryptocurrency
04:27 21   exchanges, provide the indicia for determining
04:27 22   location, not to specify a particular location
04:27 23   with respect to any one exchange.
04:27 24          Q.    Is it also true that your opinion
04:27 25   is -- does not include specifying a particular

239

04:27 1   location with respect to any one particular

04:28 2   trade?

04:28 3           A.    No, it does not.

04:28 4           Q.    Okay.  Let's move to paragraph

04:28 5   101, please.  That's on page 55.

6               You write in the first full

7   sentence:

8               "In determining where offers are

9           made and where transactions match and

10          become final, pinpointing the exact

11          geographic location of cryptocurrency

12          exchanges poses logistical and

13          analytical challenges."

04:28 14          Do you see that?

04:28 15          A.    I'm sorry, which paragraph are we

04:29 16  on?

04:29 17          Q.    We're on 101 and it's the top of

04:29 18  page 55.  It's the first full sentence on the

04:29 19  top of page 55.

04:29 20          A.    (Document review.)

04:30 21          Q.    My question is:  What are the

04:30 22  logistical and analytical challenges that you

04:30 23  reference in paragraph 101?

04:30 24          A.    The logistical and analytical

04:30 25  challenges here point to the fact that

                                                    240

04:30  1     cryptocurrency exchanges are, relatively

04:30  2     speaking, newer to the marketplace.  Some of

04:30  3     them may be smaller exchanges.

04:30  4              That may be largely -- the

04:30  5     smaller exchanges that are -- that include

04:30  6     people located in different jurisdictions, so

04:30  7     on and so forth.  So it's difficult to

04:30  8     pinpoint with precise -- with precision

04:30  9     exactly where the cryptocurrency exchange is

04:30 10     located.

04:31 11          Q.   Okay.  Let's move on to paragraph

04:31 12     102.  The first sentence says:

04:31 13              "The mobile, digital nature of

04:31 14              cryptocurrency exchanges arguably

04:31 15              exacerbates the challenge of ascribing

04:31 16              particular weight to various potential

04:31 17              indicia of location (e.g., location of

04:31 18              employees, servers, cold key storage) as

04:31 19              providing definitive 'proof' of the

04:31 20              location of the exchange on which trades

04:31 21              are made final."

04:31 22              Do you see that?

04:31 23          A.   (Document review.)

04:31 24              Yes.

04:31 25          Q.   Focusing just on location of

                                                    241

04:31  1  employees, servers, and cold key storage, in

04:32  2  forming your opinions in this case, did you

04:32  3  consider whether or not to ascribe any weight

04:32  4  to those items as indicia of location of

04:32  5  cryptocurrency exchanges?

04:32  6       A.   I gave it thought.  I reflected

04:32  7  on it.  And then I determined that I could not

04:32  8  credibly put any weight on these factors as

04:32  9  indicators of location.

04:32 10       Q.   Why is that?

04:32 11       A.   With respect to which factor?

04:32 12       Q.   Let's take servers.

04:32 13       A.   With respect to servers, servers

04:32 14  are located around the world with respect to

04:32 15  exchanges and the firms that use them.  As

04:32 16  seen in Mr. Gil's testimony, for example, his

04:32 17  firm locates servers throughout the world.

04:32 18            Servers are really not

04:32 19  informative at all with respect to the

04:32 20  location of where an exchange might be or a

04:32 21  firm might be located, given the fact that

04:32 22  they proliferate globally in order to enable

04:33 23  global trading to take place.

04:33 24       Q.   Is it true that the exchanges

04:33 25  that are listed in Table A have servers that

242

04:33  1    proliferate globally?

04:33  2         A.    I couldn't say with respect to

04:33  3    the exchanges specifically.  But as a general

04:33  4    principle, it is commonplace for firms, for

04:33  5    exchanges to enable global trading to happen

04:33  6    to facilitate that process to locate servers

04:33  7    around the globe.

04:33  8              As such, I consider that to be

04:33  9    completely uninformative as to where the

04:33  10   exchange is actually located.

04:33  11        Q.    Did you take any steps to

04:33  12   determine where the servers of the exchanges

04:33  13   listed in Table A -- strike that.

04:33  14              Did you take any steps to

04:33  15   determine, with respect to the exchanges in

04:33  16   Table A, where those exchanges' servers were

04:34  17   located?

04:34  18        A.    Based on my research and

04:34  19   experience, based on my understanding of

04:34  20   market structure and trading, I conclude

04:34  21   strongly that servers in today's modern

04:34  22   digital global electronic marketplace really

04:34  23   have no significance whatsoever in providing

04:34  24   definitive and credible indicia of where an

04:34  25   exchange or firm is located.

                                                      243

```
04:34   1           Q.    Is it fair to say, then, that you
04:34   2   did not take any steps to locate where those
04:34   3   exchanges' servers were because you did not
04:34   4   think that their location had any relevance?
04:34   5           A.    I reflected on the question about
04:34   6   servers.  I thought hard about it.  I applied
04:34   7   my professional experience, research,
04:34   8   judgment, and concluded strongly that, in
04:34   9   today's economy and financial marketplace,
04:34  10   servers are too ubiquitous to be able to
04:35  11   provide any credible signal as to the location
04:35  12   of an exchange or firm.
04:35  13           Q.    And this question is just focused
04:35  14   on your methodology that you applied in
04:35  15   preparing your opinion.  So I just want to ask
04:35  16   you to limit your answer to steps that you
04:35  17   took or did not take.
04:35  18               Did you take any steps to
04:35  19   determine where the exchanges on Exhibit A
04:35  20   have servers?
04:35  21           A.    No.
04:35  22           Q.    Let's go back to our Bitlish
04:35  23   example.  If everything that you wrote about
04:35  24   Bitlish in Table A remained the same --
04:35  25           A.    Yeah.
```

244

04:35  1          Q.    -- this is hypothetical -- but

04:35  2     all of its servers were in the United States,

04:35  3     would that affect your opinion at all?

04:35  4          A.    It would not.

04:35  5          Q.    Okay.  If you had wanted to

04:35  6     determine where the exchanges on your Table A

04:36  7     had their servers, is that something that you

04:36  8     could have figured out?

04:36  9                MS. ZORNBERG:  Objection.

04:36  10         A.    I think it would have been very

04:36  11    difficult to figure out simply because I

04:36  12    believe that servers are so widespread that

04:36  13    pinpointing exact servers with respect to

04:36  14    firms or platforms or exchanges is just very

04:36  15    difficult logistically in today's marketplace.

04:36  16         Q.    If -- understanding you didn't

04:36  17    want to do it, if you had wanted to do it,

04:36  18    what steps would you have taken?

04:36  19                MS. BUNTING:  Objection.

04:36  20                MS. ZORNBERG:  Objection.

04:36  21         A.    I think it's a tough question.  I

04:36  22    think I would have researched the issue.  I

04:36  23    would have conducted searches as to where

04:36  24    servers might be located.  I would have to

04:36  25    really think about that question as to how I

                                                      245

04:36  1    would have approached it exactly.

04:36  2              It's a tough question.  I think

04:36  3    it's ultimately one doomed to failure, given

04:36  4    the incredible proliferation of servers across

04:37  5    the globe today.

04:37  6         Q.   Is it your view that it would be

04:37  7    doomed to failure because the information is

04:37  8    not publicly available?

04:37  9              MS. ZORNBERG:  Objection.

04:37 10         A.   That's part of it potentially.

04:37 11    In addition, it's hard to identify.  Certain

04:37 12    servers may not even operate.  They may be

04:37 13    broken.  They may not work.  They may be old.

04:37 14    Any number of reasons.

04:37 15         Q.   Okay.  I want to turn to your

04:37 16    process of selecting the four criteria that

04:37 17    you applied.

04:37 18         A.   Yeah.

04:37 19         Q.   Walk me through what steps you

04:37 20    took to select those four criteria, please.

04:37 21         A.   The steps I took here really

04:37 22    brought to bear the professional experience

04:37 23    and judgment that I have developed in my

04:37 24    career in legal practice as part of my work at

04:37 25    the World Bank, as part of my research into

                                                      246

04:37  1    market microstructure and international

04:38  2    financial regulation.

