PX 47



Message

**From:**   Ryan Zagone           @ripple.com]
on behalf of   Ryan Zagone            @ripple.com> [            @ripple.com]
**Sent:**   1/31/2017 6:13:49 PM
**To:**           (DFS)           @dfs.ny.gov];            (DFS) [           @dfs.ny.gov]
**CC:**           @ripple.com]; Antoinette O'Gorman           @ripple.com]
**Subject:**   XRP II 2016 Year End Update

and

I write to share a 2016 year end update on XRP II.

The attached letter is intended to update you on new additions and changes to Ripple Labs Inc.'s leadership team and XRP II's customer activity.

We have also attached the 2016 Independent BSA/AML audit, which notes satisfactory ratings across all categories with just one recommendation that has since been addressed.

Hard copies of both documents have been mailed. We are working on the annual reporting requirements and will provide those within the required timeframe.

**Meeting Request:** We also write to request an in-person meeting to continue to build our relationship. Do let us know a convenient time for you and your colleagues.

Regards,
Ryan Zagone

# Report of Independent BSA/AML Review



HIGHLY CONFIDENTIAL

RPLI_SEC 0532019

September 13, 2016

Board of Directors
Ripple Labs, Inc. DBA XRP II, LLC
C/O Antoinette O'Gorman
300 Montgomery Street, 12th Floor
San Francisco, CA 94104

Dear Antoinette:

Thank you for the opportunity to provide Bank Secrecy Act and Anti-Money Laundering independent testing services to XRP II, LLC.

The enclosed report outlines the observations and recommendations resulting from our testing. It has been prepared with the scope of work as specified in our engagement letter signed April 8, 2016.

This report contains the following:

- Executive Summary to give the Board of Directors, or Committee thereof, a frame of reference for the methodology and scope, basis of report and conclusions;
- Observations and conclusion; and
- Summary of recommendations.

The result of our testing is based on materials provided at our request, as well as statements and representations made by Company personnel. The Executive Summary is designed to give a brief overview of results, while the remainder of the report is written so that BSA/AML compliance personnel and appropriate senior management effectively implement corrective actions measures and revise policies and procedures as needed.

We appreciate the courtesies and cooperation extended to us during the engagement and look forward to the opportunity to be of service to you again in the future.

Please feel free to contact me personally if you have any questions about this report.

Very truly yours,

CAMS, CFE, CFCS, CCRP
President & Founder

# REPORT OF
# INDEPENDENT REVIEW

U.S. Bank Secrecy Act / Anti-Money Laundering Compliance /
Office of Foreign Assets Control

Prepared for

# XRP II, LLC

September 6, 2016



# Table of Contents

## OVERVIEW

I.    EXECUTIVE SUMMARY ........................................................................................................... 3

II.   METHODOLOGY & SCOPE ................................................................................................... 3

III.  BASIS OF REPORT ................................................................................................................. 4

IV.   CONCLUSIONS ..................................................................................................................... 5

V.    SUMMARY OF RECOMMENDATIONS ................................................................................. 5

## DETAILED OBSERVATIONS & RECOMMENDATIONS

1.   OVERVIEW ............................................................................................................................. 7

2.   COMPANY BACKGROUND & KEY PERSONNEL ................................................................. 7

    2.1  Business Model ............................................................................................................ 7

    2.2  Activity Exclusions ...................................................................................................... 8

3.   COMPANY REGISTRATION & LICENSING ........................................................................... 8

    3.1  FinCEN Registration .................................................................................................... 8

    3.2  State Licensing ............................................................................................................ 9

4.   OVERSIGHT & GOVERNANCE/ AML COMPLIANCE OFFICER & DEPARTMENT ............... 9

5.   SYSTEM OF INTERNAL CONTROLS ..................................................................................... 11

    5.1  Risk Assessment ......................................................................................................... 11

    5.2  Written AML Policies & Procedures ............................................................................ 12

    5.3  Customer Identification / Customer Due Diligence .................................................... 14

    5.4  Suspicious Activity Monitoring & Reporting .............................................................. 15

    5.5  Transaction Monitoring System ................................................................................. 16

    5.6  Report of Foreign Bank and Financial Accounts (FBARs) ........................................... 17

    5.7  Information Sharing & Law Enforcement Requests .................................................... 18

    5.8  Record Retention ........................................................................................................ 19

6.   AML TRAINING PROGRAM .................................................................................................. 19

7.   INDEPENDENT TESTING ...................................................................................................... 20

8.   OFFICE OF FOREIGN ASSETS CONTROL ............................................................................. 20

9.   TESTING SUMMARY ............................................................................................................. 22

10.  BIOGRAPHIES ....................................................................................................................... 22

HIGHLY CONFIDENTIAL                                                                                    RPLI_SEC 0532022

# I.   EXECUTIVE SUMMARY

XRP II, LLC ("XRPII") engaged █████████████████ on April 8, 2016 for the purpose of conducting an independent review and test for compliance with the Bank Secrecy Act ("BSA"), Anti-Money Laundering ("AML"), the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act ("USA PATRIOT Act"), and the Office of Foreign Assets Control ("OFAC") requirements. The review activities commenced on July 21, 2016 and the on-site portion of the review was conducted on July 25-26, 2016 with additional off-site work performed. This agreed review period was June 1, 2015 through May 31, 2016 ("Review Period").

The purpose of an independent AML review is to evaluate the level of the Company's BSA/AML Program (the "Program"), across all required pillars and to determine the effectiveness of detection and monitoring systems, and to determine compliance with regulatory requirements. This review is not intended to be a substitute for a regulatory examination. Rather, it serves to establish benchmarks for compliance with current laws, regulations, regulatory expectations and best practices.

Every Money Services Business ("MSB") is required by law to have an effective AML compliance program, which is reasonably designed to prevent the MSB from being used to facilitate money laundering and the financing of terrorist activities. Each program must be commensurate with the MSB's risk profile, must be in writing, and must:

- Include policies, procedures and internal controls reasonably designed to assure compliance with the BSA/AML laws;
- Designate a compliance officer responsible for day-to-day compliance with the BSA;
- Provide education and/or training of appropriate personnel; and
- Provide for independent review.

