# PX 716

# XRP/EUR Volume Incentive Program

**Overview:**
This Volume Incentive Agreement (the "Agreement") is made as of January 11, 2017 (the "Effective Date") by and between Ripple Markets Inc. ("Ripple"), a California corporation doing business at 300 Montgomery Street, 12th Floor, San Francisco, CA 94129, and Bitstamp Ltd. ("Bitstamp"), a corporation, doing business at 5 New London Square, London EC4A 3TW in the United Kingdom. In this Agreement Ripple and Bitstamp may be referred to individually as "Party" and together as "Parties."

**Purpose:**
The Parties are entering into this Agreement in an effort to increase the liquidity of XRP, a asset native to the Ripple Consensus Ledger ("RCL"), through the application of certain XRP transaction volume incentives. Pursuant to the terms and conditions of this Agreement, Bitstamp agrees to engage in efforts to promote the liquidity of XRP on its exchange platform by implementing an incentive program applicable to a selection of its qualified registered members of Bitstamp's services. In return for Bitstamp's efforts intended to increase XRP liquidity, Ripple agrees to reserve certain and defined incentives, as described in this Agreement, and will compensate Bitstamp in XRP or US Dollars. Lock Up Periods are referenced in the below terms.

**Duties of Bitstamp:**
Bitstamp has implemented systems and procedures to meet anti-money laundering, sanctions and other regulations. These systems and procedures include risk-based customer due diligence such as identification, verification and "know your customer" procedures and enhanced due diligence for those customers presenting higher risk, such as Politically Exposed Persons. Bitstamp also maintains a sanctions policy which prohibits it from transacting with individuals, companies and countries on proscribed sanctions lists, including the UK Treasury and the US Office of Foreign Assets Control. Bitstamp will continue to maintain these policies and procedures to ensure that its services comport with applicable law, including, but not limited to, those discussed above. The Parties agree that Bitstamp will adhere to these requirements for the duration of the Parties' Agreement.

For market transparency and to engage Bitstamp's registered members who meet Bitstamp's user requirements ("Participants"), Bitstamp will announce the terms of the Volume Incentive Program (the "Program") on or before January 10, 2017. Bitstamp will

publish the material terms of the Program in an effort to notify and encourage participation, and to inform the market of these Program incentives.

Bitstamp will enroll Participants in the Program between January 10, 2017 and January 17, 2017.

Enrolled Bitstamp Participants trading XRP/EUR for the period of January 17, 2017 at 12:00 am EST to January 31, 2017 at 11:59 pm EST, will be ranked, highest to lowest, based on dollar notional trading volume in XRP/EUR, excluding any and all self-matching volume ("Ranking").

From the Ranking, Bitstamp will select the top three (3) Participants as eligible for the Program. Participants in the Program will receive a monthly rebate of ▇ on a maximum ▇ market share of monthly notional trade volume in XRP/EUR. Self-matching volume will be excluded. The monthly rebate will not exceed ▇ per participant. The Program will be live for period of February 1, 2017 at 12:00 am EST to March 31, 2017 at 11:59 pm EST.

Bitstamp agrees to make any and all necessary changes to its website and user agreements to further facilitate participation in the Program.

**Incentives and Payment:**
Ripple agrees to reserve an incentive pool with the maximum ▇ or equivalent amount in XRP based on the previous trading day's XRP/USD (volume weighted average price) on Bitstamp, on February 1, 2017 and March 1, 2017. By no later than the first Monday of the following month (Mar 2017, Apr 2017) that the Program is live (Feb 2017, March 2017) Bitstamp will inform Ripple of the total calculated incentive payout. The payout will be deducted from the incentive pool and paid to Bitstamp by no later than the third Monday of the applicable month. Ripple reserves the right to deduct payment from the incentive pool in either USD or XRP. If deducted in XRP, the conversion from USD to XRP will be based upon the previous trading day's XRP/USD VWAP (volume weighted average price) on Bitstamp's exchange.

**Desired Outcome of the Volume Incentive Program**
The Parties anticipate that the end result of the Program will be a liquid and robust XRP/EUR market on Bitstamp's exchange. If the Program is successful, the Parties may extend the Program through an additional agreement.

