PX 720

<u>XRP Listing, Volume Incentive and Rebate Agreement</u>

This Volume Incentive and Rebate Agreement (the "Agreement") is between Ripple Markets Inc., a California corporation doing business at 300 Montgomery Street, 12th Floor, San Francisco, CA 94129 ("Ripple"), and Payward, Inc., a Delaware corporation doing business at 237 Kearny Street #102, San Francisco, CA 94108 ("Kraken") as of the date the last party signs (the "Effective Date"). Ripple and Kraken may be referred to herein as a "Party" and together as "Parties."

<u>Recitals</u>

Whereas Kraken maintains a leading exchange for digital currencies ("Kraken Exchange");

Whereas Ripple maintains a holding of XRP, an asset native to the Ripple Consensus Ledger ("RCL");

Whereas Ripple maintains that XRP is a superior digital asset when compared with others with respect governance, settlement speed and potential global reach and the Parties wish to increase the liquidity of XRP; and

Whereas, Ripple would like to increase the liquidity of XRP through additional XRP listing the Kraken Exchange,

NOW, THEREFORE, The Parties Agree as follows:

1. **Purpose.** Pursuant to the terms and conditions of this Agreement, Kraken agrees to engage in efforts to promote the liquidity of XRP on the Kraken Exchange by implementing an incentive and rebate program ("Program") to a selection of its registered members who meet Kraken's user requirements ("Participants"). In return for Kraken's efforts intended to increase XRP liquidity and as set forth in this Agreement, Ripple agrees to both pay, in XRP, one-time set up fees to Kraken and to fund certain volume incentive and rebate programs.

2. **XRP Listings.** Kraken agrees to facilitate the listing of XRP on the Kraken Exchange. Although the Program and other payments to Kraken are specifically focused on XRP/EUR, XRP/CAD, XRP/USD, and XRP/JPY trading pairs, the Parties also have an interest in Kraken listing additional XRP trading pairs. Kraken also agrees to make any and all necessary changes to its website and user agreements to further facilitate participation in the Program and the Purpose of this Agreement.
   2.1. **Publicity.** For market transparency and to engage Participants, Kraken will publicly announce the listings as described in this Agreement on or before the first full Calendar Month following the Effective Date. Kraken will publish the material terms of the listings in an effort to notify and encourage participation. In particular, Kraken will publicize and market the listings through the Kraken homepage, customer email lists, blogs and social media channels.
   2.2. **Trading Features.** To encourage the trading of XRP on the Kraken Exchange, Kraken will offer substantially similar features that it makes available to its Participants trading in Bitcoin (XBT) and Ether (ETH), including certain leverage features and margin.
   2.3. **Set-Up Fees.** Upon the commencement of Live Trading on the Kraken Platform, Ripple will make the following one-time payments to Kraken. "Live Trading" means XRP/EUR, XRP/CAD, XRP/USD, and XRP/JPY live listings pairs on the Kraken Exchange, with the ability to scale substantial volume. Within thirty (30) days of the commencement of Live Trading and documentation provided to Ripple from Kraken that will reflect evidence of Live Trading, Ripple will pay to Kraken:
       2.3.1. ███████████████████████ XRP
       2.3.2. ███████████████████████ XRP, provided that this XRP cannot be sold or traded for a period of ███ days and a liquidation limit of 0.5% of the daily trading of XRP on the Kraken Exchange.
       2.3.3. ███ US dollars ███

3. **Incentive and Rebate Program.**
   3.1. **Communication.** For market transparency, Kraken will communicate the Volume Incentive and Rebate Program (the "**Program**") to its clients as appropriate.

3.2. **Rebate and Incentives Program Term.** The Program will be administered on a Calendar Month basis for a duration of three consecutive (3) Calendar Months (**"Program Duration"**), commencing on the first day of the Calendar Month following the first day of Live Trading. A Calendar Month is defined as 12:00 a.m. Pacific Time on the first day of the calendar month through 11:59 p.m. Pacific Time on the final day of the calendar month. For example, the Calendar Month of January would be considered 12:00 a.m. Pacific Time January 1 through 11:59 p.m. Pacific Time January 31.

