# PX 737

Final Copy

## MASTER XRP CUSTODY AGREEMENT

This Master XRP Custody Agreement ("Agreement") is effective the date the last Party signs ("Effective Date") and is between Ripple Labs Inc. ("Company") and ▮▮▮▮▮▮ (the "Foundation"). Company and Foundation are hereby referred to as "Party" individually and together as "Parties".

NOW, THEREFORE, in consideration of the mutual promises contained in this Agreement, the Parties agree as follows:

**SECTION 1. CUSTODY OF XRP.**

(a) Strictly as a courtesy to the Foundation, the Company will custody, at the Foundation's instruction, XRP owned by the Foundation ("Foundation XRP"), which the Foundation shall cause to be transferred to a certain XRP address designated by the Company for the sole purpose of holding Foundation XRP and the private key to which is known solely to the Company ("Custody XRP Address").

(b) The Foundation acknowledges that any custody services provided by the Company pursuant to this Agreement is on a courtesy basis and as such, the Company is providing such custody free of charge. The Company shall not be required to indefinitely hold XRP on behalf of the Foundation, and in its sole discretion, the Company may terminate any and all custody arrangements or terms outlined in this Agreement at any time with advance notice to the Foundation. Following receipt of such notice, the Foundation must promptly instruct the Company to transfer any XRP from the Custody XRP Address to an XRP address of the Foundation as provided in subsection (d) below.

(c) The Company will use reasonable efforts to secure and safeguard the private key associated with the Custody XRP Address, including from theft, loss, damage, destruction, malware, hackers or cyber-attacks which are no less than the efforts the Company take to secure its own key(s). Subject to the obligations in the preceding sentence, the Company shall not be responsible for any other loss or theft related to the Custody XRP Address and its private key.

(d) In the event the Foundation wishes to transfer XRP from the Custody XRP Address to an XRP address of the Foundation, the Foundation must submit to the Company an electronic copy of written instructions signed by the individuals authorized to conduct business on behalf of the Foundation identified in Attachment B, indicating: (a) the XRP address of the Foundation to which the XRP is to be transferred and (b) the total XRP units subject to the transaction. For the avoidance of doubt, in no event will the Company transfer XRP from the Custody XRP Address to an XRP address of a party other than the Foundation. When the Foundation issues an instruction to the Company, the Company will call or email an authorized individual listed in Attachment B to authenticate the instruction before acting with respect to such instruction; in the event that Attachment B lists only one individual,

1

Final Copy

the Company will call such individual at the telephone number specified in Attachment B to authenticate the instruction before acting with respect to such instruction. The Company shall use commercially reasonable efforts to transfer the Foundation XRP to the XRP address of the Foundation as specified in the Foundation's written instructions. Once the transfer is completed, as recorded on the XRP Ledger, the Company shall have no further responsibility for the transferred XRP, and such transfer cannot be cancelled, reversed or changed.

(e) The Foundation acknowledges and agrees that transfers of XRP from the Custody XRP Address may be subject to such additional terms and conditions (including additional authentication requirements) as the Company may reasonably from time to time require. The Company reserves the right to refuse to complete or to cancel any instruction relating to the XRP held in the Custody XRP Address under this Agreement in its sole discretion in the event these terms and conditions are not met.

**SECTION 2. [RESERVED.]**

**SECTION 3. TERMS AND CONDITIONS OF THE CUSTODYING SERVICES.**

(a) **Risk of Loss**. Immediately upon the the Company's transfer of XRP from the Custody XRP Address at the instruction of the Foundation under this Agreement, all title to and risk of loss related to such XRP passes to the Foundation. The Foundation acknowledges and agrees that the Company has no liability to the Foundation or any third party for any loss, theft or misuse of any XRP that the Company has transferred at the instruction of the Foundation as provided in this Agreement.

