# PX 81

1

1                    UNITED STATES DISTRICT COURT

2                    SOUTHERN DISTRICT OF NEW YORK

3

4       SECURITIES AND EXCHANGE        )
        COMMISSION,                    )
5                                      )
                        Plaintiff,     )
6                                      ) Case No.
                 v.                    ) 20-Civ-10832(AT)(SN)
7                                      )
        RIPPLE LABS, INC., BRADLEY     )
8       GARLINGHOUSE, and CHRISTIAN    )
        LARSEN,                        )
9                                      )
                        Defendants.    )
10      _____)

11

12          **CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**

13

14                  VIDEOTAPED DEPOSITION OF

15              BRADLEY KENT GARLINGHOUSE, JR.

16                 Monday, September 20, 2021

17

18

19

20

21

22

23
        Reported by:
24      BRIDGET LOMBARDOZZI,
        CSR, RMR, CRR, CLR
25      Job No. 210920BLO

2

1                    UNITED STATES DISTRICT COURT

2                    SOUTHERN DISTRICT OF NEW YORK

3

4    SECURITIES AND EXCHANGE        )
     COMMISSION,                    )
5                                   )
                    Plaintiff,      )
6                                   ) Case No.
              v.                    ) 20-Civ-10832(AT)(SN)
7                                   )
     RIPPLE LABS, INC., BRADLEY     )
8    GARLINGHOUSE, and CHRISTIAN    )
     LARSEN,                        )
9                                   )
                    Defendants.     )
10   _____)

11

12

13

14

15          Videotaped deposition of BRADLEY KENT GARLINGHOUSE,

16   JR. taken on behalf of Plaintiff, held at the offices of

17   Cleary Gottlieb Steen & Hamilton LLP, 1 Liberty Plaza,

18   New York, New York, commencing at 8:20 a.m. and ending

19   at 8:01 p.m., on Monday, September 20, 2021, before

20   Bridget Lombardozzi, CCR, RMR, CRR, CLR, and a Notary

21   Public of the States of New York and New Jersey,

22   pursuant to notice.

23

24

25

3

1    A P P E A R A N C E S (Via Remote where indicated):

2

3    For the Plaintiff:

4

5         UNITED STATES SECURITIES AND EXCHANGE COMMISSION

6         NEW YORK REGIONAL OFFICE

7         BY:   JORGE G. TENREIRO, ESQUIRE

8              MARK SYLVESTER, ESQUIRE

9              JON DANIELS, ESQUIRE

10             DAPHNA A. WAXMAN, ESQUIRE.

11             LADAN STEWART, ESQUIRE (Remote)

12             BEN HANAUER, ESQUIRE (Remote)

13             ELIZABETH GOODY, ESQUIRE (Remote)

14         200 Vesey Street

15         Suite 400

16         New York, New York  10281-1022

17         Telephone:  212.336.1060

18         Email:   tenreiroj@sec.gov

19                  hanauerb@sec.gov

20                  jdaniels@sec.gov

21                  waxmand@sec.gov

22                  stewartl@sec.gov

23                  goodye@sec.gov

24

25

4

1    A P P E A R A N C E S (Continued):

2

3    For Defendant Ripple Labs Inc.:

4

5            DEBEVOISE & PLIMPTON LLP

6            BY:  ANDREW CERESNEY, ESQUIRE

7                 MICHAEL J. PISEM, ESQUIRE (Remote)

8                 ASHLEY V. HAHN, ESQUIRE (Remote)

9                 CHRISTOPHER FORD, ESQUIRE (Remote)

10           919 Third Avenue

11           New York, New York  10022

12           Telephone:  212.909.6000

13           E-Mail:  aceresney@debevoise.com

14                    apisem@debevoise.com

15                    avhahn@debevoise.com

16                    cford@debevoise.com

17                    -and-

18           KELLOGG, HANSEN, TODD, FIGEL & FREDERICK PLLC

19           BY:  BRADLEY OPPENHEIMER, ESQUIRE (Remote)

20           Sumner Square

21           1615 M Street, N.W.

22           Suite 400

23           Washington, D.C.  20036

24           Telephone:  202.326.7999

25           E-mail:  Boppenheimer@kellogghansen.com

[9/20/2021] Garlinghouse, Bradley 9.20.2021

5

1    A P P E A R A N C E S (Continued):

2

3    For Defendant/Witness Bradley Garlinghouse:

4

5            CLEARY GOTTLIEB STEEN & HAMILTON

6            BY:   MATTHEW C. SOLOMON, ESQUIRE

7                  NICOLE TATZ, ESQUIRE

8                  SAMUEL LEVANDER, ESQUIRE

9                  JACKIE BRUNE, ESQUIRE (Remote)

10                 NOAH BAMBERGER, ESQUIRE

11                 JORGE BONILLA LOPEZ, ESQUIRE (Remote)

12                 TAYLOR H. BATES, ESQUIRE (Remote)

13                 BEN ROSENBLUM, ESQUIRE (Remote)

14                 CALEB J. ROBERTSON, ESQUIRE (Remote)

15            2112 Pennsylvania Avenue, NW

16            Washington, D.C.   20037

17            Telephone:   202.974.1500

18            E-mail:   Msolomon@cgsh.com
                        ntatz@cgsh.com
19                      Slevander@cgsh.com
                        jabrune@cgsh.com
20                      nbamberger@cgsh.com
                        jbonillalopez@cgsh.com
21                      tbates@cgsh.com
                        brosenblum@cgsh.com
22                      crobertson@cgsh.com

23

24

25

[9/20/2021] Garlinghouse, Bradley 9.20.2021

6

1    A P P E A R A N C E S (Continued):

2

3    For Defendant Christian A. Larsen:

4

5            PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

6            By:   JUSTIN WARD, ESQUIRE

7                  MICHAEL GERTZMAN, ESQUIRE (Remote)

8                  CONNOR RITSCHARD, ESQUIRE (Remote)

9                  KRISTINA BUNTING, ESQUIRE (Remote)

10           1285 Avenue of the Americas

11           New York, New York  10019-6064

12           Telephone:  212.373.2491

13           E-mail:  Jward@paulweiss.com

14                    mgertzman@paulweiss.com

15                    critschard@paulweiss.com

16                    kbunting@paulweiss.com

17

18   ALSO PRESENT:

19

20           ███████████, General Counsel, Ripple

21           NICOLE FORBES, SEC (Remote)

22           DAVID SHERECK, Videographer

23

24

25

7

```
 1                    INDEX
 2   WITNESS                        EXAMINATION
 3   BRADLEY KENT GARLINGHOUSE, JR.
 4      BY MR. TENREIRO                 18
 5
 6
 7
 8                   EXHIBITS
     SEC BG
 9   NUMBER            DESCRIPTION        PAGE
10
11   Exhibit 1    4/1/15 Ripple Labs Employment    342
12                Offer Letter Garlinghouse
13                GARL_Civil-000462-73
14
15   Exhibit 13   Series of emails dated     378
16                March 2017
17                RPLI_SEC 0763477-78
18
19   Exhibit 15   4/6/17 Email from       348
20                Garlinghouse to  ███  , et al
21                ███ 0058119-21
22
23   Exhibit 16   4/7/17 Email from Garlinghouse    363
24                to Larsen, et al
25                SEC- ███ RIPPLE 0010806-07
```

[9/20/2021] Garlinghouse, Bradley 9.20.2021

8

1                            EXHIBITS

2    SEC BG
     NUMBER              DESCRIPTION              PAGE
3

4    Exhibit 17   4/8/17 Email from Garlinghouse      368

5                 to ▮▮▮▮   et al

6                 RPLI SEC 0361257-60

7

8    Exhibit 18   5/1/17 Email from Garlinghouse      385

9                 to Larsen, et al

10                SEC-▮▮ RIPPLE 0010934-35

11

12   Exhibit 27   9/27/17 Email from Garlinghouse     215

13                to O'Gorman, et al

14                RPLI SEC 0866887-88

15

16   Exhibit 31   12/1/17 Email from Garlinghouse     309

17                to Leadership

18                RPLI SEC 0054606-07

19

20   Exhibit 32   String of emails dated             429

21                12/14/17

22                ▮▮▮▮ 041460-61

23

24

25

9

```
1                          EXHIBITS

2     SEC BG
      NUMBER             DESCRIPTION              PAGE
3

4     Exhibit 33    12/15/17 Email from          434

5                   Garlinghouse to Larsen, et al

6                   RPLI_SEC_0866480-84

7

8     Exhibit 35    Printout of Text Messages     407

9                   ▮▮▮▮▮ - Garlinghouse

10                  GARL Civil 000982-93

11

12    Exhibit 36    Twitter tweet 10/17/17        409

13                  Garlinghouse

14                  NO BATES, 2 pages

15

16    Exhibit 41    String of emails dated        199

17                  7/12/18

18                  RPLI SEC 0949371-72

19

20    Exhibit 44    String of emails dated        267

21                  July 2018

22                  RPLI SEC 0221392-95

23

24

25
```

10

1                              EXHIBITS

2    SEC BG
     NUMBER                 DESCRIPTION              PAGE
3

4    Exhibit 49   10/26/18 Email from               78

5                 Garlinghouse to ███████

6                 RPLI SEC 0766852

7

8    Exhibit 50   11/11/18 Email from               86

9                 Garlinghouse to Larsen

10                RPLI SEC 0626652-53

11

12   Exhibit 51   11/11/18 Email from               74

13                Garlinghouse to ██████ et al

14                RPLI SEC 0235167

15

16   Exhibit 53   String of emails dated            109

17                12/13/18

18                RPLI SEC 0971415-17

19

20   Exhibit 68   3/29/20 Email from                480

21                Garlinghouse

22                GARL Civil 000394

23

24

25

11

```
 1                        EXHIBITS

 2   SEC BG
     NUMBER              DESCRIPTION              PAGE
 3

 4   Exhibit 77   String of emails dated         255

 5                2/23/16

 6                RPLI SEC 0765249-50

 7

 8   Exhibit 78   String of emails dated         418

 9                June 5, 2017

10                RPLI SEC 0054397-400

11

12   Exhibit 81   String of emails dated         262

13                October 31, 2016

14                RPLI SEC 0761766-67

15

16   Exhibit 87   3/26/17 Email from Long        393

17                to Garlinghouse

18                RPLI SEC 0513551

19

20   Exhibit 90   String of emails dated         476

21                January 2018

22                RPLI SEC 0054005-08

23

24

25
```

12

```
1                        EXHIBITS

2   SEC BG
    NUMBER              DESCRIPTION           PAGE
3

4   Exhibit 94   String of emails dated       184

5                July 11, 2018

6                RPLI SEC 1028005-07

7

8   Exhibit 96   Printout of text             166

9                messages

10               RPLI SEC 0533153-61

11

12  Exhibit 97   12/9/20 Email from ███       223

13               to Garlinghouse

14               RPLI SEC 0494774-75

15

16  Exhibit 99   Video Transcription          458

17               Undated

18               SEC-SEC-E-0010269-97

19

20  Exhibit 101  Video Transcription          451

21               Undated

22               SEC-SEC-E-0010452-82

23

24

25
```

[9/20/2021] Garlinghouse, Bradley 9.20.2021

13

```
 1                            EXHIBITS
 2      SEC BG
        NUMBER              DESCRIPTION              PAGE
 3
 4      Exhibit 106  Printout of Chat Messages       146
 5                   Garlinghouse - ███████████
 6                   GARL Civil 001344-48
 7
 8      Exhibit 108  Printout of Chat Messages       233
 9                   Garlinghouse - ████████
10                   GARL Civil 001342-43
11
12      Exhibit 121  String of emails dated          243
13                   November 27, 2018
14                   RPLI SEC 0235028
15
16      Exhibit 122  String of emails dated          246
17                   May 27-28, 2020
18                   RPLI SEC 0591715-16
19
20      Exhibit 127  7/27/17 Email from Griffin       327
21                   to ██████████, et al
22                   RPLI SEC 0178836
23
24
25
```

14

```
1                        EXHIBITS

2    SEC BG
     NUMBER              DESCRIPTION              PAGE
3

4    Exhibit 129  Video Transcription,            469

5                 Undated

6                 SEC-SEC-E-0010519-22

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

15

```
1                    DEPOSITION SUPPORT INDEX

2

3       DIRECTION TO WITNESS NOT TO ANSWER

4          Page    Line

5           45      9

6          192      2

7          193      4

8

9

10

11      STIPULATIONS

12         Page    Line

13          17      11

14

15

16      QUESTIONS MARKED

17         Page    Line

18          - -none- -

19

20

21

22      REQUEST FOR DOCUMENTS

23         Page    Line

24          - -none- -

25
```

1                    - - -

2                 8:20 a.m.

3            September 20, 2021

4                    - - -

5            THE VIDEOGRAPHER:  We're on the

6      record.  The time is approximately 8:20

7      a.m.  Today's date is Monday, September

8      20th, 2021.  This is the video deposition

9      of Bradley Kent Garlinghouse, Jr., in the

10     matter of the Securities and Exchange

11     Commission versus Ripple Labs Inc.,

12     Bradley Garlinghouse, and Christian

13     Larsen.  The index number is 20-Civ-10832

14     in the United States District Court,

15     Southern District of New York.

16            My name is David Shereck,

17     certified legal videographer, with

18     Shereck Video in association with

19     Gradillas Court Reporting of Glendale,

20     California.  We're located today at the

21     office of Cleary Gottlieb, located at 1

22     Liberty Plaza in New York.  And all

23     attorneys present will appear on the

24     stenographic record.  And the court

25     reporter is Bridget Lombardozzi.  Thank

1          you.

2                    And will you please swear in the

3          witness.

4                    B R A D L E Y   K E N T

5          G A R L I N G H O U S E, Jr., having been

6          duly sworn, was examined and testified as

7          follows:

8                    THE REPORTER:  Thank you.

9                    You may proceed.

10                    MR. TENREIRO:  Thank you.

11                    Stipulations, Matt?

12                    MR. SOLOMON:  Yes.  Just that any

13          objection by any counsel will be deemed an

14          objection by all counsel if that's

15          agreeable to the SEC.

16                    MR. TENREIRO:  Yes.

17                    MR. HORTON:  Thank you.

18                    MR. TENREIRO:  And we're going

19          to --

20                    MR. SOLOMON:  And confidentiality

21          as well.

22                    MR. TENREIRO:  Sure.  We're going

23          to go nine hours today as we discussed.  I

24          think that's also stipulated.

25

18

1    DIRECT-EXAMINATION

2    BY MR. TENREIRO:

3        Q.   Good morning.  Could you please state

4    your name for the record.

5        A.   Good morning.  Brad Garlinghouse.

6        Q.   Good morning, Mr. Garlinghouse.  I'm

7    Jorge Tenreiro for the SEC.  I'll be asking

8    questions on behalf of the plaintiff today.

9             Mr. Garlinghouse, you gave testimony to

10   the SEC in an investigation that led up to this

11   case in September of 2020, is that right?

12       A.   I believe the date's correct, yeah.

13       Q.   And you were under oath for that

14   testimony, is that right?

15       A.   I was.

16       Q.   And did you provide truthful answers to

17   the SEC during your testimony on that date?

18       A.   I did.

19       Q.   Since that -- since that testimony, have

20   you given under -- other under oath testimony

21   other than in the ███████ matter?

22       A.   Not that I can recall, no.

23       Q.   Okay.  And other than ███████ and the

24   SEC investigation, have you given other testimony

25   under oath before?

1          A.   I don't recall.  You're asking in my

2     whole lifetime?

3          Q.   Sure.  Yes.

4          A.   Not that I can recall.

5          Q.   Okay.  The important thing to keep in

6     mind today, I think as you've done this before,

7     other than to try to speak slowly and not talk

8     over each other, is that I'm never asking you to

9     tell me the substance of any advice you got from

10    counsel.  So let's try to stay away from that.

11             Do you understand?

12         A.   I do.

13         Q.   Is there any reason why you cannot

14    testify truthfully or accurately today?

15         A.   No.

16         Q.   Did you take steps to prepare for

17    today's deposition?

18         A.   I did.

19         Q.   And what steps did you take, without

20    discussing the substance of conversations with

21    counsel?

22         A.   I met with counsel to prepare for today.

23         Q.   How many times did you meet?

24         A.   I don't know exactly.  As you may

25    recall, this -- the date of this event moved a few

 1    times.  And so we met a couple times to prepare

 2    each time that it got moved.

 3            So, you know, more than five, less than

 4    ten.

 5        Q.   How many hours would you approximate you

 6    met?

 7        A.   Twenty hours.

 8        Q.   Did you review documents?

 9        A.   Yes.

10        Q.   Did any of the documents you reviewed

11    refresh your recollection as to the matters

12    related to this case?

13        A.   Not specifically, no.

14        Q.   Who was present at the preparation

15    sessions, generally, other than your counsel?

16        A.   Other than my counsel?

17        Q.   Yes.

18        A.   No one.

19        Q.   Was counsel for Ripple present?

20        A.   Yes.  Sorry.  I -- I should have been

21    more precise.  When you said my counsel, I

22    included Ripple's counsel within that construct.

23        Q.   Okay.  What about counsel for

24    Mr. Larsen?

25        A.   No.

1      Q.   Did you discuss your testimony with

2   Mr. Larsen?

3      A.   No.

4      Q.   Did you discuss his testimony with him?

5      A.   Actually, one clarification.  I didn't

6   discuss my testimony with him because I haven't

7   given the testimony yet.  I did not discuss his

8   testimony with -- his testimony, we didn't discuss

9   that either.

10      Q.   Did you discuss your preparation for

11   your testimony with Mr. Garling -- with

12   Mr. Larsen?

13      A.   Other than acknowledging that I was

14   doing preparation because I would be out-of-pocket

15   for some segment of time, no.

16      Q.   Okay.  And did you discuss any other

17   witness's testimony with that witness?

18      A.   No.

19      Q.   Okay.  Do you own any XRP today?

20      A.   Yes.

21      Q.   How much?  How many units?

22      A.   I have -- that's a direct question.  I'm

23   trying to parse it a little bit.  In terms of my

24   direct ownership that I have custody myself?  Are

25   you asking what I have custody of myself or are

1   you asking --

2        Q.   I'm asking how much XRP you own.

3        A.   Well, so, by virtue of my ownership in

4   Ripple, the company, I have indirect ownership of,

5   you know, say, three and a half billion units of

6   XRP as a -- as a rough estimate.

7        Q.   Okay.  And by -- and what about other

8   holdings of XRP that are not by virtue of your

9   ownership in Ripple, the company?

10       A.   I hold some XRP at CoinBase.  I don't

11   know exactly how much.  Maybe ███████████

12   ██████████████████  And I hold XRP in a couple of

13   cold wallets which cumulatively probably

14   represents ███████████ units of XRP.

15       Q.   Any other units of XRP that you might

16   own indirectly through an organization, an LLC, a

17   family trust, anything like that?

18                 MR. SOLOMON:  Objection to form.

19       A.   Not that I can recall.

20       Q.   Okay.  And other than XRP that you might

21   own indirectly through your ownership in Ripple,

22   have you ever sold any of your XRP?

23       A.   Yes.

24       Q.   How?  How did you sell it?

25       A.   I have sold XRP through Bitstamp and I

1    have sold XRP through a -- an entity called GSR.

2         Q.   On what platforms did GSR sell the XRP

3    for you?

4         A.   I can't recall.

5         Q.   Are there records that reflect that

6    information?

7         A.   Yes.

8         Q.   Where are those records?

9         A.   In my e-mail I have those records.   I'd

10   imagine GSR has it.   I -- I don't think I can

11   provide an exhaustive list of where those records

12   are.

13        Q.   When is the last time you sold XRP?

14   Again, I'm talking about yours, not the indirectly

15   owned.

16        A.   ████████████    is my recollection.

17        Q.   Do you have any present plans to sell

18   your XRP?

19        A.   No, I don't.

20        Q.   Okay.   And why did you sell XRP in

21   ███████████?

22        A.   I had a trading plan that I -- that -- a

23   company-approved trading plan of XRP.   I vested

24   some XRP as part of an XRP grant from the company,

25   and as part of that trading plan, I sold XRP.

24

