1     A.    I don't recall.

2     Q.    Anyone outside Ripple?

3     A.    I expect, yes.

4     Q.    Did you ever discuss XRP's use cases --

5   or case or cases -- using Signal?

6     A.    I -- I don't recall.

7     Q.    Did you ever discuss Ripple's efforts

8   with respect to the XRP ecosystem using Signal?

9           MR. SOLOMON:  Objection; calls

10        for a legal conclusion.

11          Go ahead.

12    A.    Could you repeat the question?

13    Q.    Did you ever discuss Ripple's efforts

14  with respect to the XRP system using Signal?  XRP

15  ecosystem.

16    A.    Sorry.  Maybe one more time just to make

17  sure I got it.

18    Q.    Did you ever discuss Ripple's efforts

19  with respect to the XRP ecosystem using Signal?

20          MR. CERESNEY:  Objection to form.

21    A.    I don't recall.

22    Q.    Did you ever discuss the reasons why

23  someone might buy XRP with anyone on Signal?

24    A.    I don't recall.

25    Q.    Did you ever disclose to a third party

1    the advice you might have gotten from counsel as

2    to the legal status of XRP under the securities

3    laws?

4              THE REPORTER:  Could you repeat?

5       Q.   Did you ever disclose to a third party

6    the legal advice you might have gotten from

7    counsel as to the legal status of XRP under the

8    securities laws?

9       A.   I don't believe so.

10      Q.   Did you ever discuss you or Ripple's

11   sales of XRP using Signal?

12      A.   As we discussed earlier, with GSR, I

13   would have facilitated to confirm appropriate

14   wallet information to verify that we're being

15   secure in those transfers.  Beyond that, I don't

16   recall.

17      Q.   Okay.  So when you say you don't recall,

18   would you say it's possible you just don't know

19   sitting here today?

20              MR. SOLOMON:  Objection to form.

21      A.   When I -- when I say that I don't recall

22   on that --

23      Q.   On this last question.

24      A.   Remind me what the last question was

25   exactly.

1      Q.    Which was, did you discuss you or

2   Ripple's sales of XRP using Signal?

3      A.    Yeah, I don't recall.  And so the answer

4   to your second question -- I mean, generally

5   speaking, Ripple's sales of XRP would not have

6   been discussed via Signal.

7      Q.    Okay.  Is it possible you discussed them

8   and you just don't recall?

9      A.    It's possible and I don't recall.

10     Q.    Okay.  And separate from the sales, but

11  is it possible that you discussed XRP with -- with

12  anyone on Signal?

13            MR. SOLOMON:  Objection; asked

14        and answered.

15            You can answer.

16     A.    Yes, it's possible.

17     Q.    Okay.  And is it possible you discussed

18  XRP status under the securities laws on Signal?

19            MR. SOLOMON:  Objection; asked

20        and answered.

21            You can answer.

22     A.    I -- I don't recall.

23     Q.    Is it possible that you discussed on

24  Signal things like the Hinman speech on Signal?

25     A.    It's possible, yes.

1          Q.    Okay.  Let's look at 96.

2                    (Whereupon, exhibit is received

3          and marked Garlinghouse Deposition

4          Exhibit 96 for identification.)

5                    THE WITNESS:  Oh, I have two.

6                    MR. SOLOMON:  Thanks.  Sorry.

7     BY MR. TENREIRO:

8          Q.    So this is RPLI_SEC 533153.  It's a

9     number of pages.  Excuse me.  It appears to me to

10    be a series of screenshots.  Please take a look,

11    Mr. Garlinghouse.  I'll want you to read it, but

12    just by browsing it, does it -- do you know what

13    this document is?

14         A.    Not yet.

15         Q.    Okay.  Go ahead.  Take a look at it.

16               (Pause)

17         A.    Okay.

18         Q.    Having looked at the document, do you

19    know what this document is?

20         A.    This document appears to be screenshots

21    of a conversation.  I don't actually know for

22    sure, I'm assuming it's Breanne, but I don't...

23         Q.    Is the assumption based on the reference

24    to XRP-O?

25         A.    The assumption is based upon the market

1    maker purchases.

2        Q.   Market maker purchases of what?

3        A.   XRP.

4        Q.   Okay.  Do you see -- who took these

5    screenshots?

6        A.   I don't know.

7        Q.   Did you ever take screenshots of your

8    Signal communications?

9        A.   Other than for collection of -- for

10   purposes of this litigation, no.

11       Q.   Right.

12            So before the litigation, did you have a

13   practice of taking screenshots of the

14   conversations?

15       A.   No.

16       Q.   You might have taken some, but not a

17   practice of it?

18       A.   Not that I recall.

19       Q.   Okay.  Do you see that at least one of

20   these seems to say -- the second page says "June

21   25th, 2020," and then further down there's some

22   July dates.

23            Do you see all of that?  Turn to the

24   second page first.

25       A.   Yes, I see that.

1          Q.   Okay.  And there's a reference to XRP-O
2     somewhere in here.
3               Do you see that?
4          A.   Yes, I saw that.
5          Q.   Okay.  So any reason to doubt that these
6     conversations did not occur sometime in the summer
7     of 2020?
8          A.   I -- I don't have any reason to doubt
9     that these conversations occurred in the summer of
10    2020.
11         Q.   Okay.  And do you see on the first page
12    it says "Brad Garlinghouse set disappearing
13    message time to one week"?  Do you see that?
14         A.   Yes, I do.
15         Q.   Why does that show up there, do you
16    know, on the app?  Why does that pop up?
17         A.   It's letting both parties -- it's
18    letting both parties know who has set the
19    expiration disappearing message feature.
20         Q.   So you change the expiration feature, it
21    puts a notice there?
22         A.   Correct.
23         Q.   Okay.  And did you ask Ms. Madigan to
24    communicate with you via Signal?
25         A.   I -- I don't recall.

1    Q.   Okay.  Which -- which side of the

2  conversation is you and which side is Ms. Madigan?

3        A.   I believe Ms. Madigan is the dark -- the

4  right side and I'm the light or the left side.

5        Q.   Okay.  So, for example, you say I just

6  -- "I'm just off the phone with ███ -- and that's

7  Mr. ██████

8        A.   I presume, yes.

9        Q.   You think that's you saying that to her?

10       A.   I believe that's correct.

11       Q.   Okay.  On the next page, she talks about

12  speaking with legal, Comms, tax, et cetera.

13  "Given MMs need to execute these contracts, we

14  will not start buybacks until earliest tomorrow."

15            Do you see that?

16       A.   Yes.

17       Q.   What is the reference to buybacks?

18  Buybacks of what?

19       A.   I believe this is in regard to the

20  buyback of XRP.  As you're probably aware, one of

21  the things we're very cognizant of is minimizing

22  any impact we have in the XRP markets.  As some

23  products scaled -- at the time what we're calling

24  XRP-Os, XRP-Origination, which is now known as

25  Wallet Send.  And as that demand for that grew, it

1    meant we were introducing XRP into the market.

2    And in order to minimize any potential impact on

3    the market, we were creating the ability to buy

4    back XRP such that there wasn't an unexpected

5    significant increase to supply in the market.

6         Q.   Later on she says, on page 3, "Hi Brad,

7    hope you're well."

8              Do you see that message?

9              Further down, "Given ongoing regulatory

10   conversations, I've asked legal for an

11   opinion - pending from ▮▮▮▮ "

12             Do you see that?

13        A.   I do see that.

14        Q.   What regulator -- regulator

15   conversations are you discussing there?

16        A.   I don't know.  She's discussing it, not

17   me.

18        Q.   I understand, but you're having a

19   conversation with her.  So when you read that,

20   what did you understand that to mean?

21             MR. SOLOMON:  If you did.

22        A.   Yeah, I -- I don't know that I knew

23   exactly what she meant.  I -- what you're

24   describing, the conversation, I replied with

25   "Sounds great.  Thank you."

```
 1        Q.   You didn't ask her what regulator you're
 2   talking about -- are you talking about, Breanne?
 3   That was not your response?
 4        A.   No, that was not my response.
 5        Q.   Okay.  Further down, if you turn a
 6   couple pages, the message says         came back and
 7   after discussing with outside counsel" -- you're
 8   going to have to flip a couple.  Yeah, there you
 9   go.
10             Do you see that?
11        A.   Yes.
12        Q.   Who's
13        A.   I don't know.
14        Q.   It says "       came back and after
15   discussing with outside counsel, they mentioned
16   some reg concerns given their SEC inquiry and
17   suggested we may want to explore other ways to do
18   this creatively that is more in line with our
19   current contract, i.e., using derivatives."
20             Does reading that give you a hint as to
21   who       is?
22        A.   It does not.
23        Q.   Okay.  All right.  And then you say to
24   her, on the next page, "Can you send around an
25   email update on what transpired over the weekend
```

1     on removing XRP-O supply from the market?"

2                    THE REPORTER:  Can you slow

3          down, please?

4          Q.    "Can you send around an email update on

5     what transpired over the weekend on removing XRP-O

6     supply from the market?"

7                    Do you see that message?

8          A.    I do see that message.

9          Q.    Did she send around that email update?

10         A.    I don't recall.

11         Q.    An email update.  To whom were you

12    asking her to send the message to?

13         A.    I don't believe I was specific about

14    that.

15         Q.    No, but just in your mind, you know,

16    what was the practice -- when you asked her about

17    sending email updates, what was your sort of

18    expectation or practice about who it would be sent

19    to?

20                    MR. SOLOMON:  Objection; form.

21         A.    My expectation would have been she's a

22    vice president of the company.  I think maybe a

23    senior director/vice president of the company.

24    She would have had the knowledge to know, based

25    upon the content of that email, who needed to be

1    involved in that email.

2        Q.   Why did you want her to send this update

3    on what transpired over the weekend on removing

4    XRP-O supply?

5        A.   I don't recall.  I presume because I

6    wanted to make sure everyone had the same set of

7    understanding.

8        Q.   Everyone at Ripple?

9        A.   Well, not everyone at Ripple.

10        Q.   Everyone involved in these issues about

11    the buybacks or the XRP-O supply?

12        A.   Yes.

13              MR. SOLOMON:  Objection; form.

14        Q.   Okay.  All right.  We can set that

15    aside.

16           Who is ███████████

17        A.   I don't know.

18        Q.   Do you know if he did any work for

19    Ripple?

20        A.   Can you repeat the name?

21        Q.   ███████████████████

22        A.   I don't know.

23        Q.   Okay.  Do you know of any relationship

24    he had to Ripple?

25        A.   I do not.

1      Q.  Have you heard of an entity called

2      ███████████?

3      A.  I don't believe so.

4      Q.  Ripple has bank accounts at ████████

5      ███████████?

6           MR. SOLOMON:  Objection to form.

7      A.  Yes.

8      Q.  Do you have access to those bank

9 accounts?

10     A.  I believe the answer to that is

11 technically, yes.  I'm not sure that I know how to

12 access them.

13     Q.  Who accesses them on a regular basis?

14     A.  I would be speculating.

15     Q.  Do you have -- do you know of an entity

16 called ████████████?

17     A.  I don't think I do.

18     Q.  Okay.  And do you have to approve

19 disbursements from Ripple's bank account or

20 accounts?

21     A.  There's a threshold above which requires

22 multiple approvals or more than one.  I don't know

23 what that threshold is.  But there are times when

24 I am asked to log in to approve certain wire

25 transfers and disbursements of some size.

1        Q.   Log into the bank account or log into

2   some other system?  Because you just said you

3   don't know if you have access to the bank

4   accounts.

5        A.   I don't --

6             MR. SOLOMON:  Objection to form.

7        A.   -- believe that was my exact testimony.

8   I think I said I believe I do have access.  I

9   don't know if I could immediately go and gain

10  access.

11       Q.   Okay.  When you were asked to log on to

12  approve certain wire transfers, what are you being

13  asked to log on to?

14       A.   A ███████████████ --

15            MR. SOLOMON:  Objection; form.

16       A.   -- Bank website to which I would then

17  approve or disapprove a transaction.

18       Q.   What about checks?  Do you have to

19  approve those, the disbursements of checks from

20  Ripple's bank accounts?

21       A.   I don't -- I'm not aware that I've ever

22  approved a check disbursement from Ripple's bank

23  account.  I suppose, to be fair, when I approve a

24  transaction, I'm not sure I really know if it's

25  going out by wire or a check or some other

1   mechanism.

2        Q.   And what is that threshold amount that

3   you have to -- above which you have to approve?

4        A.   I'm not sure.

5        Q.   Is it in the millions or hundreds of

6   thousands?

7        A.   Millions.  I -- I believe it's millions.

8        Q.   Okay.  And did -- do -- does Ripple have

9   more than one bank account at ███████████████?

10       A.   Yes.

11       Q.   How many?

12       A.   I don't know.

13       Q.   And does Ripple have banking accounts at

14   other banks in the United States other than

15   ██████████████?

16       A.   Yes, I believe so.

17       Q.   What bank or banks?

18       A.   I believe we have an account at ████████

19   ██████ and I believe we either have or are in the

20   process of setting up an account at ████████████

21   ████?

22       Q.   For what purpose?  Why are you setting

23   up an account at ██████████████?

24            MR. CERESNEY:  You're asking him

25       about today?  You're asking him a question

```
 1              about something that Ripple is doing
 2              today?
 3                   MR. TENREIRO:  Yeah.
 4                   MR. CERESNEY:  Why is that at all
 5              within the scope of this deposition?
 6                   MR. TENREIRO:  Are you
 7              instructing him not to answer the
 8              question?
 9                   MR. CERESNEY:  Well, I'd like a
10              proffer from you as to --
11                   MR. TENREIRO:  I'm not going to
12              give you one.  I'm asking you -- he's
13              answering me where the bank accounts are
14              and I'm asking him why he's setting it up
15              at ▮▮▮▮▮▮▮▮▮▮▮▮
16                   Are you instructing --
17                   MR. CERESNEY:  Yes.
18                   MR. TENREIRO:  Are you going to
19              instruct him not to answer?
20                   MR. CERESNEY:  I would like a
21              proffer from you as to why you think this
22              is relevant to this action.
23                   MR. TENREIRO:  Where Ripple's
24              funds are is relevant to this action even
25              today.  It's relevant.  I mean, there's
```

1          remedies.  There's all sorts of issues why

2          it's relevant.

3                  MR. CERESNEY:  All right.

4                  MR. TENREIRO:  Go ahead.

5                  MR. CERESNEY:  If you can answer

6          that without discussing any discussions

7          with counsel or revealing discussions with

8          counsel.

9          A.    Could you ask the question again?

10         Q.    Why is Ripple setting up a bank account

11    at ███████████████?

12         A.    Risk diversification.  Concentration of

13    deposits at one bank, it's probably prudent to

14    have deposits at more than one bank.

15         Q.    And when did the -- is it set up yet or

16    not?

17         A.    I don't know.

18         Q.    Okay.  Did this process begin after

19    December 2020?

20         A.    I believe so.

21         Q.    Okay.  Before December 2020, did Ripple

22    have bank accounts other than ███████████████

23    and ███████████████ anywhere in the world?

24         A.    I believe yes.

25         Q.    Where?

1     A.   I don't know.

2     Q.   Who would know?

3     A.   ████████████

4     Q.   Okay.  Anyone else?

5     A.   We have a relatively new CFO who has

6  been there four-plus months.  She might know.  Her

7  name is ████████████.  On ████████ team,

8  who has subsequently left the company, ████████

9  might know.  And then there's some people

10  underneath ████████ that might have that

11  knowledge.

12     Q.   And, I'm sorry, how many bank accounts

13  are there at ████████████

14     A.   I don't know.

15     Q.   Is it more than ten?

16     A.   I don't know.

17     Q.   Okay.  And can you ballpark how many

18  countries Ripple has bank accounts in outside of

19  the United States?

20     A.   I -- I -- I don't know.

21     Q.   Okay.  And the proceeds of Ripple's XRP

22  sales while you were CEO, were they deposited in

23  ████████████ accounts or others?

24     A.   I don't know.

25         MR. SOLOMON:  Objection; form.

1    Q.   Okay.  Do you know of -- do you know

2    where they were deposited, the proceeds of XRP

3    sales for Ripple's XRP?

4    A.   I don't know.

5    Q.   Okay.  What about the proceeds of your

6    XRP sales?  Where were those deposited?

7    A.   The proceeds from my XRP sales were

8    deposited at Bitstamp and subsequently I would

9    transfer those to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10    Q.   Okay.  Any other bank you might transfer

11    them to?

12    A.   Not that I can recall.

13    Q.   Okay.  And when you sold XRP, did you

14    sell it for fiat or did you sell it for -- at

15    times for other digital assets?

16    A.   I believe I only sold it for fiat.

17    Q.   What fiat?

18    A.   I believe I only sold it for U.S.

19    dollars.

20    Q.   Okay.  And so are you saying that all of

21    the -- all of the proceeds went to Bitstamp

22    somehow, even the GSR ones?

23    A.   Yes.

24    Q.   Okay.  And then from there you would --

25    or somebody somehow would get them to ▮▮▮▮▮▮

1
2          A.   Yes.
3          Q.   All right.  And when did you open the
4    Bitstamp account?
5          A.   I believe I opened the Bitstamp account
6    in the spring, kind of February/March, maybe
7    April, of 2017.
8          Q.   For what purpose?
9          A.   To custody XRP.
10         Q.   And was selling XRP one of the reasons
11   to open that account?
12         A.   Not at the time I opened it.
13         Q.   Just to custody your XRP?
14         A.   At -- at the time I opened it, my
15   recollection is -- so I was receiving a
16   distribution of XRP associated with a grant from
17   the company.  Certain vesting provisions had been
18   met.  And so sometime in the, I think, March/April
19   time frame of 2017, the first distribution and
20   vesting of XRP occurred and, thus, was distributed
21   to me.
22              One of the things that in -- in risk
23   mitigation I thought is I'm not going to send all
24   of that XRP to one custody, one wallet.  I'm going
25   to distribute it.  And my recollection is I sent a

```
 1      third to Bitstamp, a third to            and a third
 2      to a cold wallet.            was the account that
 3      was hacked and they stole all that XRP.
 4           Q.   How many units?
 5           A.   I don't recall exactly.
 6           Q.   You divided it in thirds, equal thirds?
 7      Do you remember that?
 8           A.   Yes.
 9           Q.   Okay.  And the cold wallet, who held the
10      keys?
11           A.   I did.
12           Q.   Okay.  And the Bitstamp account that you
13      opened was to -- at first just to custody you
14      said?
15           A.   Yes.
16           Q.   So you made a decision later in time to
17      sell XRP?
18           A.   Yes.
19           Q.   When was that decision made?
20           A.   I don't recall.  I would have to go back
21      and look at records from 2017.
22           Q.   Was it sometime in 2017 that you made
23      that decision to sell your XRP?
24           A.   I began selling some XRP in 2017.
25           Q.   Why did you sell it?
```

1      A.  I -- I don't recall specifically.  My

2  guess is diversification of assets.

3      Q.  When you entered -- when you opened the

4  account at Bitstamp for the custody, did you sign

5  some sort of user agreement or check some box

6  about your, you know, relationship with Bitstamp?

7             MR. SOLOMON:  Objection to form.

8      A.  I -- I suspect I did.

9      Q.  Okay.  And how did you open this

10  account?  Was it on a computer? on your phone, or

11  did you call them up?

12             MR. SOLOMON:  Objection; form.

13      A.  I don't recall specifically.

14      Q.  Were you in the United States when you

15  did this or did you travel to some country to open

16  the account?

