The Participant Agreement provides the procedures for the creation and, if permitted, redemption of Baskets and for the delivery of the whole and fractional XRP required for such creations and, if permitted, redemptions. The Participant Agreement and the related procedures attached thereto may be amended by the Sponsor and the relevant Authorized Participant. Under the Participant Agreement, the Sponsor agrees to indemnify each Authorized Participant against certain liabilities, including liabilities under the Securities Act.

The following description of the procedures for the creation and redemption of Baskets is only a summary and investors should refer to the relevant provisions of the Trust Agreement and the form of Participant Agreement, if applicable, for more detail.

**Creation Procedures**

On any business day, an Authorized Participant may order one or more Creation Baskets from the Trust by placing a creation order with the Sponsor no later than 4:00 p.m., New York time, which the Sponsor will accept or reject. By placing a creation order, an Authorized Participant agrees to transfer the Total Basket XRP Amount from the Authorized Participant Self-Administered Account to the XRP Account.

All creation orders are accepted (or rejected) by the Sponsor on the business day on which the relevant creation order is placed. If a creation order is accepted, the Sponsor will calculate the Total Basket XRP Amount on the same business day, which will be the trade date, and will communicate the Total Basket XRP Amount to the Authorized Participant. The Authorized Participant must transfer the Total Basket XRP Amount to the Trust no later than 6:00 p.m., New York time, on the trade date. The expense and risk of delivery, ownership and safekeeping of XRP will be borne solely by the Authorized Participant until such XRP have been received by the Trust.

Following receipt of the Total Basket XRP Amount, the Transfer Agent will credit the number of Shares to the account of the Investor on behalf of which the Authorized Participant placed the creation order by no later than 6:00 p.m., New York time, on the trade date. The Authorized Participant may then transfer the Shares directly to the relevant Investor.

**Redemption Procedures**

Redemptions of Shares are currently not permitted and the Trust is unable to redeem Shares. Subject to receipt of regulatory approval from the SEC and approval by the Sponsor in its sole discretion, the Trust may in the future operate a redemption program. *Because the Trust does not believe that the SEC would, at this time, entertain an application for the waiver of rules needed in order to operate an ongoing redemption program, the Trust currently has no intention of seeking regulatory approval from the SEC to operate an ongoing redemption program.* For a discussion of risks relating to the Trust's inability to redeem Shares, see "Risk Factors—Risk Factors Related to the Trust and the Shares—The arbitrage mechanism intended to keep the price of the Shares closely linked to the XRP Index Price may not function properly due to multiple factors and the Shares may trade at a discount or premium to the XRP Holdings per Share" and "Risk Factors—Risk Factors Related to the Trust and the Shares—The restrictions on transfer and redemption may result in losses on an investment in the Shares."

If permitted, the procedures by which an Authorized Participant can redeem one or more Baskets will mirror the procedures for the creation of Baskets. On any business day, an Authorized Participant may place a redemption order no later than 4:00 p.m., New York time, which the Sponsor will accept or reject. By placing a redemption order, an Authorized Participant agrees to deliver to the Sponsor the Baskets to be redeemed through the book-entry system to the Trust. The redemption procedures do not allow a Shareholder other than an Authorized Participant to redeem Shares.

All redemption orders are accepted (or rejected) by the Sponsor on the business day on which the relevant redemption order is placed. If a redemption order is accepted, the Sponsor will calculate the Total Basket XRP Amount on the same business day, which will be the trade date, and will communicate the Total Basket XRP Amount to the Authorized Participant. The Sponsor will then direct the Transfer Agent to debit the account of the Investor on behalf of which the Authorized Participant placed the redemption order the number of Redemption Baskets ordered no later than 6:00 p.m., New York time, on the trade date.

Following receipt of confirmation by the Transfer Agent that the Redemption Baskets have been debited, the Sponsor or its delegates will (by utilizing their own Security Factors and sending valid instruction to the Key

CONFIDENTIAL

RPLI_SEC 0394559

Maintainer) send the Authorized Participant the Total Basket XRP Amount by no later than 6:00 p.m., New York time, on the trade date.

**Suspension or Rejection of Orders and Total Basket XRP Amount**

The creation or, if permitted, redemption of Shares may be suspended generally, or refused with respect to particular requested creations or redemptions, during any period when the transfer books of the Transfer Agent are closed or if circumstances outside the control of the Sponsor or its delegates make it for all practical purposes not feasible to process such creation orders or redemption orders. The Sponsor may reject an order or, after accepting an order, may cancel such order by rejecting the Total Basket XRP Amount, in the case of creations, or the Baskets to be redeemed, in the case of redemptions, (i) if such order is not presented in proper form as described in the Participant Agreement, (ii) the transfer of the Total Basket XRP Amount, in the case of creations, from an account other than an Authorized Participant Self-Administered Account or (iii) if the fulfillment of the order, in the opinion of counsel, might be unlawful, among other reasons. None of the Sponsor or its delegates will be liable for the suspension, rejection or acceptance of any creation order, redemption order or Total Basket XRP Amount.

In particular, upon the Trust's receipt of any Incidental Rights and/or IR Virtual Currency in connection with an airdrop, the Sponsor will suspend creations and redemptions until it is able to cause the Trust to sell or distribute such Incidental Rights and/or IR Virtual Currency.

None of the Sponsor or its delegates will be liable for the suspension, rejection or acceptance of any creation order, redemption order or Total Basket XRP Amount.

**Tax Responsibility**

Authorized Participants or, if Shares are issued directly to Shareholders other than Authorized Participants, such Shareholders, are responsible for any transfer tax, sales or use tax, stamp tax, recording tax, value-added tax or similar tax or governmental charge applicable to the creation (or, should the Trust commence a redemption program, redemption) of Baskets, regardless of whether such tax or charge is imposed directly on the Authorized Participant or other Shareholder, and agree to indemnify the Sponsor and the Trust if the Sponsor or the Trust is required by law to pay any such tax, together with any applicable penalties, additions to tax or interest thereon.

CONFIDENTIAL

RPLI_SEC 0394560

## VALUATION OF XRP AND DEFINITION OF XRP HOLDINGS

The Sponsor will evaluate the XRP held by the Trust and determine the XRP Holdings of the Trust in accordance with the relevant provisions of the Trust Documents. The following is a description of the material terms of the Trust Documents as they relate to valuation of the Trust's XRP and the XRP Holdings calculations.

On each business day at 4:00 p.m., New York time, or as soon thereafter as practicable (the "Evaluation Time"), the Sponsor will evaluate the XRP held by the Trust and calculate and publish the XRP Holdings of the Trust. To calculate the XRP Holdings, the Sponsor will:

1.  Determine the XRP Index Price;

2.  Multiply the XRP Index Price by the aggregate number of XRP owned by the Trust as of 4:00 p.m., New York time, on the immediately preceding day;

3.  Add the U.S. Dollar value of XRP, as calculated using the XRP Index Price, receivable under pending creation orders, if any, determined by multiplying the number of Creation Baskets represented by such creation orders by the Basket XRP Amount and then multiplying such product by the XRP Index Price;

4.  Subtract the U.S. Dollar value of the XRP, as calculated using the XRP Index Price, constituting the Sponsor's Fee, determined by multiplying the number of such XRP by the XRP Index Price;

5.  Subtract the Additional Trust Expenses, if any; and

6.  Subtract the U.S. Dollar value of the XRP to be distributed under pending redemption orders, if any, determined by multiplying the number of Redemption Baskets represented by such redemption orders by the Basket XRP Amount and then multiplying such product by the XRP Index Price.

In the event that the Sponsor determines that the primary methodology used to determine the XRP Index Price is not an appropriate basis for valuation of the Trust's XRP, the Sponsor will utilize the cascading set of rules as described in "Overview of the XRP Industry Market— XRP Value—The Index and the XRP Index Price." In addition, in the event that the Trust holds any Incidental Rights and/or IR Virtual Currency, the Sponsor may, in its discretion, include the value of such Incidental Rights and/or IR Virtual Currency in the determination of the Trust's XRP Holdings, provided that the Sponsor has determined in good faith a method for assigning an objective value to such Incidental Rights and/or IR Virtual Currency. At this time, the Trust does not expect to take any Incidental Rights or IR Virtual Currency it may hold into account for purposes of determining the Trust's XRP Holdings or the XRP Holdings per Share.

The Sponsor will publish the XRP Index Price, the Trust's XRP Holdings and the XRP Holdings per Share on the Trust's website as soon as practicable after its determination by the Sponsor. If the XRP Holdings and XRP Holdings per Share have been calculated using a price per XRP other than the XRP Index Price for such Evaluation Time, the publication on the Trust's website will note the valuation methodology used and the price per XRP resulting from such calculation.

The Shareholders may rely on any evaluation furnished by the Sponsor. The determinations that the Sponsor makes will be made in good faith upon the basis of, and the Sponsor will not be liable for any errors contained in, information reasonably available to it. The Sponsor will not be liable to the Authorized Participants, the Shareholders or any other person for errors in judgment. However, the preceding liability exclusion will not protect the Sponsor against any liability resulting from gross negligence, willful misconduct or bad faith in the performance of its duties.

## EXPENSES; SALES OF XRP

### Expenses to Be Paid by the Sponsor

The Sponsor has agreed to assume all fees and other expenses incurred by the Trust in the ordinary course of its affairs, excluding taxes, but including: the Marketing Fee; fees for the Key Maintainer, the Backup Maintainers and any other security vendor engaged by the Trust; the Transfer Agent Fee; the Trustee fee; the fees and expenses

53

RPLI_SEC 0394561

related to trading on any Secondary Market (including legal, marketing and audit fees and expenses); legal, accounting and audit fees; regulatory fees; printing and mailing costs; costs of maintaining the Trust's website; and applicable license fees. The Sponsor's Fee will generally be paid in XRP. However, if the Trust holds any Incidental Rights or IR Virtual Currency at any time, the Trust may also pay the Sponsor's Fee, in whole or in part, with such Incidental Rights and/or IR Virtual Currency by entering into an agreement with the Sponsor and transferring such Incidental Rights and/or IR Virtual Currency to the Sponsor at a value to be determined pursuant to such agreement. The Trust may use Incidental Rights and/or IR Virtual Currency to pay the Sponsor's Fee only if such agreement and transfer does not conflict with the terms of the Trust Agreement.

