# PX 764



February 19, 2014

**PRIVILEGED AND CONFIDENTIAL**

| | |
|---|---|
| TO: | Ripple Labs Inc. |
| FROM: | J. Dax Hansen<br>Carla Reyes |
| RE: | **Regulatory Analysis of Third Party Ripple Currency Balances in the Ripple Network** |

## I.     INTRODUCTION

Ripple Labs Inc. ("**Company**"), has developed a decentralized, open, global, peer-to-peer, math-based currency payment network ("**Ripple Network**") and a new math-based currency ("**Ripple Currency**" or "**XRP**").  The Ripple Network also supports and encourages transactions in currencies other than Ripple Currency ("**Third Party Ripple Currencies**").  You asked us to review the use of Third Party Ripple Currencies on the Ripple Network, to analyze the applicable laws and regulations, and to provide recommendations for mitigating relevant legal risks faced by members of the Ripple Network ecosystem.  We look forward to discussing this analysis with you after you have had a chance to review this memorandum.

## II.     DESCRIPTION OF THIRD PARTY RIPPLE CURRENCIES AND THEIR USE IN THE RIPPLE NETWORK

The Ripple Network is an open transaction network that serves as a decentralized, shared record of accounts and transactions.  In other words, the Ripple Network is a system that tracks obligations between peers that are denominated in any currency, whether fiat currency (legal tender)[1] or virtual currency, and supports cross-currency transactions.  Users, natural persons or entities (such as Ripple Gateways[2]) that use the Ripple Network ("**Users**"), access and interact with the Ripple Network using client software that uses the Ripple protocol, which is the "language" of the Ripple Network that enables Ripple Users to record transactions on the Ripple

---

[1] "**Fiat currency**" and "**legal tender**" are terms used to refer to the currency the government designates as a valid offer of payment for debts when tendered to a creditor, such that the creditor cannot refuse it based on the type of currency.  The federal law that makes the U.S. Dollar legal tender in the United States is 31 U.S.C. § 5103, which states "United States coins and currency (including Federal reserve notes and circulating notes of Federal reserve banks and national banks) are legal tender for all debts, public charges, taxes, and dues."

[2] A "**Ripple Gateway**" is a third-party service (and a Ripple Network User) that issues Balances (defined below) on the Ripple Network, that stores a list of contacts on the Ripple Network and a public-private key pair that it uses to identify itself to the Ripple Network and to cryptographically authorize changes to the wallet or information in the Ripple Network with a third-party virtual currency exchange service or on his or her own local browser

                                   RPLI_SEC 0995490

Network ("**RTXP**").[3]  A Ripple Network User must designate a "wallet," either directly, or through a Ripple Gateway.  The private key in a User's wallet is used to authorize transactions involving XRP or Third Party Ripple Currencies that are associated with that User in the ledger.

All Third Party Ripple Currencies are represented in the Ripple Network through a designation of balances ("**Balances**") even though the funds are not actually stored in the Ripple Network.  Put simply, all transactions involving Third Party Ripple Currencies follow these basic rules:

- Before issuing a Third Party Ripple Currency Balance, a User must set a trust limit for another User account in the Ripple Network;

- Before creating a Third Party Ripple Currency Balance, Users must agree on settlement[4] terms outside of the Ripple Network;

- Users can issue Third Party Ripple Currency Balances to other Users;

- Users can hold other Third Party Ripple Currency Balances issued by or to other Users;

- Subsequent holders of the Third Party Ripple Currency Balances take them subject to their original terms;

- A User can pay any other User in Third Party Ripple Currency Balances that User will accept; and

- Under technical requirements imposed by the Ripple Protocol, a User must accept as payment any Third Party Ripple Currency Balance he or she issued.

In practical terms, these rules apply to create transactions in the Ripple Network that, generally speaking, involve four types: (1) transactions involving XRP, (2) transactions involving Third Party Ripple Currencies, (3) transactions involving trust limits, and (4) cross-currency transactions.  We understand each type of transaction to function as described below.  If any of these descriptions are incorrect, please let us know so that we may update our analysis accordingly.

## A.    Transactions in XRP

Ripple Currency is the Ripple Network's proprietary, math-based currency, with a finite amount of 100 billion units in circulation.  Some XRP has been distributed by Company free to Users.  Company's affiliate, XRP Fund II LLC, also has made some wholesale sales of XRP to virtual currency exchanges and Ripple Gateways.  Ripple Currency can also be purchased from a third-

---

[3] A useful analogy is the "HTTP" protocol that is now used to enable Users of various operating systems, computer makes and models, and networks to commonly communicate with one another on the Internet.

[4] Typically, these terms will be defined by the agreement entered into between consumers and Ripple Gateways, here both Users of the Ripple Network.

LEGAL29208625.7

CONFIDENTIAL

RPLI_SEC 0995491

party virtual currency exchange, for the price set by the exchange, or within the network through the distributed currency exchange, for the price set by market makers. XRP operates in the Ripple Network in the same way that cash works in the traditional economy. Transactions are final. Ripple Currency is recorded in the Ripple Network's ledger, and units of Ripple Currency are associated with the Users that own them using the private keys that are recorded in the Users' wallets. Only transactions using XRP are settled in the Ripple Network. This is done by using the private key stored in the payer's wallet to communicate and record an adjustment to the ledger entries in the Ripple Network corresponding to the payer and payee.

## B.      Transactions in Third Party Ripple Currencies

Where transactions take place using Third Party Ripple Currencies rather than XRP, the ledger records the transaction through a system of Balances, but no Third Party Ripple Currencies are actually stored in the Ripple Network. One method through which Users might record an initial ledger entry for a Third Party Ripple Currency is by presenting that currency to a Ripple Gateway. Essentially, the Ripple Gateway issues a Balance to the User for the amount of Third Party Ripple Currency tendered to it, and that Balance is represented in the Ripple Network as the User's Third Party Ripple Currency Balance. Such issuance of Third Party Ripple Currencies to the User occurs subject to the terms and conditions of the Ripple Gateway.

For example, if Bob presents $100 to a Ripple Gateway, the Ripple Gateway would issue a Balance to Bob such that Bob's Ripple Network account would reflect a Balance of $100. Bob can then use that $100 Balance to conduct transactions with other Users or with other Ripple Gateways who consent to do so. In other words, Balances are transferable across Users and, in certain circumstances, across Ripple Gateways.

Notably, transactions conducted in Balances are confirmed and cleared in the Ripple Network. Balances are not settled within the Ripple Network, rather Ripple Users settle them outside of the Ripple Network. There is no required out-of-network settlement procedure. Typically, however, out-of-network settlements are accomplished using Ripple Gateways. Once the out-of-network settlement occurs, the holder of the Balance sends back the issuer's Balance in the Ripple Network to extinguish the Balance on the ledger. Under the Ripple Protocol, issuers are required to accept Balances that they originally issued. The function of the Ripple Network with regard to transactions using Third Party Ripple Currencies is simply to keep track of Ripple Pathways (described below) and the Balances that are issued within each Ripple Pathway.

## C.      Trust Limits

The Ripple Network is fundamentally a peer-to-peer network. As part of this peer-to-peer system, the Ripple Network enables Users to offer "**Trust Limits**" to other Users as a prerequisite to allowing them to issue Third Party Ripple Currency Balances and transfer them to one another through chained promises to pay. For example, Bob and Sam are friends and Bob is willing to let Sam owe him up to $150. Bob sets a trust limit for Sam of $150. Meanwhile, Sam trusts his cousin Jane to owe him up to $100, and so Sam sets a Trust Limit for Jane of $100.

LEGAL29208625.7

 RPLI_SEC 0995492

Bob meets Jane for the first time when they go out to dinner. Jane doesn't have cash on hand to cover her whole bill, so Bob covers the cost of dinner and Jane sends Bob a Balance through the Ripple Network. Jane can do this because the Trust Limit Bob extended to Sam is chained to the Trust Limit Sam extended to Jane in the Ripple Network.[5]

This type of chained Trust Limits is referred to as a **"Ripple Pathway**." Ripple Pathways not only enable transactions between people who do not necessarily know each other, such as Jane and Bob, but are also the mechanism through which the Ripple Network supports transactions in Third Party Ripple Currencies (as discussed above) and supports cross-currency transactions.

## D.     Cross-Currency Transactions

Furthermore, Ripple Network Users can record transactions in their preferred currency without taking the additional step of a foreign exchange transaction. This is possible because Ripple Pathways enable the Ripple Network to chain Users' Third Party Ripple Currency Balances and XRP holdings such that a User can, for example, begin a payment in XRP and another User can receive the payment in USD.[6]

## III.     SUMMARY OF CONCLUSIONS AND RECOMMENDATIONS

### A.     Conclusions

1.     **Ripple Gateways are Likely Money Transmitters Under Federal Law When Issuing Third Party Ripple Currency Balances Denominated in Something Other Than Legal Tender.** Third Party Ripple Currency Balances are likely to be designated convertible virtual currency when the Balance is itself denominated in convertible virtual currency. To the extent that the Ripple Gateway issues the Third Party Ripple Currency Balance and then permits the holder of the Balance to transfer it across Users and accounts, the Ripple Gateway is likely conducting money transmission as an administrator as contemplated by the FinCEN (defined below) Virtual Currency Guidance.[7] Further, if a Ripple Gateway allows a User to create a Balance by depositing legal tender or virtual currency, the Ripple Gateway is likely to be regulated for activity associated with being an exchanger, as that term is used in the Virtual Currency Guidance.

---

[5] It is worth noting that Trust Limits are essentially a way in which Users of the Ripple Network assume counterparty risk. Here, counterparty risk is a term that refers to a User's risk of default against balance redemptions. When a User extends a Trust Limit to another User, he is assuming the counterparty risk associated with the trusted party up to the amount of the Trust Limit.

[6] Although a detailed description of this process is beyond the scope of this memorandum, it is worth noting that this functionality is possible because the Ripple Network offers Users an internal distributed exchange. Ripple maintains an automatic currency exchange that enables peer-to-peer foreign exchange and cross-currency payments. In other words, transactions originating in one currency can route through foreign exchange offers to resolve cross-currency payments.

[7] FinCEN, *Guidance: Application of FinCEN's Regulations to Persons Administering, Exchanging, or using Virtual Currencies*, FIN-2013-G001, at 1 (Mar. 18, 2013) [hereinafter **"Virtual Currency Guidance"**].

