# PX 769

## MASTER XRAPID MARKET MAKER SERVICES AGREEMENT

This Master xRapid Market Maker Services Agreement (the "Agreement") is effective as of July 1, 2019 and is by and between Ripple Payments Inc., a Delaware corporation ("Ripple") and GSR Markets ("Service Provider"). Service Provider and Ripple are hereby individually referred to as "Party" and together as "Parties."

WHEREAS, Ripple's products include xRapid, a hosted service that enables Ripple's financial institution customers to source liquidity in cross-border payments through XRP, a digital asset native to the XRP Ledger ("XRP").

WHEREAS, Ripple wishes to engage Service Provider to perform independent services as a market maker for XRP in trades for specified currency pairs on certain digital asset exchanges that are integrated with xRapid.

NOW, THEREFORE, in consideration of the mutual promises contained in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1. **Services.** Service Provider shall perform the following services hereunder in accordance with the terms and conditions of the Agreement (collectively, the "Services"):

    a. During the Term of this Agreement Service Provider shall act as a market maker for XRP in trades for specified currency pairs on (i) the Mexican digital asset exchange, Bitso ("Bitso"), which supports xRapid, (ii) the Philippines digital asset exchange, Coins.pro ("Coins"), which supports xRapid and (ii) other similar xRapid exchanges or markets as Ripple shall require pursuant to Section 4 (Additional Currency Pairs) (together with Bitso and Coins, each an "Exchange") using each Exchange's applicable quotation system. Service Provider shall open an account with each Exchange in accordance with each Exchange's applicable rules and requirements, and shall open such accounts within a reasonable period of time from the Effective Date with respect to BitSo and Coins, and Ripple's written notice of the expansion of Services to any Additional Currency Pair with respect to other Exchanges.

    b. Service Provider shall maintain a minimum of US$ ▮▮▮ worth of XRP/FIAT bid liquidity ("Bid Liquidity") per each currency pair pursuant to the Services per trading day, such that each trading day, Service Provider is available to execute trades of up to US$ ▮▮▮ worth of XRP with MXN on Bitso, US$ ▮▮▮ worth of XRP with PHP on Coins, and US$ ▮▮▮ worth of XRP with applicable fiat currency per each Additional Currency Pair on each relevant Exchange. Notwithstanding the foregoing, Service Provider shall not be obligated to maintain combined Bid Liquidity across all Exchanges that exceeds ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ripple has made to Service Provider under separate agreement(s) for the purpose of facilitating Service Provider's performance of this Agreement.

HIGHLY CONFIDENTIAL

 c. Service Provider shall maintain open bid quotes for XRP/MXN trades, XRP/PHP trades and any Additional Currency Pairs according to the following requirements (which are incremental and shall not overlap):

  i. Bid quotes of between US$▆▆ and US$▆▆ worth of XRP with each fiat currency pursuant to the Services for applicable XRP/FIAT trades that are between ▆▆▆▆▆▆▆▆ and ▆▆▆▆▆▆▆▆ from the respective XRP/FIAT Offer Rate..

  ii. Bid quotes of a minimum of US$▆▆ and a maximum of US$▆▆ worth of XRP with each fiat currency pursuant to the Services for applicable XRP/FIAT trades that are between ▆▆▆▆▆▆▆%) and ▆▆▆▆ (▆▆%) from the respective XRP/FIAT Offer Rate.

  iii. Bid quotes of a minimum of US$▆▆ worth of XRP with each fiat currency pursuant to the Services for applicable XRP/FIAT trades that are between ▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆%) from the respective XRP/FIAT Offer Rate.

 d. All transactions in XRP executed by Service Provider shall be solely for its own account, and Service Provider shall retain all gains and suffer all losses in connection with such transactions as a principal. Service Provider shall be responsible and accountable for all financial obligations and trade obligations of its trades of XRP and any obligations to any applicable Exchange. Without limiting the generality of Section 12 (Indemnification) hereof, Service Provider shall be solely liable for any claim made by any customer or any third party to the trade or any Exchange.

 e. Service Provider shall be solely responsible for all relevant fees required by each Exchange for the conduct of the within activities and for other costs and expenses of any kind or nature incurred in performing the Services under this Agreement. Without limiting the foregoing, any persons or entities providing services to Service Provider shall be compensated solely by Service Provider and Ripple shall have no liability for the same.

