# PX 771

## Master XRP Commitment to Sell Agreement

This Master XRP Commitment to Sell Agreement (this "Agreement") is effective the date the last Party signs ("Effective Date") and is between **XRP II, LLC**, a New York limited liability company regulated by the New York State Department of Financial Services (the "Company") and ▇▇▇▇▇▇▇▇▇▇ a Delaware limited liability company (the "Customer"). The Company and Customer are hereby referred to as "Party" individually and together as "Parties".

NOW, THEREFORE, in consideration of the mutual promises contained in this Agreement, the Parties agree as follows:

### 1. XRP COMMITMENT

(a) Segregated Wallet. From time to time, the Parties may enter into transactions in which the Company will make available XRP, the digital asset native to the XRP Ledger ("XRP"), for purchase by Customer in accordance with this Agreement. Each such transaction is referenced herein as a "Commitment" and, unless otherwise agreed in writing, is to be governed by this Agreement. With respect to each Commitment, the Company shall transfer such XRP to a specified wallet directly and wholly owned by Customer, to be used specifically and solely in accordance with this Agreement (the "Segregated Wallet"). The security of the Segregated Wallet created and maintained by Customer will be the sole responsibility of Customer. In no event may Customer transfer any XRP into, or allow any XRP to be transferred into, the Segregated Wallet, other than XRP transferred by the Company to the Segregated Wallet in connection with a Commitment. If any XRP is transferred into the Segregated Wallet other than XRP transferred by the Company to the Segregated Wallet in connection with a Commitment, then Customer shall be required to promptly purchase all Committed XRP in the Segregated Wallet pursuant to Section 2. Customer may only transfer XRP out of the Segregated Wallet in accordance with Section 2.

(b) The Parties acknowledge and agree that the transfer of XRP by Company to Customer's Segregated Wallet pursuant to Section 1 paragraph (a) is for administrative convenience to facilitate Customer's ability to purchase such XRP at market price in accordance with Section 2. For the avoidance of doubt, the Parties acknowledge and agree that the mere transfer of XRP by Company to Customer's Segregated Wallet pursuant to this Section 1 paragraph (a) is not intended to be a sale or purchase of such XRP by Customer and that Customer holds such XRP as a bailee. The Parties acknowledge and agree that neither party shall the Company's mere transfer of XRP to Customer's Segregated Wallet as a sale or exchange for purposes of the United States Internal Revenue Code or state and local tax law purposes.

(c) Commitment Procedures. Upon agreeing to enter into a Commitment, the Company shall promptly deliver to Customer via email a written confirmation of the Commitment, substantially in the form attached hereto as Appendix A (the "Terms of XRP Commitment") that contains information including:

  (i) Customer's Segregated Wallet address;

  (ii) the total XRP units subject to the Commitment, referred to as the "Committed XRP";

1

(iii) the maturity date for such Commitment (the "Maturity Date").

Unless Customer countersigns the Terms of XRP Commitment and submits an electronic countersigned copy to the Company, the Company will not complete the Commitment. The countersigned Terms of XRP Commitment, together with this Agreement, shall constitute the terms agreed between the Company and Customer with respect to the Commitment to which the Terms of XRP Commitment relates.

The Company will complete a Commitment only in the event that Customer returns a countersigned Terms of XRP Commitment within twenty-four (24) hours from the time the Company sends such Terms of XRP Commitment to Customer, after which the terms of the Commitment as reflected in the Terms of XRP Commitment will expire.

In all events, and in its sole discretion, the Company reserves the right to refuse to complete, or to otherwise cancel, any pending Commitment prior to receipt of Customer's countersignature to the applicable Terms of XRP Commitment, even after the delivery of the Terms of XRP Commitment to Customer. The Company will have no liability to Customer if the Company exercises the right set forth in the preceding sentence.

(d) Return of Unpurchased XRP. With respect to each Commitment, on or prior to the applicable Maturity Date, Customer shall return all Committed XRP with under such Commitment, minus any Committed XRP under such Commitment that has been purchased by Customer pursuant to Section 2 ("Unpurchased XRP"). If Customer does not return such Unpurchased XRP to the Company by 12:00:01 AM PST on the Maturity Date, Customer must pay the Company an amount equal to the number of units of Unpurchased XRP multiplied by the Market Price as of 12:00:01 AM PST on the Maturity Date. Such payment must be made within 5 business days after the Maturity Date.

