# PX 624

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE SOUTHERN DISTRICT OF NEW YORK

 3   SECURITIES AND EXCHANGE        )

 4   COMMISSION,                    )

 5        Plaintiff                 )

 6                                  )

 7   VS.                            )CIVIL ACTION

 8                                  )NO. 20-CV-10832(AT)(SN)

 9   RIPPLE LABS, INC. BRADLEY      )

10   GARLINGHOUSE and CHRISTIAN     )

11   A. LARSEN,                     )

12             Defendants           )

13        -----------------------------------------

14             VIDEOTAPED ORAL DEPOSITION OF

15                  LAWRENCE ANGELILLI

16                    AUGUST 3, 2021

17        ***CONFIDENTIAL PER PROTECTIVE ORDER***

18        -----------------------------------------

19

20

21

22

23

24

25   JOB #197723
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 2

1          VIDEOTAPED ORAL DEPOSITION OF LAWRENCE

2     ANGELILLI, produced as a witness at the instance of the

3     DEFENDANTS, and duly sworn, was taken in the above-styled

4     and numbered cause on the 3rd day of August, 2021, from

5     9:07 a.m. to 3:33 p.m., before Kathryn R. Baker, CSR, RPR,

6     in and for the State of Texas, reported by machine

7     shorthand, at the offices of DLA Piper, LLP, 1900 N. Pearl

8     Street, Suite 2200, in the City of Dallas, State of Texas,

9     pursuant to the Federal Rules of Civil Procedure.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 3

```
 1                    A P P E A R A N C E S

 2   FOR THE PLAINTIFF:
     Mr. Robert Moye
 3   SECURITIES AND EXCHANGE COMISSION
     175 W. Jackson Boulevard
 4   Chicago, Illinois 60604

 5
     -and-
 6
     Ms. Daphna Wasman
 7   SECURITIES AND EXCHANGE COMISSION
     New York Regional Office
 8   200 Vesey Street
     New York, New York 10281
 9

10
     FOR THE DEFENDANT, RIPPLE LABS, INC.:
11   Mr. Andrew Ceresney
     Mr. Kyle Chermak
12   Ms. Anna Gressel
     DEBEVOISE & PLIMPTON
13   919 Third Avenue
     New York, New York 10022
14

15   -and-

16   Mr. Christopher Ford
     DEBEVOISE & PLIMPTON
17   650 California Street
     San Francisco, California 94108
18
     -and-
19
     Ms. Bethan Jones
20   KELLOGG, HANSEN, TODD, FIGER & FREDERICK
     1615 M. Street N.W.
21   Washington, DC 20036

22
     -and-
23
     Ms. ███████████████████████
24   RIPPLE LABS, INC.
     315 Montgomery Street
25   San Francisco, California 94101
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 4

```
 1    FOR THE DEFENDANT, CHRISTIAN LARSEN:
      Ms. Ms. Kristina Bunting
 2    Mr. Michael Gertzman
      PAUL WEISS
 3    1285 Avenue of the Americas
      New York, New York 10019
 4

 5    FOR THE DEFENDANT, BRADLEY GARLINGHOUSE:
      Mr. Samuel Levander
 6    Ms. Jackie Brune
      CLEARY, GOTTLIEB, STEEN & HAMILTON
 7    One Liberty Plaza
      New York, New York 10006
 8
      -and-
 9
      Mr. Nowell Bamberger
10    CLEARY, GOTTLIEB, STEEN & HAMILTON
      2112 Pennsylvania Avenue, NW
11    Washington, DC 20037

12
      FOR THE WITNESS:
13    Mr. Jason Lewis
      Ms. Marina Stefanova
14    DLA Piper
      1900 N. Pearl Street
15    Dallas, Texas 75201

16
      -and-
17
      Mr. Cory Feinberg
18    Mr. Robert Villasenor
      MONEY GRAM
19    2828 N. Harwood
      Dallas, Texas
20

21
      ALSO PRESENT:
22    Mr. Gery Payne, Videographer

23

24

25
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 5

```
 1                          INDEX

 2   Appearances. . . . . . . . .              3

 3   LAWRENCE ANGELILLI

 4        Examination by Mr. Ceresney . . .    8

 5        Cross-Examination by Mr. Moye . . .  189

 6        Further Examination by Mr. Ceresney . . .  212

 7   Signature and Changes. . . . .            221

 8   Reporter's Certification . . .            223

 9

10                          EXHIBITS

11   NO./DESCRIPTION                          PAGE

12   Exhibit 1.....................................  21
          Exhibit A, Declaration
13   Exhibit 2.....................................  64
          April 3, 2018, E-mail from Steve Angelich
14        with Attachment
          RPLI_SEC 0653097-653110
15        ***CONFIDENTIAL***
     Exhibit 3.....................................  84
16        E-mail Chain with Attachment
          MONEYGRAM_SEC_0011478-11486
17        ***FOIA CONFIDENTIAL TREATMENT REQUESTED***
     Exhibit 4.....................................  92
18        MoneyGram 2019 Second Quarter Results,
          August 2, 2019
19   Exhibit 5.....................................  98
          Thompson Reuters Edited Transcript, Q2
20        2019 MoneyGram International, Inc., Earnings
          Call
21   Exhibit 6.....................................  111
          Thompson Reuters Edited Transcript, Q3
22        2019 MoneyGram International, Inc., Earnings
          Call
23   Exhibit 7.....................................  122
          Linked Video of CNN Interview with Alex
24        Holmes, December 17, 2019

25
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 6

```
 1                            INDEX

 2                         (CONTINUED)

 3                          EXHIBITS

 4  NO./DESCRIPTION                                    PAGE

 5  Exhibit 8......................................     125
        Thompson Reuters Edited Transcript, MGI-Q4
 6      2019 MoneyGram International, Inc., Earnings
        Call
 7      RPLI_SEC 0714743-0714761
        ***CONFIDENTIAL***
 8  Exhibit 9......................................     130
        Linked Video of CNN Interview with Alex
 9      Holmes, December 16, 2020
    Exhibit 10.....................................     159
10      May 29, 2020, Letter from MoneyGram
        MONEYGRAM_SEC 0016307-16309
11      ***FOIA CONFIDENTIAL TREATMENT REQUESTED***
    Exhibit 11.....................................     162
12      November 26, 2019, E-mail from John Stoneham
        with Attachment
13      ***FOIA CONFIDENTIAL TREATMENT REQUESTED***
    Exhibit 12.....................................     183
14      Article from CFO Journal, MoneyGram's
        Decision to Halt Ripple Partnership
15      Leaves CFO with Earnings Hole

16

17                     CERTIFIED QUESTIONS

18                          (NONE)

19

20

21

22

23

24

25
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 7

1                        LAWRENCE ANGELILLI

2                    P R O C E E D I N G S

3                    THE VIDEOGRAPHER:   This is the start of

4    media labeled Number 1 in the video-recorded deposition of

5    Lawrence Angelilli, in the matter of Securities and

6    Exchange Commission vs. Ripple Labs, Inc., et al., U.S.

7    District Court For Southern District of New York, Cause

8    Number 20-CV-10832.

9                    This deposition is being held at DLL -- DLA

10   Piper, LLP, in Dallas, Texas, on August 3rd, 2021, at

11   approximately 9:07 a.m.

12                   My name is Gery Payne.   I'm the legal video

13   specialist representing TSG Reporting, Inc., headquartered

14   at 747 Third Avenue, New York, New York.   The court

15   reporter is Kat Baker, in association with TSG Reporting.

16                   Will counsel please identify themselves for

17   the record.

18                   MR. CERESNEY:   Yes.   Andrew Ceresney and

19   Chris Ford, Debevoise & Plimpton, representing Ripple

20   Labs.

21                   MR. LEWIS:   Jason Lewis and Marina

22   Stefanova, DLA Piper, on behalf of the witness, along with

23   Robert Villasenor and Cory Feinberg of MoneyGram, on

24   behalf of the witness.

25                   MR. MOYE:   Robert Moye, here for the

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 8

1                     LAWRENCE ANGELILLI

2     Plaintiffs, the SEC.

3                     LAWRENCE ANGELILLI,

4     having been first duly sworn, testified as follows:

5                         EXAMINATION

6     BY MR. CERESNEY:

7          Q.   Mr. Angelilli, good to meet you.  My name is

8     Andrew Ceresney, I represent Ripple Labs in this

9     litigation.  Thank you for taking the time today to -- to

10    be with us.

11               Can you please just first state and spell

12    your full name.

13         A.   Lawrence, L-A-W-R-E-N-C-E, Angelilli,

14    A-N-G-E-L-I-L-L-I.

15         Q.   Great.

16               Can you give us your educational

17    experience?

18         A.   I have a master's in business administration,

19    and a bachelor's in economics.

20         Q.   What year did you graduate from business school?

21         A.   MBA in '81; bachelor's in '77.

22         Q.   And are you -- do you have any professional

23    certifications?

24         A.   No.

25         Q.   Are you a CPA?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 9

```
 1                     LAWRENCE ANGELILLI

 2      A.   No.

 3      Q.   When did you first start working at MoneyGram?

 4      A.   10 years ago.  August of 2011.

 5      Q.   Can you give us just a summary of your work

 6  history before you went to work at MoneyGram?

 7      A.   Prior to MoneyGram, I was the director of

 8  underwriting at a private equity fund called ███████

 9  ██████ based in Dallas, with their entity called ██████

10  █████.

11           Prior to that I was the senior VP of

12  finance at ████████████████ which was a public

13  homebuilder and mortgage company.

14           Prior to that I was with a subsidiary of

15  ████████████ called ████████████ I was the senior

16  vice president/treasurer of ████████████

17      Q.   Okay.  And you joined MoneyGram, you said, about

18  10 years ago?

19      A.   Yes.

20      Q.   What was your initial position?

21      A.   Treasurer.  Senior VP/treasurer.

22      Q.   And tell us about your work experience at -- at

23  MoneyGram?

24      A.   So I started when the company moved their

25  headquarters from Minneapolis to Dallas.  They were
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 10

1                           LAWRENCE ANGELILLI

2     restacking their management team and establishing the

3     headquarters where it is today, in downtown Dallas.

4                  I was the first of that sort of second

5     layer they were putting in to replace their finance staff,

6     and ultimately moved the treasury and finance functions

7     from Minnesota to Dallas within the following 12 months.

8                  Since that time my job was to, I would say,

9     improve and streamline the cash management settlement

10    operations of the company, to establish a foreign exchange

11    trading operation globally, and to establish, essentially,

12    capital markets capabilities to manage the capital

13    structure and the assets of the company.

14         Q.    Okay.  And who did you report to as treasurer?

15         A.    The CFO at the time.

16         Q.    And who was that?

17         A.    His name was Jim Shields, who was the CFO when I

18    was hired.

19         Q.    And who was the CEO at the time?

20         A.    Pam Patsley was CEO.

21         Q.    Okay.  And give us the rest of your history at

22    MoneyGram, in terms of your work history?

23         A.    So Jim Shields was replaced by Alex Holmes in

24    March of 2012.  Alex Holmes became CFO.  I reported to

25    Alex Holmes.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 11

1        LAWRENCE ANGELILLI

2             And then subsequent to that change, my

3    responsibilities expanded, where I was given the tax

4    department of the company.  And then, following that, I

5    was given the financial planning and analysis part of the

6    company.

7             And then when ███████████ was elevated to

8    CEO, I was elevated to CFO subsequent to that.

9        Q.    And when was that?

10       A.    It was a public announcement in October of '17,

11   effective January 1st of '18.

12       Q.    So you became CFO in January of 2018?

13       A.    Right.

14       Q.    And how did your responsibilities change when

15   you became CFO?

16       A.    It in -- it expanded to include the

17   controllership operation.  I did not have the accounting

18   and controllership operation.  Also expanded my role in

19   terms of my outward exposure.  I began to deal more with

20   shareholders rather that pure fixed income investors,

21   which was the role of the treasurer at the time.

22             Other than that, it was sort of a natural

23   extension of what I had been expanded to in the finance

24   role.

25       Q.    Okay.  And who reported to you once you became

Case 1:20-cv-10832-AT-SN  Document 869-87  Filed 06/18/23  Page 13 of 225

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 12

1               LAWRENCE ANGELILLI

2    CFO?  How many -- well, actually, let me start, how many

3    direct reports do you have?

4         A.    It's varied greatly, but, essentially, had the

5    controller, the treasurer, the head of tax, head of FBNA.

6    I was assigned risk management responsibilities from

7    a -- for the online and digital piece of the business, so

8    I had the head of risk management for that reporting to

9    me.

10                  And then with resignations and

11   terminations, the next layer down would report to me,

12   until I had the replacement.  But those were principal --

13   and then I also have a -- a risk management professional

14   that handles insurance risk management that reports to me

15   as well.

16        Q.    Obviously, our focus today is going to be on the

17   relationship between MoneyGram and Ripple.

18                  What was your re -- what was your role

19   within the relationship with Ripple?

20        A.    It started out when our -- we have a lab that is

21   designated with the responsibility of trying new

22   technologies that might have implications for the company

23   in the long-term basis.  They came with the suggestion

24   that we try the Ripple -- well, at the time it was called

25   the xRapid product, which we wanted to try it out as a

TSG Reporting - Worldwide     877-702-9580

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 13

1                    LAWRENCE ANGELILLI

2    potential foreign exchange option.

3              And I green-lighted that program and

4    authorized $700 to do test trades in -- on the Ripple

5    xRapid program.

6         Q.   That must have been a very difficult decision,

7    $700?

8         A.   It was, believe it or not, revolutionary at the

9    time, even though it was $700.

10        Q.   Why was it revolutionary?

11        A.   I think blockchain and cryptocurrencies were

12   revolutionary in their nature, and so it was really

13   something that was brand-new and kind of un -- unheard of

14   prior to that.

15        Q.   Okay.  And that $700, those were -- so it was

16   seven transactions that were --

17        A.   Well, that's what I authorized.  I authorized

18   seven $100 transactions to send money to Mexico, bring it

19   back, send it back, bring it back, and ultimately bring

20   the money back.

21              We ultimately did six transactions, because

22   in this discovery we learned that we could only send money

23   to Mexico, we couldn't return it through the xRapid

24   platform.

25        Q.   So then -- so once you -- we're going to,

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 14

1                          LAWRENCE ANGELILLI

2    obviously, spend much more time on this, but just so we

3    get a sense, but once you authorized the pilot

4    transactions and did the pilot transactions, and I'm using

5    that term, I assume that's a term to describe the seven --

6        A.    Yeah, I think that's fair.

7        Q.    -- six transactions.

8                    Once you did that, what was your role with

9    the relationship as it evolved over time?

10       A.    Well, we made a decision at that time that

11   the -- the technology wasn't mature or sufficient to

12   support our needs.  We moved millions, not hundreds.  And

13   the -- the effective cost of the Mexican peso during that

14   pilot program was prohibitive, and so we -- we continued

15   to watch the technology, assuming that it was immature.

16   But at the time we didn't view it as a viable product for

17   MoneyGram.

18                   And I think that we, at the time after the

19   end of the six transactions, viewed that it was probably

20   the end of the test.

21                   It was not in conjunction with Ripple.  I'm

22   not sure Ripple had any knowledge that we did that.  It

23   was really something that we did through -- any person in

24   the public could do.

25       Q.    Okay.  At some point, though, did you then

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 15

```
 1                    LAWRENCE ANGELILLI

 2   commence negotiations with Ripple to expand the

 3   relationship after that?

 4        A.    There was a period later than that, which was

 5   coincidence, but we were introduced to Brad Garlinghouse

 6   by a private equity fund.  He came to Dallas.  It was part

 7   of an exploratory due diligence that was going on at the

 8   time to see if there was a possible investment in the

 9   company.

10              Brad came to Dallas for one of those due

11   diligence meetings.  And then from -- ultimately, the

12   exploratory due diligence didn't lead to a transaction,

13   and Brad got to know the company and thought maybe that

14   they could do something independent of the private equity

15   fund that it came with originally.

16        Q.    Which private equity fund was it originally?

17        A.    ████

18        Q.    So then what happened after that with the

19   relationship?

20        A.    Well, then he introduced his team.  ████████

21   ████ was introduced to us as sort of a lead.  And at that

22   time we explained to ████ that we had already had

23   familiarity with the product, that it was not economically

24   viable.  And we were told that -- you know, that we should

25   take another look at it, and if we did an integration or
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 16

1                          LAWRENCE ANGELILLI

2    some sort of relationship, that we'd find that the results

3    could be different.

4          Q.    Okay.  And then what happened after that?

5          A.    So we began exploratory due diligence again,

6    except specifically with them.  They came in with various

7    employees.  They came with the team.  They wanted to

8    understand what we had learned and why we didn't view the

9    product as viable, and started to formulate the backbone

10   of a commercial agreement where we would do an integration

11   and try to be able to scale the business.  And I think at

12   the time their thesis was that if there was some sort of

13   risk aversion, you know, in other words, they would

14   basically subsidize the transactions and we would do an

15   integration and there would be sort of a -- you know, a

16   risk solution, so that if we could give it time to develop

17   into a mature product.

18                     And it evolved where we had several turns

19   of the agreement and it evolved into the agreement that

20   you have today.

21         Q.    And ultimately, with -- did this lead to Ripple

22   making an investment in MoneyGram, and then also a

23   commercial agreement with the use of xRapid?

24         A.    Those were really two separate discussions that

25   were going on.  And I think the -- the investment in

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

LAWRENCE ANGELILLI

1

2    MoneyGram was sort of managed by ▌▌▌▌▌ and myself at

3    the time.  It wasn't something that we had sought.  We

4    didn't ask for it, it was sort of offered to us.

5                    And not -- everybody on the team wasn't

6    aware that that was also going down a parallel path.  It

7    wasn't as interesting to us as the commercial agreement

8    was.  And that also went through various iterations of an

9    agreement that ultimately came to fruition, but it was

10   not -- they weren't, essentially, part and parcel when

11   this process started.

12        Q.   So, essentially, this is two separate

13   transactions that you entered into, correct?

14        A.   Yes.

15        Q.   You viewed those as two separate issues,

16   basically?

17        A.   Yes.

18        Q.   And I think what you said was you saw the

19   commercial agreement which was the use of xRapid as being

20   a very interesting proposition?

21        A.   Correct.

22        Q.   Why did you see it as interesting?

23        A.   I've said -- and I said this publicly -- we

24   thought that if there was anybody that would -- that

25   needed to look at this technology to see if it was viable,

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 18

1                     LAWRENCE ANGELILLI

2    it was us, because at the time, you know, we traded 36

3    different currencies.  At the time we were trading █████

4    ████████████████████████████████████████ a month in foreign

5    exchange.  And we continued to escalate from that.

6              And we also have very steady and predicable

7    flows, so that we were a constant participant in the

8    foreign exchange markets that we participate in.

9              So it seemed ideal that if you were going

10   to do a beta test or you would have some sort of partner,

11   that the two of us -- it made a lot of sense, because they

12   had this blockchain, we had this flow, and you could put

13   them together and really do a fluidity test to see if this

14   was viable in the long-term.

15       Q.   Was this something in which you saw as sort of a

16   long-term project, where over time it would grow?

17       A.   I think -- you know, I'm not sure how you would

18   define "long term."  I think Ripple was very optimistic

19   that within, let's say, two years, that this would be a

20   deep liquid multicurrency platform, and the original

21   commercial agreement was in the two- to three-year range.

22   And that was the discussion, and that the theory being

23   that within two years we wouldn't need a commercial

24   agreement anymore, that basically -- that we would be, you

25   know, essentially, using it in our day-to-day activities

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 19

1                    LAWRENCE ANGELILLI

2   and would never want to stop.

3       Q.   And was it -- did you ultimately extend that

4   agreement to four years at some point?

5       A.   Yes.  I think it went to three and then to four,

6   if I am correct, but it did get extended.

7       Q.   And was the liquidity of the markets important

8   to the product working as well as you -- as you had hoped

9   it would?

10      A.   It's essential to the product working.  And that

11  was the, you know, I would say the piece that was missing

12  when we started this.  And that was really the whole

13  reason of the combination, is to develop deep and liquid

14  markets for these foreign currencies.

15      Q.   Is it your understanding that Ripple was very

16  focused on trying to increase liquidity in the markets in

17  which xRapid was --

18      A.   Yes.  They represented to us that that was

19  basically the majority of their efforts.  We had

20  established a list of currencies that were the most

21  advantageous for MoneyGram, where we would be able to

22  provide the most liquidity on our side.  We compared notes

23  with them.  We gave them a list.  And they had a team

24  diligently trying to establish counterparties in those

25  markets.

1              LAWRENCE ANGELILLI

2        Q.   Was it your understanding that the xRapid

3   product was a viable -- potentially viable product?

4             MR. MOYE:  Objection, foundation.

5        A.   It was -- it was viable from its -- I would

6   describe it as viable from its mechanics, but not viable

7   from its effectiveness as a -- as a product.  In other

8   words, it worked in terms of moving the currency within

9   the time frame that they established, which was literally

10  minutes, but it wasn't viable from a -- a commercial

11  standpoint, where we would use it as an alternative to

12  traditional foreign exchange markets.

13       Q.   (BY MR. CERESNEY)  And was that a possibility

14  over time, that it could become --

15       A.   That was the hope.  That was the expectation.

16  And the documents were crafted so that there was a bridge

17  between when that eventuality would take place and when we

18  started in the summer of '19.

19       Q.   And is it fair to say that during the term of

20  the relationship with Ripple, you were working with Ripple

21  to try to get to a place where it could be the kind of

22  product that you initially, in entering into this

23  agreement, thought it could be?

24       A.   Correct.

25       Q.   And we'll get to this -- well, let's come back

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1            LAWRENCE ANGELILLI

2    to that.

3                 We took a detour.  I want to go back.  I'll

4    come back to a lot of this in more detail as we -- as we

5    go ahead today.

6                 I want to just -- let me -- let me show you

7    what's been marked as Exhibit 1.

8                 (Exhibit 1 marked.)

9       Q.   (BY MR. CERESNEY)   And I'll ask you to take a

10   look at that and tell me whether you recognize --

11      A.   That is my sworn statement to the SEC.

12      Q.   Okay.  If you look at the last page of this

13   document, page 13.

14                Is that your signature on the document?

15      A.   Yes, it is.

16      Q.   And that's dated March 14th, 2021?

17      A.   Correct.

18      Q.   And you signed this document under the penalty

19   of perjury; is that fair?

20      A.   That's correct.

21                MR. MOYE:  Is this 1?

22                MR. CERESNEY:  Yeah.

23      A.   Yes.

24      Q.   (BY MR. CERESNEY)   Now, who drafted this

25   document?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 22

1                    LAWRENCE ANGELILLI

2        A.    The SEC drafted the first draft of this document

3   based on my response or the company's response to

4   questionnaires that they had provided.

5              So what they did is there was a series of

6   questionnaires.  They took those answers and crafted them

7   into the first draft of this document.

8        Q.    When you say "questionnaires," were those

9   written questionnaires?

10       A.    They were.

11       Q.    Okay.  And did you actually provide the SEC with

12  written responses to their questionnaires?

13       A.    We did.

14             MR. CERESNEY:  Okay.  I'm going to ask

15  Jason that you produce those, that's if all right with the

16  SEC.

17             MR. LEWIS:  We'll talk about that maybe at

18  the break.  Just -- you want to go off the record real

19  quick or do you want to do it at the break?

20             MR. CERESNEY:  Why don't we do it at the

21  break.

22             MR. LEWIS:  Okay.  Okay.

23             MR. CERESNEY:  Okay.

24       Q.    (BY MR. CERESNEY)   But you recall that there

25  were questionnaires and you answered -- did you provide

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 23

1                    LAWRENCE ANGELILLI

2    the answers to those questionnaires yourself?

3         A.    Many of the technical questions in here were my

4    answers.

5         Q.    And did you actually meet with the SEC before

6    this declaration was signed?

7         A.    No, never.

8         Q.    Have you ever met with the SEC?

9         A.    We had a brief Zoom call on Friday evening

10   before this meeting; so last Friday and then we met with

11   them yesterday afternoon.

12        Q.    Okay.  How long did the call on Friday last?

13        A.    45 minutes to an hour.

14        Q.    And how long was the meeting yesterday?

15        A.    Three hours.

16        Q.    Three hours, okay.

17              And who from the SEC did you meet with

18   those two times?

19        A.    Well, in person we met with Rob yesterday.  And

20   on the call he had two associates with him on the phone.

21        Q.    Do you remember who the names of those

22   associates were?

23        A.    I don't remember their name.

24        Q.    And what did you discuss with the SEC during --

25   during those meetings?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 24

1                    LAWRENCE ANGELILLI

2      A.    Well, the Friday call was very perfunctory in

3   terms of how a deposition works, what the definitions of

4   objections are, sort of the procedural aspects of how this

5   would work, and what it means when an attorney objects.

6              It was also, I think, encouraged me to tell

7   the truth and to remind me that I was under oath.  And

8   that -- I mean, it was a procedural, I would say, you

9   know, depositions 101 type of class.

10     Q.    Okay.  How about the meeting yesterday?

11     A.    Yesterday was -- there was a little bit of a

12  repeat of -- of that, and then some exploratory questions

13  based on my sworn statement.

14     Q.    Any particular areas that you recall covering?

15     A.    Mainly around the beginning of the relationship,

16  similar to the questions you were just asking, and then

17  went to the end of the relationship for some exploratory

18  questions around that, and then questions around the SEC

19  accounting impact, where we had gone for preclearance on

20  some accounting rules, and we discussed that.

21     Q.    Anything -- sitting here today, is there

22  anything that you want to correct in the declaration?

23     A.    No.

24     Q.    And anything that you told the SEC yesterday

25  that wasn't in the declaration?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 25

1                    LAWRENCE ANGELILLI

2       A.   I would say probably.  I think there was

3   background information, just in the same vein of the

4   questions that you were just asking me.

5       Q.   Okay.  So the SEC drafted the first draft of

6   this declaration?

7       A.   Yes.

8       Q.   Did you provide edits to the declaration?

9       A.   I did.

10      Q.   And did the SEC then edit it further after you

11  provided that --

12      A.   Generally, they accepted the vast majority of my

13  edits.

14      Q.   How extensive were your edits?

15      A.   That's a really hard -- I don't know what

16  extensive means.

17      Q.   Right.

18           Would you say that it was a heavily edited

19  document from what they initially drafted?

20      A.   I don't know what heavily edited means.  I mean,

21  you could imagine we -- we edit the documents a lot in my

22  role.

23      Q.   And how did it compare to the typical amounts of

24  edits that that you had done when editting a document?

25      A.   Probably fairly typical of a financial document

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 26

                    LAWRENCE ANGELILLI

1    that I would edit.

2         Q.   So you had a good -- would you say you had more

3    than 20 comments?

4         A.   I don't know how to answer that.

5              MR. CERESNEY:  Jason, I'm going to ask for

6    the production of all the drafts of the -- at least what

7    was shared with the SEC back and forth, okay?

8              MR. LEWIS:  Yes.

9              MR. CERESNEY:  Thank you.

10        Q.   (BY MR. CERESNEY)   Did the SEC ask you during

11   their meeting yesterday to emphasize anything today during

12   your deposition?

13        A.   No.

14        Q.   Did they give you any direction about particular

15   things to talk about during your deposition?

16        A.   No.

17        Q.   Okay.  All right.  I'm going to refer to the

18   declaration as -- a number of times as we go through it

19   today.

20             But -- and you have already talked about

21   some of this.  But what are the principal ways that

22   MoneyGram earns revenue?

23        A.   There are two components to our revenue.  We

24   charge a fee when someone sends money.  And then we --

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 27

1                    LAWRENCE ANGELILLI

2  depending on the corridor, which is the currency pair, we

3  will charge a spread on foreign exchange.  And the

4  combination of that fee and foreign exchange is virtually

5  100 percent of our revenue in the money transfer business.

6       Q.    Okay.  And how many jurisdictions do you have

7  offices in?

8       A.    It's an estimate, but I believe we have about 35

9  or 36 foreign offices around the world.

10      Q.    And so somebody can send money between each of

11 those jurisdictions?

12      A.    No.  An office for MoneyGram is -- is irrelevant

13 to the countries that we remit to.  We actually allow

14 remittances to over -- I think it's 200 or 201 countries

15 or sovereign entities.  There are some temporaries

16 involved in there, too.

17      Q.    And within a particular country, do you have

18 licensees or other relationships --

19      A.    It varies by country.  Every country has their

20 own rules.

21      Q.    Just wait until I finish the question.

22      A.    All right.

23            MR. LEWIS:  She -- she's going to yell at

24 us in a minute.

25            THE WITNESS:  I -- I -- you know, the last

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 28

1                   LAWRENCE ANGELILLI

2    time I was deposed, I got yelled at by the court reporter.

3         Q.    (BY MR. CERESNEY)    So within each country,

4    though, you have some representative that could take

5    remittances and route them through MoneyGram?

6         A.    We have agent relationships that handle that.

7         Q.    Within each country?

8         A.    Yes.

9         Q.    And you said about 200 countries?

10        A.    Correct.

11        Q.    Okay.  And what proportion of your revenue comes

12   from money transfer services?

13        A.    It varies based on interest rates, but I would

14   say currently roughly 90 -- probably 95 percent of our

15   revenues come from money transfers.

16        Q.    And is your revenue concentrated in any

17   particular currency in any particular markets?  In other

18   words, does a larger part of your revenue come from

19   particular markets?

