# PX 639



# Memo

**Date:**     February xx, 2014

**To:**        Ripple Labs, Inc.

**From:**

**Subject:**  Status of Ripple under Section 83

**Any tax advice included in this written communication was not intended or written to be used, and it cannot be used by the taxpayer, for the purpose of avoiding any penalties that may be imposed by any governmental taxing authority or agency.**

Ripple Labs, Inc. ("Ripple Labs" or the "Company") and its founders have created an open source global payments network, ("Ripple") and a cryptocurrency called "ripple" or "XRP" which is intended to be used as currency by third parties to buy goods and services within this network. This memo addresses whether ripple should be considered "property" under section 83.[1]

This memo is based on our understanding of the facts, assumptions, information, and documents referenced herein and current tax laws and published tax authorities in effect as of the date of this memo, which are subject to change. If the facts and assumptions are incorrect or change or the tax laws change, the memo would likewise be subject to change.          ("            " or "we") assumes no obligation to update the memo for any future changes in tax law, regulations, or other interpretations and does not intend to do so.

This memo is not a tax opinion and its conclusions are not opinions of          However, this memo provides what appear to be the resulting tax consequences based on the facts provided. Additional research and analysis would be required before we could issue a formal opinion. In various sections of this memo, for ease of understanding and as a stylistic matter, we may use language (such as "will" or "should") that might suggest that we are expressing an opinion on the tax consequences of a transaction or series of transactions, including the degree of probability that the stated tax consequences would ultimately be validated by a court if challenged by the relevant tax authorities. Such language should not be so construed.

This memo is not binding on the Internal Revenue Service (the "Service"), the states, or the courts and should not be considered a representation, warranty, or guarantee that the Service, the states, or the courts will concur with our conclusions. Only the specific tax issues and tax consequences described herein are within the scope of this memo. Our analysis is limited to the specific U.S. federal income tax issues as set forth below. Our analysis does not address any other U.S. federal or state income tax issues, or any non-income taxes, including sales, use or transfer taxes, or any local, or foreign tax issues. We also provide no analysis on non-income tax issues, such as corporate law or securities matters. No other federal, state, or local laws of any kind were considered and are beyond the scope of this memo. Additional issues may

---

[1] Unless otherwise indicated, all "section" references in this memo are to the Internal Revenue Code of 1986 ("Code"), as amended through the date of this memo.

1

exist that could affect the U.S. federal income tax treatment of ripple or matter that is the subject of the memo, and the memo does not consider or provide a conclusion with respect to any additional issues.

███████ hereby acknowledges and agrees that there are no conditions of confidentiality associated with the transactions described herein. Neither ███████ nor any party known to ███████ has or claims to have any proprietary interest in the Company. Even though Company is hereby expressly authorized to discuss and disclose the full content of any advice it receives pursuant to this engagement and every aspect of the tax treatment of the transactions described herein with any and all persons without limitations of any kind, Company agrees that this memo is solely for the benefit of Company. This memo is not intended for the express or implied benefit of any third party. No third party is entitled to rely, in any manner or for any purpose, on this memo.

Facts

Ripple is a distributed open source global payments network developed by Chris Larsen and Jed McCaleb ("the Founders") in August of 2011. The Ripple network ("the ledger") is a distributed ledger which gains global consensus every few seconds. The ledger is capable of maintaining and tracking the balance of any form of currency, such as the ripple (defined below). Consensus is a process to prevent double spending without a central authority. This replication is across a network of servers that are not maintained by Ripple Labs (defined below). Each time a ripple changes hands, all servers must agree on the transaction. As transactions occur, the ledgers synchronize in a matter of seconds. The theory is that if ledgers are maintained by multiple unrelated parties, it becomes very unlikely that anyone could "hack" or steal ripple, as any fake transaction would be rejected by other servers, and therefore no account balances would change. See appendix for examples / graphics provided by Ripple Labs to depict the transaction flows.

The Founders also developed a cryptocurrency called ripple, (also known as "XRP"), which like bitcoins, is a math-based currency. The Founders created 100 billion ripple, the number of which is fixed and cannot be changed. Each ripple is accessed by its unique "key", which is a long series of numbers, letters, and characters making it virtually impossible to replicate. If lost by its owners, a ripple cannot be re-created. Ripple Labs is currently seeking a currency designation "XRP" from the International Organization of Standardization ("ISO").

