# PX 187

| | |
|---|---|
| **From:** | Breanne Madigan <​@ripple.com> |
| **Sent:** | Monday, July 06, 2020 7:49 AM |
| **To:** | |
| **Cc:** | |
| **Subject:** | Re: GSR <> Ripple Singapore |
| **Attachments:** | RW_XRP Purchase Agreement (7.3_GSR).docx (1).pdf |

Here is the first executed

 is reviewing your doc now and we will revert ASAP

Thanks!

On Mon, Jul 6, 2020 at 5:05 AM <​…io> wrote:

Hi & Breanne,

Thank you for sending the revised XRP Master Purchase Agreement.

Please find a signed copy attached to this email. Please also find attached a signed copy of our Sale & Purchase Agreement.

As confirmed on Telegram, both agreements have been backdated to 3rd July 2020.

We look forward to receiving the countersigned agreements in due course.

Kind regards,

 GSR
Legal & Compliance Analyst

Stay updated on: Linkedin Telegram Twitter Blog

On Fri, 3 Jul 2020 at 19:56, <​@ripple.com> wrote:

I hope you are well. Please find attached a revised draft of the agreement.

Best,

CONFIDENTIAL RPLI_SEC 0878010



Ripple
ripple.com | ripple.com

--
Breanne Madigan
VP, Head of Global Institutional Markets
@ripple.com

CONFIDENTIAL
RPLI_SEC 0878011

# MASTER PURCHASE AGREEMENT

This Master Purchase Agreement ("Agreement") is effective the date the last Party signs ("Effective Date") and is between GSR ███████████ ("Company") and Ripple Labs Singapore Pte. Ltd. ("Customer"). Company and Customer are hereby referred to as "Party" individually and together as "Parties".

WHEREAS, Customer, for its own account and not for the account of any other person or entity, may seek to purchase XRP from the Company to offset amounts of XRP that Customer is selling to its own customers for their use in cross border payments via Customer's On Demand Liquidity product ("Purpose"),

NOW, THEREFORE, in consideration of the mutual promises contained in this Agreement, the Parties agree as follows:

### SECTION 1.   SOURCING XRP

(a) **General**. The Company shall use its knowledge and expertise to source XRP, the digital asset native to the XRP Ledger, from third party exchanges and/or OTC desks. Each such transaction is referenced herein as a "**Transaction**" and, unless otherwise agreed in writing, is to be governed by this Agreement.

(b) **Confirmation**. The Parties may mutually agree to enter into a Transaction from time via email ("**Confirmation**"). Each Confirmation shall include a told amount of USD ("**Purchase Amount**") with which Company shall purchase XRP from third party exchanges (subject to Section 2(b) and 2(d)) at prevailing market prices. Following a Confirmation, Customer shall provide Company the Purchase Amount after which Company shall have a mutually agreed number of days to source XRP using it. Upon sourcing such XRP, Company shall promptly (a) deliver such XRP to Customer's preferred wallet address, and (b) provide Customer an electronic invoice at an email address designated by Customer, which shall include (i) the total XRP Units subject to the Transaction ("**Purchased XRP**"), (ii) the relevant Purchase Amount (iii) the total transaction value (including currency) ("**Purchase Price**"), and (iv) competent evidence of the Purchase Price. If the Purchase Amount is greater than the Purchase Price, Company shall return the difference to Customer within 3 days of Customer's receipt of the invoice.

(c) **Purchased XRP**. Company shall retain discretion as to the manner and means of sourcing the XRP, provided that such manner and means is in compliance with applicable laws pursuant to Section 2(b) and 2(d) and the parameters in Section 2(a). The Parties agree that all Purchased XRP is for Customer's own account. Upon delivery of the Purchased XRP, Customer shall retain sole ownership and control of the Purchased XRP, and bear the risk of all gains and losses from such Purchased XRP.

(d) **Reporting**. On a daily basis, Company shall provide reporting regarding the Purchased XRP, including the price, amount, any fees, and source, in addition to other information that Customer may reasonably request.

1

CONFIDENTIAL

CONFIDENTIAL                                                                                                                                       RPLI_SEC 0878012

## SECTION 2. TERMS AND CONDITIONS OF TRANSACTIONS.

(a) **Execution Parameters**. The Company will ensure orderly markets and avoid undue market impact in relation to any purchases under this Agreement, including by ensuring compliance with the following parameters:

(i) **Diversification**. The Company will distribute purchasing activities across several venues (including over the counter markets) as appropriate to avoid concentrated purchasing activities at any particular venues.

(ii) **Volume**. The Company will not trade more than 25% of the total volume traded at any given venue over the applicable timeframe, or such smaller amount as appropriate to ensure orderly markets.

