**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SECURITIES AND EXCHANGE COMMISSION,

　　　　　　　　　　Plaintiff,

　　　v.

RIPPLE LABS INC., BRADLEY
GARLINGHOUSE, and CHRISTIAN A.
LARSEN,

　　　　　　　　　　Defendants.

Case No. 20-CV-10832 (AT) (SN)

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
MOTION TO CERTIFY INTERLOCUTORY APPEAL**

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

BACKGROUND .................................................................................................................... 2

LEGAL STANDARD.............................................................................................................. 4

ARGUMENT ........................................................................................................................ 5

    I.    The Court's Order Does Not Involve a Pure Or Controlling Question of Law ............... 5

        A.  The SEC's Challenge Does Not Raise a Pure Question of Law ................................... 5

        B.  The SEC's Challenge Does Not Raise a Controlling Question of Law...................... 10

    II.    The SEC Cannot Show a Substantial Ground for Difference of Opinion .................... 11

        A.  There Is No Substantial Ground for Difference of Opinion as to
           Programmatic Sales ................................................................................................ 11

        B.  There Is No Substantial Ground for Difference of Opinion as to Other
           Distributions.......................................................................................................... 14

    III.    An Immediate Appeal Will Not Advance the Termination of This Litigation.............. 15

CONCLUSION....................................................................................................................... 18

## TABLE OF AUTHORITIES

**CASES**                                                                    **Page(s)**

*Barsoumian v. Univ. at Buffalo,*
   2012 WL 3095582 (W.D.N.Y. July 30, 2012)................................................. 10

*In re Bibox Grp. Holdings Ltd. Sec. Litig.,*
   534 F. Supp. 3d 326 (S.D.N.Y. Apr. 2021) .................................................. 6

*Century Pac., Inc. v. Hilton Hotels Corp.,*
   574 F. Supp. 2d 369 (S.D.N.Y. 2008).............................................. 7, 9, 10

*Chen-Oster v. Goldman, Sachs & Co.,*
   2022 WL 3586460 (S.D.N.Y. Aug. 22, 2022) ................................... 4, 6, 13

*City of New York v. Milhelm Attea & Bros., Inc.,*
   2012 WL 4959502 (E.D.N.Y. Oct. 17, 2012)................................................ 16

*Corwin v. NYS Bike Share, LLC,*
   2017 WL 1318010 (S.D.N.Y. Apr. 7, 2017).................................................. 17

*Estevez-Yalcin v. The Children's Vill.,*
   2006 WL 3420833 (S.D.N.Y. Nov. 27, 2006) ...................................... 11, 14

*In re Facebook, Inc., IPO Sec. & Derivative Litig.,*
   986 F. Supp. 2d 524 (S.D.N.Y. 2014).......................................................... 6

*In re Goldman Sachs Grp., Inc. Sec. Litig.,*
   2014 WL 5002090 (S.D.N.Y. Oct. 7, 2014) ................................................ 17

*Harris v. TD Ameritrade Inc.,*
   2019 WL 10945228 (S.D.N.Y. July 9, 2019) .............................................. 14

*Hermés Int'l v. Rothschild,*
   590 F. Supp. 3d 647 (S.D.N.Y. 2022).............................................. 11, 12, 14, 15

*Isra Fruit Ltd. v. Agrexco Agric. Exp. Co.,*
   804 F.2d 24 (2d Cir. 1986).......................................................................... 10

*Klinghoffer v. S.N.C. Achille Lauro,*
   921 F.2d 21 (2d Cir. 1990).......................................................................... 5

*Koehler v. Bank of Bermuda Ltd.,*
   101 F.3d 863 (2d Cir. 1996)............................................................... 4, 15

*Liu v. SEC,*
   140 S. Ct. 1936 (2020) ............................................................................... 3

*LoCurto v. AT&T Mobility Servs. LLC*,
 2019 WL 2491248 (S.D.N.Y. June 13, 2019) ............................................. 4, 15, 17

*McNeil v. Aguilos*,
 820 F. Supp. 77 (S.D.N.Y. 1993) ............................................................. 15

*Morrison v. National Australia Bank Ltd.*,
 561 U.S. 247 (2010) ........................................................................... 3

*In re Perry H. Koplik & Sons, Inc.*,
 377 B.R. 69 (S.D.N.Y. 2007) .................................................................. 5

*Piambino v. Bailey*,
 610 F.2d 1306 (5th Cir. 1980) ................................................................ 6

*Picard v. Katz*,
 466 B.R. 208 (S.D.N.Y. 2012) ................................................................ 14

*Platinum Partners Value Arbitrage Fund L.P. v. Goldberg*,
 2022 WL 4357548 (S.D.N.Y. Sept. 19, 2022) ............................................... 16

*Pollack v. Laidlaw Holdings*,
 27 F.3d 808 (2d Cir. 1994) ................................................................... 8

*Ret. Bd. of the Policemen's Annuity v. Bank of New York Mellon*,
 2016 WL 2744831 (S.D.N.Y. May 9, 2016) .................................................. 12

*SEC v. Coinbase, Inc.*,
 No. 23-cv-4738 (S.D.N.Y.) .................................................................... 7

*SEC v. LBRY, Inc.*,
 2022 WL 16744741 (D.N.H. Nov. 7, 2022) ................................................ 12, 14

*SEC v. Genesis Glob. Cap., LLC.*,
 No. 23-cv-287 (S.D.N.Y.) .................................................................... 11

