USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __10/3/2023__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
SECURITIES AND EXCHANGE COMMISSION,

                            Plaintiff,

-against-

RIPPLE LABS, INC., BRADLEY
GARLINGHOUSE, and CHRISTIAN A. LARSEN,

                            Defendants.

20 Civ. 10832 (AT)

**ORDER**

ANALISA TORRES, District Judge:

      Plaintiff, the Securities and Exchange Commission (the "SEC"), brings this action against Defendants Ripple Labs, Inc. ("Ripple") and two of its senior leaders, Bradley Garlinghouse and Christian A. Larsen, alleging that Defendants engaged in the unlawful offer and sale of securities in violation of Section 5 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77e(a), (c). Am. Compl. ¶¶ 9, 430–35, ECF No. 46. The SEC also alleges that Larsen and Garlinghouse aided and abetted Ripple's Section 5 violations. *Id.* ¶¶ 9, 436–40. On July 13, 2023, the Court granted in part and denied in part the parties' cross-motions for summary judgment (the "Order"). Order, ECF No. 874; *see SEC v. Ripple Labs, Inc.*, No. 20 Civ. 10832, 2023 WL 4507900 (S.D.N.Y. July 13, 2023).

      The SEC now moves to certify for interlocutory appeal two holdings in the Order. ECF No. 892; SEC Mem. at 1, ECF No. 893. For the reasons stated below, the SEC's motion for certification of the interlocutory appeal is DENIED.

# BACKGROUND[1]

This case involves Defendants' offer and sale of XRP. XRP is the native digital token of the XRP Ledger, a cryptographically secured ledger, or "blockchain." Order at 2. The SEC alleges that Ripple engaged in three categories of unregistered XRP offers and sales:

> (1) Institutional Sales[2] under written contracts for which it received $728 million;
> (2) Programmatic Sales on digital asset exchanges for which it received $757 million; and
> (3) Other Distributions under written contracts for which it recorded $609 million in "consideration other than cash."

*Id.* at 15–16; *see id.* at 4–5. The SEC also alleges that Larsen and Garlinghouse engaged in unregistered individual XRP sales from which they received at least $450 million and $150 million, respectively. *Id.* at 5, 16.

Under Section 5 of the Securities Act, it is "unlawful for any person, directly or indirectly, . . . to offer to sell, offer to buy or purchase[,] or sell" a "security" unless a registration statement is in effect or has been filed with the SEC as to the offer and sale of such security to the public. 15 U.S.C. §§ 77e(a), (c), (e). To prove a violation of Section 5, the SEC must show: (1) that no registration statement was filed or in effect as to the transaction, and (2) that the defendant directly or indirectly offered to sell or sold the securities (3) through interstate commerce. *See SEC v. Cavanagh*, 445 F.3d 105, 111 n.13 (2d Cir. 2006).

At summary judgment, Defendants did not dispute that they offered and sold XRP through interstate commerce and that they did not register those offers or sales. Order at 10. Rather, the relevant question before the Court was whether Defendants offered to sell or sold XRP as a security. *Id.* The SEC alleged that Defendants sold XRP as an "investment contract,"

---

[1] The Court presumes familiarity with the facts and procedural history of this matter as detailed in prior orders, *see* Order at 2–9, and, therefore, only summarizes those facts necessary for its decision here.
[2] Capitalized terms not otherwise defined herein have the meanings set forth in the Order.

which is a type of security as defined by the Securities Act, 15 U.S.C. § 77b(a)(1). *Id.*; Am. Compl. ¶¶ 3, 9, 60. Defendants argued that they did not sell XRP as an investment contract, and, therefore, no registration statement was required. Order at 11.

