


NEW YORK
REGIONAL OFFICE

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
100 PEARL STREET, SUITE 20-100
NEW YORK, NY 10004-2616

January 11, 2024

**VIA ECF**
Hon. Sarah Netburn
United States Magistrate Judge
Southern District of New York

Re: *SEC v. Ripple Labs, Inc.*, et al., No. 20 Civ. 10832 (AT) (SN) (S.D.N.Y.)

Dear Judge Netburn:

The SEC respectfully requests an order compelling Ripple Labs, Inc. ("Ripple") to produce two narrow categories of documents: (a) its financial statements for the years 2022-2023; and (b) its post-Complaint contracts governing "Institutional Sales"—the same types of transactions which Judge Torres held to constitute, for the pre-Complaint period, unregistered offers and sales of securities. *See* Dkt. 874 ("MSJ Order") at 4, 16-22. Relatedly, the SEC seeks to compel Ripple to answer a single interrogatory setting forth the amount of XRP Institutional Sales proceeds that it received after the filing of the Complaint for contracts entered into pre-Complaint.

The SEC requests this limited and targeted discovery to aid Judge Torres in determining whether, having found Ripple liable for violating Section 5 of the Securities Act of 1933 ("Securities Act"), the Court should impose relief such as injunctions and civil penalties and, as to the latter, in what amount. *See generally* 15 U.S.C. §§ 77t(b), (d).

In imposing such remedies, courts regularly consider a defendant's conduct since the violations occurred to determine the likelihood of repetition (for injunctions) and the amount of the pecuniary gain and the need for deterrence (for penalties). This information is particularly central to the injunctive relief inquiry here because Ripple appears to argue it should not be enjoined on the basis that its future sales of XRP are or will be exempt from registration or the reach of the federal securities laws. Ripple's actions between the filing of the complaint and the present, specifically its XRP Institutional Sales contracts in that time, are thus highly probative of the plausibility of Ripple's forthcoming assurances of no upcoming violations. Similarly, Ripple's current financial condition and the actual total amount it received from its violative Institutional Sales is fundamental to tailoring a penalty to deter future violations.

Having agreed to participate in discovery concerning remedies and having taken advantage of this discovery period to submit its own supplemental expert report, Ripple's refusal to produce *any* post-Complaint discovery is baseless. This Court's June 15, 2021 Order (Dkt. 249 at 2) does not preclude this discovery, as Ripple contends. That Order denied post-Complaint discovery without prejudice in the context of the *liability* phase of this two-stage proceeding. Courts routinely order discovery and consider evidence of post-Complaint conduct in the remedies phase, much of which by definition cannot be requested unless and until a violation has been found. Nor is the burden undue or disproportional to the need of resolving the remedies phase of this contested litigation on a fulsome record, with hundreds of millions of dollars at stake. The SEC is not requesting, for example, a wide search of documents such as emails as would otherwise be required under Rule 26. Rather, the SEC merely seeks two years of financial statements, sales contracts of the sort Ripple relied on prominently in its liability-phase defense, and the answer to a single interrogatory about revenues received from a discrete set of sales for which Judge Torres already found Ripple liable.

Pursuant to Rule II.C of this Court's Individual Practices, the SEC avers that the parties met and conferred via Zoom and email several times since December 14, and are at an impasse.[1]

## I. Relevant Factual and Procedural Background

On July 13, 2023, Judge Torres held that Ripple violated Section 5 because it offered and sold securities in unregistered transactions when it sold XRP "directly to certain counterparties (primarily institutional buyers, hedge funds, and ODL customers) pursuant to written contracts (the 'Institutional Sales')." MSJ Order at 4. Judge Torres found that Ripple illegally sold approximately $729 million in XRP via these sales, reasoning, among other things, that certain "provisions in the Institutional Sales contracts support the conclusion that the parties did not view the XRP as a sale of a commodity or a currency." *Id.* at 22. In other words, whether Ripple's sales occurred via contracts containing certain provisions was relevant to the outcome of the case. *See also id.* at 24-25 (lack of similar contractual provisions one factor in outcome as to "Programmatic Sales").

On July 31, Ripple published an XRP Market Report purporting to "set the record straight" as to a supposed "misconception" that the Order "makes it impossible for Ripple to do business." Ex. A (July 2023 XRP Market Report) at 3. Ripple claimed the Order did not impact Ripple's business going forward because "*[s]ince the SEC filed suit in December 2020*, the vast majority of [its] … *counterparties* have been outside the United States." *Id.* (emphasis added). It thus appears Ripple continued its XRP Institutional Sales post-Complaint.

