**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION,    :
                                       :
                            Plaintiff, :        20 Civ. 10832 (AT) (SN)
                                       :
            - against -                :        ECF Case
                                       :
RIPPLE LABS, INC., BRADLEY GARLINGHOUSE, :
and CHRISTIAN A. LARSEN,               :
                                       :
                          Defendants.  :
                                       :
------------------------------------------------------------------------x


**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S**
**MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR REMEDIES AND**
**ENTRY OF FINAL JUDGMENT**

Jorge G. Tenreiro
Benjamin Hanauer
Marc J. Jones
Peter B. Moores

Attorneys for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
New York Regional Office
100 Pearl Street
New York, New York 10014
(212) 336-9145 (Tenreiro)
TenreiroJ@sec.gov

March 22, 2024

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iii

PRELIMINARY STATEMENT ....................................................................................... 1

ARGUMENT ..................................................................................................................... 2

    I.    RIPPLE SHOULD BE PERMANENTLY ENJOINED. ........................................ 3

        A.    Legal Standard ............................................................................................ 3

        B.    The *Cavanagh* Factors Weigh Heavily in Favor of the Requested Injunctions. ............... 4

    II.    DISGORGEMENT OF $876,308,712 AND PREJUDGMENT INTEREST OF $198,150,940 ARE WARRANTED. ....................................................... 10

        A.    Legal Standard ......................................................................................... 11

        B.    The SEC's Reasonable Approximation of Ill-Gotten Gains from Ripple's Violations. ............................................................................................. 12

            1.    Proceeds from Institutional Sales ................................................ 12

            2.    Marginal Cost of Institutional Sales ........................................... 13

        C.    Ripple's Institutional Sales Violations Caused Pecuniary Harm. ................... 16

            1.    Lack of Registration and Disclosure Harm Investors. .................. 17

            2.    Ripple's Failure to Disclose Discounts to Certain XRP Institutional Sales Investors Caused Pecuniary Harm to Other XRP Institutional Sales Investors. ........................................................................... 18

            3.    Ripple's Failure to Disclose Institutional Sales Discounts Caused Pecuniary Harm to XRP Institutional Sales Investors When Those Purchasers Sold Their XRP. ....................................................... 20

        D.    The Court Should Order Ripple to Pay $198,150,940 in Pre-Judgment Interest. .................................................................................................. 21

    III.    A CIVIL PENALTY EQUAL TO RIPPLE'S ILL-GOTTEN GAINS IS PROPER. ....................................................................................................... 21

        A.    Legal Standard ......................................................................................... 22

        B.    Given The Egregiousness of Ripple's Misconduct, the Strong Need for Deterrence, and Ripple's Unique Financial Condition, a Significant Civil Penalty is Warranted. ................................................................................ 23

CONCLUSION .............................................................................................................. 26

# TABLE OF AUTHORITIES

**Federal Cases**                                                                                   **Page(s)**

*CFTC v. Tayeh,*
   848 F. App'x 827 (11th Cir. 2021) ........................................................................... 14

*Finkel v. Stratton Corp.,*
   962 F.2d 169 (2d Cir. 1992) .................................................................................. 13

*Kokesh v. SEC,*
   581 U.S. 455 (2017) ......................................................................................... 13, 15

*Liu v. SEC,*
   140 S. Ct. 1936 (2020) .................................................................................. *passim*

*Pinter v. Dahl,*
   486 U.S. 622 (1988) ............................................................................................. 26

*Reves v. Ernst & Young,*
   494 U.S. 56 (1990) ............................................................................................... 26

*SEC v. Ahmed,*
   72 F.4th 379 (2d Cir. 2023) ..................................................................... 11, 16, 21

*SEC v. Alpine Sec. Corp.,*
   413 F. Supp. 3d 235 (S.D.N.Y. 2019) ................................................................ 24

*SEC v. Am. Growth Funding II, LLC,*
   2019 WL 1748186 (S.D.N.Y. Apr. 19, 2019) ...................................................... 6

*SEC v. Am. Growth Funding II, LLC,*
   2019 WL 4623504 (S.D.N.Y. Sept. 24, 2019) ................................................. 5-6

*SEC v. Amerindo Inv. Advisors Inc.,*
   2014 WL 2112032 (S.D.N.Y. May 6, 2014) ...................................................... 22

*SEC v. Bajic,*
   2023 WL 6289953 (S.D.N.Y. Sept. 27, 2023) .............................. 13, 15, 22, 23

*SEC v. Cavanagh,*
   155 F.3d 129 (2d Cir. 1998) ................................................................................. 3

*SEC v. Cavanagh,*
   445 F.3d 105 (2d Cir. 2006) ........................................................................ 11, 17

*SEC v. CKB168 Holds., Ltd.,*
   2022 WL 3347253 (E.D.N.Y. Aug. 12, 2022) .................................................... 3

*SEC v. Coates*,
 137 F. Supp. 2d 413 (S.D.N.Y. 2001) ............................................................... 23

*SEC v. Colonial Inv. Mgmt. LLC.*,
 381 F. App'x 27 (2d Cir. 2010) ......................................................................... 24

*SEC v. Commonwealth Chem. Sec., Inc.*,
 574 F.2d 90 (2d Cir. 1978) ................................................................................. 3

*SEC v. Contorinis*,
 743 F.3d 296 (2d Cir. 2014) ............................................................................. 21

*SEC v. First Jersey Secs., Inc.*,
 101 F.3d 1450 (2d Cir. 1996) ..................................................................... *passim*

*SEC v. Forest Res. Mgmt. Corp.*,
 2010 WL 2077202 (S.D.N.Y. May 18, 2010) ................................................... 22

*SEC v. Fowler*,
 440 F. Supp. 3d 284 (S.D.N.Y. 2020), *aff'd in relevant part*, 6 F.4th 255 (2d Cir. 2021) ............ 5, 8, 12

*SEC v. Gallison*,
 2023 WL 3090857 (S.D.N.Y. Apr. 26, 2023) ..................................................... 3

*SEC v. Govil*,
 86 F.4th 89 (2d Cir. 2023) ............................................................. 13, 15, 16, 17

*SEC v. Haligiannis*,
 470 F. Supp. 2d 373 (S.D.N.Y. 2007) ........................................................... 23-24

*SEC v. iFresh, Inc.*,
 2024 WL 416709 (E.D.N.Y. Feb. 5, 2024) ....................................................... 17

*SEC v. Inorganic Recycling Corp.*,
 2002 WL 1968341 (S.D.N.Y. Aug. 23, 2002) ................................................... 22

*SEC v. Juno Mother Earth Asset Mgmt., LLC*,
 2014 WL 1325912 (S.D.N.Y. Mar. 31, 2014) ................................................... 12

*SEC v. LBRY, Inc.*,
 639 F. Supp. 3d 211 (D.N.H. 2022) ................................................................... 5

*SEC v. LBRY, Inc.*,
 2023 WL 4459290 (D.N.H. July 11, 2023) .................................................... 5, 10

*SEC v. Lorin*,
 76 F.3d 458 (2d Cir. 1996) ............................................................................. 6, 8

*SEC v. Manor Nursing Ctrs., Inc.*,
 458 F.2d 1082 (2d Cir. 1972) ............................................................................. 8

*SEC v. Mattessich,*
    2022 WL 16948236 (S.D.N.Y. Nov. 15, 2022) ............................................................... 8

*SEC v. McDermott,*
    2022 WL 16533556 (E.D. Pa. Oct. 28, 2022) ........................................................... 13-14

*SEC v. Olins,*
    762 F. Supp. 2d 1193 (N.D. Cal. 2011) ...................................................................... 10

*SEC v. Pentagon Cap. Mgmt. PLC,*
    725 F.3d 279 (2d Cir. 2013) ........................................................................................ 23

*SEC v. Posner,*
    16 F.3d 520 (2d Cir. 1994) ............................................................................................ 3

*SEC v. Rajaratnam,*
    918 F.3d 36 (2d Cir. 2019) .......................................................................... 23, 24, 26

*SEC v. Razmilovic,*
    738 F.3d 14 (2d Cir. 2013) ......................................................................................... 22

*SEC v. Rinfret,*
    2020 WL 6559411 (S.D.N.Y. Nov. 9, 2020) .............................................................. 11

