**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

RIPPLE LABS INC., BRADLEY
GARLINGHOUSE, and CHRISTIAN A.
LARSEN,

Defendants.

Case No. 20-CV-10832 (AT) (SN)

**PUBLIC VERSION**

**DEFENDANT RIPPLE LABS INC.'S OPPOSITION TO**
**PLAINTIFF'S MOTION FOR REMEDIES AND ENTRY OF FINAL JUDGMENT**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................... 1

ARGUMENT ............................................................................................................... 2

I.    THE SEC FAILS TO SHOW THAT ANY INJUNCTION IS WARRANTED ............... 2

    A.    The SEC Fails to Establish a Reasonable Likelihood of Future Violations ............... 2

    B.    The SEC Fails to Show That an Injunction Is Needed ............................................. 10

    C.    Any Injunctive Relief Should Be Narrow and Tailored .......................................... 16

II.   THE SEC FAILS TO SHOW THAT ANY DISGORGEMENT IS WARRANTED ...... 18

    A.    *Govil* Bars Disgorgement Because the SEC Cannot Show Pecuniary Harm ........... 18

    B.    Alternatively, *Liu* Requires That Ripple's Legitimate Business Expenses Be
        Deducted from Any Disgorgement Award ............................................................. 21

III.  ANY CIVIL PENALTY SHOULD NOT EXCEED $10 MILLION ............................. 26

    A.    The Relevant Factors Counsel a Low Penalty, Not a High One ............................. 26

    B.    Comparison to Previous Digital Asset Cases Supports a Penalty Far Lower
        than the SEC's Unreasonable $876 Million Request ............................................. 29

CONCLUSION ............................................................................................................ 30

# TABLE OF AUTHORITIES

**CASES**                                                       **Page(s)**

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
  677 F.3d 60 (2d Cir. 2012) ........................................................... 8

*ASPCA v. Animal & Plant Health Inspection Serv.*,
  60 F.4th 16 (2d Cir. 2023) ........................................................... 16

*Arthur Lipper Corp. v. SEC*,
  547 F.2d 171 (2d Cir. 1976) ......................................................... 2

*Barlas v. United States*,
  279 F. Supp. 2d 201 (S.D.N.Y. 2003) ........................................... 14

*In re Block.one*,
  SEC Rel. No. 33-10714, 2019 WL 4793292 (Sept. 30, 2019) ........... 29, 30

*In re BlockFi Lending LLC*,
  SEC Rel. No. 33-11029, 2022 WL 462445 (Feb. 14, 2022) ............... 30

*Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*,
  843 F.3d 48 (2d Cir. 2016) ........................................................... 17

*Ezekiel v. Volusia S.S. Co.*,
  297 F.2d 215 (2d Cir. 1961) ......................................................... 14

*Finkel v. Stratton Corp.*,
  962 F.2d 169 (2d Cir. 1992) ......................................................... 25

*Forschner Grp., Inc. v. Arrow Trading Co.*,
  124 F.3d 402 (2d Cir. 1997) ......................................................... 17

*Hecht Co. v. Bowles*,
  321 U.S. 321 (1944) ..................................................................... 3

*Liu v. SEC*,
  591 U.S. 71 (2020) ........................................................ 18, 21, 22, 24

*Mull v. Ford Motor Co.*,
  368 F.2d 713 (2d Cir. 1966) ......................................................... 14

*Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*,
  763 F.3d 198 (2d Cir. 2014) ......................................................... 8

*Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*,
  317 F.3d 209 (2d Cir. 2003) ......................................................... 17

*Providence Rubber Co. v. Goodyear*,
  76 U.S. (9 Wall.) 788 (1869) ................................................................ 21

*Radiation Dynamics, Inc. v. Goldmuntz*,
  464 F.2d 876 (2d Cir. 1972) ................................................................ 25

*Root v. Lake Shore & M.S. Ry. Co.*,
  105 U.S. 189 (1881) ................................................................ 21

*S.C. Johnson & Son, Inc. v. Clorox Co.*,
  241 F.3d 232 (2d Cir. 2001) ................................................................ 16

*Schwab v. E\*TRADE Fin. Corp.*,
  258 F. Supp. 3d 418 (S.D.N.Y. 2017) ................................................................ 11

*SEC v. Ahmed*,
  72 F.4th 379 (2d Cir. 2023) ................................................................ 19

*SEC v. Alpine Sec. Corp.*,
  413 F. Supp. 3d 235 (S.D.N.Y. 2019) ................................................................ 10

*SEC v. Am. Bd. of Trade, Inc.*,
  751 F.2d 529 (2d Cir. 1984) ................................................................ 2, 3, 13

*SEC v. Bausch & Lomb, Inc.*,
  565 F.2d 8 (2d Cir. 1977) ................................................................ 2

*SEC v. Cavanagh*,
  155 F.3d 129 (2d Cir. 1998) ................................................................ 2, 3, 10

*SEC v. Commonwealth Chem. Sec., Inc.*,
  574 F.2d 90 (2d Cir. 1978) ................................................................ 2, 3

*SEC v. Contorinis*,
  743 F.3d 296 (2d Cir. 2014) ................................................................ 21

*SEC v. Digit. Licensing Inc.*,
  2024 WL 1157832 (D. Utah Mar. 18, 2024) ................................................................ 16

*SEC v. Goble*,
  682 F.3d 934 (11th Cir. 2012) ................................................................ 16

*SEC v. Govil*,
  86 F.4th 89 (2023) ................................................................ 18, 19, 20

*SEC v. Grenda Grp., LLC*,
  621 F. Supp. 3d 406 (W.D.N.Y. 2022) ................................................................ 10

*SEC v. Haligiannis*,
   470 F. Supp. 2d 373 (S.D.N.Y. 2007)................................................................... 27

*SEC v. LBRY, Inc.*,
   2023 WL 4459290 (D.N.H. July 11, 2023) .......................................................... 11

*SEC v. Liu*,
   2021 WL 2374248 (C.D. Cal. June 7, 2021) ....................................................... 24

*SEC v. Monarch Fund*,
   608 F.2d 938 (2d Cir. 1979)................................................................................ 13

*SEC v. Nat'l Student Mktg. Corp.*,
   457 F. Supp. 682 (D.D.C. 1978) ......................................................................... 13

*SEC v. Parklane Hosiery Co.*,
   422 F. Supp. 477 (S.D.N.Y. 1976) ...................................................................... 13

*SEC v. Rajaratnam*,
   918 F.3d 36 (2d Cir. 2019)............................................................................ 27, 29

*SEC v. Stubos*,
   634 F. Supp. 3d 174 (S.D.N.Y. 2022)................................................................... 2

*SEC v. Telegram Grp. Inc.*,
   448 F. Supp. 3d 352 (S.D.N.Y. 2020)............................................................ 29, 30

*SEC v. Tourre*,
   4 F. Supp. 3d 579 (S.D.N.Y. 2014).................................................................. 2, 16

*SEC v. Westport Cap. Mkts., LLC*,
   547 F. Supp. 3d 157 (D. Conn. 2021)................................................................... 3

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)............................................................................................ 11

*Tilghman v. Proctor*,
   125 U.S. 136 (1888)............................................................................................ 21

*Wickham Contracting Co. v. Loc. Union No. 3, Int'l Bhd. of Elec. Workers*,
   955 F.2d 831 (2d Cir. 1992)........................................................................... 21, 23

## STATUTES

15 U.S.C. § 77t.................................................................................................... 26

**RULES AND REGULATIONS**

17 C.F.R. § 230.501 ................................................................................................... 8

17 C.F.R. § 230.506 ................................................................................................. 17

**OTHER AUTHORITIES**

Restatement (Third) of Restitution and Unjust Enrichment § 51 ................................. 23

## PRELIMINARY STATEMENT

The remedies in this case should reflect its facts. Ripple is a 12-year-old financial technology company that has played a key role in developing innovative technologies that use the open-source XRP Ledger blockchain. Its On-Demand Liquidity ("ODL") service generates real value by making cross-border payments faster, more transparent, and more cost-effective. This Court has ruled that Ripple violated Section 5 of the Securities Act, a strict liability statute, by offering certain sophisticated investors investment contracts related to the digital asset XRP. Ripple has publicly acknowledged that ruling, and does so again now. It has changed the way it sells XRP and changed its contracts to avoid the problems identified by this Court. It has ensured that its counterparties qualify as accredited investors. And its subsidiaries have obtained licenses to sell XRP as a digital currency outside the United States, under the supervision of regulators who do not treat XRP sales as sales of securities. Those appropriate responses to this Court's ruling provide reasonable assurance that the violation will not recur.

The SEC's remedial requests are more evidence of the administrative overreach that has beset this case. The agency acts as though it had prevailed entirely and had proved reckless conduct. It has done neither. The Court ruled that most of Ripple's pre-Complaint XRP sales were lawful. When it brought this action, the SEC did not even allege that Ripple itself acted recklessly. It did make such allegations against Ripple's Chairman and CEO, but abandoned any attempt to prove them to a factfinder. Yet the agency now urges this Court to find Ripple reckless at the penalty stage and to issue an injunction based on mere speculation that Ripple may break the law in the future. The agency also seeks disgorgement barred by controlling Supreme Court and Circuit precedent and a separate penalty that exceeds by more than 20 times what it has obtained from any other defendant or respondent in a digital-asset case.

