# Exhibit A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>     Plaintiff,<br><br> v.<br><br>RIPPLE LABS INC., BRADLEY GARLINGHOUSE, and CHRISTIAN A. LARSEN,<br><br>     Defendants. | No. 20-CV-10832 (AT) (SN) |

**DECLARATION OF MONICA LONG IN SUPPORT OF
DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION
FOR REMEDIES AND ENTRY OF FINAL JUDGMENT**

  I, Monica Long, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

**Identification and Basis of Knowledge**

  1. My name is Monica Long. I have been an employee of Ripple Labs Inc. ("Ripple") since September 2013 and have been employed by Ripple continuously since that time. I have held various roles at Ripple over the years including leading various teams and business units. I am now President of Ripple (having been promoted in 2023) and I serve on Ripple's Compliance and Risk Management Committee. The statements in this Declaration are true to the best of my personal knowledge, and on information made known to me in the course of my duties at Ripple, including my familiarity with the present litigation, and including reasonable inquiries that I have made or directed others at Ripple to make. If called to testify, I would testify competently to them.

2.     Because of my work at Ripple, I am familiar with Ripple's business, including its legal and compliance efforts.  In particular, as President, I am familiar with Ripple's current distributions of XRP, its sales contracts for XRP and the circumstances surrounding those sales and generally familiar with Ripple's past sales of XRP.

3.     Although I am not an attorney, I am also generally familiar with Ripple's efforts both before and during the present litigation to comply with laws and regulations to which it is subject, including the federal securities laws, other U.S. federal and state laws, and the laws of other jurisdictions.  Nothing in this statement is intended to waive any attorney-client privileges.

**Ripple's Acknowledgement of the Court's Decision**

4.     I have reviewed this Court's July 13, 2023, decision finding that Ripple violated Section 5 of the Securities Act of 1933 by making certain unregistered sales of securities.  From my review, I am familiar with the Court's finding that from 2013 to 2020 Ripple sold investment contracts (the "Institutional Sales") to certain sophisticated investors (the "Institutional Buyers"). From April 1, 2014 through December 22, 2020, Ripple made Institutional Sales to 41 counterparties.

5.     Ripple has made (at least) the following public statements acknowledging the Court's decision.  I have not done an exhaustive search of all of Ripple's public statements on this point and this list is not intended to be exhaustive.

a.     In its XRP Markets Report for the second quarter of 2023, published shortly after this Court's decision, Ripple stated that one of the "main takeaways from the Court's ruling" was that "[c]ertain Ripple sales pursuant to written contracts were investment contracts."  I understand that Report is in the record as Exhibit 1 to the March 22, 2024 Declaration of Peter Bryan Moores.

b.      In its XRP Markets Report for the third quarter of 2023, Ripple stated that

this case will "move . . . into the remedies stage . . . in light of the Court's finding that

certain institutional sales were sales of securities."  I understand that Ripple is submitting

that Report as an Exhibit to the April 22, 2024 Declaration of Gregory G. Rapawy.

c.      In its XRP Markets Report for the fourth quarter of 2023, Ripple stated

that it "acknowledges that the Court found that certain historical XRP sales . . . were

investment contracts and therefore should have been registered with the SEC."  I

understand that Report is in the record as Exhibit 3 to the Moores Declaration.

d.      I understand that on or around July 17, 2023, CNBC published an article

regarding the decision, including statements by Ripple's Chief Legal Officer, Stuart

Alderoty, in which he said, "She [Judge Analisa Torres] found — although we had

disagreed with her — that our earlier sales directly to institutional buyers had the

attributes of a security and should have been registered."  I understand that Ripple is

submitting that Report as an Exhibit to the Rapawy Declaration.

**Ripple's Current and Prospective Compliance with the Court's Decision**

6.      Based on my reading of the Court's decision, I understand that the finding that

Institutional Sales from the period 2013 to 2020 were investment contracts was based on

several factors.

7.      The Court on page 21 of its decision stated that "some Institutional Buyers agreed

to lock-up provisions or resale restrictions based on XRP's trading volume," which the Court

found "inconsistent with the notion that XRP was used as a currency or for some other

consumptive use."

