# Exhibit B



# Blockchain & Cryptocurrency Regulation

# 2019

## First Edition

Contributing Editor

**Josias Dewey**







# GLOBAL LEGAL INSIGHTS – BLOCKCHAIN & CRYPTOCURRENCY REGULATION

## 2019, FIRST EDITION

Editor
Josias Dewey, Holland & Knight LLP

Production Editor
Andrew Schofield

Senior Editors
Suzie Levy
Caroline Collingwood

Group Consulting Editor
Alan Falach

Publisher
Rory Smith

*We are extremely grateful for all contributions to this edition.*
*Special thanks are reserved for Josias Dewey for all his assistance.*

Published by Global Legal Group Ltd.
59 Tanner Street, London SE1 3PL, United Kingdom
Tel: +44 207 367 0720 / URL: www.glgroup.co.uk

Copyright © 2018
Global Legal Group Ltd. All rights reserved
No photocopying

ISBN 978-1-912509-35-5
ISSN 2631-2999

This publication is for general information purposes only. It does not purport to provide comprehensive full legal or other advice.  Global Legal Group Ltd. and the contributors accept no responsibility for losses that may arise from reliance upon information contained in this publication.  This publication is intended to give an indication of legal issues upon which you may need advice.  Full legal advice should be taken from a qualified professional when dealing with specific situations.  The information contained herein is accurate as of the date of publication.

Printed and bound by CPI Group (UK) Ltd, Croydon, CR0 4YY
August 2018

# Japan

Taro Awataguchi
Anderson Mōri & Tomotsune

## Government attitude and definition

<u>General overview</u>

With the steep rise of the Bitcoin price and increasing enthusiasm for initial coin offerings ("**ICO**"), the Japanese cryptocurrency market has seen explosive growth in 2017. It is often said that Japan has become one of the largest cryptocurrency markets in the world.

The Japanese government intends to support and encourage the sound growth of cryptocurrency business. Actually, Japan is the first country in the world to have enacted a law defining Virtual Currency as a legal term, and requires an entity to register as a Virtual Currency Exchange Service Provider in order to provide Virtual Currency Exchange Services to residents in Japan. The definition of these terms will be discussed in detail in "**Cryptocurrency regulation**".

The purpose of the Japanese government's immediate legislation above is to: (i) protect customers of cryptocurrency exchanges; and (ii) attend to anti-money laundering and combating the financing of terrorism ("**AML/CFT**").

Looking back on history, in February 2014, a Japanese company named MTGOX Co., Ltd ("**MTGOX**"), the world's largest exchange at that time providing convertible cryptocurrency exchange services between cryptocurrencies and fiat currencies, filed for civil rehabilitation proceedings with the Tokyo District Court. Through the proceedings, money (fiat currencies) and bitcoins which actually remained in the bankruptcy estate were found to be far less than the amount which had been escrowed by the customers. The refund claims of MTGOX customers were treated as bankruptcy claims (unsecured ordinary claims) in the bankruptcy proceedings, and hence the creditors were forced to incur loss in the proceedings. This particular case led the Japanese government to recognise the intense necessity to protect customers of cryptocurrency exchanges.

In addition, in 2015, following the Leaders' Declaration at the G7 Elmau Summit, the Financial Action Task Force ("**FATF**") published "Guidance for a Risk-based Approach to Virtual Currencies" ("**FATF Guidance**") in June 2015, which requested any virtual currency exchange to be registered and/or licensed, and to comply with regulations on money laundering and terrorist financing, including customer identification obligations.

Given these circumstances, a bill to amend the Payment Services Act and the Act on Prevention of Transfer of Criminal Proceeds was submitted to the Japanese Diet on March 4, 2016, and passed the Diet on May 25, 2016. The amended laws came into force on April 1, 2017.

Since the enforcement of the laws, 16 cryptocurrency exchanges have been registered with

© Published and reproduced with kind permission by Global Legal Group Ltd, London

the Financial Services Agency of Japan (the "**FSA**") as Virtual Currency Exchange Service Providers by the end of 2017.

