# Exhibit C

 Monetary Authority of Singapore

# PAYMENT SERVICES ACT 2019

# (ACT 2 OF 2019)

## GUIDELINES ON LICENSING FOR PAYMENT SERVICE PROVIDERS

**Guideline No: PS-G01**
**Issue Date : 18 December 2019**

## GUIDELINES ON LICENSING FOR PAYMENT SERVICE PROVIDERS

## TABLE OF CONTENTS

1. **Purpose** …………………………………………………..…...……………..  **2**

2. **Licences under the Payment Services Act** …………………....………………..  **2**

3. **Admission Criteria** …………..………………………………………………  **4**

4. **Ongoing Requirements for Licensees** …………….………………….…………  **7**

**Appendices** …………………………………………………………………..  **9**
    A1 - Governance and Ownership Requirements
    A2 - Minimum Compliance Arrangements
    A3 - Guidance on Licence Applications
    A4 - Fees

1

# 1    Purpose

1.1    The Guidelines on Licensing for Payment Service Providers (the "Guidelines") are intended to provide guidance on the licensing criteria and ongoing requirements for payment service providers under the Payment Services Act (the "PS Act").

1.2    These Guidelines should be read in conjunction with the provisions of the PS Act, the Payment Services Regulations (the "PSR") and other relevant legislation, notices, guidelines and FAQs issued by the Monetary Authority of Singapore ("MAS").

1.3    MAS will update these Guidelines periodically to provide further guidance.

# 2    Licences under the PS Act

2.1    Pursuant to section 5 of the PS Act, any person that conducts payment services as defined in the First Schedule of the PS Act is required to hold a licence unless that person is exempted. Section 13 of the PS Act sets out the applicable exemptions from holding a licence.

**Types of Payment Services**

2.2    An applicant should consider which types of payment services apply to their business model. The seven payment services in the First Schedule of the PS Act are set out in Table 1 below with a brief description of each payment service. The applicant should also consider whether its proposed activities fall within any exclusions from the scope of payment services regulated under the PS Act, under Part 2 of the First Schedule. Refer to the Frequently Asked Questions on the Payment Services Act for more information.

2.3    Should companies require further guidance on the applicable licensing requirements for their business model, they may seek legal advice. If they are unsure of who to approach, they may consider participating in the Payments Regulatory Evaluation Programme ("PREP"), although this is not mandatory and MAS does not endorse any of the service providers. More information on PREP is available on the Singapore Academy of Law's website.

## Table 1 - Payment Services under the PS Act

| Activity Type | Brief Description |
|---|---|
| Activity A<br><br>Account issuance service | The service of issuing a payment account or any service relating to any operation required for operating a payment account, such as an e-wallet (including certain multi-purpose stored value cards) or a non-bank issued credit card. |
| Activity B<br><br>Domestic money transfer service | Providing local funds transfer service in Singapore. This includes payment gateway services and payment kiosk services. |
| Activity C<br><br>Cross-border money transfer service | Providing inbound or outbound remittance service in Singapore. |
| Activity D<br><br>Merchant acquisition service | Providing merchant acquisition service in Singapore where the service provider processes payment transactions from the merchant and processes payment receipts on behalf of the merchant. Usually the service includes providing a point-of-sale terminal or online payment gateway. |
| Activity E<br><br>E-money issuance service | Issuing e-money to allow the user to pay merchants or transfer to another individual. |
| Activity F<br><br>Digital payment token service | Buying or selling digital payment tokens ("DPTs") (commonly known as cryptocurrencies), or providing a platform to allow persons to exchange DPTs. |
| Activity G<br><br>Money-changing service | Buying or selling foreign currency notes. |

3

**Types of Licences**

2.4     There are three types of licences as set out in section 6 of the PS Act. The applicant should ensure that the licence it chooses accommodates its needs over a reasonable timeframe. An applicant should:

> (a) apply for a **money-changing** ("MC") licence if it only intends to carry out money-changing service; or,
> (b) in any other case, apply for:
>> (i) a **Standard Payment Institution** ("SPI") licence if it intends to conduct payment services below the specified thresholds[1]; or
>> (ii) a **Major Payment Institution** ("MPI") licence if it intends to conduct payment services without being subject to the specified thresholds.

