# Exhibit J

# Master XRP Commitment to Sell Agreement

This Master XRP Commitment to Sell Agreement (this "Agreement") is effective the date the last Party signs ("Effective Date") and is between Ripple Services Inc., a Delaware corporation, along with XRP II, LLC, a New York limited liability company regulated by the New York State Department of Financial Services acting as disbursing agent for Ripple Services Inc. (collectively, the "Company") and ▮▮▮▮▮▮▮▮▮▮▮▮, an Australian corporation (the "Purchaser"). The Company and Purchaser are hereby referred to as "Party" individually and together as "Parties."

NOW, THEREFORE, in consideration of the mutual promises contained in this Agreement, the Parties agree as follows:

1. **XRP COMMITMENT**

    (a) Bailment Account. From time to time, the Parties may enter into transactions in which the Company will make available XRP, the digital asset native to the XRP Ledger ("XRP"), for purchase by Purchaser in accordance with this Agreement. Each such transaction is referenced herein as a "Commitment" and, unless otherwise agreed to in writing, is to be governed by this Agreement. With respect to each Commitment, the Company shall transfer such XRP to a Purchaser's account at Bitstamp or another digital asset account mutually agreed by the Parties, such account directly and wholly controlled by Purchaser (the "Bailment Account"), to be used specifically and solely in accordance with this Agreement or other agreement the Purchaser may have entered into with Company.

    (b) Bailment Relationship. The Parties acknowledge and agree that the transfer of XRP by Company to Purchaser's Bailment Account pursuant to Section 1(a) is for administrative convenience to facilitate Purchaser's ability to purchase such XRP at market price in accordance with Section 2. For the avoidance of doubt, the Parties acknowledge and agree that except as otherwise provided in this Agreement, the mere transfer of XRP by Company to Purchaser's Bailment Account pursuant to this Section 1(a) is not a sale or purchase of such XRP by Purchaser, is not a transfer or conveyance of legal title of the Committed XRP (as defined below) to Purchaser, and that Purchaser holds such XRP as a bailee until Purchaser withdraws the Committed XRP pursuant to Section 2(a), which shall cause legal title to such Committed XRP to transfer to Purchaser. The Parties acknowledge and agree that neither party shall treat Company's mere transfer of XRP to Purchaser's Bailment Account as a sale or exchange for financial reporting purposes or for purposes of the United States Internal Revenue Code or state and local tax law purposes. Neither Party shall take a financial or tax reporting position, make a disclosure, or file a tax return with an applicable tax authority inconsistent with the foregoing.

    (c) Bailment Account Designation. Purchaser agrees to identify and designate the Bailment Account in Purchaser's books and records as a bailment account subject to this Agreement.

    (d) No Commingling. Purchaser agrees to not deposit, commingle, or hold any XRP in the Bailment Account other than XRP transferred by Company pursuant to the Agreement or other XRP held by Purchaser as bailee on behalf of the Company. If Purchaser breaches this Section 1(d), Purchaser shall be deemed to have withdrawn all Unpurchased XRP (defined below) and Other Assets (defined below) then held in the Bailment Account, and shall purchase all such Unpurchased XRP at the Breach Price, as provide in Section 3(n), and Other Assets at their fair market value, with both rates calculated as of 12:00:01 AM PST on the date such commingling occurred.

(e) No Encumbrance. Purchaser represents and warrants that the Bailment Account and the digital assets held therein are not subject to any pledge, security interest, lien, or encumbrance. Further, Purchaser agrees to not sell, assign, transfer, pledge, hypothecate, encumber, or otherwise dispose of the Bailment Account or the Committed XRP or Other Assets (if any) therein prior to purchase in accordance with the terms of this Agreement. If Purchaser breaches this Section 1(e), Purchaser shall be deemed to have withdrawn all Unpurchased XRP (defined below) and Other Assets (defined below) then held in the Bailment Account, and shall purchase all such Unpurchased XRP at the Breach Price, as provided in Section 3(n), and any Other Assets at their fair market value, with both rates calculated at 12:00:01 AM PST on the date such breach occurred.

(f) Bailment Account Keys. Purchaser shall not share the address of the Bailment Account with any third party other than the Company and its affiliates. Purchaser acknowledges and agrees that the security of the Bailment Account created and maintained by Purchaser shall be the sole responsibility of Purchaser.

(g) Commitment Procedures. Upon agreeing to enter into a Commitment, the Company shall promptly deliver to Purchaser via email a written confirmation of the Commitment, substantially in the form attached hereto as Appendix A (the "Terms of XRP Commitment") that contains information including:

(i) Purchaser's Bailment Account address and the destination tag;

(ii) the total XRP units subject to the Commitment, referred to as the "Committed XRP";

(iii) the maturity date for such Commitment (the "Maturity Date").

