**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION,   :
   :
                              **Plaintiff,**   :       20 Civ. 10832 (AT) (SN)
   :
                - against -   :       ECF Case
   :
RIPPLE LABS, INC., BRADLEY GARLINGHOUSE,  :
and CHRISTIAN A. LARSEN,   :
   :
                   **Defendants.**   :
   :
------------------------------------------------------------------------x

### PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
### REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION
### FOR REMEDIES AND ENTRY OF FINAL JUDGMENT

Jorge G. Tenreiro
Benjamin Hanauer
Marc J. Jones
Peter B. Moores

Attorneys for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
New York Regional Office
100 Pearl Street
New York, New York 10014
(212) 336-9145 (Tenreiro)
TenreiroJ@sec.gov

May 6, 2024

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... iii

I.   THE COURT SHOULD ENTER THE REQUESTED INJUNCTIONS. .............. 1

    A.   Ripple's Claims That It Did Not Act Recklessly Are Contrary to Evidence. ................ 2

    B.   Ripple's Supposed Assurances Demonstrate Why Injunctions are Needed. ................ 4

    C.   Ripple's Additional Arguments Are Unavailing. ................................................................ 5

II.   RIPPLE'S ARGUMENTS FOR NO DISGORGEMENT IN LIGHT OF
    THE HUNDREDS OF MILLIONS IT MADE ARE MERITLESS. ....................... 8

    A.   The SEC Has Made *Govil*'s Required Showing of Pecuniary Harm. .............................. 8

    B.   Ripple Fails to Refute the SEC's Reasonable Approximation of Ill-Gotten
    Gains. .......................................................................................................................................... 9

III.   A LARGE PENALTY THAT PUNISHES AND DETERS IS NEEDED. ............. 13

    A.   Ripple's "Comparable" Penalty Cases are All Settlements. .............................................. 14

    B.   Courts Regularly Impose Penalties that Equal Defendant's Ill-Gotten Gains. ............ 15

CONCLUSION ............................................................................................................................. 15

## TABLE OF AUTHORITIES

**Cases**

*ASCPA v. Animal & Plant Health Inspection Serv.*, 60 F.4th 16 (2d Cir. 2023) ............................................4

*Cato Inst. v. SEC*, 4 F.4th 91 (D.C. Cir. 2021) ................................................................................14

*Chill v. Gen. Elec. Co.*, 101 F.3d 263 (2d Cir. 1996) .........................................................................3

*Finkel v. Stratton Corp.*, 962 F.2d 169 (2d Cir. 1992) .....................................................................13

*In re Block.one*, 2019 WL 4793292 (Sept. 30, 2019) ........................................................................14

*In re BlockFi Lending LLC*, 2022 WL 462445 (Feb. 14, 2022) ........................................................14

*In re Grand Jury Proceedings*, 219 F.3d 175 (2d Cir. 2000) ...............................................................3

*Kokesh v. SEC*, 581 U.S. 455 (2017) ...................................................................................... 10, 11

*Liu v. SEC*, 591 U.S. 71 (2020) ............................................................................................. 10, 11

*Providence Rubber Co. v. Goodyear*, 76 U.S. 788 (1869) .................................................................10

*SEC v. Ahmed*, 72 F.4th 379 (2d Cir. 2023) ............................................................................ 9, 13

*SEC v. Alpine Secs. Corp.*, 413 F. Supp. 3d 235 (S.D.N.Y. 2019)
    *aff'd,* 982 F.3d 68 (2d Cir. 2020) ......................................................................................7

*SEC v. Am. Bd. of Trade, Inc.*, 751 F.2d 529 (2d Cir. 1984) .............................................................6

*SEC v. Arias*, 2021 WL 7908041 (E.D.N.Y. Nov. 11, 2021),
    *report and recommendation adopted*, 2023 WL 1861641 (Feb. 9, 2023) ......................................12

*SEC v. Bajic*, 2023 WL 6289953 (S.D.N.Y. Sept. 27, 2023) ..........................................................10

*SEC v. Blackburn*, 2020 WL 1702362 (E.D. La. Apr. 8, 2020) ......................................................15

*SEC v. Cavanagh*, 155 F.3d 129 (2d Cir. 1998) ..................................................................... 1, 2, 6

*SEC v. Citigroup Glob. Mkts., Inc.*, 752 F.3d 285 (2d Cir. 2014) ....................................................14

*SEC v. CKB168 Holds., Ltd.*, 2022 WL 3347253 (E.D.N.Y. Aug. 12, 2022) ...................................7

*SEC v. Coinbase*, 2024 WL 1304037 (S.D.N.Y. Mar. 27, 2024) .......................................................2

*SEC v. Complete Bus. Solutions Grp., Inc.*, 2023 WL 4196949 (11th Cir. June 27, 2023) ...................10

*SEC v. Elliot*, 180 F. Supp. 3d 230 (S.D.N.Y. 2016) .......................................................................15

*SEC v. Elliot*, 2011 WL 3586454 (S.D.N.Y. Aug. 11, 2011) .......................................................15

*SEC v. First Jersey Sec.*, 101 F.3d 1450 (2d Cir. 1996)................................................................1

*SEC v. Fowler*, 17 Civ. 139 (S.D.N.Y. Feb. 28, 2020).................................................................7

*SEC v. Genesis Glob. Cap., LLC*, 23 Civ. 287 (S.D.N.Y. Mar. 18, 2024) ...............................14

*SEC v. Govil*, 86 F.4th 89 (2d Cir. 2023) ...................................................................8, 9, 10, 11

*SEC v. iFresh, Inc.*, 2024 WL 416709 (E.D.N.Y. Feb. 5, 2024) ..................................................9

*SEC v. Jankovic*, 2018 WL 301160 (S.D.N.Y. Jan. 4, 2018) ......................................................7

