UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

                      Plaintiff,

-against-

RIPPLE LABS, INC.,

                      Defendant.

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 08/07/2024
```

20 Civ. 10832 (AT)

**ORDER**

ANALISA TORRES, District Judge:

Plaintiff, the Securities and Exchange Commission (the "SEC"), brings this action against Defendant, Ripple Labs, Inc. ("Ripple"), alleging that Ripple engaged in the unlawful offer and sale of securities in violation of Section 5 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77e(a), (c). Am. Compl. ¶¶ 9, 430–35, ECF No. 46. On July 13, 2023, the Court granted in part and denied in part the parties' cross-motions for summary judgment (the "Order"). Order, ECF No. 874; *see SEC v. Ripple Labs, Inc.*, 682 F. Supp. 3d 308 (S.D.N.Y. 2023), *motion to certify appeal denied*, 697 F. Supp. 3d 126 (S.D.N.Y. 2023).

Now before the Court is the SEC's motion for remedies and the entry of final judgment.[1] SEC Mot., ECF No. 948; SEC Mem., ECF No. 949; Proposed Judgment, ECF No. 950. For the reasons stated below, the SEC's motion is GRANTED IN PART and DENIED IN PART.

**BACKGROUND**[2]

This case involves Defendants' offer and sale of XRP, the native digital token of the XRP Ledger, a cryptographically secured ledger or "blockchain." Order at 2. On December 22, 2020,

---

[1] Ripple has also moved to seal certain documents filed in connection with the SEC's motion. ECF No. 963; *see* ECF Nos. 964–68. The Court will address the sealing requests by separate order.

[2] The Court presumes familiarity with the facts and procedural history of this matter as detailed in prior orders, *see* Order at 2–9, and, therefore, only summarizes those facts necessary for its decision here.

the SEC commenced this action. *See* Complaint, ECF No. 1. An amended complaint was filed on February 18, 2021. ECF No. 46. As relevant here, the SEC alleged that Ripple engaged in three categories of unregistered XRP offers and sales:

> (1) Institutional Sales[3] under written contracts for which it received $728 million;
> (2) Programmatic Sales on digital asset exchanges for which it received $757 million; and
> (3) Other Distributions under written contracts for which it recorded $609 million in "consideration other than cash."

*Id.* at 15–16; *see id.* at 4–5. The SEC also alleged that Bradley Garlinghouse and Christian A. Larsen, two of Ripple's senior leaders, engaged in unregistered individual XRP sales from which they received at least $450 million and $150 million, respectively. *Id.* at 5, 16.

Under Section 5 of the Securities Act, it is "unlawful for any person, directly or indirectly, . . . to offer to sell, offer to buy or purchase[,] or sell" a "security" unless a registration statement is in effect or has been filed with the SEC as to the offer and sale of such security to the public. 15 U.S.C. §§ 77e(a), (c), (e). To prove a violation of Section 5, the SEC must show: (1) that no registration statement was filed or in effect as to the transaction, and (2) that the defendant directly or indirectly offered to sell or sold the securities (3) through interstate commerce. *See SEC v. Cavanagh*, 445 F.3d 105, 111 n.13 (2d Cir. 2006).

At summary judgment, the Court—applying the Supreme Court's test set forth in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946)—concluded that Ripple's Institutional Sales constituted offers or sales of investment contracts, but that Ripple's Programmatic Sales and Other Distributions did not. Order at 30. The Court also held that Larsen's and Garlinghouse's individual sales were not offers or sales of investment contracts for "substantially the same reasons" stated in the Court's analysis of Ripple's Programmatic Sales. *Id.* at 27–28.

---

[3] Capitalized terms not otherwise defined herein have the meanings set forth in the Order.

The SEC subsequently moved to certify for interlocutory appeal the Court's holdings on Programmatic Sales and Other Distributions. ECF No. 892. On October 3, 2023, the Court denied the SEC's motion and set for trial the SEC's claim that Larsen and Garlinghouse aided and abetted Ripple's violations of Section 5 with regard to the Institutional Sales. ECF No. 917. By stipulation dated October 19, 2023, the SEC dismissed its pending claims against Larsen and Garlinghouse, obviating the need for a trial. ECF No. 921.

