

**DECISIVE EVIDENCE**

May 21, 2025

The Honorable Analisa Torres
United States District Judge
United States Courthouse
500 Pearl St.
New York, NY  10007

*1:20-CV-10832* *(handwritten)*

Re: *Decisive Evidence* - Ripple Labs, Inc.

---

## **Emergency Request** - Presentation of ***Decisive Evidence*** in Favor of the Defendants and in Favor of Liberty for the American People

---

Interest - Decisive Evidence

    I, Justin W. Keener, am not a party to this lawsuit but I certify that I have an interest in its outcome for multiple reasons.  For one – by God's miracle – I hold *data and information* believed to be ***decisive evidence*** to settle controlling questions and matters central to 10 years of nightmarish chaos thrown upon all of us unsuspecting Americans.



**DECISIVE EVIDENCE**

The ***enclosed proprietary information*** should be of tremendous interest and value to the defendants and the broader crypto industry.  Further, I believe the information would be of immeasurable interest and value to the broader crypto industry, the American people, and the Congress.

Please Grant this Request, the Truth Must Be Known and Liberty Upheld

Ripple's public statements indicate that it has expended not less than $175,000,000 to defend itself over this litigation, and prior statements made suggest that it may surrender another $50,000,000 as part of a settlement with the SEC.  That totals not less than $225,000,000 by rough/low estimates.  Our team notes that if we were Ripple or any other defendant, we would want to know *everything*, especially given the staggering numbers involved.

As for the damages done to me in the 1934 Act faux so-claimed "securities dealer case" (one of among roughly 20 cases), which was parallel to and directly linked to all other faux so-claimed "securities dealer" cases and all crypto cases, my legal fees alone were upwards of $15,000,000.  While that is a fraction of



**DECISIVE EVIDENCE**

Ripple's legal fees, keep in mind that I'm a self-made SSFO (small single family office) - *that was my personal money* - not company funds. Ouch. And worse, the total damages done to me are a multiple of that, and likely the same for Ripple and all others. My injuries will be addressed elsewhere, but this illustrates the magnitude of the devastation that spreads high, far, and wide.

Needless to say, my studies were a very expensive self-education and this has been a very costly endeavor in many ways. Please rest assured that I am uniquely positioned, exceptionally qualified, and deeply educated on these matters.

The foregoing information was included to enable the Court to consider this request to present to the Court limited proprietary data and information that is in my possession (lawfully of course) and enclosed here. **Simply put: this data is believed to be decisive evidence never presented before.**

We are aware that my request to present this data, especially at this stage, is not ideal and it is a very unusual request. We will *pray* that it is granted, as we believe this never presented before data is of the highest importance. Included



**DECISIVE
EVIDENCE**

with the data is an affidavit which I hope will help the Court trust in me and this

critical information.  Please know that intentions are genuine, sincere, and

respectfully requested this 21st day of May, 2025.

Thank you,

Justin W. Keener
(312) 476-9201
truth@TheHoweyTest.com

5601 Bridge Street
Suite 300
Fort Worth, TX  76112

**Copyright © 2025**

# Copyright © 2025

**No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means electronic, mechanical, photocopying, scanning, recording, or otherwise, without the written permission of the author.**

# EXTREME WAYS
# EXCEPTIONAL CIRCUMSTANCES

## Part One

## May 21, 2025

---

## Fallacy by
## Intentional Omission and
## Misinterpretation

# Investment Contracts

---

From 1933 to 1950, bad actors inside the government *betrayed* the American people. This betrayal has been an ongoing regulatory *deception* for 90 years.

With a touch of inspiration from a *007* assignment in Ian Fleming's novel *Moonraker* (Fleming, 1955), questions arose and that *deception* was targeted, identified, and proven. Now, in this moment with this Part One of these works, the *deception* and *the truths* begin to be revealed.

The American people witnessed and suffered from the pre-2025 SEC's relentless attacks over the last 10 years. These works demonstrate with no doubt: the 90-year-old *deception playbook* was resurrected and operating in full force during that painful decade.

Until now. And never again.