04:38  3             Bringing that process to bear, I

04:38  4    have thought very carefully during my years in

04:38  5    practice as well as in my research about where

04:38  6    transactions become final, where firms are

04:38  7    located for the purposes of their

04:38  8    transactions, their home state, for the

04:38  9    purposes of liability, for the purposes of

04:38 10    various jurisdictional issues that, when

04:38 11    attached to them, have thought of those issues

04:38 12    throughout my career and practice at Clifford

04:38 13    Chance, World Bank, as well as in my research.

04:38 14             And I brought that judgment to

04:38 15    bear in identifying four key credible,

04:38 16    informative signals that would provide a real

04:38 17    indication of where cryptocurrency exchanges

04:38 18    could be located, given the difficulties of

04:38 19    doing so.

04:38 20        Q.   Prior to your engagement in this

04:38 21    case, had you ever considered the question of

04:38 22    where trades on cryptocurrency exchanges were

04:39 23    located?

04:39 24        A.   I have often.  Throughout my

04:39 25    years in practice, it was very normal to give

247

04:39  1    thought to various aspects of jurisdiction; as

04:39  2    to where transactions are happening, where

04:39  3    firms are located, where settlement finality

04:39  4    may be taking place in order to determine

04:39  5    particular risk management or governance that

04:39  6    may be applicable.  That was extremely

04:39  7    frequent as a part of my practice.

04:39  8             At the World Bank, I was

04:39  9    frequently engaged in discussions, thinking

04:39 10    about, researching questions as to

04:39 11    international insolvency, which oftentimes

04:39 12    engages questions about location, in order to

04:39 13    determine aspects such as the center of main

04:39 14    interests applicable to a particular firm or

04:39 15    transaction.

04:39 16             In my research, I am teaching as

04:39 17    well as researching questions about

04:39 18    international financial institutions.  In the

04:39 19    case of my teaching, I've delivered lectures,

04:39 20    thought about aspects of location,

04:40 21    particularly as it pertains to where financial

04:40 22    institutions develop subsidiaries or branches,

04:40 23    what difference does that make in terms of how

04:40 24    transactions are finalized and liability

04:40 25    arises with respect to the those firms and

248

04:40  1     institutions.

04:40  2                And so I applied that knowledge

04:40  3     to the novel question of where cryptocurrency

04:40  4     exchanges finalize their trades.  To me, it

04:40  5     represented an extremely natural and logical

04:40  6     extension of my past work.

04:40  7                And I used that substance and

04:40  8     analysis to apply, in this case, to developing

04:40  9     the four indicia that I identify here.

04:40 10          Q.    I'd like to focus very narrowly

04:40 11     on the question of where trades on

04:40 12     cryptocurrency exchanges are finalized.

04:40 13                Prior to your engagement in this

04:40 14     case, had you ever considered the question of

04:40 15     where trades on cryptocurrency exchanges were

04:40 16     finalized?

04:40 17                MS. ZORNBERG:  Objection.  Asked

04:40 18          and answered.

04:40 19          A.    I reject your premise in the

04:40 20     sense that you are creating a deep distinction

04:41 21     between the finalization of trades on

04:41 22     cryptocurrency exchanges relative to

04:41 23     traditional exchanges.

04:41 24                As detailed throughout my report,

04:41 25     cryptocurrency exchanges borrow methodology

                                                      249

04:41  1    for finalizing trades very, very deeply, in

04:41  2    fact, from traditional exchanges.

04:41  3              So all of the questions that I

04:41  4    have just discussed, all the material I just

04:41  5    discussed in my previous answer I feel is

04:41  6    incredibly applicable and relevant to thinking

04:41  7    about the question of cryptocurrency exchanges

04:41  8    precisely because cryptocurrency exchanges

04:41  9    rely so heavily on their methodologies, on

04:41 10    traditional exchanges, and how they establish

04:41 11    their trading systems.

04:41 12         Q.   Okay.  Focusing narrowly on the

04:41 13    question of where trades on cryptocurrency

04:41 14    exchanges are finalized, had you ever written

04:41 15    any publication whatsoever on that narrow

04:41 16    topic prior to this report?

04:41 17         A.   No.

04:41 18         Q.   Okay.  Again, prior to your

04:41 19    engagement in this case, have you ever made

04:42 20    any kind of public statement about where

04:42 21    trades on cryptocurrency exchanges are

04:42 22    finalized?

04:42 23         A.   I don't believe so.  Then again,

04:42 24    it's a novel question, so I'm not surprised

04:42 25    about that.

250

04:42 1          Q.    Okay.   Are there any indicia of

04:42 2    location, other than the ones we've already

04:42 3    discussed, that you considered including

04:42 4    within your test but ultimately decided not to

04:42 5    include?

04:42 6                MS. ZORNBERG:   Objection.   Asked

04:42 7          and answered.

04:42 8                You can answer again.

04:42 9          A.    So, for example, as detailed in

04:42 10   102, paragraph, I considered aspects like the

04:42 11   location of employees, servers, cold key

04:42 12   storage, for example.   And I rejected these

04:42 13   indicia as being essentially noise that is

04:42 14   uninformative as to the location of an

04:42 15   exchange.

04:42 16         Q.    Other than location of employees,

04:43 17   servers, and cold key storage, were there

04:43 18   additional indicia that you had considered

04:43 19   including in your methodology but ultimately

04:43 20   rejected?

04:43 21         A.    I think there would have been.   I

04:43 22   can't exactly recall, as I sit here today,

04:43 23   exactly which ones.

04:43 24         Q.    In your view, is the geographic

04:43 25   location of servers that house a

251

04:43  1    cryptocurrency exchange's matching engine

04:43  2    relevant at all to determining where a trade

04:43  3    on that exchange is finalized?

04:43  4            MS. BUNTING:  Objection.

04:43  5            MS. ZORNBERG:  Object to form.

04:43  6        A.    So there are two aspects to your

04:43  7    question that I disagree with on their

04:43  8    fundamental premise; firstly, that servers are

04:43  9    important in respect of establishing location

04:43 10    as discussed.  I do not believe they are at

04:43 11    all for the reasons that we just discussed.

04:44 12            In addition, as previously

04:44 13    discussed throughout, I do not believe that

04:44 14    matching engines can be distilled to a

04:44 15    location on a server.

04:44 16            As discussed, matching engines

04:44 17    comprise the rules and processes of an

04:44 18    exchange, the governance of an exchange, and

04:44 19    are far bigger, far more deeply embedded

04:44 20    within an exchange's institutional presence

04:44 21    than the simple mechanical matching of one

04:44 22    byte, b-y-t-e, with another on some server

04:44 23    somewhere.

04:44 24        Q.    Have you reviewed any other

04:44 25    expert reports in this case?  Other than your

252

04:44  1    own.  That's what I mean by "other."

04:44  2           A.    I reviewed the rebuttal report of

04:44  3    Mr. Dewey.

04:44  4           Q.    Any others?

04:44  5           A.    No.

04:44  6           Q.    Other than any testimony that may

04:44  7    be listed in your materials considered, have

04:44  8    you reviewed any deposition testimony

04:44  9    transcripts in this case?

04:44  10          A.    I have not.

04:44  11          Q.    Okay.  The very end of paragraph

04:45  12   102, page 55, you mentioned, among other

04:45  13   things, that Bitstamp has servers in Ireland

04:45  14   and Germany.

04:45  15                Do you see that?

04:45  16          A.    (Document review.)

04:46  17                Yes.

04:46  18          Q.    How did you determine that

04:46  19   Bitstamp has servers in Ireland and Germany?

04:46  20          A.    I believe it was in one of the

04:46  21   materials that I've reviewed with respect to

04:46  22   Bitstamp.

04:46  23          Q.    One of the materials cited in

04:46  24   your report.  Is that right?

04:46  25          A.    That's right.

                                                        253

04:46  1          Q.    Okay.  Let's move to paragraph

04:46  2     104 on page 56, please.  The first sentence

04:46  3     says:

04:46  4               "These indicia might not all be

04:46  5          applicable for every exchange or even

04:46  6          knowable for every exchange."

04:46  7               Do you see that?

04:46  8          A.    (Document review.)

04:47  9               Yes.