In conducting this independent review, █████ evaluated XRPII's internal operating procedures and controls designed to detect, monitor, and report suspicious activities. The review also focused customer identification,

# II.   METHODOLOGY & SCOPE

Our engagement commenced with a risk-based scope agreed-upon in our engagement letter that was consistent with the following federally issued methodologies and guidelines:

- BSA/AML Examination Manual for Money Services Businesses, as issued by the Financial Crimes Enforcement Network ("FinCEN") and the IRS (12/2008);
- Guidelines and applicable portions of the Federal Financial Institutions Examination Council ("FFIEC") BSA Compliance and AML Examination Manual, published in the FFIEC BSA/AML Examination Manual (12/2014);
- FinCEN guidance memo FIN-2013-G0001, *Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies* (03/2013); and
- FinCEN guidance memo FIN-2006-G012, *Conducting Independent Reviews of Money Services Business (MSB) Anti-Money Laundering (AML) Programs* (09/2006).

HIGHLY CONFIDENTIAL                                                                 RPLI_SEC 0532023

The first phase of the engagement included a review and analysis of the following:

- Written AML compliance policies and procedures documentation;
- AML risk assessment;
- Company business model and infrastructure;
- Previous independent reviews and management responses; and
- Transaction data.

On July 25-26, 2016, ▇▇▇▇▇▇ and ▇▇▇▇▇▇ conducted an on-site visit to XRPII's headquarters located at 300 Montgomery Street, San Francisco, CA, which consisted of interviews with key personnel, observations, and walkthroughs of the implementation of the Program's policies and procedures, processes and document testing, BSA reports filed, and verification of document retention. We examined documentation, systems, and controls necessary to inform and develop conclusions and to make appropriate recommendations to advance the efficacy of the Program. A representative portion of the Company's records were reviewed, and procedures and transactions were tested to determine if the Program was adequately implemented and in compliance with regulatory and industry standards.

The following aspects of the Program were covered in our review:

- The Company's oversight and management of BSA/AML compliance;
- Comprehensiveness of the written BSA/AML and OFAC policies, procedures and controls;
- Reasonableness of the risk assessment;
- Designation and qualifications of AML Compliance Officer(s);
- Scope and level of AML Training for appropriate personnel;
- Quality of previous independent reviews and recommendations / corrections implemented;
- Customer identification / verification procedures, and customer due diligence;
- Transaction monitoring systems and processes;
- Review of unusual and potentially suspicious activity;
- BSA reporting, recordkeeping, and record retention;
- Information sharing and law enforcement requests; and
- OFAC Specially Designated Nationals and Blocked Entities List ("SDN") and Sanctions Screening.

## III.   BASIS OF REPORT

▇▇▇ conducts independent testing of BSA/AML and sanctions programs for bank and non-bank financial institutions. ▇▇▇ additional expertise includes curriculum development and custom training, and compliance consulting services, including the design of BSA/AML/OFAC and fraud prevention programs.

▇▇▇▇▇▇ CAMS, CFE, CFCS, CCRP and ▇▇▇▇▇▇ CAMS conducted this examination. Biographies are included at the end of this report.

This report and included observations and recommendations are intended to assist the Company in validating the effectiveness of and adherence to procedures established to comply with the requirements of the BSA and the implementing regulations promulgated thereunder by the Department of the Treasury.

HIGHLY CONFIDENTIAL                                                                                    RPLI_SEC 0532024

Services were performed, and this report was developed, in accordance with our signed engagement letter, and is subject to the assumptions, terms, and conditions included therein. Our work was based only on the information made available to us by XRPII and its personnel for the stated Review Period. Accordingly, information that was not made available, or changes in circumstances after this date, could affect the observations and recommendations that are outlined in this report. This BSA/AML/OFAC review was conducted on XRPII and did not include Ripple Labs.

Explanations for each of our observations and recommendations are contained in the details of this report. It is management's responsibility to evaluate and implement recommendations for improvement. ███ does not retain any documentation once the final report is accepted.

This report is presented to and intended solely for the information and use by the management of XRPII. XRPII agrees that the report and information received from ███ re strictly confidential and is intended solely for their private and exclusive use. ███ understands that XRPII may provide copies of this report to regulators, affiliate financial institutions and correspondents that request proof of independent compliance reviews, but they themselves must abide by these confidentiality clauses and restricted use warning. Any other use and any communication, publication, disclosure, dissemination or reproduction of this report or any portion of its contents without the written consent of ███ is strictly prohibited. XRPII agrees to indemnify and hold harmless ███ against any damages or claims resulting from such unauthorized use. ███ assumes no direct, indirect or consequential liability to any third party or any other person who is not the intended addressee of this report for the information contained herein, its interpretation or applications, or for omissions, or for reliance by any such third party or other person thereon.

## IV.   CONCLUSIONS

It is our opinion that XRPII has implemented a risk-based BSA/AML/OFAC program that is effectively designed to satisfy the requirements of the BSA, OFAC and anti-money laundering laws and regulations.

For purposes of enhancing the program, we have included several recommendations in the following summary, each of which is fully detailed throughout this report.

## V.   SUMMARY OF RECOMMENDATIONS

| Scope Area | Recommendations |
|---|---|
| Written AML Policies & Procedures | 1.  Consider the following enhancements:<br>• Include section on activity exclusion and include currency, sale and transportation of negotiable instruments; CTR, FBAR and CMIR reporting, agency relationships, and other non-applicable aspects of Program.<br>• Change Record Keeping to Recordkeeping & Retention and include provisions to retain records under the virtual currency license issued by NYDFS.<br>• Move management reporting section under compliance oversight committee responsibilities.<br>• Move policy variances under written policies and procedures. |

HIGHLY CONFIDENTIAL                                                                                    RPLI_SEC 0532025

# OBSERVATIONS
# AND
# RECOMMENDATIONS

HIGHLY CONFIDENTIAL

RPLI_SEC 0532026

## 1.    OVERVIEW

XRPII is considered a MSB and is subject to Section 352 of the USA PATRIOT Act, which requires that all United States ("U.S.") MSBs adopt a risk-based AML program, and submit that program to a periodic independent review. The term "money services business" includes any person doing business, whether or not on a regular basis or as an organized business concern, in one or more of the following capacities:

- Money transmitter;
- Currency dealer or exchanger;
- Check casher;
- Issuer of traveler's checks, money orders, or stored value;
- Seller or redeemer of traveler's checks, money orders, or prepaid access; or
- US Postal Service.