**Compliance with Laws:** Each party shall at all times comply with all laws, regulations, and administrative or judicial orders that are applicable to the operation of its business, this Agreement, and its performance hereunder, including, but not limited to, any applicable asset control or anti-money laundering laws, rules, and regulations. Without limiting the generality of the foregoing, each party shall at all times at its own expense, obtain and maintain all certifications, authorizations, licenses, and permits materially necessary to the exercise of its rights and the performance of its obligations under this Agreement.

**Intellectual Property:** Each party shall retain all right, title and interest in its intellectual property rights, including those held before this Agreement, or have developed independently of this Agreement.

**Confidentiality:** The parties agree to hold all non-public, proprietary information about their businesses, including but not limited to technology, intellectual property, business plans, strategies, pricing, systems, methods, programs, techniques, etc. in strictest confidence and use it solely to fulfill the Purpose and for no other uses. The precautions taken by the parties shall be at least equivalent in scope and effect to the measures taken by the party receiving the confidential information to protect its own confidential information of a like or similar nature, but in no case less than a reasonable degree of care. The parties further agree that the contents of this Agreement constitutes Confidential Information and shall be protected as such.

**Limitation of Liability:** Except for a breach of confidentiality, to the maximum extent permitted by applicable law, each party's liability to the other for any breach of this Agreement, and other party's sole and exclusive remedy, for any cause whatsoever and regardless of the form of action (whether in contract or it tort, including negligence) will be limited to actual, direct damages. In no event will Ripple or Bitstamp's Aggregate Liability for any losses and damages arising out of or related to this Agreement exceed the total amount paid to Bitstamp or received from Ripple. Furthermore, in no event will either party be liable to the other party for any lost profits, loss of business, or other consequential, special, incidental, indirect, exemplary or punitive damages arising out of or related to this Agreement, even if the party has been advised of the possibility of such damages. Each party shall defend, indemnify and hold the other party harmless from any and all claims, liabilities, costs and expenses (including reasonable attorneys' fees) arising out of or related to the other party's breach of this Agreement

**Warranties:** Each party represents to the other party that it: (a) is a legal entity duly organized and validly existing under the laws of the jurisdiction in which it is registered or

in which its principal office is located, as the case may be; (b) has all necessary power and authority to enter into this Agreement and perform its obligations hereunder; and (c) when executed and delivered by such party, this Agreement will constitute legal, valid and binding obligation of such party that is enforceable in accordance with its terms hereunder.

**Termination:** This Agreement shall continue until the earliest of:

1) The expiration of the Volume Incentive Program on March 31, 2017 at 11:59 pm EST;
2) Upon written notice of termination by a party if the other party is in material breach of this Agreement, if the breaching party does not, within ten (10) calendar days after receiving written notice describing an alleged material breach of this Agreement, cure the material failure; or
3) Upon the mutual agreement of the Parties to terminate this Agreement.

**Relationship of the Parties:** This Agreement will not be construed as creating an agency, partnership, joint venture or any other form of association, for tax purposes or otherwise between the parties and the parties will at all times be and remain independent contractors. Neither party will have the authority to enter into any contract on behalf of the other party or to otherwise bind the other party to any legal obligation.

**Assignment:** Neither party may assign this Agreement or any right hereunder without the prior written consent of the other Party. Any purported assignment made in violation of this provision will be deemed to be and will be void. Notwithstanding the foregoing, each party shall be entitled to assign this Agreement to in its entirety to an affiliate, acquirer or successor entity as the result of a restructuring, merger, or sale of all or a substantial part of its business or assets.

**Entire Agreement:** This Agreement shall constitute the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior proposals, negotiations, and other communications between the parties, whether oral, written, electronic or otherwise.

**Severability:** If any provision of this Agreement is held to be invalid or unenforceable, the parties agree that such invalidity or unenforceability shall not affect the validity of the remaining provisions of this Agreement and that they shall undertake to negotiate in good faith a substitute valid provision which most closely approximates the intentions and economic effect of the invalid provisions.