3.3. **Rebates.** For the Rebate Program, Ripple agrees to pay a rebate amount of up to USD [redacted] or the equivalent amount in XRP as specified below (**"Conversion"**), for each calendar month for the Program Duration (**"Rebate Funds"**). Ripple will pay to Kraken the Rebate Funds, for each of the three (3) Calendar Months of the Program, for the sole purpose of rebating the trading fees paid by Participants arising out of their XRP trades on the Kraken Exchange during a Calendar Month ("Rebate Eligible Participants"). Ripple, at its own option, may pay the Rebate Funds in USD or XRP. Kraken will administer the Rebate Program and will have the sole responsibility to identify and forward Rebate Funds to any Rebate Eligible Participants in the Program.

3.4. **Volume Incentives.** For the Program Duration, Volume Incentives will be paid to the top three (3) Participants ranked by notional trading volume in each pair, XRP/EUR, XRP/USD, XRP/CAD, and XRP/JPY, on Kraken based on the proportion of their volume of the top three (3) Participants, not to exceed the total and cumulative amounts in the table below, or the equivalent amount in XRP as specified below (**"Conversion"**), for all three (3) Participants in total for each month, excluding self-matching volume (**"Volume Incentives"**). For clarity and to provide an example, if the top three (3) Participants' volume in XRP/EUR equals 100,000 XRP, and the Participant with the largest volume is 50% of that volume, or 50,000 XRP, that Participant would receive [redacted] of the monthly incentives, which equates to [redacted] with the total Volume Incentives for that month not to exceed [redacted] pair.

| Qualified Trading Pair | Maximum Monthly Incentive, per month |
|---|---|
| XRP/EUR | [redacted] |
| XRP/USD | [redacted] |
| XRP/CAD | [redacted] |
| XRP/JPY | [redacted] |

3.5.

3.6. **Conversion.** Ripple, at its own option, may pay the Rebate in USD or XRP. If paid in XRP, Ripple will value the XRP using the price of XRP traded against USD on the Primary Market at 12:00:01 a.m. GMT, as reported on https://charts.ripple.com, for the day immediately preceding the Payment Date. The Primary Market means the market for the exchange of XRP on Ripple Consensus Ledger where trades are made on the XRP/USD cross, which has the highest volume of trading as compared to other XRP/USD crosses on the relevant date. For all fees to be paid in XRP under this Agreement that are described as a value of the US dollar, the conversion from USD to XRP will be based on the volume weighted average price on the Kraken Exchange on the day before payment is made.

3.7. **Program Reporting.** Kraken will provide to Ripple, by the second Monday of the month following a Program Calendar Month, a written report that reflects the number of Participants eligible for Rebate Funds, the volume of transactions attributable to each Participant, which participants are eligible for Volume Incentives (and the volume of their transactions) and the amount of Rebate Funds and Volume Incentives due for that Calendar Month ("Report"). Kraken will anonymize the Report with respect to any Participant identifying information.

3.8. **Program Payments.** Ripple will pay the undisputed Rebate Funds and Volume Incentives to Kraken no later than the third Monday of the month following the Calendar Month, provided that Kraken has provided the Report. To illustrate, if the Calendar Month in which Participants trade in XRP, and entitled to Rebate Funds, is January, Kraken will provide the Report to Ripple by the second Monday in February, and Ripple will pay the Rebate Funds by the third Monday in February.

Confidential - 2

4. **Compliance with Laws.** Each Party shall at all times comply with all laws, regulations, and administrative or judicial orders that are applicable to this Agreement, and its performance hereunder.

5. **Intellectual Property.** Each party shall retain all right, title and interest in its intellectual property rights, including those held before this Agreement, or have developed independently of this Agreement.