(b) **Acknowledgement**. The Foundation acknowledges and agrees that (i) XRP do not represent a right to make any demand on the Company, (ii) the Company has no obligation to redeem or exchange XRP for monetary value, goods, services or any other item; and (iii) the Company is not responsible for any use by the Foundation or any third party of XRP.

(c) **Applicable Laws**. The Foundation shall comply with all applicable laws, rules, and regulations, including, but not limited to, laws related to its activities and to its resale or distribution of XRP, if any. These laws include, but are not limited to, those related to sanctions and asset controls and the prevention of market manipulation, fraud and anti-money laundering.

(d) **Publicity**. Neither Party may issue any press release of make any other public statement with respect to this Agreement and its terms and conditions unless the content, timing and method of distribution of the press release or public statement has been approved in writing by the other Party.

(e) **Confidentiality**. Each Party shall maintain all Confidential Information (as that term is defined in Attachment A) it receives in strict confidence and not disclose any Confidential Information to any third party or use any Confidential

2

Final Copy

Information for any purpose other than the Performance of this Agreement, unless agreed upon in writing. A Party may disclose Confidential Information required to be disclosed by law, regulation, or a valid court order if that Party (i) gives the other Party timely notice, unless legally prohibited, so that other Party may seek a protective order, confidential treatment, or other appropriate relief and (ii) discloses only the portion of Confidential Information that is necessary to comply with such law, regulation, or order. The obligations in this sub-paragraph are in addition to, and do not supersede, any confidentiality and nondisclosure obligations provided in any other written agreement between the Parties.

(j) **Indemnification**. The Foundation agrees to defend, indemnify and hold the Company, its affiliates, and their respective employees, shareholders, directors, and representatives harmless and settle against any Claim or Loss (as those terms are defined in Attachment A), including attorneys' fees and any fines, fees or penalties imposed by any regulatory authority, arising out of or related to: (i) any violation of law by the Foundation or the Foundation's employees, contractors, or agents in connection with this Agreement, (ii) any breach of this Agreement by the Foundation or the Foundation's employees, contractors, or agents, and (iii) any use, distribution or resale of the XRP by the Foundation or by the Foundation's employees, contractors or agents. Notwithstanding anything to the contrary in this Agreement, the Foundation is not obligated to indemnify, hold harmless, or defend the Company against any claims, demands, losses, expenses, and liabilities arising out of or relating to the Company's gross negligence, fraud, or willful misconduct in the performance of this Agreement.

(k) **Indemnification Procedure**. In connection with any Claim or Loss, the Company shall give the Foundation prompt notice of the Claim or Loss (however, that any delay in notification will not relieve the Foundation of its obligation to indemnify, except and solely to the extent that the delay materially impairs the Foundation's ability to defend the Claim or Loss). In addition, the Company will cooperate with the Foundation in connection with the defense and settlement of the Claim or Loss, with the Foundation having the right to choose counsel. The Foundation shall not enter into any settlement or compromise of any Claim or Loss without the Company's prior written consent if such settlement or compromise arises from or is part of any criminal action, suit, or proceeding, or contains a stipulation to or admission or acknowledgement of any liability or wrongdoing (whether in contract, tort or otherwise) on the part of the Company, or otherwise requires the Company to refrain from or take material action (such as payment of fees). At its cost, the Company has the right to participate in the defense or settlement of the Claim or Loss with counsel of its own choosing.

**SECTION 4. DISCLAIMERS, LIMITATIONS AND RESERVATIONS.**

(a) EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT, THE COMPANY MAKES NO REPRESENTATIONS OR WARRANTIES IN RELATION TO THE CUSTODIED XRP, THIS AGREEMENT OR ITS PERFORMANCE HEREUNDER, INCLUDING (WITHOUT LIMITATION) IMPLIED WARRANTIES OF MERCHANTABILITY, NON-INFRINGEMENT, FITNESS FOR A PARTICULAR PURPOSE,

3.

CONFIDENTIAL

RPLI_SEC 0314263

Final Copy

OR IMPLIED WARRANTIES ARISING OUT OF COURSE OF DEALING, COURSE OF PERFORMANCE OR USAGE OF TRADE.