```
 1          Q.   But why did you sell it?  For what
 2   purpose?
 3          A.   No particular purpose.
 4          Q.   Who did you sell it to, the one -- the
 5   XRP you sold in ██████████████?
 6          A.   I don't know.
 7          Q.   How much did you sell it for?
 8          A.   I can't recall specifically.  I mean,
 9   I -- I think in ████████████, my recollection is
10   XR -- I would be, not speculating, but guessing
11   where the price of XRP was ██████████ which I
12   can't recall exactly.
13          Q.   Can you recall the number of units you
14   sold in ████████████?
15          A.   I -- I would guess it's between ████
16   ████████████████ units.
17          Q.   And why have you not sold since?
18                    MR. CERESNEY:  Objection to
19           form.
20                    THE REPORTER:  Who --
21                    MR. TENREIRO:  That was Andrew.
22          A.   I think that would encroach upon
23   attorney-client privilege.
24          Q.   Okay.  How is it that you don't know who
25   you sold the XRP to in ████████████
```

[9/20/2021] Garlinghouse, Bradley 9.20.2021

1           MR. SOLOMON:  Objection; form.

2      A.   The nature of how -- I guess the way I

3   think about that is if I ever -- well, when you

4   are selling XRP on an exchange, you don't know who

5   the counterparty is.

6      Q.   Okay.  And is that true for the Bitstamp

7   platform?  Is that true that you don't know who

8   the counterparty is?

9      A.   Yes.

10      Q.   And is that true for the platforms on

11   which GSR sold your XRP?

12      A.   I believe so.

13      Q.   Okay.  Have you ever asked GSR if they

14   know who they're selling your XRP to?

15      A.   Not that I can recall.

16      Q.   Okay.  So you are currently employed as

17   Ripple's CEO, is that right?

18      A.   Yes.

19      Q.   Okay.  And you've held that position

20   since January 1st, 2017, is that correct?

21      A.   Yes.

22      Q.   Before that you were Ripple's COO, is

23   that right?

24      A.   That is correct.

25      Q.   Okay.  And I think you became the COO

1   around April of 2015, is that correct?

2        A.   Yes, that sounds correct.

3        Q.   As CEO, do you have the power to make

4   decisions on behalf of Ripple?

5        A.   As CEO, I have the authority to make

6   decisions on behalf of Ripple.

7        Q.   Do you have authority to manage Ripple's

8   activities?

9        A.   Yes.

10       Q.   How about to direct -- sorry.

11       A.   I believe so.  Yes.

12       Q.   How about to direct its policies?

13               MR. CERESNEY:  Objection to

14        form.

15       A.   Yes.

16       Q.   Did Ripple ever file a registration

17   statement for any XRP offer or sale with the SEC?

18       A.   Not of which I'm aware.

19       Q.   If you decided -- if you,

20   Mr. Garlinghouse, decided that Ripple should file

21   such a registration statement, would you have the

22   power to make that decision?

23               MR. CERESNEY:  Objection to

24        form.

25               MR. SOLOMON:  Objection.

1        A.    Yes.

2        Q.    Is there anyone else who would have the

3    authority at Ripple to make the decision to file a

4    registration statement?

5                MR. SOLOMON:   Objection.

6        A.    I guess -- during what time period?

7    After January 1st, 2017?

8        Q.    Sure.

9        A.    I mean, I think the -- the board of

10   directors could act in some manner to facilitate

11   that.

12       Q.    And have you ever sat on the board?

13       A.    I do sit on the board.

14       Q.    Since when?

15       A.    I believe I officially took the board

16   seat in January of 2017.

17       Q.    How many directors are on the board as

18   of December of 2020?

19       A.    December 2020.  I don't recall exactly.

20   I think seven.

21       Q.    Okay.  And who are they?

22       A.    In -- in December of 2020, the board

23   members would have been myself, Chris Larsen, Anja

24   Manuel, Susan Athey, I think, depending upon

25   what -- I think Ben Lawsky resigned from the board

1    in roughly December 2020.  Craig Phillips, Yoski

2    Kitao.

3         Q.   That's seven.

4         A.   Yeah, I feel like I forgot somebody.

5         Q.   It's confidential.  They won't see it.

6    It's okay.  If you don't remember, it's okay.

7         A.   You don't want to forget one of your

8    board members.

9         Q.   Yeah.

10        A.   I said Craig Phillips.  Gene -- he's

11   already off the board at that time.  I think

12   that's it.

13        Q.   Who selects -- as of December 2020, who

14   selected who would be on the board?

15        A.   I mean, I'd say, generally speaking,

16   Chris Larsen would be -- would have been the

17   primary person, but typically what would happen if

18   we were adding a board member is I would take

19   point in interviewing candidates, discussing

20   various -- you know, the possibility of the

21   various candidates, and then would present to

22   Chris and the rest of the board, you know,

23   effectively a finalist or two for the board's

24   consideration.

25        Q.   Why was Mr. Larsen the primary person?

1             MR. SOLOMON:  Objection.

2       A.   Chris was the executive chairman of

3 Ripple.  And as executive chairman, you know, I

4 think, generally speaking, you -- the Chair of the

5 board as -- if the Chair of the board is not

6 supportive of a candidate, that probably isn't a

7 good path to push.

8       Q.   And why did Lawsky resign?

9       A.   Mr. Lawsky had been on the board for a

10 few years.  He was approaching his four-year

11 tenure.  He had worked at a digital asset

12 investment group -- or he does work at a digital

13 asset investment group, as an advisor, called

14 █████, which I think stands for ████████████

15 ████████████

16       And by virtue of his position -- you

17 know, his board position sometimes created

18 knowledge he had about Ripple that couldn't be

19 shared and needed to be kind of firewalled within

20 the ████████████████.  And I think over time

21 he felt like, as █████ was growing and his time

22 spent on █████ was growing, I think he felt that

23 his -- that the conflict was becoming more

24 problematic.  Or the potential conflict was

25 becoming more problematic.

1     Q.   Before working for Ripple,

2  Mr. Garlinghouse, did you have any experience with

3  cryptography?

4     A.   No.

5     Q.   Did you have any experience before

6  working for Ripple with distributed ledgers?

7     A.   No.

8     Q.   Did you have any experience before you

9  joined Ripple with cryptocurrency?

10     A.   Minimal.

11     Q.   What was that experience?

12     A.   I owned some bitcoin.

13     Q.   Other than that, did you have any

14  experience with cryptocurrency?

15     A.   No.

16     Q.   Did you have any experience with

17  Byzantine fault theory?

18     A.   No.

19     Q.   When you joined Ripple, what, if any,

20  work did you do to sort of educate yourself or

21  familiarize yourself with distributed ledgers and

22  blockchain technology?

23     A.   I met with people at Ripple to better

24  understand Ripple's technology.

25     Q.   What people did you meet with?

1        A.   Certainly ███████████ I believe was

2   the CTO at the time. ████████ was the VP of

3   engineering at the time.  Arthur Britto was an

4   outside advisor to the company.  That would be a

5   handful of examples.

6        Q.   Okay.  When you joined Ripple, did you

7   understand that Ripple owned XRP?

8        A.   I actually don't recall what I actually

9   understood at the time I joined Ripple.

10       Q.   You're talking about, like, the day you

11  started?

12       A.   Yeah.

13       Q.   Shortly after starting Ripple --

14  starting to work at Ripple, did you come to

15  understand that Ripple held XRP?

16       A.   Certainly during the course of calendar

17  year 2015 I came to understand that Ripple owned

18  XRP.

19       Q.   Before you started at Ripple, who did

20  you meet with about Ripple at Ripple?

21       A.   Sorry.  Maybe just restate the question,

22  please.

23       Q.   Sure.

24       Who did you meet with Ripple sort of --

25  let me start again.

1          Who did you meet with at Ripple in
2     connection with starting your employment there?
3          A.   Including interviews?
4          Q.   Yeah.
5          A.   So my first interview -- well, the
6     interview came by virtue of outreach from a
7     recruiter named ▇▇▇▇▇▇ with a recruiting firm
8     I can't recall the name of.  Includes the name
9     ▇▇▇▇▇▇

10          And I first met with Chris Larsen.  I
11     probably met people coming and going, but the
12     first meeting was Chris Larsen.  I think I was
13     introduced to a couple of people on the way in and
14     the way out.

15          I remember coming back and meeting with
16     a number of people who would have reported to this
17     newly created position of COO.  That included
18     ▇▇▇▇▇▇ that included Monica Long, that
19     included Patrick Griffin.  I think that included
20     Asheesh Birla.

21          I met with at least one board member, a
22     gentleman named Arjan Schutte, who is no longer on
23     the board.  I can't -- that's all I can recall.
24          Q.   So is it your recollection today that
25     after these meetings, these sort of preliminary

33

1    meetings or interviews, you were not necessarily

2    sure about whether Ripple owned XRP, is that

3    right?

4              MR. SOLOMON:   Objection.

5       A.    Yeah, I actually remember -- and I think

6    in my deposition from the investigation, you know,

7    I remember interviewing with Chris Larsen.  I

8    remember leaving the meeting and thinking I did

9    not know what he was talking about because I maybe

10   hadn't done enough homework going into the meeting

11   to understand some of the things that he was

12   describing.

13             I remember him talking about billions of

14   XRP and me -- the word "billions" is a notable

15   thing.  And so I was, like, what is he talk -- you

16   know.  So I did not understand and sought to

17   better understand, but I don't recall, you know,

18   what research I did.

19       Q.    Sure.

20             So throughout the calendar year 2015,

21   you -- you came to understand that Ripple held

22   billions of XRP, is that right?

23       A.    Yes.

24       Q.    And how did you come to gain that

25   understanding?

1        A.    I don't recall.

2        Q.    And throughout calendar year 2015, did

3    you come to understand that Ripple's XRP holdings

4    were a significant asset for Ripple?

5                    MR. SOLOMON:   Objection to form.

6        A.    No.

7        Q.    Did you ever come to understand that

8    X -- Ripple's XRP holdings were a significant

9    asset for Ripple?

10       A.    Yes.

11       Q.    At what point did you come to understand

12   that?

13       A.    I didn't consider Ripple's holdings of

14   XRP significant probably until 2017.

15       Q.    And why -- why in 2017 did you start to

16   consider them to be significant?

17       A.    Two factors:   One is the liquidity in

18   the XRP market had increased markedly and the

19   value of the XRP that Ripple held increased

20   markedly.

21       Q.    And "the value," do you mean the -- does

22   that include the price of XRP?

23       A.    Price I think would be included in

24   value, yes.

25       Q.    Okay.   So -- understood.

1          Has the regulatory status of XRP -- I'm

2    not talking just about securities laws, but has

3    the regulatory status of XRP been an important

4    issue for you throughout your tenure as Ripple's

5    CEO?

6               MR. SOLOMON:  Objection to form.

7          A.   No.

8          Q.   Has -- at any time during your tenure as

9    Ripple's CEO, has the regulatory status of XRP

10   been important to you?

11              MR. SOLOMON:  Objection to form.

12         A.   Yes.

13         Q.   At what time did that -- did it begin

14   being important to you?

15         A.   What I -- what I recall is Ripple

16   received a letter from the SEC in spring, late

17   spring, of 2018.  And that was a time when I was,

18   like, oh, okay, this needs to increase on the

19   prioritization list.

20              MR. SOLOMON:  And if I could just

21          interrupt, when you say "regulatory

22          status," do you mean across the board or

23          just with respect to the Securities and

24          Exchange --

25              MR. TENREIRO:  No, I meant across