17             MR. SOLOMON:  Objection; form.

18      A.  I don't recall.

19      Q.  Okay.  And the vesting conditions that

20  had met -- been met, are you talking about pricing

21  volume conditions that were in your option or

22  granting contract with Ripple?  I'm describing it

23  incorrectly as a "contract," but...

24             MR. SOLOMON:  Objection; form.

25      A.  I mean, I think we're saying the same

1    things.  I don't recall all the provisions of what

2    had to occur in order for vesting to occur.  Some

3    of that was time-based employment.  I thought that

4    the other one was just volume based.

5         Q.    Uh-huh.

6         A.    But I don't recall.

7         Q.    Okay.  We'll look at the pricing one in

8    a minute.

9              Let's go back to Mr. ███████ who you seem

10   to not recall.  Let's look at Exhibit 94.

11                   (Whereupon, exhibit is received

12             and marked Garlinghouse Deposition

13             Exhibit 94 for identification.)

14                   MR. TENREIRO:  All right.  Let's

15             start here.

16                   MR. SOLOMON:  We're also about

17             five minutes away from another 90 minutes.

18             So we can -- happy to go through whatever

19             this line of questioning is, but at a good

20             point we may want to take another short

21             break.  We can make this one short.

22                   MR. TENREIRO:  Let's do this.

23                   MR. SOLOMON:  Okay.

24                   MR. TENREIRO:  All right.  For

25             the record, this is a document,

1         RPLI_SEC_1028005, a multipage email.  It

2         appears to be a thread occurring --

3         actually, it might -- yeah, it's a couple

4         emails. Seems to be on July 11, 2018.

5              (Pause)

6  BY MR. TENREIRO:

7      Q.  Okay.  Mr. Garlinghouse, having reviewed

8  the email, do you see in the last page Mr. █████

9  writes "I would like authorization to communicate

10  with the SEC on Ripple's behalf"?  Do you see

11  that?

12      A.  I do see that.

13      Q.  Was that authorization given?

14      A.  I don't know.

15      Q.  Who would know?  So let me ask this.

16  In -- in this email thread, I see Mr. █████

17  Mr. █████ yourself, some of your counsel, and

18  Ms. █████ copied.

19         Do you see that at the top?

20      A.  I do see that.

21      Q.  Did you forward --

22      A.  Yeah.

23      Q.  Sorry.

24         Did you forward this email to anyone?

25      A.  I don't know.

186

```
 1        Q.   Did you discuss the substance of this
 2   email with anyone?
 3        A.   I don't recall.
 4        Q.   Okay.
 5             MR. SOLOMON:  Did you read this
 6        email?
 7             THE WITNESS:  I don't know.
 8        Oops, that was not your question.  It was
 9        his question.  But I don't know.
10             MR. TENREIRO:  That's okay.
11   BY MR. TENREIRO:
12        Q.   Did you have a practice of not reading
13   some of your emails?
14        A.   I mean, I got a lot of email every day
15   and the longer the email, the less likely it is I
16   read the whole thing.  So, you know, just by
17   virtue of trying to prioritize and manage my
18   inbox, there's definitely some emails that I
19   haven't read.  I think, according to my iPhone,
20   there's ten thousand of them.
21        Q.   Right.
22             So there's some that are, like, marked
23   as unread --
24        A.   Yes.
25        Q.   -- in your iPhone.
```

```
 1            But if you -- if you click on it --
 2    you're saying that even if you click on it, you
 3    might still not read it?  Is that what you're
 4    saying?
 5            A.   I -- it's definitely possible.
 6            Q.   Uh-huh.
 7            A.   In part based on who the sender is.
 8            Q.   Right.
 9                 Would you read an email from -- the top
10    of this is from Mr.          right?
11            A.   Yes.
12            Q.   He's a legal advisor, right?
13            A.   Yes.
14            Q.   Okay.  And so do -- how often did you
15    not read your emails from your legal advisors?
16            A.   I don't know.
17            Q.   You can exclude Mr. Solomon if you want.
18                 But did you -- did you have a practice
19    of not reading emails from legal advisors around
20    the time of this email in July of 2018?
21                     MR. SOLOMON:  That's not what
22            he's saying.  Just ask him the questions.
23                     MR. TENREIRO:  Let me just -- let
24            me just ask.
25    BY MR. TENREIRO:
```

1        Q.   Did you -- did you have any practice

2   with respect to emails from your legal counsel or

3   legal advisors?

4        A.   Did I have any practice?  What does that

5   mean?

6        Q.   Yeah.  You know, did you think to

7   yourself, you know, if I get an email from my

8   legal advisor, I better read those, or did you

9   have a practice that said I don't really trust the

10  guy; I'm not going to ask it?  I mean, that's what

11  I'm asking.

12            MR. CERESNEY:  Objection; form,

13       among other things.

14       A.   I don't even know what the question is.

15  I apologize.

16       Q.   My question is, did you have a practice

17  of reading or not reading emails from your legal

18  advisors?

19       A.   I wouldn't -- I didn't have a different

20  practice from my legal advisors than I had from

21  anybody else.

22            MR. SOLOMON:  Objection.

23       Q.   Did you consider emails from your legal

24  advisors to be important?

25       A.   It depends who the legal advisor was.

1          Q.    What about Mr. ████ - Mr. ████

2     Sorry. ████

3                    MR. SOLOMON:  You're under oath.

4          Just kidding.

5          A.    There are other lawyers I would have

6     prioritized more highly.

7          Q.    Than Mr. ████

8          A.    Yes.

9          Q.    Okay.  So based on that, you can't

10    recall either way if you actually read the

11    substance of this email, is that correct?

12         A.    I don't recall this email.

13         Q.    Okay.  Is it possible that you did read

14    it, though?

15         A.    For certain.

16         Q.    Okay.  And the authorization, you just

17    don't know if that was given, the authorization

18    that he requests?

19         A.    That's correct.

20         Q.    Okay.  And having read the email, you

21    know, I don't -- I'm not going to spend a lot of

22    time on some of these things, but it appears that

23    he's suggesting that there's some report that's

24    going to be presented to the SEC.

25                    Do you see that?

```
 1        A.   I do.

 2        Q.   And there's a reference to Val.  Do you

 3   know who that is?

 4        A.   I do.

 5        Q.   Who is that?

 6        A.   Val Szczepanik, as described -- although

 7   I think they spelled "czar" wrong.

 8        Q.   They did.

 9        A.   Is, I think, publicly pronounced from

10   the SEC as the Crypto Czar.

11        Q.   And had you met Ms. Szczepanik at this

12   point in time?

13        A.   I believe Ms. Szczepanik was in the

14   meetings that I attended at the SEC, but I had

15   only met her in that construct.

16        Q.   Do you remember if she was in the

17   Division of Enforcement back then?

18        A.   I don't.

19        Q.   At the top Mr.         says "Got it.

20   Meanwhile let's avoid contact with Val so we can

21   coordinate.  Andrew will be in touch with you

22   today.  Thanks."

23             Do you know who the reference to Andrew

24   is there?

25        A.   Well, I'm assuming, because Andrew
```

1    Ceresney is on the cc, that they're referring to

2    Andrew Ceresney.

3        Q.   Okay.  Did Mr. ███ have sort of the

4    authority to direct Mr. Ceresney who to call back

5    as suggested by this email?

6             MR. SOLOMON:  Objection; form.

7        A.   That's unclear.

8        Q.   I feel like I'm missing something here

9    about the relationship with Mr. ███  So why

10    don't you go ahead and tell me, because there's

11    some chuckling going on.  What --

12        A.   Mr. ███ is a very -- you all have, I

13    believe, met Mr. ███  Fair?  Yes?  No?

14        Q.   Just answer the question.

15             MR. SOLOMON:  Brad is

16       referencing -- referencing the SEC side of

17       the table just for the record.

18             Go ahead, Brad.

19        A.   Mr. ███ is an intelligent,

20    opinionated, cantankerous advisor.

21        Q.   Uh-huh.

22        A.   So I -- particularly in this time

23    period, I think there were a group of people --

24             MR. CERESNEY:  You know what,

25       Brad?  Let's end the answer there.

```
 1                    THE WITNESS:  Okay.

 2                    MR. CERESNEY:  I'm instructing

 3          the witness not to answer further because

 4          now he's going to tread into legal advice

 5          and we're not going to go there.

 6                    MR. TENREIRO:  Well, I

 7          didn't think -- you should not tread into

 8          legal advice, but I thought he said there

 9          was a group of -- are you talking there

10          was a group of advisors -- how does that

11          tread --

12                    MR. CERESNEY:  He was about to

13          tread into legal advice in his answer.

14                    MR. TENREIRO:  Okay.

15     BY MR. TENREIRO:

16          Q.   Can you explain further what

17     relationship Mr. ▮▮▮▮▮ had to Ripple in this time

18     period?

19                    MR. CERESNEY:  I think he's

20          already explained that.  Asked and

21          answered.

22          Q.   Okay.  Go ahead.

23                    MR. CERESNEY:  Objection.

24          A.   A legal advisor to the company.

25          Q.   Okay.  And did he have the -- did you
```

```
 1    have a belief that he was sort of acting outside

 2    of the scope of the authority you had granted him?

 3                    MR. SOLOMON:  Objection.

 4                    MR. CERESNEY:  I'm going to --

 5           I'm going to instruct the witness not to

 6           talk about the authority he's granted

 7           Mr. ███████ because that gets into the

 8           substance of legal advice.

 9                    MR. TENREIRO:  The authority he's

10           granted him gets into the substance of

11           legal advice?

12                    MR. CERESNEY:  Yeah, it does.

13                    MR. TENREIRO:  Okay.

14                    MR. CERESNEY:  And, by the way,

15           it's a good time for a break.  So if you

16           want to finish this document.

17                    MR. TENREIRO:  Sure.

18    BY MR. TENREIRO:

19           Q.   Did -- after -- after this email

20    exchange, did you avoid -- did Ripple avoid

21    contact with Val to coordinate with Mr. ███████

22           A.   I don't know.

23                    MR. SOLOMON:  Objection.

24                    MR. TENREIRO:  Okay.  Let's go

25           off.
```

194

```
 1              THE VIDEOGRAPHER:  Okay.  Going
 2       off the record at 11:44.
 3                  (Whereupon, a recess is taken.)
 4                  THE VIDEOGRAPHER:  Back on the
 5       record, 11:59.
 6  BY MR. TENREIRO:
 7       Q.   Okay.  Just to finish up on 94,
 8  Mr. Garlinghouse, do you see that the subject
 9  matter -- the subject is "Heads up:  Adverse
10  action by          Re:  XRP and Ripple"?  Do
11  you see that?
12       A.   I do.
13       Q.   Okay.  So do you think, based on that
14  and based on who the email is from, that you would
15  have read it or not read it?
16                  MR. SOLOMON:  Objection to form.
17       A.   I think it's likely I opened this email.
18  I think it's likely I read it.  I don't recall
19  specifically reading it.
20       Q.   Okay.  Now, I --
21       A.   I do now recall who          is, but
22  it's not a name that I knew.
23       Q.   Who is          ?
24       A.          was, I think, maybe
25  affiliated with    but he and two partners had a
```

1    firm that were trying to advise.  And my general

2    view is ███████ nd his partners were trying to take

3    advantage of what they viewed as an opportunity to

4    make money.  And I -- my experience with the group

5    was they embellished realities and overpromised,

6    you know, what they were capable of.

7         Q.   So let me try to unpack that.

8              They were trying to advise -- you said

9    '████████ was, I think, maybe affiliated with

10   ████ but he and two partners had a firm that were

11   trying to advise."

12             Trying to advise Ripple?

13        A.   Yes.

14        Q.   Okay.

15        A.   And I do believe we actually paid them

16   some money to be advisors for some period of time.

17   I was not an advocate and I found it to be -- you

18   know, one of the things -- or particularly early,

19   after we received the SEC letter, you know -- I

20   think, you know, having more people involved is

21   not necessarily better.  And I think Chris Larsen

22   and I didn't always agree on that.

23             And so for me, this was yet -- yet

24   another group that was trying to extract money

25   from Ripple that promised to be helpful in some

1   way.

2         Q.   So when you said earlier they saw --

3   "they were trying to take advantage of what he

4   viewed as an opportunity to make money," are you

5   referring to an opportunity to make money by

6   advising Ripple with respect to the SEC issue?

7         A.   I believe that's correct.

8         Q.   Okay.  And you also said you paid them

9   some money.  How much?

10        A.   I don't recall.  I do recall thinking

11   they were offensively expensive.

12        Q.   Was it at least ▮▮▮▮▮▮

13        A.   Order of magnitude.  That would be what

14   I would have guessed, but I don't recall.

15        Q.   If you thought they were offensively

16   expensive, why did you pay them?  Why did Ripple

17   Pay them?

18        A.   Chris Larsen hired them.

19        Q.   So it was Mr. Larsen's decision?

20        A.   I believe it was Chris Larsen's decision

21   to engage this particular group of, the

22   triumvirate of ▮▮▮▮▮▮▮ and his compatriots.

23             THE REPORTER:   Repeat.  "I

24         believe it was Chris Larsen's..."

25        A.   I believe it was Chris Larsen's decision

 1    to engage [redacted] and him compatriots.

 2        Q.   Did you express to Mr. Larsen your

 3    differing views as to whether it was a good idea

 4    to have Shrier?

 5                MR. SOLOMON:  Outside the

 6            presence of counsel.

 7        A.   I -- I think Chris was aware of my view

 8    that more doesn't always equal better.  And that

 9    applied to this group and just in general our

10    partnership and working together at Ripple over

11    the six and a half years that we've worked

12    together.

13        Q.   But Mr. Larsen had the authority to hire

14    this group irrespective of your views on whether

15    you should hire that group?

16                MR. SOLOMON:  Objection to form.

17        A.   Mr. Larsen's the chairman -- executive

18    chairman of Ripple.  If he wants to hire an

19    advisor, you know, unless I'm going to lay in the

20    tracks, I'm not sure that's, you know, okay.

21        Q.   Does he ask you, like, for your

22    permission when he wants to hire an advisor?  Has

23    he ever done that?

24        A.   I mean, we don't really have a dynamic

25    where somebody asks permission.  We discuss

1   professional courtesy and respect, but, you know,

2   Chris and I don't always agree.

3        Q.   Sure.

4             If Mr. Larsen had wanted to file a

5   registration statement with the SEC for XRP sales,

6   could he have done that?

7             MR. SOLOMON:  Objection; calls

8        for speculation.

9        Q.   As far as you know.

10       A.   I don't think any one individual could

11  have filed a registration statement.  It would

12  have taken a collaboration of lawyers, advisors,

13  work, time.  And so I don't think Chris Larsen

14  could have.  I don't think I could have.  I think

15  a team effort would have enabled that.

16       Q.   Right.  I'm not talking about actually

17  doing it.  I'm talking about making the decision.

18  I'm sorry.

19            Could he have made that decision?  Hey,

20  this is what we're going to do.  We're filing a

21  registration statement.

22       A.   I --

23            MR. CERESNEY:  Objection to form.

24            MR. SOLOMON:  Objection.

25       A.   I think Chris Larsen, as the executive

199

```
 1    chairman, had immense influence.  And, by

 2    extension, if he came to me and said, you know,

 3    we're -- hey, absolutely there should be a

 4    registration statement filed, I think we would

 5    have gotten behind that and made it happen.

 6         Q.   Did Mr. Larsen tell you why he decided

 7    to hire ████████ outside of the presence of counsel?

 8         A.   I don't recall.

 9         Q.   Okay.

10         A.   I didn't recall who he was.

11         Q.   Sure.

12              MR. TENREIRO:  Let's do 41, which

13         is an email I think a day later than 94.

14              (Whereupon, exhibit is received

15         and marked Garlinghouse Deposition

16         Exhibit 41 for identification.)

17              MR. TENREIRO:  And while you take

18         a look, it's a two-page email, RPLI_SEC

19         949371.

20              (Pause)

21    BY MR. TENREIRO:

22         Q.   Okay.  Mr. Garlinghouse, do you see that

23    the title of the email, the subject, is "FYI:

24    ████████ report was changed to be more

25    favorable"?  Do you see that?
```

200

```
 1         A.   I do.

 2         Q.   Do you think you would have read an

 3    email that said that?

 4         A.   I don't think subject lines are a major

 5    determinant of whether or not I read an email.  So

 6    I don't think that would have necessarily impacted

 7    whether or not I read it.

 8         Q.   How about who it's copied to?

 9         A.   Well, when you look at your inbox, you

10    don't see who is copied on an email.  So I don't

11    think that would be a primary determinant.

12         Q.   What would be the primary determinant

13    then?

14         A.   How busy I was that day.

15         Q.   Did you read this email?

16         A.   I don't recall.

17         Q.   Okay.  Did you -- Mr. Larsen does not

18    appear to be copied on this email, right?

19         A.   That's correct.

20         Q.   Given that Mr. Larsen had hired

21    did you convey to him what          was reporting to

22    you here?

23              MR. SOLOMON:  Objection to form.

24         A.   I don't recall.

25         Q.   You -- you were at this time -- this is
```

1   the summer of 2018, so you were having

2   conversations with the SEC.  I think you mentioned

3   meetings where I was, commissioners, et cetera, et

4   cetera, is that correct?

5              MR. SOLOMON:  Objection to form.

6        A.   Certainly in the summer -- well, I don't

7   remember when I met with the -- you or the SEC

8   specifically.  By virtue of the emails you've

9   shown me today, I have seen that I apparently met

10  with some people at the SEC on November 9th.  But

11  I think your question was did I meet with --

12       Q.   Just --

13       A.   -- in the summer of 2018?  And I

14  think -- I don't recall the summer of 2018.

15       Q.   Fair to say that in late 2018, from,

16  like, the middle to the latter part of 2018, you

17  were having SEC meetings with SEC staff?

18             MR. SOLOMON:  Objection to form.

19       A.   I don't know how many meetings we had at

20  the SEC in that time period.

21       Q.   Was Val in some of the meetings?

22  Ms. Szczepanik.

23       A.   I'm re meeting -- I remember meeting Val

24  Szczepanik at one of the SEC meetings.  I don't

25  know when that meeting took place.

 1          Q.   And in these meetings, I think,

 2     generally -- generally speaking, you were -- one

 3     of the things you were doing was providing

 4     information about Ripple and XRP, is that right?

 5     Educating I think you said?

 6                    MR. SOLOMON:   Objection to form.

 7          A.   Answering questions, sharing

 8     perspectives about what's going on in crypto and

 9     what's going on in the XRP markets, what -- what

10     Ripple is doing.

11          Q.   In any of the meetings with the

12     commissioners, did -- or with any SEC staff, did

13     you tell them when you were discussing what Ripple

14     was doing that Ripple had to pay ▮▮▮▮▮ to

15     ▮▮▮▮

16          A.   I seriously doubt that I would have done

17     that.  I -- I mean, even today I didn't know who

18     ▮▮▮▮ was until you refreshed my memory.  I would

19     not have considered -- what's the name of this

20     group? ▮▮▮▮▮? ▮▮▮▮▮▮thing?  I

21     didn't consider them a particularly relevant or

22     impactful point in our conversations with the SEC.

23          Q.   Mr. ▮▮▮▮ eferences that "a negative

24     mention of Ripple was removed - but swung to a

25     somewhat positive."