**Extraordinary and Other Expenses**

In certain extraordinary circumstances, the Trust may pay, in addition to the Sponsor's Fee, expenses that are not Sponsor-paid Expenses, including, but not limited to, taxes, expenses and costs of any extraordinary services performed by the Sponsor (or any other Service Provider) on behalf of the Trust, indemnification expenses of the Key Maintainer and other agents, service providers and counterparties and extraordinary legal fees and expenses, including in connection with any Incidental Rights and IR Virtual Currency (collectively, "Additional Trust Expenses"). If Additional Trust Expenses are incurred, the Trust will be required to pay these Additional Trust Expenses by selling or delivering XRP, Incidental Rights and/or IR Virtual Currency. See "—Disposition of XRP, Incidental Rights and/or IR Virtual Currency" for further information on sales of XRP, Incidental Rights and/or IR Virtual Currency. Although the Sponsor cannot definitively state the frequency or magnitude of the Additional Trust Expenses, the Sponsor expects that they may occur infrequently.

**Disposition of XRP, Incidental Rights and/or IR Virtual Currency**

To pay the Sponsor's Fee, the Sponsor, by using its Security Factors and by instructing the Key Maintainer, will (i) withdraw from the XRP Account (or other applicable account) the quantity of XRP, Incidental Rights and/or IR Virtual Currency, determined as described above in "Activities of the Trust—Trust Expenses," equal to the accrued but unpaid Sponsor's Fee and (ii) transfer such XRP, Incidental Rights and/or IR Virtual Currency to an account maintained by the Sponsor. In addition, if the Trust incurs any Additional Trust Expenses, the Sponsor or its delegates, by using its Security Factors and by instructing the Key Maintainer, will (i) withdraw XRP, Incidental Rights and/or IR Virtual Currency from the XRP Account (or other applicable account) in such quantity as may be necessary to permit payment of such Additional Trust Expenses and (ii) convert such XRP, Incidental Rights and/or IR Virtual Currency into U.S. Dollars or other fiat currencies at the Actual Exchange Rate or deliver XRP, Incidental Rights and/or IR Virtual Currency in kind, in each case in such quantity as may be necessary to permit payment of Additional Trust Expenses. Shareholders do not have the option of choosing to pay their proportionate shares of Additional Trust Expenses in lieu of having their shares of Additional Trust Expenses paid by the Trust's delivery or disposition of XRP, Incidental Rights and/or IR Virtual Currency. The transfer or sale of XRP, Incidental Rights and/or IR Virtual Currency to pay the Trust's expenses will be a taxable event for Shareholders. See "U.S. Federal Income Tax Consequences—Tax Consequences to U.S. Holders."

Because the number of the Trust's XRP will decrease as a consequence of the payment of the Sponsor's Fee in XRP or the sale of XRP to pay Additional Trust Expenses (and the Trust will incur additional fees associated with converting XRP into U.S. Dollars), the number of XRP represented by a Share will decline at such time and the XRP Holdings of the Trust may also decrease. Similarly, the number (if any) of Incidental Rights and IR Virtual Currency represented by a Share will decrease as a consequence of the use of Incidental Rights and IR Virtual Currency to pay the Sponsor's Fee and Additional Trust Expenses. Accordingly, the Shareholders will bear the cost of the Sponsor's Fee and any Additional Trust Expenses.

The Sponsor will also cause the sale of the Trust's XRP, Incidental Rights and/or IR Virtual Currency if the Sponsor determines that sale is required by applicable law or regulation or in connection with the termination and liquidation of the Trust. The Sponsor will not be liable or responsible in any way for depreciation or loss incurred by reason of any sale of XRP, Incidental Rights and/or IR Virtual Currency.

54

RPLI_SEC 0394562

## BOOKS AND RECORDS; STATEMENTS, FILINGS AND REPORTS

**Books and Records**

The Sponsor will keep proper books and records of accounts of the Trust at its office located in New York or such office as it may subsequently designate. These books and records are open to inspection at all reasonable times during the usual business hours of the Sponsor by any person who establishes to the Sponsor's satisfaction that such person is a Shareholder.

**Reports to Shareholders**

The Sponsor will furnish Shareholders with an annual report of the Trust within 180 calendar days after the Trust's fiscal year (or as soon as reasonably practicable thereafter) including, but not limited to, annual audited financial statements (including a statement of income and statement of financial condition), prepared in accordance with GAAP and accompanied by a report of the independent registered public accounting firm that audited such statements.

The accounts of the Trust will be audited, as required by law and as may be directed by the Sponsor, by independent registered public accountants designated by the Sponsor. The accountants' report will be furnished by the Sponsor to Shareholders upon request.

**Fiscal Year**

The fiscal year of the Trust is the period ending May 31 of each year. The Sponsor may select an alternate fiscal year.

CONFIDENTIAL

RPLI_SEC 0394563

## DESCRIPTION OF THE TRUST DOCUMENTS

**Description of the Trust Agreement**

The following is a description of the material terms of the Trust Agreement. The Trust Agreement establishes the roles, rights and duties of the Sponsor and the Trustee.

**The Sponsor**

### *Liability of the Sponsor and Indemnification*

The Sponsor and its affiliates (each a "Covered Person") will not be liable to the Trust or any Shareholder for any loss suffered by the Trust which arises out of any action or inaction of such Covered Person if such Covered Person determined in good faith that such course of conduct was in the best interests of the Trust. However, the preceding liability exclusion will not protect any Covered Person against any liability resulting from its own willful misconduct, bad faith or gross negligence in the performance of its duties.

Each Covered Person will be indemnified by the Trust against any loss, judgment, liability, expense incurred or amount paid in settlement of any claim sustained by it in connection with the Covered Person's activities for the Trust, provided that (i) the Covered Person was acting on behalf of, or performing services for, the Trust and had determined, in good faith, that such course of conduct was in the best interests of the Trusts and such liability or loss was not the result of fraud, gross negligence, bad faith, willful misconduct or a material breach of the Trust Agreement on the part of such Covered Person and (ii) any such indemnification will be recoverable only from the property of the Trust. Any amounts payable to an indemnified party will be payable in advance under certain circumstances.

### *Fiduciary and Regulatory Duties of the Sponsor*

The Sponsor is not effectively subject to the duties and restrictions imposed on "fiduciaries" under both statutory and common law. Rather, the general fiduciary duties that would apply to the Sponsor are defined and limited in scope by the Trust Agreement.

The Trust Agreement provides that in addition to any other requirements of applicable law, no Shareholder will have the right, power or authority to bring or maintain a derivative action, suit or other proceeding on behalf of the Trust unless two or more Shareholders who (i) are not affiliates of one another and (ii) collectively hold at least 10% of the outstanding Shares join in the bringing or maintaining of such action, suit or other proceeding.

Beneficial owners may have the right, subject to certain legal requirements, to bring class actions in federal court to enforce their rights under the federal securities laws and the rules and regulations promulgated thereunder by the SEC. Beneficial owners who have suffered losses in connection with the purchase or sale of their beneficial interests may be able to recover such losses from the Sponsor where the losses result from a violation by the Sponsor of the anti-fraud provisions of the federal securities laws.

### *Actions Taken to Protect the Trust*

The Sponsor may, in its sole discretion, prosecute, defend, settle or compromise actions or claims at law or in equity that it considers necessary or proper to protect the Trust or the interests of the Shareholders. The expenses incurred by the Sponsor in connection therewith (including the fees and disbursements of legal counsel) will be expenses of the Trust and are deemed to be Additional Trust Expenses. The Sponsor will be entitled to be reimbursed for the Additional Trust Expenses.

### *Successor Sponsors*

If the Sponsor is adjudged bankrupt or insolvent, the Trustee may terminate and liquidate the Trust and distribute its remaining assets. The Trustee will have no obligation to appoint a successor sponsor or to assume the duties of the Sponsor, and will have no liability to any person because the Trust is or is not terminated. However, if a certificate of dissolution or revocation of the Sponsor's charter is filed (and ninety (90) days have passed after the date of notice to the Sponsor of revocation without a reinstatement of the Sponsor's charter) or the withdrawal,

56

RPLI_SEC 0394564

removal, adjudication or admission of bankruptcy or insolvency of the Sponsor has occurred, Shareholders holding at least a majority (over 50%) of the Shares may agree in writing to continue the affairs of the Trust and to select, effective as of the date of such event, one or more successor Sponsors within ninety (90) days of any such event.

## The Trustee

The Trustee is a fiduciary under the Trust Agreement and must satisfy the requirements of Section 3807 of the Delaware Trust Statute. However, the fiduciary duties, responsibilities and liabilities of the Trustee are limited by, and are only those specifically set forth in, the Trust Agreement.

### Limitation on Trustee's Liability

Under the Trust Agreement, the Sponsor has exclusive control of the management of all aspects of the activities of the Trust and the Trustee has only nominal duties and liabilities to the Trust. The Trustee is appointed to serve as the trustee for the sole purpose of satisfying Section 3807(a) of the DSTA which requires that the Trust have at least one trustee with a principal place of business in the State of Delaware. The duties of the Trustee are limited to (i) accepting legal process served on the Trust in the State of Delaware and (ii) the execution of any certificates required to be filed with the Delaware Secretary of State which the Trustee is required to execute under the DSTA.

To the extent the Trustee has duties (including fiduciary duties) and liabilities to the Trust or the Shareholders under the DSTA, such duties and liabilities will be replaced by the duties and liabilities of the Trustee expressly set forth in the Trust Agreement. The Trustee will have no obligation to supervise, nor will it be liable for, the acts or omissions of the Sponsor, Key Maintainer, any Backup Maintainer or any other security vendor engaged by the Trust. Neither the Trustee, either in its capacity as trustee or in its individual capacity, nor any director, officer or controlling person of the Trustee is, or has any liability as, the issuer, director, officer or controlling person of the issuer of Shares. The Trustee's liability is limited solely to the express obligations of the Trustee as set forth in the Trust Agreement.

Under the Trust Agreement, the Sponsor has the exclusive management, authority and control of all aspects of the activities of the Trust. The Trustee has no duty or liability to supervise or monitor the performance of the Sponsor, nor does the Trustee have any liability for the acts or omissions of the Sponsor. The existence of a trustee should not be taken as an indication of any additional level of management or supervision over the Trust. The Trust Agreement provides that the management authority with respect to the Trust is vested directly in the Sponsor. The Trust Agreement provides that the Trustee is not responsible or liable for the genuineness, enforceability, collectability, value, sufficiency, location or existence of any of the XRP or other assets of the Trust.

### Possible Repayment of Distributions Received by Shareholders; Indemnification by Shareholders

The Shares are limited liability investments. Investors may not lose more than the amount that they invest plus any profits recognized on their investment. Although it is unlikely, the Sponsor may, from time to time, make distributions to the Shareholders. However, Shareholders could be required, as a matter of bankruptcy law, to return to the estate of the Trust any distribution they received at a time when the Trust was in fact insolvent or in violation of its Trust Agreement. In addition, the Trust Agreement provides that Shareholders will indemnify the Trust for any harm suffered by it as a result of Shareholders' actions unrelated to the activities of the Trust.