LEGAL29208625.7

CONFIDENTIAL

RPLI_SEC 0995493

2.    **Ripple Gateways Will Likely be Providers of Prepaid Access Under Federal Law When Issuing Third Party Ripple Currency Balances Denominated in Legal Tender.**  Third Party Ripple Currency Balances denominated in legal tender likely will be designated prepaid access.  With the exception of a single issue regarding whether an account login and password constitute an electronic device or vehicle under the prepaid access rule, there is a strong argument that Third Party Ripple Currency Balances denominated in legal tender are prepaid access.  Further, because a Ripple Gateway issues, redeems and otherwise exercises oversight and control over the Third Party Ripple Currency Balances that it issues, to the extent such Balances are categorized as prepaid access, the Ripple Gateway will likely be designated a provider of prepaid access.

3.    **Ripple Gateways Will Likely be Sellers of Prepaid Access Under Federal Law When Issuing Third Party Ripple Currency Balances Denominated in Legal Tender, Unless Certain Limits Apply to the Program.**  A Ripple Gateway will also likely be considered a seller of prepaid access to the extent that it issues Third Party Ripple Currency Balances denominated in legal tender that can be used without first conducting customer identity verification or if the Ripple Gateway issues Balances equivalent to $10,000 or more to a single person in a single day.

4.    **Ripple Market Makers are Likely Not Dealers in Foreign Exchange When Trading in Balances.**  Any trade with virtual currency on one or both sides of the transaction, or trades of Balances of one fiat currency for Balances of another fiat currency will likely not be considered a foreign exchange transaction.

5.    **Ripple Market Makers Will Likely be Sellers of Prepaid Access when Trading Third Party Ripple Currency Balances Denominated in Legal Tender, Unless Certain Limits Apply to the Program.**  A market maker that trades Balances in fiat currency held by the market maker with a User in return for virtual currency, or Balances of a different fiat currency, will likely be considered a seller of prepaid access if such trades exceed $10,000 in a given day.

6.    **Ripple Market Makers May be Money Transmitters Under Federal Law Depending on the Types and Volumes of Trading Undertaken by the Market Maker.**  Sellers of prepaid access are exempt from regulation as money transmitters because they are separately regulated.  However, market makers that trade in virtual currency pairs may be considered money transmitters under the "exchanger" paradigm discussed in the Virtual Currency Guidance.[8]

7.    **Users of the Ripple Network May be Money Transmitters Under Federal Law When Using the "Convert" or "Open Order Book" Tools to Sell Virtual**

---

[8] *Id.*

LEGAL29208625.7

CONFIDENTIAL

RPLI_SEC 0995494

**Currency for Other Virtual Currency.**  Users will likely not be considered money transmitters when legal tender Balances are involved on at least one side of the transaction.  However, when Users sell virtual currency for other virtual currency (whether virtual currency balances or XRP), they may be considered money transmitters under federal law.  The risk for categorization as a money transmitter is higher when Users undertake virtual currency pair transactions using the "convert" or "open order book" functions of the Ripple Client Software because the distributed exchange function of the Ripple Network prevents Users from ensuring that the transaction occurs with only a single counterparty and a single wallet (location).

8.     **Balances are Not Article 3 Instruments Under the Uniform Commercial Code.**  Balances are not written, and they are not negotiable, as that term is defined in the UCC (defined below).  As a result, Balances do not meet the definition of instrument under the UCC, which requires both a writing and that the writing be negotiable.

9.     **Under the Present Facts as Described, Third Party Ripple Currency Balances Issued by Ripple Gateways Are Likely Not "Securities" Within the Meaning of the Federal Securities Laws When Used to Conduct Transactions on the Ripple Network.**  While there is no certainty regarding how courts and/or securities regulators would view Third Party Ripple Currency Balances, we believe that, based on the facts and circumstances surrounding their current issuance and usage, it is more likely that Third Party Ripple Currency Balances would not be deemed securities under the federal securities laws because (a) they could be viewed as equivalent to a formal statement of an open-account debt incurred in the ordinary course of business, and (b) even if their features do not warrant such a classification, it is probable that Third Party Ripple Currency Balances would be deemed not to be securities because they do not appear to be designed to generate profits (as that concept is applied under securities laws), are arguably not distributed to the general public (as that phrase is defined under securities laws), do not seem to be marketed as investment products and do not appear to subject their Users to substantial risk of loss.

10.    **Ripple Gateways Will Likely Not be Regulated by the Commodity Futures Trading Commission.**  Balances are unlikely to be categorized as commodities because: (1) the issuance of a Balance does not represent an agreement for delivery in the future, and (2) a Balance does represent the actual transfer of legal ownership in an underlying legal or virtual currency and is simply not a transfer of potential benefit or economic risk.  The risk of regulation would increase dramatically if an active futures and options on futures market in Balances emerges in the industry.

LEGAL29208625.7

CONFIDENTIAL                                                          RPLI_SEC 0995495

11. **Ripple Gateways Will Likely be Regulated Under State Money Transmission Laws.** Ripple Gateways are likely to be regulated by states under one or more of the three most common categories of state money transmission entities - money transmitter, issuer of payment instruments and issuer of stored value. Depending on the statute of the particular state, a Ripple Gateway will likely be regulated under one or more of those three categories.

12. **It is Uncertain Whether the Electronic Fund Transfer Act Applies to Ripple Gateways, and Additional Regulatory Guidance or Rulemaking May be Necessary in Order to Clarify.** Therefore, Ripple Gateways should closely monitor ongoing developments with respect to the application of the EFTA (defined below) and Regulation E, or Regulation E-type protections, to virtual currencies, and consider whether and how they could implement the requirements of the EFTA and Regulation E if necessary.

B. **Recommendations**

1. **Ripple Gateways Should Register as a Money Transmitter and as a Provider and/or Seller of Prepaid Access under Federal Law, Depending on Their Service Offerings.** Each Ripple Gateway should undertake a thorough analysis of their unique service offerings under the Bank Secrecy Act (**"BSA"**)[9] and its implementing regulations. However, there is a high likelihood that most Ripple Gateways will be regulated as money transmitters if they accept deposits of legal tender and/or virtual currency in exchange for the issuance of a Balance. There is also a high likelihood that if they issue Third Party Ripple Currency Balances denominated in legal tender that they will be regulated as providers and/or sellers of prepaid access under federal law.

2. **Ripple Gateways Should Only Issue Balances in States Where They Can Act as Licensed Money Transmitters or are Exempt.** Many states will govern the issuance of Balances as money transmission either under provisions regulating money transmission, the issuance of payment instruments or the issuance of stored value. As a result, each Ripple Gateway should undertake a careful analysis of the services they offer in connection with the Ripple Network and determine which states regulate those activities on which grounds, and whether the Ripple Gateway can operate under a license or an exemption.

3. **Keep Counsel Informed as to Possible Futures Market and Options on Futures Market for Balances.** If a Ripple Gateway develops a futures market or an options on futures market for trading Balances, that Ripple Gateway should keep its counsel informed of such developments and carefully evaluate associated risk under the Commodity Exchange Act.

---

[9] 31 U.S.C. § 5311 *et seq*; *see also* the BSA implementing regulations at 31 C.F.R. Chapter X (**"BSA Regulations"**).

LEGAL29208625.7

CONFIDENTIAL

RPLI_SEC 0995496

# IV.   LEGAL ANALYSIS

**A.   Federal Money Services Business Laws**

    **1.   Money Transmitter**

        **a.   Whether Third Party Ripple Currency Balances are a Convertible Virtual Currency**

The Financial Crimes Enforcement Network, a bureau of the U.S. Department of the Treasury that exercises regulatory functions under the BSA ("**FinCEN**"), defines "virtual currency," in contrast to "real currency," as "a medium of exchange that operates like a currency in some environments, but does not have all the attributes of real currency;"[10] specifically, virtual currency lacks the status of legal tender in any jurisdiction.[11]  The Virtual Currency Guidance is limited to "convertible" virtual currency, which means a virtual currency that either has "an equivalent value in real currency, or acts as a substitute for real currency."[12]  The Virtual Currency Guidance then splits convertible virtual currencies into three categories: (1) e-currencies and e-precious metals,[13] (2) centralized virtual currencies,[14] and (3) decentralized virtual currencies.[15]  A centralized virtual currency is a "convertible virtual currency that has a centralized repository.[16]  Although FinCEN indicates that it expects the centralized repository to have an administrator, it does not define "centralized repository."  It is unclear whether FinCEN intends this category to include virtual currencies involving a centralized ledger, those involving a single issuer, or both.  A decentralized virtual currency is a "convertible virtual currency (1) that has no central repository and no single administrator, and (2) that persons may obtain by their own computing or manufacturing effort."[17]

Third Party Ripple Currency Balances denominated in virtual currency may themselves be considered convertible virtual currency.  Namely, Third Party Ripple Currency Balances denominated in virtual currency (a) are a medium of exchange that operates like a currency in the Ripple Network, (b) lack the status of legal tender in any jurisdiction, and (c) have an equivalent value in real currency at any given time.  However, unlike the decentralized virtual currency in which a Third Party Ripple Currency Balance might be denominated, the Balance itself has a

---

[10] Virtual Currency Guidance, *supra* note 7, at 1.

[11] *Id.*

[12] *Id.*  Notably, the BSA regulations define money transmission services to include "other value that substitutes for currency" - the same language FinCEN uses in the Virtual Currency Guidance to describe "convertible."  FinCEN explained as early as July 21, 2011 that "other value that substitutes for currency" was intended "to state that businesses that accept stored value or currency equivalents as a funding source and transmit that value are providing money transmission services."  76 Fed. Reg. 43592 (July 21, 2011).

[13] The Virtual Currency Guidance seems to assume that this category does not require further definition, as none is provided.

[14] Virtual Currency Guidance, *supra* note 7, at 4.

[15] *Id.* at 5.

[16] *Id.*

[17] *Id.*

CONFIDENTIAL　　　　　　　　　　　　　　　　　　　　　　　RPLI_SEC 0995497

single issuer and is redeemable by that issuer - namely, the Ripple Gateway.  As a result, Third Party Ripple Currency Balances denominated in virtual currency might be described as having an administrator, and depending on how the administrator internally tracks the Balances it has issued, Third Party Ripple Currency Balances issued from the same Ripple Gateway might also be described as having a centralized repository.  In any event, every Third Party Ripple Currency Balance is tracked on a decentralized ledger and Ripple Gateways issue Balances through their own computing effort.  As such, Third Party Ripple Currency Balances denominated in virtual currencies are likely convertible virtual currencies of either the centralized or decentralized variety.[18]

> **b.    Whether any Entity Acts as an Administrator or Exchanger of Third Party Ripple Currency Balances**

Under the BSA, a "money transmitter" is a person (i) who accepts "currency, funds, or other value that substitutes for currency from one person" and transmits "currency, funds, or other value that substitutes for currency to another location or person by any means" or (ii) is "engaged in the transfer of funds."[19]  Therefore, whether a payments system involved fiat currency or virtual currency, an entity in that system will only be regulated as a money transmitter to the extent that its activities fall within the definition of money transmission.