2. **XRP/FIAT Offer Rates Calculations**. XRP/FIAT Offer Rate shall be calculated per each currency pair pursuant to the Services and means the rate of XRP to applicable fiat currency (for example, MXN for XRP/MXN trades executed on Bitso and PHP for XRP/PHP trades executed on Coins) at a given time calculated by multiplying (i) the XRP Offer Rate by (ii) the lowest applicable USD/FIAT ask price as published by FC Stone. The XRP Offer Rate means the lowest XRP/USD ask price available on Bitstamp's then current off-ledger XRP/USD order book.

3. **XRP Mid-Rate Calculation**. The XRP Mid-Rate means the average of the XRP Bid Rate and the XRP Offer Rate (as defined in Section 2) at any given time. The XRP Bid Rate means the highest XRP/USD bid price available on Bitstamp's then current off-ledger XRP/USD order book.

HIGHLY CONFIDENTIAL

4. **Additional Currency Pairs.** Ripple reserves the right to expand the Services to additional exchanges and fiat currencies for purchase XRP (each an, "Additional Currency Pair") in its sole discretion and by providing Service Provider written notice, upon which Service shall commence providing Services in connection with such Additional Currency Pair(s) as soon as reasonably practicable. Any Additional Currency Pair will be subject exclusively to the terms and conditions herein.

5. **Reporting Requirements.** During the Term of the Agreement, Service Provider shall maintain records of all of its and its Affiliates' (as defined in Attachment A) trading activity on a per Exchange basis, including (a) each individual executed trade (each an, "Exchange Transaction"), (b) to the extent it is made available by the relevant Exchange, time stamp, price, identification number on the Exchange, buy or sell direction, and any other identifying information for each Exchange Transaction(c) all XRP/FIAT Offer Rates and XRP Mid-Rate calculations individually reported, including every update thereof, relevant data from FC stone under 2(ii) and calculations of the Bid Rate under Section 3, and (d) any other information Ripple may reasonably request Service Provider to maintain from time to time within fourteen (14) days of Ripple's written request (together, "Activity Records"). Service Provider shall send Ripple its Activity Records via a mutually agreed upon automated delivery system biweekly during the Term of the Agreement.

6. **Service Fees.** In consideration for its Services and subject to Section 8 (Service Availability), Ripple shall pay Service Provider on a monthly basis (each calendar month, a "Payment Period) (a) US$ ▮▮▮▮▮▮▮▮▮▮ and (b) ▮▮▮▮▮▮▮▮▮▮ over the relevant Payment Period (together, "Service Fees"). XRP Volume means the total amount of XRP Service Provider purchases with fiat currencies pursuant to the Services that is then utilized in an xRapid transaction. Ripple may in its sole discretion set-off the amount of Service Fees owed by Ripple to Service Provider under this agreement against any fees, principal, interest, fees, or other amounts owed by Service Provider to Ripple or its Affiliates under any other agreement. Ripple reserves the right to, and may pursue, any and all remedies available to it by law, in equity, and under contract as it sees fit.

    a. In the event the Parties dispute the amount of XRP Volume for a given Payment Period ("Volume Dispute"), the Parties shall work together in good faith to attempt to remedy such Volume Dispute. In order to give effect to the foregoing, Ripple shall (i) maintain complete records of all xRapid trades executed on each Exchange, including time stamp, price, quantity, identification number on the Exchange, buy or sell direction, and any other identifying information for each xRapid trade ("xRapid Data," and (ii) in the event of a Volume Dispute, provide Service Provider with xRapid Data for the relevant payment period in an anonymized and aggregated form via a mutually agreed upon delivery system.

7. **Payment Terms.** Service Provider shall submit a Valid Invoice to Ripple for Service Fees at the beginning of each calendar month for Services rendered in the prior Payment Period. A Valid Invoice shall include (i) a purchase order number, which Ripple shall provide, (ii) the dates covered by the invoice, and (iii) itemized charges and summary of the Services

performed. Subject to Section 8 (Service Availability) and Ripple's receipt of adequate Activity Reports under Section 5 (Reporting Requirements), Ripple shall pay Service Provider any undisputed Services Fees within thirty (30) days of Ripple's receipt of Valid Invoice, provided that Service Provider provides Ripple with a wallet address that is (a) in Service Provider's sole custody, and (b) is solely used for receipt of Service Fee payments. Service Provider shall provide such wallet address by completing the "XRP Counterparty Wallet Address Confirmation" (<u>Attachment B</u>) and represents and warrants that such wallet address conforms with the foregoing requirements. Ripple shall have no obligation to make Service Fee payments to any wallet that is not in Service Provider's sole custody, and Service Provider shall fully cooperate with Ripple in order to give effect to the foregoing. The amounts of XRP payable for Service Fees shall be calculated based on the the [REDACTED]