(e) Receipts; Cancellations and Reversals. Following the completion of a Commitment between Customer and Company under this Agreement, including the delivery of the Committed XRP to Customer as recorded on the XRP Ledger, the Company shall provide to Customer a receipt, substantially in the form attached hereto as Appendix B and adapted as appropriate. Once completed, a Commitment cannot be cancelled, reversed or changed.

2. **XRP PURCHASES**

(a) Withdrawal of XRP. Customer may purchase any Committed XRP from the Company by withdrawing such Committed XRP from the Segregated Wallet, subject to the following terms. Prior to any withdrawal, Customer shall send an email to xrpii@ripple.com (a "Purchase Notice") which, at a minimum, shall include the following information: (i) the number of units of XRP Customer seeks to withdraw from the wallet (the "Purchased XRP"); (ii) the date and time Customer seeks to withdraw from the wallet; and (iii) the preferred rate ("Preferred Rate"), as measured by the indexed price of XRP traded against U.S. Dollar as published on https://tradeblock.com/markets/index/xrx (or, if unavailable, such other publication as the Parties reasonably agree). Upon delivery of a Purchase Notice, Customer shall withdraw the Purchased XRP from the Segregated Wallet on the date and at or about the time specified in the Purchase Notice. Upon such withdrawal, Customer shall be deemed to

2

have purchased the Purchased XRP from the Company, and Customer's obligation to repay such XRP to the Company on the applicable Maturity Date shall terminate.

(b) Purchase Invoices. Promptly following the receipt by the Company of a Purchase Notice, the Company will invoice Customer for an amount of US Dollars equal to the number of units of Purchased XRP multiplied by the Rate set forth on such Purchase Notice (the "Purchase Price"); provided, however, if the Company reasonably determines that the Rate does not reflect the indexed price of XRP traded against U.S. Dollar as published on https://tradeblock.com/markets/index/xrx (or, if unavailable, such other publication as the Parties reasonably agree) at or as close as reasonably possible to the timestamp of the withdrawal from the Segregated Wallet ("Standard Rate"), the Company may at its sole discretion substitute the Standard Rate for the Rate in the calculation of the Purchase Price. The Company will indicate on the invoice whether the Rate or Standard Rate was used in the calculation. Within five (5) days of receiving the invoice, Customer shall pay the Company the Purchase Price in USD noted on the invoice. Following receipt of payment, the Company shall send Customer a receipt confirming such payment. Notwithstanding the remainder of this paragraph, to the extent Customer delivers multiple Purchase Notices to the Company, the Company, may in its discretion, combine purchases reflected in the Purchase Notices and issue a single invoice for such purchases.

## 3. TERMS AND CONDITIONS OF THE PURCHASE

(a) Taxes. The Purchase Price is exclusive of any applicable taxes. To the extent any taxes are applicable to Customer on the sale of the Committed XRP, Customer shall be obligated to pay all applicable taxes. The Company is not responsible for any taxes that Customer is legally obligated to pay in any jurisdiction in which such taxes are incurred or arise in connection Customer's business activities (under this Agreement or otherwise).

(b) Delivery. Subject to any and all rights the Company may have in Section 1(b), upon receipt by the Company of an electronic countersigned copy of the Terms of XRP Commitment from Customer, the Company shall use commercially reasonable efforts to deliver the Committed XRP to the Segregated Wallet within two (2) business day, or, if later, the Commitment delivery date specified on the Terms of XRP Commitment.

(c) Risk of Loss. Immediately upon the Company's delivery of the Committed XRP to Customer, all risk of loss related to such XRP passes to Customer. Customer acknowledges and agrees that the Company has no liability to Customer or any third party for any loss, theft or misuse of any XRP that the Company has delivered to Customer as provided in this Agreement.

(d) Customer Acknowledgement. Customer acknowledges and agrees that (i) the Committed XRP do not represent a right to make any demand on the Company, (ii) the Company has no obligation to redeem or exchange the Committed XRP for monetary value, goods, services or any other item and (iii) the Company is not responsible for any use by Customer or any third party of the Committed XRP.