20        A.    The United States is the largest send country

21   for us in the world.  We book our revenue at the send.

22   The receiver doesn't pay a fee, but the sender does.  So

23   the United States is our largest.  And Europe, the

24   continent, would be sort of -- the euro zone would be

25   number two.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1                       LAWRENCE ANGELILLI

2          Q.    And then how about recipient countries, do you

3    measure the volume in recipient countries?

4          A.    The largest is Mexico, and then it -- it goes

5    down from there.  But the typical large receive countries

6    of the world are our larger markets, so India, the

7    Philippines would be in the top five.

8          Q.    Okay.  And so the U.S./Mexico corridor, is that

9    the largest corridor that you guys have?

10         A.    It is, yes.

11         Q.    It is.

12               And what -- what is the next largest

13   corridor after that?

14         A.    I don't know that off the top of my head.

15         Q.    Okay.  But you said the Philippines is a -- is a

16   large recipient of funds?

17         A.    Correct.

18         Q.    And how about Australia, is Australia also a

19   large venue for -- or a large market for you to either

20   send or receive?

21         A.    It's a send country.  And relative to the rest

22   of the world, it's not -- it's important, but I wouldn't

23   say it's top five.

24         Q.    Okay.  And what is the volume of money -- I

25   think you mentioned this earlier.  I think you mentioned a

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 30

```
 1                      LAWRENCE ANGELILLI

 2    billion dollars.  But what is the volume of money that you

 3    typically process on a daily basis?

 4         A.   If you segregate money transfers of what we --

 5    we typically will move approximately a ███████████

 6    ██████████████       a day in all of our money transfer

 7    activity.

 8              Now, we also have a subsidiary that's

 9    called ███████████████   which is a U.S.-based

10    business, which we would move much larger quantities of

11    that, but I don't think that is, you know, pertinent to

12    this discussion because it doesn't involve foreign

13    exchange.

14         Q.   And how about the U.S./Mexico corridor, do you

15    have a sense for what the daily volume of that corridor

16    is?

17         A.   It can be $10 million a day.

18         Q.   Okay.  And is it fair to say that MoneyGram is

19    one of the world's largest money remitters?

20         A.   Yes.

21         Q.   What -- how do you rank as a money remitter?

22         A.   It's -- it's hard to determine that based on

23    what metric you use.  But under any kind of public

24    information, we're usually considered the second largest

25    or the third largest depending on what metric you use.
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 31

1          LAWRENCE ANGELILLI

2     Q.   And what are the other -- one or two other

3  competitors?

4     A.   ███████████ is the largest in the world by

5  far.  They're probably four times as large as we are.  And

6  then there is a company called ███ which is a subsidiary

7  of a public company called ████████  They have a money

8  transfer segment.  They're actually a diversified company.

9  And it's difficult to ascertain whether they are larger or

10  smaller than us from a revenue, but they're smaller than

11  us from a transaction perspective.

12     Q.   Is it fair to say -- and strike that.

13          There are lots of other smaller money

14  remitters out there; is that fair?

15     A.   Yeah.

16     Q.   As a large money remitter, are you able to

17  negotiate certain relationships and efficiencies in terms

18  of your money -- in terms of your foreign exchange

19  operations?

20     A.   Negotiate is probably not a relevant word in

21  that case.  The foreign exchange markets are typically

22  very deep and liquid.  And our transaction size permits us

23  to have large efficient transactions.

24     Q.   Fair to say that the cost for you to transfer FX

25  between countries is cheaper than much smaller -- than

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 32

1                    LAWRENCE ANGELILLI

2    smaller money remitters?

3         A.   It would be highly dependent on the currency.

4         Q.   So how about the U.S./Mexico corridor, is it

5    fair to say that you have cheaper FX exchange rates than

6    smaller remitters?

7                    MR. MOYE:  Objection, call for speculation.

8         A.   It would be -- if -- if it was, I don't have the

9    ability to answer that. ██████████████████████████████

10   ██████████████████

11        Q.   (BY MR. CERESNEY)   You have negotiated a flat

12   fee for money transfers, a base fee; is that fair?

13        A.   To the consumer?

14        Q.   No.  Let me strike that.  Let me back up.

15        A.   Okay.

16        Q.   When you -- so a consumer sends money to

17   somebody in Mexico; is that fair?

18        A.   Yes.

19        Q.   You don't transfer funds for each one of those

20   money transfer -- money remitters -- money transfers; is

21   that fair?

22        A.   Correct.

23        Q.   How do you go about conducting your operations

24   to transfer money between jurisdictions?

25        A.   So the business is open 24/7, and we have a

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 33

```
1                      LAWRENCE ANGELILLI
2   system that records all of the transactions real-time from
3   our agents all over the world.  We have cutoffs during the
4   day where we are able to aggregate those transactions and
5   either buy or sell the currencies that we need to settle
6   with the agents in those -- in those countries.
7                 So specifically for Mexico, we know when we
8   come in in the morning what transactions have been
9   completed over the last 24 hours.
10                                                       And
11  we know through -- we have some algorithms and some models
12  that are predictive in terms of how much money we will
13  need, because
14
15                                   that's -- that we predict
16  based on our models and algorithms.
17       Q.   So you aggregate all of the money transfers in a
18  particular day, and you make sure that you have the money
19  in that jurisdiction to cover all of those transfers; is
20  that fair?
21       A.   Correct.
22       Q.   And so you place that money in that jurisdiction
23  really in advance of those transfers occurring?
24       A.   It depends.  It depends, again, on the country
25  and the currency.  In Mexico, as long as we're on
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 34

                    LAWRENCE ANGELILLI

1

2    Mexico --

3        Q.    Let's use Mexico.

4        A.    -- Mexico has a very active what's called a

5    today market and a tomorrow market and a spot market, and

6    because we're in that same time zone, what we have the

7    ability to do is access all three of those markets.  And

8    so as our needs are evolving during a period of time, we

9    can top up our -- the amounts that we need in Mexico.  So

10   we do access typically what are called the cash/tom and

11   spot market in Mexican peso.  But I'd say the majority of

12   our trades are spot, which is T+2.

13       Q.    And what is T+2?

14       A.    That is the day that you execute the trade

15   versus the day that you receive the proceeds in your

16   account.

17       Q.    And so that means that you need to settle

18   transactions two days after they actually occur; is that

19   fair?

20       A.    It means that we're -- we're funding agents for

21   transactions that were done two days ago.  Yes.

22       Q.    Okay.  Do you need to preposition funds in a

23   particular country given the foreign transfer operations

24   you just described?

25       A.    We have established treasury operations in

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 35

1                     LAWRENCE ANGELILLI

2  Singapore and in London, and we've done some trading out

3  off Dubai from time to time that will let us shorten that

4  window and not be subject to forward trades.  And we've

5  shortened the window.  But typically, we are using the

6  spot market mainly because it's the most efficient market.

7  But we tend to have the ability to use shorter trades if

8  we need to.

9         Q.   So in the declaration that you -- let me

10 actually look at the declaration that you filed.

11              And in the declaration, I want to direct

12 your attention to paragraph -- paragraph 3.

13              And in the declaration, you talk about, in

14 paragraph 3, I will just read this -- yes -- you talk

15 about how, To meet our consumer obligations, MGI must have

16 sufficiently -- sufficient highly liquid assets at all

17 times and be able to move funds globally on a timely

18 basis.  On average, we receive and pay out a similar

19 amount of funds on a daily basis to collect and settle the

20 principal amount of our payment instruments sold, as well

21 as related fees and commissions with our end consumers and

22 agents.  We preposition cash in various countries and

23 currencies to facilitate the settlement of our

24 transaction, which we accomplish with foreign currency

25 trades.  On average, MGI typically has

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 36

1                    LAWRENCE ANGELILLI

2    in working capital to support its settlement in foreign

3    currencies and approximately ███████████ of foreign

4    currency prefunds in selective countries each day.

5                    So just this reference to ███████████ in

6    working capital and ███████████ in foreign currency

7    prefunds, can you just explain to us what each of those

8    concepts entails?

9         A.    Sure.   So the ███████████ represents the amount

10   of foreign currency that was essentially on deposit in

11   banks around the world in non-U.S. dollars.

12                   And when we're settling a transaction -- so

13   when an agent pays out, you know, a transaction -- I will

14   just kind of walk you through maybe a typical day.   If

15   an -- if an agent pays out a transaction today on a

16   Tuesday, it will record in our system real-time.   And then

17   we need to settle with them under the SLAs under their

18   contract to -- basically within 12 to 24 hours for them to

19   be reimbursed for their payment to the consumer.

20                   So considering that we've got every time

21   zone in the world, what you're really doing is you have to

22   have money in that jurisdiction so that you can move that

23   money to the agent so that on his Wednesday morning, he

24   comes in and sees the money in his bank account that he's

25   been reimbursed for the payment that he made.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

```
1                    LAWRENCE ANGELILLI

2          That is not the case in every agent

3   transaction, but that's a typical agent transaction.

4        Q.   And that's ██████████

5        A.   And that's ███.  It's been as high as

6   ███████████

7        Q.   So as high as █████████ that you have to have

8   around the world to settle those transactions?

9        A.   Correct.

10       Q.   Okay.  And then what is the ████████ that is

11  referenced here?

12       A.   So foreign governments around the world have

13  instituted consumer protection legislation.  Typically,

14  receive companies like India, they're probably the best

15  example.  They have what's called a regulatory or

16  mandatory prefund.  Rather than do credit work in terms of

17  every remitter that's remitting money in India, what they

18  do is they say, well, you're just going to have to post

19  essentially cash collateral.  And it's a formula based on

20  your level of activity.  So if your activity goes up, then

21  there is lagging sort of prefund that you have to do.

22          That is above and beyond the ████████

23  So those funds are not used for settlement.  They're

24  basically overcollateralization.  In the European Union

25  one, we actually have the opposite, where they have
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 38

```
 1                    LAWRENCE ANGELILLI

 2   consumer protection legislation for sends.  Europe tends

 3   to be a send continent.  And so what happens there is we

 4   have to actually post collateral in a separate account for

 5   the regulators there where it's also not used for

 6   settlement, but overcollateralization for sends.

 7                   So the total of those -- again, they

 8   fluctuate based on our activity -- have averaged around

 9   ████████████

10        Q.   So -- and working capital, by the way, you said

11   could go as high as $████████████

12        A.   Correct.

13        Q.   So that is over ████████████ that would need to

14   be either prepositioned or available to settle

15   transactions in foreign currencies?

16        A.   Right.

17                   MR. MOYE:  I'm sorry; we may have lost

18   sound on the Zoom.  Is there any way we can check.

19                   THE VIDEOGRAPHER:  It looks like we did.

20                   Can we go off the record?

21                   MR. CERESNEY:  Yeah.

22                   THE VIDEOGRAPHER:  I apologize.

23                   Off the record at 9:48.

24                   (Recess in the proceedings from 9:48

25                   to 9:50 a.m.)
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 39

1        LAWRENCE ANGELILLI

2            THE VIDEOGRAPHER:  Back on the record at

3    9:50.

4        Q.    (BY MR. CERESNEY)    So, Mr. Angelilli, you were

5    explaining before the break that there is about ▮▮▮

6    ▮▮▮▮▮ plus in dollars that are committed to settlement

7    of transactions or prefunding transactions?

8        A.    Yes.

9        Q.    Are there costs to having that large amount of

10    money tied up for those types of transactions?

11        A.    In our capital structure, the offset to that is

12    debt.  So we tend to look at the amount of working capital

13    that are -- is required to run the business.  In a -- in

14    our balance sheet, we support those assets with external

15    borrowing, so it would be our cost of funds.

16        Q.    So there are interest costs and other costs to

17    obtaining debt; is that fair?

18        A.    It's a complicated -- it's not a yes-no answer

19    to that question.  There's a built-in amount of

20    variability in our balance sheet that our debt is not

21    automatically prepayable.  So what I -- what I think needs

22    to be clear is that -- I'll just give an extreme example.

23    If we reduce our working capital needs by ▮▮▮▮▮, it

24    doesn't result in the repayment of ▮▮▮▮▮ of debt.

25        Q.    Right.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 40

1                    LAWRENCE ANGELILLI

2          A.    So there's -- the assets are highly variable.

3    The liabilities tends to be fixed.  So that is where I

4    think we get to the concept of scale, is that at scale,

5    the reduction in our working capital can have an impact of

6    reducing our interest expense, but it has to be

7    significant.  And it has to be -- I mean, extremely large.

8          Q.    And so if something -- if you're able to operate

9    on a different basis at scale, then you're able to reduce

10   your costs?

11         A.    In theory, yes.

12         Q.    And that was something that at least in your

13   deal with Ripple, you were conceiving was possible?

14         A.    That was something particularly that I was

15   particularly interested in.  And, in fact, Ripple didn't

16   come to us with the idea that this was going to be a

17   capital-efficient transaction.  It was our understanding

18   of our own balance sheet that it was attractive to us that

19   if we could find a way to fund our foreign exchange on a

20   current-day basis and match off against our settlement,

21   that it could have the impact of reducing our working

22   capital needs.  And that is where a lot of the language

23   that you probably see publicly around this being a capital

24   efficient, that was a MoneyGram invention.

25         Q.    So -- and I just want to make sure that the

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 41

1                    LAWRENCE ANGELILLI

2    record is totally clear on this.

3              So the ODL product allowed you to settle

4    transactions in real time; is that fair?

5        A.   Yes.

6        Q.   And so you didn't need to float capital to fund

7    the settlement of transactions during that -- to fund

8    settlement transactions?

9        A.   That was the theory.  In practice, it didn't

10   work that way.

11       Q.   But in theory, if it -- if -- if the liquidity

12   of the markets was sufficient for the ODL product to

13   operate at scale, then that could operate as a real time

14   settlement?

15       A.   No.  And the reason for the negative answer is

16   that the introduction of exchanges into the ODL process,

17   which is outside of the control of Ripple, was actually

18   extremely inefficient in terms of its impact on our

19   working capital.

20       Q.   And does -- and we're going to get to the

21   exchange costs in a moment.

22       A.   Okay.

23       Q.   If you were able to lower those exchange costs

24   to a certain level, might it then be as efficient as the

25   traditional payment route?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 42

1                    LAWRENCE ANGELILLI

2          MR. MOYE:  Objection, calls for

3    speculation.

4      A.    Actually, I can answer that very specifically.

5    No.  There's two components to the exchanges.

6               Number one, which is reflected in my sworn

7    statement, that the exchanges were expensive and did throw

8    an impediment to effectiveness on the cost of these funds.

9               But the second impact, which came as

10   somewhat of a surprise, was that they also required us to

11   post collateral.  So what was happening was even though we

12   were transacting in real time and not having to prefund

13   the accounts in this working capital that we were

14   discussing, we were using similar or, in some cases, more

15   to satisfy the credit needs of the exchanges or their

16   working capital.  And we were providing prefunds to the

17   exchanges.  And so net-net, it was no benefit to using the

18   ODL service.

19      Q.    (BY MR. CERESNEY)   And was that the sending

20   exchanges that you were prefunding?

21      A.    I'm sorry?

22      Q.    The sending -- there's two exchanges, right?

23   There's the exchange where you convert dollars to XRP,

24   and then there's the exchange with you converting XR --

25      A.    Yes.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 43

1                          LAWRENCE ANGELILLI

2          Q.   Hold on.

3          A.   Okay.

4          Q.   -- XRP to pesos, right?  So let's just take the

5    U.S./Mexico corridor.

6                         There's the -- there's the initial exchange

7    where you purchase XRP, and then there's the exchange

8    where you sell the XRP for pesos.  When you talk about

9    that you needed to post collateral, is there -- is one --

10   is both of those exchanges what you're talking about, or

11   is it one of those exchanges?

12         A.   I'm not sure.  I think it was the send exchange.

13         Q.   And if you were able to purchase the XRP from

14   Ripple as opposed to from the exchange, would that

15   eliminate the need to post the collateral?

16         A.   In theory, yes.  We were never able to test that

17   theory.

18         Q.   Is that something that you ended up discussing,

19   though, with Ripple as a possibility?

20         A.   It was suggested by them and never brought to

21   fruition.

22         Q.   But was that something that you understood that

23   other participants in the ODL product had done, that is,

24   purchased XRP from Ripple that then was transferred to

25   pesos?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 44

1                    LAWRENCE ANGELILLI

2           MR. MOYE:  Objection, form, foundation.

3      A.    I wasn't aware what others were doing.

4      Q.    (BY MR. CERESNEY)   Okay.  But you did have

5  discussions with Ripple about that possibility?

6      A.    The topic came up.

7      Q.    And tell us about those discussions.

8      A.    I was not a direct party to those discussions.

9  We had been having repeated conversations with them about

10  the lack of cost-effectiveness.  Ripple was also highly

11  motivated to solve for that problem because of the

12  make-whole agreement.  And as the transactions became less

13  and less efficient, the amount of the make-whole was going

14  up.  So I think they were also coming up with ideas.

15           Now, in terms of the working capital side

16  of this, that was secondary to us.  It wasn't -- even if

17  that problem had been solved, it wouldn't have made the

18  ODL product any more interesting or have any utility to

19  us.  The working capital argument was a secondary argument

20  that we thought was -- if I could just use a common

21  term -- like frosting on the cake.  In other words, if --

22  ultimately, we still needed two things in terms of foreign

23  exchange.  We needed effective cost of the currency, and

24  we needed reliability in terms of having those

25  transactions land on time and in the right place.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 45

```
1                      LAWRENCE ANGELILLI

2                The impact on our working capital was

3     secondary.  And it really goes to what I was describing

4     earlier in that based on the scale of what we were doing,

5     even if we had done 100 percent of our Mexico peso and we

6     were doing ███████████, buying directly from them and

7     relieving the collateral at the exchanges wasn't going to

8     change the formula in terms of our cost of capital.  And

9     even without the exchange fees, the execution on the

10    Mexican peso spreads independent of the exchange fees was

11    nowhere near the market.

12         Q.   Okay.  So let me just break down that answer for

13    a moment.

14                So I want to just sort of explore the

15    performance of the product and the issues that you just

16    discussed.

17                In terms of -- well, let's just talk about

18    some of the components of the product.  So in terms of

19    speed of transactions, how quickly did the ODL

20    transactions settle?

21         A.   It -- we could see the proceeds hit our balance

22    reporting in Mexico, for example, within 6 minutes.

23         Q.   And was that much quicker than the typical

24    settlement of foreign transactions?

25         A.   Yes.
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 46

1                    LAWRENCE ANGELILLI

2      Q.   How much quicker?

3      A.   Again, a hard question to answer.

4           The -- the way the cash markets work is

5  typically you have to close your trade before noon in the

6  time zone of your common party.  And if you close that

7  trade before noon, in Mexico, which has the ability to do

8  real time bank-to-bank transfers, we would see that in our

9  account the same day.  And it was really academic whether

10  it was within our account within 6 minutes or within the

11  same day.  We were in our system needing it the same day.

12          What Ripple did was provide the ability to

13  cash trades after noon, and then what it did was extended

14  the window for cash trades in those markets because we

15  didn't have a new deadline.

16     Q.   And so Ripple's ability to do those trades 24/7

17  was a major plus of the ODL product.

18     A.   That was what was particularly interesting to us

19  in the beginning was that it was 24/7, and for a while, we

20  were doing trades on Saturdays and Sundays and holidays

21  when the banks were closed.  We stopped doing that because

22  the trades became actually very expensive for us.  They

23  were off-market trades, so we stopped doing it.

24          But the blockchain was extremely effective

25  in getting those trades through when -- on seven days a

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 47

1                    LAWRENCE ANGELILLI

2    week.  I --

3         Q.   I think that answers the question.

4         A.   Okay.

5         Q.   So the ODL product did work in terms of the

6    speed that it promises; is that fair?

7         A.   Correct.

8         Q.   And it did work in terms of the 24/7 ability to

9    do trades?

10        A.   Yes.

11        Q.   You mentioned reliability of transactions.

12             Was the ODL product over time reliable in

13   terms of landing transactions that -- that had been

14   executed?

15        A.   It's reliable -- its reliability decreased over

16   time, and it tended to become less reliable the more

17   volume that we were putting through it.

18        Q.   Okay.  Was that something that Ripple indicated

19   could get better as the liquidity in the markets improved?

20        A.   I don't think they understood why that was

21   happening.

22        Q.   Okay.  What -- were there discussions about

23   trying to solve that through improving liquidity in the

24   markets?

25        A.   No.  At least not that I'm aware of, because

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 48

```
 1                     LAWRENCE ANGELILLI

 2     the -- the other aspect of this is that -- and again,

 3     I'll -- we'll stay on Mexico -- assuming we were going to

 4     do $10 million in trades a day.  We might do two trades,

 5     maybe three, sometimes one.

 6                     With Ripple we were doing -- we had a bot

 7     that actually was directly integrated with their system,

 8     and was going out and doing $30,000 trades in rapid

 9     succession, to get us to the amount of trading that we

10     needed.

11                     What was happening is that occasionally

12     these $30,000 trades would fail.  They had a concept

13     called a slippage pool, which would basically take that

14     trade off of the screen and put that XRP into some sort of

15     escrow.

16                     And what happened was -- is we continued to

17     ramp up these volumes.  We would have more and more of

18     these failures on $30,000 transactions.  It was random.

19     And in our grand scheme of things, you know, if we had,

20     you know, I don't know, 10 of these things fail, it

21     $300,000.                                       but it was

24     not -- it was just a caution to us that there was

25     increasing amounts of these transactions that were not
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 49

1                    LAWRENCE ANGELILLI

2    completed.

3         Q.    And was that something that you were working

4    with Ripple over time to try to address?

5         A.    It was not something that we could address.  It

6    was clearly on their side.  It was -- their market makers

7    were not there for the other side of that trade.  We were

8    never -- you know, we never saw behind the curtain, in

9    terms of how they were handling their market makers or on

10   that side of the counterparty.

11        Q.    Did Ripple indicate to you that they were trying

12   to address that issue?

13        A.    Not to me directly.

14        Q.    Were there others, by the way, in your

15   organization that were dealing on a day-to-day basis with

16   Ripple?

17        A.    In the -- in the -- beginning and then probably

18   in the first six to nine months of the Ripple arrangement

19   there was a weekly call.  Sometimes in person, when they

20   would come to Dallas, where their team would meet with our

21   treasury team to discuss problems, issues, and also to

22   develop a roadmap for additional currencies.

23        Q.    Were you in those meetings during the first six

24   months?

25        A.    Not -- not usually.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 50

1            LAWRENCE ANGELILLI

2      Q.   And how about -- how about after that, were you

3   in any meetings directly with Ripple on a day-to-day

4   basis?

5      A.   No.  I was informed of those meetings and of the

6   issues.  And then what started to happen was Ripple

7   started to have some resignations of some of those key

8   people that we were dealing with.

9           And then also, you know, one of the things

10  that happened, and it's explained here in my statement, is

11  that we took a fairly dramatic reduction, in terms of the

12  amount of XRP or the amount of currency that we were

13  running through their system.

14          Around that same time they had indicated to

15  us that they weren't having success adding new currencies,

16  so we suspended the weekly meetings, because now our

17  volumes were so much lower, and that the planning for

18  additional currencies had been, at least seemingly to us,

19  curtailed. And the frequency of the -- the meetings

20  decreased, and especially when some of their key people

21  had resigned.

22     Q.   Okay.  So but there were others within MoneyGram

23  who were dealing on a day-to-day basis with Ripple more

24  directly?

25     A.   Yeah.  In fact, we had -- our treasury was

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1                    LAWRENCE ANGELILLI

2  trading on the platform.  So most of it was automated

3  through this integration.  But in the event that there

4  were issues, our treasury people were talking to their

5  temporary people.

6       Q.   Okay.  I want to come back to the FX plus in a

7  moment.  I wanted to focus --

8                 MR. CERESNEY:  You want to take a break?

9                 MR. LEWIS:  Well, we've been going a little

10  over an hour --

11                 MR. CERESNEY:  Okay.  Oh, yeah, sure.

12                 THE VIDEOGRAPHER:  We're off the record at

13  10:07.

14                 (Recess in the proceedings from 10:07 to

15                 10:19 a.m.)

16                 THE VIDEOGRAPHER:  We're back on the record

17  at 10:20.

18       Q.   (BY MR. CERESNEY)   Mr. Angelilli, one question

19  about the failed transactions you talked about earlier,

20  and the rate of failures.

21                 And we've done analysis of the data that

22  MoneyGram supplied to the SEC.  And what we see in the

23  data actually shows that the rate of failure of

24  transactions went down over time.

25                 Is that consistent with your understanding?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 52

1                    LAWRENCE ANGELILLI

2              MR. MOYE:  Objection, argumentative,

3    foundation, calls for speculation.

4        A.   I don't have trend analysis.

5        Q.   (BY MR. CERESNEY)   Okay.  And so you don't --

6    you don't actually have that analysis to be able to opine

7    upon that issue right here?

8        A.   I just heard about it more as time went on.

9        Q.   Okay.  So you don't actually have data

10   to -- to -- specific data that would tell you that; that's

11   just anecdotal is what you're saying?

12       A.   Correct.

13       Q.   I want to go back to traditional money

14   transfers.  You know, and again, separate from the ODL, I

15   want to just go back to -- and we've done some talking

16   about this already, obviously, in a bunch of ways.  I just

17   want to make sure I've got the full scope of what the

18   traditional costs of transfers between jurisdictions is.

19             We've talked about -- well, let -- let's

20   just list them.  And you've mentioned some of these

21   already, but let's just go through some of those costs. We

22   talked about the capital cost of prepositioning cash.

23             What other costs, if you had to list them,

24   exist?

25       A.   Commission expense is our largest expense.  In

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 53

1                    LAWRENCE ANGELILLI

2     agent contracts, we pay commissions to the send agent and

3     the receive agent.

4                    And then in certain contracts and certain

5     countries we pay commissions off of the foreign exchange

6     spread.  So it's highly variable.  But -- so what we share

7     is a portion of our fee and a portion of our foreign

8     exchange.  And those are our primary costs per

9     transaction.

10        Q.   So fee and foreign exchange, basically?

11        A.   So it's -- it's -- it's sort of in the same

12    category as the revenue; you get the revenue as fee, plus

13    foreign exchange, and our principal expense is sharing

14    both fee and foreign exchange.

15        Q.   And so tell us what -- when you say "fee," what

16    do you mean by that?

17        A.   So if you wanted to send $300 and we charged you

18    $10, we would pay away a portion of that $10 to the send

19    agent, and a portion of that $10 to the receive agent.

20        Q.   So that's a fee to your agents?

21        A.   That's a commission to the agents and a fee to

22    us.

23        Q.   Okay.  But I -- I want to focus, though, less on

24    the transactions -- money remittence transactions and the

25    cost of the actual currency transfers that you --

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 54

1                    LAWRENCE ANGELILLI

2          A.    Okay.  So now, in the -- in the currency, you

3     know, if -- if we -- we take a rate off of a published

4     database, like Bloomberg, and we use that in our system as

5     a base rate, then we calculate a spread based on current

6     market conditions, competitive positions, sometimes the

7     liquidity of that currency, and then we either buy or sell

8     that currency.  Let's speak about sends, because that's

9     where the income is.

10               So in a send transaction we tend -- end up

11    having to receive that currency, right?  If someone sends

12    money from Australia, they pay the agent $100 to an

13    Australia agent, that agent owes us Australian dollars, we

14    have to sell that currency, we need to understand what our

15    cost to liquidate that currency is.

16               On a receive country like Mexico, we're

17    buying the peso and then sending those pesos to agents who

18    pay it out.  The calculus that we go through is to look at

19    both sides of that transaction and understand what our

20    cost of that currency is, because that would be like a

21    hidden expense, in terms of our -- our ability to do those

22    transactions profitably.

23               What we don't see in our expense is what

24    Wall Street is taking off of the exchange rate.  Although

25    everybody knows in markets what those spreads are, they

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 55

1                          LAWRENCE ANGELILLI

2    tend to be somewhere in the neighborhood of a half of a

3    basis point to a basis point, based on the -- the currency

4    that we're talking about.  The major G10 currencies

5    usually have a half a basis point to one basis point in

6    trading expenses that Wall Street takes for itself.

7         Q.   Okay.  So one cost is that half a basis point to

8    a basis point in G10 countries?

9         A.   Correct.

10        Q.   And what about non-G10 countries, can that cost

11   be much higher?

12        A.   Yes.

13        Q.   How high can that go?

14        A.   In terms of what the trading counterparty is

15   taking?

16        Q.   Yes.

17        A.   It's unclear.  I mean, the -- in certain like

18   thinly traded currencies, every trade can be different.

19   And we just look at it as a spread to the index.  We don't

20   know how much they're taking for themselves or how much is

21   just due to liquidity factors in the market.

22        Q.   Okay.  Can it be as high as 5 or 10 basis

23   points?