As noted above, the Founders collectively owned 100 billion ripple (45 billion for Chris and Jed, and 10 billion for an unrelated third party) before the contribution to Ripple Labs. The Founders contributed 1) 80 billion ripple (36 billion for Chris and Jed, and 8 billion for an unrelated third party), 2) about $400,000 in cash, and 3) the ledger software to Ripple Labs in October 2012. Ripple Labs' business plan is to slowly distribute 50 to 55 billion ripple in the following ways:

1) Payment to Market Makers.
2) Payment to third party vendors of Taxpayer in exchange for services such as software development, advertising, and professional services.
3) General distribution to users of third party software applications. Users of targeted software applications may receive deposits of ripple into their e-wallet. It is not intended that the recipients will be required to perform any services in exchange for the ripple. Rather the users of the targeted software applications are believed to represent a demographic that is open to the use of virtual currency. This technique, known also as a "fountain", is an efficient means to get ripple into the general population, which will allow the currency to begin to trade and establish value. The Company does not intend to receive any property or cash in exchange for the distribution through the fountain. The first small give away of ripple through the fountain occurred in February 2013.

2

4) The remaining ripple of approximately 25 to 30 billion will be sold through wholesale transactions and forward contracts in which the Company intends to receive property (i.e., cash) in exchange for ripple. The Company will sell ripple through various currency exchanges, also known as gateways. The Founders retained 20 billion ripple which was not contributed to the corporation.

Ripple Labs released the source code for the software to the general public, thus granting the general public the ability to make any necessary changes to the ledger system as the currency evolves, similar to Linux or RedHat. Anyone can access the open source Ripple code without license or fee at github.com. This allows ripple to continue to trade on the ledger system even if Ripple Labs were to dissolve. The current version of the code, which is the first version without fatal errors, was finalized in December of 2012.

Since the software containing the distributed ledger became open source, employees at Ripple Labs continue to work with regulators to promote the legal uses of the currency and to enhance the code. Employees of Ripple Labs will make changes to the code as the currency evolves, similar and no different to other contributors to open source software. Any changes made to the code by Ripple Labs employees or any other contributor will need to be accepted and adopted by all servers running the distributed ledger before the code can be effectively changed. Ripple Labs does not have control of the software code, but they can make changes to improve the functionality of the distributed ledger system. They also actively promote ripple as an alternative to political backed currency to the public, including recruiting businesses to accept ripple as payment. Further, it is contemplated that Ripple Labs will eventually develop related tangential mobile applications that will assist consumers and merchants as they use ripple. Access to these applications will be sold to consumers much like other downloaded mobile applications.

The three forms of revenue to the Company will come from the wholesale transactions of the sale of ripple (XRP), sale of forward contracts, and the sale of the mobile applications. The Company does not intend to repurchase any XRPs as part of its business model.

In addition to Ripple, Ripple Labs also owns a patent for the ledger. Per discussion with Chris Larsen, this patent is meant to protect the system from being misused by people trying to either disrupt or misuse the distributed ledger system. Ripple Labs also owns the domain name for ripple.com. The website is used to promote the currency and inform the public how to use it.

Recently, the company received venture capital funding from [redacted]

Beginning in March 2013, Ripple Labs began selling ripple through wholesale transactions to BitStamp (a Slovenian company) and Bitcoin Japan. Both of these companies are BitCoin exchanges, unrelated third parties to Ripple Labs.

This memo assumes that XRP is not currently considered legal tender in any sovereign nation nor is it contemplated to be considered legal tender in the near term. If Ripple Labs pursues a course of action that would make XRP legal tender in one or more jurisdictions, the conclusions reached in this memo would be impacted at which point we would recommend additional analysis.

3

## Issue

Ripple Labs has considered compensating service providers with ripple. Is ripple "property" under section 83?

## Law and Analysis

Section 61(a)(1) includes in gross income amounts received as compensation. For individuals using the cash basis method of accounting, compensation income is based on actual or constructive receipt. *See* IRC § 451. Section 83, however, provides special rules that apply specifically to "property" that is transferred (to anyone other than the service recipient) in connection with the performance of services.