(iii) **Price**. The Company will conduct any purchases on a market basis using a volume weighted average price ("VWAP") algorithm.

(iv) **Confidentiality**. The timing, amount, and nature (in any respect) of Transactions under this Agreement shall constitute Customer's Confidential Information pursuant to Section 2(f). For the avoidance of doubt, Company shall not disclose Customer's Confidential Information to any other party (including but not limited to other market participants), except for and to the limited extent necessary for purposes of executing the Transactions under this Agreement, and Customer shall not use or disclose Customer's Confidential Information for its own trading purposes or those of any other party.

(b) **Representations**. Company represents and warrants that it (i) possesses and maintains all necessary licenses, permits, approvals, and registrations from all applicable state and federal regulatory and governmental authorities which are required to provide the Services (ii) is registered with the U.S. Department of the Treasury's Financial Crimes Enforcement Network as a "money services business" under 31 C.F.R. 1022.380 or any successor provision. Customer represents and warrants that it has received an opinion from Singapore legal counsel concluding that XRP is not a "security" as that term is defined in Section 2(1) of the Securities and Futures Act Of Singapore. To the extent that the representations and warranties in this paragraph are not true at any time during the term of this Agreement, the Party that made the representation shall shall promptly notify the other Party and cease all activities under this Agreement (except as to delivering any undelivered Purchased XRP or Purchase Price, as appropriate).

(c) **Taxes**. Company and Customer acknowledge and agree that net income taxes, franchise taxes, branch profit taxes, or similar income taxes imposed on a Party as a result of such Party being organized under the laws of, having its principal office, management and control, or employees located in, conducting business within, or by reason of another connection between Party and the jurisdiction imposing such tax, shall be the sole responsibility of such Party. The Purchase Price for Purchased XRP is exclusive of any applicable taxes. Customer shall bear any transactional taxes related to the purchase of XRP as is customary of a purchaser. Customer and Company shall cooperate to minimize transactional taxes to the extent permitted under law. As necessary, Customer shall collect appropriate tax certifications and official tax documentation (e.g., W-9 or W-8 series) to properly withhold and report on any amounts paid as purchase price or fees to Company or any seller. Customer

2

shall not bear or gross-up Company or any seller for any income taxes or VAT whether collected through withholding or by other mechanism.

(d) **Applicable Laws**. The Company shall comply with all applicable laws, rules, and regulations, and orders in all relevant jurisdictions (collectively, "Laws") including, but not limited to Laws related to the Services. Without limiting the foregoing, the Company agrees not to violate (a) any applicable domestic or foreign anti-corruption Law, including the United States Foreign Corrupt Practices Act; (b) any applicable domestic or foreign Laws related to Anti-Money Laundering and anti-terrorist financing requirements, including the USA Bank Secrecy Act, as amended by the USA PATRIOT Act; (c) any applicable sanctions Laws administered by the U.S. Department of Treasury's Office of Foreign Assets Control; (d) applicable export restrictions or other Laws, including United States Export Administration Regulations, as well as end user, end use and destination restrictions which may be issued by the United States and other governments; and (e) antitrust, anti-competition, or other market manipulations Laws.

(e) **Publicity**. Neither Party may issue any press release or make any other public statement with respect to this Agreement and its terms and conditions unless the content, timing and method of distribution of the press release or public statement has been approved in writing by the other Party.

(f) **Confidentiality**. Each Party shall maintain all Confidential Information (as that term is defined in Attachment A) it receives in strict confidence and not disclose any Confidential Information to any third party, except to employees and representatives on a "need to know" basis who have signed confidentiality agreements or otherwise are bound by confidentiality obligations at least as restrictive as those herein. Each Party shall not use any Confidential Information for any purpose other than the Performance of this Agreement, unless agreed upon in writing. A Party may disclose Confidential Information required to be disclosed by law, regulation, or a valid court order if that Party (i) gives the other Party timely notice, unless legally prohibited, so that other Party may seek a protective order, confidential treatment, or other appropriate relief and (ii) discloses only the portion of Confidential Information that is necessary to comply with such law, regulation, or order. The obligations in this sub-paragraph are in addition to, and do not supersede, any confidentiality and nondisclosure obligations provided in any other written agreement between the Parties.

(g) **Indemnification**. Company agrees to defend, indemnify and hold the Customer, its affiliates, and their respective employees, shareholders, directors, and representatives (together with the Customer and its affiliates, the "Customer Indemnitees") harmless and settle against any Claim or Loss (as those terms are defined in Attachment A), including attorneys' fees and any fines, fees or penalties imposed by any regulatory authority, arising out of or related to: (i) any violation of law by the Company or the Company's employees, contractors, or agents in connection with this Agreement, or (ii) any breach of this Agreement by the Company or the Company's employees, contractors, or agents.