*SEC v Green United, et al.*,
 No. 23-cv-00159-BSJ (D. Utah) ............................................................... 7

*SEC v. Rio Tinto PLC*,
 2021 WL 1893165 (S.D.N.Y. May 11, 2021) .................................................. 8

*SEC v. Straub*,
 2013 WL 4399042 (S.D.N.Y. Aug. 5, 2013) .................................................. 18

*SEC v. Terraform Labs Pte. Ltd.*,
 2023 WL 4858299 (S.D.N.Y. July 31, 2023) .............................................. 12, 13

*SEC v. Terraform Labs, Pte. Ltd.,*
   No. 23-cv-1346 (S.D.N.Y.) ....................................................................................... 10

*SEC v. W.J. Howey Co.,*
   328 U.S. 293 (1946) ....................................................................................... *passim*

*Stone v. Patchett,*
   2009 WL 1544650 (S.D.N.Y. June 3, 2009) ........................................................... 6

*TSC Indus., Inc. v. Northway, Inc.,*
   426 U.S. 438 (1976) ............................................................................................... 8

*Westwood Pharms., Inc. v. Nat'l Fuel Gas Distrib. Corp.,*
   964 F.2d 85 (2d Cir. 1992) .................................................................................... 8

*Youngers v. Virtus Inv. Partners Inc.,*
   228 F. Supp. 3d 295 (S.D.N.Y. 2017) ............................................................... 5, 10

## STATUTES

28 U.S.C. § 1292(b) ..................................................................................... *passim*

## INTRODUCTION

On December 22, 2020, the Securities and Exchange Commission ("SEC") commenced this unprecedented enforcement action alleging that virtually all of Defendants' transactions in XRP over eight years were investment contracts under *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946).  The SEC's case against Defendants has been a centerpiece in its strategy of regulating the U.S. crypto industry through case-by-case enforcement rather than through general rules (or seeking new authority from Congress).  In keeping with that strategy, the SEC has repeatedly argued that the only question before this Court is how *Howey* applies to the specific and unique facts of this case.  It has made similar representations to the public and other courts.

The Court did not rule in the SEC's favor on all issues.  In response, the agency is now rushing to appeal what it claims is a purely "legal question" applicable to every digital-asset case.  But the SEC's latest shift of "litigation positions to further its desired goal[s]," like its earlier ones, shows no "allegiance to the law."  ECF No. 531 at 6.  The exceptional circumstances required for interlocutory appeal are absent.  *First*, the Court's summary judgment order does not present a controlling question of law suitable for interlocutory appeal.  *Second*, the supposed substantial ground for disagreement is merely the SEC's dissatisfaction with the Court's application of *Howey* to most of Defendants' transactions in XRP.  And, *third*, the SEC concedes that protracted litigation is necessary regardless of whether its requested interlocutory appeal succeeds – meaning certification has no chance of hastening the end of this litigation.

Independently, the Court should also deny the SEC's request for a stay.  The SEC has not even attempted to meet the standard for a stay, even after the Individual Defendants identified that omission in their pre-motion letter.  The Individual Defendants write separately to oppose the SEC's request.  Ripple joins that opposition.

## BACKGROUND

From January 2021 to May 2022, the parties engaged in intensive fact and expert discovery.  Following discovery, the parties filed cross-motions for summary judgment.  The affirmative motions relied, collectively, on nearly 2,000 separate factual averments and hundreds of exhibits.  *See* ECF No. 838 (1,601 allegedly undisputed material facts for the SEC); ECF No. 826 (310 for Defendants).  The parties' opposition papers added hundreds more.  *See* ECF No. 842 (additional 465 alleged facts for the SEC); ECF No. 835 (200 for Defendants).

On July 13, 2023, the Court resolved the parties' summary judgment motions.  *See* ECF No. 874 ("Order").  It found that Ripple's "Institutional Sales" – sales of XRP made directly to certain counterparties pursuant to written contracts – were offers or sales of investment contracts, but Defendants' "Programmatic Sales" – sales of XRP made on public trading platforms – and Ripple's "Other Distributions" were not.  To reach that conclusion, it "examine[d] the totality of circumstances surrounding Defendants' different transactions and schemes involving the sale and distribution of XRP," *id.* at 15, engaging in a fact-specific analysis for each type of sale.  For example, the Court's ruling on the Programmatic Sales cited evidence that:

- XRP sales were "blind bid/ask transactions" and therefore "Programmatic Buyers could not have known if their payments of money went to Ripple or any other seller of XRP," *id.* at 23 (citing ECF No. 844 ("SEC 56.1 Resp.") ¶ 96; ECF No. 835 ("Defs. 56.1 Resp.") ¶¶ 652-654);

- Because Programmatic Sales were "less than 1% of the global XRP trading volume," *id.* (citing SEC 56.1 Resp. ¶¶ 77, 82), "the vast majority of individuals who purchased XRP from digital asset exchanges did not invest their money in Ripple at all," *id.*;

- "[T]he record establish[ed] that with respect to Programmatic Sales, Ripple did not make any promises or offers because Ripple did not know who was buying the XRP[] and the purchasers did not know who was selling it," *id.* at 24;

- "[M]any Programmatic Buyers were entirely unaware of Ripple's existence," *id.* (referencing paragraph 1606 of Ripple's 56.1 Statement, which cited affidavits from over 1,300 XRP purchasers);

- The SEC failed to provide "evidence that" Ripple's promotional materials "were distributed . . . broadly to the general public, such as XRP purchasers on digital asset exchanges," *id.* at 25; and

- The SEC failed to provide proof that the "Programmatic Buyers" "derive[d an] expectation [of profit] from Ripple's efforts (as opposed to other factors, such as general cryptocurrency market trends)," *id.* at 24.