In *SEC v. W.J. Howey Co.*, the Supreme Court held that under the Securities Act, an investment contract is "a contract, transaction[,] or scheme whereby a person [(1)] invests his money [(2)] in a common enterprise and [(3)] is led to expect profits solely from the efforts of the promoter or a third party." 328 U.S. at 298–99; *see also SEC v. Edwards*, 540 U.S. 389, 393 (2004). In analyzing whether a contract, transaction, or scheme is an investment contract, "form should be disregarded for substance and the emphasis should be on economic reality" and the "totality of circumstances." *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967); *Glen-Arden Commodities, Inc. v. Constantino*, 493 F.2d 1027, 1034 (2d Cir. 1974).

In the Order, the Court declined to adopt Defendants' novel "essential ingredients" test. Order at 11–13. Instead, the Court applied *Howey* to each category of Defendants' unregistered XRP offers and sales. *Id.* at 16–27. After the Court "examine[d] the totality of circumstances surrounding Defendants' different transactions and schemes involving the sale and distribution of XRP," *id.* at 15, the Court concluded that Ripple's Institutional Sales constituted offers or sales of investment contracts, but Ripple's Programmatic Sales and Other Distributions did not, *id.* at 30. The Court also held that Larsen's and Garlinghouse's individual sales were not offers or sales of investment contracts for "substantially the same reasons" stated in the Court's analysis of Ripple's Programmatic Sales. *Id.* at 27–28. The Court, therefore, granted in part and denied in part the parties' cross-motions for summary judgment.[3]

---

[3] The Court also rejected Defendants' due process defenses and denied the SEC's motion for summary judgment on the aiding and abetting claim against Larsen and Garlinghouse. Order at 29–30, 33–34. Those holdings are not at issue in this order.

3

On August 9, 2023, the Court set a pretrial scheduling order and directed the parties to submit blackout dates for trial. ECF No. 884. On August 18, 2023, the SEC moved to certify for interlocutory appeal two holdings in the Order:

> (1) the ruling that, as a matter of law, Defendants' "Programmatic" offers and sales of XRP over crypto asset trading platforms could not lead investors to reasonably expect profits from the efforts of others; and
>
> (2) the ruling that Ripple's "Other Distributions" of XRP as a "form of payment for services" . . . was legally insufficient to constitute an "investment of money" under [*Howey*].

SEC Mem. at 1; ECF No. 892. The SEC also requested that the Court "stay any remedies litigation and any pretrial proceedings while [its] interlocutory certification request and any appeal are pending." SEC Mem. at 19.

## DISCUSSION

I. <u>Legal Standard</u>

Pursuant to 28 U.S.C. § 1292(b), a district court may certify an order for interlocutory appeal where: (1) "[the] order involves a controlling question of law," (2) "as to which there is substantial ground for difference of opinion," and (3) "an immediate appeal from the order may materially advance the ultimate termination of the litigation." *See also Flo & Eddie, Inc. v. Sirius XM Radio Inc.*, No. 13 Civ. 5784, 2015 WL 585641, at *1 (S.D.N.Y. Feb. 10, 2015). The moving party bears the burden of establishing the three factors. *Bellino v. JPMorgan Chase Bank, N.A.*, No. 14 Civ. 3139, 2017 WL 129021, at *1 (S.D.N.Y. Jan. 13, 2017).

Section 1292(b) is "a rare exception to the final judgment rule that generally prohibits piecemeal appeals." *Koehler v. Bank of Bermuda Ltd.*, 101 F.3d 863, 865 (2d Cir. 1996). Because interlocutory appeals are strongly disfavored, "only exceptional circumstances will justify a departure from the basic policy of postponing appellate review until after the entry of a

final judgment." *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 921 F.2d 21, 25 (2d Cir. 1990) (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 475 (1978)) (cleaned up).