In the Order, Judge Torres also held that certain other Ripple offers and sales of XRP were not securities transactions. MSJ Order at 22-27. The SEC then sought leave to file an interlocutory appeal as to those rulings. Dkt. 893. In opposition, Ripple stated that if the SEC sought remedies based on post-Complaint conduct, Ripple would argue that "post-Complaint ODL sales … lack the characteristics the Court relied on to find Ripple made sales of unregistered investment contracts." Dkt. 913 ("Ripple Interlocutory Br.") at 4 n.1. Ripple also contended that at the remedies phase, "additional factual questions must be resolved to determine … whether any of Ripple's post-Complaint ODL sales qualify as 'Institutional Sales.'" *Id.* at 16.

On October 3, Judge Torres denied the SEC's request for interlocutory review. Dkt. 917. Then, Ripple and the SEC agreed to a 90-day remedies phase discovery period, including allowing Ripple to submit a new expert report to support its own arguments regarding financial remedies, which Ripple has done. Dkt. 923. On November 13, Judge Torres ordered the parties to complete remedies-phase discovery by February and file remedies briefs in March and April. Dkt. 924.

On November 14, the SEC served three requests for production and nine interrogatories, related solely to the remedies to be imposed for the Institutional Sales violations. *See* Ex. B (Resp. & Obj. to RFP); Ex. C (Resp. & Obj. to Interrogs). Nonetheless, on December 14, Ripple served its responses and objections ***refusing to produce a single document or answer a single interrogatory***. *See id.*

Even though Ripple has unjustifiably objected to all requests, the SEC is only moving to compel on two narrow document requests and on one interrogatory. The SEC seeks (a) "Ripple's audited financial statements for the years 2022 and 2023, and any quarterly financial statements for 2023," Ex. B at RFP No. 1; (b) Ripple's post-Complaint written contracts governing XRP sales to "institutional buyers, hedge funds, and ODL customers," *id.* at RFP No. 2; and (c) the specific

[1] The parties understand Judge Torres' July 17, 2023 Order, Dkt. 878, as directing the parties to bring additional discovery-related disputes to this Court. The parties further met and conferred and stipulate that, should the Court agree, Ripple's opposition letter shall be due no later than January 19, 2024, and the SEC's reply no later than January 24, 2024.

amount of proceeds Ripple received for delivering XRP after the Complaint was filed, but pursuant to written contracts entered into *before* the filing of the Complaint. *See* Ex. C at Rog. No. 9.

During the parties' meet and confers, Ripple did not appear to dispute that it has engaged in additional post-Complaint unregistered offers and sales of XRP in ODL transactions, including *after* Judge Torres' MSJ Order. In fact, post-Complaint, Ripple appears to have received billions of dollars from additional unregistered offers and sales of XRP. *See* Ex. A; *see also* Exs. E through O (2021-2023 Ripple Market Reports describing net proceeds) ("XRP Market Reports"). Nor did Ripple appear to dispute that it has sold post-Complaint and intends to continue selling XRP to "Institutional Sales" buyers in ODL transactions. Ripple averred, instead, that it intends to argue that no injunction is needed because it believes it can structure its future ODL sales in ways that do not violate the federal securities laws, as the Court's MSJ Order found Ripple's prior Institutional Sales had. Finally, the contracts catalogued by one of Ripple's expert reports, filed in the liability phase, suggests that after the Complaint was filed Ripple may have received proceeds in exchange for XRP it delivered to Institutional Sales counterparties with respect to contracts Ripple entered into *before* the filing of the Complaint. *See also* Dkt. 548-9 at ¶¶ 22, 24 & Ex. C (Ripple's expert cataloguing "Master Commitment to Sell Agreements" entered into in mid-to-late 2020 and describing these contracts as establishing the terms of sale for subsequent delivery of XRP for cash).

## II. Remedies-Related Legal Principles

The Securities Act authorizes courts to impose injunctions and civil penalties on those who, like Ripple, have been found to have violated any of the Act's provisions. *See* 15 U.S.C. §§ 77t(b), (d). "An injunction … is appropriate where 'there is a likelihood that, unless enjoined, the violations will continue.'" *SEC v. First Jersey Secs., Inc.* 101 F.3d 1450, 1477 (2d Cir. 1996) (citations omitted). In making this determination, "a court must look beyond the mere facts of past violations and demonstrate a realistic likelihood of recurrence." *SEC v. Mattessich*, 2022 WL 16948236, at *5 (S.D.N.Y. Nov. 15, 2022) (quotation omitted). Courts do so by balancing factors including whether the defendant is in a position where future violations may be anticipated. *See id.* at *5-6; *see also SEC v. Fowler*, 440 F. Supp. 3d 284, 301 (S.D.N.Y. 2020) *aff'd as modified* 6 F.4th 255 (2d Cir. 2021).