*SEC v. Rust,*
    2021 WL 2850615 (S.D.N.Y. July 8, 2021) .......................................................... 22, 23

*SEC v. Savino,*
    2006 WL 375074 (S.D.N.Y. Feb. 16, 2006) .............................................................. 10

*SEC v. Telegram Grp., Inc.,*
    448 F. Supp. 3d 352 (S.D.N.Y. 2020) ........................................................................ 20

*SEC v. Tourre,*
    4 F. Supp. 3d 579 (S.D.N.Y. 2014) ............................................................................ 24

*SEC v. U.S. Envt'l, Inc.,*
    2003 WL 21697891 (S.D.N.Y. July 21, 2003) .......................................................... 10

*SEC v. Universal Express, Inc.,*
    646 F. Supp. 2d 552 (S.D.N.Y. 2009) ........................................................................ 21

*SEC v. W.J. Howey Co.,*
    328 U.S. 293 (1946) .................................................................................................... 26

*SEC v. Wyly,*
    56 F. Supp. 3d 394 (S.D.N.Y. 2014) .......................................................................... 17

*Slack Technologies, LLC v. Pirani,*
    598 U.S. 759 (2023) .................................................................................................... 17

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.,*
    551 U.S. 308 (2007) ................................................................................................ 4

*Tull v. United States,*
    481 U.S. 412 (1987) .............................................................................................. 11

*United Hous. Foundation, Inc. v. Forman,*
    421 U.S. 837 (1975) ............................................................................................. 26

*Zakinov v. Ripple Labs, Inc.,*
    2023 WL 4303644 (N.D. Cal. June 30, 2023) ...................................................24

## Federal Statutes

15 U.S.C. § 77aa ....................................................................................................... 18

15 U.S.C. § 77e ................................................................................................ *passim*

15 U.S.C. § 77j .......................................................................................................... 18

15 U.S.C. § 77t ............................................................................................... 3, 22, 23

15 U.S.C. § 78u ............................................................................................... 3, 11, 12

## Other

*Adjustments to Civil Monetary Penalty Amounts,*
    2024 WL 111023, (SEC Rel. No. 6521 Jan. 5, 2024)........................................ 23

Doidge, C. et al., *Why are foreign firms listed in the U.S. worth more?*, 71 J. Fin. Econ. 205 (2004)............18

Franklin D. Roosevelt, *Statement on Signing the Securities Bill* (May 27, 1933),
    *https://www.presidency.ucsb.edu/documents/statement-signing-the-securities-bill* ....................... 25

Goldstein, M., *Transparency and Liquidity: A Controlled Experiment on Corporate Bonds,*
    20 Rev. Fin. Stud. 235, 237, 269-70 (2007) ....................................................... 19

Leuz, C. et al., *The Economic Consequences of Increased Disclosure*, 38 J. Acct. Res. 91 (2000) ................... 17

Restatement (Third) of Restitution and Unjust Enrichment § 51 cmt. a ............. 11

Restatement (Third) of Restitution and Unjust Enrichment § 51 cmt. h ............. 13

*In re Ripple Labs, Litig.,*
    18 Civ. 6753 (N.D. Cal. Jan. 10, 2024) ................................................................9

Plaintiff Securities and Exchange Commission ("SEC") respectfully asks this Court to enter a final judgment against Defendant Ripple Labs, Inc. ("Ripple") that: (i) permanently enjoins it from future violations of Section 5 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77e, and from conducting an unregistered offering of XRP in Institutional Sales, *see* ECF No. 874 ("MSJ Op." or "Summary Judgment Order") at 4; (2) orders it to pay $876,308,712 in disgorgement and $198,150,940 in prejudgment interest; and (3) orders it to pay an $876,308,712 civil penalty.

## PRELIMINARY STATEMENT

The Court has found that Ripple violated Section 5 by its unregistered offer and sale of XRP directly to counterparties (primarily institutional buyers, hedge funds, and "On-Demand Liquidity" or "ODL" customers) pursuant to written contracts ("Institutional Sales").  MSJ. Op. at 4, 16-22.

Ripple's years-long, nearly $1 billion, course of violations of the securities laws alone warrants injunctions, significant penalties, and the disgorging of Ripple's profits.  Additional evidence shows the egregiousness of Ripple's misconduct, highlighting the importance of this relief for deterrence and to ensure Ripple ceases its illegal conduct.  *First*, and perhaps most telling, since the filing of the Complaint, Ripple has *increased* its sales of XRP.  The amount of unregistered XRP Institutional Sales discussed in the Summary Judgment Order—nearly $729 million—is staggering. Yet it pales in comparison to the *more than* ███████ in XRP sales that Ripple has made since the start of this lawsuit, including *billions* since the Summary Judgment Order, most or all, it seems, in sales akin to Institutional Sales.  Thus, Ripple is well-positioned to pay a significant civil penalty. And one is warranted here both because a civil penalty should not be just the cost of doing business for a securities law violator, as the Second Circuit has held, and because the need for deterrence is clear given Ripple's enormous amount of unregistered sales of XRP over the last three years.

*Second*, Ripple has not accepted responsibility for its near-decade long violations of the law, other than in a perfunctory comment issued on the eve of remedies briefing and buried in a

document otherwise showing defiance of the law.  Instead, shortly after the Summary Judgment Order, Ripple made a series of public statements mischaracterizing the ruling, among other things, as a "total victory" for Ripple.  At the same time, Ripple continued its public relations campaign to deflect blame from its conduct and from its failure to be transparent about its business as the law requires.  Nor has Ripple taken a single step to correct course, for example by providing past Institutional Sales investors with the information unlawfully withheld from them.  To the contrary, since the Summary Judgment Order, Ripple has provided *less* information about its XRP sales, all the while blaming the SEC for its decision to do so.

*Third*, even though scienter is not an element of a Section 5 case, the evidence establishes that Ripple, in fact, intended to evade the law.  Ripple received and quickly ignored the advice a reputable law firm provided in two memoranda before Ripple sold a single unit of XRP.  The advice was, in essence: do not sell XRP for cash and do not promote it as an investment.  But Ripple chose to follow the opposite approach.  It opted for the money it gained by promoting an investment it sold for cash, while acting with the apparent fear that the disclosure of its finances and business activities required by law of those who sell securities would interfere with its profitable plan.

Only a significant sanction from this Court and the return of the ill-gotten gains Ripple made from its violations will cause Ripple to correct its conduct, either by registering its securities sales and making the disclosures required, or not selling securities.  To deter Ripple and others from additional violations of the securities laws, to deprive Ripple of its ill-gotten gains, and in recognition of the harm caused to the markets, the SEC asks this Court to issue a final judgment providing for the relief set forth above and herein.

## ARGUMENT

Courts in this District routinely impose injunctive relief, disgorgement, prejudgment interest, and penalties on defendants that violate the securities laws.  "Once [a] district court has found

federal securities law violations, it has broad equitable power to fashion appropriate remedies." *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1474 (2d Cir. 1996). The Court should do so here, given its finding that Ripple illegally raised hundreds of millions of dollars by engaging in unregistered offers and sales of securities over the course of many years.

## I.   RIPPLE SHOULD BE PERMANENTLY ENJOINED.

### A.   Legal Standard

Securities Act Section 20(b) authorizes courts to issue a permanent injunction against future violations of the Securities Act and against the "acts or practices" which violate it. 15 U.S.C. § 77t(b); *see also SEC v. Cavanagh*, 155 F.3d 129, 135 (2d Cir. 1998) (in SEC enforcement actions "[i]njunctive relief is expressly authorized"). A conduct-based injunction prohibiting Ripple from engaging in any unregistered offering of XRP in "Institutional Sales" is also proper under the Court's inherent equitable authority. *See* 15 U.S.C. § 78u(d)(5); *see also SEC v. Posner*, 16 F.3d 520, 521 (2d Cir. 1994). Such relief is warranted if there is a reasonable likelihood that a defendant will commit future violations of the securities laws. *SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 99–100 (2d Cir. 1978); *SEC v. Gallison*, 2023 WL 3090857, at *2 (S.D.N.Y. Apr. 26, 2023).