This Court's ruling has provided welcome clarity and guidance about the ways in which Ripple can lawfully distribute XRP.  Ripple has every intent of adhering to that guidance in the future and every incentive to do so.  The SEC's draconian remedial requests are ungrounded in law or principle.  This Court should reject them in their entirety.

## ARGUMENT

## I.   THE SEC FAILS TO SHOW THAT ANY INJUNCTION IS WARRANTED

### A.   The SEC Fails to Establish a Reasonable Likelihood of Future Violations

#### 1.   The SEC Has the Burden to Come Forward With Positive Proof that Ripple Will Likely Violate the Law in the Future

Injunctive relief serves "to prevent threatened future harm."  *Arthur Lipper Corp. v. SEC*, 547 F.2d 171, 180 n.6 (2d Cir. 1976); *SEC v. Stubos*, 634 F. Supp. 3d 174, 191-92 (S.D.N.Y. 2022) (collecting cases).  It is "well settled" that the SEC "cannot obtain [injunctive] relief without positive proof of a reasonable likelihood that past wrongdoing will recur."  *SEC v. Am. Bd. of Trade, Inc.*, 751 F.2d 529, 537 (2d Cir. 1984) (quoting *SEC v. Bausch & Lomb, Inc.*, 565 F.2d 8, 18 (2d Cir. 1977)); *see also SEC v. Cavanagh*, 155 F.3d 129, 135 (2d Cir. 1998) ("The SEC must demonstrate that there is a substantial likelihood of future violations of illegal securities conduct."); *SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 100 (2d Cir. 1978) ("Our recent decisions have emphasized . . . the need for the SEC to go beyond the mere facts of past violations and demonstrate a realistic likelihood of recurrence.").

The SEC stresses (at 3-10)[1] the "*Cavanagh* factors," which include:

the fact that the defendant has been found liable for illegal conduct; the degree of scienter involved; whether the infraction is an "isolated occurrence;" whether defendant continues to maintain that his past conduct was blameless; and whether,

---

[1] Parenthetical references to the SEC's contentions or citations to "SEC Mem." refer to the SEC's Memorandum of Law, filed publicly at ECF No. 949.

> because of his professional occupation, the defendant might be in a position
> where future violations could be anticipated.

155 F.3d at 135 (quoting *Commonwealth Chem.*, 574 F.2d at 100).  Those factors are relevant

only so far as they show a likelihood of future violations.  They are not ends in themselves.  *E.g.*,

*SEC v. Westport Cap. Mkts., LLC*, 547 F. Supp. 3d 157, 166 (D. Conn. 2021) (denying SEC

request for injunction based on fraud that persisted for "several years" and involved "willfully

. . . false" statements because conduct was unlikely to recur) (citation omitted).  An injunction in

an SEC enforcement action remains subject to the principles governing "[t]he historic injunctive

process," including "the power of the Chancellor to do equity and to mould each decree to the

necessities of the particular case," to act with "[f]lexibility rather than rigidity," and to "adjust[]

and reconcil[e] . . . the public interest and private needs."  *Am. Bd. of Trade*, 751 F.2d at 543

(quoting *Hecht Co. v. Bowles*, 321 U.S. 321, 329-30 (1944)).

 Equity and flexibility are important here.  The Court agreed with the SEC that Ripple's

pre-Complaint Institutional Sales violated Section 5, but agreed with Ripple that Ripple's

Programmatic Sales and Other Distributions did not.  Ripple accepts that ruling (reserving its

appellate rights, as does the SEC).  It has changed the way it sells XRP and changed its contracts

to avoid any future violation.  The SEC's arguments that Ripple should be enjoined rest on

unsupported contentions (at 4, 6) that Ripple "reckless[ly] disregard[ed]" Section 5 or has not

"accepted responsibility."  Yet the SEC would hardly say that its own Complaint recklessly

disregarded the law, even though the Court has rejected the agency's positions on Programmatic

Sales and Other Distributions just as it has rejected Ripple's position on Institutional Sales.

In support of this opposition, Ripple is submitting the Declaration of Monica Long, Ripple's President.  Ex. A ("Long Decl.").[2]  The Long Declaration gives historical context for Ripple's Institutional Sales before this Court's summary judgment ruling, *see infra* Part I.A.2; and describes steps that Ripple has taken to avoid future violations, *see infra* Part I.A.3.

### 2. Ripple's Institutional Sales Before the Court's Ruling Did Not Show Reckless Disregard for the Law

When Ripple was founded in 2012, there was widespread uncertainty about how the law would apply to digital assets.  In 2014, a GAO report to Congress on virtual currency stated that "federal agencies' responsibilities with respect to virtual currency [we]re still being clarified" and cited XRP as a "prominent example[ ]" of a "decentralized" "virtual currenc[y]."  ECF No. 830-38 (RPLI_SEC 1079990), at 004-005.  That report (on which the SEC commented) discusses SEC jurisdiction over "virtual-currency-related securities," but does not suggest that Ripple – or any other digital-asset company – was selling regulated investment contracts.  *Id.* at 010.

Ripple sought advice from respected law firms on how to comply with applicable laws when selling XRP.  One 2012 memorandum noted "the lack of applicable case law."  ECF No. 846-30 (RPLI_SEC 0099462), at 466.  It nevertheless suggested steps Ripple could take to avoid running afoul of the federal securities laws and of other laws governing payment transactions. Ripple took such steps.  *See id.*; *see also* ECF No. 827-8 (Larsen Dep. Tr.) 252:19-253:15.[3] Three years later, another firm advised that "XRP does not appear to be a security under the

---

[2] Citations to "Ex." refer to the exhibits attached to the Declaration of Gregory G. Rapawy filed in support of this opposition.

[3] The SEC (at 4) points to the 2012 memorandum, but then cites this Court's summary judgment opinion to suggest that Ripple disregarded it.  To the contrary, the Court determined that Defendants' evidence, if credited, would show they did not act recklessly, including testimony that "Ripple took specific steps to ensure compliance with the advice contained within the [law firm's] memorandum."  ECF No. 874 ("SJ Order") at 32.

*Howey* test" and was "unlikely to be deemed a security under either federal or state law."  ECF No. 847-2 (RPLI_SEC 1002117), at 121, 123.  That firm noted that "the [SEC] has not taken a public position on whether virtual currencies are securities within the meaning of federal securities law," but observed that "the treatment to date suggests that the SEC views virtual currencies as more akin to commodities than securities."  *Id*. at 125.

Ripple voluntarily gave the SEC information about its business in 2013, *see, e.g.*, ECF No. 830-52 (SEC Answer to RFA No. 490), at 75; ECF No. 831-28 (Larsen Decl. (Oct. 18, 2022)), ¶ 4; ECF No. 831-39 (RPLI_SEC 0530419), years before the agency first suggested an inquiry into Ripple's conduct in 2018.  Long Decl. ¶ 20.  In 2019, Ripple voluntarily halted nearly all XRP sales, attempting to cooperate with the SEC and reach an agreement.  *Id.* ¶ 21.  In 2020, Ripple began making ODL Sales, in which it sells XRP to be used as a bridge currency in cross-border transactions.  *Id.* ¶¶ 8, 23.  Before those sales, Ripple disclosed to the SEC its intent to do so.  *Id*.  Ripple had an objectively reasonable basis to believe that ODL Sales are not investment contracts.  Ripple's counterparties ("ODL Buyers") hold XRP so briefly that they cannot reasonably expect to profit from any increase in value, and Ripple's ODL agreements prevent them from doing so.  *Infra* p. 7.

Ripple's interactions with other regulators further show its reasonable attempts to follow the law.  In 2013, Ripple registered its main XRP-selling subsidiary as a "money services business" with the U.S. Treasury's Financial Crimes Enforcement Network ("FinCEN").  Long Decl. ¶ 17(a).  In 2015, a Ripple subsidiary applied for a virtual currency license with the New York Department of Financial Services (a "BitLicense") just two months after the BitLicense regulatory regime was created.  *Id.* ¶ 17(b).  It became the fourth company to receive a

BitLicense, and the first licensed for "an institutional use case [for] digital assets."[4]  As of today,

that subsidiary is licensed as a money transmitter in 37 U.S. states and territories, with eight

more applications pending.  Long Decl. ¶ 17(b).

Ripple's reasonable basis to believe that its sales in the United States were not sales of

securities was also supported by regulatory actions in other major foreign jurisdictions.  For

example, by 2019, Japanese law recognized XRP as a "Virtual Currency" and not as a security.[5]

By mid-2020, Singaporean law recognized XRP as a "digital[] token" that could be used as part

of a "[d]igital payment token service."[6]  *See also* SJ Order 31-32 (discussing testimony).[7]

### 3. Ripple's ODL Sales After the Court's Ruling Do Not Show Disregard for the Law

Ripple has taken measures since the Court's ruling to avoid future violations of the

securities laws.  *First*, Ripple's sales of XRP under contracts signed since the ruling have been

---

[4] Ripple, *Ripple Receives New York's First BitLicense for an Institutional Use Case of Digital Assets* (June 13, 2016), https://perma.cc/RQB2-JXG8; Press Release, NYDFS, *DFS Grants Virtual Currency License to XRP II, LLC, an Affiliate of Ripple* (June 13, 2016), https://perma.cc/DCN6-2VTT.