8.      In Fall 2019, Ripple and its subsidiaries ceased nearly all Institutional Sales; the single exception was one customer with a preexisting contract pursuant to which XRP sales continued until mid-2021 ("Customer A").  Beginning in May 2020, Ripple subsidiaries began to sell XRP to its On-Demand Liquidity ("ODL") customers.  I understand that Ripple gave the SEC notice in advance of beginning such sales.  As of the date of this declaration, since 2020, the only Institutional Sales by Ripple and its subsidiaries have been to ODL customers and Customer A as described above.

9.      As of the date of this declaration, neither Ripple nor any of its subsidiaries has entered into any XRP sales agreements with such characteristics for four or more years, as follows:

        a.      Neither Ripple nor any of its subsidiaries has sold XRP under an agreement that includes a lockup provision since 2019.

        b.      Neither Ripple nor any of its subsidiaries has sold XRP under an agreement that includes a discount since 2019.

        c.      Neither Ripple nor any of its subsidiaries has sold XRP since 2020 except to ODL customers who use the XRP as a virtual currency to effect cross-border payments and to Customer A (whose XRP purchases ended in 2021).

10.     Based on my reading of the Court's decision, I understand that the Court on pages 19 and 20 of its decision specifically identified three promotional brochures that contributed to its finding:

        a.      a brochure titled "Deep Dive," from which the Court quoted language stating that Ripple's "business model is predicated on a belief that demand for XRP will increase . . . if the Ripple protocol becomes widely adopted," and that "[i]f the Ripple

protocol becomes the backbone of global value transfer, Ripple . . . expects the demand for XRP to be considerable";

b.      a brochure titled "Ripple Primer," from which the Court quoted language stating that Ripple "hopes to make money from XRP if the world finds the Ripple network useful"; and

c.      a brochure titled "Gateways," from which the Court quoted language stating that Ripple's business model is based on [XRP's] success" and also pointed to a graphical representation of bitcoin's price change accompanied by language stating that "Bitcoin proves" that "a virtual currency [can] really create and hold value."

11.     Based on a reasonably diligent search, I understand that neither Ripple nor any of its subsidiaries has distributed the "Deep Dive," "Ripple Primer," or "Gateways" documents since 2016.  I was head of marketing at Ripple from 2013-2020.  Based on my best recollection, I do not recall marketing collateral for institutional purchasers similar to the "Deep Dive," "Ripple Primer," or "Gateways" from 2016 through 2019.

12.     Ripple's focus is creating an "Internet of Value," where value (money) can move on the blockchain as instantaneously as information moves on the internet.  Ripple and its subsidiaries use XRP and the decentralized XRP Ledger to build products.  As explained later in this declaration, Ripple's core product offering, its ODL solution, is agnostic as to the price of XRP.  In the ODL product offering, XRP is used as a virtual currency to effect cross-border payments.  As explained below, customers that use XRP in ODL are contractually bound to use it only to facilitate payments.

13.     It is Ripple's intent, when it sells XRP going forward, to ensure that all XRP sales by Ripple or any of its subsidiaries comply with the securities laws as interpreted in the Court's decision, because such sales meet one or more of the following conditions:

     a.     they will have been registered as securities;

     b.     they will be exempt from registration under an applicable law or regulation;

     c.     they will lack the characteristics that define Institutional Sales as set forth in the Court's decision; or

     d.     they will be extraterritorial, meaning the transactions will involve Ripple subsidiaries and counter-parties outside the United States and the transactions will be approved by (or exempt from approval by) regulators outside the United States.

14.     Ripple's intent to comply has been communicated to all Ripple officers and employees whose knowledge and cooperation is necessary for compliance.  I understand that Ripple is submitting one example of such a communication as an Exhibit to the Rapawy Declaration.  I am aware of no one within the company who has refused to implement or comply with this policy as communicated to them.

15.     To the extent that the Court's decision is appealed by the SEC, by Ripple, or by both, or the relevant laws or regulations may be amended, it is Ripple's intent to comply with the law as established by any future controlling appellate decision or statutory amendment.

**Ripple's Efforts to Obtain Licenses**

16.     Throughout its existence, as set forth below, Ripple and its subsidiaries have made continuous efforts to comply with applicable laws and regulations in every jurisdiction where they operate or offer services.