<u>Recent developments</u>

In January 2018, however, Coincheck, Inc. ("**Coincheck**"), one of the largest cryptocurrency exchanges in Japan, announced that it had lost approximately US$530 million worth of cryptocurrencies through a hacking attack on its systems.

As mentioned above, the purpose of the laws was to protect exchange customers from such an incident; however, a hacking incident occurred again in Japan after all.  This incident became a social problem because the exchange had a number of users in Japan, and caused FSA to take stricter approach against the exchanges and applicants for registration.  After the incident, FSA made intensive on-site and off-site inspections on the exchanges including Coincheck, and approval of new registration has been suspended for more than six months, although a number of applicants have filed and waited for registration.  Coincheck was finally acquired by Monex Group Inc., one of the largest online brokerage companies in Japan, in April 2018.

Given the incident, on March 8, FSA formulated a study group on Virtual Currency Exchange Services, etc. in order to address outstanding issues including many findings through on-site inspections against the exchanges, and the circumstances surrounding cryptocurrencies being used for the purpose of speculation rather than settlement.  As of June 30, 2018, four sessions have been held since April 10, 2018.

The incident also accelerated integration of the exchange industry.  Japan Virtual Currency Exchange Association ("**JVCEA**") was established on March 29, 2018, and all the 16 Virtual Currency Exchange Services Providers have participated as members.  JVCEA aims at being appointed by FSA as the self-regulatory organisation under the Payment Services Act.

Furthermore, on June 22, 2018, pursuant to the Payment Services Act, FSA took administrative actions against six Virtual Currency Exchange Service Providers, ordering improvement of their business operations based on the findings from FSA's on-site and off-site inspections, in which the entities were found to have failed to establish an effective management structure to ensure appropriate and reliable business operations.

June 22, 2018 was also an important date for Japanese cryptocurrency history because the Tokyo District Court commenced civil rehabilitation proceedings of MTGOX on that date.  As mentioned above, MTGOX first filed for civil rehabilitation proceedings in February 2014, but at that time it was found to be impossible to formulate the rehabilitation plan and the proceeding was converted to liquidation-type bankruptcy in April 2014.  However, under the Bankruptcy Act of Japan, a bankruptcy claim, including Bitcoin refund claims, must be evaluated in Japanese yen as of the commencement of the case, which is a much lower amount than the current market price of Bitcoin.  In addition, there are some creditors who prefer distribution by Bitcoin than cash, the legality of which was questioned under the bankruptcy proceedings.  Hence, a petition for commencement of the civil rehabilitation was filed by some creditors with the court in November 2017.  The court, after appointment of the examiner and receipt of the examiner report, ordered commencement of the civil rehabilitation proceedings of MTGOX on June 22, 2018.  The creditors, even if they have already filed a proof of claim in the previous bankruptcy proceedings, need to file it again in the new civil rehabilitation proceedings to make sure of their positions.  The bar date of filing the proof of rehabilitation claim is October 22, 2018.

© Published and reproduced with kind permission by Global Legal Group Ltd, London

To sum up, after the Coincheck incident, FSA took a stringent approach towards the cryptocurrency industry.  Given these circumstances, it is expected that mergers and acquisitions of the registered exchanges will be active in 2018 and going forward.

Very recently, on August 10, 2018, FSA published an interim report which outlines the problems found from the inspections of cryptocurrency exchanges.  FSA uses the term "crypto-assets", which includes Virtual Currencies, for the first time in the report.  The report points out that the total assets of the exchanges expanded rapidly to 533% on average in one year, but their internal control systems have not kept up with the rapid expansion.  According to the report, through the inspections of the exchanges, there was found to be: insufficient evaluation of the risks of each's crypto-assets; improper sale of the crypto-assets; advertisement without establishment of internal control systems; insufficiency of countermeasures against AML/CFT; insufficiency of segregation of assets; insufficiency of security personnel; insufficiency of control over outsourcees; insufficiency of internal audit; insufficiency of corporate governance; and so forth.