2.4     **Variation or change of licence** – A licensee must apply for a variation or change of licence in **Form 2** if it intends to (i) add or remove any payment service[2], or (ii) change its licence type.

The licensee should ensure that it allocates sufficient time to prepare for any licence variation required as part of its future business needs. It should be able to comply with the requirements of any new payment service or the new licence type at the point of application. Approval must be obtained prior to commencing business of any new payment service or under the new licence type.

In particular, an SPI that intends to become an MPI should initiate its licence variation process at a reasonable period of time prior to approaching the specified thresholds. An SPI should therefore monitor its transaction volumes and/or value of e-money issued or stored, and consider if changes such as new target clientele or new business initiatives could result in significant changes to the volume and/or value. It should also ensure that it is able to meet the MPI requirements at the point of application. Until its MPI application is approved, an SPI must implement measures to remain below the specified thresholds.

---

[1] The thresholds are set out in section 6(5) of the Act and are, in summary:
- S$3m monthly transactions for any activity type
- S$6m monthly transactions for two or more activity types
- S$5m of daily outstanding e-money

[2] An MC licensee will need to apply to change its licence to an SPI or MPI licence to conduct any additional payment service.

4

# 3   <u>Admission Criteria</u>

3.1     An applicant must fulfil the criteria set out below and must demonstrate how it will be able to comply with its obligations under the PS Act as a licensee.

3.1.1   **Governance and ownership requirements** - The applicant must comply with the governance and ownership structure set out in *Appendix 1* and must be registered with ACRA.

3.1.2   **Fit and Proper** - The applicant must satisfy MAS that its sole-proprietor, partners, or directors and CEO, shareholders and employees, as well as the applicant itself, are fit and proper, in accordance with the <u>Guidelines on Fit and Proper Criteria [FSG-G01]</u>. The entity and group should not have any adverse reputation, particularly with regard to financial crime.

3.1.3   **Competency of Key Individuals** - The applicant must ensure that its sole-proprietor, partners, or executive directors and CEO have sufficient experience in operating a business in the payment services industry or related areas in the financial services industry.

Where the individual will be managing a sizeable team, the sole-proprietor, partners, or executive directors and CEO should also have the relevant experience, competencies and influence, to allow them to exercise effective oversight and control over the business activities and staff.

The applicant should also consider the educational qualifications and professional certification of its key individuals.

3.1.4   **Permanent place of business or registered office** - The applicant must have a permanent place of business or registered office. It must be an office area where the applicant's books and records can be securely held. The applicant must also appoint at least one person to be present to address any queries or complaints from customers.[3]

---

[3] As set out in MAS Notice PSN07, licensees must appoint at least one person to be present at its permanent place of business or registered office for a minimum of 10 days a month and a minimum of eight hours on each of those days during its normal business hours, unless:

(a)  it has notified all its customers in writing and in advance of any planned non-operating days that will prevent it from meeting the specified days and hours; or

(b)  there are circumstances beyond the control of the licensee that could not reasonably have been foreseen that prevent it from meeting the specified days and hours.

https://www.mas.gov.sg/-/media/mas/sectors/guidance/guidelines-on-licensing-for-payment-service-providers-1.pdf

3.1.5 **Base Capital** - An SPI or MPI licence applicant must satisfy MAS how it will meet the base capital requirements set out in the PSR[4], as summarized in Table 3 below, upon obtaining its licence. In view of this obligation, the applicant must ensure that it maintains sufficient capital buffer in excess of the base capital requirement, bearing in mind the scale and scope of its operations and the potential for profit and losses.

**Table 3 - Base Capital Requirement**

| Type of Licence | Base Capital Requirement |
|---|---|
| SPI | S$100,000 |
| MPI | S$250,000 |

3.1.6 **Security** - An MPI licence applicant must provide the required security, as summarised in Table 4 below, prior to commencing business, in the form of a cash deposit with MAS or a bank guarantee in the prescribed format.