Unless Purchaser countersigns the Terms of XRP Commitment and submits an electronic countersigned copy to the Company, the Company will not complete the Commitment. The countersigned Terms of XRP Commitment, together with this Agreement, shall constitute the terms agreed between the Company and Purchaser with respect to the Commitment to which the Terms of XRP Commitment relates.

The Company will only be obligated to complete a Commitment in the event that Purchaser returns a countersigned Terms of XRP Commitment within twenty-four (24) hours from the time the Company sends such Terms of XRP Commitment to Purchaser, after which the terms of the Commitment as reflected in the Terms of XRP Commitment will expire.

In all events, and in its sole discretion, the Company reserves the right to refuse to complete, or to otherwise cancel, any pending Commitment prior to receipt of Purchaser's countersignature to the applicable Terms of XRP Commitment, even after the delivery of the Terms of XRP Commitment to Purchaser. The Company will have no liability to Purchaser if the Company exercises the right set forth in the preceding sentence.

(h) Return or Purchase of Unpurchased XRP. Without limiting Sections 1(d), 1(e), 1(i), 3(a), and 5, with respect to each Commitment, on or prior to the applicable Maturity Date, Purchaser may return the Committed XRP minus any Committed XRP under such Commitment that has been purchased by Purchaser pursuant to Section 2 ("Unpurchased XRP"). If the Purchaser does not return such Unpurchased XRP to the Company by 12:00:01 AM PST on the Maturity Date, Purchaser must pay the Company an amount equal to the number of units of Unpurchased XRP multiplied by the

Breach Price, as Provided in Section 3(n), as of 12:00:01 AM PST on the Maturity Date. Such payment must be made within five (5) business days following the Maturity Date.

(i)     Return or Purchase of Other Assets.  Without limiting Sections 1(d), 1(e), 1(h), 3(a), and 5, Purchaser shall deliver any other asset, property, right, or entitlement arising from a split, fork, airdrop, or similar occurrence of the Committed XRP (collectively "Other Assets"), with such delivery being made to a wallet identified by Company, unless Company waives its rights to such Other Assets. If Purchaser does not return such Other Assets to the Company by 12:00:01 AM PST on the Maturity Date, Purchaser must pay the Company the fair market value of such Other Assets as of 12:00:01 AM PST on the Maturity Date. Such payment must be made within 5 business days following the Maturity Date.

(j)     Receipts; Cancellations and Reversals.  Following the completion of a Commitment between Purchaser and Company under this Agreement, including the delivery of the Committed XRP to Purchaser as recorded on the XRP Ledger, the Company shall provide to Purchaser a receipt, substantially in the form attached hereto as Appendix B and adapted as appropriate.  Once completed, a Commitment cannot be cancelled, reversed or changed.

2.     **XRP PURCHASES**

(a)     Withdrawal of XRP.  Purchaser purchases Committed XRP from Company by withdrawing such Committed XRP from the Bailment Account.  Each withdrawal of Committed XRP shall be converted into a USD purchase price based on Purchaser's acceptance of a mutually agreed upon rate quote ("Market Rate") managed by an automated software system. If Purchaser withdraws XRP outside of a mutually agreed upon rate quote managed by an automated software system, the Market Rate shall be the USD/XRP Breach Price, provided in Section 3(n), as of the time of such withdrawal. Company shall retain reasonable records regarding the Market Rate on a per transaction basis. For the avoidance of doubt, upon each withdrawal, Purchaser shall be deemed to have purchased the XRP from the Company, and Purchaser's obligation to repay the withdrawn XRP to the Company on the applicable Maturity Date shall terminate.

(b)     Purchase Invoices.  On a weekly basis, for any week where Purchaser has withdrawn XRP, the Company will invoice Purchaser for an amount of US Dollars equal to the sum of all USD purchase prices for withdrawals for that week. Within five (5) business days of receiving the invoice, Purchaser shall pay the Company the USD for the amount noted on the invoice.  Following receipt of payment, the Company shall send Purchaser a receipt confirming such payment.

3.     **TERMS AND CONDITIONS OF THE PURCHASE**

(a)     Restrictions on Committed XRP.  Purchaser represents that it is not purchasing Committed XRP for investment purposes or with an expectation of profit, and agrees that it only shall sell, trade or otherwise transact the Committed XRP for the sole purpose of completing a payment transaction over On-Demand Liquidity through parties or exchanges that have been authorized for use with On-Demand Liquidity. Company may monitor the Purchaser's Bailment Account and On-Demand Liquidity activity to evaluate compliance with such requirements. In the event Company reasonably believes Purchaser has breached the foregoing requirements, Company may immediately terminate this Agreement and Purchaser shall return all Unpurchased XRP along with any Other Assets within five (5) business days in accordance with Section 1(h) and 1(i), as applicable. For avoidance of doubt, Purchaser's failure to complete a transaction over On-Demand Liquidity for any reason (including any third party error or malfunction of On-Demand Liquidity) shall not excuse Purchaser

from any of its obligations under this Agreement, including (without limitation) any return of Unpurchased XRP or payment for Committed XRP.