*SEC v. LBRY, Inc.*, 2023 WL 4459290 (D.N.H. July 11, 2023)...................................................3

*SEC v. Leffers*, 289 Fed. App'x 449 (2d Cir. 2008)..................................................................15

*SEC v. Lemelson*, 619 F. Supp. 3d 246 (D. Mass. 2022) ............................................................8

*SEC v. Lorin*, 76 F.3d 458 (2d Cir. 1996) .............................................................................. 1, 5

*SEC v. Mattessich*, 2022 WL 16948236 (S.D.N.Y. Nov. 15, 2022) ...........................................2

*SEC v. McDermott*, 2022 WL 16533556 (E.D. Pa. Oct. 28, 2022) ...........................................10

*SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801 (2d Cir. 1975) ......................................................1

*SEC v. Monarch Fund*, 608 F.2d 938 (2d Cir. 1979) ..................................................................6

*SEC v. O'Brien*, 2023 WL 3645205 (S.D.N.Y. May 25, 2023)..................................................12

*SEC v. Offill*, 2012 WL 1138622 (N.D. Tex. Apr. 5, 2012) ......................................................15

*SEC v. Parklane Hosiery Co.*, 422 F. Supp. 477 (S.D.N.Y. 1976)
      *aff'd*, 558 F.2d 1083 (2d Cir. 1977) ...................................................................................6

*SEC v. Pentagon Cap. Mgmt., PLC*, 2012 WL 1036087 (S.D.N.Y. Mar. 28, 2012) .................15

*SEC v. Rajaratnam*, 918 F.3d 36 (2d Cir. 2019) ......................................................................13

*SEC v. StratoComm Corp.*, 89 F. Supp. 3d 357 (N.D.N.Y. 2015) ..............................................7

*SEC v. Telegram Grp., Inc.*, 19 Civ. 9439 (S.D.N.Y. June 26, 2020)........................................14

*SEC v. The Heartland Group Ventures, LLC, et al.*, 21 Civ. 01310 (N.D. Tex.)..........................8

*SEC v. Wayland*, 8:17-01156 (C.D. Cal. May 7, 2019) ............................................................15

*SEC v. Wyly*, 2015 U.S. Dist. LEXIS 24018 (S.D.N.Y. Feb. 26, 2015).......................................7

*SEC v. Zenergy Int'l, Inc.*, 430 F. Supp. 3d 384 (N.D. Ill. 2019) ..................................................15

*Tilghman v. Proctor*, 125 U.S. 136 (1888) ..........................................................................12

*Triodetic Inc. v. Statue of Liberty IV, LLC*, 582 F. App'x 39 (2d Cir. 2014)...................................4

*Williams v. Binance*, 96 F.4th 129 (2d Cir. 2024)..............................................................5

**Treatises**

Restatement (Third) of Restitution and Unjust Enrichment § 51 cmt. h.......................................10, 11

**Regulations**

17 C.F.R. § 230.502(d).............................................................................................5

17 C.F.R. § 230.506(d)(1)(ii)(A) ..................................................................................7

## I.   THE COURT SHOULD ENTER THE REQUESTED INJUNCTIONS.

The parties agree that the central question is "whether 'there is a reasonable likelihood that [Ripple's] wrong will be repeated.'" *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 807 (2d Cir. 1975).[1]

Ripple does not appear to dispute two key factors: (1) that it has been found liable for a violation that (2) took place over many years. SEC Br. at 5-6; Opp. at 2-3, 14-15. Courts readily enter injunctions in such cases because they indicate a higher likelihood of repetition. *SEC v. Lorin*, 76 F.3d 458, 461 (2d Cir. 1996); *see also SEC v. First Jersey Sec.*, 101 F.3d 1450, 1477 (2d Cir. 1996). Nor can there be doubt that Ripple's ongoing business places it in a position where "violations could be anticipated." *SEC v. Cavanagh*, 155 F.3d 129, 135 (2d Cir. 1998). Ripple's primary business continues to be, as it has been since 2013, unregistered sales of XRP. SEC Br. at 8-10. It also plans to issue a new unregistered crypto asset. *See* Apr. 4, 2024 Press Release (Ex. 1). And the Court already found that Ripple's ODL Institutional Sales up to 2020 violate the law. MSJ Order (D.E. 874) ("Order") at 4, 16-21. Ripple tellingly does not dispute that *all* its post-2020 sales are unregistered ODL sales, or that it has made *over* ███ ███ from these activities since the case was filed. SEC Br. at 9.

Under the law, even if Ripple had not committed a single violation since 2020, another violation could still "be anticipated." "[I]njunctive relief is not barred by a defendant's disclaimer of an intent to violate the law in the future, or even by cessation of the illegal acts," where the nature of the violations suggests that another violation could occur absent an injunction. *Mgmt. Dynamics*, 515 F.2d at 807; *see also First Jersey*, 101 F.3d at 1477 (injunction affirmed where defendant's business, ownership, and key personnel remained unchanged). Thus, although Ripple contends that "apparent resemblance" of activities does not warrant an injunction, Opp. at 9, Section 5 injunctions validly protect against a defendant's "*potential* for *future* involvement in [the same] *type* of scheme." *Cavanagh*,

---

[1] Capitalized terms have the meaning given in the SEC's opening memorandum (D.E. 949) ("SEC Br."). Ripple's opposition brief (D.E. 953) will be referred to as "Opp." or "Opposition."

155 F.3d at 135 (emphasis added). Here, Ripple engages almost entirely in the same business—unregistered Institutional Sales of XRP—that led to the violation in the first place. *See also infra* § I.B.

Ripple's remaining arguments against the SEC's proposed injunctions are equally meritless.