Now before the Court is the SEC's motion for remedies and entry of judgment on Ripple's violations of Section 5 as to the Institutional Sales. The SEC seeks a final judgment against Ripple that (1) permanently enjoins it from future violations of Section 5 and from conducting an unregistered offering of XRP in Institutional Sales; (2) orders Ripple to pay $876,308,712 in disgorgement and $198,150,940 in prejudgment interest; and (3) orders Ripple to pay an $876,308,712 civil penalty. SEC Mem. at 1. Ripple contends that an injunction and disgorgement are unwarranted, and that any civil penalty should not exceed $10 million. *See* Ripple Opp., ECF No. 955.

## DISCUSSION

"Once [a] district court has found federal securities law violations, it has broad equitable power to fashion appropriate remedies[.]" *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474 (2d Cir. 1996). Such remedies may include injunctive relief, disgorgement of ill-gotten profits, and civil penalties. *SEC v. Frohling*, 851 F.3d 132, 138 (2d Cir. 2016). The SEC asks for all three.

I.   Injunctive Relief

A. Legal Standard

"Injunctive relief is expressly authorized by Congress to proscribe future violations of federal securities laws." *SEC v. Cavanagh*, 155 F.3d 129, 135 (2d Cir. 1998) (citing 15 U.S.C. § 78u(d)). "Such relief is warranted if there is a reasonable likelihood that [a] defendant[ ] will commit future violations of the securities laws." *SEC v. Am. Growth Funding II, LLC*, No. 16 Civ. 828, 2019 WL 4623504, at *1 (S.D.N.Y. Sept. 24, 2019) (*citing SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 99–100 (2d Cir. 1978)). To award injunctive relief, "a court must look beyond the mere facts of past violations and demonstrate a realistic likelihood of recurrence." *In re Rsrv. Fund Sec. & Derivative Litig.*, No. 09 Civ. 4346, 2013 WL 5432334, at *22 (S.D.N.Y. Sept. 30, 2013) (quotation marks and citations omitted). To determine whether injunctive relief is appropriate, courts are directed to consider:

> [1] the fact that the defendant has been found liable for illegal conduct; [2] the degree of scienter involved; [3] whether the infraction is an "isolated occurrence;" [4] whether defendant continues to maintain that his past conduct was blameless; and [5] whether, because of his professional occupation, the defendant might be in a position where future violations could be anticipated.

*Cavanagh*, 155 F.3d at 135 (quoting *Commonwealth Chem. Sec., Inc.*, 574 F.2d at 100).

B. Application

The SEC asks the Court to enjoin Ripple from "violating Section 5 and from conducting an unregistered offering of Institutional Sales of XRP." SEC Mem. at 4. Ripple argues that the SEC has failed to show that an injunction is warranted. *See* Ripple Opp. at 2–16. The Court agrees with the SEC.

As to the first and third *Cavanagh* factors, Ripple has been found liable for violating Section 5 in its sales of XRP to the Institutional Buyers. Order at 22. These violations were not isolated: they spanned eight years and involved forty-one counterparties. *Id.* at 4; Long Decl.

4

¶ 4, ECF No. 957-1; *see SEC v. Fowler*, 440 F. Supp. 3d 284, 301 (S.D.N.Y. 2020) (offenses not isolated when they involved "13 clients over the course of three years").

On the second *Cavanagh* factor, the degree of scienter, the SEC contends that Ripple's violations "involved, at least, a reckless disregard for the law." SEC Mem. at 4. The SEC notes that in February 2012, before the XRP Ledger was publicly launched, Ripple received a memorandum from the Perkins Coie LLP law firm advising it that "if sold to investors, XRP tokens are likely to be securities." Order at 7 (cleaned up). A subsequent Perkins Coie memorandum counseled that "although we believe that a compelling argument can be made that XRP tokens do not constitute 'securities' under federal securities laws, given the lack of applicable case law, we believe that there is some risk, albeit small, that the SEC disagrees with our analysis." *Id.* at 8 (cleaned up). The law firm also advised Ripple that the more it promoted XRP as an investment opportunity, "the more likely it is that the SEC will take action." *Id.* Larsen testified that after receiving the second Perkins Coie memorandum, Ripple took steps to ensure compliance with its advice. *Id.* at 32.