CREATED - DEVISED - DEVELOPED
**JUSTIN W. KEENER**


**DECISIVE EVIDENCE**

Copyright © 2025    2

## Reader Beware - This is a First in U.S. History

There has never been a study like this to the best of our knowledge. We have seen thousands of reports and projects covering the securities acts, investment contracts, the definition of "security," the Howey Test, and the securities business in general.

Over 90 years of court cases and studies on securities laws, apparently I was the only skeptic to ask myself, act on, and fully execute on a few simple questions:

> *What if...the* SEC is *cheating...lying...or worse? Could that be possible?*

Surely I'm not the only one to ask myself that, but we can be pretty certain that I'm the only person who has taken it this far. This has been a massive undertaking—this document and our extensive proprietary data and information are the result of countless months, thousands and thousands of hours, quant computing with AI, a brilliant team, and *millions and millions* of dollars.

The non-monetary costs and the cruel self-inflicted toll that this grueling endeavor took on us is hard to convey. But it was a willful and duty-bound choice to see it through with resolve and make it the best.

For **nine solid decades** the SEC's version of the interpretation, necessity, purpose, and utility of our securities laws has gone mostly unchallenged, even though thousands of scholars, attorneys, and regulators have focused on it for decades. Hundreds of thousands of bright minds have generated literally thousands of articles, statements, speeches, papers, and text books, and have pored over every scrap of written work on investment contracts,the "security definition," and the Howey Test.

Yet **until now** not one of those works cracked the core to expose the fraud and the evidence to prove it like this document you are reading now.

This is the first investigation—*ever*—in U.S. and SEC history to prove, with bulletproof evidence, that *the term of art investment contract was hijacked from its meaning and understanding as provided by the securities business and the Congress.* The *term of art* was **illegally** transformed and rewritten into a *generic phrase*, and over the following 80 years it was weaponized by the SEC to expand its reach and punish its chosen targets, among other things, for government gain and personal gain.

**Reader beware: this is real, and this is true.**

Copyright © 2025    2



**DECISIVE**
**EVIDENCE**

Copyright © 2025    3

---

## *What follows is based on <u>fact and truth</u>, and the information within is <u>supported by the record</u>.*

---

AFFIDAVIT

I, Justin W. Keener, currently located on this 21st day of May, 2025 in Chicago, IL, do hereby state the following:

> To the best of my knowledge and belief, I believe the material information contained herein to be true and correct on this day and time of its release.

With my hand placed upon the *Holy Bible* and with Him as my witness, I declare that the foregoing is true and correct to the best of my knowledge and belief.

Executed on this 21st day of May, 2025, in Chicago, IL.

---

Justin W. Keener

Copyright © 2025    3



**DECISIVE EVIDENCE**

Copyright © 2025    4

# One (1)

## The Torch - The Playbook - The Last 90 Years to Today

The deception torch has been passed with calculated planning and orchestrated efforts from one decade to the next decade. The result is an easily traceable 90 year timeline–not only in practice at the SEC, but also in educational institutions, academic works, speeches, statements, and even law school curriculum.

It all became collective knowledge, and unfortunately, it was *incorrect collective* knowledge that was skewed. 90 years is a relatively brief time period for accumulation of collective knowledge, and thankfully, we have the opportunity to correct the course.

One may naturally assume that over the many decades that have passed, perhaps the *deception* has developed or evolved–but it really hasn't. And neither has their **playbook** behind the deception, as I call it. It's all the same trickery, same methods, same securities laws, and even the same or similar motives that were in action 90 years ago–the playbook was indeed resurrected and put into operation.

In modern times over the last 10 years, the deception seems to have been refined into an institutional machine with plenty of resources and willing participants. The claim remains *"investor protection,"* yet by the misuse of the agency and its power to engage in a staggering amount of litigation against so-claimed "dealers" and so-claimed "crypto issuers/dealers," it is evident that the true mission was foregone.

**Note** that we must remember: *we are not here to discuss common law or contract law, form and substance, validity of contracts, etc.* **We are here for securities law in the world of the securities business**. Everyone seems to lose sight of that.