04:47 10          Q.    Did it concern you at all in

04:47 11     forming your opinion that the indicia you

04:47 12     selected did not always -- weren't always

04:47 13     knowable for every exchange?

04:47 14               MS. ZORNBERG:  Object to form.

04:47 15               You can answer.

04:48 16          A.    It did not bother me at all.

04:48 17          Q.    Why is that?

04:48 18          A.    This is a new industry.  It is to

04:48 19     be expected that certain information at

04:48 20     present may not exist or be knowable.

04:48 21               In my opinion, the methodology I

04:48 22     establish is sound and provides a real world,

04:48 23     concrete, logical, reasonable understanding of

04:48 24     location.  The fact that not every exchange

04:48 25     has every indicia, that doesn't -- to me, that

                                                        254

04:48  1      doesn't seem like a problem at all.

04:48  2           Q.   Prior to forming your opinions

04:48  3      set forth in your report, had you ever applied

04:48  4      this for the four indicia to determine the

04:48  5      location of trading on any particular

04:48  6      cryptocurrency exchange?

04:48  7           A.   As I stated in my previous

04:48  8      responses, I addressed the question of

04:49  9      location on cryptocurrency exchanges in this

04:49 10      opinion as part of forming this opinion.

04:49 11           This is a brand-new question,

04:49 12      essentially, in the literature, as far as I'm

04:49 13      aware.  I have taken steps in this opinion to

04:49 14      bring my professional judgment, experience,

04:49 15      and research to establishing these four

04:49 16      indicia.  And I believe I do so in a way that

04:49 17      others in my field would consider to be

04:49 18      extremely credible.

04:49 19           So this is -- this is my attempt

04:49 20      to set out four key indicia that I believe

04:49 21      credibly speak to the location of a

04:49 22      cryptocurrency exchange.  This is the first

04:49 23      time I'm doing it.

04:49 24           Q.   You testified, among other

04:49 25      things, that this is a brand-new question,

255

04:49  1    essentially, in the literature, as far as

04:49  2    you're aware.

04:49  3                Does that mean it's fair to say

04:49  4    there's not really a literature that addresses

04:49  5    the issue of where a trade on a cryptocurrency

04:49  6    exchange takes place?

04:49  7         A.    I'll be very clear, this

04:50  8    literature and answering this question

04:50  9    intertwines deeply with existing practices,

04:50  10   with respect to existing literature, with

04:50  11   respect to international standards, in

04:50  12   relation to the location of exchanges,

04:50  13   transactions, and firms.

04:50  14               There is extensive discussion,

04:50  15   literature, thinking around the question of

04:50  16   where international firms establish

04:50  17   themselves, questions of liability, questions

04:50  18   of locating where particular assets might be

04:50  19   located.  There is a deep literature,

04:50  20   thinking, and practice surrounding those

04:50  21   questions.

04:50  22               That literature, practice, and

04:50  23   experience is very relevant to determining the

04:50  24   question of how cryptocurrency exchanges

04:50  25   should be analyzed.

256

04:50 1         And I've sought to bring that

04:50 2 research and expertise in the traditional

04:50 3 marketplace with respect to international

04:50 4 standards, with respect to market practice, to

04:51 5 the determination of what four indicia should

04:51 6 be applied here, to determining the location

04:51 7 of cryptocurrency exchanges.

04:51 8         Q.    Are there any academic articles

04:51 9 you're aware of that address the specific

04:51 10 question of where a trade on a cryptocurrency

04:51 11 exchange takes place?

04:51 12         A.    In my opinion, based on the best

04:51 13 of my belief, I don't believe there is.

04:51 14         Q.    Moving to paragraph 105, please,

04:51 15 the first two sentences say:

04:51 16              "These indicia are important for

04:51 17         a variety of reasons.  They provide

04:51 18         concrete attributes that are possible to

04:51 19         identify for the large majority of

04:51 20         exchanges with a degree of certainty."

04:51 21              Do you see that?

04:51 22         A.    (Document review.)

04:53 23              Yes.

04:53 24         Q.    My question is:  Were you able to

04:53 25 achieve a greater degree of certainty with

257

04:53  1    respect to some of your indicia versus other

04:53  2    indicia?

04:53  3              MS. ZORNBERG:  Object to form.

04:53  4        A.    I'm not really sure what you

04:53  5    mean.

04:53  6        Q.    Let me provide an example.  Like,

04:53  7    were you able to be more certain about where a

04:53  8    cryptocurrency exchange was incorporated

04:54  9    versus market participants' perception of

04:54 10    where it was located?

04:54 11        A.    It really depends on the

04:54 12    exchange.

04:54 13        Q.    Were there instances in which

04:54 14    your level of certainty varied among indicia

04:54 15    with respect to a single exchange?

04:54 16              MS. ZORNBERG:  Object to form.

04:54 17        A.    Take one example.  Binance has

04:54 18    the potential for different places of

04:54 19    incorporation and domicile.  It's difficult to

04:54 20    establish.  However, the terms of service make

04:54 21    clear that arbitrations are to be undertaken

04:54 22    in Hong Kong.

04:54 23              So it's very clear to read the

04:54 24    terms of service and establish choice of venue

04:54 25    for disputes.  However, establishing the place

                                                          258

04:55  1    of incorporation and domicile is more

04:55  2    difficult.

04:55  3         Q.    Are you offering any opinion as

04:55  4    to where the books and records of any

04:55  5    particular exchange listed on your Table A are

04:55  6    located?

04:55  7         A.    I'm not.

04:55  8         Q.    Okay.  Are you offering any

04:55  9    opinion that any of the exchanges listed on

04:55 10    your Table A are subject to the recordkeeping

04:55 11    demands that you describe in paragraph 105?

04:55 12              MS. ZORNBERG:  Object to form.

04:55 13         A.    Are you talking about a

04:55 14    particular exchange?  I'm not sure I fully

04:55 15    appreciate and understand the question.

04:55 16         Q.    Fair enough.  Let's break it

04:55 17    down.  You discuss in paragraph 105, in your

04:55 18    words, "strict recordkeeping demands on

04:55 19    regulated entities."

04:55 20              Do you see that?

04:55 21              MS. ZORNBERG:  What page are you

04:55 22         on?

04:55 23              MR. SYLVESTER:  Sorry.  The very

04:56 24         bottom of 56, or almost the very bottom.

04:56 25         A.    (Document review.)

                                                259

04:56  1          Q.    Do you see that?

04:56  2          A.    I do.

04:56  3          Q.    Okay.  So my question is whether

04:56  4     or not you're offering any opinion as to

04:56  5     whether or not any of the exchanges that are

04:56  6     listed in your Table A are subject to any of

04:56  7     the strict recordkeeping demands that you

04:56  8     reference in paragraph 105.

04:56  9          A.    What I'm saying here is that the

04:56  10    indicia identified in Table A includes the

04:56  11    place of incorporation domicile, place of

04:56  12    business, registered office, governing laws.

04:56  13              The governing laws, with respect

04:56  14    to a particular exchange, may subject the

04:56  15    exchange to particular recordkeeping

04:56  16    requirements.  That is commonplace with

04:57  17    respect to the regulation of exchanges in

04:57  18    traditional markets.

04:57  19              So it is certainly very

04:57  20    reasonable to imagine that a governing law

04:57  21    with respect to a particular exchange is -- as

04:57  22    identified as part of the indicia, would

04:57  23    establish the same with respect to some of the

04:57  24    exchanges established in Table A.

04:57  25          Q.    But sitting here today, are you

                                                        260

04:57  1    aware of any such recordkeeping demands that

04:57  2    are applicable to any of the exchanges that

04:57  3    you list in Table A?

04:57  4              MS. ZORNBERG:  Object to form.

04:57  5         A.    I haven't researched the

04:57  6    different laws of the different countries

04:57  7    listed here in the terms of service.

04:57  8         Q.    So is it fair to say that you're

04:57  9    not sure one way or the other whether the

04:57 10    exchanges listed in Table A are subject to

04:57 11    recordkeeping demands?

04:57 12              MS. ZORNBERG:  Objection.

04:57 13         A.    As I sit here today, I can't make

04:57 14    that determination.