## 2.    COMPANY BACKGROUND & KEY PERSONNEL

XRP Fund II, LLC is a wholly owned subsidiary of Ripple Labs, Inc., a software company, that was formed and incorporated in South Carolina on July 1, 2013. XRPII engages in wholesale transactions of the digital currency XRP. This independent review was conducted on XRPII and did not include Ripple Labs.

Table 1: Senior Management

| Name | Title |
|------|-------|
| Brad Garlinghouse | President & CEO, Ripple Labs |
| Antoinette O'Gorman | Chief Compliance Officer, Ripple Labs |
| █████████ | General Counsel, Ripple Labs |

### 2.1    Business Model

XRPII engages in the sale and transfer of the virtual currency XRP to various third parties on a wholesale basis. XRPII makes these sales of XRP for the benefit of Ripple Labs, its ultimate parent company. Ripple Labs created and maintains the Ripple protocol, the Ripple Consensus Ledger, an open source, peer-to-peer payment protocol that enables low cost, instant payments in any currency. XRPII's sales of XRP represent one method by which Ripple Labs raises working capital. Ripple Labs has also received funding from outside investors.

XRPII has sold XRP only to customers that have approached its management or management at Ripple Labs with a request to purchase XRP. XRPII does not advertise its services or maintain an Internet presence. To date, XRPII counterparties have consisted of technology companies or individuals associated with technology companies who are familiar with Ripple Labs.

The Company operates from its single headquarters location in San Francisco, California, and does not operate and will not establish any agency relationships. XRPII has no other products or services and currently has no intention to develop any at this time, and has no current plans to change its means of customer acquisition. Presently, XRP has limited commercial use and is mainly held as a speculative investment by companies and individuals that expect it to rise in value as the Ripple network expands.

HIGHLY CONFIDENTIAL                                                                                                          RPLI_SEC 0532027

## 2.2    Activity Exclusions

XRPII does not participate in the following activities:

- Agency Relationships
- Currency Transaction Reporting (CTRs)
- International Transportation of Currency or Monetary Instruments (CMIR)
- Sales of Monetary Instruments
- Foreign Correspondent/Payer Relationships

## 3.    COMPANY REGISTRATION & LICENCING

### 3.1    FinCEN Registration

#### Requirements
Subject to the BSA, a MSB is required to:

- Register with the Department of the Treasury;
- Register by filing FinCEN Form 107 "Registration of Money Services Business"; and
- Retain a copy of the registration form.

The company must be registered for the initial registration period and each renewal period. The initial registration period is the two calendar year period beginning with the calendar year in which the MSB is first registered.

#### Observations
XRPII renewed its registration with FinCEN as money transmitter under MSB registration # 31000057631707 dated December 3, 2014. The Company submitted an amended RMSB on December 3, 2014 to correct this error. A review of the original registration, filed on September 3, 2013, indicated that XRPII was operating one (1) branch office.

Table 3: FinCEN renewal dates:

| Renewal Date 1: | December 31, 2016 |
| Renewal Date 2: | December 31, 2018 |
| Renewal Date 3: | December 31, 2020 |
| Renewal Date 4: | December 31, 2021 |
| Renewal Date 5: | December 31, 2023 |

#### Conclusion
XRPII complies with requirements to register with FinCEN and the renewal was submitted correctly and timely and was acknowledged.

HIGHLY CONFIDENTIAL                                                                    RPLI_SEC 0532028

## 3.2    State Licensing

### Observation

XRPII is not subject to state licensing as a money transmitter at this time in accordance with the Counsel opinion.

However, the Company did apply for and receive a Bit License or Virtual Currency License issued by the State of New York Department of Financial Services ("NYDFS") under license BL000002. The Company is required to maintain records for a period of seven (7) years.

### Conclusion

XRPII maintains its virtual currency licensing requirements under the NYDFS.

# 4.    OVERSIGHT & GOVERNANCE / AML COMPLIANCE OFFICER & DEPARTMENT

### Requirements

Section 352 of the USA PATRIOT Act requires MSBs to designate an AML Compliance Officer to administer the AML compliance program. Additionally, Federal and State Regulators expect the designated AML Compliance Officer to have the necessary authority and resources to effectively execute all of their duties.  The responsibilities of such person shall include:

- The responsibility for day-to-day compliance with the BSA;
- The proper submission of reports such as SARs and CTRs, and creation and retention of records, in accordance with applicable requirements;
- Updating the compliance program as necessary to reflect current requirements and related guidance issued by the Department of the Treasury; and
- Ensuring that the MSB provides training commensurate with the risks imposed by the employees' duties and responsibilities.

### Observations

#### Compliance Team

**Antoinette O'Gorman, CAMS, Chief Compliance Officer ("(CCO")** is the designated BSA Officer ("BSAO"). Ms. O'Gorman has over fifteen (15) years of financial services experience including banking and compliance consulting services. She is responsible for the implementation and administration of all facets of the Program.

████████████ **CAMS** was hired as the BSA Manager and was recently promoted to Director of BSA Operations. Ms. ████ joined the Company in July 2015 following completion of her MBA and her work at a technology start up. Her previous experienced includes working in the financial intelligence unit at ████ ████ where she was responsible for managing a team of investigators. She has MSB experience where she managed audit preparation and remediation during an enforcement action for ████ She reports to Antoinette O'Gorman.