**Law and Disputes:**

1. Governing Law -- any claim, controversy or dispute arising under or related to this Agreement will be governed by the of California, without regard to any provision of California law that would require or permit the application of the substantive law of any other jurisdiction.
2. Informal Dispute Resolution -- At the written request for either party, the parties will attempt to resolve any dispute arising under or relating to this Agreement through the informal means described in this paragraph. Each party will appoint a senior management representative and this representative will furnish the other all non-privileged information with respect to the dispute that the parties believe is germane. The representatives will negotiate in an attempt to to resolve the dispute without the necessity of a formal proceeding. A formal proceeding for the resolution of the dispute may not commence until the earlier of (i) the designated representatives conclude that resolution through continued negotiation does not appear likely, or (ii) fourteen calendar days have passed since the initial request to negotiate the dispute was made -- unless this time has been extended by both parties in a writing.
3. Any dispute arising out of or related to this Agreement which cannot be settled via informal means in accordance with the paragraph above shall be irrevocably submitted to federal court sitting in San Francisco, California.

**Signatures:**

[signature redacted]     January 13, 2017
Ripple     Date
Patrick Griffin, EVP Business Development

_____ _____
Bitstamp     Date

**Law and Disputes:**

1. Governing Law -- any claim, controversy or dispute arising under or related to this Agreement will be governed by the of California, without regard to any provision of California law that would require or permit the application of the substantive law of any other jurisdiction.
2. Informal Dispute Resolution -- At the written request for either party, the parties will attempt to resolve any dispute arising under or relating to this Agreement through the informal means described in this paragraph. Each party will appoint a senior management representative and this representative will furnish the other all non-privileged information with respect to the dispute that the parties believe is germane. The representatives will negotiate in an attempt to to resolve the dispute without the necessity of a formal proceeding. A formal proceeding for the resolution of the dispute may not commence until the earlier of (i) the designated representatives conclude that resolution through continued negotiation does not appear likely, or (ii) fourteen calendar days have passed since the initial request to negotiate the dispute was made -- unless this time has been extended by both parties in a writing.
3. Any dispute arising out of or related to this Agreement which cannot be settled via informal means in accordance with the paragraph above shall be irrevocably submitted to federal court sitting in San Francisco, California.

**Signatures:**

|                          |              |                   | 1/16/2017 |
| ------------------------ | ------------ | ----------------- | --------- |
| _____         | _____       | [redacted] _____ | _____    |
| Ripple                   | Date         | Bitstamp          | Date      |

# XRP/EUR Fee Rebate Program

**Overview:**

This Fee Rebate Agreement (the "Agreement") is made as of January 11, 2017 (the "Effective Date") by and between Ripple Markets Inc. ("Ripple"), a California corporation doing business at 300 Montgomery Street, 12th Floor, San Francisco, CA 94129, and Bitstamp Ltd. ("Bitstamp"), a corporation, doing business at 5 New London Square, London EC4A 3TW in the United Kingdom. In this Agreement Ripple and Bitstamp may be referred to individually as "Party" and together as "Parties."

**Purpose:**

The Parties are entering into this Agreement in an effort to increase the liquidity of XRP, an asset native to the Ripple Consensus Ledger ("RCL"), through the application of certain XRP transaction volume incentive rebates. Pursuant to the terms and conditions of this Agreement, Bitstamp agrees to engage in efforts to promote the liquidity of XRP on its exchange platform by implementing an incentive rebate program for its qualified registered members of Bitstamp's services. In return for Bitstamp's efforts intended to increase XRP liquidity, Ripple agrees to fund certain rebates, as described in this Agreement, and will compensate Bitstamp in US Dollars.

**Duties of Bitstamp:**

Bitstamp has implemented systems and procedures to meet anti-money laundering, sanctions and other regulations. These systems and procedures include risk-based customer due diligence such as identification, verification and "know your customer" procedures and enhanced due diligence for those customers presenting higher risk, such as Politically Exposed Persons. Bitstamp also maintains a sanctions policy which prohibits it from transacting with individuals, companies and countries on proscribed sanctions lists, including the UK Treasury and the US Office of Foreign Assets Control. Bitstamp will continue to maintain these policies and procedures to ensure that its services comport with applicable law, including, but not limited to, those discussed above. The Parties agree that Bitstamp will adhere to these requirements for the duration of the Parties' Agreement.

For market transparency and to engage Bitstamp's registered members who meet Bitstamp's user requirements ("Participants"), Bitstamp will announce the Fee Rebate Program (the "Program") on or before January 10, 2017 in an effort to notify and encourage participation, and to inform the market of the Program.