6. **Confidentiality.** The Parties agree to hold all non-public, proprietary information about the other Party's businesses, including but not limited to technology, intellectual property, business plans, strategies, pricing, systems, methods, programs, techniques, etc. ("Confidential Information") in strictest confidence and use it solely to fulfill the Purpose and for no other uses. The precautions taken by the parties shall be at least equivalent in scope and effect to the measures taken by the party receiving the confidential information to protect its own confidential information of a like or similar nature, but in no case less than a reasonable degree of care. The Parties further agree that, with the exception of the terms of the Program that shall be published, the contents of this Agreement constitute Confidential Information and shall be protected as such. A receiving Party may disclose Confidential Information required to be disclosed by law, regulation or a valid court order, if it (a) gives the other disclosing Party timely notice so that disclosing Party may seek a protective order, confidential treatment, or other appropriate relief, (b) provides assistance as reasonably necessary for disclosing Party, at its expense, to seek a protective order, confidential treatment, or other appropriate relief, and (c) only discloses the portion of Confidential Information that receiving Party's legal counsel advises is legally required to be disclosed. These confidentiality obligations shall survive the Term of this Agreement for a period of five (5) years.

7. **Limitation of Liability**
   7.1. IN NO EVENT WILL EITHER PARTY, THEIR RESPECTIVE REPRESENTATIVES, LICENSORS OR SUPPLIERS BE LIABLE TO THE OTHER PARTY OR ITS REPRESENTATIVES FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, EXEMPLARY, SPECIAL, HYBRID OR PUNITIVE DAMAGES, OR DAMAGES FOR LOST PROFITS, REVENUE GOODWILL OR SAVINGS, LOSS OF USE, BUSINESS INTERRUPTION, LOSS OF DATA, COST OF REPLACEMENT GOODS OR REPUTATIONAL HARM, WHETHER OR NOT BASED ON A CLAIM OF BREACH OF CONTRACT OR WARRANTY, NEGLIGENCE OR OTHER TORT, STRICT LIABILITY OR OTHERWISE UNDER ANY THEORY OF LAW, EVEN IF SUCH PARTY WAS ADVISED OF THE POSSIBILITY OF SUCH LOSSES OR DAMAGES, WHETHER OR NOT A REMEDY SHOULD FAIL ITS ESSENTIAL PURPOSE.
   7.2. Each Party shall defend, indemnify and hold the other Party harmless from any and all claims, liabilities, costs and expenses (including reasonable attorneys' fees) arising out of or related to such Party's breach of this Agreement
   7.3. The Parties understand and agree that the Program, and any and all payments to Participants, will be the responsibility of Kraken (both for administration and Participant payment). Unless the failure to provide payments to Participants is the direct result of Ripple's failure to pay undisputed amounts, Kraken will be fully responsible to any and all Participants for any amounts due under the Program. Kraken agrees that it will communicate and resolve all Participant inquiries and disputes related to Participant payments under the Program, and Ripple shall neither have responsibility nor obligation to handle disputes or to make payments to Participants beyond the terms of this Agreement.
   7.4. Related to unavoidable losses of XRP on the Kraken Platform directly resulting from the release, by Ripple, of protocol changes to the Ripple Consensus Ledger, such as: changes that inadvertently allow for the rollback of a transaction that has appeared in a validated ledger; transaction malleability; transaction replay; transaction replacement; or excluding amendments, ledger forking or other undocumented features that may cause monetary damages to Kraken for transactions occurring on the Kraken Platform, Ripple will indemnify Kraken for its monetary losses, up to [redacted] XRP, proved to be directly related to Ripple Consensus Ledger changes coded by Ripple. Kraken must immediately notify Ripple of any issues with a Ripple release that may trigger this indemnification, and Kraken must move immediately to mitigate any and all damages. For the avoidance of doubt, only unavoidable losses to Kraken and no other party, as described above, will be covered by Ripple.

8. **Warranties and Representations.** Each Party warrants and represents to the other Party that it: (a) is a legal entity duly organized and validly existing under the laws of the jurisdiction in which it is registered or in which its principal office is located, as the case may be; (b) has all necessary power and authority to enter into this Agreement and perform its obligations hereunder; (c) is

legally authorized to carry out the business anticipated by this Agreement and (d) when executed and delivered by such Party, this Agreement will constitute legal, valid and binding obligation of such Party that is enforceable in accordance with its terms hereunder.