(b) IN NO EVENT SHALL THE COMPANY, ITS AFFILIATES, OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, AGENTS, EMPLOYEES OR REPRESENTATIVES, BE LIABLE TO THE FOUNDATION FOR ANY SPECIAL, INCIDENTAL, INDIRECT, INTANGIBLE, OR CONSEQUENTIAL DAMAGES OR DAMAGES FOR LOSS OF PROFITS, WHETHER BASED ON CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY, OR OTHERWISE, ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO AUTHORIZED OR UNAUTHORIZED TRANSACTIONS SUBJECT TO THIS AGREEMENT. THE COMPANY, ITS AFFILIATES, OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, AGENTS, EMPLOYEES OR REPRESENTATIVES' ENTIRE LIABILITY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT WILL IN NO EVENT EXCEED THE TOTAL AMOUNT OF XRP CUSTODIED BY THE COMPANY UNDER THIS AGREEMENT.

### SECTION 5. TERMINATION.

(a) **Termination by Mutual Consent.** Either Party may terminate this Agreement by providing written notice. In the event of termination of this Agreement in accordance with this subsection, the Foundation must submit written instructions to the Company, at least three (3) business days in advance of the effective date of the termination, to transfer any XRP from the Custody XRP Address to an XRP address of the Foundation as provided in Section 1(d).

(b) **Termination for Breach.** Without limiting any other right or remedy that the Party may have at law or otherwise, either Party may, in its sole discretion terminate this Agreement immediately upon notice to the other if the other Party breaches any of its obligations under this Agreement. In the event of termination of this Agreement in accordance with this subsection, the, the Foundation must promptly submit written instructions to the Company to transfer any XRP from the Custody XRP Address to an XRP address of the Foundation as provided in Section 1(d).

### SECTION 6. DISCLOSURES.

(a) The Foundation acknowledges and agrees that the Foundation cannot cancel, reverse, or change any XRP transaction that has been completed, as recorded on the XRP Ledger.

(b) The Foundation acknowledges and agrees that the Foundation is solely responsible for maintaining adequate security and control of any and all IDs, passwords, hints, personal identification numbers (PINs), secret keys or any other codes that s/he uses to access XRP or issue instructions to the Company with respect to with respect to the XRP custodied by the Company under this Agreement ("**Foundation Credentials**"). Any loss or compromise of Foundation Credentials may result in unauthorized access to XRP by third-parties and the loss or theft of such XRP.

4

CONFIDENTIAL

RPLI_SEC 0314264

Final Copy

**The Company assumes no responsibility for any loss that the Foundation may sustain due to compromise of Foundation Credentials.**

  (c) The Foundation acknowledges the following material risks associated with virtual currency, including XRP:

    (i) Virtual currency is not legal tender, is not backed by the government, and accounts and value balances are not subject to Federal Deposit Insurance Corporation or Securities Investor Protection Corporation protections.

    (ii) Legislative and regulatory changes or actions at the state, federal, or international level may adversely affect the use, transfer, exchange, and value of virtual currency.

    (iii) Transactions in virtual currency may be irreversible and, accordingly, losses due to fraudulent or accidental transactions may not be recoverable.

    (iv) Some virtual currency transactions shall be deemed to be made when recorded on a public ledger, which is not necessarily the date or time that the transaction is initiated.

    (v) The value of virtual currency may be derived from the continued willingness of market participants to exchange fiat currency for virtual currency, which may result in the potential for permanent and total loss of value of a particular virtual currency should the market for that virtual currency disappear.

    (vi) There is no assurance that a person who accepts a virtual currency as payment today will continue to do so in the future.

    (vii) The volatility and unpredictability of the price of virtual currency relative to fiat currency may result in significant loss over a short period of time.

    (viii) The nature of virtual currency may lead to an increased risk of fraud or cyber attack.