```
 1              the board.  And that's why I want to go
 2              back, because I think he might have --
 3                      MR. SOLOMON:  That's what I was
 4              clarifying, yes.
 5   BY MR. TENREIRO:
 6         Q.   So let me -- let me -- thank you for
 7   that.  I want to get to that.
 8                      MR. TENREIRO:  And thank you to
 9              Mr. Solomon, because my question was
10              broader first.
11         A.   Okay.
12         Q.   So sort of the regulatory status of XRP.
13         A.   Oh, yeah.
14         Q.   You know, it doesn't just have to be
15   securities laws.
16              Was that important in general to you
17   when you were the CEO?
18         A.   Well, maybe even going slightly more
19   macro, you know, I -- I would say I spent --
20   certainly before the time I referenced earlier of
21   the spring of 2018, early spring of 2018, you
22   know, I was meeting with central bankers around
23   the world.  You know, that was primarily to
24   provide clarity, transparency, education about
25   Ripple, about how we used XRP.
```

1           You know, other governments around the

2    world are, frankly, ahead of the United States in

3    providing clarity about how they looked at digital

4    assets broadly.  You know, the UK created

5    something called the Token Taxonomy Act.  Other

6    governments created various things.

7           So I spent time, energy -- directly,

8    indirectly -- to educate myself as well as

9    evangelize and hopefully educate the market on,

10   you know, various constructs that I thought would

11   allow for these industries to thrive.

12       Q.   Okay.  So -- and -- and in terms of the

13   importance -- let me start again.

14           As the CEO of Ripple, throughout your

15   tenure has it been important to you that Ripple

16   comply with U.S. law?

17               MR. CERESNEY:  Objection to

18        form.

19       A.   Yes.

20       Q.   Okay.  And to the extent that you spent

21   time -- I think we said central bankers -- did

22   this begin when you were COO? when you were CEO?

23   Can you give me a point of reference as to when

24   this sort of activity began for you?

25       A.   I don't recall specifically.  I think

38

1    it's fair to say that it has always been a

2    priority for Ripple to act, you know, within and

3    in concert with governments around the world in

4    how the digital asset market was evolving.

5            As you probably are aware, I think in

6    contrast -- and, frankly, one of the things that

7    drew me to Ripple, I felt, having owned bitcoin

8    and looked at the digital asset mark -- market

9    broadly, I felt that the idea that bitcoin and

10   some in the early origins of the kind of crypto

11   industry were very anti-government, anti-bank,

12   we're going to circumvent the government, we're

13   going to circumvent the banks.  And I always felt

14   that that was, at best, shortsighted.

15           And one of the things that drew me to

16   Ripple was Ripple's view that, hey, we're going to

17   work with the banks, we're going to work alongside

18   the governments, and use these technologies to

19   provide benefit to customers, to consumers, to,

20   you know, all segments of the population.

21       Q.   Okay.  And did you -- you -- you -- you

22   mentioned a few moments ago sort of the late

23   spring of 2018 as a moment where you got a letter

24   from the SEC, is that correct?

25       A.   That's correct.

1          Q.   Did you get it personally or did you get

2     it through counsel?

3          A.   I believe I got it through counsel.

4          Q.   Okay.  And who was that?

5          A.           ████          was our general counsel at

6     the time.

7          Q.   Okay.  Do you know how  ████   got it?

8          A.   I do not.

9          Q.   Okay.  Did you read the letter?

10         A.   And, by the way, to be fair, it may have

11    come directly to me.  Someone -- between the time

12    it came into the building and got to me, I think

13    ████   was probably the first recipient of it.

14         Q.   Did you read the letter?

15         A.   At some point I'm sure I did.

16         Q.   Okay.  Did you -- so I'm just going to

17    use the late spring of 2018 as that moment in

18    time.

19              Before the late spring of 2018, had you

20    had conversations with your chief compliance

21    officer about the regulatory status of XRP under

22    U.S. laws?

23         A.   I don't recall.

24         Q.   And the chief compliance officer, just

25    to be clear, was Antoinette O'Gorman at that time?

1      A.   I believe so, yes.

2      Q.   Okay.  If XRP is deemed to be a security

3   under United States law, would that have a

4   significant impact on Ripple?

5              MR. CERESNEY:  Objection.

6              MR. SOLOMON:  Objection.

7      A.   Well, part of -- I mean, I think, to

8   answer that question, I'd be commenting on

9   conversations I've had with counsel.

10      Q.   So I'm asking you as the CEO of the

11   business, you know.  From your business

12   perspective, would that determination have a

13   significant impact on your company?

14              MR. SOLOMON:  Only if you can

15         answer the question without getting into

16         conversations that you've had with

17         attorneys.

18              THE WITNESS:  Yeah.

19      A.   When I arrived at Ripple, I knew nothing

20   about securities laws.  Probably in late spring of

21   2018, I had limited familiarity with securities

22   laws.

23              So my understanding of how Ripple's

24   business might, could have been, would be affected

25   by -- if XRP were deemed to be a security was

41

1    certainly informed by legal counsel.

2        Q.    Okay.  If you -- if Ripple was not ever

3    able to sell another unit of XRP again, would that

4    be significant for Ripple?

5                MR. SOLOMON:  Objection to form.

6        A.    Possibly.

7        Q.    What would it depend on?

8        A.    How Ripple's business evolved without

9    having XRP.

10       Q.    We'll get back to that.

11             Let's -- you said when you arrived at

12   Ripple you knew nothing about securities laws, is

13   that correct?

14       A.    I knew very little about securities

15   laws.

16       Q.    You've -- you've never gone to law

17   school, for example, correct?

18       A.    Correct.

19       Q.    You've never practiced law?

20       A.    I have never practiced law.

21       Q.    Okay.  In 2017 you read the SEC's DAO

22   Report, D-A-O Report?

23                MR. SOLOMON:  Objection to form.

24       A.    I don't recall reading the DAO Report.

25       Q.    You were aware of the DAO Report?

1              MR. SOLOMON:  Objection to form.

2       A.   I was aware of the DAO Report.

3       Q.   And -- all right.

4            So do you understand that one of the

5  issues in this case is whether XRP was offered and

6  sold by -- by Ripple as a security subject to

7  regulation by the SEC?

8              MR. SOLOMON:  Objection to form.

9       A.   Can you repeat that question?

10      Q.   Yes.

11           Do you understand that one of the issues

12  in this matter, in this litigation, is whether

13  Ripple offered and sold XRP as a security?

14             MR. SOLOMON:  Objection to form.

15      A.   Yes.

16      Q.   Has anyone at the SEC ever told you that

17  they did not view Ripple's offers and sales of XRP

18  as securities transactions?

19             MR. CERESNEY:  Do you mean other

20        than with discussions with counsel?

21             THE REPORTER:  I'm sorry, I

22        can't hear you.

23             MR. CERESNEY:  Do you mean other

24        than through discussions with counsel?

25             MR. SOLOMON:  I think he was

1          saying at the -- has any SEC employee --

2                    MR. TENREIRO:  Has any SEC

3          employee told him --

4                    THE WITNESS:  Will you repeat the

5          question, please?

6                    MR. TENREIRO:  Yes.

7                    THE WITNESS:  Thank you.

8     BY MR. TENREIRO:

9          Q.   Has any SEC employee ever told you that

10    they did not view Ripple's offers and sales of XRP

11    as securities transactions?

12         A.   No.

13         Q.   Has any SEC employee ever told you that

14    they did not view your offers and sales of XRP as

15    a securities transaction?

16         A.   No.

17         Q.   Has any SEC employee ever told you that

18    the SEC does not view Ripple's offers and sales of

19    XRP as a securities transaction?

20         A.   No.

21         Q.   Has any SEC employee ever told you that

22    the SEC does not view your offers and sales of XRP

23    as a securities transaction?

24         A.   I think implicit in that question is

25    that -- sorry, could you repeat the question?

44

1          Q.   Has any SEC employee ever told you that

2     the SEC does not view you, Mr. Garlinghouse's,

3     sales of XRP as securities transactions?

4          A.   I'm not trying to be -- I'm having

5     trouble following that whole thing.  One more

6     time.  I apologize.

7          Q.   Yeah.  No problem.

8               Has any SEC employee ever told you that

9     the SEC itself --

10         A.   Yes.

11         Q.   -- does not view Mr. Garlinghouse's

12    transactions as securities transactions?

13         A.   No.

14         Q.   Okay.  Are you aware of anyone

15    affiliated with the SEC communicating to anyone at

16    Ripple sort of in sum and substance that Ripple's

17    transactions are not securities transactions?

18         A.   Well, when you include anyone at the SEC

19    and anyone at Ripple, I guess that includes public

20    statements that the SEC and individuals at the SEC

21    may have made to the public.

22         Q.   Well, we can talk about those, but I --

23    here I was asking about conversations between SEC

24    employees or, you know, people affiliated with the

25    SEC, working for the SEC, and people working for

1    Ripple.

2         A.   Not of which I'm aware.

3         Q.   Okay.  And are you aware that in

4    approximately September of 2019, SEC staff

5    informed Ripple that they were likely to conclude

6    that it did view Ripple's offers and sales of XRP

7    as securities transactions?

8              MR. SOLOMON:  Objection to form.

9              MR. CERESNEY:  Also, here again,

10        this is other than discussions with

11        counsel.  So if the only discussion you

12        had was with counsel in this regard, then

13        I would instruct you not to answer.

14             MR. TENREIRO:  So you're going to

15        instruct him not to answer the transmittal

16        information simply repeating what the SEC

17        said.  Okay.

18             MR. CERESNEY:  Yes, I am.

19             MR. TENREIRO:  Go ahead.

20             MR. CERESNEY:  And not -- and

21        not simply repeating.  Your question was

22        broader than that.  In any event, the

23        discussion between counsel and

24        Mr. Garlinghouse would be privileged.

25             MR. TENREIRO:  My question is not

1          broader.

2     BY MR. TENREIRO:

3          Q.   My question is:  Are you aware -- yes or

4     no.  Are you aware that in September of 2019, SEC

5     staff informed Ripple that the SEC staff was

6     likely to conclude that it viewed Ripple's offers

7     and sales of XRP as securities transactions?

8          A.   No.

9               MR. SOLOMON:  Objection to form.

10              MR. CERESNEY:  And I'm going to

11          instruct the witness that if that

12          discussion was with counsel, he should

13          not answer the question.

14         Q.   So are you -- you're -- go ahead.

15         A.   My testimony is no.

16         Q.   Okay.  In 2018 you met with certain SEC

17    Commissioners at the SEC's headquarters in

18    Washington, correct?

19         A.   Sorry.  Could you repeat the dates?

20         Q.   In 2018.

21              MR. SOLOMON:  Objection; form.

22         A.   I don't know the exact dates.  I -- in,

23    I believe, June of 2018 -- you know, to be honest,

24    I don't remember the exact dates.  It was later in

25    the summer of 2018 I met with Chairman Clayton and

1    subsequently had meetings with Commissioner

2    Roisman and Commissioner Pierce.

3         Q.   What was the purpose of the meetings?

4         A.   To discuss, as I had with, you know,

5    kind of many government officials around the

6    world, what Ripple does, how we use XRP, our views

7    on the crypto markets.

8         Q.   How did you procure the meetings?

9              MR. SOLOMON:  Objection to form.

10        A.   Which -- well, I recall the meeting with

11   Chairman Clayton was organized by individuals at

12   the White House.  I don't recall how the meetings

13   with Commissioner Pierce or Commissioner Roisman

14   came to fruition.

15        Q.   Okay.  What individuals at the White

16   House were you referencing in your prior answer?

17        A.   A gentleman,              had taken an

18   interest in what was going on and he had been

19   helpful in organizing the meeting.

20        Q.   Had taken an interest in what had been

21   going on.  Can you be a little more specific?

22        A.   So I think this was after the SEC had --

23   let me back up a little bit.

24             One of the things that I came to feel

25   in, you know, early 208 -- sorry, early summer of

1     2018, as evidenced by the letter we received from

2     the SEC, is that we had not been -- I had not been

3     particularly proactive or, frankly, I don't think

4     I made any trips to Washington, D.C., despite

5     talking to governments in other parts of the world

6     to talk about what Ripple's doing, how we use

7     these technologies, how the crypto markets were

8     evolving.

9            So I came to feel that we needed to be

10    more proactive in Washington.  And          had

11    taken an interest in, I guess, the crypto markets

12    and had offered to help arrange a meeting.

13    Q.   Did someone at Ripple know him or did

14    someone just contact him randomly?

15           MR. SOLOMON:  Objection.

16    A.   No, it -- it was even more circuitous

17    than that.  The                              a

18    gentleman, as I recall, named              he

19    proactively reached out to me via an introduction

20    by a gentleman named                  reached

21    out to me -- he's a friend -- and said

22         would like to talk to you."  Again, I don't

23    remember exactly.  But, "Hey, would you be open to

24    an introduction to the

25    He's, you know, pro crypto.  You might enjoy

1    talking to him."
2           I talked to him.  And he mentioned -- I
3    think          used to work for him.  And the
4    three of us did a phone call --         and
5    myself -- and then after that    arranged -- or,
6    actually, I don't know how    arranged the
7    meeting, but he --          attended the
8    meeting.
9        Q.    So you're talking about the Clayton
10   meeting?
11       A.    Yes.
12       Q.    Let me put a pause on that because I
13   want to go back to something we were discussing a
14   moment ago.
15          I had asked you if you were aware of
16   anyone affiliated with the SEC communicating to
17   anyone at Ripple that they did not view Ripple's
18   transactions to be securities transactions.  And
19   I'm paraphrasing, but you said -- you referenced
20   public statements that the SEC and individuals
21   made.
22          Do you recall referencing that a few
23   moments ago?
24       A.    I do.
25       Q.    What were you referring to when you were

1    referencing public statements?

2         A.   I mean, there have been a number of

3    interviews by people who are currently at the SEC,

4    people who were at the SEC, who have given

5    interviews about crypto and about the regulatory

6    status of crypto.

7         Q.   Did any -- in any of those interviews

8    someone at the SEC mention a view that XRP

9    transactions by Ripple were not securities

10   transactions?

11        A.   Well, I think members of SEC staff, both

12   at that time and members of the SEC today, have

13   made comments which have suggested that they did

14   not view XRP as a security.

15        Q.   What -- and what comments are you

16   referencing?

17        A.   Well, I happened to see on Twitter

18   yesterday Chair Gensler was saying in 2018 that he

19   viewed 75 percent of the crypto market as not

20   securities, as one example.

21        Q.   Right.

22             So Mr. Gensler was not associated with

23   the SEC in 2018, correct?

24        A.   As far as I know, yes.

25        Q.   Okay.  So let me frame the question in

1    time.

2          Before the filing of the lawsuit, did

3    anyone at -- at the SEC, who was at the SEC at

4    that time, make public statements that they did

5    not view Ripple's transactions in XRP as

6    securities transactions?

7          A.    Well, I mean, again, referencing public

8    statements, the director of corporate finance,

9    Bill Hinman, had given an in-depth speech.  One of

10   the topics he covered in that was that X -- excuse

11   me, ETH was not a security and, in large part,

12   because of the decentralization of ETH, which I

13   viewed -- and I think others viewed as well -- XRP

14   in many ways is more decentralized than ETH.  And

15   if decentralization was an important component of

16   the SEC's determination that ETH was not a

17   security, that seemed like a positive indicator

18   for how the SEC may view XRP.

19               MR. SOLOMON:   That was your

20          inference.  I think what he's asking is

21          specifically about XRP.  If you recall

22          anybody from the SEC specifically

23          commenting on the regulatory status of

24          XRP, whether it was or was not a security,

25          if I have that right.

1        A.    No.

2              MR. TENREIRO:  You do.

3              MR. SOLOMON:  Okay.

4    BY MR. TENREIRO:

5        Q.    Okay.  So let's go back to the -- the

6    meeting, I think with Clayton.  Generally your

7    recollection is somebody named ████████ might

8    have helped secure that meeting, correct?

9        A.    Not might have.  He did.

10       Q.    Oh, he did.  Okay.

11             And what about -- did he also help you

12   set up the meeting with Commissioner Pierce?

13       A.    I don't recall.

14       Q.    Okay.  And did Ripple give ████████

15   anything of value in connection with him setting

16   up the meeting?

17       A.    Not that I'm aware of.

18       Q.    Okay.  Did you meet with Commissioner

19   Pierce?

20       A.    Yes.

21       Q.    Who was present?  Sorry.

22       A.    Yes.  I believe so.

23       Q.    Okay.  Where?

24       A.    I believe it was at the SEC's offices.

25       Q.    Who was present?

1          A.   Commissioner Pierce was present.  I was

2     present.  And I don't recall who else.

3          Q.   Were any of your lawyers present?

4          A.   Not to my recollection.

5          Q.   And at the meeting with Commissioner

6     Roisman, who was present?

7          A.   Commissioner Roisman was present.  I

8     believe his chief of staff was present.  Actually,

9     I do believe at that meeting that maybe his -- to

10    the extent he has counsel, I think there was a

11    lawyer that attended from the SEC.

12         Q.   You mean for Mr. Roisman?

13         A.   Yes.

14         Q.   Commissioner Roisman.

15         A.   Sorry.  Yes.

16         Q.   Did -- was your counsel present?

17         A.   No.  Actually, let me restate that.  Not

18    to my recollection.

19              MR. SOLOMON:  And just for

20         clarification, when you say "your

21         counsel," do you mean Ripple's counsel,

22         Brad's personal counsel, or both?  I just

23         want to make sure that we're clear on

24         that.

25    BY MR. TENREIRO:

1      Q.    Were either of -- either your personal

2   counsel or Ripple's counsel present?

3      A.    I didn't have personal counsel until

4   2020.  So I'm certain that my personal counsel was

5   not present.

6      Q.    Sure.  And -- okay.

7            And, now, at the meeting with Chair

8   Clayton, was -- since you did not have personal

9   counsel, was Ripple's counsel present at that

10  meeting?

11     A.    No.

12     Q.    Who was present?

13     A.    From Ripple?

14     Q.    Yes.  Well, anybody.  Who was present?

15     A.    I -- I doubt I can -- I mean, my

16  recollection, Chair Clayton was certainly there,

17  Director Hinman was there.  I believe Chair

18  Clayton's chief of staff was there, David Schwartz

19  was there, I was there, and ████████ was there.

20  And I think that's a comprehensive list.

21     Q.    How long did that meeting last?

22     A.    I believe an hour.

23     Q.    Did -- have you ever met with any other

24  sitting SEC commissioner?  I understand, you know,

25  there's some former commissioners, but have you

1    ever had meetings with sitting -- sitting SEC

2    commissioners?

3          A.    Not to my knowledge.

4          Q.    Other than the meetings with Chair

5    Clayton, Commissioners Roisman and Pierce, other

6    than those three meetings -- sorry.

7               Did you meet with any of them more than

8    once?

9               MR. SOLOMON:   Objection to form.

10         A.    Sorry.   One recollection I just had is I

11   did -- I don't remember when Commissioner Jackson

12   left his tenure.   I think I may have met with him

13   immediately before, within like the week before he

14   exited his commissioner status.

15         Q.    Okay.   For what purpose did you meet

16   with him?

17         A.    I mean, similar to talk about what's

18   going on in crypto, to talk about with what's

19   going on with Ripple.   Evangelizing, you know,

20   what Ripple's up to and our views of, you know,

21   U.S. regulatory dynamics.

22         Q.    Did you meet with him at the SEC?

23         A.    No.

24         Q.    Where did you meet with him?

25         A.    Here in New York.

1      Q.   Where in New York?

2      A.   I don't recall the name of the place, to

3    be honest with you.  It was a coffee shop, I

4    think.

5      Q.   In these meetings with the

6    Commissioners, did any of the commissioners tell

7    you that they did not believe that XRP is a

8    security?

9      A.   Yes.

10     Q.   Who?

11     A.   I recall Commissioner Roisman very

12   specifically saying "I'm sorry you've even had to

13   come here."  I think that the confusion about the

14   status of XRP he viewed as not healthy for the

15   market.  I -- I don't -- I recall less about the

16   meeting with Commissioner Pierce.

17     Q.   Okay.  Did the Chair tell you he did not

18   believe XRP was a security?

19     A.   No.

20     Q.   Okay.  And Commissioner Roisman, you --

21   you referenced he said he was sorry you had to

22   come here, but did he tell you that he did not

23   view XRP as a security?

24          MR. SOLOMON:  If you recall.

25     A.   Yeah.  I don't recall the exact words

1    that were used.  I -- I think -- I mean,

2    understandably, you're asking me did I have

3    clarity -- you're asking about each of these

4    meetings and did someone make an affirmative

5    statement they didn't view XRP as a security.  In

6    none of these meetings did everyone -- anyone ever

7    say they viewed that XRP was a security.

8         Q.   Okay.  So you recall that -- you recall

9    that at none of these meetings anyone said that

10   they viewed that XRP was a security?  You recall

11   that, is that fair?

12        A.   I think I would certainly recall if a --

13   if a -- and as I testified earlier in this

14   deposition, if a SEC member, commissioner or

15   otherwise, had said they viewed XRP was a

16   security, I would remember that.

17        Q.   And would you remember if one of them

18   had said they viewed it as not a security?

19        A.   Well, I -- I recall Commissioner

20   Roisman, without knowing exactly the words that

21   were said, making statements that in the -- you

22   know, there may be contemporaneous emails,

23   although those may have been internal with

24   counsel, but said that, you know, having had these

25   meetings, I -- I think it's worth pointing out,

1    you know, I didn't go to any of these meetings

2    with a lawyer because there never was a viewpoint

3    that that would have even have been necessary.

4    And certainly no one at the SEC ever said anything

5    to suggest that perhaps the SEC might view XRP as

6    a security and perhaps they might view Ripple's

7    sales of XRP as unregistered such that a lawyer

8    would have even have been necessary.

9         Q.   Okay.  But let's just go back because

10   I'm trying to get an answer on the Rois -- the

11   Commissioner Roisman question.

12              You have a recollection that none of the

13   Commissioners told you they viewed it as a

14   security.  And my question is, do you have a

15   recollection of any of the Commissioners telling

16   you they did view it as a security specifically?

17              MR. SOLOMON:  Objection to form.

18        A.   Can you repeat the question?

19        Q.   Yes.

20              Do you have a recollection of any of the

21   commissioners at these meetings telling you they

22   viewed XRP as a security?

23        A.   I think I testified the answer to that

24   is no.

25        Q.   Okay.  And do you have any recollection

59