1            Do you see that?

2        A.   I do.

3        Q.   Okay.  Did you mention that to the SEC

4    when you met with the SEC?

5        A.   I am certain I would not have.  I mean,

6    I don't consider ▮▮▮▮▮▮▮ to be a particularly

7    credible person, and so I wouldn't want to present

8    not credible information to the SEC.

9        Q.   Right.

10            Did you have -- did there come any time

11   on or after 2018 where Ripple engaged in

12   activities relating to removing negative mentions

13   of Ripple from public statements?

14             MR. CERESNEY:  Objection; form.

15       A.   Could you repeat the question?

16       Q.   Did there come any time on or after 2018

17   where Ripple engaged in activities relating to

18   removing negative mentions of Ripple from public

19   statements?

20             MR. SOLOMON:  Objection; form.

21       A.   I guess the way I think about this is we

22   engage a PR firm with the goal of educating,

23   sharing and communicating with the world about

24   what Ripple is doing.  To the extent a reporter

25   has signaled that they have a negative viewpoint

1    about X or Y or Z, would we, meaning Ripple and/or

2    our PR firm, seek to obviate, minimize, or

3    otherwise dampen a negative reference?  Yes, I'm

4    sure we did that.

5         Q.   So, like, letters to The New York Times,

6    for example, is that included in those efforts?

7              MR. SOLOMON:  Objection; form.

8         A.   What -- what do you mean, a letter to

9    The New York Times?

10        Q.   About Mr. ███████████

11             MR. SOLOMON:  Objection; form.

12        A.   You mean -- maybe you could be more

13   specific with your question if you would.

14        Q.   Yes.  Was a letter to The New York Times

15   about ███████████  a part of the efforts to --

16   seeking to obviate, minimize or otherwise dampen

17   negative references?

18        A.   Well, I think what you're referencing is

19   an email to -- to an editor to -- with whom I had

20   a previous -- well, I don't know exactly what

21   you're referencing.  I didn't send a letter to The

22   New York Times.

23        Q.   Did you send an email to The New York

24   Times?

25        A.   I sent an email to an editor on the West

205

```
 1    Coast with whom -- I had known for some years
 2    seeking to sit down and talk about ████████
 3    ████ 's posture towards Ripple.
 4         Q.   Okay.  So to the extent that Ripple
 5    hired a PR firm to, again -- the reporter has
 6    signaled that they might have a negative view
 7    about X, Y or Z, Ripple and the PR -- the PR firm
 8    might seek to obviate, minimize or otherwise
 9    dampen negative references.
10              To the extent Ripple did that, is that
11    any different than what Ripple hired Mr. ████ to
12    do?
13              MR. SOLOMON:  Objection; form.
14         A.   Look, sitting here today, I can't tell
15    you why we hired Mr. ████ nd what he was
16    supposed to do or what he did do.
17         Q.   Okay.
18         A.   I did not consider him a particularly
19    credible person/resource.  I found his -- as I, I
20    think, testified earlier, I found him to
21    embellish, overstate.  I didn't -- I didn't
22    basically trust him.
23         Q.   Okay.  But Ripple did hire a PR firm --
24    and we're talking about ████ right? -- to
25    dampen/obviate negative references, right?
```

1        MR. SOLOMON:  Objection; form.

2        A.    Well, I mean, you hire a PR firm to do

3   lots of things.  You're -- a subset of that would

4   be what you're describing.

5        Q.    Any other advisor that you might have

6   hired for the purpose -- and understanding that

7   you might hire an advisor for several purposes,

8   but is there any other advisor that you hired for

9   that purpose, seeking to obviate, minimize or

10  otherwise dampen negative references about Ripple?

11       A.    I -- we definitely have other PR firms.

12  I can't name them all.  I think we have one in --

13  I think we might have two in Asia and one in

14  Europe that are on some sort of retainer.  And

15  those are the only PR firms that -- I mean, again,

16  it depends a little bit -- dampen, obviate,

17  otherwise minimize -- I can't remember exactly the

18  phrases I used, but I think my experience in

19  Silicon Valley, my experience professionally, is

20  many, many, many, many companies hire PR firms to

21  engage in reactive and proactive communication

22  with press.

23       Q.    But other than PR firms, did Ripple hire

24  other advisors to either, you know, dampen

25  negative references or engage in reactive or

1    proactive communications with press?

2        A.   Yes.

3        Q.   Okay.  Who?

4        A.   I -- I -- I can't name all of them.  As

5    I said,        was the primary one, based in San

6    Francisco, with whom we had some relationship.  I

7    actually don't think we use        anymore.  I

8    don't know who replaced them.  Maybe        ?  I'm

9    not a hundred percent sure.

10           We have worked with -- in Washington we

11   worked with a group called    .  And the firms

12   outside in -- in Japan and otherwise I don't know

13   the names of.

14       Q.   Right.  But I'm asking for other

15   advisors who are not PR firms.

16       A.   Oh.  Oh, to work on those --

17       Q.   Yeah.

18       A.   I mean, I couldn't -- I guess the answer

19   to your question is yes.              apparently

20   falls in that.  As we saw earlier, I had no

21   recollection of who            was until I saw

22   this email.  And so I would imagine there's

23   someone else who we may have hired during that

24   time period.  I think the answer's yes.

25       Q.   But you just can't recall who?

```
 1        A.   I don't recall.
 2        Q.   Okay.  And so who -- what about -- who
 3   is
 4        A.              was a board member at Ripple.
 5        Q.   Okay.  When did you meet him?
 6        A.   I met him as an introduction from Chris
 7   Larsen.  And I don't remember exactly when.  I
 8   guess I would -- somewhere, I'm guessing, 2017.
 9        Q.   And is he still on the board?
10        A.   He is not.
11        Q.   Do you recall when he left?
12        A.   I don't recall the exact timing.  I
13   think it was right before the presidential
14   election.  So probably about a year ago.  Is that
15   right?  Twenty -- yeah.
16        Q.   Why did -- who asked him to join the
17   board?
18             THE REPORTER:   I'm sorry?
19        Q.   Who asked him to join the board?
20        A.   Chris Larsen, I guess, nominated him to
21   join the board.  I believe he met with a couple of
22   the other board members, including myself.  And he
23   joined the board, I think, in 2017.
24        Q.   And does he own XRP?
25        A.   I believe the answer to that is yes.  I
```

```
 1    generally had a practice of not asking people
 2    about their personal XRP transactions outside of
 3    Ripple.
 4        Q.   Okay.  And let -- let's take a look at
 5    Exhibit 27.
 6             And while we get that exhibit, other
 7    than being on the board, what other relationship,
 8    if any, did Mr. ▮▮▮ -- sorry, ▮▮▮▮▮▮▮▮▮▮▮▮
 9    have with Ripple?
10        A.   I don't recall specifics.  I think he
11    may have been an advisor to Ripple prior to -- oh,
12    two things.  One, I think he was a -- prior to
13    joining the board, I think he was an advisor of
14    some sort, about which I don't remember the
15    specifics.
16             He also started a website called ▮▮▮▮▮
17    ▮▮▮▮▮▮▮▮ of which he was -- I don't know what
18    his role was at ▮▮▮▮▮▮▮▮▮▮▮▮  Owner?  And
19    Ripple did a sponsorship of ▮▮▮▮▮▮▮▮▮▮▮ for a
20    couple of years.
21        Q.   Why did Ripple do that sponsorship?
22        A.   I think -- I think having more
23    reputable, good journalism around crypto is good
24    for the crypto industry.  I personally have never
25    thought ▮▮▮▮▮▮▮ as one of the primary -- you
```

210

1     know, I think the lexicon -- you know, trade rags
2     of the crypto industry.  I've never thought
3     ████████ was that great.  And so to the extent
4     that there are other more reputable outlets that
5     have financial success, that's good for the crypto
6     industry.  And I generally think what's good for
7     the crypto industry is probably good for Ripple.
8          Q.    And ████████ had experience as a
9     journalist?
10                MR. SOLOMON:  Objection; form.
11         A.    He did.  He did have experience as a
12    journalist.  I believe he was publisher or editor
13    of a New York-based publication called The
14    Observer.
15         Q.    Okay.  And ████████ offered to
16    introduce Ripple to people connected to the Trump
17    administration?
18                MR. SOLOMON:  Objection; form.
19         A.    I believe that's fair, yeah.
20         Q.    And did he?
21         A.    Yes.
22         Q.    Who did he introduce you to?
23         A.    He introduced me to Jared Kushner.
24         Q.    Okay.  You personally?
25         A.    Yes.

1       Q.    What was the purpose of the

2    introduction?

3       A.    You know, it was, frankly, I'd say, more

4    social than it was professional.  We met on a

5    Sunday morning at a country club and we sat

6    informally around a pool table -- or, sorry, a

7    swimming pool at a country club and I don't

8    remember all the things we discussed.

9       Q.    So I only -- I'm only interested in

10   whatever part of it that was professional.

11            Do you recall what the purpose of the

12   introduction was?

13      A.    You know, I think the more we have --

14   the more there are influential senior people who

15   are believers in the crypto industry and how it's

16   evolving and the need for clear regulation in the

17   United States to help that industry thrive in the

18   United States, I think that's good for the crypto

19   industry.  I think it's good for Ripple.  You

20   know, good for the industry.

21      Q.    And so Mr. Kushner was one of those

22   people?

23      A.    One --

24      Q.    One of those people who believed in the

25   crypto industry and how it's evolving?

212

```
 1          A.   No, I don't think that was my testimony.
 2     I -- I -- I think I said we wanted to evangelize
 3     and educate people of influence about --
 4          Q.   I see.
 5          A.   And I would think many people in the
 6     room probably agree that Mr. Kushner was a person
 7     of influence.
 8          Q.   I see.
 9               So you -- so more -- sorry.  More --
10     more to educate/evangelize to him about crypto?
11     That was the professional purpose of the meeting
12     to the extent there was one?
13               MR. SOLOMON:  Objection; form.
14          A.   Yeah, again, I don't think I'd call it a
15     meeting.  I think I might have been wearing a
16     swimsuit.
17          Q.   Did you ask him to introduce you to
18     other people?
19          A.   No.
20          Q.   Did you ask him to talk to the SEC
21     about, you know, XRP?
22          A.   No.
23          Q.   Did you ask -- did you or anyone at
24     Ripple ask the staff of Senator Cotton to talk to
25     the SEC about XRP?
```

1    A.    I don't recall.  I don't know.

2    Q.    Did you have conversations with the

3  staff of Senator Cotton about XRP?

4    A.    I don't recall.

5    Q.    And who -- what documents might refresh

6  your recollection about that?  Would it be your

7  meeting agenda, your calendar, or something else?

8         MR. SOLOMON:  Objection; form.

9    A.    I recall meeting with Senator Cotton.  I

10  don't recall meeting with any of his staff.  I

11  don't recall speaking to any of his staff.  And I

12  don't know what documents would refresh my memory.

13    Q.    You recall meeting with him.

14         Did you discuss Ripple or XRP at the

15  meeting or was it about something else?

16         MR. SOLOMON:  Objection; form.

17    A.    We did discuss Ripple and I don't

18  remember the specifics.  It was, you know, I think

19  two years ago?  I don't remember exactly.  It was

20  a while ago.  And he came to our office and we

21  talked about what Ripple's doing and -- I guess it

22  may have been more than two years ago just given

23  COVID time.  So two and a half years ago maybe.

24    Q.    After the SEC letter?  After you

25  received the SEC letter?

214

```
 1          A.   I -- I actually don't recall, but that's
 2    certainly possible.
 3          Q.   Did you discuss the SEC with him?
 4          A.   I don't recall.
 5          Q.   Did anyone take notes at the meeting?
 6          A.   I don't know.
 7          Q.   Do you have a practice about taking
 8    notes?
 9          A.   Me personally?  No.
10          Q.   You or, you know, maybe your assistant,
11    the people who came with you to the meetings.
12          A.   Generally speaking, no.  I -- there was
13    not a practice.  Maybe one of the blessings and
14    curses of being a start-up is things don't have a
15    practice as opposed to you're kind of trying to
16    figure it out every day.
17          Q.   Did Mr. Kushner offer to speak with
18    anyone about Ripple?
19          A.   I suspect yes.  I -- I don't have a
20    specific -- well, I mean, he offered to organize
21    a -- what was largely a social visit with
22    Mr. Kushner.  I --
23          Q.   Sorry.  I asked if Mr. Kushner offered
24    to speak with anyone at Ripple.
25          A.   Oh, sorry.  I thought you asked
```

```
 1    Mr. ███████     Sorry.  I apologize.

 2         Q.    No, no.  Kushner.

 3         A.    I don't recall.

 4               (Whereupon, exhibit is received

 5         and marked Garlinghouse Deposition

 6         Exhibit 27 for identification.)

 7    BY MR. TENREIRO:

 8         Q.    Here's Exhibit 27.

 9               (Pause)

10         Q.    Okay.  Sorry.

11               Mr. Garlinghouse, do you see this email

12    thread with you, Ms. O'Gorman, and Monica Long?

13         A.    I do.

14         Q.    Okay.  And here Ms. O'Gorman references

15    ████ asking Chris Giancarlo to state certain things

16    in an upcoming speech.

17               Do you see that?

18         A.    I do.  I'm not sure if your

19    characterization is correct about who wrote that.

20         Q.    Who wrote it?

21         A.    I don't know.

22         Q.    Well, I -- I wasn't -- I wasn't saying

23    who wrote it.  I'm simply asking you --

24         A.    I think you asked me do you see what

25    Ms. O'Gorman asked as it relates to ████ asking
```

[9/20/2021] Garlinghouse, Bradley 9.20.2021

1   Giancarlo.  And I'm just saying I don't know.

2   Given the indented structure of this email, I'm

3   not sure who wrote the email part you're

4   referencing.

5       Q.   Right.

6            I'm simply saying there was some idea

7   going on that ███████████ might ask Chris Giancarlo

8   to say certain things, is that correct?

9                MR. SOLOMON:  Objection; form.

10      A.   It looks like there's a -- I'm sorry,

11  repeat the question one more time.

12      Q.   Is there this sort of idea being

13  discussed at Ripple at this time that ███████████

14  might ask Chris Giancarlo to make statement --

15  certain statements?

16      A.   It looks like there's some desire to get

17  the then-chair, I think, of the CFTC to

18  differentiate between consumer-facing digital

19  currency use cases versus institutional.

20      Q.   What is consumer facing?

21      A.   Could you elaborate on that question,

22  please?

23      Q.   What does consumer-facing digital

24  currency use cases mean?

25      A.   I mean, I don't know.  I didn't write

217

1   it.

2         Q.   Just generally, forget the email, what

3   is -- if you hear "consumer-facing digital

4   currency use cases," what do you understand that

5   to mean?

6         A.   Well, if I heard that in 2017 versus

7   2021, I might have a different answer.  In 2017,

8   when this email was written, I'm probably thinking

9   about -- you know, this is around the time when

10  there had been an explosion of ICO activity and

11  you had things like Bananacoin being launched and

12  you had, frankly, I think, lots of craziness going

13  on in the market.

14         Some of those had consumers in mind as

15  direct -- direct adopters or direct, even,

16  investors.  And so I don't know beyond that what

17  they're referencing.

18        Q.   And back in 2017, you would distinguish

19  XRP from that?  You know, you're absolutely

20  welcome to look at the email, but I'm just asking

21  you, if you're sitting back in 2017, would you

22  distinguish XRP from consumer-facing digital

23  currency use cases?

24        A.   When you ask that, what are you thinking

25  of as a consumer-facing --

```
 1        Q.   It's whatever you mean as
 2   consumer-facing digital currency use cases.
 3             MR. SOLOMON:   I think those
 4        questions are -- are vague and hard for me
 5        to follow.   I don't know if you can follow
 6        them, but...
 7        A.   I don't know what -- I don't know who
 8   wrote this.   I don't know what they meant when
 9   they said "consumer-facing digital currency use."
10   You're asking me a question about using the
11   expression digital facing consumer -- or
12   digital -- whatever the -- and I'm asking what you
13   mean by that.
14        Q.   Do you not understand the phrase, the
15   term then, "consumer-facing digital currency"?
16        A.   I think there's lots of potential
17   interpretations of what that means.
18        Q.   Okay.   Is -- you also mentioned that
19   your understanding might be different in 2017 than
20   in 2021.
21             How has that evolved?
22        A.   I think in the four years since this
23   email was written, the crypto markets, digital
24   currencies, have changed and evolved a lot.   You
25   know, there's lots of ways to measure that.   And
```

1   so, you know, without knowing who wrote it,

2   without knowing what they meant, it's just hard

3   for me to know how to answer the question.

4       Q.   Again, setting the email aside, you

5   know, did there come times in, say, 2017 and 2018

6   when you stated publicly your view that you did

7   not think of the use case for digital currencies

8   as, you know, buying things, like going to

9   Starbucks and getting a cup of coffee?

10      A.   That's directionally accurate.  It's a

11  little bit incomplete.  I -- you know, I think

12  what I have said publicly is I more often than

13  not, particularly in that time period, referred to

14  these as digital assets or crypto assets.  What I

15  typically pointed out is to the extent you're

16  thinking of these as fiat currencies, I had said

17  that I view the G20 fiat currencies -- and

18  typically I call it the dollar or euro or yen --

19  as very effective in solving the use case and

20  problems that -- for consumer -- consumer-facing

21  experiences.

22           I have often gone on to explain there

23  are some markets where that's less true outside

24  the G20 where governments have effectively lost

25  control of their currencies already and, by

220

1    extension, there might be more consumer interest,

2    consumer demand, consumer usefulness.

3          But I typically have pointed out for a

4    U.S. audience, whether it be media or a panel,

5    that for those that are saying we're going to use

6    bitcoin to buy coffee at Starbucks or bitcoin at

7    Amazon, I've found that to be, particularly in

8    2017, less likely.

9          Q.   Has that view changed?

10         A.   A little bit.

11         Q.   How so?

12         A.   Maybe I'm wrong.

13         Q.   But how -- how -- how has your view

14    changed?  Do -- do you view --

15         A.   The adoption, usage and custody of

16    cryptocurrencies here in the United States by

17    consumers has exceeded what I might have forecast

18    four years ago.

19         Q.   In your last couple of answers, you --

20    you have used the word "consumers" a number of

21    times.  And I think I understand when you're using

22    that word you're talking about people who might go

23    to Starbucks with a digital currency.  Is that

24    fair?

25         A.   Sure.

```
 1            Q.   Okay.  In this email -- I know you don't
 2     know who wrote it.  In this email, do you see a
 3     distinction between Ripple's XRP and that sort of
 4     consumer use case?
 5                 MR. SOLOMON:  Objection; calls
 6            for speculation, asked and answered.
 7                 You can answer as best you can.
 8            A.   You know, as you're well aware, there
 9     are lots of ways that XRP is used outside of what
10     Ripple does with XRP.  There are today, and there
11     were in 2017, consumer-facing experiences of how
12     people used XRP.
13                 Ripple's approach, both then -- well,
14     I'll just talk about then and when it was written.
15     Ripple's approach and how we pri -- focused on
16     using XRP was using XRP to solve an institutional
17     liquidity management problem.  And so I think for
18     purposes of this email, my guess is they're trying
19     to make that distinction.
20            Q.   So Ripple's approach back then was
21     not -- Ripple's approach was not the
22     consumer-facing experience.  Is that fair?
23                 MR. SOLOMON:  Objection; form.
24            A.   I think what I said is, you know, lots
25     of people in the XRP ecosystem, and including
```

222

1    2017, there were certainly consumer use cases of

2    XRP in 2017.  Ripple's focus and the customers we

3    were targeting was more to use XRP at an

4    institutional level for liquidity management.