The foregoing repayment of distributions and indemnity provisions (other than the provision for Shareholders indemnifying the Trust for taxes imposed upon it by a state, local or foreign taxing authority, which is included only as a formality due to the fact that many states do not have statutory trust statutes therefore the tax status of the Trust in such states might, theoretically, be challenged) are commonplace in statutory trusts and limited partnerships.

### Indemnification of the Trustee

The Trustee and any of the officers, directors, employees and agents of the Trustee will be indemnified by the Trust as primary obligor and ███ as secondary obligor and held harmless against any loss, damage, liability, claim, action, suit, cost, expense, disbursement (including the reasonable fees and expenses of counsel), tax or penalty of any kind and nature whatsoever, arising out of, imposed upon or asserted at any time against such indemnified person in connection with the performance of its obligations under the Trust Agreement, the creation, operation or termination of the Trust or the transactions contemplated therein; provided, however, that neither the Trust nor ███ will be required to indemnify any such indemnified person for any such expenses which are a result of the willful

CONFIDENTIAL

misconduct, bad faith or gross negligence of such indemnified person. If the Trust has insufficient assets or improperly refuses to pay such an indemnified person within 60 days of a request for payment owed under the Trust Agreement, ███ will, as secondary obligor, compensate or reimburse the Trustee or indemnify, defend and hold harmless such an indemnified person as if it were the primary obligor under the Trust Agreement. Any amount payable to such an indemnified person under the Trust Agreement may be payable in advance under certain circumstances and will be secured by a lien on the Trust property. The obligations of ███ and the Trust to indemnify such indemnified persons under the Trust Agreement will survive the termination of this Trust Agreement.

### *Holding of Trust Property*

The Trust will hold and record the ownership of the Trust's assets in a manner such that it will be owned for the benefit of the Shareholders for the purposes of, and subject to and limited by the terms and conditions set forth in, the Trust Agreement. The Trust will not create, incur or assume any indebtedness or borrow money from or loan money to any person. The Trustee may not commingle its assets with those of any other person.

The Trustee may employ agents, attorneys, accountants, auditors and nominees and will not be answerable for the conduct or misconduct of any such custodians, agents, attorneys or nominees if such custodians, agents, attorneys and nominees have been selected with reasonable care.

### *Resignation, Discharge or Removal of Trustee; Successor Trustees*

The Trustee may resign as Trustee by written notice of its election so to do, delivered to the Sponsor with at least 60 days' notice. The Sponsor may remove the Trustee in its discretion. If the Trustee resigns or is removed, the Sponsor, acting on behalf of the Shareholders, will appoint a successor trustee. The successor Trustee will become fully vested with all of the rights, powers, duties and obligations of the outgoing Trustee.

If the Trustee resigns and no successor trustee is appointed within 180 days after the Trustee notifies the Sponsor of its resignation, the Trustee will terminate and liquidate the Trust and distribute its remaining assets.

### *Amendments to the Trust Agreement*

In general, the Sponsor may amend the Trust Agreement without the consent of any Shareholder. However, the Sponsor may not make an amendment, or otherwise supplement the Trust Agreement, if such amendment or supplement would permit the Sponsor, the Trustee or any other person to vary the investment of the Shareholders (within the meaning of applicable Treasury Regulations) or would otherwise adversely affect the status of the Trust as a grantor trust for U.S. federal income tax purposes. In addition, no amendments to the Trust Agreement that materially adversely affect the interests of Shareholders may be made without the vote of at least a majority (over 50%) of the Shares (not including any Shares held by the Sponsor or its affiliates).

### *Termination of the Trust*

The Trust will dissolve if any of the following events occur:

- a U.S. federal or state regulator requires the Trust to shut down or forces the Trust to liquidate its XRP, Incidental Rights and/or IR Virtual Currency or seizes, impounds or otherwise restricts access to Trust assets;

- any ongoing event exists that either prevents the Trust from making or makes impractical the Trust's reasonable efforts to make a fair determination of the XRP Index Price;

- any ongoing event exists that either prevents the Trust from converting or makes impractical the Trust's reasonable efforts to convert XRP, Incidental Rights and/or IR Virtual Currency to U.S. Dollars; or

- the filing of a certificate of dissolution or revocation of the Sponsor's charter (and the expiration of 90 days after the date of notice to the Sponsor of revocation without a reinstatement of its charter) or the withdrawal, removal, adjudication or admission of bankruptcy or insolvency of the Sponsor has occurred unless (i) at the time there is at least one remaining Sponsor and that remaining Sponsor carries on the Trust or (ii) within 90 days of any such event Shareholders holding at least a majority (over 50%) of Shares agree

58

RPLI_SEC 0394566

in writing to continue the activities of the Trust and to select, effective as of the date of such event, one or more successor Sponsors.

The Sponsor may, in its sole discretion, dissolve the Trust if any of the following events occur:

- the SEC determines that the Trust is an investment company required to be registered under the Investment Company Act of 1940;

- the CFTC determines that the Trust is a commodity pool under the CEA;

- the Trust is determined to be a "money service business" under the regulations promulgated by FinCEN under the authority of the U.S. Bank Secrecy Act and is required to comply with certain FinCEN regulations thereunder;

- the Trust is required to obtain a license or make a registration under any state law regulating money transmitters, money services business, providers of prepaid or stored value, digital currency business or similar entities;

- the Trust becomes insolvent or bankrupt;

- a security vendor to the Trust, such as the Key Maintainer or one of the Backup Maintainers, resigns or is removed without replacement;

- all of the Trust's assets are sold;

- the determination of the Sponsor that the aggregate net assets of the Trust in relation to the expenses of the Trust make it unreasonable or imprudent to continue the Trust;

- the Sponsor receives notice from the IRS or from counsel for the Trust or the Sponsor that the Trust fails to qualify for treatment, or will not be treated, as a grantor trust under the Code;

- if the Trustee notifies the Sponsor of the Trustee's election to resign and the Sponsor does not appoint a successor trustee within 180 days; or

- the Sponsor determines, in its sole discretion, that it is desirable or advisable for any reason to discontinue the affairs of the Trust.

The death, legal disability, bankruptcy, insolvency, dissolution, or withdrawal of any Shareholder (as long as such Shareholder is not the sole Shareholder of the Trust) will not result in the termination of the Trust, and such Shareholder, his or her estate, custodian or personal representative will have no right to a redemption or value such Shareholder's Shares. Each Shareholder (and any assignee thereof) expressly agrees that in the event of his or her death, he or she waives on behalf of himself or herself and his or her estate, and he or she directs the legal representative of his or her estate and any person interested therein to waive the furnishing of any inventory, accounting or appraisal of the assets of the Trust and any right to an audit or examination of the books of account for the Trust, except for such rights as are set forth in Article VIII of the Trust Agreement relating to the books of account and reports of the Trust.

Upon dissolution of the Trust and surrender of Shares by the Shareholders, Shareholders will receive a distribution in U.S. Dollars or XRP, Incidental Rights and/or IR Virtual Currency, at the sole discretion of the Sponsor, after the Sponsor has sold the Trust's XRP, Incidental Rights and IR Virtual Currency, if applicable, and has paid or made provision for the Trust's claims and obligations.

If the Trust is forced to liquidate, the Trust will be liquidated under the Sponsor's direction. The Sponsor, on behalf of the Trust, will engage directly with either accessible XRP Exchanges or over-the-counter XRP markets to liquidate the Trust's XRP as promptly as possible while obtaining the best fair value possible. The proceeds therefrom will be applied and distributed in the following order of priority: (a) to the expenses of liquidation and termination and to creditors, including Shareholders who are creditors, to the extent otherwise permitted by law, in satisfaction of liabilities of the Trust other than liabilities for distributions to Shareholders and (b) to the holders of Shares pro rata in accordance with the respective percentage of percentages of Shares that they hold. It is expected

59

RPLI_SEC 0394567

that the Sponsor would be subject to the same regulatory requirements as the Trust, and therefore, the markets available to the Sponsor will be the same markets available to the Trust.

### Governing Law; Consent to New York Jurisdiction

The Trust Agreement and the rights of the Sponsor, Trustee and Shareholders under the Trust Agreement are governed by the laws of the State of Delaware. Each Participant Agreement is also governed by the laws of the State of Delaware. The Key Maintenance Agreement and the Backup Security Factor Agreements are governed by the laws of the state of New York. The Sponsor, the Trustee and each Shareholder, consent to the jurisdiction of the courts of the State of New York and any federal courts located in the borough of Manhattan in New York City.

## Description of the Key Maintenance Agreement

The Key Maintenance Agreement establishes the rights and responsibilities of the Key Maintainer and the Trust with respect to the Protected Coins in the Trust's XRP Account, which is established by the Key Maintainer on behalf of the Trust. For a general description of the Key Maintainer's obligations, see "The Key Maintainer—The Key Maintainer's Role."

### Location of XRP; Account

The Key Maintainer will hold Security Factors of an on-blockchain XRP account on behalf of the Trust, the XRP Account. The XRP in this account are referred to as the "Protected Coins." Under the Key Maintenance Agreement, the Trust and Key Maintainer agree that the location of the Protected Coins is the United States.

The Agreement does not specify the location where the Security Factors must be held but requires that they not be held in jurisdictions that present an elevated risk of hostile regulatory treatment and social, economic or political unrest. The Key Maintainer must have written approval from the Sponsor or the Trust to change the location of the Security Factors held by the Key Maintainer or records relating to the XRP Account.

### Access to the XRP Account; Deposits, Withdrawals and Storage

The Key Maintainer will use its best efforts to keep safe and secure the Security Factors of the XRP Account that it holds, and will not be accessible or disclosed to affiliates or subsidiaries of the Key Maintainer, the Trust, Sponsor, or any other party. The Key Maintenance Agreement provides that all Protected Coins credited to the XRP Account must be appropriately identified as being held for the Sponsor or Trust and held in the XRP Account on a non-fungible basis. The Protected Coins cannot be commingled with other XRP held by the Key Maintainer and cannot be deposited or held with any third-party depository, Key Maintainer, clearance system or wallet without prior written consent of the Sponsor or Trust.

The Trust will be able to transfer XRP from the XRP Account to another XRP account that is not maintained or controlled by the Key Maintainer. Except in the case of certain prohibited activities of the Trust and the Sponsor, the Key Maintainer will not suspend the Trust's access to the Key Maintainer's Services, and any suspension of access to the Key Maintainer's Services will constitute a breach of the Key Maintenance Agreement.