According to the Virtual Currency Guidance, certain entities are more likely to engage in regulated activity than others.  In particular, an administrator - namely, "a person engaged as a business in issuing (putting into circulation) a virtual currency, and who has the authority to redeem (to withdraw from circulation) such virtual currency"[20] - is a "money transmitter to the extent that it allows transfers of value between persons or from one location to another."[21]  Similarly, FinCEN suggests that an exchanger - namely, "a person engaged as a business in the exchange of virtual currency for real currency, funds, or other virtual currency"[22] - acts as a money transmitter when it accepts real currency in exchange for virtual currency and when it resells or anonymizes the sale of virtual currency.[23]  In other words, the mere act of selling or exchanging convertible virtual currency for real currency constitutes money transmission.  FinCEN claims that this activity is money transmission because even though the money is transferred to the same person, it involves currency being transferred from one location to another (*e.g.*, the person's real bank account to the person's virtual currency account).[24]

---

[18] Notably, Third Party Ripple Currency Balances can be issued in legal tender as well.  Such Balances are analyzed in Part IV.A.2 below.  Essentially, Third Party Ripple Currency Balances denominated in legal tender might be considered prepaid access.  The analysis will turn on whether FinCEN finds that Third Party Ripple Currency can be accessed through an electronic vehicle or device, such as an account login and password.
[19] 31 C.F.R. § 1010.100(ff)(5).
[20] Virtual Currency Guidance, *supra* note 7, at 2
[21] *Id.* at 4.
[22] *Id*. at 2.
[23] *Id*.
[24] *Id*.

LEGAL29208625.7

Each Ripple Gateway has the power to issue (put into circulation) and to redeem (withdraw from circulation) its own Balances for Third Party Ripple Currencies. The Ripple Gateway might therefore be considered the administrator of the Third Party Ripple Currency Balances it issues in virtual currency. Unless the Ripple Gateways put restrictions on the Balances they issue such that they cannot be transferred across Users or accounts (assuming such restrictions are possible or otherwise desirable), then Ripple Gateways that issue Balances will likely be considered money transmitters under the Virtual Currency Guidance.

### c. Whether Any Exemptions Apply

The regulations exclude six categories of persons from the definition of a money transmitter - namely, those who only:

i. "Provide[] the delivery, communication or network access services used by a money transmitter to support money transmission services;"

ii. "Act[] as a payment processor to facilitate the purchase of, or payment of a bill for, a good or service through a clearance settlement system by agreement with the creditor or seller;"

iii. "Operate[] a clearance and settlement system or otherwise act[] as an intermediary solely between BSA regulated institutions;"

iv. "Physically transport[] currency, other monetary instruments, other commercial paper, or other value that substitutes for currency," under certain circumstances;

v. "Provide[] prepaid access;" and

vi. "Accept[] and transmit[] funds integral to the sale of goods or the provision of services, other than money transmission services by the person who is accepting and transmitting the funds."[25]

The Virtual Currency Guidance specifically states that the fifth and sixth exemptions - for providers of prepaid access and for transmission "integral to the sale of goods and services" - are not applicable in the context of convertible virtual currency.[26] The other four exemptions are very narrow, and would not likely apply to the operation of a Ripple Gateway. As a result, no exemption applies and a Ripple Gateway is likely a money transmitter in relation to the issuance of Third Party Ripple Currency Balances.

---

[25] 31 C.F.R. § 1010.100(ff)(5)(ii)(A).
[26] Virtual Currency Guidance, *supra* note 7, at 4-5. FinCEN clearly ruled out the prepaid access exemption when it categorically announced that only real currency can be prepaid access. *Id.* at 5.

LEGAL29208625.7

CONFIDENTIAL

RPLI_SEC 0995499

## 2.    Prepaid Access

"Prepaid access" is defined as "access to funds or the value of funds that have been paid in advance and can be retrieved or transferred at some point in the future through an electronic device or vehicle, such as a card, code, electronic serial number, mobile identification number, or personal identification number." However, the term "funds or the value of funds" is not defined in the BSA Regulations. This leaves FinCEN a large measure of discretionary regulatory power in determining what constitutes prepaid access. FinCEN exercised that discretionary regulatory power in the Virtual Currency Guidance by interpreting "funds or the value of funds" as involving only "real" currency (*i.e.* legal tender). Although virtual currency denominated Balances are clearly not prepaid access, a full evaluation of legal tender denominated Balances remains necessary.

### a.    Whether Third Party Ripple Currency Balances Denominated in Legal Tender are Prepaid Access

Third Party Ripple Currency Balances denominated in legal tender will likely be considered prepaid access. A Ripple Gateway User often obtains a Third Party Ripple Currency Balance for legal tender by first depositing legal tender in his or her Ripple Gateway account and then "withdrawing" that legal tender to his or her Ripple Network account. As a result, a Third Party Ripple Currency Balance might be viewed as "access to funds or the value of funds that have been paid in advance." Similarly, the holder of the Third Party Ripple Currency Balance issued by the Ripple Gateway can transfer the Balance to other Ripple Network Users, and the ultimate holder of the Balance can present it to the Ripple Gateway that issued it for redemption. As such, the funds represented in the Balance "can be retrieved or transferred at some point in the future." Finally, all of this might be accomplished "through an electronic device or vehicle, such as a card, code, electronic serial number, mobile identification number, or personal identification number." Specifically, the Third Party Ripple Currency Balance is accessed, transferred and redeemed through account login credentials. The account login credentials might be considered an electronic vehicle or device. If so, FinCEN will likely categorize Third Party Ripple Currency Balances denominated in legal tender as prepaid access.

### b.    Whether a Ripple Gateway is a Provider of Prepaid Access

Even where a product is categorized as prepaid access, only the entities deemed to be a provider or seller of that prepaid access are subject to the requirements of the BSA. The provider of prepaid access is "the participant within a prepaid program that agrees to serve as the principal conduit for access to information from its fellow program participants." Acknowledging that some prepaid access programs will not have a participant volunteer to act as the provider, FinCEN has indicated that in the absence of registration, the provider will be "the person with principal oversight and control over the prepaid program." The determination of the person who exercises "principal oversight and control over the prepaid program is a matter of facts and circumstances." In making its determination FinCEN will consider which entity: (i) organized the program; (ii) "set[s] the terms and conditions of the prepaid program and determin[es] that

LEGAL29208625.7

CONFIDENTIAL

RPLI_SEC 0995500

the terms have not been exceeded;" (iii) "determin[es] the other businesses that will participate in the prepaid program, which may include the issuing bank, the payment processor, or the distributor;" (iv) "control[s] or direct[s] the appropriate party to initiate, freeze or terminate prepaid access;" and (v) "engage[es] in activity that demonstrates oversight and control of the prepaid program."[27]

If Third Party Ripple Currency Balances denominated in legal tender are categorized as prepaid access, then the Ripple Gateway is likely the provider of the legal tender Balances it issues. First, the Ripple Gateway organizes its own Balance program. Second, the Ripple Gateway sets the terms and conditions regarding to whom and in what amount it will issue Third Party Ripple Currency Balances, and the Ripple Gateway can determine when a User has exceeded those terms and terminate Users from the service. Third, the Ripple Gateway determines whether and which other businesses will participate in its Third Party Ripple Currency Balance program. Fourth, the Ripple Gateway can initiate an Balance or suspend a User's access to Balances. Fifth, the Ripple Gateway otherwise acts as though it exercises oversight and control over the Third Party Ripple Currency Balances it issues, including, but not limited to, redeeming the Balances and extinguishing outstanding Balances in the Ripple Network ledger once they have been redeemed or settled. As a result, if legal tender Third Party Currency Balances are considered prepaid access, the Ripple Gateways that issue them would be regulated as a provider of prepaid access.

### c.    Whether a Ripple Gateway is a Seller of Prepaid Access

A Ripple Gateway might also be regulated by the BSA if it can be categorized as a seller of prepaid access. Sellers of prepaid access include "any person that receives funds or the value of funds in exchange for an initial loading or subsequent loading of prepaid access if that person" (a) "sells prepaid access offered under a prepaid program that can be used before verification of customer identification" or (b) "sells prepaid access (including closed loop prepaid access) to funds that exceed $10,000 to any person during any one day, and has not implemented policies and procedures reasonably adapted to prevent such a sale."[28] The definition of a seller focuses on receiving "funds or the value of funds in exchange for an initial loading or subsequent loading." This language was a change from the definition in the proposed rule that categorized a seller of prepaid access as a person that receives funds or the value of funds "in exchange for providing prepaid access…directly to the person that provided the funds or value, or to a third party as directed by that person."[29]

Assuming that when a Ripple Gateway issues Third Party Ripple Currency Balances denominated in legal tender, it can also be thought of as having loaded an initial value of funds for prepaid access, a Ripple Gateway will only be regulated as a seller of prepaid access if one of two things is true. First, if the Ripple Gateway does not complete customer identification and verification procedures sufficient to satisfy the BSA Regulations prior to selling a Balance, it

---

[27] 31 C.F.R. §1010.100(ff)(4).
[28] 31 C.F.R. § 1010.100(ff)(7).
[29] 76 Fed. Reg. 45411 (July 29, 2011).

-12-

CONFIDENTIAL                                                     RPLI_SEC 0995501

will be regulated as a seller.  This might be the case, for example, if, as an agent or authorized delegate of one Ripple Gateway, another Ripple Gateway sells a Balance to a User in sole reliance on the principal Ripple Gateway's customer identification and verification procedures. Under such circumstances the Ripple Gateway acting as an agent or an authorized delegate would not conduct its own customer verification procedures and would be considered a seller of Balances issued by the principal Ripple Gateway - the provider.  Second, if the Ripple Gateway issues legal tender Third Party Ripple Currency Balances valuing $10,000 or more to a single person in a single day, it will be regulated as a seller of prepaid access.  In light of the above conclusions that Ripple Gateways will likely be regulated as money transmitters and as prepaid access providers, further regulation as a seller of prepaid access may not substantially alter the Ripple Gateway's federal regulatory obligations.

### 3. Application of Federal Money Services Business Laws to Market Makers

In addition to Ripple Gateways, market makers also participate in the Ripple Network ecosystem.  Market makers are entities and/or individuals that provide liquidity to the Ripple Network by engaging in a high volume of trading activity:

- Market makers may trade in any Third Party Ripple Currencies in the Ripple Network, including, but not limited to BTC, XRP and fiat currencies;

- Because fiat currencies only enter the Ripple Network in the form of Balances (formerly referred to by Company as "IOUs"), when market makers trade in anything other than XRP, they are trading in Balances;

- Market makers trade in Balances issued by Ripple Gateways; and

- Market makers may not have the ability to perform Know Your Customer (**"KYC"**) screening on each User they trade with, but when a market maker trades in a Balance issued by a Ripple Gateway, the User on the other end of the trade should legally have undergone the KYC screening of the Ripple Gateway that issued the Balance.