8. **Service Availability**. Service Provider shall perform its Services with respect to each Exchange for a minimum of 23.5 hours a day, 7 days a calendar week and 365 days a calendar year ("<u>Service Availability</u>"). In the event that Service Provider fails to maintain Service Availability on any given day during a Payment Period, excluding any failure due to a outages or failures of third parties, such as exchanges, banks and foreign exchange brokers, (each such failure to maintain Service Availability, a "Service Failure"), the Services Fees for the relevant Payment Period shall be reduced by [REDACTED] for each Service Failure ("<u>Fee Reduction</u>") (with the price of XRP calculated based on the price of XRP trading against USD as published on XRP Charts at approximately 9:00 a.m. PST on the Payment Day). For avoidance of doubt, performance of Services for any duration less than 23.5 hours in a given calendar day, not due to services outages at Exchanges, constitutes a single Service Failure. Service Fees for the first and/or last calendar month(s) of the Term shall be pro-rated, as applicable, according to the same calculation.
    a. In the event of a Disruption Event (as defined in Attachment A), with respect to any affected Exchange, Ripple's obligation to pay monthly Service Fees pursuant to Section 6 (Service Fees) and Service Provider's obligation to provide Services shall be suspended until the Parties mutually agree on an alternative Exchange and performance of the Services is resumed on such alternative Exchange. Ripple shall pay Service Provider a pro-rata amount of the monthly Service Fee pursuant to 6a. and any Service Fee accrued pursuant to 6b. for the days Service Provider did provide Services and has not yet been paid prior to the Disruption event.

9. **Taxes**. Service Provider shall bear all applicable taxes, duties, deductions, imposts, or governmental levies, including withholding taxes, transfer taxes, sales or use taxes, value-added taxes, stamp taxes, excise taxes, or other similar taxes (collectively "Taxes") arising under this Agreement. Ripple shall have no obligation to indemnify, gross-up, or otherwise reimburse Service Provider for applicable Taxes. If and to the extent applicable law obligates Ripple to deduct Taxes from any Service Fees to Service Provider including from a payment of XRP, Ripple shall timely deduct and remit such Taxes to the applicable tax authority and shall furnish Service Provider with an official receipt or other appropriate evidence of such remittance. If requested by Ripple, Service Provider shall

HIGHLY CONFIDENTIAL

promptly provide Ripple with a valid IRS W-9 form or a valid IRS series W-8 form, as appropriate. Without limiting the foregoing, Ripple and Service Provider acknowledge and agree that net income taxes, franchise taxes, branch profit taxes, or similar income taxes imposed on a Party as a result of such Party being organized under the laws of, having its principal office, management and control, or employees located in, conducting business within, or by reason of another connection between Party and the jurisdiction imposing such tax, shall be the sole responsibility of such Party.

10. **Compliance with Law**. Service Provider shall comply with all applicable laws, rules, and regulations, and orders in all relevant jurisdictions (collectively, "Laws") including but not limited to Laws related to its activities and to its use, resale or distribution of XRP units. Without limiting the foregoing, Service Provider agrees not to violate any of (a) any applicable domestic or foreign anti-corruption Law, including the United Kingdom Bribery Act of 2010 and the United States Foreign Corrupt Practices Act; (b) any applicable domestic or foreign Laws related to Anti-Money Laundering and anti-terrorist financing requirements, including the USA Bank Secrecy Act, as amended by the USA Patriot Act and the Financial Conduct Authority's Anti-Money Laundering Regulations; (c) any applicable sanctions Laws administered by the U.S. Department of Treasury's Office of Foreign Assets Control; (d) applicable export restrictions or other Laws, including United States Export Administration Regulations, as well as end user, end use and destination restrictions which may be issued by the United States and other governments; and (e) anti-trust, anti-competition, or other market manipulations Laws.