(e) Applicable Laws. Each Party shall comply with all laws, regulations, and administrative or judicial orders that are applicable to the operation of its business, this Agreement, and its performance hereunder, including, but not limited to, any applicable laws, rules, and regulations related to sanctions and asset controls, the prevention of market manipulation, fraud, anti-bribery, corruption,

CONFIDENTIAL

RPLI_SEC 1056387

and anti-money laundering. Any breach of this section is a material breach of this Agreement and is grounds for immediate termination.

(f) Responsibility to Customer's Customers. Customer is responsible for all customer service and other issues or claims that relate to Customer's distribution or sale of the Committed XRP. Customer shall make no representations or warranties to any other party concerning, or on behalf of, the Company.

(g) Publicity. Neither Party may issue any press release or make any other public statement with respect to this Agreement and its terms and conditions unless the content, timing and method of distribution of the press release or public statement has been approved in writing by the other Party.

(h) Confidentiality. Each Party shall maintain all Confidential Information it receives in strict confidence and not disclose any Confidential Information to any third party, unless agreed upon in writing. A Party may disclose Confidential Information required to be disclosed by law, regulation, or a valid court order if that Party (i) gives the other Party timely notice, unless legally prohibited, so that other Party may seek a protective order, confidential treatment, or other appropriate relief and (ii) discloses only the portion of Confidential Information that is necessary to comply with such law, regulation, or order. The obligations in this sub-paragraph are in addition to, and do not supersede, any confidentiality and nondisclosure obligations provided in any other written agreement between the Parties. "Confidential Information" means the terms of this Agreement and any non-public information or materials provided by either Party to the other Party in connection with the performance of this Agreement, but does not include any information or materials that: (A) was previously known to the receiving party free of any obligation to keep it confidential, (B) becomes generally available to the public through no wrongful act, (C) is rightfully received from a third party under no obligation of confidence to such third party, (D) is independently developed by the receiving party without reference to information which has been disclosed pursuant to this Agreement, or (E) is required to be disclosed in invoice to comply with all applicable laws, administrative process, stock exchange rule or governmental or court invoices; provided, however, that in a circumstance in which disclosure is compelled by applicable law, administrative process, stock exchange rule or governmental or court invoices, the party that is subject to such compelled disclosure shall limit the disclosure to only that information that must be disclosed to comply with the invoice and shall give the other party prompt prior notice of such compelled disclosure so that the other party may seek to protect such information.

(i) Indemnification. Customer agrees to defend, indemnify and hold the Company, its affiliates, and their respective employees, shareholders, directors, and representatives (together with the Company and its affiliates, the "Company Indemnitees") harmless and settle against any Claim or Loss, including attorneys' fees and any fines, fees or penalties imposed by any regulatory authority, arising out of or related to: (i) any violation of law by Customer or Customer's employees, contractors, or agents in connection with this Agreement, (ii) any breach of this Agreement by Customer or Customer's employees, contractors, or agents, and (iii) any use, distribution or resale of the Committed XRP by Customer or by Customer's employees, contractors or agents. Notwithstanding anything to the contrary in this Agreement, Customer is not obligated to indemnify, hold harmless, or defend the Company against any claims, demands, losses, expenses, and liabilities arising out of or relating to the Company's gross negligence, fraud, or willful misconduct in the performance of this Agreement. "Claim" means any claim, action, audit, investigation, inquiry or other proceeding brought or instituted against the Company, its affiliates, or any of their respective employees, shareholders, directors or representatives) by a person or entity other than Customer, or its affiliates or subsidiaries. "Loss"

4

CONFIDENTIAL
RPLI_SEC 1056388

means any claim, cost, loss, damage, judgment, penalty, interest and/or expense (including reasonable attorneys' fees) arising out of any Claim.