24        A.   Very rarely.

25        Q.   Okay.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 56

```
1                      LAWRENCE ANGELILLI

2        A.   Very, very, extremely rarely.

3        Q.   So somewhere between one and five basis points,

4   basically?

5        A.   And probably much closer to one.

6        Q.   Other than that cost, that FX cost, what other

7   cost exists in connection with the transfer of funds

8   between jurisdictions?

9        A.   Banking fees.

10       Q.   And what -- how are those calculated?

11       A.   When a -- I mean, this is a little bit esoteric

12   and not relevant to anything we're doing with Ripple.

13            But in certain currencies, if the Central

14   Bank is the one settling the currencies, they'll take the

15   spread, and we book that as a bank charge.

16            The other piece of this is that sometimes

17   we have to have an armored car pick up cash or sometimes

18   we have -- when our own -- we're sending money to

19   ourselves, when we send money to -- or a trade lands in

20   our bank account in a country, that bank will usually

21   charge us incoming wire transfer charges, you know, things

22   like that.

23       Q.   So what do those banking fees end up being?

24            When you think about what that cost is, how

25   do you think about it in your head?
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 57

1                    LAWRENCE ANGELILLI

2        A.    That's the value of aggregation, is that if

3   we're taking -- you know, if we're trading $10 million of

4   foreign exchange in one day and we're not having costs per

5   transaction, it can be de minimus, because we're spreading

6   the cost of those transactions across one large trade.

7        Q.    Okay.  Is there a crunch per transaction cost in

8   those instances, though?

9        A.    No.

10       Q.    So I saw in the -- a reference in the

11  declaration.

12             Why don't we look at the declaration at --

13  at paragraph -- just give me one moment.

14             Yeah.  Paragraph 40 of the -- actually,

15  hold on.

16             Paragraph 38 -- sorry -- of the declaration

17  talks about how in a traditional foreign exchange trade,

18  MGI enters into a trade -- enters into a trade with a

19  commercial bank to sell fiat currency and purchase a

20  secondary fiat currency.

21             For highly liquid currencies such as the

22  euro, MGI would pay one basis point of the notional amount

23  of the transfer as the foreign exchange spread, to sell

24  one fiat currency and buy the second fiat currency.

25             So let me just stop there.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 58

1                       LAWRENCE ANGELILLI

2              Is that, essentially, the one basis point

3    that you were just taking about before?

4         A.    Yes.

5         Q.    Okay.  And then the next sentence says, MGI also

6    incurs a flat fee of $15 to transfer funds cross-border,

7    which does not vary, regardless of the size of the

8    transaction.

9              So is that -- what is that -- is that what

10   you were just talking about?

11        A.    That's a wire transfer fee.

12        Q.    Okay.  And so, do you pay wire transfer fees

13   when you move money between jurisdictions?

14        A.    Yes.

15        Q.    Okay.  So is that another cost of the

16   transaction?

17        A.    That would be for the entire trade, yes.

18        Q.    Okay.  What I -- so those are two costs of each

19   transaction involving -- traditional transactions.

20              What other costs are there in addition to

21   those two costs?

22              There's capital cost we talked about

23   earlier.

24        A.    Uh-huh.

25        Q.    What other costs are there?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 59

1                    LAWRENCE ANGELILLI

2        A.    If you go to 40.  So this outlines the total

3    cost of a foreign exchange trade.  But when you -- when we

4    look at our costs, we're looking at the cost of an

5    aggregated -- so if I trade $5 million, I'm spreading

6    those costs over $5 million.  They're fixed.

7              So on a per-transaction basis, they're de

8    minimis to our calculation.

9        Q.    But other than the wire transfer cost and the FX

10   costs that we talked about, are there other costs that are

11   baked into that, even if they're de minimis, as you say?

12       A.    Just fixed costs associated with running the

13   company, but not on a per-transaction basis.

14       Q.    How about hedging costs; do you hedge foreign

15   currencies?

16       A.    No, we don't.  The only currency that we

17   actively hedge is the euro.  We are -- euro is one of the

18   largest currencies that we have inventory of in the world

19   because the European Union is a send continent.  So we're

20   receiving euros constantly.  And we hedge that euro

21   position for our own purposes, not to support transaction

22   costs.

23              But typically, we use our foreign exchange

24   as just-in-time inventory, which is why we were interested

25   in -- in the Ripple product.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 60

1                    LAWRENCE ANGELILLI

2        Q.   And just explain that to me.  Why -- why does

3   the Ripple product -- why is it beneficial for the

4   just-in-time inventory concept?

5        A.   Because the closer that you match the cost of

6   the currency and the price that we quote to the customer,

7   the less basis risk there is in a transaction.

8        Q.   You used the term "basis risk."  What do you

9   mean by that?

10       A.   Basis risk is the amount of risk that you're

11  taking for the volatility between the time of when you

12  lock a rate for a consumer and when that transaction

13  ultimately settles.  There is different volatilities for

14  every currency in the world.

15       Q.   And so just to make sure I understand this, the

16  time between when the transaction occurs versus when you

17  actually have to fulfill the currency in that transaction,

18  if the FX rate moves during that period of time, that is

19  your basis risk?

20       A.   Correct.

21       Q.   And real-time settlement, which is the ODL

22  product, the idea behind the ODL product would solve that

23  problem?

24       A.   In theory, yes.

25       Q.   And how would it solve that problem, just to

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 61

1                        LAWRENCE ANGELILLI

2    make sure we're clear?

3         A.    Because if somebody sent money at 11:00 in the

4    morning and the money was received in our Mexican peso

5    account at 11:06, the window for volatility was compressed

6    versus if we were doing a spot trade or even, you

7    know -- so it was -- it was an interesting and important

8    concept that we wanted to explore in this.

9         Q.    Okay.  Other than the -- and so we talked about

10   hedging -- hedging -- hedging costs.  Any other costs that

11   you can think of in connection with those transactions,

12   other than the cost to run the business basically?

13        A.    No.

14        Q.    Now, I want to go back to the start of the

15   relationship with -- with Ripple.  You talked about how

16   you guys had a -- you guys being MoneyGram -- had a

17   lab -- an internal lab that was exploring solutions.

18              Tell us about that internal lab.  Is it

19   called an innovation lab?

20        A.    Yes.

21        Q.    Tell us about the innovation lab.

22        A.    We formulated that to put a few dedicated people

23   that would be at the front end of all evolving

24   technologies and financial technology.

25        Q.    What types of technology were you looking at in

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 62

1      LAWRENCE ANGELILLI

2   that lab?

3       A.   Obviously, blockchain.  And what they look at is

4   essentially everything that is evolving with financial

5   technology through other firms, start-ups.  It was really

6   a gamut of anything that involved a remittance, a

7   cross-border transfer, foreign exchange, and even some

8   technologies regarding stored value or any of the

9   innovations that you are reading about with personal

10  financial technology.

11      Q.   Other than the Ripple products, the ODL product,

12  that you ended up forming a relationship with Ripple to

13  use, did any other products -- were any other products

14  adopted by MoneyGram from that lab?

15      A.   There were some features on our app that

16  were -- that benefitted from that research.

17      Q.   How about blockchain-related applications, was

18  anything other than the Ripple ODL something that

19  MoneyGram ended up using?

20      A.   When we signed the agreement with Ripple, we

21  also agreed to a -- like a noncompete, which basically

22  ended most of the blockchain research that we had been

23  doing.

24      Q.   Was that part of -- was that an amendment that

25  added that exclusivity?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 63

1                     LAWRENCE ANGELILLI

2          A.   No.   That -- I believe that was in the

3    first -- first iteration.

4          Q.   Okay.   Well, we can come back to that.

5                    As of today, now that you don't use the ODL

6    product anymore, are there other alternatives on the

7    market?

8          A.   There isn't a precise version of what ODL is.

9    There is iterations of it.   There's tokens called

10   stablecoins, which have potential implications for

11   MoneyGram.   There is other blockchain technology that

12   might be relevant.   We haven't had a lot of time to --

13   since the termination of the agreement to really beta-test

14   a lot of the technology, but there are alternatives, not

15   just a perfect alternative.

16         Q.   Is it fair to say that there's no other

17   comparable solutions to facilitate cross-border

18   transactions in real time besides the ODL product?

19         A.   That is what I said to the "Wall Street

20   Journal."   That -- what I was referring to there is that

21   there isn't a brand X that we could just plug and play

22   with -- with what we were doing with Ripple.   There isn't

23   like a brand X that does what Ripple does.

24         Q.   So ODL is a unique product in that respect?

25         A.   Yes.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 64

1                       LAWRENCE ANGELILLI

2       Q.    And that's one of the attractive things of ODL?

3       A.    Yes.

4       Q.    The -- okay.  You have mentioned the pilot that

5  you started -- that you did with the ODL product.

6                   The -- let me show you a document relating

7  to that pilot.

8                   Did you see any analysis of that pilot

9  program?  Did you -- did you actually review any analysis

10  of it?

11      A.    Yes, I did.

12      Q.    Okay.  Let me show you what we'll mark as

13  Exhibit 2.

14                  (Exhibit 2 marked.)

15      Q.    (BY MR. CERESNEY)   And just -- and I will hand

16  this to you.

17                  MR. CERESNEY:  And just for the record,

18  this is RPLI_SEC 0653097 to 3110, and it's an e-mail from

19  ███████████████████ to a number of MoneyGram employees,

20  including ██████████ and ████████████.

21      Q.    And the e-mail says, Hi, ████ and████

22  Attached please find the MoneyGram xRapid pilot executive

23  report that we will review on our call today.  Please

24  forward to the MoneyGram team.

25                  So take a look at that and tell me if you

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 65

1                        LAWRENCE ANGELILLI

2     recognize this document.

3         A.    I remember some of it, but I don't think I was

4     on this distribution.

5         Q.    Did you ever see this document at the time?

6         A.    I remember seeing this flowchart.  I don't --

7         Q.    Flowchart being on page -- slide 4.  Yeah.

8               What else do you remember seeing?

9         A.    I don't specifically recall these pages.

10        Q.    Okay.  By the way, you mentioned that there

11    was -- you had authorized ███ as a pilot transaction.

12    Was that the extent of the pilot transactions?

13        A.    No.  We did two separate pilots.  We did that

14    one that I described previously, which was before Ripple

15    even knew about us.  And then we did a subsequent pilot of

16    6 transactions that was done, I think, probably in

17    conjunction with what you're looking at.

18        Q.    So this is the subsequent pilot?

19        A.    Yes.

20        Q.    Okay.  So this is the second phase of whatever

21    pilots you did.

22               And you mentioned the first -- you have to

23    answer "yes."

24        A.    Yes.

25        Q.    Yes, okay.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 66

LAWRENCE ANGELILLI

2          You mentioned that the first series of

3     pilots was before really there was any real discussion of

4     the ultimate relationship?

5          A.   Yes.

6          Q.   Okay.  So then looking at this one, I want

7     to -- first of all, looking at slide 4, which is, I think,

8     you said you did see, this -- these pilot

9     transactions -- between what jurisdictions did these pilot

10    transactions -- were they done?  Through what

11    jurisdictions were they done?

12         A.   Can you repeat that question?

13         Q.   Which jurisdictions -- what's the corridor that

14    was used for these pilot transactions?

15         A.   Mexico.

16         Q.   So U.S. to Mexico?

17         A.   Correct.

18         Q.   Okay.  And then did these transactions

19    essentially work -- why don't you just describe how these

20    transactions worked?

21         A.   My understanding is that this was the first test

22    of having the integration with Ripple.  And this was the

23    beta test of -- and if ▮▮▮▮▮▮▮▮ was involved, which is

24    who this was generated by, it was in an operational

25    exercise to make sure that the integration worked and

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1                    LAWRENCE ANGELILLI

2    that -- and then we were looking at the effectiveness

3    of -- of our cost per transaction.

4         Q.   So you mentioned Yale Vinson.  Who is Yale

5    Vinson?

6         A.   He was in the lab.

7         Q.   Okay.  And was he the head of the lab?

8         A.   No.

9         Q.   What was his role in the lab?

10        A.   To be one of the testers of the technologies

11   that were out there.

12        Q.   And was that his role throughout this period

13   that you had the relationship with Ripple?

14        A.   I -- I'm not real close to what his job

15   description is.

16        Q.   Okay.  Who day-to-day managed the relationship

17   with Ripple?

18        A.   I'm sorry?

19        Q.   Who day-to-day at MoneyGram managed the

20   relationship with Ripple?

21        A.   It -- it changed over time.  Prior to the

22   agreement, there were two simultaneous teams.  There was

23   the IT function that was working on the specs that were

24   required to do an integration and you create the bot that

25   was necessary to run these transactions.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 68

```
1                     LAWRENCE ANGELILLI

2                The second team was Alex Holmes and myself,

3    and then Kamila Chytil, who was the COO at the time, and

4    ran IT.  And we were running point on negotiating the

5    agreements and dealing with more of the management issues

6    on the -- on the agreement.

7         Q.   Okay.  And ███████████████ who is she?  She's

8    also on this.

9         A.   I don't know.

10        Q.   Turning to page 6 of this document, I wanted to

11   just walk through some of what this shows.  On the

12   left-hand side is dates.  Are those the dates of the

13   transactions?

14        A.   Yes.

15        Q.   And then there's a reference to -- in the next

16   column -- xRapid FX rate, and then the -- under that is

17   spot FX rate.  Do you know what those two columns

18   represent?

19        A.   Those are the two metrics that we were using.

20   It was the rate that we executed through the xRapid system

21   on the left and the Bloomberg spot rate, which we

22   referenced in our commercial agreement.

23        Q.   Okay.  And what did that analysis show about the

24   difference between those two rates in these pilot

25   transactions?
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 69

1                        LAWRENCE ANGELILLI

2        A.    That it was cost-effective on a currency

3   conversion perspective, but not in all-in cost

4   perspective.

5        Q.    Okay.  So on a currency perspective, what do you

6   mean by that?  Just --

7        A.    Just that the average execution on the foreign

8   exchange trades prior to fees was better than the spot

9   rate.

10       Q.    And what -- what -- what are the fees that

11  you're referencing here?

12       A.    My belief is these are exchange fees, but I was

13  not a party to creating this.

14       Q.    Okay.  But your understanding with regard to the

15  ODL product was that the two sets of fees were the FX rate

16  and the exchange fees; is that fair?

17       A.    Yes.

18       Q.    And so this pilot project showed that as to FX,

19  the ODL product performed better than the spot market?

20       A.    On these days, yes.

21       Q.    But it also showed that there were fees to the

22  exchanges paid as well?

23       A.    Yes.

24       Q.    And that ultimately, what was the -- what did it

25  show about the ultimate cost of the ODL transactions?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 70

1                          LAWRENCE ANGELILLI

2          A.    The ultimate cost was that this was not

3    cost-effective.

4          Q.    Okay.  As currently structured?

5          A.    In this test.

6          Q.    In this test.

7                Looking at the next page, there are a

8    number of measures here.  First one is payment speed, and

9    it talks about a pilot target of 2 minutes, 30 seconds and

10   then an ultimate result of 2 minutes, 37 seconds.

11               What was your understanding as to the speed

12   of the pilot transactions?

13         A.    It was excellent.

14         Q.    And that was important to MoneyGram in

15   connection with the use of this product?

16         A.    Yes.

17         Q.    And transparency is the next one.  The pilot

18   target was full visibility as to the status of payment,

19   and the pilot result is X.

20               Do you know what that means?

21         A.    This was early, and it was hard for us -- we

22   were not receiving information from Ripple that would help

23   us to reconcile our Mexican bank account.

24         Q.    Okay.  The next line says, Average slippage less

25   than ██ percent and the pilot result shows ██ percent.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 71

```
 1                    LAWRENCE ANGELILLI

 2              What is your understanding as to what

 3    slippage is?

 4        A.   My understanding is those are transactions that

 5    didn't -- that weren't fulfilled.

 6        Q.   Well, the next one says, Payment failure rate.

 7    And that says, The target was less than    percent, but the

 8    result was         percent.

 9              Does that provide you with any -- any

10    insight as to what the word "slippage" means there?

11        A.   No.

12        Q.   Okay.

13        A.   So I would say I'm -- I'm not familiar, then,

14    with what the slippage -- average slippage is.

15        Q.   Okay.  Fair enough.

16              Now, I want to just go back

17    to -- paragraph 10 of your declaration, if you just go

18    back to that for a moment.  That is Exhibit 1.

19              It indicates, In 2018 and early 2019, MGI

20    represented to Ripple, including its senior management,

21    that the pilot test did not produce better economic

22    results for the company than MGI's existing trading

23    practices due to the excessive cost of transacting in XRP.

24              Paragraph 11 then says, In August 2018,

25    Ripple responded to MGI's concerns by suggesting that a
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 72

1                       LAWRENCE ANGELILLI

2    commercial agreement, including an integration of MGI

3    systems with the ODL platform, would solve most of MGI's

4    issues related to XRP trade execution by creating

5    a reli- --- sorry, by creating reliable XRP transaction

6    flows as a result of the proposed agreement.  Ripple also

7    claimed that it could develop a network of training

8    counterparties and prioritize certain foreign currency

9    markets over time, thereby ensuring that MGI could execute

10   transactions in the same matter as its existing FX

11   trading.

12                  I just want to ask you about this reference

13   to the integration of the MGI system with the ODL

14   platform.

15                  What was your understanding about what that

16   involved?

17       A.    I was actually in the room at the time of this

18   conversation.  And when we discussed the issues in Number

19   10, there was a response that was sort of like, well, of

20   course, because it's not -- it's not integrated with us,

21   we couldn't see these, and that the whole idea here is

22   that we were going to be arranging trading counterparties;

23   that we were going to have market makers on the other

24   side; and that when you give us the opportunity to

25   establish market makers, you're going to see the spreads

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 73

```
 1                     LAWRENCE ANGELILLI
 2    come in, and it will solve the problem.
 3        Q.    And just -- was this a particular meeting that
 4    you had with Ripple personnel?
 5        A.    Yes.
 6        Q.    And who else was present at that meeting?
 7        A.    ██████████████      was really the person that
 8    responded to my concern.  And, you know, it was sort of
 9    matter of fact that that's the reason that we needed a
10    commercial agreement was that we were correct and the
11    commercial agreement would be the solution to the problem.
12        Q.    And what was your response to her in that
13    meeting?
14        A.    We were interested in pursuing it to see if that
15    was true.  But it also inspired me to insert the language
16    into the commercial agreement that we would have a
17    make-whole agreement.
18        Q.    Okay.  Is it true that over time Ripple did
19    try -- did arrange for an increase in market makers and
20    liquidity in the markets in which the ODL transactions
21    were occurring?
22        A.    Yes.
23        Q.    And is it also true that over time the
24    integration of the platform improved MoneyGram's
25    performance -- I'm sorry; improved the ODL product's
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 74

1                          LAWRENCE ANGELILLI

2    performance in connection with the MoneyGram transactions?

3         A.    In Mexican peso, yes.  In euros, yes.  In Aussie

4    dollars and in Filipino peso, no.

5         Q.    Okay.  And is that because those were newer

6    markets that -- where the liquidity wasn't as extensive?

7         A.    Australian dollars, yes; Filipino peso, no.

8         Q.    What was the issue with the Filipino peso?

9         A.    We don't know.  We just know that our execution

10   was not favorable.

11        Q.    Okay.  Were you also aware at the time that the

12   ODL was a new product?

13        A.    Yes.

14        Q.    And that Ripple was trying to address a number

15   of issues that had arisen because it was a new product?

16        A.    Yes.

17        Q.    And that -- is it fair to say that Ripple was

18   trying to work overtime to address those issues?

19               MR. MOYE:  Objection, foundation.

20        Q.    (BY MR. CERESNEY)   From your perspective?

21        A.    From my perspective, their -- their effort

22   declined over time.

23        Q.    Okay.  But at least in the initial stages, you

24   believe they were trying to address those issues?

25        A.    Yes.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 75

1                    LAWRENCE ANGELILLI

2        Q.    And did it decline over time because people left

3    that you might have referenced earlier?

4        A.    I don't know.

5        Q.    Okay.  And when you say "declined over time,"

6    you mean the actual performance declined as opposed to the

7    efforts to try to address?

8        A.    I was referring to the effort.

9        Q.    Okay.  And what specifically would you point to

10   along those lines?

11       A.    In the initial phases, we gave a list of

12   approximately eight currencies, in addition to the four

13   that we were trading in ,that we thought were very

14   important to the success of the relationship.  They were

15   currencies that were important to MoneyGram in terms of

16   our flows, and they were also important to MoneyGram where

17   those were currencies that didn't have established cash

18   markets and where the ODL product would be highly

19   complementary to our funding strategies in those

20   currencies.

21                  They took those lists in the beginning.

22   They actually, I believe, added a couple that they were

23   interested in.  And then, ultimately, we saw the effort

24   around adding any additional currencies fall almost to

25   zero.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 76

1                       LAWRENCE ANGELILLI

2        Q.   Was there any discussion as to whether that was

3   because Ripple was trying to address and improve

4   performance in the currency markets in which they were

5   already operating?

6        A.   They never explained it.

7        Q.   Okay.  But you didn't have visibility into why

8   that was?

9        A.   I just know that the people that were working on

10  it ultimately resigned, and I don't think they were

11  replaced.

12       Q.   Okay.  And by the way, you also indicated that

13  over time, I think, following the June 2020 amendment of

14  the -- of the agreement, that your volumes went down

15  pretty significantly?

16       A.   At their behest, yes.

17       Q.   At Ripple's request?

18       A.   Yes.

19       Q.   Okay.  By the way, were you aware of whether

20  they were other ODL customers as well?

21       A.   There are a couple public Web sites that you can

22  go to that show ODL volume, and we started to become aware

23  of those.  And we began to realize that when we subtracted

24  our volume from what we could see publicly, that we were

25  in excess of ████ to ████ percent of their total volume on

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 77

```
 1                    LAWRENCE ANGELILLI

 2   ODL.

 3        Q.   And what period of time are you talking about

 4   when you --

 5        A.   That would be.

 6        Q.   -- made that analysis?

 7        A.   Starting in the spring of 2020, and through the

 8   end of the relationship.

 9        Q.   And what public sites are you referring to when

10   you say that?

11        A.   I don't know the names of them offhand, but they

12   are -- and -- and I didn't have them on my phone, but I

13   was constantly made aware of -- of that stat.

14        Q.   And were you aware -- okay, strike that.

15             Now, I want to show you some documents.

16   Let's do this, let's start with --

17             MR. LEWIS:  Andrew, maybe before we start

18   this document --

19             MR. CERESNEY:  Oh, yeah.

20             MR. LEWIS:  -- can we take just like a

21   five-minute --

22             MR. CERESNEY:  Yeah.  Okay, let's go off

23   the record.

24             THE VIDEOGRAPHER:  Off the record at 10:57.

25             (Recess in the proceedings from 10:57 to
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 78

1              LAWRENCE ANGELILLI

2          11:10 a.m.)

3          THE VIDEOGRAPHER:  We're back on record at

4    11:10.

5      Q.   (BY MR. CERESNEY)   Before I go to the exhibit

6    and focus on some of the public statements that you've

7    made, I just want to ask you a couple of questions about

8    other -- I asked you early on about other money remitters

9    that are out there, smaller ones.

10              Is it fair to say that those money

11   remitters don't have the sophisticated treasury operations

12   that MoneyGram has?

13          MR. MOYE:  Objection, foundation,

14   speculation.

15      A.   Yeah, hard to say.

16      Q.   (BY MR. CERESNEY)   Well, you attended industry

17   conferences?

18      A.   I would say that foreign exchange is the core

19   competency of MoneyGram.

20      Q.   And you guys are much more sophisticated than

21   nearly every money remitter out there; is that fair?

22      A.   I would qualify that answer in saying that we're

23   more sophisticated across a broad range of currencies, but

24   within specific markets, we can get outgunned in those

25   foreign exchange markets by locals who are either

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 79

1                    LAWRENCE ANGELILLI

2   domiciled in those countries or that specialize in maybe

3   one or two currencies.

4                    So it's not necessarily true that we're

5   sophisticated across the board against all of our smaller

6   competitors.  And, in fact, sometimes they may even have a

7   lower cost structure than we do.

8       Q.   Are some of the remitters -- do all money

9   remitters aggregate transactions like MoneyGram does, in

10  terms of transfers across jurisdictions?

11                   MR. MOYE:  Objection.

12      A.   I believe so, yes.

13      Q.   (BY MR. CERESNEY)   All do?

14      A.   I don't think there's technology that would

15  author -- avail them other than that.

16      Q.   Does the ODL technology have the potential to

17  allow for remittence-by-remittence type transfers?

18                   MR. MOYE:  Objection, calls for

19  speculation.

20      A.   In its purest form, yes.

21      Q.   (BY MR. CERESNEY)   And so a money remitter that

22  does a trans -- a remittance-by-remittance transfer

23  through the ODL system, that might be a different cost

24  structure than the cost structure that MoneyGram has?

25                   MR. MOYE:  Same objection.  No foundation.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 80

1              LAWRENCE ANGELILLI

2        A.   It would be a higher cost structure than

3   MoneyGram has.

4        Q.   (BY MR. CERESNEY)   And the ODL product might

5   actually be more efficient for those types of

6   transactions?

7        A.   No.  And the reason for that is that this gets

8   to trade failures, is that in our business, we really have

9   100 percent -- we don't have a slippage concept.  We don't

10  have a -- the ability to clear 99.9 percent of our

11  transactions.  We have to have 100 percent.  And that's

12  one of the risks that we were cognizant of here, is that

13  if a customer didn't get their money through some fault

14  that's not our own, it's still our problem.  And it's a

15  major issue for this industry, not just MoneyGram.

16       Q.   So even if you could solve for the failure rate,

17  though, you could do money remittence transactions

18  directly through ODL; that might be more cost-effective

19  than the aggregated transactions?

20       A.   I can't -- I can't visualize that, so I can't

21  answer that question.

22       Q.   It's possible, though?

23       A.   The issue that you're bumping up against here is

24  sort of the concept of wholesale and retail, is that one

25  of the axioms of the foreign exchange markets is that size

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 81

```
 1                        LAWRENCE ANGELILLI

 2   creates cost benefit.

 3              So if we were to go out and try to do a

 4   series of ▮▮▮ transactions, which is our average customer

 5   transaction, going out and buying ▮▮▮ of a currency

 6   typically would cost you a lot more than going out and

 7   buying ▮▮▮▮▮ of a currency.

 8              So one of the reasons that this industry

 9   has been able to grow is this aggregation concept, in that

10   you're -- you're creating, you know, sort of a tension

11   against a foreign currency market that works opposite.

12                   Typically, if you want to buy more of

13   something, you get a discount.  I think that that's the

14   way the foreign exchange markets work.  So that's why,

15   theoretically, I would suggest that, no, doing a million

16   ▮▮▮ transactions would not be cost-beneficial to doing

17   one ▮▮▮▮▮ transaction.

18       Q.    Okay.  If you -- though, if you had a smaller

19   number of transactions -- in other words, didn't have the

20   volumes that you're assuming, and you were doing smaller

21   volume transactions -- in theory, the ODL product could be

22   more efficient than the transactional payment rails; is

23   that fair?

24       A.    No.  Because if you were competing against

25   MoneyGram, our foreign exchange rate would always be
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 82

                        LAWRENCE ANGELILLI

1

2    favorable to where your cost of foreign exchange would be.

3        Q.    Okay.    But there are ways in which you said

4    local remitters can compete against MoneyGram?

5        A.    But they're also aggregating.

6        Q.    Okay.    Are there disruptors in the money

7    remittence industry?

8        A.    There's many people attempting to disrupt the

9    remitter industry.

10        Q.    And are some of those disruptors engaging in

11    transactions on a remittance-by-remittance basis as

12    opposed to aggregating?

13        A.    The only one that I can think of was a company

14    called ███, whose average transaction is 10 to 15 times

15    larger than ours.  But on all the others, I'm not aware

16    that anybody is.

17        Q.    And ███ is doing it with -- by transaction by

18    transaction?

19        A.    I'm not aware of how their back office works,

20    but some of their public statements suggest that is true.

21    I'm not sure.

22        Q.    Okay.    One other set of questions, then we'll go

23    back.