Section 83 does not define "property." Treasury regulation § 1.83-3 is entitled "Meaning and use of certain terms." Subsection (e) provides, in part, as follows:

> For purposes of section 83 and the regulations thereunder, the term "property" includes real and personal property other than either money or an unfunded and unsecured promise to pay money or property in the future. The term also includes a beneficial interest in assets (including money) which are transferred or set aside from the claims of creditors of the transferor, for example, in a trust or escrow account.

Thus, if XRP is "money," then it is not "property" under section 83. Neither the regulation nor its regulatory history expounds on the meaning of "money" in this context, and we are not aware of any tax authorities addressing this issue.

Amounts received as compensation that are not classified as property are subject to inclusion in income under section 61. Treasury regulation § 1.61-2 governs compensation income generally, and specifically addresses payments of compensation other than in "cash". Treasury regulation § 1.62-2(d)(4) provides in part:

> Notes or other evidences of indebtedness received in payment for services constitute income in the amount of their fair market value at the time of the transfer. A taxpayer receiving as compensation a note regarded as good for its face value at maturity, but not bearing interest, shall treat as income as of the time of receipt its fair discounted value computed at the prevailing rate. As payments are received on such a note, there shall be included in income that portion of each payment which represents the proportionate part of the discount originally taken on the entire note.

While the current language of Treasury regulation § 1.61-2(d)(4) also references transfers of property, Treasury regulation § 1.61-2(d)(6) provides that paragraph (d)(4) "[does] not apply to the transfer of property (as defined in § 1.83-3(e)) after June 30, 1969, unless § 1.83-8 (relating to the applicability of section 83 and transitional rules) applies."

When a note or other evidence of indebtedness should be considered subject to section 61, rather than "property," depends on whether that note should be considered a "cash equivalent." The primary authority on this issue is *Cowden v. Comm'r*,[2] In that case, the court concluded that there was income on the facts presented, stating in part

---

[2] 32 T.C. 853 (1959), rev'd and rem'd, 289 F.2d 20 (5th Cir. 1961), opinion on remand, T.C. Memo 1961-229. See BNA Portfolio 385-5th, VII.C (discussion of cash equivalency).

4

HIGHLY CONFIDENTIAL

RPLI_SEC 1027265

> [I]f a promise to pay of a solvent obligor is unconditional and assignable, not subject to set-offs, and is of a kind that is frequently transferred to lenders or investors at a discount not substantially greater than the generally prevailing premium for the use of money, such promise is the equivalent of cash and taxable in like manner as cash would have been taxable had it been received by the taxpayer rather than the obligation.[3]

Given the status of XRP as a fungible currency for purposes of transactions conducted through the Ripple ledger, it seems likely that it would be considered a "cash equivalent" within the meaning of section 61 and the cash equivalent doctrine, rather than "property" for purposes of section 83.

A separate concept under the Code is the concept of "currency." This term is not a defined term for purposes of the Code, but there is no authority that would suggest that "currency" and "money" would be defined consistently, and in particular that "money" for purposes of section 83 is the same as "currency" as interpreted for other purposes, such as section 988. Instead, as noted by the FinCEN guidance mentioned below, "money" can be interpreted more broadly to include virtual currencies that might not be considered a "currency" for other purposes.

Generally used definitions of "money" are broader than currency.[4] A specific application of this difference can be seen in guidance issued by FinCEN, the Financial Crimes Enforcement Network in the Department of Treasury, which indicates that "[t]he definition of a money transmitter does not differentiate between real currencies and convertible virtual currencies."[5] Thus, while FinCEN recognizes that there are differences between virtual and real currencies, it seems to consider both types of currency to be money.

---



[3] 289 F.2d at 23.
[4] *See, e.g.*, "Money." Merriam-Webster.com. Merriam-Webster, n.d. Web. 23 Jan. 2014. <http://www.merriam-webster.com/dictionary/money>; Black's Law Dictionary, Eighth Edition.
[5] FIN-2013-G001 (March 18, 2013).

5

HIGHLY CONFIDENTIAL

RPLI_SEC 1027266