(h) **Indemnification Procedure**. In connection with any Claim or Loss, the Customer shall give the Company prompt Notice of the Claim or Loss (however, that any delay in notification will not relieve the Customer of its obligation to indemnify, except and solely to the extent that the delay materially impairs the Customer's ability to defend the Claim or Loss). In addition, the Customer will cooperate with the Company in connection with the defense and settlement of the Claim or Loss, with Company having the right to choose counsel. The Company shall not enter into any settlement or compromise of any Claim or Loss without the Customer's prior written consent if such settlement or

3

CONFIDENTIAL

compromise arises from or is part of any criminal action, suit, or proceeding, or contains a stipulation to or admission or acknowledgement of any liability or wrongdoing (whether in contract, tort or otherwise) on the part of the Customer, or otherwise requires the Customer to refrain from or take material action (such as payment of fees). At its cost, the Customer has the right to participate in the defense or settlement of the Claim or Loss with counsel of its own choosing.

### SECTION 3.  DISCLAIMERS, LIMITATIONS AND RESERVATIONS

(a) EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT, NEITHER PARTY MAKES ANY REPRESENTATIONS OR WARRANTIES IN RELATION TO THE PURCHASED XRP, THIS AGREEMENT OR ITS PERFORMANCE HEREUNDER, INCLUDING (WITHOUT LIMITATION) IMPLIED WARRANTIES OF MERCHANTABILITY, NON-INFRINGEMENT, FITNESS FOR A PARTICULAR PURPOSE, OR IMPLIED WARRANTIES ARISING OUT OF COURSE OF DEALING, COURSE OF PERFORMANCE OR USAGE OF TRADE.

(b) IN NO EVENT SHALL CUSTOMER, ITS AFFILIATES, OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, AGENTS, EMPLOYEES OR REPRESENTATIVES, BE LIABLE TO THE CUSTOMER FOR ANY SPECIAL, INCIDENTAL, INDIRECT, INTANGIBLE, OR CONSEQUENTIAL DAMAGES OR DAMAGES FOR LOSS OF PROFITS, WHETHER BASED ON CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY, OR OTHERWISE, ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO AUTHORIZED OR UNAUTHORIZED TRANSACTIONS SUBJECT TO THIS AGREEMENT. CUSTOMER, ITS AFFILIATES, OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, AGENTS, EMPLOYEES OR REPRESENTATIVES' ENTIRE LIABILITY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT WILL IN NO EVENT EXCEED THE PURCHASE PRICE PAID BY CUSTOMER UNDER THIS AGREEMENT FOR THE TRANSACTION.

### SECTION 4.  TERMINATION

(a) **Termination**.  Either party may terminate this Agreement at any time upon written notice, provided that there is no Transaction for which either XRP or the respective Purchase Price has not been delivered.

(b) **Termination for Breach**. Without limiting any other right or remedy that the Parties may have at law or otherwise, a non-breaching Party may, in its sole discretion. terminate this Agreement immediately upon notice to the breaching Party if the breaching Party breaches any of its obligations under this Agreement, in particular its obligation to comply with applicable laws and regulations as set forth in Section 2 of this Agreement.

(c) **Effect of Termination.** The expiration or termination of this Agreement, for any reason, shall not release either Party from any obligation or liability to the other Party, including any payment obligation, that has already accrued hereunder.

## SECTION 5. MISCELLANEOUS PROVISIONS

(a) **Choice of Law; Jurisdiction and Venue**. This Agreement shall be governed by, and construed in accordance with, the laws of Singapore without reference to any conflict of laws rules or provisions. The Parties irrevocably consent to the non-exclusive jurisdiction and venue of Singapore courts with respect to any claim, action or proceeding arising out of or in connection with this Agreement.

(b) **Notice.** Any notices under this Agreement shall be sent by certified or registered mail, return receipt requested, to the Notices address and party set forth below, or if to Customer, to generalcounsel@ripple.com. Notice shall be effective upon receipt.

(c) **Entire Agreement; Amendments; Counterparts**. This Agreement constitutes the entire contract between the Parties hereto with regard to the subject matter hereof. It supersedes any other agreements, representations or understandings (whether oral or written and whether express or implied) that relate to the subject matter hereof. Except for a writing signed by both parties, this Agreement may not be modified or amended. If any provision of this Agreement is held to be invalid, such invalidity will not affect the remaining provisions. This Agreement may be signed in any number of counterparts, each of which is an original and all of which taken together form one single Agreement. A signed copy of this Agreement transmitted by email or any other means of electronic transmission shall be deemed to have the same legal effect as an original executed copy of this Agreement.