As to Ripple's Other Distributions, including XRP that Ripple distributed to charitable organizations and to employees as compensation, the Court found that "the record shows that recipients of the Other Distributions did not pay money or 'some tangible and definable consideration' to Ripple." *Id.* at 26 (citation omitted). The Court made similarly case-specific findings about Defendants' Institutional Sales. *See id.* at 15-22.

Important factual and legal issues remain open before final judgment can be entered. For example, the Court will need to determine whether any of the XRP transactions that may qualify as "Institutional Sales" are nonetheless beyond the scope of the SEC's jurisdiction under *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010). *See, e.g.*, ECF No. 825 at 59 & n.40 (preserving the argument that the SEC cannot prove, on a transaction-by-transaction basis, that most of Ripple's trades were domestic). The Court will also need to determine whether any Section 4 exemptions apply to those transactions and consider evidence that Ripple incurred expenses in the normal course of its business, which will offset any disgorgement ordered by the Court. *See Liu v. SEC*, 140 S. Ct. 1936, 1950 (2020) (instructing that "courts must deduct legitimate expenses before ordering disgorgement").

In addition, the SEC has signaled that it may seek remedies based on Ripple's post-Complaint XRP sales (an effort Ripple will oppose). To the extent the SEC seeks to enjoin future Institutional Sales in the remedies phase, the Court will need to consider whether and to what extent Ripple's post-Complaint sales of XRP to sophisticated commercial customers in connection with its On-Demand Liquidity ("ODL") platform have the characteristics this Court

recognized as defining "Institutional Sales," fall outside the scope of the SEC's jurisdiction under *Morrison*, or qualify for exemptions from registration.[1]

## LEGAL STANDARD

The SEC seeks a certification for immediate appeal under 28 U.S.C. § 1292(b) and a stay pending the Second Circuit's resolution of that appeal. A district court may certify an order for interlocutory appeal under Section 1292(b) only when three conditions are met: (1) "the order involves a controlling question of law," (2) "as to which there is substantial ground for difference of opinion," and (3) "an immediate appeal from the order may materially advance the ultimate termination of the litigation." *Chen-Oster v. Goldman, Sachs & Co*., 2022 WL 3586460, at *5 (S.D.N.Y. Aug. 22, 2022) (citations omitted).

Section 1292(b) is "a rare exception to the final judgment rule that generally prohibits piecemeal appeals." *Koehler v. Bank of Bermuda Ltd*., 101 F.3d 863, 865 (2d Cir. 1996). "[O]nly exceptional circumstances will justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment." *LoCurto v. AT&T Mobility Servs. LLC*, 2019 WL 2491248, at *1 (S.D.N.Y. June 13, 2019) (punctuation and citations omitted). As

---

[1] Ripple disputed the SEC's inclusion of Ripple's ODL sales in its categorization of "Institutional Sales." *See*, *e.g*., Defs. 56.1 Resp. at 4-5 (objecting generally to SEC's invocation of "Institutional Sales" as a category); *id.* ¶¶ 566, 575, 577, 578, 614, 674, 713, 716, 717, 736, 789, 790-797, 800, 802, 806, 817, 820, 822, 826. Regardless of whether Ripple's pre-Complaint ODL sales were properly categorized as Institutional Sales, Ripple will defend any attempt to base remedies on post-Complaint ODL sales by showing that these sales lack the characteristics the Court relied on to find that Ripple made sales of unregistered investment contracts. For example, the "marketing" relied on by the Court dates back to as early as 2013, *see* Order at 19, which is far removed from post-Complaint ODL sales. In addition, post-Complaint ODL sales have no "lockup provisions or resale restrictions based on XRP's trading volume," *id.* at 21, and contain express provisions that commercial customers must use the purchased XRP to facilitate cross border payments, *cf. id.* at 22 (noting certain contract provisions stating that an "Institutional Buyer was purchasing XRP 'solely to resell or otherwise distribute . . . and not to use [XRP] as an [e]nd [use] or for any other purpose' ") (citing Defs. 56.1 Resp. ¶ 793).

"[t]he party seeking an interlocutory appeal," the SEC "has the burden of showing [those] 'exceptional circumstances.'" *In re Perry H. Koplik & Sons, Inc.*, 377 B.R. 69, 73 (S.D.N.Y. 2007) (quoting *Klinghoffer* v. *S.N.C. Achille Lauro*, 921 F.2d 21, 25 (2d Cir. 1990)).

## ARGUMENT

The SEC fails to establish any of the three conditions required for certification of an interlocutory appeal.  This Court should follow the Second Circuit's instruction that the use of Section 1292(b) "must be strictly limited to the precise conditions stated in the law," *Klinghoffer*, 921 F.2d at 24-25 (citation omitted), and deny the SEC's request for certification.