II. <u>Application</u>

A. Controlling Question of Law

Under § 1292(b), "[a] question of law must refer to a pure question of law that the reviewing court could decide quickly and cleanly without having to study the record." *Youngers v. Virtus Inv. Partners Inc.*, 228 F. Supp. 3d 295, 298 (S.D.N.Y. 2017) (cleaned up); *see Stone v. Patchett*, No. 08 Civ. 5171, 2009 WL 1544650, at *2 (S.D.N.Y. June 3, 2009). A question of law is controlling where: "(1) reversal of the district court's opinion could result in dismissal of the action, (2) reversal of the district court's opinion, even though not resulting in dismissal, could significantly affect the conduct of the action, or (3) the certified issue has precedential value for a large number of cases." *Flo & Eddie, Inc.*, 2015 WL 585641, at *1 (citation omitted); *see Klinghoffer*, 921 F.2d at 24.

Here, the SEC has not presented a "pure question of law" that could be "decided quickly and cleanly without having to study the record." *Youngers*, 228 F. Supp. 3d at 298 (cleaned up). To the contrary, the Court "examine[d] the totality of circumstances surrounding Defendants' different transactions and schemes involving the sale and distribution of XRP," Order at 15, and ultimately found that the Institutional Sales were sales of securities, but the Programmatic Sales and Other Distributions were not, *id.* at 16–27. In doing so, the Court studied an extensive, heavily disputed factual record and detailed expert reports. *See, e.g.*, ECF Nos. 814, 835, 842. For example, the SEC's Rule 56.1 statement contains over 1,600 purported facts—many of which are disputed by Defendants—and cites over 900 exhibits. ECF Nos. 629, 835.

5

The SEC does not argue that the Court applied the wrong legal standard in deciding the cross-motions for summary judgment. *See Stone*, 2009 WL 1544650, at *2 (holding that litigant's argument that court misapplied the law is not a pure question of law). In fact, the Court specifically rejected Defendants' "essential ingredients" legal test and applied the SEC's legal standard. *See* Order at 11–13. Rather, the core of the SEC's argument is that the Court improperly applied the *Howey* test to the facts in the undisputed record. As the SEC has repeatedly argued, "*Howey* must be applied to the facts and circumstances at hand." SEC MSJ Reply at 34, ECF No. 843; *see also* SEC MSJ Mem. at 6, ECF No. 837 ("Whether or not a particular transaction involves the offer and sale of a security . . . will depend on the facts and circumstances, including the economic realities of the transaction." (quoting SEC Rel. No. 81207, *available at* https://www.sec.gov/litigation/investreport/34-81207.pdf)). "Under these circumstances, such questions do not present issues of pure law and therefore are not appropriate for interlocutory appeal." *Stone*, 2009 WL 1544650, at *2; *cf. Century Pac., Inc. v. Hilton Hotels Corp.*, 574 F. Supp. 2d 369, 371–72 (S.D.N.Y. 2008).

The Court also rejects the SEC's argument that the questions presented are "controlling" questions of law because the "certified issue[s] ha[ve] precedential value for a large number of cases." *Flo & Eddie, Inc.*, 2015 WL 585641, at *1 (citation omitted); *see* SEC Mem. at 8–9.[4] The Court's findings come from a direct application of *Howey* to the unique facts and circumstances of this case. The other enforcement actions cited by the SEC involve different

---

[4] As to the SEC's argument that the questions are "controlling" because reversal of the Order "could significantly affect the conduct of the action," *Flo & Eddie, Inc.*, 2015 WL 585641, at *1 (citation omitted), the Court notes that the questions are not dispositive of the parties' cross-motions for summary judgment. The Order explicitly did not reach the other *Howey* prongs as to the Programmatic Sales and the Other Distributions. *See* Order at 25 n.17, 27 n.18. The Court also did not reach other arguments, such as whether Defendants are entitled to summary judgment on offers and sales on "foreign exchanges" and Defendants' fair notice defenses as to the Programmatic Sales and Other Distributions. *See id.* at 28 n.19, 29 n.20. If the Order were reversed and the case remanded, the Court may consider some of these questions in the first instance.

6

digital assets and different companies, which offered and sold those digital assets under different factual circumstances and economic realities.  *See* SEC Mem. at 9 (listing cases).