Courts balance similar factors to determine the size of any civil penalty, including "a defendant's financial condition, [and] … failure to admit wrongdoing." *SEC v. Lek Secs. Corp.*, 612 F. Supp. 3d 287, 295-96 (S.D.N.Y. 2020) (citing *SEC v. Alpine Sec. Corp.*, 413 F. Supp. 3d 235, 245 (S.D.N.Y. 2019)). The Second Circuit has "no hesitation in concluding that, in calculating the size of a penalty necessary to deter misconduct, the extent of a defendant's wealth is a relevant consideration. A fine that would be significantly painful to a person of modest means might be a mere slap on the wrist or 'cost of doing business' to a wealthier offender." *SEC v. Rajaratnam*, 918 F.3d 36, 45 (2d Cir. 2019). A civil penalty may be imposed in the amount of a party's gross pecuniary gain from a violation. *See* 15 U.S.C. § 77t(d)(2).

In making these assessments, courts routinely consider post-complaint conduct. *Mattessich*, for example, examined the defendant's post-complaint and post-liability employment to determine whether it presented a heightened risk of a future violation. 2022 WL 16948236, at *9. *Fowler* similarly considered the defendant's post-complaint and post-liability employment and his contention that he had not violated the law since the filing of the complaint. 440 F. Supp. 3d at 302; *see also SEC v. Jones*, 476 F. Supp. 2d 374, 384 (S.D.N.Y. 2007) (passage of time since violation "without incident" counseled against finding defendant posed risk of repetition); *SEC v. Penn*, 2020 WL 1272285, at *6 (S.D.N.Y. Mar. 17, 2020) (considering post-complaint denials of liability).

### III. The Court Should Compel Ripple to Produce the Requested Discovery

Ripple's contention that the SEC is not entitled to *any* discovery that postdates the Complaint is meritless. As the cases cited above show, courts consider this evidence, and they also order it produced. *See also SEC v. Bravata*, 2011 WL 2133508, at *1 (S.D. Ind. May 27, 2011) (refusing to quash subpoena for post-complaint bank records, which were relevant to determining likelihood of defendant's continuing violations); Ex. P (Order in *SEC v. LBRY*, No. 21 Civ. 260 (D.N.H. Feb. 6, 2023)) (ordering discovery of post-complaint balance sheet); *SEC v. LBRY*, 2023 WL 4459290, at *2-4 (D.N.H. July 11, 2023) (considering post-complaint evidence, including defendant's post-complaint sales and future intentions, in imposing remedies for Section 5 violations).

This Court's July 2021 Order does not foreclose this discovery—it was issued without prejudice during the *liability* phase and was about an expert potentially using post-Complaint XRP price movements to give an opinion related to liability, not remedies. Moreover, Ripple's transparent attempt to portray the SEC as choosing to put Ripple's post-complaint conduct at issue, *e.g.*, Ripple Interlocutory Br. at 4 n.1, is baseless. Given the factors courts routinely consider in determining whether and what remedies to impose against defendants for violations, and given that Ripple itself has expressly stated that it intends to rely upon its future conduct in seeking to avoid the imposition of a remedy, Ripple's post-Complaint conduct will be, at a minimum, highly relevant to the analysis.

Nor can Ripple argue that it will be prejudiced by producing these documents, as Judge Torres held that similar material could be kept under seal. *See* Dkt. 819 at 7-11. Similarly, the burden of producing this discovery is in no way disproportional to the needs of this case. Again, the SEC is not requesting that Ripple search emails or do anything different than what Ripple did when it provided its own expert with thousands of pre-Complaint contracts. *See* Dkt. 548-9 (Prof. Schwartz report).

#### A. Recent Statements of Financial Condition

Ripple cannot genuinely dispute that evidence of its current financial condition is relevant to the proper size of a civil penalty. *Rajaratnam*, 918 F.3d at 44-46. It is also relevant to Ripple's motives and incentive to commit additional violations. From its public statements, it appears as if Ripple's business remains centered and dependent on selling XRP into public markets in transactions that appear to include Institutional-style Sales. *See* XRP Market Reports. If Ripple's continuing financial structure depends on XRP sales that are at least substantially similar to the Institutional Sales, Judge Torres may conclude that Ripple should be enjoined because it has an incentive to continue selling XRP even in illegally unregistered transactions. Ripple's audited financial statements contain highly relevant evidence to determine the proper remedies on a complete record.