To determine the likelihood of a future violation, courts look to "'the fact that the defendant has been found liable for illegal conduct; the degree of scienter involved; whether the infraction is an 'isolated occurrence;' whether defendant continues to maintain that his past conduct was blameless; and whether … the defendant might be in a position where future violations could be anticipated.'" *Cavanagh*, 155 F.3d at 135 (quoting *Commonwealth Chem.*, 574 F.2d at 100). "[A]n injunction is particularly within the court's discretion where a violation was 'founded on systematic wrongdoing, rather than an isolated occurrence.'" *First Jersey*, 101 F.3d at 1477 (citation omitted); *see also SEC v. CKB168 Holds., Ltd.*, 2022 WL 3347253, at *4 (E.D.N.Y. Aug. 12, 2022) (considering *Cavanagh* factors in determining to impose conduct-based injunction).

### B.   The *Cavanagh* Factors Weigh Heavily in Favor of the Requested Injunctions.

The relevant factors weigh heavily in favor of a permanent injunction restraining Ripple from violating Section 5 and from conducting an unregistered offering of Institutional Sales of XRP.

*First*, as the Court found, Ripple violated Section 5 by engaging in illegally unregistered offers and sales of XRP in Institutional Sales.  *See* MSJ Op. at 16-22.

*Second*, while scienter is not an element of a Section 5 offense, Ripple's violations were not just an accidental regulatory foot fault.  They involved, at least, a reckless disregard for the law.  As the Court found, in 2012 (before a single XRP Institutional Sale took place), Ripple received two memoranda from a prominent law firm analyzing the legal risks of selling XRP.  MSJ Op. at 7-8. These memoranda noted that "'[t]he more that [the founders and Ripple] promote [XRP] as an investment opportunity,'" the more likely the SEC would argue Ripple was selling investment contracts.  *Id.* at 8 (citing Defs. 56.1 Resp. ¶ 993, ECF No. 663).  But instead of following this advice, "[s]tarting in 2013, Ripple marketed XRP to potential investors, including the Institutional Buyers, by distributing promotional brochures that touted XRP as an investment tied to the company's success."  *Id.* at 19.  "These statements, *and many more*, are representative of Ripple's overall messaging to the Institutional Buyers about the investment potential of XRP."  *Id.* at 21 (emphasis added).

Given the massive revenues from Institutional Sales, it is not hard to surmise why—despite the clear legal advice it received—Ripple decided to act in reckless disregard that its conduct could be illegal.  It "may well have been inclined to protect one of its major revenue streams and thus ignore … potential wrongdoing related to its sale of … securities."  *SEC v. Am. Growth Funding II, LLC*, 2019 WL 1748186, at *4 (S.D.N.Y. Apr. 19, 2019); *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 325 (2007) ("personal financial gain may weigh heavily in favor of a scienter inference").

Ripple has candidly revealed a further reason why it very consciously decided to act outside the securities laws' registration provisions:  to avoid making the accompanying disclosures, including of its financial statements and of the heavily discounted way it was selling XRP to some but not all Institutional Sales investors.  *See infra* § II.C.  Ripple considers making these disclosures "highly detrimental to [its] business" and that they could cause "serious damage" to its negotiating position with XRP counterparties.  ECF No. 744-2 at ¶ 8; ECF No. 744 at 6.  Indeed, the SEC fully expects that Ripple, despite having been adjudged a Section 5 violator, will continue its dogged efforts to keep hidden the information that Section 5 requires be disclosed for the benefit of investors.

Under less egregious circumstances, the court in *SEC v. LBRY, Inc.* concluded that this factor was satisfied.  *See* 2023 WL 4459290, at *2 (D.N.H. July 11, 2023).  The court reasoned that even though defendant's unregistered sales "did not involve fraud, its [Section 5] violations were nonetheless more egregious than a mere unregistered offering" because the defendant's "efforts went beyond selling" its crypto asset security.  *Id.*  Instead, the defendant "was 'acutely aware of [the token's] potential value as an investment' and 'made sure potential investors were too.'"  *Id.* (citing *SEC v. LBRY, Inc.*, 639 F. Supp. 3d 211, 217 (D.N.H. 2022)).  Ripple's conduct provides a more extreme case than LBRY's, because Ripple received legal advice but ignored it, seemingly for financial reasons.

*Third*, Ripple's violations were not isolated.  They spanned eight years (from the beginning of 2013 through 2020), involved many promotional statements and sales of XRP to Institutional Sales buyers, and gave Ripple massive amounts of money.  *E.g.*, MSJ Op. at 4 (citing Defs. 56.1 Resp. ¶¶ 619-20, 647, 716) (describing timespan of and proceeds from sales); *id.* at 6-7, 18-21 (describing extensive marketing campaign).  According to Ripple, they involved "more than 1,700 relevant contracts."  Defs. 56.1 ¶ 105 & n.3, ECF No. 826.

Courts have found this factor satisfied, and imposed injunctions, based on conduct far more limited (in duration and dollars raised) than the series of violations here.  *E.g.*, *SEC v. Fowler*, 440 F.

Supp. 3d 284, 301 (S.D.N.Y. 2020) (defendant's violations were "not isolated" when they lasted three years and affected thirteen customers), *aff'd in relevant part*, 6 F.4th 255 (2d Cir. 2021); *SEC v. Am. Growth Funding II, LLC*, 2019 WL 4623504, at *1, *2, *4 (S.D.N.Y. Sept. 24, 2019) (violations over the course of nearly four years and affecting 86 investors were "violations [that] continued over a period of years, and were not simply an isolated occurrence of bad judgment"); *see generally SEC v. Lorin*, 76 F.3d 458, 461 (2d Cir. 1996) ("[w]hen the violation has been founded on systematic wrongdoing, rather than an isolated occurrence, a court should be more willing to enjoin future misconduct") (quotation omitted).

*Fourth*, Ripple has not accepted responsibility for its violations.  It has, instead, continued a campaign of defecting blame, even after the Court found Ripple liable.  To illustrate, two weeks after the Summary Judgment Order, Ripple issued a "XRP Markets Report."  *See* Ex. 1 (XRP Markets Report for Second Quarter 2023 ("Q2 2023 XRP Markets Report")).[1]  The report acknowledges no wrongdoing.  It instead states Ripple would "debunk several misconceptions … about" the Summary Judgment Order.  *Id.*  Then, under a "Ripple's Victory" subheading, Ripple discussed supposed misconceptions that "The decision is a split decision" and that "The Court ruled against Ripple on its fair notice defense."  *Id.* at 2-4.  Yet those supposed misconceptions are anything but, since the Court expressly found Ripple illegally raised more than $728 million in unregistered securities sales and ruled against it on its fair notice defense of its Institutional Sales.  MSJ Op. at 1, 4, 22, 28-30.

Ripple's CEO has made similar public statements that, rather than accepting responsibility for the violations found by the Court, misleadingly characterize the Summary Judgment Order as an "unequivocal win for Ripple."  Ex. 7 (July 19, 2023 tweet); *see also* Ex. 6 (July 15, 2023 tweet) (the "attempt by the SEC to paint this as some sort of split victory is pathetic … We won.  They lost.").

---

[1] Citations to "Ex. __" are to the Exhibits attached to the Declaration of Peter B. Moores filed herewith ("Moores Decl.").

Moreover, although it was Ripple that decided to sell XRP in unregistered transactions, the Q2 2023 XRP Markets Report also continued Ripple's practice of deflecting blame for that decision—and any resulting harm from the filing of the case—away from Ripple. *See* Ex. 1 at 3 (noting the supposed "$15B in market cap [that] was eviscerated" when this lawsuit was filed); *see also* Ex. 2 (XRP Markets Report for Fourth Quarter 2020) at 2 (containing similar statements).

Nor has Ripple shown contrition by redressing its lack of disclosures to Institutional Sales investors. Ripple has not provided its Institutional Sales investors with the information required to be disclosed to securities offerees, including financial statements, offering terms and pricing, and other information. To the contrary, since the Summary Judgment Order, Ripple has *stopped disclosing* the amounts of its XRP sales to ODL customers—information about the very types of sales the Court found violated the law. *See also infra* § III.B.

Given the absence of any statements accepting responsibility, it is no surprise that, in its December 2023 discovery responses, Ripple objected and refused to identify any statements where it acknowledged responsibility for its misconduct. *See* Ex. 9 (Ripple Interrog. Resp. No. 7) at 10-11.