[5] Ex. B, T. Awataguchi et al., "Japan," *Blockchain & Cryptocurrency Regulation* 349-358, 352, 354 (1st ed. 2019) (explaining that "XRP" is considered a "Virtual Currency" under Japanese law and that "Virtual Currencies[] do not fall within the definition of 'Securities' under the Financial Instruments and Exchange Act of Japan").

[6] Ex. C, Monetary Authority of Singapore, *Payment Services Act 2019 (Act 2 of 2019): Guidelines on Licensing for Payment Service Providers* 15 (as amended July 3, 2020) (referring to "Ripple" as a recognized "digital token" that does not require a new "supporting legal opinion" to be used as part of a "[d]igital payment token service").

[7] More recently, the United Kingdom and the Dubai International Financial Centre have each determined that sales of XRP are not sales of securities.  *See* Ex. D, HM Treasury, *UK regulatory approach to cryptoassets and stablecoins: Consultation and call for evidence* 5 (Jan. 2021); Ex. E, *DIFC Champions Dubai as a Global Crypto Hub with Approval of XRP Under its Virtual Assets Regime*, BUSINESSWIRE (Nov. 2, 2023).

limited to ODL Sales. Long Decl. ¶¶ 8, 9(c).[8] ODL is a software product that uses the inherent properties of XRP – fast settlement and low transaction costs – to settle customers' cross-border transactions in nearly real time. *Id.* ¶ 23. ODL is much faster than traditional cross-border payment methods and works when traditional payment services like banks are closed. *Id.* The XRP used in ODL transactions acts as a bridge currency between two fiat currencies. *Id.* For example, an ODL Buyer who wants to exchange Euros for Australian dollars purchases XRP with Euros and sells XRP for Australian dollars, converting one fiat currency to another almost instantly. *Id.* ¶ 24. ODL Buyers are mostly licensed financial institutions such as remittance companies. *Id.* ¶ 25.

ODL Buyers hold purchased XRP for mere seconds. *Id.* ¶ 27. Ripple's ODL contracts protect Buyers from losses – and prevent them from earning profits – due to even momentary volatility in the price of XRP. *Id.* They buy XRP solely to use for ODL transactions. *Id.* ¶ 26(a). ODL contracts do not contain provisions that this Court has found show an intent to invest, such as lock-up periods, resale restrictions, and discounts. *Id.* ¶ 28.

*Second*, most of Ripple's ODL business is outside the United States – primarily, between its Singapore subsidiary and foreign counterparties. *Id.* ¶¶ 31, 34, 36-38. Ripple's Singaporean contracts are made by a Singaporean subsidiary and governed by Singaporean law. *Id.* ¶ 32. They are supervised by a Singaporean regulator, which has licensed Ripple's subsidiary to sell XRP to ODL customers. *Id.* ¶ 31.[9] Ripple's remaining ODL business in the United States uses a non-XRP bridge currency. *Id.* ¶ 38. Even if today's ODL contracts otherwise met this Court's

---

[8] Ripple could also lawfully sign other contracts for Institutional Sales by registering those particular contracts as securities, by taking advantage of an applicable exemption, or by ensuring that all transactions are extraterritorial and permitted under governing law.

[9] Ripple's affiliated entities are currently pursuing more financial services registrations and license applications in jurisdictions where they are seeking to do business. Long Decl. ¶ 18.

criteria for investment contracts (which they do not), those foreign contracts would not violate U.S. securities laws. *See Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 62 (2d Cir. 2012) (holding that securities transactions are not domestic unless "irrevocable liability was incurred or . . . title was transferred within the United States"); *see also Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 215-16 (2d Cir. 2014) (holding that "conduct that occurred in a foreign country, concerning securities in a foreign company, traded entirely on foreign exchanges" was "so predominantly foreign" as to be "extraterritorial").[10]

*Third*, since the Court's decision, Ripple has ensured that all new ODL customers have at least $5 million in total assets, Long Decl. ¶ 39, so that they are "accredited investor[s]" under 17 C.F.R. § 230.501(a)(3). To be clear, Ripple is not selling and does not intend to sell securities to ODL Buyers. Nevertheless, the potential availability of exemptions to registration for accredited investors (including under Section 4(a)(2) of the Securities Act) provides added assurance that Ripple's ODL Sales are lawful and do not threaten the public with harm.

*Fourth*, Ripple has not distributed since at least 2016 the brochures that this Court found gave rise to an expectation of profit. Long Decl. ¶ 10. It has communicated to all necessary Ripple officers and employees its intent to comply with this Court's ruling. *Id.* ¶ 14; Ex. F (Feb. 7, 2024 email to Ripple leadership discussing ruling and related compliance policies).

---

[10] To the extent the SEC may contend that XRP sold though Singaporean ODL contracts may ultimately make its way back to the United States, that cannot show a violation. *First*, under this Court's ruling, "XRP, as a digital token, is not in and of itself . . . an investment contract." SJ Order 15. Rather, the investment contract is defined by "the totality of circumstances surrounding [a] . . . transaction[] [or] scheme[] involving the sale and distribution of XRP." *Id.* An ODL contract is a bilateral agreement with a non-assignment clause. Long Decl. ¶ 33. It cannot flow back to the United States. *Second*, the Court has rejected the SEC's theory that Institutional Buyers of XRP act as underwriters. SJ Order 22 n.15. Accordingly, sales of XRP by an ODL Buyer or another downstream holder of XRP are not sales by Ripple and cannot be violations by Ripple.

The SEC asserts (at 1) that Ripple's ongoing ODL Sales "*seem*[ ]" to be "*akin* to Institutional Sales.*" (emphases added).  Mere apparent resemblance does not warrant an injunction.  In any event, the SEC's assertion is inaccurate, because Ripple's ongoing ODL Sales do not have the key characteristics that this Court relied on in finding that Ripple's Institutional Sales were sales of investment contracts.  *Supra* p. 7.  The SEC also quotes (at 9) this Court's summary judgment ruling, which cited an SEC definition of "Institutional Sales" as including sales to "ODL customers."  SJ Order 4.  The Court did say that, and Ripple has not challenged the inclusion of pre-Complaint ODL Sales in the category of Institutional Sales for disgorgement or penalty purposes.[11]  But neither party briefed the issue in detail, and as a result the Court did not analyze the facts and circumstances that surround ODL Sales.[12]  Remedies briefing is not the time or place to do so.  What matters is that Ripple has given the Court reasonable assurances that its current conduct complies with the law, and its future conduct will continue to do so.  It has not shown reckless disregard for the law.

---

[11] Although Ripple's subsidiaries began ODL Sales before the SEC filed its Complaint, the number of counterparties and sales was small:  three ODL contracts, only two of which had resulted in actual ODL Sales.  Long Decl. ¶ 29.

[12] The SEC itself has acknowledged that ODL Buyers did not buy to invest.  In its 56.1 Statement, the SEC stated that ODL Buyers sold XRP "immediately" to avoid "any economic exposure to XRP"; and that the "risk teams" for ODL Buyers did not "want . . . to hold XRP on their balance sheets" and instead "want[ed] to immediately sell XRP."  ECF No. 838, ¶¶ 787-788.  For its part, Ripple disputed the SEC's averments that ODL purchases should be counted as Institutional Sales.  *See* ECF No. 835, ¶¶ 716, 817, 820, 822, 826 (disputing SEC's inclusion of "ODL-related sales" as "Institutional Sales").  Indeed, the SEC contradicted itself elsewhere, arguing that "ODL contracts are just another iteration of Ripple's Programmatic Sales" or a "replace[ment]" for "Programmatic Sales."  ECF No. 730, at 46; ECF No. 837, at 65.

### B.    The SEC Fails to Show That an Injunction Is Needed

#### 1.    The SEC Errs in Contending that a Mere Possibility of Future Violations is Enough for Injunctive Relief

The SEC initially acknowledges (at 3) that an injunction requires a "reasonable likelihood . . . [of] future violations."  Later (at 10) it incorrectly asserts that "[a]ll that matters[] . . . is that Ripple's status and business activities have not changed such that it is in a position where more violations are *possible*."  The SEC purports to find this standard in the fifth *Cavanagh* factor, which it partially quotes (at 3) as "whether . . . the defendant might be in a position where future violations could be anticipated."  155 F.3d at 135 (alteration by SEC; citation omitted).  But courts do not grant injunctions because of mere possibility.

The SEC's editing of *Cavanagh* leaves out important words.  The full language reads: "whether, *because of his professional occupation*, the defendant might be in a position where future violations could be anticipated."  155 F.3d at 135 (emphasis added; citation omitted). That is, courts more readily enjoin securities industry participants such as "a lawyer specializing in securities transactions," *id.* at 135; "registered investment advisers," *SEC v. Grenda Grp., LLC*, 621 F. Supp. 3d 406, 411 (W.D.N.Y. 2022); or a "broker-dealer," *SEC v. Alpine Sec. Corp.*, 413 F. Supp. 3d 235, 251 (S.D.N.Y. 2019), *aff'd*, 982 F.3d 68 (2d Cir. 2020).  That reasoning does not apply here.  Ripple is not a securities industry participant, does not want to sell securities, and can sell XRP in ways that do not implicate the securities laws.