17.     Ripple's subsidiaries have obtained the following licenses and authorizations:

a.      In 2013, Ripple's main XRP-selling subsidiary first registered as a money services business with the U.S. Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN").  As of the date of this declaration, seven Ripple entities are registered as money services businesses with FinCEN.

b.      In June 2016, a Ripple subsidiary was one of the first entities ever to receive a "BitLicense" – a business license to conduct virtual currency activities – from the New York State Department of Financial Services.  Ripple's subsidiary filed its application just two months after the BitLicense regulatory regime was created.  As of the date of this declaration, that subsidiary also holds licenses to conduct money transmission from 37 other U.S. states and territories, and pending applications for money transmission or the local equivalent in eight additional states.

c.      In 2020, a Ripple subsidiary registered with the Financial Services Standards Association (VQF), a Swiss self-regulatory agency, to be able to conduct virtual currency activity.

d.      In October 2023, Ripple's Singapore subsidiary received its Major Payment Institution (MPI) license from the Monetary Authority of Singapore to carry out Digital Payment Token Services.  This license permits Ripple's Singapore subsidiary to sell XRP ("ODL Sales") to certain counterparties ("ODL Buyers") to use in Ripple's ODL product.  From 2020 until it received its license in October 2023, Ripple's Singapore subsidiary was operating under an exemption from licensure pursuant to Singapore regulations.

e.      In December 2023, Ripple's Irish subsidiary received its Virtual Asset

Service Provider (VASP) registration from the Central Bank of Ireland, so that it can

provide certain digital asset services within Ireland.

18.      Ripple entities are pursuing several additional financial services registrations and

licenses in jurisdictions where they are seeking to do business.

19.      In May 2015, Ripple reached a settlement with FinCEN and the U.S. Department

of Justice ("DOJ") under which Ripple was required to register as a money services business

with FinCEN and in which these agencies characterized XRP as a convertible virtual currency.  I

understand that Ripple is submitting that settlement as an Exhibit to the Rapawy Declaration.

a.      As part of that settlement, FinCEN and DOJ considered certain early

Institutional Sales by Ripple or its subsidiaries.

b.      Following the May 2015 settlement, I and others at Ripple believed that

XRP would be treated as a currency by US regulators and that we were in full compliance

with the law.[*]

**Ripple's Compliance Steps Taken in Response to the SEC's Investigation**

20.      In 2018, Ripple started responding to various documents requests from the SEC.

I understand that individuals from Ripple met with investigative staff members of the SEC three

times in 2018:  June, September and December.

21.      I understand that the next meeting between SEC staff and Ripple took place in

September 2019.  At the September 2019 meeting, the SEC's staff first informed Ripple that

---

[*] I acknowledge that this Court has now determined that the Institutional Sales considered by FinCEN and DOJ are investment contracts that should have been registered as securities before sale in the United States.  My statements above are intended to provide historical context about Ripple's efforts to comply with the law.

Ripple had yet to convince the SEC that its XRP sales did not violate the federal securities laws, and its investigation would continue.  Ripple and its subsidiaries promptly stopped all programmatic sales and ceased all institutional sales except for the one agreement with Customer A referenced above, attempting to cooperate with the SEC and reach an agreement.

22.     In April 2020, I understand that Ripple gave notice to the SEC that the following month Ripple's subsidiaries would begin selling XRP to ODL Buyers.

23.     ODL is a software product that uses the inherent properties of XRP – fast settlement and low transaction costs – to settle customers' cross-border transactions in nearly real time.  ODL is much faster than traditional cross-border payment methods and works when traditional payment services like banks are closed.  The XRP used in ODL transactions acts as a bridge currency between fiat currencies.

24.     ODL Buyers that use XRP use it only as a virtual currency to facilitate near real time cross-border transactions.  For example, an ODL Buyer that wants to exchange Euro for Australian dollars purchases XRP with Euros and then sells the XRP for Australian dollars, converting the Euros to Australian dollars nearly instantaneously.