FSA said in the report that, given the findings, it will deepen its monitoring of Virtual Currency Exchange Service Providers and substantialise the examination of applicants for registration. As of August 10, the number of Virtual Currency Exchange Service Providers is still 16, but recently FSA has resumed the examination of applicants. FSA reflected the findings to the examination, and broadened the contents of the questionnaire to applicants (the number of questions increased from 166 to approximately 400).  It is expected that FSA's examination of the applicants will be tightened in the future for the purpose of sound growth of the cryptocurrency market.

Central Bank's thoughts toward cryptocurrencies

Under Japanese law, cryptocurrency is neither treated as "money" nor equated with fiat currency.  There is no cryptocurrency that is backed by the Japanese government or the central bank of Japan (the Bank of Japan, "**BOJ**").  According to a speech on April 16, 2018 by the deputy governor of BOJ, BOJ does not have a plan to issue its own digital currency at this juncture because the issuance of central bank digital currencies for general use could be analogous to allowing households and firms to directly have accounts in the central bank and it may have a large impact on the two-tiered currency system and private banks' financial intermediation.

## Cryptocurrency regulation

Under Japanese law, "Virtual Currency" is not listed as "Securities" defined in the Financial Instruments and Exchange Act (Please note, however, that a certain type of token may be subject to regulation of the Act, as discussed later in "**Sales regulation**").  The Payment Services Act defines "Virtual Currency", and requires a person who provides Virtual Currency Exchange Services to be registered with FSA.  A person conducting Virtual Currency Exchange Services without registration will be subject to criminal proceedings and punishment.

Therefore, the definitions of Virtual Currency and Virtual Currency Exchange Services are very important.

Definition of Virtual Currency

The term "Virtual Currency" is defined in the Payment Services Act as:

(i)   proprietary value that may be used to pay an unspecified person the price of any goods purchased or borrowed or any services provided and which may be sold to or purchased

© Published and reproduced with kind permission by Global Legal Group Ltd, London

from an unspecified person (limited to that recorded on electronic devices or other objects by electronic means and excluding Japanese and other foreign currencies and Currency Denominated Assets; the same applies in the following item) and that may be transferred using an electronic data processing system; or

(ii) proprietary value that may be exchanged reciprocally for proprietary value specified in the preceding item with an unspecified person and that may be transferred using an electronic data processing system.

Though the definition is complicated, in short, a cryptocurrency which is usable as a payment method to an unspecified person and not denominated in fiat currencies falls under Virtual Currency.  For example, Bitcoin, Litecoin, Dogecoin, Ether and XRP fall under Virtual Currencies.

"Currency Denominated Assets" means any assets which are denominated in Japanese or other foreign currency, and which do not fall under the definition of Virtual Currency.  For example, prepaid e-money cards usually fall under Currency Denominated Assets.  If a coin issued by a bank is guaranteed to have a certain value of fiat currency, such a coin will likely be treated not as Virtual Currency but as Currency Denominated Assets.  Tether (USDT), assuming that it is pegged with USD, is not likely to fall under the definition of Virtual Currency.

Definition of Virtual Currency Exchange Services

The term "Virtual Currency Exchange Services" means any of the following acts carried out as a business:

(i) sale and purchase of Virtual Currency or exchange of Virtual Currency for other Virtual Currency;

(ii) intermediary (*bai-kai*), brokerage (*tori-tsugi*) or delegation (*dai-ri*) for the acts listed in (i) above; or

(iii) management of users' money or Virtual Currency in connection with the acts listed in (i) or (ii) above.

A person so registered with FSA is called a Virtual Currency Exchange Service Provider. Only Virtual Currency Exchange Service Providers may engage in Virtual Currency Exchange Services.  A Foreign Virtual Currency Exchange Service Provider who has not obtained registration is prohibited from making solicitations of items (i) through (iii) above to a person in Japan.  Advertisements on the websites of Foreign Virtual Currency Exchange Service Providers fall under solicitation except where reasonable measures (such as prevention of access from Japan by blocking Japanese IP addresses and disclaimer language cautioning that residents in Japan may not participate in the transaction) have been taken, so that the advertisements will not lead to transactions related to Virtual Currency Exchange Services with a person in Japan.