**Table 4 - Security Requirement**

| Category | Security Requirement |
|---|---|
| The average, over a calendar year, of the total value of all payment transactions in one month does not exceed S$6 million for any one payment service | S$100,000 |
| All other cases | S$200,000 |

*[Amended on 28 January 2020]*

3.1.7 **Compliance Arrangements** - The applicant must have in place plans for compliance arrangements that are commensurate with the nature, scale and complexity of its business. The minimum requirements in respect of compliance arrangements are set out in *Appendix 2*. Regardless of the setup of the compliance arrangements, the ultimate responsibility and accountability for ensuring compliance with applicable laws and regulations will still rest with the applicant's sole-proprietor, partners, or directors and CEO, and compliance officer.

---

[4] Base capital means the sum of (i) the paid-up ordinary share capital and irredeemable and non-cumulative preference share capital and (ii) any unappropriated profit or loss, less any interim loss and dividend that has been declared.

3.1.8 **Technology Risk Management** - Where the applicant intends to provide online financial services, it must perform a penetration test of its proposed online financial services, remediate all high risk findings identified, and conduct independent validation on the effectiveness of the remediation actions. This does not need to be completed prior to application but must be completed prior to the grant of licence.

*[Amended on 13 April 2020]*

3.1.9 **Audit Arrangements** - The applicant must have plans in place for adequate independent audit arrangements to regularly assess the adequacy and effectiveness of its procedures, controls, and its compliance with regulatory requirements. The audit arrangements should be commensurate with the scale, nature and complexity of its operations. The audit may be conducted by an internal audit function within the applicant, an independent internal audit team from the head office of the applicant, or outsourced to a third party service provider.

3.1.10 **Annual Audit Requirements** - The applicant must have in place plans to meet the annual audit requirements as set out in section 37 of the PS Act. The auditor must be appointed at the applicant's own expense to carry out an audit of its accounts and transactions, and compliance with the relevant regulations and requirements.

3.1.11 **Letter of Responsibility and/or Letter of Undertaking** - Where appropriate, MAS may require applicants to procure a Letter of Responsibility and/or Letter of Undertaking from the applicant's majority shareholders, parent company and/or related company The template will be provided by MAS if the application is approved.

*[Amended on 13 April 2020]*

3.2 **Other Factors** - MAS may also take into consideration factors such as:

3.2.1 track record and financial condition of the applicant, its holding company or related corporations, where applicable;

3.2.2 operational readiness of the applicant, including ability to comply with regulatory requirements;

3.2.3 whether the applicant, its holding company or related corporations are subject to proper supervision by a competent regulatory authority;

3.2.4 commitment of the applicant's holding company to operations in Singapore; and

3.2.5 whether the public interest will be served by granting a licence.

3.3    MAS considers each application on its own merits and may take into account other factors on a case-by-case basis. The criteria and considerations listed above are not meant to be exhaustive; MAS may impose additional conditions or requirements to address the unique risks posed by applicants.

3.4    Applicants who have assessed that they are able to meet the admission criteria should refer to *Appendix 3* for guidance on information required for submission of licence applications and submit an application in **Form 1**. All applicants and licensees are required to pay the relevant fees set out in the Schedule to the PSR. Please refer to *Appendix 4* for more information on fees.

# 4    Ongoing Requirements for Licensees

4.1    A licensee is required to comply, on an ongoing basis, with all applicable requirements set out under the PS Act, as well as other relevant legislation. Licensees are expected to put in place systems, policies and procedures to ensure that they fulfil all ongoing obligations, including applications and notifications to MAS where necessary. Some of these requirements are summarised below.

4.2    **Anti-Money Laundering and Countering the Financing of Terrorism** ("**AML/CFT**") **Requirements** - A licensee must comply with the AML/CFT requirements as set out in the Notices on Prevention of Money Laundering and Countering the Financing of Terrorism [PSN01 and/or PSN02] and Notice on Reporting of Suspicious Activities & Incidents of Fraud [PSN03]. A licensee should also refer to the Guidelines to Notices PSN01 and/or PSN02 for guidance on the AML/CFT requirements.

*[Amended on 18 March 2020]*

4.3    **Periodic Returns** - A licensee must submit periodic regulatory returns in relation to its payment service activities, in accordance with the PSR. The requirements are set out in the Notice on Submission of Regulatory Returns [PSN04].