(b) Taxes.  Any purchase payments made by Purchaser to Company under this Agreement shall be made free and clear of any deduction or withholding of taxes.  To the extent any taxes are applicable to Purchaser on the purchase of the Committed XRP, Purchaser shall be obligated to pay all applicable taxes.  The Company is not responsible for any taxes that Purchaser is legally obligated to pay in any jurisdiction in which such taxes are incurred or arise in connection with Purchaser's business activities (under this Agreement or otherwise).

(c) Delivery.  Subject to any and all rights the Company may have in Section 1(b), upon receipt by the Company of an electronic countersigned copy of the Terms of XRP Commitment from Purchaser, the Company shall use commercially reasonable efforts to deliver the Committed XRP to the Bailment Account within two (2) business days, or, if later, the Commitment delivery date specified on the Terms of XRP Commitment.

(d) Compliance Audit Rights.  During the term of this Agreement, no more frequently than once per year, at the sole cost of the Company, and provide that the Company gives Purchaser 14 days prior written notice, the Company may audit the Purchaser's policies, procedures and records relating to its compliance with laws and regulations related to its anti-money laundering, terrorist financing, economic sanctions and asset control programs (collectively, "Compliance Programs").  Notwithstanding the foregoing, Company and its affiliates may audit Purchaser more frequently in the event (i) a governmental or regulatory authority requires Company to perform an audit, (ii) Company reasonably believes an audit is necessary to address a threat or material risk to its business, or (iii) a prior audit has resulted in findings of non-compliance with applicable laws, or significant deficits in its Compliance Programs (collectively, "Negative Findings").  In the event that an audit results in any Negative Findings, the Company may in its sole discretion (a) terminate this Agreement, or (b) provide Purchaser with 30 days to remediate such Negative Findings and provide Company evidence of such remediation, which Company shall judge the sufficiency of within its sole discretion.  Purchaser's failure to reasonably cooperate with any audit shall be considered a material breach of this Agreement.

(e) Notice of Personnel Changes. In the event that Purchaser's Bank Secrecy Act Officer, Chief Compliance Officer, the equivalents thereof, or any other key management personnel responsible for Purchaser's Compliance Programs is replaced or leaves Purchaser's organization ("Personnel Change"), Purchaser shall give Company notice of such Personnel Change, including the date of its occurrence and any interim or replacements plans within 14 days of it taking effect.

(f) Risk of Loss.  Immediately upon the Company's delivery of the Committed XRP to Purchaser, all risk of loss related to such XRP arising from a hack, theft, security breach, or similar occurrence passes to Purchaser.  Purchaser acknowledges and agrees that the Company has no liability to Purchaser or any third party for any loss, theft or misuse of any XRP that the Company has delivered to Purchaser as provided in this Agreement.

(g) Purchaser Acknowledgement.  Purchaser acknowledges and agrees that (i) the Committed XRP do not represent a right to make any demand on the Company, (ii) the Company has no obligation to redeem or exchange the Committed XRP for monetary value, goods, services or any other item, (iii) the Company is not responsible for any use by Purchaser or any third party of the Committed XRP and (iv) the Purchaser has a right to receive periodic account statements and valuations from the Company.

HIGHLY CONFIDENTIAL                                                                                                    RPLI_SEC 0898844

(h)   Compliance with Laws. Purchaser shall comply with all applicable laws, rules, and regulations, and orders in all relevant jurisdictions (collectively, "Laws") including, but not limited to, Laws related to its activities and to its use, resale or distribution of XRP. Without limiting the foregoing, Purchaser agrees not to violate (a) any applicable domestic or foreign anti-corruption Law, including the United Kingdom Bribery Act of 2010 and the United States Foreign Corrupt Practices Act; (b) any applicable domestic or foreign Laws related to Anti-Money Laundering and anti-terrorist financing requirements, including the USA Bank Secrecy Act, as amended by the USA Patriot Act and the Financial Conduct Authority's Anti-Money Laundering Regulations; (c) any applicable sanctions Laws administered by the U.S. Department of Treasury's Office of Foreign Assets Control; (d) applicable export restrictions or other Laws, including United States Export Administration Regulations, as well as end user, end use and destination restrictions which may be issued by the United States and other governments; and (e) antitrust, anti-competition, or other market manipulations Laws.