### A.   Ripple's Claims That It Did Not Act Recklessly Are Contrary to Evidence.

Ripple tries to refute the "degree of scienter" factor with a series of unavailing arguments. First, it invokes supposed "widespread uncertainty" about the law. Opp. at 4. This Court has already rejected this "fair notice" defense, Order at 28-30, as have others. *See, e.g.*, *SEC v. Coinbase*, 2024 WL 1304037, at *1, *15-17 (S.D.N.Y. Mar. 27, 2024). By relitigating this rejected argument, Ripple shows that it "continues to maintain that [its] past conduct was blameless." *Cavanagh*, 155 F.3d at 135; *see also SEC v. Mattessich*, 2022 WL 16948236, at *7 (S.D.N.Y. Nov. 15, 2022) ("continu[ing] to deflect blame … by pursuing arguments that failed" at the liability stage supports injunctions).

Ripple also argues that it "voluntarily gave the SEC information about its business in 2013." Opp. at 5, 13. But the presentation Ripple cites does not discuss investors or raising capital, and only obliquely references a "Distribution of XRP" at the end. D.E. 831-39 at 25. If these arguments are credited, every time any market participant had any communication with any of thousands of SEC employees about anything, the agency would be "on notice" as to all possible violations by that entity and preclude injunctive relief. Ripple identifies no legal support for this position, which it also unsuccessfully pressed on summary judgment. *See* D.E. 841 at 31-32 (SEC addressing arguments).

Next, Ripple points to the legal advice it sought. Opp. at 4, 10-11. But its brief does not address one of the 2012 memos, or all the steps Ripple took in contravention of both 2012 memos. *See* D.E. 846-29 at 7 (recommending **"Do not sell [XRP]"**); *id.* at 12-13 (do not sell to "Investors"); D.E. 846-30 at 6, 20 (counseling to seek "no action" relief and warning against promoting XRP as an investment). Ripple started XRP sales less than a year later, targeting investors, distributing brochures promoting XRP as an investment (Order at 6), and not seeking "no action" relief. The

point is not that the memos concluded definitively that XRP was a security as Ripple suggests may

be required for a finding of recklessness, *e.g.*, Opp. at 4, 11, but that the "danger [that Ripple's

actions would violate the law] was … known" and Ripple chose to act anyway. *Chill v. Gen. Elec. Co.*,

101 F.3d 263, 269 (2d Cir. 1996); *SEC v. LBRY, Inc.*, 2023 WL 4459290, at *2 (D.N.H. July 11, 2023)

(Section 5 injunction because violations were "more egregious than a mere unregistered offering").[2]

The SEC also showed *why* Ripple chose to proceed this way: it believed that registering and

disclosing information would cause "serious damage to [its] negotiating position" with XRP investors,

D.E. 744-2 at ¶ 8; D.E. 744 at 6, at a time when it was completely dependent on XRP sales to fund

itself. SEC Br. at 4. Not disputing this, Ripple responds that a "generic profit motive" does not

show scienter. Opp. at 11 n.13. But this is an existential, not a "generic" motive. Nor is it Ripple's

"[m]ere [o]wnership of XRP" (*id.* at 12) that suggests additional violations "could be anticipated."

The violations can be anticipated because selling XRP has always been Ripple's near sole source of

revenue. *See* SEC Br. at 9; D.E. 945-14 at 2. Tellingly, the ODL product Ripple touts, Opp. at 1-2, 6-

7, does not produce revenue for Ripple other than from selling XRP, and Ripple does not contend

otherwise.[3] Simply put, Ripple has strong incentives to sell XRP even if doing so violates the law.

That it has *increased* ODL sales, even after the SEC sued it over those sales, demonstrates as much.

---

[2] All of this occurred before Ripple obtained the legal opinion in 2015 that it now claims the SEC ignores. Opp. at 11. The SEC sought to discover the facts underlying these communications, which Ripple opposed. D.E. 166, 174. Judge Netburn denied discovery on these topics, holding that Ripple's state of mind was not at issue unless Ripple argued it "thought that XRP was not an investment contract." D.E. 210 at 6. Thus, Ripple cannot now "rely on privileged communications to support its claim or defense." *Id.* at 7 (citing *In re Grand Jury Proceedings*, 219 F.3d 175, 182 (2d Cir. 2000)). And though Ripple now claims that its interactions with other U.S. regulators gave it further reason to believe its XRP sales did not implicate the securities laws, the 2012 memos warned that XRP sales could be subject to different and overlapping regulatory regimes in the U.S. D.E. 846-29, 846-30.

[3] Ripple mischaracterizes the Order as having determined that Ripple did not act recklessly, citing passages where the Court was instead explaining how a jury could draw different conclusions about the Individual Defendants' state of mind. *E.g.*, Opp. at 6, 12 (citing MSJ Op. at 31-32). Now that Ripple's liability has been established, this Court, not a jury, decides whether an injunction is proper based on the evidence, including of scienter. *See LBRY*, 2023 WL 4459290, at *2 (court deciding).

### B.      Ripple's Supposed Assurances Demonstrate Why Injunctions are Needed.

Ignoring the critical facts that established its liability—which speak directly to the *Cavanagh* factors—Ripple seeks to shift focus solely to its post-Complaint conduct. More specifically, Ripple assures the Court it has undertaken since the Order, and will presumably undertake in perpetuity, "change[s]" supposedly aimed at "avoid[ing] future violations." Opp. at 1, 6. These "assurances," however, hinge on the false premise that the Order provided legal "guidance about the ways" in which Ripple can structure *future* sales of XRP. *Id.* at 2. Courts do not provide parties advisory opinions about future conduct. *ASCPA v. Animal & Plant Health Inspection Serv.*, 60 F.4th 16, 22-23 (2d Cir. 2023). Moreover, if Ripple was truly following what the Order said was legal, it would be doing only Programmatic Sales, not increasing unregistered Institutional ones. Opp. at 6-9, n.11.