At summary judgment, the Court found that a genuine issue of material fact remained as to whether Larsen and Garlinghouse had recklessly disregarded the securities laws. *Id.* at 31–33. Because the SEC has adduced no new facts to support a finding of recklessness at this stage, the Court finds that Ripple's scienter, too, is inconclusive. *See SEC v. Haligiannis*, 470 F. Supp. 2d 373, 381–82 (S.D.N.Y. 2007) (collecting cases imputing the scienter of a corporate agent to the corporation). Although the SEC points to Ripple's profit motive to avoid registration and disclosure, SEC Mem. at 5, this fact alone does not support an inference that Ripple recklessly disregarded regulatory requirements in making its business decisions. *Cf. Prickett v. N.Y. Life*

5

*Ins. Co.*, 896 F. Supp. 2d 236, 247 (S.D.N.Y. 2012) (noting that, in the common-law fraud context, "the profit motive common to all businesses is insufficient to establish scienter").

On the fourth *Cavanagh* factor, the defendant's willingness (or unwillingness) to accept blame, the SEC points to a number of post-Order statements made by Ripple and its corporate agents to argue that "Ripple has not accepted responsibility for its violations." SEC Mem. at 6. Ripple, in turn, notes that it has acknowledged the Court's ruling on the Institutional Sales in each of its quarterly market reports and contends that the other cited statements are taken out of context. Ripple Opp. at 14–16. Having considered the post-Order statements, the Court does not find that Ripple has "continued a campaign of def[l]ecting blame." SEC Mem. at 6. Although Ripple and its employees have largely emphasized the favorable aspects of the Order in their public statements, Ripple has also repeatedly acknowledged the Court's holding as to its Institutional Sales. *See* Long Decl. ¶ 5. Ripple's post-Order statements do not rise to the level of blame-shifting required to justify injunctive relief based on this factor alone. *E.g.*, *SEC v. Mattessich*, No. 18 Civ. 5884, 2022 WL 16948236, at *6–7 (S.D.N.Y. Nov. 15, 2022) (citing defendant's "continued protestations that his conduct was blameless").

Ripple's actions, however, are another story. Relevant to the fourth and fifth *Cavanagh* factors, the SEC asserts that Ripple "continues to sell [XRP], unregistered," to Institutional Buyers—specifically, in "continu[ing] to execute contracts for unregistered sales of XRP in direct [on-demand liquidity ('ODL')] transactions."[4] SEC Mem. at 8. Ripple admits that after the Order was issued, it has continued to sell XRP in ODL transactions. Ripple Opp. at 6–7. It also concedes that the Order defined Institutional Sales as including sales to "ODL customers."

---

[4] "ODL facilitates cross-border transactions by allowing customers to exchange fiat currency (for example, U.S. dollars) for XRP and then the XRP for another fiat currency (for example, Mexican pesos)." Order at 3.

*Id.* at 9 (citing Order at 4). However, Ripple argues that its "ongoing ODL Sales do not have the key characteristics that this Court relied on in finding that Ripple's Institutional Sales were sales of investment contracts." *Id.* Not so. Although the Court noted that "*some* Institutional Buyers agreed to lockup provisions or resale restrictions"—features "inconsistent with the notion that XRP was used as a currency or for some other consumptive use"—the Court did not hold that a contract lacking these features is *ipso facto* lawful under Section 5. Order at 21–22 (emphasis added). Ripple attempts to relitigate the Court's inclusion of ODL transactions in Institutional Sales, *see* ECF No. 825 at 6–7, while at the same time suggesting that "[r]emedies briefing is not the time or place" to analyze the ODL transactions in detail, Ripple Opp. at 9. The company cannot have it both ways.

To be clear, the Court does not today hold that Ripple's post-Complaint sales have violated Section 5.[5] Rather, the Court finds that Ripple's willingness to push the boundaries of the Order evinces a likelihood that it will eventually (if it has not already) cross the line. On balance, the Court finds that there is a reasonable probability of future violations, meriting the issuance of an injunction.

Turning to the scope of the injunction, Ripple first contends that Part I of the SEC's Proposed Judgment—which "permanently restrain[s] and enjoin[s] [Ripple] from violating Section 5 of the Securities Act," Proposed Judgment at 2—is an unhelpfully vague "directive not to violate" the law. Ripple Opp. at 16. But, the Second Circuit has found that an injunction that "merely parrot[s]" statutory language is proper. *SEC v. Manor Nursing Ctrs., Inc.,* 458 F.2d

---

[5] Ripple notes that "most of [its] ODL business is outside the United States," where its contracts are governed by foreign law, and that Ripple now ensures that "all new ODL customers have at least $5 million in total assets, so that they are 'accredited investor[s]' under 17 C.F.R. § 230.501(a)(3)." Ripple Opp. at 7–8 (citation omitted). Whatever merit these defenses may have, they are not determinative of the question before the Court: whether the SEC has shown a risk of future violations.