The Securities Act of 1933 was originally presented as a straightforward solution: requiring full and fair disclosure in legitimate securities offerings. That's all, simple and easy, nothing else.

However, despite the simplicity of the purpose and underlying principles of the '33 Act–the demand for full and fair disclosure of securities for investor protection–the Act became something else, as clearly demonstrated by its **expansion from only 22 original pages to over 70 pages today**.

Federal authorities **expanded their reach far beyond this purpose**—not through explicit legislative changes, but through manipulation and misguidance, and by the employment of fallacy, perjury, deceit, and manipulation.

Copyright © 2025    4



Copyright © 2025    5

**DECISIVE EVIDENCE**

# <u>Two (2)</u>

## The Point

At the center of that expansion is the term *"investment contract"*—a term that had a specific meaning within the securities business that was once perfectly understood by millions of people leading into 1933 when the Act was drafted.

*The point is* that it was all a *scheme* perpetuated for 90 years–we were all tricked, brainwashed, misled.  The *point* that we will demonstrate and make very clear  through this process is that *investment contracts were not what the 1930s and 1940s SEC, the 1946 Supreme Court, and the pre-2025 SEC claimed them to be.*

*Despite the passing of 90 years with plenty of time and opportunity to course correct on what transpired, the deception has remained what it was from the beginning:  it has all been an elaborate, orchestrated, and unlawful scheme of trickery against the American people.*

*Indeed, investment contracts are not what the SEC and courts have claimed them to be, and we can prove that.  We know exactly what investment contracts are*, and *we know exactly what they are not–and soon the reader will* learn the same shocking truth through this process.

**Once readers learn the truth behind the SEC and investment contracts, they will understand that XRP, for example, as related to "security" as defined in the '33 Act, is not remotely a security and XRP is not remotely an investment contract .**

That is not opinion, these are facts demonstrated by the bulletproof evidence presented in these works.

**In short, what they did in the 1930s and 1940s, and what they did over the last 10 years:**

- **intentionally omitted and ignored critical *exculpatory* information**
- **they invented and fostered intentional misinterpretation**
- **they invented and fostered mis-definitions of terms, words, phrases**

***Simply put into other words… <u>they cheated</u>.***



**DECISIVE EVIDENCE**

Copyright © 2025      6

# <u>Three (3)</u>

## How *I* Got Here - How *We* Got Here - Intentional Fallacy

Between 2013 and 2015, some bad actors inside key government financial agencies—like the IAWG and the SEC—completed the game plan to roll out their scheme I call "Operation Treasury Market." Their goal was simple: rewrite securities laws, rules, regs, and definitions without having to go through Congress, using fraud and deceit to tighten their grip on market participants and dealers in the treasury market.

In 2018, I got pulled into their plan without even knowing it. They used the same sneaky tricks they were using in the crypto industry litigation, at the same time and in parallel, picking me out as a convenient target as a so-claimed "securities dealer."

In truth, I was a completely innocent investor, unsuspecting, and no idea what was happening.  But to the bad actors with Operation Treasury Market—I was more than an innocent investor—I was a useful pawn to advance their bigger agenda.  My involvement, along with about 20 other similar lawsuits, was critical. Without us, their plan would've gone nowhere.  We were the *foundation* to their plan, without us, there was no plan.

The government agencies behind it barely spent a dime—they just redirected resources they already had. Meanwhile, all the real costs landed on us. We, the defendants, spent billions on lawyers, lost massive opportunities, and sacrificed years of our lives. Our forced participation is exactly what made their shady agenda possible.

From the very beginning, I knew something wasn't right. I wasn't alone in my thoughts, pretty much everybody except for the SEC knew something was fishy.  But nobody could figure it out or put their finger on it.

Over six tough years and after spending about $15 million of my own money, I took a step outside of the box and created a secret operation—a massive undertaking— to investigate everything myself. We quickly realized the SEC had been pulling this kind of trickery and deliberate deception for decades, twisting securities laws for their own ends.

To fully expose their lies, I created a powerful system called "The Mainframe," using



Copyright © 2025     7

**DECISIVE EVIDENCE**

advanced AI, quant computing, brilliant minds, and millions of dollars. It was a huge effort that took serious dedication, resources, and time.