04:57 15         Q.    In a case where an exchange may

04:58 16    conduct most of its business in a different

04:58 17    jurisdiction from its registered domicile, in

04:58 18    your view, is its registered domicile still

04:58 19    relevant to the analysis of where a trade on

04:58 20    that exchange takes place?

04:58 21         A.    Yes.

04:58 22              MS. ZORNBERG:  Objection.

04:58 23         Q.    Why is that?

04:58 24         A.    Yes, the place of incorporation

04:58 25    and domicile may determine the corporate forum

                                                    261

04:58 1  that the particular exchange inhabits.  It may

04:58 2  determine the potential rules that apply in

04:58 3  the event that exchange becomes insolvent.

04:58 4        It may have certain applicability

04:58 5  as to the particular rules that govern the

04:59 6  internal recordkeeping of the exchange, as I

04:59 7  set out in this report as part of my thinking

04:59 8  here.

04:59 9        So even though the place of

04:59 10 business may be in a different jurisdiction,

04:59 11 it's perfectly under- -- it's perfectly

04:59 12 reasonable to think that an exchange may still

04:59 13 be subject to various obligations, demands

04:59 14 with respect to the corporate forum that it

04:59 15 has and that is registered in its place of

04:59 16 incorporation and domicile.

04:59 17       Q.   Did you take any steps to

04:59 18 determine -- strike that.

04:59 19       For the exchanges that are listed

04:59 20 in your Table A, did you take any steps to

04:59 21 determine as part of your analysis whether

04:59 22 these exchanges conducted most of their

04:59 23 business in a place other than their domicile?

04:59 24       A.   Table A sets out information that

04:59 25 I've gathered as referenced here.  That sets

262

05:00  1   out what I believe to be the place of business

05:00  2   with respect to the different exchanges listed

05:00  3   in Table A, and as derived from information

05:00  4   that is referenced in Table A.

05:00  5        Q.    Can you --

05:00  6        A.    And footnotes.

05:00  7        Q.    I'm sorry.  Can you define for me

05:00  8   what "domicile" means as used in your Table A?

05:00  9        A.    For me, "domicile" essentially

05:00 10   means the place where the exchange may be

05:00 11   registered, essentially the home base where

05:00 12   the exchange has been incorporated and is

05:00 13   based.

05:00 14        Q.    Is there any difference in your

05:00 15   mind between place of incorporation and

05:00 16   domicile?

05:00 17        A.    I can't say for sure.  Different

05:00 18   countries may apply different jurisdictional

05:00 19   criteria to what they consider to be

05:00 20   incorporation versus how they consider an

05:00 21   exchange to be naturalized within their

05:01 22   particular jurisdiction.

05:01 23        Q.    For each of the exchanges listed

05:01 24   on Exhibit A, for the column that says "Place

05:01 25   of Incorporation/Domicile," do you know

263

05:01  1    whether the entry reflects the place of

05:01  2    incorporation or the domicile or both?

05:01  3         A.   I would have to go through the

05:01  4    footnotes to the different exchanges to be

05:01  5    able to answer your question.  I mean, the

05:01  6    information that I have here is set out in the

05:01  7    footnotes.  To be able to make an attempt at

05:01  8    answering it, I would need to go through the

05:01  9    different footnotes.

05:01 10         Q.   But prior to today, you went

05:01 11    through the sources and the footnotes and made

05:01 12    the determination that each of these had the

05:01 13    place of incorporation or domicile reflected

05:01 14    in Table A.  Is that right?

05:01 15         A.   That's right.

05:02 16         Q.   Can we go to paragraph 103 on

05:02 17    page 56.  I'd like to ask a question about

05:02 18    your third criteria which reads:

05:02 19              "Third, in what country do market

05:02 20              participants and the public believe the

05:02 21              exchange does business?"

05:02 22              Do you see that?

05:02 23         A.   (Document review.)

05:03 24         Q.   What is the relevance of what the

05:03 25    public believes as to where a cryptocurrency

264

05:03  1    exchange is located as distinct from market

05:03  2    participants?

05:03  3              A.    The --

05:03  4                    MS. ZORNBERG:  Object to form.

05:03  5                    You can answer.

05:03  6              A.    Indicia here references the view

05:04  7    of reasonable market participants, including

05:04  8    members of the public, obviously, as to what

05:04  9    they considered to be the location of an

05:04 10    exchange.  I believe that's very important

05:04 11    because it goes directly to the business of

05:04 12    what an exchange does, which is try to attract

05:04 13    traders to the platform to transact in

05:04 14    cryptocurrencies.

05:04 15              Q.    In concluding for purposes of

05:04 16    application of your indicia what market

05:04 17    participants believe as to the geographic

05:04 18    locations of an exchange, I believe you've

05:04 19    testified that you relied on your review of

05:04 20    the user agreements, and you also relied on

05:04 21    the sources that are cited in the footnotes

05:04 22    beneath your Table A.

05:04 23                    Are there any other sources that

05:04 24    inform that application of that criteria?

05:05 25                    MS. ZORNBERG:  Objection.  Asked

                                                              265

05:05  1          and answered.

05:05  2                  You can answer again.

05:05  3          A.    Those are the main sources of

05:05  4   information that I relied on with respect to

05:05  5   this indicia.

05:05  6          Q.    Your fourth indicia is what

05:05  7   regulators believe with respect to the

05:05  8   location of an exchange.  Is that correct?

05:05  9          A.    That's correct.

05:05 10          Q.    Why is that relevant to the

05:05 11   question of the geographic location of where a

05:05 12   trade occurs?

05:05 13          A.    It's extremely relevant in my

05:05 14   opinion.  It reflects what informed regulators

05:05 15   believe the regulation -- the location of an

05:05 16   exchange to be.  In my mind, that is extremely

05:05 17   important because international regulators

05:05 18   tend to be informed.

05:05 19                  Furthermore, they are subject to

05:05 20   and apply international standards as

05:05 21   promulgated by IOSCO in relation to

05:05 22   cooperation between regulators to address

05:06 23   issues of mutual concern.

05:06 24                  In that regard, steps taken by

05:06 25   regulators pursuant to IOSCO standards reflect

                                                      266

05:06  1   formal procedures that regulators are subject

05:06  2   to under these different standards, providing

05:06  3   an indication of what informed regulators are

05:06  4   doing, affirmative steps they are taking,

05:06  5   recognizing the jurisdiction of another

05:06  6   country, another location with respect to the

05:06  7   firm whose location they are -- with respect

05:06  8   to the firm that they are seeking information

05:06  9   about.

05:06 10          Q.    In preparing your opinions, did

05:06 11   you speak with anyone from any of the

05:06 12   exchanges listed in Table A?

05:06 13          A.    No, I did not.

05:06 14          Q.    In preparing your opinion, did

05:06 15   you speak to any traders who have traded on

05:06 16   the exchanges listed in Table A?

05:06 17          A.    No, I did not.

05:06 18          Q.    Turning to paragraph 104 again,

05:07 19   the second sentence says:

05:07 20                "Not every factor is necessary,

05:07 21          and no factor is sufficient, to

05:07 22          understand the location of the

05:07 23          exchanges."

05:07 24                Do you see that?

05:07 25          A.    (Document review.)

267

05:07  1              Yes.

05:07  2        Q.    Is it fair to say that that

05:07  3   sentence, at least in part, describes the

05:07  4   application of your methodology as set forth

05:07  5   in your report?

05:07  6              MS. ZORNBERG:  Objection to form.

05:07  7              You can answer.

05:07  8        A.    That sentence describes the

05:07  9   application of the methodology to the

05:07 10   exchanges in Table A.

05:07 11        Q.    How did you reach your opinion

05:07 12   for purposes of the application of your

05:07 13   methodology that not every factor is necessary

05:08 14   and no factor is sufficient?

05:08 15        A.    I set out in my opinion what the

05:08 16   indicia do is establish a constellation of

05:08 17   informative factors that help in providing a

05:08 18   guidepost as to where the location of an

05:08 19   exchange is.

05:08 20              And what that does for the

05:08 21   purposes of my opinion is allow that exchange

05:08 22   to either be included or excluded as an

05:08 23   exchange that is located within the United

05:08 24   States.