████████████ **CAMS, Senior BSA Investigator**, joined the Company in May 2014 with a background in advocacy services in the transportation and housing sectors. After relocation to the San Francisco area, she joined Ripple where her responsibilities include monitoring and investigations, quality control reviews, reporting-related processes and special projects. She reports to Ms. ████████

HIGHLY CONFIDENTIAL                                                                                     RPLI_SEC 0532029



████████████ **CAMS, BSA Investigations Analyst**, joined in October 2015. She has over five years of experience in BSA/AML and fraud risk as an analyst and investigator. Her previous experience includes three years as an analyst and investigator for global money transmitter, and two years in fraud and risk operations at bank. Her responsibilities include monitoring, investigations, OFAC sanctions alerts management and other projects. Ms. ████ was not in during our onsite visit and therefore was not interviewed. She reports to Ms.
████

████████████ **Due Diligence Specialist**, joined the AML team in March 2016 from ████████████ a locally headquartered broker-dealer. Previously, he was with a global bank for two years as a member of the AML team responding to an enforcement action. He has experience in BSA/AML, OFAC, Sanctions, FCPA and SOX. He was also employed for two years as a FINRA analyst following graduation from college. He reports to Ms. ████

XRPII has implemented several dual controls for critical AML functions to ensure that each is effectively designed. Compliance personnel escalate to the secondary reviewer for review and approval. Additionally, quality assurance reviews are performed by compliance personnel to (a) provide dual controls, and (b) ensure training is effectively implemented.

**Compliance Oversight Committee**

Effective November 2015, XRPII established a Compliance Oversight Committee ("COC") and began reporting on a quarterly basis to the Committee in accordance with its written charter. The committee has responsibility for overseeing and implementing enhancements to the Program including policies and procedures, risk assessment, AML training program and issue escalation, and approval of same. Approval is then submitted the Board of Directors during quarterly board meetings. The COC is comprised of the BSA Officer, Ripple General Counsel, and Ripple Advisor and Head of Regulatory Relations and Strategic Policy Initiatives. The Chair of the Committee is the BSA Officer.

The BSAO provides the following reporting to the Committee:

- Quarterly reporting evidencing appropriate governance of the Program;
- Any material issues of BSA/AML/OFAC non-compliance and the BSA Officer's corrective action response;
- Suspicious activity trends, including all instances of three (3) or more SAR filings on the same customer; and
- All approved Program variances.

Reporting of BSA/AML and OFAC compliance activities to the Board was observed in quarterly reports containing ongoing Program activities as well as other operational and sales items.

XRPII has implemented the following tools to facilitate compliance with its compliance obligations:

- BSA/AML/OFAC policy and procedures including detailed CIP requirements;
- BSA/AML/OFAC Risk Assessment;
- Transaction monitoring; and
- Multiple screening tools, KYC measures, and EDD reviews of high-risk customers.

HIGHLY CONFIDENTIAL                                                                                    RPLI_SEC 0532030



## Testing

We conducted interviews with key AML personnel and conducted walkthrough of compliance processes. We reviewed committee reports and Board minutes validating receipt of reports and governance over the Program.

## Conclusion

XRPII complies with requirements to designate a Compliance Officer and the Company's Board provides effective oversight and governance over the Program.

## 5. SYSTEM OF INTERNAL CONTROLS

### 5.1 Risk Assessment

## Best Practice

The Risk Assessment, while not a requirement under regulation or law, is an expectation of regulators and an industry best practice. Conducting a risk assessment, focusing on all business lines, products, services, customers, and geographical locations, will allow the Company to determine exposure to the risks associated with money laundering and terrorist financing. The risk assessment drives the development and adequacy of each of the pillars of the AML program.

The risk assessment should be designed to identify potential events that may affect the institution. It should be comprehensive, and contain a documented rationale for the risk scoring methodology used. Metrics are generally included in determining the overall quantity of risk, and mitigating controls will offset the residual risk, which the Compliance Officer and department manage on a day-to-day basis. The resulting residual risk should align with the institution's risk appetite and be accepted by the Board as demonstrated by its adoption and approval.

## Observations

**XRPII has a written BSA/AML/OFAC risk assessment dated and approved February 16, 2016 by the COC. The BSAO updates the Company's risk assessment on an annual basis and is presented annually by the BSAO to the COC for review and approval. The CCO/BSAO is responsible for presenting and reporting this approval to the Ripple Board of Directors.**

The Risk Assessment was last conducted in January 2016 by the CCO/BSAO, and includes a summary of XRPII's business model, applied risk methodology, assessment of inherent risks, mitigating controls, and residual risks for a variety of risk factors the Company faces in its day-to-day operations. The Company measured its products and services, customers, geographic areas, assessment of controls and residual risks.

The Company assessed its overall inherent BSA/AML risk as High. XRPII identified that its system of existing controls is considered to be adequate to mitigate its risks, and the overall resulting residual BSA/AML and OFAC risk as Moderate. The Company maintains that its BSA/AML and OFAC risk has remained stable.

## Conclusion

XRPII's methodology and overall approach is comprehensive and is reasonable based on the location, size and complexity of the Company.

HIGHLY CONFIDENTIAL                                                                RPLI_SEC 0532031



## 5.2    Written AML Policies & Procedures

### Requirements

Section 352 of the USA PATRIOT Act requires MSBs to establish a written AML compliance program that is reasonably designed to achieve and monitor ongoing compliance with the requirements of the BSA and related rules and commensurate with the risks posed by the location, size, nature and volume of the services provided. The AML program should have in place, at a minimum, the following elements:

- Written policies, procedures, and internal controls;
- Designated Compliance Officer;
- Training for appropriate personnel; and
- Independent review of the AML program.

### Observations

The Company's Program is set forth in the BSA/AML/OFAC Policy dated September 2013 and updated in December 2015.