Confidential - 1

Bitstamp will apply applicable fee rebates to Participants in the Program between January 17, 2017 through April 30, 2017 (the "Program Duration"). Participants in XRP/EUR during the Program Duration will be eligible for XRP/EUR fee rebates. Volume must exclude any and all self-matching volume. All other criteria related to eligibility will be developed and administered by Bitstamp but such criteria will be consistent with the Purpose of this Agreement.

Bitstamp agrees to make any and all necessary changes to its website and user agreements to further facilitate participation in the Program.

**Rebates:**

For the Program, Ripple agrees to reserve a rebate pool on a monthly basis for the Program Duration with a maximum reserved of ▮ (the "Pool"). For the months of February 2017 through April 2017, Ripple will reserve the Pool on the first day of the month, and no later than the first Monday of each month. For January, the Program will be live on January 17, 2017 and the Pool will be reserved no later than January 17, 2017. The amount reserved for January 2017 will not exceed ▮ By no later than the first Monday of the following month (Feb, Mar, Apr, May 2017) that the Program is live (Jan, Feb, Mar, Apr 2017) Bitstamp will inform Ripple of the total calculated rebate due. That amount will be deducted from the rebate Pool and paid to Bitstamp by no later than the third Monday of that following month. For clarity and to provide an example, for the Pool reserved February 1 for the Program live in February, Bitstamp will inform Ripple of the February total calculated rebate by March 6 (the first Monday), and Ripple will pay Bitstamp (from the applicable Pool) no later than March 20 (the third Monday).

The Parties agree that Bitstamp will apply the Pool to Participants as a percentage rebate of Bitstamp fees, with the percentage of rebate to decline over Program Duration. The agreed percentage of rebate and the maximum Pool for each month of the Program will be as follows:

| Date | Percentage of Rebate | Maximum Rebate Pool |
|---|---|---|
| Until 10 February 2017 | ▮ trading fees | up to ▮ |
| Until 28 February 2017 | ▮ trading fees | up to ▮ |
| Until 31 March 2017 | ▮ trading fees | up to ▮ |
| Until 30 April 2017 | ▮ trading fees | up to ▮ |

Confidential - 2

Any and all allocation of the Pool to Participants will be under the sole discretion of Bitstamp, following the percentage of rebate of Program Participant fees up to the maximum rebate pool and all other applicable restrictions, consistent with the terms and purpose of this Agreement. Any amount of the Pool not allocated to Participant fees will revert to Ripple.

**Desired Outcome of the Fee Rebate Program**
The Parties anticipate that the end result of the Program will be a liquid and robust XRP/EUR market on Bitstamp's exchange. If the Program is successful, the Parties may extend the Program through an additional agreement.

**Compliance with Laws:** Each party shall at all times comply with all laws, regulations, and administrative or judicial orders that are applicable to the operation of its business, this Agreement, and its performance hereunder, including, but not limited to, any applicable asset control or anti-money laundering laws, rules, and regulations. Without limiting the generality of the foregoing, each party shall at all times at its own expense, obtain and maintain all certifications, authorizations, licenses, and permits materially necessary to the exercise of its rights and the performance of its obligations under this Agreement.

**Intellectual Property:** Each party shall retain all right, title and interest in its intellectual property rights, including those held before this Agreement, or have developed independently of this Agreement.

**Confidentiality:** The parties agree to hold all non-public, proprietary information about their businesses, including but not limited to technology, intellectual property, business plans, strategies, pricing, systems, methods, programs, techniques, etc. in strictest confidence and use it solely to fulfill the Purpose and for no other uses. The precautions taken by the parties shall be at least equivalent in scope and effect to the measures taken by the party receiving the confidential information to protect its own confidential information of a like or similar nature, but in no case less than a reasonable degree of care. The parties further agree that the contents of this Agreement constitutes Confidential Information and shall be protected as such.