9. **Termination.** This Agreement shall continue until the earliest of:
   9.1. Twelve (12) months from the Effective Date of this Agreement;
   9.2. Upon written notice of termination by a Party if the other Party is in material breach of this Agreement, and the breaching Party does not, within ten (10) calendar days after receiving written notice describing an alleged material breach of this Agreement, cure the material failure; or
   9.3. Mutual agreement of the Parties to terminate this Agreement.

10. General.
    10.1. Governing Law. Any claim, controversy or dispute arising under or related to this Agreement will be governed by the of California, without regard to any provision of California law that would require or permit the application of the substantive law of any other jurisdiction.
    10.2. **Venue.** For any disputes arising out of, relating to, or in connection with this Agreement, the Parties irrevocably submit to the jurisdiction and venue of the courts of the State of California and the Federal Courts of the United States located in the Northern District of California, except that either Party may seek equitable relief in any court of competent jurisdiction to protect its Confidential Information from misappropriation or disclosure as monetary damages may not be adequate or easily ascertainable in such a situation.
    10.3. **Survival.** The following rights and obligations shall survive the expiration or termination of this Agreement: Section 4 (Compliance with Laws), Section 5 (Intellectual Property), and Section 6 (Confidentiality).
    10.4. Relationship of the Parties: No agency or partnership relationship is established. Neither Party may incur any expenses on behalf of the other Party.
    10.5. Assignment: Neither Party may assign this Agreement to a third party without the prior written consent of the other Party, except to a successor in interest to the Party (with prompt written notice). Any attempted assignment made by a Party without the required prior written consent shall be void and of no effect. This Agreement shall inure to the benefit of and be binding upon the Parties and their successors and permitted assigns.
    10.6. **Notices.** Any notices under this Agreement shall be sent by certified or registered mail, return receipt requested, to the Notices address and party set forth at the signature section below. Such notice shall be effective upon confirmed receipt or acknowledgment.
    10.7. **Force Majeure.** Neither Party shall be liable for failure or delay in the fulfillment of any of its obligations hereunder (excluding payment of Fees) where such failure is due to war, riot, strike, labor dispute, civil disturbance, rebellion, invasion, terrorist attack, embargo, national or local emergency, natural disaster, acts of God, flood, fire, malfunction of equipment or facilities, failure by the other Party or a third party to perform a prerequisite necessary to fulfill such obligation, or any other cause beyond its reasonable control. The Party unable to fulfill its obligations due to such a force majeure event shall use diligent efforts to restore its performance thereof as soon as reasonably possible.
    10.8. Severability; Waiver. If any provision of this Agreement is or becomes illegal, unenforceable or invalidated, by operation of law or otherwise, that provision shall be omitted to such extent and the remainder of this Agreement shall remain in full force and effect. Any waiver by either Party of any condition, term, part or provision of this Agreement shall not be a waiver of any other condition, term, part or provision, nor will the waiver be a future waiver of such condition, term, part or provision.
    10.9. **Entire Agreement; Counterparts.** This Agreement constitutes the entire agreement of the Parties pertaining to its subject matter and supersedes all prior and contemporaneous agreements, representations and understandings of the Parties, whether written or oral. This Agreement may be signed in any number of counterparts, each of which is an original and all of which taken together form one single Agreement. A signed copy of this Agreement transmitted by email or any other means of electronic transmission shall be deemed to have the same legal effect as an original executed copy of this Agreement.

Confidential - 4

As of the Effective Date, the Parties agree to be bound, and have caused this Agreement to be executed, by their authorized representatives.

**RIPPLE MARKETS INC.**

By: ▉

Name: Patrick Griffin

Title: SVP Business Development

Date: May 17th, 2017

Address: 300 Montgomery Street, 12th Floor

San Francisco, CA 94104

Attn: General Counsel

**PAYWARD, INC.**

By: ▉

Name: ▉

Title: CEO

Date: 17/May/2017

Address: 237 Kearny St. #102

San Francisco, CA 94108

CONFIDENTIAL                                                                                                                          RPLI_SEC 0511338