    (ix) The nature of virtual currency means that any technological difficulties experienced by the Company may prevent the access or use of an individual's virtual currency.

  (d) If the Foundation has any questions, needs assistance, or wishes to contact the Company with a complaint, the Foundation may contact the Company at complaints@ripple.com.

  (e) The Foundation acknowledges and agrees that the Company may share information concerning the Foundation (i) with appropriate state and federal

5

Final Copy

regulatory authorities in connection with the transactions contemplated by this Agreement, (ii) in response to a court or government order, and (iii) with other affiliates of the Company in accordance with applicable laws. Lastly, the Foundation agrees that the Company may obtain and use such information as may be necessary for legitimate business needs in connection with the operation of the Company and its affiliates.

**SECTION 7. MISCELLANEOUS PROVISIONS.**

(a) Notwithstanding anything to the contrary in this Agreement, the Foundation and the Company intend that no provision of this Agreement shall be construed to cause the Foundation and the Company to engage in an act of "self-dealing" within the meaning of Section 4941(d) of the Internal Revenue Code of 1986, as amended. The Foundation and the Company agree to cooperate to effectuate this intent.

(b) **Choice of Law; Jurisdiction and Venue**. This Agreement shall be governed by, and construed in accordance with the laws of the State of California, U.S.A., as such laws are applied to contracts entered into and performed in such State and without reference to any conflict of laws rules or provisions. The Parties irrevocably consent to the non-exclusive jurisdiction and venue of the federal and state courts located in the Northern District of California, U.S.A. with respect to any claim, action or proceeding arising out of or in connection with this Agreement. The U.N. Convention on Contracts for the International Sale of Goods shall not apply to this Agreement.

(c) **Notice**. Any notices under this Agreement shall be sent by certified or registered mail, return receipt requested, to the Notices address and party set forth below; provided, however, the Foundation agrees and consents to receive electronically all communications, agreements, documents, notices and disclosures that the Company provides in connection with this Agreement. Notice shall be effective upon receipt.

(d) **Entire Agreement; Amendments; Counterparts**. This Agreement constitutes the entire contract between the Parties hereto with regard to the subject matter hereof. It supersedes any other agreements, representations or understandings (whether oral or written and whether express or implied) that relate to the subject matter hereof. Except for a writing signed by both Parties, this Agreement may not be modified or amended. If any provision of this Agreement is held to be invalid, such invalidity will not affect the remaining provisions. This Agreement may be signed in any number of counterparts, each of which is an original and all of which taken together form one single Agreement. A signed copy of this Agreement transmitted by email or any other means of electronic transmission shall be deemed to have the same legal effect as an original executed copy of this Agreement.

(e) **Successors and Assigns**. The Foundation may not assign any rights granted under this Agreement without the prior written consent of the Company. The Company reserves the right to assign its rights without restriction,

6

CONFIDENTIAL

RPLI_SEC 0314266

Final Copy

including without limitation to any affiliates or subsidiaries. Any attempted transfer or assignment in violation hereof shall be null and void. Subject to the foregoing, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the Company and its successors and assigns and be binding upon the Foundation and the Foundation's successors and assigns by operation of law, whether or not any such person has become a party to this Agreement or has agreed in writing to join herein and to be bound by the terms, conditions and restrictions hereof. In addition, this Agreement is not intended to confer any right or benefit on any third party.

(f) **Relationship of the Parties.** Nothing in this Agreement shall be construed or is intended to be construed as creating an employer-employee or agency relationship, a partnership, or a joint venture between the Parties.

(g) **Survival.** Section 3(a), Section 3(e), Section 3(j), Section 3(k), Section 4, and Section 7 shall survive the termination of this Agreement, as well as any other provision that, in order to give proper effect to their intent, should survive such expiration or termination. Termination of this Agreement shall not affect or limit any independent rights of a Party in or to its Confidential Information under applicable laws.