```
 1   of any of the commissioners at these meetings
 2   telling you they did not view XRP as a security?
 3        A.   And I think I testified yes.
 4        Q.   Okay.  And that's Commissioner Roisman?
 5        A.   Correct.
 6        Q.   And did any of the commissioners' staff
 7   members share with you their views as to whether
 8   XRP was a security?
 9        A.   I don't recall.
10        Q.   Okay.  Did you convey what Commissioner
11   Roisman told you to anybody else?
12             MR. SOLOMON:  And, again, be
13        careful here not to --
14             THE WITNESS:  Yeah.
15             MR. SOLOMON:  -- disclose
16        information that you may have conveyed to
17        counsel in connection with privileged
18        conversation.
19        A.   Could you repeat the question?
20        Q.   Did you convey what the commissioner
21   told you, Commissioner Roisman told you, to
22   anybody else?
23        A.   Not that I can specifically recall.
24        Q.   At the time of the meeting with
25   Commissioner Roisman, you are aware that the SEC
```

1    was investigating Ripple, correct?

2         A.   No.

3         Q.   You had not received -- you had not

4    received the letter from SEC when you met with

5    Commissioner Roisman?

6         A.   I definitely did not and I don't think

7    even from the SEC's definition that that would

8    have been considered an investigation at that

9    time.

10        Q.   Okay.  You had received -- you

11   definitely did -- had not received a letter from

12   the SEC by the time you met with Commissioner

13   Roisman?

14        A.   No, that's not my testimony.

15        Q.   Okay.  I -- I apologize.  Can you

16   clarify?

17        A.   Ask the question again, please.

18        Q.   Yes.

19             At the time that you -- that you met

20   with Commissioner Roisman, had you received a

21   letter from the SEC?

22        A.   Yes.

23        Q.   Okay.  So you were aware that the SEC

24   was asking questions about Ripple's activities at

25   that time?

1         A.   I don't remember, and I haven't reread

2    the -- that letter from the SEC.  I think my

3    understanding at the time was that the SEC wanted

4    to discuss the status of XRP, not necessarily

5    Ripple's activity with it.

6         Q.   The status of XRP under the securities

7    laws?

8         A.   Under the securities laws.

9         Q.   Okay.  What was the understanding based

10   on?

11             MR. SOLOMON:  Again, be very

12        careful in responding that you don't

13        disclose attorney-client privileged

14        information you may have had with counsel.

15        Not me, other counsel.

16        A.   Okay.  Can you ask the question again?

17        Q.   Sure.

18             You said "my understanding at the time

19   was that the SEC wanted to discuss the status of

20   XRP, not necessarily Ripple's activity with it."

21   And my question is, what was that understanding

22   based on?

23        A.   I think I can't really comment to that

24   outside of attorney-client privilege.

25        Q.   Okay.  So you had -- but you had an

1      understanding that the SEC wanted to discuss the

2      status of XRP when you met with Commissioner

3      Roisman?

4           A.   Yes.

5           Q.   Did that understanding that the SEC

6      wanted to discuss the status of XRP change after

7      your meeting with Commissioner Roisman?

8           A.   You know, even today I don't fully

9      understand the dynamic between a commissioner and

10     staff.  And so I would not have expected that a

11     commissioner having a viewpoint, whether or not

12     that affected staff's activity.

13              And, again, I think it's worth pointing

14     out I never would have used the word

15     "investigation" to describe the SEC's activities.

16     I think it was primarily led by corporate finance

17     as it related to XRP in this time period.

18              And so I kind of viewed it as, okay, you

19     know, as I had with many government -- governments

20     around the world, this was an opportunity to

21     explain, discuss, educate.  And in part, frankly,

22     because other governments around the world had

23     taken express clarifying views that XRP was a

24     currency, I viewed it as, okay, you know, let's

25     have conversations with the SEC as well.

1          Q.   You said "other governments around the

2    world have taken express clarifying views that XRP

3    was a currency."  As of the time you were having

4    conversations with the SEC?

5          A.   I think that's right, yes.  I believe

6    so.

7          Q.   Can you recall which ones?

8          A.   Well, certainly the UK, Japan, and

9    Singapore would all come to mind.

10          Q.   Any others?

11          A.   Switzerland has taken a -- I mean, my

12    one qualification here is I don't remember exactly

13    what timelines and, you know, the fuzzy --

14    fuzziness of, you know, what happened in 2017,

15    2018.  But certainly in -- my recollection is that

16    a number of governments around the world in 2017,

17    because of what I would describe as an ICO boom,

18    an initial coin offering boom, got more active and

19    provided clarifying statements.

20               And so I would probably highlight Japan,

21    UK, Singapore, maybe Switzerland.

22          Q.   Okay.  And, again, this issue of

23    regulatory status was important to you as CEO.

24    You were meeting with, I think you said, central

25    banks, et cetera.

 1              MR. SOLOMON:   Objection to form.

 2        A.   I don't think that was my testimony.  I

 3   think my testimony -- I didn't consider regulatory

 4   status.  I thought it was important that central

 5   banks understood that how Ripple uses its

 6   technology doesn't circumvent any of the

 7   financial, you know, rules and regulations

 8   associated with money laundering, KYC, OFAC

 9   compliance.

10              And I think -- my experience was that

11   when central banks, when various regulators

12   understood that the nature of Ripple's technology,

13   and even how we use XRP, doesn't circumvent a

14   regulated end point in a financial institution,

15   that the laws that they apply for whatever

16   financial regulations they want to put in place

17   don't change based upon using Ripple's technology

18   in their markets.

19        Q.   Separate from meetings with central

20   banks, was the regulatory status of XRP important

21   to you as CEO in 2017?

22        A.   No.

23        Q.   Okay.  Did it ever become important to

24   you?

25        A.   Yes.

1      Q.   When?

2      A.   I -- I think my testimony earlier was

3   when we received a letter from the SEC, it -- it

4   raised on my prioritization list.

5            MR. SOLOMON:  Again, I just want

6         to clarify.  His regulatory status in

7         relation to the SEC or generally?

8            MR. TENREIRO:  I was talking

9         generally.

10           MR. SOLOMON:  Okay.  That's not

11        the question.  He was asking you --

12           THE WITNESS:  Yes.

13           MR. SOLOMON:  -- as to whether

14        the regulatory status was important to you

15        at any point in time.

16           THE WITNESS:  Repeat the question

17        one more time.  I apologize.

18  BY MR. TENREIRO:

19     Q.   Was the regulatory status of XRP

20  important to you as CEO in 2017?

21     A.   The thing I'm trying to separate is

22  regulatorily -- regulatory status as opposed to,

23  you know, regulatory, you know, rules and

24  regulations associated with money transmission.

25  The latter would have always been important to me.

1      Q.   Okay.

2      A.   The former generally wasn't because I

3   didn't think of it as an important, critical

4   issue, because it seemed so obvious to me that it

5   was a currency and is being regulated as a

6   currency by many governments around the world.  I

7   didn't think of it as a critical, important issue

8   that needed lots of attention because it seemed

9   obvious to me.

10     Q.   So the regulatory status of XRP, for

11  example, with respect to money transmission rules,

12  were important to you throughout your tenure as

13  CEO, is that correct?

14     A.   Yes.

15     Q.   Okay.  Were there any other sort of

16  regulatory frameworks that were important to you?

17  So I think you -- we've been talking about

18  securities and -- and money transmission.  Other

19  regulatory frameworks that were important to you

20  with respect to XRP in 2017?

21     A.   It's a very broad question.  You know,

22  well, maybe ask the question one more time so I --

23  or if you could maybe narrow it a little bit, that

24  would be helpful.

25     Q.   Well, other -- just -- I'm just asking

1    for a recollection.

2            So other than, you know, money

3    transmission type rules, securities-related

4    issues, were there other regulatory issues that

5    were important to you with respect to XRP in 2017?

6        A.   Is KYC considered a money transmission

7    rule?

8        Q.   So KYC is another.

9            Any -- anything else you can recall?

10       A.   So I view -- I viewed -- my recollection

11   from really the earliest days, in part because of

12   the settlement that Ripple had with FinCEN, from

13   the earliest days thinking that any rule,

14   regulation, law, as it related to banking, whether

15   it's, you know, OFAC compliance, anti-money

16   laundering, terrorist finance protection, you

17   know, all of those constructs as very important --

18   our work with banks meant that all of those were

19   very important and needed to be -- we needed to

20   educate, both internally/externally, how Ripple

21   did or did not impact those dynamics.

22       Q.   Okay.  And then after you received the

23   letter from the SEC, I think you said that the

24   securities issues raised in importance for you.

25       A.   Yes, as a -- as a prioritization matter,

1    I had not considered that a high priority. And

2    after receiving the SEC's letter, it became a

3    higher priority.

4        Q.   Okay.  After your meeting with

5    Commissioner Roisman, did you come to understand

6    that whatever questions the SEC had about Ripple's

7    XRP activities had ceased?

8            MR. SOLOMON:  Objection.

9        A.   No.

10       Q.   And did the issue of XRP status with the

11   SEC, did that lower in priority after your meeting

12   with Commissioner Roisman?

13           MR. SOLOMON:  Objection to form.

14       A.   I -- probably directionally, yes.

15   Right?  I mean, if you meet with a commissioner of

16   the SEC and you come away feeling like there's,

17   you know -- at no point did it seem like there

18   was a -- at least at that point it did not seem

19   like there was an investigation.  At no point did

20   it seem like, you know -- the posture of an

21   important U.S. regulator was kind of, hey, we're

22   exploring and trying to figure this out ourselves.

23   And it seemed very cooperative and -- to me.  Even

24   meetings I recall you sitting in, you know, there

25   were 20 people from the SEC attending and, you

1    know, 18 or 19 of them were not from enforcement.

2         Q.   So I guess I'm trying to understand.  At

3    no point you said -- I'm reading.  You said "At no

4    point did it seem like -- the posture of an

5    important U.S. regulator was kind of, hey, we're

6    exploring and trying to figure this out

7    ourselves."

8              So what did it seem like to you that it

9    was?

10              MR. SOLOMON:  Objection to form.

11         Q.   So --

12         A.   I'm not sure that's exact -- I mean, I

13    understand that's what you're reading, but I don't

14    recall saying exactly that.  But maybe just to

15    answer your question, I think my recollection is

16    that a letter was received from the SEC and our

17    engagement with the SEC was not with enforcement.

18    It was with corporate finance.

19              And we spent a fair bit of energy with,

20    generally speaking -- I mean, I think I used -- I

21    think there were about 20 people from the SEC at

22    one meeting I recall of which I think you may have

23    been the only person from enforcement.

24         Q.   (Indicating.)

25         A.   A couple.  All right.  Very few.

1       And, you know, so my view was, hey, this

2  is a -- a new asset class.  The SEC was trying to

3  understand how different projects work.  I

4  don't -- I mean, I think all those meetings

5  happened after Director Hinman's speech about ETH.

6  And, you know, I think we were pushing for further

7  clarity.  I thought the ETH speech, you know,

8  begged many, many questions.  Like, okay, now we

9  know the SEC's position on bitcoin.  Now we know

10  the SEC's position on ETH.  And that's all we

11  knew.  I mean, with the exceptions of enforcement

12  cases that had come out against maybe more

13  traditionally defined ICOs.

14       THE REPORTER:  "I mean" --

15    repeat.

16    A.   I mean, other than cases that had

17  already been brought against what we would more

18  formally consider traditional ICOs.

19    Q.   And I think you said enforcement cases,

20  but, okay.

21       So when -- what --

22    A.   Are there cases that aren't enforcement?

23    Q.   That's a good point.

24       So what did you understand the purpose

25  then of the meetings with CorpFin were?  With

1      CorpFin were, what was the purpose in your mind?

2                    MR. SOLOMON:  And I just want to

3           know, with CorpFin, can you be more spe --

4           you can ask him the general question.  He

5           can say what he recalls.  I don't know if

6           you wanted him to be more specific in your

7           answer.  I don't know.

8                    MR. TENREIRO:  Yeah.  I mean -- I

9           guess let me try this.

10     BY MR. TENREIRO:

11          Q.   You were talking about the meetings,

12     there were 20 people.  I was at one of them, you

13     know.

14               What did you think the purpose of Ripple

15     meeting with the SEC was at that point in time?

16          A.   To learn.

17          Q.   For the SEC to learn?

18          A.   Yeah.

19          Q.   Okay.  To learn about what?

20          A.   Ripple.  To learn about XRP.

21          Q.   Okay.  Anything else you can recall sort

22     of thinking the purpose was?

23          A.   (Indicating.)

24          Q.   Verbal, please.  Verbal answer.

25          A.   No.  Sorry.

1        Q.    The court reporter --

2        A.    Right.  Right.

3        Q.    Okay.  All right.  So I think -- going

4    back, you know, I think you said directionally

5    your meeting with Commissioner Roisman was

6    important given what he said to you.  Is that --

7        A.    I don't think that was my testimony.

8        Q.    Okay.  So was -- was the meeting with

9    Commissioner -- given that you were having

10   meetings with the SEC, was your meeting with

11   Commissioner Roisman and what he told you

12   important to you?

13       A.    All of the meetings I had with the SEC

14   were important to me.  I mean, I traveled to

15   Washington, D.C. as one evidence that I was

16   prioritizing this and taking it seriously.  I took

17   all the meetings I had with individuals at the SEC

18   as important and informative.

19       Q.    Okay.  But to the extent Commissioner

20   Roisman conveyed to you or to the extent that --

21   to the extent that Commissioner Roisman conveyed

22   to you his views about XRP, was that of particular

23   significance --

24            MR. SOLOMON:  Objection.

25       Q.    -- in the role of these several

1    meetings?

2              MR. SOLOMON:  Objection to form.

3         A.   I mean, I wouldn't say it was of

4    particular significance beyond the idea -- I

5    viewed all the meetings with the SEC as

6    significant.  It was significant.  I viewed all

7    the meetings as significant.  I didn't view the

8    Roisman conversation as massively more significant

9    or less significant.

10        Q.   Okay.  Now, is your understanding of the

11   purpose of your meetings with the CorpFin staff

12   based on advice from counsel or is it based on

13   your own sort of understanding?

14             MR. SOLOMON:  Objection to form.

15        A.   Could you ask that question again?

16        Q.   Yes.

17             Is your understanding of the purpose of

18   your meetings with the CorpFin staff based on

19   advice from counsel or is it based on your own

20   understanding?

21        A.   That's an excellent question.  Meaning,

22   you know, I had very little knowledge.  As I

23   testified earlier, I -- you know, I'm not a

24   lawyer.  I'm not a securities lawyer.  I had very

25   little knowledge about how the SEC worked.  And so

1    part of -- certainly part of the education of how

2    the SEC worked and the significance of who was in

3    the room for various meetings would have come from

4    conversations with counsel.

5        Q.    Okay.

6              MR. TENREIRO:   Can we take a look

7         at Exhibit 51, please?

8              (Whereupon, exhibit is presented

9         and marked SEC Garlinghouse Exhibit 51

10        for identification.)

11             MR. TENREIRO:   Here's to you,

12        Matt, and then the rest down there.   One

13        for Bridget, please.

14   BY MR. TENREIRO:

15       Q.    All right.   So I'm going to just read

16   into the record while you take a look at the

17   exhibit, Mr. Garlinghouse.   This is BG-51, Bates

18   RPLI_SEC 235167.   It appears to be an email of

19   November 11, 2018, from Mr. Garlinghouse.

20             Do you see all that?

21       A.    I do.

22       Q.    Okay.   And it appears to be addressed to

23   a ▮▮▮▮▮▮▮        is that correct?

24       A.    Yes.

25       Q.    Who is that?

75