5         Q.   Not to go to Starbucks to buy their

6    coffee?

7         A.   Not to go to Starbucks to buy their

8    coffee.

9         Q.   Okay.  And has that charged?

10        A.   I mean, Ripple's --

11        Q.   I'm not talking --

12             (Indiscernible cross talk; reporter

13   requests one speaker.)

14        A.   I don't think Ripple's focus has

15   changed.

16        Q.   Okay.

17        A.   As I said, to the extent my opinion

18   about this topic has changed over the years, I

19   have been surprised by the breadth of consumer

20   adoption of cryptocurrencies, including XRP, and

21   how people are using them beyond what I might have

22   thought given the strength of the dollar and what

23   have you.

24        Q.   Sure.

25             (Whereupon, exhibit is received

 1            and marked Garlinghouse Deposition

 2            Exhibit 97 for identification.)

 3    BY MR. TENREIRO:

 4        Q.    All right. let's look at Exhibit 97.

 5                MR. SOLOMON:  Just for the

 6            record, pages 3, 4 and 5 are something

 7            akin to an Excel spreadsheet-like chart

 8            and it is impossible for me to read and I

 9            have 20/20 vision.

10                So I want you to be careful

11            about answering questions on those last

12            four pages.

13                MR. TENREIRO:  Sure.  And it's

14            there for completeness.  I don't think I

15            have questions on those sheets.  I might.

16                MR. SOLOMON:  Right.  And I'm not

17            being difficult.  I just wanted to point

18            out I just can't read it.

19                MR. TENREIRO:  We can blow it up

20            on the laptop if we need to read it.

21                MR. SOLOMON:  Yeah, that's

22            perfect.

23                (Pause)

24    BY MR. TENREIRO:

25        Q.    Can you read the attachment?

224

```
 1        A.   Not all of it.  I wear glasses, which
 2   helps.  No.
 3        Q.   Focus in on the email first.  If
 4   you're -- if you're still reading, go ahead.
 5             MR. SOLOMON:  Why don't you
 6        just -- would it be okay if he just read
 7        the email or do you want him to make sure
 8        that he's read the whole thing?
 9             MR. TENREIRO:  I want to ask
10        about the email, but I don't want to stop
11        him from reading if he wants to read it.
12             THE WITNESS:  I'm good.
13   BY MR. TENREIRO:
14        Q.   Okay.  What is -- what is this email
15   about in your own words, Mr. Garlinghouse?
16        A.   This is an email from
17   soliciting a renewal of previous marketing spend
18   on the website
19        Q.   The -- at the bottom of the email,
20   there's a reference to "          the same as
21   Ripple had paid over the last three years."
22             Do you see that?
23        A.   I do see that.
24        Q.   Is that accurate, that Ripple --
25        A.   I don't actually think it is.
```

225

```
 1          Q.   Okay.  What do you think the payments
 2   were?
 3          A.   I think that that's an increase, but I'm
 4   not sure.
 5          Q.   Did you -- did Ripple approve this --
 6   did Ripple respond to this request?
 7          A.   I don't recall.
 8          Q.   Okay.  Would it be reflected in bank
 9   records?
10          A.   Well, I thought you meant did someone
11   reply to the email.
12          Q.   No.  Did Ripple simply respond to the
13   request in any way?
14          A.   I -- I think we ended up spending maybe
15   ████████     in 2021 on ████████████████
16          Q.   Okay.  And you referred to it as a
17   marketing spend?
18          A.   It would have been considered a
19   marketing spend, yeah.
20          Q.   What does that mean?
21          A.   I mean, my recollection is that we
22   actually got ads on the website.
23          Q.   In the -- in the email he's referencing
24   all the stories about XRP and Ripple that he's
25   published.
```

226

```
 1              Do you see that?
 2        A.    Well, if you look at the list, I mean,
 3    there's a bunch of stories that have nothing to do
 4    with Ripple or XRP.
 5        Q.    I understand that.  But in the email, is
 6    he not referencing -- I mean, why don't we just go
 7    through it.
 8              "I have been able" -- "I believe we've
 9    been able to show over the course of the year that
10    the site has been incredibly valuable in advancing
11    Ripple's aims.  I've attached a spreadsheet that
12    contains almost 50 stories that align with
13    Ripple's goals."
14              Do you see that?
15        A.    Yes, I see that.
16        Q.    Okay.  So why is he referencing stories
17    that align with Ripple's goals in his request for
18    funding?
19              MR. SOLOMON:  Objection; calls
20        for speculation.
21        A.    I don't know.
22        Q.    Were the ads for Ripple or for XRP?
23        A.    Ripple.
24        Q.    If I -- if I clicked on the ad, what
25    would it take me to?
```

227

```
 1        A.   I think it would take you --
 2                MR. SOLOMON:  Objection.
 3        A.   I think it would take you to the Ripple
 4   website.
 5        Q.   The how to buy XRP part of it?  Which
 6   part of it?
 7        A.   I don't know.
 8        Q.   Okay.  You don't know either way, so it
 9   could have been that part?
10        A.   I would be very surprised if that were
11   the case.
12        Q.   Why?
13        A.   When Ripple thinks about its marketing
14   of Ripple, its primary goal is signing up
15   financial institutions to RippleNet or other
16   goals.
17        Q.   And one of the ways you sign up
18   financial institutions is ads on ████████
19   ████████
20                MR. SOLOMON:  Objection; form.
21        A.   We spend marketing dollars to generate
22   leads on financial institutions globally in lots
23   of different ways.  One of them has been spending
24   money on ███████████████
25        Q.   And has Mr. ████████ ever sort of given
```

1    you any, like, traffic numbers to show that

2    financial institutions are visiting his web to --

3    you know, so that it's sort of worth your money?

4         A.    I mean, if -- maybe I can save us both

5    some time on this.  I will stipulate up front that

6    I don't think this is the best marketing spend we

7    ever spent.  I think a board member is

8    championing -- and as I testified earlier -- the

9    creation of a new website.  It hopefully improves

10   the overall coverage of crypto and blockchain in a

11   way that matures the industry.

12             Even if that doesn't yield a direct

13   lead, as a board member it's probably something

14   that I'm going to be slightly more sympathetic to

15   than the specific measurement of how many

16   financial institution leads did we get from the

17   website.  But we also may have gotten some leads.

18   I don't know.

19        Q.    Sure.

20             And I guess my question is, do you have

21   any understanding as to why Mr.         is giving

22   you a list of articles published about crypto as

23   opposed to a list of leads you got from the ads on

24   his website?

25             MR. SOLOMON:  Objection; asked

1          and answered.

2          A.    I think he's trying to substantiate

3     something that he's saying that is his opinion by

4     providing data.  I happen to have scanned some of

5     the stories and I don't agree with him.

6          Q.    You don't agree with the stories?

7          A.    I don't agree with his

8     characterization --

9          Q.    Oh, I'm sorry.

10         A.    -- that you read earlier.

11         Q.    You don't agree with his

12    characterization that the site has been valuable

13    in advancing Ripple's aims?

14              MR. SOLOMON:  Objection; form.

15         A.    What he writes is "I believe we've been

16    able to show over the course of the year that the

17    site has been incredibly valuable in advancing

18    Ripple's aims.  I've attached" --

19              THE REPORTER:  You're going to

20         have to slow down.

21              THE WITNESS:  Sorry.

22              MR. SOLOMON:  Read -- read

23         slower.

24         A.    "I believe we have been able to show

25    over the course of the year that the site has been

```
 1    incredibly valuable in advancing Ripple's aims.
 2    I've attached a spreadsheet that contains almost
 3    50 stories that align with Ripple's goals."
 4           The font size makes it challenging, but
 5    I -- as I scan this, I have a hard time
 6    understanding how the Central Bank of the Bahamas
 7    launching the world's first central bank digital
 8    currency aligned -- sorry.
 9                MR. SOLOMON:  It's not just me
10           even though you're wearing glasses, just
11           for the record.
12       A.   That power -- tourism economy -- you
13    know, here's a -- "The nonprofit has already
14    joined forces with the Libra Association and Celo
15    Foundation to use blockchain technology to bring
16    the" --
17                THE REPORTER:  You're going to
18           have to slow down when you read.
19                THE WITNESS:  I apologize.
20       A.   I don't think I need to read the
21    headlines.  My point is Mr.           is seeking --
22    he's selling.  He's seeking money from Ripple and
23    he's creating a narrative of why it would be good
24    for Ripple to do that.  I'm reviewing what he said
25    and I'm reviewing his data he's substantiating it
```

231

1    with and I'm saying I don't know.

2         Q.   In other words, you don't think that all

3    of these articles advance Ripple's goals?

4         A.   Yeah.  Yeah.  I -- it's not clear to me

5    that what he is representing, that there's 50

6    stories that have -- "contains almost 50 stories

7    that align with Ripple's goals," I don't know if

8    that's true or not.

9         Q.   There's a story, though, referenced

10   about Chris Giancarlo's statement that XRP is not

11   a security, right?

12              MR. SOLOMON:  Let's focus in on

13        that.  I want to see that one.

14              MR. TENREIRO:  It's in the last

15        page that actually has language.

16              MR. SOLOMON:  Okay.  Give me a

17        minute to read that one, please.

18              THE WITNESS:  Actually, can

19        somebody point to me where that is?

20              MR. SOLOMON:  I really think you

21        guys should put this up or give him a

22        chance to really closely review it.  I

23        don't think it's fair.

24              MR. TENREIRO:  Yeah.  It's just

25        on the last page with text on the middle

232

```
1          of the page.  It's on 6/18/2020.  "'Crypto
2          Dad' Chris Giancarlo."  And I'll just read
3          it since I apparently have a little bit
4          better vision.
5                    "'Crypto Dad' Chris Giancarlo:
6          XPR is not a security."  That's the head.
7          The subhead is "The former Commodity
8          Futures Trading Commission chair was a
9          leading force in removing the Scarlett
10         'S' from bitcoin and ether, and he
11         remains influential.  But making the same
12         argument for XRP is weakened as his law
13         firm works for Ripple."
14    BY MR. TENREIRO:
15         Q.   Do you see that?
16         A.   Yes.
17         Q.   Does that article advance Ripple's
18    goals?
19         A.   Yeah.
20         Q.   Okay.  And did you provide Mr. █████
21    with talking points to share with Mr. Giancarlo
22    before he made public statements about XRP's
23    status under the securities laws?
24         A.   Not that I'm aware of.
25         Q.   Let's look at Exhibit 108, please.
```

[9/20/2021] Garlinghouse, Bradley 9.20.2021

233

```
 1                    (Whereupon, exhibit is received
 2           and marked Garlinghouse Deposition
 3           Exhibit 108 for identification.)
 4    BY MR. TENREIRO:
 5           Q.   While they get it, do you think someone
 6    who was a board member for Ripple for three years
 7    understands Ripple's goals?
 8                    MR. SOLOMON:  Objection; calls
 9           for speculation.
10           A.   I would hope so.
11           Q.   Okay.  Did Mr. Larsen have any input in
12    the decision to hire ███████████████?
13                    MR WARD:  Object to form.
14           A.   I don't think we hired ███████████
15           Q.   To pay ██████████████
16           A.   Yes.
17           Q.   What input did he have?
18           A.   He thought we should do it.
19           Q.   And did you think that you should do it?
20           A.   I didn't know.  I believe that advancing
21    journalistic credibility and journalistic
22    professionalism in the crypto industry is a good
23    thing.  Whether or not █████████████████ was the
24    best way to achieve that, I don't know.
25           Q.   Did Ripple have involvement in ████████
```

234

```
 1         ██████████ s preparation of articles it might

 2    publish on its website related to Ripple?

 3         A.   No.  Well, wait, wait, wait.  That's not

 4    fair.  You're asking me did Ripple have

 5    involvement?  I made myself available for

 6    interviews by reporters who worked for ██████

 7    ██████████ who then wrote articles about Ripple.

 8    As he references, sometimes I didn't like them.

 9         Q.   And in terms of journalistic

10    professionalism, did you request that ██████████

11    ██████████ disclose payments from Ripple to ██████

12    ██████████ hen it was reporting on Ripple?

13         A.   I believe -- you'd have to ask ██████

14    ██████████   I believe ████████████████ did have

15    information on its website that disclosed that ████

16    ███████████████████████████████

17         Q.   My question:  In terms of journalistic

18    professionalism, did you request that ██████████

19    ██████████ disclose payments from Ripple to ██████

20    ██████████ when it was reporting on Ripple?

21         A.   I've never heard of any company --

22    that's a question for a journalist, not for the

23    company.  For me to request The New York Times --

24    I mean, I don't know.  At some point we have

25    sponsored things at Fortune Magazine.  When they
```

```
 1   write about Ripple, do they disclose that we have
 2   spent marketing dollars on Fortune related -- you
 3   know, that's a question for a journalist.  I don't
 4   think it's a question for Ripple.
 5        Q.   Right.  My only question, though, was
 6   whether you requested that.
 7                MR. SOLOMON:  Do you remember
 8        requesting that?
 9        A.   I don't recall ever requesting that.
10        Q.   Okay.  Here's Exhibit 108, which is
11   GARL_Civil-1342.  Two-page text messages.
12                THE WITNESS:  Sorry.  Could you
13        make a copy available for --
14                MR. SOLOMON:  He's bringing some
15        more copies.  Oh, do you have any more?
16                MR. TENREIRO:  I gave you six.
17        There's just one page there.
18                THE WITNESS:  Oh, sorry.  Oh,
19        right.  Sorry, sorry, sorry.
20                (Pause)
21   BY MR. TENREIRO:
22        Q.   Okay.  Having looked at that text chain,
23   does that refresh your recollection as to whether
24   you provided talking points to Mr. Giancarlo
25   through             ?
```

236

```
 1        A.   I -- I still don't recall.  I see that
 2   on the piece of paper.
 3        Q.   So did you provide it?  I mean, do you
 4   have any reason to believe that you did not
 5   provide talking points?
 6        A.   No, I see that I provided some
 7   information to Mr.          via text messages.  I --
 8   I don't recall doing this.
 9        Q.   Why did you provide that information to
10   Mr. Kurson for ideas for -- let's be clear.
11             On the second page of the email -- of
12   the text chain, there appears to be a text from
13   you at 21:25:02.
14             Do you see that?
15        A.   I do.
16        Q.   Okay.  Is that -- is that your phone
17   number?
18        A.   It is.
19        Q.   Okay.  And it says "Here are three ideas
20   for C."
21             Do you see that?
22        A.   I do.
23        Q.   Is that a reference to Chris Giancarlo?
24        A.   I presume.
25        Q.   Okay.  And then you have three points.
```

1    I'm not going to read them.

2            Why did you provide those points to C?

3        A.   I think I'm suggesting ideas at ███ s

4    request as to how Giancarlo could be helpful.

5        Q.   Helpful to what?

6        A.   To providing clarity in the market about

7    the regulatory status of XRP.

8        Q.   By removing the Scarlett S as he called

9    it in the article on ███████████?

10       A.   I --

11           MR. SOLOMON:  Objection; form.

12       A.   I -- I mean, you're conflating -- you're

13   merging two things that have a lot of distance

14   between them in my mind, but...

15       Q.   Well, the Scarlett S is a reference to

16   security, right?  Is that how you understand it?

17       A.   I -- I believe so.

18           MR. SOLOMON:  Objection; form.

19       A.   I'm not sure I read the article.

20       Q.   Okay.  And did Mr. ███████ provide these

21   ideas to Mr. Giancarlo?

22       A.   I don't know.

23       Q.   In terms of advancing professional

24   behavior in journalism, did you request to

25   Mr. ███████ that he disclose in his article about

238

1    Giancarlo that you had provided some of the

2    talking points?

3                    MR. SOLOMON:  Do you remember

4         doing that, Brad?

5                    THE WITNESS:  Well, hold --

6                    MR. TENREIRO:  Please don't

7         coach, Matt.

8         Q.   Did you ask -- did you ask --

9                    MR. SOLOMON:  That's the question

10        you just asked.

11                   MR. TENREIRO:  No.

12        Q.   I simply -- I asked you if you requested

13   to Mr. Kurson that he disclose that you had

14   provided talking points.

15        A.   Okay.  So the first thing, I think, is I

16   am not aware that the article you're referencing

17   was written by Mr. █████████.

18        Q.   Did you request to Mr. █████ that

19   ████████████████ whoever wrote it, make a

20   disclosure about your talking points?

21        A.   No.  I don't think these talking

22   points -- let's look at the date on the previous

23   exhibit and see if --

24        Q.   June 2020.

25                   THE REPORTER:  June?

239

```
 1              MR. TENREIRO:  2020.

 2              MR. SOLOMON:  What's June 2020?

 3              MR. TENREIRO:  I think he's

 4      looking for the date of the article.

 5              MR. CERESNEY:  Right.  The

 6      article is June 2020.  His text

 7      is January --

 8              MR. TENREIRO:  I understand.

 9              MR. CERESNEY:  The subsequent

10      email is December 2020.

11      A.   Is your assertion that the text --

12      Q.   I'm not making any assertions.

13              MR. CERESNEY:  I think you

14      interrupted.

15              MR. SOLOMON:  I think he thinks

16      you are.  So maybe ask him questions.

17 BY MR. TENREIRO:

18      Q.   My question is, did you request that

19 Mr.        disclose in the

20 article about Giancarlo that you had provided

21 talking points to Mr.          It's a question.

22      A.   I provided talking points to Mr.

23 in January.  Someone at              wrote an

24 article five months later, not Mr.        And

25 you're wondering if I asked Mr.        to disclose
```

240

```
 1    in the article that I had provided talking points
 2    to a board member about a conversation with
 3    Giancarlo?  Do I have that right?
 4        Q.   Yes.
 5        A.   No.
 6        Q.   Okay.  Did you make public comments
 7    about Mr. Giancarlo's statement about XRP?
 8        A.   I don't recall.
 9        Q.   Okay.  Did you, if you made public
10    comments about Mr. Giancarlo's statement about
11    XRP, talk about Mr. ▓▓▓▓▓ s relationship to
12    Giancarlo, for example?
13              MR. SOLOMON:  I'm sorry.  You
14         said if he made comments?
15              MR. TENREIRO:  Well, he says he
16         doesn't recall.  But I'm asking if he
17         made, you know, public statements about
18         ▓▓▓▓▓▓ s relationship to Giancarlo.
19              MR. SOLOMON:  So, separately, do
20         you recall making statements about --
21              THE WITNESS:  I don't know what
22         ▓▓▓▓▓▓ s relationship with Giancarlo is.
23    BY MR. TENREIRO:
24        Q.   Okay.  Did he provide the talking points
25    you suggest in your text?
```

241

1       A.   I believe you asked that and I said no.

2       Q.   Have you ever --

3       A.   I don't know.

4       Q.   Have you ever met Mr. Giancarlo?

5       A.   I don't know.

6       Q.   Have you ever spoken to him?

7       A.   I think I might have had a phone call

8   with him once.

9       Q.   About what?

10      A.   I don't recall.

11      Q.   And Ripple has hired his law firm?

12      A.   I believe that's the case.

13      Q.   Okay.  And just to -- what's -- is this

14  for legal advice?

15      A.   I believe that's the case.

16      Q.   Who -- when was the law firm hired?  Is

17  this Willkie Farr?