The Key Maintainer will provide the Sponsor with the information that is necessary for Authorized Participants to transfer XRP to the XRP Account. The Key Maintainer will only allow withdrawals of XRP from the XRP Account by authorized representatives of the Trust. The Key Maintainer will use its best efforts to design and put in place a secure procedure to allow the Sponsor to receive such addresses, and to facilitate such withdrawals.

The Key Maintenance Agreement provides that the Trust and Authorized Persons will be able to access the XRP Account via the Key Maintainer's services at all times, in order to check information about the XRP Account, add XRP to the XRP Account, withdraw XRP from the Wallet Account and initiate withdrawal of XRP from the Vault Account, and otherwise use the Key Maintainer's services.

Authorized persons of the Trust will initiate withdrawals by sending a valid instruction to the Key Maintainer. Under the Key Maintenance Agreement, the Key Maintainer will timely carry out any valid Instructions given to it with respect to the Security Factors of the XRP Account that it holds. Timely will mean acting within the same business day, or, if the instruction is received after 5:00 p.m., New York Time, the next business day.

60

RPLI_SEC 0394568

### Security of the Account

Under the Key Maintenance Agreement, the Key Maintainer must use its best efforts to keep the Security Factors of the XRP Account that it holds safe and secure. Such Security Factors may only be controlled and accessed by the Key Maintainer and will not be controlled, accessible, or disclosed to any other party, including third parties, affiliates or subsidiaries of Key Maintainer, or the Trust. Such Security Factors will be used by Key Maintainer only in compliance with Instructions it has received.

The Trust, Sponsor and Key Maintainer will comply with certain security procedures with respect to the delivery or authentication of instructions and will use its best efforts to reasonably safeguard any codes, passwords or similar devices. Under the Key Maintenance Agreement, the Key Maintainer must exercise best efforts in all Ripple Network transactions executed in connection with its services.

### Record Keeping

The Key Maintainer will keep appropriate records of its services pursuant to the Key Maintenance Agreement, and such records must be retained by the Key Maintainer for no less than seven years. The Key Maintenance Agreement also provides that the Key Maintainer will permit, to the extent it may legally do so, the Trust or Sponsor's auditors or third-party accountants, upon reasonable notice, to inspect, take extracts from and audit the records that it maintains. The Key Maintainer is obligated to provide a copy of any audit report prepared by its internal or independent auditors to the Trust or Sponsor.

### Standard of Care; Limitations of Liability

The Key Maintainer will use best efforts in performing its obligations under the Key Maintenance Agreement. The Key Maintainer is liable to the Sponsor and the Trust for the loss of any Protected Coins to the extent that such loss is caused by and directly attributable to the Key Maintainer, even if the Key Maintainer meets its duty of exercising best efforts.

The Key Maintainer's monetary liability is limited to the greater of $1 million or 10% of the loss caused by and directly attributable to a breach of the Key Maintainer's obligations under the Key Maintenance Agreement.

Under the Key Maintenance Agreement, the Trust and Key Maintainer agreed that any liability relating to a number of XRP should be valued in terms of the market value of the XRP at the time that payment of damages will be made to the other party. Alternatively, such portion of damages can be satisfied by actual delivery of the relevant quantity of XRP.

The Key Maintainer and Trust are not liable to each other for any indirect, incidental, special or consequential damages whether or not such losses were foreseeable. Furthermore, the Key Maintainer is not responsible or liable to the Trust for a failure to perform under the Key Maintenance Agreement or for loss of Protected Coins due to circumstances beyond its reasonable control when exercising best efforts, including acts of God, terrorist activities, war, rebellion, military or usurped power or confiscation. A cybersecurity attack, hack or other intrusion by a third party or by someone associated with Key Maintainer is not a circumstance that is beyond Key Maintainer's reasonable control when exercising best efforts.

Pursuant to the Key Maintenance Agreement, the Key Maintainer does not guarantee the value of the Protected Coins. The Key Maintainer is not responsible for the services provided by the Ripple Network, such as verifying and confirming transactions that are submitted to the Ripple Network. Furthermore, the Key Maintainer cannot cancel or reverse a transaction that has been submitted to the Ripple Network. To the extent the Key Maintainer does not cause or contribute to a loss that the Trust or Sponsor suffers in connection with any XRP transaction initiated pursuant to the Key Maintainer's services, the Key Maintainer will have no liability for such loss.

### Indemnity

Each of the Key Maintainer and the Trust may agree to indemnify and hold harmless the other such parties from and against any and all damages arising out of or caused by (whether directly or indirectly) a third-party claim relating to the nonperformance or misperformance by the Key Maintainer or Trust, as the case may be, of its duties and obligations under the Key Maintenance Agreement as well as a party's reasonable reliance on any representations or warranties made by the Key Maintainer or Trust, as the case may be, under the Key Maintenance

61

RPLI_SEC 0394569

Agreement that were or become in fact untrue. The Key Maintainer has further agreed to indemnify and hold harmless the Trust from the holding of Security Factors by the Key Maintainer, including any loss or damage caused by any act or omission of any employee of the Key Maintainer or any agent, representative or independent contractor engaged by the Key Maintainer, whether or not such act or omission occurred within the scope of his employment or engagement.

### Fees and Expenses

The Key Maintainer is entitled to fees for services, which may be increased upon 60 days written notice to the Sponsor or Trust. The Trust must pay the Key Maintainer such fees within 30 days of the Key Maintainer's invoice. The Sponsor and the Trust will be liable for all taxes with respect to any XRP held on its behalf or any transaction related to these XRP. The Trust, as primary obligor, and the Sponsor as secondary obligor, will defend and indemnify the Key Maintainer for any damages related to any such tax, other than a tax arising out of the Key Maintainer's negligence or willful misconduct.

### Termination

The Key Maintenance Agreement provides an initial period of 30 days from its effective date within which the Trust may terminate the agreement upon two days' notice. Otherwise, generally, the Key Maintainer, Trust or Sponsor may terminate the Key Maintenance Agreement for any reason upon 60 days' written prior notice. The Key Maintenance Agreement provides for annual, automatically renewable terms. In certain situations, including a material breach or failure to perform obligations of the Key Maintenance Agreement, the Key Maintainer, Sponsor and Trust may terminate the Key Maintenance Agreement immediately after providing written notice. Upon termination of the Key Maintenance Agreement, the Key Maintainer must promptly deliver all the Trust's XRP to the Trust as of the effective date of termination, together with copies of the records maintained pursuant to the Key Maintenance Agreement.

### Governing Law

The Key Maintenance Agreement is governed by New York law.

### Description of the Backup Security Factor Agreements

The Backup Security Factor Agreements establish the rights and responsibilities of the Backup Maintainers, the Sponsor and the Trust with respect to the Security Factors of the Trust's XRP Account held by the Backup Maintainers. For a general description of the Backup Maintainers' obligations, see "The Backup Maintainers—The Backup Maintainers' Role."

Each Backup Security Factor Agreement is structured as a master agreement between one Backup Maintainer and the Sponsor on behalf of one or more trusts or other investment vehicles, including the Trust. Additional trusts or other investment vehicles sponsored or managed by the Sponsor may be added to an appendix attached to the agreement. The Sponsor enters into the Backup Security Factor Agreements on behalf of each trust or other investment vehicle, including the Trust, individually. No trust or other investment vehicle is responsible for any obligation or liability incurred under the Backup Security Factor Agreements by another trust or other investment vehicle, or by the Sponsor acting on behalf of another trust or other investment vehicle.

### Obligations of the Backup Maintainers

Each Backup Maintainer will hold Backup Factors of the Trust's XRP Account and will not give access to the Backup Factors to the Trust, the Sponsor, the Backup Maintainer's affiliates, or any other party. Each Backup Maintainer will not have the right or ability to access or use its Backup Factors until the occurrence of a Backup Contingency. "Backup Contingency" means that, under the Backup Security Factor Agreement between any Backup Maintainer and the Trust, the Backup Maintainer has received (i) a notice in writing from the Trust certifying the Trust's inability to reasonably effect transactions involving the XRP Account or (ii) a court order that states that the Trust is unable to reasonably effect transactions involving the XRP Account and identifies a Restore Party, which court order the Backup Maintainer believes, in good faith and after confirming with legal counsel, is valid. The "Restore Party" is the person or party that the Trust or a court with jurisdiction, as applicable, has chosen to receive the Backup Factors after a Backup Contingency. After the Backup Contingency, the Backup Maintainer(s) must timely deliver the Backup Factors solely to any person of the Trust's or a court's choosing, and the Backup Security

62

RPLI_SEC 0394570

Factor Agreement will terminate with respect to the Trust and the Backup Maintainer(s) will have no further obligations to the Trust after 30 days from the date of such delivery.

### Standard of Care; Limitations of Liability

Each Backup Maintainer will exercise reasonable care in performing its obligations under each Backup Security Factor Agreement.

The Backup Maintainers and Trust are not liable to each other for any indirect, incidental, special or consequential damages whether or not such losses were foreseeable. The Backup Maintenance Agreements contain additional provisions that significantly limit the liability of the Backup Maintainers, for example, limiting liability to situations in which the Backup Maintainer has engaged in willful misconduct.

### Indemnity

Under the Backup Security Factor Agreements, the Trust will indemnify and hold harmless each Backup Maintainer from and against any and all damages arising out of or caused by (whether directly or indirectly) a third-party claim relating to (i) the breach by the Backup Maintainer or the Trust, as the case may be, of its duties and obligations under the Backup Security Factor Agreement or (ii) the Trust's or Backup Maintainer's reasonable reliance on any representations or warranties made by the Backup Maintainer or the Trust, as the case may be, under the Backup Security Factor Agreements that were or become in fact untrue. However, the Trust will not indemnify a Backup Maintainer to the extent damages are caused by willful misconduct (or in certain circumstances, gross negligence or bad faith) on the part of the Backup Maintainer.

### Fees and Expenses

Each Backup Maintainer is entitled to fees for services, which may be increased upon 60 days written notice to the Sponsor or Trust. The Trust must pay each Backup Maintainer such fees within 30 days of the Backup Maintainer's invoice.

### Term, Termination and Succession

The term of each Backup Security Factor Agreement is one year, and automatically renews if neither the Backup Maintainer who is party to the agreement nor the Trust provide notice of termination at least 60 days before the end of the term. The Trust may terminate the agreement upon fourteen days' notice. Backup Maintainers may be able to terminate their respective Backup Security Factor Agreement quickly under certain circumstances. The Backup Security Factor Agreements allow a successor Backup Maintainer to be appointed with the approval of the Trust, which will not be unreasonably withheld.

### Governing Law

The Backup Security Factor Agreements are governed by New York and Delaware law.