In light of the above, market maker trading generally involves three possible scenarios: (1) trading virtual currency (XRP) for a Balance of either a different virtual currency or a fiat currency, (2) trading a Balance of virtual currency for a Balance of fiat currency, and (3) trading a Balance of fiat currency for a Balance of a different fiat currency.  Balances denominated in a virtual currency are likely themselves to be thought of as virtual currency, while Balances denominated in fiat currency are likely to be categorized as prepaid access.  Therefore, for the purposes of analysis under the BSA, the three types of market maker trades can be re-categorized as follows: (1) trades of virtual currency for other virtual currency, (2) trades of virtual currency for Balances of fiat currency, and (3) trades of Balances of one fiat currency for Balances of another fiat currency.

LEGAL29208625.7

### a. Whether a Ripple Market Maker is a Dealer in Foreign Exchange

The regulations implementing the BSA define "dealer in foreign exchange" as "[a] person that accepts the currency, or other monetary instruments, funds, or other instruments denominated in the currency of one or more countries in exchange for the currency, or other monetary instruments denominated in the currency, of one or more countries in an amount greater than $1,000 for any other person on any day in one or more transactions, whether or not for same-day delivery."[30]  Monetary instruments are defined to include: "(i) Currency; (ii) Traveler's checks in any form; (iii) All negotiable instruments (including personal checks, businesses checks, official bank checks, cashier's checks, third-party checks, promissory notes (as that term is defined in the Uniform Commercial Code), and money orders) that are either in bearer form, endorsed without restriction, made out to a fictitious payee (for the purposes of 1010.340), or otherwise in such form that title thereto passes upon delivery; (iv) Incomplete instruments (including personal checks, business checks, official bank checks, cashier's checks, third-party checks, promissory notes (as that term is defined in the Uniform Commercial Code), and money orders) signed but with the payee's name omitted; and (v) Securities or stock in bearer form or otherwise in such form that title thereto passes upon delivery."[31]  Although the term "other instrument" is not defined in the regulations, at least one provision indicates that the term does not include prepaid access.[32]

Under these definitions, market makers are not dealers in foreign exchange.  First, any trade with virtual currency on at least one side of the transaction will not be considered a foreign exchange transaction.[33]  Second, because the definitions above suggest that prepaid access is neither a "monetary instrument" or "other instrument" as defined in the BSA Regulations, trades of Balances of one fiat currency for Balances of another fiat currency will not cause market makers to be categorized as dealers in foreign exchange.

### b. Whether a Ripple Market Maker is a Seller of Prepaid Access

The BSA Regulations define a seller of prepaid access to include: "Any person that receives funds or the value of funds in exchange for an initial loading or subsequent loading of prepaid access if that person: Sells prepaid access offered under a prepaid program that can be used before verification of customer identification under 1022.210(d)(1)(iv); or Sells prepaid access (including closed loop prepaid access) to funds that exceed $10,000 to any person during one day, and has not implemented policies and procedures reasonably adapted to prevent such a

---

[30] 31 C.F.R. § 1010.100(ff)(1)

[31] 31 C.F.R. § 1010.100(dd)(1)

[32] See 31 C.F.R. § 1010.100(ff)(2)(ii)(A) (stating that a check casher does not include a person that sells prepaid access for a monetary instrument or other instrument, implying that prepaid access and "other instrument" are two different categories).

[33] Virtual Currency Guidance, *supra* note 7, at 5-6 (Mar. 18, 2013) (stating that "[a] person must exchange the currency of two or more countries to be considered a dealer in foreign exchange.  Virtual currency does not meet the criteria to be considered "currency" under the BSA because it is not legal tender.  Therefore, a person who accepts real currency in exchange for virtual currency, or vice versa, is not a dealer in foreign exchange under FinCEN's regulations.").

-14-

CONFIDENTIAL                                                                                          RPLI_SEC 0995503

sale."[34]  Under these definitions, a market maker may be considered a seller of prepaid access when conducting the following trades: Balances in fiat currency held by the market maker exchanged with a User in return for virtual currency, and Balances in fiat currency held by the market maker exchanged with a User for Balances of a different fiat currency.  Because market makers will only trade with Users who have Balances issued by Ripple Gateways, and because Users will have to return to Ripple Gateways to "draw" the fiat currency out of the Ripple Network, market makers will likely not be considered sellers of prepaid access under the first definition as long as Ripple Gateways are complying with their KYC obligations - the Users they trade with should have undergone KYC screening through the Ripple Gateway (the provider of prepaid access) before trading with the market maker.  However, if a market maker conducts any combination of these two types of trades with any given User in an amount greater than $10,000 in a single day, the market maker may be considered a seller of prepaid access.

### c.    Whether a Ripple Market Maker is a Money Transmitter

A money transmitter is defined by the BSA Regulations to include any person that provides money transmissions services, where money transmission services involves "the acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds or other value that substitutes for currency to another location or person by any means" or "any other person engaged in the transfer of funds."[35]  Sellers of prepaid access are exempt from regulation as a money transmitter because they are separately regulated.  Therefore, any trades of Balances in fiat currency for a User's virtual currency or of Balances in one fiat currency for a User's Balances in another fiat currency will not cause market makers to be treated as money transmitters under the BSA.  However, market makers that trade in virtual currency pairs may be considered money transmitters under the "exchanger" paradigm discussed in the Virtual Currency Guidance.  The sale of one virtual currency in exchange for payment in another virtual currency may qualify as the receipt of "other value that substitutes for currency from one person and the transmission of … other value that substitutes for currency to another location."[36]  Thus, the sale of virtual currency for either real currency or its equivalent may constitute money transmission.

The result of the above analysis is that, depending on the types and volume of trading undertaken by a market maker, the market maker may be considered either a seller of prepaid access or a money transmitter.  Under such circumstances, the market maker would be required to comply with the requirements the BSA Regulations impose upon sellers of prepaid access and money transmitters: the establishment of a written Anti-Money Laundering Program and other requirements.

---

[34] 31 C.F.R. § 1010.100(ff)(7).
[35] 31 C.F.R. § 1010.100(ff)(5).
[36] Virtual Currency Guidance, *supra* note 7, at 4-5.

LEGAL29208625.7

CONFIDENTIAL

RPLI_SEC 0995504

4.      **Application of Federal Money Services Business Laws to Users**

In addition to Ripple Gateways and market makers, Users also participate in the Ripple Network ecosystem.  Users undertake a variety of activity in the Ripple Network, however, for the purposes of analysis under the Federal money services business laws, the most pertinent activity Users undertake include: (1) trading virtual currency (XRP) for a Balance of either a different virtual currency or a fiat currency, (2) trading a Balance of virtual currency for a Balance of fiat currency, and (3) trading a Balance of fiat currency for a Balance of a different fiat currency.  As discussed above, Balances denominated in a virtual currency are likely themselves to be thought of as virtual currency, while Balances denominated in fiat currency are likely to be categorized as prepaid access.  Therefore, for the purposes of analysis under the BSA, the three pertinent types of User trades can be re-categorized as follows: (1) trades of virtual currency for other virtual currency, (2) trades of virtual currency for Balances of fiat currency, and (3) trades of Balances of one fiat currency for Balances of another fiat currency.  Notably, for the purposes of this analysis, Users may undertake any of these three types of transactions in several different ways: (1) using the "convert" function on the Ripple Client Software, (2) placing an order on the open order book in the Ripple Client Software, and (3) negotiating a direct trade with a specific user outside of the Ripple Network and completing the transaction in the Ripple Network through direct transfers solely between the two counterparties.

a.      **Whether Users' Trading Activity Qualifies Them as Dealers in Foreign Exchange**

As explained in detail above in Section IV.A.3.a, the regulations implementing the BSA define "dealer in foreign exchange" very specifically as, in sum, a person that accepts certain specific categories of monetary instruments in exchange for other specific categories of monetary instruments as a service to others above specified volumes.  The monetary instruments governed by these definitions do not include virtual currency or prepaid access.  Therefore, similarly to the analysis of market makers above, under these definitions, Users are not dealers in foreign exchange, even when undertaking trading activity.  First, any trade with virtual currency on at least one side of the transaction will not be considered a foreign exchange transaction.   Second, because the definitions above suggest that prepaid access is neither a "monetary instrument" or "other instrument," trades of Balances of one fiat currency for Balances of another fiat currency will not cause Users to be categorized as dealers in foreign exchange.

b.      **Whether Users' Trading Activity Gives Rise to Obligations as Sellers of Prepaid Access**

As explained in detail above, the BSA Regulations define a seller of prepaid access to include: "Any person that receives funds or the value of funds in exchange for an initial loading or subsequent loading of prepaid access if that person: Sells prepaid access offered under a prepaid program that can be used before verification of customer identification under 1022.210(d)(1)(iv); or Sells prepaid access (including closed loop prepaid access) to funds that exceed $10,000 to any person during one day, and has not implemented policies and procedures reasonably adapted

LEGAL29208625.7

CONFIDENTIAL

RPLI_SEC 0995505

to prevent such a sale."[37]  Under these definitions, as with market makers, Users who conduct trades with Balances of fiat currency on the sale side of the transaction will likely not be considered sellers of prepaid access under the first definition so long as they trade only in Balances previously issued by a Gateway.  However, Users that conduct trades involving fiat currency Balances with any other single User in an amount greater than $10,000 in a single day, may be subject to the regulatory obligations of sellers of prepaid access.

### c.  Whether Users' Trading Activity Qualifies Them as Money Transmitters

A money transmitter is defined by the BSA Regulations to include any person that provides money transmissions services, where money transmission services involves "the acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds or other value that substitutes for currency to another location or person by any means" or "any other person engaged in the transfer of funds."  Sellers of prepaid access are exempt from regulation as a money transmitter because they are separately regulated.  Therefore, any trades of Balances in fiat currency for a User's virtual currency or of Balances in one fiat currency for a User's Balances in another fiat currency will not trigger the BSA money transmission regulations.  However, Users that trade in virtual currency pairs may be considered money transmitters under the "exchanger" paradigm discussed in the Virtual Currency Guidance. This is especially true when the User undertakes the transaction through the "convert" or open order book functions of the Ripple Client Software.  The "convert" and open order book functions of the Ripple Client Software rely on the distributed exchange function of the Ripple Network to complete transactions, such that the initiating User is unable to limit the counterparty to a single User or single wallet.  As a result, the transaction is much more likely to fall under the federal definition of money transmission involving receipt of funds from one person and the transmission of funds to another person (or multiple people) or another location (or multiple locations).  Thus, the sale of virtual currency for either real currency or its equivalent may constitute money transmission.