11. **Responsibility to Third Parties**. Ripple is not responsible for any matters or issues or claims relating to or in connection with any use, distribution or sale of XRP pursuant to the Services (including any consideration it receives for Services). Service Provider shall make no representations or warranties to any person or entity concerning or otherwise act on behalf of Ripple or its Affiliates at any time.

12. **Indemnification**. Service Provider agrees to defend, indemnify and hold harmless (collectively, "indemnify" or "indemnification" or any variation) Ripple, its Affiliates, and its or their respective officers, employees, owners, directors and representatives (together with Ripple and its Affiliates, the "Ripple Indemnitees") and to settle against any Claim or Loss (as those terms are defined in Attachment A), including attorneys' fees and litigation expenses and any fines, fees or penalties imposed by any regulatory authority, relating to or in connection with any of the following: (i) any violation of Laws by Service Provider or its employees, contractors, or agents, (ii) any breach of this Agreement by Service Provider or its employees, contractors, or agents, (iii) any Claim of any customer or any third party or any Exchange with respect to any trade of XRP made by or for Service Provider at any time, and (iv) any use, distribution or sale of any of XRP by Service Provider or its employees, contractors, or agents; other than to the extent any Claim or Loss is caused by the gross negligence, fraud, or willful misconduct of Ripple or any other Ripple Indemnitee.

13. **Indemnification Procedures**. In connection with any Claim or Loss, Ripple shall give Service Provider prompt Notice of the Claim or Loss (provided that any delay in notification will not relieve Service Provider of its indemnification obligations except and solely to the

HIGHLY CONFIDENTIAL

GSR00000992

extent that the delay materially impairs Service Provider's ability to defend the Claim or Loss). In addition, Ripple will cooperate with Service Provider in connection with the defense and settlement of the Claim or Loss, with Service Provider having the right to choose competent counsel. Notwithstanding the foregoing, Ripple may choose in its sole discretion and option whether it will control the defense and settlement of the Claim or Loss. Service Provider shall not enter into any settlement or compromise of any Claim or Loss without Ripple's prior written consent if such settlement or compromise (i) arises from or is part of any criminal action, suit, or proceeding, (ii) contains a stipulation or admission or confession or acknowledgement of any liability or wrongdoing or judgement (whether in contract, tort, or otherwise) on the part of Ripple, (ii) otherwise requires Ripple to refrain from or take material action (such as payment of fees) or does not contain an unconditional release of all Ripple Indemnitees. At its cost, Ripple has the right to participate in the defense or settlement of the Claim or Loss with counsel of its own choosing.

14. **Risk of Loss**. Immediately upon Ripple's transfer of any XRP to Service Provider's XRP wallet address and Service Provider's receipt of such XRP therein, all risk of loss related to such XRP passes to Service Provider. Service Provider acknowledges and agrees that Ripple has no liability to Service Provider or any third party for any loss, theft or misuse of any XRP that Ripple has transferred to Service Provider per the terms of this Agreement.

15. **Material Risks**. Service Provider acknowledges the following material risks associated with virtual currency, including XRP:

    a. Virtual currency is not legal tender, is not backed by the government, and accounts and value balances are not subject to Federal Deposit Insurance Corporation or Securities Investor Protection Corporation protections.

    b. Legislative and regulatory changes or actions at the state, federal, or international level may adversely affect the use, transfer, exchange, and value of virtual currency.

    c. Transactions in virtual currency may be irreversible and, accordingly, losses due to fraudulent or accidental transactions may not be recoverable.

    d. Some virtual currency transactions shall be deemed to be made when recorded on a public ledger, which is not necessarily the date or time that the transaction is initiated.

    e. The value of virtual currency may be derived from the continued willingness of market participants to exchange fiat currency for virtual currency, which may result in the potential for permanent and total loss of value of a particular virtual currency should the market for that virtual currency disappear.

    f. There is no assurance that a person who accepts a virtual currency as payment today will continue to do so in the future.

    g. The volatility and unpredictability of the price of virtual currency relative to fiat currency may result in significant loss over a short period of time.

HIGHLY CONFIDENTIAL
GSR00000993

h. The nature of virtual currency may lead to an increased risk of fraud or cyber-attack.

i. The nature of virtual currency means that any technological difficulties experienced by Ripple may prevent the access or use of Ripple's virtual currency.