(j)     Indemnification Procedure. In connection with any Claim or Loss, the Company shall give Customer prompt notice of the Claim or Loss (however, that any delay in notification will not relieve Customer of its obligation to indemnify, except and solely to the extent that the delay actually prejudices Customer). In addition, the Company will cooperate with Customer in connection with the defense and settlement of the Claim or Loss, with Customer having the right to choose counsel. Customer shall not enter into any settlement or compromise of any Claim or Loss without the Company's prior written consent (which consent shall not be unreasonably withheld, conditioned or delayed) if such settlement or compromise arises from or is part of any criminal action, suit, or proceeding, or contains a stipulation to or admission or acknowledgement of any liability or wrongdoing (whether in contract, tort or otherwise) on the part of the Company, or otherwise requires the Company to refrain from or take material action (such as payment of fees). At its cost, the Company has the right to participate in the defense or settlement of the Claim or Loss with counsel of its own choosing.

## 4.  DISCLAIMERS, LIMITATIONS AND RESERVATIONS

(a)     EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT, THE COMPANY MAKES NO REPRESENTATIONS OR WARRANTIES IN RELATION TO THE PURCHASED XRP, THIS AGREEMENT OR ITS PERFORMANCE HEREUNDER, INCLUDING (WITHOUT LIMITATION) IMPLIED WARRANTIES OF MERCHANTABILITY, NON-INFRINGEMENT, FITNESS FOR A PARTICULAR PURPOSE, OR IMPLIED WARRANTIES ARISING OUT OF COURSE OF DEALING, COURSE OF PERFORMANCE OR USAGE OF TRADE.

(b)     IN NO EVENT SHALL THE COMPANY, ITS AFFILIATES, OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, AGENTS, EMPLOYEES OR REPRESENTATIVES, BE LIABLE TO CUSTOMER FOR ANY SPECIAL, INCIDENTAL, INDIRECT, INTANGIBLE, OR CONSEQUENTIAL DAMAGES OR DAMAGES FOR LOSS OF PROFITS, WHETHER BASED ON CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY, OR OTHERWISE, ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO AUTHORIZED OR UNAUTHORIZED TRANSACTIONS SUBJECT TO THIS AGREEMENT. THE COMPANY, ITS AFFILIATES, OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, AGENTS, EMPLOYEES OR REPRESENTATIVES' ENTIRE LIABILITY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT WILL IN NO EVENT EXCEED THE AGGREGATE PURCHASE PRICE PAID BY CUSTOMER UNDER THIS AGREEMENT.

THIS MEANS, BY WAY OF EXAMPLE ONLY (AND WITHOUT LIMITING THE SCOPE OF THE PRECEDING SENTENCE), THAT IF CUSTOMER CLAIMS THAT THE COMPANY FAILED TO PROPERLY PROCESS A PURCHASE OF XRP PURSUANT TO THIS AGREEMENT AND THE TERMS OF XRP COMMITMENT, CUSTOMER'S DAMAGES ARE LIMITED TO NO MORE THAN THE PURCHASE PRICE PAID BY CUSTOMER, AND THAT CUSTOMER MAY NOT RECOVER FOR LOST PROFITS, LOST BUSINESS OPPORTUNITIES, OR OTHER TYPES OF DAMAGES IN EXCESS OF THAT TOTAL TRANSACTION VALUE.

CONFIDENTIAL                                                                                      RPLI_SEC 1056389

## 5. TERM AND TERMINATION

(a) Term. The term of this Agreement commences on the Effective Date and continues thereafter for one (1) year (the "Initial Term"). After the Initial Term, this Agreement shall renew automatically in successive one year periods ("Renewal Terms").

(b) Termination by Notice. The Parties may terminate this Agreement by ten (10) days written notice; provided, however, that Customer may not terminate this agreement unless if (i) the Maturity Dates of any and all Commitments have passed, and (ii) Customer has satisfied all of its obligations under Section 1, including but not limited to its obligation to return Unpurchased XRP pursuant to Section 1(d).

(c) Termination for Breach. Without limiting any other right or remedy that the Company may have at law or otherwise, the Company may, in its sole discretion, terminate this Agreement immediately upon notice to Customer if Customer breaches any of its obligations under this Agreement, in particular its obligation to comply with applicable laws and regulations as set forth in Section 3(e).