24                    MoneyGram was a big name in the money

25    remittence field.  I think we established that, correct?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 83

```
 1                    LAWRENCE ANGELILLI

 2       A.    Yes.

 3       Q.    Was it -- were you conscious of the fact that

 4   for Ripple to have MoneyGram as a customer, it was a

 5   positive thing for Ripple?

 6       A.    Yes.

 7       Q.    And in fact, from Ripple's perspective, would

 8   that have potentially had the impact of providing them

 9   with an incentive to provide certain incentives to

10   MoneyGram to become a customer?

11       A.    Yes.

12       Q.    Is that a phenomenon, of providing those types

13   of incentives to get big headline customers, is that

14   something that you're familiar with in the business world?

15       A.    Yes.

16       Q.    Can you think of other companies that -- that do

17   that these days?

18       A.    You know, in Internet commerce you see it all

19   the time, where people will lead with a low price or even

20   lose money in the initial phases of their growth curve.

21       Q.    Was it your understanding that some of the

22   incentives that Ripple was providing to you was because of

23   that dynamic?

24       A.    Yes.

25       Q.    Okay.  Let me show you what has been marked as
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 84

1                    LAWRENCE ANGELILLI

2    Exhibit 3.

3                    (Exhibit 3 marked.)

4         Q.   (BY MR. CERESNEY)   Which is a -- yeah.   Which

5    is a Q&A that's attached to an e-mail.

6                    So just for the record, the -- this is

7    MoneyGram SEC 0011478 to 486.   And it's an e-mail that has

8    attached to it Q&A that looks to be from June

9    17th -- well, a press release and then a Q&A from June

10   17th, 2019, which I believe was the day that the Ripple

11   agreement was announced?

12        A.   Okay.

13        Q.   Do you recognize -- I want to direct your

14   attention to the Q&A that's attached to it, which is on

15   page -- 482 is the Bates, and just page 5 of the exhibit.

16                   It says at the top, MoneyGram Ripple

17   announce FAQ 6/17/2019.

18        A.   Yes.

19        Q.   And do you recognize this FAQ?

20        A.   Yes.

21        Q.   What was the purpose of this FAQ?

22        A.   These were talking points to make sure that

23   everybody understood our motives and aspirations for the

24   agreement.

25        Q.   And who -- who were these talking points

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1                    LAWRENCE ANGELILLI

2    designed to be used with?

3         A.    We were concerned at the time that a lot of our

4    employees all over the world were going to be getting

5    inquiries.  This was a global news story.  And rather

6    than -- and we were also expecting that a lot of our large

7    financial institution agents would be asking their --

8    their representatives from MoneyGram about the Ripple

9    arrangement. The banks were -- and regulators were very

10   interested in this at the time.

11                    So we put this out to make sure that

12   everybody had a consistent and accurate description of the

13   program.

14        Q.    And did you review these at the time?

15        A.    I did.

16        Q.    Were you satisfied that they were accurate?

17        A.    Yes.

18        Q.    And sitting here today, do you believe they are

19   accurate?

20        A.    Yes.

21        Q.    So looking at this page, the Question Number 3

22   says, What are the benefits of this partnership to

23   MoneyGram?

24                    And the answer there is:  Through our

25   partnership with Ripple, we will have the opportunity to

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 86

1                       LAWRENCE ANGELILLI

2    significantly enhance our operations, lower our costs of

3    foreign currencies, reducing the foreign exchange risk,

4    and dramatically streamlining our global liquidity

5    management.  The on-demand liquidity offered through XRP

6    will further enhance how we complete cross-border

7    payments.

8                       So I want to ask you:  First of all, is

9    this accurate?

10        A.    At the time, yes.

11        Q.    And you believed at the time that the ODL

12   product had great promise?

13        A.    This was -- this describes our aspirations.

14        Q.    Okay.  And so I wanted to ask you about a number

15   of the concepts that are in this answer.

16                       So one of the concepts is that you'll have

17   the opportunity to significantly enhance our operations.

18                       In what way did you think you would have

19   the opportunity through the ODL product to significantly

20   enhance your operations?

21        A.    It provided an opportunity through the bot of

22   actually automating our foreign exchange and having the

23   ability to scale and cash markets on an automated basis.

24        Q.    Then it says, You'll have the opportunity to

25   lower our costs of foreign currencies.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 87

1                        LAWRENCE ANGELILLI

2              What did you understand that to mean?

3        A.   Well, under the agreement, because we had a

4    ████████████   in the agreement, we knew that it was going to

5    execute at or near the market on a net-net basis.  And we

6    had been assured, as we've discussed, that, you know, over

7    time we would probably be able to get execution that was

8    through the -- through the market.

9        Q.   And you say -- or then it says you have an

10   opportunity to reduce the foreign exchange risk.

11             What did you mean by that?

12       A.   That's the basis risk we discussed earlier.

13       Q.   Okay.  And that's the risk that the currency can

14   move from the time of the transaction with -- that the --

15   the time between the transfer of the currency and the

16   actual currency reaching the account, basically?

17       A.   Yes.

18       Q.   And then the last part of that this, it says,

19   And -- and in brackets, dramatically, close brackets,

20   streamlining our global liquidity management.

21             Why did you believe at the time that the

22   ODL product had the potential to dramatically streamline

23   your global liquidity management?

24       A.   We basically looked at our major currencies and

25   realized that, you know, a significant majority of our

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 88

                         LAWRENCE ANGELILLI

1

2    trades were conducted in the spot market.

3                 So we extrapolated from that and said,

4    well, if we were able to convert our major currencies into

5    the cash market and not use the spot market, or even

6    eliminate the number of forwards that we needed to do

7    around holidays and weekends, that it would have a

8    dramatic impact on our working capital.

9         Q.   And just for the purposes to make sure that

10   folks understand, let's just define what we mean by spot

11   market and cash market.

12               So can you sort of give us an explanation

13   of what each of those is.

14        A.   Sure.  So in the -- in the foreign exchange

15   markets there's three primary short-term purchase options.

16   One is called the today market or the cash market.  That

17   is the -- essentially, the disruptive technology that

18   Ripple was offering and saying they were offering a

19   substitute for that same-day trade, where the money, as I

20   described earlier, you get a trade done before noon, and

21   you'll see it in the bank account the same day.

22               Not every country has a liquid currency

23   that can provide a cash market.  But, typically, in the

24   G10 there is a cash market for most of those currencies.

25               Then there is the tomorrow market, which is

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 89

1                          LAWRENCE ANGELILLI

2    T+1 market.  It's not as liquid.  It's not as frequently

3    used, but it's available in large liquid currencies.  And

4    that's just a T+1 market.

5                      And then there's the spot market, which is

6    the most commonly used foreign exchange market.  And

7    that's the market that rates are based on.

8                      So you start with the spot market, and then

9    there's sort of a time value of money calculation that

10   goes with, I'm going to charge you more for T+1 and I'm

11   going to charge you even more for T+2.

12                     So spot is -- usually, if you're looking at

13   a screen, spot is going to be the best foreign exchange

14   rate that you will see on the screen.

15   Q.   And so the concept here is the ODL product would

16   allow you to use the cash market, which has benefits over

17   the spot market?

18   A.   From a working capital and from a basis risk

19   perspective.

20   Q.   And that was a positive aspect of -- of the ODL

21   product, as you understood it at the time?

22   A.   Yes.

23   Q.   Let's turn to page Bates Number 484, which is

24   just two pages later.  And I just want to ask you about

25   Question Number 9 there, which says -- the question is:

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 90

1                    LAWRENCE ANGELILLI

2    Western Union had negative feedback about its trial with

3    Ripple, why will this partnership be different?

4              Okay.  Just pause there for just a second.

5              What's your understanding as to what

6    Western Union had said about the -- its trial with Ripple?

7         A.   It was our understanding that Ripple had been

8    attempting to do relationships with other remitters.  We

9    weren't the only ones.  And Western Union, being the

10   largest in the world, was certainly a target of theirs.

11              On an earnings call, where their chairman

12   and CEO was responding to a question about their interest

13   in blockchain and cryptocurrencies, he made a statement

14   that said, Well, we tried out Ripple and it doesn't work.

15   And he made that in a very public forum at the same time

16   that we were actually signing this agreement.

17        Q.   And what was your -- what was your view on that

18   feedback at the time?

19        A.   Our view was that they did what we did, and came

20   to the same result that we came to, and that it wasn't

21   viable for Western Union, but that we signed a commercial

22   agreement that had indemnifications in it that shielded us

23   from those losses.

24        Q.   And so you thought the product had enough

25   potential to justify using it, notwithstanding the fact

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 91

1                    LAWRENCE ANGELILLI

2    that at the time, the cost structure -- the costs

3    were -- notwithstanding the cost structure at the time?

4         A.   I would phrase it differently and say that we

5    were comfortable that we were indemnified from the

6    downside, so we could take that risk and felt comfortable

7    that we were going to be -- it was sort of a no-downside

8    agreement for us.

9         Q.   And lots of upside?

10        A.   Yes.

11        Q.   Okay.  And then the answer there is:  We cannot

12   speak to Western Union's experience, but what we can tell

13   you is that for the duration of our initial partnership

14   announced in January of 2018, Ripple has been an

15   outstanding partner and has had a positive impact on our

16   business. This is one of the reasons why we have decided

17   to enter into the partnership announced today.

18             What was your understanding at the time,

19   when the answer said Ripple has been an outstanding

20   partner and has had a positive impact on our business,

21   what was your understanding about what was intended there?

22        A.   In the initial phases of the relationship, they

23   assigned an entire team of people.  And in fact, under the

24   agreement, we even made provisions where they could have

25   up to three offices at MoneyGram's headquarters for their

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 92

1                    LAWRENCE ANGELILLI

2    employees to work with us on a full-time basis to launch

3    this program.

4                    There was a tremendous amount of energy and

5    enthusiasm and analysis of how we conducted our foreign

6    exchange operations.  And it was very promising that these

7    were energetic, competent people that were basically

8    coming and spending, from what I could tell, you know,

9    virtually all of their time on the MoneyGram relationship.

10        Q.    And did these people seem committed to trying to

11   make the product work?

12        A.    Yes.

13                    (Exhibit 4 marked.)

14        Q.    (BY MR. CERESNEY)    Let's take a look at Exhibit

15   4, which is a PowerPoint from MoneyGram's 2019 second

16   quarter results.  And I'll turn this to you.

17                    And while I do, just can you -- each

18   quarter, does MoneyGram do an earnings call with analysts?

19        A.    Yes.

20        Q.    What's the purpose of the earnings call?

21        A.    Reply to forum for us to --

22                    MR. MOYE:  Can we just wait until we hand

23   these out?  Sorry.

24                    MR. CERESNEY:  Well, I'm just asking

25   general questions.  I'm not asking about the document.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 93

1                    LAWRENCE ANGELILLI

2              MR. MOYE:  Hard to concentrate on two

3     things at once.

4        A.   It's a forum --

5              MR. CERESNEY:  Okay, Rob.  I'm not going to

6     comment on that, Rob.

7              MR. MOYE:  Hard for me, I should say.

8              MR. LEWIS:  He's trying to chew gum at the

9     same time, but I'm not sure.

10             MR. CERESNEY:  Fair enough.  I don't want

11    to -- I don't want to tax you, Rob, okay?

12                  Are you okay?

13             MR. MOYE:  Yeah.

14       Q.   (BY MR. CERESNEY)   Just tell us about --

15       A.   It's a forum for us and -- and most public

16    companies to provide additional color around the

17    performance of the company, and to answer questions from

18    the key analysts who covered the stock.

19       Q.   And in those calls, do you prepare for those

20    calls?

21       A.   We do.

22       Q.   How do you prepare for those calls?

23       A.   We have a series of meetings where we write the

24    press release, and we also create a script to -- to read

25    from for the first part of the call.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 94

1                    LAWRENCE ANGELILLI

2        Q.   Do you also have a Q&A, in case questions are

3    asked by analysts?

4        A.   We do that informally.

5        Q.   Okay.  Is there a written document that's a Q&A,

6    or is it a -- or --

7        A.   No there isn't.

8        Q.   -- is it in your head?

9        A.   It's in our head.

10       Q.   Okay.  But you have meetings to discuss what

11   might come up?

12       A.   Yes.

13       Q.   And you're prepared to address questions that

14   might come up?

15       A.   Yes.

16       Q.   Are you careful in those calls to be completely

17   accurate about what you say to the analyst?

18       A.   We are.

19       Q.   And -- and there are consequences if you're not

20   accurate in those calls; is that fair?

21       A.   It's all on the record, and yes, there are

22   consequences.

23       Q.   And in fact, some of the consequences could

24   include civil lawsuits, SEC investigations and other types

25   of consequences; is that fair?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1                    LAWRENCE ANGELILLI

2        A.   Yes.

3        Q.   And by the way, there has been a class action

4   lawsuit filed against MoneyGram relating to statements

5   that you made -- you and the CEO made on earnings calls;

6   hasn't there been?

7        A.   That was dismissed, I think, on Friday.

8        Q.   Okay.  Congratulations.

9        A.   Thank you.

10        Q.   Was that on a motion to dismiss it was

11   dismissed?

12        A.   It was extremely -- I think they withdrew it

13   themselves, if I am correct.

14        Q.   Did that allege misstatements on these calls?

15        A.   It -- it did allege them, but I'm not sure which

16   statements they were alleging.

17        Q.   Okay.  Bottom line, though, you didn't believe

18   there was any merit to that suit?

19        A.   Correct.

20        Q.   Yeah, okay.

21             So I want to just focus, then, on

22   this -- oh, for every earnings call, is there also a dec

23   that is used?

24        A.   Yes.

25        Q.   And how is that dec used?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 96

1                      LAWRENCE ANGELILLI

2        A.    It is timed to go with the part of the script

3   where we're describing what is on this line.

4        Q.    Was this the first earnings call after the

5   Ripple agreement had been signed?

6        A.    Yes.

7        Q.    And also, would it be fair to say that you made

8   sure that the dec was accurate as well?

9        A.    Yes.

10        Q.    I want to turn to slide 7 of this slide dec.

11   There is no Bates number on this, but slide 7 -- slide 7

12   of the slide dec talks about strategic partnership with

13   Ripple.

14              Do you see that?

15        A.    Yes.

16        Q.    On the left-hand side of the slide, it says, The

17   partnership enables us to more closely align funding costs

18   to daily transactions, which will help streamline our

19   global liquidity management.

20              We talked about the streamlining of global

21   liquidity management.  I assume that's the same point that

22   you referenced a moment ago?

23        A.    Yes.

24        Q.    On the closely aligned funding costs to daily

25   transactions, what did that mean?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 97

1                    LAWRENCE ANGELILLI

2        A.   That is the basis risk I was describing.

3        Q.   Okay.  So when you say, "the partnership enables

4   us to do that," you understood at the time that the

5   partnership, the ODL product, was going to enable you to

6   do those things, basically?

7        A.   And then I think, you know, in my review of this

8   slide, the word "enable" was important.  That this was an

9   enabler, that it wasn't yet.  But, yes, that's true.

10       Q.   So enable means over time?

11       A.   Yes.

12       Q.   Okay.  And then on the right-hand side, you

13  say -- it says -- not you say, it says, Reduces operating

14  costs and working capital needs, to improve earnings and

15  free cash flow.

16                 What did that mean?

17       A.   So the reducing operating costs of foreign

18  exchange costs actually run through our operating expense

19  line.  So to put the right with the left in the sense that

20  there was a reduction in basis risk, it also could improve

21  our -- our cost of -- of foreign exchange.  And also,

22  the -- we knew at the time that the commercial agreement,

23  the incentives would be a material improvement of our

24  earnings to cash flow.

25       Q.   And this reference here to working capital, is

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 98

1                        LAWRENCE ANGELILLI

2     that a reference to what we talked about earlier, which is

3     the potential to reduce your capital costs?

4          A.    Yes.

5          Q.    Okay.  So at the time, you believed that the ODL

6     product had the potential to do all of these things that

7     are in this slide?

8          A.    Yes.

9          Q.    Okay.  Let's look at Exhibit 5.

10                    MR. CERESNEY:  5?

11                    Yeah.

12                    (Exhibit 5 marked.)

13         Q.    (BY MR. CERESNEY)    Exhibit 5.  And this is

14    going to be the earnings call transcript for this earnings

15    call.

16                    And just in terms before we get to the

17    exhibit, in terms of how the earnings call worked, I take

18    it the CEO would make his -- his comments, and then you

19    would make comments as well?

20         A.    Correct.

21         Q.    And, generally, how did you divide up what the

22    CEO, Alex Holmes, covered versus what you covered?

23         A.    In general, it could vary, but generally, the

24    CEO discusses the strategic and, you know, business issues

25    of the quarter.  And I take everybody through the numbers.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 99

1          LAWRENCE ANGELILLI

2     Q.   Okay.  And then in terms of the questions, how

3  do you decide who handles which question?

4     A.   Typically, if it's a question regarding -- well,

5  many times the analyst will direct their questions either

6  to myself or to Alex.  If the -- if the question isn't

7  directed to me or him, we typically answer them if it's a

8  balance sheet or credit-related question, I will take it,

9  and if it's a business performance issue or strategic

10  issue, he would take it.

11     Q.   Okay.  We've been talking a lot today about some

12  of the benefits of the ODL product and the like.

13          Would it -- would it be fair to say that

14  Alex Holmes, CEO, shared your views at the time on the ODL

15  product?

16     A.   Yeah.

17     Q.   Okay.  In other words, there was no daylight

18  between your views and his views on these issues?

19     A.   No.

20     Q.   Okay.  Looking at page 3 of the transcript, does

21  this appear to be a -- a transcript of the earnings call?

22     A.   Yes.

23     Q.   And it's put out by Thomson Reuters.  Do they

24  provide accurate transcripts of earnings calls?

25     A.   With my experience, yes.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 100

1                         LAWRENCE ANGELILLI

2         Q.   Okay.  So on page 3, I want to look at the one,

3    two, three, fourth full paragraph there.  Starting with

4    "As you know."

5                   And this is in Mr. Holmes' comments.  He

6    says, As you know, with our partnership, Ripple has become

7    our key partner for cross-border settlement using digital

8    assets.  And I am so excited to announce today that

9    MoneyGram is now live and transacting on the MoneyGram --

10   I'm sorry; on the Ripple xRapid platform.

11                  First of all, would you agree with his

12   characterization as Ripple at the time as a key partner?

13        A.   Yes.

14        Q.   And then he says, We started executing trades

15   earlier this week.  And all signs point to this being a

16   tremendously beneficial relationship for all parties

17   involved.

18                  Would you agree with that characterization

19   at the time?

20        A.   Yes.

21        Q.   And, in fact, were you -- you were generally

22   excited by the prospects?

23        A.   Yes.

24        Q.   And then you said -- and then he said, We are

25   literally settling currencies in seconds, and to quote my

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1                    LAWRENCE ANGELILLI

2   friend Larry, -- that is you, right?

3        A.   Yes.

4        Q.   -- This is really cool.

5        A.   Yes.

6        Q.   Did you actually say that to Mr. Holmes?

7        A.   I did.

8        Q.   What did you mean when you said that?

9        A.   When we started executing officially, I pressed

10  the button, so to speak, on the very first Ripple

11  transaction.  And we had our screens up.  And I could see

12  the money actually go into our Mexican peso account

13  5 minutes after we executed the trade.  And I said at the

14  time, Wow, that is real cool.

15       Q.   Okay.  It's like pushing the button at the New

16  York Stock Exchange, yeah.

17       A.   It's sort of similar, yeah.

18       Q.   And then the next paragraph says, One of the

19  core strengths of MoneyGram is our global liquidity and

20  settlement engine that enables millions of customers to

21  move billions of dollars across 200 countries and

22  territories using 120 currencies.  We believe our

23  settlement engine is a key asset with additional

24  applications in use cases that could lead to new revenue

25  streams down the road.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 102

1                    LAWRENCE ANGELILLI

2              Let me stop there.

3              He says, We believe our settlement engine

4    is a key asset with additional applications in use cases.

5              What did he mean by that as far as you

6    understood?

7         A.   There's only two companies in the world that can

8    settle across 200 countries, and it's Western Union and

9    MoneyGram.  So it is a unique platform.  It's also one of

10   only two settlement engines in the world where we settle

11   with a country.  In other words, you send money to a

12   country.  You send money to Mexico.  You don't send money

13   to an agent location.

14             Both are unique, and both had been deemed

15   extremely valuable intrinsically to the company.

16        Q.   Just one question about that.  You said that you

17   and Western Union are one of the only two that send money

18   to the country as opposed to to the agent; is that what

19   you said?

20        A.   Yes.

21        Q.   So other money remitters -- we were talking

22   earlier about how other money remitters do transactions,

23   and you talked about aggregation.  Was the aggregation you

24   were referencing there aggregation by agent as opposed to

25   by country?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 103

1             LAWRENCE ANGELILLI

2       A.   No.  By aggregation, I was referring to just

3   lumping all of the transactions together to get money to

4   that country.  But the difference is, is that if you're

5   using somebody other than Western Union or MoneyGram, the

6   customer goes in and says, I want to send money to Mexico,

7   and the teller will say, Well, which location do you want

8   to send it to?  And they say, Oh, I want it to be picked

9   up at the corner of 5th and Main.  If the recipient goes

10  to the same agent -- I mean, the same remitter, but at

11  10th and Main, the money won't be there.  They have to go

12  to 5th and Main.

13            In our case, anybody who has the MoneyGram

14  flag would pay out that transaction.

15      Q.   I gotcha.  Okay.  So that is not about how the

16  money is moved; it's about where the customer can get

17  that?

18      A.   It's a customer experience issue.

19      Q.   Gotcha.  Okay.

20            So when it says here, Our settlement

21  engine, you're talking about the payout to the

22  customer there -- or I'm sorry; Mr. Holmes is talking

23  about the payout to the customer?

24      A.   It's -- no.  Our settlement engine actually now

25  has those agents where we can settle with them in these

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 104

1              LAWRENCE ANGELILLI

2    very tight window tolerances when we don't know in advance

3    where -- whether they're going to pay out or not.

4              So, you know, you think about it from a

5    day-to-day activity.  If I know that $1,000 is going to be

6    paid out at the corner of 5th and Main, I can stage that,

7    and I know where it's going to go.

8              In MoneyGram's case, we don't have any idea

9    of who is going to pay out on a transaction.  So our

10   settlement engine has greater flexibility and settlement

11   capabilities to be able to handle what, really until it

12   happens, we're not aware of which agents are going to

13   require a settlement.

14   Q.    Gotcha.  Okay.

15             And what revenue streams was he referring

16   to here?  What potential revenue streams was he referring

17   to here?

18   A.    Well, when you look at blockchain technology and

19   when you look at the ability to be 100 percent in the cash

20   market and when you look at the technology of actually

21   being able to do real time money transfers, where the

22   actual settlement of money coincides with the actual

23   transaction, which is not what we were using ODL for, but

24   it -- you know, it had promise in that regard.  There are

25   other personal financial transactions that are possible if

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 105

1                    LAWRENCE ANGELILLI

2   you can get that technology to work right.

3        Q.   So the ODL product had other potential uses

4   besides the one that you were using it for at that time?

5        A.   Yes.

6        Q.   And that was exciting to you?

7        A.   Yes.

8        Q.   Okay.  Let's turn to page 7 of the earnings

9   call.  And I want to focus on the question from the

10  Barclay's analysts.  He says -- he asks, And then I wanted

11  to ask on the Ripple partnership, I don't know, can you

12  maybe help us get a sense how much of the cost base you

13  think you could save?  Or I mean, clearly there is -- I

14  mean, you guys communicated.  There is some cost benefit,

15  but just trying to look -- trying to looking through the

16  income statement, help us understand a little bit where

17  and when we might expect to see that starting to come

18  through.

19                    And then Mr. Holmes responds -- he starts

20  to respond, And I mean, I guess, fundamentally right.  I

21  love to say there really is no way to instantly move money

22  anywhere around the world, right?  We run a giant net

23  settlement engine, and I think we do it better than

24  anybody.  That's kind of how you get money from Point A to

25  Point B these days.  And I think you have two ways of

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 106

1                      LAWRENCE ANGELILLI

2   doing that.  You have kind of the consumer side of it.

3   Then you have your back-end settlement and trading

4   processes.  And we know what this product has the

5   capability to do is actually completely streamline and

6   transform our back-end capabilities and for the first

7   time, I think ever really, actually enable money to move

8   instantly or as close to instantly -- to instant as

9   humanly possibly.

10                      So, first all, what did -- what was your

11  understanding about what Mr. Holmes meant in that comment

12  there?

13       A.    He was describing what we've been discussing and

14  that this was the first time we actually saw the

15  capability for a real-time moving of money across border.

16       Q.    And you agreed with his sentiment here?

17       A.    Yes.

18       Q.    And the next paragraph says, So if you think

19  about hundreds of millions of dollars circling the world

20  every day waiting to be settled and sort of what we call

21  money trapped in transit, the ability to streamline that

22  can drive a ton of efficiency.

23                      What did you understand him to mean there?

24       A.    He's referring to the working capital impact.

25                      THE REPORTER:  Working capital what?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 107

1            LAWRENCE ANGELILLI

2            THE WITNESS:  Impact.

3       Q.   (BY MR. CERESNEY)    So in other words, this

4  could have the impact of allowing you to reduce your

5  working capital?

6       A.   Correct.

7       Q.   Which could have benefits financially?

8       A.   Correct.

9       Q.   Next paragraph, you jump in.  And I want to move

10 to, I think, the third sentence of what you say, We did --

11 or fourth -- we did move money to Mexico in a minute, 13

12 seconds.

13            Was that something that actually happened?

14      A.   That was when I said it was really cool.

15      Q.   Okay.  And that is much quicker than any other

16 money movements you have had ever?

17      A.   The fastest I had ever seen, yes.

18      Q.   And then you say, But it's -- I think we're

19 really -- we're really -- we're going to ramp.  We're not

20 going to be maxing out or stressing their system.  And so

21 it would build gradually.

22            What did you mean by that?

23      A.   We had an agreement with Ripple at the time

24 where we would meet weekly, and they would dictate how

25 much more we could trade on their platform.  And it

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 108

1                    LAWRENCE ANGELILLI

2    started out where we would increase approximately

3    15 percent per week in Mexican peso, but they had a

4    governor on it because, as we discussed previously, they

5    were also lining up their market makers or trading

6    counterparties.  And we didn't want to be in a system

7    where we stressed that system.  And so we worked in

8    concert with them to gradually increase the amount of

9    trading we were doing to make sure that it didn't create

10   any more inefficiencies.

11       Q.    Fair to say this was a -- a new product that you

12   were trying to work out the kinks with?

13       A.    And it was what we were receiving incentives to

14   do.

15       Q.    Right.  Okay.  And then let's look at page 14.

16   There is a question from the ███████ analyst.  He says,

17   You did mention speed as an advantage.  How about other

18   benchmarking around it, I mean, costs and anything else

19   that you can just share, at least relative to expectations

20   or relative to benchmarks, just so we better understand

21   the potential behind it.

22            Mr. Holmes responds, I think what I would

23   say is the following, right, is that all of this, I mean,

24   it's not new for Ripple, but it's new for a lot of us in

25   terms of exploration of how we do this, right.  And when

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 109

```
 1                    LAWRENCE ANGELILLI

 2   you think about traditional settlement and traditional

 3   foreign exchange markets, right, it's a lot of banking

 4   applications, a lot of platform, and sort of a lot of

 5   internal management to have an integrated product into

 6   their platform.  We built kind of our own unique interface

 7   with them that I think the team internally has done an

 8   amazing job.

 9                    Just let me stop there.

10                    What unique interface is he referring to

11   here?

12        A.   That was the integration and the creation of a

13   bot that would trade directly into their platform.

14        Q.   Okay.  And then if we -- if we go down to

15   the -- to the brackets below or to the -- below the line

16   where Mr. Holmes picks up.

17                    If you can see where he says, The Mexican

18   peso is inherently volatile and is moving around all of

19   the time.

20                    Do you see that?

21        A.   Yes.

22        Q.   And then he says, If you can actually time the

23   cash flows and settlement flows with what is happening on

24   a per-transaction basis with the customer, it's pretty

25   remarkable what you can start thinking about and doing
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 110

1                    LAWRENCE ANGELILLI

2    with that type of technology.

3                    What did you understand him to mean there?

4         A.    So at the time, the Mexican peso market was a

5    market that we used the cash market the most frequently in

6    primarily because we're in the same time zone.  So when we

7    looked at the Ripple technology, what we thought was that

8    we could do a series of multiple tranches of trades during

9    the day that would more closely align our volume with

10   movements in the currency because the peso can be

11   volatile.  So even though it wasn't matching on a

12   one-for-one basis, our ability to essentially dollar-cost

13   average through the course of the day was interesting to

14   us, and it was a substitute for what we were currently

15   doing, which was doing large block cash trades as a

16   substitute.

17        Q.    So just so I understand that, so doing a number

18   of smaller transactions throughout the day, which would

19   allow you to dollar-cost average the cost of those, could

20   be actually as beneficial as doing one transaction that

21   has efficiencies because it's a large transaction?

22        A.    Theoretically, yes.

23        Q.    And that was something you thought was possible

24   at the time?

25        A.    Yes.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1                     LAWRENCE ANGELILLI

2        Q.    And that made up for some of the limitations on

3   volume that the ODL product had at the time?

4        A.    Yes.

5                     (Exhibit 6 marked.)

6        Q.    (BY MR. CERESNEY)    Okay.   Okay.   Let's go to

7   the next document, which is the November 1st, 2019,

8   earnings call transcript.   This is the next earnings call.

9   We're not going to do every quarter, I promise, but we're

10  going to do a number.

11                    You're so eloquent.

12       A.    This was a popular topic.

13       Q.    Actually, let me ask you -- ask you about that.

14  This was something that analysts asked about pretty

15  frequently; is that fair?

16       A.    Yes.

17       Q.    And why did you think the analysts were so

18  focused on this?

19       A.    They were looking for a financial impact from

20  this.

21       Q.    Did they also -- were they also attracted by the

22  other opportunities from this technology?

23       A.    It's difficult for me to ascertain other than

24  they tend to be very shortsighted.   Buy-side -- I mean,

25  sell-side analysts tend to be more of a quarter to

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 112

1                    LAWRENCE ANGELILLI

2   quarter.  And so they were interested in the financial

3   ramifications of Ripple rather than some long-term

4   strategic benefit.

5        Q.   Okay.  So is this the earnings transcript

6   from -- the earnings call transcript from November 1st,

7   2019?

8        A.   Okay.

9        Q.   And this appears to be also a █████████

10  product; is that correct?

11       A.   Yes.

12       Q.   So let's look at page 6 of the transcript.  And

13  this is in the portion of your comments at the beginning

14  of the call.  You say in the third full paragraph, Ever

15  since we announced Ripple investment into MoneyGram, we've

16  had many questions about the impact of its partnership

17  both from a financial and operational perspective.  I

18  would like to take this opportunity to describe how we are

19  using the blockchain and its benefit to MoneyGram.