(d) **Successors and Assigns.** The Company may not assign any rights granted under this Agreement without the prior written consent of the Customer. The Customer reserves the right to assign its rights without restriction, including without limitation to any affiliates or subsidiaries. Any attempted transfer or assignment in violation hereof shall be null and void. Subject to the foregoing, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the Company and its successors and assigns and be binding upon the Customer and the Customer's successors and permitted assigns, whether or not any such person has become a party to this Agreement or has agreed in writing to join herein and to be bound by the terms, conditions and restrictions hereof. In addition, this Agreement is not intended to confer any right or benefit on any third party.

(e) **Relationship of the Parties.** Nothing in this Agreement shall be construed or is intended to be construed as creating an employer-employee or agency relationship, a partnership, or a joint venture between the Parties.

(f) **Survival.** Sections 2 through Section 5 shall survive the termination or expiration of this Agreement, as well as any other provision that, in order to give proper effect to their intent, should survive such expiration or termination. Termination or expiration of this Agreement shall not affect or limit any independent rights of a Party in or to its Confidential Information under applicable laws.

(g) **Severability**. If any provision of this Agreement is determined to be invalid or unenforceable under any rule, law or regulation or any governmental agency, local, state, or federal, such provision will be changed and interpreted to accomplish the objectives of the provision to the greatest extent possible under any applicable law and the validity or enforceability of any other provision of this Agreement shall not be affected.

CONFIDENTIAL

CONFIDENTIAL                                                                                                                                               RPLI_SEC 0878016

(h) **Non-Waiver**. The failure of either Party to enforce any provision of this Agreement or to exercise any rights or remedies under this Agreement will not constitute a waiver of the Party's rights to subsequently enforce the provision or exercise those rights or remedies. The remedies specified in this Agreement are in addition to any other remedies that may be available at law or equity.

(i) **Force Majeure**. Neither Party shall not be liable for delays, failure in performance or interruption of service which result directly or indirectly from any cause or condition beyond its reasonable control, including but not limited to, any delay or failure due to any act of God, act of civil or military authorities, act of terrorists, civil disturbance, war, strike or other labor dispute, fire, interruption in telecommunications or Internet services or network provider services, failure of equipment and/or software, other catastrophe or any other occurrence which is beyond its reasonable control and shall not affect the validity and enforceability of any remaining provisions.

[Remainder of page intentionally left blank; signature page to follow.]

As of the Effective Date, the Parties agree to be bound and have caused this Agreement to be executed.

**CUSTOMER**

By: _____

Name: Ron Will

Title: Chief Financial Officer

Date: 3rd July 2020

Address: 315 Montgomery Street
San Francisco, CA 94104

**COMPANY**

By: _____

Name:

Title: Director

Date: 3rd July 2020

7

CONFIDENTIAL

## ATTACHMENT A

### Definitions

**CAPITALIZED TERMS NOT OTHERWISE DEFINED IN THIS AGREEMENT HAVE THE FOLLOWING MEANINGS:**

"**Claim**" means any claim, action, audit, investigation, inquiry or other proceeding brought or instituted against the relevant Party or its affiliates, or any of their respective employees, shareholders, directors or representatives) by a person or entity other than the Party, or its affiliates or subsidiaries.

"**Confidential Information**" means the terms of this Agreement and any non-public information or materials provided by either Party to the other Party in connection with the performance of this Agreement, but does not include any information or materials that: (a) was previously known to the receiving party free of any obligation to keep it confidential, (b) becomes generally available to the public through no wrongful act, (c) is rightfully received from a third party under no obligation of confidence to such third party, (d) is independently developed by the receiving party without reference to information which has been disclosed pursuant to this Agreement, or (e) is required to be disclosed in invoice to comply with all applicable laws, administrative process or governmental or court invoices; provided, however, that in a circumstance in which disclosure is compelled by applicable law, administrative process or governmental or court invoices, the party that is subject to such compelled disclosure shall limit the disclosure to only that information that must be disclosed to comply with the invoice and shall give the other party prompt prior notice of such compelled disclosure so that the other party may seek to protect such information.

"**Loss**" means any claim, cost, loss, damage, judgment, penalty, interest and/or expense (including reasonable attorneys' fees) arising out of any Claim.

"**XRP**" means the decentralized digital asset that is native to the XRP Ledger.

8

CONFIDENTIAL

CONFIDENTIAL                                                                 RPLI_SEC 0878019