## I.  The Court's Order Does Not Involve a Pure Or Controlling Question of Law

### A.    The SEC's Challenge Does Not Raise a Pure Question of Law

The first condition for certification is that the order to be certified must "involve[] a controlling question of law."  28 U.S.C. § 1292(b).  The statutory phrase "'question of law' . . . refer[s] to a 'pure' question of law that the reviewing court c[an] decide quickly and cleanly without having to study the record."  *Youngers v. Virtus Inv. Partners Inc.*, 228 F. Supp. 3d 295, 298 (S.D.N.Y. 2017) (citation omitted).  Yet here, the Court's Order "examine[d] the totality of circumstances surrounding" Defendants' sales of XRP.  Order at 15.  It found that the Institutional Sales (which the SEC alleged amounted to $728.9 million) were sales of securities, while the Programmatic Sales and the Other Distributions (which the SEC alleged amounted to more than $1.3 billion) were not.  *See id.* at 4-5.  The Court did not make those rulings "without having to study the record."  *Youngers*, 228 F. Supp. 3d at 298 (citation omitted).  Nor would the Second Circuit be able to review the Court's Order without doing so.

The SEC incorrectly argues that § 1292(b)'s "question of law" requirement does nothing more than exclude cases involving genuine fact disputes, and allows interlocutory appeals of

cases involving the application of law to facts.  *See* ECF No. 893 ("Mot.") at 10 (arguing that relevant question for purposes Section 1292(b) is "whether the ruling at issue involves a *legal* dispute or a *factual* dispute between the parties").  Courts in this District have repeatedly rejected that position.  "A Section 1292(b) appeal *requires a pure question of law*."  *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 524, 536 (S.D.N.Y. 2014) (punctuation and citations omitted; emphasis added).  Thus, where "the questions presented for interlocutory appeal . . . would require the Second Circuit to review th[e] Court's application of the law to the facts presented by the parties," they "do not present issues of pure law and . . . are not appropriate for interlocutory review."  *Stone v. Patchett*, 2009 WL 1544650, at *2 (S.D.N.Y. June 3, 2009); *see also Chen-Oster*, 2022 WL 3586460, at *5 (defendants could not "satisfy the first prong of the § 1292(b) analysis" because the question for which defendants sought certification was "a mixed question" and appellate review would be "fact-intensive").

The SEC fails to address this authority, which Defendants cited in their pre-motion letter. *See* ECF No. 889 at 2.  Nor does it grapple with the overbreadth of its position.  If the mere lack of genuine fact disputes created a "question of law," then *every* partial grant of summary judgment would satisfy this part of the § 1292(b) standard.  That would turn interlocutory appeals from the exception to the rule.

The SEC's argument also misconstrues the Court's Order.  As that Order reflects, the *Howey* "test is a fact intensive inquiry and will reach a result that depends on the unique characteristics of each [digital asset]."  *In re Bibox Grp. Holdings Ltd. Sec. Litig.*, 534 F. Supp. 3d 326, 336 (S.D.N.Y. Apr. 2021); *see also Piambino v. Bailey*, 610 F.2d 1306, 1320 (5th Cir. 1980) ("What a 'reasonable investor' would under all the circumstances expect is for determination by the trier of fact in much the same manner as the determination of what a

reasonable person would or would not have done concerning acts claimed to have been

negligent.").  Until it decided to seek interlocutory appeal, the SEC itself had always taken that

same position in this case.  *E.g.*, ECF No. 837 at 6 ("Whether or not a particular transaction

involves the offer and sale of a security . . . will depend on the facts and circumstances"); ECF

No. 843 at 34 ("*Howey* must be applied to the facts and circumstances at hand").[2]  Indeed, in its

affirmative motion for summary judgment and its opposition, the SEC submitted more than

2,000 factual assertions that it claimed were relevant and material.  *See* ECF Nos. 838, 842.

Because the questions the SEC presents for interlocutory appeal "would require the Second

Circuit to review this Court's application of the law to the evidence adduced in [the parties']

summary judgment motion[s]," "an interlocutory appeal [is] inappropriate."  *Century Pac., Inc.*

*v. Hilton Hotels Corp.*, 574 F. Supp. 2d 369, 371-72 (S.D.N.Y. 2008) (citation omitted).

---

[2] The SEC has made similar averments in other cases.  *E.g.*, SEC's Mem. in Opp. of
Defs' Mot. to Dismiss at 24, *SEC v Green United, et al*., No. 23-cv-00159-BSJ (D. Utah June 30,
2023), ECF No. 38 (arguing in opposition to defendant's motion to dismiss that "this case is not
about 'all digital assets'; it only concerns Defendants' crypto asset "GREEN" and that "[e]very
cryptocurrency, along with the issuance thereof, is different and requires a fact-specific
analysis"); Compl. ¶ 101, *SEC v. Coinbase, Inc.*, No. 23-cv-4738 (S.D.N.Y. June 6, 2022), ECF
No. 1 ("Coinbase also understood that an evaluation of whether an offer and sale of crypto assets
is an offer and sale of securities is dependent on individualized facts and circumstances.").  It has
done the same in statements to the public. *E.g.*, SEC, *Framework for "Investment Contract"*
*Analysis of Digital Assets*, https://www.sec.gov/corpfin/framework-investment-contract-analysis-
digital-assets (last modified Mar. 8, 2023) ("Whether a particular digital asset at the time of its
offer or sale satisfies the Howey test depends on the specific facts and circumstances."); SEC,
*Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The*
*DAO*, Securities Exchange Act Release No. 81207 (July 25, 2017), https://www.sec.gov/
litigation/investreport/34-81207.pdf ("Whether or not a particular transaction involves the offer
and sale of a security . . . will depend on the facts and circumstances, including the economic
realities of the transaction."); William Hinman, Dir., Div. Corp. Fin., SEC*, Remarks at the Yahoo*
*Finance All Markets Summit: Crypto* (June 14, 2018), https://www.sec.gov/news/speech/speech-
hinman-061418 (stating that "legal analysis must follow the economic realities of the particular
facts of an offering" and that "whether a digital asset is offered as an investment contract . . . will
always depend on the particular facts and circumstances").