In arguing that the Order has "precedential value" for other digital-asset cases, the SEC misconstrues the Court's holdings.  For example, the SEC seeks to appeal the question, "[C]an an issuer's offers and sales on crypto asset trading platforms create a reasonable expectation of profits based on the efforts of others?"  *Id.* at 10.  But the Court did not hold that offers and sales on a digital asset exchange cannot create a reasonable expectation of profits based on the efforts of others.  The Court held that based on the totality of the circumstances in *this* case, including an examination of the facts, circumstances, and economic realities of the transactions, Ripple's Programmatic Sales could not lead investors to reasonably expect profits from Ripple's efforts.  *See* Order at 22–25.  In so concluding, the Court considered several factors, including:

> (1) "Ripple's Programmatic Sales were blind bid/ask transactions, and Programmatic Buyers could not have known if their payments of money went to Ripple";
>
> (2) "Ripple's Programmatic Sales represented less than 1% of the global XRP trading volume";
>
> (3) "Ripple did not make any promises or offers [to the Programmatic Buyers] because Ripple did not know who was buying the XRP";
>
> (4) "[M]any Programmatic Buyers were entirely unaware of Ripple's existence";
>
> (5) "[T]he Programmatic Sales were not made pursuant to contracts that contained lockup provisions, resale restrictions, indemnification clauses, or statements of purpose";
>
> (6) The SEC failed to provide evidence that "Ripple's promotional materials . . . were distributed more broadly to the general public, such as [to Programmatic Buyers]";
>
> (7) The SEC failed to provide evidence that objective, reasonable "Programmatic Buyers understood that statements made by Larsen, [Ripple chief cryptographer David] Schwartz, Garlinghouse, and others were representations of Ripple and its efforts"; and

(8) The SEC failed to provide evidence that an objective, reasonable Programmatic Buyer "could parse through the multiple documents and statements . . . (sometimes inconsistent) across many social media platforms and news sites from a variety of Ripple speakers (with different levels of authority) over an extended eight-year period" to discern "Ripple's marketing campaign and public statements connecting XRP's price to its own efforts."

*Id.* The Court also concluded that although the record may have demonstrated that "many Programmatic Buyers purchased XRP with an expectation of profit," the SEC failed to provide evidence that such Programmatic Buyers' "speculative motive derived from the entrepreneurial or managerial efforts of others."[5] *Id.* at 24 (citation omitted). The Court's holding did not turn on the fact that Ripple's "offers and sales [were] on crypto asset trading platforms." SEC Mem. at 10.

Likewise, the Court's holding as to Ripple's Other Distributions was based on applying *Howey* to the facts and circumstances of this case. Order at 26–27. The Court did not conclude that "distributing an asset in exchange for services" cannot "constitute[] an investment of money." SEC Mem. at 16 (capitalization altered); *cf.* Order at 26 (citing *Int'l Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 560 (1974)). Indeed, *Howey*'s first prong, that there be an "investment of money," may include "goods [or] services," provided that "the purchaser gave up some tangible and definable consideration." *Int'l Bhd.*, 439 U.S. at 560 & n.12; *see* Order at 26.

Applying that standard, the Court concluded that "the record shows that recipients of the Other Distributions did not pay money *or* 'some tangible and definable consideration' to Ripple." Order at 26 (emphasis added). For example, the Other Distributions included grants to

---

[5] Consider, for example, a Programmatic Buyer who, while browsing on a digital asset exchange, sees the price of XRP dramatically increase but is unaware of Ripple's existence. If the Programmatic Buyer then purchases XRP from the exchange with the intention of later selling XRP for a profit, she would have purchased XRP "with an expectation of profit," but that motive was not "derived from the entrepreneurial or managerial efforts of others," as required under *Howey*. *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852 (1975).