#### B. Post-Complaint Institutional Sales Contracts

For many of the same reasons, Ripple's post-Complaint Institutional Sales contracts are indisputably relevant. The pre-Complaint contracts have been at the crux of this litigation, with Ripple hiring an expert to catalog them, and the Court finding certain provisions in those contracts to be a feature in determining liability. In response to the Order, Ripple itself touted that it "continue[d] to partner" with various "customers and counterparties" as part of its post-Complaint activity, in order to "set the record straight" that it would be able to continue selling XRP. *See* Ex. A at 3. Ripple also contended that an injunction may not be proper given "factual questions" as to "whether any of Ripple's post-Complaint ODL sales qualify as 'Institutional Sales.'" Ripple Interlocutory Br. at 16. Ripple put it best: "To the extent the SEC seeks to enjoin future Institutional Sales in the remedies phase, the Court will need to consider whether and to what extent Ripple's post-Complaint sales of XRP to sophisticated commercial customers in connection with its [ODL]) platform have the

characteristics this Court recognized as defining 'Institutional Sales.'" *Id.* at 3-4. The discovery that the SEC seeks to compel is aimed at answering precisely that question.

Ripple intends to tell the Court that even though it generated more than $729 million in illegal pre-Complaint Institutional Sales profits, it intends to comply with the law going forward—and therefore the Court need not enter an injunction. But Ripple does not get to make that determination. The Court does. If, in fact, Ripple has continued in the years since the Complaint to sell XRP to institutional buyers via contracts containing provisions similar (or identical) to those that Judge Torres found violated the securities laws (including after the MSJ Order), the SEC should not be prevented from presenting a full record and the Court should have that information in evaluating Ripple's assurances. *See, e.g.*, *SEC v. Murphy*, 50 F.4th 832, 851-52 (9th Cir. 2022) (courts may properly assess credibility of assurances that no further violations will occur); *see also* Ex. D at 2-3 (article dated November 30, 2023, detailing "ongoing partnership" and post-MSJ Order large XRP transfers from Ripple to ODL-related entity Ripple has done business with since 2019).

Ripple should not be permitted to argue publicly that its post-Complaint conduct is relevant and exculpatory, repeat that plea to the Court to stave off an interlocutory appeal, but then demur when it comes to producing the relevant documents. The SEC is entitled to present evidence that Ripple's post-Complaint Institutional Sales contracts have "the characteristics the Court relied on to find Ripple made sales of unregistered investment contracts." Dkt. 913 at 4 n.1. Whether, and in what ways, Ripple has changed its sales contracts since the filing of the Complaint and, particularly, the MSJ Order, is not only evidence highly relevant to the Court's determination of the likelihood of new violations—it is the best evidence of it.

### C. Post-Complaint Proceeds for Pre-Complaint XRP Institutional Sales

Finally, the actual amount Ripple has received in *total* from pre-Complaint XRP Institutional Sales is at the core of the remedies determination before Judge Torres, which may include a determination of Ripple's "gross … pecuniary gain … as the result of [its] violation." 15 U.S.C. § 77t(d)(2).

There can be no dispute that the "sales" at issue for pre-Complaint contracts occurred when those contracts were entered into. "A sale occurs for [Securities Act] purposes when 'the parties obligate[] themselves to perform what they had agreed to perform even if the formal performance of their agreement is to be after a lapse of time.'" *Finkel v. Stratton Corp.*, 962 F.2d 169, 173 (2d Cir. 1992).

Ripple's principal actual objection to Interrogatory 9 appears to be that the SEC has used all of the 25 interrogatories provided for by Rule 33, *see* Ex C, suggesting in meet and confers that the SEC should have saved interrogatories for remedies. The Court should overrule this objection. While it is true that the SEC has used its default interrogatories provided for by Rule 33, Ripple, for its part and to suit its purposes, readily sought to deviate from the Court's *liability* expert discovery orders (*see* Dkts. 312, 313) by submitting a new expert report as part of *remedies* discovery. Just as Ripple did not feel bound by the October 4, 2021 date for the submission of expert reports (*id.*), the SEC should be able to propound limited interrogatories during this agreed-upon expert discovery period. And indeed, the SEC asks the Court to compel Ripple to respond to only a single interrogatory with information that Ripple can easily provide. To that end, the most efficient and least burdensome way of getting to the amount of actual, total XRP *pre-Complaint* Institutional Sales proceeds is for Ripple to provide that number as an answer to Interrogatory 9.

## IV. Conclusion

For these reasons, the Court should compel Ripple to produce documents in response to requests numbers 2 and 3 and answer Interrogatory No. 9.

Respectfully submitted,

Jorge G. Tenreiro

cc: All parties (via ECF).