More than six months after the Summary Judgment Order, on the eve of remedies briefing and after the SEC had asked Ripple to identify such statements, Ripple included a single sentence in its Markets Report where it "acknowledges that the Court found that certain historical XRP sales that Ripple made to sophisticated entities—Institutional Sales—were investment contracts and therefore should have been registered with the SEC." Ex. 3 at 2. But even this statement only acknowledges what "the Court found"—not that Ripple recognized the wrongful nature of its conduct. And while Ripple does say that it "will ensure that Ripple's sales conform to the legal standards set by the Court," it does not say how, or that Ripple will provide Institutional Sales investors with the missing disclosures. Indeed, even this "acknowledge[ment]" of what the "the Court found" is followed by a candid admission that Ripple was "[l]ooking ahead" to the "'remedies

phase' of the case" when it offered this statement.  *Id.*  Ripple's statement of deciding for itself that

it has conformed to legal standards rings hollow where this report otherwise continues Ripple's

decision to defy the law by providing *fewer* disclosures about its XRP sales activities.

Together, Ripple's post-Summary Judgment Order statements and conduct show that Ripple

has not accepted responsibility for its violations.  To be clear, the SEC does not seek to hold against

Ripple its decision to mount a legal defense.  Instead, Ripple's *conduct* in defending itself, and in

particular its statements *after* it was found liable, establish the need to enjoin it.  *See, e.g.*, *Fowler*, 440 F.

Supp. 3d at 301-02 (considering defendant's defiant nature and blaming of other parties during the

trial); *SEC v. Mattessich*, 2022 WL 16948236, at *7 (S.D.N.Y. Nov. 15, 2022) (considering post-liability

statements).  The fourth *Cavanagh* factor is accordingly satisfied here.  *See, e.g.*, *Lorin*, 76 F.3d at 461 ("a

culpable defendant's continued protestations of innocence [are properly] an indication that injunctive

relief is advisable") (citing *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1101 (2d Cir. 1972)).

*Fifth*, Ripple remains in a position to violate Section 5 today and is highly incentivized to do so.

Ripple still holds the largest amount of XRP by any person and continues to sell it, unregistered, to

institutional purchasers.  *See* Ex. 3 at 7 (noting Ripple held about 45.77 billion units of XRP as of

December 31, 2023).  And Ripple has continued to generate massive revenues from XRP sales in ODL

transactions to sophisticated counterparties under contracts that are, at a minimum, quite like those the

Court found violated Section 5.  Specifically, Ripple has continued to execute contracts for unregistered

sales of XRP in direct ODL transactions, including with a sophisticated institutional party to whom

Ripple sold XRP before the Complaint was filed—a transaction that the SEC specifically cited in its

Complaint.  *See* Ex. 4 (Aug. 2021 contract with same entity Ripple admitted entering XRP sales contract

in May 2020); Am. Compl. ¶ 373 (ECF No. 46); Defs. 56.1 Resp. ¶ 820 (ECF No. 663).  Indeed, after

vigorously refusing to produce the contracts until Judge Netburn compelled Ripple to do so (ECF No.

936 at 2-3), Ripple was forced to disclose that it has entered into more than 80 Institutional Sales

contracts since the filing of this lawsuit.  *See* Moores Decl. ¶ 3.  This conduct has, remarkably, continued unabated even after the Court's Summary Judgment Order.  *E.g.*, Ex. 5 (Jan. 2024 contract).

In addition, Ripple's own financial statements show that, after the Complaint was filed, Ripple's XRP sales revenues from these unregistered sales skyrocketed, for a total of ████████ from 2021 to 2023.  This is more than ██ times the revenue from unregistered XRP Institutional Sales for the six-year period 2014 to 2020, as measured by dollar amount.  *See* MSJ Op. at 4 (nearly $729 million in Institutional Sales); Ex. 13 at 6 (2022 financial statements showing ████████ total "XRP transactions" revenues for 2021 and 2022); Ex. 14 at 2 (2023 draft financial statements showing $████ ████ total "Digital asset transactions" revenue for 2023).  In the private action against Ripple brought by XRP Programmatic Sales investors, Ripple explained that "ODL sales constitute the bulk of Ripple's sales pursuant to bilateral contracts during the time period from July 2017 to June 2023."  Ex. 11 (Decl. of Carolyn Dicharray, *In re Ripple Labs, Inc. Litig.*, 18 Civ. 6753, ECF No. 329-29, at ¶ 3 (N.D. Cal. Jan. 10, 2024)).  The financial statements also confirm that XRP sales remain nearly all of Ripple's total revenues through 2023.  *See* Ex. 14 at 2 (of the $████████ in "total revenue" for 2023, only $████ ████████, corresponded to something other than "digital asset transactions").

Remarkably, Ripple's financials statements reveal that $████████ in sales occurred in the second half of 2023 alone, *see* Ex. 14 at 2, most of which is after the Summary Judgment Order.  This eclipses by a sizable order of magnitude the nearly $729 million at issue in that Order.  *See also* MSJ Op. at 4 ("Institutional Sales" counterparties include "ODL" customers).  In other words, Ripple made over ████ times more in XRP sales pursuant to contracts with sophisticated parties in just the six months after the Court found Ripple liable as it did in the six years before the Complaint was filed.

These facts thus unequivocally show that the fifth *Cavanagh* factor (remaining in a position to violate) is easily met here—Ripple remains highly dependent on selling XRP to institutional purchasers in unregistered sales pursuant to written contracts to drive its revenues and profits.  *E.g.*, *SEC v. Savino*,

2006 WL 375074, at *17 (S.D.N.Y. Feb. 16, 2006) (defendant was "in a position to engage in further fraudulent conduct" in part due to securities business occupation); *SEC v. U.S. Envt'l, Inc.*, 2003 WL 21697891, at *25 (S.D.N.Y. July 21, 2003) (defendants' continued employment in same industry gave them opportunities to commit further violations and contributed to need for injunction); *SEC v. Olins*, 762 F. Supp. 2d 1193, 1196 (N.D. Cal. 2011) (finding broad-based nature of Section 5 violations and intent to work in industry created likelihood of recidivism). Ripple's business model and conduct show it is still in a position where additional violations could occur.

Ripple may argue that there is no finding that its post-Complaint sales violated the law. *E.g.*, ECF No. 929 at 4-5. All that matters, though, is that Ripple's status and business activities have not changed such that it is in a position where more violations are *possible*—no finding of *actual* post-Complaint violations is required. *E.g.*, *LBRY*, 2023 WL 4459290, at *2 ("the continuous nature of LBRY's unregistered offering—which persisted *in some form even after the lawsuit was filed* and the SEC's position on the registration requirement became clear—points to a risk of future violations," warranting injunction "from participating in unregistered offerings of crypto asset securities" (emphasis added)). Given that Ripple continues to generate enormous revenues from selling XRP to institutional purchasers directly via written contracts, the Court should impose the requested injunctions to prevent Ripple's illegal conduct from recurring.

## II.   DISGORGEMENT OF $876,308,712 AND PREJUDGMENT INTEREST OF $198,150,940 ARE WARRANTED.

Ripple received almost a billion dollars from its illegal sales of XRP via contracts that the Court determined violated Section 5.

Ripple's illegal profits, aka Ripple's unjust enrichment, should be disgorged because "it would be inequitable that a wrongdoer should make a profit out of his own wrong." *Liu v. SEC*, 140 S. Ct. 1936, 1943 (2020) (internal quotations omitted). The SEC asks this Court to right that inequity and order Ripple to disgorge the ill-gotten gains it received from its violations.

A.      **Legal Standard**

Sections 21(d)(3) and (7) of the Securities Exchange Act of 1934 ("Exchange Act") permit the Court to require disgorgement of "any unjust enrichment by the person who received such unjust enrichment as a result of such violation."  15 U.S.C. §§ 78u(d)(3), (7).  Disgorgement is also permissible equitable relief under Section 21(d)(5) of the Exchange Act.  *Liu*, 140 S. Ct. at 1939. Disgorgement is a "'profit-based measure of unjust enrichment'" that is "measured by the defendant's wrongful gain."  *Id.* at 1943 (quoting Restatement (Third) of Restitution and Unjust Enrichment ("Restatement") § 51, cmt. a, at 204).  Disgorgement thus aims to return the violator to the "'status quo.'"  *Id.* (quoting *Tull v. United States*, 481 U.S. 412, 424 (1987)).  To return to the status quo before its illegal offering, Ripple must give up the net profits it received from the unregistered Institutional Sales.  *Id.* at 1942 ("[e]quity courts have routinely deprived wrongdoers of their net profits from unlawful activity."); *see also SEC v. Cavanagh*, 445 F.3d 105, 116-20 (2d Cir. 2006) (affirming order requiring defendant to disgorge all profits from Section 5 violations).