#### 2.    The SEC Offers No Evidence That Ripple Knowingly or Recklessly Violated the Law

Throughout this case, the SEC has relied on the strict liability nature of its claim against Ripple – including in the very first sentence of its summary judgment brief.  *See* ECF No. 730, at 1; *see also*, *e.g.*, ECF No. 205, at 1 (arguing that because "Section 5 is a strict liability offense[] . . . [Ripple's] intent or the reasonableness of its conduct is irrelevant"); ECF No. 299, at 1

("Section 5 is a strict liability offense such that the SEC need not prove scienter or negligence.") (cleaned up); ECF No. 573, at 9 (similar).  On summary judgment, the Court decided the strict liability Section 5 claims, but required the SEC to prove at trial its allegations that the Individual Defendants had a culpable mental state.  SJ Order 30-33.  The agency promptly stipulated to the dismissal of all claims that would require it to do so.  *See* ECF No. 919.  Yet it now seeks to argue recklessness at the penalty stage.

The SEC's account of the state-of-mind evidence is partial and misleading.  The agency mischaracterizes (at 2, 4) both the part of this Court's summary judgment order that discussed two memoranda opining on XRP sales, and the memoranda themselves.  As the Court's order explains, the October 2012 memorandum (1) describes a "compelling argument" that XRP tokens are not securities; (2) assesses as "small" the risk that the agency would "disagree[ ]"; and (3) notes that the risk that "the SEC w[ould] take action" would increase if Ripple were to "promote [XRP] as an investment opportunity."  SJ Order 8 (quoting ECF No. 846-30, at 6).  Read as a whole, the memorandum advised on how to minimize the risk of the SEC taking enforcement action against lawful XRP sales.  That is why the Court treated the memorandum as evidence supporting the Individual Defendants' contention that they did not act recklessly.  *Id.* 31-32.  The SEC also fails to address the 2015 memorandum from a second firm advising that "XRP does not appear to be a security."  *Supra* pp. 4-5.[13]

The SEC misplaces reliance on *SEC v. LBRY, Inc.*, 2023 WL 4459290 (D.N.H. July 11, 2023).  Nothing in *LBRY* resembles the facts here that weigh against an inference of scienter:

---

[13] The SEC also fails to establish Ripple's scienter by arguing (at 4) that Ripple acted for "personal financial gain" (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 325 (2007)).  A "generic profit motive . . . is insufficient to establish scienter."  *Schwab v. E*TRADE Fin. Corp.*, 258 F. Supp. 3d 418, 435 (S.D.N.Y. 2017).

here there were "multiple foreign regulators . . . [who] had determined that XRP was not a security," SJ Order 31-32; statements by DOJ and FinCEN that XRP was a "virtual currency," which Ripple reasonably understood to cut against treating XRP as a security, *id.* at 32; advice from reputable law firms, *id.*; testimony that the Individual Defendants "did not believe that the proceeds from [XRP] were pooled and understood that Ripple did not manage, operate, or control the XRP Ledger or the broader 'XRP ecosystem,' " *id.*; and the Court's rejection of claims that Ripple's Programmatic Sales and Other Distributions violated the law, *id.* at 22-27.[14]

### 3.  Ripple's Mere Ownership of XRP is Irrelevant

The SEC errs in contending (at 8) that Ripple is "incentivized" to violate Section 5 because it "still holds the largest amount of XRP by any person."  The Court's decision leaves clear avenues for Ripple to sell and distribute XRP lawfully.  Ripple's ongoing ODL Sales respect the lines the Court has drawn by avoiding lock-up provisions, resale restrictions, or discounts, and by preventing ODL Buyers from earning profits or taking losses from changes in XRP's price.  *Supra* p. 7.  Ripple can make Programmatic Sales, sell extraterritorially, or use exemptions.  It can make many kinds of Other Distributions, such as grants and compensation for services.  It has no incentive to expose itself to liability through future violations.

### 4.  The SEC's Delay Undermines Its Claims

The Court should also take into account the SEC's own conduct in assessing its request for injunctive relief.  In *American Board of Trade*, the Second Circuit reversed as an abuse of discretion an injunction against a defendant that sold unregistered securities from 1969 to 1983,

---

[14] This Court also cited testimony that one Individual Defendant understood "the 2018 speech by the then-Director of the SEC Division of Corporate Finance, Bill Hinman – in which he stated that neither bitcoin nor ether (another digital asset) were securities – to further reinforce the SEC's position that XRP was not a security."  SJ Order 32.  The *LBRY* Court's opinion does not mention Hinman's speech.

ordering a substantially narrower one.  751 F.2d at 530-31, 542-43.  The court took into account "the SEC's long delay in taking action with respect to violations it knew to exist."  *Id.* at 543; *see id.* at 538 ("While ABT should have [ceased its conduct] without formal action on the SEC's part, it was not unnatural for ABT to interpret the SEC's long inaction as indicating, if not acquiescence, at least that the SEC did not take the violations very seriously.").[15]

Ripple began Institutional Sales in 2013.  SJ Order 4.  The SEC knew of Ripple's activities no later than October 2013, when Ripple informed a group of regulators (including the SEC) that its "[d]istribution of XRP" was "on-going."  ECF No. 831-39 (RPLI_SEC 0530419), at 442; *supra* p. 5.  The SEC also knew of the May 2014 GAO report that described "XRP" as a "prominent example[ ]" of a "virtual currenc[y] . . . not based on the bitcoin protocol."  ECF No. 830-38 (RPLI_SEC 1079990), at 003-004; *supra* p. 4.  The SEC initiated its investigation in April 2018, sued in December 2020, and sought no injunctive relief until March 2024.  That delay of ten years after Ripple's first disclosure to the agency, almost six years after the start of the SEC's investigation, and three years after the SEC's Complaint "belies the [agency's] claim of pressing need for . . . relief."  *Parklane Hosiery*, 422 F. Supp. at 486.

---

[15] *See also SEC v. Monarch Fund*, 608 F.2d 938, 943 (2d Cir. 1979) (finding it "[in]appropriate" to enter a permanent injunction where "judgment" was "entered . . . seven years after the alleged violations" and the SEC had never "attempt[ed] to expedite the requested injunctive relief"); *SEC v. Nat'l Student Mktg. Corp.*, 457 F. Supp. 682, 716 (D.D.C. 1978) ("[I]n the six years since the filing of this action, [the SEC] has made no attempt to obtain interlocutory injunctive relief against these defendants.  Such inaction argues strongly against the need for injunctive relief."); *SEC v. Parklane Hosiery Co.*, 422 F. Supp. 477, 486 (S.D.N.Y. 1976) ("I find it significant that a year and a half has elapsed from the date of the violation to the Commission's request for injunctive relief."), *aff'd*, 558 F.2d 1083 (2d Cir. 1977).

**5.      The SEC Points to No Further Information That ODL Buyers Require to Protect Themselves**

The SEC fails to show that any Institutional Buyers suffered any pecuniary loss because Ripple did not register.  *Infra* pp. 19-21.  Its arguments are particularly weak as to ODL Sales.  As a class, ODL Buyers are sophisticated institutions who are able to negotiate for contractual rights and disclosures to protect their interests.  They have contractual protection from losses, and no right to gains, caused by XRP's short-term volatility.  Indeed, they are exposed to changes in the price of XRP for mere moments while a cross-border transaction settles.  *Supra* p. 7.  Even if the securities laws required Ripple to provide the information that the SEC suggests (at 5) – such as financial statements and disclosures of past discounts given to non-ODL Institutional Buyers – that information would not help ODL Buyers.

**6.      The SEC Errs in Contending that an Injunction Is Warranted by Supposed Failures to "Accept Responsibility" or "Show Contrition"**

The SEC contends (at 6-7) that an injunction is warranted by Ripple's supposed attempts to "deflect[] blame" or failures to "accept[] responsibility" or "show contrition."  Again, this is a strict liability case.  "'[S]trict tort liability' . . . is based on considerations of social policy and not on fault."  *Mull v. Ford Motor Co.*, 368 F.2d 713, 717 (2d Cir. 1966) (footnote omitted); *Barlas v. United States*, 279 F. Supp. 2d 201, 212 (S.D.N.Y. 2003) ("Blameless he may be; nevertheless he is liable.") (quoting *Ezekiel v. Volusia S.S. Co.*, 297 F.2d 215, 218 (2d Cir. 1961) (Clark, J., dissenting)).  The appropriate response to a finding of strict liability is to acknowledge the court's ruling and take steps to conform one's conduct in the future, as Ripple is doing.