25.     ODL Buyers are mostly licensed financial institutions such as remittance companies.

26.     Ripple's subsidiaries' contracts for XRP sales to ODL customers contain contractual provisions such as:

        a.      "Purchaser represents that it is not purchasing and will not purchase Committed XRP for investment purposes or with an expectation of profit.  Purchaser agrees to only sell, trade or otherwise transact with, the Committed XRP **for the sole purpose of completing a payment transaction** over On-Demand Liquidity through

parties or exchanges that have been authorized for use with On-Demand Liquidity." (emphasis added).

       b.    "Purchaser acknowledges and agrees that (i) the Committed XRP does not represent a right to make any demand on Company, (ii) Company has no obligation to redeem or exchange the Committed XRP for monetary value, goods, services or any other item, (iii) Company is not responsible for any use by Purchaser or any third party of the Committed XRP, (iv) Purchaser does not have the right to receive periodic account statements and valuations from Company, (v) XRP is not intended to constitute securities of any form, units in a business trust, units in a collective investment scheme or any other form of regulated investment or investment product in any jurisdiction, (vi) this Agreement is not to be construed, interpreted, classified or treated as enabling, or according any opportunity to, Purchaser to participate in or receive profits, income, or other payments or returns arising from or in connection with Company or its affiliates, XRP, or the XRP Ledger, or to receive sums paid out of such profits, income, or other payments or returns, and (vii) this Agreement does not constitute a prospectus or offer document of any sort and is not intended to constitute an offer of securities of any form, units in a business trust, units in a collective investment scheme or any other form of regulated investment or investment product in any jurisdiction or a solicitation for any form of investment in any jurisdiction."

27.    ODL contracts contain "anti-slippage" provisions that protect ODL Buyers from suffering any loss, and prevents them from earning any profit, due to any change in XRP's value during the very short time – mere seconds – they use the token to facilitate a payment.

28.     No ODL contract contains lockup, resale restrictions or discount provisions like the Institutional Sales agreements discussed in the Court's decision.

29.     Ripple's subsidiaries had entered into only three ODL contracts before the SEC filed its Complaint, and only two of those customers used ODL prior to the SEC's filing.  Ripple itself had entered into none.

**Ripple's Compliance Steps Taken After the SEC's Lawsuit Was Filed**

30.     When the SEC sued Ripple, Ripple's Singapore subsidiary was already permitted to sell XRP to ODL customers under a licensing exemption pursuant to Singapore regulations. See paragraph 17(d) above.

31.     After the SEC sued Ripple, Ripple's Singapore subsidiary became the primary contracting entity for XRP sales contracts to new ODL customers.  These contracts were entered into pursuant to Ripple's licensing exemption through October 2023.  As explained above in paragraph 17(d), in October 2023, Ripple's Singapore subsidiary was granted a Major Payment Institution license from the Monetary Authority of Singapore to carry out Digital Payment Token Services and its XRP sales to ODL customers are now governed by that license.

32.     The contracts through which Ripple's Singapore subsidiary makes XRP sales to ODL customers contain provisions stating that they are governed by Singaporean law.

33.     The contracts through which Ripple's Singapore subsidiary makes XRP sales to ODL customers contain non-assignment clauses.

34.     As of the date of this Declaration, to the best of my knowledge based on reasonable inquiry, all ODL customers of any Ripple subsidiary who use XRP in the ODL product are domiciled outside the United States and are sophisticated counterparties.  Ripple itself has no ODL customers.

35.     Other than as described in the above paragraphs, neither Ripple nor any of its subsidiaries sold any XRP during the time period between the SEC's December 2020 filing of its Complaint and the Court's July 2023 decision.

**Steps Taken After the Court's Decision**

36.     When the Court issued its decision, neither Ripple nor any of its subsidiaries had any ODL customers domiciled in the United States, with three exceptions.

37.     The three exceptions were ODL customers domiciled in the U.S. who contracted with a FinCEN registered subsidiary of Ripple Labs Inc. to purchase XRP to facilitate cross-border payments leveraging the purchased XRP.

38.     Immediately following the decision, Ripple's subsidiary terminated one of the three US-based customers.  Ripple's subsidiary migrated the other two US-based customers from using XRP in the ODL product to using a different digital asset – a stablecoin not at issue in the SEC's case against Ripple – as the bridge currency so that these customers could continue to use Ripple's ODL solution in facilitating their cross border payments.