The applicant must be (i) a stock company (*kabushiki-kaisha*), or (ii) a Foreign Virtual Currency Exchange Service Provider which has an office(s) and representative in Japan. Accordingly, any foreign entity wishing to register as a Virtual Currency Exchange Service Provider must establish either a subsidiary (in the form of *kabushiki-kaisha*) or a branch in Japan.

In addition, the applicant must have: (a) a sufficient financial basis (minimum capital amount of JPY10 million and positive minimum net assets); (b) a satisfactory organisational structure and certain systems to conduct the Virtual Currency Exchange Service appropriately and properly; and (c) certain systems to ensure compliance with relevant laws and regulations.

© Published and reproduced with kind permission by Global Legal Group Ltd, London

Registration process for the Virtual Currency Exchange Service Provider

The applicant must submit a registration application containing: (i) its trading name and address; (ii) capital amount; (iii) director's name; (iv) the name of the Virtual Currencies to be handled; (v) contents and means of Virtual Currency Exchange Services; (vi) name of outsourcee (if any) and its address; and (vii) method of segregation management and other particulars.

The registration application must be accompanied by documents including: (i) a document pledging that there are no circumstances constituting grounds for refusal of registration; (ii) extract of the certificate of residence of its directors, etc.; (iii) a resume of the directors etc.; (iv) a list of shareholders; (v) financial documents; (vi) documents containing particulars regarding the establishment of a system for ensuring the proper, secure provision/ performance of Virtual Currency Exchange Services; (vii) an organisational chart; (viii) internal rules; and (ix) a form of the contract to be entered into with users.

Practically, during the registration process, FSA requests applicants to fill in the checklist, which consists of approximately 400 questions, in order to confirm that the applicants have established systems to properly and securely perform the Virtual Currency Exchange Service. In addition, FSA separately prepares a detailed progress chart to confirm the checking process. The registration process is a kind of due diligence by FSA, and FSA is deliberate in approving the registration. In substance, the "registration" process is like issuing a "licence".

Upon registration, the registry of Virtual Currency Exchange Service Providers will be made available publicly.

Principal regulation on the Virtual Currency Exchange Service Provider

A Virtual Currency Exchange Service Provider must: (i) take measures necessary to ensure safe management of information; (ii) provide information to users (content of transactions, outline of each Virtual Currency handled by the provider, fees, the amount of cash or Virtual Currency which the provider has received from the user, the date of receipt, transaction records, etc.); (iii) take measures necessary for the protection of users and proper performance of its services; (iv) segregate users' property from its own property (with respect to cash, bank deposit or trust; with respect to Virtual Currency, clear distinction in a manner such that the user's Virtual Currency is immediately identifiable), and regularly undergo an audit of the status of such segregated management by a certified public accountant or audit firm; and (v) establish an internal management system to make fair and appropriate responses to customer complaints and take measures to resolve any disputes through financial ADR proceedings.

Principal supervision on the Virtual Currency Exchange Service Provider

A Virtual Currency Exchange Service Provider must: (i) prepare and maintain books and documents relating to Virtual Currency Exchange Services; (ii) prepare a report on its Virtual Currency Exchange Services for each business year and submit the same to FSA, which must be accompanied by financial documents and a certified public accountant's or audit firm's audit report on such documents; and (iii) prepare a report on the amount or quantity of users' money or Virtual Currency managed by the provider and submit the same to FSA.

When FSA finds it necessary for the proper and secure provision/performance of Virtual Currency Exchange Services, FSA may: (i) order the relevant Virtual Currency Exchange Service Provider to submit reports or materials; (ii) have officials enter its office or other

© Published and reproduced with kind permission by Global Legal Group Ltd, London

facilities; or (iii) inquire about the status of its business or properties or inspect its books and documents.

FSA may order a Virtual Currency Exchange Service Provider to take necessary measures to improve its business operation or financial conditions, or other measures necessary for the purpose of supervision.