4.4    **Cyber Hygiene** - A licensee must comply with the cyber hygiene requirements as set out in the Notice on Cyber Hygiene [PSN06] and put in place appropriate safeguards to protect customer information.

4.5    **Business Conduct** - A licensee must comply with business conduct requirements in the PS Act, the PSR and the Notice on Conduct [PSN07]. These obligations include safeguarding of customers' monies, record of transactions, issuance of receipts, adhering to the prescribed time period for transmission of money, display of exchange rate and fees, and notification of normal business hours. Licensees must also ensure that they comply with all prohibitions and restrictions, including personal payment account stock and flow restrictions, as well as prohibited business activities.

4.6    **Disclosures and Communications** - A licensee must make accurate representation on the scope of its licence and provide the disclosures set out in the Notice on Disclosures and Communications [PSN08] where applicable to its business. A licensee should also ensure that customers receive timely updates regarding any material changes to the disclosures.

4.7    **Annual Audit Requirements** - A licensee must, on an annual basis, appoint an auditor to carry out an audit of its accounts and transactions, and compliance with regulations and requirements. The licensee must ensure that the auditor submits a report to MAS in **Form 4**.

4.8    Licensees should also understand and apply the relevant MAS Guidelines such as the Guidelines on Technology Risk Management and E-payments User Protection Guidelines, and keep abreast of regulatory changes.

**Appendix 1**

# A1    Governance and Ownership Requirements

### Table A1-1 - Governance/Ownership Requirements for Money-Changing Licence

| Entity type | Governance/Ownership requirements |
|---|---|
| Sole-proprietor | • The applicant must be a Singapore citizen.<br>• The applicant must have a minimum of 1 year's relevant working or business experience on a full-time basis. |
| Partnership or Limited Liability Partnership (LLP) | • The majority of its partners should be Singapore citizens. If there are only two partners, only one needs to be a Singapore citizen.<br>• Each partner must have a minimum of 1 year's relevant working or business experience on a full-time basis. |
| Singapore-owned Company | • More than 50% of the equity shareholdings should be beneficially owned and effectively controlled by Singapore citizens.<br>• A majority of the board of directors of the company should be Singapore citizens. If there are only two directors, only one of the directors needs to be a Singapore citizen.<br>• Each executive director must have a minimum of 1 year's relevant working or business experience on a full-time basis. |
| Singapore incorporated wholly-owned subsidiary of a foreign bank, or a foreign company primarily engaged in money-changing | • The parent company must:<br>  o Be of significant size. In case of a foreign bank, it needs to rank among the top banks in the country where it is incorporated.<br>  o Possess a good track record and reputation.<br>  o Be adequately regulated and supervised by its home supervisory authority for AML/CFT. |

Guidelines on Licensing for Payment Service Providers

**Table A1-2 - Governance/Ownership Requirements for Standard or Major Payment Institution Licence**

| Entity type | Governance/Ownership requirements |
|---|---|
| Singapore-incorporated company | • At least one Executive Director[5] of the applicant is a Singapore citizen or permanent resident; **or**, |
| Singapore branch of a foreign corporation | • At least one Executive Director of the applicant is a Singapore Employment Pass holder **and** at least one other director of the applicant is a Singapore citizen or permanent resident |

*[Amended on 28 January 2020]*

---

[5] As set out in section 2 of the PS Act, executive directors should be involved in the day-to-day running of and making of executive decisions on behalf of the business or operations of the applicant. They are expected to be resident in Singapore to oversee the activities of the licensee. Nominee directors such as investors, legal advisers or corporate secretaries are not Executive Directors. Non-Executive Directors provide oversight as members on the Board of Directors, but are not involved in the day-to-day business or operations of the licensee. The job titles and designations of directors should reflect the substance of the role and responsibilities of the individual.

https://www.mas.gov.sg/-/media/mas/sectors/guidance/guidelines-on-licensing-for-payment-service-providers-1.pdf

Guidelines on Licensing for Payment Service Providers

Appendix 2

## A2    Minimum Compliance Arrangements

The applicant should ensure that it has adequate compliance arrangements commensurate with the scale, nature and complexity of its operations. This may take the form of:

- An **independent compliance function** - The applicant should put in place an independent compliance function in Singapore with staff who are suitably qualified. Compliance staff may perform other non-conflicting and complementary roles such as that of an in-house legal counsel.