(i)   Responsibility to Purchaser's Purchasers. Purchaser is responsible for all Purchaser service and other issues or claims that relate to Purchaser's distribution or sale of the Committed XRP. Purchaser shall make no representations or warranties to any other party concerning, or on behalf of, the Company.

(j)   Publicity. Neither Party may issue any press release or make any other public statement with respect to this Agreement and its terms and conditions unless the content, timing and method of distribution of the press release or public statement has been approved in writing by the other Party.

(k)   Confidentiality. Each Party shall maintain all Confidential Information it receives in strict confidence and not disclose any Confidential Information to any third party, unless agreed upon in writing. A Party may disclose Confidential Information required to be disclosed by law, regulation, or a valid court order if that Party (i) gives the other Party timely notice, unless legally prohibited, so that other Party may seek a protective order, confidential treatment, or other appropriate relief and (ii) discloses only the portion of Confidential Information that is necessary to comply with such law, regulation, or order. The obligations in this sub-paragraph are in addition to, and do not supersede, any confidentiality and nondisclosure obligations provided in any other written agreement between the Parties. "Confidential Information" means the terms of this Agreement and any non-public information or materials provided by either Party to the other Party in connection with the performance of this Agreement, but does not include any information or materials that: (A) was previously known to the receiving party free of any obligation to keep it confidential, (B) becomes generally available to the public through no wrongful act, (C) is rightfully received from a third party under no obligation of confidence to such third party, (D) is independently developed by the receiving party without reference to information which has been disclosed pursuant to this Agreement, or (E) is required to be disclosed in invoice to comply with all applicable laws, administrative process, stock exchange rule or governmental or court invoices; provided, however, that in a circumstance in which disclosure is compelled by applicable law, administrative process, stock exchange rule or governmental or court invoices, the party that is subject to such compelled disclosure shall limit the disclosure to only that information that must be disclosed to comply with the invoice and shall give the other party prompt prior notice of such compelled disclosure so that the other party may seek to protect such information.

(l)   Indemnification. Purchaser agrees to defend, indemnify and hold the Company, its affiliates, and their respective employees, shareholders, directors, and representatives (together with the Company and its affiliates, the "Company Indemnitees") harmless and settle against any Claim or Loss, including attorneys' fees and any fines, fees or penalties imposed by any regulatory authority, arising out of or related to: (i) any violation of law by Purchaser or Purchaser's employees, contractors, or agents in connection with this Agreement, (ii) any breach of this Agreement by Purchaser or

Purchaser's employees, contractors, or agents, and (iii) any use, distribution or resale of the Committed XRP by Purchaser or by Purchaser's employees, contractors or agents. Notwithstanding anything to the contrary in this Agreement, Purchaser is not obligated to indemnify, hold harmless, or defend the Company against any claims, demands, losses, expenses, and liabilities arising out of or relating to the Company's gross negligence, fraud, or willful misconduct in the performance of this Agreement. "Claim" means any claim, action, audit, investigation, inquiry or other proceeding brought or instituted against the Company, its affiliates, or any of their respective employees, shareholders, directors or representatives by a person or entity other than Purchaser, or its affiliates or subsidiaries. "Loss" means any claim, cost, loss, damage, judgment, penalty, interest and/or expense (including reasonable attorneys' fees) arising out of any Claim.

(m)     Indemnification Procedure. In connection with any Claim or Loss, the Company shall give Purchaser prompt notice of the Claim or Loss (however, that any delay in notification will not relieve Purchaser of its obligation to indemnify, except and solely to the extent t hat the delay actually prejudices Purchaser). In addition, the Company will cooperate with Purchaser in connection with the defense and settlement of the Claim or Loss, with Purchaser having the right to choose counsel. Purchaser shall not enter into any settlement or compromise of any Claim or Loss without the Company's prior written consent (which consent shall not be unreasonably withheld, conditioned or delayed) if such settlement or compromise arises from or is part of any criminal action, suit, or proceeding, or contains a stipulation to or admission or acknowledgement of any liability or wrongdoing (whether in contract, tort or otherwise) on the part of the Company, or otherwise requires the Company to refrain from or take material action (such as payment of fees). At its cost, the Company has the right to participate in the defense or settlement of the Claim or Loss with counsel of its own choosing.

(n)     Breach Price. The Breach Price is equal to the real-time, USD/XRP spot rate as published on https://tradeblock.com/markets/index/xrx ("Tradeblock Price"), plus ten percent (10%).