Worse, Ripple's "assurances" that its unregistered sales "avoid the problems identified" in the Order, *id.* at 2, are based on misreading or ignoring what the Order says. Ripple's first "assurance" is not even an actual assurance—it is instead another attempt to relitigate summary judgment arguments (this time, about whether ODL XRP sales constitute the sale of securities) while (again) denying that Ripple is relitigating these issues. *See id.* at 9 & n.12. *Compare id.* at 6-7 *with* D.E. 641 at 6-7; D.E. 675 at 1-2, 9, 19. Ripple can appeal, but its persistent refusal to accept the Order's holding for purposes of remedies shows an injunction is critical to avoid another violation.

Ripple's next "assurances" are its dual contentions that its ODL sales are now "outside" the United States and are also exempt from registration because they are to "accredited investors." Opp. at 7-8. Ripple's Answer pled these two specific defenses, D.E. 51 at 99, yet Ripple abandoned them as to Institutional Sales on summary judgment. *E.g.*, D.E. 641 at 59 n.40 (discussing extraterritoriality defense only as to Programmatic Sales but not asserting it even as to those sales); *see also Triodetic Inc. v. Statue of Liberty IV, LLC*, 582 F. App'x 39, 40 (2d Cir. 2014) (affirmative defenses not raised at summary judgment are waived). So Ripple mischaracterizes the Order as

giving it clearance to "sell extraterritorially[] or use exemptions." Opp. at 12. As Ripple did not make these arguments, the Order does not mention them as to Institutional Sales at all.[4]

Ripple finally argues it has "changed its contracts" and also that "ODL contracts do not contain … lock-up periods, resales restrictions, and discounts." Opp. at 1, 7. But the Order noted that only "some" of the Institutional Sales contracts had these provisions, all contracts that predated the ODL ones that violated Section 5. *See* Order at 21 (citing Defs. 56.1 Resp. ¶¶ 575, 800–01 (in turn citing D.E. 840-39, 840-47, 849-13, 849-14)). The ODL contracts at issue already contained no such restrictions as Ripple itself previously pointed out when it was litigating the legality of these contracts. *See* D.E. 675 at 1-2, 9, 19, 51. This is no "change" at all.[5]

### C.   Ripple's Additional Arguments Are Unavailing.

**1.** Ripple argues the Court "should also take into account the SEC's own conduct," and that because the SEC supposedly "knew of Ripple's activities no later than October 2013," this also counsels against injunctive relief. Opp. at 12-13. Ripple's contentions are meritless.

To be sure, "a district court may properly consider the amount of time between the" liability finding and the violations as "just one factor among several." *Lorin*, 76 F.3d at 461. But the Second Circuit has *rejected* that this should become an inquiry about *the SEC's conduct*, declining to adopt the argument that an injunction "was inappropriate in light of the SEC's failure to move" earlier. *Id.*

---

[4] While citing post-*Morrison* Second Circuit cases, Opp. at 8, Ripple fails to alert the Court of the Second Circuit's recent decision holding that *Morrison* poses no bar to securities laws claims based on unregistered sales on crypto asset platforms to U.S. investors. *Williams v. Binance*, 96 F.4th 129, 139-140 (2d Cir. 2024) *reh'g denied* No. 22-972, D.E. 109 (Apr. 26, 2024). It is also unclear how the potential private offering exemption, Opp. at 8, would apply given that Ripple admits there are no resale restrictions. *See id.* at 7; *see generally* 17 C.F.R. § 230.502(d).

[5] Similarly, while Ripple claims it has "not distributed since at least 2016 the brochures that this Court found gave rise to an expectation of profit," Opp. at 8, some of this material was available online, including on Ripple's websites, through at least 2021. *E.g.*, D.E. 626-2 at 14 (Ripple post, accessed in 2021, referencing "Deep Dive" document). In any event, it was the totality of circumstances, including hundreds of post-2016 statements, that gave rise to the expectation of profits. Order at 16-21; *see also* D.E. 917 at 5.

Courts recognize that delays "are caused by the difficulties of investigation, the myriad documents," and the "consideration … of the rights of possible defendants." *SEC v. Parklane Hosiery Co.*, 422 F. Supp. 477, 486 n.6 (S.D.N.Y. 1976) *aff'd*, 558 F.2d 1083 (2d Cir. 1977). Here, the SEC began investigating Ripple when XRP grew in market size (it was worth less than a penny until 2017, D.E. 861-18 at 14-17), gathered evidence about billions in sales, engaged with Ripple to avoid litigation, Opp. at 5, and instituted and prosecuted this action diligently. Any suggestion that it has not taken Ripple's "violations very seriously," *id.* at 13 is spurious. However the SEC decided to handle its case does not affect the key inquiry of whether another violation by Ripple could be anticipated.[6]

Similarly, Ripple's return to the 2013 presentation it emailed a random SEC staff member, *id.*, rings just as hollow as it did before. *Infra* § I.A. Ripple suggests that injunctions are unwarranted where a market participant discusses *anything* with *any* of the SEC's 4,400 or so employees, unless the SEC conducts a rapid investigation into *all* that market participant's activities and seeks preliminary injunctive relief even if on an incomplete record. No court has endorsed these extreme positions.[7]

**2.** Ripple shows a stunning unwillingness to "admit wrongdoing," *First Jersey*, 101 F.3d at 1477, when it invents its own standard (which Ripple claims without citation to authority applies in strict liability cases) that the "appropriate response [to a violation] is to acknowledge the [c]ourt's ruling." Opp. at 14. This is not the law. *Cavanagh* itself set forth the injunction standard for a

---

[6] The cases Ripple cites (Opp. at 12-13 & n.5) involved starkly different facts. *SEC v. American Board of Trade Inc.* involved a defendant who had for 14 years discussed its specific activities at issue with the relevant SEC staff and offered to cease and then did stop the problematic conduct. *See* 751 F.2d 529, 531-32 (2d Cir. 1984). In *SEC v. Monarch Fund*, an injunction was not proper because there was no violation at all. 608 F.2d 938, 942-43 (2d Cir. 1979). *Parklane Hosiery* imposed an injunction against the corporate defendant but not against an individual based on the passage of time from what was an "isolated occurrence" by an investor who was not an issuer. 422 F. Supp. at 487.