7

1082, 1103 (2d Cir. 1972). Courts in this Circuit routinely impose such injunctions in securities cases. *See* SEC Reply at 7 (collecting cases); *e.g.*, *SEC v. Fowler*, 17 Civ. 139, ECF No. 205 (S.D.N.Y. 2020); *SEC v. Bronson*, 12 Civ. 6421, ECF No. 186 (S.D.N.Y. 2017).

Ripple also argues that Part II of the Proposed Judgment, which enjoins it from "conducting an unregistered offering of Institutional Sales," Proposed Judgment at 3, should be altered to clarify that "it does not bar ODL sales, does not bar extraterritorial conduct, and does not bar sales that qualify for exemptions from registration," Ripple Opp. at 17. The Court agrees that the SEC's proposed language is too categorical and, in any case, duplicative of behavior proscribed by Part I of the Proposed Judgment. The Court will, therefore, omit the SEC's proposed Part II.

Finally, Ripple asks the Court to "waive the 'bad actor disqualification' provisions of § 230.506(d)(1), which prevent an enjoined issuer from using the SEC's Regulation D exemption for certain private securities offerings." Ripple Opp. at 17. Although the Court has the discretion to do so, *see* 17 C.F.R. § 230.506(d)(2)(iii), Ripple cites no authority that persuades the Court that judicial waiver is necessary or appropriate here.

Accordingly, the SEC's request for injunctive relief is GRANTED, and the Court will impose a permanent injunction consistent with Part I of the Proposed Judgment.

II. <u>Disgorgement</u>

A. Legal Standard

In addition to injunctive relief, a district court may also order disgorgement, which "serves to remedy securities law violations by depriving violators of the fruits of their illegal conduct." *SEC v. Contorinis*, 743 F.3d 296, 301 (2d Cir. 2014). Disgorgement is an equitable

8

remedy, permissible only where it "does not exceed a wrongdoer's net profits and is awarded for victims." *Liu v. SEC*, 591 U.S. 71, 75 (2020).[6]

Following *Liu*, the Second Circuit clarified the meaning of "victims" in *SEC v. Govil*, 86 F.4th 89 (2d Cir. 2023). There, the defendant caused his company "to engage in three fraudulent securities offerings," representing to investors that the company "would use the proceeds from the transactions to satisfy outstanding debts and for general corporate purposes." *Id.* at 93. "Instead, he diverted over $7.3 million of the offering proceeds to his own private accounts." *Id.* The district court determined that disgorgement was warranted, reasoning that the defrauded investors were victims of the defendant's conduct because they were lied to, even if they "may not have been financially harmed" as a result of the lie. *Id.* at 97.

The Second Circuit reversed, holding that "a 'victim' for purposes of § 78u(d)(5) is one who suffers pecuniary harm from the securities fraud." *Id.* at 102. The Circuit explained that an equitable remedy is meant to "restore[] the status quo"—in the context of disgorgement, by "returning the funds to victims." *Id.* at 103 (quoting *Liu*, 591 U.S. at 80, 88) (cleaned up). Allowing "defrauded investors who suffered no pecuniary harm . . . to receive the proceeds of disgorgement," the Circuit reasoned, would "confer[] a windfall on those who received the benefit of the bargain." *Id.* at 103. Therefore, for purposes of ordering disgorgement, it is not enough that investors are lied to and "thus denied the right to make an informed decision when considering whether to make [an] investment." *Id.* at 105. "[O]ffending that right" does not result in pecuniary harm." *Id.* (citing *Ciminelli v. United States*, 598 U.S. 306, 315 (2023)).

---

[6] Six months after *Liu*, "Congress enacted § 78u(d)(7), which "gives the SEC the power to 'seek' and federal courts the power to 'order' the remedy of 'disgorgement.'" *SEC v. Govil,* 86 F.4th 89, 99–100 (2d Cir. 2023) (discussing 15 U.S.C. § 78u(d)(7)). The Second Circuit has interpreted § 78u(d)(7) to limit disgorgement to the bounds established by the Supreme Court's decision in *Liu*. *Id.* at 102 (citing *SEC v. Ahmed*, 72 F.4th 379, 396 (2d Cir. 2023)). *But see SEC v. Hallam*, 42 F.4th 316, 338 (5th Cir. 2022) (holding that "Section 78u(d) authorizes disgorgement in a legal—not equitable—sense.").