Once I figured out how the SEC abused the '34 Act in my case–*cracked it* as I like to say–we turned immediately to the parallel crypto cases. I assumed that I would find the same methods of deception, and the playbook, and indeed, we discovered the same dirty tactics at play.

Looking deeper into history, we uncovered something even darker: for nearly 100 years, corrupt players have hijacked the SEC for political and personal gains, cleverly using tools on unsuspecting defendants and unsuspecting Americans.

One such tool, as we have pinpointed, is the intentional use of **fallacies** to manipulate securities laws. This organized deception successfully kept courts, industry experts, defendants, and the public from understanding the real purpose of securities regulations for almost a century.

I had heard the word fallacy before, but wasn't really familiar with it. I knew it was somehow related to academic studies of classic literature, as well as to the study of logic. I knew there had to be some "name" for the tactics that were deployed so I brainstormed and researched–and *fallacy* it was.

Copyright © 2025     7

Copyright © 2025    8

**DECISIVE EVIDENCE**

# Four (4)

### Fal·la·cy  *noun*

*Flawed meanings, understandings, or arguments that were created with the intention to mislead , manipulate, or deceive; for the purpose of achieving the creator's desired results.*

***The SEC employed fallacy as follows:***

> **Fallacy by *Intentional Omission*** - the SEC and certain staff members *knowingly, wilfully, and intentionally omitted decisive evidence and information that it was aware of and knew*; or they were *careless and reckless in not knowing the very laws, evidence, and information to be used to regulate the securities business.*
>
> > *Ex*: the SEC intentionally omitted and ignored all exculpatory evidence , and there's a ton of it
>
> **Fallacy by *Intentional Misdefinition*-** the SEC and certain staff members *knowingly, wilfully, and intentionally  misdefined various words, phrases, and terms to mislead parties such as defendants, the courts, attorneys, and the American people in their investigations and litigation;*  or they were *careless and reckless in not knowing that they were misdefining various words, phrases, and terms to be used to regulate the securities business.*
>
> > *Ex*: the SEC intentionally misdefined (and led all others to believe) what investment contracts actually are, as shown by 125 years of investment contract history.
>
> **Fallacy by *Intentional Misinterpretation*-** the SEC and certain staff members *knowingly, wilfully, and intentionally  misinterpreted various words, phrases, terms, passages, laws, rules, statements, and more, to mislead parties such as defendants, the courts, attorneys, and the American people in their investigations and litigation;*  or they were *careless and reckless in not knowing that they were misinterpreting various words, phrases, terms, passages, laws, rules, statements, and more to be used to regulate the securities business.*
>
> > *Ex*: the SEC intentionally misinterpreted (and led all others to believe) the truth of what investment contracts are.

Copyright © 2025    9

**DECISIVE EVIDENCE**

# Five (5)

## Understanding Investment Contracts

This investigation uncovers the deliberate hijacking of the term of art *"investment contract,"* the financial product invented by and popularized by John Tappan. Tappan was the founder of Investor's Syndicate in Minneapolis, where he first created his investment contract in 1894.

For purposes of the '33 Act, this was the *actual instrument* from which the term *"investment contract"* originated, and flowed *directly* from its 1894 genesis to its enumeration in the Securities Act under the definition of "security."

 The phrase had been around for a while, at least since the 1870s or 1880s, as seen in newspaper ads and the like. But *that* phrase investment contract isn't what we're talking about here, and that wasn't what Congress was talking about when it enacted the Securities Act.  And don't worry, it's easily proven and documented.

 The term of art in the securities business, ***investment contract,*** referred to that one, specific structured financial product developed by John Tappan in 1894—and just like people in the securities business referred to stocks, bonds, or warrants by those names, those same people in the securities business referred to this specific product as the *investment contract.*

The drafters of the Securities Act did not coin "investment contract."  They borrowed it from the Uniform Sales of Securities (1921-1930) and in parallel from state blue sky laws;  the USS and the blue-skies borrowed it from Minnesota's laws of 1917;  and Minnesota borrowed it from Tappan, who developed the product in 1894..