05:08 25        Q.    Are there any factors in your

                                                     268

05:08  1    methodology that are necessary to draw a

05:08  2    conclusion as to where a trade -- sorry --

05:08  3    strike that.

05:08  4           Are there any factors in your

05:08  5    methodology to conclude -- that are necessary

05:08  6    to conclude where a cryptocurrency exchange is

05:08  7    located?

05:08  8           A.   My methodology sets out four

05:08  9    indicia.  It doesn't give particular weight to

05:08  10   any specific one of those indicia.  What it

05:09  11   does is to set out four credible, informative,

05:09  12   reasoned criteria that provide a set of

05:09  13   factors to consider when trying to establish

05:09  14   the location of a cryptocurrency exchange.

05:09  15          Q.   Is it fair to say that none --

05:09  16   there's no one factor that's more important

05:09  17   than others under your methodology?

05:09  18          A.   My methodology sets out the four

05:09  19   factors.  It does not choose one particular

05:09  20   indicia as being particularly dispositive over

05:09  21   and above the others.

05:09  22          Q.   Understanding no one is

05:09  23   dispositive, are there any that are more

05:09  24   important than the others?

05:09  25          A.   It sets out four factors to guide

269

05:09  1    regulators, provides a framework.  It does not

05:09  2    stipulate as to what weight should be given to

05:09  3    each of these different factors.

05:09  4         Q.    Do you think that someone could

05:09  5    apply your four factors to the same set of

05:10  6    exchanges and come up with a different

05:10  7    conclusion about where the exchange is

05:10  8    located?

05:10  9              MS. ZORNBERG:  Objection.

05:10 10         A.    My opinion here is not to provide

05:10 11    particular locations for the different

05:10 12    exchanges in Table A.  My -- the scope of my

05:10 13    opinion is to set out the four indicia and to

05:10 14    decide on that basis whether they're indicia

05:10 15    that can include or exclude the US as a

05:10 16    possible location of the different exchanges

05:10 17    in Table A.

05:10 18              MR. SYLVESTER:  Can we take a

05:10 19         brief break, please.

05:11 20              MS. ZORNBERG:  Yes.

05:11 21              THE VIDEOGRAPHER:  The time is

05:11 22         5:11 p.m.  This concludes Media 8.  Off

05:11 23         the record.

05:32 24              (Recess taken from 5:11 p.m. to

05:32 25         5:32 p.m.)

                                                    270

05:32  1              THE VIDEOGRAPHER:  The time now
05:32  2         is 5:32.  This begins Media 9.  On the
05:32  3         record.
05:32  4   BY MR. SYLVESTER:
05:32  5         Q.    Professor, let's turn back to
05:32  6   paragraph 102 on page 55, please.
05:32  7              Why was it that you decided to
05:32  8   exclude from your indicia of location,
05:32  9   location of employees?
05:32 10         A.    So the reason why I rejected that
05:32 11   indicia as being an informative one was
05:33 12   because employees could be located anywhere,
05:33 13   particularly given what we know today about
05:33 14   remote work.  People are working from
05:33 15   everywhere.
05:33 16              And so to me -- or could
05:33 17   potentially be working from any location --
05:33 18   and so to me, that did not feature as a
05:33 19   reliable indicator of location.
05:33 20         Q.    If all of the management of a
05:33 21   specific cryptocurrency exchange were located
05:33 22   in one place, would that change your opinion
05:33 23   as to that factor's relevance?
05:33 24         A.    It would not.
05:33 25         Q.    Why was it that you decided to

                                                            271

05:33  1    include cold key storage as a possible indicia

05:33  2    of location of cryptocurrency exchange?

05:34  3                    (Discussion off the record.)

05:34  4        A.    The reason I excluded cold key

05:34  5    storage was because cold keys are essentially

05:34  6    the passwords to the user accounts at the

05:34  7    exchanges.  They are incredibly portable and

05:34  8    they could be essentially anywhere.

05:34  9                They could be carried in

05:34 10    someone's pocket.  They could be moved to any

05:34 11    locale.  So to me, that was a completely

05:34 12    unreliable indicator of the location of an

05:34 13    exchange.

05:34 14        Q.    I want to pose for you another

05:35 15    hypothetical, going back to Bitlish.  What if

05:35 16    100 percent of the traders trading on Bitlish

05:35 17    were trading from the US?

05:35 18                Would that affect your opinion at

05:35 19    all as to the location of Bitlish?

05:35 20        A.    My indicia here set out the four

05:35 21    criteria.  Where the traders are located that

05:35 22    are trading into Bitlish, that is not relevant

05:35 23    as a part of my criteria.

05:35 24        Q.    I believe that you testified

05:35 25    earlier that you were aware that Binance has a

                                                          272

05:35   1       US affiliate.  Is that right?

05:35   2               A.    Based on my general knowledge in

05:35   3       this area, as well as, I believe, a couple of

05:35   4       sources that may be in the report, yes.

05:35   5               Q.    Is the existence of a US

05:36   6       affiliate for Binance an indication that some

05:36   7       offers or trades on Binance may have become

05:36   8       final in the United States?

05:36   9               A.    I'm sorry.  Could you repeat the

05:36   10      question.

05:36   11              Q.    Sure.  Is the existence of a US

05:36   12      affiliate for Binance an indication that some

05:36   13      offers or trades on Binance may have become

05:36   14      final in the United States?

05:36   15              A.    I'm not sure I understand.  Why

05:36   16      would that be an indication as to why that

05:36   17      would happen?

05:36   18              Q.    I believe that if you return to

05:36   19      paragraph 99, you'll recall we discussed

05:36   20      earlier your opinion that, because certain

05:36   21      exchanges have a foreign arm, it is not

05:36   22      determinable in the abstract whether for any

05:36   23      particular trade the transaction became final

05:36   24      within the United States.

05:36   25                     Do you remember that?

273

05:36  1          A.     That's right.

05:36  2          Q.     Okay.  So I'm just trying to flip

05:36  3     that analogy the other way.  So since Binance

05:37  4     has a US affiliate, is it possible that some

05:37  5     of the trades on Binance became final in the

05:37  6     United States?

05:37  7          A.     So I think my methodology here

05:37  8     you may be slightly misunderstanding in how

05:37  9     you're presenting it.  The four indicia here

05:37 10     provide a guide as to the location of a

05:37 11     particular cryptocurrency exchange.

05:37 12               I applied these four indicia, the

05:37 13     25 exchanges, to determine whether one can

05:37 14     exclude the US as a possible location where

05:37 15     these exchanges may be based.

05:37 16               I made the observation here based

05:37 17     on my reading of the Gil deposition as well as

05:37 18     my possession of and my review of the Coinbase

05:37 19     Singapore terms that, for completeness, it may

05:37 20     be worth looking at the potential for trades

05:37 21     to have occurred through the foreign

05:37 22     affiliates of Coinbase, Kraken, Bittrex, and

05:38 23     Poloniex.

05:38 24               With respect to that observation,

05:38 25     the second part, one could apply my indicia to

                                                          274

05:38  1    the foreign affiliates of Kraken, Poloniex,

05:38  2    Bittrex, and Coinbase to establish where they

05:38  3    may likely be located and whether they may be

05:38  4    including or excluding the US as an indicia.

05:38  5              So my methodology does not

05:38  6    require looking at the different affiliates.

05:38  7    What it's doing is identifying four core

05:38  8    indicia, applying them to the exchanges in

05:38  9    Table A as a way to include or exclude the US

05:38 10    as a possible place where indicia may point to

05:38 11    as a location for an exchange.

05:38 12        Q.    Okay.  So since Binance has a

05:39 13    United States arm, how is it that you're able

05:39 14    to exclude the US as a possible location for

05:39 15    Binance?

05:39 16        A.    I looked at the exchanges in

05:39 17    Table A.  I applied my indicia to those

05:39 18    exchanges in Table A.  Binance US was not

05:39 19    on -- one of the exchanges on Table A.

05:39 20        Q.    How did you determine which

05:39 21    exchanges to include in Table A?

05:39 22              MS. ZORNBERG:  Object to form.

05:39 23        A.    I received those specific

05:39 24    exchanges from counsel.

05:39 25        Q.    Do you have any understanding of

                                                    275

05:40  1    the significance, if any, of this set of 24

05:40  2    exchanges reflected in Table A?