The Program includes the following:

- Introduction;
- Scope and Applicability;
- Policy Statement:
  - Designation of BSA/AML Officer;
  - Roles and Responsibilities;
    - BSA Compliance Officer
    - Compliance Oversight Committee
    - Company Employees
    - Money Transmission, Licensing and Registration
    - Agency Relationships
    - Foreign Bank Account Registration
    - Annual Risk Assessment
- The Program
  - Internal Controls
    - Customer Identification Program (CIP) and Know Your Customer (KYC)
    - Identification requirements for individuals
    - Identification requirements for entities
    - Verification procedures
    - Prohibited customers
    - Highest Risk Customers
    - Enhanced Due Diligence

- Monitoring Transactions for Suspicious Activity
  - Investigations
  - Reporting Suspicious Activity
  - SAR Follow-up
    - Maintaining confidentiality of the SAR
    - Employee referrals of Unusual Activity

HIGHLY CONFIDENTIAL                                                                    RPLI_SEC 0532032



- Anonymous Reporting of Unusual Activity
    - Cooperation with law Enforcement
    - National Security letters (NSLs)
    - Voluntary Information Sharing
- OFAC Compliance and Section 311 Screening
- Testing of Controls
    - Independent Auditing of Policy and Program
- Training and Education
- Correcting Program Violations
- Management Reporting
- Record Keeping
    - Funds Transmittal Recordkeeping
    - Currency Sale and Transportation of Negotiable Instruments
- Policy Variances
- Policy Administration

XRPII has a system of internal controls that includes:

- COC and Board of Directors oversight;
- Chief Compliance Officer/BSA Officer;
- BSA/AML department personnel;
- BSA/AML/OFAC compliance policies and procedures including desk procedures;
- BSA/AML/OFAC risk assessment;
- Compliance tools including transaction monitoring system and dual controls;
- CIP/KYC and multiple screening tools;
- Ongoing AML training of employees;
- Independent testing; and
- OFAC screening.

## Conclusion
XRPII's complies with requirements to implement written policies and procedures.

## Recommendations
1. Consider the following enhancements:
    - Include section on activity exclusion and include currency, sale and transportation of negotiable instruments; CTR, and CMIR reporting, agency relationships, and other non-applicable aspects of Program.
    - Change Record Keeping to Recordkeeping & Retention and include provisions to retain records under the virtual currency license issued by NYDFS.
    - Move management reporting section under compliance oversight committee responsibilities.
    - Move policy variances under written policies and procedures.

### 5.3    Customer Identification Requirements & Customer Due Diligence

## Requirements
Under the BSA, financial institutions are required to establish and maintain a written policy and procedure for

HIGHLY CONFIDENTIAL                                                            RPLI_SEC 0532033

Customer identification requirements appropriate for its size and business. Identification requirements for MSBs are specific to the particular product and transaction amount.

Customer Due Diligence ("CDD") is critical because they can aid in detecting and reporting unusual or suspicious transactions that can potentially expose the institution to financial loss, increased expenses, or reputational risk; avoiding criminal exposure from persons who use or attempt to use the products and services for illicit purposes; and adhering to safe and sound business practices. The objective of CDD should be to enable the institution to predict with relative certainty the types of transactions in which a customer is likely to engage. These processes assist the Company in determining when transactions are potentially suspicious.

In addition, the AML program should provide guidance on the types of clients that are considered "high risk" to the institution; thereby, necessitating enhanced due diligence ("EDD") measures. EDD for higher-risk customers is especially critical in understanding anticipated transactions and implementing a suspicious activity monitoring system that reduces the company's reputation, compliance, and transaction risks.

Higher-risk customers and their transactions should be reviewed more closely at account opening and more frequently throughout the term of the relationship with the Company. As due diligence is an ongoing process, a company should take measures to ensure account profiles are current and monitoring should be risk-based. Companies should consider whether risk profiles should be adjusted or suspicious activity reported when the activity is inconsistent with the profile

## Observations

XRPII has a comprehensive CIP/KYC program and well-documented customer identification requirements. The Company collects customer identification information and verifies that information before permitting a customer to conduct an initial transaction, and on an ongoing basis as necessary or required by law. Due to the high inherent BSA/AML risk associated with virtual currency, the Company conducts additional due diligence on all of its customers, and has implemented the use of several custom forms to document all due diligence.

The Company also conducts the following:

- Sanctions and Section 311 screening;
- Politically exposed persons ("PEP");
- Negative news, and
- Internet search for other potential risk factors.

To purchase XRP an individual customer must provide:
- Full legal name;
- Physical Address;
- Date of Birth;
- Social security, Tax ID number, or other government-issued ID number acceptable to the BSAO; and
- Copy of a valid, government-issued photo identification card such as a driver's license or passport

To purchase XRP an entity customer must provide:
- Names of the party; beneficial owners, officers and directors, and subsidiaries and controlled affiliates;
- Identification of the countries in which the applicant and its subsidiaries and controlled affiliates have operations/offices;

HIGHLY CONFIDENTIAL                                                           RPLI_SEC 0532034

- Address;
- Tax ID Number;
- A list of all beneficial owners or ultimate beneficial owners with 25% or more ownership;
- Certified copy of a document evidencing the legal existence of the entity, such as articles of incorporation or association; and
- Copy of a valid, government-issued photo identification for at least one of: (1) an entity director, (2) a person with 25% or more beneficial ownership in the entity, (3) a partner/member of the entity, or (4) a managing executive of the entity.

The Company maintains a database of active and inactive customer relationships detailing the various required identification and other relevant information pertaining to its customer relationships. There were two new customers (entities) onboard in the Review Period and we noted that customer files contained required CIP/KYC documentation as well as documentation of applicable enhanced due diligence.

The existing customers are also subjected to EDD due to their high risk status and EDD was performed as evidenced by the Company's list of high risk customers and EDD log. XRPII subjects any customers who do not transact over a six-month period to refresh KYC requirements. In evidence was supporting documentation for each of the EDD reviews.

### Testing
From a population of two (2) new account relationships established in the Review Period, each was tested for CDD/KYC requirements and all requisite documentation was on file. From a population of six (6) high risk customers, we reviewed each for EDD requirements. There were no exceptions.

### Conclusion
The Company complies with customer identification and verification requirements and customer due diligence for its high risk customers.

### 5.4    Suspicious Activity Monitoring & Reporting (SARs)

### Requirements
Under the BSA, a SAR must be filed whenever any activity is attempted, or occurs, that involves or aggregates funds or other assets of at least $2,000 and it is suspected that the activity:

- Involves funds derived from illegal activity or is intended to hide funds derived from illegal activity;
- Is structured to avoid record keeping or reporting requirements;
- Has no business or apparent lawful purpose; or
- Facilitates criminal activity.



HIGHLY CONFIDENTIAL                                                          RPLI_SEC 0532035



## 5.5    Transaction Monitoring System

### Requirements

MSBs are required to establish procedures and processes to monitor and identify unusual activity. The MSB must ensure adequate staff is assigned to the identification, research, and reporting of suspicious activities, taking into consideration the MSB's overall risk profile, products and services, and the volume of transactions.