Confidential - 3

CONFIDENTIAL

RPLI_SEC 0507287

**Limitation of Liability:** Except for a breach of confidentiality, to the maximum extent permitted by applicable law, each party's liability to the other for any breach of this Agreement, and other party's sole and exclusive remedy, for any cause whatsoever and regardless of the form of action (whether in contract or it tort, including negligence) will be limited to actual, direct damages. In no event will Ripple or Bitstamp's Aggregate Liability for any losses and damages arising out of or related to this Agreement exceed the total amount paid to Bitstamp or received from Ripple. Furthermore, in no event will either party be liable to the other party for any lost profits, loss of business, or other consequential, special, incidental, indirect, exemplary or punitive damages arising out of or related to this Agreement, even if the party has been advised of the possibility of such damages. Each party shall defend, indemnify and hold the other party harmless from any and all claims, liabilities, costs and expenses (including reasonable attorneys' fees) arising out of or related to the other party's breach of this Agreement.

**Warranties:** Each party represents to the other party that it: (a) is a legal entity duly organized and validly existing under the laws of the jurisdiction in which it is registered or in which its principal office is located, as the case may be; (b) has all necessary power and authority to enter into this Agreement and perform its obligations hereunder; and (c) when executed and delivered by such party, this Agreement will constitute legal, valid and binding obligation of such party that is enforceable in accordance with its terms hereunder.

**Termination:** This Agreement shall continue until the earliest of:

1) The expiration of the Fee Rebate Program on April 30, 2017 at 11:59 pm EST;
2) Upon written notice of termination by a party if the other party is in material breach of this Agreement, if the breaching party does not, within ten (10) calendar days after receiving written notice describing an alleged material breach of this Agreement, cure the material failure; or
3) Upon the mutual agreement of the Parties to terminate this Agreement.

**Relationship of the Parties:** This Agreement will not be construed as creating an agency, partnership, joint venture or any other form of association, for tax purposes or otherwise between the parties and the parties will at all times be and remain independent contractors. Neither party will have the authority to enter into any contract on behalf of the other party or to otherwise bind the other party to any legal obligation.

CONFIDENTIAL    RPLI_SEC 0507288

**Assignment:** Neither party may assign this Agreement or any right hereunder without the prior written consent of the other Party. Any purported assignment made in violation of this provision will be deemed to be and will be void. Notwithstanding the foregoing, each party shall be entitled to assign this Agreement to in its entirety to an affiliate, acquirer or successor entity as the result of a restructuring, merger, or sale of all or a substantial part of its business or assets.

**Entire Agreement:** This Agreement shall constitute the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior proposals, negotiations, and other communications between the parties, whether oral, written, electronic or otherwise.

**Severability:** If any provision of this Agreement is held to be invalid or unenforceable, the parties agree that such invalidity or unenforceability shall not affect the validity of the remaining provisions of this Agreement and that they shall undertake to negotiate in good faith a substitute valid provision which most closely approximates the intentions and economic effect of the invalid provisions.

**Law and Disputes:**

1. Governing Law -- any claim, controversy or dispute arising under or related to this Agreement will be governed by the of California, without regard to any provision of California law that would require or permit the application of the substantive law of any other jurisdiction.
2. Informal Dispute Resolution -- At the written request for either party, the parties will attempt to resolve any dispute arising under or relating to this Agreement through the informal means described in this paragraph. Each party will appoint a senior management representative and this representative will furnish the other all non-privileged information with respect to the dispute that the parties believe is germane. The representatives will negotiate in an attempt to to resolve the dispute without the necessity of a formal proceeding. A formal proceeding for the resolution of the dispute may not commence until the earlier of (i) the designated representatives conclude that resolution through continued negotiation does not appear likely, or (ii) fourteen calendar days have passed since the initial request to

negotiate the dispute was made -- unless this time has been extended by both parties in a writing.

3. Any dispute arising out of or related to this Agreement which cannot be settled via informal means in accordance with the paragraph above shall be irrevocably submitted to federal court sitting in San Francisco, California.

**Signatures:**

| | January 13, 2017 | | |
|---|---|---|---|
| Ripple | Date | Bitstamp | Date |
| Patrick Griffin, EVP Business Development | | | |

CONFIDENTIAL                                              RPLI_SEC 0507290

negotiate the dispute was made -- unless this time has been extended by both parties in a writing.

3. Any dispute arising out of or related to this Agreement which cannot be settled via informal means in accordance with the paragraph above shall be irrevocably submitted to federal court sitting in San Francisco, California.

**Signatures:**

_____ _____

Ripple          Date

[REDACTED]     1/16/2017

Bitstamp          Date