(h) **Severability.** If any provision of this Agreement is determined to be invalid or unenforceable under any rule, law or regulation or any governmental agency, local, state, or federal, such provision will be changed and interpreted to accomplish the objectives of the provision to the greatest extent possible under any applicable law and the validity or enforceability of any other provision of this Agreement shall not be affected.

(i) **Non-Waiver.** The failure of either Party to enforce any provision of this Agreement or to exercise any rights or remedies under this Agreement will not constitute a waiver of the Party's rights to subsequently enforce the provision or exercise those rights or remedies. The remedies specified in this Agreement are in addition to any other remedies that may be available at law or equity.

(j) **Force Majeure.** The Company shall not be liable for delays, failure in performance or interruption of service which result directly or indirectly from any cause or condition beyond its reasonable control, including but not limited to, any delay or failure due to any act of God, act of civil or military authorities, act of terrorists, civil disturbance, war, strike or other labor dispute, fire, interruption in telecommunications or Internet services or network provider services, failure of equipment and/or software, other catastrophe or any other occurrence which is beyond its reasonable control and shall not affect the validity and enforceability of any remaining provisions.

[Remainder of page intentionally left blank; signature page follows]

CONFIDENTIAL                                                                                           RPLI_SEC 0314267

Final Copy

As of the Effective Date, the Parties agree to be bound and have caused this Agreement to be executed.



Date: 8/28/18

**RIPPLE LABS INC.**

By: ⬛
Name: ⬛
Title: ⬛
Address: 315 Montgomery St. 2nd Floor
San Francisco, CA 94104

8

CONFIDENTIAL

RPLI_SEC 0314268

Final Copy

## ATTACHMENT A
### Definitions

**CAPITALIZED TERMS NOT OTHERWISE DEFINED IN THIS AGREEMENT HAVE THE FOLLOWING MEANINGS:**

"**Claim**" means any claim, action, audit, investigation, inquiry or other proceeding brought or instituted against the Company, its affiliates, or any of their respective employees, shareholders, directors or representatives) by a person or entity other than the Foundation, or its affiliates or subsidiaries.

"**Confidential Information**" means the terms of this Agreement and any non-public information or materials provided by either Party to the other Party in connection with the performance of this Agreement, but does not include any information or materials that: (a) was previously known to the receiving party free of any obligation to keep it confidential, (b) becomes generally available to the public through no wrongful act, (c) is rightfully received from a third party under no obligation of confidence to such third party, (d) is independently developed by the receiving party without reference to information which has been disclosed pursuant to this Agreement, or (e) is required to be disclosed in invoice to comply with all applicable laws, administrative process or governmental or court invoices; provided, however, that in a circumstance in which disclosure is compelled by applicable law, administrative process or governmental or court invoices, the party that is subject to such compelled disclosure shall limit the disclosure to only that information that must be disclosed to comply with the invoice and shall give the other party prompt prior notice of such compelled disclosure so that the other party may seek to protect such information.

"**Loss**" means any claim, cost, loss, damage, judgment, penalty, interest and/or expense (including reasonable attorneys' fees) arising out of any Claim.

"**XRP**" means the decentralized digital asset that is native to the XRP Ledger.

Final Copy

# ATTACHMENT B
## Authorization List

The following individuals are authorized to issue instructions on the ▮▮▮▮▮ behalf to the Company in connection with the XRP custodied by the Company under the Agreement, as well as to view information, issue instructions, and engage in transactions on behalf of the ▮▮▮▮▮ as necessary or incidental to such.

| Name: | ███████████████████ |
|---|---|
| Title: | ███████████████████ |
| Phone: | ███████████████████ |
| Specimen signature: | ███████ |

| Name: | ███████████████████ |
|---|---|
| Title: | ███████████████████ |
| Phone: | ███████████████████ |
| Specimen signature: | ███████████ |

| Name: | |
|---|---|
| Title: | |
| Phone: | Email: |
| Specimen signature: | |

| Name: | |
|---|---|
| Title: | |
| Phone: | Email: |
| Specimen signature: | |

CONFIDENTIAL