```
 1        A.    ██████████    is a friend of Chris
 2   Larsen's.
 3        Q.    But what does he do in life?
 4        A.    I don't know exactly.  I know he's been
 5   a very successful businessman.
 6        Q.    Why did you send him this email?
 7        A.    Can I read the email first?
 8        Q.    Yeah.  Oh, I thought you had.  I'm
 9   sorry.
10        A.    No.
11              (Pause)
12        A.    Okay.
13        Q.    Why did you send him this email?
14              MR. SOLOMON:  Objection to form.
15        A.    I don't recall.
16        Q.    Did Mr. Larsen ask you to send this
17   email?
18              MR. SOLOMON:  Objection to form.
19        A.    I don't recall.
20        Q.    The subject is "Notes for Eli."
21              Who is Eli?
22        A.    I believe Eli -- well, I'm not a hundred
23   percent sure.  I believe Eli is Secretary
24   Mnuchin's Chief of Staff.
25        Q.    Was, right?  Back then.
```

1      A.   Yeah.

2      Q.   Okay.

3      A.   Well, actu -- I don't know.

4      Q.   Why -- why were you sending notes for

5  Eli?

6      A.   Maybe can you clarify the question a

7  little bit?

8      Q.   Yeah.

9           Why were you sending ███████ notes

10 for Eli?

11     A.   My recollection is that ███████ has

12 a personal relationship with Mnuchin, with the

13 then-sitting Secretary Mnuchin.  And in an effort

14 to, you know -- my understanding is that the Chief

15 of Staff to the Secretary of the Treasury might be

16 a facilitator of things that the Secretary might

17 choose to engage or not engage in.

18     Q.   Okay.  Was one of the purposes to see if

19 he might engage in statements about the regulatory

20 status of XRP?

21          MR. SOLOMON:  Objection to form.

22     A.   I don't recall.  I obviously read the

23 email, but I don't recall.

24     Q.   Okay.  The email -- let's -- let's go

25 through it.

1          You say "As briefly discussed, my

2    meetings in D.C. went very well and I continue to

3    gather evidence that the SEC (and those tangential

4    to the SEC) do Not" -- and "not" is capitalized --

5    "believe that XRP is a security."

6          Do you see that?

7      A.   I do see that.

8      Q.   Who are you talking about there?  What

9    evidence are you referring to?  Let's start with

10   that.

11     A.   I guess the first thing, I think the

12   absence of anyone saying that they view XRP as a

13   security, to me, would be evidence that they don't

14   view XRP as a security.

15     Q.   Any other evidence?

16     A.   As I testified earlier, I think my

17   conversations with Roisman -- I mean, I don't

18   remember the -- the exact time frame of -- it's

19   been years.  I remember certain nuggets of my

20   conversation with Commissioner Roisman.  As I

21   mentioned, I don't particularly recall my meeting

22   with Commissioner Pierce.  Based upon her other

23   public statements, it certainly is reasonable in

24   my mind to imagine that I left those meetings, as

25   I describe here, that I feel they went very well

1    and felt like good news.

2         Q.   Let's situate -- let's look at 49 just

3    so we can have some timing.

4                (Whereupon, exhibit is presented

5         and marked SEC Garlinghouse Exhibit 49

6         for identification.)

7                MR. TENREIRO:  All right.

8    BY MR. TENREIRO:

9         Q.   I'm just going to -- I'm not going to

10   spend any time on this, but I just want you to

11   take a look because it seems to reference the date

12   of your meeting with Commissioner Pierce.  This is

13   BG-49 which is an email, RPLI_SEC 766852.

14               And just take a look -- have you read

15   the email?

16        A.   I have.

17        Q.   Okay.  Do you have -- you're probably

18   not going to remember the exact date of your

19   meeting with Commissioner Pierce, do you?

20        A.   No.

21        Q.   Okay.  Do you have any reason to believe

22   it was not on or around November 9th, 2018?

23        A.   No.

24        Q.   Okay.  And who is ██████████ by the

25   way?

79

1          A.   She was my executive assistant at the

2     time.

3          Q.   Okay.  And you see this email, Exhibit

4     49, references Mr. Roscoe?

5          A.   Yes.

6          Q.   Does that refresh your memory as to

7     whether Mr. Roscoe also helped you procure the

8     meeting with Commissioner Pierce?

9          A.   It doesn't refresh my memory.  Obviously

10    I see what the email says.

11         Q.   Okay.  All right.

12              So back to Exhibit 51, which is a

13    November 11th email -- and I'm going to get you

14    the date of the Roisman meeting in a second.

15    Okay.  My understanding is that it was also on the

16    9th, the same day.

17              Do you recall if you met with both of

18    them on the same day?

19         A.   I don't recall.

20         Q.   Okay.  Any reason to believe that that

21    is not true?

22         A.   No reason to believe that.

23         Q.   Okay.  So back to Exhibit 51.  We're

24    talking -- I was asking you what evidence you had

25    gathered.  Can you -- I'm sorry.  I'm going to ask

1  you just repeat, please.  Can you repeat for me

2  what evidence you had gathered that you're

3  referencing in this email?

4      A.   Yeah.  I think my earlier testimony was

5  that the -- you know, if you have lots of meetings

6  with the SEC and no one says that XRP is a

7  security, or even at that point no one said they

8  think it is a security, the absence of that

9  information would certainly be a -- I view a

10 positive.

11     Q.   Okay.  Any other evidence that you have

12 gathered?

13     A.   Well, as I -- I testified earlier, my --

14 my recollection from -- my recollections from my

15 meeting with Commissioner Roisman were more

16 specific in his viewpoints that he did not view

17 XRP as a security.  And I remember him apologizing

18 that I felt like I needed to even come meet with

19 him.

20     Q.   Are you referencing any other evidence?

21     A.   I don't recall other evidence.

22     Q.   Okay.  And then you say "and those

23 tangential to the SEC."  That's in the

24 parenthetical.

25          Do you see that?

1        A.    I do see that it's a parenthetical.

2        Q.    Who are you referring to as "those

3   tangential to the SEC"?

4        A.    I do not recall.

5        Q.    Okay.  Further down you say "I've

6   outlined some key bullets that I believe capture

7   the major points for outreach to Eli."

8              Do you see that?

9        A.    I do see that.

10       Q.    Okay.  So I'll get to the bullets in a

11  minute, but is it fair to -- am I correct in

12  understanding that you were transmitting proposed

13  sort of bullet points or ideas that

14  could decide to transmit to -- to Eli?

15             MR. SOLOMON:  Objection to form.

16       Q.    Is that what -- what's going on here?

17             MR. SOLOMON:  Objection to form.

18       A.    That's my interpretation of what's going

19  on here, yes.

20       Q.    Do you have any reason to believe that

21  that's not what happened?

22       A.    No.

23       Q.    Okay.  Well, that's not --

24       A.    Actually, I have no idea what happened,

25  just to be clear.  I know I sent an email as

1     evidenced here.  I don't recall sending the email.

2     But I have no idea what happened after ▮▮▮▮▮▮▮▮

3     received the email.

4          Q.   Right.

5               So, for example, you don't know if he

6     did or did not contact the Chief of Staff of the

7     Secretary of the Treasury?

8          A.   Correct.

9          Q.   Okay.  Did you ever speak to the

10    Secretary of the Treasury about XRP?

11         A.   Yes.

12         Q.   Okay.  When?

13         A.   I don't recall.  Around this time frame.

14         Q.   Did he express any views as to the

15    status of the XRP under the securities laws?

16         A.   I don't recall.

17         Q.   Did his Chief of Staff, Eli?  I don't

18    remember his last name.  I apologize.

19         A.   Miller maybe?  I don't remember.  I

20    don't recall.

21         Q.   Okay.  All right.  So you don't know if

22    ▮▮▮▮▮▮▮▮▮▮ sent these talking points or conveyed

23    the talking points, but -- to Eli, but you did

24    talk to Eli or the Secretary of the Treasury at

25    some point?

1          MR. SOLOMON:  Objection to form.

2     A.   Yes.

3     Q.   Okay.  Did you convey to them what --

4  the evidence that you had gathered about the SEC's

5  views of XRP under the securities laws?

6     A.   I don't recall.  I think it's unlikely I

7  would have taken that approach in a meeting with

8  the Secretary of the Treasury.  My recollection is

9  a meeting with the Secretary of the Treasury, as

10  my meetings with other senior officials at

11  governments around the world, is usually to talk

12  about what Ripple is doing as a company, how we

13  use XRP in our technology stack, how...

14          You know, one thing I do recall from

15  that meeting is there are -- a number of those

16  people at the meeting with the Secretary of the

17  Treasury, and there was a particular interest in

18  how crypto flows could or could not be used to

19  circumvent regulatory -- financial regulations in

20  ways that, you know, could be used for terrorist

21  financing and things like that.

22     Q.   This evidence that you were gathering

23  that's referenced in this email, did you convey it

24  to any other government official in the United

25  States?

84

1          A.    I don't recall.

2          Q.    Did you convey it to any Ripple

3     employee?

4          A.    I don't recall.

5          Q.    Did you convey it to anybody?

6          A.    Apparently I did.

7          Q.    Other than -- other than ███████████

8          A.    I don't recall.

9          Q.    Okay.  Did -- in your meetings with the

10    commissioners, did the commissioners or their

11    staff, you know, tell you not to discuss publicly

12    the conversations you had with them?

13         A.    I don't recall.

14         Q.    Did the commissioners or their staff

15    warn you not to talk about the SEC's

16    investigation?

17         A.    No.

18         Q.    Okay.

19         A.    Again, I will reiterate earlier

20    testimony.  I -- at that point I certainly did not

21    view what -- the SEC's engagement with Ripple to

22    be an investigation.

23         Q.    At what point did you start to view this

24    as an investigation?

25         A.    I don't know.  I don't recall.

1    Certainly in 2020 it reached that point in my

2    mind.

3         Q.   Okay.  You don't recall the point.  It

4    could have been in 2019?

5         A.   Could have.  I don't recall.

6         Q.   Okay.  Okay.  So you say -- sorry.

7    "Those tangential to the SEC," who are you

8    referring there to again?

9              MR. SOLOMON:  Objection; asked

10        and answered.

11        A.   I don't recall.

12        Q.   You don't recall.  Okay.  All right.

13             The third bullet point says "Brad

14   Garlinghouse, Ripple's CEO, has met with SEC Chair

15   Clayton, Commissioners Roisman and Pierce to

16   discuss the above and the Ripple team has had

17   several meetings with SEC staff.  All indications

18   have been that they do not believe XRP is a

19   security."

20             Do you see that?

21        A.   I do.

22        Q.   Who does "they" refer to in that

23   sentence?

24        A.   I -- I -- I don't believe that I wrote

25   the sentence.  I think that the sentence seems to

1    be referring to all of the people referred to in

2    the previous sentence.

3            Q.   Who wrote the sentence?

4            A.   I don't know.

5                    MR. TENREIRO:  Let's look at

6            Exhibit 50, please.

7                    (Whereupon, exhibit is presented

8            and marked SEC Garlinghouse Exhibit 50

9            for identification.)

10                   MR. TENREIRO:  Here you go.

11                   MR. SOLOMON:  Thank you.

12                   MR. TENREIRO:  All right.  I'm

13           just going to read into the record while

14           Mr. Garlinghouse takes a look.  This is a

15           two-page email, RPLI_SEC 626652.

16   BY MR. TENREIRO:

17           Q.   Do you -- do you see this appears to be

18   an email from you to Mr. Larsen on November 11th,

19   2018?

20           A.   Yes.

21           Q.   Okay.  And you tell Mr. Larsen you're

22   planning to send              these points later

23   today.

24                Do you see that?

25           A.   Yes, I do see that.

1          Q.   Okay.   And it says "I've outlined some

2     key bullets that I believe capture the major

3     points for outreach to Eli."

4               Do you see that?

5                    MR. SOLOMON:   Did you read the

6          email?

7                    THE WITNESS:   Yeah, let me just

8          do a quick, full read of it.   Sorry.

9                    (Pause)

10         A.   Okay.   Can you repeat the question,

11    please?

12         Q.   Yes.

13              Do you see the part of the email that

14    says "I've outlined some key bullets that I

15    believe capture the major points for outreach to

16    Eli"?

17         A.   Yes.

18         Q.   Okay.   Does that refresh your

19    recollection that you did, in fact, write these

20    bullets?

21         A.   Certainly no.

22         Q.   Okay.   Do you have any reason to

23    believe, though, that what you told Mr. Larsen in

24    your email, where you say "I've outlined some key

25    bullets" is not true?

1        A.    Yes.

2        Q.    What is the reason?

3        A.    I -- I think my experience in how I work

4   with my team is that somebody on my team probably

5   put these together.

6        Q.    Okay.

7        A.    I -- I use the pronoun "I" in talking

8   about work that my team does.  I take credit for

9   their work all the time.

10       Q.    Got it.  Got it.

11             So, in fact, you took credit for these

12  bullets?

13       A.    Yes.

14       Q.    All right.  And you read them, right?

15       A.    I think it's almost certain that I would

16  have read them, yes.

17       Q.    Okay.  And you -- all right.

18             So going back to Exhibit 51, my question

19  was the third bullet talks about "All indications

20  have been that they do not believe that XRP is a

21  security." I asked you who "they" referred to.

22  And you said "I don't believe that I wrote the

23  sentence.  I think that the sentence seems to be

24  referring to all of the people referred to in the

25  previous sentence."

1          So is it your understanding that "they"

2    means the SEC staff, SEC Chair Clayton,

3    Commissioners Roisman and Pierce?  Is that your

4    testimony?

5          A.   Yes.

6          Q.   Okay.  And on what basis did you have a

7    belief that all of those people did not believe

8    that XRP was a security?

9          A.   Given the opportunity, none of them

10   chose to express to me they did believe XRP was a

11   security.

12         Q.   Anything else?

13         A.   As I've already testified, I think I do

14   have some recollections today of my conversations

15   with Roisman.  I don't recall anything specific in

16   my conversations with Commissioner Pierce and I

17   only had one meeting with Chair Clayton.

18          So sitting here today, I can't recall

19   other reasons why I may have said that.

20         Q.   Is there any document that might help

21   refresh your memory with respect to any other

22   reasons why you may have said this?

23         A.   I don't recall.

24         Q.   To the extent that your staff is the one

25   who wrote these bullet points, what information

1   did you give your staff so that they were able to

2   write a bullet point saying that all indications

3   have been that they do not believe XRP is a

4   security?

5       A.   I probably had contemporaneous verbal

6   conversations to debrief on various meetings.

7               MR. SOLOMON:   Would the SEC's

8          notes of these meetings refresh your

9          recollection perhaps?

10               THE WITNESS:   If the SEC has

11          notes about these meetings, that would be

12          super helpful.

13   BY MR. TENREIRO:

14       Q.   Wait a second.   Wait a second.   I'm not

15   talking about the meetings between the SEC.   I'm

16   talking about your meetings with your staff first.

17   That's what I'm talking about.

18       A.   Okay.

19       Q.   I would hope the SEC does not have notes

20   of those meetings.

21               Do you have notes of those meetings,

22   though?

23       A.   No.

24       Q.   Okay.   Do you have recordings of those

25   meetings?

 1          A.   No.

 2          Q.   Okay.  So you're saying these meetings

 3     were in person?

 4          A.   I believe you told me those meetings

 5     were in person.

 6          Q.   No.  I'm talking about your meetings

 7     with your staff, Mr. Garlinghouse.

 8          A.   Oh, I apologize.

 9          Q.   Were the --

10          A.   Let me -- yeah, let me back up.  I think

11     I misunderstood a number of those questions.

12     Maybe we should rewind for a moment.

13          Q.   Let's rewind.  I think you were telling

14     me that your staff might have drafted these bullet

15     points and I'm asking you what information you

16     gave them so that they were able to draft the

17     bullet points.  And so I think you said,

18     generally, that you had meetings with them and I'm

19     trying to understand where, when, how these

20     meetings occurred.

21               MR. SOLOMON:  Objection.

22          Q.   So were these meetings in person?

23               MR. SOLOMON:  Objection.

24          A.   So let me rewind just so I now have

25     clarification of the questions you're asking.

1          I expect, based upon my behaviors of how
2     I would operate, is after I left the meeting, I
3     would probably --
4          Q.   Sir, I'm going to stop you.  The meeting
5     with the SEC?
6          A.   Correct.
7          Q.   Okay.
8          A.   Well, with members of the SEC.
9          Q.   Uh-huh.
10          A.   I would have had a verbal conversation,
11     a telephone call, to debrief about, hey, just had
12     this meeting.  Here's how it went.  Here's a
13     couple bullets about it.
14          Q.   And who would that conversation have
15     been with?
16          A.   I mean, amongst others, it would have
17     included general counsel.  I -- I don't recall.
18          Q.   After your meeting with Commissioner
19     Roisman, who did you debrief?
20          A.   I don't recall.
21          Q.   Okay.  Mr. -- Commissioner Roisman
22     telling you his views that XRP was not a security
23     and apologizing to you, I think you described that
24     as -- as significant.  I think you said all the
25     meetings were significant, is that right?

1      A.   I did view all of the meetings with the

2   SEC as significant.

3      Q.   Okay.  So did you ask -- did you

4   memorialize that anywhere in writing, what he told

5   you?

6      A.   I don't recall.

7      Q.   Did you ask anyone to memorialize it in

8   writing?

9      A.   I don't recall.

10      Q.   Okay.  So can you tell me which of your

11   staff members wrote the drafts of these bullet

12   points?

13      A.   I don't recall.

14      Q.   Would they have taken notes --

15      A.   Just to clarify, I believe my testimony

16   was I don't recall who wrote these bullets.  I'm

17   not saying definitively I didn't or did.  I'm just

18   saying my experience is it's unlikely I wrote

19   these bullets.

20      Q.   To the extent that you did not, which of

21   your staff members would have, you know, given

22   past practice?

23      A.   I don't recall.

24      Q.   Well, just give me a list of staff

25   members that wrote bullets for you.

94