18           MR. SOLOMON:  Objection; form.

19      A.   Had you not said the name, I wouldn't

20  have known the answer, but I believe that's

21  correct.  And I would have to ask one of the

22  people at this table for when Willkie Farr was

23  engaged.

24      Q.   Right.

25           Have you ever provided anything of value

242

1   to Mr. Giancarlo?

2        A.   Have I personally provided anything of

3   value --

4        Q.   Ripple.

5        A.   I mean, to the extent that Ripple hired

6   the law firm Willkie Farr, I think by extension

7   that we provided some value to Mr. Giancarlo --

8              MR. SOLOMON:  Objection to your

9         use of -- of a legal term.  Anything of

10        value?  I'm not sure what the insinuation

11        is.  They hired a firm.  That's what they

12        did.

13             MR. TENREIRO:  I asked --

14             MR. SOLOMON:  I was

15             (Indiscernible cross talk;

16        reporter requests one speaker)

17             MR. SOLOMON:  Are you asking

18        something apart from hiring a law firm

19        when you say "a thing of value"?  I want

20        to make that clear --

21             MR. TENREIRO:  Yeah, I --

22             MR. SOLOMON:  -- because that's

23        confused.  It has all kinds of legal

24        meaning, as you know.

25             MR. TENREIRO:  Thank you.

243

1  BY MR. TENREIRO:

2      Q.   Other than the hiring of the law firm,

3  has Ripple ever, you know, paid anything for

4  Mr. Giancarlo?  I was using "anything of value"

5  just to be broad.

6      A.   Not that I can recall.

7      Q.   Okay.  And have -- have you,

8  Mr. Garlinghouse, directly or indirectly, ever

9  provided anything of value to Mr. Giancarlo?

10      A.   Not that I'm aware of.

11      Q.   Okay.

12           MR. TENREIRO:  Let's do 121,

13      which I have.  And this one, I don't know

14      how many copies I have.

15           MR. SOLOMON:  That's okay.  We'll

16      deal with it.

17           (Whereupon, exhibit is received

18      and marked Garlinghouse Deposition

19      Exhibit 121 for identification.)

20           MR. TENREIRO:  All right.  For

21      the record, this is an email with Bates

22      RPLI_SEC 235028.  It appears to be around

23      November 27, 2018.

24  BY MR. TENREIRO:

25      Q.   I don't see you on the e-mail, but I'm

244

```
 1      going to ask you some questions about the

 2      contents.

 3              Have you read it?

 4          A.   Yes.

 5          Q.   Okay.  Do you recall an article on

 6      ████████████ about infighting at CoinBase and

 7      the exclusion of XRP from CoinBase?  Do you recall

 8      that?

 9          A.   No.

10          Q.   Mr. Larsen says, "Nice.  We're getting

11      very friendly with them, by the way.  ████ even

12      apologized to me at a recent event."

13              Do you see that?

14          A.   Yes.

15          Q.   Do you know who the reference to ████

16      is to?

17          A.   I assume ████████, but I don't

18      know.

19          Q.   Who is ████████?

20          A.   He's the ████████

21          Q.   Okay.  And then it says "Yes, Brad told

22      me that.  But I didn't put it in the story because

23      I didn't want to blow you up."

24              Do you see that?

25          A.   I do.
```

245

```
 1          Q.   Okay.  Did you tell -- what did you tell
 2     Mr. ███████ about the relationship with ██████
 3     before the article was published?
 4          A.   I -- I don't recall.
 5          Q.   Okay.  Were you around November of 2018
 6     getting more, you know, friendly with
 7     Mr. ███████████?
 8          A.   No.
 9          Q.   Okay.  And do you recall a story
10     suggesting that there were personal reasons why
11     CoinBase was not listing XRP?
12          A.   Can you ask the question again?
13          Q.   Do you recall a story in the media
14     suggesting that there were personal reasons why
15     CoinBase was not listing XRP?
16          A.   The only recollection I have is there
17     was a meme suggesting that I had dated ████████
18     ████████████████████████ and there was somebody
19     upset with somebody about it.  And I -- I don't
20     know where that came from, but I thought it was
21     funny so I happen to remember it.
22          Q.   Someone suggesting that and that could
23     have been the reason why there was no listing?
24          A.   Yeah.
25          Q.   All right.
```

246

```
 1                    MR. TENREIRO:  Let's look at 122.
 2                    (Whereupon, exhibit is received
 3            and marked Garlinghouse Deposition
 4            Exhibit 122 for identification.)
 5                    MR. TENREIRO:  All right.  So
 6            this is a two-page email, RPLI_SEC 591715.
 7            And it appears to be an email between
 8            Ms. Long and Mr. ▊▊▊▊ on April -- May
 9            28, 2020.
10       BY MR. TENREIRO:
11            Q.    Now, before I get into the email,
12       Mr. Garlinghouse, did you have an understanding as
13       to what sort of authority Mr. ▊▊▊ had at ▊▊▊
14       ▊▊▊ with respect to content of articles?
15            A.    I -- I don't know.
16            Q.    Okay.  And "XRP Facts" is the title of
17       this email?  The subject, rather.  Do you see
18       that?
19            A.    Yes, I do see it.
20            Q.    Okay.  And Ms. Long says "Hi, ▊▊
21       Below are facts or arguments to these 3-4 topics.
22       I'm stalled coming up with expert sources, but
23       will keep thinking on it."
24                    Then he says "This is a great start for
25       our reporting, thank you.  Definitely would
```

247

1    benefit from an expert who could verify some of

2    this."

3              Do you see that?

4        A.   Yes.

5        Q.   Okay.  And what -- what is the purpose

6    of Ms. Long, if you know, providing this

7    information to Mr. █████?

8        A.   I'm going to read the document first.

9        Q.   Yes.

10             MR. SOLOMON:  He's not on this

11        email.  It's fine to show it to him, but I

12        just...

13             MR. TENREIRO:  Okay.

14             MR. SOLOMON:  What do you think?

15             MR. TENREIRO:  After this, let's

16        do it.

17       A.   Can you repeat the question?

18       Q.   Yes.

19             The question is, what is the

20        purpose of Ms. Long providing this

21        information to Mr. █████ if you know?

22             MR. SOLOMON:  Objection;

23        speculation.

24       A.   I don't know.

25       Q.   Did she discuss with you providing XRP

```
 1    facts to Mr. ███████ for his reporting?
 2         A.   I don't recall.
 3         Q.   Did you approve of her providing XRP
 4    facts to Mr. ██████ for her reporting?
 5         A.   I don't recall.
 6         Q.   Were there other occasions other than
 7    this where you -- whether anyone -- sorry.
 8              Were there other occasions other than
 9    what's reflected in this email where people at
10    Ripple might have provided facts about XRP for
11    reporting on ███████████████?
12              MR. SOLOMON:  Objection;
13         speculation.
14         A.   If ████████████ were writing a story
15    about Ripple, we would have cooperated with them,
16    as we would most media outlets, to clarify,
17    correct, educate what is Ripple, what is XRP, and
18    the differences between.
19         Q.   And did the -- did other media outlets
20    -- did other media outlets come to Ripple often to
21    educate about what is XRP?
22         A.   Well, they would come to us in covering
23    Ripple and/or covering XRP.  And to the extent
24    they had questions, we would engage with them as
25    constructively as we could.
```

1      Q.   But my question is, did that occur often

2   with other media outlets other than █████████

3   ████████?

4      A.   Yes.

5      Q.   Okay.

6      A.   There was a lot of interest in crypto.

7   And I think Ripple as a leader in the space gets a

8   lot of media attention.

9      Q.   And did a lot of media outlets come to

10  Ripple for information about XRP other than █████

11  ████████?

12     A.   Yes.

13     Q.   Is that it?  Okay.

14          MR. SOLOMON:  He's saying "a

15     lot."  If there's just something -- I just

16     want to make sure.

17          MR. TENREIRO:  I think he

18     answered.

19     A.   Yeah.  I think my -- my testimony is

20  Ripple has a lot of attention in the marketplace.

21  Ripple is known as having expertise as it relates

22  to XR -- XRP, both by virtue of our engineering

23  resources, the fact that we use it in our

24  technology stack.  And so to the extent people are

25  interested in XRP, they would come to us on

250

1    occasion.

2        Q.   When you said "people," you're referring

3    to the press, right?

4        A.   Yeah.

5        Q.   Okay.

6        A.   Well, press and analysts.  I mean,

7    apparently ███████████

8        Q.   Members of the public?

9        A.   Sometimes, yeah.

10       Q.   Okay.

11              MR. TENREIRO:  Let's go off the

12       record.

13              THE VIDEOGRAPHER:  All right.

14       Going off the record at 1:04.

15              (Whereupon, a luncheon recess is

16       taken.)

17

18

19

20

21

22

23

24

25

251

```
 1                A F T E R N O O N   S E S S I O N
 2                    THE VIDEOGRAPHER:  Okay.  Back on
 3            the record at 1:53.
 4                    Go ahead.
 5       BY MR. TENREIRO:
 6            Q.   Mr. Garlinghouse, I see you brought your
 7       phone.
 8            A.   I did, actually.
 9            Q.   Can you tell me who you communicated on
10       with Signal, please?
11            A.   My -- I was -- I did communicate on
12       Signal --
13            Q.   No, not now.  Just generally, who have
14       you communicated with on Signal, since you have
15       the list on your phone with the messages?
16            A.   Oh, you want me to -- sorry.  You would
17       like me to open my phone and go through who on
18       Signal I've communicated with?
19            Q.   Yes.
20            A.              (phonetic)
21            Q.   Why don't we do this.  Why don't you
22       just read me the people who work at Ripple first.
23       I don't need to know anyone -- everyone you
24       communicated with.
25            A.   Okay.                       Monica
```

[9/20/2021] Garlinghouse, Bradley 9.20.2021

252

1    Long.
2           I'm now back on July 3rd and I haven't
3    hit any other names.
4           June, Chris Larsen.
5           May, Asheesh Birla.  May 11th,
6    ███████████████████.
7           I'm now back to the beginning of the
8    year.  Do you want me to keep going?
9       Q.   Yes.
10      A.   ████████████  He is no longer, but...
11           MR. SOLOMON:  Are you able to
12      clarify text versus phone calls versus
13      email?
14           THE WITNESS:  I'd have to open it
15      to --
16           MR. SOLOMON:  Okay.
17           THE WITNESS:  -- see that.
18           MR. SOLOMON:  Do you want him to
19      sit here and do this now?
20           MR. TENREIRO:  I just -- just the
21      Ripple people.  If you want him to
22      clarify, you can clarify.  I asked who he
23      communicated with --
24           MR. SOLOMON:  Okay.
25      Communications --

253

```
 1                    (Indiscernible cross talk;
 2          reporter requests one speaker.)
 3                    MR. SOLOMON:  Communications may
 4          be either a telephone call or a
 5          communication.  That's fine.
 6          A.                     Now we're back in 2020, but
 7                         Patrick Griffin,
 8
 9          Q.    Just let me know when you get to 2018.
10          A.    Oh, geez.
11          Q.    This is the last time you communicated
12    with these people?  Is that what it reflects?
13          A.    To be honest with you, I don't -- well,
14    actually, an -- an important clarification that
15    Mr. Solomon has brought up, the            entry
16    does not suggest I've communicated with her.  It
17    just says "             is on Signal."
18               So I think what happens, if you were
19    to -- if I had your mobile number in my address
20    book and you started using Signal, I would get a
21    notification.  So all it says is that "
22    is on Signal."  I apparently have never
23    communicated with her on Signal.
24               So some of the names I've -- I'm reading
25    to you the Ripple -- as you requested, I'm reading
```

1    to you the names of employees or those affiliated,

2    like board members, at Ripple as they come up

3    chronologically.

4             I'm now back in April of 2020. ████████

5    ████████ is listed at April 2020.

6        Q.   Okay.  Well, we'll get the rest of the

7    information from your counsel.  Let's move --

8    let's move on then.

9             Thank you.

10       A.   Well, if I may clarify.

11       Q.   Please.

12       A.   I believe, as part of discovery, you

13   have received the information that -- this is

14   information that was collected during discovery.

15       Q.   Okay.

16            MR. SOLOMON:  Yeah, I'm not quite

17       clear on what those names are relevant to

18       or what they signify.  We'd have to go

19       through each of them to see whether it was

20       a phone call, whether it was a message,

21       whether it was them popping up as having

22       joined Signal.

23            THE WITNESS:  Right.

24            MR. SOLOMON:  We haven't done

25       that yet, but I think the SEC got a

255

```
 1            sampling of the people in the last year or

 2            so whose names come up through your phone

 3            when you scroll through your phone.  So

 4            that's fine.

 5                    MR. TENREIRO:  Yeah.

 6     BY MR. TENREIRO:

 7            Q.   Okay.  Sorry, when you were scrolling

 8     there, was Mr. Solomon there as well?  I know I

 9     asked you for Ripple people, but...

10            A.   I believe I saw his name.  I did not

11     include him in the --

12                    MR. SOLOMON:  Right.

13            A.   He's sort of a Ripple person.

14                    MR. SOLOMON:  Sure.

15                    MR. TENREIRO:  Okay.  Let's do

16            Exhibit 77.

17                    (Whereupon, exhibit is received

18            and marked Garlinghouse Deposition

19            Exhibit 77 for identification.)

20                    MR. TENREIRO:  So for the record,

21            this is an email, RPLI_SEC 765249, two

22            pages.  It appears to be around February

23            of 2016.

24                    (Pause)

25                    THE WITNESS:  Okay.
```

1   BY MR. TENREIRO:

2      Q.   Okay.  Mr. Garlinghouse, just generally,

3   is it fair to say that this email, one of the

4   things that it's about, it's about a potential

5   how-to guide about buying XRP?

6      A.   I believe that's fair, yeah.

7      Q.   Okay.  You say "Echoing Monica's

8   sentiment, a how-to guide would be very valuable."

9

10             Why would it be valuable or why

11      was it valuable in February of 2016 to

12      have such a guide?

13      A.   I -- I don't recall.  What the email

14   seems to suggest is that consumers are -- well,

15   one point of reference.          at that

16   point read -- ran customer support.  And so he's

17   getting, I'm sure, inquiries from people all over

18   the world that -- to          and trying

19   to address a question that I guess is coming up

20   frequently.  So it's answering a question.

21      Q.   The question is how to buy XRP?

22      A.   I believe that's what      is saying,

23   yes.

24      Q.          references "consumers."  And I

25   think you just said that word, or maybe you said

257

1   customer, but -- oh, you said consumer.  Okay.

2              So was there a practice at Ripple around

3   February of 2016 to refer to potential purchasers

4   of XRP as consumers?

5        A.   I don't know.

6        Q.   Okay.  And so what is the reference to

7   "consumer" here?  "If you, as a consumer, heard

8   about XRP from the news and wanted to buy some,

9   there's a better than average chance you'd find

10  the whole process too difficult and quit."

11             What is the reference to "consumer"

12  there?

13       A.   We'd have to ask ▮▮▮▮▮▮

14       Q.   What did you understand it to mean when

15  you read the email?

16       A.   There's another reference to consumers

17  above that.  It says "Even though we don't serve

18  consumers" --

19       Q.   Uh-huh.

20       A.   -- "they play a role in the broader

21  Ripple ecosystem."

22       Q.   Right.

23       A.   So I think consumers are individuals

24  around the globe that may be emailing

25  ▮▮▮▮▮▮@ripple.com.

258

```
 1          Q.   And so Ms. Long says "We don't serve
 2     consumers."
 3               Do you understand that to mean "we,"
 4     Ripple, doesn't serve consumers?
 5               MR. SOLOMON:  Objection; form.
 6          A.   I -- I don't want to speculate what she
 7     meant.  I -- I read it as that we, Ripple, don't
 8     have consumers as a target market.
 9          Q.   Right.  And I definitely want to know
10     what you read it as, not what you speculate as.
11     So that's helpful.
12               And then the email says "Even though we
13     don't serve consumers, they play a role in the
14     broader Ripple ecosystem, and whether we like it
15     or not, they go to ripple.com to figure out how to
16     get started."
17               So, again, just reading that, do you
18     have an understanding as to what she's talking
19     about, the role that consumers play in the Ripple
20     ecosystem?
21          A.   I do not.
22          Q.   Okay.  What role do -- in -- what role
23     in 2016 did consumers play in the Ripple
24     ecosystem?
25          A.   I don't think I could give you an
```

1    exhaustive list.  As we've discussed during the

2    deposition, there's many use cases for XRP.  Some

3    of them in 2016 were consumer oriented; some of

4    them not consumer oriented.  And so I don't know

5    that I have a list.  I don't remember in 2016 what

6    consumer-facing projects existed in the XRP

7    ecosystem.

8         Q.   And who would know?

9         A.   In -- who would know today or --

10        Q.   Yeah.  If I wanted to find out in 2016

11   the projects that might have existed.

12        A.   I -- I -- I don't know.

13        Q.   Okay.  You say "We can run it by AOG to

14   make sure we aren't overdoing/promoting."

15             Do you see that?

16        A.   I do.

17        Q.   Who's AOG?

18        A.   I believe I'm referencing Antoinette

19   O'Gorman.

20        Q.   What were you trying to run by her?  The

21   how-to guide?

22        A.   I believe that's what I'm suggesting,

23   yep.

24        Q.   Did the how-to guide actually get

25   published at some point by Ripple?

260

1          A.    I don't know.

2          Q.    Did the how-to guide discuss potential

3     use cases of XRP by the consumers that were

4     reading the guide?

5          A.    I don't know if the guide existed.

6          Q.    Fair enough.

7                Why are you suggesting that you consult

8     AOG?

9          A.    I don't recall.  I have -- I mean, I

10    could speculate based upon, you know, what I wrote

11    about five years ago.  More than five years ago.

12         Q.    You talked about -- you talk about "to

13    make sure we aren't overdoing/promoting."

14               What are you referring to there?

15    Overdoing what?

16         A.    I -- I don't recall.  I can speculate

17    based upon what I might have meant five years ago.

18         Q.    Go ahead.

19         A.    So Antoinette O'Gorman was our chief

20    compliance officer.  We had signed a settlement

21    with FinCEN that restricted certain activities and

22    what have you.  And so AOG would have been making

23    sure we were living within the framework of that

24    settlement agreement with FinCEN.

25         Q.    Okay.  Was there something in the

1    agreement that related to overdoing something or

2    promoting something?

3         A.   I -- I don't recall.

4         Q.   So Ms. O'Gorman, one of her functions

5    was to make sure that Ripple was complying with

6    that -- with that settlement agreement?

7         A.   As chief compliance officer, that would

8    be part of her responsibilities, yes.

9         Q.   And that settlement agreement has

10   expired?

11        A.   I don't know the details.

12        Q.   Okay.  Ms. O'Gorman -- was this how-to

13   guide run by her?

14        A.   I don't know if the how-to guide exists.

15        Q.   Understood that maybe it didn't exist,

16   but did someone consult her with -- about a

17   potential how-to guide?

18        A.   Beyond this email, I don't recall.

19        Q.   Okay.  And if typically -- I mean, were

20   you typically following her directive about how to

21   comply with the FinCEN settlement, if she gave any

22   directives?

23        A.   Yes, I --

24             MR. SOLOMON:  Objection.

25        A.   I took the advice of the chief

 1    compliance officer seriously.  And to the extent

 2    she felt we were acting outside the scope of the

 3    FinCEN agreement, I would certainly take that

 4    seriously.