CONFIDENTIAL

RPLI_SEC 0394571

## U.S. FEDERAL INCOME TAX CONSEQUENCES

The following discussion addresses the material U.S. federal income tax consequences of the ownership of Shares. This discussion does not describe all of the tax consequences that may be relevant to a beneficial owner of Shares in light of the beneficial owner's particular circumstances, including tax consequences applicable to beneficial owners subject to special rules, such as:

- financial institutions;

- dealers in securities or commodities;

- traders in securities or commodities that have elected to apply a mark-to-market method of tax accounting in respect thereof;

- persons holding Shares as part of a hedge, "straddle," integrated transaction or similar transaction;

- Authorized Participants (as defined below) (i.e., persons holding Shares acquired by them as part of a Creation Basket or redeeming Shares in exchange for the underlying XRP represented by the redeemed Shares);

- U.S. Holders (as defined below) whose functional currency is not the U.S. dollar;

- entities or arrangements classified as partnerships for U.S. federal income tax purposes;

- real estate investment trusts;

- regulated investment companies; and

- tax-exempt entities, including individual retirement accounts.

This discussion applies only to Shares that are held as capital assets and does not address alternative minimum tax consequences or consequences of the Medicare contribution tax on net investment income.

If an entity or arrangement that is classified as a partnership for U.S. federal income tax purposes holds Shares, the U.S. federal income tax treatment of a partner will generally depend on the status of the partner and the activities of the partnership. Partnerships holding Shares and partners in those partnerships are urged to consult their tax advisers about the particular U.S. federal income tax consequences of owning Shares.

This discussion is based on the Code, administrative pronouncements, judicial decisions and final, temporary and proposed Treasury regulations as of the date hereof, changes to any of which subsequent to the date hereof may affect the tax consequences described herein. Prospective investors are urged to consult their tax advisers about the application of the U.S. federal income tax laws to their particular situations, as well as any tax consequences arising under the laws of any state, local or foreign taxing jurisdiction.

### Tax Treatment of the Trust

The Trust should be treated as a grantor trust for U.S. federal income tax purposes. Assuming that the Trust is a grantor trust, the Trust will not be subject to U.S. federal income tax. Rather, a pro rata portion of the Trust's income, gain, losses and deductions will "flow through" to each beneficial owner of Shares.

Because of the evolving nature of digital currencies, it is not possible to predict potential future developments that may arise with respect to digital currencies, including "forks," "airdrops" and other similar events. Such developments may result in uncertain tax consequences for beneficial owners of Shares and may increase the uncertainty with respect to the treatment of digital currencies more generally. Certain future developments could render it impossible, or impracticable, for the Trust to continue to be treated as a grantor trust for U.S. federal income tax purposes.

If the Trust were not classified as a grantor trust, the Trust might be classified as a partnership for U.S. federal income tax purposes. However, due to the uncertain treatment of digital currency for U.S. federal income tax

64

RPLI_SEC 0394572

purposes, there can be no assurance in this regard. If the Trust were classified as a partnership for U.S. federal income tax purposes, the tax consequences of owning Shares generally would not be materially different from the tax consequences described herein, although there might be certain differences, including with respect to timing. In addition, tax information reports provided to beneficial owners of Shares would be made in a different form. If the Trust were not classified as either a grantor trust or a partnership for U.S. federal income tax purposes, it would be classified as a corporation for such purposes. In that event, the Trust would be subject to entity-level U.S. federal income tax (currently at a maximum rate of 21%) on its net taxable income and certain distributions made by the Trust to Shareholders would be taxable as dividends to the extent of the Trust's current and accumulated earnings and profits (which, in the case of non-U.S. Holders (as defined below), generally would be subject to U.S. federal withholding tax at a 30% rate (or a lower rate provided by an applicable income tax treaty)).

The remainder of this discussion is based on the assumption that the Trust will be treated as a grantor trust for U.S. federal income tax purposes.

**Uncertainty Regarding the U.S. Federal Income Tax Treatment of Digital Currency**

As discussed below, each beneficial owner of Shares generally will be treated for U.S. federal income tax purposes as the owner of an undivided interest in the XRP (and, if applicable, any Incidental Rights and/or IR Virtual Currency) held in the Trust. Due to the new and evolving nature of digital currencies and a general absence of clearly controlling authority with respect to digital currencies, many significant aspects of the U.S. federal income tax treatment of digital currency are uncertain, and the Sponsor does not intend to request a ruling from the Internal Revenue Service ("IRS") on these issues. On March 25, 2014, the IRS released a notice (the "Notice") discussing certain aspects of the treatment of digital currencies, such as XRP, for U.S. federal income tax purposes. In the Notice, the IRS stated that, for U.S. federal income tax purposes, (i) digital currency is "property" that is not currency and (ii) digital currency may be held as a capital asset. There can be no assurance, however, that the IRS will not alter its position with respect to digital currency in the future or that a court would uphold the treatment set forth in the Notice. In addition, legislation has been introduced that likely would, if enacted, cause digital currency to be treated as currency for U.S. federal income tax purposes. If digital currency were properly treated as currency for U.S. federal income tax purposes, gains recognized on the disposition of digital currency, and on a disposition of Shares, would constitute ordinary income, and losses recognized on the disposition of digital currency, and on a disposition of Shares, could be subject to special reporting requirements applicable to "reportable transactions." The remainder of this discussion assumes that digital currency is properly treated for U.S. federal income tax purposes as property that is not currency.

The Notice does not address other significant aspects of the U.S. federal income tax treatment of digital currency, including: (i) whether digital currency is properly treated as a "commodity" for U.S. federal income tax purposes; (ii) the proper method of determining a holder's holding period and tax basis for digital currency acquired at different times or at varying prices; and (iii) whether and how a holder of digital currency acquired at different times or at varying prices may designate, for U.S. federal income tax purposes, which of the units of digital currency are transferred in a subsequent sale, exchange or other disposition. It is unclear what guidance on the treatment of digital currency for U.S. federal income tax purposes may be issued in the future.

Prospective investors are urged to consult their tax advisers regarding the substantial uncertainty regarding the tax consequences of an investment in the Trust and XRP.

**Incidental Rights and IR Virtual Currency**

It is possible that, in the future, the Trust will hold Incidental Rights and/or IR Virtual Currency that it receives in connection with its investment in XRP. The uncertainties with respect to the treatment of digital currency for U.S. federal income tax purposes, described above, apply to Incidental Rights and IR Virtual Currency, as well as to XRP. Moreover, the Notice addressed only digital currency that is "convertible virtual currency," defined as digital currency that has an equivalent value in fiat currency or that acts as a substitute for fiat currency. It is conceivable that certain IR Virtual Currency the Trust may receive in the future would not be within the scope of the Notice. The discussion that follows assumes that any Incidental Right or IR Virtual Currency is properly treated for U.S. federal income tax purposes as property that may be held as a capital asset.

In general, it is expected that the Trust would receive Incidental Rights and IR Virtual Currency as a consequence of a "fork," an "airdrop" or a similar event related to its ownership of XRP. The Notice does not

65

RPLI_SEC 0394573

address the U.S. federal income tax treatment of a fork, airdrop or similar event. It is possible that the Trust's receipt of Incidental Rights or IR Virtual Currency in connection with a fork, airdrop or similar event would be a taxable event, giving rise to taxable income for the Shareholders. It is also not clear whether any portion of the tax basis of the XRP held in the Trust would be apportioned to any Incidental Right or IR Virtual Currency received by the Trust and, if so, how that apportionment would be done. Moreover, the Trust's receipt of Incidental Rights or IR Virtual Currency may give rise to other tax issues. The possibility that the Trust will receive Incidental Rights and/or IR Virtual Currency thus increases the uncertainties and risks with respect to the U.S. federal income tax consequences of an investment in Shares.

The Trust may distribute Incidental Rights or IR Virtual Currency, or cash from the sale of Incidental Rights or IR Virtual Currency, to the Shareholders. Alternatively, the Trust may form a liquidating trust to which it contributes Incidental Rights or IR Virtual Currency and distribute interests in the liquidating trust to the Shareholders. Any such distribution will not be a taxable event for a U.S. Holder (as defined below). A U.S. Holder's tax basis in the Incidental Rights or IR Virtual Currency distributed, whether directly or through the medium of a liquidating trust, will generally be the same as the U.S. Holder's basis in the distributed assets immediately prior to the distribution, and the U.S. Holder's tax basis in its pro rata share of the Trust's remaining assets will be reduced by the amount of such basis. As noted above, if a U.S. Holder holds Shares at the time the Trust acquires any Incidental Rights or IR Virtual Currency, it is not clear how the U.S. Holder's basis in its pro rata share of any Incidental Rights or IR Virtual Currency will be determined. Immediately after any such distribution, the U.S. Holder's holding period with respect to the distributed Incidental Rights or IR Virtual Currency will generally be the same as the U.S. Holder's holding period with respect to the distributed assets immediately prior to the distribution. A subsequent sale of the distributed Incidental Rights or IR Virtual Currency will generally be a taxable event for a U.S. Holder.

For simplicity of presentation, the remainder of this discussion assumes that the Trust will hold only XRP. However, the principles set forth in the discussion below apply to all of the assets that the Trust may hold at any time, including Incidental Rights and IR Virtual Currency, as well as XRP. Without limiting the generality of the foregoing, each beneficial owner of Shares generally will be treated for U.S. federal income tax purposes as owning an undivided interest in any Incidental Rights and/or IR Virtual Currency held in the Trust, and any transfers or sales of Incidental Rights and/or IR Virtual Currency by the Trust (other than distributions by the Trust as described in the preceding paragraph) will be taxable events to Shareholders with respect to which Shareholders will recognize gain or loss in a manner similar to the recognition of gain or loss on a taxable disposition of XRP, as described below.

**Tax Consequences to U.S. Holders**

As used herein, the term "U.S. Holder" means a beneficial owner of a Share for U.S. federal income tax purposes that is:

- an individual who is a citizen or resident of the United States for U.S. federal income tax purposes;

- a corporation, or other entity treated as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States or of any political subdivision thereof; or

- an estate or trust the income of which is subject to U.S. federal income taxation regardless of its source.

For U.S. federal income tax purposes, each U.S. Holder will be treated as owning an undivided interest in the XRP held in the Trust and will be treated as directly realizing its pro rata share of the Trust's income, gains, losses and deductions. When a U.S. Holder purchases Shares for cash, the U.S. Holder's initial tax basis in its pro rata share of the XRP held in the Trust will be equal to the amount paid for the Shares. **This discussion assumes that each U.S. Holder will acquire all of its Shares for cash on the same date and at the same price per Share. U.S. Holders that acquire, or contemplate acquiring, multiple lots of Shares at different times or prices are urged to consult their tax advisers regarding their tax bases and holding periods in their pro rata shares of the XRP held in the Trust**.