This analysis is congruent with recent FinCEN administrative letter rulings, which first instruct that any person or entity that "buys or sells convertible virtual currency in exchange for currency of legal tender or another convertible virtual currency for any reason (including when intermediating between a user and a seller of goods or services the user is purchasing on the user's behalf) is a money transmitter under FinCEN's regulations, unless a limitation to or exemption from the definition applies to the person."[38]  The letter rulings go on to explain, however, that when a user of virtual currency undertakes such activity "for its own account" and

---

[37] 31 C.F.R. § 1010.100(ff)(7).

[38] FinCEN, *Administrative Ruling: Application of FinCEN's Regulations to Virtual Currency Mining Operations*, FIN-2014-R001, at 2 (Jan. 30, 2014), *available at* http://www.fincen.gov/news_room/rp/rulings/pdf/FIN-2014-R001.pdf [hereinafter "Mining Ruling"]; FinCEN, *Administrative Ruling: Application of FinCEN's Regulations to Virtual Currency Software Development and Certain Investment Activity*, FIN-2014-R002, at 3 (Jan. 30, 2014), *available at* http://www.fincen.gov/news_room/rp/rulings/pdf/FIN-2014-R002.pdf [hereinafter "Software and Investment Ruling"].

-17-

CONFIDENTIAL

not as a "business of exchanging convertible virtual currency for currency of legal tender for other persons," the person likely falls outside the definition of money transmission, notwithstanding the fact that the transaction involves the receipt of legal tender and the transmission of value that substitutes for legal tender.[39]  For example, a user who "converts" virtual currency into another virtual currency or legal tender for the purposes of "diversify[ing] currency holdings in anticipation of future needs or for the user's own investment purposes," is undertaking the conversion "solely for the user's own purposes and not as a business service performed for the benefit of another."[40]  FinCEN instructs that under such limited circumstances, a user of virtual currency is likely not a money transmitter.  In other words, FinCEN is making clear that Users who convert virtual currency in a way not captured by the definition of money transmission will not be transformed into a money services business merely by engaging in virtual currency transactions, while users that do engage in activity covered by the definition will.

The result of the above analysis, especially in light of FinCEN's letter rulings, is that Users may be money transmitters when they trade in virtual currency pairs using the "convert" or open order book functionality of the Ripple Client Software because Users cannot control the number of counterparties or recipient wallets involved in the transaction.  Such transactions likely fall within the definition of money transmission, whereas the other trading activity Users might undertake (such as trades with legal tender Balances on one side of the equation and specifically negotiated exchanges of virtual currency pairs) will likely not fall within the definition of money transmission under federal law.

## B.    Uniform Commercial Code Article 3

It is unlikely that Third Party Ripple Currency Balances will be treated as an "instrument" under Article 3 of the Uniform Commercial Code (the "**UCC**"), whether the Balance is denominated in virtual currency or legal tender.  To be an "instrument" under the UCC, an item must be a negotiable instrument.  An instrument is either an order (such as a check) or a promise (such as a promissory note).[41]  "Order" means "a written instruction to pay money signed by the person giving the instruction."[42]  "Promise" means "a written instruction to pay money signed by the person giving the instruction."[43]  Furthermore, "[a]n acknowledgement of an obligation by the obligor is not a promise unless the obligor also undertakes to pay the obligation,"[44] and the Official Comments state that this sentence "is intended to make it clear that an I.O.U. . . . is not a note unless there is also an undertaking to pay the obligation."[45]

---

[39] Mining Ruling, *supra* note 38, at 3; Software and Investment Ruling, *supra* note 38, at 4.
[40] Mining Ruling, *supra* note 38, at 3.
[41] UCC § 3-104(e).
[42] UCC § 3-103(a)(8).
[43] UCC § 3-103(a)(12).
[44] *Id.*
[45] Official Comment 3 to UCC § 3-103.

LEGAL29208625.7

CONFIDENTIAL

RPLI_SEC 0995507

Notably, the definition of both an order and a promise require a writing. A "'[w]riting' includes printing, typewriting, or any other intentional reduction to a tangible form. 'Written' has a corresponding meaning."[46] The UCC itself evidences a specific intent not to include electronically stored information in the definition of "writing" and "written." Specifically, the UCC includes a separate term, "record," which relates to information whether in a tangible medium or stored in an electronic medium.[47]

In light of these provisions, Third Party Ripple Currency Balances are likely not an instrument under Article 3 of the UCC. A Balance is not a writing as that term is defined by the UCC. Furthermore, the issuer of a Balance has no obligation to settle with the holder of a Balance absent a separate settlement agreement between the issuer and the holder. As such, the Balances are both non-negotiable and not written, likely preventing them from being categorized as instruments under the UCC.

## C.    Securities Laws

The federal securities laws define the term "security" very broadly to cover virtually all types of commercial financial instruments.[48] What is covered by this definition can be vague in certain contexts, and thus the U.S. Supreme Court has developed a number of tests to determine whether a particular instrument is a security. Depending on the circumstances of their issuance and the expectations of the parties, Third Party Ripple Currency Balances issued by Ripple Gateways could potentially be construed either as "notes" or "investment contracts," and thus securities, under the federal securities laws. As a result, we evaluate Third Party Ripple Currency Balances under the tests applied to both notes and investment contracts below.

### 1.    Evaluation of Third Party Ripple Currency Balances under securities laws if considered notes.

Third Party Ripple Currency Balances could be construed as notes regardless of whether they constitute an instrument under the UCC, because the securities laws both consider a broader definition of the term "note" and consider things that are similar to a note. Accordingly, an evaluation of whether Third Party Ripple Currency Balances are securities involves application of the "family resemblance test" developed by the Supreme Court in *Reves v. Ernst & Young.*[49] It is important to keep in mind that while the test is firmly rooted in the law, determining whether a note is a security under *Reves* is a very fact-specific task which can yield ambiguous and inexact results.

---

[46] UCC § 1-201(b)(40).

[47] UCC § 3-103(a)(14).

[48] Section 2(a)(1) of the Securities Act of 1933 (the **"Securities Act"**) and Section 3(a)(10) of the Securities Exchange Act of 1934 (the **"Exchange Act"**) generally define the term "security," among other things, as any note, stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, transferable share, investment contract, certificate of deposit, or, in general, any interest or instrument "commonly known as a security." The Securities Act includes short-term instruments with maturities of less than nine months in its definition of "security," while the Exchange Act excludes such short-term instruments.

[49] 494 U.S. 56 (1990).

CONFIDENTIAL                                                                                           RPLI_SEC 0995508

The family resemblance test adopted by the Supreme Court in *Reves* presents a two-prong framework for analyzing whether a note is a security.  The test begins with a rebuttable presumption that every note with a maturity of longer than nine months is a security and then looks to see whether the note in question is one of the types of notes identified by the Supreme Court as not securities.  Notes that "are not properly viewed as securities" include: (i)  a note delivered in consumer financing; (ii) a note secured by a home mortgage; (iii) a note secured by a lien on a small business or some of its assets; (iv) a note evidencing a "character" loan to a bank customer; (v) a short-term note secured by an assignment of accounts receivable; (vi) a note evidencing a loan made by a commercial bank to a business to fund its  current operations; and (vii) a note which simply formalizes an open-account debt incurred in the ordinary course of business.

If the note in question is one of the instruments described above, then it "[is] not properly viewed as a security" per *Reves*.  If a note, however, fails to appear in the list set forth above, *Reves* establishes a framework to perform additional analysis to consider whether the note at issue is a security.  In the second prong of the *Reves* family resemblance test, the presumption that a note is a security can be rebutted "by a showing that the note bears a strong resemblance…to one of the enumerated categories" of notes that are not securities.  Whether this strong resemblance exists is measured by applying the following four factors, none of which on its own is dispositive.

- Motivation of the Parties - If the purpose of the issuer of the note "is to raise money for the general use of a business enterprise or to finance substantial investments" and the buyer of the note "is interested primarily in the profit the note is expected to generate, the instrument is likely to be a security." But "if the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose, on the other hand, the note is less sensibly described as a security."

- The Plan of Distribution - Is the issuer of the note broadly distributing similar notes to the public for "common trading for speculation or investment?"  If so, the note will look more like a security.  If the note is not sold to the general public, but only to a segment thereof, it will look less like a security.  One the other hand, if the note is not sold to the general public, but is distributed for speculative or investment purposes, it is more likely to be considered a security.

- Reasonable Expectations of the Public - Is the note advertised or otherwise presented to the public as an instrument intended to create profit, including in the form of interest?  If the note is marketed as income-generating or sold in any way that would lead a reasonable investor to believe that purchasing the note will lead to profits, the note will look more like a security.  In fact, as the Supreme Court explained in *Reves*, notes will be considered to be securities "on the basis of such public expectations, even where an economic analysis of the circumstances of the particular transaction might suggest that the instruments are not 'securities' as used in that transaction."

LEGAL29208625.7

CONFIDENTIAL

- Other Factors, Including Existence of a Regulatory Scheme - Is there any other "factor such as the existence of another regulatory scheme [that] significantly reduces the risk of the instrument" to investors? If the note in question is, for example, subject to regulation by the Employee Retirement Security Act of 1974 or insured by the Federal Deposit Insurance Corporation, under *Reves* application of the federal securities laws to the note is less necessary.

Based on the facts available at this time, we believe there is a persuasive argument that Third Party Ripple Currency Balances are not securities under the *Reves* family resemblance test. First, it is possible that Third Party Ripple Currency Balances could fall within a category of notes that the Supreme Court has excluded from the definition of securities. To the extent Third Party Ripple Currency Balances can be characterized as notes that function merely to formalize an open-account debt incurred in the ordinary course of business, Third Party Ripple Currency Balances would not be deemed to be not securities within the meaning of the federal securities laws.