16. **No Payment Reversal.** With respect to any payment of XRP from Ripple to Service Provider under this Agreement, Service Provider acknowledges and agrees that Ripple cannot cancel, reserve, or change any XRP transfer that has been completed, as recorded on the XRP Ledger.

17. **No Recourse.** Service Provider shall have no recourse against Ripple, its Affiliates, employees, directors or officers for any liabilities of any type incurred by Service Provider and/or any of its Affiliates as a result of its use, resale or distribution of XRP, including the materialization of any of the risks in Section 8 (Material Risks). Service Provider shall comply with all applicable laws related to its activities and to its use, resale or distribution of XRP.

18. **Service Provider Security Acknowledgment.** Service Provider acknowledges and agrees that Service Provider is solely responsible for maintaining adequate security and control of any and all IDs, passwords, hints, personal identification numbers (PINs), secret keys or any other codes that it uses to access its XRP, including any XRP it receives under this Agreement ("Service Provider Credentials"). Any loss or compromise of Service Provider Credentials may result in unauthorized access to XRP by third-parties and the loss or theft of such XRP. Ripple assumes no responsibility for any loss that Service Provider may sustain due to compromise of Service Provider Credentials

19. **Service Provider XRP Acknowledgments.** Service Provider acknowledges and agrees that (i) XRP does not represent a right to make any demand on Ripple, (ii) Ripple has no obligation to redeem or exchange XRP for monetary value, goods, services or any other item; and (iii) Ripple is not responsible for any use by Service Provider or any third party of any XRP that Ripple has delivered to Service Provider under this Agreement.

20. **Confidentiality.** Each Party shall maintain all Confidential Information (as defined in Attachment A) it receives in strict confidence and not disclose any Confidential Information to any third party or use any Confidential Information for any purpose other than the performance of this Agreement, unless agreed upon in writing by the other Party. A Party may disclose Confidential Information required to be disclosed by law, regulation, a valid court order or other Laws if that Party (a) gives the other Party timely notice, unless legally prohibited, so that other Party may seek a protective order, confidential treatment, or other appropriate relief and (b) discloses only the portion of Confidential Information that is necessary to comply with such law, regulation, or order. The obligations in this subsection are in addition to, and do not supersede, any confidentiality and nondisclosure obligations provided in any other written agreement between the Parties.

21. **Publicity.** Neither Party may issue any press releases or make any other public statement

HIGHLY CONFIDENTIAL
GSR00000994

with respect to this Agreement and its terms and conditions unless the content, timing and method of distribution of the press release or public statement has been approved in writing by the other Party, other than disclosures to the extent strictly required under applicable Laws.

22. **Warranties, Disclaimers, Limitations.**

    a. <u>Authority</u>. Each Party represents and warrants to the other Party that it: (a) is a legal entity duly organized and validly existing under the Laws of the jurisdiction in which it is registered or in which its principal office is located, as the case may be; (b) has all necessary power and authority to enter into this Agreement including any Attachment and perform its obligations hereunder; (c) when executed and delivered by such Party, this Agreement including any Attachment will constitute a legal, valid and binding obligation of such Party that is enforceable in accordance with its terms hereunder; (d) is not creating a conflict of interest or causing a breach with a preexisting Agreement between a Party and another third party.

    b. <u>Service Provider Warranties and Representations</u>. Service Provider further represents and warrants that it and/or any of its Affiliates:

        i. are not or will not be owned or controlled by any individual or entity subject to any sanctions administered or enforced by the United States, including the SDN List and Sectoral Sanctions Identifications List maintained by the U.S. Department of the Treasury's Office of Foreign Assets Control, the United Nations Security Council, the European Union and the relevant sanctions authorities of each of its member states, including HM Treasury of the United Kingdom, or other relevant sanctions authority;

        ii. are not or will not be located, organized, or resident in Cuba, Iran, North Korea, Syria, the Crimea Region of Ukraine, or any other embargoed or sanctioned countries or regions to the extent then prohibited by United States export regulations, or owned or controlled by any individual, entity or government in those countries or regions.

        iii. will not enter into any agreement containing any provisions which would be violated or breached by the performance of Service Provider's obligations under this Agreement or in connection herewith.