(d) Effect of Termination. The expiration or termination of this Agreement, for any reason, shall not release either Party from any obligation or liability to the other Party, including any payment obligation, that: (i) has already accrued hereunder; (ii) comes into effect due to the expiration or termination of this Agreement; or (iii) otherwise survives the expiration or termination of this Agreement. In particular, on or before the expiration or termination of this Agreement, Customer shall return any XRP remaining in the Segregated Wallet to Company.

## 6. REQUIRED DISCLOSURES

(a) Customer acknowledges and agrees that Customer cannot cancel, reverse, or change any XRP transaction that has been completed, as recorded on the XRP Ledger, including as described in Section 1(e).

(b) Customer acknowledges and agrees that Customer is solely responsible for maintaining adequate security and control of any and all IDs, passwords, hints, personal identification numbers (PINs), secret keys or any other codes that Customer uses to access the Committed XRP ("Customer Credentials"). Any loss or compromise of Customer Credentials may result in unauthorized access to the Committed XRP by third-parties and the loss or theft of such XRP. The Company assumes no responsibility for any loss that Customer may sustain due to compromise of Customer Credentials.

(c) Customer acknowledges the following material risks associated with virtual currency, including XRP:

(i) Virtual currency is not legal tender, is not backed by the government, and accounts and value balances are not subject to Federal Deposit Insurance Corporation or Securities Investor Protection Corporation protections.

(ii) Legislative and regulatory changes or actions at the state, federal, or international level may adversely affect the use, transfer, exchange, and value of virtual currency.

6

(iii) Transactions in virtual currency may be irreversible and, accordingly, losses due to fraudulent or accidental transactions may not be recoverable.

(iv) Some virtual currency transactions shall be deemed to be made when recorded on a public ledger, which is not necessarily the date or time that the transaction is initiated.

(v) The value of virtual currency may be derived from the continued willingness of market participants to exchange fiat currency for virtual currency, which may result in the potential for permanent and total loss of value of a particular virtual currency should the market for that virtual currency disappear.

(vi) There is no assurance that a person who accepts a virtual currency as payment today will continue to do so in the future.

(vii) The volatility and unpredictability of the price of virtual currency relative to fiat currency may result in significant loss over a short period of time.

(viii) The nature of virtual currency may lead to an increased risk of fraud or cyber attack.

(ix) The nature of virtual currency means that any technological difficulties experienced by the Company may prevent the access or use of a customer's virtual currency.

(x) Any bond or trust account maintained by the Company for the benefit of its customers may not be sufficient to cover all losses incurred by customers.

(d) If Customer has any questions, needs assistance, or wishes to contact the Company with a complaint, Customer may contact the Company's Customer Support at complaints@ripple.com. If Customer is dissatisfied with the manner in which a complaint has been handled, or for any other reason, Customer can also refer the matter to the New York State Department of Financial Services ("NYDFS") located at: One State Street, New York, NY 10004-1511, USA; Tel: + (800) 342-3736 (Monday through Friday, 8:30 AM to 4:30 PM EST). To file an electronic compliant with NYDFS, visit https://myportal.dfs.ny.gov/web/guest-applications/consumer-complaint.

(e) Customer acknowledges and agrees that the Company may share information concerning Customer in accordance with the Company's Privacy Policy Addendum (attached as Appendix C) including, without limitation, sharing such information (i) with appropriate state and federal regulatory authorities in connection with the transactions contemplated by this Agreement, (ii) in response to a court or government order, and (iii) with other affiliates of the Company in accordance with applicable laws. Lastly, Customer agrees that the Company may obtain and use such information as may be necessary for legitimate business needs in connection with the operation of the Company and its affiliates.

7. **MISCELLANEOUS PROVISIONS**

(a) Choice of Law; Jurisdiction and Venue. This Agreement shall be governed by, and construed in accordance with the laws of the State of New York, U.S.A., as such laws are applied to contracts entered into and performed in such State and without reference to any conflict of laws rules

7

CONFIDENTIAL
RPLI_SEC 1056391

or provisions. The Parties irrevocably consent to the non-exclusive jurisdiction and venue of the federal and state courts located in New York, New York, U.S.A. with respect to any claim, action or proceeding arising out of or in connection with this Agreement. The U.N. Convention on Contracts for the International Sale of Goods shall not apply to this Agreement.