20            The Ripple blockchain enables MoneyGram to

21  achieve what we are calling real-time settlement.

22  Currently, MoneyGram is using Ripple to facilitate what

23  our almost instant foreign exchange trades.

24            And what did you mean by that at the time?

25       A.   That we were using it as a cash market

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 113

1                         LAWRENCE ANGELILLI

2   alternative, and we were seeing money within 5 minutes.

3       Q.   And that was a positive thing from your

4   perspective?

5       A.   Yes.

6       Q.   The next paragraph says, In Mexican peso, for

7   example, we purchased the cryptocurrency XRP on a U.S.

8   exchange, transfer it to an exchange in Mexico, and sell

9   the XRP on the exchange in Mexico for pesos all within

10  about 60 seconds.  Essentially, we're using cryptocurrency

11  as a unit of measure through the Ripple blockchain.

12                    What do you mean by "using cryptocurrency

13  as a unit of measure"?

14      A.   One of the concerns among regulators, banks and

15  the market in general was the volatility of the token.

16  And what I was attempting to describe here is that there

17  was a period of time between where we had to buy crypto

18  and sell crypto, that that window was so short, that it

19  was really serving as a mechanism to transfer from one

20  exchange to the other rather than posing a volatility risk

21  to the company.

22      Q.   Fair to say it was functioning as a currency at

23  the time?

24      A.   No.  In fact, I was saying it wasn't functioning

25  as a currency.  I was -- it was functioning as a unit of

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

```
 1                      LAWRENCE ANGELILLI

 2   measure, like a digital unit of measure that wasn't a

 3   currency.  And that's why we weren't as concerned about

 4   the volatility, as it was really just a digital mechanism

 5   to facilitate a transfer from one exchange to the other.

 6        Q.   So it had utility as a digital transfer

 7   mechanism?

 8        A.   Yes.

 9        Q.   And, in fact, this was part of a currency

10   transaction?

11             MR. MOYE:  Objection, leading, calls for a

12   legal conclusion.

13        Q.   (BY MR. CERESNEY)   You can answer.

14        A.   It was part of a foreign exchange transaction.

15        Q.   Okay.  Looking at the next paragraph -- or

16   actually, I'm sorry.  You then go on to say, This means

17   that we can reduce our inventory of pesos and reduce our

18   exposure to volatility during the shortened time that we

19   need to hold them.

20             I assume that is what you just explained?

21        A.   Correct.

22        Q.   And then, This is just like

23   just-in-time-inventory for our currency position, reducing

24   our working capital needs, as well as matching the timing

25   of our sends and the settlement with our agents.
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 115

1                    LAWRENCE ANGELILLI

2              What did you mean just-in-time inventory?

3         A.   That was the elimination of our shortening the

4    time from basis risk, that we were buying the currency at

5    the time that we needed it rather than on a T+2 sell.

6         Q.   And the next thing you say, The majority of

7    these benefits will come with scale in the future.

8              One question on that.  You say "the

9    majority of the benefits."  There were certain benefits

10   that were happening at that time; is that fair?

11        A.   It was early days, so I -- I don't think we were

12   really getting any benefit at this time.

13        Q.   Well, you said "majority of benefits" though?

14        A.   I don't -- I don't -- I don't know that I read

15   that much into that word.

16        Q.   Okay.  Well, you just -- you had described

17   earlier in the paragraph other benefits from the --

18        A.   I mean, the benefit of being in the cash market

19   was the principal benefit at that time regardless.  And we

20   were -- we were actually making money doing it because of

21   the make-whole and the incentives.  So that was a huge

22   benefit.

23        Q.   Right.  And you talk about scale here, though.

24   What -- at the time, you thought that the ODL product had

25   the potential to scale to provide those benefits; is that

Page 116

1                        LAWRENCE ANGELILLI

2   fair?

3        A.   Correct.

4        Q.   And the next paragraph says, In addition to

5   those benefits, we are compensated for developing and

6   bringing liquidity to these markets as well as providing a

7   reliable level of foreign trading on a daily basis.

8                  There you're talking about the incentives?

9        A.   Correct.

10       Q.   You say, Today, we're driving about 10 percent

11  of our daily Mexican peso volume through this technology.

12                 Is that the level of trading at that time?

13       A.   Yes.

14       Q.   And so that ends up being, I think you said

15  earlier, it's about ████████████ a day of volume going from

16  U.S. to Mexico; is that fair?

17       A.   Correct.

18       Q.   So it was about ██████████████████ a day of ODL

19  product trading?

20       A.   Yes.

21       Q.   Towards the end of that paragraph, you say, On

22  top of that, we believe we can develop new digital

23  products that would benefit from real-time settlement as

24  XRP markets become more established and more liquid.

25                 What did you mean by that?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 117

1                       LAWRENCE ANGELILLI

2          A.    One example that we were thinking about is we

3     were in the bill payment business.  And a lot of those

4     payments are time-sensitive, and they also -- they're very

5     time-sensitive.  And the ability to use a product like

6     this to facilitate a real-time transfer for the payment of

7     a bill or invoice and apply it to, for example, a

8     cross-border transaction was alluring at the time.  And

9     it's not a -- and we don't do cross-border bill pay today,

10    and we never have.  So this was sort of a -- from a

11    laboratory perspective or from an R&D perspective, an

12    interesting option.

13         Q.    So the ODL product and the use of XRP more

14    generally had the potential to be expanded to other uses?

15         A.    Correct.

16         Q.    Let me look at the next page.  Just look at

17    Mr. Holmes' comment.  I think it's the third comment down

18    on the page.

19               He says in the middle of that paragraph, We

20    prepositioned cash all around the world.  And so the more

21    real time we can make that, the more efficient we'll

22    become, and the better revenue opportunities there are.

23               I think right now we're using the on-demand

24    liquidity platform, but there are opportunities through

25    RippleNet to begin to move money directly into accounts

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 118

1                      LAWRENCE ANGELILLI

2      with other partners inside of Ripple.

3                      What did you understand him to mean there;

4      what he was talking about?

5           A.    Ripple was developing a -- an alternate

6      technology called RippleNet, that was not ODL and didn't

7      involve foreign exchange trades.  It was a blockchain

8      technology that they were developing and wanted us to

9      assist with them on that, too.

10          Q.    Now, was that something that you discussed with

11     them using?

12          A.    Not me personally.

13                THE REPORTER:  Not?

14                THE WITNESS:  Not me personally.

15          Q.    (BY MR. CERESNEY)   But folks at MoneyGram did

16     discuss that with them?

17          A.    Yes.

18          Q.    And did you ultimately end up using RippleNet?

19          A.    It was also -- it didn't function

20     satisfactorily, and I don't we believe we ever got beyond

21     the pilot stage.

22          Q.    Okay.  Then let's just look at page 12 briefly.

23                You answer a question about the ODL

24     product.  And you say in your answer -- you reference

25     basis risk.  And you say, We have to settle with our

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 119

1                    LAWRENCE ANGELILLI

2   agents generally within hours.  And we have a position in

3   Mexican peso that could reprice on a real-time basis.

4                    So when you think about that, and you think

5   about all of the currencies that we have exposure to,

6   eliminating basis risk, it doesn't show up in your P&L,

7   what you have is a mismatch that impacts margins, but

8   without really on a line item.

9                    What did you mean by that?

10        A.    We don't record a -- an expense in our P&L that

11   you can look at and say, Oh, that was your mismatch, you

12   priced your transaction here and you executed there.  And

13   so it's impossible to break it out so no one can find out

14   what it really is.

15        Q.    So some of the benefits that might flow from ODL

16   you couldn't necessarily point to a place on the

17   balance -- on the balance sheet or income statement that

18   might show that benefit, but it still would exist?

19        A.    Yes.

20        Q.    And then the next thing you say is, And then the

21   other thing that doesn't show up specifically is the

22   amount of capital that is required to essentially prefund

23   all of our foreign exchange markets all over the world.

24   And that's the point we're making about the future state

25   requiring scale.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 120

1                          LAWRENCE ANGELILLI

2                    So is that what we were talking about

3    earlier, vis-?-vis the prefunding requirements in a number

4    of jurisdictions?

5         A.   Yes.   The thought at the time was if we had

6    multiple currencies all over the world, you could magnify

7    the impact; it would have a material impact on our balance

8    sheet size.

9         Q.   And then the next sentence, And I don't think in

10   one quarter doing 10 percent of our Mexican peso volume

11   through this product.  It didn't really materially change

12   the amount of working capital that we needed.  It didn't

13   materially change the basis risk that we experienced on

14   Mexican peso.  But you could think about it in the future

15   state where when does this become a meaningful part of our

16   currency pairs?  And when you're taking the time -- that

17   timing and matching it to the settlement of the

18   transaction, and then actually designing products that

19   could benefit from that, that's where we think it does

20   start to resonate.

21                    So what did you mean by that?

22        A.   I was really describing what scale means; that

23   whether we did 10 percent or 100 percent of Mexican peso

24   or even 10 percent or 20 percent or -- of a basket of

25   currencies, that the real benefits from ODL would not be

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 121

1                          LAWRENCE ANGELILLI

2    material in terms of reducing the size of our balance

3    sheet until it was broadly spread around the company and

4    had a material impact on how we traded currency.

5         Q.   And as of November 1st, 2019, you still thought

6    that was possible?

7         A.   Yes.  At that time we were still meeting

8    regularly with them, attempting to expand the number of

9    currencies that we would include.

10        Q.   And then later on down the page, Mr. Holmes

11   adds, in response to the same question, And I think the

12   company that can take advantage of that and monetize it is

13   going to do exceedingly well.  And that's what we're

14   running hard against and hard at, because I think that's

15   an awesome opportunity, to just fundamentally rethink how

16   money really moves around the world and how you actually

17   offer and provide service and value to customers.

18               That -- fair to say that this idea behind

19   the ODL product was an innovative idea that had potential?

20        A.   Yes.

21        Q.   And that's basically what Mr. Holmes is saying

22   here?

23        A.   Yes.

24        Q.   Let's look at a -- at -- what are we on, Exhibit

25   6?  Exhibit 7.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 122

1          LAWRENCE ANGELILLI

2          (Exhibit 7 marked.)

3     Q.    (BY MR. CERESNEY)    I'm going to show you a

4  transcript of an interview on CNN with Mr. Holmes dated

5  December 17th, 2019.

6          Do you have any recollection of Mr. Holmes

7  being on CNN around that time?

8     A.    Yes.

9     Q.    Did you watch that interview?

10    A.    After the fact.

11    Q.    Okay.  And do you remember he was asked about

12  Ripple in that interview?

13    A.    Yes.

14    Q.    Looking at this transcript, I want to direct

15  your attention to page 5.  He says, So -- line 19.

16          So what's interesting about Ripple and

17  what's happening in the blockchain and crypto space is for

18  the first time there is a technology available that has

19  the potential to truly transform that capability and

20  actually move money with data, which, to me, is just kind

21  of magical in lots of ways.

22          Did you agree with Mr. Holmes that it was,

23  in many ways, magical, the way that this product was

24  working?

25    A.    When we saw money move in a minute or two, we

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 123

1                          LAWRENCE ANGELILLI

2    thought that was -- magical is not my word, but we were

3    impressed.

4         Q.    And then on the next page, he says in response

5    to a question -- the question is:  You chose Ripple

6    because you think right now have the best platform to do

7    this most efficiently?  And Mr. Holmes says, I think they

8    not only have the best platform to do it efficiently, but

9    they also have the vision that I think encapsulates what

10   we're trying to do, as well, right?  How would you drive

11   down costs?  How do you improve throughput?  How do you

12   drive efficiency and provide a better service not only for

13   our customers, but also for the future and potential

14   customers that are coming?  And so I think Ripple and its

15   cryptocurrency XRP is really innovative in that sense.

16              Do you agree with his comments here about

17   the ODL product and Ripple?

18        A.    I think they're general in nature and I don't

19   think there's -- it's an aspirational comment, and I guess

20   I would agree with that aspiration.

21        Q.    And that was your view at the time?

22        A.    Yes.

23        Q.    And then let's look at the next page, page 8.

24   Mr. Holmes says, So if you're able -- and line 20.

25              So if you're able to take that $300 that

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 124

1                       LAWRENCE ANGELILLI

2    the consumer wants to send and actually settle it

3    instantly, real-time, and give the same rate to MoneyGram

4    that you're giving to the customer, it's actually a very

5    interesting opportunity to streamline and take costs out.

6                       What did you understand Mr. Holmes to be

7    referring to here?

8         A.    What page are you on?  I'm sorry.

9         Q.    I'm sorry, page 8, line 20?

10        A.    I'm sorry.

11        Q.    Yeah, it's okay.

12                      So I read from line 20 to page 9, line 1.

13   So just read that to yourself and tell me what you

14   understand Mr. Holmes to be referring to there?

15        A.    So you -- could you repeat the question.

16        Q.    Yeah.  I just asked what was Mr. Holmes

17   referring to here?

18        A.    So his term there was is that technology had the

19   potential to -- for us to price the transaction at the

20   same time that we executed on an ODL transaction, and

21   match them off, perfectly and completely eliminate basis

22   risk.

23        Q.    And that was something the product had the

24   potential to do?

25        A.    Correct.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 125

1                    LAWRENCE ANGELILLI

2       Q.   Okay.  Let me look at -- I'm going to show you

3  Exhibit 8, I think it is.  Is that right?

4                    (Exhibit 8 marked.)

5       Q.   (BY MR. CERESNEY)   Exhibit 8, which is the

6  February 25th, 2020, earnings call.  Just look at this

7  briefly.

8                    MR. LEWIS:  He did say he wasn't going to

9  go through all of them.

10                    MR. CERESNEY:  This is the last one.  This

11  is the last one.

12       Q.   (BY MR. CERESNEY)   And first I want to just

13  direct your attention to page 5 of the transcript.

14                    And these are comments that Mr. Holmes

15  makes in the fifth full paragraph there.  He says, I

16  couldn't be more pleased with the partnership and the

17  success we've had with Ripple.  Today our trading volume

18  continues to grow, and we're partnering to expand the

19  service to more corridors.  I'm also excited to announce

20  that we're working to integrate RippleNet for our

21  account-to-account transfers in 2020.

22                    So, first sentence, did you agree with

23  Mr. Holmes at the time that you were pleased with the

24  partnership and the success that you had at that point?

25       A.   Yes.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 126

```
1                         LAWRENCE ANGELILLI

2        Q.    And was the ODL product at that point continuing

3   to expand to more corridors?

4        A.    Yes.

5        Q.    And was that -- did you view that as a positive,

6   growing aspect of the product?

7        A.    Yes.

8        Q.    And then the second sentence he talks about

9   integrating RippleNet for our account-to-account

10  transfers.

11              Is that -- what was that a reference to?

12       A.    I wasn't a party to that technology.  That was

13  outside of my scope.  I knew that we had our IT department

14  and operations department trying to implement and

15  integrate that product.

16       Q.    Okay.  Do you know if that ever was successful?

17       A.    It was not successful.

18       Q.    Okay.  And I think we talked about it earlier.

19              Your under -- do you have an understanding

20  as to why it was not successful?

21       A.    We didn't find that it added any functionality

22  to the company beyond what we were already able to do.

23       Q.    Okay.  Do you have any sense -- you didn't have

24  familiarity, though, with the details of the product

25  during this --
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 127

1                         LAWRENCE ANGELILLI

2       A.   Correct.

3       Q.   Okay.  And then let's just look briefly at page

4  11.

5                 Somebody from -- an analyst from Northland

6  Capital Markets asked the question:  And are you adding a

7  couple of corridors, a dozen or so corridors?  How do we

8  think through that?

9                 And you say, We do it kind of one at a

10  time.  It really -- what we're doing is creating markets

11  from -- almost from scratch.  And so they start out really

12  small.  So, for example, we're doing Aussie dollars now.

13  We're doing Filipino peso now.  We can cross some of those

14  hits.  And so those markets have to evolve and develop,

15  especially what we're getting paid for.  They start out

16  really small, and then as markets become deeper and more

17  liquid, then we put more volume through, and then as we

18  get those stabilized, we start the new ones.

19                 So first question is:  At this time did it

20  appear like you were making progress and adding corridors

21  to the ODL product?

22       A.   Yes.

23       Q.   And are you saying here -- what were you saying

24  here in terms of the need to develop liquidity in new

25  markets as you expand the product to those markets?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 128

1                    LAWRENCE ANGELILLI

2        A.    A feature of our commercial agreement with them

3    is it established a target pool of compensation for us of

4    ██████ million.

5               We earned that incentive as basis points

6    times the amount of volume that we put through.  So from

7    our planning perspective and from our excitement around

8    the product, increasing -- we were incentivized to assist

9    them in increasing the flow and the number of currencies.

10              And at this time we saw significant growth

11   in our ability to trade Mexican peso.  And we're hopeful

12   that we saw similar results in other currencies around the

13   world.

14       Q.    In fact, did you actually achieve scale in the

15   Mexican peso and the Philippine peso?

16       A.    We did.

17       Q.    And why would you say that you achieved scale in

18   those two currencies?

19       A.    It became a meaningful counterparty for us in

20   our daily trading activity.  From a risk management

21   perspective, we don't like to be single-threaded in a

22   single currency or have a single counterparty, but we

23   would want our counterparties to be able to handle 100

24   percent of our daily volume, if we so elected to do that.

25              And it became apparent that if we wanted

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 129

1          LAWRENCE ANGELILLI

2  to, we could trade 100 percent of our daily needs through

3  ODL on Mex and Filipino peso.

4          Q.    So in those two corridors, the ODL product

5  actually achieved the kind of scale that could have some

6  of the financial benefits we talked about earlier?

7          A.    From a dollar-trading perspective, yes.  From an

8  efficiency or a cost of foreign exchange, no.

9          Q.    But it has that potential, is what you're

10 saying?

11         A.    Yes.  And I think their counterparties were

12 sufficient to be able to handle our flows.

13         Q.    And the difference between the economic aspect

14 of it and whether it would be economic to do it that way

15 was the exchange fees?

16         A.    It was a combination of both the exchange fees

17 and they were not able to get to market rates on the

18 foreign exchange, fundamentally.

19         Q.    Okay.  It improved the exchange fee -- exchange

20 rates?

21         A.    It -- I believe it improved the Mexican peso.  I

22 think it was actually widening out the Filipino peso as we

23 ramped up the volume.

24         Q.    Okay.  One more and then we'll --

25                 MR. LEWIS:  I think we have lunch here for

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 130

1                      LAWRENCE ANGELILLI

2   everyone, whenever you're ready.

3                 MR. CERESNEY:  So why don't we just do one

4   more transcript --

5                 THE WITNESS:  Sure.

6       Q.   (BY MR. CERESNEY)   Let me show you Exhibit 9.

7                 (Exhibit 9 marked.)

8       Q.   (BY MR. CERESNEY)   Do you remember

9   Mr. Holmes -- sorry.

10                Do you remember Mr. Holmes appearing on CNN

11  in December 2020?

12      A.   Yes.

13      Q.   Let me show what has been marked as Exhibit 9,

14  which is a transcript of Mr. Holmes's appearance on CNN on

15  December 16th, 2020.

16                Did you watch that appearance?

17      A.   After the fact, yes.

18      Q.   Okay.  And just so we're clear, December 16,

19  2020, that is six days -- the SEC filed their complaint

20  against Ripple on December 22nd, 2020.

21                Does that date sound right to you?

22      A.   Yes.

23      Q.   So this was six days before that.

24      A.   Okay.

25      Q.   And then if we go to page 10 of this document,

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 131

1                          LAWRENCE ANGELILLI

2    the interviewer asked about the Ripple relationship.  And

3    Mr. Holmes says, We have been partnering with Ripple now

4    for about 18 months.  And the idea behind that for us was

5    to really push innovation and see how we can help in the

6    pioneering of the expansion of global utilization of

7    blockchain.  And we've been doing that, as you said, for

8    settlement, for treasury management, really FX management

9    services, and the ability to send money cross border is

10   really affected by our ability to actually settle

11   real-time.  Our customers are looking for real-time

12   payouts, so the money has to be there really before the

13   transaction is even initiated, if you think about it.

14                  So for us, having access to liquidity,

15   improving speed of transaction and throughput, is really

16   what I think could be transformative for our industry and

17   our business in particular in the coming decade.  And

18   Ripple is doing a lot of unique things with blockchain and

19   with crypto, to help drive that, and it's been a very nice

20   partnership.

21                  We've, obviously, learned a lot together

22   and continue to push -- I think really push the boundaries

23   of what can be.  And it's a lot of fun for sure.

24                  So at this time, I think we talked about

25   the reduction in volume by this point of transactions.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 132

1                         LAWRENCE ANGELILLI

2                 But you were still doing transactions with

3    Rip -- with the ODL product at this time?

4         A.    Yeah.

5         Q.    And did you foresee continuing that relationship

6    in the coming months?

7         A.    We had prepared a budget that included the

8    Ripple incentive fees in it for 2021.

9         Q.    So the answer -- so you had intended to continue

10   the partnership to the next year?

11        A.    Yes.  Well, the word "continue" is -- is maybe

12   not the right word, because on December 8th, I believe, or

13   the 9th, we completed our quota under the amendment of the

14   agreement.  We had reduced our volume by somewhere in the

15   vicinity of 90 percent, which was at the request of

16   Ripple, because the payments they were making under the

17   make-whole agreement they viewed as problematic.

18                 At the time of this agreement, we had

19   suspended -- I mean, at the time of this interview, we had

20   suspended trading, because we had hit the maximum under

21   our quota system.  And if we had traded for the remaining

22   month of December, we wouldn't have earned any incentive.

23                 We were currently in negotiations with them

24   on what the new agreement would look like, and they were,

25   you know, attentive at that time about trying to figure

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 133

1                     LAWRENCE ANGELILLI

2    out what to do next.  We didn't -- we didn't know whether

3    they wanted us to continue what we did that terminated in

4    December, where we had reduced our trading levels.

5                     But we had explained to them that in order

6    for us to earn the incentives, we would have had to

7    significantly ramp up trading in Mexican peso and PHP, or

8    Filipino peso.  And we -- they were engaged in dialogue at

9    that time on what the trading levels should be and what we

10   would do in the new year.

11        Q.    Did you fully expect to reach an agreement on

12   volume levels in the next year?

13        A.    We did.

14        Q.    And you intended to continue the partnership

15   going forward?

16        A.    To the extent that they could accommodate our

17   needs in terms of the ability to trade.

18        Q.    Were you still find -- you still find the

19   product at the time to have certain potential benefits

20   going forward?

21        A.    No.

22        Q.    Did you still think that there was some promise

23   in the product going forward?

24        A.    We had lost a lot of confidence in the product

25   by this time.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 134

1                      LAWRENCE ANGELILLI

2         Q.   Did you still think there was potential?

3         A.   We were interested in continuing to explore new

4    currencies.  We wanted to earn our incentives, which is

5    what those incentives were for.  And we were increasingly

6    frustrated that the level of energy on their side didn't

7    match the level of energy on our side to try to expand

8    these corridors.

9              And at this time our negotiations on the

10   contract and our dialogue with them were complicated by

11   the fact that there was really only two currencies at this

12   time that they were able to scale on, which was those two.

13   And that it was becoming less -- less important to us, in

14   terms of our operations, and it was becoming impossible to

15   achieve all those aspirational goals.

16             We were at that time encouraged that they

17   wanted to engage in a dialogue with us.  We had been told

18   that we really didn't need to worry about the class action

19   or the SEC suits.  So that was not viewed as a prime

20   threat in our mind at the time of this interview.

21             And I think we were at a crossroads, where

22   we still viewed the product as having a potential, but

23   that the level of energy around it had been completely

24   reduced.

25        Q.   Well, you see what Mr. Holmes says here.  He

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 135

1                     LAWRENCE ANGELILLI

2   says, I think -- he says, I think -- I assume he means the

3   product can be transformative for industry and our

4   business in the coming decade.

5                     Did you still agree with that at the time?

6        A.    I think the word is "can be."  And I think that

7   nothing had changed in terms of that the product was

8   immature and not cost-effective.  But what had changed was

9   the run of energy to solve for that.

10       Q.    But if that could be solved for, it could be a

11  tremendous transformative product for the industry?

12       A.    Correct.

13       Q.    And he says, Ripple is doing a lot unique things

14  with blockchain and with crypto to help drive that, and

15  it's been a nice partnership.

16                    Would you agree with that?

17       A.    They were exploring all sorts of new

18  technologies at the time.

19       Q.    So you talked about the -- you know, reduction

20  in energy.  There still was efforts being made by Ripple

21  to make the product work?

22                    MR. MOYE:  Objection, foundation.

23       A.    It seems that -- it seems that the energy was

24  around other non-ODL products.

25       Q.    (BY MR. CERESNEY)    Okay.  So they were talking

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 136

1                    LAWRENCE ANGELILLI

2    about other potential products that MoneyGram might be

3    able to use?

4        A.    Correct.

5        Q.    What kind of products were they?

6        A.    RippleNet was the primary goal, it seemed.

7        Q.    Was this around the time where there was a

8    discussion of the Wallet's End or the -- do you know what

9    Wallet's End is?  Does that mean anything to you?

10       A.    No.

11       Q.    The idea of Ripple selling the XRP to MoneyGram

12   that it would use in the ODL transaction.

13             Was that discussion around this time?

14       A.    We already had a wallet.  We were already using

15   a wallet of XRP.  That was how we were paid.

16       Q.    Right.

17       A.    So they had established a wallet so that we

18   weren't incurring -- you know, it was easier and faster

19   for us to liquidate our position on a daily basis, which

20   was our goal.  We didn't want to be long on

21   cryptocurrency.

22             So they established the wallet for us.  And

23   we used that wallet on a daily basis.  And we calculated

24   our incentive on a daily basis.  Extracted it from that

25   wallet and sold it into the market.  So we already were

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 137

1                    LAWRENCE ANGELILLI

2    using their wallet.

3         Q.    But you didn't use that XRP for the ODL

4    transactions?

5         A.    We were not permitted to.

6         Q.    Right.

7               And so what do -- I think you said earlier

8    on that there were discussions about potentially

9    purchasing XRP from Ripple that would then be used in the

10   ODL transaction?

11        A.    But it was never offered to us.  You know,

12   obviously, we were indifferent.  I mean, we were -- it was

13   actually in their best interest to offer it to us, because

14   it would reduce their make-whole payments.

15              So why it never occurred, I think really is

16   probably a question for them.

17        Q.    Okay.  I think you did say that there were

18   discussions about potentially MoneyGram using that?

19        A.    It came up, but it didn't seem to have traction.

20              MR. CERESNEY:  Okay.  I'm done with this.

21   Why don't we take a break and go off the record.

22              THE WITNESS:  Okay.

23              THE VIDEOGRAPHER:  We're off the record at

24   12:28.

25              (Recess in the proceedings from 12:28 to

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 138

1          LAWRENCE ANGELILLI

2              1:17 p.m.)

3              THE VIDEOGRAPHER:  We are back on the

4     record at 1:17.

5          Q.   (BY MR. CERESNEY)   Great.  So, Mr. Angelilli, a

6     few questions up front here.  We talked about the

7     incentive payments that were made under the commercial

8     agreement to MoneyGram by Ripple during the 2019/2020

9     period, remember?

10         A.   (Witness nods head affirmatively.)

11         Q.   Do you -- were those incentive payments or the

12    amounts of those incentive payments disclosed in your

13    public filings?

14         A.   They were.

15         Q.   And where would they have been disclosed in your

16    public filings?

17         A.   They were disclosed as a negative or a contra

18    expense in our transaction and operational line.

19         Q.   And would that -- were the -- were the specific

20    amount of those specific incentives disclosed?

21         A.   Yes.

22         Q.   So anyone who wanted to understand what those

23    incentive payments were would have been able to look at

24    your financials?

25         A.   Yes.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 139

1              LAWRENCE ANGELILLI

2      Q.   And was MoneyGram transparent with its investors

3 about the reason for those payments?

4      A.   Yes.  In fact, we stated from the very beginning

5 that those payments were a part of a partnership for us to

6 develop these currency pairs for them.

7      Q.   Now, you mentioned before the break your

8 understanding about the status of the SEC investigation

9 involving Ripple prior to the SEC bringing suit in this

10 case.

11            Where did you get that understanding from?

12     A.   My -- my counsel.

13     Q.   Okay.  So everything you shared with us about

14 your understanding came from discussions with counsel?

15     A.   Yes.

16     Q.   Okay.

17            MR. CERESNEY:  Did you want to assert --

18            MR. LEWIS:  Well, yeah, but I'm not sure I

19 under --

20            THE WITNESS:  Maybe I didn't understand

21 your question.

22            MR. LEWIS:  Can you repeat the question?

23            MR. CERESNEY:  Yeah.

24            Earlier on in the testimony, I think

25 Mr. Angelilli talked about his understanding about the

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 140

1                    LAWRENCE ANGELILLI

2   status of the SEC investigation of Ripple prior to the SEC

3   bringing suit.

4                    And I just want to understand the basis for

5   his understanding that.  And it sounds like that came from

6   discussions with counsel.

7                    THE WITNESS:  I don't recall

8   what you're -- can you point me to what you're referring

9   to because I'm not recalling that we even discussed the

10  case?

11                   MR. MOYE:  Are you talking about the

12  lawsuit?