The cases the SEC cites (at 7 n.1, 11) do not hold otherwise.  Each addressed pure questions of law and none required the Second Circuit to review the district court's factual findings.  *E.g.*, *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 443 (1976) (considering the definition of a material fact under certain SEC regulations); *Westwood Pharms., Inc. v. Nat'l Fuel Gas Distrib. Corp.*, 964 F.2d 85, 86 (2d Cir. 1992) (deciding pure question of statutory interpretation).  The SEC's reliance on *Pollack v. Laidlaw Holdings*, 27 F.3d 808 (2d Cir. 1994) and *SEC v. Rio Tinto PLC*, 2021 WL 1893165 (S.D.N.Y. May 11, 2021), is also unavailing.  Both cases involved certified appeals of motion-to-dismiss decisions, where the Second Circuit accepted as true the factual allegations in the complaint.

The SEC attempts to divorce the Court's rulings from the facts upon which they are based, claiming (at 10) that it seeks to appeal only certain "legal disputes at issue in the Order's rulings – whether issuer offers and sales over trading platforms and/or in exchange for noncash consideration satisfy *Howey's* requirements."  The Court's Order simply does not present those questions.  The Court did not rule that "offers and sales over crypto asset trading platforms can [never] give rise to an investment contract."  Mot. at 12.  It found that *Defendants'* Programmatic Sales were not sales of investment contracts on the facts of this case.  Among other things, the Court cited evidence that "Ripple did not make any promises or offers" to programmatic purchasers, Order at 24, and that "Ripple's Programmatic Sales represented less than 1% of the global XRP trading volume," thus "the vast majority of individuals who purchased XRP from digital asset exchanges did not invest their money in Ripple at all."  *Id.* at 23.

The Court's ruling as to Ripple's Other Distributions was similarly case-specific.  The Court found that "*the record shows* that recipients of the Other Distributions did not pay money or 'some tangible and definable consideration' to Ripple."  *Id.* at 26 (emphasis added).  It further

found, "as a factual matter," that the SEC failed to present evidence that "Ripple funded its projects by transferring XRP to third parties and then having them sell the XRP," because "Ripple never received the payments from these XRP distributions," or "develop [its] argument" that Ripple's "Other Distributions were an indirect public offering." *Id.* at 26-27.  As with Defendants' Programmatic Sales, the Court's holding was based on "the economic reality and totality of circumstances" surrounding Ripple's Other Distributions. *Id.* at 27.

Nor can the SEC credibly claim (*e.g.*, at 8, 10) that the Second Circuit will not need to study the factual record because key facts are "undisputed."  There are more than 1,700 arm's-length contracts by which Ripple sold XRP to various counterparties.  Contrary to the SEC's argument (*e.g.*, ECF No. 536), and as this Court has already observed, those "contracts and th[eir] provisions are . . . relevant to the question of whether an investment contract exists."  ECF No. 814 at 29.  The existence and contents of those contracts may be undisputed, but that hardly means they do not require study.  Defendants can and will make arguments based on the contract provisions to the Second Circuit, just as Defendants did before this Court.  The SEC cannot obtain appeal on the premise that the Second Circuit will ignore facts in the record that this Court has already deemed relevant and on which Defendants will rely on appeal.[3]

Further, if the SEC is permitted to appeal, Defendants will seek to cross-appeal the portion of the Court's Order finding Defendants' Institutional Sales were sales of securities.  *See*

---

[3] In addition, the Court's Order found that the SEC could not carry its burden to establish *Howey's* third prong (as to Programmatic Sales) and *Howey's* first prong (as to Ripple's Other Distributions) based on certain facts, without reaching the other *Howey* prongs.  Accordingly, additional facts in the record that undermine the SEC's case on those other prongs, including disputed facts, would defeat the SEC's burden on summary judgment and might need to be considered on appeal.  This further demonstrates why the SEC's attempt to frame the Court's holdings as purely legal determinations is untenable and why interlocutory appeals of summary judgment decisions often are inappropriate.  *See Century Pac.*, 574 F. Supp. 2d at 371-72.

*Isra Fruit Ltd. v. Agrexco Agric. Exp. Co*., 804 F.2d 24, 25 (2d Cir. 1986) ("[S]ection 1292(b) authorizes certification of orders . . . not certification of questions."). That cross-appeal, too, will call for a review of the full record, not merely those parts the SEC wishes to emphasize.[4]

## B. The SEC's Challenge Does Not Raise a Controlling Question of Law

The SEC's questions presented are also not "controlling" issues of law because they apply only to part of the case. *E.g.*, *Barsoumian v. Univ. at Buffalo*, 2012 WL 3095582, at *3 (W.D.N.Y. July 30, 2012) ("[T]his issue does not present a controlling question of law, as a reversal of this part of the prior decision would neither expedite nor terminate the action."); *Century Pac.*, 574 F. Supp. 2d at 372 (noting "[t]he Second Circuit has repeatedly cautioned that the 'use of th[e] certification procedure should be strictly limited'" and finding the question presented was not "controlling" because reversal of the order "would not terminate the action") (citations omitted).