8

"third parties as part of Ripple's Xpring initiative to develop new applications for XRP and the XRP Ledger." *Id.* Ripple does not own the XRP Ledger, which is "based on open-source software; anyone can use the ledger, submit transactions, host a node to contribute to the validation of transactions, propose changes to the source code, or develop applications that run on the ledger." *Id.* at 3. The SEC failed to provide evidence that the development of "use cases" for the XRP Ledger constitutes "tangible and definable" consideration to Ripple. *Id.* at 26. The Court also rejected the SEC's argument that XRP provided to Ripple employees as compensation and bonuses satisfies *Howey*'s first prong where the SEC did not identify or explain what "tangible and definable" employee labor was provided in exchange for XRP.[6] *Id.*

Accordingly, the SEC has failed to meet its burden to show that the two holdings that it moves to certify for interlocutory appeal "involve[] . . . controlling question[s] of law." 28 U.S.C. § 1292(b).

### B. Substantial Ground for Difference of Opinion

A substantial ground for difference of opinion exists where "(1) there is conflicting authority on the issue, or (2) the issue is particularly difficult and of first impression for the Second Circuit." *In re Goldman Sachs Grp., Inc. Sec. Litig.*, No. 10 Civ. 3461, 2014 WL 5002090, at *3 (S.D.N.Y. Oct. 7, 2014) (quoting *Cap. Records, LLC v. Vimeo, LLC*, 972 F. Supp. 2d 537, 551 (S.D.N.Y. 2013)). "Mere conjecture that courts would disagree on the

---

[6] The Court further notes that in its summary judgment briefing, the SEC presented shifting and inconsistent arguments as to its legal theory about the Other Distributions. At one point, the SEC argued that the Other Distributions were unregistered offers and sales of securities because they were made in exchange for non-cash consideration. *See* SEC MSJ Mem. at 31–32. But at another point, the SEC argued that the Other Distributions were indirect offers and sales to the public, and the initial recipients of the Other Distributions—like the Xpring initiative third parties—were conduits (or underwriters) to "get XRP off [Ripple's] balance sheet and into the hands of market participants in order to create XRP liquidity and to advance Ripple's interests in attracting people to its technology." SEC MSJ Opp. at 9, 26, ECF No. 841. The Court rejected the latter argument for the reasons stated in the Order. *See* Order at 26–27. It is also unclear how these legal theories relate to the SEC's position that Ripple "gifted" XRP to third parties, which the SEC did not charge in its complaint. *See* SEC MSJ Opp. at 26 n.15.

9

issue" is insufficient. *Bellino*, 2017 WL 129021, at *3. Instead, "there must be substantial doubt that the district court's order was correct." *Century Pac.*, 574 F. Supp. 2d at 372 (quoting *SPL Shipping Ltd. v. Gujarat Cheminex Ltd.*, No. 06 Civ. 15375, 2007 WL 1119753, at *2 (S.D.N.Y. Apr. 12, 2007)) (quotation marks omitted).

As to the Programmatic Sales, the SEC cites a recent decision in *SEC v. Terraform Labs Pte. Ltd.*, No. 23 Civ. 1346, 2023 WL 4858299, at *15 (S.D.N.Y. July 31, 2023), for the proposition that "there is a substantial ground for difference of opinion on whether issuer offers and sales over crypto asset trading platforms can give rise to an investment contract under *Howey*." SEC Mem. at 12 (capitalization altered). Not so. Notwithstanding that the SEC misstates the Court's holding, *see supra* § II.A, the Order does not conflict with the *Terraform* court's reasoning. The *Terraform* court did not engage with the Court's reasoning in the Order. Nor was it required to, given the different procedural postures of the two cases.