"[T]he amount of disgorgement ordered need only be a reasonable approximation of profits."  *SEC v. Ahmed*, 72 F.4th 379, 407 (2d Cir. 2023); *see also SEC v. Rinfret*, 2020 WL 6559411, at *5 (S.D.N.Y. Nov. 9, 2020) ("The SEC is not required to establish with certainty the disgorgement amount, but need only present a 'reasonable approximation of profits causally connected to the violation.'") (quoting *First Jersey Secs.*, 101 F.3d at 1475).

Once the SEC has presented a reasonable approximation of profits causally connected to the violation, "the burden shifts to the defendant[ ] to contest the Government's calculations."  *SEC v. Juno Mother Earth Asset Mgmt., LLC*, 2014 WL 1325912, at *2 (S.D.N.Y. Mar. 31, 2014); *Fowler*, 6 F.4th at 267 (post-*Liu* approval of burden shifting).  And "any risk of uncertainty [in calculating disgorgement] should fall on the wrongdoer whose illegal conduct created that uncertainty."  *First Jersey Secs.*, 101 F.3d at 1475 (alteration in original).

As detailed below, the SEC's reasonable approximation of disgorgement is $876,308,712, equaling the proceeds Ripple received from its Institutional Sales ($991,212,963) minus the expenses Ripple itself identified as the cost of generating those proceeds ($114,904,251).  Decl. of Andrea Fox, dated March 22, 2024 ("Fox Decl.") ¶¶ 8-17.

**B.    The SEC's Reasonable Approximation of Ill-Gotten Gains from Ripple's Violations**

### 1.    Proceeds from Institutional Sales

Ripple's gross proceeds from pre-Complaint XRP Institutional Sales contracts that are within the statute of limitations were $991,212,963, consisting of two components:  Institutional Sales proceeds received prior to the filing of the Complaint, and proceeds received after the filing of the Complaint pursuant to Institutional Sales contracts Ripple entered before the Complaint was filed.  Fox Decl. ¶¶ 8-10.

For the first component, the Court held that Ripple's Institutional Sales proceeds received prior to the Complaint exceeded $728 million.  MSJ Op. at 4, 16.  Only proceeds received on or after April 1, 2014, however, are within the five-year statute of limitations applicable to the SEC's disgorgement claim, *see* 15 U.S.C. § 78u(d)(8)(A)(i), as tolled.  *See* Am. Compl. (ECF No. 46) ¶ 428; Am. Answer (ECF No. 51) ¶ 428.  According to Ripple's expert, the proceeds received from XRP Institutional Sales in that period equal approximately $725,221,000.  *See* Ex. 12 (Supp. Expert Report of Anthony Bracco ("Bracco Supp. Rep.")) at Schedule 1-B.

For the second component, Ripple received $265,991,963 in proceeds from four different Institutional buyers after the filing of the Complaint, pursuant to unregistered XRP Institutional Sales contracts Ripple entered into before the Complaint was filed.  Ex. 10 (Rog. Supp. Resp. No. 9) at 3-4.  A "sale" occurs under the Securities Act when the parties are bound to deliver the securities, even if performance occurs at a later date.  *See Finkel v. Stratton Corp.*, 962 F.2d 169, 173 (2d Cir. 1992).  These amounts, too, correspond to violative sales and are thus subject to disgorgement.

Accordingly, combined, Ripple's gross proceeds from pre-Complaint XRP Institutional Sales contracts that are within the statute of limitations were $991,212,963.

### 2.   Marginal Cost of Institutional Sales

Under *Liu*, however, disgorgement is limited to a defendant's "net profits" from its wrongdoing.  *See* 140 S. Ct. at 1946.  *Liu* requires deducting "legitimate expenses," but leaves to the lower courts to "ascertain[] whether expenses are legitimate or whether they are merely wrongful gains 'under another name.'"  *Id.* at 1950.  Despite the lack of specific guidance, the Supreme Court and the Second Circuit, in *Liu* itself and elsewhere, have thrice cited the Restatement (Third) of Restitution and Unjust Enrichment to explain that courts must deduct expenses that are the "marginal cost" of producing the revenues subject to disgorgement.  *Id.* (citing Restatement § 51 cmt. h); *see also Kokesh v. SEC*, 581 U.S. 455, 466 (2017) (same); *SEC v. Govil*, 86 F.4th 89, 110 (2d Cir. 2023) (same), *reh'g denied* No. 22-1658, Dkt. Nos. 72, 78.

In distinguishing the type of expenses that are deductible from those that are not, the Restatement draws a contrast between "all marginal costs incurred in producing the revenues that are subject to disgorgement" which are deductible, and "expenses (such as ordinary overhead) that would have been incurred in any event" which are not.  Restatement § 51 cmt. h; *see also SEC v. McDermott*, 2022 WL 16533556, at *8-9 (E.D. Pa. Oct. 28, 2022) (rejecting defendant's proposed deductions for overhead expenses when calculating defendant's ill-gotten gains because they were not part of the marginal costs to produce the offending revenue).  "The deductions contemplated in *Liu* are only those 'incurred in producing the revenues that are subject to disgorgement.'"  *SEC v. Bajic*, 2023 WL 6289953 at *4 (S.D.N.Y. Sept. 27, 2023) (quoting *Liu*, 140 S. Ct. at 1950) (also noting that defendant's business did not "benefit the investors who were harmed by [his] conduct").

Here, in its financial statements, Ripple recorded the costs it incurred to generate all its revenue, including but not limited to from sales of XRP, and aptly labeled it as its "cost of revenue."

*See* Ex. 24 (Initial Expert Report of Anthony Bracco ("Bracco 1st Rep.")) ¶ 32 ("Cost of revenue is

the cost of goods sold related to the sale of software and services, as well as *the cost of XRP sold* and

impairment of purchased XRP." (emphasis added)); Ex. 16 (Ripple 2019 and 2020 consolidated

financial statements) at 3.[2]  "Cost of revenue" included expense subcategories associated with XRP

sales revenue, expense subcategories associated with other revenue like software services, and an

allocation of three different general categories Ripple tracked: Operations, Engineering, and Client

Services.  Fox Decl. ¶¶ 13-14, Ex. 21 (Fiscal Year 2020 Reporting File); Ex. 17 (Dep. Tr. of Anthony

Bracco ("Bracco Tr.")) at 158:10-163:3; 227:25-229:16; 249:1-250:5.[3]

Ripple's remedies expert further identified the difference between the "cost of revenue"

expense category, and other business expenses not specifically related to the Institutional Sales:

> there's a distinction between cost of sales, which are the costs directly related
> to generating the revenue, versus a general and administrative expense like

---

[2] Ripple's expert and its financial statements detail three other categories of expenses:  "Research
and development costs" which "include costs incurred by the Company to develop software
products or the software components of products to be sold, leased or marketed to external users as
well as the costs to develop software to be used solely to meet internal needs and cloud-based
applications used to deliver services."  Ex. 24 (Bracco 1st Rep. at ¶ 33); "Sales and marketing
expenses" which "include costs related to customer acquisition, personnel-related expenses, product
marketing programs, and XRP ledger development and promotional programs." *id.* ¶ 34; and
"General and administrative costs" which "include payroll costs for management, accounting and
finance, legal and other administrative positions, legal fees, external accounting and consulting fees,
including audit, tax and other consulting fees."  *Id.* ¶ 35.  These three categories of expenses are
not linked to the cost of making Institutional Sales—according to Ripple's own accounting—and should
not be deducted from disgorgement for the reasons set forth herein.  Ripple is also not entitled to
deduct "Sales and Marketing" expenses associated with selling unregistered securities to Institutional
Sales investors for the additional reason that such expenses were "incurred for the purposes of
furthering" Ripple's wrongdoing.  *Liu*, 140 S. Ct. at 1950; *see CFTC v. Tayeh*, 848 F. App'x 827, 829
(11th Cir. 2021) ("[D]efendants in a disgorgement action are not entitled to deduct costs associated
with committing their illegal acts.").