Ripple has consistently acknowledged the Court's ruling that Ripple's pre-Complaint Institutional Sales were sales of securities.  It has done so in each of its quarterly market reports since the Court's ruling, including the ones that the SEC criticizes.  *See* ECF No. 949-1, at 2 (Q2 2023) (describing one of the "main takeaways from the Court's ruling" as a finding that

- 14 -

"[c]ertain Ripple sales pursuant to written contracts were investment contracts") (boldface omitted); Ex. G, at 4 (Q3 2023) (explaining that this case will "move . . . into the remedies stage . . . in light of the Court's finding that certain institutional sales constituted sales of securities"); ECF No. 949-3, at 2 (Q4 2023) ("Ripple . . . acknowledges that the Court found that certain historical XRP sales . . . were investment contracts and therefore should have been registered with the SEC."); Ex. H, at 2 (statement by Ripple's Chief Legal Officer acknowledging the Court's finding "that our earlier sales directly to institutional buyers had the attributes of a security and should have been registered").  Those statements are accurate and clear.

The SEC also takes out of context Ripple's characterization of the ruling as a "victory" or a "win," as well as Ripple's rejection of the term "split decision."  As Ripple's statements explain, the most important part of this case has been the need for "clarity about the regulatory status of XRP in the U.S." and the point that "XRP is not a security" itself, although it can form part of an investment contract.  ECF No. 949-1, at 2.  The Court's ruling that "XRP, as a digital token, is not in and of itself . . . an investment contract," SJ Order 15, vindicated that position.  Newspapers and commentators likewise described the Court's decision as a "victory" for Ripple and the industry.[16]  The SEC itself acknowledged that the Court's decision was largely a loss.  It sought an immediate appeal, stating that the decision would have "particular consequence to an issue of programmatic concern to the SEC's enforcement of the securities laws."  ECF No. 887,

---

[16] *See* 1 Thomas Lee Hazen, Law of Sec. Reg. § 1:80 & n.47.25 (2023) (stating that "[t]he *Ripple Labs* decision was hailed by many in the crypto industry as a major industry win," and collecting examples, although cautioning that an "appeal[ ]" is "likely"); David Yaffe-Bellamy, *Crypto Industry Secures Early Victory in Legal Battle with Regulators*, N.Y. TIMES (July 13, 2023), https://www.nytimes.com/2023/07/13/business/crypto-ripple-ruling.html (describing this Court's ruling as an "early victory" for "[t]he cryptocurrency industry . . . in its court battle with U.S. regulators"); Eli Tan, *Ripple Ruling Threatens SEC's Crypto Regulation Push*, WASH. POST (July 13, 2023), https://perma.cc/B8LG-FNRN (quoting statement that "[i]n general, the ruling is a little bit better than the crypto industry had expected or even hoped for").

at 3.  Its Chairman pronounced himself "disappointed" with the Court's ruling "about retail investors."[17]  In that context, Ripple's fair comments in no way support an injunction.

### C.      Any Injunctive Relief Should Be Narrow and Tailored

If this Court concludes that injunctive relief is warranted, it should not enter the SEC's Proposed Judgment.  Part I of the Proposed Judgment is a directive not to violate Section 5.  "But '[u]nder Rule 65(d), an injunction must be more specific than a simple command that the defendant obey the law.'"  *ASPCA v. Animal & Plant Health Inspection Serv.*, 60 F.4th 16, 22 (2d Cir. 2023) (quoting *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 240 (2d Cir. 2001)); *see SEC v. Tourre*, 4 F. Supp. 3d 579, 598 (S.D.N.Y. 2014) ("[E]veryone is required to obey the law, the law comes with its own penalties, and merely reciting statutory provisions gives an individual 'little guidance on how to conform his conduct to the terms of the injunction.'") (quoting *SEC v. Goble*, 682 F.3d 934, 949-52 (11th Cir. 2012)).

The reasons that courts disfavor general obey-the-law injunctions have special force here.  The SEC has already suggested that Ripple's post-Complaint sales violate Section 5.  Ripple has responded with good reasons that they do not.  Neither party supports deciding the issue on the current record.  If the SEC believes it has a case, it should bring a new enforcement action.  That would permit the development of a full record on which the Court can weigh the parties' competing arguments, rather than requiring adjudication in a summary contempt proceeding.  It would also prevent the SEC from using the threat of contempt to chill lawful conduct.[18]

---

[17] Hannah Lang, *US SEC 'Disappointed' by Outcome in Ripple Case Ruling*, REUTERS (July 17, 2023), https://www.reuters.com/article/idUSL1N3931QJ/.

[18] Recent experience shows that the SEC has aggressively and improperly used equitable relief as a weapon against digital asset companies.  *SEC v. Digit. Licensing Inc.*, 2024 WL 1157832, at *35 (D. Utah Mar. 18, 2024) (sanctioning the SEC for "bad faith conduct in seeking, obtaining, and defending [an] ex parte TRO, asset freeze, and appointment of a receiver").

Part II of the Proposed Judgment would prohibit without exception any "unregistered offering of Institutional Sales."  That language could be read to bar all post-Complaint ODL Sales, regardless of their characteristics.  It could be read to prohibit conduct that is lawful in other jurisdictions.  It contains no exceptions for sales that are exempt from registration.  Any order that the Court enters should be clear that it does not bar ODL Sales, does not bar extraterritorial conduct, and does not bar sales that qualify for exemptions from registration. *Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*, 843 F.3d 48, 72 (2d Cir. 2016) ("[I]njunctive relief should be 'no broader than necessary to cure the effects of the harm caused by the violation,' . . . and 'should not impose unnecessary burdens on lawful activity.'") (quoting *Forschner Grp., Inc. v. Arrow Trading Co.*, 124 F.3d 402, 406 (2d Cir. 1997); and *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209, 220 (2d Cir. 2003)).

Finally, if the Court enters an injunction, it should exercise its authority under 17 C.F.R. § 230.506(d)(2)(iii) to waive the "bad actor disqualification" provisions of § 230.506(d)(1), which prevent an enjoined issuer from using the SEC's Regulation D exemption for certain private securities offerings.[19]  Ripple satisfies many of the SEC's own criteria for waiver.  It has taken steps to ensure future XRP transactions are compliant.  Disqualification would adversely affect Ripple's business and ODL counterparties that rely on Ripple for XRP sales.  Disqualification would also affect sales of Ripple's equity, which was not at issue in this case –

---

[19] The SEC's guidance on waiver states that relevant factors include:  (1) whether the requester has taken steps to address the violation; (2) whether disqualification would adversely affect the requester's operations; (3) whether the misconduct was not intentional, not scienter-based, or not criminal in nature; (4) whether the misconduct was limited to a short time period or occurred many years ago; (5) whether the requester no longer engages in the line of business implicated in the misconduct; and (6) whether disqualification would adversely affect third parties.  *See* SEC, *Waivers of Disqualification under Regulation A and Rules 505 and 506 of Regulation D* (Aug. 4, 2022), https://perma.cc/3LBB-SF83.

the SEC has never accused Ripple of any violation of the securities laws as to its equity shareholders.  The violations in question were non-scienter-based.  The vast majority of institutional sales occurred many years ago.  Even if the Court determines that an injunction is appropriate, that determination would have nothing to do with the purposes of Regulation D.

## II.   THE SEC FAILS TO SHOW THAT ANY DISGORGEMENT IS WARRANTED

The SEC has failed to show that it should obtain the equitable monetary remedy of disgorgement under *Liu v. SEC*, 591 U.S. 71 (2020), and *SEC v. Govil*, 86 F.4th 89 (2023), *reh'g denied*, No. 22-1658, ECF No. 78 (2d Cir. Jan. 24, 2024).  *Liu* held that the SEC's disgorgement remedy is subject to the "restrict[ions]" of "equity jurisprudence."  591 U.S. at 79.  Among other restrictions, (1) disgorgement must be "awarded for victims"; and (2) the SEC can obtain disgorgement only of a defendant's "net profits," after "deducting legitimate expenses."  *Id.* at 79, 84.  *Govil* further held that an "investor is not a 'victim' for equitable purposes if he suffered no pecuniary harm."  86 F.4th at 94.  Accordingly, the SEC must show that "investors suffered pecuniary harm" as a "predicate" for a disgorgement remedy.  *Id.* at 97-98.

### A.   *Govil* Bars Disgorgement Because the SEC Cannot Show Pecuniary Harm

**1.**   Ripple's Institutional Sales caused no pecuniary harm.  In *Govil*, the defendant had told investors that proceeds from a securities offering would be used for "corporate purposes."  *Id.* at 95 (citation omitted).  That representation was fraudulent because Govil "knowingly misappropriated at least $7,300,000 of offering proceeds."  *Id.* (citation omitted).  As a result, Govil's investors were "denied the right to make an informed decision when considering whether to make the investment."  *Id.* at 105.  But the investors "received the return on the[ir] investment contemplated at the outset."  *Id.*  There was no finding that they "suffered pecuniary

harm." *Id.*  Accordingly, the Second Circuit vacated the SEC's disgorgement award and "remand[ed] with instructions to make a factual determination as to pecuniary harm." *Id.* at 106.