39.     In addition, in September 2023, Ripple implemented a formal $5 million total asset threshold for every new ODL customer who sought to purchase XRP from any Ripple entity to use in the ODL product to facilitate a cross-border payment.

40.     To ensure compliance with the Court's decision, Ripple has also taken additional steps:

        a.     I and others at Ripple have sent internal communications explaining the Court's Order and steps Ripple will take to ensure compliance with the Order.  The email described in paragraph 14 above is one such communication.

b.      As part of its annual Enterprise Risk Assessment (ERA) to support its Enterprise Risk Management program which aligns to industry best practice and meets regulatory expectations, including those from the New York State Department of Financial Services and Monetary Authority of Singapore, Ripple's Internal Audit team has included review of Ripple's compliance with the Court's decision in its annual audit plan.

### Ripple's Legal and Compliance Functions

41.      Ripple has invested significant resources in its legal, compliance and government relations departments, and maintained open lines of communication with U.S.-based regulators to minimize the risk that its conduct could later be viewed as a violation of applicable laws or regulations.  Ripple has engaged similarly with foreign regulators as well.

42.      Ripple has seen enormous growth in its legal, compliance, and government relations functions since its founding, including in these areas.

a.      Currently, Ripple has more than 50 full time lawyers, paraprofessionals, compliance, audit and government relations professionals.

b.      Ripple's Chief Legal Officer, Stuart Alderoty, joined Ripple in January 2019.  Mr. Alderoty is a seasoned attorney with nearly forty years of legal experience with expertise in financial services and regulatory affairs.  Prior to joining Ripple, he spent years on the executive leadership teams of some of the largest traditional financial institutions.

c.      Ripple's Chief Compliance Officer, Minakshi Yerra, joined Ripple nearly five years ago and has more than 20 years of international banking, fintech, payments and cryptocurrency experience specializing in the areas of anti-money laundering (AML),

economic sanctions, counter-terrorism financing (CTF), fraud, trade finance and general compliance.  Ms. Yerra regularly reports to Ripple's Board of Directors.

      d.     Ripple's Internal Audit and Privacy Officer, Ravi Inthiran, joined Ripple over six years ago.  Mr. Inthrian regularly reports to the Audit Committee of Ripple's Board of Directors.

      e.     As Ripple has expanded globally, and as Ripple has obtained licenses and authorizations in the various jurisdictions described above in paragraph 17, Ripple's compliance program has appropriately expanded.

      f.     Ripple has robust board oversight of its compliance efforts.  Each quarter, Ripple's Compliance Oversight Committee of the Board meets and Ripple's Chief Compliance Officer discusses relevant compliance issues from the prior quarter.  As noted earlier, I am a member of Ripple's Compliance and Risk Management Committee and that Committee meets quarterly.

43.     As of the date of this declaration, Ripple's board has 7 independent directors including:

      a.     Warren Jenson, Chair of the Audit Committee.  During his career Mr. Jenson has served as CFO of Amazon.com, Delta Air Lines, Electronic Arts and NBC.  In 2023 he became Nielsen's Chief Financial Officer;

      b.     Anja Manuel, a lawyer, former diplomat, and Co-Founder and Partner of Rice, Hadley, Gates & Manuel LLC, a strategic consulting firms that helps companies navigate international markets;

      c.     Sandie O'Connor, former JPMorgan Chase Chief Regulatory Affairs Officer;

      d.      Masashi Okuyama, Executive Officer and General Counsel at SBI

Holdings, who is the CEO of SBI Ripple Asia;

      e.      Rosie Rios, former Treasurer of the United States;

      f.      Michael Warren, Managing Director of Albright Stonebridge Group.  Mr.

Warren also served in the administrations of two U.S. presidents, President Obama and

President Clinton; and

      g.      Asheesh Birla, former SVP at Ripple.


I hereby declare under penalty of perjury under the laws of the United States of America

that to the best of my knowledge, information, and belief, the foregoing is true and correct.


Executed on this 22nd day of April, 2024.

Monica Long