If a Virtual Currency Exchange Service Provider (i) becomes subject to any of the grounds for refusal of registration, (ii) obtains registration through fraudulent means, or (iii) violates the Payment Services Act or an order issued pursuant to the act or a disposition given pursuant thereto, FSA may revoke the registration or order the Virtual Currency Exchange Service Provider to suspend all or part of its services for a specified period of not more than six months.  When FSA renders such disposition, it must give public notice to that effect.

### Sales regulation

Overview

Cryptocurrencies (including Virtual Currencies) do not fall within the definition of "Securities" under the Financial Instruments and Exchange Act of Japan, and sale of Virtual Currencies or tokens (including ICO) are not specifically or directly regulated by the Financial Instruments and Exchange Act (Please note that a certain type of token may be subject to regulation of the Act as discussed below).

There are various types of tokens issued by way of ICO, and Japanese regulation applicable to ICO varies according to the respective schemes.

Main types of tokens and applicable regulations

1.  *Virtual Currency type*

    If the token falls under the definition of Virtual Currency, the Virtual Currency regulation under the Payment Services Act is applicable.  Hence, in this case, the token must be sold through a Virtual Currency Exchange Services Provider.

    According to a prevalent view under the current practice, (i) if the tokens issued via ICO are already dealt by Japanese or foreign exchanges, the tokens would fall within a Virtual Currency under the Payment Service Act because there must already exist exchange markets for the tokens, and (ii) even if the tokens are not yet dealt by Japanese or foreign exchanges, in the case where the token issuer does not give substantial restrictions so that they may not be exchanged for Japanese or foreign fiat currencies or Virtual Currencies, the tokens would likely fall within Virtual Currency under the Payment Services Act.

    The Virtual Currency-type tokens issued via ICO would fall within Virtual Currency at the time of issuance, and sale thereof would fall within sale of Virtual Currency.  Hence, as a general rule, a token issuer itself must be registered as a Virtual Currency Exchange Service Provider if the token sale (ICO) is targeted to residents in Japan.  However, there is a view that if the token issuer completely outsources the token issuance to a reliable ICO platformer which is registered as a Virtual Currency Exchange Service Provider, the token issuer may not need the registration.

2.  *Securities (equity interest in an investment fund) type*

    If any distributions paid to token holders are based on the profits of the business conducted by the token issuer and are calculated based on the holder's ownership ratio of the tokens, this type of token may fall under equity interest in an investment

© Published and reproduced with kind permission by Global Legal Group Ltd, London

fund (collective investment scheme) under the Financial Instruments and Exchange Act.  In this case, the token issuer is subject to relevant regulations under the Financial Instruments and Exchange Act.

3. *Prepaid card type*

If the tokens are similar in nature to prepaid cards and may be used as consideration for goods or services provided by token issuers, they may be regarded as "Prepaid Payment Instruments" (*maebarai-shiki-shiharai-shudan*) and subject to relevant regulation under the Payment Services Act (in this case, regulation on Virtual Currency under the same Act would not be applicable).

<u>Recent developments</u>

On October 27, 2017, FSA made a cautionary announcement on ICO.  In the announcement, FSA warns token purchasers about the high-risk nature of a token, including the high volatility of a token price and potential risk of fraud.  The announcement states: "You should transact in tokens at your own risk only after sufficiently understanding both the risks noted above and the other relevant details of the ICO.  You should also pay careful attention to suspicious solicitation on ICOs."

The FSA announcement also warns token issuers that ICO may fall within the scope of the Payment Services Act or the Financial Instruments and Exchange Act, depending on how they are structured.  FSA further warns that, if the ICO has an investment nature, even if the token is purchased by way of Virtual Currencies, the Financial Instruments and Exchange Act will be applicable to a scheme which could be deemed as if it were purchased by way of fiat currencies in substance.  FSA also warns token issuers to adequately fulfil their duties required by related laws and regulations (such as making the relevant registrations when their services are regulated by those acts), and that delivering such services without registration is subject to criminal penalties.