- **Compliance support from holding company or overseas related entity** - The applicant may obtain compliance support from an independent and dedicated compliance team at its holding company, or at an overseas related entity, provided that it is able to demonstrate that there is adequate oversight by the applicant's compliance officer, sole-proprietor, partners, or directors and CEO and other senior management.

The applicant must also develop appropriate compliance management arrangements, including at least, the appointment of a suitably qualified compliance officer at the management level. This individual is expected to have sufficient expertise and authority to oversee the compliance function of the applicant, although he may be assisted by other staff in day-to-day operations.

If this officer has yet to be employed at the point of application, he/she must, at the minimum, have been identified at the point of application and must be employed and appointed prior to the applicant commencing business.

The applicant should note that regardless of the arrangement chosen, the sole-proprietor, partners, or directors and CEO, and compliance officer of the applicant are ultimately responsible for all compliance and regulatory matters and must maintain adequate oversight over the arrangements.

https://www.mas.gov.sg/-/media/mas/sectors/guidance/guidelines-on-licensing-for-payment-service-providers-1.pdf

Appendix 3

## A3    Guidance on Information required for Licence Applications

The applicant should ensure that it fully meets the admission criteria, and has ensured that the application is complete, free of errors and inconsistencies, and accompanied by the requisite supporting documents stated in the application form. In particular, it should include the following information in its proposed business plan:

The applicant should provide a clear description of its business model and plans, which are supported by the professional experience and expertise of the proposed management team. The business plan should illustrate compliance with the PS Act and relevant subsidiary legislation, and include the information below:

- Jurisdictions serviced.

- Profile of target clientele.

- Proposed products and services. The applicant should indicate clearly its assessment of which payment services will be conducted at each stage of the transaction process. Where the applicant intends to provide more than one product or service, the applicant should provide a separate assessment for each product or service.

- Detailed funds flow plan and channels, including transaction and/or process flow diagrams. If there is more than one product or service, or more than one type of transaction and/or process flow, one diagram should be provided for each flow. The diagrams should:

   o  Describe the beginning to end of a typical transaction, starting from the sources of funds that the applicant will accept (e.g. bank transfers, cash, cards) until where the obligation to the customer is fully discharged.

   o  Illustrate both the interactions between the customer and the applicant and the flow of funds.

   o  Have timelines indicated, including service level agreements with third parties, and payment and settlement cycles, where applicable.

   o  Highlight where it uses innovative technology (e.g. use or offering of digital tokens, distributed ledger technology) or a different manner of delivering products or services from that commonly seen in the market.

   o  Include all third parties involved (e.g. other payment service providers, banking partners, intermediaries, other agents) and show their roles in the process.

- Implementation plans, including the anticipated timeline for launch, as well as systems, processes, and third parties that will perform a key role in its operations.

- Whether the payment services are incidental to, or bundled with, any other products or services offered by the applicant.

- Brief description of any other activities regulated by MAS that it conducts or intends to conduct e.g. financial advisory, dealing in securities etc.

- For applicants that are part of a global payment services group:

  o Role of the applicant within the group, including the functions or services that it will receive and/or provide to related corporations within the group, if any.

  o Confirmation that all its entities are adequately licensed/registered, with the licensing/registration details of each entity.

Applicants should also refer to Table A3-1 below for activity-specific guidance on information to include in the proposed business plan.