## 4.     DISCLAIMERS, LIMITATIONS AND RESERVATIONS

(a)     EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT, THE COMPANY MAKES NO REPRESENTATIONS OR WARRANTIES IN RELATION TO THE PURCHASED XRP, THIS AGREEMENT OR ITS PERFORMANCE HEREUNDER, INCLUDING (WITHOUT LIMITATION) IMPLIED WARRANTIES OF MERCHANTABILITY, NON-INFRINGEMENT, FITNESS FOR A PARTICULAR PURPOSE, OR IMPLIED WARRANTIES ARISING OUT OF COURSE OF DEALING, COURSE OF PERFORMANCE OR USAGE OF TRADE. PURCHASER SHALL HAVE NO RECOURSE AGAINST COMPANY, ITS AFFILIATES, EMPLOYEES, DIRECTORS, OR OFFICERS FOR ANY LIABILITIES OF ANY TYPE INCURRED BY PURCHASER AND/OR ITS AFFILIATES AS A RESULT OF ITS USE, RESALE, OR DISTRIBUTION OF XRP, INCLUDING THE MATERIALIZATION OF ANY OF THE RISKS IN SECTION 6.

(b)     IN NO EVENT SHALL THE COMPANY, ITS AFFILIATES, OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, AGENTS, EMPLOYEES OR REPRESENTATIVES, BE LIABLE TO PURCHASER FOR ANY SPECIAL, INCIDENTAL, INDIRECT, INTANGIBLE, OR CONSEQUENTIAL DAMAGES OR DAMAGES FOR LOSS OF PROFITS, WHETHER BASED ON CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY, OR OTHERWISE, ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO AUTHORIZED OR UNAUTHORIZED TRANSACTIONS SUBJECT TO THIS AGREEMENT. THE COMPANY, ITS AFFILIATES, OR ANY OF THEIR RESPECTIVE OFFICERS,

HIGHLY CONFIDENTIAL                                                                                                          RPLI_SEC 0898846

DIRECTORS, AGENTS, EMPLOYEES OR REPRESENTATIVES' ENTIRE LIABILITY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT WILL IN NO EVENT EXCEED THE AGGREGATE PURCHASE PRICE PAID BY PURCHASER UNDER THIS AGREEMENT.

THIS MEANS, BY WAY OF EXAMPLE ONLY (AND WITHOUT LIMITING THE SCOPE OF THE PRECEDING SENTENCE), THAT IF PURCHASER CLAIMS THAT THE COMPANY FAILED TO PROPERLY PROCESS A PURCHASE OF XRP PURSUANT TO THIS AGREEMENT AND THE TERMS OF XRP COMMITMENT, PURCHASER'S DAMAGES ARE LIMITED TO NO MORE THAN THE PURCHASE PRICE PAID BY PURCHASER, AND THAT PURCHASER MAY NOT RECOVER FOR LOST PROFITS, LOST BUSINESS OPPORTUNITIES, OR OTHER TYPES OF DAMAGES IN EXCESS OF THAT TOTAL TRANSACTION VALUE.

5. **TERM AND TERMINATION**

(a) Term. The term of this Agreement commences on the Effective Date and continues thereafter for one (1) year (the "Initial Term"). After the Initial Term, this Agreement shall renew automatically in successive one year periods ("Renewal Terms").

(b) Termination by Notice. The Parties may terminate this Agreement by ten (10) days written notice ("Termination Date"); provided, however, that Purchaser may not terminate this agreement unless (i) the Maturity Dates of any and all Commitments have passed, and (ii) Purchaser has satisfied all of its obligations under Section 1, including but not limited to its obligation to return all Unpurchased XRP and all Other Assets in accordance with Section 1(h) and 1(i)

(c) Termination for Breach. Without limiting any other right or remedy that the Company may have at law or otherwise, the Company may, in its sole discretion, terminate this Agreement immediately upon notice to Purchaser if Purchaser breaches any of its obligations under this Agreement, in particular its obligation to comply with applicable laws and regulations as set forth in Section 3(h).

(d) Termination for Insolvency. Without limiting any other right or remedy the Company may have at law or otherwise, in the event Purchaser (i) files for protection under bankruptcy or insolvency laws, (ii) makes an assignment for the benefit of creditors, (iii) appoints or suffers appointment of a receiver or trustee over substantially all of its property (iv) proposes a written agreement of composition or extension of its debts, (v) proposes or is a party to any dissolution or liquidation, or (vi) files a petition under any bankruptcy or insolvency act or has any such petition filed against it, then the Company may immediately terminate this Agreement.

(e) Effect of Termination. The expiration or termination of this Agreement, for any reason, shall not release either Party from any obligation or liability to the other Party, including any payment obligation, that: (i) has already accrued hereunder; (ii) comes into effect due to the expiration or termination of this Agreement; or (iii) otherwise survives the expiration or termination of this

HIGHLY CONFIDENTIAL

Agreement. This includes, but is not limited to Purchaser's obligation to comply with Section 1(h) as to any Unpurchased XRP and Section 1(i) as to any Other Assets.