[7] It is particularly ironic for Ripple to advance these arguments while criticizing the SEC's conduct in a case which did involve expedited requests for injunctions, Opp. at 16 n.18, and while suggesting that adjudications about Ripple's future conduct should occur not at a "summary contempt proceeding" but following a lengthy new investigation and protracted lawsuit. *Id.* at 16.

defendant accused only of a Section 5 violation. 155 F.3d at 135; *see also SEC v. Alpine Secs. Corp.*, 413 F. Supp. 3d 235, 251 (S.D.N.Y. 2019) *aff'd* 982 F.3d 68 (2d Cir. 2020). Moreover, Ripple responds to its misleading post-Order statements, *see* SEC Br. at 6, by pointing to media analysis and (once again) to the SEC. Opp. at 15-16 & n.16. This is the opposite of accepting responsibility. *E.g., SEC v. Jankovic*, 2018 WL 301160, at *8 (S.D.N.Y. Jan. 4, 2018) (enjoining defendant "minimiz[ing]" role and "mak[ing] only perfunctory statements regarding" culpability).

**3.** Ripple also assures the Court it need not be worried about whether Ripple could again violate the *U.S. securities* laws by pointing to different licenses it has obtained from different jurisdictions, including those Ripple explains "do not treat XRP sales as sales of securities." Opp. at 1; *see also id.* at 5-6. This argument—akin to saying a New York restaurant need not obtain a liquor license because it obtained a fishing license in California—is absurd.

**4.** Ripple's requests to modify the SEC's two proposed injunctions, Opp. at 16-17, are meritless. The first proposed injunction is specific and tracks the statutory language. Injunctions tracking statutory language are routinely imposed in this circuit and are not just a "command" to "obey the law." *Id.* at 16; *see, e.g., SEC v. Fowler*, 17 Civ. 139 (D.E. 205) (S.D.N.Y. Feb. 28, 2020); *SEC v. Wyly*, 2015 U.S. Dist. LEXIS 24018, *19-20 (S.D.N.Y. Feb. 26, 2015); *SEC v. StratoComm Corp.*, 89 F. Supp. 3d 357, 374 (N.D.N.Y. 2015); *SEC v. CKB168 Holds., Ltd.*, 2022 WL 3347253, *4 (E.D.N.Y. Aug. 12, 2022) (each imposing injunctions tracking statutory language). The second uses specific language to prohibit precisely the conduct the Court found to be violative (D.E. 950 at 3). Ripple's request that an injunction parse out different kinds of Institutional Sales based on their granular "characteristics," Opp. at 17, finds no support in the evidence, *supra* § I.B, or the cases Ripple cites.

**5.** Congress, in the Dodd-Frank Act of 2010, authorized the SEC to disqualify those enjoined from securities laws violations from using the private offering exemption to sell securities. *See* 17 C.F.R. § 230.506(d)(1)(ii)(A). The SEC administers a process to determine whether waiving

disqualification would protect investors, and courts have deferred to that process. *SEC v. The Heartland Group Ventures, LLC, et al.*, 21 Civ. 01310, D.E. 51 (N.D. Tex.) (Ex. 2); *SEC v. Lemelson*, 619 F. Supp. 3d 246, 250 (D. Mass. 2022) (declining to grant waiver). Ripple points to no instance in which a court overrode disqualification and its request that this Court do so should be rejected.

## II.   RIPPLE'S ARGUMENTS FOR NO DISGORGEMENT IN LIGHT OF THE HUNDREDS OF MILLIONS IT MADE ARE MERITLESS.

### A.   The SEC Has Made *Govil*'s Required Showing of Pecuniary Harm.

Ripple agrees that under *SEC v. Govil*, 86 F.4th 89 (2d Cir. 2023) pecuniary harm is simply a "predicate" for ordering disgorgement. Opp. at 18.  Nor does it dispute that *quantifying* the harm is not required. SEC Br. at 16. Instead, Ripple claims that the SEC is arguing that the "harm" here is the "right to make an informed decision," which under *Govil* does not suffice, and that the SEC must show instead that an "investor lost money." Opp. at 18-19 (citing 86 F.4th at 105).

 But that is not the SEC's position here. The SEC has shown that Ripple's violation—its failure to provide statutorily mandated disclosures about pricing and discounts—caused pecuniary harm because some institutional investors paid more than they would have had they received all required information. SEC Br. at 18. Nowhere does *Govil* foreclose finding pecuniary harm *that flows* from a lack of disclosure. 86 F.4th at 104. When nondisclosure causes victims to pay more than they would have with proper disclosure, pecuniary harm, not just the loss of information, occurs.