9

B. Application

The parties dispute whether the Circuit's decision in *Govil* bars disgorgement of Ripple's profits from Institutional Sales. The Court finds that it does.

The SEC contends that ordering disgorgement would not run afoul of *Govil* because Ripple's violation of Section 5, via "entirely tainted transactions, caused pecuniary harm to investors." SEC Mem. at 17. Specifically, the SEC argues that Ripple sold XRP to certain Institutional Buyers at "deep undisclosed discounts" as high as ▬. *Id.* at 18. Because Ripple failed to publicly register these discounted Institutional Sales, the SEC argues, "non-favored investors" were deprived of "the information they needed to determine whether Ripple was treating them worse and whether they could purchase [] XRP at a better price." *Id.* The SEC estimates that if Ripple had disclosed its "significant discounts to other investors," non-favored investors could have saved "potentially more than ▬." *Id.* at 19–20. The SEC further contends that the discounted sales caused pecuniary harm by "put[ting] downward pressure on the market price of XRP," as investors who bought discounted XRP could sell for below-market prices and still profit. *Id.* at 20.

*Govil* forecloses this argument. The SEC contends that Ripple "appears to have not uniformly disclosed the disparate prices and discounts offered" to Institutional Buyers. *Id.* at 18. The Circuit held, however, that "the right to make an informed decision when considering whether to make [an] investment" is not a property interest that can be vindicated through disgorgement. *Govil*, 86 F.4th at 105. As Ripple argues, many of the *Govil* investors would have likely been dissuaded from investing—or, at least, valued the shares at a lower price—had they known that the company's founder intended to pocket the funds for his own use. *See* Ripple Opp. at 20. Yet the Circuit found that the pecuniary-harm requirement was not satisfied, as the

10

district court acknowledged that "the investors received the return on the investment contemplated at the outset." *Govil*, 86 F.4th at 105.

Here, the SEC offers only speculative evidence that the Institutional Buyers did not "receive[] the return on the investment contemplated." *Id*; *see also id.* at 104 n.16 (noting that "whether the investors actually suffered pecuniary harm would depend on the type of securities held, the terms of those securities, and when those securities were sold," a level of detail missing from the record in *Govil*). The SEC's ▮▮▮▮▮▮▮▮ estimate of lost potential savings comes from an analysis conducted by SEC accountant Andrea Fox, who calculated "how much less Institutional Buyers in the aggregate would have paid for XRP if the best price offered to Institutional Buyers had been obtained by every Institutional Buyer."[7] Fox Decl. ¶ 34, ECF No. 946. But, the SEC does not (and cannot) establish that Ripple would have, in fact, offered any additional discounts to investors had it complied with Section 5's registration requirements. It is possible that some investors "could have demanded and potentially paid lower prices." SEC Mem. at 18. Yet, it is at least equally possible that Ripple would have opted to offer fewer and smaller discounts overall. *Cf. id.* at 17 (explaining that "unregistered shares . . . are [generally] worth less" than their registered counterparts). The fact that some investors "may have been able to negotiate better deals if discounts [offered to others] were disclosed as required," SEC Mem. at 19, does not establish that they suffered pecuniary harm by paying the sticker price. *Cf. Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005) (noting that in fraud-on-the-market cases, "an

---

[7] Ripple separately moves to strike Fox's declaration and supporting exhibits, arguing that they were filed late. ECF No. 951; *see* ECF Nos. 959, 960. In light of the Court's finding that no disgorgement is permitted, the motion is DENIED as moot.

inflated purchase price will not itself constitute or proximately cause the relevant economic loss").[8]

Relying on *SEC v. Ahmed*, 72 F.4th 379 (2d Cir. 2023), the SEC also argues that disgorgement is appropriate because Ripple's failure to disclose the discounts "tainted" each of the Institutional Sales. SEC Reply at 9, ECF No. 961. In *Ahmed*, the investment-manager defendant "stole over $65 million" from his employer and ten portfolio companies, including by negotiating transactions in which he had an undisclosed conflict of interest. 72 F.4th at 390. The Second Circuit found that the conflicted transactions were "entirely tainted," holding that the defendant was obligated to disgorge the full amount he received. *Id.* at 397. But the Circuit's inquiry into the permissible *amount* of disgorgement sheds little light on the threshold question here: whether the SEC has shown pecuniary harm at all such that disgorgement is warranted. In *Ahmed*, which involved the defendant's knowing misappropriation of millions of dollars from his employer, there was no question that the employer had suffered an economic loss. *See id.* at 390–91. Here, pecuniary harm is far less apparent.