For those 39 years leading to the '33 Act, the term of art *investment contract* served as the proper name for fixed-return instruments held by hundreds of thousands of small savers across America.

### About Investment Contracts

Despite the many ridiculous claims, ICs *are actual contracts* that are *in writing* and the *form of a document.*  They are complex instruments that are difficult to understand and difficult to structure.



Copyright © 2025    10

**Investment Contract Securities - Bullet Point Facts**

- ICs must be paid for with money (official legal tender *money*).

- ICs are obligations, meaning financial obligations.

- ICs are not divided interests or subdivided interests. They can

  only be representative of (fractional) undivided interests.

- ICs generate investment income. There is only one type of investment income generated by debt securities, that is interest income.

- ICs are not debt or equity interests in a business operation. There is no investment made in the operations of the issuer, ICs are simply a product created to sell to customers.

  Take a bank, for example: one can buy shares of the bank's stock that trades on the market—those shares relate to the bank's business operations and represent ownership in the bank's business, property, assets etc. That stock is "tethered" to the business operations, and vice versa. Separately, one can buy a CD from the bank, which is simply an investment issue—an investment product, the performance of which is not tied to the success of the bank's business operations.

- ICs are not common today for many reasons. ICs are often not financially practical anymore. They began to disappear roughly 60 years ago for various reasons.

- Whether a financial instrument is an IC or not has nothing to do with common enterprise, vertical or horizontal, efforts of others, risk, reward, etc. All nonsense.

- ICs do not generate profits; they only generate investment income—specifically, interest. They do not generate profits from the sale of Howey oranges, for example. See below for explanation.

- ICs are *not* designed to generate gains.

Copyright © 2025    10



Copyright © 2025    11

**Investment contracts are only designed to generate income**—that is, *investment income* in the form of interest. **Profit** and **gain** are not investment income. They are:

- *Profit* from the sale of products and services, such as the sale of Howey oranges.

- *Gain* from the sale of a capital asset that has increased in value.

**Income, profits, and gains are all different.**

> *Remember*: We are not here to debate contract law, form vs. substance, common law, or commercial law. We are here for **securities law in the securities business**. In this field, the terms *income*, *profit*, and *gain* each have their own specific, unique meanings. They are terms of art in the securities business and the accounting practices related thereto.

It's probable that *nobody* has ever seen this much detail or information about investment contracts, yet this information has existed or has been determinable for decades (enter *The Mainframe*).

Sure enough, investment contracts have been this way since the late 1800s. They were still that way in **1932 when over 500,000 Americans held investment contracts created and sold by Tappan as well as other firms that adopted his product.** They were still that way in 1933 when the Securities Act was drafted with Tappan's *investment contract security* enumerated under the definition of "security."

Between the cases of Howey, Joiner, and Wickham, there was a total of less than 100 (one hundred) people... in total less than 100 people over a three year period.

In dollars: that's *Howey* $165,000 worth of land sold over three years to an average of 13 people per year, or around 40 people in total. *Wickham* is unknown as there was no purchase of any contract at all, he was more or less offering profit share on fund management akin to hedge fund management of today–to a total of *six people–yes, six people*. *Joiner*, less than $3,000.

Those three cases had *not one single victim*, and *not a single complaint* out of the *whopping total of less than 100 people,* to the best of my knowledge.

Stack that against over **500,000** investors who were, indeed, actually **holding the *real* investment contracts** as enumerated in the definition of "security"–not those fairy tale versions fraudulently invented by bad actors with ulterior motives.



DECISIVE EVIDENCE

Copyright © 2025     12

# Six (6)

## Tracing the Timeline From 1894 to 1933, and Beyond

**Original, Real, Proper - Investment Contracts as Known from Inception (1894-1933)**

The term *"investment contract"* did **not** originate with legislators or regulators. It originated in the private sector **within the securities business**, with John Tappan and his 1894 founding of Investor's Syndicate.

Tappan's *investment contract* was a structured financial product sold to customers. Truly a great and simple concept, in theory. But complicated and complex in reality.