05:40  3             A.    I believe --

05:40  4             MS. ZORNBERG:  I will say, you

05:40  5        can answer without disclosing

05:40  6        communications with counsel.

05:40  7        A.    My understanding is that there

05:40  8    may have been trades of XRP on the exchanges

05:40  9    listed in Table A.

05:40 10        Q.    If one of the exchanges on your

05:40 11    Table A had a US parent company, would that be

05:40 12    any indication of -- that some offers or

05:40 13    trades on that exchange may have become final

05:40 14    in the United States?

05:40 15        A.    No.  The exchange is as set out

05:41 16    in Table A.

05:41 17             MS. ZORNBERG:  Hold on, the audio

05:41 18        is echoing.  It stopped but it was -- we

05:41 19        were getting feedback.  Everything the

05:41 20        witness said was being -- spitting back

05:41 21        out.

05:41 22             Coming from your --

05:41 23        Q.    Do you want to say something

05:41 24    again, Professor?

05:41 25        A.    I'm so sorry.  I think I lost

                                                        276

05:41  1    my--

05:41  2         Q.    That's fine.  I just -- I think

05:41  3    we're good.

05:41  4              MS. ZORNBERG:  Okay.  It stopped.

05:41  5              THE VIDEOGRAPHER:  Somebody might

05:41  6         have unmuted themselves on Zoom.

05:41  7         Q.    Let me repeat the question if

05:41  8    that's okay.

05:41  9         A.    Thank you.

05:41 10         Q.    If one of the exchanges on Table

05:41 11    A had a US parent company, would that be any

05:41 12    indication that some of the offers or trades

05:41 13    on that exchange may become final in the

05:41 14    United States?

05:41 15         A.    What my report does is set out

05:41 16    the four indicia that point to the location of

05:41 17    a cryptocurrency exchange looking at aspects

05:42 18    such as registered office, domicile, place of

05:42 19    business, to determine whether that indicia

05:42 20    points to the US or otherwise as a possible

05:42 21    location.

05:42 22              The parent as a separate legal

05:42 23    entity has no bearing on the application of

05:42 24    these indicia to the actual exchange itself.

05:42 25    The indicia could be applied to the parent to

277

05:42  1    determine where its possible location could

05:42  2    be.

05:42  3              But with respect to the exchanges

05:42  4    set out in Table A as well as more generally

05:42  5    with respect to the methodology, it sets out

05:42  6    four criteria that help point to the location

05:42  7    of a cryptocurrency exchange, where trades

05:42  8    become final on that exchange.  And that's

05:42  9    really what the methodology is doing here.

05:42 10         Q.    Do you know one way or the other

05:42 11    whether defendants employed market makers to

05:42 12    sell XRP?

05:42 13              MS. ZORNBERG:  Objection.

05:42 14         A.    I really have no idea.

05:43 15         Q.    Okay.

05:43 16         A.    I don't know.

05:43 17         Q.    Did you as part of your

05:43 18    analysis -- strike that.

05:43 19              You cite Mr. Gil's testimony at

05:43 20    various places in your report.  Correct?

05:43 21         A.    I do, yes.

05:43 22         Q.    Do you know what firm Mr. Gil is

05:43 23    affiliated with?

05:43 24         A.    I believe he's affiliated with

05:43 25    GSR.

278

05:43  1          Q.    And do you know what, if any,
05:43  2   relationship GSR has with Ripple?
05:43  3          A.    My understanding based on
05:43  4   Mr. Gil's deposition is that he was an
05:43  5   execution agent.
05:43  6          Q.    When you say "execution agent,"
05:43  7   will you tell me what you mean by that?
05:43  8          A.    I believe he --
05:43  9                MS. ZORNBERG:  Objection.
05:43 10                THE WITNESS:  Sorry.
05:43 11                MS. ZORNBERG:  You can answer.
05:43 12          A.    I believe he helped facilitate
05:43 13   trades for the defendants.
05:43 14          Q.    Okay.  XRP trades.  Is that
05:43 15   right?
05:44 16          A.    I --
05:44 17                MS. ZORNBERG:  Object to form.
05:44 18          A.    I'm not sure.  I believe -- I
05:44 19   believe so based on my recollection of the
05:44 20   deposition.
05:44 21          Q.    Okay.  Have you reviewed the
05:44 22   terms of service of any agreements that GSR
05:44 23   may have signed with any cryptocurrency
05:44 24   exchange?
05:44 25          A.    I have reviewed the terms of

                                                    279

05:44  1     service as set out in my report.  I have not

05:44  2     reviewed any terms of service specific to GSR.

05:44  3          Q.    Other than GSR, are you aware of

05:44  4     any other market makers the defendants

05:44  5     employed to sell XRP?

05:44  6               MS. ZORNBERG:  Objection.  Lack

05:44  7          of foundation.

05:44  8          Q.    Go ahead.

05:44  9          A.    No.

05:44  10         Q.    As part of your work in forming

05:44  11    your opinions, did you analyze which exchanges

05:44  12    accepted US customers?

05:44  13         A.    No.

05:44  14         Q.    As part of your work in forming

05:44  15    your opinion, did you analyze which, if any,

05:45  16    exchanges affirmatively blocked US customers

05:45  17    from trading on their exchanges?

05:45  18         A.    Could you repeat the question.

05:45  19         Q.    Sure.  As part of your work in

05:45  20    forming your opinion, did you assess whether

05:45  21    any of the exchanges listed in your Table A

05:45  22    took any steps to block US customers from

05:45  23    trading on those exchanges?

05:45  24         A.    In forming my opinion, I did not

05:45  25    look at that as a factor relevant to forming

                                                        280

05:45  1    my opinion about where trades become final and

05:45  2    where exchanges are located.

05:45  3            Q.    And you're not opining on where

05:45  4    any particular trade became final as part of

05:45  5    your opinion, are you?

05:45  6            A.    I'm not.

05:45  7            Q.    Could we turn to page -- sorry --

05:45  8    paragraph 113, page 70 of your report.

05:46  9            A.    I'm sorry, I missed that.

05:46  10           Q.    Fair enough.  Paragraph 113, page

05:46  11   70.

05:46  12           A.    Thank you very much.

05:46  13           Q.    I'll direct you to the second

05:46  14   sentence where you say:

05:46  15               "First, I am aware that certain

05:46  16           of the exchanges listed in Table A,

05:46  17           including those that I do not believe

05:46  18           finalize trades in the US, have had

05:46  19           contact with or submitted license

05:46  20           applications to certain US regulators."

05:46  21               Do you see that?

05:46  22           A.    (Document review.)

05:47  23           Q.    My first question is:  Are you

05:47  24   aware of any instances of the exchanges listed

05:47  25   in Table A submitting license applications

                                                    281

05:47  1    other than those that are cited in

05:47  2    Footnote 287?

05:47  3         A.    Other than that -- other than

05:48  4    those cited in the footnotes, I'm not aware of

05:48  5    other exchanges listed in Table A submitting

05:48  6    applications.

05:48  7         Q.    And then one sentence later, you

05:48  8    say:

05:48  9              "Importantly, to the best of my

05:48 10         understanding, these interactions with

05:48 11         regulators do not constitute evidence

05:48 12         that these exchanges were finalizing

05:48 13         trades in the US."

05:48 14              Do you see that?

05:48 15         A.    (Document review.)

05:48 16              Yes.

05:48 17         Q.    What is your understanding

05:48 18    described in that sentence based upon?

05:48 19         A.    It's based upon my general

05:48 20    knowledge of the marketplace and what the

05:48 21    purposes of licensure tends to be.

05:48 22              The purposes of licensure with

05:48 23    respect to FinCEN registration, for example,

05:49 24    based on my general research and

05:49 25    understanding, is not necessarily related to

                                                     282

05:49  1    any meaning to finalize trades.  It can be

05:49  2    done for any number of reasons that have

05:49  3    nothing to do with that.

05:49  4         Q.    Other than the money services

05:49  5    business registrant search -- strike that.

05:49  6              Are you aware of any of the

05:49  7    exchanges listed in Table A applying for any

05:49  8    kind of license with any US regulator other

05:49  9    than money services business license?