### Observations

XRPII has a policy and procedures to conduct transaction monitoring to ensure that its products and services are not used to launder money, finance terrorism, evade U.S. government sanctions, or otherwise facilitate criminal activity.

The BSA compliance analysts have responsibility for daily monitoring of transactions and uses several methods by which patterns will be revealed. Under the Company's current monitoring system, the analysts perform several types of monitoring:

- Conducted on a Daily Basis
  - Monthly Rolling-90 Day Expected versus Actual Activity Monitoring
  - Daily Threshold Monitoring
- Conducted on a Monthly Basis
  - Transaction Monitoring for Bitcoin Payments
  - Monitoring for Ripple Network USD Payments
  - Monthly Threshold Monitoring

- Conducted on a Monthly Basis
  - Quarterly Trending/Unusual Activity Patterns
  - Quarterly Ongoing Dormant Accounts Monitoring

HIGHLY CONFIDENTIAL                                                                    RPLI_SEC 0532036

Additionally, the compliance analyst performs the following manual monitoring processes:

- High Volume Threshold Monitoring (daily)
- Threshold Monitoring

These analyses will prompt the analysts with triggers that require certain activity to be escalated to the Director of BSA Operations for disposition in accordance with written procedures. Due diligence is performed to determine if the activity is outside of that expected as compared with KYC and other documentation on file, and the Director of BSA Operations will identify an appropriate course of action, which may include filing a Suspicious Activity Report (SAR), following up with the customer for additional KYC documentation, or recommending the CCO/BSAO the termination of the customer relationship.

XRPII has implemented the use of the Unusual Activity Reporting ("UAR") process for employees to escalate directly to the BSA investigations team, as well as a confidential hotline for anonymous reporting unusual activity and/or non-compliance with the Program.

XRPII relies on its BSA investigations team to serve as the centralized function for the detection, prevention and reporting of potentially suspicious client activity. The team has many risk monitoring tools at its disposal, and comprehensive procedures are written to assist the team in taking the appropriate steps to investigate and dispose or advance alerts, investigate, and report activity as appropriate. All monitoring is captured in the Transaction Monitoring Workbook.

### Testing

We performed a walkthrough of the transaction monitoring workbook and processes indicated that the compliance team adequately performs and documents the required monitoring steps, as evidenced by the actions taken and documentation reviewed. There were no exceptions.

### Conclusion

XRPII complies with requirements to perform transaction monitoring.

### 5.6    Report of Foreign Bank and Financial Accounts (FBAR)

### Requirements

MSBs are required to file Reports of Foreign Bank and Financial Accounts (FBARs) if it has a financial interest in or signature authority over one or more bank accounts in any foreign countries. FBARs are filed with FinCEN using Form 114 on or before June 30 of the succeeding calendar year if one or more accounts exceed $10,000 in aggregate value at any time during the calendar year.

### Observation

The policies and procedures indicated that XRP II does not maintain a foreign bank account and therefore has no FBAR filing obligation. However, the Company communicated that an FBAR was filed on behalf of Ripple Labs, Inc. and included an XRP II Bitstamp account valued over $10,000. Bitstamp is an independently owned and operated gateway that has no affiliation with Ripple Labs, or XRP II.

The Company indicated it will update the Program to reflect the foreign Bitstamp account when revisions are submitted for review and approval in December 2016. We reviewed the FBAR filed June 30, 2016 and acknowledged on July 5, 2016 under FinCEN acknowledgment 31000088579170.

HIGHLY CONFIDENTIAL                                                                                   RPLI_SEC 0532037

### Conclusion

The Company complies with requirements to file Reports of Foreign Bank and Financial Accounts (FBARs) where applicable.

## 5.7    Information Sharing & Law Enforcement Requests

### Requirements

There are several elements that fall under information sharing. They include Information Sharing between law enforcement and financial institutions under Section 314(a) and Voluntary Information Sharing under Section 314(b) of the USA PATRIOT Act. Documentation of all requests received or made when under voluntary sharing provision, must be maintained and retained.

Law Enforcement Requests may include government subpoenas, National Security Letters, grand jury subpoenas, and other legal requests and may serve as an alert to investigate transactions by any named subject. Tracking and documenting all communications is required and must be retained by the MSB.

### Observations

XRPII is not mandated to participate in the Section 314(a) program at this time, and the Company does not have a policy in place in the event requirements change.

In the previous review, we recommended the Company **Implement a policy pursuant to Section 314(a) information requests to ensure that in the event such a request is made, the Company can effectively respond.** Management responded that a Policy will be drafted based on guidelines from FinCEN if and when section 314(a) becomes applicable to MSBs.

XRPII has policies and procedures to participate in Section 314(b) and a comprehensive procedure is implemented. The Company has registered and the FinCEN acknowledgment was reviewed for accuracy and to ensure it is currently in force. We noted that the most recent effective share date was February 12, 2016. There were no requests made or received in the Review Period.

XRPII has policies and procedures to manage Law Enforcement Requests, NSLs, and other government requests, and the CCO/BSAO is responsible for ensuring that necessary government reports are filed in a timely manner and also for responding to all external Inquiries related to the Program. The General Counsel receives and reviews such requests and shares applicable requests with the CCO/BSOA who maintains and tracks any such requests on a log in a confidential file.

### Conclusion

XRPII complies with requirements to participate in voluntary information sharing and law enforcement requests.

## 5.8    Record Retention

### Requirements

The BSA establishes recordkeeping requirements related to various types of records including: customer accounts, BSA filing requirements, and records that document an institution's compliance with the BSA. In general, the BSA requires that the institution maintain most records for at least five years. These records can be

HIGHLY CONFIDENTIAL                                                                              RPLI_SEC 0532038

maintained in many forms including original, microfilm, electronic, copy, or a reproduction. An institution is not required to keep a separate system of records for each of the BSA requirements; however, it must maintain all records in a way that makes them accessible in a reasonable period of time. Records to be retained include:

- All filed SARs and supporting documentation;
- All records created for the AML program requirements;
- Copy of MSB registration;
- Current agent and previous agent list for last five (5) years; and
- Records required for transmittals of funds.