```
1              MR. SOLOMON:  For the entire time
2         he was at --
3              MR. TENREIRO:  Yeah.
4         A.   I mean, all of my direct reports at one
5    point or another would have drafted bullets for
6    me.
7         Q.   Okay.  Would your assistants have
8    drafted bullets for you, your administrative
9    assistants?
10        A.   Probably not.
11        Q.   Okay.  So when you talk about your
12   direct reports, you're talking, for example,
13   Ms. Long, as one example?
14             MR. SOLOMON:  Objection.
15        A.   Yes, that would be one example.
16        Q.   Mr. Schwartz was not your direct report,
17   at least in 2017?
18             MR. SOLOMON:  Objection to form.
19        A.   I don't recall when Mr. Schwartz started
20   reporting to me, but he would not have been
21   someone who is likely to have written bullets for
22   me.
23        Q.   Mr. Griffin was a direct report?
24        A.   Mr. Griffin in 2017 would have been a
25   direct report, yes.
```

1      Q.   Okay.  So is there anything other than

2   the absence of statements and the conversation

3   with Commissioner Roisman upon which you base all

4   indications that the staff and these commissioners

5   do not believe XRP is a security?

6              MR. SOLOMON:  Objection; asked

7      and answered.

8      A.   I don't recall.

9      Q.   Okay.  The next bullet says "Ripple is

10   seeking from the SEC to proactively make a

11   statement that XRP is not a security."

12              Do you see that?

13      A.   Yes.

14      Q.   Was that true at that time?

15      A.   I -- I don't recall, but I believe it to

16   be true based upon what's written here.

17      Q.   And then it references a speaking

18   engagement that the Chair had, a coming speaking

19   engagement in New York.  And a statement -- you

20   make a statement -- or the bullet makes a

21   statement about the opportune time for him to make

22   a statement such as "we continue to look carefully

23   at this developing landscape," et cetera.

24              Do you see that?

25      A.   I do see that.

1        Q.   Okay.  Did the Chair make this statement

2   at that public engagement?

3        A.   Not that I'm aware of.

4        Q.   Okay.  Did -- is -- was one of the

5   purposes of this email to          to suggest a

6   way in which to convince Clayton to make the

7   statement?

8        A.   Could you repeat the question?

9        Q.   Yeah.

10            Was the purpose -- was one of the

11   purposes of this email to sort of see if

12            could help in outreach to the Chair so

13   that he would make that statement on the public

14   engagement?

15            MR. SOLOMON:  Objection to form.

16        Q.   Perhaps to Eli or the Secretary of the

17   Treasury, but...

18            MR. SOLOMON:  Objection to form.

19        A.   I believe so.

20        Q.   Okay.  Okay.  Did -- did anyone at the

21   SEC proactively make a statement that XRP is not a

22   security after this date, as you describe it here?

23        A.   Not that I'm aware of.

24        Q.   Okay.  Why did you want the SEC to

25   make proactively --

1              MR. SOLOMON:  A -- a -- a public

2         statement?

3              THE WITNESS:  Oh, that's an

4         excellent clarification.

5              MR. SOLOMON:  No, I'm asking what

6         the question was.

7              MR. TENREIRO:  Well, I said

8         statement.

9    BY MR. TENREIRO:

10        Q.   Let's start with public.

11        A.   I'm unaware of a public statement.

12        Q.   Okay.  And private?

13        A.   After --

14        Q.   I'm talking about after this.

15        A.   Sorry.  Not of which I'm aware.

16        Q.   Okay.  All right.  Why did Ripple want

17   the Chair to make this statement?

18        A.   In making a statement about the status

19   of bitcoin -- at the time that -- I believe at the

20   time that Director Hinman made an affirmative

21   statement about the status of ETH, I believe XRP

22   was the second-most valuable digital asset ahead

23   of ETH.

24              In making this clarification and

25   statement, it was ETH performed better in the

1    markets and became more valuable than XRP.  Many

2    people in the XRP community were concerned about

3    the lack of clarity, including myself, and felt

4    that it was -- given the clarity that had been

5    provided to bitcoin and Ether and given that XRP

6    was one of the most important and valuable and

7    liquid digital assets, we felt that it was only a

8    step of responsibility -- to the extent the SEC's

9    mission is around orderly markets, I felt like the

10   SEC should seek to provide that clarity.

11        Q.   I -- I -- my question, though, is why

12   did Ripple want the Chair to make the statement?

13   Maybe the answer's in there and I just didn't

14   understand.  Why did the -- why would Ripple want

15   the Chair to make the statement?

16        A.   Ripple is one stakeholder, and an

17   important stakeholder, in the XRP ecosystem.  To

18   the extent that -- that public statements from the

19   SEC had not provided clarity -- and, in fact, some

20   would argue had actually added to confusion in the

21   crypto landscape -- we sought to provide that

22   clarity.

23        Q.   Okay.  And why did you seek to provide

24   that clarity?

25        A.   I think a community's interest in having

99

1    clarity about the laws in which they operate is

2    useful.

3         Q.   For what purpose?

4         A.   To follow the law.

5         Q.   Okay.  Anything else or any other

6    purpose?

7         A.   That would be the most important one, I

8    think.

9         Q.   And you said "in making this

10   clarification and statement, ETH performed better

11   in the markets."

12              Are you talking about -- what are you

13   talking about that it performed better?  Its price

14   went up?

15        A.   I -- to be fair, I don't remember

16   exactly.  At various times XRP has been by market

17   capitalization the second-most valuable digital

18   asset.  I was making an observation that there are

19   three -- at the time there were three that were

20   kind of above the rest of the noise in the crypto

21   market.  The SEC had provided clarity about two of

22   those top three and not provided clarity about the

23   third.

24              It's apparent, I believe, that Director

25   Hinman and Chair Clayton wanted to provide that

100

1    clarity around bitcoin and ETH, presumably,

2    because there wasn't clarity.  They made a public

3    statement.  They provided that clarity.  That

4    helps market participants in those -- those that

5    choose to participate in trading those digital

6    assets, speculating on those digital assets, to

7    provide that clarity.

8            The absence of that clarity around XRP,

9    which at the time was second or third in terms of

10   overall value in liquidity, seemed like it was

11   only in the market's interest, and I would assume

12   the SEC's interest, to provide that clarity.

13       Q.   When you say, though, X -- you said in

14   your prior answer, X -- XRP was one of the most

15   important assets.

16            How did you measure that importance?

17   Was it market --

18       A.   Liquidity and market cap.

19       Q.   Okay.  And market cap is measured by the

20   price and the units outstanding?

21       A.   That's how I calculate market cap.

22       Q.   I understand there's -- we'll probably

23   get to this later.  I understand you had some

24   conversations with people about whether the market

25   cap was based on the number of units that had been

101

1    created or the number of units that were in the

2    market.

3              But setting aside that sort of debate,

4    how do you measure market cap?

5        A.   I -- I was making a macro general

6    observation.  Regardless of how you measure market

7    cap --

8        Q.   Right.

9        A.   -- actually, let me just answer your

10   question.  How do I measure market cap?  Yes, I

11   measure market cap by multiplying price by number

12   of units.

13       Q.   Okay.

14             MR. SOLOMON:  When you're done

15        with this line of questioning, whenever

16        that is, it probably would be a good time

17        to take a break.

18             MR. TENREIRO:  Oh, okay.  Yeah.

19             MR. SOLOMON:  There's no --

20        whenever you're done.

21             MR. TENREIRO:  Just one -- one or

22        two more questions.

23   BY MR. TENREIRO:

24       Q.   Okay.  So -- so when you were saying

25   that XRP was one of the most important assets, the

102

1    measure of importance is the market cap or is

2    there any other measure?

3        A.   I think my testimony was I -- in my mind

4    there's multiple measures.  I think my testimony

5    was liquidity and market cap were two things that

6    make digital assets more prominent than others.

7        Q.   And so are you saying that XRP was one

8    of the most liquid digital assets at that time?

9        A.   Yes, I believe so.

10       Q.   Okay.  In the top three?

11       A.   I believe so.

12       Q.   Okay.  And just -- again, I'm trying to

13   understand.  When Hinman -- when Director Hinman

14   made statements about ETH, you -- your view was

15   that ETH performed better in the markets and

16   became more valuable than XRP.

17            So are you referring there to the market

18   cap? to the price?  What were you referring to

19   there that it became more valuable than XRP?

20       A.   Well, I'm probably referring to the same

21   components that I was referencing earlier.  It

22   probably became more liquid.  It probably became

23   more valuable in price.

24       Q.   Okay.  And how do you measure liquidity?

25       A.   I tend to use CryptoCompare or

103

1   CoinMarketCap as reporting mechanisms for overall

2   liquidity in the crypto landscape.

3        Q.   Does it have -- do those have a page

4   that report liquidity?

5        A.   Yes.

6        Q.   Okay.

7        A.   Actually -- yes.

8        Q.   What -- what -- what measure -- what's

9   the -- what's the measure for liquidity that they

10  use?

11            MR. SOLOMON:  Are you talking

12       about today?

13            MR. TENREIRO:  Sure.  Today.

14       A.   Dollar volume.

15       Q.   Volume is a measure for liquidity?

16       A.   Yeah.

17       Q.   Okay.  That's -- your understanding of

18  liquidity is volume?

19       A.   One measure of liquidity is trading

20  volume.

21       Q.   Why don't you tell me what your

22  understanding of liquidity in the market means.

23       A.   I believe that liquidity in a market

24  from my point of view is -- one of the measures is

25  how much is trading.

1          Q.    And you don't understand that to be

2     volume?

3          A.    I think I just said that.  I apologize.

4     Yes, I understand that to be volume.

5          Q.    So liquidity and volume are the same?

6                MR. SOLOMON:  Objection.

7          A.    I think my testimony was I think one

8     important input into liquidity is volume.

9          Q.    Okay.  Do you understand liquidity to be

10    the existence of willing buyers and the existence

11    of willing sellers?

12                MR. SOLOMON:  Objection to form.

13         A.    I think that's a fair description.

14         Q.    Okay.  Where did you derive your

15    understanding of what liquidity in the market

16    means?

17         A.    I don't recall.

18         Q.    Did you have experience in financial

19    markets before you joined Ripple?

20         A.    I mean, frankly, it depends how you

21    define financial markets, I guess.

22         Q.    What --

23         A.    I was an active trader in public

24    securities.  I had spent time at venture capital

25    firms.  I received my MBA from Harvard.  So I -- I

1    felt educated about generally how markets work and

2    how to think about liquidity.

3         Q.   Okay.

4              MR. TENREIRO:  Why don't we take

5         a break.

6              THE VIDEOGRAPHER:  Okay.  Going

7         off the record at 9:51.

8              (Whereupon, a recess is taken.)

9              THE VIDEOGRAPHER:  Okay.  Back on

10        the record, 10:10.

11             Go ahead.

12             MR. TENREIRO:  Okay.  Thank you.

13   BY MR. TENREIRO:

14        Q.   Mr. Garlinghouse, who is ███████████?

15        A.   ███████████ in the context of Ripple is

16   a -- I guess simplistically defined as a legal

17   advisor.

18        Q.   Okay.  Outside of the context of Ripple,

19   who is he?

20        A.   I certainly don't know that I can do a

21   robust job of biography, but I believe he's been a

22   practicing criminal attorney and teaches law at

23   ████████████████████  in some construct.  He also, I

24   think, is a legal advisor employed by ██████████

25   ████████████

106

1        Q.   Okay.  And so in the context of Ripple,

2   you said he's a simplistically defined legal

3   advisor?

4        A.   I think that's a fair characterization,

5   yes.

6        Q.   When was he hired as a legal advisor?

7        A.   Sometime in the summer of 2018.

8        Q.   Who decided to hire him?

9        A.   I'd say Chris Larsen decided to hire

10  him.

11       Q.   For what purpose was he hired?

12            MR. CERESNEY:  I'm going to

13        instruct the witness to answer at a high

14        level and not to get into any details.

15       A.   To be a legal advisor.

16       Q.   Was he advising with -- was he supposed

17  to advise with respect to the federal securities

18  laws?

19       A.   I would say he was advising on all

20  matters associated with reg -- the SEC's -- yes, I

21  guess.  Yes, I should say.  Yes.

22       Q.   The SEC's what?

23       A.   I don't know what I was going to say so

24  I stopped.

25       Q.   That's okay.

1            So he was advising on all matters

2    related to the SEC?

3         A.   And others.

4         Q.   What are the others?

5         A.   I think that would definitely encroach

6    on attorney-client privilege.

7         Q.   No, I'm not asking you to -- I'm asking

8    you, was he advising you with respect to labor

9    law?

10        A.   He may have.  I don't recall

11   specifically.

12        Q.   Okay.  What other subject areas of law

13   was he a legal advisor for?

14        A.   I --

15             MR. CERESNEY:  Hold on.  Hold on.

16        You know, I want to be sensitive here.  He

17        was a legal advisor to the company.  He

18        was retained as a lawyer.  He's already

19        said he's -- he's advised the company in

20        connection with the SEC.

21             What else is relevant to this

22        proceeding?

23             MR. TENREIRO:  I don't think

24        there's a relevance issue here.  I'm just

25        asking what he was retained --

108

BY MR. TENREIRO:

1

2      Q.   Was there a retention letter?

3      A.   I don't recall.

4      Q.   Okay.  Did -- so Mr. Larsen made the

5  decision to hire him.  Did you have to approve the

6  decision or...?

7      A.   I implemented the decision.

8      Q.   Okay.  How did you implement it?

9      A.   He was compensated, and by virtue of

10  being compensated, he -- his engagement with the

11  company needed to be implemented and to some

12  degree integrated into our operational -- you

13  know, he hears legal matters of which we would

14  seek his counsel.

15      Q.   Okay.  So you don't recall if there was

16  a retention letter but there was some

17  compensation?

18      A.   I would --

19           MR. SOLOMON:  Objection to form.

20      A.   I believe there's likely some sort of

21  engagement letter with Mr. ████████  I don't recall

22  specifically.

23      Q.   Okay.  Let's take a look at Exhibit 53,

24  please.

25           (Whereupon, exhibit is received

1              and marked Garlinghouse Deposition

2              Exhibit 53 for identification.)

3    BY MR. TENREIRO:

4         Q.   While they pull it up, was he on

5    Ripple's board at any time?

6         A.   Board of directors?

7         Q.   Uh-huh.

8         A.   No.

9         Q.   And do you know -- do you know who

10   Mr. ██████████ is? ████████████████

11              MR. CERESNEY:  Do we have --

12              MR. TENREIRO:  One second.

13        A.   I do not.

14        Q.   Okay.  That's fine.

15             All right.  Here we go, 53.  And this is

16   a multipage email with Bates 971415, RPLI.  Most

17   of it is redacted.  The front page is what I'm

18   going to ask you about.

19        A.   Okay.

20        Q.   This appears to be an email from you on

21   December 13, 2018, to ████████████████ and Monica

22   Long.  Subject "Re:  Clayton."

23             Do you see that?

24        A.   Yes.

25        Q.   Who is ████████████████?

1       A.       ████████████ --

2                MR. SOLOMON:  Did you read the

3       email?

4                THE WITNESS:  I have not read the

5       email.

6       Q.   Oh.  Read it, please.

7                THE WITNESS:  I thought I --

8                MR. SOLOMON:  Sorry.  Sorry.

9       Yeah.  Just read it.  Everything he hands

10      to you, just read it first.

11               THE WITNESS:  Okay.

12      A.   Okay.  ████████████ is currently SVP

13      of communications and people at Ripple.

14      Q.   And what about around the time of the

15      email, December 18 -- December 2018?

16      A.   I don't know when she became a full-time

17      employee top of mind.  Prior to Ripple, she was a

18      principal at a public relations firm -- a public

19      relations firm called ████ and Ripple used ████

20      as our outside PR firm.

21      Q.   Okay.  And when did you meet her?

22      A.   Oh, my gosh.  I met ████ in 2004

23      probably.

24      Q.   Under what circumstances?

25      A.   We both worked at ████

1      Q.   Okay.  Here she refers to ███

2           Do you see that?

3      A.   I do see that.

4      Q.   And what is ███

5      A.   I do not know.

6      Q.   The ██████ website?

7      A.   I have no idea.

8      Q.   Okay.  It says "An update here on

9   outreach and plan of attack.  I've reached out to

10  both ███ (reporter and his editor) to correct the

11  below.  They are in Hong Kong so we're also

12  tracking down phone numbers so I can follow up

13  with a phone call."

14          Do you see all that?

15     A.   Yes.

16     Q.   And then there's a reference to ██████

17  and there's a request to correct some -- something

18  or -- as well.

19          Do you see all that?

20     A.   Yes.

21     Q.   What is she trying to correct?

22     A.   I don't recall.

23     Q.   Okay.  The subject of the email is "Re:

24  Clayton."

25          Do you see that?

1     A.    Yes.

2     Q.    Okay.  Was there a -- was there a point

3  in time where Ripple became aware that there might

4  be a publication claiming that the SEC had

5  determined that XRP was a security and seeked

6  to -- and sought to correct that publication?

7     A.    I don't recall.

8     Q.    Okay.  It says "We're also drafting a

9  suggested tweet for Brad to post."

10          Do you see that?

11    A.    I do see that.

12    Q.    Okay.  Did you make a tweet after the

13 draft reflected in this email?

14    A.    I don't recall.

15    Q.    Okay.  And did Ms. ███████ --

16 Ms. ███████ frequently draft tweets for you to

17 make?

18    A.    Depends how you define "frequently."

19 And I don't recall in 2018 how frequently that may

20 have happened.

21    Q.    Did others at Ripple draft tweets for

22 you to make while you were CEO of Ripple?

23    A.    While I was CEO?

24    Q.    Yes.

25    A.    Yes.

1      Q.   And Monica Long was copied.  What was

2  her role at this time?

3      A.   In 2018 I believe she was SVP -- or VP

4  of marketing.

5      Q.   Okay.  Did she draft tweets for you to

6  make?

7           THE REPORTER:   I'm sorry?

8      Q.   Did she draft tweets for you to make

9  while you were CEO?

10     A.   Not that I recall.

11     Q.   So to the extent others at Ripple

12  drafted tweets, who would the others be?

13  Ms.          Who else?

14     A.   Under what period of time?

15     Q.   While you were CEO.

16     A.   So during my tenure as CEO,

17           would be on that list.          would

18  be on that list.  Other people on the Ripple

19  communications team would have participated as

20  well.

21     Q.   Did you typically, just generally

22  typically, when they drafted a tweet, did you --

23  did you actually tweet those tweets?

24     A.   Sometimes.

25     Q.   Okay.  Were there times when you did

114

1    not?

2         A.   Yes.

3         Q.   Okay.  What was the result of her

4    outreach to ▇▇▇ and the reporter, the editor and

5    the chief tech correspondent for ▇▇▇▇▇▇▇?

6              MR. SOLOMON:  Objection to form.

7         A.   I don't know.

8         Q.   Okay.  We can set that aside, although

9    we should definitely keep the exhibits somewhere

10   in case we need to go back to them, but I'm done

11   with them now.

12             So, Mr. Garlinghouse, other than this

13   litigation, are you a party to any action

14   currently?

15             MR. SOLOMON:  Do you understand

16        the question?

17        A.   Yeah.  Could you --

18        Q.   A party in a lawsuit.

19        A.   I believe, yes.

20        Q.   What lawsuit or lawsuits?

21        A.   Is -- is that a question of me

22   individually or me as CEO of Ripple?

23        Q.   You in -- well, you, Mr. Garlinghouse.

24        A.   Right.  The distinction I'm making is

25   you're -- the SEC is suing Ripple.  I'm the CEO of

1    Ripple.  You're also suing me personally.  I

2    believe the answer is yes.

3         Q.   What lawsuit or lawsuits?

4         A.   I -- I would need to get clarity from

5    counsel to answer that with certainty.

6         Q.   Let's not -- let -- we'll use -- is

7    there a pending class action involving Ripple?

8         A.   Yes.

9         Q.   Okay.  Are you named in that class

10   action?

11        A.   I believe, yes.

12        Q.   Okay.  And was the first class -- there

13   was a series of class actions filed, correct?

14              MR. SOLOMON:  Objection to form.

15        A.   I believe that's correct.

16        Q.   And consolidated into one?

17              MR. SOLOMON:  Objection to form.

18        A.   I believe that's correct.

19        Q.   Okay.  And that -- I'll just refer to it

20   as the class action pending in California, is that

21   right?

22              MR. SOLOMON:  Objection, form.

23        A.   I don't know.

24        Q.   Okay.  And the class action was filed

25   when, the first one?

1          A.   I don't recall.

2          Q.   Was there an allegation in the class

3     action that you committed fraud?

4          A.   I don't recall.

5          Q.   Okay.  And the class action is filed by

6     a group of XRP holders, is that right?

7                    MR. SOLOMON:  Objection to form.

8          A.   My vague recollection is it was filed by

9     one XRP holder to begin with and I don't know if

10    others have joined.  I don't understand the

11    nuances of how class actions work.

12         Q.   Do you have counsel that represents

13    Ripple with respect to that class action?

14         A.   Yes.

15         Q.   What's the law firm?

16         A.   I don't know.

17         Q.   Okay.  How often do you meet with them

18    about that lawsuit?

19         A.   I am not aware that I've -- I don't

20    recall.

21         Q.   Okay.  Are you, Mr. Garlinghouse,

22    represented by counsel in connection with that

23    class action?

24         A.   Not to my knowledge.

25         Q.   Okay.  The class action is pending,

```
 1    right?
 2         A.   As far as I'm aware.
 3         Q.   Okay.  And I don't want to get into
 4    advice, the substance of advice, but you've
 5    received advice about that lawsuit, correct?
 6         A.   I suppose, yes.
 7         Q.   Ripple has received advice as well?
 8         A.   Yes.
 9         Q.   Okay.  And that class action alleges
10    that Ripple engaged in unregistered offers and
11    sales of securities, correct?
12              MR. SOLOMON:  Objection to form.
13         A.   I don't know.
14         Q.   Okay.  And you have never moved to
15    dismiss that claim in the class action, correct?
16              MR. SOLOMON:  Objection; form.
17         A.   I don't know.
18         Q.   Okay.  Did Ripple continue to sell XRP
19    after that lawsuit was filed?
20         A.   I -- I believe, yes.  I don't know
21    exactly when that was filed, so if you could help
22    me with specifics, I would -- could be more
23    precise.
24         Q.   I don't have the exact date, but my
25    understanding is the first one was filed on or
```

1    around April of 2018.  And your counsel probably

2    remembers better than I do.

3         A.    Then, yes.

4         Q.    Okay.  And did you continue to sell XRP

5    after that lawsuit was filed?

6         A.    Yes.

7         Q.    Did you rely on legal advice to do that?

8         A.    I don't recall.

9         Q.    Did Ripple rely on legal advice to sell

10   XRP after the lawsuit was filed?

11        A.    I don't recall.

12        Q.    Okay.  Is it fair -- well, did you learn

13   of -- how did you learn of the class action

14   lawsuit?

15        A.    I don't recall.

16              MR. SOLOMON:  Objection.

17        Q.    Okay.  Do you recall learning of it

18   around the time it was filed?

19              MR. SOLOMON:  Objection; form.

20        A.    Or did you come to find out at some

21   point that it had been pending for months and you

22   just found out about it?

23              MR. SOLOMON:  Objection; form.

24        A.    I doubt that it's the latter and very

25   likely the former.

[9/20/2021] Garlinghouse, Bradley 9.20.2021

1      Q.   Okay.  When did you first hire

2   Mr. Ceresney?

3      A.   Around the summer of 2018.

4      Q.   Okay.  Earlier this morning we talked

5   about how there was an SEC letter that either you

6   received or Ms. ▮▮▮▮ or whomever in the late

7   spring of 2018, is that correct?

8      A.   I believe that was my testimony.

9      Q.   Okay.  Is that the first time that you

10   heard about the SEC's, you know -- I call it an

11   investigation; I understand you have your own view

12   of it -- but the SEC's reach out to Ripple?  Is

13   that the first time you learned of it?

14      A.   Yes.

15      Q.   Okay.  And did you become aware that the

16   SEC had asked Ripple to preserve documents in

17   connection with the inquiry?

18      A.   Yes.

19      Q.   Okay.  Did you follow these directives?

20      A.   Yes.

21      Q.   Okay.  Did Ripple have a document

22   retention policy at any point in time since --

23   well, since you've been working there?

24      A.   I believe so.

25      Q.   And what is the document retention

120

1    policy?

2         A.   I don't recall.

3         Q.   Who drafted it?

4         A.   I don't know.

5              MR. SOLOMON:   Separate and apart

6         from any document retention policy in

7         connection with a pending litigation

8         you're asking him?

9              MR. TENREIRO:   That's right.

10             MR. SOLOMON:   Okay.

11             MR. TENREIRO:   I'm going to

12        get -- Matt's in my head today and he's

13        right every time.   I'm going to -- I'm

14        going to ask about that in a second.

15             MR. SOLOMON:   Okay.

16   BY MR. TENREIRO:

17        Q.   So just generally, document -- corporate

18   document retention policy, your testimony is you

19   believe there is -- there's been one at some point

20   in time; don't recall who drafted it.

21             Have you read it?

22        A.   I expect I have.

23        Q.   And when?

24        A.   I don't recall.

25        Q.   Where is it stored?   Maybe I should ask,

1    is it a written policy?

2        A.    I believe it's a written policy and I

3    would expect that it's in the employee handbook.

4        Q.    And it was given to employees -- was the

5    employee handbook handed out to employees when

6    they begin to work the company?

7        A.    Well, I guess I should clarify.  When we

8    say it's written, I'm not sure that we have ever

9    printed the employee handbook.  I think when

10   you're -- when you join the company, I believe we

11   share various things like code of conduct; like a

12   handbook that I expect would likely, to your

13   question, include a document retention policy.

14       Q.    Okay.  But sitting here today, you

15   just -- you don't -- you don't know who wrote it,

16   for example?

17       A.    That's correct.

18       Q.    Okay.  Do you have any specific

19   recollection of the retention policy?

20       A.    No.

21       Q.    Do you know generally what the retention

22   policy says?

23       A.    No.

24       Q.    Okay.  Now, in connection with the

25   lawsuit, the -- the class action lawsuit, was

122

1    there a document retention policy implemented by

2    the company?

3        A.    I believe so.

4        Q.    Okay.  And what did it provide?

5        A.    I don't know specifically.

6        Q.    Is that in some sort of -- is that

7    documented, maybe not printed, but documented in

8    some form of, you know, electronic record?

9        A.    I believe so.

10        Q.    And where is that record stored?

11        A.    I believe it's stored somewhere in

12    Ripple's data infrastructure.

13        Q.    Ripple's data infrastructure?  What is

14    Ripple's data infrastructure?

15            MR. SOLOMON:  Don't guess.  If

16        you know where it's stored, tell him.  If

17        you don't know where it's stored, say you

18        don't know.

19        A.    I don't know.

20            MR. SOLOMON:  I don't want to

21        waste time with these questions if you

22        don't know.  If you do, say so.

23        A.    The -- the distinction I was making in

24    describing Ripple's data infrastructure, my

25    recollection is that when Ripple sends a document

1    hold -- when Ripple's legal team sends a document

2    hold, I believe it's in a Google Doc form and it's

3    collected as a Google form.

4            So when I describe Ripple's data

5    infrastructure, I'm being inclusive of

6    infrastructure that we may not -- it may not be

7    our servers.  I would include Ripple -- sorry,

8    Google's data infrastructure in that context for

9    us to have some license.  I don't know the

10   relationship there, but I believe that the data

11   you are asking about would be stored on a Google

12   Doc somewhere.

13       Q.   Maybe Google Drive that the company

14   accesses, for example?

15       A.   That's my best guess.  I don't know.

16       Q.   Okay.  Is it -- just -- your best

17   recollection is that it might be in some sort of

18   Google Doc, a document hold that the -- that the

19   legal team sends.

20            Do you know why it's a Google Doc?  Are

21   people able to sort of check that they read it or

22   is there any other reason?

23            MR. SOLOMON:  Objection; form.

24       Q.   Is there any reason, sorry, that it's a

25   Google Doc that you know of?

124