 5        Q.   Okay.  So would hers be emails you read?

 6    If you got emails from Antoinette O'Gorman --

 7            THE REPORTER:  Wait.

 8        Q.   If you got emails from Antoinette

 9    O'Gorman, would those be more likely to have been

10    read or not?

11            MR. SOLOMON:  Objection to form.

12        A.   I -- I -- I believe my testimony earlier

13    was my reading of emails probably has more to do

14    with how busy I am that day on other projects, not

15    filtered so much by who they're from.  I found

16    Antoinette's emails to be not dissimilar to other

17    emails.

18        Q.   Okay.  Let's look at this one.

19            MR. TENREIRO:  Exhibit 81.

20            MR. SOLOMON:  Can I have one?

21            THE WITNESS:  Oh, sorry, sorry,

22        sorry.

23            (Whereupon, exhibit is received

24        and marked Garlinghouse Deposition

25        Exhibit 81 for identification.)

263

```
 1                  MR. TENREIRO:  For the record,
 2           RPLI_SEC 761766, two-page email.
 3                  MS. FORBES:  Which exhibit is
 4           this?
 5                  MR. TENREIRO:  81.
 6                  MS. FORBES:  81.  Thank you.
 7                  (Pause)
 8      BY MR. TENREIRO:
 9           Q.   Okay.  This appears to be an email
10      thread from October 31st, 2016, Halloween.
11                  Do you see that?
12           A.   I do.
13           Q.   Okay.  Ms. O'Gorman says to you and
14      Mr. Griffin -- sorry.  Mr. Griffin asks "Can XRP
15      be both a currency (FinCEN territory) and a
16      commodity, (CFC territory)" -- "(CFTC)?"
17                  She responds, "Yes, it can, and more.
18      IRS is of the opinion that virtual currency is
19      'property.'  CFTC treats it as a 'commodity.'
20      FinCEN has stated their opinion that 'virtual
21      currency operates as "real" currency in some
22      environments' and the SEC may well come out on the
23      side that certain cryptocurrencies are
24      securities."
25                  And then she says something about
```

1    "interesting conundrum...that begs for a more

2    uniform regulatory approach."

3            Do you see that?

4        A.   I do.

5        Q.   Okay.  And is this some of the advice

6    from your chief compliance officer that you took

7    seriously?

8        A.   I don't know.

9               MR. SOLOMON:  Do you want to read

10       the rest of the sentence to him rather

11       than read just a portion of it?

12       Q.   It says "Interesting conundrum and one

13   that begs for a more uniform regulatory approach

14   at the federal and state levels, but the

15   probability of that ever happening is extremely

16   low."

17           Do you see all that?

18       A.   I do.

19       Q.   Okay.  And below Ms. O'Gorman -- sorry.

20           Below that, at the bottom, you have said

21   that you and she had just caught up on the issue

22   about some legal guidance.

23           Do you see that?

24       A.   I do.  I'm trying to understand the time

25   frame here because it looks like this reply

1    happened on October 31st, but this happened on

2    November 1st, which doesn't really make sense.

3    But anyway, that maybe isn't relevant to your

4    question.

5        Q.   Yeah.  I think that's because of the

6    time, you know, 1:33 a.m.  Emails report different

7    times based on where you're sending them.

8              MR. SOLOMON:  Maybe you were

9         overseas or something.  That is weird.

10             MR. TENREIRO:  Yeah.  All right.

11   BY MR. TENREIRO:

12       Q.   Did you -- when you caught up with

13   Antoinette O'Gorman on the issue here, did you

14   discuss the possibility that different regulatory

15   agencies can view XRP as different things under

16   their regimes?

17             MR. SOLOMON:  Objection; form.

18       A.   I don't recall.

19       Q.   Did Ms. O'Gorman ever state to you

20   anything different, other than what she's stating

21   here, that while FinCEN might have one

22   classification for XRP, other agencies such as the

23   IRS --

24             THE REPORTER:  Slow down,

25        please.

1    BY THE REPORTER:

2          Q.   -- such as the IRS and the SEC might

3    have different --

4                THE REPORTER:  You're going to

5            have to start the question over again.

6                MR. TENREIRO:  Yes.

7          Q.   Did Ms. O'Gorman ever state anything to

8    you different other than what she's stating here,

9    that while FinCEN might have one classification

10   for XRP, other agencies such as the IRS, the CFTC

11   and the SEC, might have different classifications?

12         A.   I don't recall.

13         Q.   And didn't she, in fact, reiterate this

14   view to you a few years later, after she left the

15   company?

16         A.   I don't recall.

17                MR. SOLOMON:  Objection; form.

18         Q.   All right.  Did anyone ever tell you

19   something contrary to what Ms. O'Gorman said here,

20   again, in sum and substance, that different

21   agencies could have different classifications for

22   XRP?

23                MR. SOLOMON:  Objection; form.

24         A.   I don't recall.

25                MR. TENREIRO:  Here we go.  This

1          is 44.

2                  (Whereupon, exhibit is received

3          and marked Garlinghouse Deposition

4          Exhibit 44 for identification.)

5                  (Pause)

6    BY MR. TENREIRO:

7          Q.    Okay.  So, first, is it fair to say that

8    while you were Ripple's -- as Ripple's CEO, you

9    send periodic updates to Ripple employees and

10   board members and Ripple -- Ripple shareholders?

11                MR. SOLOMON:  Objection to form.

12         A.    Could you ask the question one more

13   time?

14         Q.    Is it fair to say that as Ripple's CEO,

15   you send periodic updates about Ripple's business

16   to employees, board members and shareholders?

17         A.    Yes.

18         Q.    Okay.  Sometimes I think you did it

19   quarterly, sometimes maybe even weekly, is that

20   right?

21                MR. SOLOMON:  Objection to form.

22         A.    Depends on which audience we're talking

23   about.

24         Q.    Well, for Ripple board members and

25   shareholders.

268

1        A.    I think at various times over my tenure,

2    we've sent them monthly and sometimes we've sent

3    them quarterly.

4        Q.    And some of the Ripple shareholders are

5    also XRP holders, right?

6        A.    I don't know.

7        Q.    What about the board members?  Some of

8    them are XRP holders?

9        A.    I don't know.

10        Q.    Like Mr. Larsen?

11        A.    Yes.  Mr. Larsen, I do know he has XRP.

12        Q.    And Mr. Kurson?

13        A.    I don't know.

14        Q.    And yourself?

15        A.    Yes, I know that about myself.

16        Q.    Okay.  So some board members are XRP

17    holders?

18        A.    Yes.

19        Q.    Okay.  This email thread, Exhibit 44,

20    there's a -- one of these updates to investor and

21    advisors -- do you see that? -- from you.

22        A.    Yes.  Is that how I addressed it?

23        Q.    "Subject:  Re:  Ripple's Q2 investor and

24    advisor update."

25        A.    Okay.

269

1          Q.   Okay.  And Ms. O'Gorman responds.

2               Do you see that?

3          A.   I do.

4          Q.   Okay.  She says -- in the middle, she

5     says "And please let's never say again our belief

6     remains the same.  XRP should be regulated as a

7     currency," and then she goes on to repeat her view

8     that XRP will be regulated "as a property, as a

9     commodity, as convertible virtual currency and

10    potentially a security, all depending on facts and

11    circumstances."

12              Do you see that?

13         A.   I do see that.

14         Q.   Okay.  So Ms. O'Gorman, in fact -- does

15    this refresh your memory that Ms. O'Gorman

16    repeated to you in 2018 the advice she had given

17    to you in 2016 about the treatment of XRP in the

18    United States?

19         A.   It does not refresh my memory.  I read

20    what she has written here.

21         Q.   Did you -- did she ever after this point

22    have a conversation with you where she told you

23    anything to the contrary, that it would be only

24    regulated as a currency and not as a security?

25         A.   I don't recall.

1          Q.   Did you have a conversation with her
2     after this email -- about this email after this
3     email?
4          A.   I don't believe I spoke to her about
5     this email specifically.  I've spoken to
6     Antoinette since she wrote this email.
7          Q.   Sure.
8               And did you discuss -- when you've
9     spoken to her, did you discuss the issue of --
10              THE REPORTER:  Slow down.
11         Q.   When you spoke to her, did you discuss
12    the issue of currency versus security?
13         A.   Not that I recall.
14         Q.   Okay.  And in -- in your update -- I'd
15    like to direct you on page 3 to the part where you
16    say "That's one of the reasons we announced the
17    University Blockchain Research Initiative."
18              Do you see that?
19         A.   I do.
20         Q.   Who drafted these emails for you, by the
21    way, typically?
22         A.   I don't recall.
23         Q.   Did you have counsel review them?
24         A.   I don't know.
25         Q.   Okay.  Whose decision was it to commit

1     50 million to the UBRI?

2          A.   The company's decision.

3          Q.   Did you approve it?

4          A.   Yes, I did.

5          Q.   Did Mr. Larsen?

6          A.   I suspect he did.

7          Q.   Okay.  And the purpose of this funding

8     was what?

9          A.   For research and innovation in

10    blockchain.

11         Q.   Did any of the companies that are

12    involved with this administrative -- sorry.

13    Companies.

14              Did any of the universities involved in

15    this initiative become -- start operating

16    validators on the XRP Ledger?

17         A.   I believe some of them did.

18         Q.   Which ones?

19         A.   I don't recall.  I think the University

20    of Kansas was one of them.  Just I know because

21    I'm an alum.

22         Q.   Did you ask them to?

23         A.   No, I didn't.

24         Q.   Who did?  Did someone ask them to?

25         A.   I don't know.

272

1          Q.   Okay.   Further down you say "Ripple has

2     looked closely at this topic for several years,

3     and our belief remains the same:   XRP should be

4     regulated as a currency."

5               Do you see that?

6          A.   I do not.

7          Q.   Sir, there's a heading that says "Global

8     Progress on Regulation."

9          A.   Yep.

10         Q.   Two paragraphs in.

11         A.   Yep.   I'm with you now.   Sorry.

12         Q.   Okay.   "Ripple has looked closely at

13    this topic for several years."

14              Can you explain what you mean by that?

15         A.   I don't recall.

16         Q.   What -- well, what had Ripple looked

17    into for several years?

18         A.   I don't recall.   I mean, I, as any

19    reader of this email, could surmise, that we've

20    been paying attention to U.S. regulation and other

21    countries' regulation of digital assets.

22         Q.   For years?

23         A.   Yeah.

24         Q.   Does that --

25         A.   Yes.   Sorry.

1      Q.   Does that include you, Mr. Garlinghouse?

2      A.   I think -- depending upon the time

3   frame, I would say I looked at it closely at some

4   times and less closely at other times.

5      Q.   When was it more times -- sorry, more

6   closely?

7      A.   As I indicated in my testimony this

8   morning, I looked at it more closely after

9   receiving a letter from the SEC in late spring of

10  2018.

11     Q.   Excuse me.

12          Sitting here today, are you aware that

13  different agencies in the United States might

14  treat crypto assets in different ways?

15          MR. SOLOMON:   Objection to form.

16     A.   Yes, which I think contributes to the

17  U.S. confusion.

18     Q.   And this belief that you state here,

19  "Our belief remains the same:   XRP should be

20  regulated as a currency.   FinCEN and the DOJ

21  confirmed this," do you see that?   And then it

22  goes on to say "My team continues to educate the

23  market, regulators and courts."   Finally, you say

24  "For XRP to be a security, as some have asserted,

25  it would have to represent ownership in a company,

1   which it does not."

2           That paragraph, do you see -- do you see

3   that?

4       A.   I do.

5       Q.   Okay.  That idea, that belief, had you

6   expressed it internally at Ripple before this

7   email?

8       A.   I don't recall.

9       Q.   Had you expressed it externally into the

10  market before this email?

11      A.   I don't recall.

12      Q.   How many times before April of 2018 did

13  you express this view outside of Ripple?

14           MR. SOLOMON:  Objection; asked

15       and answered.

16      A.   I don't recall.

17      Q.   And how about internally?  How many

18  times did you express this view before April of

19  2018?

20           MR. SOLOMON:  Objection; asked

21       and answered.

22      A.   I don't recall.

23      Q.   Okay.  Do you recall if you did at all?

24  You just don't remember the number of times, or --

25           MR. SOLOMON:  Objection --

1          Q.   -- you just don't recall at all

2     whatsoever?

3                    MR. SOLOMON:  Objection; asked

4          and answered.

5          A.   Yeah, I think the question was did I

6     recall speaking to it publicly before 2018, and I

7     don't recall.

8          Q.   What about China's control -- well, what

9     about the potential for China's control of

10    blockchain?  Did you speak about that publicly

11    before 2018?

12                   MR. CERESNEY:  Objection; form.

13         A.   Could you reask the question?

14         Q.   Did you speak publicly about China's

15    potential control of blockchain before 2018?

16                   MR. CERESNEY:  Objection; form.

17         A.   I -- I think the vagueness of the

18    question makes it difficult to answer.

19         Q.   What's -- what -- I'm sorry --

20         A.   There's lots of blockchains.

21         Q.   How about let's start with the bitcoin

22    blockchain.

23                   Did you speak publicly about

24         China's potential control of the bitcoin

25         blockchain before 2018?

1          A.   I don't know.  I don't recall.

2          Q.   Did you speak privately at Ripple about

3     China's potential control of the bitcoin

4     blockchain since 2018?

5          A.   I don't recall.

6          Q.   Okay.  Did you have -- do you know, if I

7     say the name "          " what I'm referring to?

8          A.   Yes.

9          Q.   What is

10         A.          is a -- is an investment

11    group based here in New York that invests capital

12    typically in debt financings.

13         Q.   Thank you.

14                   So I'm going to go back to one

15              thing that I forgot.  Just a second ago,

16              we were talking about DOJ guidance or DOJ

17              confirmation in 2015 based on your email.

18                   Do you see that?

19         A.   I do see that.

20         Q.   Okay.  And you are aware that in 2020,

21    the DOJ issued guidance about how --

22                   THE REPORTER:  I'm sorry.  You're

23              going to have to slow down.

24         Q.   You are aware that in 2020 the DOJ

25    issued guidance about how different regulators in

277

1    the United States could regulate digital assets?

2              MR. SOLOMON:  Objection; form.

3         A.   I'm aware that I think sometime about a

4    year ago, in late Q3/early Q4, the DOJ did a

5    report on cryptocurrencies that enumerated many

6    different potential agencies and regulators in the

7    United States who may have some oversight of

8    digital assets and who, unfortunately, don't have

9    an aligned view on those.

10        Q.   And did you view that report as

11   providing regulatory clarity or not?

12             MR. SOLOMON:  Objection; form.

13        A.   Well, no, I did not.

14        Q.   Why not?

15        A.   I -- I believe the report indicated

16   that, as I recall, there are seven or eight

17   different federal agencies or departments that all

18   looked at digital assets a little bit differently,

19   which, in my estimation, fuels confusion in the

20   marketplace about the regulatory status of digital

21   assets in the United States in contrast to other

22   countries.

23        Q.   And the DOJ statement in 2015, do you

24   view that as providing regulatory clarity or not?

25        A.   I don't know what statement the DOJ made

278

1     in 2015.

2          Q.   The DOJ settlement with -- with Ripple,

3     do you view that as providing regulatory clarity?

4          A.   Oh, the FinCEN settlement.

5          Q.   You referenced FinCEN and the DOJ

6     confirmed this in 2015.

7          A.   I actually don't recall the email, as I

8     mentioned earlier.  And so I actually read that

9     differently than now you're reading it.  I read it

10    as FinCEN and the DOJ separately, as two separate

11    events.  Since I joined in 2015, I thought maybe

12    there was some other event that happened in 2015

13    that may have happened with the DOJ.

14               Recognizing the FinCEN settlement was

15    both, I guess, stamped by FinCEN and the DOJ, then

16    I think those two entities described XRP as a

17    currency, as a virtual currency, I believe.

18         Q.   And did you -- when did you find out

19    about that settlement, by the way?

20         A.   Can you maybe ask the question who --

21    when did I find out the FinCEN settlement?

22         Q.   Yeah.

23         A.   You know, within the first few weeks of

24    my tenure at Ripple.

25         Q.   Okay.  And who told you about it?

1          A.   I don't recall.

2          Q.   Did you ask for any sort of -- within

3     the first few weeks -- first let me ask what I

4     asked earlier.

5                    Did you view the FinCEN

6           settlement as providing regulatory

7           clarity?

8          A.   I suppose I was so new to the company

9     and so new to digital assets that I wasn't

10    thinking about the fact that there may not have

11    been regulatory clarity at that point.  So I, at

12    that point in time, don't think I had any thoughts

13    about it.

14         Q.   What about the point in time when you

15    write the email in 2018?  Did you view at that

16    point in time the FinCEN settlement as providing

17    regulatory clarity?

18         A.   I think any time a government is

19    speaking authoritatively through a court system

20    and describing something in a certain way, it

21    provides a certain level of clarity about, well,

22    is it this government entity, which collaborates

23    with other parts of the government, that the

24    government has said they view XRP as a virtual

25    currency?

1      Q.   Do you recall the public statements you
2   made about a euphemism in the digital asset crypto
3   world about when people said regulatory
4   uncertainty, what they meant was they don't like
5   the regulatory uncertainty and they would like for
6   it to be different?
7      A.   I made that comment in reference to
8   initial coin offerings and -- those initial coin
9   offerings that I thought were trying hard to avoid
10  being construed as anything other than, you know,
11  initial coin offerings that were raising capital
12  for a project that didn't exist.
13     Q.   Why -- why in your estimation were they
14  trying hard to avoid being construed as such?
15     A.   Because they didn't want to draw the ire
16  of the SEC.
17     Q.   Going back to -- you found out -- okay.
18          The first few weeks at Ripple, I think
19  you said you find out about the FinCEN settlement,
20  but you don't recall who told you about it.  Is
21  that fair?
22     A.   Yes.
23     Q.   Okay.  Did you read it?
24     A.   I don't recall.
25     Q.   Did you understand that the FinCEN

1    settlement was a serious thing for Ripple?

2        A.   Yes.

3        Q.   You had, for example, Ms. O'Gorman to

4    make sure you complied with the settlement, is

5    that right?

6             MR. SOLOMON:   Objection; form.

7        A.   With -- the role of chief compliance

8    officer we had for lots of reasons.  One of them,

9    which she took on, was making sure that we were

10   complying with the FinCEN settlement.  We took a

11   number of other steps obviously to make sure we

12   were complying with the FinCEN settlement,

13   including winding down a consumer-facing product

14   called Ripple Trade.

15       Q.   Right.  And when was that wound down?

16       A.   I mean, I believe summer of 2015.  Right

17   around there.

18       Q.   And is it fair to say you understood

19   that, you know, the FinCEN settlement arose from

20   essentially a dispute between Ripple and the U.S.

21   government --

22             MR. SOLOMON:   Objection; form.

23       Q.   -- that leads to a settlement of the

24   dispute?

25       A.   To be honest, I wasn't at Ripple when

282

1    all this was going on, so I really can't speak to

2    how it came to be or how it evolved.

3        Q.   Right.  And I'm not asking you to.  I'm

4    just asking you for what understanding you gave

5    when -- when you -- you know, you find out about

6    the settlement.  I'm trying to figure out what

7    understanding you gained about what the settlement

8    was.

9        A.   I -- I don't recall.

10       Q.   Okay.  But you understood it was a

11   serious thing, something to be taken seriously?