When the Trust transfers XRP to the Sponsor as payment of the Sponsor's Fee, or sells XRP to fund payment of any Additional Trust Expenses, each U.S. Holder will be treated as having sold its pro rata share of those units of XRP for their fair market value at that time (which, in the case of XRP sold by the Trust, generally will be equal to the cash proceeds received by the Trust in respect thereof). As a result, each U.S. Holder will recognize gain or loss

66

RPLI_SEC 0394574

in an amount equal to the difference between (i) the fair market value of the U.S. Holder's pro rata share of the XRP transferred and (ii) the U.S. Holder's tax basis for its pro rata share of the XRP transferred. Assuming that XRP is not treated as currency for U.S. federal income tax purposes, any such gain or loss will generally be short-term capital gain or loss if the U.S. Holder has held its Shares for one year or less and long-term capital gain or loss if the U.S. Holder has held its Shares for more than one year. The deductibility of capital losses may be subject to significant limitations. A U.S. Holder's tax basis in its pro rata share of any XRP transferred by the Trust generally will be determined by multiplying the tax basis of the U.S. Holder's pro rata share of all of the XRP held in the Trust immediately prior to the transfer by a fraction the numerator of which is the amount of XRP transferred and the denominator of which is the total amount of XRP held in the Trust immediately prior to the transfer. Immediately after the transfer, the U.S. Holder's tax basis in its pro rata share of the XRP remaining in the Trust will be equal to the tax basis of its pro rata share of the XRP held in the Trust immediately prior to the transfer, less the portion of that tax basis allocable to its pro rata share of the XRP transferred.

U.S. Holders may deduct their respective pro rata shares of the expenses incurred by the Trust to the same extent as if the expenses were directly incurred by the U.S. Holders. U.S. Holders' pro rata shares of the expenses incurred by the Trust will be treated as "miscellaneous itemized deductions" for U.S. federal income tax purposes. If a U.S. Holder is an individual, trust or estate, the U.S. Holder's share of these expenses will be deductible for regular U.S. federal income tax purposes only to the extent that the U.S. Holder's share of the expenses, when combined with other "miscellaneous itemized deductions," exceeds 2% of the U.S. Holder's adjusted gross income for the particular year, will not be deductible for U.S. federal alternative minimum tax purposes and will be subject to certain other limitations on deductibility.

On a sale or other disposition of Shares, a U.S. Holder will be treated as having sold the XRP underlying such Shares. Accordingly, the U.S. Holder generally will recognize gain or loss in an amount equal to the difference between (i) the amount realized on the sale of the Shares and (ii) the portion of the U.S. Holder's tax basis in its pro rata share of the XRP held in the Trust that is attributable to the Shares disposed of. Such tax basis generally will be determined by multiplying the tax basis of the U.S. Holder's pro rata share of all of the XRP held in the Trust immediately prior to such sale or other disposition by a fraction the numerator of which is the number of Shares disposed of and the denominator of which is the total number of Shares held by such U.S. Holder immediately prior to such sale or other disposition. Assuming that digital currency is not treated as currency for U.S. federal income tax purposes, that gain or loss will generally be short-term capital gain or loss if the U.S. Holder has held its Shares for one year or less and long-term capital gain or loss if the U.S. Holder has held its Shares for more than one year.

As explained above in "Description of the Trust," the Trust has not obtained authorization from the SEC to operate a redemption program. If such authorization is obtained and the Trust redeems all or portion of a U.S. Holder's Shares in exchange for the underlying XRP represented by the redeemed Shares, such redemption generally will not be a taxable event to the U.S. Holder. The U.S. Holder's tax basis in the XRP received in the redemption generally will be the same as the U.S. Holder's tax basis for the portion of its pro rata share of the XRP held in the Trust immediately prior to the redemption that is attributable to the Shares redeemed, determined as described above, and the U.S. Holder's tax basis in its remaining pro rata portion, if any, of the XRP held in the Trust after the redemption will be equal to the tax basis of its pro rata share of the total amount of the XRP held in the Trust immediately prior to the redemption, less the U.S. Holder's tax basis in the XRP received in the redemption. The U.S. Holder's holding period with respect to the XRP received will generally include the period during which the U.S. Holder held the Shares so redeemed. A subsequent sale of the XRP received in such redemption will generally be a taxable event.

After any sale, redemption or other disposition of fewer than all of a U.S. Holder's Shares, the U.S. Holder's tax basis in its pro rata share of the XRP held in the Trust immediately after the sale (or other disposition) generally will equal the tax basis in its pro rata share of the total amount of the XRP held in the Trust immediately prior to the disposition of Shares, less the portion of that tax basis that is taken into account in determining the amount of gain or loss recognized by the U.S. Holder on the disposition (or, in the case of a redemption, that is treated as the basis of the XRP received by the U.S. Holder in the redemption).

Any brokerage or other transaction fee incurred by a U.S. Holder in purchasing Shares will be added to the U.S. Holder's tax basis in the underlying assets of the Trust. Similarly, any brokerage fee or other transaction fee incurred by a U.S. Holder in selling Shares will reduce the amount realized by the U.S. Holder with respect to the sale.

CONFIDENTIAL

RPLI_SEC 0394575

**Tax Consequences to Non-U.S. Holders**

As used herein, the term "non-U.S. Holder" means a beneficial owner of a Share for U.S. federal income tax purposes that is:

- a nonresident alien individual;

- a foreign corporation; or

- a foreign estate or trust.

The term "non-U.S. Holder" does not include (i) nonresident alien individuals present in the United States for 183 days or more in a taxable year, (ii) former U.S. citizens and certain expatriated entities or (iii) persons whose income in respect of Shares is effectively connected with the conduct of a trade or business in the United States. Prospective investors described in the preceding sentence should consult their tax advisers regarding the U.S. federal income tax consequences of owning Shares.

A non-U.S. Holder generally will not be subject to U.S. federal income or withholding tax with respect to its share of any gain recognized on the Trust's transfer of XRP in payment of the Sponsor's Fee or any Additional Trust Expenses or on the Trust's sale of XRP. In addition, assuming that the Trust holds no asset other than XRP, a non-U.S. Holder generally will not be subject to U.S. federal income or withholding tax with respect to any gain it recognizes on a sale of Shares. A non-U.S. Holder also will generally not be subject to U.S. federal income or withholding tax with respect to any distribution received from the Trust, whether in cash or in kind. However, there is uncertainty with respect to the proper treatment of "forks," "airdrops" and similar events for U.S. federal income tax purposes, and it is possible that a non-U.S. Holder would be subject to U.S. federal income or withholding tax if such an event were treated as a taxable event for U.S. federal income tax purposes. Moreover, given the evolving nature of digital currency, it is conceivable that a non-U.S. Holder's pro rata share of income derived from an IR Virtual Currency that the Trust may hold in the future, and any gain or proceeds received by a non-U.S. Holder upon a sale of Shares to the extent attributable to such IR Virtual Currency, would be subject to U.S. federal income or withholding tax.

**U.S. Information Reporting and Backup Withholding**

The Trust or the appropriate broker will file certain information returns with the IRS and provide Shareholders with information regarding their annual income (if any) and expenses with respect to the Trust in accordance with applicable Treasury regulations.

A U.S. Holder may be subject to backup withholding in certain circumstances if it fails to provide its taxpayer identification number or to comply with certain certification procedures. In order to avoid the information reporting and backup withholding requirements, a non-U.S. Holder may have to comply with certification procedures to establish that it is not a U.S. person. The amount of any backup withholding will be allowed as a credit against the Shareholder's U.S. federal income tax liability and may entitle the holder to a refund, provided that the required information is furnished to the IRS.

CONFIDENTIAL

RPLI_SEC 0394576

## ERISA AND RELATED CONSIDERATIONS

**General**

The following section sets forth certain consequences under ERISA and the Code which a fiduciary of an "employee benefit plan" as defined in and subject to the fiduciary responsibility provisions of ERISA, or of a "plan" as defined in and subject to Section 4975 of the Code, who has investment discretion should consider before deciding to invest the plan's assets in the Trust (such "employee benefit plans" and "plans" being referred to herein as "Plans," and such fiduciaries with investment discretion being referred to herein as "Plan Fiduciaries"). The following summary is not intended to be complete, but only to address certain questions under ERISA and the Code that are likely to be raised by the Plan Fiduciary's own counsel.

\* \* \* \*

In general, the terms "employee benefit plan" as defined in ERISA and "plan" as defined in Section 4975 of the Code together refer to any plan or account of various types which provides retirement benefits or welfare benefits to an individual or to an employer's employees and their beneficiaries. Such plans and accounts include, but are not limited to, corporate pension and profit sharing plans, "simplified employee pension plans," Keogh plans for self-employed individuals (including partners), individual retirement accounts described in Section 408 of the Code and medical benefit plans.

Each Plan Fiduciary must give appropriate consideration to the facts and circumstances that are relevant to an investment in the Trust, including the role an investment in the Trust plays in the Plan's investment portfolio. Each Plan Fiduciary, before deciding to invest in the Trust, must be satisfied that investment in the Trust is a prudent investment for the Plan, that the investments of the Plan, including the investment in the Trust, are diversified so as to minimize the risks of large losses and that an investment in the Trust complies with the documents of the Plan and related trust and that an investment in the Trust does not give rise to a transaction prohibited by Section 406 of ERISA or Section 4975 of the Code.

EACH PLAN FIDUCIARY CONSIDERING ACQUIRING SHARES MUST CONSULT ITS OWN LEGAL AND TAX ADVISERS BEFORE DOING SO.

**Restrictions on Investments by Benefit Plan Investors**

ERISA and a regulation issued thereunder contain rules for determining when an investment by a Plan in an entity will result in the underlying assets of the entity being deemed assets of the Plan for purposes of ERISA and Section 4975 of the Code (i.e., "plan assets"). Those rules provide that assets of an entity will not be plan assets of a Plan that purchases an interest therein if the investment in the entity by all "benefit plan investors" is not "significant" or certain other exceptions apply. The term "benefit plan investors" includes all Plans (i.e., all "employee benefit plans" as defined in and subject to the fiduciary responsibility provisions of ERISA and all "plans" as defined in and subject to Section 4975 of the Code) and all entities that hold "plan assets" (each, a "Plan Assets Entity") due to investments made in such entities by already described benefit plan investors. ERISA provides that a Plan Assets Entity is considered to hold plan assets only to the extent of the percentage of the Plan Assets Entity's equity interests held by benefit plan investors. In addition, all or part of an investment made by an insurance company using assets from its general account may be treated as a benefit plan investor. Investments by benefit plan investors will be deemed not significant if benefit plan investors own, in the aggregate, less than 25% of the total value of each class of equity interests of the entity (determined by not including the investments of persons with discretionary authority or control over the assets of such entity, and any person who provides investment advice for a fee (direct or indirect) with respect to such assets, and "affiliates" (as defined in the regulations issued under ERISA) of such persons; provided, however, that under no circumstances are investments by benefit plan investors excluded from such calculation).