Second, even if Third Party Ripple Currency Balances cannot be said to fall squarely within a category of notes that have been deemed not to be securities, application of the four *Reves* factors points, on balance, to their not being considered securities. Given the current facts, it seems that Users who obtain Third Party Ripple Currency Balances from Ripple Gateways do so in order to enable them to conduct transactions with other Users on the Ripple Network. It does not appear that Users seek out Third Party Ripple Currency Balances as a means of investing in some future profit, but rather as a means of facilitating the purchase of goods and/or services through the Ripple Network. Thus, the motivation of the parties to Third Party Ripple Currency Balances points towards the instruments being deemed not to be securities. That Ripple Gateways do not seem to have any broad scheme of distributing Third Party Ripple Currency Balances for the purpose of "common trading *for speculation or investment*," but instead appear to issue them so that Users can, along with Ripple Gateways themselves, transact through the Ripple Network, also suggests that Third Party Ripple Currency Balances should not be deemed to be securities under *Reves*.[50] Similarly, based on the facts at this point, it does not appear as though the public would expect to earn future returns from Third Party Ripple Currency Balances, which presents a better argument that Third Party Ripple Currency Balances would not be deemed to be securities under *Reves*. As long as there is no indication that Ripple Gateways have led Users to believe that they will profit by obtaining Third Party Ripple Currency Balances, Users should most reasonably equate Third Party Ripple Currency Balances with basic account balance statements and not with investment vehicles from which income is likely to be

---

[50] The "common trading" component of the second *Reves* factor is probably met with respect to Third Party Ripple Currency balances. There is no indication that Users must satisfy any measure of financial education when acquiring Third Party Ripple Currency balances, and the courts have found a broad plan of sale and distribution to exist when notes are sold to individuals, as opposed to sophisticated institutions. *See, e.g., Stoiber v. Securities and Exchange Commission,* 161 F.3d 745 (D.C. Cir. 1998). Moreover, that Third Party Ripple Currency balances, and the virtual currencies to which they relate, are generally fungible and thus saleable points to their being commonly traded. *See, e.g., Fletcher Int'l, Ltd. v. ION Geophysical Corp.,* C.A. No. 5109 (Del. Ch. May 23, 2012) (suggesting that the marketability of a note could lead to its being deemed a security).

LEGAL29208625.7

RPLI_SEC 0995510

earned. With respect to the last factor of the *Reves* test, in so far as Third Party Ripple Currency Balances are covered by current or future regulations under, for example, the BSA, or current or future oversight by, for example, FinCEN, it is more likely that the family resemblance test would weigh in favor of a finding that Third Party Ripple Currency Balances would not be deemed to be securities. Also, that Ripple Gateways are required to accept back Third Party Ripple Currency Balances that they have issued to Users illustrates that Users are sufficiently protected against the risk of loss such that there is no need for formal regulation of Third Party Ripple Currency Balances under *Reves*.[51]

Again, we believe that the application of the *Reves* family resemblance test to the facts currently surrounding the issuance and usage of Third Party Ripple Currency Balances would favor, on balance, a finding that Third Party Ripple Currency Balances should not be deemed to be securities. However, we note that if the current facts change, the analysis under *Reves* could change drastically. The family resemblance test is a very fact-specific analysis and whether a note is a security under *Reves* is not always clear. Especially in cases of innovative instruments such as Third Party Ripple Currency Balances, in applying *Reves* courts will look to the legislative history of the federal securities laws which indicates that, as the Supreme Court articulated in its *Reves* decision, in defining the term "security," Congress recognized and intended to capture "the virtually limitless scope of human ingenuity, especially in the creation of 'countless and variable schemes devised…on the promise of profits'."

> ### 2. Evaluation of Third Party Ripple Currency Balances under securities laws if considered investment contracts.

If Ripple Gateways and/or Ripple Users undertake to purchase Third Party Ripple Currency Balances for investment purposes, there may be a possibility that the SEC would find Third Party Ripple Currency Balances a potential security under the "investment contract" theory. The investment contract analysis depends heavily on the expectation of the parties, and therefore the more that Third Party Ripple Currency Balances are promoted as an investment opportunity, the more likely it is that the SEC will take action and argue that they should be considered "investment contracts" and thus securities under the federal securities laws. To the extent that Third Party Ripple Currency Balances are purchased with an expectation of profit because of the efforts of Company, Ripple Gateways or other promoters, there is a risk that they might constitute investment contracts and be subject to federal securities regulation. An investment contract has been defined by the U.S. Supreme Court to involve (i) an investment of money with the expectation of profits, (ii) in a common enterprise, and (iii) derived solely from the efforts of others.[52] These factors are known as the *Howey* test.

---

[51] *See Simmons Investments, Inc., v. Conversational Computing Corp.,* 2011 U.S. Dist. LEXIS 15962 (D. Kan. Feb 17, 2011) (explaining that under *Reves* a personal guarantee on the amount owed through a note reduced the note holder's risk and thus mitigated against a finding that the instruments in question were a security).
[52] *See S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 299 (1946).

LEGAL29208625.7

### a.   Application of the *Howey* Test – Investment of Money with the Expectations of Profits

In determining whether an investment of money was made with the expectation of profits, courts will look to "whether an investor 'chose to give up a specific consideration in return for a separable financial interest with the characteristics of a security.'"[53] The issue here will turn on the motivations of those obtaining Third Party Ripple Currency Balances. If a person obtains Third Party Ripple Currency Balances primarily to purchase goods or services, then they are less likely to be deemed securities. How secondary markets promote the use of Third Party Ripple Currency Balances, and the type of consideration they receive may place Third Party Ripple Currency Balances in a different position.

The Supreme Court has recognized that an "expectation of profits" exists where there is (i) capital appreciation from the original investment and (ii) participation in earnings resulting from the use of investors' funds.[54] In such a case, the investor is attracted solely by prospects of a return on his investment. By contrast, where a purchaser is motivated by a desire to use or consume the item purchased or to occupy the land or develop it, the "investment" will not be deemed to be a security. In applying this standard, courts will look at the representations used to induce use of the instrument.[55] We understand that the *primary* reason for obtaining Third Party Ripple Currency Balances is to facilitate online commerce, not to engage in speculative investment trading. Accordingly, given their commercial nature, Third Party Ripple Currency Balances should not be considered securities under the first prong of the *Howey* test.

### b.   Application of the *Howey* Test – Common Enterprise

Different circuits have examined the existence of a common enterprise differently. Many courts have found that a common enterprise can arise from showing "'horizontal commonality': the tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of assets, usually combined with the pro rata distribution of profits."[56] In examining horizontal commonality, courts have looked at whether the instruments in question promise specific returns.[57] Some circuits also utilize the "vertical commonality" test, which focuses on the relationship between the promoter and the investors, eliminating the requirement that investors pool their funds.[58] The Ninth Circuit has stated that "[a] common enterprise is one in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those

---

[53] *S.E.C. v. SG Ltd.,* 265 F.3d 42, 48 (1st Cir. 2001) (*quoting International Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 559 (1979).

[54] *Id. at* 53 (*citing United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 852 (1975)).

[55] *Id.* ("In our view, these profit-related guarantees constitute a not-very-subtle form of economic inducement").

[56] *See Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994).

[57] *S.E.C. v. SG Ltd.*, 265 F.3d 42, 48(1st Cir. 2001); *see also S.E.C. v. Infinity Grp.*, 212 F.3d at 184-185 (3d Cir. 2000) (finding that funds were pooled and that investors in turn received transfer agreements promising high rates of return).

[58] *See, e.g., First Citizens Federal Sav. & Loan Ass'n. v. Worthen Bank & Trust Co., N.A.*, 919 F.2d 510 (9th Cir. 1980); *Ballard & Cordell Corp. v. Zoller & Dannenberg Explor., Ltd.*, 544 F.2d 1059 (10th Cir. 1976).

-23-

CONFIDENTIAL

seeking the investment or of third parties."[59]  Thus, strict vertical commonality (as the Ninth Circuit standard has been labeled) is established by showing that the investor's profits are directly related to the promoter's profits.[60]

Should the value of any particular virtual currency in which Third Party Ripple Currency Balances are denominated increase, each person who purchased that virtual currency and obtained a Third Party Ripple Currency Balance in that currency will be proportionally better off, such that all individual holders of that virtual currency stand to receive gains through an increased value in their virtual currency if the virtual currency market succeeds.  Some commentators have pointed out that decentralized virtual currencies do not have a common enterprise[61] because there is no centralized money-making entity that will be raising money, but rather many individuals separately participating in a decentralized program.[62]

An entity could subject itself to greater risk of being seen as a common enterprise if it acts as the common entity responsible for the distribution, marketing, and promotion of virtual currencies, including Third Party Ripple Currency Balances.  In other words, the common enterprise risk increases to the extent that there is an identifiable entity that is driving the promotion and pooling of investor funds, etc.

### c.   Regulation of Securities Exchanges

Some commentators have noted that although a virtual currency, on its own, may not be considered a security, the act of bringing together willing buyers and sellers of virtual currencies through an exchange, might subject virtual currencies and related exchange platforms to regulatory oversight.[63]  Under this theory, transactions in virtual currencies occurring on an exchange might be viewed as a common economic scheme where a profit is based on the efforts of a third party, thus meeting the requirements of an investment contract under *Howey*.  If investors are subjecting their money to an enterprise (the exchange) over which a third party (the company) has primary control, there is a chance that this too might viewed as bolstering the arguments in favor of horizontal commonality under the *Howey* factors.  Finally, some might argue that the mere existence of an exchange skews the perception that the primary reason for

---

[59] *SEC v. Glenn W. Turner Enters.*, 474 F.2d 476, 482 n.7 (9th Cir. 1973).  This test is also referred to as the "risk capital test."  Under the risk capital test, the ultimate question is whether the capital contributed by an investor in the enterprise will be used to fund the entrepreneurial or managerial efforts of others to increase the value of the enterprise.  If the capital in question was so contributed, the investment is a security under the risk capital test.

[60] *SEC v. Pinckney*, 923 F.Supp.76, 82 (E.D.N.C. 1996).  Our analysis focuses on "strict" vertical commonality because the concept of "broad" vertical commonality has been largely rejected by federal courts.  *See Revak*, 18 F.3d at 87-88 (common enterprise within meaning of test, for a land sale contract to constitute investment contract and thus security under federal securities law, may not be established by mere showing of "broad vertical commonality" which requires fortunes of investors to be linked only to efforts of promoter).

[61] Reuben Grinberg, *Bitcoin: An Innovative Alternative Digital Currency*, 4:1 HASTINGS SCI. & TECH. L.J. 191, 199 (2011).

[62] *Id.* at 197.

[63] *See, e.g.,* Derek A. Dion, *I'll Gladly Trade You Two Bits on Tuesday for a Byte Today: Bitcoin, Regulating Fraud in the E-Conomy of Hacker Cash*, 2013 ILL. J. LAW, TECH. & POL. 165 (Spring 2013) ("But where the securities laws may fail to regulate Bitcoins themselves, they can be used to regulate Bitcoin exchanges.").

LEGAL29208625.7

CONFIDENTIAL                                                                            RPLI_SEC 0995513

purchasing virtual currencies is to facilitate online commerce, not to engage in speculative investment trading. These same arguments might be made about the Ripple Network, Company, Ripple Gateways, and combined efforts to create a Ripple Network ecosystem.