    c. <u>Disclaimers</u>. EXCEPT FOR ANY EXPRESS REPRESENTATIONS OR WARRANTIES SET FORTH IN THIS AGREEMENT AND TO THE FULLEST EXTENT NOT PROHIBITED BY APPLICABLE LAW, RIPPLE MAKES NO REPRESENTATIONS OR WARRANTIES OR CONDITIONS OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING (WITHOUT LIMITATION) IMPLIED WARRANTIES OF MERCHANTABILITY, NON-INFRINGEMENT, SUITABILITY, TITLE, FITNESS FOR A PARTICULAR PURPOSE, OR ANY CLAIM OF RIGHT OR ANY WARRANTIES OR OBLIGATIONS ARISING FROM OF A COURSE OF DEALING, COURSE OF PERFORMANCE OR USAGE OR

TRADE PRACTICE, AND ALL SUCH REPRESENTATIONS AND WARRANTIES AND OBLIGATIONS ARE HEREBY DISCLAIMED.

d. <u>Limitations of Liability</u>. NOTWITHSTANDING ANY CONTRARY PROVISION OF THIS AGREEMENT OR FAILURE OF THE ESSENTIAL PURPOSE OF ANY REMEDY, AND TO THE FULLEST EXTENT NOT PROHIBITED BY APPLICABLE LAW:

   i. IN NO EVENT SHALL THE AGGREGATE AND CUMULATIVE LIABILITY OF RIPPLE AND/OR ITS AFFILIATES, AND/OR ANY OF ITS OR THEIR RESPECTIVE OFFICERS, DIRECTORS, AGENTS, EMPLOYEES, CONTRACTORS, OR REPRESENTATIVES, FOR ALL MATTERS OR CLAIMS ARISING FROM OR RELATING TO OR IN CONNECTION WITH THIS AGREEMENT AT ANY TIME, EXCEED TEN THOUSAND DOLLARS (USD $ 10,000) IN TOTAL.

   ii. IN NO EVENT SHALL RIPPLE, ITS AFFILIATES, OR ANY OF ITS OR THEIR RESPECTIVE OFFICERS, DIRECTORS, AGENTS, EMPLOYEES, CONTRACTORS, OR REPRESENTATIVES, BE LIABLE TO MARKET MAKER OR ANY AFFILIATE THEREOF FOR (i) ANY SPECIAL, INCIDENTAL, INDIRECT, EXEMPLARY, PUNITIVE, HYBRID, OR CONSEQUENTIAL DAMAGES, OR (ii) ANY DAMAGES FOR LOST PROFITS, REVENUE, GOODWILL OR SAVINGS, LOSS OF USE, BUSINESS INTERRUPTION, REPUTATIONAL HARM, OR MARKET VOLATILITY, OR (iii) ANY DAMAGES OR LIABILITIES OF ANY KIND INCURRED BY MARKET MAKER OR ANY OF ITS AFFILIATES OR RELATED PERSONS RELATING TO OR IN CONNECTION WITH ANY USE, DISTRIBUTION OR SALE OF ANY XRP PROVIDED BY RIPPLE TO MARKET MAKER UNDER THE AGREEMENT OR RELATING TO THE SERVICES; IN EACH CASE WHETHER OR NOT BASED ON A CLAIM OF BREACH OF CONTRACT OR WARRANTY, NEGLIGENCE OR OTHER TORT, STRICT LIABILITY, OR OTHERWISE ARISING UNDER ANY THEORY OF LAW, EVEN IF SUCH PARTY IS WAS ADVISED OF THE POSSIBILITY OF SUCH LOSSES OR DAMAGES.

e. For the avoidance of doubt, neither Service Provider nor any of its Affiliates or related persons shall be deemed to be an agent or contractor or representative of Ripple or any of its Affiliates for any purpose.