(b) Notice. Any notices under this Agreement shall be sent by certified or registered mail, return receipt requested, to the Notices address and party set forth below; provided, however, each Party agrees and consents to receive electronically all communications, agreements, documents, notices and disclosures that the other Party provides in connection with this Agreement, including but not limited to the Terms of XRP Commitment, Purchase Notices, Commitment receipts, and any other disclosures or statements the Company may be required under applicable law or regulation to make to Customer. Notice shall be effective upon receipt at the email addresses below:

(i) If to the Company: xrpii@ripple.com with a copy to xrpmarkets@ripple.com

(ii) If to Customer: ███████████████ with a copy to ███████████████

(c) Entire Agreement; Amendments; Counterparts. This Agreement constitutes the entire contract between the Parties hereto with regard to the subject matter hereof. It supersedes any other agreements, representations or understandings (whether oral or written and whether express or implied) that relate to the subject matter hereof. Except for a writing signed by both parties, this Agreement may not be modified or amended. If any provision of this Agreement is held to be invalid, such invalidity will not affect the remaining provisions. This Agreement may be signed in any number of counterparts, each of which is an original and all of which taken together form one single Agreement. A signed copy of this Agreement transmitted by email or any other means of electronic transmission shall be deemed to have the same legal effect as an original executed copy of this Agreement.

(d) Successors and Assigns. Customer may not assign any rights granted under this Agreement without the prior written consent of the Company. The Company reserves the right to assign its rights without restriction to any affiliates or subsidiaries. Any attempted transfer or assignment in violation hereof shall be null and void. Subject to the foregoing, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the Company and its successors and assigns and be binding upon Customer and Customer's successors and permitted assigns, whether or not any such person has become a party to this Agreement or has agreed in writing to join herein and to be bound by the terms, conditions and restrictions hereof. In addition, this Agreement is not intended to confer any right or benefit on any third party.

(e) Relationship of the Parties. Nothing in this Agreement shall be construed or is intended to be construed as creating an employer-employee or agency relationship, a partnership, or a joint venture between the Parties.

(f) Survival. Section 1, Section 2, Section 3(a), Section 3(h), Section 3(i), Section 3(j), Section 4, and Section 7 shall survive the termination or expiration of this Agreement, as well as any other provision that, in order to give proper effect to their intent, should survive such expiration or termination. Termination or expiration of this Agreement shall not affect or limit any independent rights of a Party in or to its Confidential Information under applicable laws.

8

CONFIDENTIAL

RPLI_SEC 1056392

(g) Severability. If any provision of this Agreement is determined to be invalid or unenforceable under any rule, law or regulation or any governmental agency, local, state, or federal, such provision will be changed and interpreted to accomplish the objectives of the provision to the greatest extent possible under any applicable law and the validity or enforceability of any other provision of this Agreement shall not be affected.

(h) Non-Waiver. The failure of either Party to enforce any provision of this Agreement or to exercise any rights or remedies under this Agreement will not constitute a waiver of the Party's rights to subsequently enforce the provision or exercise those rights or remedies. The remedies specified in this Agreement are in addition to any other remedies that may be available at law or equity.

(i) Force Majeure. The Company shall not be liable for delays, failure in performance or interruption of service which result directly or indirectly from any cause or condition beyond its reasonable control, including but not limited to, any delay or failure due to any act of God, act of civil or military authorities, act of terrorists, civil disturbance, war, strike or other labor dispute, fire, interruption in telecommunications or Internet services or network provider services, failure of equipment and/or software, other catastrophe or any other occurrence which is beyond its reasonable control and shall not affect the validity and enforceability of any remaining provisions.

[Remainder of page intentionally left blank; signature page to follow.]

As of the Effective Date, the Parties agree to be bound and have caused this Agreement to be executed.