13                   MR. LEWIS:  The SEC lawsuit?

14                   THE WITNESS:  Yeah.

15                   MR. LEWIS:  Is that what you're referring

16  to, Andrew?

17                   MR. CERESNEY:  I thought that there was

18  some reference -- but I am happy to be corrected because

19  then that would eliminate the need for this line of

20  questioning.

21    Q.   (BY MR. CERESNEY)   Well, let me ask it again.

22  Let me start from the beginning.

23                   Prior to the SEC filing suit in connection

24  with this matter, did you have an understanding from

25  anyone other than counsel about whether there was an

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 141

1          LAWRENCE ANGELILLI

2    investigation of Ripple by the SEC?

3          A.   I think -- prior to this, I referred to that we

4    were -- we were aware that there was an investigation, and

5    we had been assured that it was not an issue by Ripple.

6                MR. LEWIS:  Okay.

7          Q.   (BY MR. CERESNEY)   Okay.  But who -- okay.  So

8    that is what I am referring to, your comment on that.

9                Where did that -- where did that come from,

10   your knowledge of that, your statement --

11         A.   Brad Garlinghouse.

12         Q.   And Bradley Garlinghouse, what -- when did you

13   have those discussions with Mr. Garlinghouse?

14         A.   We had those discussions even when we were

15   negotiating the original agreement.  There was a class

16   action.  And we wanted some assurance at the time that

17   this couldn't, you know, disrupt the formation of a

18   partnership.  And we were assured at that point.

19               And then our internal counsel had various

20   conversations that were -- that I was aware of that were

21   told that this was a --

22         Q.   Hold on.

23               MR. LEWIS:  So -- so if you -- if you have

24   independent knowledge, Larry, outside of what you

25   discussed with in-house counsel or external counsel, me or

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 142

1                    LAWRENCE ANGELILLI

2    anyone else, that is okay.  But if your information is

3    based on those discussions solely with -- the knowledge is

4    based solely on discussions with either in-house or an

5    external counsel, then those would be privileged

6    communications.  And I'm going to instruct you not to

7    answer.

8                    But if you had communications outside of

9    those discussions, with Ripple or anywhere else, that is

10   okay.

11                   THE WITNESS:  Then I would say that other

12   than the assurances from Mr. Garlinghouse at the

13   beginning, I had no knowledge from any other source about

14   the -- the proceedings.

15        Q.   (BY MR. CERESNEY)   And when you talk about the

16   beginning, you mean back in June of 2019 at the start of

17   the relationship?

18        A.   That summer, yes.

19        Q.   Okay.  And can you tell us specifically what you

20   recall about Mr. Garlinghouse's statements to you?

21        A.   He was dismissive and told us something to the

22   effect that it was a nonevent or a nuisance.

23        Q.   And did you have further -- you didn't have

24   further discussions with --

25        A.   Myself, no.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 143

1           LAWRENCE ANGELILLI

2       Q.   Let me just finish.

3       A.   Yeah, sorry.

4       Q.   -- with Mr. Garlinghouse after that initial

5  discussion?

6       A.   No.

7       Q.   And was that before you entered the relationship

8  or after the agreement?

9       A.   Before.

10      Q.   Okay.  So that would have been before June 17th,

11  2019?

12      A.   Yes.

13      Q.   Okay.  And that was based, presumably, on his

14  understanding at the time?

15      A.   Yes.

16      Q.   Now I want to ask you about -- about -- we've

17  had some discussions about liquidity in the various

18  markets and about the need for counterparties that would

19  purchase the XRP in the receive market; is that fair?

20      A.   Yes.

21      Q.   And you talked about market makers that Ripple

22  had some relationships with as being part of that

23  liquidity; is that fair?

24      A.   Yes.

25      Q.   Did you have any transparency into what those

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 144

1                        LAWRENCE ANGELILLI

2    arrangements were with the market makers?

3         A.   No.

4         Q.   Did you know what, if any, incentive payments

5    were being made to those market makers?

6         A.   No.

7         Q.   And over time, you had no -- you had no

8    visibility into what those relationships were?

9         A.   The only visibility that I had personally was

10   also in a meeting or a call that we had with Brad

11   Garlinghouse where he told us that they had arrangements

12   with, quote/unquote, a household name hedge fund that

13   would be counterparties.

14        Q.   When was that --

15             THE REPORTER:   I'm sorry, what?

16             MR. CERESNEY:   Counterparties.

17        Q.   (BY MR. CERESNEY)   When was that discussion?

18        A.   It was -- I'm not sure, but most likely, shortly

19   after we started the arrangement, and we were trying to

20   grow these counterparties in Mexican pesos.

21        Q.   So it would have been early in the relationship?

22        A.   Yes.

23        Q.   And one other question.  I asked you about a

24   number of declaration -- I'm sorry; a number of earnings

25   calls.  I asked you about CNN interviews.  I showed you

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 145

```
 1                    LAWRENCE ANGELILLI

 2   some exhibits.

 3               Any of that appear in the declaration that

 4   the SEC sent you to execute?

 5        A.   No.

 6               MR. MOYE:  Objection, argumentative.

 7        Q.   (BY MR. CERESNEY)   And did that declaration

 8   provide any of the statements that you made publicly on

 9   these issues?

10               MR. MOYE:  Same objection.

11        A.   Could you ask that again?

12        Q.   (BY MR. CERESNEY)   Did that declaration

13   reference any of those public statements that you made on

14   these issues?

15               MR. MOYE:  Same objection.

16        A.   No.

17        Q.   (BY MR. CERESNEY)   Okay.  Now, I want to turn

18   to a separate topic.

19               And can you pull up Exhibit 1, which is the

20   declaration again?  And I want to just ask about

21   paragraph 19 of that declaration.

22               That reads, Based on our -- on this

23   understanding, MGI views itself as providing a distinct

24   service to Ripple under the commercial agreement, which is

25   to provide the XRP marketplace with liquidity by executing
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 146

1                    LAWRENCE ANGELILLI

2      consistent purchases and sales of XRP on a daily basis on

3      third-party exchanges.

4                    My question is:  Do you have a reference

5      here to providing a distinct service?  And -- and then I

6      want to ask you about also paragraph 28, actually.  In

7      paragraph 28, there is a reference to December 31st, 2019.

8      The parties entered into an amendment to the commercial

9      agreement.  The amendment, among other things -- other

10     changes added new bonus opportunities, adjusted certain

11     bonus-related thresholds and added a ▮▮▮ million bonus

12     payable at 2 MPSI at the end of 2019.  MGI was no longer

13     identified as a customer of Ripple, but instead was

14     referred to as the service provider for Ripple under this

15     revision to the commercial agreement.

16                    Do you see that?

17     A.    Yes.

18     Q.    That amendment to the commercial agreement that

19     now identified MGI as a service provider, who requested

20     that amendment?

21     A.    I did.

22     Q.    Why did you request that amendment?

23     A.    Part of the confusion around our accounting

24     treatment was the interpretation under the contract that

25     Ripple was a vendor of MoneyGram, which was making us

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1                       LAWRENCE ANGELILLI

2    subject to an arcane accounting rule regarding vendors.

3    And it was our hope that by changing the definition of the

4    agreement, it would clear up any ambiguity around that

5    issue.

6         Q.   Prior to that change, you had -- MoneyGram had

7    been defined as a customer of Ripple; is that fair?

8         A.   Yes.

9         Q.   And Ripple advertised publicly that MoneyGram

10   was its customer; is that fair?

11        A.   I don't know.

12        Q.   Okay.  So it was MoneyGram that requested this

13   amendment to the agreement?

14        A.   Yes.

15        Q.   Did Ripple object to this amendment?

16        A.   No.

17        Q.   So I want to focus on the accounting treatment

18   that you just described.

19             What were the -- were there two alternative

20   accounting treatments for the incentives that were paid by

21   Ripple to MoneyGram?

22        A.   There were really no alternatives.  It was

23   creating something from scratch because nothing like this

24   had ever been done before.

25        Q.   My understanding is that one potential treatment

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 148

1                          LAWRENCE ANGELILLI

2    of the incentives was as revenue to MoneyGram; is that

3    fair?

4          A.    Yes.

5          Q.    And just tell us what is meant by treating the

6    incentives as revenue to MoneyGram.

7          A.    We were interested in the most easy to

8    understand or transparent disclosure when it came to the

9    MoneyGram agreement.  And from a layman's perspective, we

10   interpreted that if somebody pays you, that is revenue.

11   We elected to use that accounting treatment for our third

12   quarter 10Q for the first three months after we started

13   under the commercial agreement.  And we recorded Ripple

14   incentive fees as a component of revenue.

15                What we wanted to do was separate it from

16   the revenue associated with the money transfer or FPB

17   business, but nevertheless show that incoming transfers of

18   funds from a third party represented revenue, which was a

19   common-sense view of the -- of the -- of the transactions.

20                Since there are two components, there's a

21   make-whole and there's the incentives, we used the

22   make-whole as an offset to expenses.  So we broke it into

23   two and said that the make-whole was really offsetting an

24   increase in costs, the MoneyGram, and they washed.  And

25   they would flow through on the expense side and that the

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 149

1              LAWRENCE ANGELILLI

2    commercial agreement and the incentive payments would flow

3    through with revenue.  That was really that simple and

4    that easy to understand.

5         Q.   So let me make sure we understand what the two

6    types of payments were.  The make-whole payments, were

7    those the payments that were intended to make MoneyGram

8    whole for any additional costs from the -- from the ODL

9    transaction over and above what it would cost MoneyGram to

10   do that transaction for the traditional payment route?

11        A.   Yes.

12        Q.   And that payment -- that make-whole payment,

13   what was the level above which Ripple agreed to reimburse

14   MoneyGram?

15        A.   Under the agreement, everything above 5 basis

16   points above the spot rate would be made in a cash payment

17   to MoneyGram.

18        Q.   And that would include both the exchange costs,

19   the cost for the exchange fees, as well as the FX cost?

20        A.   Yes.

21        Q.   And that you treated as contra expense in the

22   third quarter of 2019?

23        A.   Yes.

24        Q.   And just so it's -- so we're clear, contra

25   expense and what that means, can you explain that to us?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 150

```
1                     LAWRENCE ANGELILLI

2        A.    Yes.   It's a negative expense.

3        Q.    So in other words, on your income statement, you

4    have expenses that are in one line on the income

5    statement, right, and then you reduce those expenses by

6    the contra expense?

7        A.    Yes.

8        Q.    And the thinking was that -- tell us why that

9    made sense to you as an accounting treatment.

10       A.    As we've discussed, there was a tremendous

11   amount of interest in this transaction.   Our shareholders

12   and the analyst community was interested in the financial

13   implications.

14             We wanted to be transparent and really make

15   it clear that there were going to be two sorts of payments

16   received from Ripple; one of them was going to have a

17   positive impact on our earnings and cash flow, and the

18   other would wash.   And so it was -- we thought it was the

19   proper treatment to separate those two and make it

20   transparent.

21       Q.    And so a -- an investor or anyone else looking

22   at MoneyGram's financial statements would be able to see

23   how much of the incentive payments were make-whole

24   payments?

25       A.    Correct.
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 151

1                          LAWRENCE ANGELILLI

2        Q.   Now let's take the other part of the incentives

3   that were paid, the volume incentives.

4        A.   Right.

5        Q.   Well, tell us what the volume incentives were.

6        A.   So that's what I've been referring to as the

7   incentives.  So there was a gradual reduction in those

8   incentives, based on volume.  So the theory being that it

9   would be harder to establish markets in the beginning than

10  later.

11             And so we had a ███ million pool of

12  incentives that were paid out based on a sliding scale of

13  basis points against the volume of trading that we did on

14  ODL.

15       Q.   Just so it's clear.  Up front, it sounds like

16  the expectation was that it was going to take time to ramp

17  up the volume, because you needed to create liquidity in

18  those markets.

19             Is that fair?

20       A.   Yes.

21       Q.   Okay.  Those incentives were booked as revenue

22  in the third quarter of 2019?

23       A.   Yes, in the third quarter.

24       Q.   And just so we're clear, what it means to book

25  something as revenue is that is just money coming into the

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 152

1                           LAWRENCE ANGELILLI

2    company, that's a line on the income statement as revenue?

3         A.   Yes.

4         Q.   And that would be in addition to other revenues

5    that you had?

6         A.   Yes.  And my recollection is we broke it out so

7    that it was visible and people wouldn't confuse it with

8    money transfer fees.

9         Q.   So again, any investor or somebody looking at

10   your financial statements and your public filings could

11   tell how much of the incentive fees were volume

12   incentives?

13        A.   Yes.

14        Q.   That's how you booked it in third quarter 2019?

15        A.   Yes.

16        Q.   What happened after that?

17        A.   When it came to producing our 10-K in the fourth

18   quarter, we met with ███ to discuss the agreement, what

19   the proper accounting for it was --

20        Q.   Let me just stop you.

21             Who is ███?

22        A.   Those are our external auditors who certify our

23   financial statements.

24        Q.   And external auditors audit your financial

25   statements that get filed with the SEC?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 153

```
 1                     LAWRENCE ANGELILLI

 2        A.    Correct.

 3        Q.    Okay.  So keep going.

 4        A.    Because this was new technology and because no

 5   one had a precedent for anything like this, there was

 6   uncertainty at ███ on how to properly account for it.

 7                    And one of the issues that came up was an

 8   accounting bulletin or rule called ASC606, which had to do

 9   with vendor payments.  And it was the interpretation of

10   some of the people at ███, not all of the people at ███,

11   that the -- both the payments for the make-whole and the

12   payments for the incentives were subject to ASC606, which

13   means that they would be needed to be treated as a contra

14   expense.

15        Q.    Just so we understand that.  Whereas, before you

16   were treating the volume incentives as revenue, KP -- some

17   people at ███ were taking the position that those volume

18   incentives should, instead, be treated just like the

19   make-whole payments, as contra expense?

20        A.    Correct.

21        Q.    And when you said some people at ███ felt this

22   way and others didn't, what did you mean?

23        A.    There were partners under agreement that

24   agreed -- I mean, under our audit team that agreed with

25   the -- the way we accounted for it in the third quarter,
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 154

```
 1                         LAWRENCE ANGELILLI

 2   and that there were partners at the firm that felt

 3   otherwise.

 4        Q.   Did the national office of ▮▮▮ weigh in on the

 5   matter?

 6        A.   They did.

 7        Q.   And what was their -- and just so we're clear

 8   what's the national office of ▮▮ ?

 9        A.   The national office is sort of the ultimate

10   arbiter of how their interpretation of accounting rules

11   would be imposed.

12        Q.   And did the national office -- what was the

13   national office's position?

14        A.   We're not sure that there was unanimity there

15   either, that basically they were leaning towards the

16   vendor payment accounting treatment of a negative expense.

17   And -- but they also agreed with us that it was peculiar,

18   in terms of what it was going to do to our disclosure and

19   actually make our disclosure harder to understand.

20        Q.   And so I think what you said, though, is that --

21   is it fair to say that on balance, the national office

22   took the position that it should be booked as contra

23   expense?

24        A.   I think there was enough influence there where

25   it couldn't be ignored.  And as a result of that, actually
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 155

1                    LAWRENCE ANGELILLI

2    it was my decision, we elected to go to the SEC for

3    preclearance on the issue.

4         Q.   Just so we're clear, if the amount was booked as

5    a contra expense, would that essentially mean that you

6    were a customer of Ripple rather than a service provider?

7         A.   That was irrelevant to our conversation.  The

8    whole -- the whole theory about whether this was a

9    negative expense or revenue was completely irrelevant to

10   MoneyGram.

11            Our ultimate goal was to eliminate

12   confusion and to show disclosure that was comprehendible.

13   And we knew that if we had to book this as a contra

14   expense, that we would be explaining this for every

15   quarter for the rest of our existence under the Ripple

16   contract, because it didn't make intuitive sense to the

17   readers of our financial statements.

18            And so because there was such a -- an

19   amount of uncertainty around it, and because even

20   couldn't agree within themselves, we decided, well, let's

21   go for preclearance to the SEC and let them decide.

22        Q.   So the question about whether you were a service

23   provider versus a customer, that wasn't really relevant to

24   you?

25        A.   I didn't care.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 156

1              LAWRENCE ANGELILLI

2      Q.   Okay.  And so on the -- you went to the SEC to

3  seek guidance --

4      A.   Yes.

5      Q.   -- is that fair?

6              Now, did you advocate a particular position

7  to the SEC when you sought guidance?

8      A.   No.

9      Q.   So you laid it out as if, here's the issue, you

10  tell us how to book it?

11     A.   My understanding is that's the way it's done.

12     Q.   Okay.  And did you make a written submission to

13  the SEC on this issue?

14     A.   We did.

15     Q.   Ultimately -- we're going to look at the written

16  submission in a second, but what was the SEC's ultimate

17  position on this issue?

18     A.   That it should be treated as a contra expense.

19     Q.   And so, therefore, just to be clear, that -- the

20  volume incentives that you were paid by Ripple in this

21  arrangement were a reduction in your expenses in

22  connection with these transactions?

23     A.   Yes.

24     Q.   In -- in the SEC rendering that opinion, which

25  parts of the SEC did you have contact with?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 157

1                        LAWRENCE ANGELILLI

2        A.    Their office of accounting, it's OCA or --

3        Q.    The Office of Chief Accounting?

4        A.    Yes.

5        Q.    Did you also have dealings with the

6   department -- the Division of Corporation Finance?

7        A.    No.

8        Q.    Are you sure about that?

9        A.    I don't -- not me personally.

10        Q.    Okay.  I'll show you some documents on that.

11        A.    Okay.

12        Q.    In connection with any of those dealings, did

13   anyone at the SEC raise with you -- well, first of all,

14   was it transparent to that SEC in these discussions or did

15   you explain to the SEC in these discussions how you were

16   using XRP in your transactions?

17        A.    Yes.

18        Q.    Did you explain to them how you were going into

19   the market and selling XRP as part of these transactions?

20        A.    Yes.

21        Q.    Did you explain to them that you were dealing

22   with millions of XRP in these transactions?

23        A.    Yes.

24        Q.    In any of those discussions at any time, did the

25   SEC or anyone at the SEC indicate to you that XRP was an

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 158

```
 1                      LAWRENCE ANGELILLI

 2    investment contract or a security?

 3         A.   No.

 4                   MR. MOYE:  Objection.

 5         Q.   (BY MR. CERESNEY)   Did anyone --

 6                   MR. MOYE:  Argumentative.

 7         Q.   (BY MR. CERESNEY)   Did anyone at the SEC ever

 8    tell you that it was illegal for you to transact in XRP?

 9                   MR. MOYE:  Same objection.

10         Q.   (BY MR. CERESNEY)   You can answer.

11         A.   Specifically, no.

12         Q.   Generally?

13         A.   These discussions were arcane discussions about

14    ASC606.  There were never any suggestions of any kind that

15    there was any other motive for their investigation.  In

16    fact, we had gone to them, so it was really along the

17    lines of the documents that we had provided.  It was a

18    factual discussion about the mechanics of how this worked.

19    And I was never aware of anything other than that.

20         Q.   Okay.  I wanted to show you one document before

21    we get to the actual submissions you made, which is a

22    document which shows some communications with the Division

23    of Corporation Finance about these issues, just to see if

24    that refreshes your recollection.

25                   Let's take a look at Exhibit -- Exhibit --
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 159

                    LAWRENCE ANGELILLI

1

2    what are we talking, 10?  10.

3                    (Exhibit 10 marked.)

4         Q.    (BY MR. CERESNEY)    Take a look at that

5    document.

6         A.    Okay.

7         Q.    That is a May 29th, 2020, communication with the

8    Division of Corporation Finance.  And it's -- it's a

9    letter to the Division of Corporation Finance from you and

10   signed by you.  And it's dated May 29th, 2020.

11                    The Bates Number is MoneyGram SEC 16307 to

12   16309.  And I want to direct your attention to comment

13   Number 4.  The reference to, We note your disclosure that

14   you entered into a multiple-element arrangement with

15   Ripple.  Please provide us with a specific and

16   comprehensive discussion of how you concluded it was not

17   necessary to allocate any of the proceeds from the SPA to

18   the commercial agreement.

19                    Do you see that comment there?

20        A.    Yes.

21        Q.    And was that a reference to both the share

22   purchase agreement that Ripple made with MoneyGram, as

23   well as the commercial agreement with Ripple?

24        A.    That was the second issue that the SEC had

25   raised in our preclearance discussions.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 160

 1                          LAWRENCE ANGELILLI

 2        Q.    And what did that issue relate to?

 3        A.    They initially asked questions around whether

 4   Ripple's investment in MoneyGram was an at-the-market

 5   transaction or whether there was a baked-in premium that

 6   was sort of a prepayment of an incentive, and that there

 7   was an accounting treatment associated with that, where if

 8   it was not a market transaction, that we would have to

 9   also book the premium over the stock price as revenue

10   accrued over the life of the commercial agreement.

11        Q.    Okay.  And as part of that, was that part of the

12   dialogue you were having with the SEC on these issues?

13        A.    Yes.

14        Q.    And so the -- what we described earlier about

15   your description of the transactions to the SEC, and the

16   SEC's -- information you provided to the SEC about your

17   dealings in XRP, would that apply to this piece of the --

18   of the comments as well?

19        A.    Well, they're really two separate issues, but

20   that's what we had discussions with them as well.

21        Q.    And does this appear to have been a dialogue

22   that you also had with the Division of Corporation

23   Finance?

24        A.    We had conference calls where I didn't know the

25   division of the SEC that the people represented, so to me

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 161

1                    LAWRENCE ANGELILLI

2    they were the same.  So I guess this is addressed to the

3    Division of Corporate Finance, so I stand corrected.

4                         But they were done in concert with one

5    another.

6         Q.   And that's why I refreshed your recollection.  I

7    totally understand the nameless, faceless people on the

8    other side of a conference call.

9         A.   It was Covid and it was sort of just a giant

10   conference call.

11        Q.   Understood.

12                        But it does look like this does refresh

13   your recollection that the Division of Corporation Finance

14   was involved in this discussion?

15        A.   Yes.

16        Q.   And again, just to ask you, in your dialogue

17   with the Division of Corporation Finance, did anyone in

18   the Division of Corporation Finance ever raise with you a

19   question about whether XRP was a security?

20                   MR. MOYE:  Objection, argumentative.

21        A.   No.

22        Q.   (BY MR. CERESNEY)   What was your answer?

23        A.   No.

24        Q.   Did anyone ever inform you that they believed

25   that XRP was an investment contract?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 162

1               LAWRENCE ANGELILLI

2          MR. MOYE:  Same objection, asked and

3   answered.

4          A.   No.

5          Q.   (BY MR. CERESNEY)   Okay.  Let me now show you

6   what we'll mark as Exhibit 11, which is a submission that

7   was made to the SEC on these accounting issues.

8               (Exhibit 11 marked.)

9          Q.   (BY MR. CERESNEY)   I will put that in front of

10  you.  And this is going to be MoneyGram SEC 1 to 69.  And

11  it's an e-mail dated November 26th, 2019, from John

12  Stoneham to ocarequest@sec.gov.  And then attached to it

13  is a letter dated November 22nd, 2019, from Mr. Stoneham,

14  who appears to be the controller and principal accounting

15  officer of MoneyGram.

16               Is he the chief accounting officer?

17         A.   At that time, yes.

18         Q.   And he appears to attach to this -- he says,

19  Ladies and gentlemen, MoneyGram International requests

20  preclearance from the Office of Chief Accountant of the

21  U.S. Securities and Exchange Commission of our accounting

22  treatment related to fees received from Ripple Services,

23  Inc., to transact in the XRP cryptocurrency.

24               Do you see that?

25         A.   Yes.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 163

```
1                     LAWRENCE ANGELILLI

2        Q.   Is it -- can we agree that it's clear from that

3   request that what you're seeking clearance for is a

4   treatment of transactions in XRP?

5        A.   Yes.

6        Q.   Okay.  And you're cc'd on this letter, correct?

7        A.   Yes.

8        Q.   Were you involved in the preparation of this

9   submission?

10       A.   Yes.

11       Q.   Okay.  Did you review it before it was

12  submitted?

13       A.   Yes, sir.

14       Q.   Okay.  I want to -- and this was a -- the

15  preclearance -- just, generally, what is a preclearance

16  request?

17       A.   This would avoid the need for comment letter on

18  our SEC disclosure post-filing, and give us clearance to

19  use the accounting treatment before we filed.

20       Q.   Okay.  So let's look at page 2 of this

21  submission.  I want to ask you about one statement on

22  this -- this page.

23                 If you look at the paragraph, it's the

24  second full paragraph of the text, towards the bottom of

25  the page.  The language starting with, Ripple's business
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 164

1                          LAWRENCE ANGELILLI

2   model does not include the sale of licenses as a source of

3   revenue.  Rather, Ripple generates revenue by selling XRP

4   pursuant to its, quote, drip program, unquote, which is

5   Ripple's systematic approach for slowly selling XRP into

6   the marketplace.

7                    Do you see that?

8        A.    Yes.

9        Q.    Where did you get the information that's

10  included in the submission about the drip program?

11       A.    When we were formulating the agreements, we had

12  due diligence and Ripple's CFO at the time explained to us

13  where their money or cash came from, and explained the

14  whole concept of having a zero basis and issuing XRP.

15       Q.    Did he use the term "drip program"?

16       A.    I don't recall him using that program -- that

17  name.

18       Q.    So is that something that MoneyGram -- that was

19  language that MoneyGram itself came up with?

20       A.    I don't know.  I don't know the answer to that.

21       Q.    It's possible that that was MoneyGram's

22  language?

23       A.    It's in quotes, but it's unlikely.  I -- but I

24  don't know where that term came from.

25       Q.    Okay.  The first sentence says that Ripple's

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 165

1                         LAWRENCE ANGELILLI

2    business model does not include the sale of licenses as a

3    source of revenue.

4                    Did that come from the due diligence

5    meeting, as well, if you know?

6         A.    I don't know that.

7         Q.    Okay.  And go further in the -- in the

8    paragraph, there's a reference to Ripple's best interest

9    to market and promote XRP by providing potential users of

10   XRP with proven use cases for the utility of XRP, as well

11   as increase the overall liquidity of XRP -- I'm sorry --

12   as well as to increase the overall liquidity of XRP with

13   multiple commercial users of the product, thereby creating

14   a more robust marketplace for the buying and selling of

15   XRP.

16                    Do you know where that in -- that

17   language -- that information came from?

18        A.    That was the way it was explained to us.  In our

19   agreement, it's actually contingent upon the price of XRP.

20   We have in the agreement a ██████ floor, where the amount

21   of XRP that we would receive is based on the basis points

22   times the volume of foreign exchange, assuming a ████████

23   price of XRP.

24                    If the value of XRP were to fall below ███

25   ████, which it did for extended periods of time, it was

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 166

1                         LAWRENCE ANGELILLI

2   detrimental to MoneyGram.

3                    When we negotiated that agreement, we

4   were -- also, it was explained to us that they were

5   actively involved in promoting the use of XRP and making

6   attempts to increase its value.

7        Q.   Making attempts to increase its value, meaning

8   the price?

9        A.   Meaning the price of XRP, yeah.

10       Q.   Do you recall that people in that discussion

11  talked about Ripple trying to influence the price of XRP

12  upwards?

13       A.   Yes, I do.

14       Q.   Or the utility of XRP?

15       A.   The price.

16       Q.   How about the liquidity of XRP, did they refer

17  to that?

18       A.   There was a theory that was put forward to us

19  that by increasing the utility of XRP, it would result in

20  a higher price of XRP, but it was, you know, one component

21  of the -- they were interested in working to increase the

22  price of XRP.

23       Q.   And did you -- did you have -- what did they say

24  in that meeting about what they were doing; was it

25  increasing the utility that would impact the price of XRP?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 167

1                    LAWRENCE ANGELILLI

2          A.    They have a series of investor conferences.

3    They have the spell conference that they wanted us to

4    participate in.   They had a very active public relations

5    campaign.   They were aggressive in terms of their wanting

6    to promote the Ripple and MoneyGram alliance.   And, you

7    know, the explanation was, is that that would increase the

8    value of MoneyGram and increase the value of XRP.

9          Q.    Okay.   What was your understanding as to why

10   that would increase the value of XRP?

11         A.    It would disassociate it from other

12   cryptocurrencies, that there was a frustration on their

13   part that it was highly correlated to the trading of

14   bitcoin and other types of cryptocurrencies, and that by

15   having its own utility, that it would be decoupled and

16   have its own value, and that they would be able to

17   increase its value without having to rely on general

18   market conditions for XRP at -- versus bitcoin or any

19   other cryptocurrency.

20         Q.    Are you aware sitting here today whether the

21   price of XRP ever decoupled from the correlation with the

22   other virtual currencies of the market?

23         A.    It seems to remain coupled today.   But I -- I

24   haven't been a student of it to know.   I don't follow

25   bitcoin.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 168

1          LAWRENCE ANGELILLI

2      Q.   Okay.  But your current understanding is that,

3  essentially, the price of XRP has been correlated with the

4  virtual -- with other virtual currencies, like bitcoin?

5      A.   Yes.

6           MR. MOYE:  Objection, foundation.

7      A.   In a general sense, yes.

8      Q.   (BY MR. CERESNEY)   Okay.  So, by the way, did

9  you ever share this submission with Ripple, to allow them

10  to review it?