The SEC does not contend otherwise. It complains instead (at 9) that the Court's rulings "could have a substantial impact on a large number of pending litigations." Looking to *other* cases cannot satisfy the requirement that interlocutory appeal accelerate the resolution of *this* one. But even if it could, the SEC's argument goes nowhere. The factual and procedural postures of other SEC enforcement actions are different, as the SEC itself has argued. *See* SEC's Resp. to Supp. Authority at 5 n.2, *SEC v. Terraform Labs*, *Pte. Ltd.*, No. 23-cv-1346 (S.D.N.Y.

---

[4] In addition, Defendants raised a purely legal question about the scope of the statutory term "investment contract" and whether it can be applied where there is no contract between the buyer and the seller that grants rights to the buyer and imposes obligations on the seller. As noted in Defendants' pre-motion letter, Defendants would also seek to cross-appeal on this issue. Although the SEC claims (at 11 n.3) such an appeal would similarly present a factual question, this question of statutory construction is a pure question of law that can be resolved "quickly and cleanly without having to study the record." *Youngers*, 228 F. Supp. 3d at 298 (citation omitted). The contrast with the heavily fact-bound issues raised by the SEC is clear.

July 21, 2023), ECF No. 49 (distinguishing this Court's ruling based on the factual finding that "retail investors did not necessarily know that they were investing into Ripple's efforts"); *see also* SEC's Mem. of Law in Opp. to Defs.' Mot. to Dismiss at 5 n.2, *SEC v. Genesis Glob. Cap., LLC.*, No. 23-cv-287 (S.D.N.Y. July 21, 2023), ECF No. 41 (similar).  If the SEC fails to meet its burden under *Howey* in those other cases, as it did here, its claims will fail.  That is not a reason to disrupt the orderly proceeding of this case with an exception to the general federal policy disfavoring piecemeal appeals.

## II.    The SEC Cannot Show a Substantial Ground for Difference of Opinion

The second condition for certification is a "substantial ground for difference of opinion" on the proposed questions of law.  28 U.S.C. § 1292(b).  The SEC "must show that courts are in clear conflict with one another on the subject and that the 'issue is particularly difficult and of first impression[.]' "  *Hermés Int'l v. Rothschild*, 590 F. Supp. 3d 647, 651 (S.D.N.Y. 2022) (citation omitted).  Moreover, such "conflict" must go to "the underlying legal rule"; "merely quibbling with th[e] Court's application of the facts to the law" does not suffice.  *Estevez-Yalcin v. The Children's Vill.*, 2006 WL 3420833, at *4 (S.D.N.Y. Nov. 27, 2006).  That is all the SEC purports to do here.  The SEC's contention that this Court reached the wrong result in applying *Howey* to the facts of this case does not show any difference of opinion about an underlying legal rule warranting certification.

### A.    There Is No Substantial Ground for Difference of Opinion as to Programmatic Sales

The SEC errs in relying on several digital asset cases that it claims "reach[ed] conclusions contrary to the Order's ruling that investors' reasonable expectations *may* turn on the issuer's choice of how it offers and sells or on the existence of intermediaries between the issuer and the investor."  Mot. at 12-13 (emphasis added).  As an initial matter, whether a particular

11

fact "may" be relevant to an acknowledged fact-specific inquiry is not the kind of "entrenched and longstanding" disagreement about a legal rule, *Hermès*, 590 F. Supp. 3d at 656, necessary to justify an interlocutory appeal.

Nor does the Court's Order actually conflict with the cases the SEC cites.  Each involved contractual rights and obligations that are absent here.  *See* ECF No. 825 at 34-36 (distinguishing *Balestra* and *Telegram* on this ground); ECF No. 832 at 23, 29, 34, 35, 55 (distinguishing *LBRY*). The courts in those cases reached different results based on materially different facts.  *See Ret. Bd. of the Policemen's Annuity v. Bank of New York Mellon*, 2016 WL 2744831, at *2 (S.D.N.Y. May 9, 2016) (characterizing an alleged "intra-district split" as "illusory" where supposedly conflicting decisions were fact-based) (citation omitted).

The SEC points (at 1, 12-13) to the recent decision in *SEC v. Terraform Labs Pte. Ltd.*, 2023 WL 4858299, at *15 (S.D.N.Y. July 31, 2023), which it claims "explicitly disagreed with the Order's ruling on the Programmatic Sales."  Mot. at 1.  But *Terraform* agreed with this Court that a digital asset, in and of itself, does not embody the *Howey* requirements of an investment contract.  *Compare* Order at 14-15, *with Terraform*, 2023 WL 4858299, at *11-12.  And *Terraform* did not address how the *Howey* test should be applied to Defendants' offers and sales of XRP based on the record presented at summary judgment.[5]  Although the SEC now argues (at 16) that "the different procedural posture of the two cases [does not] matter," it said the opposite in *Terraform* itself.  *See supra* pp. 10-11.  It was right there and is wrong here.  This Court's

---

[5] The SEC states (at 16) it "does not seek appellate review of any holding relating to the fact that the underlying assets here are nothing but computer code with no inherent value."  The Court made no such ruling.  To the contrary, undisputed evidence established XRP's inherent utility as a bridge currency to facilitate cross-border transactions.  *See* ECF No. 825 at 7. Instead, the Court found that an XRP token is not, in itself, an investment contract because it does not, in itself, meet *Howey*'s requirements.

summary-judgment ruling relied on record evidence that Ripple made no "promises or offers" to purchasers in Programmatic Sales. *See* Order at 24-25. *Terraform*, by contrast, accepted the SEC's allegations that Terraform and its founder promised *all* purchasers – those who bought directly from Terraform or from some other source – "rates of returns of 19-20% on the coin owners' initial investment." 2023 WL 4858299, at *2, *13. That factual distinction is critical to any *Howey* analysis and further illustrates why "mixed question[s]" of law and fact are inappropriate for interlocutory review. *Chen-Oster*, 2022 WL 3586460, at *5.[6]