The *Terraform* court was required—as it must at the motion to dismiss stage—to accept as true "all well-pleaded allegations" and to draw "all reasonable inferences . . . in the SEC's favor." 2023 WL 4858299, at *1 (quoting *Buon v. Spindler*, 65 F.4th 64, 76 (2d Cir. 2023)). For instance, the *Terraform* court accepted as true that the defendants "embarked on a public campaign to encourage *both* retail and institutional investors to buy their crypto-assets by touting the profitability of the crypto-assets and the managerial and technical skills that would allow the defendants to maximize returns on the investors' coins"; and "the defendants said that sales from purchases of *all* crypto-assets—no matter where the coins were purchased—would be fed back into the . . . blockchain and would generate additional profits for *all* crypto-asset holders." *Id.* at *15 (emphasis in original). The *Terraform* court then presumed that the defendants' representations would "have reached individuals who purchased their crypto-assets on secondary

markets . . . [and] [s]imply put, secondary-market purchasers had every bit as good a reason to believe that the defendants would take their capital contributions and use it to generate profits on their behalf." *Id.*

As stated above, the Order did not turn on the fact that Programmatic Sales were "sold through secondary market transactions to retail investors." *Id.* Rather, the Court concluded, based on the totality of circumstances, that an objective, reasonable Programmatic Buyer was not led to expect profits from the efforts of Ripple. Order at 24. Unlike in *Terraform*, the reasonable Programmatic Buyer would not believe that "sales from purchases of *all* [XRP] . . . would be fed back into [Ripple and the XRP Ledger] and would generate additional profits for *all* [XRP] holders." *Terraform*, 2023 WL 4858299, at *15. Similarly, the undisputed record makes clear that many of Ripple's key promotional materials—such as the "Ripple Primer," which states that Ripple "hopes to make money from XRP if the world finds the Ripple network useful," and the "Gateways" brochure, which states that "Ripple's business model is based on the success of [XRP]," Order at 19–20—were only distributed to Institutional Buyers, and not more broadly to Programmatic Buyers, *id.* at 24–25. In other words, after a close examination of the extensive factual record and expert reports, the Court concluded that the Programmatic Buyers did not "ha[ve] every bit as good a reason [as the Institutional Buyers] to believe that [Defendants] would take their capital contributions and use [the capital] to generate profits on their behalf." *Terraform*, 2023 WL 4858299, at *15.

For substantially the same reasons, the Court rejects the SEC's remaining argument that "[c]ourts have accordingly found Section 5 violations where unregistered crypto asset transactions occur not between the issuer and the investor, but through intermediaries, including on trading platforms." SEC Mem. at 12. In each of the cases cited by the SEC, the district court

applied the *Howey* test to the facts and circumstances of that particular case. The SEC does not contend that courts substantially differ as to the proper legal standard to be applied.

Likewise, the Court rejects the argument that there is substantial ground for difference of opinion about the Court's holding as to the Other Distributions. *See* SEC Mot. at 16. The SEC cites one out-of-circuit digital-asset case for the proposition that courts "have held that issuers sold investment contracts in exchange for non-cash consideration such as labor, service, or other assets." *Id.* (citing *SEC v. LBRY, Inc.*, 639 F. Supp. 3d 211 (D.N.H. 2022)).[7] But in that case, the parties did not dispute *Howey*'s first prong. *See LBRY*, 639 F. Supp. 3d at 216 ("Here, only the third component of the *Howey* test is in dispute."). The Court cannot draw any conclusions about the *LBRY* court's reasoning as to an issue that was never litigated. Therefore, the SEC fails to point to any digital-asset cases which conflict with the Court's holding as to the Other Distributions and, thus, cannot show beyond "[m]ere conjecture that courts would disagree on the issue." *Bellino*, 2017 WL 129021, at *3.

Accordingly, the SEC fails to meet its burden to show "substantial ground for difference of opinion" as to the two holdings that it moves to certify for interlocutory appeal. 28 U.S.C. § 1292(b).

### C. Materially Advance the Ultimate Termination of the Litigation

In determining whether certification will materially advance the ultimate termination of the litigation, "courts must consider the institutional efficiency of both the district court and the appellate court." *Tocco v. Real Time Resolutions, Inc.*, No. 14 Civ. 810, 2015 WL 5086390, at *2 (S.D.N.Y. Mar. 4, 2015).