[3] Ripple's accounting system, however, did identify certain accounting entries that appear to be
direct costs of XRP sales.  In addition to the net profits calculation described above, the SEC
accountant has provided a net profits calculation based on the deduction of these direct costs
only.  *See* Fox Decl. ¶¶ 18-21 (Calculation Two).  The SEC here has recommended the approach that
allows for more of Ripple's expenses to be deducted (Calculation One).

janitorial, **which isn't something specific towards generating the revenue, but it's an expense of the business**.

Ex. 17 (Bracco Tr.) at 179:15-20 (emphasis added).[4]  In other words, only "Cost of Revenue" expenses are the type of expenses to be deducted, according to the portion of the Restatement cited by *Kokesh*, *Liu*, and *Govil* about deductions:  Restatement § 51, cmt. h (deductions should not include "expenses (such as ordinary overhead) that would have been incurred in any event"); *see also Bajic*, 2023 WL 6289953, at *4 (proceeds used to develop a software business were not deductible because they were not expenses "incurred in procuring the revenues that are subject to disgorgement" (citing *Liu*, 140 S. Ct. at 1950 (leaving it to lower courts to determine whether to deduct expenses that "have value independent of fueling a fraudulent scheme")))).

Nor should all the "cost of revenue" expenses be deducted, because only a portion of them relate to the Institutional Sales proceeds the SEC seeks to disgorge.  The rest, presumably, relate to other sources of revenue like Programmatic Sales.  The SEC and Ripple's expert agree on the method for determining what portion of expenses should be deducted:  take the percentage that XRP Institutional Sales revenue was to the total revenue for each year and multiply the deductible expenses for that year by that percentage.[5]  *See* Ex. 17 (Bracco Tr.) at 184:11-13 (describing this approach as "a reasonable methodology to allocate the expenses based on where their revenues are being generated."); Ex. 12 (Bracco Supp. Rep.) at ¶ 43 and Schedule 2-B; Fox Decl. ¶ 16.

Through this method, the SEC calculated properly deductible "cost of revenue" expenses to be $114,904,251.  Fox Decl. ¶¶ 13-17.[6]  Subtracting those apportioned expenses from the entire

---

[4] Bracco used "cost of revenue" and "cost of sales" interchangeably.  Ex. 17 (Bracco Tr.) at 161:23-162:3.

[5] (Institutional Sales Revenue/Total Monetary Revenue) * Cost of Revenue, calculated for each year.

[6] The SEC has not deducted expenses incurred after the filing of the Complaint because the costs for those contracts would have occurred when the contracts were signed.  *See* Bracco Tr. at 178:17-

Institutional Sales proceeds at issue, $991,212,963, results in the amount of net ill-gotten gains subject to disgorgement, $876,308,712. *Id.* ¶ 17.

### C.      Ripple's Institutional Sales Violations Caused Pecuniary Harm.

Recently, the Second Circuit held that a district court at the remedies phase of a SEC fraud action abused its discretion when it ordered disgorgement without finding that the victims of the fraud suffered pecuniary harm. *Govil*, 86 F.4th 89. *But see Ahmed*, 72 F.4th at 397-98 (refusing to offset disgorgement based on argument that defendant's victim did not suffer pecuniary harm, because the defendant's "misconduct … was not in misrepresenting the purchase prices but in failing to disclose his conflicts of interest," such that the "transactions were thus entirely tainted" and his entire proceeds were, therefore, the "net profits from wrongdoing").

As a preliminary matter, in *Liu* the Supreme Court emphasized that disgorgement aims to "deprive[] wrongdoers of their net profits from unlawful activity," not to compensate victims' losses. 140 S. Ct. at 1942; *see id.* at 1945 (calling disgorgement a "profits-based remed[y]"); *id.* at 1946 ("profits from wrongdoing"); *id.* at 1948 ("profits remedy"); *id.* at 1949 ("profits-focused remedy"); *id.* at 1950 ("profits-based remedy"). *Govil* accordingly recognized that disgorgement is ordered not "'to compensate victims' but 'to prevent wrongdoers from unjustly enriching themselves through violations'" and that "disgorgement aims to divest profits" of the wrongdoer. 86 F.4th at 106-08. But the court held that "how to quantify the ill-gotten gains" is a "different issue" from "whether an investor has suffered pecuniary harm." *Id.* at 105. Thus, once the court finds that some victim suffered pecuniary harm because of the defendant's wrongdoing, disgorgement is measured by the violator's ill-gotten *gain*, which can be *less or more* than the victims' loss. *Id.* at 103, n.14, 107-08;

---

179:1 (stating that "most" of the direct cost of a particular kind of revenue "should correlate or occur in the same period" as the revenue is earned). In other words, costs of revenue incurred after the Complaint was filed would likely relate to contracts (and thus revenue from contracts) entered after that date, and thus not included in either the revenue or expense portions of this disgorgement calculation.

*Cavanagh*, 445 F.3d at 117.  A court can thus exercise its authority to prevent unjust enrichment without *quantifying the amount* of pecuniary harm suffered or identifying the specific investors who suffered pecuniary harm.  *See SEC v. iFresh, Inc.*, 2024 WL 416709, at *3 (E.D.N.Y. Feb. 5, 2024) (finding that consent judgment establishing "that iFresh's stock prices were artificially inflated" was sufficient to "establish[] the requisite pecuniary harm" under *Govil* and ordering disgorgement).

As discussed below, *Govil* is satisfied here because Ripple's violation of Section 5, via entirely tainted transactions, caused pecuniary harm to investors.

### 1.      Lack of Registration and Disclosure Harm Investors.

As a general principle, the Supreme Court has explained that one of the key benefits of disclosure, registration, and periodic filing of information is that it leads to more accurate securities prices.  *See Slack Technologies, LLC v. Pirani*, 598 U.S. 759, 762 (2023).  One court in this District has specifically quantified the "average discounts on [the trading price for] unregistered shares [as] … ranging from 20% to 35%."  *SEC v. Wyly*, 56 F. Supp. 3d 394, 422-24 & n.188 (S.D.N.Y. 2014).  Economists have similarly found that unregistered shares of securities trading outside the robust disclosure requirements of U.S. securities exchanges are worth less and have limited liquidity relative to their registered or U.S. counterparts.  *See generally* Ex. 26 (Doidge, C. et al., *Why are foreign firms listed in the U.S. worth more?*, 71 J. Fin. Econ. 205, 206, 221, 235 (2004)) (also finding an average valuation premium of 16.5% for foreign firms that cross-list in the U.S. and are subject to stricter reporting requirements, and that "this valuation premium is negatively related to the level of investor protection in" the country).  Academic research also shows that firms that voluntarily commit themselves to increased levels of disclosure had an average reduction in trading costs (as measured by bid-ask spreads) of more than 35%.  *See* Ex. 27 (C. Leuz et al., *The Economic Consequences of Increased Disclosure*, 38 J. Acct. Res. 91, 109, 120-21 (2000) ("firms committing to increased levels of disclosure garner economically and statistically significant benefits" including as a reduction in trading costs).

2.     **Ripple's Failure to Disclose Discounts to Certain XRP Institutional Sales Investors Caused Pecuniary Harm to Other XRP Institutional Sales Investors.**

The principle that non-disclosure resulting from lack of registration leads to investor harm is illustrated here.

Ripple caused pecuniary harm to non-favored investors by conducting Institutional Sales to favored ones in large amounts that were often at deep undisclosed discounts, including those as high as ▮% in 2019 and 2020.  *See* Ex. 15 ¶ 2 (Institutional Sales agreement with ▮% discount).  Had Ripple registered these Institutional Sales, as it was required to, Ripple would have had to disclose these discounts to all Institutional Sales investors.  Specifically, Schedule A under the Securities Act requires disclosure of the "price at which it is proposed that the security shall be offered to the public or the method by which such price is computed and *any variation* therefrom at which any portion of such security is proposed to be offered to any persons or classes of persons."  15 U.S.C. § 77aa(16) (emphasis added); *see also id.* § 77j(a)(1) (requiring registered issuers to provide the information in Schedule A).