*Govil*'s logic applies here even more strongly.  Ripple committed no fraud.  It made pre-Complaint Institutional Sales to forty-one Buyers.  Long Decl. ¶ 4.[20]  After years of investigation and more years of discovery, the SEC does not and cannot point to any Institutional Buyer that lost money as a result of purchasing XRP from Ripple.  Instead, those Buyers "received the benefit of th[eir] bargain"; any "disgorgement" for them would be "conferring a windfall." *Govil*, 86 F.4th at 103.  That should be the end of the agency's request.[21]

2.     Each of the SEC's three contrary arguments falls short.  *First*, the agency asserts (at 17) that more disclosure generally "leads to more accurate securities prices" and "reduc[es] . . . trading costs," and that unregistered shares are "worth less" as a class than registered ones. A general policy argument that disclosure benefits the system as a whole does not show that any Institutional Buyer lost money.  At most, the SEC's argument suggests that Institutional Buyers might have been willing to pay *Ripple* more for investment contracts involving XRP if Ripple

---

[20] The SEC's statement (at 5) that "[a]ccording to Ripple," its "violations" involved "'more than 1,700 relevant contracts'" is false.  The statement that the SEC quotes is referring to the report of Ripple's expert Alan Schwartz.  ECF No. 826, ¶ 105 & n.3.  As Schwartz's report makes clear, the 1,700-contract figure includes "programmatic contracts" and "contracts . . . pursuant to which Ripple paid . . . in XRP . . . [for] various services."  ECF No. 827-40, ¶¶ 5, 18. That is, the figure includes hundreds of contracts related to Programmatic Sales and Other Distributions, which the Court has ruled were not violations.

[21] The SEC appears to argue (at 16-17) that disgorgement is appropriate even without a showing of pecuniary harm because Ripple's transactions were "entirely tainted" by its failure to comply with Section 5.  *SEC v. Ahmed*, 72 F.4th 379 (2d Cir. 2023), *pets. for cert. filed*, No. 23-741 (U.S. Jan. 9, 2024), and No. 23-987 (U.S. Mar. 11, 2024), on which the agency relies, held no such thing.  There was no dispute that the victim in *Ahmed* suffered pecuniary harm.  *See id.* at 390 (defendant "stole" money by "divert[ing]" it "into bank accounts that he and his wife controlled").  The Second Circuit's description of Ahmed's fraudulent transactions as "entirely tainted" came in the course of refusing offsets for particular sales where he argued he had sold to a victim at or below market value.  *Id.* at 397.  That is fully consistent with *Govil*'s holding that the SEC cannot obtain disgorgement where it has shown no pecuniary harm to anyone.

had filed a registration statement for those investment contracts.  It does not imply, much less

establish, that the Institutional Buyers were Ripple's victims.

*Second*, the SEC asserts at (18-20) that some Institutional Buyers suffered pecuniary

harm because they did not receive "undisclosed discounts" Ripple offered to other Buyers.  To

be clear, there is no argument that the discounts themselves were unlawful.  Instead, the SEC

contends (at 18) that if Ripple had disclosed the discounts it offered some Buyers, other Buyers

"could have demanded and potentially paid lower prices."  That argument is speculative on its

face, both as to the disclosures that would have been required and the effect of those disclosures

if made.  That is why the SEC must say "potentially."  It is also the same argument that the

Second Circuit rejected in *Govil* – that the loss of a "right to make an informed decision," 86

F.4th at 105, equates to pecuniary harm.  After all, the investors whom Govil defrauded certainly

would have paid less, and might well not have invested at all, had they known he was

misappropriating their funds.  But the Second Circuit held squarely that such an injury does not

support disgorgement where an investor has "received the return" that was "contemplated."  *Id.*

The Institutional Buyers received just that.

*Third*, the SEC asserts (at 20-21) that some Institutional Buyers "sold their XRP at a

lower price than the market would have set" if not for discounted sales because the Institutional

Buyers who received the discounted sales "put downward pressure on the market price of XRP"

and "diluted Institutional Sales investors' capital investment."  Again, the SEC makes no

argument that Section 5 bars the discounts themselves.  Its only argument is the speculative one

that the Institutional Buyers who received smaller discounts could have argued for bigger ones if

they had known the discounts Ripple was giving others.  The SEC does not explain how (if that

had occurred) it would have increased XRP market prices.  Record evidence shows, moreover,

that "Ripple's XRP distributions did not have a statistically significant effect on XRP's long-run price returns."  ECF No. 827-11 (Ferrell Expert Report), ¶ 108.[22]

Because zero disgorgement is appropriate, there is no need for prejudgment interest.  *See SEC v. Contorinis*, 743 F.3d 296, 308 (2d Cir. 2014) ("[T]he amount on which a violator must pay prejudgment interest usually tracks the amount that the party is ordered to disgorge.").[23]

### B. Alternatively, *Liu* Requires That Ripple's Legitimate Business Expenses Be Deducted from Any Disgorgement Award

1. Even if the lack of pecuniary harm did not bar disgorgement entirely, the appropriate amount would be zero or far less than the SEC contends.  *Liu* instructs that disgorgement should equal "the gain made upon [a] business or investment when both the receipts and payments are taken into account."  591 U.S. at 83 (quoting *Providence Rubber Co. v. Goodyear*, 76 U.S. (9 Wall.) 788, 804 (1869)); *see also id.* at 92 ("A rule . . . that 'make[s] no allowance for the cost and expense of conducting [a] business' would be 'inconsistent with the ordinary principles and practice of courts of chancery.' ") (quoting *Tilghman v. Proctor*, 125 U.S. 136, 145-46 (1888)).  Courts deny deductions for expenses only "when the 'entire profit of a business or undertaking' results from the wrongful activity."  *Id.* at 84 (quoting *Root v. Lake Shore & M.S. Ry. Co.*, 105 U.S. 189, 203 (1881)).  In such cases, courts "ascertain[ ] whether

---

[22] The SEC's exhibits discuss supply causing prices to fall in the short term, and say nothing about discounts.  *See* ECF No. 945-18, at 4 (discussing the effect of "incremental supply"); ECF No. 945-19, at 359:7-17 (discussing the "market dislocation" effect of "large one-directional order flow").  The "structural problem" described in SEC Exhibits 20 and 22 stemmed from a contract under which a particular Institutional Buyer would have sold large quantities of XRP into the market to meet a fixed dollar target even as the XRP price decreased.  *See* ECF No. 945-22, at 213:11-214:20; ECF No. 945-20.  That would have been a problem regardless of disclosure.

[23] The SEC cannot obtain prejudgment interest on penalties.  *See Wickham Contracting Co. v. Loc. Union No. 3, Int'l Bhd. of Elec. Workers*, 955 F.2d 831, 834 (2d Cir. 1992) ("[P]rejudgment interest should not be awarded if the statutory obligation on which interest is sought is punitive in nature.").

expenses are legitimate or whether they are merely wrongful gains 'under another name.'" *Id.* at 92 (citation omitted); *see also id.* (directing assessment on remand of whether certain expenses "ha[d] value independent of fueling a fraudulent scheme").

This Court has determined that "Ripple pooled the proceeds of its Institutional Sales into a network of bank accounts" and "used the funds raised from [those] Sales to finance its operations." SJ Order 17. The funds were thus used to pay the "cost[s] and expense[s] of conducting [a] business." *Liu*, 591 U.S. at 92 (citation omitted). Ripple's legitimate business expenses should be deducted from its gains to calculate an appropriate disgorgement award. None of the bases recognized in *Liu* for denying deductions applies. Ripple's entire profit did not result from wrongdoing. Ripple's expenses were not wrongful gains under another name. And because Ripple engaged in no fraudulent scheme at all, it paid no expenses to fuel one.

**2.**       Ripple's accounting expert, Anthony Bracco, calculated Ripple's total legitimate business expenses from April 1, 2014, through December 22, 2020. Bracco calculated Ripple's monetary operating costs and income taxes paid, which total ███████████. ECF No. 945-12 (Bracco Suppl. Rep.), Sched. 1-B ("Operating Expenses - Monetary Only"). Those expenses are legitimate, and it is equitable to deduct them, because they are amounts Ripple paid to operate its business. Deducting those expenses from Ripple's pre-Complaint revenue from Institutional Sales in that period, which totals ███████, and further deducting income taxes, which total ███████, Ripple had a loss of ███████. *Id.* ¶ 42(b). That leaves no gains to disgorge.