Given the prudent attitude of FSA against ICO, there must be an established rule for ICO.  In this context, a self-regulatory rule on ICO by the self-regulatory organisation of the Virtual Currency Exchange Service Providers (which is to be appointed by FSA pursuant to the Payment Service Act) is desirable.

In order to conduct ICO in Japan in the form of sale of Virtual Currencies, as a basic rule, the token issuer itself must be registered as Virtual Currency Exchange Service Provider.  Although there have been some examples where ICO successfully completed in Japan, as FSA has become deliberate and slow in approving registrations, ICO in Japan have become temporarily slow.

Given the circumstances, there appear some different approaches.  If reliable ICO platformers emerge in Japan, then token issuers would become able to outsource token sales to them.  Another way is to attempt ICO outside Japan; however, in this case, the token issuer would be prohibited from soliciting residents in Japan unless the issuer is registered as a Virtual Currency Exchange Service Provider.  The other way is to consider new funding schemes such as Simple Agreement for Future Tokens ("**SAFT**") and so forth.  Mergers and acquisition of Virtual Currency Exchange Service Providers will also be an option.

**Taxation**

One of the most important issues in Japanese taxation of cryptocurrencies has been the treatment of consumption tax.  Under Japanese tax law, sale of cryptocurrencies has been subject to consumption tax to the extent that the office of the transferor is located in Japan.

© Published and reproduced with kind permission by Global Legal Group Ltd, London

However, the relevant tax law was amended in 2017.  If the sold cryptocurrency is Virtual Currency under the Payment Services Act such as Bitcoin, consumption tax is no longer imposed after July 1, 2017.  The National Tax Agency of Japan also announced that gains realised by sale or use of Virtual Currency will be treated as "miscellaneous income" (*zatsu-shotoku*) where the taxpayer is unable to utilise losses elsewhere to offset gains realised by sale or use of the Virtual Currency.  Furthermore, inheritance tax will be imposed upon the death of a person who has held the Virtual Currency.

### Money transmission laws and anti-money laundering requirements

Money transmission

Under Japanese law, only licensed banks or fund transfer business operators may engage in the business of money remittance transactions.  Money remittance transactions mean, according to the Supreme Court precedent, "to undertake the task of transferring funds requested by customers utilising the systems of fund transfer without transporting cash between distant parties, and/or to carry out such task".  Technically speaking, Virtual Currency does not fall under the "fund"; however, if the remittance transaction of Virtual Currency contains exchange of fiat currencies in substance, such transaction will likely be deemed to be a money remittance transaction.

Anti-money laundering requirements

Under the Act on Prevention of Transfer of Criminal Proceeds, Virtual Currency Exchange Service Providers are obligated to: (i) verify identification data of the customer and a person who has substantial control over the customer's business for the purpose of conducting the transaction and occupation of business, (ii) prepare verification records and transaction records; (iii) maintain the records for seven years, (iv) report suspicious transactions to the relevant authority, and so forth.

### Promotion and testing

On June 15, 2018, the "Basic policy of Regulatory Sandbox scheme in Japan" was announced by the Cabinet Office of Japan.  The Regulatory Sandbox is a scheme to implement new outstanding technology such as AI, IoT, big data and blockchain, and is open to ideas for the "testing project" involving any industrial sector, inside and outside Japan.

### Ownership and licensing requirements

There is no restriction on an entity simply owning cryptocurrencies for its own investment purpose, or investing in cryptocurrencies for its own dealing purpose.  As a general rule, the Virtual Currency regulation under the Payment Services Act will not be applicable unless an entity conducts Virtual Currency Exchange Services as a business.  Please note, however, that sale of certain types of tokens may be subject to regulation under the Payment Services Act or Financial Instruments and Exchange Act, as applicable, as discussed in "**Sales regulation**" above.

### Mining

Mining of cryptocurrencies is not regulated.  Mining in itself does not fall under the definition of a Virtual Currency Exchange Service.  Please note, however, that if the mining scheme is formulated as the collective investment scheme and contains sale of equity interest in an investment fund, it is subject to relevant regulation by the Financial Instruments Exchange Act.