## Table A3-1 - Activity-specific guidance

| Activity Type | Information to include in proposed business plan |
|---|---|
| Activity A<br><br>Account issuance service | • The applicant should provide the rationale for the limits set and how they will be monitored. It should also indicate the jurisdictions from which loading and redemption can be done (for online services, indicate accordingly and highlight if there are any restrictions).<br><br>• Applicants who operate personal payment accounts should describe their planned monitoring measures to comply with the stock and flow restrictions in section 24 of the PS Act. The description should set out all relevant systems, policies and procedures, including the thresholds that will be set, the frequency of monitoring, and the remedial measures in the event that the account approaches the limit. |
| Activity B<br><br>Domestic money transfer service<br><br>Activity C<br><br>Cross-border money transfer service | • The applicant should demonstrate how it will meet the timelines of three and seven business days for domestic and cross-border money transfer respectively as prescribed in MAS Notice PSN07. The applicant should detail the proposed remedial measures in the event that the prescribed timeline cannot be met. |
| Activity D<br><br>Merchant acquisition service | • The applicant should provide details on the agreements entered into with merchants, including payment and settlement cycles, and due diligence conducted on merchants. |

14

| Activity E<br>E-money issuance service | • The applicant should indicate the currency that the e-money will be denominated in and explain how it will ensure that the e-money is issued in a timely manner.<br>• The applicant should also provide a list of account issuers and third parties that support and accept the e-money, if any, and explain how it will ensure that the balance is recorded and reflected accurately by all parties involved. |
|---|---|
| Activity F<br>Digital payment token service | • The applicant must conduct a holistic risk assessment of all the digital tokens and digital token services (e.g. exchange platform, custody) that they intend to support or provide. It should provide a full list of digital tokens supported (including tokens that are not DPTs), indicate its assessment of the nature of the token under MAS' regulatory framework (e.g. if it is a security token or a payment token), and provide a supporting legal opinion of the assessment for all tokens, except Bitcoin, Bitcoin Cash, Bitcoin Gold, Bitcoin SV, Ethereum, Ethereum Classic, Litecoin and Ripple[6].<br>*[Amended on 3 July 2020]* |
| Activity G<br>Money-changing service | • The applicant should provide a list of the currencies that it will offer and the sources of the foreign currency notes. It should also explain how it derives the exchange rates offered. |

Third parties

Where the applicant intends to engage any third parties, it should provide details on such third parties, including the name, jurisdictions that it operates in, and licensing/registration status. It should also set out its framework for assessing and maintaining oversight of third party relationships, including how it will comply with MAS Notices PSN01 and/or PSN02.

Technology risk management

The applicant should set out its framework for assessing and managing technology risks, and implement measures to protect customer data, transactions and systems that are commensurate with the level of risk and complexity of the financial services offered and the technologies supporting such services. The applicant should refer to the Technology Risk Management Guidelines for guidance on IT risk management principles and best practices.

---

[6] This list is subject to review.

https://www.mas.gov.sg/-/media/mas/sectors/guidance/guidelines-on-licensing-for-payment-service-providers-1.pdf

Safeguarding

The applicant should provide details of the intended safeguarding arrangement, including name of safeguarding institution and draft contract if available, and systems and/or processes that will be used to comply with the timelines in section 23 of the PS Act. Where the applicant will be using more than one safeguarding measure and/or safeguarding institution, it should indicate the intended coverage of each safeguarding measure (e.g. by value at each safeguarding institution, or by each type of safeguarding measure). The applicant should also indicate in its business model description or the transaction and/or process flow diagram where it has assessed its safeguarding obligation to start and end.

If the application is approved, the applicant will be required to provide documentary evidence that the safeguarding arrangement is in place prior to commencing business. Applicants that choose to safeguard by undertaking or banker's guarantee will also be required to provide a legal opinion that the arrangement fulfils the requirements in section 23 of the PS Act.

*[Amended on 30 September 2020]*

SPI threshold monitoring

SPI licence applicants should describe their planned threshold monitoring measures to comply with the thresholds in section 6 of the PS Act. The description should set out all systems, policies and procedures that will be used, including the limits that will be set, the frequency of monitoring, and the measures that will be taken in the event that the applicant approaches the threshold.

Compliance and audit

The applicant should provide the following information and documents that are in line with the nature of the proposed business model:

- AML/CFT policies and procedures that demonstrate compliance with MAS Notices PSN01 and/or PSN02. This should include the framework for assessing and maintaining oversight of agents.

- Enterprise-wide money-laundering/terrorism financing risk assessment.

- AML/CFT governance, escalation and reporting arrangements. This should include details of the involvement of the sole-proprietor, partners, or directors and CEO and other senior management in the oversight and resolution of AML/CFT issues that may arise in the course of the licensee's business.