6. **REQUIRED DISCLOSURES**

(a) Purchaser acknowledges and agrees that Purchaser cannot cancel, reverse, or change any XRP transaction that has been completed, as recorded on the XRP Ledger, including as described in Section 1(e).

(b) Purchaser acknowledges and agrees that Purchaser is solely responsible for maintaining adequate security and control of any and all IDs, passwords, hints, personal identification numbers (PINs), secret keys or any other codes that Purchaser uses to access the Committed XRP ("Purchaser Credentials"). Any loss or compromise of Purchaser Credentials may result in unauthorized access to the Committed XRP by third-parties and the loss or theft of such XRP. The Company assumes no responsibility for any loss that Purchaser may sustain due to compromise of Purchaser Credentials.

(c) Purchaser acknowledges the following material risks associated with virtual currency, including XRP:

(i) Virtual currency is not legal tender, is not backed by the government, and accounts and value balances are not subject to Federal Deposit Insurance Corporation or Securities Investor Protection Corporation protections.

(ii) Legislative and regulatory changes or actions at the state, federal, or international level may adversely affect the use, transfer, exchange, and value of virtual currency.

(iii) The sale of XRP may be determined to be subject to the United States or state securities laws by the relevant regulatory authorities or by a court in pending litigation in which the outcome is currently unknown.

(iv) Transactions in virtual currency may be irreversible and, accordingly, losses due to fraudulent or accidental transactions may not be recoverable.

(v) Some virtual currency transactions shall be deemed to be made when recorded on a public ledger, which is not necessarily the date or time that the transaction is initiated.

(vi) The value of virtual currency may be derived from the continued willingness of market participants to exchange fiat currency for virtual currency, which may result in the potential for permanent and total loss of value of a particular virtual currency should the market for that virtual currency disappear.

(vii) There is no assurance that a person who accepts a virtual currency as payment today will continue to do so in the future.

(viii) The volatility and unpredictability of the price of virtual currency relative to fiat currency may result in significant loss over a short period of time.

(ix) The nature of virtual currency may lead to an increased risk of fraud or cyber attack.

HIGHLY CONFIDENTIAL                                                                                        RPLI_SEC 0898848

(x) The nature of virtual currency means that any technological difficulties experienced by the Company may prevent the access or use of a Purchaser's virtual currency.

(xi) Any bond or trust account maintained by the Company for the benefit of its Purchasers may not be sufficient to cover all losses incurred by Purchasers.

(d) If Purchaser has any questions, needs assistance, or wishes to contact the Company with a complaint, Purchaser may contact the Company's Purchaser Support at complaints@ripple.com, Tel: + (800) 887-4084, or 315 Montgomery St., 2nd Floor, San Francisco, CA 94104, USA to the attention of the XRP II, LLC Legal Department. If Purchaser is dissatisfied with the manner in which a complaint has been handled, or for any other reason, Purchaser can also refer the matter to the New York State Department of Financial Services ("NYDFS") located at: One State Street, New York, NY 10004-1511, USA; Tel: + (800) 342-3736 (Monday through Friday, 8:30 AM to 4:30 PM EST). To file an electronic compliant with NYDFS, visit https://myportal.dfs.ny.gov/web/guest-applications/consumer-complaint.

(e) Purchaser acknowledges and agrees that the Company may share information concerning Purchaser in accordance with the Company's Privacy Policy Addendum (attached as Appendix C) including, without limitation, sharing such information (i) with appropriate state and federal regulatory authorities in connection with the transactions contemplated by this Agreement, (ii) in response to a court or government order, and (iii) with other affiliates of the Company in accordance with applicable laws. Lastly, Purchaser agrees that the Company may obtain and use such information as may be necessary for legitimate business needs in connection with the operation of the Company and its affiliates.

7. **MISCELLANEOUS PROVISIONS**

(a) Choice of Law; Jurisdiction and Venue. This Agreement shall be governed by, and construed in accordance with the laws of the State of New York, U.S.A., as such laws are applied to contracts entered into and performed in such State and without reference to any conflict of laws rules or provisions. The Parties irrevocably consent to the non-exclusive jurisdiction and venue of the federal and state courts located in New York, New York, U.S.A. with respect to any claim, action or proceeding arising out of or in connection with this Agreement. The U.N. Convention on Contracts for the International Sale of Goods shall not apply to this Agreement.