Ripple challenges the SEC's showing of pecuniary harm by alleging that it is "speculative" whether disclosure of the discounts would have occurred with registration, and also whether such disclosure would have affected the price at which Institutional Sales investors bought XRP. Opp. at 20. But disclosure of the discounts is a legal requirement (SEC Br. at 18) that Ripple fails to address. Nor is it speculative to find that failure to disclose a ▮▮ price discount distorted pricing and caused pecuniary harm to institutional investors who were unaware of those discounts. Ripple, in insisting on redacting its XRP sales discounts from public filings in this case, explicitly stated its own view

that if "the financial terms of Ripple's contracts" such as "pricing strategies" were publicly known, this could lead to other contractual counterparties seeking the "more favorable terms that Ripple provided to other counterparties." D.E. 744-2 at ¶¶ 8, 17. The Opposition fails to grapple with this concession. Instead, Ripple has continued to insist on these redactions. *E.g.*, D.E. 949 at 1, 9, 18-21.[8]

And Ripple's assertion that "no one lost money" purchasing XRP (Opp. at 19) too narrowly interprets pecuniary harm. An investor may buy and sell a stock whose price is inflated and still make a profit, while suffering pecuniary harm. Where "stock prices were artificially inflated … the requisite pecuniary harm to those who purchased" is established. *SEC v. iFresh, Inc.*, 2024 WL 416709, at *3 (E.D.N.Y. Feb. 5, 2024). This more comprehensive concept of pecuniary harm is shown by *Govil*'s associating "pecuniary harm" with "economic loss." 86 F.4th at 104.

Ripple also misreads *Govil* as precluding disgorgement when the victim "'received the return' that was 'contemplated.'" Opp. at 20. This argument ignores *SEC v. Ahmed* which disgorged profits from certain deals even when the victim suffered *no* out of pocket losses and received the benefit of their bargain. 72 F.4th 379, 396-98 (2d Cir. 2023). *Ahmed* ruled the defendant's failure to disclose a conflict tainted the entire transaction. *Id.* at 397-98. Ripple's failure to disclose discounts is like the failure in *Ahmed* to disclose a conflict, and awarding disgorgement here would be similarly equitable.[9]

### B.     Ripple Fails to Refute the SEC's Reasonable Approximation of Ill-Gotten Gains.

Ripple raises no factual dispute about the financial data supporting the SEC's disgorgement

---

[8] Ripple also attempts to dismiss its own internal documents describing the decrease in XRP market prices caused by the deep discounts at which it sold some XRP by noting that this market effect "would have been a problem regardless of disclosure." Opp. at 21 n.22. But it would not have been a problem for any Institutional Sales investor who had received the disclosures the law entitles them to, and demanded better prices to protect themselves before the "market dislocation" occurred.

[9] Ripple also attempts to distinguish *Ahmed* by noting the case involved misappropriation. Opp. at 19 n.21. But so did *Govil*. *See* 86 F.4th at 95. Misappropriation may be a measure of the ill-gotten gain, but the existence of *pecuniary harm to the victim* does not turn on the existence of misappropriation.

calculation. Ripple concedes that Ripple accounted for the costs of generating its revenue under the "Cost of Revenue" category in its financial statements. To lower the disgorgement award, Ripple instead advances two incorrect legal positions, that: (1) to calculate ill-gotten gains, *all* of Ripple business expenses should be deducted from Institutional Sales revenues, and (2) revenue from pre-Complaint offers and sales contracts received post-Complaint must be excluded.

 **1.** Ripple incorrectly asserts that the Court must deduct *all* "Legitimate Business Expenses" whether or not the expenses relate to its Section 5 violations. Opp. at 21. While legitimacy is one criterion of a deductible expense, it is not the only one. The threshold inquiry is nexus: the "deductions contemplated in *Liu* are only those 'incurred in producing the revenues that are subject to disgorgement.'" *SEC v. Bajic*, 2023 WL 6289953, at *4 (S.D.N.Y. Sept. 27, 2023). Only legitimate expenses causally linked to the problematic revenues should be deducted because ill-gotten gains are the "net profits *from wrongdoing.*" *Liu v. SEC*, 591 U.S. 71, 85 (2020) (emphasis added). *Liu* and *Kokesh* each quote the Restatement to explain this: "a defendant is entitled to a deduction for all marginal costs incurred in producing the revenues that are subject to disgorgement." *Liu*, 591 U.S. at 91; *Kokesh v. SEC*, 581 U.S. 455, 466 (2017); *see also, e.g.*, *Providence Rubber Co. v. Goodyear*, 76 U.S. 788, 802, 804 (1869) (calculating net profits by first excluding revenue and expenses unrelated to patent infringement and then deducting expenses specifically tied to making and selling the offending products) (cited in *Liu*, 591 U.S. at 83). So does *Govil.* 86 F.4th at 110; *see also SEC v. Complete Bus. Solutions Grp., Inc.*, 2023 WL 4196949, at *2 (11th Cir. June 27, 2023) ("legitimate expenses" are the "marginal costs incurred in producing the revenues that are subject to disgorgement" (quoting *Liu*)).

 Thus, the Court should not deduct expenses unrelated to the wrongful revenue. Ripple would have paid those costs anyway, and to do so would just give it a windfall and not restore the status quo. Tellingly, Ripple does not address *Bajic* (or *SEC v. McDermott*, 2022 WL 16533556, at *8-9 (E.D. Pa. Oct. 28, 2022)) or cite any case applying *Liu* how Ripple wants.

Undeterred, Ripple counters that *Liu* did not place a "marginal cost" limitation on what is deductible. Opp. at 23-24. Ripple's overreading of *Liu*, where the Court did not ultimately determine what was deductible but instead remanded for determination of what deductions were proper, is incorrect. *Liu* involved two individuals who misappropriated investment proceeds. 591 U.S. at 78. The Court noted that certain un-diverted corporate expenditures (like lease payments and cancer-treatment equipment), may have independent value, and in any event did not benefit the married defendants and would therefore likely not qualify as a wrongful gain to them. *Id.* at 92. Calculating disgorgement, thus, required distinguishing the money the defendants diverted for themselves (*i.e.*, wrongful gain), from the money expended consistent with representations made to investors (un-embezzled investment proceeds). In other words, those expenditures were "deductible" not because, as Ripple contends, *all* corporate expenses with independent value or that may be couched as "legitimate" are deductible, but because the spouses had not originally diverted those funds to begin with.[10] Moreover, none of the Court's statements about the independent value of the lease payments erased or overrode its citation to the Restatement's "marginal cost" principle to provide lower courts guidance as to what *is* deductible. 591 U.S. at 91-92. Whatever the "marginal cost" of producing the offending revenues (the diverted funds) was, those facts were not before the Court in *Liu*.