Because binding Circuit precedent precludes disgorgement based on the facts of this case, the SEC's request for disgorgement and prejudgment interest[9] is DENIED.

---

[8] The SEC's sole authority to the contrary, *SEC v. iFresh, Inc.*, No. 22 Civ. 3200, 2024 WL 416709 (E.D.N.Y. Feb. 5, 2024), is an unpublished district court opinion that found (without analysis) the fact that stock prices were artificially inflated sufficient to establish pecuniary harm. *Id.* at *3; *see* SEC Reply at 9, ECF No. 961. That case—involving a consent order—required the district court to accept the SEC's allegations of stock price inflation as true. *iFresh, Inc.*, 2024 WL 416709 at *3.

[9] "[T]he amount on which a violator must pay prejudgment interest usually tracks the amount that the party is ordered to disgorge." *Contorinis*, 743 F.3d at 308.

III.    Civil Penalties

A.  Legal Standard

The SEC is also authorized to seek the imposition of civil monetary penalties, which serve "the dual goals of punishment of the individual violator and deterrence of future violations." *Off. Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC*, 467 F.3d 73, 81 (2d Cir. 2006) (quotation marks and citation omitted). "Courts can impose penalties in civil injunctive actions not to exceed the greater of: (i) the gross pecuniary gain to a defendant as a result of the violation, or (ii) a specified amount per violation, depending on whether the violation falls in the first, second[,] or third penalty tier." *SEC v. Bajic*, No. 20 Civ. 07, 2023 WL 6289953, at *4 (S.D.N.Y. Sept. 27, 2023) (citing 15 U.S.C. § 77t(d)(2); 15 U.S.C. § 78u(d)(3)(B)). A court may impose a first-tier penalty for any violation of the Exchange or Securities Acts; a second-tier penalty if the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement"; and a third-tier penalty if, in addition to meeting the second-tier requirements, the "violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." *Id.* (citations omitted). Because "[t]he term 'violation' is not defined by the statutory scheme," courts have discretion to determine the unit of violation for the purposes of imposing civil penalties under the tier method. *SEC v. Fowler*, 6 F.4th 255, 264 (2d Cir. 2021); *see id.* at 265.

Although gross pecuniary gain or "the tier determines the maximum penalty, . . . the actual amount of the penalty [is] left up to the discretion of the district court." *SEC v. Kern*, 425 F.3d 143, 153 (2d Cir. 2005). In determining the appropriate penalty, courts may consider factors including:

> (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk

13

of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.

*SEC v. Rajaratnam*, 918 F.3d 36, 44 (2d Cir. 2019) (citation omitted); *see also id.* at 45 (noting that the list is not exhaustive); *cf. Fowler*, 6 F.4th at 266 (noting that the Circuit has not held that "the civil penalty for a securities fraud offense needs to be proportional to the disgorgement amount"). The Court may also consider "the extent to which other aspects of the relief and/or judgment issued in this matter will have the desired punitive effect." *SEC v. Universal Exp., Inc.*, 646 F. Supp. 2d 552, 568 (S.D.N.Y. 2009), *aff'd*, 438 F. App'x 23 (2d Cir. 2011).

B. Application

The SEC asks the Court to impose a penalty of $876,308,712, equal to the net profits it calculates for the Institutional Sales. SEC Mem. at 23. Ripple argues that a penalty of no more than $10 million, or "about ▓▓▓ of Ripple's actual gross revenues . . . from pre-Complaint Institutional Sales," is appropriate. Ripple Opp. at 30 (citation omitted).

The Court finds that a first-tier penalty is appropriate in this case, which involves no allegations of "fraud, deceit, [or] manipulation," and no conclusively established "deliberate or reckless disregard of a regulatory requirement." 15 U.S.C. § 77t(d)(2)(B); *see supra* Part I.B. Although Ripple's gross pecuniary gain from the Institutional Sales sets a higher statutory ceiling, the Court finds that the tier-analysis method more closely tailors the penalty to the scope of Ripple's actual wrongdoing than the parties' (virtually) all-or-nothing requests.