By the early 1920s, many firms across the nation were offering *real* investment contracts—either Tappan's or their own version thereof after adopting his invention and adding their own Tappan-style investment contracts to their repertoire.

In fact, at that time the leading issuers of investment contacts alone had over 500,000 customers holding their investment contracts by 1932. Historical documents from 1920–1925 confirm these instruments were **structured**, **fixed**, and **consistently understood**.

***Investment contract was an established term of art in the securities business and it*** *was the **given proper name for those instruments**—*assuredly, it was <u>not</u> a catch-all phrase invented by legislators or regulators.

---

**Minnesota's 1917 Codification of the Term**

Minnesota was the first state to write the term ***investment contract* into its laws in 1917**. That statute recognized *investment contracts* as a distinct investment product as developed by Tappan and sold throughout Minnesota (and other states) by Investor's Syndicate and many other firms.

Critical to understand is that *no other state* had codified *investment contracts* before Minnesota, and there was no federal statutory use of the term prior to



Copyright © 2025    13

Minnesota's statute alone proves *investment contract* was a **securities business term of art**, not a vague invention to unlawfully serve as a catch-all. This is all proven by the record.

---

### The Uniform Sale of Securities Act (1921-1929)

Between 1921 and 1929, during drafting of the Uniform Sale of Securities Act, the term *investment contract* spread to other states as Tappan's investment contracts themselves were sold over many states in tremendous numbers to hundreds of thousands of Americans.

However, note that:

- The Uniform Act **maintained** the original meaning, the term of art, as identified by Tappan's financial product and its features.

- It did **not** expand the term into a generalized theory of catch-all.

- The Uniform Act's use was directly derived from **Minnesota's statutes**

- **Minnesota's use was directly derived from Tappan and his product**

---

**By 1933**, *investment contracts* **had a settled meaning for 39 years**—grounded in clarity within the securities business. At that time, there was a salesforce of over 4,000 selling investment contracts in many states, and there were well over *500,000 Americans holding them as investments.*



Copyright © 2025     14

# <u>Seven (7)</u>

## The Fun Stuff

Following the 1933 Act, the SEC deliberately **hijacked** the *term of art* to turned it into a meaningless two-worded generic phrase. ***Instead of going through the Congress in the lawful manner***, the SEC:

- Illegally tried to re-write the definition of it into a vague tool to regulate almost anything as a so-called "catch-all."

- Discarded truth, honor, liberty, and fidelity to betray fellow Americans in favor of political gain, organizational gain, and personal gain.

- *Simply put:* ***they cheated***, with the use of intentional fallacy, deceit, misguidance, manipulation, and so much more.

The SEC's investment contract studies that were produced by dozens of staff members over several years acknowledged that ***investment contracts were well-known instruments*** *held by several hundred thousand customers*—proving the agency's extensive knowledge of investment contracts and extensive knowledge of the term's roots. These studies and staff members trace *directly* to Tappan's product that he created in 1894.

> *This was not an accident, an evolution, or a mistake–this was a* ***strategic regulatory and political operation of mal intent.***

**Now it's time for *<u>Show and Tell</u>*. Here's how we *<u>know</u>* that investment contracts were that one specific structured investment product – *<u>not a "catch-all."</u>***

Copyright © 2025     14



DECISIVE EVIDENCE

Copyright © 2025    15

## Agreement vs. Contract

**The "security" definition honors the distinction between *agreement and contract*, as seen demonstrated in the definition highlighted below.**

**Not all agreements are contracts. But all contracts are agreements. The word *agreement* is much more broad than *contract*, as a contract is a *type* of agreement.**

**In other words, if drafters and Congress genuinely intended to make *investment contracts* a "catch-all generic phrase"…they would have used the phrase investment *agreements*, they would not have used the term of art *investment contract*.**

73d CONGRESS.   SESS. I.   CH. 38.   MAY 27, 1933.

[CHAPTER 38.]

AN ACT

To provide full and fair disclosure of the character of securities sold in interstate and foreign commerce and through the mails, and to prevent frauds in the sale thereof, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

TITLE I

SHORT TITLE

SECTION 1. This title may be cited as the "Securities Act of 1933".