05:49 10         A.    I'm not aware.

05:49 11         Q.    Okay.  Going back to 113, the

05:49 12    next sentence, you say:

05:49 13              "Rather, a more plausible account

05:49 14         is that these exchanges were trying to

05:49 15         get permission to engage in some

05:49 16         exchange business in the US (e.g.,

05:49 17         through registration with FinCEN as a

05:50 18         money services business."

05:50 19              Why is that more plausible in

05:50 20    your view than the conclusion that an exchange

05:50 21    was seeking a license from a US regulator

05:50 22    because it finalizes trades in the US?

05:50 23         A.    The purposes of registering with

05:50 24    FinCEN, as far as I understand it, is to gain

05:50 25    permission to be able to conduct potential

                                                      283

05:50  1    payments related money services business, or

05:50  2    sometimes defensively as a way to avoid

05:50  3    inadvertently being caught in US money

05:50  4    laundering and terrorist financing

05:50  5    regulations, or as a potential aspirational

05:50  6    matter where the exchange may be looking for

05:50  7    some future presence in the US.

05:50  8         Q.   How did you come to the

05:50  9    understanding of the purposes that you just

05:50 10    listed?

05:50 11         A.   Based on my general research and

05:50 12    knowledge in this area.

05:50 13         Q.   Were you aware of those purposes

05:50 14    prior to your engagement in this case?

05:50 15         A.   I was aware of FinCEN, what

05:51 16    FinCEN does as part of my general knowledge in

05:51 17    the financial markets and regulatory sphere.

05:51 18         Q.   In forming your opinion in this

05:51 19    case, did you consider the definition of

05:51 20    "exchange" under the US securities laws?

05:51 21              MS. ZORNBERG:  Objection.

05:51 22         A.   No, I did not.

05:51 23         Q.   Do you have any understanding of

05:51 24    the factors that the SEC uses in determining

05:51 25    whether an exchange has to register with the

                                                  284

05:51  1    commission?

05:51  2          A.    I'm not here to give a legal

05:51  3    opinion or to look at legal factors.

05:51  4          Q.    Understanding that, I'm just

05:51  5    asking you for your understanding.  Do you

05:51  6    have an understanding of the factors that the

05:51  7    SEC uses in determining whether an exchange

05:51  8    has to register with the commission?

05:51  9          A.    Again, without -- with the caveat

05:51 10    that I'm not giving a legal opinion but a

05:51 11    market structure opinion, I'm aware.

05:51 12          Q.    Does the commission focus on the

05:51 13    physical location that orders are matched on

05:51 14    the exchange in making that determination?

05:51 15                MS. ZORNBERG:  Objection.  Calls

05:51 16          for a legal conclusion.

05:51 17          A.    I'm not here to give a legal

05:52 18    opinion.

05:52 19          Q.    Understanding that, I'm just

05:52 20    asking about the facts that are or are not in

05:52 21    your head.

05:52 22                MS. ZORNBERG:  Yeah, but it's so

05:52 23          far outside of scope that it's not

05:52 24          proper.

05:52 25                MR. SYLVESTER:  I'm not sure

                                                    285

05:52  1            that -- I mean, are you instructing her

05:52  2            not to answer?  It doesn't sound

05:52  3            privileged to me.  I'm asking just

05:52  4            whether she knows or she doesn't know.

05:52  5                 MS. ZORNBERG:  Please note my

05:52  6            objection.

05:52  7                 MR. SYLVESTER:  Fair enough.

05:52  8                 MS. ZORNBERG:  Improper line of

05:52  9            questioning.

05:52 10                 MR. SYLVESTER:  Okay.

05:52 11   BY MR. SYLVESTER:

05:52 12        Q.    Does the commission focus on the

05:52 13   physical location that orders are matched on

05:52 14   an exchange in order to determine whether an

05:52 15   exchange has to register with the commission?

05:52 16                 MS. ZORNBERG:  Objection.

05:52 17        A.    Again, with the caveat that I'm

05:52 18   not giving a legal opinion, I would have to go

05:52 19   ahead and consult the statute book and the

05:52 20   application of the statutes.  So that question

05:52 21   is a complicated question.

05:52 22        Q.    Do you know, sitting here today,

05:52 23   whether, in determining whether an exchange

05:52 24   has to register with the commission, the

05:52 25   commission looks at whether any component of

05:52  1    the exchange is used by US investors?

05:52  2              MS. ZORNBERG:  Objection.

05:52  3         A.    I'm not here to give a legal

05:52  4    opinion.  With that caveat, again, I'd have to

05:53  5    go and do research.

05:53  6         Q.    Again, just asking your

05:53  7    understanding, do you know whether or not the

05:53  8    commission looks at whether any component of

05:53  9    an exchange is located in the US in

05:53 10    determining whether or not that exchange has

05:53 11    to register with the commission?

05:53 12              MS. ZORNBERG:  Objection.

05:53 13         A.    With the caveat I'm not giving a

05:53 14    legal opinion, that's a question for which I

05:53 15    would have to go and do research.

05:53 16         Q.    Let's look at the last sentence

05:53 17    of paragraph 113, please.  That's on the top

05:54 18    of page 71.  It says:

05:54 19              "Thus, absent other specific

05:54 20              indicia, and based on the approach

05:54 21              outlined in this section, I would

05:54 22              continue to conclude that trades on the

05:54 23              exchanges in Table A other than Bittrex,

05:54 24              Poloniex, Coinbase, and Kraken would not

05:54 25              have occurred in the US."

05:54  1            My question is just, what are the

05:54  2  other specific indicia that might affect your

05:54  3  opinion as set forth at the end of paragraph

05:54  4  113?

05:54  5        A.    (Document review.)

05:54  6            So what that sentence refers to

05:54  7  is the fact that there are no indicia with

05:54  8  respect to the 25 exchanges, other than the

05:54  9  four mentioned here, that point to the US as a

05:54 10  plausible location for the exchanges mentioned

05:54 11  outside of the four mentioned here.

05:55 12        Q.    Let's look at your final

05:55 13  paragraph, paragraph 114.  Second sentence,

05:55 14  you write:

05:55 15            "Based on my research, it is my

05:55 16            understanding that many cryptocurrency

05:55 17            exchanges tend to avoid becoming located

05:55 18            in the US and falling within the purview

05:55 19            of US regulators."

05:55 20            What's the basis for that

05:55 21  statement?

05:56 22        A.    (Document review.)

05:56 23            The basis for that statement is

05:56 24  my general research and understanding of the

05:56 25  marketplace.

                                                  288

05:56  1          Q.    Is that research and

05:56  2    understanding of the marketplace that is

05:56  3    specific to the preparation of this report, or

05:56  4    something that predated your report?

05:56  5          A.    Predated.

05:56  6          Q.    Why is it, if you have an

05:56  7    understanding, that many cryptocurrency

05:56  8    exchanges tend to avoid becoming located in

05:56  9    the US and falling within the purview of US

05:56 10    regulators?

05:56 11          A.    Speculating, hypothetically.  I

05:56 12    can't speak to the exchanges themselves.

05:56 13    Based on what I've read, I think it's a

05:56 14    general fear of being caught potentially

05:56 15    within regulation inadvertently.  That appears

05:57 16    to be the driving reason.

05:57 17          Q.    When you say regulation, what is

05:57 18    it that you're referring to?

05:57 19          A.    Potentially being caught within

05:57 20    the purview of US regulation.