### Observations

XRPII's recordkeeping and document retention policy is documented and clearly states the five (5) year period in accordance with BSA requirements. For the Company's New York Virtual Currency License, the Company maintains records for a period of seven (7) years as required under the state requirement. The CCO/BSAO ensures that all records are maintained as stated in the policies.

### Conclusion

XRPII complies with all record retention requirements.

## 6.    AML TRAINING PROGRAM

### Requirements

Section 352 of the USA PATRIOT Act requires MSBs to provide for training of appropriate personnel. Adequate training is not only one of the four required elements of all AML Programs, but also it is essential for mitigating risk that employees will fail to follow BSA/AML regulatory requirements or fail to recognize signs of illegal activity within its transaction processing network and environment.

### Observations

XRPII policies require that all new hires receive training on BSA/AML/OFAC compliance no later than thirty (30) days after commencing work at XRPII. Refresher training must be provided every year, and Board training is required annually.

XRPII's policy identifies that the CCO/BSAO is responsible for ensuring that employees receive training on the requirements of the Program and is responsible for providing BSA/AML and OFAC training to Ripple Labs' Board of Directors on an annual basis, or more frequently if needed.

The COC must approve the BSA/AML/OFAC Training Program and the CCO/BSAO then reports evidence of the approval annually to the Ripple Labs' Board of Directors. The XRPII BSA compliance department maintains a central file for all training documentation.

The Company uses a blended training approach by offering in person training events presented by internal personnel and external experts, as well as a review and discussion of regulatory guidance and advisories. The BSAO maintains a transcript of all training events containing dates, topics and personnel in attendance. In addition, XRPII's BSA Compliance staff are required to attend a minimum of ten (10) hours of internal or external Payments and/or AML-related education and training sessions.

HIGHLY CONFIDENTIAL                                                                                RPLI_SEC 0532039

### Testing

Training documentation was reviewed to ensure that the content was adequate, and that accurate records were maintained. There were no exceptions.

### Conclusion

XRPII complies with requirement to provide AML training to appropriate personnel.

## 7.  INDEPENDENT TESTING

### Requirements

Section 352 of the USA PATRIOT Act requires an independent review of the AML compliance program. The results should be documented and reported to the Company's senior management, internal audit committee, or Board of Directors. The scope and frequency of the reviews shall be commensurate with the risk of the financial services provided by the company. A company may satisfy the independent review requirement with its own personnel (such as internal audit staff) as long as they do not perform or oversee AML functions.

### Observations

**Independent Review**

XRPII policies call for a review of the program at least annually. ▮▮▮ conducted the previous review for the period July 21, 2014 through May 31, 2015 with a report dated July 26, 2015. Several recommendations for enhancement were issued and XRPII implemented all but one. A tracking log was in evidence and contained management responses and rationale for rejecting recommendations.

XRPII engaged ▮▮▮ to conduct this review for the period June 1, 2015 through May 31, 2016, which is approximately twelve months from the last review in accordance with their policy and within regulatory guidelines.

**Regulatory Examinations**

XRPII and its parent, Ripple Labs, Inc., entered into a settlement agreement with FinCEN and the Office of the United States Attorney for the Northern District of California. The Program was fully remediated and the matter is still ongoing.

There we no federal or state examinations in the Review Period.

### Testing

Recommendations from the previous independent review report were fully documented and tracked in a log. We reviewed management responses and validated that each of the action items was implemented. There were no exceptions.

### Conclusion

XRPII is compliant with regulatory and policy requirement to independently test the Program.

HIGHLY CONFIDENTIAL                                                          RPLI_SEC 0532040

## 8.    OFFICE OF FOREIGN ASSETS CONTROL (OFAC)

### Requirements

The Office of Foreign Assets Control (OFAC) is responsible for enforcing U.S. economic and trade sanctions against targeted foreign countries, terrorists, drug cartels and others.  OFAC maintains a list of individuals, businesses, non-profits and government agencies called the Specially Designated Nationals and Blocked Entities List (SDN List). All businesses are required to check customers against the OFAC list.

### Observations

XRPII has fully implemented OFAC policies procedures and processes used by the BSA compliance team use World-Check One to screen XRPII customers against OFAC sanctions lists, Section 311 screening for designated persons and entities, and screening to identify PEPs.

World-Check One also screens potential customers against additional lists and jurisdictions subject to sanctions not imposed by the U.S., pursuant to local sanctions laws and regulations ("Non U.S. Sanctions") e.g. European Union ("EU") sanctions and United Nations sanctions.

Procedures are in place to manage any potential matches using the World-Check One where they are logged in a case report which is saved to the KYC file. The Director of BSA Operations is responsible for escalating via e-mail any identified exact matches to XRPII's CCO/BSAO for immediate action. In addition, procedures for blocking/rejecting and freezing of assets and the reporting of such actions are fully implemented. There were no positive matches in the Review Period.

### Testing

OFAC compliance screening was tested in conjunction with CIP/KYC and EDD testing. We performed a walkthrough of the alerts management process and identified that potential matches are effectively managed There were no exceptions.

### Conclusion

XRPII complies with OFAC regulatory requirements.

HIGHLY CONFIDENTIAL                                                                                    RPLI_SEC 0532041

## 9. TESTING SUMMARY

| Item | Description | Tested | Conclusion | Deficiencies/Recommendation |
|------|-------------|--------|------------|------------------------------|
| 1 | Risk Assessment | ✓ | Satisfactory | None |
| 2 | AML Policies, Procedures | ✓ | Satisfactory | Recommendation (1) |
| 3 | Oversight & Governance/ AML Compliance Officer & Department | ✓ | Satisfactory | None |
| 4 | FinCEN Registration | ✓ | Satisfactory | None |
| 5 | State Licensing | ✓ | Satisfactory | None |
| 6 | Customer Identification/Customer Due Diligence | ✓ | Satisfactory | None |
| 7 | Suspicious Activity Monitoring & Reporting (SARs) | ✓ | Satisfactory | None |
| 8 | Transaction Monitoring & Analysis | ✓ | Satisfactory | None |
| 9 | Reports of Foreign Bank and Financial Accounts (FBARs) | ✓ | Satisfactory | None |
| 10 | Information Sharing | ✓ | Satisfactory | None |
| 11 | Law Enforcement Requests | ✓ | Satisfactory | None |
| 12 | Funds Transfers Recordkeeping | ✓ | Satisfactory | None |
| 13 | Record Retention | ✓ | Satisfactory | None |
| 14 | AML Training | ✓ | Satisfactory | None |
| 15 | Independent Testing | ✓ | Satisfactory | None |
| 16 | Office of Foreign Assets (OFAC) | ✓ | Satisfactory | None |