```
 1              MR. SOLOMON:  Objection; form.
 2         A.   I don't know.
 3         Q.   Okay.  Did -- and let me just go back.
 4              Did the company implement a document
 5    retention policy after -- or with respect to the
 6    class action?
 7         A.   Sorry.  Could you repeat the question,
 8    please?
 9         Q.   Yes.
10              Did the company implement a document
11    retention policy with respect to the class action?
12         A.   You mean a document hold?
13         Q.   A document hold.
14         A.   Thank you.  Yes.
15         Q.   What did it provide?
16         A.   I don't recall.
17         Q.   Did you -- but you read the whole thing?
18         A.   I believe I received that and I believe
19    I would have reviewed it, yes.
20         Q.   Did you follow it?
21         A.   Yes.
22         Q.   Okay.  And did the document -- did the
23    company implement a document hold policy with
24    respect to the SEC's letter?
25         A.   Yes.
```

1          Q.   Okay.  And what did that provide?

2          A.   I don't recall.

3          Q.   Okay.  Who -- do you know who drafted

4     the hold?

5          A.   I do not.

6          Q.   And where is that hold -- where is it?

7     Is that also -- where is the document?

8          A.   I don't know.

9          Q.   Okay.  Did you abide by that hold?

10         A.   Yes.

11         Q.   Okay.  You used a messaging app called

12    Signal, right?

13         A.   Yes.  I use, current tense, as well.

14         Q.   When did you start using it?

15         A.   I don't recall when I was first

16    introduced to Signal.  I -- I expect it predated

17    my experience at Ripple, but I used it while at

18    Ripple, also.

19         Q.   Ripple didn't give you, like, a company

20    phone, right?

21         A.   Not when I joined.

22         Q.   Do you have one now?

23         A.   I guess you could describe it as a

24    Ripple phone, yes.

25         Q.   What do you mean, "you could describe it

1    as a Ripple phone"?

2         A.   It's actually provided by a third-party

3    security firm that Ripple contracts to improve the

4    security posture that Ripple has on the company

5    from bad actors.

6         Q.   Do you have a separate personal phone

7    other than that phone?

8         A.   No.   My -- my hesitation there is I do

9    have more than one phone.   I use my Ripple phone

10   which is provided by a third-party security firm

11   as my primary phone.

12        Q.   You have another phone device?

13        A.   I have more than one, yes.

14        Q.   How many?

15        A.   I would say I have three phones and a

16   Google Voice number.   So maybe four phone numbers.

17        Q.   Phone -- four phone numbers, but three

18   devices?

19        A.   Yes.

20        Q.   Are they all Apple?

21        A.   Yes.

22        Q.   Okay.   And is Signal installed on all

23   three of them?

24        A.   I don't know.

25        Q.   Is Signal installed on the phone you

1   have with you now?

2       A.  I don't have a phone with me right now.

3       Q.  Okay.  Is Signal installed on the phone

4   that you're going to go to when you leave here

5   today?

6       A.  Yes.

7       Q.  Okay.  And which one is that phone?  Is

8   that the Ripple one, the one that Ripple --

9       A.  Oh, yeah.  Yes.  My primary phone that I

10  consider my, you know, 99 percent use case phone

11  is a -- my personal phone, my Ripple phone, it's

12  provided by a third-party security firm for

13  various security management.

14      Q.  And that -- and Ripple pays for that

15  phone?

16      A.  Yes.

17      Q.  Okay.  So my questions are going to

18  focus on that phone for the moment.

19          When did you install Signal on that --

20  on that phone?

21      A.  Well, to be precise in answering the

22  question, I got a new phone within the last 60

23  days and I reinstalled all of the apps that I'd

24  had.  And so --

25      Q.  When did you first install the app in

1    your Ripple phone?  I understand that it, you

2    know, moves along when you get a new phone.

3        A.    Yeah.  Well, my -- you're asking

4    specific to my Ripple phone.  I would have

5    installed Signal when I first got the Ripple

6    phone.

7        Q.    Which was when?

8        A.    Probably the summer of 2017.

9        Q.    Okay.  Why did you install it?

10        A.    I was using it prior to that and I was

11   using -- I was getting a new phone and I was

12   switching phone numbers at the time.  And so I was

13   kind of re-establishing the same applications I

14   had on my old phone, old phone number, to a new

15   phone.

16        Q.    When did you first install -- install

17   Signal on your old phone?

18        A.    I don't recall.

19        Q.    For what purpose did you install Signal?

20        A.    To communicate with people.

21        Q.    Any other purpose?  Any other reason?

22   Sorry.  Any other reason that you installed it?

23   Did you like that app better than others, you

24   know?

25        A.    You know, Signal particularly -- you

1    know, I was using it before I joined Ripple, but I

2    probably started using it more at Ripple.  I think

3    a lot of people in the crypto industry use Signal.

4    It's, I think, viewed -- fairly or unfairly -- as

5    more secure and more private.

6         Q.   What about Telegram?  Why not Telegram?

7    You know, what's the difference?

8         A.   I've never used Telegram to my knowledge

9    so I don't have a comparison.

10        Q.   All right.  Did you clear your use of

11   Signal with any counsel?

12             MR. SOLOMON:  Objection; form.

13        A.   My use of Signal predates my employment

14   at Ripple and so I doubt that I would have reached

15   out to personal counsel to use a messaging app.

16        Q.   You understand that messages on Signal

17   are ephemeral?

18        A.   I'm aware that messages on Signal can be

19   set to disappear.

20        Q.   Okay.  And when did you become aware of

21   that?  I'm sorry, who told you about the existence

22   of the app or how did you find out?

23        A.   I -- I don't recall.

24        Q.   Okay.  When did you become aware that

25   messages on Signal can be set to disappear?

130

1          A.   I expect when I first started using it.

2          Q.   Okay.  And did you set your messages to

3     disappear when you first started using it?

4          A.   Yes.  I -- I've always taken the point

5     of view that I'm going to set it on the longest

6     time period of expiration so that I don't forget

7     things.  But I -- so I generally set it at the

8     one-week interval.

9          Q.   That's the longest period of expiration?

10         A.   It was, I -- I think, until very

11    recently, it was the longest period of expiration.

12         Q.   Okay.  And what is it now?

13         A.   I think it may now be four weeks.

14         Q.   And is it fair to say that you can have

15    on Signal conversations only with other Signal

16    users?

17         A.   I believe that's correct.

18         Q.   And can you have group chats on Signal?

19         A.   Yes.

20         Q.   Okay.  And is it correct -- is my

21    understanding correct that if I have a

22    conversation with you on Signal and I set it to

23    auto delete in one day and you set it in one week,

24    it deletes in one day?

25         A.   That's correct.

131

1      Q.   Okay.  But --

2      A.   But that's my understanding.

3      Q.   Right.

4           You're saying that your recollection is

5   for your setting it was typically one -- a

6   one-week setting, is that right?

7      A.   Correct.  As you described, either party

8   can set the expiration of a message.  You can't

9   override the other person.  It goes to whatever is

10  set for the -- whoever sets the shortest duration.

11     Q.   Shorter.

12     A.   It uses that setting.

13     Q.   And do you have -- how many Signal

14  accounts do you have?

15     A.   I'm not even sure I understand the

16  question.

17     Q.   Well, do you have more than one login?

18     A.   It's my understanding that Signal -- in

19  order to authenticate on Signal, it's by a phone

20  number.  I use one -- I mean, is your question do

21  I use Signal on my other phones?  I think you

22  answered that -- or asked that.  I don't use

23  Signal on my other phones.  To my knowledge, it's

24  not installed there.

25     Q.   Okay.  So just one account, one phone,

132

1   that you associate with Signal?

2       A.   Yes.

3       Q.   Okay.  What setting -- what auto delete

4   setting do you have on the app now?

5       A.   I -- I prob -- I set one week typically.

6       Q.   Okay.  And did you -- have you at any

7   time discussed, you know, your employment --

8   things related to your employment at Ripple on

9   Signal?

10      A.   Yes.

11      Q.   Have you at any time discussed XRP on

12  Signal?

13      A.   I suspect at some point I have, yes.

14      Q.   Who do you communicate with on Signal?

15      A.   I'd say about 95 percent of my activity

16  on Ripple is either communicating with my

17  executive assistant or communicating with the

18  security team within my work.

19              MR. SOLOMON:  You said "on

20      Ripple."

21              THE WITNESS:  Oh, sorry.

22              MR. SOLOMON:  No, and I didn't

23      mean to scare you.  I just want to make

24      sure you're answering his question.

25              MR. TENREIRO:  Yes, that was very

1          confusing to me as well.

2     BY MR. TENREIRO:

3          Q.   Let me -- let me -- so I didn't ask --

4     ask the best question.

5               So on Signal -- let's -- let's take it

6     step by step.

7               Do you talk to friends and family

8     members on Signal?

9          A.   Yes.

10         Q.   Okay.  Set those aside.

11              Do you talk to coworkers on Signal?

12         A.   Yes.

13         Q.   Okay.  Now back to the friends and

14    family members.

15              Do you discuss Ripple or XRP with them?

16    Have you ever discussed Ripple or XRP with them on

17    Signal?

18         A.   I suspect at some point I have, yes.

19         Q.   Have you ever discussed the --

20    conversations with the SEC on Signal?  Still

21    focused on family and friends.

22         A.   Not to my knowledge.

23         Q.   Okay.  Now coworkers.  What coworkers do

24    you chat with on Signal about anything?

25         A.   So when I misspoke a moment ago, what I

134

1  was describing is about 95-plus percent of my

2  Signal activity consists of communication with

3  either my executive assistant or the security team

4  that -- with whom I work.

5      Q.   Is the security team, generally

6  speaking, related to safeguarding your XRP or

7  Ripple's XRP or something else?

8      A.   Physical security, kind of all aspects

9  of security associated with my position as CEO of

10  Ripple.

11      Q.   Okay.  And the not 95-plus percent of

12  communications, who are they with?

13      A.   I mean, I don't have a list available

14  off the top of my head.  You know, certainly a lot

15  of crypto people use Signal.  So if I'm

16  communicating with other members of the crypto

17  community at other companies, a lot of those

18  messages would be via Signal.

19      Q.   Right.  So I was going to get to that

20  third bucket.

21      A.   Okay.

22      Q.   But right now I'm focused on coworkers

23  at Ripple.  So you said that for the 95 percent,

24  executive assistant or security team, but I'm

25  focused on that -- the not 95 percent.

1          What are -- who are those conversations

2     with that you've had on Signal?

3                MR. SOLOMON:  Who today?  Who

4          during the time?

5                MR. TENREIRO:  Who during the

6          time period I mean.

7                MR. SOLOMON:  The entire time

8          period?  Okay.  Generally what you

9          remember during the entire time period.

10    BY MR. TENREIRO:

11         Q.   Who at Ripple have you communicated on

12    Signal?  You've told me your executive assistant

13    and executive team.

14         A.   I've communicated with Chris Larsen on

15    Signal.  I've communicated with Asheesh Birla on

16    Signal.  I've communicated with Monica Long on

17    Signal.  I don't recall communicating with Patrick

18    Griffin, but I probably have communicated with

19    Patrick Griffin on Signal.  I don't recall

20    communicating with David Schwartz on Signal.  You

21    know, I mean, as we go through -- I've

22    communicated with ▇▇▇▇▇▇▇▇▇▇ on Signal.

23    I've communicated with ▇▇▇▇▇▇▇ on Signal.

24          In general, I think many employees at

25    Ripple know that I use Signal and they know that

1     I'm quite responsive.  And so to the extent they

2     are trying to reach me about something, they know

3     that Signal's a good way for me to be responsible

4     in that regard.

5          Q.   And how do they know that?

6          A.   Experience.

7          Q.   So, like, did you ever tell anyone that

8     you might be more responsive if they reach out to

9     you on Signal and then the word of mouth got out

10    or --

11         A.   I don't recall specifically, but I

12    think -- I don't hide the fact that I use Signal

13    from the team.  And so people know that I use it

14    and they -- you know, trial and error.  They -- if

15    they send me a Slack message, sometimes I may not

16    reply for days.  If they send me a Signal message,

17    I'm more likely to be responsive.

18         Q.   Did you ever -- of these people you

19    recall communicating with, the communications were

20    messages, right, not phone calls?

21         A.   Both phone calls and messages.

22         Q.   Can you have phone calls using the

23    Signal app?

24         A.   Yes.

25         Q.   Sort of like WhatsApp, you can have a

137

1    message -- are you familiar with the app WhatsApp?

2        A.   I am.

3        Q.   Okay.  With WhatsApp you can call

4    someone or send them a message, correct?

5        A.   I believe so.

6        Q.   So that's the same on Signal?

7        A.   Yes.

8        Q.   Okay.  Are the records of the phone

9    calls also -- do they also auto delete on Signal?

10       A.   I don't believe so.  I don't know to be

11   honest.

12       Q.   Like the call log?  You know what I

13   mean?

14       A.   Yeah, I -- I believe the call log is

15   maintained.

16       Q.   Okay.  But when you -- just to be clear,

17   you -- you said you communicated with Larsen,

18   Birla, Long, Griffin -- actually, you said I don't

19   recall Griffin, but probably.

20            To the extent you communicated with

21   those people, it was on Signal, both phone calls

22   and messages?

23            MR. SOLOMON:  Objection; form.

24       A.   I believe at one point or another I may

25   have had phone calls with all of those people.

1    And to make sure I'm being clear, I don't view

2    that list as exhaustive --

3         Q.   Sure.

4         A.   -- because I don't have a list of all

5    the Ripple employees.  But --

6         Q.   Absolutely.

7         A.   Okay.

8         Q.   I'm just trying to make sure that it was

9    messages and phone calls that you recall.

10        A.   Yes.

11        Q.   And did you discuss -- in these, you

12   know, conversations, did you discuss, for

13   example -- did you discuss Ripple business?

14        A.   Yes.  At some point I'm sure with all of

15   those people I would have discussed Ripple

16   business.

17        Q.   And what about XRP?

18        A.   During some period of time, yes.

19        Q.   Okay.  What about conversations with the

20   SEC?

21        A.   I didn't have any conversations with the

22   SEC via Signal.

23        Q.   Did you discuss with those people

24   conversations that the company was having with the

25   SEC?

1          A.    I don't recall.

2          Q.    Okay.  What about -- so now we've talked

3     friends and family, coworkers.  Now other parties,

4     third parties.

5                Did you discuss -- did you have

6     communications on Signal with GSR?

7          A.    Yes.

8          Q.    Go ahead.

9          A.    One particular person at GSR.  To my

10    knowledge, I only communicated with

11         Q.    Uh-huh.

12                Before I get to              did you ask

13    any of the Ripple employees to communicate with

14    you via Signal?  Did you affirmatively ask them to

15    do that?

16         A.    I -- I don't recall specifically.  I'm

17    sure that there's times when I -- people are aware

18    that I respond to -- I think people know that I

19    communicate regularly with my assistant and the

20    securities team and I'm in communication with them

21    frequently.  And so I think they know that.  And I

22    certainly expect at some point I've said, Hey, you

23    know, send me a message on Signal.

24         Q.    I see.

25                Did you -- what about with Mr. Larsen?

1    Did you ask -- did you suggest to him that he

2    install the app or did he have it before you?

3          A.   I don't recall.

4          Q.   Okay.  Okay.  Now back to third parties.

5               So you communicated -- it seems like you

6    remember communicating with Mr. ████ about -- on --

7    on Signal, correct?

8          A.   Yes.

9          Q.   And generally what were those

10   communications about?

11         A.   GSR -- I -- I used GSR to sell some XRP.

12   We would share via Signal wallet information to

13   securely -- make sure that various transfers were

14   done securely.

15         Q.   So you discussed sales of XRP with

16   Mr. ███?

17         A.   No.  I don't recall speaking of sales.

18   I recall speaking of the -- the logistics of

19   administering movement of XRP through Signal.

20         Q.   Logistics of sales?  The logistics of

21   administrating some of your sales?

22         A.   Sure.  Yes.

23         Q.   Okay.  What other third parties have you

24   communicated with on Signal about Ripple or XRP?

25         A.   I -- I -- I don't have an exhaustive

1   list.  Certainly around the time I started using

2   Signal more, which was kind of 2017, there was a

3   group of -- a group of Signal -- as you described,

4   a group chat, effectively, of various leaders in

5   the crypto industry that had a -- a group chat

6   sharing various best practices around securities.

7        Q.   Okay.  And what about members of the XRP

8   Army?  Have you communicated with them on Signal?

9        A.   No.  I mean, the XRP Army is an

10  amorphous nonspecific.  Like, I don't know who is

11  -- who's included on that list.  I didn't really

12  count.

13       Q.   Secretly being part of it.

14            To your knowledge, have you been -- you

15  know, communicated -- have you communicated with

16  members of the XRP Army on Signal?

17       A.   Again, I don't know how to define the

18  XRP Army and so...

19       Q.   Fine.

20            Have you communicated with holders of

21  XRP on Signal?

22       A.   Yes.

23       Q.   Third parties.  Third parties.  I know

24  employees of Ripple have XRP.

25       A.   I mean, I'm almost certain the answer to

142

1    that is yes.

2        Q.   Okay.  And why are you almost certain?

3        A.   Well, as I described, there's a group

4    chat of other leaders in the XRP -- excuse me, in

5    the crypto community with whom I -- there's a

6    group chat around security.  I'm certain that some

7    of them own XRP.  I believe some of them own XRP.

8    So I'd expect the answer is yes, as I said.

9        Q.   I was just --

10        A.   I mean, I think there's 15-ish people on

11    that group chat.  I'd have to go through it and

12    look at who all's on there.

13        Q.   Just at top of -- top of mind.  You

14    know, who's on there that you think --

15        A.   ███████████████

16        Q.   Anyone else?

17        A.   My -- my connective -- I think the --

18    the CEOs of other exchanges are on there.  I --

19    I -- I don't recall who all's on there.

20        Q.   Okay.  Other than this group chat with

21    leaders of the crypto industry, any other holders

22    of XRP you have communicated with on Signal?

23        A.   That aren't Ripple employees?

24        Q.   That's right.

25        A.   I think █████████ owns some XRP.

143

 1        Q.   Okay.  Others?

 2        A.   I -- I -- I don't have a recollection

 3   without the benefit of -- if I went through the

 4   list with whom I've communicated on Signal,

 5   perhaps I could come up with some others.

 6        Q.   And where's that list?

 7        A.   On the Signal app.

 8        Q.   So the Signal app has a list of who you

 9   communicated with but not the messages?

10        A.   Correct.  I mean, sim -- using WhatsApp,

11   it sounds like you're familiar with, you know, you

12   see with whom you've communicated.  And so that

13   would refresh my memory.

14        Q.   By looking at the list?

15        A.   Correct.

16        Q.   But the messages won't be there?

17        A.   That depends.

18        Q.   Well, messages beyond the week or four

19   weeks or whatever?

20             MR. SOLOMON:  Objection; form.

21        A.   I mean, there's some messages on there.

22   I mean, some people don't set an expiration at all

23   and so the messages would still be there.

24        Q.   Well, I'm talking about your messages.

25   Have you always had the expiration of a week or

1    maybe four weeks more recently?

2           MR. SOLOMON:  Objection; form.

3        A.   I have always intended to, you know, in

4    the interests of data security, data privacy, to

5    use Signal with that feature.  I'm certain there

6    are times when I have not done that.

7        Q.   Okay.

8           MR. SOLOMON:  You said you

9        started using it more in 2017.  You might

10       want to explain to the SEC the

11       circumstances around that.  It might be

12       helpful.

13          MR. TENREIRO:  Yeah.  I think I'm

14       familiar, but go ahead.

15          MR. SOLOMON:  Yeah, I'm sorry.

16       It's their question, but you had mentioned

17       it.

18       A.   In the late spring/early summer of 2017,

19    my phone was compromised by hackers and a lot of

20    my personal data was accessed, including

21    financial.  You know, lots of money was stolen.

22    And after that I took and prioritized uses of --

23    of Signal more highly in the interest of data

24    protection such that if my phone is compromised,

25    my phone is stolen, I have better protection of --

145

1    or I felt that there would be better protection of

2    my data.

3          Q.    Okay.  And with respect to the

4    litigation hold note and documents or -- or

5    policies that Ripple had with respect to class

6    action and the communications with the SEC, what

7    steps, if any, did you take to ensure that Signal

8    messages were preserved for those hold notices?

9                MR. SOLOMON:  Objection to form.

10         A.    I generally follow the same practices I

11   had been practicing.  I continued to make phone

12   calls.  I continued to write emails.  I continued

13   to use Signal.  And so I'd say my communication

14   practices didn't materially change.

15         Q.    Did you seek -- without getting into

16   substance, did you seek the advice of any counsel

17   with respect to using Signal after you got these

18   hold notices?

19         A.    No.

20         Q.    Okay.  And without getting into the

21   substance, did you receive any advice from any

22   counsel with respect to using Signal after the

23   hold notices?

24         A.    Not that I recall.

25                MR. TENREIRO:  Let's look at

1          Exhibit 106, please.

2                    (Whereupon, exhibit is received

3          and marked Garlinghouse Deposition

4          Exhibit 106 for identification.)

5    BY MR. TENREIRO:

6          Q.    While Mark gets the exhibit, did you

7    ever use the desktop version of Signal?

8          A.    Yes.

9          Q.    Okay.  Do you have it installed on your

10   computer now?

11         A.    I do.

12         Q.    Okay.  And the computer one that you

13   use, your primary one, is that a Ripple computer?

14         A.    Yes.

15         Q.    Laptop?

16         A.    Yes.

17         Q.    Apple?

18         A.    Yes.

19         Q.    Okay.  And did -- did you use WhatsApp?

20   Do you use WhatsApp?

21         A.    I had a WhatsApp account.  I would say,

22   you know, define "use."  Minimally.

23         Q.    With Ripple employees?

24         A.    Not to my recollection.

25         Q.    Did you communicate with ███ on Signal?

1        A.    No.

2        Q.    Did you communicate with anyone here on

3    Signal?

4        A.    I -- I have communicated with Matt

5    Solomon on Signal.

6        Q.    Okay.  This is Exhibit 106.  This is

7    GARL Civil 1344.  It appears to be a series of

8    text messages.

9             Take your time.

10            (Pause)

11       Q.    Okay.  Who is ███████████████████

12       A.    ███████████████████  is currently the

13   chief business officer at Ripple.

14       Q.    Who was he in 2020?  This email --

15   this -- this appears to be a series of text

16   messages.

17            Do you agree?

18       A.    It appears to be a series of text

19   messages, yes.

20       Q.    Okay.  And they appear to be from

21   Monday, 27 January 2020.

22            Do you see that?

23       A.    I don't see that it's Monday, but I

24   accept that it may be Monday.  I see that it's

25   January 27, 2020.

1      Q.   And there's a little thing here on top

2   that says "Monday," but that's fine.

3      A.   Okay.

4      Q.   Did you provide your phone to counsel to

5   sort of, like, download messages?  Do you know the

6   origin of this document?

7             MR. SOLOMON:  Objection; form.

8      A.   I do not know the exact origin of this

9   document, no.

10     Q.   Did you provide your phone to counsel to

11  sort of --

12             THE REPORTER:  I'm sorry?

13     Q.   Did you provide your phone to counsel in

14  connection with this litigation to gather

15  information?

16     A.   I mean, I think the technical answer to

17  your question is no.  I mean, I think I understand

18  the question you're trying to ask.

19     Q.   So go ahead and answer that question.

20     A.   I think the question you're trying to

21  ask is did counsel arrange for my phone to be

22  reviewed or otherwise.  And so I believe my

23  counsel engaged a third party that came -- I

24  guess, shipped me a collection -- during COVID the

25  mechanisms for collection I think were unique,

149

1    perhaps.

2           But, in effect, I think the answer to

3    your question is, yes, my phone was made available

4    and -- to provide data as part of this litigation.

5        Q.   And you -- was that true with respect to

6    all three of your phones or just your primary

7    Ripple phone?

8        A.   No, all of my phones.

9        Q.   All of your phones.  Okay.

10          Do you recognize your phone number on

11   this document?  Don't read it into the record.

12   Just yes or no.

13       A.   Yes.

14       Q.   Okay.  All right.  So having had a

15   chance to read this document, at some point on the

16   third page, the one that says 1346 at the bottom,

17   you say "Speaking of nothing.  Do you use Signal?"

18   Do you see that?

19       A.   I do see that.

20       Q.   Okay.  And is it fair to say that before

21   that you were having a text conversation with

22   Mr. ███████████ about the amount of XRP

23   hitting the market and some sort of deal with

24   someone referred to as ████████

25       A.   You have put a description of the

150

1   conversation that I don't totally agree with, but,

2   yes, before that I see a text message exchange

3   between me and Mr ███████████

4        Q.   Why don't you describe for me what this

5   conversation was about before we get to the part

6   where you ask "Do you use Signal?"

7        A.   It appears to be about some frustrations

8   I'm having with the CFO of Ripple.

9        Q.   With Ron Will?

10       A.   That's correct.

11            THE REPORTER:   I'm sorry?

12            MR. TENREIRO:   With Ron Will.

13       Q.   What -- what were the sources of your

14  frustration?

15       A.   My -- my recollection, in part informed

16  by what I'm reading, is that he had made a

17  decision of, you know, over a million dollars

18  without asking me for my opinion or input.  That

19  seemed surprising.

20       Q.   Over a million dollar sale of XRP?

21       A.   No.  It looks like -- there's a

22  discussion -- my -- from what I'm reading here,

23  no.

24       Q.   So like a -- sort of -- some sort of

25  investment of some sort?

1        A.   No.

2        Q.   So what is the decision of $1 million?

3    What -- what is it?  About what?

4        A.   I think it's a payment.

5        Q.   Uh-huh.

6        A.   And it's $1.75 million.  And as

7    described in the thread, it says they would take

8    XRP or cash.

9        Q.   A payment for what?

10       A.   I don't recall.

11       Q.   And where are you seeing $1.75 million?

12       A.   Didn't I see that?

13              MR. SOLOMON:  Yeah, you did.

14              THE WITNESS:  Okay.

15              MR. SOLOMON:  It's about

16         three-quarters of the way down the first

17          page.

18       Q.   Oh, sorry.  Yeah.  "Ron makes a decision

19   on $1.75 and doesn't check with me."

20              You were frustrated about that?

21       A.   It seems like it's a big enough number.

22   You're the CFO of the company.  It feels like

23   something that would -- in the normal course of

24   business that you would talk to the CEO about.

25       Q.   Were there not sort of, like, approval

1  matrices at Ripple?

2      A.   Yes, Ripple had approval matrices.

3      Q.   And was this above his approval grade or

4  whatever the term is?

5      A.   I don't recall exactly.  I think almost

6  certainly the answer would have been yes.

7  Moreover, it just seems like this would be

8  something that you would, as CFO, communicate

9  about.

10     Q.   Were you ever involved in decisions

11  about, you know, firing Ripple employees or

12  letting people go?

13     A.   Yes.

14     Q.   Which ones?

15     A.   Is the question which employees was I

16  part of without actually firing over the course of

17  my entire tenure of my --

18     Q.   No, that you recall.

19     A.   I mean, I'm sure there's many.

20     Q.   Okay.  Which ones do you recall, though?

21     A.   Maybe repeat the question so I get --

22  make sure I get it right.

23     Q.   What Ripple employees were you involved

24  in decisions about letting go?

25     A.   Well, we can start chronologically of my

153

1    recollections. ███████████████████████
2    ████████████ (phonetic), ██████████
3            I mean, if I may, if you'd like me to
4    try to remember all of them -- I mean, there's
5    scores, you know.  There's no way I'm going to get
6    them all.
7        Q.   Okay.  So there's a lot?  Does Mr. --
8        A.   If anyone was terminated from Ripple
9    involuntarily during my tenure, generally
10   speaking, I probably had some visibility into it.
11   And if I had an opinion on the topic, I would have
12   shared that.
13       Q.   Well, did -- let me ask you this:  Did
14   you ever make the decision?  Was it ever your
15   decision initiated by you to terminate a
16   particular employee?
17       A.   Yes.
18       Q.   Who?
19       A.   Well, anyone who reported to me directly
20   it would have been my decision.
21       Q.   So who did you decide to terminate?
22       A.   I mean, again, over the six and a half
23   years I've been there, you know, it would -- I
24   would have to look at a list of who departed
25   during that time frame.

154