12       A.   Yeah.  I recall there was a $700,000,

13   maybe, fine which for us at the time was a

14   material amount of money.

15       Q.   Right.

16            At that time, when you found out that

17   you -- you know, Ripple would have to pay a

18   material amount of money to settle a dispute with

19   the government, did you take any steps to ensure

20   that Ripple would not get in trouble with the

21   government again?

22       A.   I guess my reaction is that we have

23   always sought, as I testified earlier today, to

24   work within the clear understanding of laws around

25   the world and making sure we are partnering,

283

1   working, and collaborating with law enforcement,

2   with governments, et cetera.

3           So I guess my reaction is I don't think

4   we took any steps specifically -- I mean, the

5   question kind of suggests that we didn't take

6   steps beforehand that we started taking

7   afterwards.  And I guess my point is, as an

8   organization and culture, of course we've always

9   tried to live within the letter of the law.

10      Q.   Right.  I apologize.  I'm not trying to

11   suggest anything.

12          My question is, you know, you find out

13   that there's this settlement and you're starting

14   at Ripple -- you're starting to learn.  What steps

15   did you, Mr. Garlinghouse, take?  You know, did

16   you ask someone, This company's been around for a

17   few years.  I want to make sure that what we're

18   doing is all aboveboard?  Did you ask anyone

19   something like that?

20              MR. SOLOMON:  Objection; form.

21      A.   No.

22      Q.   Okay.  Did you ask, for example, to see

23   any legal opinions that the firm might have

24   procured with respect to the potential legal

25   consequences of its activities?

284

1          A.   No.

2          Q.   Why not?

3          A.   Actually, to be more precise, I don't

4     recall.

5          Q.   So you might have, you might not have,

6     you just don't recall?

7          A.   Yeah.

8          Q.   Okay.  Do you think you would have done

9     that?  I mean, just knowing yourself, you started

10    at a new company --

11         A.   No.

12         Q.   I'm sorry?  You don't think you would

13    have done that?

14         A.   I don't think I would have done that.

15         Q.   Okay.  So back to            What

16    relationship, if any, did            have to

17    Ripple?

18         A.   None to my knowledge.

19         Q.   Potential relationship?

20         A.   We had discussed with them participating

21    in our Series C financing.

22         Q.   What -- what is Project Raven?

23         A.   I don't recall.

24         Q.   And did          participate?

25         A.   Not to my knowledge.

285

```
 1        Q.   Why not?
 2        A.   I think we chose a different path.
 3        Q.   You chose            ?
 4        A.   Correct.
 5        Q.   Okay.  But why?
 6        A.   My vague recollection is the terms of
 7   the         deal were more compelling to us than
 8   the terms of the deal          had offered.
 9        Q.   Was one of the terms of the
10   deal as offered a restrictive covenant with
11   respect to potential regulatory action --
12               THE REPORTER:  Repeat.
13               MR. SOLOMON:  Objection.  And
14        you've got to slow down.  I'm barely
15        following.
16        Q.   Was one --
17               MR. SOLOMON:  You've got to slow
18        down, too.
19        Q.   Was one of the terms of the
20   deal as offered a restrictive covenant with
21   respect to potential regulatory action by the SEC?
22               MR. SOLOMON:  Objection; form.
23        A.   Sitting here today, I am aware that at
24   some point, let's see,          included a
25   provision in their term sheet that that was the
```

1    case.  When we were comparing term sheets, I had

2    no idea that was the case.

3        Q.  Fair enough.

4        A.  I guess my point is that was not a

5    relevant data point as to why we selected ████████

6    and not ████████

7        Q.  Okay.  With ████████ was there a

8    covenant with respect to potential SEC action?

9            MR. SOLOMON:  Objection; form.

10       A.  Not specifically the SEC, but

11   government, yes.

12       Q.  Government what?

13       A.  I think the -- in the Series C

14   financing, as it completed, there was a provision

15   that said, roughly, if there's an official

16   determination by a government -- I'm not sure it

17   said U.S. or SEC; I don't recall -- that XRP is a

18   security on a go-forward basis, then X and Y and

19   Z.

20       Q.  Right.

21           And that was also a term in the

22       term sheet with ████████ even though I

23       understand you didn't enter into that

24       deal, is that right?  Something similar?

25       A.  I did not know that.  I am aware of that

1    now based upon the ████████ litigation, but I

2    would not have known that then and --

3                    MR. SOLOMON:  That's what I want

4         you to be careful of, because you've had

5         discussions with lawyers, including Quinn

6         Emanuel, about ████████  So testify about

7         what you knew at the time --

8                    THE WITNESS:  Yeah, okay.

9                    MR. SOLOMON:  -- which is

10        perfectly fine and fair for him to ask

11        you.  Not what you know now --

12                    THE WITNESS:  Okay.

13                    MR. SOLOMON:  -- from that

14        litigation.  It was a poor question from

15        Mr. Tenreiro --

16                    THE REPORTER:  I'm sorry, you're

17        talking over one another and you're

18        talking too fast.  I can't get that.  I

19        don't know how else to say it.

20                    MR. SOLOMON:  Let me say it

21        again.  Do not answer questions in

22        relation to ████████ to the extent it

23        touches on any advice you received or were

24        party to from Quinn Emanuel, Debevoise, or

25        any other law firm.  It is perfectly fair

1          game for them to ask you questions about

2          what you understood about the relationship

3          with ████████ or this other company at the

4          time.

5                    THE WITNESS:  Yes.

6                    MR. SOLOMON:  Please don't mix

7          the two because it's just going to make

8          for a very confusing record.  Thank you,

9          Brad.

10                   THE WITNESS:  Yeah, okay.

11   BY MR. TENREIRO:

12        Q.   So take a step back.

13             What involvement did you have with the

14   Series C negotiations?

15        A.   Not a lot.

16        Q.   Did you sign any agreements?

17        A.   I don't recall.

18        Q.   Did Mr. Larsen have involvement with the

19   Series C funding?

20                   MR. CERESNEY:  Object to form.

21        A.   Less than I did.

22        Q.   Okay.  And did you have involvement in

23   poten -- in negotiations with ████████?

24        A.   Not material.

25        Q.   Who was involved?  Mr. Will?

289

```
 1        A.   I actually --
 2             MR. SOLOMON:  Objection; form.
 3        A.   I don't know who was on point to
 4   negotiate the terms of Series C financing -- our
 5   Series C financing.
 6        Q.   You didn't select someone to be on point
 7   for that negotiation?
 8             MR. SOLOMON:  Objection; form.
 9        A.   That would not have been something that
10   I would have selected, no.
11        Q.   Who would have selected that person?
12        A.   Probably Ron Will.
13        Q.   Okay.  And based on your knowledge
14   simply of the facts, without getting into, you
15   know, conversations with counsel, I think you've
16   told me there was some sort of provision in the
17   ██████████funding related to potential
18   determinations about XRP as a security, is that
19   right?
20        A.   Yes.
21        Q.   And did you know that fact when Ripple
22   entered into the Series C?
23        A.   No.
24        Q.   When was that, by the way?
25        A.   When was what?
```

290

1          Q.    The Series C.  Around 2019?

2          A.    Our Series C financing closed I think in

3     December of 2019.

4          Q.    Okay.  And you're saying at the time

5     that it closed, you were not aware of this

6     covenant that we're discussing?

7          A.    That's correct.

8          Q.    You came to find out because of the

9     litigation or in between the funding and the

10    litigation?

11         A.    I don't know exactly when I came to find

12    out, but it would have been much, much closer to

13    the litigation.

14         Q.    Okay.  And did you ever ask anyone why

15    that covenant was in there?  Not lawyers.  You

16    know, anyone.  Businesspeople or --

17         A.    No.

18         Q.    Okay.  Did you ever ask that the

19    covenant be removed?

20         A.    No.

21         Q.    Okay.  And Ripple -- you have stated

22    Ripple's view was that XRP was a currency, not a

23    security, correct?

24         A.    It was also FinCEN's view, but, yes.

25         Q.    Why was that covenant in there?  If

291

1    Ripple had that view, why was it necessary?

2              THE REPORTER:  Repeat that.  Why

3         was?

4         Q.   Why was it necessary?

5              MR. SOLOMON:  Objection; calls

6         for a legal conclusion.  He's not a

7         lawyer.  He didn't write the contract.

8         Q.   From a business perspective, why was a

9    covenant of that nature necessary?

10        A.   I think it's a covenant that ▮▮▮▮▮▮

11   put in there.  You'd have to ask them.

12        Q.   You didn't ask them to take it out?

13        A.   I was not involved in the negotiation of

14   the term sheet or final documents to close the

15   financing.

16        Q.   Okay.  Did you have, I guess, what one

17   might call Investor Days with Ripple shareholders

18   from time to time?

19        A.   Yes.

20        Q.   Okay.  What was the purpose of those?

21        A.   If you were a shareholder in Ripple, you

22   were likely interested in how the company is

23   doing.  I also think it's good practice for

24   Silicon Valley start-ups that might aspire to

25   being a public company to start practicing

292

1   behaviors that are more public company-esque.

2        Q.   Was ███████ one of Ripple's

3   shareholders before the Series C?

4        A.   Not to my knowledge.

5        Q.   What about an entity called ████████

6   ██████████████

7        A.   Not to my knowledge.

8        Q.   When you had Investor Days from time to

9   time, did you provide these people with truthful

10  and accurate information?

11       A.   I believe so.

12       Q.   Okay.  And would you consider the equity

13  investors that Ripple had as sort of sophisticated

14  players in the financial markets?

15       A.   Could you repeat the question?

16       Q.   Would you consider the equity investors

17  that Ripple had as sophisticated players in the

18  financial markets?

19       A.   I don't know.  I mean, Ripple has an

20  order of magnitude of 1- or 200 shareholders.  I'm

21  sure some of them are sophisticated investors and

22  I'm sure some of them are less sophisticated.

23       Q.   The ones that you gave Investor Day

24  presentations to, would you consider those to be

25  sophisticated?

```
 1        A.   I don't know who attended Investor Day.
 2        Q.   Okay.  When -- did -- where were these
 3   Investor Days held, at Ripple or at their offices?
 4        A.   I mean, perhaps I'm -- the only Investor
 5   Day I specifically remember was held at a hotel in
 6   downtown San Francisco.  I think we had more than
 7   one, but that's the one that I happen to remember.
 8        Q.   Can you ballpark the date of that?
 9        A.   I don't know.  Two to three years ago.
10        Q.   And what the purpose of it was, can you
11   tell me that?
12        A.   I think my testimony earlier, I'd have
13   to go back and read exactly, but I think to give
14   our shareholders more information about what's
15   going on with the company and to get better at
16   practicing to being -- adopting behaviors that are
17   more public company-esque.
18        Q.   Okay.  Do you know who            is?
19        A.   I have met
20        Q.   Who is he?
21        A.   I believe he's an associate at
22        Q.   Okay.  And did he attend this Investor
23   Day presentation?
24        A.   I don't know.
25        Q.   Okay.  In July 2018 -- on or around July
```

294

1    2018, did you speak to Ripple's equity investors

2    about what was going on in the company -- what was

3    going on in the company?

4         A.   I don't recall when, as I testified

5    earlier.  I -- I do recall now two different

6    Investor Days.  There was one that was here in New

7    York at a hotel and one was at a hotel in San

8    Francisco.  So I remember those two, but I don't

9    remember the dates of them.

10        Q.   Were they after or before the SEC letter

11   of April 2018?

12        A.   I don't recall.

13        Q.   Okay.

14        A.   No.

15        Q.   Did you express at invest -- at these

16   Investor Days that you were optimistic about the

17   SEC's investigation, but could not guarantee the

18   outcome of the investigation?

19             MR. SOLOMON:  Objection; form.

20        A.   No.

21        Q.   Okay.  Did you express anything about

22   the conversations with the SEC at these Investor

23   Days?

24        A.   That's a very different question.  The

25   first time you called it an investigation.

1        Q.   It's a different question.

2        A.   Yeah.  I don't recall specifically.  I

3    would imagine we generally would practically talk

4    about regulatory dynamics globally.  Is it

5    possible what you asked was included in that?

6    That's quite possible.

7        Q.   Okay.  Separate from, you know, whether

8    it's an investigation or the conversations with

9    the SEC -- you understood that the SEC in 2018 had

10   not made a statement about whether it viewed XRP

11   as a security or not, correct?

12            MR. SOLOMON:  Objection; form.

13       A.   Yes.  I am aware that to my knowledge

14   the SEC had not made a determination in the summer

15   of 2018 as to whether or not XRP is a security.

16       Q.   And did you understand that the SEC was

17   considering the issue?

18       A.   I really didn't know.

19       Q.   You didn't know --

20       A.   It's -- sorry.

21       Q.   You didn't know that the SEC was

22   considering whether XRP was or was not a security

23   in the summer of 2018?

24       A.   I was very confused by the SEC's

25   behavior in choosing, for example, to proactively

1      come out and say that Ether was not a security.

2      And at the time we received a letter, which I

3      would have described as an informal inquiry, to

4      which we were cooperating, to learn more about XRP

5      and to learn more about Ripple.

6          Q.    But did you have an understanding, you

7      know, just from attending meetings with the SEC --

8      we've talked about some of them -- that the SEC

9      was determining the issue about whether it was or

10     was not a security?

11              MR. SOLOMON:  Objection; form.

12         A.    I believe in the summer of 2018, which

13     is when you're asking about, I had not had any

14     meetings with the SEC other than with Chairman

15     Clayton.  And Chairman Clayton did not express a

16     view that XRP was a security or that even it was

17     being discussed.

18         Q.    Okay.  And in the fall -- after you had

19     meetings in the fall, did you have an

20     understanding that the SEC was considering

21     whether maybe it was, maybe it was not a security?

22              MR. SOLOMON:  Objection; form.

23         A.    I -- again, I don't recall.  My

24     viewpoint -- you know, we were having

25     conversations with almost entirely CorpFin.  And

1  given the construct around decentralization as an

2  important tenet of the -- Director Hinman's speech

3  about Ether, it seemed like educating the SEC

4  about how the XRP Ledger is decentralized was a

5  step in the journey of -- maybe a similar journey

6  to what Joe Rubin and metallic had done with the

7  SEC previously.

8      Q.   So a journey that might end with a

9  statement publically about XRP?

10     A.   I think market clarity would have been

11 helpful as soon as possible.

12     Q.   Okay.  And so in -- in -- in or around

13 July 2018, did you state to Mr. ▮▮▮▮ or at a

14 meeting that Mr. ▮▮▮▮ attended, that you felt

15 optimistic that the SEC will rule in XRP's favor,

16 but could not guarantee that?

17            MR. SOLOMON:  Objection; form.

18     A.   I don't know what it means for the SEC

19 to rule in XRP's favor.  I mean, there had been a

20 speech by Director Hinman.  I -- I -- I don't

21 recall saying that to Mr. ▮▮▮▮

22     Q.   Do you recall saying whether -- you

23 know, did you recall saying that you felt

24 optimistic that the SEC could potentially conclude

25 that XRP was not a security, but you could not

1    guarantee that?

2              MR. SOLOMON:  Objection to form.

3         A.   I don't recall speaking to Mr. ███ -- I

4    don't recall meeting Mr. ████  I know more who he

5    is, but I don't recall speaking to him about the

6    SEC's inquiry into XRP and Ripple.

7         Q.   What about not speaking to him

8    necessarily but speaking at an event where he's at

9    such as an Investor Day?  Do you recall stating at

10   one of these Investor Days, either in the New York

11   hotel or the San Francisco hotel, and saying

12   something along the lines of you feel optimistic

13   that the SEC will determine that XRP's not a

14   security, but you could not guarantee that?

15             MR. SOLOMON:  Objection; form.

16        A.   I don't recall making any statement like

17   that.

18        Q.   Okay.  Do you have any reason to think

19   you did not make that statement?

20        A.   No.  I mean, there's some interesting

21   timing-related things there based on information

22   you showed me this morning which is just hard to

23   reconcile.  And it depends a little bit when the

24   Investor Day was.

25        Q.   All right.  Mr. Garlinghouse, over the

1    course of your time at Ripple, is it fair to say

2    that Ripple has made efforts to get XRP listed on

3    digital asset trading platforms?

4         A.   Yes.

5              MR. CERESNEY:  Objection; form.

6         Q.   And what was the purpose for making

7    those efforts?

8              MR. CERESNEY:  Objection; form.

9         A.   A precondition to Ripple's product

10   strategy is liquidity between XRP and various fiat

11   currencies around the world.  And if XRP doesn't

12   have trading pairs, then you don't have that

13   liquidity.  And so if that's a precondition to

14   your product strategy, you want to make sure that

15   that exists.

16        Q.   To -- to provide that liquidity, for

17   example, let's say between XRP and the Mexican

18   peso, Ripple has engaged market makers to help

19   provide that liquidity, is that right?

20             MR. SOLOMON:  Objection; form.

21        A.   I believe that's yes.

22        Q.   Okay.  And so why didn't Ripple do that,

23   you know, just provide that liquidity by engaging

24   market makers as opposed to putting it on

25   exchanges?

1          MR. SOLOMON:  Objection; form.

2      A.   Well, in the example I think you're

3  using, ████████ listed XRP independently of any work

4  with Ripple.  So that liquidity existed there.  We

5  then, as we brought customer flows, wanted to make

6  sure there was adequate liquidity to address those

7  customer flows and so we partnered with market

8  makers in those markets.

9      Q.   And Ripple from time to time publicly

10  communicated the efforts it was making with

11  respect to getting XRP on exchanges, is that

12  right?

13          MR. SOLOMON:  Objection; form.

14      A.   Well, what time frame are we talking

15  about here?

16      Q.   You know, when -- at various times when

17  you worked at Ripple.  Well, if -- if there was a

18  moment when Ripple stopped, you can tell me.  But

19  my question is:  Ripple from time to time told the

20  market that it was making efforts to get XRP

21  listed, is that right?

22          MR. SOLOMON:  Objection; form.

23      A.   My recollection is that XRP, I mean, as

24  of within the last couple of years, has traded at

25  a couple hundred exchanges around the world, of

 1    which Ripple partnered or facilitated a, you know,

 2    very small percentage of those.  Kind of less than

 3    5 percent of those did Ripple facilitate or

 4    partner in some way.

 5           Separately, Ripple, in the interest of

 6    transparency, in the interest of trying to get

 7    what tended to be a little bit of a clandestine

 8    market, trying to encourage more transparency,

 9    trying to minimize misinformation in the market,

10    Ripple started years ago to proactively

11    communicate what's our view and what's going on in

12    the XRP markets and what we are doing in the XRP

13    markets.

14        Q.    And did that include proactively

15    communicating Ripple's engagement with exchanges

16    to get XRP listed?

17        A.    I think those would have included just

18    updates on the number of exchanges XRP was listed

19    independent of whether or not Ripple had

20    facilitated that.

21        Q.    Did Ripple disclose publicly if Ripple

22    had facilitated a listing on the exchange?

23           MR. SOLOMON:  Objection; form.

24        A.    I don't know.

25        Q.    Well, in terms of providing

1    transparency, did Ripple communicate its efforts

2    to get XRP listed on exchanges?

3         A.   Isn't that the same question you just

4    asked?

5         Q.   I'm trying to understand how -- you're

6    telling me that you wanted to have transparency,

7    but you don't know if there -- if these things

8    were communicated.

9              So my question is, is communicating

10   Ripple's efforts, would that have provided

11   transparency?