In order to avoid causing assets of the Trust to be "plan assets," the Sponsor intends to restrict the aggregate investment by "benefit plan investors" to under 25% of the total value of the Shares of the Trust (not including the investments of the Trustee, the Sponsor, the Distributor, any other person who provides investment advice for a fee (direct or indirect) with respect to the assets of the Trust, any other person who has discretionary authority or control over the assets of the Trust, and any entity (other than a benefit plan investor) that is directly or indirectly through one or more intermediaries controlling, controlled by or under common control with any of such entities (including a partnership or other entity for which the Sponsor is the general partner, managing member, investment adviser or

69

 RPLI_SEC 0394577

provides investment advice), and each of the principals, officers, and employees of any of the foregoing entities who has the power to exercise a controlling influence over the management or policies of such entity or the Trust). Furthermore, because the 25% test is ongoing, it not only restricts additional investments by benefit plan investors, but also can cause the Sponsor to require that existing benefit plan investors redeem from the Trust in the event that other investors redeem their Shares. If rejection of subscriptions or such compulsory redemptions are necessary, as determined by the Sponsor, to avoid causing the assets of the Trust to be "plan assets," the Sponsor will effect such rejections or redemptions in such manner as the Sponsor, in its sole discretion, determines.

**Ineligible Purchasers**

In general, Shares may not be purchased with the assets of a Plan if the Trustee, the Sponsor, the Distributor, any placement agent, any of their respective affiliates or any of their respective employees either: (i) has investment discretion with respect to the investment of such Plan assets; (ii) has authority or responsibility to give or regularly gives investment advice with respect to such Plan assets, for a fee, and pursuant to an agreement or understanding that such advice will serve as a primary basis for investment decisions with respect to such Plan assets and that such advice will be based on the particular investment needs of the Plan; or (iii) is an employer maintaining or contributing to such Plan. A party that is described in clause (i) or (ii) of the preceding sentence is a fiduciary under ERISA and the Code with respect to the Plan, and any such purchase might result in a "prohibited transaction" under ERISA and the Code.

Except as otherwise set forth, the foregoing statements regarding the consequences under ERISA and the Code of an investment in the Trust are based on the provisions of the Code and ERISA as currently in effect, and the existing administrative and judicial interpretations thereunder. No assurance can be given that administrative, judicial or legislative changes will not occur that may make the foregoing statements incorrect or incomplete.

ACCEPTANCE OF SUBSCRIPTIONS ON BEHALF OF PLANS IS IN NO RESPECT A REPRESENTATION BY THE SPONSOR OR ANY OTHER PARTY RELATED TO THE TRUST THAT THIS INVESTMENT MEETS THE RELEVANT LEGAL REQUIREMENTS WITH RESPECT TO INVESTMENTS BY ANY PARTICULAR PLAN OR THAT THIS INVESTMENT IS APPROPRIATE FOR ANY PARTICULAR PLAN. THE PERSON WITH INVESTMENT DISCRETION SHOULD CONSULT WITH HIS OR HER ATTORNEY AND FINANCIAL ADVISERS AS TO THE PROPRIETY OF AN INVESTMENT IN THE TRUST, IN LIGHT OF THE CIRCUMSTANCES OF THE PARTICULAR PLAN.

## PLAN OF DISTRIBUTION

### Initial Purchasers

On January [•], 2018, [•] and certain other individual investors (the "Initial Purchasers") contributed $[•] and [•] XRP to the Trust in exchange for [•] Shares pursuant to the terms or a purchase agreement entered into among the Trust, the Sponsor and such Initial Purchasers. The ratio of Shares to XRP purchased by the Initial Purchasers was [ten-to-one] at the effective time of creation of this initial Basket.

### Authorized Participants

In the future, the Trust intends to issue Shares in Baskets to Authorized Participants in exchange for the Total Basket XRP Amount. An Authorized Participant may submit a creation order for its own account or for the account of one or more of its customers. As part of any creation order, an Authorized Participant will be required to (i) identify each person who will beneficially own any Shares constituting part of a Creation Basket and (ii) to confirm to the Trust in writing that such Authorized Participant has (A) taken reasonable steps within the past three months to verify that each such person is an "accredited investor" within the meaning of Rule 501(a) of Regulation D under the Securities Act and (B) determined that such person is an accredited investor. Each such person will be required to make the usual and customary representations made in private placements undertaken pursuant to Rule 506 of Regulation D, including that: (x) such person has had an opportunity and a reasonable time prior the creation date to ask questions and receive answers concerning the terms and conditions of the offering of Shares and to obtain any additional information which the Sponsor possesses or can acquire without unreasonable effort or expense that is necessary to verify the accuracy of the information in this Memorandum; and (y) such person understands that the Shares are "restricted securities" that cannot be resold without registration under the Securities Act and state securities laws or exemption therefrom, and that such person is purchasing the securities for investment purposes only and not with a view to resale. Additionally, the submission of a creation order will be deemed to bring down the representations made by the relevant Authorized Participant in the relevant Participant Agreement that no general partner, managing member, director, executive officer or other officer of such Authorized Participant participating in the offering of the Shares has experienced any disqualifying event set forth in clauses (d)(1)(i) through (d)(1)(viii) of Rule 506 of Regulation D or any event that would be required to be disclosed pursuant to clause (e) of Rule 506 of Regulation D.

The Trust may also issue Shares in exchange for direct contributions of XRP to the Trust to Shareholders that have entered into purchase agreements with the Trust and the Sponsor, provided that the Trust shall only issue Shares in this manner to the extent that the Sponsor has determined in good faith that such issuance does not otherwise conflict with the terms of the Trust Agreement or with applicable law.

### Eligibility

Only investors who are "accredited investors" within the meaning of Rule 501(a) of Regulation D of the Securities Act are eligible to participate in the Trust.

CONFIDENTIAL

RPLI_SEC 0394579

## LEGAL AND ACCOUNTING MATTERS

Davis Polk & Wardwell LLP ("Davis Polk"), New York, New York served as legal counsel to the Sponsor in connection with the organization of the Trust and the initial preparation of this Memorandum. Davis Polk may continue to serve in such capacity in the future, but has not assumed any obligation to update this Memorandum. Davis Polk may also advise the Sponsor in matters relating to the operation of the Trust on an ongoing basis. Davis Polk does not represent and has not represented the prospective investors of the Trust in the course of the organization of the Trust, the negotiation of the Trust's business terms, the offering of the Shares or in respect of the Trust's ongoing operations. Prospective investors acknowledge that, as they have had no representation in the organization process, the terms of the Trust relating to themselves and the Shares have not been negotiated at arm's length.

Davis Polk's engagement by the Sponsor in respect of the Trust is limited to the specific matters as to which it is consulted by the Sponsor and, therefore, there may exist facts or circumstances that have a bearing on the Trust's (or the Sponsor's) financial condition or operations with respect to which Davis Polk has not been consulted and for which Davis Polk expressly disclaims any responsibility. More specifically, Davis Polk does not undertake to monitor the compliance of the Sponsor with the investment objectives, valuation procedures and other guidelines set forth herein, nor does it monitor compliance with applicable laws. In preparing this Memorandum, Davis Polk relied upon information furnished to it by the Trust and/or the Sponsor, and did not investigate or verify the accuracy and completeness of information set forth herein concerning the Sponsor, the Trust's service providers and their affiliates and personnel.

Richards, Layton & Finger, P.A., special Delaware counsel to the Trust, has advised the Trust in connection with the validity under Delaware law of the issuance of the Shares being offered hereby.

Friedman LLP, 100 Eagle Rock Avenue, East Hanover, New Jersey 07936, serves as the independent certified public accountants of the Trust.

CONFIDENTIAL

RPLI_SEC 0394580

## GLOSSARY OF DEFINED TERMS

Capitalized terms used in this Memorandum, but not defined below, herein have the meanings given to them in the Trust Agreement, a copy of which is attached hereto as Exhibit A. Each of the following terms has the meaning assigned to it below:

"Administrator" — means any Person from time to time engaged by the Sponsor to assist in the administration of the Shares.

"Actual Exchange Rate" — means, with respect to any particular asset, at any time, the price per single unit of such asset (determined net of any associated fees) at which the Trust is able to sell such asset for U.S. Dollars (or other applicable fiat currency) at such time to enable the Trust to timely pay any Additional Trust Expenses, through use of the Sponsor's commercially reasonable efforts to obtain the highest such price.

"Additional Trust Expenses" — Together, any expenses of the Trust that are not assumed by the Sponsor, including, but not limited to, taxes, expenses and costs of any extraordinary services performed by the Sponsor (or any other Service Provider) on behalf of the Trust, indemnification expenses of the Key Maintainer, any Backup Maintainer or other agents, service providers or counterparties of the Trust and extraordinary legal fees and expenses.

"Administrator" —Any Person from time to time engaged by the Sponsor to assist in the administration of the Shares.

"Authorized Participant" — Certain eligible financial institutions that have entered into an agreement with the Trust and the Sponsor concerning the creation (and, should the Trust commence a redemption program, redemption) of Shares. Each Authorized Participant (i) is a registered broker-dealer, (ii) has entered into a Participant Agreement with the Sponsor and (iii) own an Authorized Participant Self-Administered Account.

"Authorized Participant Self-Administered Account" — An XRP wallet address that is recognized by the Sponsor and the Key Maintainer as belonging to the Authorized Participant.

"Backup Contingency" — The Backup Maintainer's receipt of (i) a notice in writing from the Trust certifying the Trust's inability to reasonably effect transactions involving the XRP Account or (ii) a court order that states that the Trust is unable to reasonably effect transactions involving the XRP Account and identifies a Restore Party, which court order the Backup Maintainer believes, in good faith and after confirming with legal counsel, is valid.

"Backup Factor" — A Security Factor of the XRP Account held by a Backup Maintainer that, alone, is insufficient to effect transfers from the XRP Account but together with other Security Factors in existence and not held by the Backup Maintainer will allow transfers from the Account.

"Backup Maintainer" — Persons who are engaged by the Sponsor to assist in the maintenance of the Trust's XRP.

"Backup Security Factor Agreements" — The backup security factor agreements entered into between the Trust and each Backup Maintainer providing for the security of the Trust's XRP through a multi-factor security system.

"Basket" — A block of 100 Shares.