## D. Commodities Regulations

There appears to be relatively low risk that Third Party Ripple Currency Balances would be instruments subject to regulation by the Commodity Futures Trading Commission (**"CFTC"**). The CFTC is an independent federal agency with exclusive jurisdiction to regulate the commodity futures and options markets in the United States.[64] Under the Commodity Exchange Act (**"CEA"**), the CFTC is charged with administering a comprehensive regulatory regime with respect to, among other things, agreements and transactions involving contracts of sale of a commodity for future delivery (futures), options on futures, and swaps. The regulatory jurisdiction of the CFTC therefore extends to and includes transactions that are either structured as futures, options on futures or swaps when such transactions involve interests that constitute commodities under the CEA.

Section 1a(9) of the CEA defines the term "commodity" in two distinct ways. First, Section 1a(9) specifically enumerates certain articles or goods as commodities. Second, Section 1a(9) defines the term commodity as including those articles or goods, and services, rights or interests, "in which contracts for future delivery are presently or in the future dealt in." Therefore, an underlying interest that is not enumerated in Section 1a(9) may be a statutory commodity under the CEA if it reasonably can underlie a futures contract on a forward looking basis.[65]

Generally, a futures contract is an agreement between a willing buyer and seller to purchase or sell a commodity for delivery in the future: (1) at a price that is determined at the initiation of the contract, (2) that obligates the counterparties to satisfy the contract at the agreed price, (3) that is used to assume or shift price risk, and (4) that may be satisfied by offset or delivery. An offset is accomplished through the closing of a long (buy) or short (sell) position with an equal and opposite transaction by the same counterparty (*i.e.*, buy/sell or sell/buy). An "option" contract is an agreement that gives one counterparty the right (but not the obligation) either to buy a commodity (a call option) or to sell a commodity (a put option) to another counterparty. A swap is a transaction (other than a futures contract or an option on a security) that transfers economic risk or potential benefit with respect to a property, an event, or a commodity, but that is not intended to result in a transfer of actual legal ownership of a property or a commodity.

---

[64] *See*, Section 2(a)(1) and 4c(b) of the Commodity Exchange Act, as amended ("CEA").

[65] *See*, *United States v. Valencia*, No. H–03–024, 2003 WL 23174749 at 8 (S.D. Tex Aug. 25, 2003) (noting that the determination of whether West Coast natural gas is "a commodity in which contracts for future delivery are presently or in the future dealt in," is a fact question, and that "there is no evidence that West Coast gas could not in the future be traded on a futures exchange."). *See also* CEA § 1a(19) which defines the term "excluded commodity" to mean, among other things, an interest rate, exchange rate, currency, credit risk or measure, debt or equity instrument, measure of inflation, or other macroeconomic index or measure and Section 1a(20) which defines the term "'exempt commodity'" to mean a commodity that is not an excluded or Section 1a(9) or Regulation 1.3(zz) agricultural commodity.

LEGAL29208625.7

CONFIDENTIAL

RPLI_SEC 0995514

As you have described to us, transactions involving the issuance and use of Third Party Ripple Currency Balances would appear to share few of the foregoing attributes. First, the issuance of a Balance does not represent an agreement for delivery in the future. Delivery of virtual or real currency occurs at the time of issuance of the Balance. Second, a Balance represents the actual transfer of legal ownership in an underlying virtual or real currency (albeit with a corresponding obligation on the part of the Balance issuer to repay the amount owed), and is not simply a transfer of potential benefit or economic risk. As we believe that there is relatively low risk that the CFTC would conclude that Balances are futures or options on futures, we will not consider in this writing whether they may constitute commodities for purposes of the CEA. If however, an active futures and options on futures market in Balances were to develop, it would be imperative to determine whether Balances might constitute commodities under the CEA. If Balances were to be deemed commodities, any transaction involving futures or options on futures would potentially be subject to the oversight and jurisdiction of the CFTC.

## E.     State Money Transmitter Laws

State regulations on money transmission vary widely, but can generally be grouped into several categories. Many states define money transmission as including three types of activities: (1) money transmission, (2) issuing and/or selling payment instruments, and (3) issuing and/or selling stored value.[66] Although the definition of each of these activities also varies from state to state, many state definitions share common threads, such that they can be discussed in a general manner that is nevertheless useful for reaching certain conclusions.

### 1.     Money Transmission

With regard to money transmission, many states define "money transmission" as "receiving money or monetary value for transmission."[67] "Money" is frequently defined (but not always) as "a medium of exchange that is authorized or adopted by a domestic or foreign government."[68] Similarly, states frequently define "monetary value" as "a medium of exchange, whether or not redeemable in money."[69] A Third Party Ripple Currency Balance is likely a medium of

---

[66] *See, e.g.*, Ariz. Rev. Stat. Ann. § 6-1201; Ark. Code Ann. § 23-55-202; Cal. Fin. Code § 2003(o); Iowa Code Ann. § 533C.102.

[67] *See, e.g.,* Cal. Fin. Code § 2003(s); Iowa Code Ann. § 533C.201; Kan. Rev. Stat. § 286.01; Ariz. Rev. Stat. Ann. § 6-1201.

[68] *See, e.g.*, Ariz. Rev. Stat. § 6-1201; Iowa Code Ann. § 533C.102; Kan. Rev. Stat. § 286.11-003(16). *But see, e.g.*, La. Rev. Stat. Ann. § 6:1032(12) (defining both "money" and "monetary value" as "currency or a claim that can be converted into currency through a financial institution, electronic payments network or other formal or informal payment system.").

[69] *See, e.g.*, Cal. Fin. Code § 2003(m); Conn. Gen. Stat. § 36a-596; Fla. Stat. Ann. § 560.103; Iowa Code Ann. § 533C.102; Kan. Stat. Ann. § 9-508(f). Notably, the commentary to the Uniform Money Services Act, upon which many of these statutes are based, specifically intended that the term "monetary value" would cover "e-money and internet payment systems," "internet scrip," "internet funds transfer," and internet versions of "gold/precious metals transfer and payment." National Conference of Commissioners on Uniform State Laws, *Uniform Money Services Act*, at 8-13 (Feb. 4, 2002, as amended 2004) [hereinafter "**UMSA**"]. These categories are described as including "[a]ccount-based systems involve[ing] a consumer purchasing 'E-money' by debiting an existing bank account or using a credit card to buy 'coins.'" *Id.* at 11. The commentary also recognizes that these systems might involve e-

LEGAL29208625.7

CONFIDENTIAL

RPLI_SEC 0995515

exchange that may or may not be redeemable for money (depending on whether it is denominated in legal tender or virtual currency). As such, whether a Ripple Gateway acts as a money transmitter when issuing a Third Party Ripple Currency Balance may depend on the terms on which it issues Balances. For example, if a Ripple Gateway only issues Third Party Ripple Currency Balances after a customer delivers either legal tender or virtual currency to the Ripple Gateway, the Ripple Gateway likely receives money (legal tender) or monetary value (virtual currency) for transmission to the Ripple Network in the form of a Third Party Ripple Currency Balance. It is likely then, that Ripple Gateways will be regulated as money transmitters under many state laws for issuance of Third Party Ripple Currency Balances.

### 2. Payment Instrument

Many states prohibit the sale or issuance of a payment instrument without a license.[70] "Payment instrument" is often defined as "a check, a draft, a money order, or another instrument for the transmission or payment of money or monetary value, whether or not negotiable."[71] In turn, monetary value is generally defined as a "medium of exchange whether or not redeemable in money."[72] In light of these definitions, in many states, whether a Ripple Gateway will be regulated as a money transmitter on the basis of the payment instrument provision will depend on whether (a) the provision regulates both the issuance and sale of payment instruments, and (b) the state's definition of payment instrument requires it to be negotiable. As to the first issue, Ripple Gateways arguably only issue Balances and do not sell them. States often attach a specific definition to the term "issue," such as "the entity that is the maker or drawer of the instrument in accordance with the California Commercial Code and is liable for payment."[73] A "maker" is defined under the relevant section of the UCC as adopted in all states as "a person who signs or is identified in a note as a person undertaking to pay."[74] Similarly a "drawer" is "a person who signs or is identified in a draft as a person ordering payment."[75] In the context of Third Party Ripple Currency Balances, no Ripple Gateway signs a note or draft in order to undertake payment or order payment. To the extent that settlement terms are created and adhered to, that occurs outside of the Ripple Network, in separate documents. As such, if any

---

money that is (1) redeemable by the issuer, (2) not redeemable in money necessarily, and (3) redeemable in money by some third party - a bank, credit card company (or in this case, a Ripple Gateway). *Id.* at 11-12. The first category certainly covers Ripple Network balances.

[70] Note, many states prohibit both issuing and selling payment instruments without a license. *See, e.g.* 32 Maine Rev. Stat. § 6102(10); Md. Fin. Inst. § 12-401-12-431; Mich. Compiled L. Ann. § 487.1003. Others prohibit only the sale of payment instruments without a license. *See, e.g.*, Utah Admin. Code § R331-14-1; 8 Vermont Stat. Ann. § 1500; Wash. Rev. Stat. § 19.230.010(22); NC Gen. Stat. § 53-208.2(11); Tex. Fin. Code § 151.301. Still others regulate only the issuance of payment instruments without a license. *See, e.g.*, Conn. Gen. Stat. § 36a-596. Other states do not regulate payment instruments as such. *See, e.g.*, Montana, Nevada, New Mexico, Pennsylvania, and South Carolina.

[71] *See, e.g.*, Alsk. Stat. § 06.55.990(15); Ariz. Rev. Stat. § 6-1201; Ark. Code Ann. § 23.55.102; Cal. Fin. Code § 2003(9).

[72] *See, e.g.* Alsk. Stat. § 06.55.101; Cal. Fin. Code § 2003(m); Conn. Gen. Stat. § 36a-596; Fla. Stat. Ann. § 560.103; Iowa Code Ann. § 533C.102; Kan. Stat. Ann. § 9-508(f).

[73] Cal. Fin. Code § 2003(k).

[74] Cal. Comm. Code § 3103(a)(5) and UCC §3-103(7).

[75] Cal. Comm. Code § 3103(a)(3) and UCC §3-103(5).

LEGAL29208625.7

CONFIDENTIAL

RPLI_SEC 0995516

given state law regulates only the sale of payment instrument, a Ripple Gateway's issuance of Balances is likely not regulated there.