23. **General Terms**.

   a. <u>Term</u>. The term of this Agreement is from the Effective Date through the later of (a) ▇▇▇▇▇ from the Effective Date, or (b) the term of any active Exchange Order.

   b. <u>Termination</u>.
      i. <u>Ripple Termination Right</u>. In the event that there are three (3) or more days during which Service Failures during a Payment Period for two (2) or more

HIGHLY CONFIDENTIAL

GSR00000996

consecutive Payment Periods, Ripple shall have the option to terminate this Agreement with ten (10) days written notice, and no further Service Fees shall be due.

ii. <u>Termination for Material Breach</u>. Without limiting any other right or remedy that Ripple may have at law or otherwise, Ripple may, in its sole discretion, terminate this Agreement immediately upon notice to Service Provider if Service Provider materially breaches any of its obligations under this Agreement.

iii. In addition to the other termination rights of hereunder, the Parties, in their sole discretion, may terminate this Agreement immediately upon notice to Service Provider in the event of any of the following:
   a. Either Party files for, or has filed against it a petition for voluntary or involuntary bankruptcy or similar relief from insolvency;
   b. Either Party makes a general assignment for the benefit of its creditors;
   c. Either Party becomes subject to a material judgment;
   d. Either Party has a receiver appointed for all or a substantial part of its business or assets; or
   e. Either Party otherwise admits in writing of its in ability to meet debts as they become due.

c. <u>Governing Law</u>. This Agreement and any disputes or matters arising from or relating to or in connection with the subject matter hereof shall be governed and construed by the laws of the State of New York (without regard to conflict of laws principles).

d. <u>Venue</u>. For any disputes arising out of, relating to, or in connection with this Agreement or the subject matter hereof, the Parties irrevocably submit to the jurisdiction and venue of the courts of the State of New York and the Federal Courts of the United States located in the Southern District of New York.

e. <u>Effects of Termination; Survival</u>. The following rights and obligations shall survive the expiration or termination of this Agreement: Section 9 (Tax) through Section 23 (General).

f. <u>No Agency</u>. No agency or partnership or joint venture or employment relationship is established between the Parties. Neither Party may incur any expenses or obligations on behalf of the other Party.

g. <u>Assignment</u>. Neither Party may assign or transfer or delegate or sublicense (collectively "assign" or "assignment") this Agreement or any rights or obligations hereunder or thereunder (whether voluntarily or involuntarily, by operation of law or merger or consolidation or otherwise) without the prior written consent of the other Party, except to a successor entity or an entity purchasing or acquiring substantially all of the assets of the Party (with written notice to the other Party).

h. <u>Notices</u>. Any notices under this Agreement shall be sent by certified or registered mail, return receipt requested, to the Notices address and party set forth at the

HIGHLY CONFIDENTIAL

signature section below. Such notice shall be effective upon confirmed receipt or acknowledgment.

i. Force Majeure. Neither Party shall be liable for failure or delay in the fulfillment of any of its obligations hereunder (excluding payment of Fees) where such failure is due to war, riot, strike, labor dispute, civil disturbance, rebellion, invasion, terrorist attack, embargo, national or local emergency, natural disaster, acts of God, flood, fire, malfunction of equipment or facilities, failure by the other Party or a third party to perform a prerequisite necessary to fulfill such obligation, or any other cause beyond its reasonable control. The Party unable to fulfill its obligations due to such a force majeure event shall use diligent efforts to restore its performance thereof as soon as reasonably possible.

j. Severability; Waiver. If any provision of this Agreement is or becomes illegal, unenforceable or invalidated, by operation of law or otherwise, that provision shall be omitted to such extent and the remainder of this Agreement shall remain in full force and effect. Any waiver by either Party of any condition, term, part or provision of this Agreement must be in writing and shall not be a waiver of any other condition, term, part or provision, nor will the waiver be a future waiver of such condition, term, part or provision.

k. Entire Agreement; Counterparts. This Agreement constitutes the entire agreement of the Parties pertaining to its subject matter and supersedes all prior and other contemporaneous agreements, representations, warranties and understandings of the Parties, whether written or oral or express or implied. Modifications to this Agreement may only be taken in the form of a mutually executed amendment in the sole discretion of both Parties. This Agreement may be signed in any number of counterparts, each of which is an original and all of which taken together form one single Agreement. A signed copy of this Agreement transmitted by email or any other means of electronic transmission shall be deemed to have the same legal effect as an original executed copy of this Agreement.

l. Third Party Rights. A person or entity that is not a party to this Agreement shall not have any rights to enforce any term of this Agreement, excluding for these purposes any Ripple Indemnitee.

m. Interpretation. When the context requires, the plural will include the singular and the singular the plural; and any gender will include any other gender. Section headings are not part of this Agreement and are only for the convenience of the Parties. No provision of this Agreement will be interpreted or construed against any Party because such Party or its counsel was the drafter thereof. Whenever the words "include," "includes" or "including" or any other variation are used in this Agreement, such words will be deemed to be followed by the words "without limitation."

n. Provide Assurances On Notice. Each Party, on receipt of notice from the other party, shall sign, or cause to be signed, all further documents, do, or cause to be

HIGHLY CONFIDENTIAL
GSR00000998

done, all further acts, and provide all assurances as may reasonably be necessary or desirable to give effect to the terms of this agreement.