**XRP II, LLC**

By: [redacted]

Name: [redacted]

Title: Manager

Date: 9/5/2018

Date: 9/5/2018

9

CONFIDENTIAL

RPLI_SEC 1056393

Address:                                              Address: 80 State Street, Albany, NY 12207

CONFIDENTIAL                                                              RPLI_SEC 1056394

Appendix A

XRP II, LLC
80 State Street
Albany, NY 12207

Today's Date: [Current date]

Terms of XRP Commitment

NOT A RECEIPT OR OFFER

Customer would like to acquire units of XRP, the decentralized digital asset that is native to the XRP Ledger, on the following terms:

Customer Name: [Full name of customer]

Customer XRP Address: [XRP wallet address]

Commitment Delivery Date: [Expected delivery date]

Total XRP Units: [Number of XRPs]

Maturity Date: [Insert date 3 months after Commitment delivery date]

Additional terms, if applicable:

This Terms of XRP Commitment is being delivered pursuant to, and is governed by, the terms and conditions of the Master XRP Commitment to Purchase Agreement between the parties, dated as of [_____].

XRP II, LLC

By: _____
Name:
Title:

Agreed and Acknowledged:
[CUSTOMER NAME]

By: _____
Name:
Title:

Appendix B

XRP II, LLC

11

80 State Street
Albany, NY 12207

Today's Date: [Current date]

RECEIPT

| | |
|---|---|
| Customer Name: | [Full name of customer] |
| Customer XRP Address1: | [XRP wallet address] |
| Transferor XRP Address2: | [XRP II's wallet address] |
| Transaction ID (hash): | [Transaction hash] |
| Amount of Committed XRP: | [Number of XRPs] |
| Maturity Date: | [Date] |
| Date of Commitment: | [Date] |

Additional terms, if applicable:

The Commitment of the Total XRP Units specified above is governed by the terms and conditions of the Master XRP Commitment to Sell Agreement (the "Agreement"), including but not limited to, the provisions relating to the liability of XRP II, under which XRP II will not be liable for any incidental, indirect, or consequential damages arising out of the Agreement, and its entire liability arising out of or in connection with the Agreement will not exceed any purchase price it receives under the Agreement.

If you have any questions, need assistance, or wish to contact us with a complaint, please contact XRP II Customer Support at complaints@ripple.com. If you are dissatisfied with the manner in which a complaint has been handled, you can also refer the matter to the New York State Department of Financial Services (NYDFS) located at: One State Street, New York, NY 10004-1511, USA. Tel: + (800) 342-3736 (Monday through Friday, 8:30 AM to 4:30 PM EST). To file an electronic compliant with NYDFS, you can visit https://myportal.dfs.ny.gov/web/guest-applications/consumer-complaint.

---

[1] The unique public cryptographic key specified by Customer as the address to which any purchased XRP was delivered. Customer has confirmed that this XRP address is directly and wholly owned by Customer.
[2] The unique public cryptographic key of XRP II from which the purchased XRP was delivered.

12

CONFIDENTIAL

RPLI_SEC 1056396

Appendix C

XRP II, LLC

PRIVACY POLICY ADDENDUM

13

CONFIDENTIAL　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　RPLI_SEC 1056397

# XRP II LLC
# PRIVACY POLICY ADDENDUM

Last updated: May 2nd, 2017

We are committed to protecting your personal information and helping you understand how your personal information is being used.

This Privacy Policy Addendum describes how XRP II LLC ("XRP II") collects, uses, stores, shares, and protects your information whenever you use XRP II services. It supplements the Privacy Policy, available at https://ripple.com/privacy-policy/ (the "Privacy Policy"), which provides details on how your personal information may be collected, stored, protected, and used. You should carefully read the Privacy Policy and this Privacy Policy Addendum.

By using XRP II services, you consent to the practices described in the Privacy Policy and this Privacy Policy Addendum.

We may change this Privacy Policy Addendum from time to time. When we do make updates, we will send you an email notification.

**INFORMATION WE COLLECT ABOUT YOU**

When you use XRP II services or transact with XRP II, we collect some important details about you such as your name, email, and public key. We also require you to provide additional information which we use to verify your identity and/or to manage risk, including your physical current address, date of birth, government-issued taxpayer identification number, a copy of an unexpired form of your government-issued identification, and/or other personal information, as needed. Sometimes we may need to request supplementary information to verify your identity or to meet legal and regulatory obligations. When that is necessary, we will ask you to provide such information.

We will obtain from you certain information such as your expected transaction activity as well as "know-your-customer" (KYC) information as part of the customer onboarding process.