11      A.   I don't recall.

12      Q.   Did Ripple ever agree with the characterization

13  in this paragraph about the drip program or about the best

14  interest of Ripple?

15      A.   I don't know.

16      Q.   Your understanding -- okay.

17           Let's look at page 21 of the attached.

18           And I want to ask you about this page here.

19  There is a reference here to a reconciliation of Ripple

20  exchange rate, and a calculation here of costs for a

21  particular transaction.

22           What did the -- what is being shown on

23  this -- on this page here?

24      A.   It shows the fees associated with the exchanges,

25  and then the foreign exchange spread separated out, and

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 169

```
 1                   LAWRENCE ANGELILLI

 2   comparing a Reuters rate fee with -- or execution with an

 3   ODL execution.

 4        Q.   Okay.  To be clear, you used a notional amount

 5   in this transaction of ██████

 6                  Do you see that?

 7        A.   Yes.

 8        Q.   Do you know why that amount was chosen?

 9        A.   I believe this was pulled from an actual trade

10   so that we could tie out the numbers, if required.

11        Q.   And just so it's clear what this shows.

12                  There's a reference to a Bitstamp fee.

13   What's Bitstamp?

14        A.   Bitstamp was the exchange in the United States.

15        Q.   And that's listed at $███ .

16                  Do you see that?

17        A.   Yes.

18        Q.   What did that $███ represent?

19        A.   That is what Bitstamp took out of the

20   transaction before they forwarded the amount to Bitso.

21                  THE REPORTER:  Bit what?

22                  THE WITNESS:  Before they forwarded to

23   Bitso, B-I-T-S-O.

24        Q.   (BY MR. CERESNEY)   Do you know if that was a

25   fixed fee or a variable fee on that exchange?
```

1                      LAWRENCE ANGELILLI

2        A.   Those are, I believe, fixed fees.

3        Q.   Is that right?  Are you sure about that?

4        A.   Well, that's one of the problems, is that the

5   scalability -- oh, no, I had it backwards.  You're

6   correct, it is -- it's basis points.

7                 And that's the problem with scalability,

8   the bigger the transaction, the bigger the fee.  That's

9   correct.

10       Q.   Okay.  So this was a variable fee, which varied

11  upon the size of the transaction?

12       A.   Yes.

13       Q.   So it gets larger as the transaction gets

14  larger?

15       A.   Yes.

16       Q.   Okay.  And then the Bitso fee here is listed as

17  $███████.

18                 Was that also a variable fee?

19       A.   My understanding is yes.

20       Q.   And what is Bitso?

21       A.   That's the Mexican exchange for cryptocurrency.

22       Q.   Okay.  So these were the fees for the exchange

23  transactions.

24       A.   Yes.

25       Q.   And then the third line here is, Estimated

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 171

1                       LAWRENCE ANGELILLI

2    average FX spread, excluding fees.  And that's $ █████

3                What does that represent?

4         A.   That would represent the spread differential

5    versus the Reuters rate.

6         Q.   And so that's the FX spread, basically?

7         A.   Yes.

8         Q.   So those two components, the exchange fees and

9    the FX, that would make up the cost of the transaction?

10        A.   Yes.

11        Q.   And so this shows that this ████ transaction

12   had about ████ worth of costs?

13        A.   Yes.

14        Q.   Now, in your declaration you also provided an

15   example of a cost of a particular transaction; is that

16   fair?

17        A.   Yes.

18        Q.   So let's look at Exhibit 1 -- yes, Exhibit 1.

19   And look at paragraph 40 of Exhibit 1.

20                In paragraph 40 there you have a

21   transaction with a notional value of $1,000.

22                Do you see that?

23        A.   Yep.

24        Q.   And so, presumably, the numbers below that are

25   going to represent the costs for a $1,000 transaction; is

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 172

1                    LAWRENCE ANGELILLI

2    that right?

3         A.    Yes.

4         Q.    So let's go through that and just do some math

5    here, if we could.

6               And just so we're clear, paragraph 39 gives

7    you the costs, right?

8               So paragraph 39 talks about the ODL costs

9    being about 15 basis points of the notional amount of the

10   transfer.  That's what's listed as the cost of the

11   exchange fees.

12              Is that fair?

13        A.    Yes.

14        Q.    And then the costs of the FX spread is listed as

15   about 50 to 70 basis points; is that correct?

16        A.    Yes.

17        Q.    So then let's do that math on the $1,000

18   transaction, okay.

19              So when you say here, MGI would incur on

20   the traditional payment rail, traditional commercial bank

21   transfer system, MGI would incur a $15 bank transfer fee

22   and $2.25 from the FX spread.

23              Do you see that?

24        A.    Yes.

25        Q.    So that's about a $17.20 fee, correct?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 173

1                      LAWRENCE ANGELILLI

2       A.   Correct.

3       Q.   Now let's look at it from the ODL platform.

4            You have here that MGI would incur a fee of

5  approximately █████   That's not correct, is it?  On a

6  $1,000 notional transaction; that's not correct, is it?

7            You do the math.

8       A.   Versus this explanation in this -- in the

9  previous exhibit?

10      Q.   Yeah.  So you got the █████ number from the

11  exhibit.  But that's not the amount that a $1,000 notional

12  transaction would cost; isn't that right?

13      A.   I'd have to verify where this number came from.

14      Q.   Okay.  But let's just do the math for a $1,000

15  notional.

16      A.   Okay.

17      Q.   So for a $1,000 notional, the third-party

18  exchange rate would be, as you say in the previous

19  paragraph ███ basis points, right?

20      A.   And I'm not sure, though, if there's a floor on

21  these exchange fees.  I would have to investigate that.

22      Q.   Right.

23            But if we use the amount in the previous

24  paragraph, which is where you set forth what the average

25  was, it's ██ basis points; is that fair?

```
 1                          LAWRENCE ANGELILLI

 2        A.    Yes.

 3        Q.    And if you did 1,000 times ███ basis points, what

 4   does that give you?

 5        A.    Oh, I agree with your math, I just don't know if

 6   there's a floor.

 7        Q.    Okay.  So let's just do the math together.

 8        A.    Okay.

 9        Q.    A $1,000 notional times ███ basis points, how

10   much does that come out to?

11        A.    That -- I don't ever do math in my head.

12        Q.    Do you want to do a calculator?  Yeah, feel free

13   to use a calculator.

14        A.    Okay.  I will use my calculator.

15              Okay.  I learned a long time ago when --

16        Q.    Fair enough.

17        A.    -- you deal with big numbers, don't do the math

18   in your head.

19        Q.    I came up with ███, but you'll tell me

20   whether --

21        A.    You're correct.

22        Q.    So ███

23        A.    Okay.

24        Q.    And then if we apply the $1,000 notional to the

25   foreign -- the FX spread, which you say is ██ to ██ basis
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 175

1                    LAWRENCE ANGELILLI

2    points, can we agree that that comes out to a maximum of

3    ▇▇▇

4         A.    Yes.

5         Q.    Okay.  So if we take ▇▇▇ and we add that to

6    ▇▇▇   that comes out to ▇▇▇ is that fair?

7         A.    Yes.

8         Q.    And that is less than the ▇▇▇ that is under

9    the traditional payment system, correct?

10        A.    Yes.

11        Q.    So according to the example in your declaration,

12   the cost of the ODL transaction on the basis of the

13   amounts that are in that -- are listed in that declaration

14   would be less under the ODL platform than it would be

15   under the traditional payment rails?  I'm just asking you

16   about the math.

17        A.    Yes, the math is the way you describe it.

18        Q.    Okay.  So this is -- this is -- can we agree

19   this is an error?

20        A.    This is an error.

21        Q.    And this was drafted by the SEC; is that fair?

22        A.    No.  Those numbers came from MoneyGram.

23        Q.    Okay.  So that's an error by MoneyGram?

24        A.    Yes.

25        Q.    And we can agree, though, that under the example

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 176

1                        LAWRENCE ANGELILLI

2    that is in the declaration, the correct numbers would have

3    shown the ODL transaction was less in terms of costs than

4    the traditional transaction?

5        A.    I don't believe so.   I think that the thousand

6    dollar USD is a typo.   I would suggest that we would have

7    to re-create this transaction because I don't -- I don't

8    believe that -- I think the -- the error must be in the

9    dollar size of the transaction.

10       Q.    But if you took the dollar size of the

11   transaction being a $1,000 transaction, can you agree with

12   me that under the amounts that are set forth in this

13   declaration as the average amounts, that it would be less

14   under the ODL platform?

15       A.    If these are correct, which I would question at

16   this point.

17       Q.    Uh-huh.   Well, do you have any alternative to

18   offer me right now -- as we sit here right now?

19       A.    Well, you would have to also take -- are we

20   correct on the █████ is --

21       Q.    I think you are correct on that because that is

22   a flat fee -- actually, it would be slightly less because

23   it's the flat fee of ████ and the -- and the ████████

24   ██████, I believe, is what it says.

25                   So it would be ████ plus ████████████

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 177

1                           LAWRENCE ANGELILLI

2    which is one basis point is about ▇▇▇▇▇▇  So it would

3    be ▇▇▇▇ according to the traditional.

4                    Still less -- still more than the ODL under

5    these calculations, correct?

6         A.    I think I would need to go back to my source

7    material to verify these numbers.  Intuitively, your math

8    is correct.  Intuitively, they don't make sense.

9         Q.    Well, why do you say "intuitively they don't

10   make sense"?

11        A.    Well, because --

12        Q.    Let me just ask you this:  Might it show that,

13   in fact, a smaller transaction would be more economical

14   under the -- under the ODL than under traditional payment

15   rails?

16                    MR. LEWIS:  Objection, calls for

17   speculation.

18        A.    You know, I don't think I could answer that

19   because we don't trade a thousand dollars of foreign

20   exchange.

21        Q.    (BY MR. CERESNEY)   Okay.  So you can't answer

22   one way or the other on that?

23        A.    Correct.

24        Q.    And by the way, the SEC didn't point out that

25   error to you in your declaration, did they?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 178

1                      LAWRENCE ANGELILLI

2              MR. MOYE:  Objection, argumentative.

3              MR. LEWIS:  Answer.

4       A.    They did not.

5       Q.    (BY MR. CERESNEY)   Okay.  Let's go back to the

6  SEC's dealings -- I'm sorry; MGI's dealings -- MoneyGram's

7  dealings with the SEC.

8              I want to just ask you -- by the way, I had

9  asked you earlier about your dealings with the Division of

10 Corporation Finance.  Other than the comment letter that I

11 showed, which was Exhibit --

12      A.    10.

13      Q.    -- 10, yes, did you get any other comment

14 letters from the SEC about the Ripple relationship that

15 you recall?

16      A.    They provided their conclusion to us on the

17 accounting treatment of both the investment and the

18 incentive fees verbally.  They did not submit -- we sent a

19 letter to them confirming our understanding.

20      Q.    And what was the final view of the SEC on the

21 accounting treatment?

22      A.    That we were correct in our categorization of

23 the equity investment and that we needed to change our

24 disclosure on the incentive fees.

25      Q.    You also needed to change your characterization

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 179

1                      LAWRENCE ANGELILLI

2    of the incentive fees, right; so in other words, that they

3    would be characterized as contra expenses instead of

4    revenues?

5         A.   Correct.

6         Q.   And you did that in the 10K that you filed for

7    the 2000 --

8         A.   Yes.

9         Q.   Hold on.

10                       -- for 2019?

11        A.   Yes.

12        Q.   By the way, did the -- did the declaration that

13   the SEC got from you in this case, did that contain any

14   discussion of this back and forth with the SEC about the

15   revenue versus contra expense issue?

16        A.   No.

17        Q.   Did it contain anything which suggested that you

18   had interacted with the SEC on these issues pretty

19   extensively?

20        A.   No.

21        Q.   One of the parts of the transaction with Ripple

22   was the Ripple's -- was Ripple's purchase of shares in

23   MoneyGram, right?

24        A.   Yes.

25        Q.   How much did Ripple invest in MoneyGram at this

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 180

1                        LAWRENCE ANGELILLI

2    time; do you remember?

3         A.    There was a commitment to invest ███████

4    that we pulled down in to tranches.

5         Q.    And was that ████████ and ████████?

6         A.    Yes.

7         Q.    When you announced the deal with Ripple in June

8    of 2019, did that have any impact on MoneyGram's stock

9    price?

10        A.    Yes.

11        Q.    What happened to MoneyGram's stock price after

12   that announcement.

13        A.    It approached the $4.10 price that was the

14   strike price in Ripple's transaction.

15        Q.    So it's fair to say the investors reacted

16   positively to that transaction?

17        A.    Yes.

18        Q.    Do you have any idea sitting here today what the

19   impact of that transaction was on XRP's price?

20        A.    I don't.

21        Q.    Do you know sitting here today whether Ripple's

22   dealings with MoneyGram had any impact on XRP's price?

23        A.    I don't.

24        Q.    Do you know whether Ripple's -- well, I guess I

25   asked you this a little earlier, but just to make sure the

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 181

1                         LAWRENCE ANGELILLI

2    record is clear.

3                   Do you know if Ripple's ODL activities had

4    any impact on XRP's price?

5         A.    I wouldn't -- I can't tell, no.

6         Q.    Okay.  Now, does Ripple still own MoneyGram

7    stock?

8         A.    No.

9         Q.    Did Ripple sell its MoneyGram stock?

10        A.    Yes.

11        Q.    When did it sell MoneyGram's stock?

12        A.    They did theirs in two tranches.  They had both

13   shares and they had warrants.  They sold their shares

14   first, which was in the summer months of last year.  And

15   then they converted their warrants and sold off their

16   warrants last fall, I think.  I'm not sure of the timing.

17        Q.    Do you know if they sold those shares and

18   warrants at a profit?

19        A.    Yes.

20        Q.    Do you know how much of a profit they sold them

21   at?

22        A.    I don't know where their average execution price

23   was.  But based on just watching their activity when they

24   were selling, they nearly doubled their money.

25                   MR. CERESNEY:  Let's go off the record.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 182

1                        LAWRENCE ANGELILLI

2                  THE VIDEOGRAPHER:  Off the record at 2:11.

3                  (Recess in the proceedings from 2:11

4                  to 2:34 p.m.)

5                  THE VIDEOGRAPHER:  We're back on the record

6      at 2:34.

7           Q.   (BY MR. CERESNEY)   So, Mr. Angelilli, when did

8      you terminate the agreement with Ripple?

9           A.   It was February of '21.

10          Q.   And why did you terminate the agreement with

11     Ripple?

12          A.   We were unable to trade XRP on any U.S.

13     exchange.  And in our conversations with Ripple to find an

14     alternative, they were ultimately unsuccessful.  And so --

15     so it became clear that we really couldn't use the product

16     anymore.

17          Q.   And why were you unable to trade XRP on any U.S.

18     exchange?

19          A.   U.S. exchanges stopped trading the token after

20     the SEC filed suit.

21          Q.   And but for the fact that the exchanges

22     terminated trading on XRP as a result of the SEC suit,

23     would you have terminated the agreement with Ripple?

24          A.   I can't say for sure.  We were concerned about

25     legal liability, but we were also comfortable in the fact

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 183

1                    LAWRENCE ANGELILLI

2      that we weren't a party to the suit, so it was not an

3      issue that we had to deal with.

4                    But considering that we couldn't use it,

5      that's really what the decision was based on.

6           Q.    Okay.  Let me show you Exhibit 12.

7                    (Exhibit 12 marked.)

8           Q.    (BY MR. CERESNEY)    This is the "Wall Street

9      Journal" article that we referenced earlier.

10          A.    Yes.

11          Q.    Where you were quoted.  It's dated February

12     26th, 2021.  And the headline is MoneyGram's Decision to

13     Halt Ripple Partnership Leaves CFO With Earnings Call

14     Hold.  And there's a discussion here of a number of

15     things.

16                    I want you -- to direct your attention to

17     page 2 of this article.  In the third paragraph on that

18     page is a reference to, Last year MoneyGram received

19     ███████  in net market development fees from Ripple,

20     representing about ███ percent of the company's adjusted

21     earnings before interest, taxes, depreciation and

22     amortization, but after the lawsuit was filed, the company

23     said it faced logistical challenges in using the platform,

24     as well as legal and reputational risks.

25                    Do you see that?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 184

1                    LAWRENCE ANGELILLI

2         A.   Yes.

3         Q.   Did -- did -- when it says the company faced

4    logistical challenges in using the platform, as well as

5    legal and reputational risks, what was that referencing?

6         A.   That's not a direct quote from me.  I think what

7    the reporter is referencing is the logistical challenges,

8    which was what I discussed in terms of being unable to

9    trade the token against a U.S. dollar exchange.

10                   And then legal and reputational risks,

11   there was a lot of questions around MoneyGram's -- whether

12   we were a party to this suit, what this suit meant to us.

13   And so, you know, we did have tremendous amount of inquiry

14   about whether we had exposure to this lawsuit.

15        Q.   And then there's a line that says, MoneyGram is

16   working with Ripple to figure out possible alternatives,

17   according to chief financial officer Lawrence Angelilli.

18                   What is that in reference to?

19        A.   That is what I was discussing previously, where

20   we were looking to see if we could trade the token on

21   foreign exchange, or find a creative alternative to keep

22   the commercial agreement alive.

23        Q.   And were you able to find those alternatives?

24        A.   No.

25        Q.   And then there's a quote of you, it says, If

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 185

```
 1                      LAWRENCE ANGELILLI

 2   there is a resolution to the case, especially if Ripple

 3   prevails, then I would say there would be no problem, but

 4   that could be a long time.

 5                   What did you mean by that?

 6       A.   I think going to the headline on the story,

 7   the -- the interest in the reporter was, is that would we

 8   be able to return to having an income stream from Ripple.

 9   And I said if all these externalities would go away, we

10   would be interested in having an income stream from

11   Ripple.

12       Q.   And would you also be interested in partnering

13   with Ripple on other projects as well?

14       A.   Yes, we would want to bring the agreement back.

15       Q.   Okay.  And then we looked at -- if you look at

16   page 4 of the article, we looked at this earlier, but

17   there's a reference here to you saying that there were no

18   other comparable solutions to facilitate cross-boarder

19   transactions in real time.

20                   Was that accurate as of that time?

21       A.   Yes.

22       Q.   Now, are you familiar with a company called

23   ███████████?

24       A.   Yes.

25       Q.   What is ████████
```

```
 1                    LAWRENCE ANGELILLI

 2        A.   ██████████  is -- was formed by one of the founders

 3   of Ripple.  They offer a blockchain and cryptocurrency

 4   solution.

 5        Q.   Has MoneyGram had any discussions with ██████████

 6   about a relationship?

 7        A.   Prior to the Ripple agreement, we had some brief

 8   encounters with them; following the Ripple agreement, we

 9   did not.

10        Q.   Okay.  So you haven't had any recent discussions

11   with ██████████

12        A.   Once we were released from the noncompete in the

13   commercial agreement, ██████████ did reach out, but nothing

14   substantive.

15        Q.   What did ██████████ reach out about doing with you

16   at that time?

17        A.   Exploring an alternative to Ripple.

18        Q.   You didn't proceed with it?

19        A.   No.

20        Q.   There -- there was -- well, let me just ask you

21   about it.  And then I'll show it to you if you don't know

22   about it.

23             There was a Yahoo! -- I'm sorry -- a

24   Bloomberg article dated July 21st, so a couple weeks ago,

25   the headline was MoneyGram Draws Takeover Interest From
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 187

```
 1                    LAWRENCE ANGELILLI

 2   Stellar, Advent.

 3            Are you familiar with that article?

 4       A.   I am.

 5       Q.   Was there any -- are you aware of any takeover

 6   interest from ▓▓▓▓▓▓▓▓

 7       A.   No.

 8       Q.   Are you aware of any -- any action by ▓▓▓▓▓▓ in

 9   connection with MoneyGram?

10       A.   Other than discussions on, occasionally, a

11   product, no.

12       Q.   Do you have any plans to enter into any

13   transactions with ▓▓▓▓▓▓

14       A.   No.

15       Q.   Do you know how -- do you know what Lumens is?

16       A.   Yes.

17       Q.   What is Lumens?

18       A.   That's their cryptocurrency.

19       Q.   Do you have any sense as to how Lumens might

20   differ from XRP?

21       A.   No.

22       Q.   Do you know if ▓▓▓▓▓▓ has any solutions similar

23   to the ODL product?

24       A.   I -- I think they have something dissimilar from

25   the ODL product.
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 188

```
1                    LAWRENCE ANGELILLI

2        Q.   And does MoneyGram have any plans to use that

3   product?

4        A.   Not at this time.

5             MR. CERESNEY:  Why don't we take a

6   five-minute break, just to make sure I don't have anything

7   further.

8                  THE WITNESS:  Sure.

9                  MR. LEWIS:  Sure.

10                 THE VIDEOGRAPHER:  Off the record at 2:43.

11                 (Recess in the proceedings from 2:43 to

12                 2:48 p.m.)

13                 THE VIDEOGRAPHER:  We're back on the record

14   at 2:48.

15                 MR. CERESNEY:  Okay.  So, Mr. Angelilli, I

16   don't have any questions for you -- any more questions

17   now.  I'll wait until the SEC asks questions.  I may have

18   some after they are finished.

19                 Does counsel for Mr. Garlinghouse have any

20   questions?

21                 MR. LEVANDER:  Hi.  This is Samuel Levander

22   from Cleary Gottlieb on behalf of Brad Garlinghouse.

23                 No questions from us.

24                 MR. CERESNEY:  And then does counsel for

25   Mr. Larsen have any questions?
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 189

1                          LAWRENCE ANGELILLI

2                  MS. BUNTING:  This is Kristina Bunting from

3      Paul Weiss on behalf of Mr. Larsen.

4                  No questions from us.

5                  MR. CERESNEY:  Okay.

6                  (Examination was concluded and

7                  Cross-Examination began at 2:48 p.m.)

8                  CROSS-EXAMINATION

9      BY MR. MOYE:

10         Q.   Mr. Angelilli, you've covered a lot of things in

11     a lot a detail, so I'm going to be hopscotching from topic

12     to topic.  Hopefully that's the most efficient and the

13     quickest way, rather than forging ahead.

14                 I just want to let you know, I want to ask

15     questions about some specific topics and documents you've

16     already addressed.  And I might have some more summary or

17     general questions to address as well.

18                 So let's do the -- some of the specific

19     ones first.

20                 Mr. Angelilli, do you remember Mr. Ceresney

21     asked you a number of questions about the example part of

22     your declaration, about various costs and calculations.

23                 Do you remember those questions?

24         A.   Yes.

25         Q.   So just taking a step back from that.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 190

1                    LAWRENCE ANGELILLI

2              Did -- in your interactions with Ripple,

3    did you or other employees at MoneyGram share with Ripple

4    your concerns or observations about higher costs incurred

5    doing foreign currency exchanges using the ODL product?

6        A.   On numerous occasions, yes.

7        Q.   So "numerous" is pretty broad.  Could we try to

8    quantify that a little bit.

9              Is it more than three or four times?

10       A.   I wasn't party to all the meetings that were

11   taking place, but there was a weekly meeting between our

12   treasury function and -- and the Ripple staff.  And

13   progress on the efficiency of those markets was a regular

14   agenda item that was discussed, probably ad hoc, but

15   frequently.

16       Q.   As far as you know, did -- did MoneyGram share

17   with Ripple its findings about the data it was testing,

18   either the initial tests, or the other times it was the

19   market using the ODL product in order to make foreign

20   currency exchanges?

21       A.   Are you referring to our beta tests in the

22   beginning?

23       Q.   The beta tests and the real life experiences

24   MoneyGram was having with ODL and the transactions and

25   other costs it was incurring?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 191

1                          LAWRENCE ANGELILLI

2         A.    We didn't need to because of the make-whole

3    agreement, where they were paying us.  And they were

4    paying us in currency rather than XRP.  So that was a

5    real-life daily expense for them.  They were keenly aware

6    of the number and amounts of make-whole payments they had

7    to make, whether we brought it to their attention or not.

8         Q.    Was it your understanding that the make-whole

9    payments were agreed to by Ripple because Ripple

10   recognized that there were cost insufficiencies and costs

11   to MoneyGram of using their product?

12        A.    It was more than that.  It was a deal point on

13   the agreement.  We would have never executed the agreement

14   without it.

15        Q.    Did Ripple ever deny MoneyGram's explanation of

16   the increased costs or challenge them or insist that

17   MoneyGram was wrong in the way it was calculating the

18   additional costs involved in using ODL?

19        A.    No.

20        Q.    You referenced the make-whole provision.

21              As you understand the agreement and the

22   positions of the two parties in negotiations, can you

23   think of a single reason why Ripple would have agreed to

24   those make-whole payments if Ripple didn't also believe

25   that there were certain cost inefficiencies and costs that

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 192

```
 1                    LAWRENCE ANGELILLI

 2   MoneyGram would bear in using the ODL product?

 3        A.    They were fully aware of those costs and agreed

 4   to reimburse us for it.

 5        Q.    Thank you.

 6              I guess my question is:  Do you understand

 7   that to be why they agreed to --

 8              MR. CERESNEY:  Objection.

 9        Q.   (BY MR. MOYE)    -- the make-whole provisions?

10              MR. CERESNEY:  Objection, lack of

11   foundation and speculation.

12              Just one thing, we never put on the record

13   the stipulation that an objection for one party is an

14   objection for all.

15              MR. MOYE:  That works for me.

16        A.    Can you repeat that question?

17        Q.   (BY MR. MOYE)    Sure.

18              As you understand the negotiations between

19   the parties that led to the commercial agreement, do you

20   believe that the reason Ripple agreed to the make-whole

21   provisions of the agreement was because Ripple recognized

22   that there were -- that MoneyGram would incur additional

23   costs in using ODL?

24              MR. CERESNEY:  Objection, form.

25        A.    Yes.
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 193

1               LAWRENCE ANGELILLI

2      Q.   (BY MR. MOYE)    You can answer.

3      A.   The answer is yes.

4      Q.   Were there certain -- were there times when the

5  commercial agreement was renegotiated, in other words,

6  were there subsequent agreements or modifications to the

7  initial commercial agreement?

8      A.   Yes.

9      Q.   Can you tell us generally why those were made

10  and what the general effects of those modifications were?

11     A.   The first agreement modification was inspired by

12  the fact that we were ramping slower than what was in the

13  preliminary models, and that we had budgeted a certain

14  amount of income associated with the ramps that we had

15  agreed to in advance.

16               And what was happening was that the -- the

17  number of currencies wasn't increasing, so it was putting

18  an increased reliance on Mexican peso or Filipino peso.

19  So we went to them and said we need to amend the agreement

20  so that we can essentially accelerate some of the payments

21  which were not falling short due to any action by

22  MoneyGram, but that was just, you know, sort of a -- a

23  problem with ramping up.

24               And they agreed to that in the first

25  amendment.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 194

1                       LAWRENCE ANGELILLI

2        Q.    What about the second amendment?

3        A.    The second amendment was -- and by the second

4    amendment I'm referring to the amendment that was signed,

5    I guess, approximately a year ago, or in the summer, where

6    they had come to us and said that they wanted us to ramp

7    down substantially to stop trading Aussie dollars.  They

8    had also opened up a corridor, which we thought was

9    extremely important, that was -- that was Australia to the

10   Philippines, rather than the U.S. to the Philippines.

11               That was a huge priority for MoneyGram.

12   That was not going well for them.  It was costing them a

13   disproportional amount of money.  They asked us to

14   discontinue trading on that corridor or that currency

15   pair.

16               And our reaction was we were more than

17   willing to do that if we were just, essentially, made

18   whole on what we would have earned had we not done that,

19   and they agreed to that.  So they basically quadrupled the

20   amount of basis points that we would earn, in exchange for

21   us to reduce the volume proportionally, so that we earned

22   the same amount of income.

23       Q.    So some of Mr. Ceresney's questions about the

24   calculation paragraph of your declaration, I believe --

25   I'm not certain of this, but I believe that he asked you

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 195

1                     LAWRENCE ANGELILLI

2    is it possible that the costs of transactions were

3    actually lower, and you had testified in your deposition

4    kind of a related question.

5                    If -- if, hypothetically, the costs of the

6    foreign currency exchanges were lower than MoneyGram had

7    anticipated, wouldn't that be a reason to use Ripple and

8    not need to be made whole -- sorry -- wouldn't that be a

9    reason to use ODL rather than need to be made whole for

10   using ODL?

11                   MR. CERESNEY:  Objection, speculation, no

12   foundation, et cetera.

13       A.   I mean, you know, if you think about it, I mean,

14   if that were correct, and we had not realized it, they

15   certainly would have pointed it out in order to prevent us

16   from receiving a refund against expenses.

17                   And to be honest, if we thought we could

18   have achieved savings by transacting at $1,000 apiece, we

19   would have done it.

20                   The other complicating factor here is that

21   there's only so many hours in a day and there's only so

22   many minutes in an hour, and to achieve any kind of scale

23   at $1,000 at a time is impossible when you think about the

24   amount of trade tickets that we would have to generate and

25   the amount of labor associated with it.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1                       LAWRENCE ANGELILLI

2               So it would appear that if -- if that were

3    true, somebody would have pointed it out.  But even if

4    they had pointed it out, I don't think trading in $1,000

5    increments is at all practical.

6         Q.   (BY MR. MOYE)   Would you agree with me that if

7    the costs of using the ODL were actually lower, that that

8    would have benefitted MoneyGram and MoneyGram would have

9    been interested in continuing to use ODL?

10              MR. CERESNEY:  Objection, form.

11        Q.   (BY MR. MOYE)   You can answer.

12        A.   The way we trade on a daily basis is that ODL is

13   not the only source of trading activity that we have.  We

14   generally have three, two, or four counterparties in every

15   currency.

16              The way the traders purchase their currency

17   is they buy the best price first.  So there isn't a

18   selection process that goes on by name.  Their instinct --

19   and in fact, we use a system called FX All, which on the

20   Mexican peso will shine a light on the best price.  We

21   execute off of that platform.

22              The XRP execution was done on an automated

23   basis.  So we had a bot going through.  We had to

24   predetermine how much of that we would buy.

25              If we noticed on a consistent basis that

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 197

1                          LAWRENCE ANGELILLI

2    that was the best trade of the day, we would have filled

3    up that bucket first.  And we ended up not doing that.

4         Q.    Okay.  I remember Mr. Ceresney asking you some

5    questions about -- I thought he asked you questions about

6    whether Ripple had taken -- any actions by Ripple that

7    impacted MoneyGram -- the price of MoneyGram's shares.

8                    I may have been wrong about that, but

9    that's what I thought.  That's what I have in my notes.

10                   So I want to ask you specifically.

11                   Was there any action that Ripple took with

12   respect to MoneyGram that ended up affecting the price of

13   MoneyGram's shares?

14                   MR. CERESNEY:  Objection, mischaracterizes

15   what my questions were.

16                   MR. MOYE:  Fair enough.

17        Q.    (BY MR. MOYE)    You can answer the question.

18        A.    When they went through their liquidation

19   process, when they sold their shares and then when they

20   converted their shares -- I mean their warrants to shares

21   and sold those shares, they did it in a manner that hurt

22   the value of their own shares and, in turn, hurt the value

23   of MoneyGram stock.

24        Q.    Did MoneyGram raise that issue with Ripple after

25   it occurred the first time?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 198

1                      LAWRENCE ANGELILLI

2          A.    It wasn't our role to raise that issue.  I did

3     not raise the issue.  My understanding is after they

4     completed their first tranche of sales, they acknowledged

5     they did it improperly and told us that they would do

6     better the next time.

7          Q.    So what happened the next time?

8          A.    We didn't see evidence that they did it better

9     the next time.

10         Q.    The second sell-off of the warrants and shares

11    of Ripple also hurt MoneyGram's price?

12         A.    That's correct.

13         Q.    During the relationship between MoneyGram and

14    Ripple, did you have occasion to form any opinions about

15    the truthfulness of statements that Ripple was making

16    publicly about its relationship with MoneyGram?

17               MR. CERESNEY:  Objection.

18         A.    They have an active Tweeting program.  They have

19    issued white papers on occasions, and made random public

20    statements that we believe reflected inaccuracies on the

21    MoneyGram relationship.  Although they may not have

22    mentioned MoneyGram by name, they mischaracterized the

23    pricing effectiveness or the utility of ODL.

24         Q.    (BY MR. MOYE)   Mr. Ceresney was asking you

25    questions about Exhibit 11.  This was the statement by

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 199

```
 1                      LAWRENCE ANGELILLI

 2   MoneyGram to the SEC, a long letter and attachment.

 3              Now, he asked you questions about a

 4   particular paragraph describing XRP and how it works, and

 5   asked you where you got that information there.