For similar reasons, the Court should reject the SEC's claim (at 13-14) that there is a substantial ground for difference of opinion regarding whether "purchasers who bought XRP on crypto asset platforms . . . had no reasonable basis to expect that Ripple would use the capital it received from its sales to improve the ecosystem and thereby increase the price of XRP." That is a factual question that the Court decided based on the record, including evidence that "Ripple's Programmatic Sales represented less than 1% of the global XRP trading volume." Order at 23. Nor did this Court hold that, as a matter of law, "broad, impersonal offers to sell do not establish [Section 5] liability." Mot. at 15. The SEC's mischaracterizations of (and dissatisfaction with) this Court's rulings are no basis for an extraordinary appeal.

---

[6] The SEC also refers (at 13) to the *Terraform* court's conclusion that "secondary-market purchasers had," taking the SEC's alleged facts as true, "as good a reason to believe that the defendants would take their capital contributions and use it to generate profits." Although Defendants believe that secondary-market transactions are not securities transactions and further believe that this Court's reasoning supports that view, this Court expressly reserved that question for decision in another case that presents it directly. *See* Order at 23 n.16 (stating that the court would "not address whether secondary market sales of XRP constitute offers and sales of investment contracts because that question [was] not properly before the Court," and that "[w]hether a secondary market sale constitutes an offer or sale of an investment contract would depend on the totality of circumstances and the economic reality of that specific contract, transaction, or scheme").

**B.    There Is No Substantial Ground for Difference of Opinion as to Other Distributions**

The SEC also fails to establish a substantial ground for difference of opinion as to whether "Ripple's Other Distributions did not constitute the offer and sale of investment contracts." Order at 27. As explained above, that ruling was based on the factual record in this case, and in particular that recipients of Ripple's "Other Distributions" did not invest money in Ripple; the Court did not hold that "non-cash consideration such as labor, services, or other assets" could *never* satisfy *Howey*'s first prong. Mot. at 16. Thus, the SEC does not raise any dispute as to the "the underlying legal rule," *Estevez-Yalcin*, 2006 WL 3420833, at *4, much less one that "is particularly difficult and of first impression," *Hermés*, 590 F. Supp. 3d at 656 (citation omitted).

The SEC points (at 16) to *SEC v. LBRY, Inc*., 2022 WL 16744741 (D.N.H. Nov. 7, 2022), but that out of district decision did not address (because the defendants there did not argue) *Howey*'s investment-of-money prong at all, as this Court did for the "Other Distributions." *LBRY* focused only on the token's utility under *Howey*'s third prong. The other cases to which the SEC points (at 16-17) did not concern digital assets. Nor did the SEC cite any of these cases in its motion for summary judgment (or its opposition to Defendants' motion for summary judgment). It cannot properly rely on them now. *See Harris v. TD Ameritrade Inc*., 2019 WL 10945228, at *2 (S.D.N.Y. July 9, 2019) (new "arguments are not properly considered in connection with a motion for certification of an interlocutory appeal"); *Picard v. Katz*, 466 B.R. 208, 212 (S.D.N.Y. 2012) (rejecting party's "dubious" attempt to establish a "substantial ground for difference of opinion" based on new arguments).

**III.    An Immediate Appeal Will Not Advance the Termination of This Litigation**

The third condition for certification is "that an immediate appeal from the order may materially advance the ultimate termination of the litigation."  28 U.S.C. § 1292(b).  Interlocutory appeal is generally "unwarranted" where reversal would not "terminate the litigation."  *Hermès*, 590 F. Supp. 3d at 652.  It would not do so here.

*First*, even if the SEC were successful on appeal, the likely result would only be a remand for further merits litigation.  This Court's Order disposed of the Programmatic Sales on the third *Howey* prong and the Other Distributions on the first *Howey* prong.  It declined to address the other *Howey* prongs for both types of sales.  *See* Order at 25 n.17 (declining to reach first two *Howey* prongs for Programmatic Sales); *id.* at 27 n.18 (declining to reach second and third *Howey* prongs for Other Distributions).  It also declined to resolve Defendants' fair notice defense for these sales but noted that "the SEC's theories as to [these sales] are potentially inconsistent with its [prior] enforcement."  *Id.* at 29 n.20.

*Second*, even setting aside those unresolved liability questions, the SEC admits (at 5) that the remedial phase of this litigation will "raise an array of . . . fact[ual] and legal issues" and involve additional motion practice and discovery.  That "protracted litigation" will occur even if the SEC wins an immediate appeal.  *See Koehler*, 101 F.3d at 865-66 ("The use of § 1292(b) is reserved for those cases where an intermediate appeal may avoid protracted litigation.").  "[A]ppellate reversal . . . [thus] would not terminate the litigation because the question of damages would remain."  *McNeil v. Aguilos*, 820 F. Supp. 77, 79 (S.D.N.Y. 1993); *accord LoCurto*, 2019 WL 2491248, at *3.  Further, the Court's resolution of the "array of additional fact and legal questions" the SEC describes (at 5-6, 17-19) will likely give rise to distinct appellate questions.  Accordingly, not only would interlocutory appeal fail to shorten the

remedies phase, it would also likely produce inefficient "piecemeal appeals." *See City of New York v. Milhem Attea & Bros., Inc.*, 2012 WL 4959502, at *5 (E.D.N.Y. Oct. 17, 2012).