---

[7] The other cases cited by the SEC are also out-of-circuit cases. *See* SEC Mem. at 16–17 (listing cases). These cases are also inapposite because they do not address the Order's finding that, based on the factual record in this case, the "recipients of the Other Distributions did not pay money or 'some tangible and definable consideration' to Ripple." Order at 26.

12

Here, the SEC fails to meet its burden to demonstrate that interlocutory appeal would "materially advance the ultimate termination of the litigation." *Id.* at 1 (citation omitted). As stated above, if the Second Circuit were to reverse the Order and remand the case, the Court would be in the position of considering many complicated legal and factual issues in the first instance, such as whether Ripple's Programmatic Sales satisfy *Howey*'s second prong that there exists a common enterprise or Defendants' fair notice defenses as to the Programmatic Sales and Other Distributions. *See supra* note 4. Then, any party that disagreed with the Court's subsequent summary judgment order could move again for interlocutory appeal. Therefore, any interlocutory appeal "would instead likely prolong the action as it would be subject to multiple bites at the apple for appellate review." *Platinum Partners Value Arbitrage Fund L.P. v. Goldberg*, No. 22 Civ. 6376, 2022 WL 4357548, at *4 (S.D.N.Y. Sept. 19, 2022).

Further, resource-intensive litigation remains in this matter before final judgment, including a remedial phase which could raise questions about "injunctive relief, disgorgement, and civil monetary penalties," additional *Daubert* briefing, pretrial litigation (including motions *in limine*), and trial. SEC Mem. at 5–6. Thus, complicated factual and legal issues remain to be adjudicated before final judgment. Under these circumstances, the litigation may be most expeditiously advanced by "proceeding in the ordinary course to judgment, [and] permitting a single round of appellate review on a complete record." *Platinum Partners*, 2022 WL 4357548, at *4.

The Court is aware that litigation may be extensive regardless of whether interlocutory appeal is granted. But here, the SEC has failed to meet its burden to show that such an appeal would "*materially* advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b) (emphasis added).

## CONCLUSION

For the reasons stated above, the SEC's motion for certification of interlocutory appeal is DENIED, and the SEC's request for a stay is DENIED as moot. The Clerk of Court is directed to terminate the motion at ECF No. 892.

Trial in this matter is set to begin on **April 23, 2024**, at **9:00 a.m.** in Courtroom 15D of the United States Courthouse, 500 Pearl Street, New York, New York 10007. The deadlines as set forth in the Court's Pretrial Scheduling Order remain in effect. Accordingly:

1. By **December 4, 2023**, the parties shall submit any motions *in limine*. Oppositions to any motions *in limine* shall be submitted by **December 18, 2023**.

2. By **December 4, 2023**, the parties shall submit all required pretrial filings, including their proposed joint pretrial order, requests to charge, verdict form, and voir dire questions in accordance with Paragraphs V.B, V.C, and V.D of the Court's Individual Practices in Civil Cases. The parties shall also email copies of these submissions to Torres_NYSDChambers@nysd.uscourts.gov as Word Documents.

3. By **December 4, 2023**, the parties shall deliver to the Court one copy of each documentary exhibit sought to be admitted, pre-marked (*i.e.*, labeled with exhibit stickers) and assembled sequentially in a loose-leaf binder or in separate manila folders labeled with the exhibit numbers and placed in a suitable container for ready reference in accordance with Paragraph V.C.v of the Court's Individual Practices in Civil Cases.

4. On **April 16, 2024**, at **2:00 p.m.**, counsel for all parties shall appear for a final pretrial conference in Courtroom 15D of the United States Courthouse, 500 Pearl Street, New York, New York 10007.

5. Prior to the final pretrial conference, counsel for both parties, along with the parties themselves, shall meet in person for at least one hour to discuss settlement of this matter.

SO ORDERED.

Dated: October 3, 2023
New York, New York

_____
ANALISA TORRES
United States District Judge