Thus, if Ripple was to offer any investor a different price or a discount, it was obligated to first disclose that variation to the public in its registration statement and prospectus.  And Ripple would have been required to do so throughout the duration of its offering.  *See generally* 15 U.S.C. § 77j (requiring issuer to update disclosures when offering continues).  If Ripple had followed the law, prospective investors would have had the information they needed to determine whether Ripple was treating them worse and whether they could purchase the XRP at a better price.  The non-favored XRP Institutional Sales investors could have demanded and potentially paid lower prices than the prices they paid.  But Ripple never filed a registration statement, never provided investors a prospectus, never treated investors uniformly, and appears to have not uniformly disclosed the disparate prices and discounts offered to XRP Institutional Sales investors.

Ripple apparently agrees that Institutional Sales investors may have been able to negotiate better deals if discounts were disclosed as required.  Ripple told the Court that "[r]evelation of the financial terms of its contracts with counterparties and customers … could result in serious damages to Ripple's negotiating position with future counterparties."  ECF No. 744 at 6.  Institutional Sales happen pursuant to those contracts, and discounts are one of the financial terms referenced.  In other words, disclosing discounts would hurt Ripple's ability to negotiate higher prices with others.

Ripple's lack of disclosure thus resulted in pecuniary harm.  For example, in 2018, Ripple made unregistered XRP Institutional Sales with discounts as high as ██%.  Ex. 25 (2018 XRP Institutional Sales); Fox Decl. ¶ 26.  To other 2018 investors, totaling about $██████ in Institutional Sales, it offered discounts of ████ or less.  Ex. 25; Fox Decl. ¶ 26.  In the same year, it offered no discount at all for Institutional Sales transactions that accounted for at least $███████ in sales.  *See* Fox Decl. ¶ 26 ; Ex. 25.  Economists have found that explicit disclosure of pricing disparities for securities, akin to revealing discount information here, narrows price dispersion (that is, the spread of prices in the market) and lowers prices for some buyers.[7]  If Ripple had disclosed to those 2018 investors it was offering significant discounts to other investors, then investors could have demanded and possibly received better terms and paid Ripple dramatically less for XRP.  For example, in 2018 alone, investors could have saved—and thus would have suffered pecuniary harm of—more than $██████ assuming that Institutional Sales investors uniformly received a ██████ discount.  Fox Decl. ¶ 34.  From April 2014 through 2019, Institutional Sales investors could have saved more than $██████ assuming that all investors would have received the highest discount Ripple offered in each of those years.  *Id.*  Due to the ████ discount Ripple offered selectively in late

---

[7] Studies on financial markets show that public disclosure of transaction prices reduces transaction costs imposed by dealers, ultimately benefiting investors.  *See* Ex. 23 (M. Goldstein, *Transparency and Liquidity: A Controlled Experiment on Corporate Bonds*, 20 Rev. Fin. Stud. 235, 237, 269-70 (2007)).

2019-2020, investors could have overpaid, and were thus harmed, up to approximately $██████

for Institutional Sales contracts executed in 2020.  *Id.* ¶¶ 32-34.  In total and using these

assumptions, the pecuniary harm was potentially more than $480 million.  *Id.* ¶ 34.

> 3.    **Ripple's Failure to Disclose Institutional Sales Discounts Caused
>        Pecuniary Harm to XRP Institutional Sales Investors When Those
>        Purchasers Sold Their XRP.**

Relatedly, these sales at discounts put downward pressure on the market price of XRP.

When the investors who received XRP at a discount resold their XRP, they could do so comfortably

at lower-than prevailing market prices and still profit.  The added large supply from a seller with a

lower-than-market cost basis had a dampening effect on the price of XRP and diluted Institutional

Sales investors' capital investment when the investors who purchased at discounted prices sold their

XRP.  *See generally SEC v. Telegram Grp., Inc.*, 448 F. Supp. 3d 352, 372, 380 (S.D.N.Y. 2020) (sales of

crypto asset at "a significant discount to the expected" market price created incentive for purchasers

who bought at a discount to sell into the market, even if the expected market price decreased, and in

fact created an incentive to ensure resale of the asset).

Ripple itself contemporaneously recognized this phenomenon.  In a 2019 internal analysis,

an employee in Ripple's "Institutional Markets" group explained to Ripple's head of XRP markets

that large XRP sales by an Institutional Sales investor (the one to whom Ripple had given ██

discounts, *see* Ex. 15 at ¶ 2) would ██████████████████████ Ex. 20; *see also* Ex. 22 (Dep. Tr.

of Dinuka Samarasinghe) at 208:02-209:10, 213:22-214:20 ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████ Ex. 18 at 4, 7

████████████████████████████████████████; Ex. 19

(Dep. Tr. of Breanne Madigan) at 359:23-362:1 ████████████████████████

████████████████████████████████████████████████████. The

negative effect on XRP's price that Ripple believed was occurring pecuniarily harmed XRP

Institutional Sales investors who sold their XRP at a lower price than the market would have set

under normal circumstances.

     **D.**    **The Court Should Order Ripple to Pay $198,150,940 in Pre-Judgment Interest.**

     The Court has discretion to grant prejudgment interest on the amount to be disgorged.  The

grant of prejudgment interest "is intended to deprive the wrongdoer of the benefit of holding the

illicit gains over time by reasonably approximating the cost of borrowing such gain from the

government."  *SEC v. Contorinis*, 743 F.3d 296, 308 (2d Cir. 2014).  "Because a defendant has use of

the unlawful profits from the time of the wrongdoing until entry of judgment, prejudgment interest

is necessary to capture the full measure of the defendant's ill-gotten gains."  *SEC v. Universal Express,

Inc.*, 646 F. Supp. 2d 552, 566 (S.D.N.Y. 2009) (cleaned up).

     The SEC has calculated the prejudgment interest Ripple would owe on the disgorgement

sought here by applying the IRS yearly underpayment rate to the amount to be disgorged.  *See, e.g.*,

*First Jersey Secs.*, 101 F.3d at 1476-77 (approving of that rate); *Ahmed*, 72 F.4th at 404 (same).  Using

that yearly rate and applying it to Ripple's annual net profits from its Institutional Sales (as detailed

above), from the end of the corresponding year, through April 1, 2024 (months before the

anticipated entry of a final judgment) results in $198,150,940 pre-judgment interest.  Fox Decl.

¶¶ 23-25.a (summary of per year calculation, with tables).

     Accordingly, the Court should order $198,150,940 in prejudgment interest.

## III.   A CIVIL PENALTY EQUAL TO RIPPLE'S ILL-GOTTEN GAINS IS PROPER.

     The Court should impose a significant civil penalty.

A.    **Legal Standard**

Securities Act Section 20(d) authorizes civil penalties.  15 U.S.C. § 77t(d).  Such penalties are "not to exceed the greater of: (i) the gross pecuniary gain to a defendant as a result of the violation, or (ii) a specified amount per violation, depending on whether the violation falls in the first, second or third penalty tier."  *Bajic*, 2023 WL 6289953, at *4.

"Beyond setting maximum penalties, the statute leaves 'the actual amount of the penalty ... up to the discretion of the district court.'"  *SEC v. Razmilovic*, 738 F.3d 14, 38 (2d Cir. 2013) (citations omitted).  The Court can calculate the proper penalty by the gross pecuniary gain method or the per-violation, tier-analysis method.  In doing so, courts note that "[t]he purpose of civil monetary penalties is to punish the individual violator and deter future violations of the securities laws."  *SEC v. Rust*, 2021 WL 2850615, at *3 (S.D.N.Y. July 8, 2021) (cleaned up).

When courts base a penalty on *gross* pecuniary gain, no deductions for expenses are proper. "[B]ecause the civil penalties statutes focus on the *gross* amount of pecuniary gain—as opposed to disgorgement, which is focused on simple gains—defendants are not entitled to deduct money returned to victims.  Otherwise, a defendant who paid back all gains before judgment could practically nullify the statutory penalty."  *SEC v. Amerindo Inv. Advisors Inc.*, 2014 WL 2112032, at *11 (S.D.N.Y. May 6, 2014).  Indeed, "[d]isgorgement alone is an insufficient remedy, since there is little deterrent in a rule that allows a violator to keep the profits if she is not detected, and requires only a return of ill-gotten gains if she is caught."  *SEC v. Inorganic Recycling Corp.*, 2002 WL 1968341, at *4 (S.D.N.Y. Aug. 23, 2002) (Lynch, J.); *see also SEC v. Forest Res. Mgmt. Corp.*, 2010 WL 2077202, at *2 (S.D.N.Y. May 18, 2010) ("because disgorgement represents merely a return of ill-gotten gains, an additional monetary penalty is necessary to appropriately punish and deter" violations of the law).