Bracco also prepared an alternative calculation that allocates Ripple's expenses pro rata between Institutional Sales and all other sources of revenues. Because Ripple doesn't "track expenses by revenue source," a pro rata apportionment is "a reasonable methodology for estimating the expenses related to [particular] revenue." Ex. I (Bracco Dep. Tr. (Jan. 18, 2024))

33:1-23.  Using a pro rata method, Bracco determined that Ripple had ███████ in net gains

from Institutional XRP Sales during the applicable limitations period.[24]  Accordingly, if

disgorgement were appropriate (which it is not), ███████ would be the maximum

appropriate amount.  No prejudgment interest is warranted because Ripple "acted innocently and

had no reason to know of the wrongfulness of [its] actions" and because the SEC is "responsible

for the delay in recovery."  *Wickham Contracting*, 955 F.2d at 834-35; *see supra* pp. 4-12

(Ripple's state of mind); *supra* pp. 12-13 (SEC's delay).[25]

    **3.**      The SEC erroneously contends (at 13-16) that the Court should deduct only

Ripple's "marginal costs" of obtaining revenues from Institutional Sales.  As an initial matter,

*Liu* does not limit legitimate expenses to marginal costs.[26]  *Liu* involved investment funds that

were raised fraudulently because Liu used many of them for marketing and administrative

---

[24] ECF No. 945-12 (Bracco Suppl. Rep.), Sched. 2-B ("XRP Institutional Sales as % of Total Monetary Revenues and Gains").  For his pro rata calculation, Bracco first determined what percentage of Ripple's total revenue in each year, 2014-2020, was revenue from Institutional XRP Sales.  *Id.*  He then applied each year's percentage to that year's total monetary operating expenses to determine the proportion of those monetary operating expenses that corresponded to that year's Institutional XRP Sales revenue.  *Id.* ("Total Operating Expenses after allocation").  For example, in 2017, Ripple's total revenue was ███████, and its Institutional XRP Sales revenue was ███████, making its Institutional XRP Sales revenue ███████ of its total revenue.  *See id.*, 2017 column.  Ripple's total monetary operating expenses for 2017 were ███████; apportioning ███████ of those monetary operating expenses to Institutional XRP Sales and deducting that pro rata share of expenses, as well as a proportionate share of income taxes paid, led to a net gain of ███████ for 2017.  *Id.*

[25] If the Court determines that disgorgement is warranted in a lesser amount than the SEC seeks and that some award of prejudgment interest is appropriate, it should direct the parties to meet and confer and submit either a joint proposal or competing proposals on interest.

[26] The "marginal costs" language comes from the Restatement (Third) of Restitution and Unjust Enrichment § 51 cmt. h (2024).  Comment h is discussing cases that deal "almost exclusively[] with . . . conscious wrongdoers."  But comment c explains that where "persons who are without fault" are "liable in restitution," their "unjust enrichment is measured in ways that . . . protect them from prejudice."  The approach that the SEC proposes would greatly prejudice Ripple by depriving Ripple of far more than its actual net gains from Institutional Sales.

expenses he had not disclosed to his investors.  After setting forth the equitable limits on

disgorgement, the Supreme Court remanded for consideration of whether to deduct (and the

district court on remand did deduct) expenditures for "lease payments" and "cancer-treatment

equipment" paid for with investment funds.  *Liu*, 591 U.S. at 92.[27]  Those deductions were not

the marginal costs of raising funds.  They counted as legitimate because they "ha[d] value

independent of fueling a fraudulent scheme."  *Id.*  Ripple committed no fraud at all and used the

proceeds of Institutional Sales to operate and grow its business.  Accordingly, all of its business

expenses are legitimate and deductible.

The SEC offers no persuasive reason to exclude Ripple's expenses such as "research and

development" and "general and administrative" costs.  Research and development costs include

"costs [Ripple] incurred . . . to develop software products or the software component of products

to be sold, leased or marketed to external users as well as costs to develop software to be used

solely to meet internal needs and cloud-based applications used to deliver services."  ECF No.

945-24 (Bracco Opening Expert Rep.), ¶¶ 31, 33.  Like the lease and the cancer-treatment

equipment in *Liu*, those costs had independent value and reduced the gains that Ripple obtained

from the Institutional Sales.  General and administrative costs are likewise necessary for any

firm.  If Ripple had not paid for "management, accounting and finance, [and] legal and other

administrative positions," *id.* ¶ 35, it would have become unable to conduct any business at all.[28]

---

[27] *SEC v. Liu*, 2021 WL 2374248, at *6-7 (C.D. Cal. June 7, 2021) (allowing deductions), *aff'd*, 2022 WL 3645063 (9th Cir. Aug. 24, 2022), *cert. denied*, 143 S. Ct. 2495 (2023).

[28] Even if marginal cost were the correct measure (which it is not), the SEC is also incorrect in equating Ripple's "marginal cost" to the cost-of-revenue line items from Ripple's financial statements.  The SEC's only support for this claim is a conclusory assertion (at 14 & n.2) that Ripple's "cost of revenue" "included expense subcategories associated with XRP sales revenue" but Ripple's three other categories of expenses "are not linked to the cost of making Institutional Sales."  The SEC cites no supporting evidence other than a generic reference (at n.2)

The SEC also errs in relying (at 12, 14-15) on the declaration of Andrea Fox, *see* ECF No. 946, an SEC accountant.  The SEC never disclosed Fox as a fact or expert witness.  She was not deposed during initial discovery or supplemental remedies discovery.  She lacks any personal knowledge of the facts she discusses.  Contemporaneous with this opposition, Ripple is moving to strike Fox's declaration as an untimely disclosed expert report.  Even if Fox's declaration is considered, it suffers from the same flaws as the SEC's brief.  Like her employer, Fox offers no evidence or explanation for why "cost of revenue" is the only category of Ripple's deductible expenses and fails to analyze or even consider any other categories of Ripple's expenses.

**4.**     The SEC also improperly counts towards disgorgement revenue from Institutional Sales made only after the Complaint was filed.  Citing *Finkel v. Stratton Corp.*, 962 F.2d 169, (2d Cir. 1992), the SEC contends (at 12) that an additional $266 million of Institutional Sales should be counted when Ripple signed contracts because it became "bound" to sell XRP to the Institutional Buyers.  The SEC states the right rule.  A sale of securities occurs "when the parties to the transaction are committed to one another."  *Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 891 (2d Cir. 1972), *cited in Finkel*, 962 F.2d at 173.  But the agency has its facts wrong.  Under three of the four agreements on which the agency relies, Ex. J (RPLI_SEC 0898841); ECF No. 827-47 (RPLI_SEC 0301016); ECF No. 851-2 (RPLI_SEC 0300993),[29] no mutual commitment to buy or sell XRP arose until well after the original signature dates.

Each of the three agreements has identical relevant terms.  Those terms set up a procedure through which Ripple and an ODL Buyer can "agree[ ] to enter into a Commitment."

---

to "Ripple's own accounting," which the SEC does not describe or discuss.  Other categories such as "sales and marketing expenses" are clearly linked to sales.

[29] *See* SEC Mem. 12 (citing SEC Ex. 10 (ECF No. 945-10)); *see also* ECF No. 945-10 (discussing RPLI_SEC 0898841, RPLI_SEC 0301016, RPLI_SEC 0300993, and RPLI_SEC 0899583, which correspond to Ripple Exhibit J and ECF Nos. 827-47, 851-2, and 945-15).

Ex. J (RPLI_SEC 0898841), ¶ 1(g).  The Commitment becomes binding when the Buyer

"countersign[s]" it.  *Id.*  Then, Ripple places XRP in a "Bailment Account."  *Id.* ¶ 1(a).  Even

after the Commitment, the Buyer has no obligation to buy and can instead "return [any] . . .

'Unpurchased XRP'" from the Bailment Account to Ripple until the "Maturity Date."  *Id.* ¶ 1(h).

A sale occurs only when the Buyer actually withdraws the XRP from the Bailment Account, *id.*

¶ 2(a), or allows the Maturity Date to pass without returning the XRP, *id.* ¶ 1(h).  Accordingly,

both parties became bound only when XRP changed hands.  When that transfer happened after

the filing of the Complaint, revenues from those sales are not subject to disgorgement.[30]

## III.   ANY CIVIL PENALTY SHOULD NOT EXCEED $10 MILLION

### A.    The Relevant Factors Counsel a Low Penalty, Not a High One

The SEC asks this Court to impose a penalty under Section 20(d) of the Securities Act,

15 U.S.C. § 77t(d).  Section 20(d) creates a three-tiered structure of statutory maximum

penalties.  The first tier applies to violations generally, *id.* § 77t(d)(2)(A); the second tier to

violations with culpable mental states of "fraud, deceit, manipulation, or deliberate or reckless

disregard of a regulatory requirement," *id.* § 77t(d)(2)(B); and the third tier to violations that

both involve a culpable mental state and also "directly or indirectly resulted in substantial losses

or created a significant risk of substantial losses to other persons," *id.* § 77t(d)(2)(C).  This is a

first-tier case because the SEC has never alleged "fraud, deceit, [or] manipulation" and has failed

in its belated attempt to show that Ripple recklessly disregarded the law.  *Supra* pp. 4-12.[31]  Each

---

[30] The fourth contract, ECF No. 945-15 (RPLI_SEC 0899583), does contain purchase commitments.  But Ripple's post-Complaint revenues from that contract are only ███████, *see* ECF No. 945-10, at 3, a tiny fraction of the additional $266 million the SEC seeks to add.

[31] The current first-tier maximum for a corporation under § 77t(d) is $115,231 per violation.  SEC, *Inflation Adjustments to the Civil Monetary Penalties Administered by the Securities and Exchange Commission* (as of Jan. 15, 2024), https://perma.cc/RDQ9-RCLV.

tier has an alternative maximum of the defendant's "gross pecuniary gain" – here, Ripple's revenues from pre-Complaint Institutional Sales.  The appropriate penalty is far less than that.

Courts in this District "look to a number of factors in determining whether civil penalties should be imposed, including":

> (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.

*SEC v. Haligiannis*, 470 F. Supp. 2d 373, 386 (S.D.N.Y. 2007); *see SEC v. Rajaratnam*, 918 F.3d 36, 45 (2d Cir. 2019) (stating that the factors are neither "exhaustive" nor "talismanic"). Each factor favors a low penalty here.