© Published and reproduced with kind permission by Global Legal Group Ltd, London

### Border restrictions and declaration

<u>Border restrictions</u>

Under the Foreign Exchange and Foreign Trade Act of Japan, if a resident or a non-resident has received a payment exceeding JPY30 million made from Japan to a foreign country or made from a foreign country to Japan, the resident or non-resident must report it to the Minister of Finance.  If a resident has made a payment exceeding JPY30 million to a non-resident either in Japan or in a foreign country, the same rule shall apply.

Recently, this rule extended to receiving or making payment via Virtual Currency.  That is, on May 18, 2018, the Ministry of Japan announced that receipt of payment of Virtual Currency or payment of Virtual Currency, the market price of which exceeds JPY30 million as of the payment date, must be reported to the Minister of Finance.

<u>Declaration</u>

There is no obligation to declare cryptocurrency holdings when crossing Japanese Customs.

### Reporting requirements

As explained above, a certain payment or receipt of payment exceeding JPY30 million, either by fiat currencies or Virtual Currencies, is subject to a reporting obligation to the Minister of Finance under the Foreign Exchange and Foreign Trade Act.

A Virtual Currency Exchange Service Provider must report to the relevant authority if it detects a suspicious transaction.

### Estate planning and testamentary succession

There has been no established law or court precedent with respect to the treatment of cryptocurrencies under Japanese succession law.  Under the Civil Code of Japan, inheritance (i.e., succession of assets to heir(s)) commences simultaneously upon death of the decedent. Theoretically, cryptocurrencies will be succeeded to heir(s), however, given the anonymous nature of cryptocurrencies, specification and collection of cryptocurrencies as the inherited property will be a material issue unless the relevant private key or password could be known to heir(s).  On the other hand, even if the private key or password is unknown, to the extent that the inherited property can be specified, theoretically, inheritance tax may be imposed.  An enclosed and notarised testament may be one of the solutions for these issues, but Japanese legal circumstances must be improved to attend to these new issues.

© Published and reproduced with kind permission by Global Legal Group Ltd, London



**Taro Awataguchi**
**Tel: +81 3 6775 1104 / Email: taro.awataguchi@amt-law.com**
Taro Awataguchi, a fintech partner at Anderson Mōri & Tomotsune ("AMT"), has extensive experience in advising clients, including Virtual Currency Exchange Service Providers (i.e., registered providers) and applicants for the registration, on various matters related to fintech and cryptocurrencies.

AMT is one of the largest legal firms (Big Four) in Japan, and Taro, as a member of AMT's fintech team which has one of the leading fintech practices in Japan, provides innovative, up-to-date legal advice to clients in this fast-growing and cutting-edge industry.

In addition, Taro was appointed by the Tokyo District Court as the trustee in bankruptcy proceedings of a Bitcoin-related company, where various legal issues and disputes related to Bitcoin were involved. He is a frequent speaker and author in the fintech field. For example, he made a speech on "Cryptocurrencies" at the American Bar Association ("ABA") Section of International Law 2016 Fall Meeting held in Tokyo, and he is a co-author of Japan Chapter of the *International Comparative Legal Guide to: Fintech* 2017 and 2018.

Taro already has extensive experience in the field of banking, financing, financial regulation and insolvency as well. He is one of the pioneers of Asset-Based Lending practice in Japan, and serves as the head of managing committee of the ABL Association. He is recognised by Best Lawyers (banking and financing law). He is noted for successful creditor representations in various cross-border insolvency matters, including representation of Japan's first-ever secured creditors' committee in getting full recovery from the corporate reorganisation proceedings of Spansion Japan Limited.

## Anderson Mōri & Tomotsune

Otemachi Park Building, 1-1-1 Otemachi, Chiyoda-ku, Tokyo, 100-8136, Japan
Tel: +81 3 6775 1000 / URL: www.amt-law.com

© Published and reproduced with kind permission by Global Legal Group Ltd, London