- Implementation plans of compliance management arrangements, including systems that will be used.

- Name and Curriculum Vitae ("CV") of the compliance officer, including details of any formal compliance accreditation e.g. ACAMS, IBF accreditation. If there is/will

be a separate AML/CFT compliance officer, name and CV of the AML/CFT compliance officer, including details of any formal AML/CFT accreditation.

- Staffing arrangements for the compliance function, if it is not already provided as part of the organisational chart. This should include details on all outsourced compliance functions, including where the outsourced provider and team is located, relationship between the applicant and the outsourced provider (e.g. vendor, parent company), licensing/registration status of the outsourced provider, and oversight arrangements.

- Internal and external audit arrangements.

Appendix 4

# A4    Annual Licence Fees

Under section 10 of the PS Act, licence fees are to be paid annually. A licensee will pay fixed annual fees that correspond to the licence type and types of payment services it conducts. Licensees engaging in two or more payment services will have to pay the sum of all licence fees applicable for each payment service, with some exceptions for account issuance. The annual licence fee for each payment service is set out in the Schedule to the PSR. All licence fees paid are non-refundable.

The licensee should have a GIRO arrangement with MAS for the payment of licence fees on an annual basis. The licensee should ensure that its GIRO arrangement details are updated and there are sufficient funds in its bank account on the deduction date stated on the fee advice.

**Pro-rated licence fee for new licence holders**

For new licensees that are not licensed on 1 January of the year, the licence fee payable for the first calendar year of it being licensed is computed based on the pro-rated amount of the fixed annual licence fee for the period from the licence issue date to 31 December of the same year. Example 1 shows the computation of the first year's licence fee.

Example 1

A company is issued a MC licence on 1 December 2021.

| Licence Issuance Date | 1 December 2021 |
|---|---|
| Pro-rated fee payable for the first calendar year (for the period 1 December 2021 - 31 December 2021 i.e. 31 days) | (31/365) * $1,500 = $127.40 |
| Annual licence fee payable for subsequent calendar years | $1,500 |

**Pro-rated licence fee for upward variations**

Where a licensee adds a new payment service and/or varies its licence to a higher licence class, the licence fee for the additional service and/or new licence class is also pro-rated for the period from the issue date of the new licence (that reflects the additional payment service or new licence class) to 31 December of the same year. Examples 2A and 2B below show the scenario where an existing licensee is granted approval to add a new payment service and variation of licence class respectively.

For subsequent payment of annual licence fees, the annual fee of the additional payment service will be added to the existing annual fee.

Example 2A

A company is issued an SPI licence on 1 January 2021 to conduct the following activities:

1. Account Issuance Service
2. Cross-Border Money Transfer Service

The company decides to add a new service to its licence to provide money-changing service, and a new licence is issued on 1 December 2021.

| Licence Issuance Date | 1 January 2021 |
|---|---|
| Fee payable for the first calendar year (for the period 1 January 2021 - 31 December 2021) | $5,000 |
| New Licence Issuance Date | 1 December 2021 |
| Additional pro-rated fee payable for the first calendar year for the new service (for the period 1 December 2021 - 31 December 2021 i.e. 31 days) | (31/365) * $1,500 = $127.40 |
| Total licence fee paid in 2021 | $5,127.40 |
| Annual licence fee payable for subsequent calendar years | $6,500 |

19

Example 2B

A company is issued an SPI licence on 1 January 2021 to conduct the following activities:

1. Account Issuance Service
2. E-money Issuance Service

The company decides to vary its licence to an MPI licence conducting the same activities, and a new licence is issued on 1 December 2021.

| Licence Issuance Date | 1 January 2021 |
|---|---|
| Fee payable for the first calendar year (for the period 1 January 2021 - 31 December 2021) | $5,000 |
| New Licence Issuance Date | 1 December 2021 |
| Pro-rated fee payable for the first calendar year (for the period 1 December 2021 - 31 December 2021 i.e. 31 days) | (31/365) * $10,000 = $849.32 |
| Total licence fee paid in 2021 | $5,849.32 |
| Annual licence fee payable for subsequent calendar years | $10,000 |

*[Amended on 18 March 2020]*

20