(b) Notice. Any notices under this Agreement shall be sent by certified or registered mail, return receipt requested, to the Notices address and party set forth below; provided, however, each Party agrees and consents to receive electronically all communications, agreements, documents, notices and disclosures that the other Party provides in connection with this Agreement, including but not limited to the Terms of XRP Commitment, Purchase Notices, Commitment receipts, and any other disclosures or statements the Company may be required under applicable law or regulation to make to Purchaser. Notice shall be effective upon receipt at the email addresses below:

(i) If to the Company: ▮▮▮▮▮ with a copy to ▮▮▮▮▮

(ii) If to Purchaser: ▮▮▮▮▮ with a copy to ▮▮▮▮▮

(c) Entire Agreement; Amendments; Counterparts. This Agreement constitutes the entire contract between the Parties hereto with regard to the subject matter hereof. It supersedes any other

agreements, representations or understandings (whether oral or written and whether express or implied) that relate to the subject matter hereof. Except for a writing signed by both parties, this Agreement may not be modified or amended. If any provision of this Agreement is held to be invalid, such invalidity will not affect the remaining provisions. This Agreement may be signed in any number of counterparts, each of which is an original and all of which taken together form one single Agreement. A signed copy of this Agreement transmitted by email or any other means of electronic transmission shall be deemed to have the same legal effect as an original executed copy of this Agreement.

(d)     Successors and Assigns. Purchaser may not assign any rights granted under this Agreement without the prior written consent of the Company. The Company reserves the right to assign its rights without restriction to any affiliates or subsidiaries. Any attempted transfer or assignment in violation hereof shall be null and void. Subject to the foregoing, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the Company and its successors and assigns and be binding upon Purchaser and Purchaser's successors and permitted assigns, whether or not any such person has become a party to this Agreement or has agreed in writing to join herein and to be bound by the terms, conditions and restrictions hereof. In addition, this Agreement is not intended to confer any right or benefit on any third party.

(e)     Relationship of the Parties. Nothing in this Agreement shall be construed or is intended to be construed as creating an employer-employee or agency relationship, a partnership, or a joint venture between the Parties including, for the avoidance of doubt, for purposes of applicable tax law.

(f)     Survival. Section 1, Section 2, Section 3(b), Section 3(k), Section 3(l), Section 3(m), Section 3, and Section 7 shall survive the termination or expiration of this Agreement, as well as any other provision that, in order to give proper effect to their intent, should survive such expiration or termination. Termination or expiration of this Agreement shall not affect or limit any independent rights of a Party in or to its Confidential Information under applicable laws.

(g)     Severability. If any provision of this Agreement is determined to be invalid or unenforceable under any rule, law or regulation or any governmental agency, local, state, or federal, such provision will be changed and interpreted to accomplish the objectives of the provision to the greatest extent possible under any applicable law and the validity or enforceability of any other provision of this Agreement shall not be affected.

(h)     Non-Waiver. The failure of either Party to enforce any provision of this Agreement or to exercise any rights or remedies under this Agreement will not constitute a waiver of the Party's rights to subsequently enforce the provision or exercise those rights or remedies. The remedies specified in this Agreement are in addition to any other remedies that may be available at law or equity.

(i)     Force Majeure. The Company shall not be liable for delays, failure in performance or interruption of service which result directly or indirectly from any cause or condition beyond its reasonable control, including but not limited to, any delay or failure due to any act of God, act of civil or military authorities, act of terrorists, civil disturbance, war, strike or other labor dispute, fire, interruption in telecommunications or Internet services or network provider services, failure of equipment and/or software, other catastrophe or any other occurrence which is beyond its reasonable control and shall not affect the validity and enforceability of any remaining provisions.

HIGHLY CONFIDENTIAL                                                                                                       RPLI_SEC 0898850

(j) Change of Control. Purchaser will provide written notification to the Company in the event that the ultimate ownership of Purchaser changes such that an investor who did not have 25% or more ownership as of the Effective Date of this Agreement, now maintains 25% or more ownership.

[Remainder of page intentionally left blank; signature page to follow.]

HIGHLY CONFIDENTIAL

RPLI_SEC 0898851

DocuSign Envelope ID: DA9D1938-2D89-4820-888C-8D0D9FDE7534

As of the Effective Date, the Parties agree to be bound and have caused this Agreement to be executed.

|  | **RIPPLE SERVICES INC.** |
|---|---|
| ▮▮▮▮▮▮▮▮▮▮ | ▮▮▮▮▮▮▮▮▮▮ |
| Date: 9/1/2020 | Date: 9/2/2020 |

▮▮▮▮▮▮▮▮▮▮

HIGHLY CONFIDENTIAL                                                                                   RPLI_SEC 0898852

Appendix A

**XRP II, LLC**
**80 State Street**
**Albany, NY 12207**

Today's Date:                                           [Current date]