*Liu* and the equitable principles outlined show that the first of Ripple's proposed approaches to expenses, in which Ripple deducts *all* its expenses from its *entire* business, whether related to Institutional Sales or not, and Ripple's implausible claim that its supposedly thriving company has suffered hundreds in millions of losses, *see* Opp. at 22, is a total non-starter. *See also Tilghman v.*

---

[10] Ripple also claims that the "marginal cost" principle adopted in *Liu*, *Kokesh*, and *Govil* does not apply here because it only applies to "conscious wrongdoers," which Ripple implies it is not. Opp. at 23 n.26. Ripple conspicuously omits from its quote of the Restatement that "the principle that limits liability to net gains applies equally to a defendant without fault." Restatement (Third) of Restitution and Unjust Enrichment § 51, cmt. h (Am. Law Inst. 2011). Moreover, having violated Section 5 at least recklessly, Ripple is a "conscious wrongdoer" anyway. *Supra* § I.A.

*Proctor*, 125 U.S. 136, 146 (1888) (unjust enrichment not reduced "even if from other causes the business in which that invention was employed by the defendant did not result in profits."). Even Ripple's expert does not endorse that approach. *See* D.E. 945-17 (Bracco Tr.) at 115:22-121:25.

Ripple's second approach, deducting a portion of every one of its expenses, Opp. at 22-23, ultimately also fails because it does not limit deductions to Ripple's "marginal costs" to generate Institutional Sales revenue. This approach still deducts *hundreds of millions* of dollars of overhead and other expenses that were not the marginal cost of (or even related to) Institutional Sales revenue, such as: (a) expenses related to Ripple's Software and Services business, D.E. 954-24 ¶¶ 30, 63; (b) research and development costs, *id.* ¶ 33; and (c) employee perks like "Office Refreshments," "Meals," "Teambuilding," and "Employee Swag." D.E. 945-17 at 252:24-254:17; *see also* D.E. 945-21 at 21-22. Bracco concedes that these expenses are not the marginal costs to produce Institutional Sales revenue. D.E. 945-17 at 256:2-4.[11]

Unlike Ripple's approaches, the SEC uses the closest approximation of "marginal cost" of revenue, the very same that Ripple had calculated in its financial statements, helpfully labelled as "Cost of Revenue" by its accountants. According to Bracco, "[c]ost of revenue is the costs of goods sold related to … the cost of XRP sold and impairment of purchased XRP." D.E. 945-24 ¶ 32. It even includes overhead and indirect expenses Ripple's financials allocated to the cost of producing revenue. SEC Br. at 14. If the other categories (*e.g.*, "research and development" and "general and administrative") included costs to produce XRP sales revenue, Ripple's accountants would have treated them as Cost of Revenues. Ripple should be held to its own accounting treatment.

---

[11] Bracco also deducted taxes (D.E. 945-12, Sched. 2-B). But taxes are not generally deducted from disgorgement. "Nothing in [*Liu*] states or suggests that personal income taxes must be deducted from the disgorgement amount." *SEC v. O'Brien*, 2023 WL 3645205, at *12 n.9 (S.D.N.Y. May 25, 2023); *SEC v. Arias*, 2021 WL 7908041, at *6 (E.D.N.Y. Nov. 11, 2021), *report and recommendation adopted*, 2023 WL 1861641 (Feb. 9, 2023).

**2.** Ripple's disgorgement calculation is also flawed because it does not include revenues from Section 5 violations that Ripple happened to receive post-Complaint from four Institutional Sales contracts executed pre-Complaint. Ripple's claim that it did not "commit" to selling the XRP under those contracts makes no sense. When Ripple executed the contracts pre-Complaint, it committed to providing all the XRP eventually delivered to the investors. *See Finkel v. Stratton Corp.*, 962 F.2d 169, 173 (2d Cir. 1992). While the investor may have controlled the exact number of XRP it ultimately purchased, if Ripple failed to deliver the XRP promised it would have breached the sales contract. Thus the "sale" occurred pre-Complaint, and all revenue from these violative contracts, about $266 million, constitutes wrongful gain and is subject to disgorgement.[12]

Ripple has failed to meet its burden of showing that the SEC's calculation is not a reasonable approximation of Ripple's ill-gotten gains, as Ripple's attempts to reduce its "net gains" are legally unsound. The Court should award disgorgement according to the SEC's reasonable approximation of ill-gotten gains, which is based on *Liu* and the equitable principles underlying that decision.

## III.   A LARGE PENALTY THAT PUNISHES AND DETERS IS NEEDED.

Penalties should "punish" and "deter future violations" and to do so courts impose penalties up to *gross* pecuniary gain. SEC Br. at 22. The Second Circuit also instructs courts to avoid penalties that are "a mere slap on the wrist" or "cost of doing business." *SEC v. Rajaratnam*, 918 F.3d 36, 45 (2d Cir. 2019). The SEC's penalty request—Ripple's *net* gains, $114 million less than the allowed penalty based on *gross* gains—is calibrated to the nearly $27 billion holds in XRP and ███████ it holds in cash and other assets. SEC Br. at 24. Ripple insists on a "low" penalty—under $10 million. Opp. at 26. But it fails to explain how that negligible "low" penalty would meaningfully punish its violations or deter it or others from future large-scale capital raises without required registration.