As to the amount of the penalty, the Court has discussed the second and fourth *Rajaratnam* factors, which overlap with the factors relevant to injunctive relief, above. *See supra* Part I.B. On the first factor, the egregiousness of Ripple's conduct, there is no question that the recurrent, highly lucrative violation of Section 5 is a serious offense. However, this case

14

does not involve allegations of fraud, misappropriation, or other more culpable conduct. Relatedly, as to the third factor, the SEC has not established that Ripple's failure to register the Institutional Sales caused substantial losses (or the risk thereof) to investors. *See supra* Part II.B. And, on the fifth factor, Ripple does not contest that its current financial condition does not merit a reduced penalty. *See* Ripple Opp. at 28–29.

Beyond the *Rajaratnam* factors, the Court considers that Ripple will not be ordered to pay disgorgement, which dictates in favor of a larger penalty to accomplish "the desired punitive effect." *Universal Exp., Inc.*, 646 F. Supp. 2d at 568. The Court finds, therefore, that a per-violation penalty at the first-tier maximum is appropriate.

The final step is to define and count the "violations" involved in the Institutional Sales. Because Section 5's registration requirement is "transaction-specific," it follows that each unregistered transaction constitutes a separate violation of the statute. *Cavanagh*, 155 F.3d at 133; *see also SEC v. Colonial Inv. Mgmt. LLC*, 381 F. App'x 27, 29 (2d Cir. 2010) (summary order) (affirming per-transaction penalties calculation). The SEC suggests that each of Ripple's "1,700 relevant contracts" constitutes a separate violation. SEC Mem. at 23–24 n.8. Ripple responds that the "1,700 relevant contracts" figure includes "hundreds of contracts related to Programmatic Sales and Other Distributions," which should be excluded. Ripple Opp. at 19 n.20. But, Ripple does not offer its own tabulation of the relevant contracts, and the SEC does not respond to Ripple's contention in its reply brief. Based on the Court's independent analysis of Ripple's expert report summarizing the relevant contracts, *see* Schwarz Rep., ECF No. 582-7, the Court finds that 1,278 transactions violated Section 5, resulting in a civil penalty of

$125,035,150.[10]  Accordingly, the SEC's request for a civil monetary penalty is GRANTED in part, and the Court will impose a penalty of $125,035,150.

## CONCLUSION

The SEC's motion for remedies and the entry of final judgment is GRANTED IN PART and DENIED IN PART.  The Court shall enter a final judgment enjoining Ripple from further violations of the securities laws and imposing a civil penalty of **$125,035,150**.  The Clerk of Court is directed to terminate the motions at ECF Nos. 943, 948, and 951.

SO ORDERED.

Dated: August 7, 2024
       New York, New York

_____
ANALISA TORRES
United States District Judge

---

[10] The Court arrived at this figure by first tabulating the 1,278 "Sales Contracts" listed in Exhibit C of the expert's report, which excluded "Programmatic Contracts," "Service Contracts," and "Other Contracts."  Schwarz Rep. at 80–124; *see id.* ¶¶ 18–55.  The Court then determined the applicable penalty for each contract based on its date.  *See* 17 C.F.R. § 201.1001, Tbl. I; Adjustments to Civ. Monetary Penalty Amounts, Release No. 6521, 2024 WL 111023 (Jan. 5, 2024) ("Release No. 6521").  For contracts entered into on or after November 2, 2015, the penalty is currently $115,231 per contract.  Release No. 6521.  For contracts entered into between March 6, 2013 and November 2, 2015, the penalty is $80,000 per contract.  17 C.F.R. § 201.1001, Tbl. I.  And, for contracts entered into between March 4, 2009 and March 5, 2013, the penalty is $75,000 per contract.  *Id.*  For the four undated contracts, the Court applied the current inflation-adjusted penalty amount.  Finally, the Court totaled the per-contract penalties to arrive at a civil penalty of $125,035,150.  This sum is concededly an estimate of the maximum first-tier penalty; it is possible that the contracts listed in Exhibit C are either an incomplete or overinclusive list of Ripple's Institutional Sales during the relevant period.  Because neither party provided a more specific calculation, however, the Court believes that its estimate is an adequate approximation.