DEFINITIONS

SEC. 2. When used in this title, unless the context otherwise requires—
(1) The term "security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of interest in property, tangible or intangible, or, in general, any instrument commonly known as a security, or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing.



Copyright © 2025     16

## 500,000+ Americans Held Investment Contracts by 1933

By 1933 Tappan's investment contract securities products were widely held all over America by well over _500,000 people_.    Moreover, there existed a salesforce of more than 4,000 people selling investment contracts to customers at the time.

This chart displays _new_ investment contract sales by year from 1927 to 1936 for Tappan's Investor's Syndicate product alone.





**DECISIVE EVIDENCE**

Copyright © 2025    17

## Drafting of Specific Registration Forms for Investment Contracts

As the securities acts were enacted and rolled out, there was work to be done to accommodate for securities registrations. This 1934 SEC document explains that the staff is making progress on all necessary paperwork – and that "a series of new forms is being drafted."

More importantly, the document states that "Other work in various stages of completion includes registration forms for...*investment contracts...*"

Indeed, investment contracts were a *specific* investment security product with a stand-alone meaning. They were well understood to all within the securities business, and well known to *more than half a million customers* holding investment contracts by 1933, and growing fast.

30          SECURITIES AND EXCHANGE COMMISSION

REGISTRATION OF SECURITIES UNDER THE SECURITIES ACT OF 1933

SECURITIES ACT FORMS, RULES, AND REGULATIONS

During the past year a considerable number of improving amendments have been made to the basic forms for registration under the Securities Act of 1933, as amended. These amendments are designed to clarify the requirements of the several forms and to extend the use of certain basic forms to additional classes of issuers upon the furnishing of appropriate specialized information, such as for bank holding companies and corporations resulting from consolidation. Considerable progress has been made in the direction of subdividing the major forms in order to provide specialized forms for issuers engaged in particular types of business and for issuers in various stages of development. In line with this program, there has been prepared a form for promotional mining companies which is designed to emphasize the peculiar problems of the mining industry and the special problems incident to the promotion of new companies. A companion form is also in process for securities of any company which has not yet advanced beyond the promotional stage. A series of new forms is being drafted to replace the present forms for certificates of deposit, and for securities issued in the process of reorganization. These forms will be specialized to provide separately for each of the several situations which commonly occur. Other work in various stages of completion includes registration forms for electric and gas utilities, investment trusts, insurance companies, investment contracts, foreign national governments, and foreign municipal governments.



Copyright © 2025    17



**DECISIVE EVIDENCE**

Copyright © 2025     18

## An Investor's Syndicate Ad - From *Popular Science* 1932

**This 1932 ad boasts the firm's 210,000 customers and 51 offices across the USA.**

**By the mid 1930s, there were well over 500,000 Americans holding investment contracts either created by Tappan or copy-cats that were offered by competitor firms.**





**DECISIVE EVIDENCE**

Copyright © 2025    19

## The John Tappan Investment Contract Security - Orig. 1894

**Two pages of the genuine Investor's Syndicate Investment Contract from around 1925.**

Copyright © 2025    19


**DECISIVE EVIDENCE**

Copyright © 2025    20

*This Part One is just the beginning.  We present
undisputable, documented, and supported facts.*

*We have countless amounts of proprietary
data, information, and analytics to overcome
essentially any argument set forth.*

*Any pushback to the truth will be met, overpowered,
and destroyed by the facts, the data, and the documents.
From here, the story only gets worse for the SEC.*

*I'll leave you with this fact as we polish up
Part Two over the next few days:*

**Investment contracts are only issued by
investment companies and insurance companies.**

*In the name of truth and liberty, let's fix this.*

*We can <u>never</u> let this happen again.*

*In God we trust, in government we don't.*

**Justin W. Keener
(312) 476-9201
truth@TheHoweyTest.com**

Copyright © 2025    21

**DECISIVE EVIDENCE**

# Copyright © 2025

**No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means electronic, mechanical, photocopying, scanning, recording, or otherwise, without the written permission of the author.**