05:57 21          Q.    The last two sentences of 114

05:57 22    say:

05:57 23                "Within this environment, it

05:57 24          makes sense that most of the exchanges

05:57 25          noted above would locate themselves in

289

| | | |
|---|---|---|
| 05:57 | 1 | jurisdictions outside of the US and |
| 05:57 | 2 | would seek to avoid falling within US |
| 05:57 | 3 | territorial borders.  To the extent they |
| 05:57 | 4 | do so, it is likely to be an accidental |
| 05:57 | 5 | and inadvertent mistake or by way of |
| 05:57 | 6 | minor, inconsequential physical presence |
| 05:57 | 7 | that does not affect the location of the |
| 05:57 | 8 | underlying exchange or where trades on |
| 05:57 | 9 | the exchange become final." |
| 05:58 | 10 | Do you see that? |
| 05:58 | 11 | A.    Yes. |
| 05:58 | 12 | Q.    What is your basis for concluding |
| 05:58 | 13 | that "to the extent they do so, it is likely |
| 05:58 | 14 | to be an accidental and inadvertent mistake or |
| 05:58 | 15 | by way of minor, inconsequential physical |
| 05:58 | 16 | presence"? |
| 05:58 | 17 | A.    Based on my general research and |
| 05:58 | 18 | understanding, as cited to the source here, |
| 05:58 | 19 | the, for example, the website about how to |
| 05:58 | 20 | build a cryptocurrency exchange, it is |
| 05:58 | 21 | generally, as noted here, a sentiment that |
| 05:58 | 22 | exchanges try and avoid falling within US |
| 05:58 | 23 | regulation, within the jurisdiction of the US, |
| 05:58 | 24 | and therefore, it is likely that if they do |
| 05:59 | 25 | so, it would be accidental. |

290

05:59  1          Q.    What is an example of an

05:59  2     accidental or inadvertent mistake that could

05:59  3     have that consequence?

05:59  4          A.    Hard to speculate.  They may --

05:59  5     it's hard to speculate.

05:59  6          Q.    What did you have in mind when

05:59  7     you wrote that phrase?

05:59  8          A.    For example, potentially they

05:59  9     establish a presence here of some description.

05:59 10          Q.    Same question.  What's an example

05:59 11     of a minor, inconsequential physical presence?

05:59 12          A.    For example, a post box or a

05:59 13     registered office.

05:59 14          Q.    In your view would a post office

05:59 15     box or a registered office be relevant to the

06:00 16     geographic location of the exchange?

06:00 17          A.    The four indicia do not mention

06:00 18     offices, post boxes, and so, no.

06:00 19          Q.    Did anyone assist you in

06:00 20     generating the four indicia that you apply in

06:00 21     this report?

06:00 22          A.    This was my work.

06:00 23          Q.    Be that as it may, did anyone

06:00 24     assist you in generating the four indicia that

06:00 25     you apply in your report?

                                                      291

| | | |
|---|---|---|
| 06:00 | 1 | A.    What do you mean -- |
| 06:00 | 2 | MS. ZORNBERG:  Objection. |
| 06:00 | 3 | THE WITNESS:  Sorry. |
| 06:00 | 4 | A.    I don't know what you mean by |
| 06:00 | 5 | "assist" me. |
| 06:00 | 6 | Q.    Did you receive input from anyone |
| 06:00 | 7 | as to what four indicia you should select as |
| 06:00 | 8 | your methodology in your report? |
| 06:00 | 9 | A.    No, these were my indicia based |
| 06:00 | 10 | on my research, my experience, and expertise. |
| 06:00 | 11 | MR. SYLVESTER:  Okay.  I don't |
| 06:00 | 12 | have any further questions at this time. |
| 06:00 | 13 | Do you have redirect? |
| 06:01 | 14 | MS. ZORNBERG:  Let me just |
| 06:01 | 15 | consult with counsel. |
| 06:01 | 16 | MR. SYLVESTER:  Sure. |
| 06:01 | 17 | (Continued on the next page.) |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

292

| | | |
|---|---|---|
| 06:01 | 1 | THE VIDEOGRAPHER:  The time is |
| 06:01 | 2 | 6:00 p.m.  This concludes Media 9. |
| 06:01 | 3 | The time is 6:01 p.m.  This |
| 06:01 | 4 | continues Media 9.  Still on the record. |
| 06:01 | 5 | MS. ZORNBERG:  Nothing further on |
| 06:01 | 6 | behalf of the defendants. |
| 06:01 | 7 | MR. SYLVESTER:  Wonderful. |
| 06:01 | 8 | Professor, thank you very much |
| | 9 | for your time today. |
| | 10 | THE WITNESS:  Thank you very much |
| | 11 | for your time today.  I really |
| | 12 | appreciate it. |
| | 13 | MR. SYLVESTER:  Off the record. |
| | 14 | Okay. |
| 06:02 | 15 | (Discussion off the record.) |
| 06:02 | 16 | THE VIDEOGRAPHER:  The time is |
| | 17 | 6:02 p.m.  This concludes Media 9 of 9. |
| | 18 | Off the record. |
| | 19 | (Time noted:  6:02 p.m.) |
| | 20 | - - - |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

293

```
 1                    CERTIFICATE OF WITNESS

 2

 3

 4         I, YESHA YADAV, do hereby declare under

 5      penalty of perjury that I have read the entire

 6      foregoing transcript of my deposition testimony,

 7      or the same has been read to me, and certify that

 8      it is a true, correct and complete transcript of

 9      my testimony given on February 11, 2022, save and

10      except for changes and/or corrections, if any, as

11      indicated by me on the attached Errata Sheet, with

12      the understanding that I offer these changes and/or

13      corrections as if still under oath.

14         _____ I have made corrections to my deposition.

15         _____ I have NOT made any changes to my deposition.

16

17   Signed: _____

                YESHA YADAV

18

19   Dated this _____ day of _____ of 20____.

20

21

22

23

24

25

                                                      294
```

295

1

2

3          STATE OF NEW YORK    )
                                 :  ss.
4          COUNTY OF NASSAU     )

5                        C E R T I F I C A T E

6                    I, PATRICIA A. BIDONDE, a Notary

7          Public within and for the State of New

8          York, do hereby certify:

9                    That YESHA YADAV, the witness

10         whose deposition is hereinbefore set

11         forth, was duly sworn by me, and that

12         such deposition is a true record of the

13         testimony given by the witness.

14                   I further certify that I am not

15         related to any of the parties to this

16         action by blood or marriage, and that I

17         am in no way interested in the outcome

18         of this matter.

19                   IN WITNESS WHEREOF, I have

20         hereunto set my hand this day, February

21         11, 2022.

22                        _____
                          _Patricia Bidonde_
23                        PATRICIA A. BIDONDE
                          Stenographer
24                        Registered Professional Reporter
                          Realtime Certified Reporter

25

```
 1

 2    ERRATA SHEET FOR THE TRANSCRIPT OF:

 3    Case Name:      SEC v Ripple

 4    Dep Date:       February 11, 2022

 5    Deponent:       Yesha Yadav

 6    Pg. Ln.  Now Reads        Should Read          Reason

 7    ___ ____ _____  _____  _____

 8    ___ ____ _____  _____  _____

 9    ___ ____ _____  _____  _____

10    ___ ____ _____  _____  _____

11    ___ ____ _____  _____  _____

12    ___ ____ _____  _____  _____

13    ___ ____ _____  _____  _____

14    ___ ____ _____  _____  _____

15    ___ ____ _____  _____  _____

16    ___ ____ _____  _____  _____

17    ___ ____ _____  _____  _____

18    ___ ____ _____  _____  _____

19    ___ ____ _____  _____  _____

20    ___ ____ _____  _____  _____

21    ___ ____ _____  _____  _____

22    ___ ____ _____  _____  _____

23    ___ ____ _____  _____  _____

24    _____    _____

      Date                Yesha Yadav

25
                                                        296
```

```
  1              E R R A T A (Continued)

  2     Pg. Ln.  Now Reads        Should Read          Reason

  3     ___ ____ _____  _____    _____

  4     ___ ____ _____  _____    _____

  5     ___ ____ _____  _____    _____

  6     ___ ____ _____  _____    _____

  7     ___ ____ _____  _____    _____

  8     ___ ____ _____  _____    _____

  9     ___ ____ _____  _____    _____

 10     ___ ____ _____  _____    _____

 11     ___ ____ _____  _____    _____

 12     ___ ____ _____  _____    _____

 13     ___ ____ _____  _____    _____

 14     ___ ____ _____  _____    _____

 15     ___ ____ _____  _____    _____

 16     ___ ____ _____  _____    _____

 17     ___ ____ _____  _____    _____

 18     ___ ____ _____  _____    _____

 19     ___ ____ _____  _____    _____

 20     ___ ____ _____  _____    _____

 21     ___ ____ _____  _____    _____

 22

 23     _____     _____

        Date

 24                                    Yesha Yadav

 25

                                                        297
```