## 10. BIOGRAPHIES

███████████ CFE, CAMS, CFCF, CCRP is President and Founder of ███████████ a boutique consultancy specializing in independent testing for anti-money laundering compliance programs for bank and nonbank institutions, and serves as its principal examiner. In addition, her expertise includes custom training, and compliance consulting services, which includes design and development of Bank Secrecy Act/Anti-Money Laundering and Anti-Fraud compliance programs, risk assessment and analyses, remediation and corrective action programs, and expert witness services. Ms. ████ has worked with financial institutions that have been referred to enforcement for BSA/AML violations, helping them to bring their AML programs into compliance.

In a career spanning more than thirty-five years across multiple sectors of the financial services industry, Ms. ████ has worked in a variety of executive leadership roles. Since founding ████ she has co-created sector-specific compliance officer certification programs and toured internationally presenting various AML/Fraud topics for industry-leading organizations, and has authored a number of articles on the topic of AML. Ms. ████ erves as a dispute resolution arbitrator for the Financial

HIGHLY CONFIDENTIAL

Industry Regulatory Authority ("FINRA") and contributes to multiple industry programs. She is active with several industry groups including ███████████████

████████████████████████████████████████ and ███████████████

She serves on a variety of industry task forces and committees and contributes to a number of compliance, industry, and university education programs.

███████████████ CAMS has a broad range of law enforcement, regulatory and management expertise in the areas of regulatory compliance, financial crimes and customs violations comprised of over 35 years of government and private sector experience. Her expertise includes independent reviews and investigations, threat/risk assessments, domestic and international training, monitors, expert testimony and anti-money laundering program development.

Ms. ██████ served as the Deputy Director, Operations and the Executive Assistant Director of Law Enforcement Policy for the Financial Crimes Enforcement Network (FinCEN) from 1999-2003. Ms. ██████ ed FinCEN's effort to administer the recordkeeping, reporting and anti-money laundering provisions of the BSA and USA PATRIOT Act more effectively and efficiently. Ms. ██████ conducted numerous training seminars throughout the United States and internationally for law enforcement personnel, and the financial industry on money laundering, the BSA and the USA Patriot Act. She also led delegations to international conferences and multi-lateral meetings throughout the world.

As the Executive Director of Operations for U.S. Customs Service (USCS), Office of Investigations, Ms. ██████ was responsible for the direction and oversight of all investigations conducted by USCS Special Agents, including smuggling, illegal export and money laundering investigations. During her tenure as Director of Operations, Ms. ██████ directed the largest undercover money laundering investigation in U.S. history. Prior law enforcement positions held by Ms. ██████ include the Director of Strategic Investigations, USCS; Special Agent in Charge for USCS in Dallas, Texas; and Chief of USCS Financial Investigations Branch and U.S. Customs Special Agent, Senior Special Agent, and Group Supervisor.

Ms. ██████ holds a Master's Degree in Management from ████████████████ and a Bachelor's Degree in Criminal Justice from ████████████████ She is a member of several professional organizations, including ███████████████

████████████████████████████ and ███████████████

HIGHLY CONFIDENTIAL                                                              RPLI_SEC 0532043



January 31, 2017

New York State Department of Financial Services
Attn: Messrs. ████ and ████████
One State Street
New York, NY 10004

Ref: XRP II, LLC - 2016 Year End Update

Dear Mr. ████ and Mr. ████

I would like to take this opportunity to provide you with a brief update on XRP II's activities over the past six months and to advise you of recent and upcoming changes to our management team. Because these management changes offer an opportunity to continue to build our relationship with the Department, we would also like to request an in-person meeting in the coming weeks so that we can better understand the Department's priorities for the coming year.

XRP II, LLC is a wholly-owned subsidiary of Ripple Labs Inc. ("Ripple" or "the Company"). ████ joined Ripple's Legal team in late November 2016 and will replace ████ as General Counsel; however ████ will continue to act in an advisory capacity to the Company going forward. ████ joins Ripple with a wealth of payments and regulatory experience, having worked as a senior legal director at both ████ and ████. She will be responsible for managing the Company's legal strategy and execution, reporting directly to Ripple's CEO, Brad Garlinghouse. Brad stepped into the CEO role on January 1, 2017, taking over that position from Chris Larsen. Chris remains with the Company, and is now acting as Executive Chairman of the Board of Directors.

XRP II's sales and purchases of XRP continue to increase, and Ripple's compliance oversight is scaling appropriately so that XRP II continues to meet its regulatory obligations. Annual review and updates to XRP II's BSA/AML/OFAC program were completed and approved by XRP II's Compliance Oversight in December 2016. Implementing procedures were also reviewed and updated, where appropriate. Annual updates to XRP II's BSA/AML/OFAC Risk Assessment and Training Program were also completed in January 2017 for Compliance Oversight Committee approval. As a matter of convenience for two existing customers, XRP II agreed to custody XRP for a period of time while continuing to meet minimal Capital requirements. Both of these existing customers were subject to XRP II's exacting due diligence requirements at the time of customer onboarding.

HIGHLY CONFIDENTIAL                                                        RPLI_SEC 0532044

I am attaching for your information a copy of XRP II's most recent independent BSA audit report dated September 13, 2016. As you can see from the "Testing Summary" referenced on page 22, XRP II received satisfactory ratings across all categories with just one recommendation that has since been addressed.

Please feel free to contact me at your convenience should you have any questions or require additional information.

Sincerely,

Antoinette O'Gorman
Chief Compliance Officer | Ripple Labs Inc.
@ripple.com | ripple.com

Attachment:

XRP II Report of Independent BSA/AML Review dated September 2016

HIGHLY CONFIDENTIAL