```
 1        Q.   Was Ron Will one of those people?

 2        A.   No, Ron Will quit.

 3        Q.   Okay.  What about Patrick Griffin?

 4        A.   That's more of a gray area.

 5        Q.   Please explain.

 6        A.   You know, Patrick is a talented, smart,

 7   energetic guy, who -- I guess I -- I look at the

 8   growth of a start-up in kind of various phases and

 9   having the right people for the right phase is

10   important.  And I think Patrick was very useful

11   and constructive in an early phase, but as the

12   company scaled, his efficacy managing and building

13   teams and keeping teams organized and on target

14   for their objectives wasn't as strong as other

15   people over time.

16        Q.   So the decision was a mutual decision or

17   you decided --

18        A.   I decided --

19             MR. SOLOMON:  Objection; form.

20        A.   I -- I let Patrick know that I thought

21   it was time for him to transition and I wanted to

22   work with him to facilitate a constructive

23   transition.

24        Q.   That's what the law firms do, by the

25   way.
```

1              Of the -- what about Antoinette

2     O'Gorman?

3          A.   What about?

4          Q.   Did you have a role in deciding that she

5     should leave Ripple?

6          A.   I was certainly involved in those

7     conversations, but I was sad to see her leave.

8     And she -- it was her choice to leave the company.

9          Q.   So she was not someone that you said to,

10    you know, you might -- this might be a time to

11    transition or something like that?

12         A.   No, I didn't say that.

13         Q.   Okay.  What about Ms. Madigan?

14         A.   What about her?

15         Q.   Same question.

16         A.   No.

17         Q.   Okay.  She left Ripple --

18         A.   To be fair, she didn't report to me so I

19    was not a party to those conversations.  I'm

20    aware -- I think she reported to Monica Long.  And

21    Monica and I certainly discussed her tenure and

22    whether or not she was doing a great job.

23         Q.   Was she?

24         A.   I wasn't close enough to have a strong

25    opinion myself.

1          Q.   Do you understand that her leaving was

2     voluntary or -- or Ripple suggesting to her that

3     she should leave?

4               MR. SOLOMON:  Objection to form.

5          A.   My recollection is that Ripple

6     suggested -- that Monica, as her manager,

7     suggested that it wasn't working out as well as

8     she might do at another company.

9          Q.   Okay.  And what about Miguel Vias?  Same

10    question.

11         A.   Maybe repeat the question so I get the

12    whole --

13         Q.   Sure.

14              Were you involved in the decision with

15    respect to Mr. Vias leaving the company?

16         A.   Miguel did not report to me.  And, you

17    know, was I involved in that?  I'm sure that I was

18    aware and a part of the conversations about the --

19    his exit.  I'm -- I'm certain that I would have

20    been.  I don't recall anything specific about

21    that -- those conversations.

22         Q.   And, again, was that voluntary or was

23    that Ripple more suggesting it's not working out?

24              MR. SOLOMON:  Objection; form.

25         A.   I don't recall.

1          Q.    Okay.  Who was -- who was his direct

2     report?

3          A.    His direct report or his manager?

4          Q.    I'm sorry.  His manager.  His manager.

5          A.    I think when he exited, I -- I don't

6     know if his manager was Monica or Patrick Griffin.

7          Q.    You have -- you mentioned start-ups a

8     couple times today and the evolution of Ripple as

9     a start-up.

10          Did you also -- do you recall mentioning

11     that generally to me moments ago?

12          A.    Yes.

13          Q.    Okay.  And I think you said you got an

14     MBA from Harvard, is that right?

15          A.    Yes.

16          Q.    So what -- what is a start-up in your

17     own words?

18          A.    A start-up is a new company that a small

19     group of people come together and typically raise

20     some capital and start to build product solutions

21     that they think will be adopted by their customers

22     and grow into bigger businesses.

23          Q.    From your experience prior to joining

24     Ripple, either educational experience or

25     professional background, did you come to

158

1    understand or become familiar with the various

2    ways in which start-ups might "typically raise

3    some capital"?

4         A.   Yes.

5         Q.   What were those ways that you learned

6    about?

7         A.   Is the question what ways do start-ups

8    raise capital?

9         Q.   Yeah.  That you know.  I'm not asking

10   you for the world.  That you know.

11        A.   Well, at different phases of a start-up

12   I think you see different approaches.  At the

13   earliest stages that we were discussing a moment

14   ago, you know, there's something loosely described

15   as friends and family, where a start-up might

16   raise a small amount of money from friends and

17   family.

18             As the company progresses to the extent

19   it's seeing some traction in its vision of where

20   the future might go, you might start to raise

21   money from what have become known as seed funds.

22   And that might be smaller or -- more money than

23   you might raise from friends and family, but less

24   money than you might raise from a traditionally

25   defined venture capitalist.

1          And to the extent you raise seed funds,

2     to the extent you continue to build and grow and

3     have some evidence of success, you might go and

4     raise a Series A financing or Series B financing.

5     And that would be the way I think about raising

6     capital.

7          Q.   Okay.  Sometimes start-ups eventually

8     IPO?

9          A.   I wouldn't have called them a start-up

10     at that point.

11          Q.   At that point it's no longer a start-up?

12          A.   Yeah.  I mean, the journey of company

13     creation in Silicon Valley, in my experience, does

14     not have, you know, clear lines between when even

15     a Series A should happen versus a Series B; when

16     it's a start-up, when it's something more than a

17     start-up.  So it feels more art than science in

18     those descriptions.

19          Q.   Okay.  And why did you fire ███████?

20          A.   My recollection is that when I joined

21     the company in April of 2015, one of the first

22     conversations I had with Chris Larsen was that I

23     probably needed to fire ███████

24          Q.   Why?

25          A.   You'd have to ask Chris.

1          Q.   So he told you from 2015 that you needed
2     to fire him?
3          A.   He -- he believed when I joined the
4     company in April of 2015 that one of my direct
5     reports at the time was ████████.   And he
6     expressed that I probably needed to fire ████
7     ████
8          Q.   He just said that.  He didn't tell you
9     why?
10         A.   I -- I don't recall.
11         Q.   I see.
12              Back to Exhibit 106.  Why are you asking
13    Mr. ████████████████ to use Signal here?
14              MR. SOLOMON:  You've --
15         A.   I did not ask him to --
16              MR. SOLOMON:  Let me just stop
17         you.  You've just been asked a whole
18         series of questions and intervening
19         questions.  If you need to look at the
20         document again, do it; if you don't,
21         don't.  I just want to make that clear for
22         the record.
23              MR. TENREIRO:  That's also
24         helpful.  And let me correct my question.
25    BY MR. TENREIRO:

161

1          Q.    Why did you ask him if he uses Signal?

2          A.    I don't recall.

3          Q.    Okay.  And in the next page, he says "I

4    have Telegram.  Does that do the trick?"

5                Do you see that?

6          A.    I do see that.

7          Q.    Okay.  And there seems to be like a

8    question mark that probably is an emoji.  Do

9    you -- originally was probably an emoji.

10               Do you see that?

11         A.    I do see that.

12         Q.    Okay.  Do you recall what emoji you

13   responded with?

14         A.    I do not.

15         Q.    Okay.  Whatever you said, he said,

16   "Okay, Signal it is."

17               Do you see that?

18         A.    I do see that.

19         Q.    After that did you communicate with him

20   on Signal?

21         A.    I don't believe so.

22         Q.    Okay.  What's the basis of that belief?

23         A.    Sorry.  If the question is, Did I ever

24   communicate with him after that on Signal? the

25   answer is probably yes.  To the extent I

1    communicated with him right after that, it looks

2    like the answer is no based upon the context of

3    this exchange.

4         Q.   Any time after.

5         A.   Yes.

6         Q.   All right.  Let's look --

7         A.   Actually, to be totally honest, I don't

8    know.

9         Q.   Okay.  You would have to look at that

10   list you might have?

11        A.   Right.  Yeah.

12        Q.   All right.  Did you ever discuss with

13   anyone on Signal the status of XRP under the

14   securities laws?

15        A.   I don't recall.

16        Q.   Did you ever discuss with anyone your

17   views as to whether XRP sales were securities

18   transactions on Signal?

19        A.   I don't believe so.

20        Q.   Did you ever discuss XRP with anyone on

21   Signal?

22        A.   Yes.

23        Q.   Who?

24        A.   I don't recall.

25        Q.   When?