12                  MR. SOLOMON:  Objection; form.

13        A.   I guess hypothetically -- I mean, I'm

14   not quite sure what you're asking me now.  I

15   apologize.

16        Q.   Yeah.

17                  Would communicating Ripple's

18             efforts, to the extent they were made, to

19             get XRP listed, would that in your view

20             have provided more transparency to the

21             market?

22                  MR. SOLOMON:  Objection.

23        A.   Sure.  I -- I don't know because, you

24   know, we're kind of talking hypotheticals.  If we

25   could talk about a specific example, I'd be happy

1    to --

2                MR. SOLOMON:  He'll show you

3        documents.  He's going to give you a

4        memory test first.  Just do your best to

5        answer the questions.

6        A.   Okay.  I --

7                MR. SOLOMON:  Qualify it however

8        you have to.

9        A.   I don't recall -- what I recall about

10   our XRP Markets Reports is we tried to provide as

11   much information, as you're probably aware -- and,

12   frankly, I think the SEC -- well, any regulator

13   would be concerned.  There's a lot of

14   misinformation out in the crypto marketplace.  And

15   so our goal with the Markets Report was to provide

16   as much authoritative, clear information as

17   possible.  Some of that involved what Ripple's

18   activities included and some of that certainly was

19   about observations about what we were aware other

20   people were doing.

21           You know, I guess part of your question

22   is could we be more exhaustive in the type of

23   information we provided in those XRP Markets

24   Reports?  And I guess that that answer is of

25   course you can always include more information.

1    At some point you want them readable and

2    accessible and -- you know, I don't know, I think

3    they were roughly four to five pages long and that

4    seemed about right, the level of detail that we

5    provided about the markets.

6         Q.    Thank you.

7              I'm not just talking about Market

8    Reports, but let's -- that's -- that's fine.

9    Let's be clear about something.

10             Did Ripple provide information to the

11   market about its activities outside of the Market

12   Reports?

13        A.    You mean like the shareholder updates?

14        Q.    Anything.  The shareholder -- I'm

15   talking beyond just the shareholder updates.  I

16   understand the shareholders are maybe a hundred to

17   200 people.  I'm talking beyond that.

18             Did Ripple from time to time

19        while you've been CEO provide information

20        to the market that's not just in the

21        Market Reports?  For example, tweets by

22        Ripple employees.

23        A.    Oh.

24        Q.    Interviews, et cetera.

25        A.    Yes, Ripple employees and Ripple

1    corporate tweeted.  Yes, Ripple employees

2    participated in panels, interviews, what have you.

3        Q.   In the Consensus forum Ripple

4    participated?

5        A.   Which one are we talking about?

6        Q.   Let's say Ripple or its employees

7    participated from time to time in conferences in

8    the digital asset space.

9        A.   For sure.

10       Q.   Okay.  So I just want to be sure.  The

11   Markets Reports were not the only way in which

12   Ripple communicated to the market, is that right?

13       A.   That's correct.

14       Q.   Okay.  Over the years, Ripple engaged in

15   attempts to get CoinBase to list XRP, correct?

16            MR. SOLOMON:  Objection; form.

17       A.   Over the years ripple spoke to CoinBase

18   about listing XRP.

19       Q.   For what purpose?

20       A.   Well, as I described earlier, the -- in

21   order to achieve our product strategy, providing

22   liquidity between XRP and fiat is foundational.

23   It's a precondition that needs to exist.

24            CoinBase was particularly, you know, I

25   think, robust in their own -- I viewed them as

306

1    kind of a white hat in the crypto space of having

2    robust AML procedures, robust KYC procedures.

3            And so our goal was, as I've described

4    many times, I think the more, quote/unquote,

5    adults in the crypto space that were furthering

6    the growth and expansion of the market, the

7    better.  I think CoinBase would have met some of

8    those criteria.  And so we sought to partner with

9    them around our product strategy.

10        Q.    And so I think you said earlier over the

11   years Ripple spoke to CoinBase about listing XRP.

12   And was the purpose of that to eventually get them

13   to list XRP for the, excuse me, foundational

14   precondition that you have?

15        A.    Yeah.

16        Q.    Okay.  And you yourself met with

17   CoinBase people over the years, right?

18        A.    Yes.

19        Q.    And do you recall approximately your

20   first outreach to CoinBase was?

21        A.    I don't.  My recollection is that

22   ████████████████ and I went over and had lunch at

23   the CoinBase offices at some point.  And maybe we

24   had lunch with ████████████ and I can't remember

25   who else.

307

```
1          Q.    Okay.  Separate from CoinBase, did you

2     offer Gemini money to list XRP?

3          A.    I did not.

4          Q.    Did Ripple?

5                MR. SOLOMON:  Objection; form.

6          A.    I actually don't know.  I've read that

7     speculation, but I don't know if that's true or

8     not.

9          Q.    Okay.  Did you meet with CoinBase

10    officials more than once about -- I'm sorry,

11    CoinBase, you know, employees more than once about

12    the potential listing?

13         A.    Yes.

14         Q.    Okay.  And who did you meet with?

15         A.    My recollection -- I only remember

16    having two live meetings and one phone call.  And

17    I met -- the live meeting -- the first live

18    meeting I described with                I don't

19    remember who we met with.  I think          was

20    there.  I'm not sure.  Maybe he had left.  And

21    then the other conversations were with --

22                MR. SOLOMON:  Slow down a little

23         bit for the court reporter, please.

24                THE REPORTER:  Thank you.

25                MR. SOLOMON:  Why don't you start
```

1            over with your response.

2        A.   So --

3        Q.   Two live meetings, one phone call.

4        A.   Well, at least one phone call.  I -- to

5    the extent -- I believe your question was with

6    whom did I meet.  The latter time periods, I met

7    with ███████████ in person once and I think by

8    phone once.  I think I also reached out to ██████

9    ███ who joined as their head of Corp Dev.  She

10   had been a Yahoo employee and someone I knew

11   personally.

12       Q.   And at any point in time did you offer

13   CoinBase $5 million to list XRP?

14            MR. SOLOMON:  Objection to form.

15       A.   They asked us to pay $5 million, to

16   which we declined.  And as time went by, I think

17   we went back to them and said, Was that still on

18   the table?

19       Q.   And what did they say?

20       A.   I believe they said no.

21       Q.   Let's look at Exhibit 31, please.

22            MR. SOLOMON:  It's three o'clock

23       on the nose.  Would this -- do you want to

24       take a break before this one or after?

25            MR. TENREIRO:  Either.

309

```
 1              THE WITNESS:  Let's do one more
 2        and then take a break.  Probably because
 3        the coffee is going to be here in ten
 4        minutes.
 5              MR. SOLOMON:  You're the boss.
 6        One more document.
 7              MR. TENREIRO:  Thirty-one.
 8              THE WITNESS:  Oh, gosh, I forgot
 9        about that.
10              MR. SOLOMON:  What's that?
11              THE WITNESS:  I forgot I met with
12        ███████
13              MR. SOLOMON:  That's all right.
14        That's why we're doing this.
15              (Pause)
16              (Whereupon, exhibit is received
17        and marked Garlinghouse Deposition
18        Exhibit 31 for identification.)
19   BY MR. TENREIRO:
20        Q.   Okay.  Having read this email, do you
21   see the part where you said, towards the bottom,
22   "In order to be listed, they expect a 'listing
23   fee' from all players to cover their costs.  (I
24   was transparent with him that we" had
25   previously -- sorry, "that we have previously
```

1   offered $5 million U.S. to increase the

2   prioritization/impact the decision about listing

3   XRP)"?

4               Do you see that?

5       A.   I do.

6       Q.   Okay.  So I'm just trying to understand,

7   did you offer $5 million to CoinBase?

8       A.   I think my previous testimony I stand

9   by, which is I recall them asking us to pay them

10  $5 million.  We then later went and said, "Hey, is

11  that still on the table?"  I think what I'm

12  regurgitating to ███  is that, hey, that had

13  happened.

14      Q.   So when the -- when they asked you

15  originally, you declined or did not respond, or

16  what occurred when you first asked?

17      A.   When they first --

18               MR. SOLOMON:  Objection; form.

19      A.   My recollection is when they first

20  asked, we didn't have the wherewithal from a

21  capital point of view to meet the ask and so it

22  was just kind of dismissed out of hand.

23      Q.   Okay.  And then at some point you went

24  back and said "Is that still on the table"?

25      A.   That's my recollection, yeah.

1          Q.   And that's what you're reflecting in

2     this email?

3          A.   I believe that's correct.

4          Q.   Okay.  And did Mr. -- did ███ respond

5     to that question?

6          A.   I can't quite tell from this email.

7          Q.   And what about from your memory?

8          A.   I don't recall.

9          Q.   A little bit above, it says "Some at

10    Ripple felt that the criteria were designed to

11    exclude XRP."

12              Do you see that?

13         A.   I do.

14         Q.   Who at Ripple are you referring to

15    there?

16         A.   I don't recall.

17         Q.   What criteria are you referring to

18    there?

19         A.   My recollection is around this time, I

20    guess, you know, Q4 2017, CoinBase published, as I

21    recall, an application process to have a digital

22    asset listed on CoinBase.  And I don't remember

23    what the criteria were.  I remember it being

24    laudable in its objective, a little bit chaotic in

25    its implementation, because everybody had, you

312

1   know -- this is kind of the post-ICO window.  And

2   I think CoinBase was trying to do the right thing,

3   but didn't execute it as seamlessly as one might

4   have hoped.

5        Q.   Why did you think they were designed to

6   exclude XRP, though?

7        A.   I don't recall what the criteria were so

8   I don't recall why I wrote that.

9        Q.   The email is to "Leadership."

10            Do you see that?

11       A.   I do.

12       Q.   Who is leadership?

13       A.   Leadership is an email distribution list

14  that, generally speaking, just includes all my

15  direct reports.  Chris Larsen would be included on

16  there and at various times there might have been

17  other people that were on that list.

18       Q.   All right.  Eventually CoinBase listed

19  XRP on or around February 2019, is that correct?

20            MR. SOLOMON:  Objection to form.

21       A.   It sounds correct.  I -- I don't recall

22  exactly.

23       Q.   Speaking of not CoinBase specifically,

24  but exchanges, did Ripple from time to time enter

25  into agreements with exchanges?

313

```
 1              MR. SOLOMON:  Objection; form.
 2         A.   I think my testimony earlier was I think
 3    there were over 200 exchanges around the world
 4    with XRP of which I think five or six Ripple has
 5    had some sort of relationship with.
 6         Q.   The relationship include agreements,
 7    contracts?
 8         A.   Yeah.  That's what I mean by
 9    "relationship."  Yes.
10         Q.   And, generally, some of these provide
11    for payments to the platforms, for example, with
12    respect to volume incentives and things of that
13    nature?
14              MR. SOLOMON:  Objection; form.
15         A.   I believe that's correct.
16         Q.   Okay.  And what role, if any, did you
17    have in entering into those agreements?
18         A.   Minimal, if any.
19         Q.   Did you have to approve or sign them on
20    behalf of the company?
21         A.   That probably depends upon the
22    materiality.  I don't recall sitting here today
23    signing any of them or even being involved in
24    negotiating any of them.
25         Q.   Back to CoinBase.  Who at CoinBase, if
```

1  anyone, communicated to you their decision that

2  now they're going to list XRP?

3             MR. SOLOMON:  Objection.

4       A.   I didn't know CoinBase was going to list

5  XRP until it was public.  I actually specifically

6  asked ▮▮▮▮ not to tell us or anyone at Ripple

7  because I felt like it only invited scrutiny.

8       Q.   By whom?

9       A.   The media.  Anybody.  At -- you know, at

10 the time this was going on, every time CoinBase

11 listed a digital asset, that tended to drive the

12 price.  I thought the best way to mitigate any

13 accusations, observations, was just we don't want

14 to know.

15      Q.   Ripple understood that announcements

16 about listing of XRP could have an impact on the

17 price of XRP, right?

18             MR. SOLOMON:  Objection.  Are you

19       asking him if he understood or if the

20       company understood or everybody at the

21       company?

22             MR. TENREIRO:  No, the company.

23      A.   Well, I mean, when you say "the

24 company," I mean, I don't know what all the

25 employees at Ripple thought.

[9/20/2021] Garlinghouse, Bradley 9.20.2021

1      Q.   What did you think?

2      A.   Well, it was my testimony before.  It's

3   just that when CoinBase listed a new digital asset

4   on its platform, my observation of the market was

5   that it drove the price of that digital asset.

6      Q.   Drove the price up?

7      A.   And sometimes down.

8      Q.   And do you have a belief as to why it

9   would go down?

10     A.   If I had had the foresight, even

11  hindsight, to be able to explain the gyrations of

12  the digital asset markets, I would probably be in

13  a different job.

14     Q.   But it moved the price in one direction?

15  That was your observation?

16     A.   Well, my observation was it would drive

17  volatility in that digital asset.  It sometimes

18  would drive it up; sometimes it would drive it

19  down; sometimes it would drive it up, then down.

20  My experience was -- I actually remember a meeting

21  with the SEC discussing this exact point, as I

22  recall.

23     Q.   Did -- did Ripple ent -- enter into a

24  custodial agreement with CoinBase?

25     A.   I believe so.

1        Q.    For what purpose?

2        A.    Yeah.  I mean, similar to kind of my

3    comments around ███████████ anything that is

4    helping drive the maturity, expansion, growth of

5    the digital asset market, I view that as good for

6    Ripple.  And so seeing robust custody providers

7    that worked with institutions and regulators I

8    viewed as a good thing.

9        Q.    And did you -- a good thing just for the

10   market generally or for Ripple specifically?

11       A.    Well, as I've testified, my general view

12   is if it's good for the market, it's good for

13   Ripple.

14       Q.    Okay.  And what conversations did you

15   have with CoinBase -- you, Mr. Garlinghouse -- in

16   connection with the custody asset -- custody

17   agreement?

18       A.    I don't recall having any conversations

19   with CoinBase about the custody agreement.

20       Q.    Okay.  Did you sign the custody

21   agreement?

22       A.    I don't recall.

23       Q.    After the listing, I think your

24   testimony is you had asked CoinBase not to tell

25   you about the listing and you found out when the

317

```
 1    public found out about the listing of XRP, is that
 2    right?
 3         A.   Yeah.  I -- I mean, I'm not sure I agree
 4    with exactly what you said, but I -- I didn't
 5    want -- I didn't ask -- I didn't know they were
 6    going to list XRP.  So I think your -- I just --
 7    my answer is I don't want to know.  You guys
 8    should do what you want to do.  If it makes sense
 9    for your business, CoinBase, then you should list
10    XRP.  If it doesn't make sense for your
11    business --
12                   THE REPORTER:  Wait.  Slow down.
13                   THE WITNESS:  Sorry.
14                   THE REPORTER:  "If it makes
15        sense for your business..."?
16         A.   You should list XRP.  If it doesn't make
17    sense for your business, then you shouldn't list
18    XRP.  I said to the extent you decide to list XRP,
19    we don't want to know.
20         Q.   And is it your testimony that when it
21    was announced publicly that XRP -- that CoinBase
22    was going to list XRP, that you, Mr. Garlinghouse,
23    did not know that until it was announced publicly?
24         A.   That's my recollection, yes.
25         Q.   Why the change between negotiating -- or
```

1    discussing with CoinBase $5 million, potentially

2    listing, and going to do whatever you want?

3        A.   You know, when those conversations first

4    started with CoinBase, there was a lot less

5    liquidity in the XRP markets.  There were far

6    fewer exchanges.  And CoinBase -- CoinBase's

7    importance would have been more important.

8            By the time I, you know, met with ▮▮▮▮

9    ▮▮▮▮▮ and much later -- you know, and kind of

10   this is -- I guess you said 2019.  You know, by

11   that time XRP was listed on lots of exchanges

12   around the world, had much, much, much more

13   liquidity.  And so the importance of CoinBase,

14   quite frankly, had gone down in the industry.

15               And I felt ultimately it's in

16        their capitalistic interest as an

17        exchange -- given they derive revenue

18        from trading, it's in their interest to

19        have more trading.  And if listing XRP

20        fueled that, then they would do that, or

21        not, based upon their own self-interest.

22       Q.   How do they derive revenue from trading

23   of XRP?

24               MR. SOLOMON:  Objection.

25       A.   How does -- is the question how does

319

1    CoinBase derive revenue from trading?

2         Q.   Yes.

3         A.   I'm not an expert on that.  I mean, I

4    have a basic understanding.  I'm not the right

5    person to --

6         Q.   No, just your basic understanding.

7    That's fine.  You know, you said you viewed that

8    at some point it would be in their capitalistic

9    interest because they derive revenue.

10             So just what was your understanding of

11   how an exchange -- you can focus on CoinBase or

12   not, I'm just curious.  What was your

13   understanding of how the revenue was derived?

14                  MR. SOLOMON:  Objection.

15        A.   I think my understanding is CoinBase

16   takes a percentage of -- has a fee on buying or

17   selling the digital assets they list.  And so

18   the -- the more trading, the better.

19        Q.   So you had an understanding that if it

20   was in their financial interest, they would list

21   XRP based upon their own self-interest

22   essentially?

23                  MR. SOLOMON:  Objection; form.

24        A.   Right.  I think I read -- I don't know

25   if it's accurate -- that 17 percent -- when the

320

1    SEC decided to sue Ripple and CoinBase

2    subsequently halted trading of XRP, I believe it

3    represented 17 percent of their revenue.  XRP

4    trading represented 17 percent of their revenue.

5    I don't know if it's accurate because I'm not with

6    CoinBase, but that's what I read.

7        Q.   Okay.  After CoinBase -- the decision to

8    list was announced, did you speak to CoinBase

9    about the decision?

10       A.   I don't believe -- I don't recall.

11       Q.   Is it possible you spoke to them about

12   the decision and just don't recall?

13       A.   I -- I -- I don't recall.

14       Q.   Okay.  Was the custody agreement some

15   sort of olive branch, say, that Ripple extended to

16   CoinBase with -- in connection with its

17   conversations about listing XRP?

18            MR. SOLOMON:  Objection.

19       A.   No.  I viewed the custody agreement as

20   in the interest of the crypto landscape broadly.

21   And if there's robust institutional custody,

22   even -- I mean, obviously they didn't support or

23   list XRP at the time, but the more institutional

24   custody players, the better it is for Ripple's

25   strategy.

321

```
1        Q.   And was Ripple -- around the time that
2   CoinBase actually did list XRP, which I'm telling
3   you is around February of 2019, was Ripple
4   disinterested in whether CoinBase would list XRP?
5             MR. SOLOMON:  Objection.
6        A.   Well, I think as I testified, I remember
7   speaking to                    and saying "List XRP
8   or don't list XRP, you guys should do what's best
9   for you."
10       Q.   If you -- if you have to choose, which
11  one would you have picked back then?  Would you
12  have preferred them to list it or not?
13            MR. SOLOMON:  Objection; form.
14       A.   Clearly the more -- as I've testified,
15  the more liquidity in the market, the better.  So
16  to the extent CoinBase listed XRP, I viewed that
17  as a positive for the market.
18       Q.   Did the --
19            MR. TENREIRO:  Almost done, Matt.
20            MR. SOLOMON:  Okay.
21       Q.   Did the -- sorry.  So I think I asked
22  you, but let me just make sure I did.
23            After the listing was announced, did you
24  talk to CoinBase about their decision, the basis
25  for their decision?
```

[9/20/2021] Garlinghouse, Bradley 9.20.2021