"Basket XRP Amount" — On any trade date, the number of XRP required as of such trade date for each Creation Basket or Redemption Basket, as determined by dividing (x) the number of XRP owned by the Trust at 4:00 p.m., New York time, on such trade date, after deducting the number of XRP representing the U.S. Dollar value of accrued but unpaid fees and expenses of the Trust (converted using the XRP Index Price at such time, and carried to the eighth decimal place), by (y) the number of Shares outstanding at such time (with the quotient so obtained calculated to one one-hundred-millionth of one XRP (i.e., carried to the eighth decimal place)), and multiplying such quotient by 100.

"CEA" — Commodity Exchange Act of 1936, as amended.

RPLI_SEC 0394581

"CFTC" — The U.S. Commodity Futures Trading Commission, an independent agency with the mandate to regulate commodity futures and option markets in the United States.

"Code" — The U.S. Internal Revenue Code of 1986, as amended.

"Covered Person" — As defined in the section "Description of the Trust Documents—Description of the Trust Agreement —Fiduciary and Regulatory Duties of the Sponsor."

"Creation Basket" — Basket of Shares issued by the Trust in exchange for the transfer of the Total Basket XRP Amount required for each such Creation Basket.

"Data Services Agreement" — The license agreement entered into by the Index Provider and the Sponsor governing the Sponsor's use of the XRP Index Price.

"Distributor" – ▮▮▮▮▮ who is engaged by the Sponsor to assist in the distribution of the Shares.

"Distribution and Marketing Agreement" — The agreement among the Sponsor, Distributor and Marketer which sets forth the obligations and responsibilities of the Distributor and Marketer.

"DSTA" — The Delaware Statutory Trust Act, as amended.

"ERISA" — Employee Retirement Income Security Act of 1974, as amended.

"Evaluation Time" — Each business day at 4:00 p.m., New York time, or as soon thereafter as practicable.

"Exchange Act" — The Securities Exchange Act of 1934, as amended.

"FDIC" — The Federal Deposit Insurance Corporation.

"FinCEN" — The Financial Crimes Enforcement Network, a bureau of the U.S. Department of the Treasury.

"FINRA" — The Financial Industry Regulatory Authority, Inc., which is the primary regulator in the United States for broker-dealers, including Authorized Participants.

"GAAP" — The U.S. generally accepted accounting principles.

"ICO" — Initial coin offering.

"Incidental Rights" — Rights to acquire, or otherwise establish dominion and control over, any virtual currency or other asset or right, which rights are incident to the Trust's ownership of XRP and arise without any action of the Trust, or of the Sponsor or Trustee on behalf of the Trust.

"Initial Purchasers" ▮▮▮▮▮▮▮▮ and certain other institutional and individual investors, the purchasers of the initial Baskets.

"Investment Advisers Act" — Investment Advisers Act of 1940, as amended.

"Investment Company Act" — Investment Company Act of 1940, as amended.

"Investor" — Any investor that has entered into a Subscription Agreement with an Authorized Participant, pursuant to which such Authorized Participant will act as agent for the investor.

"IR Virtual Currency" — Any virtual currency tokens, or other asset or right, acquired by the Trust through the exercise (subject to the applicable provisions of the Trust Agreement) of any Incidental Right.

"IRS" — The U.S. Internal Revenue Service, a bureau of the U.S. Department of the Treasury.

74

CONFIDENTIAL

RPLI_SEC 0394582

"Key Maintainer" —  who is engaged by the Sponsor to assist in the maintenance of the Trust's XRP.

"Key Maintenance Agreement" — The key maintenance agreement entered into by the Trust and the Key Maintainer providing for the security of the Trust's XRP through a multi-factor security system.

"Marketer" — ▮▮ or any other person from time to time engaged to provide marketing services or related services to the Trust pursuant to authority delegated by the Sponsor.

"Marketing Fee" — Fee payable to the Marketer for services it provides to the Trust, which the Sponsor will pay to the Marketer as a Sponsor-paid Expense.

"Memorandum" — This Confidential Private Placement Memorandum, as the same may at any time and from time to time be amended or supplemented.

"Mt. Gox" — Mt. Gox K.K., a Japan-based Bitcoin exchange.

"NAV" — The net asset value of the Trust determined on a GAAP basis.

"NYDFS" — The New York State Department of Financial Services.

"NYDTF" — The New York State Department of Taxation and Finance.

"Participant Agreement" — An agreement entered into by an Authorized Participant with the Sponsor that provides the procedures for the creation and, if permitted, redemption of Baskets and for the delivery of XRP required for Creation Baskets and the distribution of XRP from the Trust for Redemption Baskets.

"Protected Coins" — XRP held in the XRP Account.

"Redemption Basket" — Baskets of Shares redeemed in exchange for XRP in an amount equal to the Basket XRP Amount required for each such Redemption Basket.

"Index Provider" — ▮▮ a Delaware corporation that publishes the Index.

"Restore Party" — The person or party that the Trust or a court with jurisdiction, as applicable, has chosen to receive the Backup Factors after a Backup Contingency.

"Ripple Network" — The online, end-user-to-end-user network hosting a public transaction ledger, known as a Blockchain, and the source code comprising the basis for the cryptographic and algorithmic protocols governing the Ripple Network. See "Overview of the XRP Industry and Market."

"Ripple Blockchain" — The global transaction ledger of the Ripple Network.

"SEC" — The U.S. Securities and Exchange Commission.

"Securities Act" — The Securities Act of 1933, as amended.

"Securities Exchange Act" — The Securities Exchange Act of 1934, as amended.

"Security Factor" — A password, key or phrase that, together with other Security Factors, allows transfers of XRP.

"Service Providers" — Collectively, ▮▮ Continental Stock Transfer Corporation, ▮▮ Ledger SAS and ▮▮

"Shareholder" — Any person that owns Shares.

"Shares" — Common units of fractional undivided beneficial interest in the ownership of the Trust.

"SIPC" — The Securities Investor Protection Corporation.

75

"Sponsor" — 

"Sponsor-paid Expenses"— The fees and expenses incurred by the Trust in the ordinary course of its affairs, excluding taxes, that the Sponsor is obligated to assume and pay, including the Marketing Fee, fees for the Key Maintainer, any Backup Maintainer and any other security vendor engaged by the Trust, the Transfer Agent Fee, the Trustee fee, fees and expenses related to trading on any Secondary Market (including legal, marketing and audit fees and expenses), legal, accounting and audit fees, regulatory fees, printing and mailing costs and applicable license fees with respect to the Trust.

"Sponsor's Fee" — A fee, payable in XRP, which accrues daily in U.S. Dollars at an annual rate of 2.5% of the XRP Holdings of the Trust, calculated at the XRP Index Price as of 4:00 p.m., New York time, on each day, provided that for a day that is not a business day, the calculation shall be based on the XRP Index Price from the most recent business day.

"Subscription Agreement" — An agreement between an Investor and an Authorized Participant pursuant to which the Investor can subscribe for Shares.

"Total Basket XRP Amount" — With respect to any creation or redemption order, the applicable Basket XRP Amount multiplied by the number of Baskets being created or redeemed.

"Transfer Agency and Service Agreement" — The agreement between the Sponsor and the Transfer Agent which sets forth the obligations and responsibilities of the Transfer Agent with respect to transfer agency services and related matters.

"Transfer Agent" — Continental Stock Transfer & Trust Company, a Delaware corporation.

"Transfer Agent Fee" — Fee payable to the Transfer Agent for services it provides to the Trust, which the Sponsor will pay to the Transfer Agent as a Sponsor-paid Expense.

"Trust" — The Ripple Investment Trust, a Delaware statutory trust, formed on [October 23, 2017] under the DSTA and the pursuant to the Trust Agreement.

"Trust Agreement" — The Declaration of Trust and Trust Agreement between the Trustee and the Sponsor establishing and governing the operations of the Trust, as the same may be amended from time to time.

"Trustee" — Delaware Trust Company, a Delaware trust company, is the Delaware trustee of the Trust.

"U.S." — United States.

"U.S. Dollar" or "$" — United States Dollar or Dollars.

"XRP" — Ripple tokens, which is a type of digital asset based on the cryptographic protocol established by Ripple and existing on the Ripple Network, comprising units that constitute the assets underlying the Trust's Shares. See "Overview of the XRP Industry and Market."

"XRP Account" — An account holding the Trust's XRP which, in the discretion of the Sponsor, could be an on-blockchain hot or cold wallet or a collection of accounts or subaccounts maintained by one or more security vendors engaged by the Trust that represent or relate to on-blockchain XRP accounts that hold the Trust's XRP.

"XRP Benchmark Exchange" — A XRP Exchange that represents at least 10% of the aggregate trading volume of the XRP during the last 30 consecutive calendar days and that to the knowledge of the Sponsor is in substantial compliance with the laws, rules and regulations, including any anti-money laundering and know-your-customer procedures, of such XRP Exchange's applicable jurisdiction. If there are fewer than three individual XRP Benchmark Exchanges each of which represent at least 10% of the aggregate trading volume on the XRP Exchange Market during the last 30 consecutive calendar days, then the XRP Benchmark Exchanges that will serve as the basis for the XRP Index Price calculation will be those XRP Benchmark Exchanges that meet the above-described requirements, as well as one or more additional XRP Exchanges, as selected by the Sponsor, that has had a monthly trading volume of at least 250,000 XRP during the last 30 consecutive calendar days.

CONFIDENTIAL

RPLI_SEC 0394584

"XRP Exchange" — An electronic marketplace where exchange participants may trade, buy and sell XRP based on bid-ask trading. The largest XRP Exchanges are online and typically trade on a 24-hour basis, publishing transaction price and volume data.

"XRP Exchange Market" — The global market for the trading of XRP, which consists of transactions on electronic XRP Exchanges.

"XRP Holdings" —The aggregate value, expressed in U.S. Dollars, of the Trust's XRP, calculated using the XRP Index Price, less the U.S. Dollar value of its liabilities and expenses. See "Description of the Trust Documents—Description of the Trust Agreement—Valuation of XRP and Definition of XRP Holdings" for a description of how the Trust's XRP Holdings and XRP Holdings per Share are calculated.

"XRP Index Price" — The U.S. Dollar value of a XRP derived from the XRP Exchanges selected by the Index Provider, calculated at 4:00 p.m., New York time, on each business day. See "Overview of the XRP Industry and Market— XRP Value—The Index and the XRP Index Price" for a description of how the XRP Index Price is calculated.

CONFIDENTIAL

RPLI_SEC 0394585

**EXHIBIT A**

**TRUST AGREEMENT**

EXHIBIT A

CONFIDENTIAL

RPLI_SEC 0394586