Delaware's law provides an example of the importance of the second issue. Delaware requires a license to sell or issue "instrument[s] for the transmission or payment of money."[76] As with the discussion of "maker" and "drawer," *supra*, in the relevant section of the UCC as adopted in all states, an "instrument" is defined as "a negotiable instrument."[77] A negotiable instrument, for its part, is "an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order, if it: (1) is payable to bearer or to order at the time it is issued or first comes into possession of a holder; (2) is payable on demand or at a definite time; and (3) does not state any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money…."[78] Notably, both the term "promise" and the term "order" require a written instruction or written undertaking.[79] A Third Party Ripple Currency Balance is not a written instrument, and if it is denominated in Bitcoin or other virtual currency, it is also not tied to a fixed amount of money. As such, because Delaware defines instruments as negotiable, Third Party Ripple Currency Balances will likely not be categorized as payment instruments, and a Ripple Gateway's issuance of them will not be regulated there.

Notably, however, many states specifically define payment instruments to include "instrument[s] for the transmission or payment of money or monetary value, **whether or not negotiable**."[80] In such cases, the arguments related to requiring a writing and being tied to a fixed sum of money will not be available. As such, depending upon the other language in the statute, issuing a Third Party Ripple Currency Balance might trigger the requirements for licensure. Ultimately, then, a Ripple Gateway's obligations under any given state law regarding payment instrument will turn on whether (a) it governs issuance of a payment instrument (as opposed to solely the sale of a payment instrument), and (b) it defines instrument as a negotiable instrument, or otherwise requiring a writing.

### 3. Stored Value

Many states require licensure of entities that issue and/or sell stored value.[81] "Stored value" is often defined as "monetary value that is evidenced by an electronic record."[82] "Monetary value"

---

[76] 5 Del. Code Ann. § 2302

[77] 6 Del. Code Ann. § 3-104(b) and UCC § 3-104(b).

[78] 6 Del. Code Ann. § 3-104 and UCC § 3-104(a).

[79] 6 Del. Code Ann. §§ 3-103(a)(6) and (9); UCC §§ 3-103(8) and (12).

[80] *See, e.g.* Fla. Stat. Ann. § 560.103 (emphasis added); 205 I.L.C.S. § 657/5 (emphasis added); Iowa Code § 28-8-4-15 (emphasis added); Kan. Stat. Ann. § 9-508(i) (emphasis added); Ken. Rev. Stat; 286.11-003(22) (emphasis added).

[81] As with payment instruments, note that some states regulate both the sale and the issuance of stored value. *See, e.g.*, Cal. Fin. Code § 2003(o)(2); Iowa Code Ann. § 533C.201; 533C.102. Other states, however, only regulate one of those two activities. *See, e.g.*, Ark. Code. Ann. § 23-55-102(10) (selling); Conn. Gen. Stat. § 36a-596 (issuing); Fla. Stat. § 560.103 (selling). Still others do not regulate stored value at all. *See, e.g.,* Alabama, Arizona, Colorado, Delaware, Georgia, Hawaii, and Kansas.

CONFIDENTIAL

often means a "medium of exchange, whether or not redeemable in money,"[83] and a "record" is often defined as "information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form."[84]  Under these definitions, Third Party Ripple Currency Balances might be considered monetary value "stored in an electronic or other medium and [] retrievable in perceivable form."[85]  As the entity that issues Third Party Ripple Currency Balances, a Ripple Gateway might therefore be regulated under state laws regarding stored value, even in states where it would not otherwise be regulated as a money transmitter or seller of payment instruments.

## F.    Electronic Fund Transfer Act and Regulation E

The federal Electronic Fund Transfer Act ("**EFTA**")[86]  provides substantive consumer rights in regard to electronic fund transfers ("**EFT**"), by requiring disclosure of EFT account terms, maintenance and provision of adequate records for consumers, limitations on consumer liability for unauthorized transfers, prompt error and dispute resolution by financial institutions, and restrictions on the distribution of EFT access devices.[87]  The Consumer Financial Protection Bureau ("**CFPB**") is the agency tasked with implementing and in certain cases, enforcing the EFTA.  Given the emphasis on consumer protection that motivated both the passing of the EFTA and the creation of the CFPB, it is prudent to assume that the CFPB will interpret the EFTA broadly in order to extend its protections over a wide range of consumer financial services, and that courts will afford it substantial deference in doing so.  Following is a brief analysis of the key definitions relevant to determining whether Balances are subject to consumer protections afforded by the EFTA.

The EFTA defines "electronic fund transfer" as "any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, or computer or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account...."[88]  None of the exceptions that the definition goes on to list seem applicable to transactions carried out by Ripple Gateways involving Balances; however, an analogy may be drawn between Balances and general purpose reloadable ("**GPR**") cards, the latter of which are exempt under the EFTA as the stored value

---

[82] *See, e.g.*, Al. Stat. § 060.55.990(21); Ark. Code. Ann. § 23-55-102(19); Haw. Rev. Stat. § 489D-6; Iowa Code Ann. § 533C.102.
[83] *See, e.g.* Cal. Fin. Code § 2003(m); Conn. Gen. Stat. § 36a-596; Fla. Stat. Ann. § 560.103; Iowa Code Ann. § 533C.102; Kan. Stat. Ann. § 9-508(f).
[84] *See, e.g.* Al. Stat. § 060.55.990(21); Ark. Code Ann. § 23-55-102(16); Cal. Fin. Code § 2003(t).  But note that other states limit stored value to cards or other tangible objects.  *See, e.g.*, Ind. Code § 28-8-4-19.5.
[85] In fact, the commentary to the Uniform Money Services Act specifically explains that "the instrument in which the stored value is embedded is not conceptually relevant," and that "value might not be stored on any identifiable physical object, but instead stored by purely cryptanalytic means."  UMSA, *supra* note 37, at 22.
[86] 15 U.S.C. § 1693 *et seq.*
[87] Senate Report No. 95-915.
[88] 15 U.S.C. § 1693a(7).

LEGAL29208625.7

CONFIDENTIAL

RPLI_SEC 0995518

balance associated with the card is simply a ledger entry recorded by the card program manager, rather than an account maintained in the name of the cardholder.[89]

Whether transactions carried out through the Ripple Network or Ripple Gateways are considered "electronic fund transfers" (and hence fall within the purview of the EFTA) depends primarily on (a) whether an "account" is debited or credited in connection with a transaction, and (b) whether transactions involve any "transfer of funds." "Account" is defined as "a demand deposit (checking), savings, or other consumer asset account (other than an occasional or incidental credit balance in a credit plan []) held directly or indirectly by a financial institution and established primarily for personal, family, or household purposes, but such term does not include an account held by a financial institution pursuant to a bona fide trust agreement."[90] "Consumer" is defined as "a natural person;"[91] taken together with the requirement that a covered account be "established primarily for personal, family, or household purposes," it is clear that the provisions governing EFTs do not apply to business accounts. A "financial institution" is defined as "a [] bank, a [] savings and loan association, a mutual savings bank, a [] credit union, or **any other person that directly or indirectly holds an account belonging to a consumer**, or that issues an access device and agrees with a consumer to provide electronic fund transfer services."[92] The definition therefore makes clear that persons who are not traditional depository institutions may nonetheless be covered by the EFTA if they hold an "account" for a "consumer." The term "asset account" is not defined; however, the legislative history makes clear that it is intended as a catch-all category of other types of consumer asset account from which funds may be accessed electronically.[93]

The word "funds" is not defined in the EFTA or Regulation E, and it is therefore unclear whether it is intended to apply to anything other than legal tender. One insight into the scope Congress intended when using the word "funds" is to review its usage in the Dodd-Frank Wall Street Reform and Consumer Protection Act (**"Dodd-Frank"**), Article X of which created the CFPB. "Funds" is used dozens of times throughout Dodd-Frank. On each occasion where the term is used without further modification, it makes sense only if the term references legal tender. In Article X of Dodd-Frank, there are five instances where "funds" is used in connection with other

---

[89] The CFPB has issued an Advance Notice of Proposed Rulemaking noting that Regulation E generally does not apply to GPR cards and indicating its intent to extend Regulation E protections to such cards. *See* 77 FR 30923 (May 24, 2012). If such a rule were passed, it is probable that the exemption from the EFTA for transactions involving individual ledger accounts linked to a pooled bank account would be removed, and the analogy above with respect to GPR cards would become inapplicable.

[90] 15 U.S.C. § 1693a(2).

[91] 15 U.S.C. § 1693a(6).

[92] 15 U.S.C. § 1693a(9).

[93] Senate Report No. 95-915, at 4. ("Today's EFT systems access a consumer's bank account, but many people believe that EFT services may soon access other types of asset accounts…In order to assure that all equivalent EFT services are subject to the same standards, the bill would cover EFT systems which access traditional bank accounts as well as other types of asset accounts."). Just as importantly, it appears that the legislature intended that the definition be interpreted functionally in order to give regulators the flexibility to determine "whether new or developing electronic services should be covered by the [EFTA], and if so, to what extent...[t]his delegation of authority to the [regulator] is an important aspect of this legislation as it would enable the [regulator] to examine new services on a case-by-case basis and would contribute substantially to the act's overall effectiveness." *Id.* at 9.

CONFIDENTIAL

terms in order to expand the definition of a covered financial service or product in a manner that is broad enough to include virtual currency.[94]  This usage demonstrates Congressional intent that the term "funds," by itself, is not broad enough to include other types of items having "monetary value," such as virtual currency, which leads to the conclusion that the term "funds" as used in the EFTA is not sufficiently broad to include virtual currencies.

In sum, it is unclear if Balances are "accounts" containing "funds" for purposes of the EFTA.  If the CFPB desires to apply the EFTA to virtual currencies, it will likely be required to clarify the applicability of the EFTA through additional guidance or rulemaking, or alternatively, use its authority under Article X of Dodd-Frank to accomplish the same result.  Therefore, Ripple Gateways should closely monitor ongoing developments with respect to the application of the EFTA and Regulation E, or Regulation E-type protections, to virtual currencies, and consider whether and how they could implement the requirements of the EFTA and Regulation E if necessary.

---

[94] Specifically, the definition of "deposit-taking activity" references "the receipt of funds or the equivalent thereof and transferring funds or value of funds." 12 U.S.C. § 5481(8).  The definition of "financial product or service" references "acting as a custodian of funds or any financial instrument." 12 U.S.C. § 5481(15).  The definition of "payment instrument" references "payment of funds, or monetary value (other than currency)." 12 U.S.C. § 5481(18).  The definition of "stored value" references in three separate instances "funds or monetary value." 12 U.S.C. § 5481(28).  The definition of "transmitting or exchanging funds" references "currency, monetary value." 12 U.S.C. § 5481(29).

LEGAL29208625.7

CONFIDENTIAL

RPLI_SEC 0995520