As of the Effective Date the Parties agree to be bound, and have caused this Agreement to be executed, by their authorized representatives.

HIGHLY CONFIDENTIAL

GSR00000999

**RIPPLE PAYMENTS INC.**

By: ███████████████  
Name: ███████████████  
Title: ███████████████  
Date: Sept 6 2019  
Address: 315 Montgomery Street, 2nd Fl.  
San Francisco, CA 94104  
Attn: General Counsel

By: GSR Markets  
Name: ███████████████  
Title: ███████████████  
Date: 9/5/2019  
Address: Suite 5508, 55th Floor, Central Plaza  
18 Harbour Road, Wanchai, Hong Kong.  
999077

HIGHLY CONFIDENTIAL
GSR00001000

## ATTACHMENT A

## Certain Definitions

"Affiliate" means, with respect to a Party, any Person that controls, is controlled by or is under common control with such Party. A Person shall be regarded as being in control of another Person if it controls, directly or indirectly, more than 50 percent of the voting rights to elect directors, or if the Person is not a corporation, the corresponding managing authority; provided that in jurisdictions where applicable law does not permit more than 50 percent control, the maximum percentage of control permitted by the applicable Person.

"Claim" means any claim, action, audit, investigation, inquiry or other proceeding brought or instituted against Ripple, its Affiliates, or any of their respective employees, shareholders, directors or representatives) by a person or entity other than Service Provider, or its Affiliates or subsidiaries.

"Confidential Information" means the terms of this Agreement and any non-public information or materials provided by either Party to the other Party in connection with the performance of this Agreement, but does not include any information or materials that: (a) was previously known to the receiving party free of any obligation to keep it confidential, (b) becomes generally available to the public through no wrongful act, (c) is rightfully received from a third party under no obligation of confidence to such third party, (d) is independently developed by the receiving party without reference to information which has been disclosed pursuant to this Agreement, or (e) is required to be disclosed in invoice to comply with all applicable laws, administrative process or governmental or court invoices; provided, however, that in a circumstance in which disclosure is compelled by applicable law, administrative process or governmental or court invoices, the party that is subject to such compelled disclosure shall limit the disclosure to only that information that must be disclosed to comply with the invoice and shall give the other party prompt prior notice of such compelled disclosure so that the other party may seek to protect such information.

"Disruption Event" means the loss of XRP that is held on a Destination Exchange caused by the act or omission of the Destination Exchange (and not caused by Customer or its Affiliate) when XRP is not in the reasonable custody or control of Customer or its Affiliate. Disruption Event does not include trading losses.

"Destination Exchange" means an exchange utilized by xRapid to trade XRP for fiat currency a beneficiary of a transaction over xRapid will receive.

"Loss" means any claim, demand, cost, loss, damage, judgment, liability, settlement, fine, penalty, interest and/or other expense (including reasonable attorneys' fees and expenses) arising out of any Claim.

HIGHLY CONFIDENTIAL
GSR00001001

## ATTACHMENT B

315 Montgomery St. 2nd Flr • San Francisco, CA 94104



### 2. XRP WALLET ADDRESS CONFIRMATION

Please complete and return this form in addition to relevant supporting documentation listed in Appendix A for the Service Provider via email to █@ripple.com ("█") and █@ripple.com. You may also contact AP via email with any questions regarding the information requested.

☐ New Request        ☐ Update

Legal Name of Service Provider[1] _____

XRP Ledger Address _____

Destination Tag (if applicable) _____

---

I certify that the XRP Ledger address listed above is directly and wholly owned by the Service Provider.

Name _____    Title _____

Email _____    Phone _____

Signature _____    Date _____

---

**APPENDIX A:**
- US individuals or entities: Form W9
- Non-US individuals: Form W-8BEN
- Non-US entities: Form W-8BENE

---

[1] As shown on Service Provider's income tax return

HIGHLY CONFIDENTIAL                                                                 GSR00001002