1

CONFIDENTIAL

RPLI_SEC 1056398

Additionally, we collect certain payment activity information from you when you transact with XRP II, such as transaction amount, date and time, and information related to the recipient for each transaction.

Finally, we may collect and retain any additional information that you disclose to our customer support team.

If you terminate your relationship with XRP II, please note that we will retain your personal information for a certain period of time in order to comply with certain legal obligations or, if applicable, to resolve disputes.

## HOW WE PROTECT AND STORE PERSONAL INFORMATION

Throughout this Privacy Policy Addendum, we use the term "personal information" to describe information that can be associated with a specific person and can be used to identify that person. This Privacy Policy Addendum does not apply to personal information that has been anonymized such that it does not identify a specific user.

We take reasonable precautions, as described in this Privacy Policy Addendum, to protect personal information from loss, misuse, unauthorized access, disclosure, and alteration. We protect personal information by maintaining physical, electronic, and procedural safeguards that are designed to comply with applicable laws and regulations. The safeguards we may use include firewalls and data encryption, physical access controls to our buildings and files, and information access authorization controls. In some instances, in order to better secure personal information and use it in connection with the purposes described in the Privacy Policy and this Privacy Policy Addendum, certain personal data may be stored with a third-party service provider.

## HOW WE USE THE PERSONAL INFORMATION WE COLLECT

Our primary purpose in collecting personal information is to provide you with a secure and efficient experience. In addition to the uses of information specified in the Privacy Policy, we and our affiliates may <u>also</u> use personal information for additional purposes, including to:
- Process transactions and send notices about your transactions;
- Resolve disputes, troubleshoot problems, and deliver service update notices;

2

CONFIDENTIAL

RPLI_SEC 1056399

- Prevent and investigate potentially prohibited or illegal activities, and/or violations of our terms and conditions;
- Customize, measure, and improve XRP II services;
- Deliver targeted marketing and promotional offers (unless you opt out of receiving such communications by emailing us);
- Verify your identity by comparing your personal information against third-party databases; and
- Fulfill any other stated purpose for which the information was collected.

We do not sell or rent your personal information to third parties.

From time to time we may request your permission to allow us to share your personal information with third parties. If you grant us such permission, you may subsequently communicate to us any decision to opt out of having your personal information shared with third parties, or from allowing us to use your personal information for any purpose that is incompatible with the purposes for which we originally collected it or subsequently obtained your authorization.

**HOW WE SHARE PERSONAL INFORMATION WITH OTHER PARTIES**

In addition to sharing personal information as provided in the Privacy Policy, we and our affiliates may also share personal information with:

- Third party identity verification and screening services in order to prevent fraud and other illegal activity. This allows XRP II to confirm your identity by comparing the information you provide us to public records and other third party databases. These service providers may create derivative data based on your personal information that can be used solely in connection with provision of identity verification and fraud prevention services;
- Law enforcement, and officials, or other third parties when:
  - We are compelled to do so by a subpoena, court order, or similar legal procedure; or
  - We believe in good faith that the disclosure of personal information is necessary to prevent physical harm or financial loss, to report suspected illegal activity or to investigate violations of our terms; and
- Other third parties with your consent or direction to do so.

3

CONFIDENTIAL

RPLI_SEC 1056400

If you establish or use any XRP wallet or gateway services from a third party provider, any information that you share with that third party may be subject to their privacy policies.

## HOW YOU CAN CONTACT US ABOUT PRIVACY QUESTIONS

If you have questions regarding the Privacy Policy or this Privacy Policy Addendum, or with to contact us with a complaint, please contact XRP II Customer Support at complaints@ripple.com. If you are dissatisfied with the manner in which a complaint has been handled, you can also refer the matter to the New York State Department of Financial Services (NYDFS) located at: One State Street, New York, NY 10004-1511, USA. Tel: + (800) 342-3736 (Monday through Friday, 8:30 AM to 4:30 PM EST).
To file an electronic compliant with NYDFS, you can visit https://myportal.dfs.ny.gov/web/guest-applications/consumer-complaint.

4

CONFIDENTIAL

RPLI_SEC 1056401