 6              And you had a discussion with him

 7   about -- I believe it was at this time -- about Ripple

 8   working to increase the price of XRP.

 9              Do you remember that testimony?

10        A.   Yes.

11        Q.   Can you tell us who you heard say that or who

12   you believe said that in connection with those discussions

13   from Ripple?

14        A.   ████████████ was a board observer for

15   MoneyGram.  At one point during the relationship, the

16   price of XRP had fallen dramatically and was trading below

17   20 cents, which was having a direct impact on MoneyGram's

18   ability to earn its incentives.  One of the board members

19   asked ████ in a board meeting was there anything, you

20   know, that they could do about it, and she expressed

21   frustration and said that one of the -- that they were

22   essentially very concerned about it and that they were

23   frustrated by the fact that it correlated with other

24   currencies and that they were actively attempting as part

25   of their overall strategy to increase the price of XRP.
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 200

```
1                    LAWRENCE ANGELILLI
2      Q.    Thank you.
3            Did you hear anyone else from Ripple in the
4  context of other discussions talk about obtaining or
5  increasing or supporting the price of Ripple -- sorry, the
6  price of XRP?
7      A.    When -- when we were negotiating the agreement
8  and trying to figure out where to put the peg of setting
9  our incentive, which resulted in a ████████ price.  On
10  several occasions, Mr. Garlinghouse had said they were
11  actively promoting the value and that we should feel
12  comfortable that -- you know, that they were promoting the
13  value of the currency and that they were -- they were
14  trying to make sure that the price of XRP increased.
15      Q.    In connection with the discussions you had with
16  XRP and the SEC about the accounting treatment,
17  Mr. Ceresney asked you a number of questions about did the
18  SEC ever tell you that XRP was a security.
19            I want to ask you a related question.
20            Did anyone from the SR -- from the SEC
21  during MoneyGram's discussions about accounting treatment
22  ever tell you or anyone else from MoneyGram, that you're
23  aware of, that XRP was not a security and there were no
24  concerns about whether or not Ripple was violating the
25  securities laws?
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1                        LAWRENCE ANGELILLI

2               MR. CERESNEY:  Objection, form.

3       A.    Nothing like that ever entered the conversation.

4       Q.    (BY MR. MOYE)    It never came up?

5       A.    It never came up.

6       Q.    Okay.  But you feel certain that no one from the

7  SEC ever gave MoneyGram the green light to say, do

8  whatever you want with XRP because it's not a security?

9               MR. CERESNEY:  Objection, form.

10      A.    All the conversations were about accounting

11  treatment, and there were no conversations about whether

12  MoneyGram was -- should stop or continue on the service.

13  It was really a very arcane discussion about accounting

14  principles.

15      Q.    (BY MR. MOYE)    To the best of your

16  understanding, did MoneyGram have any motive in contacting

17  the office of chief accountant at the SEC about

18  this -- about the accounting treatment of the revenues or

19  incentive payments other than getting clarity on an

20  important accounting topic?

21      A.    No.

22      Q.    Just to clarify, did it have anything to do with

23  any with other aspect of your relationship -- with

24  MoneyGram's relationship with Ripple?

25      A.    No, it did not.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 202

1                    LAWRENCE ANGELILLI

2        Q.    Do you remember being asked a number of

3    questions about statements by you to the public or

4    statements by MoneyGram's CEO to the public --

5        A.    Yes.

6        Q.    -- about the Ripple relationship?

7              To the best of your understanding, did

8    Ripple have any desire to have the details of the

9    incentive payment and cost reimbursement program that it

10   had with MoneyGram publicly disclosed as part of these

11   discussions about the company's relationship?

12              MR. CERESNEY:  Objection, form,

13   speculation.

14        Q.    (BY MR. MOYE)   You can answer.

15        A.    We as a public company had told them on numerous

16   occasions that all of this would see daylight because of

17   the way we had to disclose it.  And when we received the

18   instructions to record the incentives as a contra expense,

19   it actually forced us to actually increase our

20   disclosures, to separate out what was the make-whole and

21   what was the incentive so that people could reconcile to

22   our income statement and their EBITDA, because of that

23   subtlety that the make-whole was an offset.

24              So it did -- it did improve the disclosure

25   for us, and it actually showed more about how much they

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 203

1                      LAWRENCE ANGELILLI

2    were paying us for the -- under the make-whole.

3         Q.   To the best of your knowledge, was Ripple making

4    any sort of corresponding disclosures in any -- when it

5    went to the public to discuss this relationship?  In other

6    words, were -- was Ripple making disclosures about the

7    cost of doing business with MoneyGram under the agreement?

8                    MR. CERESNEY:  Objection, form.

9         A.   Not specifically MoneyGram.  We were seeing

10   Tweets or other public statements touting the

11   cost-effectiveness of ODL at a time when we were making

12   disclosures on -- that the size of the make-whole payments

13   were increasing.

14        Q.   (BY MR. MOYE)   As far as you know, in these

15   public statements made by Ripple about the

16   cost-effectiveness of ODL for foreign currency exchanges,

17   are you aware of Ripple ever disclosing that they were

18   making substantial incentive and make-whole payments to

19   MoneyGram?

20                   MR. CERESNEY:  Objection, form.

21        A.   Not to my knowledge.

22        Q.   (BY MR. MOYE)   Just to clarify what you said

23   earlier, is it your understanding that MoneyGram was

24   making those detailed disclosures about the money it was

25   receiving from Ripple because it was a public company and

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 204

1                         LAWRENCE ANGELILLI

2    there are specific regulations for how a public company

3    discloses financial information?

4        A.   Yes.

5        Q.   Do you have any understanding about whether as a

6    private company Ripple was required by law to make similar

7    disclosures to what MoneyGram was making, or does it get a

8    pass?

9             MR. CERESNEY:   Objection, form, ability to

10   render a legal opinion.

11       Q.   (BY MR. MOYE)   If you can, you can answer.

12       A.   My understanding was they didn't have disclosure

13   requirements.

14       Q.   Because they were a private company?

15       A.   Because they were a private company.

16       Q.   Thank you.

17            And I'm not an accountant, so it's

18   dangerous when I talk too much about accounting, so...

19            Is it -- is it your understanding that the

20   financial information MoneyGram was disclosing about

21   incentive and make-whole payments from Ripple is because

22   in MoneyGram's view, those payments were material and

23   something that was of interest to investors?

24            MR. CERESNEY:   Objection.

25       A.   It represented a material part of our key

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

1          LAWRENCE ANGELILLI

2    metric, which was our adjusted EBITDA.  And so it was

3    extensively disclosed, and it was viewed as a key

4    disclosure item with regard to our adjusted EBITDA

5    calculation.

6          Q.    (BY MR. MOYE)    And in your job as chief

7    financial officer, do you ever use the word "material" to

8    describe things that are key or important in financial

9    statements?

10         A.    All of the time.

11         Q.    Do you view those as equivalent or nearly

12   equivalent terms?

13         A.    Material and?

14         Q.    Key or essential?

15         A.    Yes.  They're the same.

16         Q.    Could you look at Exhibit Number 3?

17               This is the MoneyGram press release and

18   attached FAQs.

19               And I'm going to ask you a question about

20   FAQ Number 9, the one about Western Union.

21         A.    Yes.

22         Q.    Feel free to refer to this if you'd like.  I'm

23   really asking about your understanding of Ripple's

24   experience with Western Union.

25               And I understand from your prior testimony

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 206

1                       LAWRENCE ANGELILLI

2    that it was based on public comments from Ripple --

3    Western Union executives about their experience with ODL;

4    is that right?

5         A.    That's correct.

6         Q.    To your -- is it your understanding that

7    MoneyGram's relationship with Ripple was different than

8    Western Union's because, among other things, you had a

9    commercial agreement and were receiving incentive and

10   make-whole payments from Ripple?

11                   MR. CERESNEY:  Objection, form.

12        A.    I'm not quite sure I understand that question.

13        Q.    (BY MR. MOYE)   I will ask a different one then.

14                   In the FAQ under Number 9, it mentions

15   Western Union had negative feedback about its trial with

16   Ripple.

17                   Do you see that?

18        A.    Yes.

19        Q.    Okay.  And I believe in your prior testimony you

20   described what you heard in the way of negative feedback;

21   is that correct?

22        A.    Correct.

23        Q.    Did you understand Western Union's experience

24   with the ODL product and the cost of using it to be

25   similar to what MoneyGram had experienced?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 207

1                     LAWRENCE ANGELILLI

2       A.   Until this statement, we had no knowledge of

3  their activity with Ripple.  And so it was merely my

4  presumption that their tests would have been the same as

5  ours, but we don't know that.

6       Q.   (BY MR. MOYE)   Okay.  But is it fair to say

7  that MoneyGram's main interest in entering the commercial

8  agreement with Ripple and using ODL was because MoneyGram

9  wouldn't lose money even if the costs were higher and

10  would gain money if the volumes of ODL that it used were

11  high enough?

12                MR. CERESNEY:  Objection, form.

13       A.   The incentives were only part of the desire of

14  the company to engage in this.  We truly believed that

15  this was technology that we needed to understand.  And we

16  felt that it was imperative that MoneyGram be on

17  the -- the front end of any developments in the blockchain

18  cryptocurrency space.

19                So our ability to do that in a risk-free

20  manner was the -- was the primary driver.  I'm not sure,

21  you know, Western Union's priorities were in the same

22  place.  Perhaps they looked at it as a foreign exchange

23  trade.  We looked at it as much more than that.

24       Q.   (BY MR. MOYE)   Okay.  Just stepping back

25  generally, in your view, would the -- would an economic

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 208

```
 1                    LAWRENCE ANGELILLI

 2   relationship between MoneyGram and Ripple have been viable

 3   and the use of ODL profitable without all of the

 4   make-whole payments and incentive payments that MoneyGram

 5   received from Ripple?

 6                    MR. CERESNEY:  Objection.  That complaints

 7   a whole bunch in that question.

 8        Q.    (BY MR. MOYE)   You can answer.

 9        A.    It would not have been viable without subsidies.

10        Q.    In the public statements that you made that

11   Mr. Ceresney took you through where you were asked about

12   the relationship or partnership with Ripple, would it be

13   fair to say that in answering those questions, you were

14   looking at the partnership to include the commercial

15   agreements and the financial components of that in

16   answering those questions?

17                    MR. CERESNEY:  Objection, form.

18        A.    I'm -- could you come at me again with that?

19        Q.    (BY MR. MOYE)   Sure.  How about looking at

20   Exhibit 4, the MoneyGram second quarter results.

21                    And let's look at the page that says,

22   Strategic Partnership with Ripple.

23        A.    Yes.

24        Q.    Okay.  And I won't read all the text, but I am

25   going to try to summarize the text.  It says, The
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 209

1          LAWRENCE ANGELILLI

2    partnership is going to enable MoneyGram to closely align

3    funding costs with daily transactions, streamline aspects

4    of the global program and reduce operating costs.

5               Is it fair to say that the partnership

6    included the financial aspects of the commercial

7    agreement?

8               MR. CERESNEY:  Objection.

9         Q.   (BY MR. MOYE)   Or maybe were you just talking

10   about ODL and the wonderful things that ODL might be able

11   to do?

12        A.   This relates to ODL, number one.  I can answer

13   that specifically.

14               I would say regarding the enhancements or

15   the make-whole or the incentive fees, the Ripple agreement

16   had a termination on it.  It was like a two- to three-year

17   agreement.  We, at this point, expected our relationship

18   with Ripple to extend beyond that.  And what we're

19   describing here is what we thought was the long-term

20   benefits of incorporating this technology into MoneyGram

21   and the incentive payments were a bridge to get us there.

22        Q.   Fair enough.  Thank you for that clarification.

23               I'm really just trying to determine when

24   you made statements about the relationship with Ripple and

25   what you hoped would come from it in the benefits to

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 210

```
 1                    LAWRENCE ANGELILLI

 2   MoneyGram.

 3             Is it fair to say, at least in the short

 4   term, the financial aspects of the commercial agreement

 5   were a part of that?

 6             MR. CERESNEY:  Objection, asked and

 7   answered, form.

 8        A.   MoneyGram was extremely interested in the

 9   earning stream that would come from this in the short

10   term.

11        Q.   (BY MR. MOYE)   Can you look at Exhibit 2,

12   please.

13             Can you turn to the page that says, Cost

14   Breakdown.

15             Can you just remind me briefly or correct

16   my understanding:  Does this test of the ODL product on

17   these dates and in these -- at the cost points shown here,

18   does this show a profitable or an unprofitable test of

19   ODL?

20        A.   An unprofitable test.

21        Q.   Okay.  And this -- who prepared this slide dec,

22   as far as you know?

23        A.   I don't recall.

24        Q.   Did it come from MoneyGram or come from Ripple?

25        A.   I believe this was a Ripple dec.
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 211

1                          LAWRENCE ANGELILLI

2          Q.    You can look at the first page if that helps

3     you.

4          A.    Yeah.  It's a Ripple dec.

5          Q.    So is it fair to say that the results of this

6     test were well known to Ripple, and Ripple helped to

7     create this document?

8          A.    Yes.

9          Q.    If you could turn over three pages into it,

10    there is a page called, xRapid Pricing Structure.

11               So I want to ask you about this if you

12    understand it.  I realize you may not have created it, and

13    this may not have been something that you have studied in

14    the past.

15               Do you have any understanding of what

16    the -- what information is being disclosed or discussed

17    here on this page of the slide?

18         A.    xRapid, which is the precedent name for ODL,

19    those are one and the same.  What it shows is that they're

20    waiving a fee structure that they had put in place and

21    also had proposed at this point a rebate with monthly

22    caps.

23         Q.    So this test was done prior to the commercial

24    agreement, correct?

25         A.    Correct.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 212

LAWRENCE ANGELILLI

1

2      Q.    And is this test one of the things that led to

3  the different provisions of the commercial agreement?

4      A.    Yes.

5      Q.    Well, would it be fair to say even at this time

6  in early 2018, there's some recognition on the part of

7  Ripple the need to provide financial incentives to use

8  ODL?

9      A.    It was part of this from the very beginning,

10  yes.

11            MR. MOYE:  Thank you.  Just give me one

12  minute, please.

13            That's all that I have for you,

14  Mr. Angelilli.

15            THE WITNESS:  Okay.

16            MR. MOYE:  They have another chance.  I

17  just want to thank you for your time.

18            (Cross-Examination was concluded and

19            Further Examination began at 3:21 p.m.)

20            FURTHER EXAMINATION

21  BY MR. CERESNEY:

22      Q.    Yeah, I have got a few more questions.

23      A.    Okay.

24      Q.    Sorry.  Can't -- lawyers need the last word.

25            This won't take long, hopefully.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 213

1                    LAWRENCE ANGELILLI

2              First, Mr. Moye asked you a bunch of

3    questions about transacting at the $1,000 level in the ODL

4    product.

5         A.   Yes.

6         Q.   I think you said originally it wasn't practical

7    for MoneyGram to transact at the $1,000 level; is that

8    fair?

9         A.   Yes.

10        Q.   And, in fact, you -- I think we talked about

11   earlier, even at the $50,000 level, there were some

12   benefits to transacting at that level from the dollar-cost

13   averaging over the course of a day, but your typical

14   transactions would be, you know, millions of dollars; is

15   that fair?

16        A.   Yes.

17        Q.   Fair to say, thought, that there could be other

18   customers who transacting at $1,000 increments made sense

19   to them?

20        A.   I wouldn't know of any.

21        Q.   Okay.  But there could be other customers,

22   whether it be money remitters or other types of financial

23   institutions, that could make sense for?  Would that be

24   fair?

25              MR. MOYE:  Objection, asked and answered.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 214

```
 1                    LAWRENCE ANGELILLI

 2        A.   Unlikely.

 3        Q.   (BY MR. CERESNEY)   Sitting here today, if there

 4   were such folks to which that could be beneficial, can we

 5   agree that under the calculations that were contained in

 6   your declaration, it would be cheaper to transact at

 7   $1,000 through the ODL product than the traditional

 8   payment rails that were --

 9        A.   I am going to have to say that the calculations

10   in my declaration are likely incorrect at $1,000.

11        Q.   Okay.  And, therefore, you can't say one way or

12   another sitting here today whether it's cheaper to do it

13   through the ODL product versus the traditional payment

14   rails?

15        A.   That is correct.  And that's supported by when

16   we were doing $100 transactions, those were uneconomical.

17   So it's unlikely.  That doing $1,000 transactions would be

18   uneconomical.

19        Q.   But none of those were in 2018, correct?

20        A.   No.  There was two tranches, the -- the ones we

21   did prior to Ripple's knowledge, and then there's the ones

22   that are on this dec.

23        Q.   And that was 2018, correct?

24        A.   Okay.  I would -- I haven't looked at the ODL

25   spreads since we terminated the contract, so I wouldn't
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 215

1                          LAWRENCE ANGELILLI

2    know.

3         Q.    Okay.  You talked earlier about -- in response

4    to Mr. Moye's questions, you said that there were

5    statements that you saw, Tweets about price effectiveness

6    and utility of ODL, that you questioned Tweets by Ripple

7    employees that you questioned whether they were fully

8    accurate, correct?

9         A.    Yes.

10        Q.    Did you do anything to -- did any of those

11   statements relate to MoneyGram --

12        A.    No.

13        Q.    -- specifically?

14        A.    Not specifically.

15        Q.    And those statements may have related to other

16   customers; is that fair?

17        A.    Presumably.

18        Q.    And you don't -- sitting here today, you don't

19   have any basis to know one way or the other whether those

20   statements as to other customers were accurate or

21   inaccurate, do you?

22        A.    I don't.

23        Q.    Okay.  You talked about some statements that you

24   attributed to Mr. Garlinghouse about the value and price.

25   You used the terms "value" and "price" when you were

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

```
 1                    LAWRENCE ANGELILLI

 2   describing the statements that he made.

 3        A.   Yes.

 4        Q.   And I want to just sort of make sure I

 5   understand.  Do you recall Mr. Garlinghouse specifically

 6   using the term "price" or "value," or do you not recall

 7   one way or the other what term he used?

 8        A.   I couldn't determine what term he used.

 9        Q.   So he might have just used the term "value of

10   XRP"?

11        A.   In the context, those two terms are

12   interchangeable.

13        Q.   Okay.  But do you know whether Mr. Garlinghouse

14   used the term "value" versus "price"?

15        A.   No.

16        Q.   Mr. Moye asked you some questions about

17   disclosures that MoneyGram made and asked you whether

18   Ripple was aware that those disclosures would be made.

19   Fair to say -- I think you answered that, as a public

20   company, you made clear to Ripple that any incentives that

21   they paid you would have to be disclosed?

22        A.   Yes.

23        Q.   And Ripple didn't object to that?

24        A.   Correct.

25        Q.   In fact, they didn't have any problem with you
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 217

1                    LAWRENCE ANGELILLI

2    disclosing the incentives, did they?

3         A.    Correct.

4         Q.    One final set of questions.

5              Mr. Moye asked you some questions about the

6    genesis of MoneyGram's use of the ODL product.  He talked

7    about the financial make-whole arrangement and whether

8    that was a factor in the use of the product.

9              I think you said -- I just want to make

10   sure the record is clear on this -- besides the make-whole

11   payments, there were other reasons why MoneyGram thought

12   the use of the ODL product has promise; is that fair?

13        A.    Yes.

14        Q.    And just for the purpose of the record here, can

15   you state what those reasons were?

16        A.    We were genuinely interested in being on the

17   forefront of blockchain technology.  And we wanted

18   to -- if -- use any technology to reduce the size of our

19   balance sheet.  And the fact that this checked both of

20   those boxes, it made this more interesting to us.

21        Q.    Is it fair to say that even sitting here today,

22   you think blockchain technology has promise for the money

23   remitter industry?

24        A.    Yes.

25        Q.    And in the future, that technology may actually

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 218

```
 1                    LAWRENCE ANGELILLI

 2    be a useful way to move money real time?

 3         A.   Yes.

 4         Q.   And in the future, you may explore other

 5    alternatives to do that?

 6         A.   Correct.

 7              MR. CERESNEY:  If we can just have two

 8    minutes so we can consult with the other counsel to make

 9    sure they don't have anything.  But let's go off the

10    record.

11              THE VIDEOGRAPHER:  Off the record at 3:27.

12              (Recess in the proceedings from 3:27 to

13              3:32 p.m.)

14              THE VIDEOGRAPHER:  On the record at 3:32.

15              MR. CERESNEY:  As I understand it, counsel

16    for Mr. Garlinghouse and Mr. Larsen do not have any

17    additional questions.  So I think we're concluded for

18    today, Mr. Angelilli.  Thank you very much, I appreciate

19    your time today.

20              THE WITNESS:  You're welcome.

21              MR. LEWIS:  Andrew, before we go off, I

22    just want to --

23              MR. CERESNEY:  Oh, yeah, you had --

24              MR. LEWIS:  We're going to -- we're going

25    to -- at this point we're going to designate the
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 219

1                        LAWRENCE ANGELILLI

2      transcript confidential under the protective order and

3      confidentiality agreement.

4                        So, again, we'll work with you on that.

5      But at this time we want to have the whole thing

6      designated as confidential.

7                        MR. CERESNEY:  Okay.  And just to put on

8      the record my request for the drafts of the declaration

9      and the questionnaires that were referenced by the witness

10     in connection with the declaration, you know, I request

11     them from you.  If you want to work with the SEC to

12     produce those to us, I'll leave that up to you two to work

13     out.

14                       MR. LEWIS:  Yeah, I'll work with Rob on

15     that issue.

16                       MR. MOYE:  Before we go, is there anything

17     you want to clarify about the term "questionnaire,"

18     Andrew?

19                       MR. LEWIS:  Not on the record.  I told him.

20                       MR. MOYE:  Okay.

21                       MR. CERESNEY:  Okay.  We're off the record.

22                       THE VIDEOGRAPHER:  Before we go off the

23     record, I want to confirm the video orders.  I assume

24     you-all have a standing order, correct?

25                       MR. CERESNEY:  Yeah, we do.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 220

```
 1                    LAWRENCE ANGELILLI

 2               THE VIDEOGRAPHER:  I assume you have

 3   standing orders --

 4               MR. LEWIS:  I don't need a video at this

 5   time.

 6               THE VIDEOGRAPHER:  We're off the record at

 7   3:33.

 8               THE REPORTER:  Hold on counsel on the

 9   telephone.

10               Counsel for the other Defendants, do You

11   need a copy of the transcript?

12               MS. BUNTING:  Yes, please.

13               MR. LEVANDER:  Samuel Levander with Cleary

14   Gottlieb.  Just a copy of the final, please, thank you.

15               (Deposition concluded at 3:33 p.m.)

16

17

18

19

20

21

22

23

24

25
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 221

| | |
|---|---|
| 1 | LAWRENCE ANGELILLI |
| 2 | |
| 3 | |
| 4 | CHANGES AND SIGNATURE |
| 5 | WITNESS NAME:  LAWRENCE ANGELILLI |
| 6 | DATE OF DEPOSITION:  AUGUST 3, 2021 |
| 7 | PAGE         LINE          CHANGE                    REASON |
| 8 | _____ |
| 9 | _____ |
| 10 | _____ |
| 11 | _____ |
| 12 | _____ |
| 13 | _____ |
| 14 | _____ |
| 15 | _____ |
| 16 | _____ |
| 17 | _____ |
| 18 | _____ |
| 19 | _____ |
| 20 | _____ |
| 21 | _____ |
| 22 | _____ |
| 23 | _____ |
| 24 | _____ |
| 25 | _____ |

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 222

```
 1                    LAWRENCE ANGELILLI

 2    _____

 3    _____

 4                 ACKNOWLEDGMENT OF DEPONENT

 5         I, _____, do hereby certify that I

 6    have read the foregoing pages, and that the same is a

 7    correct transcription of the answers given by me to the

 8    questions therein propounded, except for the corrections

 9    or changes in form and substance, if any, noted on the

10    attached Errata.

11

12              _____

13              WITNESS NAME                    DATE

14

15

16

17

18

19

20

21

22

23

24

25
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 223

1                     LAWRENCE ANGELILLI

2

3

4            IN THE UNITED STATES DISTRICT COURT

5            FOR THE SOUTHERN DISTRICT OF NEW YORK

6    SECURITIES AND EXCHANGE        )

7    COMMISSION,                    )

8         Plaintiff                 )

9                                   )

10   VS.                            )CIVIL ACTION

11                                  )NO. 20-CV-10832(AT)(SN)

12   RIPPLE LABS, INC. BRADLEY      )

13   GARLINGHOUSE and CHRISTIAN     )

14   A. LARSEN,                     )

15         Defendants              )

16         ***********************************

17              REPORTER'S CERTIFICATION

18        ORAL DEPOSITION OF LAWRENCE ANGELILLI

19                  AUGUST 3, 2021

20         ***********************************

21         I, Kathryn R. Baker, RPR, a Certified Shorthand

22   Reporter in and for the State of Texas, hereby certify to

23   the following:

24         That the witness, LAWRENCE ANGELILLI, was duly

25   sworn by the officer and that the transcript of the oral

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 224

1              LAWRENCE ANGELILLI

2   deposition is a true record of the testimony given by the

3   witness;

4           I further certify that pursuant to FRCP Rule

5   30(f)(1) that the signature of the deponent:

6           _X_ was requested by the deponent or a party

7   before the completion of the deposition and is to be

8   returned within 30 days from the date of receipt of the

9   transcript.  If returned, the attached Errata contain any

10  changes and the reasons therefor;

11          ___ was not requested by the deponent or a party

12  before the completion of the deposition.

13          I further certify that I am neither counsel for,

14  related to, nor employed by any of the parties or

15  attorneys in the action in which this proceeding was

16  taken, and further that I am not financially or otherwise

17  interested in the outcome of the action;

18          Subscribed and sworn to on this 4th day of

19  August, 2021.

20

21          _____
            KATHRYN R. BAKER, RPR, CSR #6955
22          Expiration Date:  04/30/2023
            Firm Registration No. 615
23          TSG Reporting
            228 E. 45th Street
24          Suite 810
            New York, New York 10017

25