*Third*, the factual and legal issues that remain to be adjudicated before entry of a final judgment will also inform review on appeal.  As noted above, additional factual questions must be resolved to determine whether the SEC lacks jurisdiction over any of Ripple's transactions under *Morrison*, whether any of Ripple's transactions are exempt from the registration requirement, and whether any of Ripple's post-Complaint ODL sales qualify as "Institutional Sales."  None of these fact-specific issues have been decided by this Court, and should be decided before appeal to enable the Second Circuit to review this Court's ruling on a full record. It is far more efficient to "proceed[] in the ordinary course to judgment, permitting a single round of appellate review on a complete record." *See Platinum Partners Value Arbitrage Fund L.P. v. Goldberg*, 2022 WL 4357548, at *4 (S.D.N.Y. Sept. 19, 2022) (rejecting certification in light of pending damages trial).

*Fourth*, as the Court has already recognized in its Scheduling Order, ECF No. 884, there will still be a trial for (at a minimum) the SEC's claims against the Individual Defendants[7] – and that trial would still happen even if the SEC wins on appeal.[8]  This Court should not delay that trial even if it grants interlocutory appeal, for the reasons described in the Individual Defendants' pre-motion letter.  *See* ECF No. 890.  But even without a stay, that pending trial shows why it would be inefficient to certify an interlocutory appeal:  the trial could very well generate

---

[7] The Scheduling Order refers to the "parties" collectively and permits pretrial filings that will allow Ripple and the SEC to identify those issues they believe require resolution before a final judgment can be entered.

[8] That said, it is difficult to see how the SEC could maintain an "aiding and abetting" claim against Individual Defendants on Programmatic Sales and Other Distributions, having now conceded that it believes "reasonable jurists" could disagree as to those sales.

appealable issues of its own, and there is no reason to sever them from the issues the SEC currently seeks to appeal. And, if the Court grants the stay, an immediate appeal will simply create delay, because even a successful SEC appeal would not eliminate the need for the Individual Defendants' trial. *See Corwin v. NYS Bike Share, LLC*, 2017 WL 1318010, at *9 (S.D.N.Y. Apr. 7, 2017) (rejecting certification where trial was already scheduled, finding that certification would "severely delay the termination of the litigation").

The SEC's contrary arguments lack merit. To start, its concerns (at 6) that proceeding to final judgment would require the Court to "redo remedies-phase litigation" are misplaced. Each remedies-phase issue the SEC has raised – the relevance of post-Complaint transactions and the application of *Morrison* – is best resolved before appeal so that any appellate issues they generate can be presented to the Second Circuit in a single appeal from final judgment. So too can questions about the application of *Liu* and principles limiting any possible disgorgement. Those legal questions will not need to be re-litigated in any subsequent remedies phase.

The SEC's position (at 6, 17-19) on the possibility of future trials is also internally inconsistent. It vaguely suggests (at 18-19) that it would consider abandoning its aiding-and-abetting claims against the Individual Defendants if it wins on an immediate appeal. *See LoCurto*, 2019 WL 2491248, at *3 n.4 (improper to base certification on movant's suggestion that appellate guidance would "increase the likelihood of a settlement"). But later, the SEC changes course and asserts (at 18) that if it won the same appeal after final judgment, it would instead seek a "second trial" on the same claims against the Individual Defendants. Courts reject such "one-sided" efficiency arguments. *In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2014 WL 5002090, at *2 (S.D.N.Y. Oct. 7, 2014). In any event, the SEC's speculative position "fails to take into account the (just as likely) possibility that certification will delay the action further,"

17

*id.*, or that it will lose on a post-judgment appeal, eliminating concerns about multiple remedies phases or trials.

That "just as likely[] possibility," *id.*, would moot every inefficiency the SEC describes. By contrast, the SEC's proposed approach will generate a lengthy delay from an initial appeal, subsequent litigation even if the SEC is successful, and another round of piecemeal appeals after that. *Cf. SEC v. Straub*, 2013 WL 4399042, at *6 (S.D.N.Y. Aug. 5, 2013) (rejecting movant's "entirely speculative" efficiency argument, which "ignore[d] the time that will be spent waiting for the . . . appeal to be briefed, argued, and decided"). The Court should deny certification.

## CONCLUSION

The Court should deny the SEC's motion for certification. The Court should also deny the SEC's request for a stay pending appeal for the reasons identified in the Individual Defendants' separately filed opposition.

Date:  September 1, 2023

Respectfully submitted,

*/s/ Michael K. Kellogg*
Michael K. Kellogg
Reid M. Figel
Gregory G. Rapawy
Bradley E. Oppenheimer
Bethan R. Jones
KELLOGG, HANSEN, TODD, FIGEL,
& FREDERICK, P.L.L.C.
Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
+1 (202) 326-7900
mkellogg@kellogghansen.com
rfigel@kellogghansen.com
grapawy@kellogghansen.com
boppenheimer@kellogghansen.com
bjones@kellogghansen.com

DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, NY 10001
+1 (212) 909-6000

*Counsel for Defendant Ripple Labs Inc.*

CLEARY GOTTLIEB STEEN &
HAMILTON LLP
2112 Pennsylvania Avenue, N.W.
Washington, D.C. 20037
+1 (202) 974-1680

*Counsel for Defendant Bradley Garlinghouse*

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
+1 (212) 373-3000

*Counsel for Defendant Christian A. Larsen*