Whatever calculation method they choose, courts consider the circumstances of a case in determining the amount of the penalty, including:

> (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.

*Rust*, 2021 WL 2850615, at *4 (citing *SEC v. Haligiannis*, 470 F. Supp. 2d 373, 386 (S.D.N.Y. 2007)).

These "*Haligiannis* factors" are not "an exhaustive list … and are not to be taken as talismanic." *SEC v. Rajaratnam*, 918 F.3d 36, 45 (2d Cir. 2019).  In particular, the Second Circuit has had "no hesitation in concluding that, in calculating the size of a penalty necessary to deter misconduct, the extent of a defendant's wealth is a relevant consideration.  A fine that would be significantly painful to a person of modest means might be a mere slap on the wrist or 'cost of doing business' to a wealthier offender," even if that wealth were otherwise "earned legitimately." *Id.* Moreover, a defendant's "penchant for 'blaming others, including the SEC for his own conduct,'" also justifies significant civil penalties.  *SEC v. Coates*, 137 F. Supp. 2d 413, 430 (S.D.N.Y. 2001).

**B.     Given The Egregiousness of Ripple's Misconduct, the Strong Need for Deterrence, and Ripple's Unique Financial Condition, a Significant Civil Penalty is Warranted.**

The relevant factors support a large civil penalty against Ripple.  Although the statute permits a penalty equal to the *gross* pecuniary gain (here $991,212,963), the SEC believes that a penalty equal to the total disgorgement the SEC has calculated (here $876,308,712) is enough to serve the statute's punitive and deterrent goals.[8]

---

[8] A similarly sizeable penalty would be warranted under the tier-analysis method.  The second tier applies when, as here, a defendant committed a violation with reckless disregard for a regulatory requirement. *See Bajic*, 2023 WL 6289953, at *4 (citing 15 U.S.C. § 77t(d)(2)).  The maximum penalty in that circumstance, for most of the violations here, is $576,158 per violation.  *See* Adjustments to Civil Monetary Penalty Amounts, 2024 WL 111023, at *2-3 (SEC Rel. No. 6521 Jan. 5, 2024) (penalties for post November 2015 violations).  In counting violations based on a tier-analysis, courts have used various methods, including counting the number of violative transactions.  *See, e.g.*, *SEC v. Pentagon Cap. Mgmt. PLC*, 725 F.3d 279, 288 n.7 (2d Cir. 2013) ("no error in the district court's methodology for calculating the maximum penalty by counting each late trade as a separate violation"); *SEC v. Colonial Inv. Mgmt. LLC.*, 381 F. App'x 27, 32 (2d Cir. 2010) (summary order)

The SEC has established above that *Haligiannis* factors (1), (2), and (4) are fully satisfied here. *See supra* § I.B.  For factor (3), courts in this District consider not just actual losses but the risk of losses to other "persons."  *See SEC v. Tourre*, 4 F. Supp. 3d 579, 593 (S.D.N.Y. 2014).  As noted above, *see supra* § II.C, Ripple's conduct caused pecuniary harm to certain Institutional Sales investors.  Nor can there be any doubt that by selling XRP in Institutional Sales without providing the information required by the federal securities laws, Ripple created at least a *risk* that investors deprived of that information would lose money.  *See generally* § II.C.  The securities laws' registration and disclosure provisions were crafted with precisely those risks at mind, and to mitigate them.

As for factor (5), Ripple will be unable to argue that its financial condition warrants a reduction.  To the contrary, under the principles the Second Circuit explained in *Rajaratnam*, Ripple's considerable wealth warrants a significant penalty that is not just a "slap on the wrist" or "cost of doing business."  *Rajaratnam*, 918 F.3d at 45.  In this regard, not only are Ripple's approximate █ █ in current assets held as of December 31, 2023 relevant, *see* Ex. 14 at 1, so are its vast amounts of XRP holdings (around 45 billion units, Ex. 3 at 7, worth more than $27 billion at March 22, 2024's XRP price per *www.coinmarketcap.com*).  While the penalty the SEC requests is no doubt large, so is the enormous wealth of a defendant that is before the Court having been found to have violated the bedrock provision of the federal securities laws over the course of eight years.

Finally, Ripple's penchant for continuing to deflect blame for its own conduct supports a hefty civil penalty.  *See Coates*, 137 F. Supp. 2d at 430.  Here, rather than correct its violations by providing disclosure, Ripple has chosen to avoid disclosure while deflecting blame for this conduct

---

(affirming penalty of $25,000 for each of the defendant's eighteen violative transactions); *SEC v. Alpine Sec. Corp.*, 413 F. Supp. 3d 235, 244-45, 250 n.27 (S.D.N.Y. 2019) (counting each of the 2,720 failures to make certain regulatory filings as separate violations).  Here, as noted, Ripple's Institutional Sales involved "more than 1,700 relevant contracts," Defs. 56.1 ¶ 105 & n.3, ECF No. 826, most of which were entered into after April 1, 2014, the applicable limitations period.

to the SEC.  *See* Ex. 1 at 2; *see also* Ex. 3 (Q4 2023 XRP Markets Report not providing the information); Ex. 8 (Aug. 2, 2023 tweet) (Ripple CEO blaming the SEC for Ripple's decision to provide less information).

The SEC asks the Court to consider the severity and pervasiveness of Ripple's misconduct, and the need to send a strong deterrent message to Ripple and others considering whether to raise capital by selling securities to the public in unregistered transactions involving crypto assets.

In the wake of the Great Depression, Congress enacted the federal securities laws with Section 5's registration and disclosure provision as the key to that statutory structure.  *See* Franklin D. Roosevelt, *Statement on Signing the Securities Bill* (May 27, 1933) *available at https://www.presidency.ucsb.edu/documents/statement-signing-the-securities-bill* ("the Federal Government will insist upon knowledge of the facts on which alone [an investor's investment] judgment can be based").  As the Supreme Court has accordingly recognized, "[t]he fundamental purpose undergirding the Securities Acts is 'to eliminate serious abuses in a largely unregulated securities market.'"  *Reves v. Ernst & Young*, 494 U.S. 56, 60 (1990) (quoting *United Hous. Foundation, Inc. v. Forman*, 421 U.S. 837, 849 (1975)).  And what Ripple considers damaging to its own financial interests—"full and fair disclosure of information to the public in the sales of securities," *Pinter v. Dahl*, 486 U.S. 622, 646 (1988)—Congress has made the tentpole of our markets.

Ripple's behavior here strikes at the core of the need for securities transactions to be registered and full and fair disclosure provided.  If companies can raise money with the ease that Ripple did—by simply receiving billions of units of computer code that cost little to nothing to create and then turning it into billions of dollars, without registering these transactions with the SEC and providing the requisite disclosures—the legal structure underpinning our financial markets will be jeopardized.  The SEC asks the Court to consider how easily actors, particularly in the crypto asset space, can today engage in the same sort of conduct as Ripple's, and send a strong message

that such abuses will not be tolerated.  Without the strong remedial sanctions requested by the SEC,

companies raising capital from the public could be encouraged to violate Section 5 as a mere "cost

of doing business." *Rajaratnam*, 918 F.3d at 45.  The Court's message should be unequivocal: "those

who seek the use of the money of others on the promise of profits," *SEC v. W.J. Howey Co.*, 328 U.S.

293, 299 (1946), must comply with the federal securities laws.

## CONCLUSION

For these reasons, the Court should grant the relief set forth above and enter the Proposed

Final Judgment as a Final Judgment.

Dated:  New York, New York
        March 22, 2024

                                            Respectfully submitted,

                                    By:     _____
                                            Jorge G. Tenreiro
                                            Benjamin L. Hanauer
                                            Marc Jones
                                            Peter B. Moores

                                            *Attorneys for Plaintiff*
                                            U.S. Securities and Exchange Commission
                                            New York Regional Office
                                            100 Pearl Street, Suite 20-100
                                            New York, New York 10281
                                            Tel: (212) 336-9145 (Tenreiro)

26