1.      Ripple's conduct was not egregious.  Its Institutional Sales were made to forty-one "sophisticated individuals and entities," SJ Order 16, over eight years.  Those entities were fully informed about the transactions into which they were entering and chose to do so in their own financial interests.  There is no allegation that Ripple deceived or misled them.  Indeed, there is no allegation that they were even disappointed.  To be sure, this Court has found that Ripple violated the Securities Act.  Any such violation is a serious matter.  Nevertheless, compared to other violations that warrant higher penalties – such as fraud, commingling of funds, or sales to unsophisticated investors – Ripple's Institutional Sales are far less egregious.

2.      Ripple did not act with scienter.  Most of its XRP transactions were lawful.  *Supra* p. 3.  The SEC did not allege in its Complaint that Ripple acted recklessly, has shown no recklessness now, and has dropped its claims that the Individual Defendants were reckless. *Supra* pp. 4-12.  Ripple's violation occurred against a background of great regulatory uncertainty, including advice from respected law firms that XRP sales were not likely to be considered sales of securities.  *Supra* pp. 4-5.  This Court has ruled that uncertainty about

Institutional Sales was not so great as to violate Ripple's due process rights.  SJ Order 28-30.

Nevertheless, the lack of clarity in the law at least warrants a lower penalty.

3.     Ripple caused no substantial losses and no risk of substantial losses to others.

The SEC can show no pecuniary harm to any Institutional Buyer.  *Supra* pp. 19-21.  It

incorrectly asserts (at 24) that there "can . . . be [no] doubt that by selling XRP in Institutional

Sales without providing the information required by the federal securities laws, Ripple created at

least a *risk* that investors deprived of that information would lose money."  There is doubt to

spare.  Had Institutional Buyers risked substantial losses over seven years of purchases, the SEC

would be able to point to one who actually lost money.  Further, Institutional Buyers' size and

sophistication would likely have qualified them to purchase securities (including investment

contracts) through private placements.  That undermines the SEC's speculation that they

necessarily risked substantial losses through their transactions with Ripple.

4.     Ripple's conduct is not recurrent in a sense that would call for a larger penalty.

Although Ripple engaged in Institutional Sales to forty-one Buyers, those sales reflected a single

error about the application of Section 5.  Indeed, the SEC began this case by alleging that

Ripple's Institutional Sales, Programmatic Sales, and Other Distributions were collectively a

single "ongoing Offering."  ECF No. 46, ¶¶ 74-75.  This Court's ruling has now provided Ripple

with guidance going forward.  Ripple has given reasonable assurances that it will conform its

future conduct to that ruling.  No additional deterrence is required.

5.     Finally, the SEC errs in suggesting (at 24) that Ripple's total assets warrant a

massive fine.[32]  The SEC regularly imposes far smaller fines to deter misconduct by the largest

---

[32] Indeed, the SEC seeks total monetary relief ▮▮▮▮▮ to Ripple's total liquid assets
as of the date of its filing.  *Compare* ECF No. 947, pt. III (proposed judgment including a total
payment of $1.95 billion), *with* Ex. K (RPLI_SEC 1141448) (total liquid assets of ▮▮▮▮▮

corporations in the world.  *See* SEC Press Release 2023-234, *SEC Announces Enforcement Results for FY 2023* (proudly listing fines of $6 million against Goldman Sachs, $7 million against Citadel, and $6 million against Merrill Lynch), https://perma.cc/LU9P-Z3AH.  That is especially true for strict liability violations.  In *Rajaratnam*, on which the agency relies, the District Court considered the defendant's wealth only after concluding that his highly culpable conduct – including a criminal fraud conviction – "warranted a significant penalty."  918 F.3d at 45.  This case is nothing like that.

**B.    Comparison to Previous Digital Asset Cases Supports a Penalty Far Lower than the SEC's Unreasonable $876 Million Request**

The Court should also consider penalties in comparable litigated and settled digital asset cases.  The best comparators are the *Block.one*, *Genesis Global Capital*, and *Telegram* cases, each of which involved more than a billion dollars of gross revenue obtained through significantly more egregious violations of the securities laws.  In those cases, the SEC agreed to, and the *Genesis Global Capital* and *Telegram* Courts approved, civil penalties ranging from 0.6% to 1.8% of those gross revenues.[33]  In none of those cases was the conduct at issue found lawful in part, as Ripple's has been.  In *Block.one* and *Telegram*, digital assets were sold before

---

as of Dec. 31, 2023).  Its proposal appears calculated ▮▮▮▮▮▮▮▮▮▮▮▮▮ than to create an incentive for future compliance.

[33] *In re Block.one*, SEC Rel. No. 33-10714, 2019 WL 4793292 (Sept. 30, 2019) (gross revenue of $3.96 billion (900 million tokens at average price of $4.40); penalty of $24 million (0.6%)); *SEC v. Telegram Grp. Inc.* 448 F. Supp. 3d 352, 358 (S.D.N.Y. 2020) (gross revenue of $1.7 billion); Final Judgment at 4, *SEC v. Telegram Grp. Inc.*, No. 1:19-cv-09439-PKC, ECF No. 242 (S.D.N.Y. June 26, 2020) (penalty of $18.5 million (1.1%)); Complaint, *SEC v. Genesis Glob. Cap., LLC*, No. 1:23-cv-00287-ER, ECF No. 1 (S.D.N.Y. filed Jan. 12, 2023) ("*Genesis* Compl.") (gross revenue of approximately $1.2 billion:  $169.8 million during three months in 2022, conduct lasted 21 months); Final Judgment at 2, *SEC v. Genesis Glob. Cap., LLC*, No. 1:23-cv-00287-ER, ECF No. 56 (S.D.N.Y. filed Mar. 18, 2024) (penalty of $21 million (1.8%)).  The judgment in *Telegram* included a $1.2 billion disgorgement award, but no disgorgement was ordered in either *Block.one* or *Genesis Global Capital*.

blockchains even launched, risking substantial losses if the launch failed.  *Block.one*, 2019 WL 4793292, at *4; *Telegram*, 448 F. Supp. 3d at 358.  In *Genesis Global Capital*, substantial losses actually occurred.  *Genesis* Compl. ¶ 7.

Comparing dollar amounts rather than percentages leads to the same conclusion.  In the 2022 *BlockFi* case, $50 million was reported as the SEC's largest digital-asset penalty ever.[34] *BlockFi* involved not only lack of registration but also material misrepresentations made with at least negligence.  2022 WL 462445, at *4, *8.  Aside from *BlockFi*, our research has found two digital-asset cases where the SEC has obtained a civil penalty above $20 million:  *Block.one* ($24 million) and *Genesis Global Capital* ($21 million).  As set forth above, *Block.one* involved far more gross revenue than this case, and *Genesis Global Capital* involved both more revenue and actual substantial losses to others.  The SEC's assertion that this case warrants a civil penalty twenty-one times higher than *BlockFi* deserves no credence.

Taking both discretionary and comparative factors into account, an appropriate civil penalty would be no more than $10 million.  That would reflect about ███ of Ripple's actual gross revenues (███████, *supra* p. 22) from pre-Complaint Institutional Sales, and would be proportionate in both percentage and dollar amount to comparable digital-asset cases where there was no culpable mental state and no substantial harm or risk of harm to others.

## CONCLUSION

The Court should deny the SEC's requests for an injunction, for disgorgement, and for pre-judgment interest, and should impose a civil penalty of no more than $10 million.

---

[34] *In re BlockFi Lending LLC*, SEC Rel. No. 33-11029, 2022 WL 462445, at *11 (Feb. 14, 2022); Chris Prentice, *Crypto firm BlockFi To Pay Record Penalty To Settle U.S. SEC, State Charges*, REUTERS (Feb. 14, 2022), https://www.reuters.com/technology/crypto-lending-firm-blockfi-pay-100-mln-settle-us-sec-state-charges-2022-02-14/.  BlockFi also paid an additional $50 million to settle charges brought by state regulators.

Date:  April 22, 2024                    Respectfully submitted,

                                         */s/ Michael K. Kellogg*

Andrew J. Ceresney                       Michael K. Kellogg
Douglas S. Zolkind                       Reid M. Figel
Erol Gulay                               Gregory G. Rapawy
Christopher S. Ford                      Bradley E. Oppenheimer
DEBEVOISE & PLIMPTON LLP                 Lillian V. Smith
66 Hudson Boulevard                      Bethan R. Jones
New York, NY 10001                       KELLOGG, HANSEN, TODD, FIGEL,
+1 (212) 909-6000                        & FREDERICK, P.L.L.C.
aceresney@debevoise.com                  Sumner Square
dzolkind@debevoise.com                   1615 M Street, N.W., Suite 400
egulay@debevoise.com                     Washington, D.C. 20036
csford@debevoise.com                     +1 (202) 326-7900
                                         mkellogg@kellogghansen.com
                                         rfigel@kellogghansen.com
                                         grapawy@kellogghansen.com
                                         boppenheimer@kellogghansen.com
                                         lsmith@kellogghansen.com
                                         bjones@kellogghansen.com

                        *Counsel for Defendant Ripple Labs Inc.*