**Summary of XRP Commitment**

**NOT A RECEIPT OR OFFER**

The Purchaser would like to acquire units of XRP, the decentralized digital asset that is native to the XRP Ledger, on the following terms:

| | |
|---|---|
| Purchaser Name: | [Full name of Purchaser] |
| [Bailment Account[1] Address][2]: | [Bailment Account address] |
| Destination Tag: | [Destination tag, if applicable] |
| Transaction Type: | Commitment to Purchaser |
| Commitment Delivery Date: | [Expected delivery date] |
| Total XRP Units: | [Number of XRPs] |
| Applicable fees, expenses or charges: | |
| Maturity Date: | [Insert date 3 months after Commitment delivery date] |
| Additional terms, if applicable: | |

This Terms of XRP Commitment is being delivered pursuant to, and is governed by, the terms and conditions of the Master XRP Commitment to Sell Agreement between the parties, dated as of [_____]. Once completed, the transaction cannot be cancelled or revoked. For the avoidance of doubt, once executed the transaction may not be undone.

<u>Agreed and Acknowledged</u>:

███████████████                                           XRP II, LLC

By: _____                      By: _____
Name:                                                     Name:
                                                          Title:

---

[1] As that term is defined in the Master XRP Commitment to Sell Agreement.

[2] The unique public cryptographic key specified by Purchaser as the address to which any Committed XRP will be delivered. Purchaser confirms that the Bailment Account Address listed is directly and wholly owned by Purchaser.

Page **13** of **15**
VAPRIL2020

Appendix B

XRP II, LLC
80 State Street
Albany, NY 12207

Today's Date: [Current date]

## RECEIPT

Purchaser Name: [Full name of Purchaser]
Receiving XRP Address[1]: [Receiving XRP Ledger wallet address]
Receiving Destination Tag: [Destination tag, if applicable]
Receiving Financial Institution Name: [Name of receiving exchange/custodian, if applicable]

Transferor[2] XRP Address: [XRP II XRP Ledger address]

Transaction ID (hash): [Transaction hash]

Transaction Type: [Purchase by Purchaser/Lease to Lessee/Commitment to Purchaser]
Total XRP Units: [Number of XRPs] Units [priced at $[Unit price] per Unit, if applicable]

Total Transaction Value: $[Total value, if applicable]
Date and Time of Transaction: [Transaction date and time]

Additional terms, if applicable:

The [Purchase/Lease/Commitment] of the Total XRP Units specified above is governed by the terms and conditions of the Master XRP [Purchase/Lease/Commitment to Sell] Agreement (the "Agreement") between [Ripple entity name] ("Company") with offices at [physical address of Ripple entity] and [Purchaser name] ("Purchaser") with offices at [physical address of Purchaser], including but not limited to, the provisions relating to the liability of XRP II, LLC, under which XRP II, LLC will not be liable for any incidental, indirect, or consequential damages arising out of the Agreement, and its entire liability arising out of or in connection with the Agreement will not exceed any purchase price it receives under the Agreement. In all events, and in its sole discretion, XRP II, LLC reserves the right to refuse to complete, or to otherwise cancel, any pending [Purchase/Lease/Commitment], even after receiving the signed Terms of XRP [Purchase/Lease/Commitment] document. For the avoidance of doubt, the Company have no liability for non-delivery or delayed delivery. Once a [Transaction type] is completed, a [Purchase/Lease/Commitment] cannot be undone, cancelled or reversed. For the avoidance of doubt, there are no refunds for interests or other payments, if any, associated with a [Purchase/Lease/Commitment].

If you have any questions, need assistance, or wish to contact us with a complaint, please contact XRP II, LLC support at complaints@ripple.com, Tel: + (800) 887-4084, or 315 Montgomery St., 2nd Floor, San Francisco, CA 94104, USA to the attention of the XRP II, LLC Legal Department. If you are dissatisfied with the manner in which a complaint has been handled, you can also refer the matter to the New York State Department of Financial Services (NYDFS) located at: One State Street, New York, NY 10004-1511, USA. Tel: + (800) 342-3736 (Monday through Friday, 8:30 AM to 4:30 PM EST). To file an electronic compliant with NYDFS, you can visit https://myportal.dfs.ny.gov/web/guest-applications/consumer-complaint.

---

[1] The unique public cryptographic key specified by Purchaser as the address to which any XRP was delivered.
[2] The unique public cryptographic key of XRP II from which the XRP was delivered.

Page **14** of **15**
VAPRIL2020

HIGHLY CONFIDENTIAL

RPLI_SEC 0898854

Appendix C

XRP II, LLC

PRIVACY POLICY ADDENDUM

HIGHLY CONFIDENTIAL

RPLI_SEC 0898855