---

[12] Ripple argues against prejudgment interest because it "acted innocently." Opp. at 23. Even if Ripple only "innocently" violated Section 5, prejudgment interest is equitable relief appropriately entered against non-wrongdoers. *See generally Ahmed*, 72 F.4th at 403.

A.      Ripple's "Comparable" Penalty Cases are All Settlements.

Searching for comparable cases, the best Ripple can muster is to invoke two categories of *settlements*. This is like a defendant who declines to plead guilty, loses at trial, and then demands a sentence based on plea deals. Ripple's attempt to tether its penalty to settlements ignores that SEC settlements "provide parties with a means to manage risk" and "are normally compromises in which the parties give up something they might have won in litigation." *SEC v. Citigroup Glob. Mkts., Inc.*, 752 F.3d 285, 295 (2d Cir. 2014) (citations omitted); *see also Cato Inst. v. SEC*, 4 F.4th 91, 93 (D.C. Cir. 2021) (settling defendants "gain certain benefits" including "concessions") (citations omitted).

The facts of the three *pre-litigation* settlements involving financial institutions Ripple cites, Opp. at 29, are nothing like this case, other than involving wealthy defendants. They involved violations of "recordkeeping requirements." *See* SEC Press Release 2023-234 (settlements with Goldman Sachs, Citadel, and Merrill Lynch). None involved defendants reaping ill-gotten gains. *Id.*

Ripple next seeks to premise its "low" penalty request on four settlements involving crypto asset issuers. Opp. at 29-30. But each of those defendants agreed to significant remedial relief in consideration for the SEC settling for reduced penalties. For instance, in *BlockFi* the defendant "publicly announced that it intends to register [its offers and sales]," and cease and desist from future violations. *In re BlockFi Lending LLC*, 2022 WL 462445, *10 (Feb. 14, 2022) (SEC Order).

Similarly, the *Block.one* defendant agreed to cease and desist from future Section 5 violations. *In re Block.one*, 2019 WL 4793292, *2, *5 (Sept. 30, 2019). Likewise, *Telegram*'s foreign-based issuer agreed to a Section 5 injunction, to stop issuing crypto assets, and to cancel its investment contracts and pay investors back more than $1.4 *billion* raised from them. *SEC v. Telegram Grp., Inc.*, 19 Civ. 9439, D.E. 242 (S.D.N.Y. June 26, 2020). As for *Genesis*, the defendant (who also agreed to a Section 5 injunction) had few assets, heavily weighing the "financial condition" consideration in its favor. *SEC v. Genesis Glob. Cap., LLC*, 23 Civ. 287, D.E. 56 (S.D.N.Y. Mar. 18, 2024).

**B.      Courts Regularly Impose Penalties that Equal Defendant's Ill-Gotten Gains.**

By focusing only on *settlements*, Ripple ignores that "far from uncommon, courts routinely impose civil penalties equal to disgorgement" in litigated cases. *SEC v. Pentagon Cap. Mgmt., PLC*, 2012 WL 1036087, at *8 (S.D.N.Y. Mar. 28, 2012) (citing ten such cases), *aff'd in part, vacated in part* 725 F.3d 279 (2d Cir. 2013) (reversing joint and several penalty because the law "requires that such awards be based on the 'gross amount of pecuniary gain *to such defendant*.'"); *see also SEC v. Leffers*, 289 Fed. App'x 449, 452 (2d Cir. 2008) (affirming "penalty in an amount equal to the pecuniary gain, *an appropriate sum even in the lowest tier of the penalty structure*") (emphasis added).

This includes Section 5 defendants not charged with fraud. *See, e.g.*, *SEC v. Elliot*, 2011 WL 3586454, *7, *19-20 (S.D.N.Y. Aug. 11, 2011); *SEC v. Elliot*, 180 F. Supp. 3d 230, 231 (S.D.N.Y. 2016); *SEC v. Wayland*, 8:17-01156, D.E. 81 (C.D. Cal. May 7, 2019) ($160,751 disgorgement, $160,000 penalty); *SEC v. Zenergy Int'l, Inc.*, 430 F. Supp. 3d 384, 387, 396 (N.D. Ill. 2019) (penalty twice defendant's Section 5 profits); *SEC v. Offill*, 2012 WL 1138622, *4 (N.D. Tex. Apr. 5, 2012) ($120,000 penalty for $12,500 Section 5 profits); *SEC v. Blackburn*, 2020 WL 1702362, *5 (E.D. La. Apr. 8, 2020) ($30,000 penalty for $6,800 Section 5 profits).

While the SEC's requested penalty is no doubt large, it is consistent with the above cases in which penalties equal or exceed Section 5 gains. Given the nearly $1 billion Ripple gained violating Section 5, the multi-billion-dollar business it built selling XRP (accounting for the value of Ripple's massive XRP holdings and its cash on hand), the "low" penalty Ripple demands would be a "slap on the wrist" that neither punishes nor deters. To the contrary, it would encourage other crypto asset issuers to violate Section 5 by making it a remarkably lucrative endeavor, and thus deprive investors the disclosures Congress mandates, as a mere "cost of doing business."

## CONCLUSION

For these reasons, the Court should enter the Proposed Final Judgment as a Final Judgment.

Dated:  New York, New York
       May 6, 2024

Respectfully submitted,

By: _____

    Jorge G. Tenreiro
    Benjamin J. Hanauer
    Marc Jones
    Peter B. Moores

    *Attorneys for Plaintiff*
    U.S. Securities and Exchange Commission
    New York Regional Office
    100 Pearl Street, Suite 20-100
    New York, New York 10281
    Tel: (212) 336-9145 (Tenreiro)